IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:19-cv-00467-BO

| | |
|---|---|
| JUSTIN J. WHITE,<br><br>    Plaintiff,<br><br>v.<br><br>VANCE COUNTY, NORTH CAROLINA, VANCE COUNTY SHERIFF'S OFFICE, PETER WHITE, in his official and individual capacities, LAWRENCE D. BULLOCK, in his official and individual capacities, WELDON WALLACE BULLOCK, in his official and individual capacities, and WESTERN SURETY COMPANY a division of CNA SURETY.<br><br>    Defendants. | **FIRST AMENDED COMPLAINT**<br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Mr. Justin J. White ("Plaintiff" or "Mr. White"), by and through undersigned counsel of record, and states the following as his Complaint against ("Defendants") Vance County, Vance County Sheriff's Office, Peter White, individually and in his official capacity as Sheriff of Vance County, North Carolina, Lawrence D. Bullock, individually and in his official capacity as Chief Deputy Sheriff, Weldon Wallace Bullock, individually and in his official capacity as Administrative Director and Criminal Investigations Captain, and Western Surety Company, hereby alleges and asserts as follows[1]:

### Introduction

---

[1] The Court dismissed Vance County and Vance County Sheriff's Office as Defendants and references made herein do not and are not intended to incorporate above-stated Defendants.

1.      Not all Whites are racist. Likewise, not all Blacks are proponents of diversity and inclusion on behalf of themselves, nonetheless others. Sheriff Peter White ("Sheriff White") is Black. However, under Sheriff White's leadership, Mr. White could have only been a model law enforcement officer at the Vance County Sheriff's Office ("VCSO") so long as he came to work, hung his head low and ignored the discriminatory and disparate treatment that permeated the workplace (similarly to Sheriff White). However, much Mr. White tried, Mr. White decided that he could no longer be treated as a second-class citizen, and he voiced his concerns regarding his superiors' discriminatory treatment— but only after he had been called "gay" and said to have got "hammered in the ass" and sucked "dick" by one of his supervisors in the presence of other leadership and deputies in addition to blatantly afforded lesser employment conditions and treatment than White sheriff deputies. In November 2017 and again in June, September and October 2018, Mr. White complained of race discrimination. Mr. White explained how Black sheriff deputies and citizens were treated and policed inequitably and the discrimination he faced. Mr. White escalated his complaint to the highest official: Sheriff White. But Sheriff White retaliated against him for his report. In fact, before his final report in October 2018, and in blatant contrast to well-established legal authority, Sheriff White instructed Mr. White to rescind his reports of discrimination or face termination. Mr. White refused. Days later—on October 24, 2018— Mr. White was terminated for a pretextual reason, based on a perfunctory investigation and no opportunity to be heard. After Defendants wrongfully terminated Mr. White, Defendants continued to punish him and submitted a letter of separation to the North Carolina Department of Justice, Sheriffs Standards Commission, which oversees the certification of any and all deputy sheriffs in the state of North Carolina, riddled with a false claim that Mr. White's termination was justifiable because he used excessive force. Based on Defendants' wrongful and malicious conduct, Mr. White has been irreparably damaged and continues to be harmed. Mr. White brings this action against Defendants for disparate treatment, the creation of a hostile work environment, and retaliatory dismissal in violation of 42 U.S.C. § § 1981, 1983, Government Employees Rights Act of 1991 ("GERA"), 42 U.S.C.

2000e-16a *et seq.*,[2] Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq.*, and

applicable North Carolina state laws.

## Jurisdiction and Venue

2.      Plaintiff brings federal claims for discrimination and retaliation under Civil Rights Act of 1870

(42 U.S.C. § § 1981, 1983).

3.      Plaintiff brings federal claims for discrimination and retaliation under the Government

Employees Rights Act of 1991, 42 U.S.C. 2000e-16a et seq.

4.      Plaintiff brings federal claims for discrimination and retaliation in violation of Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq.

5.      Plaintiff brings state law claims under North Carolina common law.

6.      This Court has original jurisdiction over Plaintiff's federal claim(s) pursuant to 28 U.S.C. §

1331, 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1988.

7.      This Court has supplemental pendant jurisdiction over Plaintiff's state law claims pursuant to

28 U.S.C. §1367.

8.      All material events giving rise to this cause of action occurred in Vance County, North

Carolina. Upon information and belief, Defendant Peter White ("Sheriff White" or "Defendant

White") resides in Vance County, North Carolina. Upon information and belief, Lawrence D. Bullock

("Chief Deputy Bullock") resides in Warren County, North Carolina. Upon information and belief,

Defendant Weldon Wallace Bullock ("Captain Bullock") resides in Durham County, North Carolina.

---

2      The purpose of GERA is to provide protection to certain government employees with respect to
their public employment, to be free of discrimination on the basis of race, color, religion, sex, national
origin, age or disability. 42 U.S.C. § 2000e-16a(b). GERA provides Title VII protections, and citations
are to case law under Title VII. The EEOC did not characterize Mr. White's allegations as violations
of the Government Employee Rights Act of 1991, 42 U.S.C. §§ 2000e-16a et seq., even though he
arguably was "a member of [a state] elected official's personal staff." 42 U.S.C. § 2000e- 16c(a)(1);
see 29 C.F.R. §1603.102(e). This Complaint pleads both violations of Title VII and GERA.

Under 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Eastern District of North Carolina.

## Parties

9.      Plaintiff Mr. Justin White ("Plaintiff or Mr. White") is a citizen and resident of Mecklenburg County, North Carolina.

10.     Defendant Vance County (the "County") is an organization of townships with the capacity to sue and be sued. It is a County under the laws of the State of North Carolina. The County processes all VCSO employee grievances and other employee relations. In addition, the County is responsible for the creation of VCSO standard operating procedures and policies.

11.     Defendant Vance County Sheriff's Office ("VCSO") is mandated by the North Carolina Constitution. N.C. Const. art. VII, § 2. Sheriffs and their deputies are governed by the North Carolina Sheriffs' Commission pursuant to N.C. Gen. Stat. § 17E. The acts and omissions asserted in this action were performed while each individual acted under the color and cloak of law and are imputed to VCSO under the doctrine of respondent superior.

12.     Defendant Sheriff Peter White ("Sheriff White") was the duly elected Sheriff of Vance County, North Carolina and had been since 2006. Sheriff White has final policymaking authority for VCSO. His final policymaking authority extends to personnel decisions. Sheriff White is being sued in his official and individual capacities.

13.     Defendant Chief Deputy Sheriff Lawrence D. Bullock ("Chief Deputy Bullock") was second in command of the Sheriff's Office and was appointed to the position by Sheriff White. Deputy Bullock ran the day-to-day office interactions and supervised all divisions of the Sheriff's Office. Chief Deputy Bullock is being sued in his official and individual capacities.

14.     Defendant Captain Weldon Bullock ("Captain Bullock") was Administrative Director and Criminal Investigations Captain. Captain Bullock was appointed to the position by Sheriff White. He

was responsible for use-of-force investigations. He was later promoted to Chief Deputy under Sheriff Curtis R. Brame. Captain Bullock is being sued in his official and individual capacities.

15.     Defendant Western Surety Company is a subsidiary of CNA Surety (the "Surety") and provides surety on the official bond of defendants Peter White, as Sheriff of Vance County, Lawrence Bullock, as Chief Deputy of the VCSO, and Weldon Bullock as a Captain and deputy of the VCSO, pursuant to N.C. Gen. Stat. § 162-8 and §58-76-5.

16.     Defendant CNA Surety ("CNA Surety") is the parent company of Western Surety Company and provides surety on the official bond of Defendants Peter White, as Sheriff of Vance County, Lawrence Bullock, as Chief Deputy of the VCSO, and Weldon Bullock as a Captain and deputy of the VCSO, pursuant to N.C. Gen. Stat. § 162-8 and §58-76-5.

17.     Upon information and belief, defendants Sheriff White, Chief Deputy Bullock and Captain Bullock are protected by a bond issued by the Surety, and the Surety is a corporation authorized to conduct business in the State of North Carolina. Plaintiff institutes this action individually and, with respect to the claims on the official bonds of Defendants Sheriff White, Chief Deputy Bullock and Captain Bullock, also on behalf of the State of North Carolina pursuant to N.C. Gen. Stat. § 58-76-5, et seq.

18.     Upon information and belief, Defendants Sheriff White, Chief Deputy Bullock and Captain Bullock are insured by one or more policies of liability insurance purchased pursuant to N.C. Gen. Stat. § 153A-435 or other applicable state law with respect to all acts and omissions complained of herein, or participates in a government risk pool pursuant to N.C. Gen. Stat. § 58-23-5, or maintains a funded reserve, and to such extent, defendant has waived any official, sovereign, qualified or governmental immunity to which he might otherwise be entitled in his official capacity.

**Facts**

19.     The County consists of several departments of which VCSO is one.

20.     VCSO is comprised of seven divisions: (1) Administrative Division; (2) Patrol Division; (3) Narcotics/Vice Division; (4) Criminal Investigations Unit; (5) K-9 Division; (6) Court Division; and (7) Civil Division.

21.     November 2006, Vance County citizens elected Sheriff White to the position of Sheriff.

22.     The County and VCSO hired Mr. White to the Patrol Division pursuant to a two-year employment contract on June 5, 2017, and terminated his employment on October 24, 2018.Mr. White's title was Patrol Deputy and Senior Patrol Deputy, and he also acted as on-duty supervisor in the absence of the shift sergeant on limited occasions. Mr. White's employment contract was executed by Ms. Argretta Reid Johen ("Ms. Johen"), who is the Human Resources Director for the County on behalf of the County, Sheriff White on behalf of VCSO and Mr. White.

23.     The Patrol Division is organized into four (4) squads: A, B, C, and D which collectively provide 24-hour coverage for Vance County seven days a week.

24.     Officers assigned to A and B squad work together and officers assigned C and D squad work together.

25.     A and B rotate with C and D every four days; therefore, each officer in the Patrol Division works for four days and then has four days off.

26.     Each squad consist of two (2) or three (3) Deputies and a Sergeant.

27.     Lieutenant Goolsby supervises Squad A and Lieutenant Campbell supervises Squad B of the Patrol Division.

28.     The Patrol Division's3 leadership is organized and structured as indicated below:

---

3     Captain Bullock's role is not depicted in this diagram because he is not employed under the Patrol Division. However, Captain Bullock's position is equivalent to that of Captain Watkins



29.     Under N.C. Gen. Stat. § 17E, "the office of deputy sheriff and the other officers and employees of the sheriff of a county are unique among all of the law-enforcement offices of North Carolina," in that "[t]he sheriff is the only officer of local government required by the Constitution.

30.     Section 17E further provides that "[t]he sheriff, in addition to his criminal justice responsibilities, is the only officer who is also responsible for the courts of the State, and acting as their bailiff and marshal. The sheriff administers and executes criminal and civil justice and acts as the ex officio detention officer."

31.     "The deputy sheriff has been held by the Supreme Court of this State to hold an office of special trust and confidence, acting in the name of and with powers coterminous with his principal, the elected sheriff. The offices of sheriff and deputy sheriff are therefore of special concern to the public health, safety, welfare and morals of the people of the State." N.C. Gen. Stat. § 17E-1.

32.     Deputies are required to complete field training (prior to being assigned a shift to patrol). Mr. White completed two weeks of field training with Lieutenant Campbell and 4 weeks of training with Deputy Wayne.

33.     At the end of field training, Chief Deputy Bullock assigned Mr. White to Squad A under the leadership of Lieutenant Campbell and Sergeant Roberson, effective July 2017.

34.     Almost immediately, Mr. White learned that VCSO operated in a manner that allowed individuals to exhibit their personal discriminatory animus towards protective classes without constraint or regard for the law, as such, Mr. White's employment at VCSO was riddled with disparate treatment, discrimination and racism and such treatment was continuous, hostile and pervasive in nature.

## VCSO Discriminates Against Black Sheriff Deputies

35.     Black sheriff deputies do not enjoy the same privileges of employment as White sheriff deputies, and they are treated inequitably in that:

   a. Black sheriff deputies were either not provided protective gear, *i.e.*, bullet proof vests, pepper spray, or tasers upon employment or after multiple requests while White sheriff deputies were provided protective gear at or near the inception of employment;

   1. Deputy Durham, (Black) was required to respond to calls involving violence and guns without a vest;

   2. Deputy Al-Wadeii (Asian American) was required to respond to calls involving violence and guns without a vest; while

   3. Deputy Zach Long (White) received protective equipment immediately upon hire.

b.  When and if Black sheriff deputies were provided protective equipment, it was after multiple asks and sometimes was hand-me-down or used protective equipment of White sheriff deputies;

c.  VCSO failed to provide Black sheriff deputies the same number of new uniforms as White sheriff deputies, and in to stay properly attired, Black sheriff deputies were required to reuse and rewash their items, causing more wear and tear;

d.  VCSO issued Black sheriff deputies unsafe patrol vehicles that were in need of repair and/or replacement while White sheriff deputies were provided more fit vehicles;

e.  Most sheriff deputies' supervisors were White, and those White supervisors spoke to Black sheriff deputies in a disparaging, rude, and condescending manner, and at times, demeaned Black sheriff deputies in front of White sheriff deputies; and

f.  Black sheriff deputies were not provided adequate training to progress or perform necessary job functions, and sometimes, such failures placed Black sheriff deputies' lives and safety at risk.

36.     The overwhelming mistreatment of Black sheriff deputies escapes review because the vast majority of direct leadership of Black sheriff deputies is White.

37.     Furthermore, even though upper management is Black, reports of discrimination are hardly made and unfavorably received. The culture established at VCSO under the leadership of Sheriff White mandated that no one should speak badly about VCSO, however true, and claims of discrimination were no exception.

### Mr. White's Employment was Directly Impacted by VCSO's Discrimination (Disparate Treatment)

38.     Without limitation, VCSO's disparate treatment impacted the terms and conditions of Mr. White's employment in that:

a. Even though VCSO required Mr. White to enforce traffic laws, VCSO did not issue Mr. White a ticket book;

b. Even though VCSO required Mr. White to serve felony warrants, and despite Mr. White's repeated and numerous requests for protective gear, VCSO did not provide Mr. White a bullet-proof vest prior to sending him in the field;

c. VCSO did not provide Mr. White the same number of uniforms as non-minority officers;

d. VCSO did not initially provide Mr. White with a baton, taser and/or mace prior to sending him in the field;

e. Although Mr. White made multiple requests, VCSO ignored or refused to repair his patrol vehicle even though the metal wire was visible on his

tires;

f. VCSO failed to issue Mr. White a laptop. Such failure limited Mr. White and placed him in precarious and dangerous circumstances. Because, without a laptop, Mr. White could not run comprehensive criminal background checks on individuals. Often when he approached a potential suspect, he did not know if he was encountering someone with a violent history. White sheriff deputies were provided laptops and the ability to use those laptops to screen potential suspects;

g. Most times, contrary to policy and Mr. White's request for backup, VCSO required that Mr. White serve felony warrants alone;

h. Most times, contrary to policy and Mr. White's request for backup, VCSO required that Mr. White interact with known felons alone and without backup;

i. Even though Mr. White requested, VCSO did not allow him opportunities to train in order to use certain protective equipment. For example, no sheriff deputy may deploy mace in the field without proper certification and training from VCSO pursuant to policy. Mr. White

requested that VCSO send him to train to obtain mace certification. VCSO never trained Mr. White on the use of mace;

    j.  On an almost daily basis, Mr. White observed White deputy sheriffs receive more favorable treatment and equipment than Black deputy sheriffs;

    k.  Mr. White was threatened with suspension and termination for lesser employment violations than non-minority sheriff deputies;

    l.  Mr. White was disparately critiqued for behaviors that non-minority deputy sheriffs were not; and

    m.  The terms and conditions of Mr. White's employment, i.e., shifts were discriminatorily adjusted if there was a desire to move employees around.

39.    VCSO created an environment in which Black sheriff deputies were not safe and subject to unnecessary harm and oppression.

40.    VCSO allowed Black sheriff deputies to endure racism and oppression.

### Lieutenant Campbell Exhibits Racial Animus Towards Black Sheriff Deputies, Citizens and Suspects
### (Hostile Work Environment and Disparate Treatment)

41.    Around June 29, 2017, and shortly after being assigned to Squad A, Mr. White first observed that Lieutenant Campbell's racial animus was directed at Black sheriff deputies and also towards Black suspects and citizens.

42.    On an almost daily basis, Lieutenant Campbell:

    a.  Made remarks that reflected a belief that Black sheriff deputies did not work as hard as White sheriff deputies;

    b.  Unfairly supported the progression of White sheriff deputies to the exclusion of Black sheriff deputies;

    c.  Unfairly disciplined Black sheriff deputies for conduct he permitted White sheriff deputies to engage in;

d.  Spoke to Black sheriff deputies and citizens in a criticizing and hostile tone, i.e., yelled and cursed;

e.  Overly criticized Black sheriff deputy performance, which led to the same unwarranted criticism of Black sheriff deputies' performance from team leaders and peers;

f.  Made a concerted effort to connect with White sheriff deputies and citizens, while ostracizing Black deputy sheriffs and citizens.

43.    On June 27, 2017, while on duty, Lieutenant Campbell and Mr. White chased and apprehended a Black suspect; Mr. White drove the vehicle.

44.    During the chase of the Black suspect, Lieutenant Campbell, was overly aggressive and hostile; he instructed Mr. White to stop the car and stop "pussy footing" so he could get out and "mop" or "close line" the suspect off, who was not wearing a helmet. Moping or close lining a motorist is a violation apprehension policy as it increases the likelihood of serious injure or fatality.

45.    Once the Black suspect was apprehended, Lieutenant Campbell assaulted the suspect. Lieutenant Campbell spoke to the suspect in a defamatory and demanding manner, ordered him around, forcibly attacked him, and cuffed the suspect's handcuffs exceedingly tight. Mr. White was in disbelief as it was patently clear that Lieutenant Campbell had not treated a White suspect with such lack of regard.

46.    On February 11, 2018, Lieutenant Campbell acted with extreme hostility towards a Black father in a child custody exchange (in the presence of the child). Deputies Green, Ishmael, and Hight also witnessed Lieutenant Campbell's racial hostility towards the Black father.

47.    The parents of the child came to the sheriff's office to request deputy presence during child custody exchange. No one broke any law or otherwise threatened public safety. Yet, and even though the father presented documents to Lieutenant Campbell, showing that he had joint custody and two civil orders that were signed by two judges that allowed him to personally exchange his child,

Lieutenant Campbell threatened to throw the father in jail if he attempted to conduct a personal exchange of the child.

48.     Lieutenant Campbell disregarded the court orders, told Deputy Hight to take his drink, approached the father with his fists clinched and screamed "leave or be arrested"! At all times relevant, Lieutenant Campbell's eyes were bulged and face red. Lieutenant Campbell even threatened to contact and use the magistrate's office to secure criminal charges against the father of the child.

49.     The father of the child was terrified and intimidated by Lieutenant Campbell; he left the sheriff's office as instructed by Lieutenant Campbell.

50.     Deputies have long noticed Lieutenant Campbell's racism towards Black individuals.

51.     Deputy Poole stated in an affidavit that:

    a.  Lieutenant Campbell "has a record of disrespecting [B]lacks . . . ";

    b.  "If you are not [W]hite then he [Lieutenant Campbell] will not talk to you[] right or treat you right"; and

    c.  "There are other [B]lack deputies in the department that have worked under or been in field training with [Campbell] while he was a patrol sergeant that feel the same way", i.e., that Lieutenant Campbell does not treat Blacks equitably.

52.     Deputy Green commented that Lieutenant Campbell is respectful, cool and calm to Whites but rude and nasty to Blacks.

53.     At no point in time did Lieutenant Campbell speak to White citizens or suspects with such hostility, despite there being instances were White individuals had exhibited worse behaviors and conduct.

## Supervisors Openly Harass Mr. White and Call Him Gay
### (Hostile Work Environment and Disparate Treatment)

54.     On October 18, 2017, Sergeant Martin openly made disparaging jokes about Mr. White in the presence of deputies and leadership.

55. Sergeant Martin stated, "White is gay, he gets hammered in the ass and he sucks dick"

56. Although there were several members of leadership present, no one admonished Sergeant Martin for his abusive and inappropriate comments.

57. Sergeant Martin admitted to Mr. White that his comments were inappropriate but VCSO did not discipline or otherwise educate Sergeant Martin.

58. In fact, the abuse, harassment and hostility towards Mr. White continued, and on December 2, 2017, an anonymous individual(s) placed a purple-glittery unicorn hat in Mr. White's mailbox.

59. When Mr. White discovered the unicorn hat in his mailbox, he immediately reported the harassment to Sergeant Roberson.

60. Sergeant Roberson took no action and did not investigate, substantiate, escalate or otherwise attempt to prevent further discriminatory behaviors.

## Lieutenant Campbell Transfers Mr. White to Another Shift
### (Hostile Work Environment and Disparate Treatment)

61. In the meantime, on November 22, 2017, Lieutenant Campbell authorized the transfer of Mr. White from Sergeant Roberson's shift to Sergeant Alexander's shift. Lieutenant Campbell falsely informed Mr. White that he was transferred because a new Basic Law Enforcement Training class that would start January 2018.

62. Mr. White later learned that Lieutenant Campbell replaced Mr. White with White Patrol Deputy Cody Burns. Deputy Burns was less tenured and qualified than Mr. White. Mr. White was a certified deputy sheriff; Deputy Burns was not certified.

63. A week later, Sergeant Alexander informed Mr. White that Lieutenant Campbell had explained that Mr. White's transfer was necessary because Mr. White had a personnel dispute with Deputy Wayne. Sergeant Roberson and Captain Watkins also confirmed the untruth statement that Lieutenant Campbell had fabricated.

64.     However, at no time during Mr. White's employment did he and Deputy Wayne have any altercation, nonetheless a personnel dispute. In fact, Deputy Wayne and Mr. White collectively backed one another up on an active service call that involved a break and enter threat less than two weeks prior to the transfer.

65.     In December, after Mr. White confirmed that his transfer was pretext for discrimination and made to accommodate the White deputy sheriff, Mr. White appealed his transfer and lodged a complaint against Lieutenant Campbell and Captain Watkins with Chief Deputy Bullock.

66.     Mr. White escalated his complaint to Sheriff White.

67.     Mr. White contended in his complaint that his transfer was improper because the terms and conditions of his employment had been impacted without proper investigation or opportunity to be heard pursuant to sheriff office policy/standard operating procedures. Mr. White maintained that his transfer was pretext to replace him with a white patrol deputy and indicated the above-stated acts of discrimination.

68.     Sheriff White purported to agree that Lieutenant Campbell erred in his transfer of Mr. White but did not otherwise act.

69.     In January 2018, Captain Watkins, Lieutenant Campbell, Sergeant Roberson, Sergeant Alexander and Deputy Wayne met to discuss Mr. White's shift transfer in which:

> a.  Deputy Wayne denied personnel issues with Mr. White;
>
> b.  Mr. White denied personnel issues with Deputy Wayne;
>
> c.  Both Sergeants praised Mr. White's performance;
>
> d.  Lieutenant Campbell informed Mr. White and screamed that he did not need to know the "real" reason that motivated his shift transfer; and
>
> e.  Captain Watkins indicated that Mr. White's transfer would be rescinded.

70.    Despite ample proof and corroborated statements that Lieutenant Campbell unjustifiably and discriminatorily modified the terms and conditions of Mr. White's employment, Mr. White's original shift was not reinstated.

### Mr. White Refuses to Discriminate in His Policing and VCSO Retaliates (Retaliation)

71.    Midstream VCSO's investigation into Mr. White's complaint that his shift transfer was based on discrimination, Mr. White was involved in two traffic stops.

#### a.  Traffic Incident Involving Mexican-Hispanic Man:

72.    On December 23, 2017, Mr. White was dispatched to a traffic collision in which neither car nor driver was harmed. One of the drivers was a Mexican-Hispanic man.

73.    Mr. White did not cite either driver.

74.    Sheriff White learned of Mr. White's work and ordered Mr. White to issue the Mexican-Hispanic man a ticket for DWLR (DWI) and No Operator License, even though it was clear that the Mexican-Hispanic man was not under the influence of alcohol and the collision occurred on private property.

75.    Mr. White advised Sheriff White that he did not have a ticket book. Sheriff White then ordered Mr. White to obtain a criminal summons. Sheriff White lectured Mr. White on the importance of and obligation to enforce traffic laws, and ordered that issue tickets to protect the public.

76.    Mr. White issued and served the criminal summons to the Mexican-Hispanic man as ordered.

#### b.  Traffic Incident Involving White Woman:

77.    On January 26, 2018, Mr. White observed a White woman driving recklessly. The driver crossed the line in the middle of the road several times. The third time the driver weaved in and out of the lane, she came within nominal distance of causing a head-on collision.

78.    Mr. White pulled the driver over, and she admitted to looking at her tablet and the underlying infractions of careless and reckless driving left of center and not wearing a seat belt.

79.    Based on Sheriff White's prior direction, Mr. White advised the driver that he did not have a ticket book but that she would receive a criminal summons for her traffic violations.

80.    The next day, Mr. White issued and served the criminal summons on the White woman who immediately complained to leadership.

81.    On January 27, 2018, Lieutenant Campbell received the White woman's complaint.

82.    On January 27, 2018, Lieutenant Campbell called Mr. White and verbally assaulted him and threatened to physically assault him and further disrupt his employment because he issued the traffic citation to the White woman.

83.    Later that day, on January 27, 2018, Lieutenant Campbell again verbally assaulted Mr. White in the presence of Sergeant Alexander and Deputy Poole because he issued the traffic citation to the White woman.

84.    Mr. White understood Sheriff White's instruction to issue criminal citations to Mexican-Hispanic persons and Lieutenant Campbell's instruction to not issue criminal citations to White persons to be discriminatory policing that was unethical and unprofessional.

85.    Lieutenant Campbell opened an investigation into Mr. White's issuance of the traffic citation to the White woman.

86.    Based on Lieutenant Campbell's instruction to partake in discriminatory policing, Mr. White lodged another complaint that Lieutenant Campbell subjected him and citizens to race discrimination with Sheriff White. Sheriff White conceded that he instructed Mr. White to issue criminal citations in the absence of a ticket book. Sheriff White did act to curtail the discriminatory nature of Lieutenant Campbell's instruction and/or investigation.

### Lieutenant Campbell Begins to Establish a Paper Trail to Create the False Narrative that Mr. White is Insubordinate (Further Retaliation and Pretext)

87.    As a result of Lieutenant Campbell's investigation, on February 20, 2018, Chief Deputy Bullock suspended Mr. White. To that end, Chief Deputy Bullock issued Mr. White a written suspension notification.

88.    The suspension notification indicated that Mr. White was insubordinate and conduct was unbecoming of an officer. The basis of the suspension indicated that Mr. White erred when he issued the White woman a criminal citation for a traffic violation.

89.    The suspension resulted in Mr. White losing five (5) days of work and VCSO required that he forfeit thirty (30) hours of overtime previously performed before the suspension.

90.    Chief Deputy Bullock ordered Mr. White sign the suspension notification and told Mr. White that if he appealed the suspension to Sheriff White, he would be terminated and face other adverse action.

91.    Based on Chief Deputy Bullock's treat of termination and additional adverse action, Mr. White signed the suspension notification.

92.    Months later, Mr. White received a written adverse performance evaluation from Lieutenant Campbell and Sergeant Alexander. The performance evaluation asserted that Mr. White was not a professional deputy, disrespected co-workers and citizens, did not submit reports on time, etc.

93.    Mr. White was instructed to sign the performance evaluation. Mr. White refused to sign the document and demanded to know why he had been rated poorly.

94.    Upon further push for answers, both supervisors altered their conclusions of Mr. White's performance. The alterations indicated that Mr. White was a fit deputy sheriff.

95.    Mr. White had never received a poor performance rating. Also, up to that point, all supervisors and deputies had praised Mr. White's performance.

96.    Furthermore, Mr. White observed numerous and more extreme violations that resulted in no adverse employment action, including but not limited to:

a. Sergeant Roberson (Endangering the Public): In Mid-December 2017, Sergeant Roberson, served a warrant on an inmate at the Vance County Jail. Sergeant Roberson hand-cuffed the inmate but failed to put leg restraints on the inmate. During transportation, the inmate opened the door and jumped out the sheriff's cruiser and fled on foot;

b. Lieutenant Campbell (Insubordination): Late February 2017, Lieutenant Campbell failed to adhere to Captain Watkins' order that process paperwork remain at the Sheriff's Office at all times;

c. Deputy Hight (Assault on an Officer): Deputy Hight, and Deputy B. Ray (White Male) had an altercation, and Deputy Hight threatened physical force;

d. Deputy Duke (Insubordination): On August 3rd, 2018, Deputy Duke (White Male) used profane language towards Lieutenant Campbell in the presence of other deputies; and

e. In 2018, approximately 2 deputies and 1 supervisor (1 White male, 1 Black male and 1 Arabic/Indian male) physically assaulted a black male subject on Julian Smith Road in Henderson, North Carolina, who had been reported for assaulting his pregnant girlfriend in front of his mother. The subject was viciously beat with a baton, savagely struck with closed fists and kicked repeatedly by VCSO supervisors and deputies. The black male senior deputy, in fact, went so far as to ask the mother and girlfriend/victim, if they wanted to join in and "get some hits.".

97.     Many of the above-stated incidents involve serious breach of security which jeopardized public safety due to the gross misconduct, and yet no deputy was issued a corrective action.

**Sheriff White Instructs Mr. White to Drop Race His Written Discrimination Complaints (Retaliation)**

98.     On June 15, 2018, Mr. White filed two internal written discrimination complaints against Lieutenant Campbell with the County Human Resources Department and VCSO that were received by Ms. Johen. Mr. White complained that he had been subjected to a hostile work environment based on

race and gender discrimination. Mr. White also maintained that he had not been issued protective equipment that was necessary to perform basic job duties due to race discrimination.

99.     Simultaneously, Mr. White filed a written appeal of his employee performance evaluation, which was directed to Sheriff White and Chief Deputy Bullock.

100.    In late July 2018, Sheriff White and Chief Deputy Bullock met with Mr. White to discuss the results of the investigations and written complaints. Ms. Johen had forwarded Mr. White's internal reports of discrimination to Sheriff White.

101.    Sheriff White ordered Mr. White to drop the discrimination complaints or face termination. Sheriff White drew a contrast between life and the importance of the complaints:

      a.  Sheriff White stated to Mr. White that "he had a career there, but needed to drop these issues" and was (referring to the discrimination complaints); and,

      b.  Sheriff White also indicated to Mr. White that, "if I were you I would leave it alone, I don't know about you but I have bills and I need my check and job".

102.    Chief Deputy Bullock echoed Sheriff White's sentiments:

      a.  Chief Deputy Bullock informed Mr. White to drop the complaints or face termination; and,

      b.  Chief Deputy Bullock advised Mr. White that if he appealed any decision he could be fired.

103.    Mr. White informed the pair that he would not drop his complaints and requested an impartial and thorough investigation.

104.    Sheriff White informed Mr. White that Lieutenant Campbell's suspension of Mr. White would not be reversed. Sheriff White further advised that there would be no race discrimination investigation.

**<u>Mr. White Files an EEOC Charge</u>**

105.    On August 10, 2018, Mr. White filed a *pro se* charge of discrimination with the United States Equal Employment Opportunity Commission (the "EEOC") that asserts race and gender discrimination.

106.    Mr. White amended his charge on November 7, 2018, to assert retaliatory discharge.

107.    On July 25, 2019, the EEOC terminated its investigation and issued Mr. White a Notice of Right to Sue Letter (the "Right to Sue"), provided more than 180 days had passed since the filing of Mr. White's charge. Mr. White received the Right to Sue on July 29, 2019, and properly files this action.

**VCSO Further Retaliates and Begins to Search for a Reason to Terminate Mr. White**

108.    After Mr. White filed lodged his complaint with the EEOC, the environment at VCSO grew increasingly more hostile towards Mr. White. In fact, the nature of the hostility spread to all aspects of his employment.

109.    On a daily basis, Mr. White encountered blank and ice cold coworkers. Mr. White would hear murmurs of people who would refer to him as a "snitch." No one provided basic assistance to Mr. White. People avoided Mr. White. Mr. White felt quarantined.

110.    Mr. White later learned that the increase in hostility towards him was created by Sheriff White. After Mr. White filed his internal complaints and EEOC charge, Sheriff White held a conference with leadership, deputies and staff members and informed all of Mr. White's complaints and instructed them not to speak around Mr. White.

111.    On September 6, 2018, the evermore hostile environment that Sheriff White created took form. In the presence of several sheriff deputies, Sergeant Martin falsely accused Mr. White of filing a complaint of discrimination against him; he verbally attacked him.

112.    On October 4, 2018, Sergeant Martin repeated his accusation and verbal attack during an office meeting.

113. Sergeant Martin did not end his verbal abuse until Mr. White reported Sergeant Martin's false accusation to Captain Watkins.

114. The day after Mr. White's report, Sergeant Martin drove to Mr. White's residence and apologized for his verbal attacks.

115. Sergeant Martin also warned Mr. White and confirmed that VCSO had retaliated against Mr. White and was searching for a reason to further retaliate. Sergeant Martin:

      a. Advised that Mr. White "needed to get things in order because the Sheriff's Office would be terminating him";

      b. Informed Mr. White that "the only thing they are waiting for is you to screw up so they can get you—any little thing you do they are going to blow it out of proportion"; and

      c. Advised that Mr. White "would be terminated because he filed complaints".

116. On October 6, 2018, Deputy Wayne informed Deputy Poole and Mr. White that he was directed by upper management to lie on Mr. White, and he cooperated and fabricated a statement as directed because he "has a child to take care and they are his supervisors".

## Retaliatory and Pretextual Discharge

117. Needless to say, Defendants jumped at the "opportunity" to rid themselves of Mr. White and, in fact, terminated Mr. White's employment discriminatorily.

118. On October 21, 2018, Mr. White was on routine patrol and noticed a driver in a vehicle committing several major traffic violations. However, Mr. White was nervous and confused as to whether he should issue traffic citations because of his prior suspension, pending discrimination complaints and toxic work environment.

119. Mr. White elected to radio dispatch to determine if the driver had outstanding warrants. Dispatch advised that the registered owner and driver of the vehicle did not have any outstanding criminal processes.

120.     Mr. White ended his patrol, did not cite the driver of the vehicle and ultimately returned to the Sheriff's Office.

121.     When Mr. White arrived at the Sheriff's Office, he double checked the system and discovered that the driver did, in fact, have two outstanding felony warrants. Sergeant Welborn instructed Mr. White to serve the warrants.

122.     Mr. White questioned why the warrants did not show up when he requested the warrant check earlier and could have resolved the situation at the scene. Mr. White also requested backup to serve the two felony warrants primarily because it is normal policy that sheriff deputies not serve felony warrants alone.

123.     Sergeant Welborn instructed Mr. White to serve the two felony warrants, and stated, "White, you been to handling school--Bo, you don't need me, do I have to hold your hand with everything? Go serve the damn warrant and if you need me just call me and I will come up there go serve the warrant JJ (White)!"

124.     Mr. White followed Sergeant Welborn's instruction and authority and served the felony warrants alone.

125.     Upon service, Mr. White encountered a hostile 5 feet 7 inches tall, 275 pound (larger than Mr. White) suspect who refused multiple lawful orders, became physically aggressive, combative and feloniously assaulted Mr. White in the performance of his service of the warrants.

126.     Mr. White performed a takedown, subject control ("soft hands") technique and was able to handcuff the subject and gain control and compliance by using reasonably necessary force. In the process, the suspect's arm may have been broken.

127.     The suspect claimed Mr. White assaulted and harassed her, and paramedics first determined that her arm was broken but redetermined that her arm was not broken after complaining twice.

128. On October 23, 2018, the suspect filed an excessive use of force report against Mr. White with Chief Deputy Bullock and Captains Watkins and Bullock; Captain Bullock conducted an Internal Affairs ("IA") "investigation" at the instruction of Sheriff White.

129. Captain Bullock erroneously determined that Mr. White had used excessive force to subdue the suspect, and in the process therefore failed to allow Mr. White the opportunity to be heard.

130. On October 24, 2018, Captain Bullock informed Mr. White that Sheriff White had determined that his services were no longer needed. No other reason or explanation was provided.

131. Since it terminated Mr. White, VCSO has made remarks that deputy sheriffs who file complaints against management for discrimination will end up like Mr. White.

**VCSO Prior Use of Force Determinations**

132. No one else engaged in a protected activity disciplined or discharged similarly for alleged policy violations.

133. Upon information and belief, VCSO has conducted other use-of-force investigations that have resulted in, including but not limited to, human fatalities and broken arms, wrists and fingers; the deputies were not discipline or terminated.

134. Indeed, Lieutenant Goolsby and Sergeant Welborn advised Mr. White that deputy sheriffs' employment had survived more extreme use-of-force investigations.

135. Defendants interfered with Mr. Whites prospective employment opportunities following his termination from VCSO.

**Defendants Retaliation and Continued Interference with Plaintiff's Prospective Employment**

136. Defendants' retaliation and discrimination has continued, as they expanded their network of discriminatory actors and intent.

137. Plaintiff White applied for a position with North Carolina Special Police, LLC ("NCSP"). and received a conditional offer of employment on August 22, 2019.

138.    In October of 2019, prior to the expiration of his law enforcement certification, Plaintiff sent in all necessary documentation to the North Carolina Criminal Justice Standards Division, including a statement related to IA's use of force investigation. NCSP sent application for certification to NC DOJ Training and Standards Commission ("Training and Standards"), because no officer can work without certification as a law enforcement officer.

139.    As an additional requirement of certification, in December 2019, VCSO sent Mr. White's IA report to Training and Standards. Training and Standards informed Mr. White that he had done nothing wrong and that his statement to them related to use of force was consistent with what had been reported by Vance County Sheriff's Office.

140.    Upon information and belief, between December 2019 and February 2020, NCSP contacted VCSO about Mr. White's employment.

141.    On February 5, 2020, after Mr. White had provided all necessary documentation that was in his possession and scored a 97% on NCSP's company police test, his offer of employment was withdrawn. When NCSP's offer was withdrawn, NC DOJ Training and Standards Division dropped his certification from evaluation and allowed it to expire as he no longer had prospective employment.

142.    Mr. White had received numerous, official statements from NCSP that his employment was all but guaranteed and so the decision to drop his certification evaluation shocked him.

143.    February 2020, NCSP informed Mr. White that he was not employable (and withdrew its conditional offer) because he had sued Vance County for discrimination and retaliation. Specifically, Mr. White was informed by NCSP that it would not hire someone who sued his former employer and other state agencies would be in agreement with it. Mr. White had not informed NCSP about any such lawsuit.

144.    Furthermore, NCSP conveyed that Training and Standards would not certify Mr. White, which led Mr. White to believe that NCSP knew that there was a concerted effort to keep Mr. White off the force.

145.    Training and Standards' informed Mr. White that because NCSP had withdrew its offer of employment, it had no option but to remove Mr. White's file from certification. As a result, Mr. White's certification expired.

146.    Additionally, despite being an otherwise competitive candidate, Plaintiff has been denied employment opportunities in Oxford, Franklin, Wake, Harnett and Davidson Counties, as well as with Allied Universal Special Police and G4S Special Police without justification and in retaliation.

147.    The Davidson Sheriff's Office stated that Mr. White was not being hired because of VCSO's report that he had been terminated for excessive force and because VCSO had marked on his F-5(A) form that he was untruthful. Other potential employers related similar concerns related to VCSO's characterization of his termination.

148.    But for Defendants' unjust actions, Plaintiff would have almost certainly secured employment with NCSPD, Davidson County Sheriff's Office, or one of the other law enforcement positions for which he has applied since his termination.

149.    Such interference with Plaintiff's ability to form employment contracts was unjustified and constitutes continued harassment and retaliation against Plaintiff.

**<u>Damages</u>**

150.    As the foreseeable, direct and proximate result of VCSO and the County's conduct, acts and omissions, and those of Sheriff White and Chief Deputy Bullock in their supervisory roles, Mr. White has and will continue to suffer actual and consequential economic damages and non-economic damages in amounts not presently known.

151.    Mr. White's career trajectory and progress and opportunity to earn future income has been substantially damaged. Defendants' conduct in bringing Mr. White's career to a halt and terminating him has aggravated Mr. White's economic injuries. Mr. White has applied for police work to no avail.

a. Wake County Sheriff's Office informed Mr. White in written form that because it "determined that . . . [the] "YES" box is checked on your F5 . . . the Sheriff would not consider hiring you;

b. GS4 Company Police also informed Mr. White that it would not proceed with his application due to employment issues; and

c. Because no sheriff's office will hire Mr. White, he has been reduced to accept employment as an armed security officer since the last week in April 2019 versus law enforcement.

152.    Mr. White was scheduled to lose his General Deputy Sheriff Certification on October 25, 2019, because he was not hired by a sheriff's office since Defendants maliciously, illegally and forcibly terminated his employment and ultimately marked on his F-5 form that there was an internal investigation related to the performance of duties.

153.    Mr. White has and will continue to suffer humiliation and severe emotional distress and related loss of enjoyment of life.

154.    The conduct of Defendants was intentional, as they corroborated, planned and sought to drive Mr. White from their sheriff's office solely because he filed a complaint for discrimination and after Mr. White made it clear that he would not engage in discriminatory policing and would not tolerate constant, pervasive and persistent discrimination.

155.    The conduct of VCSO, the County and the individual defendants in bringing Mr. White's career to a halt is mental cruelty and has and will continue to cause Mr. White to suffer substantial emotional distress and mental suffering.

156.    As a result of Defendants' actions, Mr. White has suffered and will continue to suffer irreparable harm.

**U.S.C. § §1981, 1983**
**(Invoked in Counts I, II and III)**

157. Section 1981 of the Civil Rights Act of 1870, 42 U.S.C. §1981, as amended ("Section 1981"), provides:

a) Statement of equal rights: All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

b) "Make and enforce contracts" defined: For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

c) Protection against impairment: The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

158. Mr. White is a person within the jurisdiction of the United States.

159. Mr. White's employment by VCSO is a "contractual relationship" under § 1981(b).

160. Under § 1981(b), Mr. White, a Black deputy sheriff, has the same rights as white citizens to make and enforce her employment contract with VCSO, including the making, performance, modification, and termination of her contract, and the enjoyment of all benefits, privileges, terms, and conditions of her employment relationship with VCSO.

161. 42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities

secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress....

162.   At all times relevant, Defendants acted under color of law.

**Count I**
**Violation of 42 U.S.C. § 1983**
**Disparate Treatment Under 42 U.S.C. § 1981**
**(Against All Defendants)**

163.   Plaintiff incorporates and re-alleges Paragraphs 1-163 of this Complaint as if fully set forth herein.

164.   In violation of § 1981(b), the County and VCSO engaged in disparate treatment denying Mr. White the enjoyment of the benefits, privileges, terms, and conditions of his employment relationship as a deputy sheriff.

165.   Without limitation, as acts or omissions constituting disparate treatment, the County and VCSO denied Mr. White:

      a.   His right to be treated as an equal in a diverse employment relationship;

      b.   His right to be treated with respect and dignity;

      c.   An equal opportunity to obtain safety training;

      d.   Honest, timely and constructive feedback on performance;

      e.   Equality in providing protective equipment;

      f.   Equality in ensuring the safety of deputy sheriffs;

      g.   Equality in providing uniforms;

      h.   Equality in proving patrol vehicles;

      i.   His right to a laptop in order ascertain the criminal history of a known suspect;

      j.   Equality in suspension and other corrective action;

      k.   Equality in recognizing successful performance;

      l.   Providing Black sheriff deputies hand-me-down uniforms;

      m.   Equality in not being subject to a hostile work environment; and

      n.   Equality in not being subject to unlawful retaliation.

166.    In violation of § 1981(b), Sheriff White directly discriminated against Mr. White when he created or tolerated a culture that allowed for Mr. White to suffer disparate treatment and be mistreated without ramification; when he attempted to force Mr. White to drop his discrimination complaints or face termination; and in providing white deputy sheriffs protective equipment and stability in shifts.

167.    In violation of § 1981(b), Chief Deputy Bullock directly discriminated against Mr. White when he created or tolerated a culture that allowed for Mr. White to suffer disparate treatment and be mistreated without ramification; when he attempted to force Mr. White to drop his discrimination complaints or face termination; and in providing white deputy sheriffs protective equipment and stability in shifts.

168.    In violation of § 1981(b), Captain Bullock directly discriminated against Mr. White because he failed to provide Mr. White an opportunity to be heard. Captain Bullock further discriminated against Mr. White when he determined that Mr. White used excessive force to subdue a suspect. Similar to all other deputy sheriff's, Mr. White is entitled to protect and or defend himself by force before being assaulted, during and after an assault. Furthermore, Captain Bullock's determination runs afoul of Graham v. Connor, 490 U.S. 386 (1989).

169.    As alleged throughout this Complaint, the County, VCSO and the individual defendants knowingly and intentionally discriminated against Mr. White based on race.

170.    The conduct of the County, VCSO and the individual defendants was intentional or in reckless disregard to Mr. White's rights under § 1981.

171.    The conduct of the County, VCSO and the individual defendants was part of a pattern and practice of discriminatory treatment.

172.     As the direct and proximate result of the Defendants' violations of § 1981(b), Mr. White has suffered substantial damages including, without limitation, actual and consequential damages for economic loss in amounts that will be proven at trial.

173.     As the direct and proximate result of the Defendants' violations of § 1981(b), Mr. White has also suffered substantial non-economic damages including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

174.     The discriminatory conduct of the Defendants continued despite Mr. White's protestations.

175.     The County's and VCSO's discriminatory conduct was intentional and malicious, making it necessary to award punitive or exemplary damages to punish them and deter other law enforcement agencies from like misconduct.

176.     The discriminatory conduct of each Individual Defendant was intentional and malicious, making it necessary to award punitive or exemplary damages to punish these law officers and deter law officers in similar positions of authority from like misconduct.

### Count II
### Violation of 42 U.S.C. § 1983
### Hostile Work Environment Under 42 U.S.C. § 1981
### (Against All Defendants)

177.     Plaintiff incorporates and re-alleges Paragraphs 1-177 of this Complaint as if fully set forth herein.

178.     In violation of § 1981(b), the County and VCSO denied Mr. White the enjoyment of these benefits, privileges, terms, and conditions of his contractual relationship, among others and without limitation, by:

    a.  Allowing supervisors to refer to Mr. White as "gay";

    b.  Allowing supervisors to demean and abuse Mr. White;

    c.  Allowing supervisors to intimidate Mr. White;

d.   Allowing supervisors to alter the terms and conditions of Mr. White's employment based on discriminatory animus;

e.   Allowing supervisors and deputies to treat Mr. White with disrespect;

f.   Allowing supervisors to issue unfair criticisms of Mr. White's performance;

g.   Allowing Mr. White to serve felony warrants alone and without backup, contrary to policy;

h.   Allowing supervisors to force Mr. White to sign performance evaluations under the threat of termination;

i.   Allowing supervisors to ignore Mr. White's request for protective equipment;

j.   Allowing supervisors to ignore Mr. White's request for repairs to his patrol vehicle;

k.   Ignoring Mr. White's request for equal treatment;

l.   Isolating Mr. White because he engaged in protected activity and requested equal treatment; and

m.   Allowing Mr. White to be terminated in retaliation to filing reports of discrimination;

n.   Allowing the continued harassment and assault on Mr. White's character even after termination.

179.   In violation of Section 1981(b), Sheriff White, as the individual with the Constitutional authority to hire and fire any employee under his leadership, directly discriminated against Mr. White and aggravated the severe, pervasive, intimidating, hostile and abusive work environment by permitting and failing to stop the occurrence of the acts and omissions creating a hostile work environment. In addition:

a.   Sheriff White caused and exacerbated the unlawful and hostile environment that Mr. White had been subjected to when he knowing failed to prevent or sanction Lieutenant Campbell's discriminatory conduct towards, and evaluations of, Mr. White;

b. In response to Mr. White's internal complaints of race discrimination, Sheriff White caused and exacerbated the unlawful hostile environment that Mr. White had been subjected to when he informed Mr. White that if he did not rescind his complaints he would be terminated, and in fact, did terminate Mr. White in retaliation;

c. After he filed his written external complaint of race discrimination, Sheriff White caused and exacerbated the unlawful hostile environment that Mr. White had been subjected to, informing those under his employ not to speak to Mr. White; and

d. As the constitutional authority to hire and fire any employee under his leadership, Sheriff White put his personal stamp of approval and effort to destroy Mr. White's career and ignored his desperate pleas to be treated as an equal person.

180. In violation of Section 1981(b), Chief Deputy Bullock directly discriminated against Mr. White and created a severe, pervasive, intimidating, hostile, and abusive work environment by allowing pervasive discrimination against Mr. White to continue unabated and to allow other leadership to intimidate and harass him without sanction; and specifically in allowing this discrimination and hostile work environment to predominate Squad A.

181. In violation of Section 1981(b), Captain Bullock directly discriminated against Mr. White and created a severe, pervasive, intimidating, hostile, and abusive work environment by his participation in pervasive discrimination against Mr. White as evidenced by his issuance of an erroneous conclusion that Mr. White applied excessive force to subdue a suspect.

182. The conduct of the County, VCSO and Individual Defendants created a hostile environment was intentional or in reckless disregard to Mr. White's employment.

183. As the direct and proximate result of the Defendants' violations of Section 1981(b), Mr. White has suffered substantial damages including, without limitation, actual and consequential damages for economic loss in amounts that will be proven at trial.

184.    As the direct and proximate result of the Defendants' violations of Section 1981(b), Mr. White has also suffered substantial non-economic damages including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

185.    The conduct of the Defendants creating a hostile environment continued despite Mr. White's protestations.

186.    The County's and VCSO's discriminatory conduct was intentional and malicious, making it necessary to award punitive or exemplary damages to punish them and deter other law enforcement agencies from like misconduct.

187.    The discriminatory conduct of each Individual Defendant was intentional and malicious, making it necessary to award punitive or exemplary damages to punish these law officers and deter law officers in similar positions of authority from like misconduct.

<u>**Count III**</u>
<u>**Violation of 42 U.S.C. § 1983**</u>
<u>**Unlawful Retaliation Under 42 U.S.C. § 1981**</u>
<u>**(Against All Defendants)**</u>

188.    Plaintiff incorporates and re-alleges Paragraphs 1-188 of this Complaint as if fully set forth herein.

189.    In violation of § 1981(b), the County and VCSO retaliated against Mr. White for filing complaints internally and externally that assert racial discrimination against leadership.

190.    In violation of Section 1981(b), the County and VCSO retaliated against Mr. White under the doctrine of *respondeat superior* regarding the acts and omissions of Sheriff White, Chief Deputy Bullock and Captain Bullock as alleged in Paragraphs 171, 172, and 173, *infra*.

191.    In violation of Section 1981(b), Sheriff White retaliated against Mr. White when he complained that he had been discriminated against because of his race and gender, by his silent approval of Lieutenant Campbell's shift transfer of Mr. White. In addition, Sheriff White retaliated against Mr. White by informing him that if he did not drop his discrimination complaints he would be

terminated. Sheriff White also retaliated against Mr. White for engaging in statutorily protected behavior by informing those under his employ of the nature and extent of Mr. White's complaints. Finally, Sheriff White retaliated against Mr. White when he ordered his termination based on pretext.

192. In violation of Section 1981(b), Chief Deputy Bullock retaliated against Mr. White by singling Mr. White out and providing unwarranted and prejudicial criticisms. Chief Deputy also retaliated against Mr. White when he authorized and or allowed Lieutenant Campbell to transfer Mr. White's shift. Furthermore, Chief Deputy Bullock retaliated against Mr. White he ordered that he sign untrue statements related to his performance or be terminated. Finally, Chief Deputy retaliated against Mr. White when he conspired to terminate him because he filed discrimination complaints.

193. In violation of Section 1981(b), Captain Bullock retaliated against Mr. White when he failed to conduct a prompt and thorough investigation into the use-of-force complaint lodged against Mr. White. Further proof of Captain Bullock's retaliation is based on his recommendation that Mr. White utilized excessive force to subdue a suspect when he knew that other officers had applied more force and been cleared.

194. The conduct of the County, VCSO and Individual Defendants was intentional or in reckless disregard to Mr. White's rights.

195. As the direct and proximate result of the Defendants' violations of Section 1981(b), Mr. White has suffered substantial damages including, without limitation, actual and consequential damages for economic loss in amounts that will be proven at trial.

196. As the direct and proximate result of the Defendants' violations of Section 1981(b), Mr. White has also suffered substantial non-economic damages, including without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

197. The unlawful retaliation by Defendants continued despite Mr. White's protestations.

198.     Defendants' unlawful retaliation was intentional and malicious, making it necessary to award punitive or exemplary damages to punish them and deter other law enforcement agencies from like misconduct.

199.     The conduct of Individual Defendants constituting unlawful retaliation was intentional and malicious, making it necessary to award punitive or exemplary damages to punish these law officers and deter law officers in similar positions of authority from like misconduct.

**Count IV**
**Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq.**
**The Government Employees Rights Act of 1991, 42 U.S.C. 2000e-16a et seq**
**Disparate Treatment**
**(Against All Defendants)**

200.     Plaintiff incorporates and re-alleges Paragraphs 1-200 of this Complaint as if fully set forth herein.

201.     Plaintiff makes specific reference to the direct incorporation of parallel claims in Paragraphs 164-177.

202.     Based upon the allegations as contained within this Count of this Complaint, Defendants discriminated against Mr. White based on his race and illegally impacted the terms and conditions of his employment.

203.     Defendants further failed to investigate or take corrective measures to eliminate all racially-motivated discrimination in the work environment that Mr. White was subjected to on a regular basis even after her apprised them of their discriminatory conduct.

**Count V**
**Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq.**
**The Government Employees Rights Act of 1991, 42 U.S.C. 2000e-16a et seq**
**Hostile Work Environment**
**(Against All Defendants)**

204.     Plaintiff incorporates and re-alleges Paragraphs 1-204 of this Complaint as if fully set forth herein.

205.    Plaintiff makes specific reference to the direct incorporation of parallel claims in Paragraphs 178-188.

206.    Based upon the allegations as contained within this Count of this Complaint, Defendants created a racially hostile and abusive work environment by allowing Mr. White to be subjected to a pervasive, racially motivated harassment on a continuous basis even after he complained of such discrimination.

207.    Defendants further failed to investigate or take corrective measures to eliminate all racially-motivated harassment and discrimination in the work environment that Mr. White was subjected to on a regular basis.

**Count VI**
**Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq. The Government Employees Rights Act of 1991, 42 U.S.C. 2000e-16a et seq Retaliation (Against All Defendants)**

208.    Plaintiff incorporates and re-alleges Paragraphs 1-208 of this Complaint as if fully set forth herein.

209.    Plaintiff makes specific reference to the direct incorporation of parallel claims in Paragraphs 189-200.

210.    Based upon the allegations as contained with this Count of this Complaint, Defendants created a racially hostile and abusive environment and allowed Mr. White to be subjected to the pervasive, racially motivated conduct and retaliation even after he engaged in protective activity.

211.    There was no legitimate non-discriminatory reason for Mr. White's termination.

212.    Mr. White was terminated because he refused to drop discrimination complaints that he lodged against Defendants, and Defendants' claim that Mr. White applied excessive for to subdue a suspect is pretext for their illegal and retaliatory conduct.

**Count VII**
**Breach of Contract**

**(Against the County, VCSO Defendants and Sheriff White[4])**

213.    Plaintiff incorporates and re-alleges Paragraphs 1-213 of this Complaint as if fully

set forth herein.

214.    Mr. White's employment relationship is a contractual relationship. In addition, the terms and

conditions of Mr. White's employment were memorialized and secured for a term of two years.

215.    As a matter of law, a covenant of good faith and fair dealing is implied in the parties'

contractual relationship.

216.    As a matter of law, the County, VCSO and Sheriff White had to act in good faith and fair

dealing in exercising all of its discretion as the employer in this contractual relationship.

217.    The County, VCSO and Sheriff White in bad faith entered a relationship with Mr. White under

the auspice of an inclusive environment, but it knew at the time of contracting it would not treat

Blacks equal to Whites. The County, VCSO and Sheriff White also knew that it would breach the

terms of an employment agreement if Mr. White complained of race discrimination.

218.    By engaging in conduct that was discriminatory, retaliatory, and constituted a hostile

environment, the County, VCSO and Sheriff White breached the employment contract and its implied

covenant of good faith and fair dealing.

219.    In bad faith and unfair dealing, the County, VCSO and Sheriff White schemed to force Mr.

White out and deprive him of the benefit of his employment contract in retaliation for her refusal to

accept discriminatory conduct and hostile environment.

220.    The County's, VCSO's and Sheriff White's conduct was in material breach of its contractual

commitments to Mr. White.

---

[4] Defendants contend that Mr. White's employment as a sheriff's deputy was a contract with Sheriff
White, and so Sheriff White's role is pleaded in the alternative.

221.    When the County, VCSO and Sheriff White hired Mr. White, it was foreseeable that its bad faith and unfair dealing in exercising its discretion would cause Mr. White to suffer economic losses including a loss of future earnings.

222.    When the County, VCSO and Sheriff White hired Mr. White, it was foreseeable that its bad faith and unfair dealing in exercising its discretion would cause Mr. White to suffer substantial emotional distress.

223.    The County's, VCSO's and Sheriff White's conduct has directly and proximately caused Mr. White to suffer actual and consequential damages, both economic and non-economic.

**Count VIII**
**Tortious Interference with Employment and Related Opportunities**
**(Against Individual Defendants[5])**

224.    Plaintiff incorporates and re-alleges Paragraphs 1-224 of this Complaint as if fully set forth herein.

225.    Mr. White's employment with the County, VCSO and Sheriff White was a contractual relationship under North Carolina common law.

226.    Defendants Chief Deputy Bullock and Captain Bullock were not parties to Mr. White's contractual relationship and prospective employment opportunities, but they knew of the contractual relationship and prospective opportunities.

227.    These Defendants also knew that Mr. White enjoyed justified expectations in his employment relationship, including opportunities to progress, maintain his life and health, develop a strong reputation in the police community, and enjoy substantially enhanced income.

228.    These Defendants' interfered with Mr. White's employment and related opportunities by discriminating against him, creating a hostile environment, retaliating against him, and spreading

---

[5] Defendants contend that Mr. White's employment as a sheriff's deputy was a contract with Sheriff White, and so Sheriff White's role is pleaded in the alternative.

untruths about his performance for reasons unrelated to any legitimate business interest and for their personal enjoyment, gain, insecurities, and biases.

229.    Chief Deputy Bullock interfered with the contract by disciplining Mr. White for enforcing traffic violations. Chief Deputy Bullock and Captain Bullock further interfered with the contract fabricating that Mr. White had applied excessive force, and thus, wrongfully terminated him.

230.    These Defendants' interference with Mr. White's employment and related opportunities was based on actual and legal malice towards Mr. White.

231.    These Defendants' interference with Mr. White's employment and related opportunities was unjustifiable.

232.    These Defendants' conduct directly and proximately caused Mr. White to suffer actual damages both economic and non- economic.

233.    Mr. White may also may recover punitive damages in an amount to be determined at trial, under N.C. Gen. Stat. § 1D-15.

### Count IX
### Tortious Interference with Prospective Economic Advantage
### (Against Individual Defendants)

234.    Plaintiff incorporates and re-alleges paragraphs 1-234 of this Complaint as if fully set forth herein.

235.    Plaintiff attempted to enter into contracts for employment with various law enforcement agencies, often being viewed as a competitive candidate and receiving at least one conditional offer of employment. In all likelihood, Plaintiff would have been able to secure one of these jobs but for the actions of Defendants.

236.    Defendants knew of Plaintiff's attempts to secure new employment in the law enforcement field and that his prospective employers would examine his record at VCSO, and Defendants knew of Plaintiff's contract.

237.    Defendants interference was unjustified and constituted harassment of Plaintiff.

238.    Defendants intended that their actions in in creating a pretextual narrative surrounding Plaintiff's use of force would result in his termination from the VCSO. Likewise, they understood and intended that it would hinder his ability secure other employment in the law enforcement field.

239.    Without limitation, Plaintiff's inability to pursue his chosen line of work, the accompanying loss of income and the humiliation of the continued aspersions cast upon his character when he seeks work have all damaged Plaintiff.

**Count X**
**Intentional Infliction of Emotional Distress**
**(Against Individual Defendants)**

240.    Plaintiff incorporates and re-alleges paragraphs 1-240 of this Complaint as if fully set forth herein.

241.    Defendant's conduct of racial discrimination, including, but not limited to, giving him insufficient training and resources compared to other employees, refusing to follow protocol when it would benefit Plaintiff's safety, subjecting him to heightened criticism and scrutiny, including cursing and screaming, when such behavior would not have been applied to a white officer, creating a false narrative of events for disciplinary action and ultimately terminating Plaintiff's employment, was extreme and outrageous.

242.    Even after Defendants terminated Plaintiff's employment, Defendants' conduct of racial discrimination, retaliation and interference with prospective employment continued, and thereby caused Plaintiff emotional distress.

243.    Plaintiff was treated with hostility and scorn on account of his race and his participation in protected activities.

244.    Defendants subjected Plaintiff to a higher degree of scrutiny than was applied to other non-minority officers, which caused Defendant constant stress and anger at the injustice of his treatment.

245.    Plaintiff often had to fear for his life unnecessarily, and to a greater degree than White deputies on account of lack of protective equipment given to him that was given to White, deputies.

246.     Despite repeated requests, Plaintiff was not given training and certification in the use of less lethal methods of subduing violent suspects, such as taser and OC spray, giving him fewer options when dealing with violent or uncooperative suspects and putting him in greater danger.

247.     Despite these lack of protections and increased scrutiny on Plaintiff, he was instructed to serve warrants on suspects alone, despite this being against policy.

248.     By failing to provide Plaintiff with a ticket book or computer and giving him contradictory information on how to proceed with traffic stops, Plaintiff was placed in no-win scenarios by management, where he was criticized and from one officer or another no matter what decision he made, causing him immense stress.

249.     Defendants either participated in, or allowed such outrageous behavior to occur, at VCSO.

250.     Defendants intended, or were at least recklessly indifferent to the idea, that their actions would cause severe emotional distress in Plaintiff and when he raised these issues with management he was, at best, ignored, but often discouraged or implicitly threatened with disciplinary action for his actions and the behavior would continue.

251.     Plaintiff suffered humiliation as a result of Defendant's actions.

252.     The consequences of Defendants' actions have been revisited upon Plaintiff every time he has had to apply for a job and further when he is rejected due to the characterization of him and his actions by Defendants towards his prospective employers.

253.     Plaintiff's inability to secure a job is due to the nature of his termination and poor references provided by Defendants.

254.     Plaintiff has been caused to feel severe distress and anxiety about his future prospects, both economically and in his ability to participate in his chosen field of work.

255.     These feelings have been exacerbated each of the numerous times that Plaintiff has applied for a job and failed to attain it due to his termination from VCSO and the manner in which Defendants have characterized it.

## Count XI
## Negligent Infliction of Emotional Distress
## (Against Individual Defendants)

256.    Plaintiff incorporates and re-alleges paragraphs 1-256 of this Complaint as if fully set forth herein.

257.    Plaintiff makes specific reference to the direct incorporation of parallel claims in Paragraphs 241-256.

258.    Defendants owed Plaintiff a duty to refrain from harassment based on his membership in a protected class of individuals.

259.    Defendants also owed Plaintiff a duty of reasonable care.

260.    Defendants breached their duties to Plaintiff by allowing and participating in discrimination and ill treatment in the workplace targeted at Plaintiff.

261.    Defendants were indifferent to the emotional distress that they caused Plaintiff.

262.    Defendants were present at numerous instances where Plaintiff was verbally assaulted in front of other members of the department on account of his race and chose to do nothing about this behavior.

263.    Defendants knew or should have known that their actions in allowing discrimination against Plaintiff and ultimately creating a false record and terminating him under false pretenses would cause severe emotional distress.

264.    All of Defendants' enumerated actions could reasonably be foreseen to cause severe emotional distress and, taken in the aggregate, the foreseeability and outrageousness of their actions become even more apparent.

## Count XII
## Wrongful Discharge under the Equal Employment Practices Act
## N.C. Gen. Stat. § 143-422.2
## (Against Individual Defendant Sheriff White)

265. Plaintiff incorporates and re-alleges paragraphs 1-265 of this Complaint as if fully set forth herein.

266. Plaintiff was wrongfully terminated in retaliation for his willingness to confront problematic and discriminatory behavior and practices to VCSO.

267. Defendant had no reason to believe that Plaintiff was unable to fulfill his duties properly and without incident.

268. Defendant had no credible reason for the premature termination of Plaintiff's employment.

269. Defendant wrongfully terminated Plaintiff under the pretext that his use of force unreasonable and that he did not follow proper procedures, despite the fact that Plaintiff followed proper procedures in handling his assailant and acted reasonably under the circumstances.

270. Further, Plaintiff's use of force was not outside of the norms of the department, where other officers had not been terminated for similar, and often far more egregious, violations of the use of force policy, violations of protocol, or basic duties of care.

<u>Count XIII</u>
<u>Negligent Retention and Negligent Supervision</u>

<u>(Against Individual Defendants Sheriff White and Chief Deputy Bullock)</u>

271. Plaintiff incorporates and re-alleges Paragraphs 1-271 of this Complaint as if fully set forth herein.

272. Defendants Sheriff White and Chief Deputy Bullock knew or should have known of Lieutenant Campbell's discriminatory conduct towards Mr. White.

273. Despite having knowledge of Lieutenant Campbell's racism and discrimination towards Mr. White, Individual Defendants retained the employment of Lieutenant Campbell.

274. Further Individual Defendants failed to properly supervise Lieutenant Campbell.

275. Individual Defendants' lack of supervision enabled a racially charged hostile work environment to fester within the VCSO.

**Count XIV**
**Ratification**

**(Against Individual Defendants Sheriff White and Chief Deputy Bullock)**

276.     Plaintiff incorporates and re-alleges Paragraphs 1-276 of this Complaint as if fully set forth herein.

277.     The actions of Lieutenant Campbell were ratified by Individual Defendants.

278.     Individual Defendants knew or should have known of Lieutenant Campbell's discriminatory conduct towards Mr. White.

279.     Individual Defendants' words and conduct indicates approval of or acquiescence to

280.     Lieutenant Campbell's conduct towards the Mr. White.

**Count XV**
**Defamation/Libel**
**(Against Individual Defendants)**

281.     Plaintiff incorporates and re-alleges Paragraphs 1-281 of this Complaint as if fully set forth herein.

282.     Defendants defamed Plaintiff in their report regarding his termination and in the publication of his F-5(a) form, creating the false impression that he is violent and untrustworthy.

283.     Plaintiff was not fired for an excessive force violation, Plaintiff was fired for being Black and willing to stick up for his rights in systemically racist institution.

284.     Furthermore, Plaintiff did not use excessive force in the incident which led to his termination.

285.     Reports on Plaintiff's record have been communicated to Training and Standards, as well as every prospective employer who has inquired about his termination from VCSO.

286.     These statements have harmed Plaintiff's reputation and affected his professional life by directly impacting his ability to maintain his law enforcement certification and to acquire another job in law enforcement.

**Count XVI**
**Punitive Damages**

**(All Defendants)**

287.     Plaintiff incorporates and re-alleges Paragraphs 1-287 of this Complaint as if fully set forth herein.

288.     Each Defendant committed or participated in outrageous, willful, wanton, malicious, and wrongful conduct they knew or should have known was reasonably likely to result in injury, damage, or other harm to Mr. White, and was in flagrant and reckless disregard of Mr. White's rights.

289.     Because of each Defendant's willful, wanton, outrageous, and egregiously wrongful conduct, Mr. White may recover punitive damages (in addition to actual and consequential damages) against each Defendant, in an amount to be determined by the trier of fact, under the United States Constitution, the North Carolina Constitution, the North Carolina General Statutes, and common law.

## Prayer for Relief

WHEREFORE, Plaintiff demands judgment be entered on his behalf against Defendants and grants the following relief:

A.   An award of compensatory damages for Plaintiff, in an amount of to be determine by the enlightened conscience of the trier of fact, jointly and severally, against Defendants;

B.   An award of back pay and front pay;

C.   An award of pre-judgement and post-judgment interest;

D.   An award of costs, including, but not limited to, discretionary costs;

E.   Attorneys' fees and expenses incurred in pursuing this case under 42 U.S.C.§ 1988;

F.   The reinstatement of Mr. White's Law Enforcement Certification

G.   Any other and further relief this Court deems just and proper; and

H.   Any other and further relief to which they may be entitled.

With respect to Plaintiff's Count XVI for punitive damages, Plaintiff requests judgment against Defendants for:

A.   Punitive damages sufficient to punish each Defendant and deter others from like misconduct;

B.   Costs of suit; and,

C.   Such other relief available under law and deemed just and proper.

### **JURY TRIAL DEMANDED**

Plaintiff demands trial by jury in open court on all Counts. Respectfully submitted this 31st day of December, 2020.

PLAINTIFF,

JUSTIN J. WHITE
By his Attorney:
/s/Sharika M. Robinson
SHARIKA M. ROBINSON,
North Carolina Bar No.: 44750
THE LAW OFFICES OF SHARIKA M ROBINSON, PLLC
10230 Berkeley Place Drive, Suite 220
Charlotte, NC 28262
Telephone: (704) 561 6771
Telefax: (704) 561-6773
*Counsel for Plaintiff Justin J. White*