IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:19-cv-00467-BO

| | | |
|---|---|---|
| JUSTIN J. WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VANCE COUNTY, NORTH CAROLINA; | ) | **MEMORANDUM OF LAW** |
| VANCE COUNTY SHERIFF'S OFFICE; | ) | **IN SUPPORT OF** |
| PETER WHITE, in his official and individual | ) | **DEFENDANTS' MOTION** |
| capacities; LAWRENCE D. BULLOCK, in his | ) | **FOR SUMMARY JUDGMENT** |
| official and individual capacities; | ) | |
| WELDON WALLACE BULLOCK, in | ) | |
| his official and individual capacities, | ) | |
| and WESTERN SURETY COMPANY | ) | |
| a division of CNA SURETY, | ) | |
| | ) | |
| Defendants. | ) | |

## STATEMENT OF THE CASE

The plaintiff, a former Vance County sheriff's deputy, was fired for using excessive force and breaking a woman's arm during an arrest. (D.E. No. 16, Answ. ¶ 1.) He filed this lawsuit on October 23, 2019, alleging 11 claims for relief under state and federal law, including for discrimination, retaliation, and wrongful discharge, and named as defendants the former sheriff of Vance County, two former senior sheriff's officers, the Vance County Sheriff's Office, and Vance County. (D.E. No. 1.)

The defendants timely answered on December 30, 2019, and also filed motions to dismiss the county and the sheriff's office. (D.E. Nos. 9, 14, 16.) The Court granted the motions and dismissed those defendants on February 26, 2020. (D.E. No. 19.)

The plaintiff moved to amend his complaint on August 4, 2020, seeking to add as defendants Western Surety Company and the current Vance County sheriff, Curtis Brame, and to add additional claims under state law. (D.E. No. 32.) The Court granted the motion in part and denied it in part, allowing addition of the defendants and some of the claims. (D.E. No. 52.)

The plaintiff filed an Amended Complaint on December 31, 2020, but did not name Sheriff Brame.[1] (D.E. No. 55.) The plaintiff also never served defendant Western Surety. The defendants answered on January 20, 2021, and filed a partial motion to dismiss under Rule 12(b)(6). (D.E. Nos. 56, 57, 58.) The court has not yet ruled on the motion. The discovery period concluded on February 28, 2021. (D.E. No. 43.)

The defendants now move for summary judgment on all claims because there is no genuine dispute of material facts as to any of the plaintiff's claims.

**FACTS**

This case stems from the plaintiff's use of excessive force on a black woman, Latwanya Oliver, during an arrest in October 2018. Ms. Oliver suffered a broken arm and filed a complaint with Sheriff White. (L. Oliver Aff. ¶ 4; Ex. A.) Capt. Weldon Bullock investigated the incident, concluded that the plaintiff had used excessive force, and recommended that he be fired. (W. Bullock Dep. Ex. 4.) Sheriff White followed his recommendation. (Amd. Compl. ¶130; P. White Aff. ¶ 4.) Ms. Oliver may sue the plaintiff and the sheriff for her injuries. (Oliver Aff. ¶ 8.)

The plaintiff claims that he was the victim of racial discrimination during his brief tenure at the Vance County Sheriff's Office and was fired in retaliation for filing an EEOC complaint against the sheriff. (Amd. Compl. ¶¶ 105, 117, 127-30.) The plaintiff is black, as are Sheriff White, Capt. Bullock, and defendant Lawrence Bullock, the chief deputy. (Amd. Compl. ¶ 28.)

---

[1] The plaintiff's attorney is confused about the Court's order and believes the Court denied the motion to add Sheriff Brame. See Pl.'s Dep. p. 226.

2

When the plaintiff applied to be a Vance County deputy sheriff in 2017, Capt. Bullock conducted a background investigation. (W. Bullock Dep. p. 17-20; Exs. 1, 2.) The plaintiff had been fired from his three previous jobs, one as a state prison guard and two as a campus security officer. (W. Bullock Dep. pp. 18-19 and Ex. 1; Pl.'s. Dep. pp 18-19, 33.) A panel at the sheriff's office recommended against hiring him, but Sheriff White hired him anyway and he started in June 2017 as a patrol deputy. (W. Bullock Dep. pp. 29-31; Amd. Compl. ¶ 21.)

Capt. Bullock then helped the plaintiff get a waiver from the state so he would not have to re-take Basic Law Enforcement Training, but he had little interaction with him after that. (P. White Dep. Ex. 18; P. White Aff. ¶ 5; W. Bullock Dep. pp. 102-03.)

At the time, Sheriff White had 40 years of experience in law enforcement, including 25 years as a trooper for the North Carolina Highway Patrol, from which he retired with the rank of major. (P. White Dep. p. 7-8, 15-16.) As a state trooper, he served five years on the governor's security detail and later oversaw all nine Highway Patrol garages in the state, as well as the aviation and motorcycle units. (Id. at 9, 15.) He ran for sheriff in 2006 promising to treat people fairly and equally, and, when elected, he became the first black sheriff in Vance County. (Id. at 15-17; P. White Aff. ¶ 3.)

The plaintiff began having problems soon after he was hired. He spent an excessive amount of time stopping motorists for minor traffic offenses and was counseled by superiors not to do this. The chief deputy told him the sheriff did not want him to make minor traffic stops, yet he made eight arrests for minor violations in his first six months. Other officers talked about this. A supervisor, Lt. Durwood Campbell, gave him a written counseling for making traffic stops and Sheriff White approved it. (Pl.'s. Dep. pp. 35, 82-84, 96-97, 100; Exs. 9-12.)

Sheriff White wanted deputies to focus on investigating crimes, responding to calls, and serving papers. The plaintiff was told to stop motorists only for serious traffic violations and that traffic enforcement was primarily the job of the state Highway Patrol. (Pl.'s Dep. p. 35; Ex. 12.)

However, on one occasion, the plaintiff failed to charge a Hispanic man for causing a minor fender-bender. The woman whose car was damaged was black and she complained to Sheriff White. The plaintiff did not have a ticket book, and the sheriff told him there was a reason for that. The sheriff told him to take out a criminal summons against the driver, so he did. (Pl.'s Dep. pp. 42-47.)

On another occasion, the plaintiff charged a white woman, Jamie Goss, for traffic violations. (Pl.'s Dep. Exs. 9, 10.) After she complained, Lt. Campbell became upset with him about his traffic stops and exchanged words with him. The plaintiff did not like being scolded and told Lt. Campbell that his father was a large black man and only he could talk to the plaintiff like that. A sergeant was surprised that the plaintiff had spoken so disrespectfully to Lt. Campbell, and the plaintiff was suspended for five days without pay. (Pl.'s Dep. pp. 89-91, 100, 112; Exs. 9, 10.) However, Sheriff White also disciplined Lt. Campbell for using the word "ass" toward the plaintiff. (P. White Dep. p. 146.)

In March 2018, the plaintiff again tried to pull someone over for a traffic violation, and he got into a minor accident. He claimed that he was running his emergency blue lights at the time, but he was not, according to video from a store security camera. His supervisors again noted that he had been told not to make minor traffic stops and recommended his suspension. (Pl.'s Dep. pp. 121-31; Ex. 14; L. Bullock Aff. ¶ 4.)

With this backdrop, the plaintiff claimed that he was subjected to discriminatory remarks and treatment. He claimed that deputies used racial slurs and that a sergeant made a homophobic

comment about him but apologized. (Pl.'s Dep. pp. 190-94.) He said Lt. Campbell treated blacks with less respect than whites. (Pl.'s Dep. pp. 238-39.) He said someone left a purple unicorn hat in his locker. (Pl.'s Dep. pp. 198-99.) However, he too made racial comments, calling an Indian-American deputy "Osama" a few times and another deputy "white boy." (Pl.'s Dep. pp. 224-25; Ex. 24.)

The sheriff had written policies against workplace harassment and discrimination, and all employees had access to them. (P. White Dep. p. 72; Exs. 16-18.) He had no tolerance for jokes about race or gender. (P. White Dep. pp. 114-15.) When he took office, he declined to swear in one deputy who said he would not work for a black sheriff, but, other than that, he never fired anyone without first doing an investigation. (P. White Dep. pp. 48-49.) He hired the first female deputy in the county and later hired several others. (P. White Dep. p. 96.)

The plaintiff never heard Sheriff White use any racial slurs or make fun of the plaintiff's race or sexual orientation. (Pl.'s Dep. p. 195.) Sheriff White had little interaction with the plaintiff except for responding to his complaints and suspending him once and did not hear any rumors about his sexual orientation. (P. White Dep. pp. 153, 156-57.)

On June 15, 2018, the plaintiff sent two notarized letters to Sheriff White, one about his performance review and the other a Title VII discrimination complaint. In the latter, the plaintiff said he should not have been suspended on February 20, 2018, for the incident with Lt. Campbell and that it was because Lt. Campbell, a white male, "heavily lied on" him and relied on a complaint by Jamie Goss, who is white. The plaintiff claimed that Chief Deputy Bullock and Capt. Watkins did not get his side of the story. He said the sheriff's office "took the white man's word over the black man" and that this violated his civil rights. He said there was "a pattern of discrimination and negligence at the sheriff's office" and threatened to sue. (P. White Dep. Ex. 21.)

The plaintiff had been a sworn law enforcement officer for only a year at this point, yet, astonishingly, recommended to the sheriff that his senior officers be disciplined. He said Chief Deputy Bullock, Lt. Shearin, and Lt. Campbell should "be issued a corrective action and suspended for 10 days without pay," and that Capt. Watkins "receive a lesser sanction." (Id.) He followed this up with an email on July 11, 2018, inquiring about the status of his complaint. (Id.)

Sheriff White looked into the allegations and obtained statements from Lt. Campbell and others. (Pl.'s Dep. Exs. 9-13; P. White Dep. pp. 147-51.) Lt. Campbell admitted having a "heated exchange" with the plaintiff and using the word "ass" toward him because he was upset that he continued to defy orders to not stop motorists for minor traffic violations. (P. White Dep. Ex. 22.)

Sheriff White responded to the plaintiff by letter on July 18, 2018. (P. White Dep. Ex. 23.) He rejected the claim that the Goss incident was racial and said the plaintiff had been told repeatedly "not to focus on traffic stops since this is not your primary duty and you had not been issued a citation book," yet he had continued to disregard these orders. (Id.) The sheriff had approved the plaintiff's suspension because the plaintiff admitted being disrespectful to Lt. Campbell. (Id.) The sheriff rejected the charge of discrimination in the sheriff's office. (Id.) He could find no basis for this allegations. (P. White Dep. p. 147.)

Three weeks later, on August 10, 2018, the plaintiff filed his complaint with the EEOC. (Amd. Compl. ¶ 105; P. White Dep. Ex. 20.) It was the only such complaint against Sheriff White during his 12 years in office. (P. White Dep. p. 69.)

The events that gave rise to the plaintiff's termination began, predictably, with his attempt to enforce traffic laws. On the night of Sunday, October 21, 2018, he approached Latwanya Oliver at a gas station and told her that she had been speeding. (Pl.'s Dep. pp. 133-37; W. Bullock Dep.

6

Ex. 4.)  They spoke briefly, and she walked away and told him to write her a ticket.  (Pl.'s Dep. pp. 132-33.)  Of course, he did not have a ticket book, so he could not write her a ticket.

The plaintiff later checked and found that Ms. Oliver had two outstanding arrest warrants.  (Pl.'s Dep. pp. 136-37.)  They stemmed from an allegation that she had not paid for clothing at a store.  (Oliver Aff. ¶ 4.)

That night, the plaintiff went to Ms. Oliver's home and knocked on her door at 2:00 a.m., ostensibly to arrest her for the warrants.  She did not answer and the plaintiff left.  He does not recall if he even announced that he was from the sheriff's office and concedes that it may not have been reasonable to go to her house at that hour.  (Pl.'s Dep. pp. 133-41, 146-47.)

The plaintiff came back the next night around 8 o'clock and told Ms. Oliver that he had warrants for her arrest, though he did not bring the warrants with him.  (Pl.'s Dep. pp. 153-54.)

Ms. Oliver left her house under the plaintiff's escort, and he tried to put her in the back seat of his patrol car.  She objected because she did not know where he was taking her, and he slammed her on the ground and handcuffed her.  She knew immediately that her arm was broken, and this was later confirmed by emergency medical technicians who arrived on the scene.  She was taken to the hospital and diagnosed with a fractured bone in her upper arm.  (Oliver Aff. ¶¶ 5-6; W. Bullock Dep. Ex. 4; Pl.'s Dep. pp. 150-57.)

During the arrest, the plaintiff put out a radio call that indicated to other officers that he was in danger and he asked that other units be "staged" near the scene.  Other officers quickly arrived, including his sergeant, who cancelled the emergency nature of the call and reported the incident as routine.  (W. Bullock Dep. Ex. 4.)

Ms. Oliver filed a written complaint with the sheriff the day after her arrest.  (Oliver Aff. Ex. A.)  She threatened to sue if the plaintiff was not fired.  (Pl.'s Dep. p. 180.)

Capt. Bullock, a 26-year law enforcement veteran, investigated her complaint. (W. Bullock Dep. pp. 6, 48-49.) He had had little interaction with the plaintiff after the plaintiff was initially hired and, at the time of his investigation, he did not know about the EEOC complaint. (W. Bullock Dep. pp. 102-03; W. Bullock Aff. ¶ 3.)

Capt. Bullock interviewed the plaintiff, Ms. Oliver, and other officers, and spoke with Chief Bullock. (W. Bullock Dep. pp. 49-56.) He concluded that the plaintiff had used excessive force because "[h]e slammed the victim and broke her arm." (W. Bullock Dep. pp. 58-61.) The plaintiff had not used an approved technique to gain control of her and, when asked, he could not identify one. "The maneuver was a slamming, and we don't have anything in our policy or training that allows you to slam anybody." (W. Bullock Dep. p. 69; Ex. 4.) Bullock also noted other problems with the way the plaintiff had handled the incident. (W. Bullock Dep. Ex. 4.) With the approval of the plaintiff's chain of command, he recommended to Sheriff White that the plaintiff be fired. (W. Bullock Dep. pp. 57-58.)

Sheriff White fired the plaintiff for using excessive force, but also considered that the plaintiff had been suspended once already, had repeatedly disregarded instructions not to cite people for minor traffic citations, and had lied about turning on his blue lights before he got into the car accident. (P. White Aff. ¶ 4.) The sheriff never asked the plaintiff to withdraw his EEOC complaint and believed it had been addressed with his July 2018 response letter. (Id.)

The sheriff was retiring at the start of December 2018, and he could have allowed the plaintiff to remain on the job until his successor took over a few weeks later, but he did not want to risk the plaintiff causing other problems, so he fired him. (Id.)

The Vance County Sheriff's Office filled out a Report of Separation form about the plaintiff's firing and sent it to the North Carolina Sheriffs' Standards Commission. (Pl.'s Dep. Ex.

25.)  The commission accredits sheriff's officers in the state, and the form is required by state law.  See N.C. Gen. Stat. § 17E-4; 12 N.C. Admin. Code 10B.0405.  The form contains a box asking if the officer was terminated as a result of a substantiated investigation, and the box on the plaintiff's form was checked yes but did not say what the investigation was about and did not mention excessive force.  (Pl.'s Dep. pp. 205-08; Ex. 25.)

This was the fourth consecutive job from which the plaintiff was fired.[2]  He then applied for other law enforcement jobs.  He provided a signed release to allow prospective employers to obtain his personnel file from Vance County and expected them to review the Oliver investigative report.  (Pl.'s Dep. Ex. 20.)  However, he claims that he was not hired because of Capt. Bullock's conclusion that he had used excessive force.  (Pl.'s Dep. pp. 209-14, 225-35; Appendix, No. 1.)

Sheriff White, Capt. Bullock, and Chief Deputy Bullock had no contact with the plaintiff's prospective employers.  (P. White Aff. ¶ 7; W. Bullock Aff. ¶ 7; Lawrence Bullock Aff. ¶ 6.)

## ARGUMENT

The plaintiff was not discriminated against, did not suffer retaliation, and was not subjected to a hostile work environment or tortious conduct by any of the defendants.  Thus, the Court should grant summary judgment for the defendants on all claims.  The defendants previously filed a motion to dismiss many of the plaintiffs' claims (D.E. Nos. 57 and 58), and that motion and supporting brief are incorporated here.

### I.  CLAIMS UNDER FEDERAL LAW

The plaintiff alleges three types of federal claims:  (a) disparate treatment, (b) hostile work environment, and (c) unlawful retaliation, all asserted under 42 U.S.C. §§ 1981 and 1983 (Amd.

---

[2] The plaintiff filed EEOC complaints against all four employers.   See Plaintiff's Interrogatory Responses of Jan. 25, 2021, No. 1 (Appendix, No. 7).  After he was fired, he also filed EEOC complaints against four entities for which he was never employed.  See id.

9

Compl., Counts I, II, and III) and both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Government Employees Rights Act of 1991 (Amd. Compl., Counts III, IV, and IV).

These claims are analyzed the same way even though they are asserted under different statutes. The Section 1981 claims, because they are "brought against a state actor," are subsumed under Section 1983, which is "the 'exclusive federal remedy for violations of the rights guaranteed in § 1981.' " Alexander v. City of Greensboro, 762 F. Supp. 2d 764 (M.D.N.C. 2011) (quoting Dennis v. City of Fairfax, 55 F. 3d 151, 156 (4th Cir. 1995)). A Section 1981 or 1983 claim is analyzed the same as a Title VII claim. Id. at 781 (stating that "analysis for a section 1981 employment discrimination claim is generally the same as for a Title VII employment discrimination claim, and courts typically apply the same theoretical categories, such as disparate treatment, retaliation, or hostile work environment."). The GERA claims are subject to dismissal as explained in the Defendants' Partial Motion to Dismiss.

## A. **Disparate treatment**

Under Title VII, 42 U.S.C. § 2000e-2(a), an employer cannot "discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." A claim for disparate treatment can be analyzed under either (1) the "mixed-motive" framework or (2) the "pretext" or "burden-shifting" framework. Worden v. SunTrust Banks Inc., 549 F.3d 334, 341 (4th Cir. 2008); Thomas v. Delmarva Power & Light Co., 715 F. App'x 301, 302 (4th Cir. 2018).

### 1. Mixed-motive framework

The mixed-motive framework requires a plaintiff to show that discrimination based on his membership in a protected class was an actual motivating factor for the employer's adverse employment action. Thomas, 715 F. App'x at 302 (citing Diamond v. Colonial Life & Acc. Ins.

Co., 416 F.3d 310, 317 (4th Cir. 2005)); see also 42 U.S.C. § 2000e–2(m). The showing can be made through direct or circumstantial evidence, but the action must "display a 'discriminatory attitude' and bear a causal relationship with the adverse employment action." Ousley v. McDonald, 648 F. App'x 346, 349 (4th Cir. 2016) (quoting Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 520 (4th Cir.2006)). The plaintiff must offer evidence of "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Warch v. Ohio Casualty Insurance Co., 435 F.3d 510, 520 (4th Cir. 2000) (citation and quotation marks omitted). Even a statement "that reflects a discriminatory attitude . . . must have a nexus with the adverse employment action." Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999).

The plaintiff's claim under this framework fails because there is no evidence that he suffered discrimination of any kind, let alone racial discrimination. There is simply no evidence of a discriminatory attitude at an agency where the entire senior leadership – Sheriff White, Chief Deputy Bullock, Capt. Bullock, and Capt. Watkins, the head of the patrol division – were black. See Amd. Compl. ¶ 28 (chart listing chain of command and races of officers). It also defies common sense that mid-level supervisors who were white would allow such a discriminatory attitude when they worked at the pleasure of a black sheriff, and, in any case, the plaintiff has not offered evidence that he was discriminated against by any white officers.

### 2. Burden-shifting or pretext framework

The burden-shifting or pretext framework requires the plaintiff to bear the initial burden of making a prima facie discrimination case as set out in McDonnell Douglas v. Green, 411 U.S. 792 (1973). Id. Under this method, when there is no direct evidence, the plaintiff must initially make out a prima facie discrimination case. See also Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S.

248, 256 (1981).  This requires a showing of "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class."  Goode v. Cent. Virginia Legal Aid Society Inc., 807 F.3d 619, 626 (4th Cir. 2015) (quoting Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd sub nom. Coleman v. Court of Appeals of Md., 566 U.S. 30 (2012)).

In determining whether the plaintiff's job performance was satisfactory, "it is the perception of the decision maker [employer] which is relevant, not the self-assessment of the plaintiff."  King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003).

First, the plaintiff cannot meet two of the four elements of a prima facie case.  Though he meets the first element because he is a member of a protected class, he cannot meet the second element because he did not have satisfactory job performance; and, though he meets the third element because he suffered an adverse employment action, he cannot meet the fourth element because he was not treated differently from similarly situated employees outside the protected class.  " 'Employees are similarly situated where they dealt with same supervisor, [were] subject to the same standards, and . . . engaged in the same conduct without such differentiating or mitigating factors that distinguish their conduct or the employer's treatment of them for it.' "  Rios v. City of Raleigh, 2020 WL 5603923, at *11 (E.D.N.C. Sept. 18, 2020) (citation omitted).  The plaintiff cannot point to anyone of any race who was similarly situated and treated differently than him with respect to his record, which included repeated insubordination, suspension, incompetence, untruthfulness, and, in the Oliver incident, use of excessive force and all-around poor judgment (involving a black woman, no less).  The plaintiff's record involved circumstances that not only distinguished his actions from those of other officers but warranted termination.

12

Even if the plaintiff could satisfy the elements of a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. McDonnell Douglas, 411 U.S. at 802; see also Ousley, 648 F. App'x at 349. The employer's burden is merely "one of production, not persuasion." Reeves v. Sanderson Plumbing Prod. Inc., 530 U.S. 133, 142 (2000), abrogated in part on other grounds by Univ. of Tex. S.W. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013). If the employer provides a legitimate, non-discriminatory reason, "the presumption raised by the prima facie case is rebutted." Burdine, 450 U.S. at 255. Here, the defendants meet that burden by showing that the plaintiff was fired for a string of poor behavior that ended when he broke a woman's arm unnecessarily.

The plaintiff then again bears the burden to "demonstrate that the employer's proffered reason was merely a pretext for discrimination." Ousley, 648 F. App'x at 349 (citations omitted). This requires the plaintiff to "show both that the reason advanced was a sham and that the true reason was an impermissible one under the law." Id. (internal quotation marks omitted). When courts evaluate potential pretext, and "an employer gives a legitimate, nondiscriminatory reason for discharging the plaintiff, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Laing v. Federal Express Corp., 703 F.3d 713, 722 (4th Cir. 2013) (citations and quotation marks omitted). A court "is not in a position to second guess executive hiring decisions that are based on legitimate, non-discriminatory rationales." Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998).

Importantly, "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989). Therefore, mere "conclusory allegations . . . are [] insufficient to support a finding of pretext." Causey, 162

F.3d at 801 (citing Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir.1988)) (affirming grant of summary judgment in part because plaintiff's "conclusory statements, without specific evidentiary support," were insufficient to create a genuine issue of fact); see also Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) ("Conclusory or speculative allegations do not suffice.").

A plaintiff can prevail without proving the elements of a prima facie case only if he can produce sufficient direct or circumstantial evidence of discrimination. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002); Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003). That evidence must show (1) circumstances, conduct, or statements that reflect a discriminatory attitude, and (2) that this attitude at least partially caused the adverse employment action. Warch, 435 F.3d at 520; Ousley, 648 F. App'x at 349. No such evidence is present here. The plaintiff may point to isolated comments made to him by his peers (though he made some in return), but even "[d]istasteful comments" of a discriminatory nature in the workplace, standing alone, are not enough to show that the decision-maker acted in a discriminatory manner. "It is the decision maker's intent that remains crucial," not "stray or isolated remarks" by others. Holley v. North Carolina Dep't of Admin., 846 F. Supp. 2d 416, 427 (E.D.N.C. 2012). Sheriff White, the sole decision-maker, never showed any discriminatory animus toward the plaintiff, and this is only logical considering both men are black. See, e.g., Pl.'s Dep. p. 195.

Furthermore, the plaintiff fails to meet the causation standard required for a federal discrimination claim. The Supreme Court has said that, in asserting a federal discrimination claim, it is not enough to show that "race played 'some role' in the decision," but rather the plaintiff must "initially plead and ultimately prove that, but for race, he would not have suffered the loss of a legally protected right." Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009,

1019 (2020) (addressing Section 1981 claim). As detailed above, the plaintiff cannot show that race – rather than his poor performance and excessive force – was the but-for cause of his termination. In fact, there is no evidence that race played <u>any</u> role in Sheriff White's decision.

In sum, under either framework, the plaintiff's claim fails.

**B. <u>Hostile work environment</u>**

A Title VII claim for racial discrimination in the form of a hostile work environment requires a plaintiff to show four things: (1) unwelcome conduct, (2) which occurred because of his race, (3) which was "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment," and (4) which "was imputable to [his] employer." <u>Bonds v. Leavitt</u>, 629 F.3d 369, 385 (4th Cir. 2011) (citation and quotation marks omitted). A court must look at the "totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Id.</u> (citation and quotation marks omitted).

"A hostile work environment exists '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive[.]" <u>Irani v. Palmetto Health</u>, 767 F. App'x 399, 415-16 (2019) (quoting <u>Harris v. Forklift Sys. Inc.</u>, 510 U.S. 17, 21)). The test is objective, and " 'judged from the perspective of a reasonable person in the plaintiff's position.' " <u>Id.</u> at 416 (citation omitted). " '[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" are insufficient, and "Title VII is not intended to become 'a general civility code.' " <u>Id.</u> (citations omitted).

This claim fails because the plaintiff has not offered any evidence – neither written discovery nor sworn testimony – to show that the environment at the sheriff's office was hostile

15

because of his race. It also defies logic that such a workplace would exist when the decision-maker was of the same race as the plaintiff, as were his senior leadership, and all officers served at the pleasure of the sheriff. The plaintiff may claim that he was subjected to a few comments from co-workers, but this is insufficient to make his case.

## C. **Unlawful retaliation**

Title VII prohibits employers from retaliating against employees who report complaints of discrimination or file discrimination charges with the EEOC. See 42 U.S.C. § 2000e-3; Boyer-Liberto v. Fountainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015).

A plaintiff must show that "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action." Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008). The alleged retaliation must occur soon after the employee's protected activity for there to be a valid claim. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (per curiam) (stating that "temporal proximity must be very close"). A one-day gap between activity and retaliation shows causation. Anderson v. G.D.C. Inc., 281 F.3d 452, 458 (4th Cir. 2002). But two and a half months is "sufficiently long so as to weaken significantly an inference of causation," King, 328 F.3d at 151 n. 5; and four months is too long, Popo v. Giant Foods LLC, 675 F. Supp. 2d 583, 590-91 (D. Md. 2009).

Here, the plaintiff meets the first two elements because he engaged in a protected activity by filing a discrimination complaint and the sheriff acted adversely against him when he fired him for using excessive force. However, the claim fails on the third element because his firing was not connected to his filing of a complaint. Even if a plaintiff can show all three elements, the claim will fail if the employer can offer "a legitimate, non-discriminatory reason for taking the adverse

employment action." Bryant v. Aiken Reg. Med. Centers Inc., 333 F.3d 536, 543 (4th Cir. 2003). The plaintiff then has the burden to show that the employer's articulated reason for adverse action was a mere pretext, and "that retaliation was a but-for cause of a challenged adverse employment action." Foster v. Univ. of Maryland-Eastern Shore, 787 F.3d 243, 251-2 (4th Cir. 2015).

The plaintiff's use of excessive force provided Sheriff White a legitimate, non-discriminatory reason for firing him. Numerous courts have held this. See, e.g., Snyder v. Ohio Dep't of Rehab. & Corr., 702 F. App'x 341 (6th Cir. 2017) (deferring to female warden who reasonably believed firing male officer was proper because "Title VII exists to prohibit discrimination – not to litigate the accuracy of employment decisions."); Murray v. City of Sapulpa, 45 F. 3d 1417 (10th Cir. 1995) (plaintiff fired for excessive force four and two months after filing two EEOC complaints); Mann v. Washington Metro Area Trans. Auth., 692 F. App'x 6 (D.C. Cir. 2017) (black male police chief fired black officer); Bradley v. S.C. Dep't of Corr., 2010 WL 883729 (D. S.C. Mar. 5, 2010); Yates v. Hall, 508 F. Supp. 2d 1088 (N.D. Fla. 2007) (white sheriff fired white deputy); Barnes v. Montgomery County, Tenn., 2006 WL 149036 (M.D. Tenn. Jan. 19, 2006) (valid firing based on internal investigation where underlying facts were undisputed); Gutierrez v. Board of County Commissioners, 791 F. Supp. 1529 (D. Kan. 1992).

Further, Sheriff White, who hired and fired the plaintiff, is the same race as the plaintiff, and based his decision on the recommendation of Capt. Bullock, who is also black and did not know the plaintiff had filed a complaint. When the same person hires and fires the plaintiff, "there is an inference that race is not a factor," and "this inference is particularly strong where [the hiring and firing party] is of the same race as the plaintiff." Parker v. Magna Innertech-Spartanburg, 2010 WL 5488599, *8 (D. S.C. Nov. 29, 2010) (citing Proud v. Stone, 945 F.2d 796, 797-98 (4th

17

Cir. 1991), for proposition that "[E]mployers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing.").

Finally, Sheriff White did not fire the plaintiff until over four months after the received the plaintiff's notarized EEOC discrimination complaint, and thus the two acts were not closely linked in time. See Breeden, 532 U.S. at 273-74 (requiring "temporal proximity" between two events). The plaintiff filed his complaint with the sheriff on June 15 and with the EEOC on August 10, and he was fired on October 24. (P. White Dep. Ex. 21; Amd. Compl. ¶¶ 98, 105, 130.) As noted above, two and a half months is "sufficiently long so as to weaken significantly an inference of causation," King, 328 F.3d at 151 n. 5; and four months is too long, Popo v. Giant Foods LLC, 675 F. Supp. 2d 583, 590-91 (D. Md. 2009). Thus, under either the June date or the August date, the retaliation claim fails.

**D. The defendants are entitled to qualified immunity on the federal claims.**

In the alternative, the defendants are entitled to qualified immunity in their individual capacities for the claims under 42 U.S.C. § 1983. Qualified immunity protects officers if " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Johnson v. Caudill, 475 F. 3d 645, 650 (4th Cir. 2007) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). An officer violates a clearly established right only if it is obvious that his actions are unlawful. Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The test is whether "an objectively reasonable official in similar circumstances" could believe that he was acting lawfully. Id. (quoting Jackson v. Long, 102 F.3d 722, 726 (4th Cir. 1996)).

In Johnson, the court held that a sheriff was entitled to qualified immunity for firing a female detective, who alleged gender discrimination, after she was no longer able to perform the

Case 5:19-cv-00467-BO   Document 65   Filed 03/30/21   Page 18 of 33

primary job for which she was hired.  Id. at 650-51.  Here, the defendants did not violate any right

of the plaintiff's and, based on long-standing precedent, reasonably believed that they were acting

lawfully in recommending the plaintiff's termination and then terminating his employment for his

use of excessive force.  Ultimately, the essence of the plaintiff's case is that the sheriff investigated

Ms. Oliver's complaint and fired him for breaking her arm unnecessarily.  The sheriff's actions

were reasonable in light of pre-existing law, as were those of Capt. Bullock and Chief Bullock,

and so each is entitled to qualified immunity.

## II.     CLAIMS UNDER STATE LAW

The plaintiff's claims under state law fail for several reasons.  First, each claim fails on the

merits for lack of evidence.  Second, the claims against the defendants in their official capacities,

except as alleged under the sheriff's bond, are barred by governmental immunity.  Third, the claims

against the defendants in their individual capacities fail because the defendants are entitled to

public officer's immunity.  The claims alleged against the sheriff's bond, and therefore Western

Surety, fail for the first reason cited above.

### A.  Breach of Contract (Count VII)

This claim applies only to Sheriff White in his official capacity, as stated in the Partial

Motion to Dismiss.  See White v. Cochran, 216 N.C. App. 125, 133, 716 S.E.2d 420, 427 (2011)

("a wrongful discharge claim may be asserted against a sheriff in his official capacity[.]")

The plaintiff claims that he had a two-year employment contract with the Vance County

Sheriff, but he cannot produce it and claims that he lost it.  (Pl.'s Dep. pp. 30-31, 232.)  However,

all deputies were at-will employees who worked at the pleasure of the sheriff.  (Peter White Aff.

¶ 5; W. Bullock Dep. p. 110.) The plaintiff acknowledged this in writing. (Pl.'s Dep. Ex. 28.)

19

Without an actual contract, the plaintiff cannot show a breach of it. "A viable claim for breach of an employment contract must allege the existence of contractual terms regarding the duration or means of terminating employment." Houpe v. City of Statesville, 128 N.C. App. 334, 344, 497 S.E.2d 82, 89 (1998). He is thus considered an at-will employee. Bigelow v. Sassafras Grove Baptist Church, 247 N.C. App. 401, 404, 786 S.E.2d 368, 362 (2016) (" '[A]bsent some form of contractual agreement between an employer and employee establishing a definite period of employment, the employment is presumed to be an "at-will" employment.' ") This is consistent with North Carolina law for deputy sheriffs. Sims-Campbell v. Welch, 239 N.C. App. 503, 506, 769 S.E.2d 643, 646-47 (2015).

When an employee is at-will, the "[p]arties to a contract of employment may end their relationship at any time for any reason when that agreement does not establish a defined term of employment." Young v. Bailey, 368 N.C. 665, 668, 781 S.E.2d 277, 279 (2016) (citations omitted). However, an at-will employee who is fired for unlawful reasons can bring a tort claim, but not a claim for breach of contract. Hill v. Medford, supra, at 618, 582 S.E.2d at 325 (Martin, J., dissenting) ("an employee terminable at will, who alleges wrongful discharge in violation of public policy, does not have a claim for breach of contract against his or her employer on that basis."). In Hill the plaintiff, a deputy sheriff, alleged that he was fired by the sheriff in violation of public policy and asserted claims for wrongful discharge and breach of contract. Id. at 326, 582 S.E.2d at 619. The court said both claims could proceed, but the decision was reversed by the North Carolina Supreme Court on the basis of the dissent, which held that the deputy could assert only a wrongful discharge claim. Id. at 627, 582 S.E.2d at 331 (Martin, J., dissenting). See also Bigelow, 247 N.C. App. at 405, 786 S.E.2d at 362 ("an 'at-will' employee cannot state a claim for breach of contract based on wrongful discharge.").

Here, the plaintiff was an at-will employee and there is no evidence of a contract, absent his bare allegation. He has asserted a wrongful discharge claim, but the breach-of-contract claim fails as a matter of law.

### B. Tortious Interference with Employment Opportunities (Count VIII)

The defendants are unaware of any such tort under North Carolina law, but the plaintiff may be asserting a claim for tortious interference with contract. He alleges that the defendants interfered with his contractual relationship with Sheriff White, the county, and the sheriff's office by discriminating and retaliating against him, creating a hostile work environment, spreading untrue statements about him, disciplining him for enforcing traffic violations, and stating that he had engaged in excessive force. (Amd. Compl. ¶¶ 225-33.) Such a claim requires a plaintiff to show (1) that he had a valid contract with a third person, (2) of which the defendant was aware, (3) that the defendant intentionally induced the third party "not to perform the contract," (4) that the defendant did this "without justification," and (5) that the plaintiff suffered damage as a result. Beck v. City of Durham, 154 N.C. App. 221, 232, 573 S.E.2d 183, 191 (2002).

This claim cannot apply to Sheriff White, who was the plaintiff's employer and therefore could not be a third party, nor to the county and the sheriff's office, which have been dismissed. This claim could apply only to Capt. Bullock or Chief Deputy Bullock. However, they had limited interactions with the plaintiff and their conduct simply does not support such a claim. See, e.g., W. Bullock Aff. ¶ 3; L. Bullock Aff. ¶¶ 3-4. Further, their limited interactions with him were entirely justified by their roles as senior officers in the sheriff's office.

### C. Tortious interference with prospective economic advantage (Count IX)

The plaintiff alleges that he tried to enter into employment contracts with law enforcement agencies but could not because of unspecified actions of the defendants. (Amd. Compl. ¶¶ 234-

21

39.) He alleges that the defendants knew that the plaintiff's "prospective employers would examine his record" as a Vance County deputy. (Amd. Compl. ¶ 236.)

This tort requires evidence of a defendant "maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference . . . [and] if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights." Beverage Systems of the Carolinas, LLC v. Associates Beverage Repair, LLC, 368 N.C. 693, 701, 784 S.E.2d 457, 463 (2016). A plaintiff's expectation that a contract will occur is not enough, however; rather, he must show "that a contract would have resulted but for a defendant's malicious intervention." Id. The defendant must have "a malicious design to injure the third person or gain some advantage at his expense." Spartan Equip. Co. v. Air Placement Equip. Co., 263 N.C. 549, 559, 140 S.E.2d 3, 11 (1965)). And the plaintiff must show a "lack of justification" for his actions and the inevitability of the contract but for the defendant's actions. Alexander, supra, 762 F. Supp. 2d at 818 (citation omitted).

This claim fails because there is no evidence that the defendants knew of any job opportunities the plaintiff had, did anything in relation to any such opportunities, or had any communication with any prospective employers, much less that they had any malicious design to interfere with his efforts to obtain a new job. (P. White Aff. ¶ 7; W. Bullock Aff. ¶ 7; L. Bullock Aff. ¶ 6.) The plaintiff has offered no evidence to the contrary. Rather, it is likely that the plaintiff was not hired again because of his past poor performance, not only in Vance County but also in the other three jobs from which he was fired. See, e.g., W. Bullock Aff. Ex. A.

D. **Intentional and negligent infliction of emotional distress (Counts X and XI):**

A claim for intentional infliction requires that the plaintiff show that the (1) defendant engaged in extreme and outrageous conduct, (2) such conduct was intended to cause severe

emotional distress, and (3), such conduct did cause severe emotional distress. Waddle v. Sparks, 331 N.C. 73, 82, 414 S.E. 2d 22, 27 (1992). A high level of stress, such that no person could be expected to endure it, is required. Waddle at 83-84, 414 S.E.2d at 27-28. A claim for negligent infliction of emotional distress requires the plaintiff to show that (1) the defendant negligently engaged in conduct; (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress, and (3) and the conduct did cause the plaintiff severe emotional distress. Johnson v. Ruark Obstetrics and Gynecology Associates, P.A., 327 N.C. 283, 302-303, 395 S.E. 2d 85, 96 (1990). For these claims, a plaintiff usually must show "ongoing emotional or mental-health treatment for severe emotional distress that has been diagnosed as a related to the alleged conduct." Pruett v. Town of Spindale, 16 F. Supp. 2d 442, 447 (W.D.N.C. 2001).

These claims fail because there is no evidence of extreme and outrageous conduct on the part of the defendants, much less conduct intended to cause the plaintiff severe emotional distress. If anything, the defendants gave the plaintiff multiple opportunities to fix his deficiencies and remain a deputy sheriff. Further, the plaintiff cannot show that he suffered severe emotional distress. The plaintiff admits that he "did not seek medical care for his injuries as related to Defendants' conduct." See Pl.'s Resps. to Interrogs., No. 6 (Appendix, No. 7). He offers no evidence of a diagnosis or treatment that he suffered severe emotional distress. (Pl.'s Dep. p. 204.)

**E. Wrongful discharge (Count XII):**

The plaintiff asserts a wrongful discharge claim under N.C. Gen. Stat. § 143-422.2, the Equal Employment Practices Act, and claims he was fired in retaliation "for his willingness to confront problematic and discriminatory behavior and practices" at the sheriff's office. (Amd. Compl. ¶ 266.)

Case 5:19-cv-00467-BO   Document 65   Filed 03/30/21   Page 23 of 33

North Carolina follows the Title VII framework in evaluating such claims. Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1985) (citing N.C. Dep't of Corr. v. Gibson, 308 N.C. 131, 301 S.E.2d 78 (1983)). Essentially, the plaintiff must show that his job performance was satisfactory and that he was not "fired because of [his] performance or qualifications[.]" Id. A plaintiff who cannot show that he was fired in violation of Title VII also cannot make out a claim under this statute, and thus this claim fails for the same reason as his Title VII claims. Ellerby v. BB&T Co., 2005 WL 2921635, *5 (W.D.N.C. 2005).

There is no genuine dispute about whether the plaintiff's performance was satisfactory. It was not. He disobeyed orders, lied about a car accident caused by his disregarding of orders, and used poor judgment and excessive force on a black woman during an arrest. He cannot show that he was subjected to discriminatory practices in an agency where all the senior officers were black.

## F. Negligent retention and supervision (Count XIII)

A claim of negligent hiring, supervision, and retention requires a plaintiff must show (1) a specific act of negligence on which the action is based; (2) inherent incompetency of the employee or incompetency inferred by previous acts; (3) actual notice to the employer or constructive notice by way of a failure to oversee and supervise the employee; and (4) proximate cause between the incompetency and alleged injury. Moricle v. Pilkington, 120 N.C. App. 383, 386, 462 S.E.2d 531, 533 (1995). An employer is presumed to use due care in hiring its employees, and the plaintiff has the burden to show an absence of due care or that the employer knew or should have known not to hire the employee. Id. at 387, 462 S.E.2d at 534.

This claim is based on the plaintiff's theory that Sheriff White and Chief Deputy Bullock failed to properly supervise Lt. Campbell and other officers who supervised the plaintiff and allowed them to engage in racial discrimination. (Amd. Compl. ¶¶ 271-75.)

The claim against Chief Deputy Bullock fails because he was not the employer; only Sheriff White was. As to the claim against Sheriff White, this claim also fails because the plaintiff cannot meet essential elements of his claim. This claim is premised on the allegation that the plaintiff was harmed because Sheriff White allowed acts of racial discrimination, but as noted above, the evidence shows that these allegations are without merit.

### G. Ratification (Count XIV)

This is not a cognizable claim under, as explained in the Partial Motion to Dismiss.

### H. Defamation and Libel (Count XV)

A claim for defamation requires that " 'the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person.' " Craven v. Cope, 188 N.C. App. 814, 817, 656 S.E.2d 732 (2008) (citation omitted). Defamation includes " 'the two distinct torts of libel and slander.' " Id. A statement can be libelous when (1) it is "obviously defamatory"; (2) when it is "susceptible of two interpretations one of which is defamatory and the other not"; and (3) when it is "not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances becomes libelous, which are termed libels per quod." Id. (citation omitted). "[L]ibel involves written words and slander involves spoken words." Priority Ambulance, LLC v. Poirier, 2016 WL 7410638, *3 (E.D.N.C. Dec. 21, 2016). The plaintiff does not allege slander here.

This claim fails because the plaintiff cannot show that any defendant made any false statement about him. The plaintiff alleges that he was defamed because the defendants filled out his F-5 form and created "the false impression that he is violent and untrustworthy." (Amd. Compl. ¶ 282.) The F-5 form says only that the plaintiff was terminated because of a substantiated investigation, but it says nothing about violence, untrustworthiness, or the underlying reason for

25

the investigation. Moreover, it is the truth – there <u>was</u> a substantiated investigation into the plaintiff – and truth is a complete defense to a libel claim. " 'To be actionable, a defamatory statement must be false[.]' " <u>Id</u>. at 817 (citation omitted). Thus, "truth is an absolute defense." <u>Priority Ambulance</u> at *4. Here, if the F-5 form had said there was no internal investigation, the sheriff would have been filing a false document with the state, one with an untruthful statement.

The sheriff's office was required to file the form with the Sheriffs' Standards Commission upon the plaintiff's separation from the sheriff's office, and it had to check this box one way or another. Only Sheriff White could have filed this form, and, because he was required to do so, he has a qualified privilege for his accurate reporting on it. Thus, this form cannot serve as the basis for any claim of defamation.

In <u>Spencer v Byrd</u>, 917 F. Supp. 368 (M.D.N.C. 1995), the court held that a sheriff could not be liable for reporting in writing his reasons for firing a deputy. After the sheriff fired the deputy, he wrote a reason for his decision, even though he was not required to, on the Report of Separation form, which was sent to the Sheriffs' Standards Commission. <u>Id</u>. at 372. The sheriff reported that the plaintiff had failed to follow departmental policies and had made "false statements," which caused "damage to good order and discipline." <u>Id</u>. This statement might harm the "[p]laintiff in her profession," but it was not defamatory because it was true," the court concluded. <u>Id</u>. at 374. The court also said the sheriff had a qualified privilege for this statement because he had a duty to file the form with the state and acted in good faith, there was a valid interest to be upheld in making the statement, the statement was "limited in its scope to this purpose," and it was published "in a proper manner and to proper parties only." <u>Id</u>. at 374-75 (citation and quotations omitted).

The statement at issue here is far more mild than that in <u>Spencer</u> and, unlike in <u>Spencer</u>, it was required to be made. Moreover, it was truthful. The same principles as in <u>Spencer</u> apply here.

In <u>Taube v. Hooper</u>, 840 S.E.2d 313 (N.C. Ct. App. 2020), the court reached the same result. There, a police chief sent an F-5 Report of Separation Form to the North Carolina Criminal Justice Standards Commission and checked a box stating, accurately, that she was aware of " 'investigation(s) . . . concerning potential criminal action or potential misconduct by this officer.' " <u>Id</u>. at 316. The court said this statement was not libelous. <u>Id</u>. at 319. The statement was true because the officer had been investigated and disciplined, and this was "an absolute defense to an allegation of defamation." <u>Id</u>. The statement also did "not tend to impeach her in her profession as a law enforcement officer as a matter of law" because it was "vague" and "did not allege the existence of any actual misconduct in and of itself." <u>Id</u>.

The plaintiff has not identified any other alleged defamatory statement made by the defendants. If the plaintiff believes that Capt. Bullock's internal affairs investigation report is defamatory, that statement cannot serve as the basis for this claim for several reasons, including that Capt. Bullock had a qualified privilege for making it and the defendants did not publish it to a third party. The statement was not released to anyone except upon the plaintiff's request. (Pl.'s Dep. Ex. 20.) The defendants also did not release the statements; they are retired from the sheriff's office and have not had any contact with the plaintiff's prospective employers. (P. White Aff. ¶¶ 2,4, 7; W. Bullock Aff. ¶¶ 2, 7.)

In addition, a claim for defamation also has a one-year statute of limitations. N.C. Gen. Stat. § 1-54(3). The internal investigation report and F-5 form were written in October 2018. (W. Bullock Dep. Ex. 4; Pl.'s Dep. Ex. 25.) The plaintiff had a year from then to assert a defamation claim, but he did not. The plaintiff did not even bring this claim to the Court's attention until

August 4, 2020, when he filed a motion to amend the complaint and add the claim. (D.E. 32.) He did not assert the claim until he filed the Amended Complaint on December 31, 2020, yet he clearly knew about it because he referred to it when he filed his original complaint in October 2019. (Compl. ¶¶ 1, 123-24, 131.)

## I. Punitive damages (Count XVI)

As explained in the Motion to Dismiss, the plaintiff cannot recover punitive damages from the defendants in their official capacities under state or federal law, including under Title VII. As to the federal claims against the defendants in their individual capacities, those fail because, "[u]nder § 1983, punitive damages may be awarded only if the official conduct is 'motivated by evil intent' or demonstrates 'reckless or callous indifference' to a person's constitutional rights." Sockwell v. Phelps, 20 F.3d 187, 193 (5th Cir. 1994) (quoting Smith v. Wade, 461 U.S. 30 (1983)). That does not exist here. The claim under state law fails because the plaintiff cannot show fraud, malice, or willful or wanton conduct, as required by N.C. Gen. Stat. § 1D-15.

## J. Defendants have public officer's immunity in their individual capacities.

A public officer sued in his individual capacity is entitled to public officer's immunity unless his actions are "corrupt, malicious, or outside the scope of his official duties." Estate of Burgess ex. rel. Hamrick, 206 N.C. App. 268, 276, 698 S.E.2d 697, 703 (2010). Thus, "[a]s long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability." Baker v. Smith, 224 N.C. App. 423, 435, 737 S.E.2d 144, 152 (2012) (quoting Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984)).

"[S]heriffs and deputy sheriffs are public officers." Sumney v. Barker, 142 N.C. App. 688, 691, 544 S.E.2d 262, 265 (2001). Thus, the defendants are entitled to this immunity in their

individual capacities because, as the evidence shows, they were not malicious, corrupt, or acting outside the scope of their duties. Rather, their dealings with the plaintiff, who was a difficult and troubled employee, were reasonable.

### K. Defendants have governmental immunity in their official capacities.

Except to the extent of the amount of the sheriff's bond, the defendants have sovereign, or governmental, immunity in their official capacities on the plaintiff's tort claims under state law.[3]

Sovereign, or governmental, immunity " 'bars actions against public officials sued in their official capacities. Sheriffs and deputy sheriffs are considered public officials for purposes of sovereign immunity.' " Russ v. Causey, 732 F. Supp. 2d 589, 610 (E.D.N.C. 2010) (quoting Phillips v. Gray, 163 N.C. App. 52, 56-57, 592 S.E.2d 229, 232 (2004)). A sheriff sued in his official capacity waives immunity to the amount of his surety bond, but otherwise retains immunity unless any insurance policy purchased on his behalf waives that immunity. Id. See also Hill v. Medford, 158 N.C. App. 618, 624, 582 S.E.2d 325, 328-29 (2003) (Martin, J., dissenting), rev'd, 357 N.C. 650, 588 S.E.2d 467 (2003) (adopting dissent) ("As a public official, if sued in his or her official capacity, a sheriff is protected against tort actions by governmental immunity unless the sheriff purchases a bond pursuant to [N.C.] G.S. § 58-76-5, and then, can only be liable on tort claims to the extent of the amount of that bond.")

In this case, there was only one policy of insurance for the Sheriff of Vance County at the time of the plaintiff's termination. See Katherine Bigelow Aff. ¶ 3 (attaching policy as Exhibit A). The language in the policy explicitly preserves governmental immunity. See Policy, Sec. II(G) and K(1) (General Liability); Sec. V(D) and J(1) (Public Officials Liability); Sec. VI(D) and J(1) (Law Enforcement Liability). This language is identical to that in Russ as well as the two

---

[3] It is undisputed that Western Surety Company provided a $10,000 bond to Sheriff White.

cases cited by <u>Russ</u>, and the court in <u>Russ</u> held that the sheriff had not waived immunity beyond the amount of the bond.  <u>Russ</u>, 732 F. Supp. 2d at 612 (citing <u>Estate of Earley v. Haywood County Dep't of Soc. Servcs.</u>, 204 N.C. App. 338, 694 S.E.2d 405 (2010), and <u>Frink v. Batten</u>, 197 N.C. App. 231, 676 S.E.2d 670 (2009) (Table) (limiting waiver of immunity to sheriff's bond)).  Other cases have held the same.  <u>See</u>, <u>e.g.</u>, <u>Cooper v. Brunswick County Sheriff's Dep't</u>, 896 F. Supp. 2d 432, 453 (E.D.N.C. 2012).

Because the sheriff has not waived governmental immunity beyond the amount of the surety bond, the plaintiff's tort claims under state law, except to the extent of the amount of the bond, fail as a matter of law on this ground.

**L.  <u>The claims against Western Surety on the official bond also fail.</u>**

All claims alleged under the surety bond fail because the plaintiff never served the surety and thus failed to obtain personal jurisdiction over it.  <u>Saimplice v. Ocwen Loan Servicing Inc.</u>, 368 F. Supp. 3d 858, 865 (E.D.N.C. 2019).  The surety is a necessary party for a claim on the bond. <u>Mellon v. Prosser</u>, 347 S.E.2d 568, 494 S.E.2d 763 (1998) (adopting dissent of Wynn, J., in <u>Mellon v. Prosser</u>, 126 N.C. App. 620, 624, 486 S.E.2d 439, 442 (1997) (holding that "a sheriff's immunity is only removed where the surety is joined as a party to the action")).  In addition, all claims against on the bond fail because a claim against the surety can be maintained only if an underlying claim is successful.  <u>Stafford v. Barker</u>, 129 N.C. App. 576, 585, 502, S.E.2d 1, 6 (1998).  Because the plaintiff cannot meet the elements of any claim, the claims against the bond also fail.

## <u>CONCLUSION</u>

For the reasons and authorities cited herein, the defendants respectfully request that this Court grant their motion for summary judgment.

Respectfully submitted, this 30th day of March, 2021.

/s/ Christopher J. Geis
CHRISTOPHER J. GEIS
N.C. State Bar No. 25523
BRIAN F. CASTRO
N.C. State Bar No. 53412
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone:  (336) 721-3600
Facsimile:  (336) 721-3660
Email: Chris.Geis@wbd-us.com
          Brian.Castro@wbd-us.com
*Attorneys for defendants*

31

**<u>CERTIFICATE OF PAGE LIMITATIONS</u>**

I certify that this brief complies with the page limitations set out in Local Rule 7.2(f)(2)(A).

/s/ Christopher J. Geis
CHRISTOPHER J. GEIS
*Attorney for defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an attorney at law licensed to practice in the State of North Carolina, is attorney for defendants in this matter, and is a person of such age and discretion as to be competent to serve process.

I hereby certify that on March 30, 2021, I electronically filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system, which will send notification of such to the following CM/ECF participant:

Sharika M. Robinson
10230 Berkeley Place Drive, Suite 220
Charlotte, NC 28262
Telephone: 704-561-6771
Facsimile: 704-561-6773
srobinson@sharikamrobinsonlaw.com
*Attorney for Plaintiff*

/s/ Christopher J. Geis
CHRISTOPHER J. GEIS
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 721-3543
Facsimile: (336) 721-3660
Email: Chris.Geis@wbd-us.com
*Attorney for defendants*

33