IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:19-cv-00467-BO

| | | |
|---|---|---|
| JUSTIN J. WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANTS'** |
| VANCE COUNTY, NORTH CAROLINA; | ) | **LOCAL RULE 56.1** |
| VANCE COUNTY SHERIFF'S OFFICE; | ) | **STATEMENT OF** |
| PETER WHITE, in his official and individual | ) | **MATERIAL FACTS** |
| capacities; LAWRENCE D. BULLOCK, in his | ) | |
| official and individual capacities; | ) | |
| WELDON WALLACE BULLOCK, in | ) | |
| his official and individual capacities, | ) | |
| and WESTERN SURETY COMPANY | ) | |
| a division of CNA SURETY, | ) | |
| | ) | |
| Defendants. | ) | |

NOW COME the defendants, by and through counsel and pursuant to Local Rule 56.1, and

present the following material facts in support of their motion for summary judgment:

1. The plaintiff broke the arm of a black woman, Latwanya Oliver, during an arrest in

October 2018, and Ms. Oliver filed a complaint with Sheriff Peter White.  (Latwanya Oliver Aff.

¶ 4 and Ex. A.)

2. Capt. Weldon Bullock investigated the incident, concluded that the plaintiff had used

excessive force, and recommended that the plaintiff be fired.  (W. Bullock Dep. Ex. 4.)

3. Sheriff White fired the plaintiff.  (Amd. Compl. ¶ 130; P. White Aff. ¶ 4.)

4. The plaintiff claims that he was the victim of racial discrimination and was fired in

retaliation for filing an EEOC complaint against the sheriff.  (Amd. Compl. ¶¶ 105, 117, 127-30.)

5.  The plaintiff is black, as are the defendants:  Sheriff White, Capt. Weldon Bullock, and Chief Deputy Lawrence Bullock.  (Amd. Compl. ¶ 28.)

6.  When the plaintiff applied to be a Vance County deputy sheriff in 2017, Capt. Bullock conducted a background investigation.  (W. Bullock Dep. p. 17-20; Exs. 1, 2.)

7.  The plaintiff had been fired from his three previous jobs, one as a state prison guard and two as a campus security officer.  (W. Bullock Dep. pp. 18-19 and Ex. 1; Pl.'s. Dep. pp 18-19, 33.)

8.  A panel at the sheriff's office recommended against hiring him, but Sheriff White hired him anyway, and he started in June 2017.  ((W. Bullock Dep. pp. 29-3; Amd. Compl. ¶ 21.)

9.  All deputies, including the plaintiff, served as at-will employees at the pleasure of the sheriff, and the plaintiff acknowledged this in writing. (Peter White Aff. ¶ 5; W. Bullock Dep. p. 110; Pl.'s Dep. Ex. 28.)

10.  Capt. Bullock helped the plaintiff get a waiver from the state so he would not have to re-take Basic Law Enforcement Training, but he had little interaction with him after that.  (P. White Dep. Ex. 18; P. White Aff. ¶ 5; W. Bullock Dep. pp. 102-03.)

11.  At the time, Sheriff White had 40 years of experience in law enforcement, including 25 years as a trooper for the North Carolina Highway Patrol, from which he retired with the rank of major.  (P. White Dep. p. 7-8, 9, 15-16.)

12.  Sheriff White ran in 2006 promising to treat people fairly and equally, and was elected the first black sheriff in Vance County.  (P. White Dep. at pp. 15-16; P. White Aff. ¶ 3.)

13.  He was elected the first black sheriff in Vance County.  (P. White Aff. ¶ 3.)

14.  As a deputy, the plaintiff spent an excessive amount of time stopping motorists for minor traffic offenses and was counseled by superiors not to do this.  The chief deputy told him the sheriff did not want him to make minor traffic stops, yet he made eight arrests for minor

violations in his first six months. Other officers talked about this. A supervisor, Lt. Durwood Campbell, gave him a written counseling for making traffic stops and Sheriff White approved it. (Pl.'s Dep. pp. 35, 82-84, 96-97, 100; Exs. 9-12.)

15.    Sheriff White wanted deputies to focus on investigating crimes, responding to calls, and serving papers. The plaintiff was told to make stops only for serious traffic violations and that traffic enforcement was primarily the job of the state Highway Patrol. (Pl.'s Dep. p. 35; Ex. 12.)

16.    Once, the plaintiff failed to charge a Hispanic man for causing a minor fender-bender. The woman whose car was damaged was black and she complained to Sheriff White. The plaintiff did not have a ticket book, and the sheriff told him there was a reason for that. The sheriff told him to take out a criminal summons against the driver, so he did. (Pl.'s Dep. pp. 42-47.)

17.    On another occasion, the plaintiff charged a white woman, Jamie Goss, for traffic violations. After she complained, Lt. Campbell became upset with him about his traffic stops and exchanged words with the plaintiff. The plaintiff did not like being scolded and told Lt. Campbell that his father was a large black man and only he could talk to the plaintiff like that. A sergeant was surprised that the plaintiff had spoken so disrespectfully to Lt. Campbell, and the plaintiff was suspended for five days without pay. (Pl.'s Dep. pp. 89-91, 100, 112; Exs. 9, 10.)

18.    In March 2018, the plaintiff again tried to pull someone over for a traffic violation, and he got into a minor accident. He told his superiors that he was running his emergency blue lights at the time, but he was not, according to video from a store security camera. His supervisors again noted that he had been told not to make minor traffic stops and recommended his suspension. (Pl.'s Dep. pp. 121-31; Ex. 14.)

19.    The plaintiff claimed that he was subjected to discriminatory remarks and treatment. He claimed that deputies used racial slurs and a sergeant made a homophobic comment about him

but apologized. He said Lt. Campbell treated blacks with less respect than whites and that someone left a purple unicorn hat in his locker. (Pl.'s Dep. pp. 190-94, 198-99, 238-39.)

20. The plaintiff made some racial comments, calling an Indian-American deputy "Osama" a few times and another deputy "white boy." (Pl.'s Dep. pp. 224-25; Ex. 24.)

21. The sheriff had written policies against workplace harassment and discrimination, and all employees had access to them. He had no tolerance for jokes about race or gender. He hired the first female deputy in the county and later hired several others. He never used any racial slurs or made fun of the plaintiff's race or sexual orientation. (P. White Dep. p. 72; Exs. 16-18, 96, 114-15; Pl.'s Dep. p. 195.)

22. Sheriff White had little interaction with the plaintiff except for responding to his complaints and suspending him once. He did not hear any rumors about his sexual orientation. (P. White Dep. pp. 153, 156-57.)

23. On June 15, 2018, the plaintiff sent two letters to Sheriff White, one about his performance review and the other a Title VII discrimination complaint. The plaintiff said he should not have been suspended on February 20, 2018, for the incident with Lt. Campbell and that it was because Lt. Campbell, a white male, "heavily lied on" him and relied on a complaint by Jamie Goss, who is white. The plaintiff claimed that Chief Deputy Bullock and Capt. Watkins did not get his side of the story. He said the sheriff's office "took the white man's word over the black man" and this violated his civil rights. He asserted "a pattern of discrimination and negligence at the sheriff's office" and threatened to sue. He recommended to the sheriff that his senior officers should be disciplined. He said Chief Deputy Bullock, Lt. Shearin, and Lt. Campbell should "be issued a corrective action and suspended for 10 days without pay," and that Capt. Watkins "receive a lesser sanction." (P. White Dep. Ex. 21.)

4

24. Sheriff White looked into the allegations and obtained statements from Lt. Campbell and others. Lt. Campbell admitted using the word "ass" toward the plaintiff because he was upset that the plaintiff continued to defy orders not to stop motorists for minor traffic violations and admitted having a "heated exchange" with the plaintiff, and Sheriff White later disciplined him for it. (Pl.'s Dep. Exs. 9-13; P. White Dep. pp. 147-51.)

25. Sheriff White responded to the plaintiff by letter on July 18, 2018. He said the Goss incident was not racial and said the plaintiff had been told repeatedly "not to focus on traffic stops since this is not your primary duty and you had not been issued a citation book," yet he had continued to disregard these orders. The sheriff had approved the plaintiff's suspension because the plaintiff admitted being disrespectful to Lt. Campbell. The sheriff rejected the charge of discrimination in the sheriff's office and found no basis for it. (P. White Dep. Ex. 23; p. 147.)

26. On August 10, 2018, the plaintiff filed his complaint with the EEOC. (Amd. Compl. ¶ 105; P. White Dep. Ex. 20.)

27. It was the only such complaint ever filed against Sheriff White during his 12 years in office. (P. White Dep. p. 69.)

28. On the night of Sunday, October 21, 2018, the plaintiff approached Latwanya Oliver at a gas station and told her that she had been speeding. They spoke briefly, and she walked away and told him to write her a ticket. (Pl.'s Dep. pp. 132-37; W. Bullock Dep. Ex. 4.)

29. The plaintiff later checked and found that Ms. Oliver had two outstanding arrest warrants. They stemmed from an allegation that she had not paid for clothing at a store. (Pl.'s Dep. pp. 136-37; Oliver Aff. ¶ 4.)

30.  That same night, the plaintiff went to Ms. Oliver's home and knocked on her door at 2:00 a.m., ostensibly to arrest her for the warrants but she did not answer and he left.  He does not recall if he even announced that he was from the sheriff's office.  (Pl.'s Dep. pp. 133-41, 146-47.)

31.  The plaintiff came back the next night around 8 o'clock and told Ms. Oliver that he had warrants for her arrest, though he did not have the warrants with him.  (Pl.'s Dep. pp. 153-54.)

32.  Ms. Oliver left her house under the plaintiff's escort, and he tried to put her in the back seat of his patrol car.  She objected because she did not know where he was taking her, and he slammed her on the ground and handcuffed her.  (Oliver Aff. ¶ 5.)

33.  Ms. Oliver's arm was broken, according to emergency medical technicians who arrived on the scene.  She was taken to the hospital and diagnosed with a fractured bone in her upper arm.  (Oliver Aff. ¶¶ 5-6; W. Bullock Dep. Ex. 4; Pl.'s Dep. pp. 150-57.)

34.  During the arrest, the plaintiff put out a radio call that indicated to other officers that he was in danger and he asked that other units be "staged" near the scene.  Other officers quickly arrived, including his sergeant, who cancelled the emergency nature of the call and called in the incident as routine.  (W. Bullock Dep. Ex. 4.)

35.  Ms. Oliver filed a written complaint with the sheriff the day after her arrest and threatened to sue if the plaintiff was not fired.   (Oliver Aff. Ex. A; Pl.'s Dep. p. 180.)

36.  Capt. Bullock, a 26-year law enforcement veteran, investigated her complaint.  He had had little interaction with the plaintiff after the plaintiff was hired and, at the time, did not know about the EEOC complaint.  (W. Bullock Dep. pp. 6, 48-49, 102-03; W. Bullock Aff. ¶ 3.)

37.  Capt. Bullock interviewed the plaintiff, Ms. Oliver, and other officers, and spoke with Chief Bullock.  He concluded that the plaintiff had used excessive force because "[h]e slammed the victim and broke her arm."  The plaintiff had not used an approved technique to gain control

6

of her and, when asked, he could not identify one. Bullock also noted other problems with the plaintiff's handling of the incident. (W. Bullock Dep. pp. 49-56, 58-61, 69; Ex. 4.)

38.    With the approval of the plaintiff's chain of command, Capt. Bullock recommended to Sheriff White that the plaintiff be fired. (W. Bullock Dep. pp. 57-58.)

39.    Sheriff White fired the plaintiff for using excessive force, but also considered that he had been suspended once, had repeatedly disregarded instructions not to cite people for minor traffic citations, and had lied about turning on his blue lights before getting into the car accident. (P. White Aff. ¶ 4.)

40.    The sheriff never asked the plaintiff to withdraw his EEOC complaint and believed it had been addressed with his July 2018 response letter. (P. White Aff. ¶ 4.)

41.    The sheriff retired in early December 2018, and he could have allowed the plaintiff to remain on the job until his successor took over a few weeks later, but he did not want to risk the plaintiff causing other problems, so he fired him. (P. White Aff. ¶ 4.)

42.    The Vance County Sheriff's Office filled out a Report of Separation form about the plaintiff's firing and sent it to the North Carolina Sheriffs' Standards Commission. (Pl.'s Dep. Ex. 25.) The commission accredits sheriff's officers in the state, and the form is required by law. (N.C. Gen. Stat. § 17E-4 and 12 N.C. Admin. Code 10B.0405.)

43.    The form contains a box asking if the officer was terminated as a result of a substantiated investigation; the box on the plaintiff's form was checked yes, but it did not say what the investigation was about and did mention excessive force. (Pl.'s Dep. pp. 205-08; Ex. 25.)

44.    This was the fourth consecutive job from which the plaintiff was fired. He filed EEOC complaints against all four employers. After he was fired, he also filed EEOC complaints against

7

four entities that never even hired him.  (Plaintiff's Interrogatory Responses of Jan. 25, 2021, No. 1 (Appx., No. 7).)

45.  The plaintiff applied for other law enforcement jobs.  He provided a signed release to allow prospective employers to obtain his personnel file from Vance County and expected them to review the Oliver investigative report.  (Pl.'s Dep. Ex. 20.)

46.  The plaintiff blames the report's conclusion that he had used excessive force on his inability to get hired to another job.  (Pl.'s Dep. pp. 209-14, 225-35; Appendix, No. 1.)

47.  The defendants have had no contact with any of the plaintiff's prospective employers. (P. White Aff. ¶ 7; W. Bullock Aff. ¶ 7; L. Bullock Aff. ¶ 6.)

Respectfully submitted, this 30th day of March, 2021.

/s/ Christopher J. Geis
CHRISTOPHER J. GEIS
N.C. State Bar No. 25523
BRIAN F. CASTRO
N.C. State Bar No. 53412
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone:  (336) 721-3600
Facsimile:  (336) 721-3660
Email: Chris.Geis@wbd-us.com
          Brian.Castro@wbd-us.com
*Attorneys for defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an attorney at law licensed to practice in the State of North Carolina, is attorney for defendants in this matter, and is a person of such age and discretion as to be competent to serve process.

I hereby certify that on March 30, 2021, I electronically filed the foregoing **DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS** with the Clerk of the Court using the CM/ECF system, which will send notification of such to the following CM/ECF participant:

Sharika M. Robinson
10230 Berkeley Place Drive, Suite 220
Charlotte, NC 28262
Telephone: 704-561-6771
Facsimile: 704-561-6773
srobinson@sharikamrobinsonlaw.com
*Attorney for Plaintiff*

/s/ Christopher J. Geis
CHRISTOPHER J. GEIS
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 721-3543
Facsimile: (336) 721-3660
Email: Chris.Geis@wbd-us.com
*Attorney for defendants*

9