IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:19-cv-00467-BO

**CERTIFIED TRANSCRIPT**

JUSTIN J. WHITE,                          )
                                          )
        Plaintiff,                        )
                                          )
v.                                        )
                                          )
VANCE COUNTY, NORTH CAROLINA,             )
VANCE COUNTY SHERIFF'S OFFICE,            )
PETER WHITE, in his official and          )
individual capacities,                    )
LAWRENCE D. BULLOCK, in his               )
official and individual capacities,       )
WELDON WALLACE BULLOCK, in his            )
official and individual capacities.       )
                                          )
        Defendants.                       )
_____  )

ZOOM DEPOSITION OF PETER WHITE, 30 (b)(6),

held in North Carolina on Friday, February 26, 2021

commencing at 10:17 A.M., before Dodie George,

Shorthand Reporter and Notary Public.



Page 2

```
1   APPEARANCES:
2   THE LAW OFFICES OF SHARIKA M. ROBINSON, PLLC
        BY: SHARIKA M. ROBINSON, ESQUIRE (VIA ZOOM)
3   BY: MICHAEL MCGURL, ESQUIRE (VIA ZOOM)
        info@sharikamrobinsonlaw.com
4   10230 Berkeley Place Drive, Suite 220
        Charlotte, North Carolina 28262
5   704.561.6771
            Counsel for Plaintiff
6
7   WOMBLE BOND DICKINSON, LLP
        BY: CHRISTOPHER J. GEIS, ESQUIRE (VIA ZOOM)
8   BY: LOUISA C. CLARK, ESQUIRE (VIA ZOOM)
        chris.geis@wbd-us.com
9   louisa.clark@wbd-us.com
        One West 4th Street
10  Winston-Salem, North Carolina 27101
        336.721.3600
11          Counsel for Defendants
12
    Also Present:
13  Joi Nelson
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1               EXAMINATION INDEX
2   PETER WHITE, 30 (b)(6)
3     BY MS. ROBINSON                              4
4
5
6               INDEX OF EXHIBITS
7   NO.                                     MARKED
8   10     Personnel Action Form *Exhibit retained*  56
9   11     F-5 Report of Separation *Exhibit retained* 59
10  12     Directives A.1 & A.2                    71
11  13     Directive B.6                           79
12  14     Directive B.9                           89
13  15     Directive D.7                          101
14  16     Directive E.2                          106
15  17     Directive E.3                          112
16  18     Request for Training Waiver            133
17  19     J. White's pay raise                   135
18  20     Notice of Charge of Discrimination     136
19  21     J. White's Rebuttal and Complaint      137
20  22     Campbell Statement                     143
21  23     P. White's Response                    146
22
23
24
25
```

Page 4

```
1                P R O C E E D I N G S
2              PETER WHITE 30(b)(6),
3       having been duly sworn, testifies as follows:
4                    EXAMINATION
5   BY MS. ROBINSON:
6        Q.   Sheriff White, can you hear me?  Good
7   morning.
8        A.   Good morning.  I can hear you.
9        Q.   Okay.  So good morning.  Thank you for --
10  for sitting down and -- and agreeing to answer
11  questions on behalf of your office and your tenure
12  there.  So I very -- very much appreciate that.
13            As I told Mr. Bullock yesterday, I'm very
14  -- my style is very conversational.  And -- and so
15  it's just us having a conversation about some of the
16  policies, practices and things that went on when you
17  were sheriff there as it relates to Mr. White's
18  employment.
19            And for purposes of this, do you mind if I
20  call you Sheriff White and I will call you Mr. White,
21  Mr. White?
22        A.   That will be fine.
23            MS. ROBINSON:  Okay.  And, Chris, just as a
24  -- a matter of -- a preliminary matter before we
25  get started, I want to address what occurred on
```

Page 5

```
1   the record yesterday.  We had that conversation
2   when we went off the record about you advising
3   your client not to answer a question.  And you
4   know the rules do not permit you to discuss any
5   type of responses with your client in breaks, on
6   the record, off the record at all.
7   BY MS. ROBINSON:
8        Q.   This has to be your testimony, Sheriff
9   White.  Okay?
10       A.   Okay.
11       Q.   Okay.  So my name is Sharika Robinson, and
12  I represent The Law Offices of Sharika M. Robinson.
13  And I want to know, have you ever been deposed
14  before?
15       A.   Yes.
16       Q.   Have you ever pro- -- provided testimony
17  before?
18       A.   Yes.
19       Q.   Okay.  So you are familiar with the rules:
20  yes and no and not uh-huh and huh-uh and all of
21  that?
22       A.   Yes, I am.
23       Q.   Okay.  Are you prepared to testify today,
24  meaning that you aren't on -- you're -- you're --
25  you're not impaired, you haven't used any substances,
```



1  no medication; you're prepared to give testimony
2  under oath today?
3      A.  I am.
4      Q.  And so can you please state your name for
5  the record?
6      A.  My name is Peter White.
7      Q.  Your birth date?
8      A.  12/5/55.
9      Q.  And can you please provide your address?
10     A.  60 Frank, F-R-A-N-K, Bullock,
11  B-U-L-L-O-C-K, Road, Manson, North Carolina.  The ZIP
12  is 27553.
13     Q.  Have you always resided in North
14  Carolina?
15     A.  Other than the time that I was in the
16  military and the time during my highway patrol
17  employment.
18     Q.  Okay.  So you would -- did you go to the
19  military out of high school or....
20     A.  Yes, out of high school.
21     Q.  Okay.  So did you go to Vance County High
22  School?
23     A.  Yes, Vance Senior High.
24     Q.  Okay.  So let's start from there.  So you
25  went to Vance Senior High and you graduated, and then

1  you went to the military.  What branch of the
2  military?
3      A.  Marine Corp.
4      Q.  How long were you in the Marine --
5      A.  I did two years.
6      Q.  Then what did you do next?
7      A.  I served my two years.  I was discharged
8  honorably, came back home to Vance County, looked for
9  a job, worked two or three jobs like factory-type
10  stuff.  That was in 1976.  And began my law
11  enforcement career I believe in 1977.
12     Q.  Okay.  Did you have to go to college or....
13     A.  I attended Vance-Granville Community
14  College.  I got two associate's degrees.
15     Q.  Uh-huh.  What are your degrees in?
16     A.  One's in criminal justice, and the other
17  one is in therapeutic and municipal recreation,
18  basically recreation therapy.
19     Q.  Like sports or something?
20     A.  Well, it's kind of like a dual major.  I
21  can either work in a nursing home-type atmosphere or
22  in -- on the sports side.
23     Q.  So you started your career in law
24  enforcement in 1977.  Were you a deputy sheriff then
25  or....

1      A.  No.  I was a police officer.
2      Q.  Police officer.
3          Okay.  What police department was that?
4      A.  This was Stovall, which is located not too
5  far from here.  It's in Granville County.
6      Q.  How long were you there?
7      A.  I was there about a year.
8      Q.  And then where'd -- where'd you go?
9      A.  I took a job at the Oxford Police
10  Department.
11     Q.  How long were -- what was your title
12  there?
13     A.  I was a police officer.
14     Q.  And how long were you there?
15     A.  I was there about three years, I believe,
16  maybe a little more.
17     Q.  Uh-huh.
18     A.  I was there until 1981, August of 1981, I
19  believe.
20     Q.  And then what -- where'd you go?
21     A.  I joined the North Carolina State Highway
22  Patrol.
23     Q.  What was your title there?
24     A.  State trooper.
25     Q.  How long were you there?

1      A.  I was there until, I believe, 1985.  I
2  remained in Wake County, but I was assigned to the
3  executive protection detail.  Some people call it
4  government security detail.
5      Q.  What does -- what does that entail?
6      A.  It entails basically making sure nothing
7  happens to the governor when he's out and about or to
8  his family members.  You're responsible for
9  transporting him different places in the state,
10  driving; if he flies, you fly with him, be it private
11  plane or commercial.  If he flies overseas, a couple
12  people on the detail have to go with him.
13     Q.  And how long were you -- you said in
14  1985?
15     A.  Around '85, yes.  I did that for five
16  years.
17     Q.  Okay.  So, what, 1990?
18     A.  Yes.
19     Q.  Okay.  Where did you go after that?
20     A.  I was promoted to the rank of sergeant, and
21  I was assigned to Martin and Pitt County here in
22  North Carolina.
23     Q.  Were you -- you weren't with the highway
24  patrol then?
25     A.  Yes, I was.  I was promoted then, sent

Page 10

1  there.
2      Q.    Okay.  Well, when you say "sent there," you
3  moved also?
4      A.    Yes.  Well, I didn't establish a permanent
5  residence.  Actually I stayed in a motel most of the
6  time I was there.
7      Q.    How long were you in that position?
8      A.    I was there right at a year, maybe a month
9  or so more.
10     Q.    And what occurred next?
11     A.    I transferred from there at here to Vance
12 County.
13     Q.    And you pa- -- you patrolled the whole
14 county in that position?
15     A.    Basically I supervised the -- I was one of
16 the supervisors for the troopers that were here at
17 that time.
18     Q.    How many people did you supervise then?
19     A.    I believe it was 20 troopers.  I'm not
20 certain, but I believe it was 20 then in that
21 position.
22     Q.    Okay.  How many supervisors were there?
23     A.    There was three.  There was a first
24 sergeant, myself as a sergeant and then another
25 individual with the rank of sergeant.

Page 11

1      Q.    And did y'all split the county or....
2      A.    Well, no.  Basically each of us were -- the
3  first sergeant supervised myself and the other
4  sergeant, and basically we supervised the troopers.
5      Q.    It was like joint supervision?
6      A.    Yes.  Yes.
7      Q.    Okay.  And how long were you in that
8  position?
9      A.    I believe it was about seven years.
10     Q.    So we're at 1998 now.  So -- and what
11 occurred next?
12     A.    After that, I was promoted to the rank of
13 first sergeant, and I was transferred to Roxboro,
14 which is Person County.  I supervised the troopers in
15 Person and Caswell counties.
16     Q.    And how long were you there?
17     A.    I think that was just a little bit over a
18 year.
19     Q.    And then what happened?
20     A.    I requested a lateral transfer here.  There
21 was a vacancy in the first sergeant's position here,
22 and I was able to come back here as the first
23 sergeant and supervise the troopers and the sergeant
24 that was here during that time.
25     Q.    And by here, you mean Vance County?

Page 12

1      A.    Yes.  We supervised Vance, Warren and
2  Franklin counties because the troopers worked those
3  three counties out of the Henderson office.
4      Q.    Had you established a residency in Vance
5  County at that time?
6      A.    Let's see.  Well, I was born in Vance
7  County, but actually I grew up in Vance County and
8  went to school here.  But I built a house here
9  sometime around, I guess, 1992.  But my parents
10 resided here.
11     Q.    Okay.  So your -- your family, everybody,
12 you just wanted to come back home?
13     A.    Well, where I was, as I said earlier, I was
14 staying in a motel.  And, you know, that got to be a
15 little bit aggravating.  And once I found out there
16 was an opening here, I decided it would be best for
17 me to come back here.
18     Q.    Okay.  And so how long -- well, after you
19 requested your lateral transfer to first sergeant,
20 how long were you in that position in Vance County?
21     A.    I'm thinking maybe two years.
22     Q.    Okay.  And so what happened next?
23     A.    I was promoted to the rank of lieutenant
24 and assigned to the Fayetteville office.
25     Q.    And how long were you in that position?

Page 13

1      A.    I was there a year or just a little bit
2  more.
3      Q.    What were your duties?
4      A.    I was a lieutenant.  And myself, one other
5  lieutenant and a captain basically supervised first
6  sergeants in something like 13 counties down that
7  way.
8      Q.    When you say "supervised," what does
9  that -- what did that entail?
10     A.    Well, we kind of monitored what they were
11 doing, reviewed their paperwork, held regular
12 meetings with them, tried to assist them in any way
13 we could, basically making sure they were doing what
14 they were supposed to do.
15     Q.    Did you handle HR issues, any of that,
16 workplace complaints?
17     A.    Some, yes.
18     Q.    Did you have the ability to hire and fire?
19     A.    No, but I could recommend hiring and
20 firing.
21     Q.    Okay.  How long were you in that
22 position?
23     A.    In Fayetteville I think it was just -- just
24 a little over a year.
25     Q.    Okay.  And what happened next?

Page 14

1    A.   I -- I took another lateral transfer to the
2  Raleigh office on Blue Ridge Road still in the
3  lieutenant's position.
4       Q.   How long were you there in Raleigh?
5       A.   I -- I want to say I was in that
6  lieutenant's position probably for another year,
7  maybe a little more.
8       Q.   And the -- was the Raleigh office
9  structured the same as the Fayetteville similarly?
10      A.   Yeah, similarly, just the counties were
11  different.  There were fewer -- there were fewer
12  counties supervising the Raleigh office than it was
13  in the eastern part of North Carolina.
14      Q.   Okay.  And what happened next?
15      A.   After that, I was promoted to the rank of
16  captain and still in Raleigh assigned to what was
17  then called communications and logistics.  Most
18  people referred it to as C&L.
19      Q.   And what -- what did that job entail?
20      A.   Well, basically I was responsible for
21  purchasing everything that the highway patrol used on
22  a day-to-day basis:  automobiles, tires, auto parts,
23  fuel, pens, papers, paper clips, basically whatever
24  the -- the highway patrol used day-to-day, uniforms.
25      Q.   So were you supervising anyone at that

Page 15

1  point?
2       A.   Yes.
3       Q.   How many officers?
4       A.   I don't recall how many officers.  It was
5  probably -- at that point it was probably about three
6  or four that was actually on what we called the
7  complex with me, and there were several civilians.
8  That entailed supervising, I think, nine highway
9  patrol garages across the state as well as auto body
10  repair shops and also communication centers.  And I
11  also supervised what we called the in addition unit
12  that worked in the state across North Carolina.  I
13  supervised the -- the motor unit, as we called it,
14  motorcycle units, and our aviation unit, which
15  included several helicopters.
16      Q.   And how long were you in that position?
17      A.   I'm not sure.  Maybe a couple of years as
18  captain.
19      Q.   Okay.  And then what happened next?
20      A.   I was promoted to the rank of major, and I
21  remained at that location.
22      Q.   And what -- what does a major do?
23      A.   I kept basically my same duties because I
24  didn't move.  I was just elevated in rank.
25      Q.   And so were you still in the communications

Page 16

1  and logistics department?
2       A.   Yes.
3       Q.   Okay.  Okay.  And then how long were you a
4  major?
5       A.   Until my retirement from there.
6       Q.   When did you retire?
7       A.   I believe it was the last day of 2005 or it
8  might have been the first day of 2006.  I want to say
9  the last day of 2005.
10      Q.   And what did you do next?
11      A.   I came back here to Vance County, which is
12  home.  And shortly thereafter I decided that I would
13  run for sheriff of Vance County.
14      Q.   What year did you run for sheriff?
15      A.   2006.
16      Q.   So tell me about that process.  What was it
17  like?
18      A.   Well, basically you -- you file, pay your
19  filing fee.  And then you been -- you been -- begin
20  campaigning, trying to, you know, get people to
21  support you, tell them why you're running, what your
22  intentions are and just prepare for the scrutiny and
23  all the agony that comes along with it.
24      Q.   What was your platform?
25      A.   Basically doing the right thing, treating

Page 17

1  everybody right regardless of your ZIP code or your
2  race or any of that stuff; basically being a sheriff
3  for everybody versus certain ZIP codes, is what I
4  told the public.  And I also told them that if I was
5  elected, they would never hear me say, "this is my
6  county."
7       Q.   Why did you say that?
8       A.   Because it's not my county.  I don't own
9  the county, and I stressed that we were all in it
10  together.  It's just as much their county as it is
11  mine.
12      Q.   Do you remember who you ran against?
13      A.   Yes, pretty much.  I remember the last
14  names.  The sheriff at the time, yes, I remember who
15  he was.
16      Q.   Who was he?
17      A.   His name was Thomas Breedlove.
18      Q.   Okay.  So you won that election?
19      A.   Yes.  I won the general -- the primary.  He
20  asked for a runoff.  I won the general.  And right
21  after that, I believe it was a sergeant with the
22  sheriff's office, he filed a petition, garnered
23  signatures; and the board of election allowed him to
24  run against me as well.
25      Q.   What happened next?

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 5 of 106

Page 18

1     A.   I won.
2     Q.   Okay.  So you won.
3          When were you sworn in?
4     A.   November of 2006, I believe, and then again
5  in December of 2006.
6     Q.   How was the sheriff's office structured
7  then or how....
8     A.   I'm not sure how it was structured before I
9  got in there.
10    Q.   How did you structure it?
11    A.   Well, basically I put people in places so
12 that I would have supervisors to do whatever needed
13 to be done.
14    Q.   Uh-huh.
15    A.   Some were there when I got there, and some
16 came in years later.
17    Q.   Okay.  So just -- just for a moment, we
18 talked about all your different promotions.  And I
19 would assume you -- you probably -- did you have to
20 take tests or exams to be promoted or --
21    A.   Yes.  It's an entire process.
22    Q.   So let's talk about the structure of the
23 sheriff's office under your leadership.  And if you
24 will just explain to me like a certified deputy, a
25 deputy, lieutenant, just that, all that.

Page 19

1     A.   A certified deputy is one that has
2  completed the BLET course somewhere during his or her
3  career.  Non-certified of course have not done that
4  yet.  Then we have sergeants that basically
5  supervises the deputies.  Then we have lieutenants
6  that supervise the sergeants and then captain.  And
7  the chief deputy position is generally a major's
8  position.
9     Q.   How large is the Vance County Sheriff's
10 Office?
11    A.   I want to say it was about 40 deputies
12 maybe.  That may not be the exact number, but I
13 believe that's pretty close to what it was.
14         And then, well, I should say -- when I say
15 -- yeah, deputies.  Well, any members of the
16 sheriff's office, which included lieutenants,
17 captains and then about six civilians, I believe.
18    Q.   When you say "civilians," what does that
19 mean?
20    A.   Office staff.
21    Q.   Office staff?
22    A.   Yes.
23    Q.   So you're talking like secretaries?
24    A.   Basically, yes.
25    Q.   And these are all people who were on the

Page 20

1  Vance County Sheriff's Office payroll?
2     A.   Yes.
3     Q.   Did the department grow any under your
4  leadership?  So....
5     A.   In term -- no, not in terms of numbers, not
6  much.  You know, it may have grown a little bit, but
7  not much.
8     Q.   And did you maintain the same structure
9  from 2006 until your retirement?
10    A.   No, not -- not necessarily.  It was
11 similar, but it wasn't the exact same structure, I
12 don't believe.
13    Q.   What did you change?
14    A.   We -- we got -- we added -- later on down
15 the road we added a -- a position.  It was called a
16 gang resource officer.  That was new.  The overall
17 structure with the sergeants, lieutenants, captain,
18 you know, that pretty much was very close to being
19 the same.
20    Q.   So gangs were an issue in Vance County?
21    A.   Yes.
22    Q.   What type of gang?
23    A.   Even though some -- yes, they were.
24    Q.   What type of gangs?
25    A.   Just the street gangs.  Some of them were

Page 21

1  organized.  Some weren't.  Some were homegrown.  Some
2  was like what we call the real gangs.
3     Q.   What are the real gangs?
4     A.   We had Bloods, Crips, a couple others.  I
5  don't recall their name.
6     Q.   Uh-huh.  What were the races?
7     A.   The Bloods and the Crips are mostly after
8  African-American.  There was another group called the
9  Surenos or something similar to that.  They were
10 primarily Hispanic.
11    Q.   Were you able to -- I don't want to say
12 eliminate.  But were you able to get that under
13 control, the gangs?
14    A.   Well, they didn't give us much problem.
15 They kind of policed themselves, so to speak.
16    Q.   What does that mean?
17    A.   Well, they kind -- they dealt with their
18 own situations.  They didn't particularly involve law
19 enforcement.  Every now and then there would be, say,
20 a shooting that we may have thought was gang-related,
21 but they weren't out threatening the public or
22 anything like that.
23    Q.   Okay.  So let's go back to the structure of
24 the -- the office, the sheriff's office.  Did -- did
25 Vance County pay for BLET training?

Page 22

1  A.  Yes.
2  Q.  **How did that process work?**
3  A.  For the deputies that were not certified
4  when we hired them?
5  Q.  **Uh-huh.**
6  A.  At some point they were scheduled to attend
7  basic law enforcement training at a community college
8  depending on which college offered the course at what
9  time.
10  Q.  **What did you look for when you hired -- in**
11  **a deputy when you hired a deputy?**
12  A.  Well, there were several things that I
13  looked at.  Excuse me.  Number one, of course, it
14  would be their background.
15  Q.  **Background.  What do you mean,**
16  **background?**
17  A.  We would start -- we would start background
18  investigation, and we would go from there.  We wanted
19  to know where they've lived; what jobs they've had; a
20  little bit about their criminal record; if they had a
21  family; education level; reputation, you know, in the
22  community that they lived in; that type of stuff; and
23  of course whether they were certified or not,
24  experience.  It was a whole host of things.
25  MS. ROBINSON:  Okay.  I see that the

Page 23

1  documents just came in, Mr. Geis.  Do you want to
2  take a second to look at them?
3  MR. GEIS:  No, that's okay.  If you --
4  you're free to just go ahead and --
5  MS. ROBINSON:  Uh-huh.
6  MR. GEIS:  -- go into them as you see fit.
7  BY MS. ROBINSON:
8  Q.  **So you looked for community involvement,**
9  **reputation, education.**
10  **And what type of character were you looking**
11  **for in a deputy?**
12  A.  Well, we -- we were looking for people
13  with, you know, good character.
14  Q.  **Okay.  And what is good character?**
15  A.  Well, you didn't have to be perfect; but,
16  you know, obviously you couldn't have been being
17  arrested and drunk and disorderly type stuff; just
18  basically being what the average person would
19  consider a good person.
20  Q.  **So did you -- did you perform interviews or**
21  **conduct interviews?**
22  A.  Yes, I did some.
23  Q.  **You said you did some?**
24  A.  Yes.
25  Q.  **Tell me about the structure, the hiring**

Page 24

1  structure at Vance County.
2  A.  The hiring, individuals apply.  Some walk
3  in, bring their application.  During the latter part
4  of my tenure as sheriff, they could apply online, but
5  most people either mailed their application in or
6  they -- they brought it in themselves.  Once the
7  applications were received, I would normally get
8  them.
9  I would look through them, and then most of
10  the time I would pass it on to the administrative
11  captain.  He would review it.  And then the ones that
12  were determined to -- or that we felt needed to be
13  interviewed, we would set up the interview for
14  them.
15  Q.  **So who is -- who is "we"?**
16  A.  When I say "we," basically I'm speaking as
17  the sheriff office as a whole, but it was me.
18  Q.  **Uh-huh.  Right.  So you mentioned the**
19  **administrative captain.  What I'm -- I'm trying to**
20  **get the process.  So I get that you were ultimately**
21  **the decision maker.  But what was your -- what did --**
22  **who did your team --**
23  A.  Okay.
24  Q.  **-- consist of?**
25  A.  The process -- there's an interview panel

Page 25

1  that consisted of -- normally it was -- it was like
2  four individuals, I believe.  Normally it was a
3  captain.  At times it was a captain, maybe two
4  lieutenants and sometimes even a sergeant.  Then
5  again, it might have been two captains, lieutenant.
6  But the process was the same.
7  Q.  **Okay.  Let's -- let's dial it back some.**
8  **So how many different departments did --**
9  **does the Vance County Sheriff Office have?**
10  A.  I'm not sure if it's seven.  We've got
11  patrol and investigations, civil, court, what we call
12  the drug unit, K-9, and I may be missing one.
13  Q.  **So what does the patrol department do?**
14  A.  Basically they -- they patrol the county
15  paying particular attention to property, businesses,
16  homes, looking out for break-ins, larcenies,
17  basically protecting the citizens and their property.
18  Q.  **And what does the investigation....**
19  A.  They -- they are the detectives.  A lot of
20  times deputies would go to a call.  Say it might be a
21  breaking and entering call.  A large amount of stuff
22  may -- may have been stolen, and that would
23  oftentimes be referred to a detective or an
24  investigator.
25  Q.  **And the civil department?**

Page 26

1    A.   Basically the civil department just serves
2  civil papers.
3         Q.   And the court?
4    A.   Court included working security at the
5  entrance to the courthouse X-ray machine and also
6  acting as bailiffs.
7         Q.   And the drug unit?
8    A.   Basically they stayed on the lookout for
9  drug activity in the county.  They made drug arrests.
10 Primarily that was their function.  Occasionally they
11 would engage in some patrol.
12        Q.   And the K-9?
13   A.   The K-9s were used in several instances:
14 some missing children, Alzheimer's patients, helping
15 tracking them.  The K-9 served kind of as a partner
16 to their handler basically, and they were used
17 sometimes to sniff out narcotics.
18        Q.   So you mentioned the administrative
19 captain.  What would that -- where would that person
20 be located in that structure?
21   A.   It would a captain, but he would not be in
22 the -- the -- he wouldn't be considered the same as a
23 patrol captain.  He would kind of be off to the side
24 still under the sheriff and the chief deputy, but not
25 in the patrol supervision-type lineup.

Page 27

1         Q.   So kind of up there in its own little
2  wing?
3    A.   No, not really.
4         Q.   Okay.  So -- so would the administrative
5  captain fall under any of these, the six categories,
6  departments that you named: patrol, investigation,
7  civil or drug unit --
8    A.   I believe --
9         Q.   -- K-9s?
10   A.   I believe the administrator was separate --
11        Q.   So --
12   A.   -- in another department.  I think that's
13 the one that I missed, I believe.
14        Q.   Okay.  And what did the administrative
15 department do?
16   A.   Basically paperwork that comes into the
17 sheriff's office.  A lot of stuff would come directly
18 to me.  A lot of times I would review it and funnel
19 it to the administrative captain.  The administrative
20 captain at times would coordinate different training
21 activities that was going on that the deputies
22 needed.  He would set that up, follow through with
23 the paperwork at ground investigations, some other
24 investigations internally with the sheriff's
25 office.

Page 28

1         Q.   Did you have an evidence department?
2    A.   Yes.
3         Q.   So that's a --
4    A.   Well, it wasn't -- it wasn't a -- no.  We
5  had a -- we had evidence, of course; but I -- I don't
6  believe -- no, evidence was not separate.  It was not
7  a separate section.
8         Q.   Okay.  What would that fall under?  Would
9  the evidence go under administrative or....
10   A.   Generally, yes.
11        Q.   And so each of these seven departments was
12 structured the way you suggested -- indicated at
13 first?
14   A.   To the best that I recall.
15        Q.   The certified deputy, non-certified
16 sergeants, lieutenant, captains, chief, is that how
17 each department was structured?
18   A.   No.  That's the sheriff's office as a
19 whole.
20        Q.   Uh-huh.  So -- so there wasn't, say, a
21 investigation's captain?
22   A.   No, not with a title investigation's
23 captain.  No.
24        Q.   Okay.  So how -- how -- so when you say --
25 so in K- -- the K-9 unit or department, did you

Page 29

1  have -- you had lieutenants in that department?
2    A.   The K-9 unit was generally supervised by a
3  sergeant.  There may have -- one time may have been a
4  lieutenant there.  I'm not sure.
5         Q.   Were these -- were the -- were the deputies
6  cross-trained or did they get in a certain department
7  and stick there?
8    A.   Some, I guess you could say they were
9  cross-trained because they -- some moved from one
10 section within the sheriff's office to another from
11 time to time.
12        Q.   Well, it wasn't like they could go in one
13 day, and one day you'll be in administrative, the
14 next day you'll be in patrol or....
15   A.   No.
16        Q.   They had a specific location, the deputies
17 did?
18   A.   They had specific duties, yes.
19        Q.   And specific -- did they have specific
20 supervisors?
21   A.   Yes.
22        Q.   Okay.  So going back to the administrative
23 department, and you -- and that is a department that
24 assisted you with hiring?
25   A.   It's -- it's really not -- I wouldn't call

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

Pages 30..33

Page 30

1    it a department.  It was just administrative.
2        Q.   So you -- you were saying that you would
3    receive an application, you would go through it, and
4    then you would reach out to the administrative
5    captain?
6        A.   Yes, normally or possibly the chief deputy.
7    Depended on how many applicants we had and how many
8    that we had planned to interview.
9        Q.   How many applicants did you get, say, in a
10   month or in a quarter on average?
11       A.   I can't say because sometimes we would get
12   several.  Sometimes we wouldn't get any.  You know,
13   it just varied.
14       Q.   Okay.  What -- what was several?
15       A.   We might get two or three a month.  We
16   might go three or four months and not get any.
17       Q.   Okay.  So you said you would convene a
18   panel?
19       A.   At right before the time of the -- well, at
20   the time of the interview.
21       Q.   Uh-huh.  Would you -- you say call, you'd
22   send an e-mail.  Was this a regular panel or....
23       A.   No.  Normally if it was a captain that was
24   in charge of the panel, they would make the contact
25   with the applicants.  And I believe most of the time

Page 31

1    that was by a phone call.
2        Q.   What would happen next?
3        A.   The interview would be scheduled.  The --
4    the applicant would report.  They would go through a
5    series of questions and answers.  And then after
6    that, the panel would consider everything that they
7    had -- had been put before them, and they would make
8    a recommendation as to hire or not hire to me.
9        Q.   Did you have a standard set of questions?
10   Was there a standard?
11       A.   Yes, there was.  They were put together by
12   the panel.
13       Q.   What were those questions?
14       A.   I don't know what they were.
15       Q.   Do you know how many?
16       A.   No, I do not.
17       Q.   Did you review the questions?
18       A.   Yes, sometimes I did.  After they were
19   interviewed, I would ask for the notes, just kind of
20   look through them checking responses to various
21   questions.
22       Q.   So the -- the panel would -- was there like
23   a chairperson who met with you or the panel would
24   meet with you after the interview?
25       A.   Normally whoever in charge of the panel,

Page 32

1    generally the most senior person on the panel.  If it
2    was two captains, it would be most likely the
3    administrative captain.
4        Q.   Uh-huh.  They would meet with you and
5    say -- and say what?
6        A.   They would let me know how they felt the
7    interview went.
8        Q.   Uh-huh.
9        A.   And then a recommendation would be made as
10   to do we proceed with this particular applicant.
11       Q.   Who made the decision to have multiple
12   interviews?  So was there one interview, two
13   interviews, three interviews?
14       A.   Well, it depended.  It varied on the
15   individual applicant based on how they answered
16   questions, based on if they mentioned certain items
17   that they had and couldn't put their hands on it
18   right then, or the panel may have decided some
19   questions were not thoroughly answered.  They may
20   call that individual back in and kind of revisit the
21   questions.
22       Q.   Were you involved in that decision to c- --
23       A.   No.
24       Q.   -- call them back?
25       A.   No.

Page 33

1        Q.   Did you meet with the interviewees
2    personally before making a decision?
3        A.   Which --
4        Q.   To hire.
5        A.   To hire?
6        Q.   Yes.
7        A.   Yes.  After the panel -- once the -- they
8    made a recommendation, then I would meet with them
9    individually.
10       Q.   Did it matter if it was a decision to hire
11   or to pass on the applicant?
12       A.   Well, if -- if it was a decision to pass on
13   an applicant, no, I wouldn't meet with them.
14       Q.   When you met with a person, what would --
15   what would, you know, be the purpose of the
16   meeting?
17       A.   Basically I would talk to them briefly,
18   introduce myself and kind of welcome them if it
19   looked as though we were going to hire them, thank
20   them for applying and just go over some general
21   things, such as how to treat people --
22       Q.   Uh-huh.
23       A.   -- how they're expected to behave.  And I
24   would also stress safety of the property and also of
25   the officers.  You know, that was something that I

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Page 34

1    did on a regular basis, and I did it with each
2    applicant, particularly their driving habits.
3        Q.    Uh-huh.
4        A.    And I would let them know that this vehicle
5    that you will be assigned will kill you if you don't
6    respect it.
7        Q.    What did --
8        A.    And I did that -- I did that because I lost
9    a deputy, a young deputy, I think in about my second
10   year as sheriff in a motor vehicle collision.
11       Q.    So you would -- you would welcome them and
12   -- and explain to them your expectations?
13       A.    Pretty much, yes.  Not all of my
14   expectations, but just cursory.
15       Q.    Uh-huh.  Your general.
16             And what would happen next?
17       A.    After that, they would leave, and then the
18   process of gathering all of their background
19   information would begin.  And once that -- all of
20   that is completed, submitted and re- -- if it's
21   satisfactory, they would be recommended for hire to
22   Sheriff's Training and Standards.
23       Q.    And that Sheriff Training and Standards,
24   that's the state?
25       A.    Yes.

Page 35

1        Q.    Would you say that you ran like a brotherly
2    or sisterly organization?
3        A.    No, I would not.
4        Q.    Okay.  So what -- what was the culture like
5    at Vance County Sheriff's Office?
6        A.    To me, the culture was great.  People got
7    along.  They worked together.  They took breaks
8    together.  Sometimes they may visit each other off
9    duty.  We -- over the years we had -- we would -- I
10   would schedule a cookout, a Christmas dinner, that
11   kind of thing.  But I think the -- the culture was a
12   professional one.
13       Q.    And so once you recommended someone for
14   hire to training and standards, typically what
15   occurred next?
16       A.    Once -- after -- once we -- when we did
17   that, we would have all the information we needed,
18   and then we would hire them.  And basically while
19   they're working their first year, if they were not
20   certified, then we -- we would schedule them at some
21   point as soon as we could to go BLET.  If they were
22   certified, then we would -- while they're working, we
23   were waiting on the paperwork to come back from the
24   Sheriff's Standards granting them their
25   certification.

Page 36

1        Q.    Uh-huh.  What was the training process
2    like?
3        A.    The -- the BLET training?
4        Q.    No, the onboarding.  What was onboarding
5    like at Vance County Sheriff's Office?
6        A.    Well, basically when they -- they came --
7    they got hired, they were assigned to a training
8    officer for a period of weeks.  I don't know exactly
9    how many weeks.  The weeks varied depended on --
10   depending on how -- how well the -- the trainee
11   caught on to the duties.
12             Some may have been a little longer than
13   others.  But none were shorter than the specified
14   period, but some may have been a little longer than
15   the specified period.
16       Q.    So no specified period?
17       A.    It was a specified period.  But none were
18   shorter than the specified period, but some may have
19   been a little longer --
20       Q.    Well --
21       A.    -- if the applicant had a -- you know, he
22   may have had difficulty in geography or something.
23   You would have to --
24       Q.    What would --
25       A.    -- work with him another week, few days or

Page 37

1    something, him or her.
2        Q.    What was the specified period?
3        A.    I don't know if it was six weeks.  I want
4    to say six weeks.  I'm -- I'm not positive.
5        Q.    Repeat that answer again.
6        A.    I said, I want to say six weeks.  I'm not
7    positive.  That's riding with a deputy and some of
8    the time spent with the sergeant.  Again, it may be
9    different.  I'm not sure.
10       Q.    Who -- who created the -- the rules related
11   to a specified period?
12       A.    I believe that was done under my
13   administration, under my tenure as sheriff.
14       Q.    Let me take a step back.  So in --
15   somewhere in the hiring process HR was involved,
16   right?
17       A.    The only time HR was involved is after an
18   applicant was hired.  Well, HR was of course in- --
19   involved in the -- the payment.
20       Q.    So I'm talking about Vance County HR.
21       A.    Yes, that's what I'm talking about.  I
22   would contact the HR rep and let them know I've got
23   an individual that I -- I want to hire, these are
24   some of their qualifications.  What can we pay them?
25   Now I had a pay scale, but there was some variance in

Page 38

1  it.
2         So HR would say, Well, okay, here's what we
3  will pay them.  And at that point I would let the ap-
4  -- the applicant know this is what is going to be
5  your pay.
6      Q.    Was -- was Vance County HR, were -- were
7  y'all in the same building or separate buildings?
8      A.    We were in an adjoining building.  There
9  was a -- like a walkway between the two buildings?
10     Q.    Okay.  So you said you had your own pay
11 chart?
12     A.    No.  The county has a pay scale.
13     Q.    Okay.
14     A.    But -- but before I tell an applicant their
15 pay, I would always verify it with HR.
16     Q.    How is the pay calculated?  Do you know
17 that?
18     A.    I don't know.
19     Q.    Is it based on years?  Is it based on....
20     A.    I don't know how it's calculated.  Again, I
21 would let HR know what I had, and the director would
22 give me the pay to offer that individual.
23     Q.    So when you let HR know what you had, what
24 would you tell HR?
25     A.    Something similar, as I said earlier.  I've

Page 39

1  got an applicant here.  They've got X number of
2  years' experience.  They're certified.  They've been
3  trained in these areas.  What can we pay them?
4      Q.    So training, the training mattered or
5  impacted pay?
6      A.    Well, sometimes it did.  Sometimes it
7  didn't.  Same as the education level.
8      Q.    So did education impact pay?
9      A.    No.
10     Q.    Well, let's clarify that because you said
11 sometimes training did and sometimes training didn't
12 impact pay and same as education level.  And then --
13     A.    Well, education level did not impact pay.
14 Training depending on HR could impact it or it could
15 not.
16     Q.    Why -- why wouldn't training -- give me an
17 instance in which training did not impact pay.
18     A.    Well, if you had a deputy with, say, two or
19 three levels of training and a deputy with one, their
20 pay may very well be the same.
21     Q.    So was there a certain threshold of
22 training?
23     A.    No.  The -- the pay is determined strictly
24 by HR who sometimes would confer with the county
25 manager.

Page 40

1      Q.    Would you confer with the county manager?
2      A.    Normally I would go to HR, but I have
3  spoken with the county manager on some -- on some
4  occasions concerning pay.
5      Q.    In those instances, were you trying to get
6  more pay or....
7      A.    I was trying to get more.
8      Q.    Okay.  So let's -- let's go back to this
9  six weeks of riding with the deputy or sergeant
10 practice.
11         You -- you indicated that you initiated
12 that practice at Vance County.
13     A.    Because I don't know what they did before I
14 became sheriff.
15     Q.    Uh-huh.
16     A.    But that was, yes, a part of, I believe,
17 what I initiated when I became -- the actual
18 documentation of the training process.
19     Q.    What did that documentation look like?
20     A.    The training officer did basically
21 evaluations on the trainee on things as their driving
22 skills, how they interact with people, were they
23 learning their way around the county, were they able
24 to talk on the radio properly, that type of stuff.
25     Q.    So what happened typically after the

Page 41

1  training process?
2      A.    They're -- the deputies are assigned to a
3  shift or a squad, as some may call it.
4      Q.    How many shifts or squads did you have?
5      A.    I believe it was four:  A, B, C and D.
6      Q.    How were they assigned to a shift or a
7  squad?
8      A.    Depending on where the vacancies were.
9      Q.    And so would each department have their own
10 shift or squad?
11     A.    No, just -- that's just the patrol division
12 that I'm speaking of.
13     Q.    Okay.  So -- so just explain the shifts.
14 Was it first shift, second shift, third shift?
15     A.    They rotated.
16     Q.    Uh-huh.
17     A.    Some worked days.  Two out of the -- they
18 worked day shift and night shift, and they rotated
19 from day to night.
20     Q.    What was day shift?
21     A.    Normally there were 12-hour shifts.
22     Q.    What were the hours?
23     A.    I believe ordinarily they were like from 6A
24 to 6P and 6P to 6A.
25     Q.    What hours did you work?



Page 42

1    A.   I did not have set hours.
2    Q.   **So after they were assigned to their shift**
3 **or squad, what occurred next?**
4    A.   They went to work and began do- -- doing
5 whatever it is their supervisors had them doing.
6    Q.   **So they were in the supervisors' hands**
7 **then?**
8    A.   Yes, pretty much.
9    Q.   **So the supervisor assigned the duties?**
10   A.   No, they -- the supervisor just supervised
11 them. The supervisor normally knew what their duties
12 were, and -- and they did also. But the supervisors
13 made sure that they performed their duties in an
14 appropriate manner and -- and basically did what they
15 were supposed to do.
16   Q.   **Who would have -- how would the officers be**
17 **assigned duties?  How would duties be assigned?**
18   A.   If they were on a patrol squad, their
19 duties were to patrol the county.
20   Q.   **Was there any type of document that listed**
21 **the duties of, say, a patrol officer versus**
22 **investigation?  Was there any type of....**
23   A.   I don't think so. I don't recall any type
24 of document that specifically spelled it out. Like I
25 said, they patrolled -- their main job was to protect

Page 43

1 the homes, property of the citizens, their businesses
2 and also serving various papers that were handed down
3 from the courts.
4    Q.   **Okay.  So the officers at some point were**
5 **evaluated --**
6    A.   Yes. The --
7    Q.   **-- correct?**
8    A.   -- performance appraisals were done.
9    Q.   **Performance.**
10        **Did you -- did you develop that process or**
11 **that form?**
12   A.   No. That was in process when I became
13 sheriff.
14   Q.   **Was it a midyear performance appraisal, a**
15 **annual?**
16   A.   There was a -- I believe it was a six-month
17 for the new people coming in, but ordinarily it was
18 annual.
19   Q.   **So explain to me a little bit about that**
20 **process.  You said it was a midyear for -- or**
21 **six-month for new employees.**
22   A.   Yes.
23   Q.   **So what would happen?  The employee**
24 **would....**
25   A.   They would be evaluated by their immediate

Page 44

1 supervisor.
2    Q.   **And what would happen after that?**
3    A.   Once that's completed, it is submitted to
4 me, and then I would forward it to -- submit it
5 through the chain to me, and I would forward it --
6 forward it to human resources.
7    Q.   **What would happen next?**
8    A.   They weren't done again until the next
9 evaluation period.
10   Q.   **Okay.  I think we're missing some links in**
11 **the chain.  Because at some point the evaluation**
12 **would reach the employee, correct?**
13   A.   Yes. It's going -- it's -- that is before
14 it is submitted to me.
15   Q.   **Okay.**
16   A.   The immediate supervisor sits down with the
17 employee, and they go over whatever they came up
18 with. And at that point it makes its way through the
19 chain to me.
20   Q.   **So just for clarity or just to clarify this**
21 **process, walk me through it one more time, please.**
22   A.   This is a process that was in place when I
23 became sheriff.
24   Q.   **Uh-huh.**
25   A.   If I remember correctly, there was a --

Page 45

1 people recently hired, there was a six-month period.
2 They were evaluated at the end of six months. And
3 then at the end of the following six months, which
4 would have been a year, they were evaluated again on
5 a form that we call performance appraisal form. That
6 was done by their immediate supervisor. And after
7 that was done, the immediate supervisor would sit
8 down with the individual, and they would go over the
9 performance appraisal together.
10   Q.   **So when you say that was done, that --**
11 **that's the kind of clarity I'm talking about, that**
12 **the -- the --**
13   A.   The -- the appraisal --
14   Q.   **Okay.**
15   A.   -- was done by the immediate supervisor.
16   Q.   **What is the appraisal?**
17   A.   The performance appraisal, the evaluation
18 that we're talking about.
19   Q.   **Was it written notes?  Was it check boxes?**
20 **Was it not --**
21   A.   It's a form designed by human resources,
22 and it had questions on it, different areas of
23 performance or ratings. And they had to be given a
24 rating or a score with an overall score.
25   Q.   **Thank you.**

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Page 46

1    A.   You're welcome.
2    Q.   But they were -- they were scored, and the
3  supervisor determined that score.  Was there
4  typically challenges to the score?
5    A.   No, not typically.
6    Q.   Was there a process by which an employee
7  could challenge their score?
8    A.   Yes.
9    Q.   And what was that process?
10    A.   They could -- at the time of the
11  evaluation, they could let their supervisor know that
12  they didn't agree with it.  At that point, they would
13  come to -- try to come to some kind of what I call
14  happy medium.  And afterwards the individual would be
15  asked to sign the appraisal just acknowledging that
16  it had been done in his or her presence along with
17  them before it comes to me.  And if they couldn't do
18  that, then it would come to me.
19    Q.   Okay.  So let's -- let's talk about the --
20  the process, the termination process.  Explain to me
21  what that process would look like.
22    A.   Well, there's really not a termination
23  process.
24    Q.   So if you wanted to terminate an employee
25  -- have -- have you terminated employees other than

Page 47

1  Mr. White?
2    A.   Yes.
3    Q.   And what procedure did you employ?
4    A.   Well, it depends on the reason for
5  termination.  Generally if warranted, there was some
6  kind of investigation done.  But it didn't
7  necessarily require an investigation to terminate an
8  employee depending on the reason.
9    Q.   Okay.  So -- so give me an example of a
10  reason that did require an investigation.
11    A.   There could be allegations that we need to
12  look into that would require an investigation.  If
13  something happened openly that was egregious enough,
14  that would require an investigation.
15    Q.   What -- what would be an egregious
16  example?
17    A.   If a deputy just stood in the front door
18  and cussed out everybody he saw, and if I heard it or
19  my command staff heard it, I don't see that requiring
20  an investigation.
21    Q.   Okay.  So let's -- let's -- let's get
22  hypothetical.
23      But can you give me an example of when you
24  terminated someone without an investigation?
25    A.   No, I cannot.

Page 48

1    Q.   So you -- are you testifying that you have
2  never terminated someone without an investigation?
3    A.   No, I'm not saying never.  I'm saying all
4  terminations during my tenure just require
5  investigation depending on the actions.
6    Q.   Can you give me an example of a termination
7  that did not require an investigation, or please give
8  me an example.
9    A.   It's -- there have been several people
10  terminated.  There were some that did not require
11  investigation.  There was one individual that was
12  terminated because he didn't want to work for a black
13  sheriff.  That did not re- -- he made the statement,
14  and it didn't require investigation.
15    Q.   Who did he make that statement to?
16    A.   He made it to the majority of the sheriff's
17  office, but that was prior to my arrival.  Well, he
18  really -- he really wasn't terminated.  He just
19  wasn't sworn in when I got there, is the way it ended
20  up.
21    Q.   So you chose not to swear him in?
22    A.   Yes.
23    Q.   How did you learn of that statement?
24    A.   As I said, basically it was made in front
25  of everybody in the sheriff's office, and it came to

Page 49

1  me.
2    Q.   Okay.  And that was a no questions asked
3  terminated -- termination?
4    A.   I just didn't swear him in.
5    Q.   Okay.  Can you think of a situation where
6  you just terminated someone, sent the document,
7  termination document?
8    A.   No.  Not without cause, no.
9    Q.   No.  I'm not saying that it had -- did or
10  did not have cause.  I'm just asking for an example.
11    A.   Have I just -- just terminated someone,
12  what, because I could or what --
13    Q.   No, no, no.  Without an investigation.
14    A.   Not that I recall, no, other than the
15  individual we are speaking of.  And, again, that was
16  just not swearing him in.
17    Q.   Right.  Well, you know, you -- you just
18  testified that you have terminated individuals
19  without an investigation.  And -- and I'm just trying
20  to get an example of a situation in which --
21    A.   Well, in this case I misspoke.  It wasn't
22  -- technically it wasn't a termination.
23    Q.   Okay.
24    A.   I just didn't swear -- re-swear him in.  He
25  worked for the previous sheriff.  I just didn't swear

Page 50

1  him in when I took over.
2      Q.   Okay.  Well, give me an example of when you
3  terminated someone with an investigation, please.
4      A.   I -- I don't recall that.  I spent 12 years
5  as sheriff, and there were some people terminated,
6  but I don't recall all the specifics in that.  But
7  there were investigations prior to termination, or an
8  investigation.
9      Q.   Sheriff White, it -- it may be time for a
10 break.  But we have called you here to testify on
11 behalf of the Vance County Sheriff Office.  And so
12 it's imperative that you provide examples and --
13 because you're speaking on behalf of that entity.
14 And I'm just trying to get an understanding about how
15 that office was run, how it hired people, how it
16 fired people.  And, you know, this is an employment
17 discrimination case.  So it would -- if you need a
18 break -- if you ever need a break, just say.
19     A.   Go ahead.
20         MR. GEIS:  Are you finished testifying?  Is
21     there a question on the table for the sheriff to
22     answer?
23         MS. ROBINSON:  There was a question.
24         MR. GEIS:  What is the question?
25 BY MS. ROBINSON:

Page 51

1      Q.   The question is that I want -- do you feel
2  comfortable letting me know when you need a break?
3      A.   Yes.
4      Q.   Okay.  Do you need a break now?
5      A.   No, not now.
6      Q.   So can you provide me an example of when
7  you terminated someone and actually conducted an
8  investigation?
9      A.   No, I cannot.  I don't recall every
10 individual that was terminated over a 12-year
11 period.
12     Q.   Can you recall one instance?
13     A.   The one that we talked about earlier, which
14 technically was not a termination.
15     Q.   The instance we discussed earlier was one
16 without an investigation.  My question is can you
17 recall one instance in which --
18         MR. GEIS:  Objection, asked and answered.
19     And I believe this lawsuit is one of those
20     instances.  So....
21         MS. ROBINSON:  I think that's a speaking
22     objection.
23         MR. GEIS:  Which you're familiar with
24     because I read a number of them in your
25     deposition of Justin White when I reviewed the

Page 52

1  transcript.  So, Sheriff, just wait for her next
2  question, and you can answer it.  You've already
3  answered this question.
4         MS. ROBINSON:  Are you instructing him not
5     to answer the question?
6         MR. GEIS:  Yes, I am.  He's already
7     answered it.  Do you have another question?
8         MS. ROBINSON:  So you're instructing him
9     not to answer the question?
10        MR. GEIS:  Do you have another question?
11        MS. ROBINSON:  I do.
12 BY MS. ROBINSON:
13     Q.   Sheriff White, explain to me your
14 termination process.
15     A.   Well, as I said earlier, technically there
16 is no termination process per se.
17     Q.   So do you make up the pro- -- does the
18 process change based on the individual?
19     A.   There's not a process as I see it.
20     Q.   Uh-huh.  Well --
21     A.   There's not a termination process.
22     Q.   Well, explain to me how a person is
23 terminated?
24     A.   Well, it depends on what they've done.  An
25 investigation is conducted.  A decision is made.  And

Page 53

1  if it warrants termination, they're terminated.
2      Q.   What does the investigation consist of?
3      A.   It depends on the particular situation or
4  particular incident or allegations.  Normally it's
5  interviewing everybody that we can that were
6  involved.
7      Q.   So you would conduct interviews?
8      A.   Yes.  They would be conducted, not
9  necessarily by me.
10     Q.   What would occur during the interviews?
11     A.   Well, I wouldn't be present during the
12 interviews, but I'm sure whatever questions that were
13 thought to be relevant would be asked.
14     Q.   And what would happen next?
15     A.   Investigation would proceed.  And at the
16 conclusion of the investigation, some type of
17 recommendation would be made.  If the investigation
18 concluded that a termination would be necessary, then
19 that person may be terminated.
20     Q.   How would the termination be executed?
21     A.   It depends on the -- the individual.
22     Q.   What does that mean?
23     A.   It depends on their behavior.  Normally
24 they -- we would inform them that their services are
25 no longer needed, and we would collect the ID and

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Page 54

1  weapon and that type of stuff at that time. Someone
2  within the sheriff's office will drive that person
3  home or wherever they need to go, and then we would
4  collect the car and that kind of stuff.
5      Q.   Would the termination be effective
6  immediately typically or....
7      A.   Yes, immediately.  Yes.
8      Q.   So let's go back to the example that you
9  provided about, you know, not swearing in the -- the
10 white deputy.
11     A.   I didn't -- now I did not say he was
12 white.
13     Q.   Well, he wa-- -- what was his race?  That's
14 a good point.  So what was his race?
15     A.   He was white.
16     Q.   He was white.
17     A.   Caucasian.
18     Q.   Okay.  How -- so you said you just didn't
19 swear him in?
20     A.   No, I did not.
21     Q.   So he just -- he just didn't show up to
22 work the next day?
23     A.   No.  He couldn't unless he was sworn.  If
24 he was not sworn in, he was no longer a deputy.
25 Again, he was under the previous sheriff.

Page 55

1      Q.   So all deputies have to be sworn in under
2  new leadership?
3      A.   Yes, and after each election.
4      Q.   Did you send him a letter or a note or
5  anything?
6      A.   Yes.  He was sent a letter.
7      Q.   What did the letter say?
8      A.   I believe it said his services were no
9  longer needed.
10     Q.   Did that deputy contact HR?
11     A.   I don't know.
12     Q.   Did that deputy file a -- a grievance
13 or....
14     A.   Not that I know of.
15     Q.   Did you ever hear from that deputy again?
16     A.   No.
17          MS. ROBINSON:  Can we -- let me take a
18     five-minute break.
19          MR. GEIS:  Okay.
20              (BREAK TAKEN)
21 BY MS. ROBINSON:
22     Q.   Sheriff -- Sheriff White, we -- we were
23 talking about the termination process.  And, you
24 know, just to move things some -- along some, there
25 is a document that you complete when you terminate an

Page 56

1  employee, correct?
2      A.   Yes.
3      Q.   Explain to me what -- what is done after
4  you effectuate and communicate the termination.
5      A.   Now which document is....
6      Q.   The termination notice.
7      A.   Well, there's one that goes to HR.
8      Q.   Uh-huh.
9      A.   And there's another one that goes to
10 Sheriff Training and Standards.
11     Q.   Explain to me the -- the process by which
12 the one that goes to HR is completed.
13     A.   It's just -- has the individuals date -- I
14 mean the individual's name and the date that they
15 were terminated.
16     Q.   Is that a document that you complete?
17     A.   Yes.
18     Q.   Do you decide --
19          MS. ROBINSON:  So let the record reflect
20 that we have on the screen, which is Exhibit 1.
21     (EXHIBIT NUMBER 10 WAS MARKED FOR IDENTIFICATION.)
22 BY MS. ROBINSON:
23     Q.   Is this the document you're referring to,
24 Sheriff White?
25     A.   Yes.  It's called a Personnel Action

Page 57

1  Form.
2      Q.   Can you review that document?  Let's give
3  him -- you a second to review that document.
4          MS. ROBINSON:  Michael, can you scroll --
5     is that the full document?
6          MR. MCGURL:  (Complies.)
7          MR. GEIS:  Are you sure you want to label
8     this as Exhibit 1?  The rules require that
9     exhibits in a case in the Eastern District be
10    labeled sequentially regardless of whether
11    they're in another deposition.  I -- I don't have
12    a problem with it.  It's your call.  I'm just
13    letting you know.
14         MS. ROBINSON:  No.  The exhibits --
15         COURT REPORTER:  I'm sorry.
16         MR. GEIS:  You need to what?
17         MS. ROBINSON:  It's Exhibit 10.
18         MR. GEIS:  That was not among -- we -- he
19    can read that.  Can you read that, Sheriff?
20         THE WITNESS:  Let me stand up and get a
21    little closer to it.
22         MR. GEIS:  That was not among the documents
23    that we have this morning.
24         Oh, Sheriff, here it is.  But it was among
25    the documents yesterday.

AdvancedONE LEGAL

(866) 715-7770
advancedONE.com

Page 58

1    MS. ROBINSON:  Right.  Some of the
2  documents -- can we go off the record?
3    MR. GEIS:  Well, I've -- I've got it right
4  here.  I'll give it to him, Exhibit 10.
5    MS. ROBINSON:  Yeah.  We sent an e-mail
6  saying that some of the documents will -- from
7  yesterday will be used today.
8    MR. GEIS:  Yes.  I've got it.
9    THE WITNESS:  Yes, I see this.
10 BY MS. ROBINSON:
11    Q.  So you reviewed the document?
12    A.  Yes.
13    Q.  Do you recognize the document?
14    A.  Yes.
15    Q.  And can you explain for the record what
16 this document is?
17    A.  Well, it's called a Payroll Action Form.
18 And it basically is just letting human resources know
19 that this particular individual is no longer on the
20 payroll.
21    Q.  And you complete that document whenever you
22 terminate an employee?
23    A.  Yes, and also when an employee leaves for
24 any other reason.
25    Q.  How soon after a termination do you

Page 59

1  complete this document?
2    A.  We do it as soon as possible, sometimes the
3  next the day or next couple of days.
4    Q.  Okay.  So you mentioned a document that you
5  send to Training and Standards also.  How soon after
6  termination do you complete that document?
7    A.  Sheriff Standards has a rule, and I believe
8  it says ten days.  I'm not certain.
9    Q.  Can you review this document, Sheriff
10 White, that we have on the screen?
11    A.  Okay.
12    Q.  Can you tell me what this document is?
13    A.  It's a report of separation.
14    Q.  And do you recognize your signature on this
15 document?
16    A.  Yes.
17    MS. ROBINSON:  Let the record reflect that
18 we are marking what is Exhibit former 11.
19 (EXHIBIT NUMBER 11 WAS MARKED FOR IDENTIFICATION.)
20 BY MS. ROBINSON:
21    Q.  How soon after termination do you complete
22 this form generally?
23    A.  I believe Sheriff Standards says within ten
24 days, if I'm not mistaken.
25    Q.  Are these the only documents that are

Page 60

1  completed when an officer is terminated?
2    A.  I know these two are, but I don't recall
3  every document that is submitted.  But these are what
4  I would consider the main two.
5    Q.  Okay.  Do you send letters to employees who
6  are terminated?
7    A.  Sometimes.  Sometimes we don't.
8    Q.  Do you provide reasons for termination?
9    A.  At times we do.  Other times we don't.
10    Q.  Why -- why would you not provide an
11 explanation?
12    A.  Generally if someone is terminated, they
13 know why.  Oftentimes we as sheriffs just tell them
14 their services are no longer needed.
15    Q.  Can you give me an example of when you did
16 provide a reason for termination?
17    A.  No, I cannot.  I don't recall a specific
18 example.
19    MS. ROBINSON:  Michael, can you take that
20 document down, please?
21    MR. MCGURL:  (Complies.)
22 BY MS. ROBINSON:
23    Q.  Well, please give me some examples for the
24 reasons or reasons that you've terminated employees
25 or deputies in your tenure?

Page 61

1    A.  That is something that I would have to
2  reflect on because that was a period of 12 years, and
3  I don't recall everybody that was terminated nor do I
4  recall why they were terminated.
5    Q.  So, Sheriff White, I -- I don't want you --
6  I don't need you to recall every one, just a few
7  examples if you could provide.
8    A.  No, I cannot.
9    Q.  Do you know how many people you've
10 terminated over your tenure?
11    A.  No, I do not.
12    Q.  Would you say it's less than ten?
13    A.  I don't know.  I haven't counted them.
14    Q.  How many people did you terminate, say,
15 your last year of service?
16    A.  I don't know.
17    Q.  Did you terminate any individuals your last
18 year of service?
19    A.  I know one was terminated.
20    Q.  What was that individual terminated for?
21    A.  A particular event that occurred that he
22 was involved in.
23    Q.  What was that particular event?
24    A.  It was a use of force and the ensuing
25 actions after the use of force, actually before and

AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

Page 62

```
1   after.
2       Q.   Was someone injured?
3       A.   Yes.
4       Q.   Was the person injured?
5       A.   Excuse me?
6       Q.   I said, was that person injured?
7       A.   They suffered a broken arm.
8       Q.   Are you talking about Mr. White?
9       A.   Yes.
10      Q.   Was that the only termination during your
11  last year of service?
12      A.   That's the only one I recall at this
13  moment.
14      Q.   What about your -- the year prior to your
15  last year? Did you terminate....
16      A.   I don't recall that.
17      Q.   You -- you said that you had a culture in
18  which you -- you invited your employees to
19  cookouts?
20      A.   Yes. At times during my earlier years as
21  sheriff, we would hold cookouts, all the employees
22  invited. We would do a Christmas dinner, all of the
23  employees invited and some of the county staff,
24  county manager and other people to cookouts, some
25  prior EMS personnel, police officers. It was more
```

Page 63

```
1   like a -- similar to just a good social gathering.
2   We just -- we just got together, ate, talked about
3   whatever; and then everybody went on their way.
4       Q.   Were they at the facility or at your home
5   or....
6       A.   No, we -- normally we would -- we did the
7   cookouts at one of the -- at the local EMS building.
8   We would get a space at a local hotel and do
9   Christmas dinner. We had music, food. Everybody
10  just enjoyed themselves.
11      Q.   Okay. What kind of music did you play?
12      A.   Well, the county manager normally would
13  play the piano. Well, the -- former county
14  manager would play the piano for us. We had a deputy
15  that at that time that liked to sing, and he liked to
16  tell jokes. He was actually in charge of the
17  bailiffs.
18      Q.   So he would sing with the pianist or....
19      A.   No. He would do his own thing. He would
20  do impersonations and stuff like that.
21      Q.   Did y'all play soul music?
22      A.   No. It was just piano.
23      Q.   The piano.
24           What type of songs would he sing?
25           MR. GEIS: Objection, relevance.
```

Page 64

```
1   BY MS. ROBINSON:
2       Q.   You can answer.
3            What type of songs would he sing?
4       A.   Are you talk -- would who? Are you talking
5   about the county manager or --
6       Q.   You -- you said the --
7       A.   -- the deputy?
8       Q.   The deputy.
9       A.   He would -- he would just sing like maybe
10  an Elvis song or something like that. He would -- he
11  wouldn't -- he would never do the whole song. He
12  would just do snippets, Christmas songs, that type of
13  stuff.
14      Q.   Did you continue that practice?
15      A.   It went on for a while. I don't know the
16  exact number of years we did it, but eventually -- it
17  eventually stopped.
18      Q.   Why did it stop?
19      A.   Well, if we served chicken, some people
20  wanted steak. If we served steak, somebody wanted
21  barbecue. If we served tea, somebody wanted
22  lemonade. And I just -- I didn't feel that it was
23  really appreciated. So we just didn't do it. You
24  know, we did it for several years. I don't recall
25  the exact number.
```

Page 65

```
1       Q.   What -- what types of events did you -- did
2   you do to -- did you do any events to replace those
3   types of events, those types of gatherings?
4       A.   No. That was just done within the
5   sheriff's office. And at some point the county would
6   do an annual event, a dinner, and all the employees
7   were invited.
8       Q.   You -- you testified earlier that you
9   thought those events, you know, helped the officers
10  bond, correct?
11      A.   That I thought -- no, I didn't say that I
12  thought it helped them bond. It was just a -- it was
13  open to -- we invited EMS and police officers at --
14  highway patrol. It was law enforcement, EMS, first
15  responders' deal, along with the sheriff's office
16  people as well as the jail.
17      Q.   Did you host any events or any activities
18  for the sheriffs alone, the sheriff's deputies?
19      A.   No.
20      Q.   Was there an effort to ensure that the
21  deputies built relationships with one another?
22      A.   Well, that was up to each individual's
23  supervisors, but most of our deputies -- our deputies
24  were mature people. And nobody had to, you know, try
25  to see that they bonded or that type of thing. They
```

AdvancedONE LEGAL

(866) 715-7770
advancedONE.com

Page 66

1  automatically looked out for each other.
2      Q.   What -- what does that mean, they
3  automatically looked --
4      A.   I mean, normally in the law enforcement
5  community law enforcement officers generally eat
6  together.  They know each other.  They may visit each
7  other's homes, that type of thing.  They would know
8  each other's kids, spouse's name.
9          MS. ROBINSON:  Okay.  We are about to go
10         into a dr- -- Chris, we are about to go into
11         these policies.  Do you want to break for lunch?
12         MR. GEIS:  It's up to you.  We -- I
13  think Sheriff White would like a break for
14  lunch, but it's up to you when to take it.
15         MS. ROBINSON:  Sheriff White, are you ready
16         for lunch?
17         THE WITNESS:  It doesn't matter to me.
18         MS. ROBINSON:  Okay.  Well, it's 12:30 now.
19  So, you know, I can eat lunch late.  But I want
20  to make sure the sheriff is comfortable.
21         MR. GEIS:  Sure, whenever.
22         THE WITNESS:  Okay.  Yeah.  Let's -- let's
23  -- let's do lunch.
24         MS. ROBINSON:  Okay.  So, what, an hour?
25         MR. GEIS:  Sure.

Page 67

1          MS. ROBINSON:  Okay.
2          MR. GEIS:  I'll see you at 1:30.
3              (LUNCH BREAK)
4  BY MS. ROBINSON:
5      Q.   Sheriff White, we left off discussing
6  certain practices that were employed.  Let's talk
7  about the -- the process in how you handled
8  complaints of harassment, discrimination, any type of
9  workplace complaint.  Can you explain to me that
10 process?
11     A.   It would depend on how the complaint comes
12 in, whether it be a letter or phone or in person.
13 And that is generally -- depending on the complaint,
14 it could be assigned to an investigator if it's a
15 serious complaint.  If somebody comes in and say I
16 want to know why your deputy was speeding yesterday
17 on I-85, you know, that, in my opinion, doesn't
18 require an investigation.  You know, we -- of course
19 we would talk to the deputy if we can figure out who
20 it was and, you know, kind of go from there.  If it
21 was something major, then, yes, it would be an
22 investigation done generally by -- depending on the
23 complaint again.  Generally we would -- the internal
24 investigation would be done by Captain Bullock.
25     Q.   What's the last name?  I'm sorry.  Cappy --

Page 68

1  or you said captain?
2      A.   Captain.
3      Q.   Yeah.
4      A.   Captain.  Yeah.  Weldon Bullock.
5          COURT REPORTER:  Captain, what was that?
6          THE WITNESS:  Weldon Bullock.
7          COURT REPORTER:  Could you just --
8          MS. ROBINSON:  Your microphone is very
9  sensitive.  We here the texts.
10         MR. GEIS:  Sorry.
11 BY MS. ROBINSON:
12     Q.   Okay.  Can you -- you continue, Sheriff
13 White?
14     A.   It depends on the -- what type of complaint
15 comes in.  If it's something that warrants an
16 internal investigation, then generally Captain Weldon
17 Bullock will conduct it.
18     Q.   And so that's a citizen's complaint.  What
19 about a workplace complaint?
20     A.   Such as?
21     Q.   Harassment, discrimination, hostile work
22 environment.
23     A.   We've only had one that I recall during my
24 time as sheriff.
25     Q.   And how were those -- how was -- so -- and

Page 69

1  -- and I suspect we're talking about Mr. White.
2      A.   Yes.
3      Q.   So did you anticipate, have a -- a practice
4  of like if a complaint came through, how you would
5  respond to it, a procedure?
6      A.   No, we didn't -- I wouldn't say we
7  anticipated.  Again, that's the only complaint that
8  we've had in my tenure as sheriff the way you
9  described it.
10     Q.   Well, did -- so how would you com- -- have
11 you ever had a situation in which a woman said that
12 she wasn't treated the same as men, male deputies?
13     A.   No.
14     Q.   Okay.  And so not had any workplace
15 complaints in terms of -- what if a officer said,
16 someone is harassing me, an employee, a co- -- a
17 deputy is harassing me or -- maybe not even those
18 words, but....
19     A.   We -- we've only had one such incident
20 similar to that.
21     Q.   Okay.  I think at this point we want to
22 look at -- go into the policies.
23         MS. ROBINSON:  Michael, can you please pull
24 up A.1 and A.2?
25         MR. MCGURL:  (Complies.)

Page 70

1  BY MS. ROBINSON:
2      Q.   Sheriff White, can you see this policy?
3      A.   Yes, I can see it, but I would have to walk
4  up there and read it.
5      Q.   Okay.  I think Mr. Geis is pulling that
6  together for you.
7           Sheriff White, will you please let me know
8  when you've had a chance to review that policy?
9      A.   Any particular section or the entire
10 policy?
11     Q.   The policy in its entirety.
12     A.   Okay.
13     Q.   Do you recognize that document, Sheriff
14 White?
15     A.   It looks to be a policy and procedure
16 manual.
17     Q.   Can you identify the document by name?
18     A.   That is Directive A.1, "Cannons of Police
19 Ethics."
20     Q.   And are those your signatures on that
21 document?
22     A.   Yes.
23     Q.   Did you draft these policies?
24     A.   No, I did not draft them.
25     Q.   Were you responsible for the drafting of

Page 71

1  these policies?
2      A.   Yes.
3      Q.   If you would go to the first page of
4  Directive A.1, please.
5      A.   (Complies.)
6      Q.   Can you read the date of this policy?
7      A.   7/15/2009.
8      Q.   How often did you update your policy
9  essentially, Sheriff White?
10     A.   I believe there was only one update that I
11 recall during my tenure since this was drafted.
12          MS. ROBINSON:  And let the record reflect
13      we're marking Exhibit 12, which is Directive A.1.
14     (EXHIBIT NUMBER 12 WAS MARKED FOR IDENTIFICATION.)
15 BY MS. ROBINSON:
16     Q.   You were saying that there was only one
17 update?
18     A.   That I can recall.
19     Q.   When did that update occur?
20     A.   I don't know.
21     Q.   Do you -- do you know about -- not
22 precisely when, but was it in 2008, 2007, before or
23 after?
24     A.   I don't know.  It would have been after
25 this July 15, 2009 date.

Page 72

1      Q.   Okay.  How often are you required to update
2  your policies?
3      A.   I'm not aware of a requirement as far as
4  updating policy, a timeline.
5      Q.   Did you have someone who was dedicated to
6  drafting policies, updating and implementing
7  policies?
8      A.   No.
9      Q.   Did you provide your deputies with copies
10 of your policies?
11     A.   They were not provided with copies of the
12 policy manual on an individual basis, but they did
13 have access to it.  There was a computer in the
14 patrol squad room that they can sit down whenever
15 they wanted to and review whatever policies they
16 chose to.
17     Q.   Why didn't you provide your deputies with
18 copies of the policy?
19     A.   Vance County, being a poor county, we just
20 couldn't afford to print 40-something-thick policy
21 manuals.
22     Q.   Okay.  So I want to turn your attention to
23 the actual exhibit, and I'm going to ask you a couple
24 questions about it.
25          Can you read the primary responsibility, so

Page 73

1  Article 1?
2      A.   "The primary responsibility of the police
3  service and the individual officer is the protection
4  of the people of the United States through the
5  upholding of their laws; chief among them is the
6  Constitution of the United States and its Amendments.
7  The law enforcement officer always represents the
8  whole of the community and its legally expressed will
9  and is never the arm of any political party or
10 clique."
11     Q.   Do you agree with that statement?
12     A.   Yes, I agree with it.
13     Q.   What does that statement mean to you?
14     A.   It means exactly what it says to me.
15     Q.   Which is?  If you paraphrase it -- can you
16 paraphrase that statement in your -- in layman's
17 terms?
18     A.   Do the right thing.
19     Q.   Okay.  I would like for you to turn your
20 attention to Article 6.
21     A.   Okay.
22     Q.   Can you just review that statement to
23 yourself?  I'm not going have you read the entire
24 paragraph.
25     A.   (Complies.)

Page 74

1    Q.   After you've reviewed that statement, will
2  you tell me what that means?  Just summarize it in
3  your terms.
4    A.   Basically be a decent, respectful person
5  and lead your life in a manner such as that.
6    Q.   Would you agree that that's on and off
7  duty?
8    A.   Yes.
9    Q.   Will you pay -- will you turn your
10 attention to Article 7?
11   A.   Okay.
12   Q.   Can you paraphrase that for me?
13   A.   Basically serving the public in -- in a
14 professional manner.
15   Q.   There is a sentence there.  It -- it says
16 -- so the second sentence from the last, can you read
17 that sentence, sir?
18   A.   Are you talking about the one that says
19 that it does not give satisfaction private --
20   Q.   No.  So we're still in Article 7.
21   A.   Okay.
22   Q.   And it says, "The officer will give...."
23   A.   Okay.  I see that.
24        "The officer will give service where he can
25 and require compliance with the law."

Page 75

1    Q.   What does that mean?
2    A.   He will give service where he can in
3  serving the public and require compliance with the
4  law.
5    Q.   Does that sentence mean that the officer is
6  expected to uphold the laws?
7    A.   Yes.
8    Q.   Can you turn to the -- to the "Code of
9  Ethics," Sheriff White?
10   A.   Okay.
11   Q.   Is this a document that you had each
12 officer sign?
13   A.   No, they would not have -- I don't believe
14 they would each sign this particular directive.
15   Q.   But you did expect the officers to act as
16 directed under this code of ethic?
17   A.   Yes.
18   Q.   Okay.  So if you -- you'll hold onto it,
19 we'll come back to this -- these policies.
20        Let's turn now to the domestic B --
21 Directive B-6.
22        MS. ROBINSON:  Do you have that policy,
23 Mr. Geis?
24        MR. GEIS:  Yes, we do.
25        THE WITNESS:  I have it.

Page 76

1  BY MS. ROBINSON:
2    Q.   Sheriff White, will you please let me know
3  when you've had a chance to review this directive?
4    A.   The entire directive?
5    Q.   If you want to skim it, we'll go through it
6  part by part like before, or if you want to read it,
7  review it in its entirety, either works.
8    A.   Okay.
9    Q.   Can you identify this document, Sheriff
10 White?
11   A.   It looks to be from the Vance County
12 Sheriff's Offices Policy and Procedure Manual.
13   Q.   What directive is this?
14   A.   B.6.
15   Q.   And can you read the name of the documents
16 at the bottom of each page?  What does it say at the
17 bottom of each page?
18   A.   Vance County Sheriff's Office Policy
19 Manual.
20   Q.   And is it -- this your signature on these
21 policies?
22   A.   Yes.
23   Q.   Did you draft this policy?
24   A.   No, I did not.
25   Q.   Did you sign off on this policy?

Page 77

1    A.   Yes.
2    Q.   Can you go to the first page of the policy
3  document?
4    A.   Okay.
5    Q.   Okay.  And can you read the effective
6  date?
7    A.   7/15/2009.
8    Q.   Has this policy been updated since?
9    A.   It's been updated once.  I don't recall the
10 date.
11   Q.   Who updated the policy?
12   A.   I did.
13   Q.   Do you know who drafted the policy?
14   A.   It was drafted by a company or a group that
15 did this type of work.
16   Q.   Do you recall the name of the group?
17   A.   No, I do not.
18   Q.   If you will turn to the -- so first page of
19 the policy and read the second sentence for me.
20   A.   "The Vance County Sheriff's Office
21 recognizes domestic incidents caused as high priority
22 and needing special attention due to the possibility
23 of violence directed to an involved party."
24   Q.   Did your office receive a lot of domestic
25 disputes?

Page 78

1   A.   We received some.  I don't recall how many.
2   Q.   Will you turn your attention to -- your
3   attention to page 7 of that document, Article 5?  Can
4   you read that?
5   A.   Which section on page 7?
6   Q.   Article 5.
7   A.   "Same Gender Disputes"?
8   Q.   Yes.
9   A.   "Although 50B does not address
10  specifically, the issue of same-sex domestic
11  incidents, deputies are reminded that domestic
12  disputes do occur with same-sex relationships.
13  Personnel are to treat calls of this nature the same
14  way in using the same methods as opposite-sex calls.
15  However, do not apply the same standards for ex-parte
16  orders under 50B if making a warrantless arrest."
17  Q.   Can you explain to me what last sentence
18  means?
19  A.   I'm not 100 percent sure, but I'm thinking
20  that it means -- apply the same standards -- it's
21  distinguishing a difference between same sex and
22  opposite sex.  You don't apply the same rules.
23  Q.   Why wouldn't you apply the same rules?
24  A.   I don't know.  That's just what it says.
25  Q.   And you expected your deputies to carry out

Page 79

1   your policies, correct?
2   A.   Yes, I did.
3   Q.   Okay.  Let's move on to --
4        MS. ROBINSON:  Let the record reflect that
5        Exhibit 13 is Directive B.6.
6   (EXHIBIT NUMBER 13 WAS MARKED FOR IDENTIFICATION.)
7   BY MS. ROBINSON:
8   Q.   Let's move on to Exhibit B.9.  I mean
9   not -- I mean Policy B.9.
10  A.   I have.
11  Q.   Will you please let me know when you're
12  ready to discuss this policy?
13  A.   I'm ready.
14  Q.   Okay.  Can you identify -- will you
15  identify this policy, Sheriff White?
16  A.   "Use of Force," Directive B.9, Vance County
17  Sheriff's Office Policy Manual.
18  Q.   And is that your signature?
19  A.   Yes.
20  Q.   Did you draft this policy?
21  A.   No.
22  Q.   Did you cause this policy to be drafted?
23  A.   Yes.
24  Q.   Can you go to the first page and read the
25  date of that policy?

Page 80

1   A.   July 15, 2009.
2   Q.   Has this policy been updated?
3   A.   Once that I recall.
4   Q.   Did you disseminate the updated policy?
5   A.   Yes.
6   Q.   To whom did you give it to?
7   A.   I believe every deputy received a copy of
8   the updated portion.  In fact, every -- every
9   member -- every officer of the sheriff's office
10  should have received one.  I believe a memo went
11  along with it, if I remember correctly.
12  Q.   Do you recall what the memo may have said
13  or would have said?
14  A.   No, I don't remember, but it would have
15  said -- identified the policy that was updated.
16  Q.   Would you have e-mailed that update or....
17  A.   No.  I believe it was hand-delivered.
18  Q.   When you updated the policy, did you update
19  the policy as the entire Vance County Sheriff's
20  Office Policy Manual or are you saying this directive
21  was updated?
22  A.   No.  I'm not saying this directive.  It was
23  a particular directive, but I don't recall which one
24  it was.
25  Q.   Okay.  Can you read the -- the -- starting

Page 81

1   at the second sentence of Article 1?
2   A.   "By vesting deputies the lawful authority
3   to use force to protect the public welfare, the
4   careful balancing of all human interests is
5   required."
6   Q.   Can you continue?  Just read that whole
7   statement, sir.
8   A.   "Therefore, it is the policy of the Vance
9   County Sheriff's office that deputies shall use only
10  that force which is reasonably necessary to
11  effectively bring an incident under control while
12  protecting the lives of the officer or another.
13  Deputies shall use physical force in arrest and
14  custody situations only in strict conformance with
15  the United States Constitution, laws of the State of
16  North Carolina and this policy."
17  Q.   Have your officers -- have your deputies
18  used force before?
19  A.   Yes.
20  Q.   Is that force prohibited?
21  A.   No.
22  Q.   Has a suspect been injured while using
23  force before?
24  A.   Yes.
25  Q.   Can you identify some types of force that

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Page 82

1  is used?
2       A.    There's soft hands.  Mace is used.  There
3  have been firearms used.
4       Q.    You said batons?
5       A.    Firearms.
6       Q.    Firearms.
7             Do your deputies have batons?
8       A.    Yeah, some of them do.
9       Q.    How do you decide who gets batons?
10      A.    It depends on how many we have available to
11 be issued.  And sometimes we look at seniority, and
12 other times we -- we may look to see who -- who has
13 an interest in one provided that they are certified
14 to use it.
15      Q.    Can you provide a deputy with an instrument
16 that he or she isn't certified to use?
17      A.    Normally we don't do that on the ones that
18 require certification.
19      Q.    What instruments must the deputy be
20 certified to use?
21      A.    The ASP baton, your mace or OC spray,
22 firearms.  That's all I can think of right now.  And
23 also, some are issued riot batons.
24      Q.    Are all officers or deputies issued
25 firearms?

Page 83

1       A.    Yes.
2       Q.    Are they trained on the use?  Do you
3  train --
4       A.    Yeah.  Yes, they are trained by a certified
5  firearms instructor.  They also are trained in Basic
6  Law Enforcement Training.
7       Q.    And that's the BLET?
8       A.    Yes.
9       Q.    How does a deputy express interest in other
10 types of equipment?
11      A.    Generally if there's equipment available,
12 some deputies will maybe approach a supervisor and
13 say, can I have one of these or can I get this or --
14 provided that they have -- have recently become
15 certified in whatever that is.
16      Q.    Do you offer certification?
17      A.    Yes.
18      Q.    Would a deputy have to request
19 certification or....
20      A.    No.  No.  Sometimes they're -- some
21 deputies are a little more eager than others.
22      Q.    Were you -- who was responsible for handing
23 out the equipment?
24      A.    There were two different individuals under
25 my tenure.  The first one was Lieutenant Stainback.

Page 84

1  He retired.  And then that went to Lieutenant Ray
2  Shearin.
3       Q.    Can you spell his last, sir?
4       A.    S-E- -- S-H-E-A-R-I-N.
5       Q.    Can you read the Chemical Agents section,
6  Sheriff White?
7       A.    "Only sheriff's office-issued chemical
8  agents may be carried and used by deputies of the
9  Vance County Sheriff's Office.  Prior to the issue of
10 oleoresin capsicum spray, OC spray, all deputies
11 shall receive training in its use, which will include
12 instruction and actual allocation -- application to
13 afford the deputy an understanding of the effects.
14 Any use of OC spray other than in a training
15 situation or spraying of animals or self-protection
16 shall be reported as required by policy."
17      Q.    Can you para- -- paraphrase that statement,
18 sir?
19      A.    Basically you should not be carrying the --
20 the chemical spray unless you have been trained in
21 its use.
22      Q.    So is it fair to say that the issuance of a
23 OC spray without training is against procedure?
24      A.    It should not have been issued without the
25 training verification.

Page 85

1       Q.    What is the training verification?
2       A.    Some type of documentation saying that they
3  have completed that training.
4       Q.    And would that training verification come
5  from Vance County Sheriff's Office?
6       A.    It would come from the instructor that
7  performed the training.
8       Q.    Would that instructor be hired by Vance
9  County or contracted by Vance County Sheriff's
10 Office?
11      A.    Well, not necessarily because it could be
12 done through a community college.
13      Q.    But it would have been at -- would the
14 training been at the request of the Sheriff's
15 Office?
16      A.    Yes.
17      Q.    Can you turn to page 3 of that document,
18 Sheriff White?
19      A.    Okay.
20      Q.    Can you read the section where it says
21 "Serious Bodily Injury"?
22            COURT REPORTER:  And I'm sorry that --
23            THE WITNESS:  "Serious bodily injury that
24 creates a substantial risk of death or is likely
25 to cause permanent disfigurement, coma,

AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

Page 86

1    protracted, or permanent condition. It is an
2    inquiry -- it is an injury that causes extreme
3    pain, prolonged or permanent loss or impairment
4    of the function of any bodily member or organ
5    that results in prolonged hospitalization."
6  BY MS. ROBINSON:
7       Q.   What does prolonged hospitalization mean?
8       A.   A long time in the hospital.
9       Q.   So would a week be prolonged?
10      A.   It could be.
11      Q.   Would a day be prolonged?
12      A.   It could be depending on the individual
13   that's hospitalized, how they feel about it.
14      Q.   So it's -- it's up to how the individual
15   feels about it?
16      A.   No, it's not up to how they feel, but
17   prolonged to one person may not be prolonged to
18   another. But basically what this policy is -- the
19   way I interpret it is saying, I mean, I guess a sub-
20   -- substantial time in a hospital.
21      Q.   Well, this is -- this is a policy that you
22   signed off on, correct?
23      A.   Yes.
24      Q.   Okay. Let's -- let's move on. Can --
25   let's turn to page 4.

Page 87

1       A.   (Complies.)
2       Q.   Can you read the first sentence of the
3    General Guidelines?
4       A.   "When lethal force is not authorized, a
5    deputy should assess the situation in order to
6    determine which less lethal technique or weapon will
7    best de-escalate the incident to bring it under
8    control in a safe manner."
9       Q.   What is lethal force, Sheriff White?
10      A.   Life-threatening.
11      Q.   And what do you paraphrase this clause to
12   mean?
13      A.   A use of force that could be
14   life-threatening or possibly take someone's life.
15      Q.   The entire clause, sir. I'm sorry. How
16   would you paraphrase the entire clause?
17      A.   The entire first sentence?
18      Q.   Yes.
19      A.   The deputy basically should assess the
20   situation and determine, as it says, which less --
21   which less than lethal technique or weapon will best
22   be -- will best deescalate the incident, bring it
23   under control in a safe manner.
24      Q.   Is this a subjective inquiry?
25      A.   Well, yeah, it could be.

Page 88

1       Q.   Let's move on to page 5, Medical
2    Assistance.
3       A.   Okay.
4       Q.   Can you read where it says, "Medical
5    assistance shall be afforded...."?
6            No. "Medical assistance afforded shall
7    be...."
8       A.   The first sentence?
9       Q.   Yes. Yes, sir.
10      A.   "Deputies shall make the scene as safe as
11   possible and shall afford medical assistance to
12   injured persons considering:"
13      Q.   And then read the next sentence.
14      A.   "Amount and type of force...." -- the next
15   sentence?
16           "Medical assistance afforded shall be the
17   same as for any other individual with similar
18   injuries including:"
19      Q.   And can you read the two?
20      A.   Including "First aid administered by the
21   deputy within the limits of the affected deputy's
22   level of training, calling or offering to call
23   emergency medical services as appropriate."
24      Q.   So is it your expectation that your
25   deputies if and when they injure someone, that they

Page 89

1    seek treatment for that person also?
2       A.   Yes, if they're in a position to do so.
3       Q.   Can you explain that? You said if they're
4    in position to do so.
5       A.   They're able to do so.
6       Q.   When would they not be able to do so?
7       A.   If they're injured themselves to the point
8    where they're incapable.
9            Let's turn to page 15 of this document.
10           MS. ROBINSON: And also, let's -- let's
11   note that this is Exhibit 14.
12   (EXHIBIT NUMBER 14 WAS MARKED FOR IDENTIFICATION.)
13   BY MS. ROBINSON:
14      Q.   Can you -- do you see the section where it
15   says, "Use of Force," Sheriff White?
16      A.   "Other Use of Force"?
17      Q.   Yes. Yes.
18      A.   Yes.
19      Q.   Can you read that first sentence?
20      A.   "A deputy shall complete the Use of
21   Force/Assault Report on each occasion that he or she
22   strikes a person with any part of his body using
23   fist, elbow, knee, or neck restraint or uses or
24   displays any defensive weapon, OC spray included, in
25   order to control a subject. On those occasions where

(866) 715-7770
advancedONE.com

Page 90

1   the deputy displayed only any defensive weapon,
2   excluding the electronic control device, ECD, a
3   brief, factual to-the-point narrative shall be
4   completed. The Use of Force/Assault Report shall
5   also be completed whenever a subject or a deputy is
6   injured, complains of injury, or has visible injury
7   or in any case where the subject is charged with
8   assaulting the deputy."
9       Q.  Okay. What is a Use of Force Report?
10      A.  It's a form used by the sheriff's office to
11  document what took place during a use of force, such
12  as I believe a date and time and what force was used
13  and why, that type of thing.
14      Q.  Did you maintain a repository of those
15  documents?
16      A.  Yes.
17      Q.  Is a Use of Force Report the same as an
18  assault report?
19      A.  No.
20      Q.  What's the difference?
21      A.  I -- I'm not familiar with an assault
22  report.
23      Q.  The policy names an assault report.
24      A.  It says use of force, slash, assault
25  report. So reading this policy, that would be one

Page 91

1   and the same.
2       Q.  They're the same. Okay. Thank you.
3           So if a deputy is injured, is it the
4   expectation that the deputy document that on forms?
5   If a -- if a deputy is injured by a suspect, it is
6   the expectation that the deputy document that
7   injury?
8       A.  Yes. If -- if the form is completed and
9   there is an injury to the deputy, yes, it should be
10  documented on that report.
11      Q.  Okay. Can -- let's turn to page 16.
12      A.  Page 16 or 17?
13      Q.  16, sir.
14      A.  Okay.
15      Q.  This -- this -- this policy says, "Review
16  by Supervisor"?
17      A.  Yes.
18      Q.  Can you read that first bullet?
19          COURT REPORTER: And could you please read
20      slower, please?
21          THE WITNESS: "The deputy's supervisor
22      shall review the use of force, slash, assault
23      report for completeness with the deputy prior to
24      submission. In addition, the supervisor shall
25      review any accompanying video and this directive

Page 92

1   as it applies to the incident with the deputy and
2   make an initial determination about whether the
3   deputy followed the Sheriff's Office Policy and
4   established training procedures. The Use of
5   Force/Assault Report -- this report and the use
6   of force policy reviewed with the deputies
7   involved. The supervisor performing the review
8   and the affected deputy, shall initial the Use of
9   Force/Assault Report below the above-mentioned
10  statement. A supervisor who is involved in the
11  incident shall not conduct the review."
12  BY MS. ROBINSON:
13      Q.  Does this -- what do you interpret this
14  policy to mean?
15      A.  The supervisor should review the policy for
16  completeness prior to submission for filing.
17      Q.  So does this mean that the supervisor makes
18  the first determination as to whether or not the
19  force used was reasonable?
20      A.  No. The supervisor is -- is reviewing this
21  for completing -- completeness and also to make sure
22  that the policy was followed.
23      Q.  Can you read the second bullet, Sheriff
24  White?
25      A.  "The deputy's supervisor shall then sign

Page 93

1   the Use of Force/Assault Report and send it, along
2   with a copy of the accompanying videos, if
3   applicable, directly to the Use of Force Board
4   liaison lieutenant. The Use of Force/Assault Report
5   is not required to be submitted to the sheriff's
6   office captain but can be provided upon request."
7       Q.  Who -- who sits on the Use of Force
8   Board?
9       A.  I don't know who -- who is on it now,
10  obviously. But when I was there, there was -- I
11  don't remember the number of people. I think it was
12  four or five. I remember Lieutenant Stainback being
13  one of them. I think Captain Lloyd Watkins was one,
14  and I don't recall the -- the others. But generally
15  they were -- there was also -- I believe there was
16  one sergeant that sat on it, if I remember correctly.
17  I don't recall who that was.
18      Q.  How regularly did the Use of Force Board
19  convene?
20      A.  I'm not sure. That depended on the number
21  of Use of Force forms we received.
22      Q.  So in the first bullet where it says, "The
23  deputy's supervisor" --
24      A.  Yes.
25      Q.  -- were you referring to the direct

Page 94

1  supervisor?
2      A.  Yes.  That would be the sergeant.
3      Q.  And -- and would that sergeant also sit on
4  the Use of Force Board?
5      A.  It wouldn't be that -- it wouldn't be the
6  sergeant that was in -- if the sergeant was involved
7  in the incident, they wouldn't do the -- they
8  wouldn't be the one who reviewed the use of force.
9  It could very well be that the sergeant on the board
10 at the time will review a Use of Force form completed
11 by someone on his shift on that board.
12     Q.  Let's go to the third bullet.
13     A.  (Complies.)
14     Q.  Can you read that third bullet, sir?
15     A.  "Training or policy issues identified
16 during a supervisory review shall not be addressed in
17 the Use of Force/Assault Report, but instead shall be
18 documented on the appropriate form, performance
19 record, official complaint, etcetera and processed in
20 accordance with procedures established by the
21 sheriff's office.  A copy of the form shall be
22 attached to the Use of Force/Assault Report, and
23 shall be forwarded to the Use of Force Review Board."
24     Q.  What -- what was the process established by
25 the sheriff's office?

Page 95

1      A.  The officer fills out a Use of Force, sub-
2  -- submits it to be reviewed by the immediate
3  supervisor.  It would go to the liaison lieutenant.
4  And when the Use of Force Board convened, they would
5  review the forms that they had before them.
6      Q.  Okay.  Can you specifically explain what it
7  means -- what you were inten- -- what you intended
8  when it says, "...and processed in accordance with
9  procedures established by the sheriff's office"?
10         How does a -- how does a Use of Force
11 training or policy, how was it -- how was that
12 processed, a policy issue?  How was it processed?
13     A.  If there was a -- an issue that appeared to
14 be a training or policy issue, then that would be
15 addressed as in maybe some kind of refresher training
16 or something or a reminder if it appeared to be some
17 kind of policy violation.
18     Q.  Who appointed the board members?
19     A.  I did.
20     Q.  How did you select the board members?
21     A.  Well, I tried to get somebody from patrol,
22 administrative, such as a patrol lieutenant.  And if
23 I remember correctly, from time to time there was a
24 sergeant on the board.  So I tried to have a
25 representation of the sheriff's office.  In other

Page 96

1  words, it -- it was not all command staff on the
2  board.
3      Q.  Will you turn to the section that says,
4  "Review by Board"?
5      A.  Yes.
6      Q.  Sheriff White, I didn't ask you this.  Did
7  you have any women under your leadership, sir?
8      A.  Any?
9      Q.  Women?
10     A.  Any what?
11     Q.  Any women who served under your
12 leadership?
13     A.  Oh.  Yes.  I -- as a matter of fact, I
14 hired the first female deputy in the Vance County
15 Sheriff's Office.
16     Q.  How many women did you employ as
17 deputies?
18     A.  Well, it varied at different times.  I
19 think the highest I've ever had at one time was three
20 or four.  I can't remember the exact number.  One,
21 two, three, four.
22     Q.  But a woman didn't sit on the -- on the Use
23 of Force Board?
24     A.  No, not that I recall.
25     Q.  Okay.  So we were about to discuss the

Page 97

1  "Review by the Board."  Can you read the last two
2  bullets?
3      A.  Under "Review by the Board"?
4      Q.  Yeah.
5      A.  "All Use of Force/Assault Reports and the
6  accompanying video will be reviewed and analyzed at
7  least bi-monthly by the Use of Force Board.  The
8  board may request, through the chain of command,
9  additional information and clarification on any Use
10 of Force/Assault Report.  The sheriff's office
11 captain shall appoint board members for three years
12 from the following sections, with one deputy holding
13 the rank of lieutenant who shares -- who shall serve
14 as chairperson: Patrol division, one member sergeant;
15 Internal affairs, one member; Training liaison,
16 member responsible for coordination of training;
17 Investigations division, one sergeant or detective;
18 Deputies, two enforcement members, road deputies;
19 Operations division."
20     Q.  Who -- who was the captain?  Who....
21     A.  Generally it was Captain Bullock once he
22 was promoted to captain, which was in my -- early in
23 my term as sheriff, first term.
24         COURT REPORTER:  And who -- what was the
25     captain's name, please?



(866) 715-7770
advancedONE.com

Page 98

1          THE WITNESS:  Weldon Bullock.
2          COURT REPORTER:  Okay.  Thank you.
3   BY MS. ROBINSON:
4      Q.   Do you recall how many Use of Force
5   incident -- incident reports or summary reports you
6   reviewed, Sheriff White?
7      A.   No, I do not.
8      Q.   Were there very few?
9      A.   I would say yes.  We didn't get very
10  many.
11     Q.   Would you say like less than 20, less than
12  50?
13     A.   I don't know how -- I don't recall.
14     Q.   Is the Use of Force a closed-type review
15  process?
16     A.   Help me understand what you mean by closed.
17     Q.   Is it limited to the incident at hand or
18  did the board consider other aspects of the deputy?
19     A.   No.  That would be limited to the reports
20  that they had in hand.
21     Q.   Can you read the last bullet, Sheriff
22  White?
23     A.   "All use of force from the" -- are we still
24  on page 16?
25     Q.   Yes, sir.  17.

Page 99

1      A.   Okay.  The last one.
2          "If a deputy is involved in three or more
3   Use of Force/Assault incidents in a quarter, or six
4   or more within a consecutive 12-month period, the
5   chairman of the Use of Force Review Board or his
6   designee will obtain this information, assign it to
7   the review board member from internal affairs who
8   will review the reports and the deputy's affair's
9   file to determine if a pattern of improper behavior
10  is apparent."
11     Q.   Who -- who -- who are you referring to when
12  you say "internal affairs"?
13     A.   Well, I didn't have --
14     Q.   What are you --
15     A.   I did not have an internal affairs section.
16  So again, that would have gone to Captain Weldon
17  Bullock.
18     Q.   What do you interpret this last bullet to
19  mean?  How would you interpret that?
20     A.   That the -- the use of force use should be
21  monitored.
22          MS. ROBINSON:  Okay.  Can we take a break
23      for about five minutes?
24          MR. GEIS:  Yes.
25              (BREAK TAKEN)

Page 100

1   BY MS. ROBINSON:
2      Q.   Can you -- Sheriff White, can you review
3   Directive D.7?
4      A.   B.7?
5          MR. GEIS:  Is it in there?
6          THE WITNESS:  Say B.7 or -- okay.  B.7.
7          Okay.
8   BY MS. ROBINSON:
9      Q.   So you've had time to review the policy,
10  Sheriff White?
11     A.   Yes.
12     Q.   Can you identify this policy, Sheriff
13  White?
14     A.   Directive D.7 from the Vance County
15  Sheriff's Office Policy Manual.
16     Q.   Did you sign this policy?
17     A.   Yes.
18     Q.   Did you -- policy?
19          COURT REPORTER:  What was the question?
20  BY MS. ROBINSON:
21     Q.   Did you implement this policy?
22     A.   No.  I thought you asked me did I sign the
23  policy.
24          No, I did not implement the policy.
25     Q.   Who implemented the policy?

Page 101

1      A.   It was a company we hired.  You mean -- no.
2   I misunderstood you.  I'm thinking that you asked me
3   if I drafted this policy.  Yes, I implemented this
4   policy.
5      Q.   Okay.  Let's go to the first page of this
6   policy.
7      A.   (Complies.)
8      Q.   Can you read the effective date?
9      A.   July 15th, 2009.
10     Q.   Has this policy been updated?
11     A.   The manual itself -- a portion or a
12  specific section of the manual itself has been
13  updated, but I can't say that this particular
14  directive has been updated.
15     Q.   Read the first sentence of this policy --
16          MS. ROBINSON:  Well, let's first identify
17  this as Exhibit 15.
18          (EXHIBIT NUMBER 15 WAS MARKED FOR IDENTIFICATION.)
19  BY MS. ROBINSON:
20     Q.   Will you read the name of this policy?
21     A.   "Grievance Procedure and Adverse Action
22  Appeal."
23     Q.   Will you also read the first paragraph, the
24  first two paragraphs?
25     A.   "It is the policy of the county to provide

Page 102

1  a just and prompt procedure for presentation,
2  consideration and disposition of employee grievances.
3  The purpose of this article is to outline the
4  procedure and to assure all employees that a response
5  to their complaints and grievances will be prompt and
6  fair.  Employees utilizing the grievance procedures
7  shall not be subjected to retaliation or any form of
8  harassment from supervisors or employees for
9  exercising their rights under the grievance
10  procedure.  Supervisors or other employees who
11  violate this policy shall be subject to disciplinary
12  action up to and including dismissal."
13      Q.   Thank you.
14           What do you consider a complaint?
15      A.   Well, a complaint can be any number of
16  things.
17      Q.   Must it be written?
18      A.   No.  All complaints don't need to be
19  written.
20      Q.   So a complaint can be oral?
21      A.   Yes.
22      Q.   Is a complaint the same thing as a
23  grievance?
24      A.   Not necessarily.
25      Q.   Explain the difference.

Page 103

1      A.   A complaint may just be something as
2  similar -- as simple as I'm working too many nights
3  or I'm working too many days or I didn't get off on
4  my birthday; and, you know, a complaint can be
5  basically anything.
6      Q.   And what's a grievance?
7      A.   To me, a grievance would be geared more
8  toward some type of mistreatment or harassment, that
9  type of thing.
10      Q.   Can a grievance be oral?
11      A.   It could be oral, but at some point the
12  individual may be asked to put it in writing.  But it
13  could begin in a oral fashion.
14      Q.   Was it your practice to require written
15  grievances?
16      A.   Not beginning -- it depends on what stage
17  the grievance was in.  If there was a grievance, when
18  it came to me, it was in writing.
19      Q.   Did you employ the same method of
20  investigation, whether a grievance be written or
21  oral?
22      A.   Basically, yes.  But, again, an oral
23  grievance that required an investigation, the person
24  initiating the grievance would mostly be asked to put
25  it in writing at some point.

Page 104

1      Q.   How did you resolve grievances?
2      A.   I've only had one that I recall that was
3  forwarded to HR and then forwarded to me.  Once I
4  received it, an investigation was done, and a
5  response was given back to the individual initiating
6  the grievance, and a copy was given to HR.
7      Q.   How did you resolve complaints?
8      A.   The investigation revealed that the
9  alleged -- the allegations in the grievance did not
10  occur as described in the grievance, were not
11  substantiated.
12      Q.   We're going to get to that.
13           My question more specifically was how did
14  you resolve complaints?
15      A.   Oh, I thought you said grievances.
16           It would depend on the type of complaint.
17  Some -- some complaints warranted an investigation.
18  Some didn't.
19      Q.   Would you conduct the investigation?
20      A.   It depended on the type of complaint.
21      Q.   What type of complaints did you
22  investigate?
23      A.   Again, all complaints did not warrant an
24  investigation.  Again, if somebody called and I
25  answered the phone, they say, I'm wondering why your

Page 105

1  deputy is speeding down I-85.  You know, I would talk
2  a bit -- little bit about how fast do you think he
3  was going, does he have his emergency equipment on,
4  that type of thing.  That did not warrant an
5  investigation in my opinion.
6      Q.   I'm -- I'm specifically asking about how
7  did you -- how -- how did you go about investigating
8  workplace complaints; so not citizen complaints, but
9  workplace complaints.
10      A.   I don't recall having but one workplace
11  complaint, and that was handled in the manner that I
12  just described.
13      Q.   So do you consider a complaint about a
14  performance evaluation a workplace complaint?
15      A.   Yes.
16      Q.   So how -- how would you go about handling a
17  workplace complaint?
18      A.   If it's -- as it relates to an evaluation
19  for a performance appraisal, I would talk with the
20  supervisor that completed the appraisal as well as
21  the individual that it was done on, try to see if
22  they can reach a happy medium, so to speak, if it was
23  because they didn't agree on something that was on
24  the evaluation form.
25      Q.   Did you ever involve human resources?



Page 106

1    A.  No, not in the -- no.  Human re- -- the
2  only involvement human resources had on a -- on a
3  evaluation or appraisal was the copies were forwarded
4  to the HR director.
5    Q.  Did all complaints and grievances have to
6  go directly to you?
7    A.  It depends on -- if it's concerning the
8  sheriff's office, they should come to me.
9    Q.  I would -- I would like for you to look at
10  Directive E.2.
11  (EXHIBIT NUMBER 16 WAS MARKED FOR IDENTIFICATION.)
12        THE WITNESS:  I have it.
13  BY MS. ROBINSON:
14    Q.  Do you need a moment to review it?
15    A.  Yes.
16        Okay.
17    Q.  Sheriff White, have you had an opportunity
18  to review the document?
19    A.  Yes.
20    Q.  Can you please identify the document?
21    A.  Directive E.2:  "Investigation of
22  Complaints and Charges Against Personnel."
23    Q.  And what -- is this a Vance County
24  Sheriff's Office policy?
25    A.  Yes.

Page 107

1    Q.  Is your signature at the bottom of the
2  policy?
3    A.  Yes, that's mine.
4    Q.  Did you implement this policy?
5    A.  Yes.
6    Q.  Can you go to the first page of the
7  document and read the date at the top right-hand
8  corner?
9    A.  Effective 7/15/2009.
10    Q.  Did you update this policy?
11    A.  I don't believe so.
12    Q.  Can you read the first sentence of this
13  policy?
14    A.  "This policy provides guidelines for
15  accepting, recording, resolving and forwarding
16  complaints."
17    Q.  How is a complaint accepted pursuant to
18  this policy?
19    A.  Sometimes they come in writing.  Sometimes
20  they come over the phone.  Sometimes they may come in
21  person.  And it is generally accepted by whoever
22  receives the complaint.
23    Q.  Will you read the second sentence of
24  Accepting Complaints?
25    A.  "Charges from within the sheriff's office

Page 108

1  shall be processed as provided in this policy."
2    Q.  What does that mean?
3    A.  That it should be accepted, documented and
4  resolved if it could be.
5    Q.  So a complaint doesn't have to go directly
6  to you?
7    A.  No.
8    Q.  And even those complaints that go to others
9  should be accepted and resolved?
10    A.  Yes, if possible before getting to me.
11    Q.  Let's talk about those complaints.  How
12  should those complaints be processed?
13    A.  Again, it depends on what type of complaint
14  it is.  If it's a citizen's complaint, we have a form
15  that we will ask the citizens to complete.  If they
16  -- if they come in person and complain, we ask them
17  to complete the form.  If they complain over the
18  phone, we ask them some questions and document what
19  they say or we may ask them to stop by and complete
20  the form.
21    Q.  How should the internal complaints be
22  processed?
23    A.  Internal complaints should go from the
24  member that's doing the complaining to his immediate
25  supervisor and go up the chain of command until it's

Page 109

1  resolved.
2    Q.  Do you require any documentation of the
3  complaint?
4    A.  Yes, it has to be documented.
5    Q.  Who documents the complaint?
6    A.  It begins with the person receiving the
7  complaint.
8    Q.  So if the -- if it's a supervisor, the
9  supervisor should document the complaint?
10    A.  Yes.  If it's a deputy complaining to a
11  supervisor, the supervisor should document it.  And
12  if that particular supervisor cannot resolve it, it
13  should be forwarded up until it is resolved.
14    Q.  Can you read the last sentence of Accepting
15  Complaints?
16    A.  "A supervisor has the obligation to
17  investigate possible violations of policy even if the
18  person providing the information does not want a
19  complaint filed."
20    Q.  What does that mean?
21    A.  To me, it means that if someone, for
22  example, calls or comes in and complain about
23  something that may be a policy violation, the
24  supervisor has an obligation to look into it.
25    Q.  So that would apply in the citizen's

Page 110

1  context and in the workplace context, correct?
2      A.  Yes.
3      Q.  Do you consider accusations or --
4  accusations isn't the best word.  But do you consider
5  reports about the distribution of bulletproof vests a
6  complaint?
7      A.  Can -- can you repeat that question?
8      Q.  Do you consider reports about the
9  distribution of bulletproof vests a complaint?
10     A.  Now what do you mean by distri- --
11 "distribution of bulletproof vests"?
12     Q.  Providing deputies....
13     A.  Okay.  To -- in the sheriff's office itself
14 providing bulletproof vests to deputies?
15     Q.  Yes.
16     A.  Well, yeah, that could be a complaint.
17     Q.  And you would expect that to be
18 investigated?
19     A.  It definitely needs to be looked into.
20     Q.  What about, would you consider a report of
21 the use of racial slurs a complaint?
22     A.  Yes.
23     Q.  What about the use of slurs related to
24 someone's sexual orientation?
25     A.  Yes.  That would be considered a

Page 111

1  complaint.
2      Q.  What -- what happens when complaints aren't
3  recorded?
4      A.  It depends on the type of complaint.  It
5  may be something that is considered minor, and
6  whoever has received a complaint may just remember
7  what it's about.  But it still needs to be looked
8  into.
9      Q.  The receiving person can store it in memory
10 and --
11     A.  Correct.  And then forward it up that way
12 if it's something that is considered minor or
13 simple.
14     Q.  When you say forwarded --
15     A.  Through the chain, if necessary, if it
16 cannot be resolved.
17     Q.  But if the complaint can be resolved, then
18 it doesn't need to be forwarded?
19     A.  After -- if it can be resolved, once it's
20 resolved, then the results need to be forwarded.
21     Q.  Okay.  Who would the results be forwarded
22 to?
23     A.  They would go through the chain of command
24 and possibly end up with me.
25     Q.  Would the results be recorded in a

Page 112

1  person -- in the personnel file?
2      A.  It depends on the type of complaint that it
3  is.
4      Q.  Would the result be commuted --
5  communicated to the employee?
6      A.  Yes.
7      Q.  We're going to turn back to this policy,
8  but I just want to move on to E.3.
9          MR. GEIS:  Is this Exhibit Number 17 or 18?
10         MS. ROBINSON:  17.
11 (EXHIBIT NUMBER 17 WAS MARKED FOR IDENTIFICATION.)
12         MR. GEIS:  Okay.  In the interest of time,
13     you are free to tell Sheriff White, but it's up
14     to you, that he doesn't have to read the whole
15     thing before you ask him questions.
16         MS. ROBINSON:  I just want him to read it
17     to get acquainted with it.
18         MR. GEIS:  Okay.
19         THE WITNESS:  Okay.
20 BY MS. ROBINSON:
21     Q.  Have you had time to read and review the
22 policy, Sheriff White?
23     A.  Yes.
24     Q.  And for the record, can you please state
25 the -- the name of this policy?

Page 113

1      A.  It's Directive E.3:  Unlawful workplace
2  Harassment.
3      Q.  And whose policy is this?
4      A.  Vance County Sheriff's Office.
5      Q.  And did you sign this policy?
6      A.  Yes.
7      Q.  Did you implement this policy?
8      A.  Yes.
9      Q.  Can you read the effective date of this
10 policy?
11     A.  July 15th, 2009.
12     Q.  Did you update the policy?
13     A.  I don't believe this particular section was
14 updated.
15     Q.  Can you read the first sentence of the
16 second paragraph?
17     A.  "It is the policy of the Vance County
18 Sheriff's Office that no employee may engage in
19 conduct that falls under the definition of unlawful
20 harassment in the workplace.  All employees are
21 guaranteed the right to work in an environment free
22 from unlawful harassment in the workplace and
23 retaliation.  The sheriff's office prohibits its
24 personnel from harassing clients, supervisors,
25 colleagues, community representatives, subordinates

AO  AdvancedONE            (866) 715-7770
LEGAL                      advancedONE.com

Page 114

1 or other persons or groups with whom they have
2 contact as representatives of the organization. The
3 sheriff's office will promptly and thoroughly
4 investigate all complaints made by an employee and
5 will take appropriate remedial or disciplinary action
6 up to and including dismissal."
7     Q.    Can you read the section where it says,
8 "Definitions of Unlawful Workplace Harassment"?
9     A.    "Unlawful workplace harassment is unlawful
10 or unsolicited speech or conduct based on race, sex,
11 creed, religion, national origin, age, color or
12 handicapping condition as defined in N.C.G.S. 168A-3
13 that creates a hostile work environment or
14 circumstances involving quid pro quo. Action, words,
15 jokes or comments based on an individual's sex, race,
16 color, national origin, disability, religion, age or
17 other status protected by State or Federal law will
18 not be tolerated."
19     Q.    What does that mean?
20     A.    There is a zero tolerance policy in the
21 Vance County Sheriff's Office for this type of stuff.
22     Q.    So jokes about someone's sexual orientation
23 isn't allowed?
24     A.    No.
25     Q.    Jokes about someone's race isn't allowed?

Page 115

1     A.    No.
2     Q.    Jokes about someone's gender isn't
3 allowed?
4     A.    If it's in a negative or type of tone that
5 could offend somebody, no.
6     Q.    What happened once -- if someone does joke
7 about someone's protected status?
8     A.    If it is brought to the attention of a
9 supervisor, then that supervisor has a responsibility
10 to look into what's happened, document it, try to
11 resolve it.
12     Q.    So you mentioned a zero tolerance policy.
13 What would you expect to be the outcome of an
14 investigation in which someone said -- made a comment
15 about someone's race, sexual orientation, gender?
16     A.    The outcome should be some type of mutual
17 understanding between all parties involved.
18     Q.    What do you mean by "mutual
19 understanding"?
20     A.    It could be an apology or I was not
21 offended by that or no harm done, that type of
22 thing.
23     Q.    Would there be any disciplinary action?
24     A.    It could be depending on the
25 circumstances.

Page 116

1     Q.    Would you consider an apology a
2 disciplinary action?
3     A.    No.
4     Q.    Do you consider tho- -- these types of
5 instances grievances or complaints?
6     A.    Yes, that could be either/or.
7     Q.    Why -- why did you implement a zero
8 tolerance policy?
9     A.    Well, it wasn't implemented as a zero
10 tolerance policy. That is just my characterization
11 of this policy, but it was clearly implemented
12 because this type of behavior is not tolerated.
13     Q.    Okay. Let's -- let's go to page 2 of this
14 document.
15     A.    (Complies.)
16     Q.    Can you read or describe -- can you please
17 describe to me what's a formal complaint?
18     A.    To me, a formal complaint is it could be
19 any complaint that's documented.
20     Q.    Documented by whom?
21     A.    Whoever is receiving the complaint.
22     Q.    So if the receiving party just stored it to
23 memory, then it wouldn't be a formal complaint?
24     A.    It would depend on the complaint itself;
25 again, if something simple that the receiving party

Page 117

1 may have made a mental note of. An example: If
2 there's a deputy internally saying that the squad
3 room is too hot or too cold, the supervisor can make
4 a mental note of that and either adjust the
5 temperature one way or the other, and hopefully it
6 would be resolved at that point.
7     Q.    Sheriff White, this policy is spe- --
8 specifically addresses workplace ha- -- harassment or
9 retaliation, correct?
10     A.    Yes.
11     Q.    So in the context of workplace harassment
12 or retaliation, can you tell me what is a formal
13 complaint?
14     A.    To me, that's any complaint that has -- has
15 been alleged.
16     Q.    What is a -- an informal complaint in the
17 context of workplace harassment or retaliation?
18     A.    An informal complaint could be something
19 said in a joking manner depending on how it was
20 initiated.
21     Q.    Do you require that informal complaints be
22 investigated?
23     A.    They need to be looked -- looked into and
24 resolved if possible.
25     Q.    Do they need to be looked into by you?

Advanced**ONE**
LEGAL

(866) 715-7770
advancedONE.com

Page 118

1    A.  No, not necessarily.  It can be resolved
2  anywhere in the chain of command.
3      Q.  Would you consider an informal complaint
4  something that you would look into and resolve?
5      A.  Yes, depending on if it's involving
6  anything in this particular policy.  Yes.
7      Q.  Have you looked into or resolved any
8  informal complaints?
9      A.  I am not aware of any informal complaints
10  that has come to my attention concerning this.
11      Q.  Okay.  Let's go down to di- -- Direct
12  Observation.
13      A.  (Complies.)
14      Q.  Can you read that statement, Sheriff White?
15      A.  "Direct Observations:  Supervisors on all
16  levels who directly observe potentially harassing
17  conduct must consider these observations equivalent
18  to any other form of complaint.  The investigation
19  process is indicated where a supervisor or department
20  head feels observed conduct may indeed represent
21  prohibited behaviors."
22      Q.  What is potentially harassing conduct?
23      A.  Can you say that again?
24      Q.  What is potentially harassing conduct?
25      A.  It's conduct that could be construed as

Page 119

1  harassing.
2      Q.  Can you give me an example?
3      A.  No, I cannot.
4      Q.  I'm sorry, sir.  I didn't hear you.
5      A.  No, I cannot.
6      Q.  You can't because -- are you saying that
7  you cannot because you can't think of any examples or
8  you haven't experienced any examples or you just
9  don't want to give an example?
10      A.  I just can't think of any examples, and I
11  don't want to speculate on anything.
12      Q.  What do you -- what does it mean by
13  supervisors who directly observe?  What is a direct
14  observation?
15      A.  Supervisors that either sees or hear
16  something.
17      Q.  So direct observation is seeing or
18  hearing?
19      A.  Yes.  If you are in proximity to hear
20  firsthand.
21      Q.  Does the supervisor have any discretion to
22  not conduct an investigation?
23      A.  No, not in this type of stuff.
24      Q.  Does the supervisor have any type of
25  discretion to not document the situation?

Page 120

1    A.  No, it should be documented.
2      Q.  Should instances in which an employee
3  reports that another employee is being harassed,
4  should those instances be documented also?
5      A.  Yes.
6      Q.  How many supervisors did you employ at the
7  time of Mr. White's tenure?
8      A.  At the time of his what?
9      Q.  Tenure.
10      A.  What was the question?
11      Q.  How many supervisors did you employ at the
12  time of Mr. White's tenure?
13      A.  I don't recall that exact number.
14      Q.  How many deputies did you employ at the
15  time of Mr. White's tenure?
16      A.  I don't recall that number either because
17  it varied based on how many vacancies we had, how
18  fast we could fill them, that type of thing.
19      Q.  But a sergeant up is a supervisor,
20  correct?
21      A.  Yes.
22      Q.  Can you look at the "Disciplinary Action"
23  section?
24      A.  Ready.
25      Q.  Can you read that?

Page 121

1    A.  "Disciplinary action taken against the
2  harasser would typically range from a written
3  warning, counseling, suspension from work, transfer
4  to a different position or termination of
5  employment."
6      Q.  What is a written warning?
7      A.  Basically putting in writing warning the
8  individual to change their behavior.
9      Q.  Is that a standard form?
10      A.  Yes.
11      Q.  What is counseling?
12          COURT REPORTER:  I'm sorry.  Say that
13  again, please.
14  BY MS. ROBINSON:
15      Q.  Counseling.  What is counseling?
16      A.  Counseling is sitting down with the
17  individual, explaining to them what they have done
18  wrong allegedly or how they could have done things
19  different and trying to get them to see how not to
20  commit the same offense again.
21      Q.  Is counseling less severe or more severe
22  than a warning?
23      A.  Well, they're both, I would say, equal.
24  Counseling is a little more detailed.
25      Q.  Is there a form that goes into an

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Page 122

1  employee's record --
2      A.   Yes.
3      Q.   -- if they receive counseling?
4      A.   Yes.  If they receive any of the things
5  listed here.
6      Q.   How detailed is a counseling form?
7      A.   I would say it's not a very, very detailed
8  form.  It's just enough to get the point across and,
9  if necessary, change the behavior of whoever the
10 offender is.
11     Q.   How long does counseling typically last or
12 take?
13     A.   It depends on the situation.
14     Q.   Ten minutes, an hour?
15     A.   It depends on the situation.  It could
16 vary.
17     Q.   What's the shortest counseling that....
18     A.   There's really no time limit on a
19 counseling.
20     Q.   Uh-huh.  Who would perform the
21 counseling?
22     A.   It depends on the situation.  It could be
23 anywhere from the immediate supervisor on up the
24 chain of command.
25     Q.   Have you ever performed counseling?

Page 123

1      A.   I -- as sheriff?  I -- I believe so.  I'm
2  not -- I don't recall any incident specifically, but
3  I believe I have.
4      Q.   Does -- does an employee have to sign a
5  form indicating that they've have been counseled?
6      A.   Yes.  They are asked to sign it, but they
7  don't have to.
8      Q.   If an employee doesn't sign the counseling
9  form, is that in any way considered a rejection of
10 the counseling?
11     A.   Well, it could be construed that way, but
12 not necessarily.
13     Q.   So what happens if an employee doesn't sign
14 a counseling form?
15     A.   Whoever it is that's doing the actual
16 counseling will continue to try to explain exactly
17 what is going on, trying to make sure that the
18 individual that's being counseled understands what
19 it's all about.  But in the end, they don't have to
20 sign it if they choose not to.
21     Q.   Okay.  And then the next disciplinary
22 action is suspension from work.  What does that
23 entail?
24     A.   Suspension from work, it could -- normally
25 it's without pay when you're suspended from work.

Page 124

1      Q.   Does the person, do they have to leave
2  their badge or -- so what's the process when a person
3  is suspended?
4      A.   Yes.  If someone is suspended, normally we
5  -- we keep their badge, their ID, the vehicle.
6  Basically we keep almost all of the equipment issued
7  to them other than the uniforms.
8      Q.   Do you consider a K-9 equipment?
9      A.   No, not really.  I consider a K-9 more of a
10 partner to the handler.
11     Q.   So the K-9 could stay with the -- the
12 handler?
13     A.   Yes, depending on the period or we could
14 get another K-9 handler to deal with that particular
15 K-9.
16     Q.   Do you have a distinction between a
17 long-term and a short-term suspension?
18     A.   No.  There's really no distinction other
19 than one is longer or shorter than the other one.
20     Q.   So what's a short-term suspension?
21     A.   The -- again, there's -- there's no
22 specific term.
23     Q.   What's the purpose of suspension?
24     A.   Disciplinary.
25     Q.   Okay.  And so then you have transfer to a

Page 125

1  different position.  What does that mean, to be
2  transferred to a different position?
3      A.   It means the changing of duties and
4  responsibilities.
5      Q.   Have you ever implemented this course of
6  action?
7      A.   I don't recall one as it pertains to
8  disciplinary action.  I may have.  I just don't
9  recall it at this moment.
10     Q.   Would this be -- is this similar to a
11 demotion?
12     A.   It could be or it could be included with a
13 demotion.
14     Q.   So are you -- you -- you can't recall an
15 instance in which you demoted someone?
16     A.   Well, yes, I can recall an incident in
17 which I demoted someone.
18     Q.   Can you tell me about that instance?
19     A.   I had an individual that was reduced in
20 rank and was given a reduction in pay.
21     Q.   What was the -- the demotion for?
22     A.   Conduct.
23     Q.   I'm sorry, sir.  I didn't hear you.
24     A.   Conduct.
25     Q.   Conduct.

Page 126

1     A.    Yes.
2     Q.    **So improper conduct.**
3           **What was the race of that individual?**
4     A.    He was a white male.
5     Q.    **Can you recall what he did?**
6     A.    Yes.
7     Q.    **What did he do to deserve the demotion?**
8     A.    Allegedly he made a comment to a female
9     that was inappropriate.
10    Q.    **Are you referring to Campbell?**
11    A.    I'm just saying that it was a deputy that I
12    had an opportunity to use disciplinary action on.
13    Q.    **What was the comment to the female?**
14    A.    I don't recall the exact comments.
15    Q.    **Were you involved in the investigation?**
16    A.    No.
17    Q.    **Was it a civilian or a -- an employee?**
18    A.    A civilian.
19    Q.    **Did the civilian complain?**
20    A.    A member of that individual's family
21    complained.
22    Q.    **Of the civilian's family?**
23    A.    Yes.
24    Q.    **What is the -- what was the race of the**
25    **civilian?**

Page 127

1     A.    The one that complained?
2     Q.    **Yes.**
3     A.    It was a white male.
4     Q.    **Was the demotion effective?**
5     A.    Yes, I believe so.
6     Q.    **Would it have -- who investigate -- you**
7     **said you weren't involved in the investigation?**
8     A.    No.
9     Q.    **Would that belong to Weldon Bul- --**
10    **Bullock?**
11    A.    I believe so.
12          MR. GEIS:  Can we take a minute break,
13    please?
14          MS. ROBINSON:  You just need a -- you just
15    need a minute?
16          MR. GEIS:  Yes.
17          MS. ROBINSON:  Sure.
18          (BREAK TAKEN)
19          MR. GEIS:  Yes, I'm ready.  I would like --
20    if we're going to calculate the time, then we
21    need to calculate it on the record so there's no
22    dispute about it.  I'm not going to hold you to a
23    precise seven-hour limit, but generally we're --
24    we're going to get pretty close in -- at about
25    7:00.

Page 128

1           MS. ROBINSON:  I -- ba- -- based on my
2     estimation, we can go well beyond 7:00.
3           MR. GEIS:  Well, then calculate, please.
4           MS. ROBINSON:  Right.  And as long as we
5     understand that this isn't deposition time.
6           MR. GEIS:  Well, we're on the record.  This
7     is deposition time.
8           MS. ROBINSON:  Well, let's take a break.
9           MR. GEIS:  No, we're not -- we're not going
10    to take a break.  We're here and we're ready to
11    go.
12          MS. ROBINSON:  Well, I -- and then come
13    back -- and then let's come back with the time
14    that's left.
15          MR. GEIS:  Well, we're -- we're -- we're
16    here.  We're ready to go.  Please ask your
17    questions.
18          MS. ROBINSON:  Well, we would like a
19    bathroom break.
20          MR. GEIS:  Well, five minutes?  Are we
21    going to take a five-minute break?
22          MS. ROBINSON:  Let's take a ten-minute
23    break.
24          MR. GEIS:  All right.  We'll take -- we'll
25    take a ten-minute break.

Page 129

1           (BREAK TAKEN)
2           COURT REPORTER:  Five hours and 34 minutes
3     is what I have.
4           MR. GEIS:  That's about what I have.  Thank
5     you.
6           So we have an hour and 25 minutes left.  So
7     we can go until about 7:00.  I'm not going to
8     hold you to that precise time, but I don't want
9     to keep the Sheriff here all night.
10          MS. ROBINSON:  Sheriff White, are you ready
11    to go back on the record.
12          THE WITNESS:  Yes.
13    BY MS. ROBINSON:
14    Q.    **So, Sheriff White, you were telling me**
15    **about an instance in which an employee was demoted.**
16    **Do -- do you recall whether or not that instance**
17    **involves an officer asking to see a woman's breast in**
18    **lieu of a ticket?**
19    A.    No, I don't recall that.  No.
20    Q.    **But -- and you don't recall the specific**
21    **instance?**
22    A.    I don't recall the in lieu of a ticket
23    part.
24    Q.    **Do you recall the deputy asking to see a**
25    **woman's breasts part?**

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 33 of 106

Page 130

1    A.   Yes, that sounds familiar.
2    Q.   Okay.  And then termination of employment
3 is pretty explanatory in terms of the policy or the
4 di- -- disciplinary action?
5    A.   Yes.
6         MS. ROBINSON:  Okay.  Let's mark this
7    document -- this document -- we've marked this
8    document as 17, correct?
9         COURT REPORTER:  Yes.
10        MS. ROBINSON:  Okay.  I am pulling up
11   Justin White's Use of Force investigation.
12        How did we -- what exhibit was this
13   document yesterday?
14        MR. GEIS:  4.
15        MS. ROBINSON:  You said the 4?
16        MR. GEIS:  Well, I haven't seen what you're
17   putting up, but if you're talking about --
18        MS. ROBINSON:  (Inaudible.)
19        MR. GEIS:  -- Captain Bullock's three-page
20   report, it -- it was 4.  If you could put up what
21   you want to put up, I'll -- I'll tell you if it's
22   the same thing I have.
23        MS. ROBINSON:  Yes.  So it is the same --
24   it's the same thing.  It's -- it's Exhibit 4.
25 BY MS. ROBINSON:

Page 131

1    Q.   Are you familiar with this document,
2 Sheriff White?
3    A.   Yes.
4    Q.   Okay.  Can you state what the document is
5 for me, sir?
6    A.   Administrative investigation complaint,
7 Latwanya S. Oliver accused Deputy Justin white.
8    Q.   Were you involved at all in the
9 investigation of Mr. White's use of force, alleged
10 use of force?
11   A.   No.
12   Q.   Did you convene the panel?
13   A.   I don't know if the panel was convened or
14 not.  The purpose of the panel is primarily to look
15 for patterns of the -- of using force.
16   Q.   So you don't know if a panel was
17 convened?
18   A.   No.
19   Q.   But an investigation was conducted?
20   A.   Yes.
21   Q.   Weldon Bullock indicated that he spoke to
22 you about his recommendation to terminate Mr. White.
23 Do you recall that conversation?
24   A.   Yes.
25   Q.   What did he say?

Page 132

1    A.   I don't recall word for word, but he
2 presented his findings to me, which included
3 recommendation for termination.
4    Q.   And what did you do next?
5    A.   Said his services were no longer needed.
6 After I reviewed what he provided to me, at some
7 point, I don't recall the exact date and time, but I
8 said, Okay, let's tell him that his services are no
9 longer needed.
10   Q.   Did you speak to Mr. White before that?
11   A.   I don't recall speaking directly to him for
12 that.  I may have.  I don't recall that.
13   Q.   Was the termination made effective
14 immediately?
15   A.   I believe so.
16   Q.   Did you speak to anyone other than Weldon
17 Bullock prior to terminating Mr. White about this
18 incident?
19   A.   No.  I don't recall speaking to anyone
20 about this incident because I was not involved in the
21 investigation.
22   Q.   Do you recall how long of a conversation
23 you had with Weldon Bullock?
24   A.   No, I do not.
25   Q.   Would you say it was pretty brief or....

Page 133

1    A.   I don't remember how long it was.
2         MS. ROBINSON:  Okay.  So we're -- we're
3    going to go into the newer exhibits.
4         Can you pull up the Request for Training
5    Waiver?
6         COURT REPORTER:  I'm sorry.  What was that?
7         MS. ROBINSON:  It's a document, the Request
8    for Training Waiver.
9         MR. MCGURL:  (Complies.)
10        THE WITNESS:  Okay.
11 BY MS. ROBINSON:
12   Q.   Can you tell me what this document is?
13   A.   It's a memorandum from my office to Sheriff
14 Standards.  It's addressed to Ms. Diane Konopka,
15 director, pertaining to Justin Jamel White.  And it's
16 requesting that the commission grant Mr. White a
17 Training Waiver and credit him with the BLET
18 completed in 2015.
19        MS. ROBINSON:  Let the record reflect that
20   this is Exhibit 18.
21   (EXHIBIT NUMBER 18 WAS MARKED FOR IDENTIFICATION.)
22 BY MS. ROBINSON:
23   Q.   Can you tell me the date of this document,
24 Sheriff White?
25   A.   It says June 1st, 2018.

Page 134

1    MS. ROBINSON: Let's -- Mr. White's pay
2    raise.
3         COURT REPORTER: What was the start of your
4    question?
5         MS. ROBINSON: Let's pull up -- I want to
6    pull up Mr. White's pay raise.
7         COURT REPORTER: Oh, sorry.
8         MR. MCGURL: (Complies.)
9    BY MS. ROBINSON:
10        Q.   So did Mr. White receive a pay raise?
11        A.   As far as I know, he did.
12        Q.   Do you have -- what -- do you have a
13   document in front of you that's dated June 6, 2018?
14        A.   Yes.
15        Q.   Can you tell me what that document says?
16        A.   It says, "Dear Mr. White; On June 5th,
17   2018, you satisfied the eligibility period to receive
18   the first year law enforcement officer $1,500 salary
19   adjustment. Your annual salary will be $34,764
20   effective June 5th, 2018. If you have any questions,
21   please feel free to give me a call at the above
22   number. Sincerely, Argretta R. Johen."
23        Q.   Who was copied on that?
24        A.   I am. Copied Sheriff Peter White.
25        Q.   Do you recall Mr. White making complaints

Page 135

1    about harassment, discrimination and performance
2    reviews?
3         A.   When I first learned of the harassment
4    situation, that came to me from HR in the form of a
5    complaint to the EEOC. The performance reviews came
6    to me. I'm not sure whether Mr. White came directly
7    to me or his supervisor did.
8         Q.   Did you -- so -- so let's -- let me clarify
9    this.
10             Do -- are you saying that you learned of
11   his complaint of discrimination through the EEOC?
12        A.   No. I'm saying it -- yes. When I learned
13   of this stuff, it was all included in an EEOC
14   complaint that was given to Ms. Johen, the HR
15   director; and she forwarded it -- it to me, if my
16   memory serves me correctly.
17        MS. ROBINSON: Michael, let's pull up
18   Mr. White's complaints.
19        MR. MCGURL: (Complies.)
20        COURT REPORTER: Did you want the last two
21   documents to be marked?
22        MS. ROBINSON: Yes. I thought we marked
23   them as 18 and 19.
24        COURT REPORTER: Okay. Thank you.
25   (EXHIBIT NUMBER 19 WAS MARKED FOR IDENTIFICATION.)

Page 136

1    BY MS. ROBINSON:
2         Q.   This is a document that -- do you have the
3    document in front of you that's showing on the
4    screen?
5         A.   Yes. Okay. It's -- yes.
6         Q.   Can you identify this document for me,
7    Mr. --
8         A.   This --
9         Q.   -- Sheriff?
10        A.   -- is a Notice of Charge of Discrimination
11   US Equal Employment Opportunity Commission.
12        MS. ROBINSON: And this is -- this is
13   Exhibit 20.
14   (EXHIBIT NUMBER 20 WAS MARKED FOR IDENTIFICATION.)
15   BY MS. ROBINSON:
16        Q.   And can you identify the date on that
17   document?
18        A.   It says September 12th, 2018.
19        Q.   And this was the first time that you
20   learned of Mr. White's allegations of harassment and
21   discrimination?
22        A.   Yeah. I see -- are you addressing the
23   performance appraisal or the Title VII, Civil Rights
24   Act one?
25        Q.   I'm just addressing any workplace

Page 137

1    harassment or discrimination complaints that
2    Mr. White made and made in writing at this moment.
3         A.   Okay. I've got a memorandum looks to be
4    from Justin White dated June 15th, 2018 --
5         Q.   Yes.
6         A.   -- when he -- when he -- in which he was
7    complaining of Title VII, Civil Rights Acts 1964,
8    Race and Gender Discrimination.
9         MS. ROBINSON: And let's mark that as
10   Exhibit 21.
11   (EXHIBIT NUMBER 21 WAS MARKED FOR IDENTIFICATION.)
12        MS. ROBINSON: Michael, can you pull those
13   complaints up?
14        MR. MCGURL: (Complies.)
15   BY MS. ROBINSON:
16        Q.   You have a document in front of you,
17   Sheriff White?
18        A.   Yes, the Title VII, Civil Rights Act
19   1964.
20        Q.   Yes.
21        A.   Yes.
22        Q.   Do you recognize this document?
23        A.   Say that again.
24        Q.   Do you recognize this?
25        A.   Yes.

Page 138

1    Q.   You considered this a complaint?
2    A.   Yes.
3    Q.   Who handed you this document?
4    A.   I don't remember who directly handed it to
5    me.  I believe this may be the one that I received on
6    June 26th or something like that.  I'm not certain of
7    the date.
8    Q.   Will you go to the second page?
9    A.   Okay.
10   Q.   The third paragraph?
11   A.   Okay.
12   Q.   Will you -- can you read that for the
13   record, sir?
14   A.   "It should be noted that there is a pattern
15   of discrimination and negligence at the sheriff's
16   office.  Upon hire, I begged Lieutenant Ray Shearin,
17   asked for a bulletproof vest for three weeks and was
18   only given one after I approached the command staff
19   while they were reading reports in late June 2017.
20   And Captain W. Bullock (S-3) ordered him to find me a
21   vest.  I responded to emergency calls, i.e., burglary
22   in progress, no vest."
23   Q.   Can you continue reading the next
24   paragraph?
25   A.   "From late June 2018 until August 2018, I

Page 139

1    begged for tires on my patrol vehicle to no avail for
2    nearly eight weeks.  I followed the chain of command,
3    Sergeant Roberson (S-10), Lieutenant Shearin and
4    former Captain, now Chief L.D. Bullock (S-2)
5    requesting tires.  Sergeant Roberson eventually told
6    me to stop asking and go to the Sheriff because these
7    people don't do their jobs.  As I was going to see
8    the Sheriff, Captain Bullock asked me what was wrong
9    after I walked in his office for the third time, and
10   where's your car.  He saw the car and went to
11   Lieutenant Shearin, and I got some tires the same day
12   despite both of them knowing I needed tires prior to.
13   The metal wires were showing on rear tires."
14   Q.   Okay.  And what did you do in response to
15   these complaints?
16   A.   When you said, "these complaints," you mean
17   everything in this entire memo?
18   Q.   Yes.
19   A.   Let me read it for a second.
20   Q.   And for purposes of this document, Sheriff
21   White, please just kind of skim it.
22   A.   Okay.  Yeah.  That's what I'm trying to do
23   now.
24        Okay.
25        MR. GEIS:  Oh, was that your phone,

Page 140

1    Sheriff?
2        THE WITNESS:  Yeah.
3        MR. GEIS:  Okay.
4        THE WITNESS:  Okay.  I skimmed it.
5    BY MS. ROBINSON:
6    Q.   So how did you respond when you received
7    this document?
8    A.   I gave him a written response.
9        COURT REPORTER:  You gave him what kind of
10   a response?
11       THE WITNESS:  Written.
12       COURT REPORTER:  Okay.
13   BY MS. ROBINSON:
14   Q.   Did you do anything in the -- in between to
15   con- -- investigate these --
16   A.   I believe this....
17   Q.   Were you surprised by the complaint?
18   A.   Yes, I was.
19       COURT REPORTER:  What was that?
20   BY MS. ROBINSON:
21   Q.   Were you --
22   A.   Yes.
23   Q.   -- surprised?
24   A.   Yes.
25   Q.   Did you investigate the complaint?

Page 141

1    A.   I'm not sure if I investigated this one or
2    not.  I may have and responded to him, but there were
3    several situations going on kind of close together.
4    But I believe I did.
5    Q.   What did you -- what did your investigation
6    entail?
7    A.   Let me scan this again.
8        I believe this is the one that -- that I
9    interviewed all of the individuals that was involved
10   if this is the same one pertaining to him changing
11   squads and that type of thing.
12   Q.   We're talking about the -- the allegations
13   of the -- the -- the harassment -- well, the tires,
14   discrimination, the pattern of discrimination and
15   the -- the comments that you just read.  What did you
16   do in response to those comments?  What type of
17   investigation did you perform, if any?
18   A.   I don't recall exactly what I did step by
19   step because it's been over a couple years ago, but I
20   believe it was investigated.  I'm not sure if I
21   investigated it or not.  I believe I did.
22   Q.   So is your testimony that you -- you
23   investigated, but you can't recall the
24   investigation?
25   A.   Again, I'm -- I'm not sure if I

Page 142

1  investigated it.  I believe that I did, but I can't
2  recall all the details because there were several
3  things going on, and it's been a couple years since I
4  retired.
5      Q.   Okay.  Do you recall -- do you recall if
6  someone in your department or office may have
7  investigated it?
8      A.   I don't.  I believe -- like I said, I'm not
9  sure if I investigated it.  If I did, it was included
10 in my written response.
11     Q.   Do you recall reviewing a statement made by
12 Durwood Campbell as it pertains to Mr. White?
13     A.   I believe so.
14          MS. ROBINSON:  Okay.  We'll -- I want to --
15 I have that statement.  Let's pull that statement
16 up.
17          MR. MCGURL:  (Complies.)
18 BY MS. ROBINSON:
19     Q.   Do you recognize this document?
20     A.   Yes.
21     Q.   And can you identify this document?
22     A.   It was written by Durwood Lee Campbell on
23 July 18, 2018.
24     Q.   What is this document?
25     A.   What was the question?

Page 143

1      Q.   What is this document?
2      A.   Again, I didn't quite understand you.
3      Q.   What is this document?
4      A.   Oh.  It's a statement regarding accusations
5  made by Deputy J.J. White from Durwood Campbell.
6          MS. ROBINSON:  Okay.  Let's mark this --
7  did we -- did I already mark this as Exhibit 22?
8          COURT REPORTER:  No.
9          MS. ROBINSON:  Let's mark this as Exhibit
10 22.
11 (EXHIBIT NUMBER 22 WAS MARKED FOR IDENTIFICATION.)
12 BY MS. ROBINSON:
13     Q.   Can you read the date of this statement?
14     A.   July 18, 2018.
15     Q.   Can you read the first paragraph?
16     A.   "On Monday, July 16th, 2018, I was
17 contacted by Captain Watkins and requested to write a
18 statement in reference to the previous incident
19 involving Deputy White and myself from back in
20 January."
21     Q.   Is it -- is it typical that a statement be
22 written seven months later?
23     A.   Well, no, it's not typical unless the
24 accusations were made much later --
25     Q.   Explain that.

Page 144

1      A.   -- well, or much earlier.
2           So this was written apparently after the
3  incidents were alleged to have happened.
4      Q.   So how do you interpret that first
5  paragraph?
6      A.   It looks that a complaint had been made by
7  Deputy J.J. White saying that Deputy White was --
8  Campbell told Deputy White, "Didn't I tell your ass
9  not to do that anymore."
10     Q.   Right.  Well, let's talk about the first
11 paragraph.  How do you interpret the first
12 paragraph?
13     A.   Statement regarding accusation made by --
14 that there had been a complaint made at some point by
15 -- or an accusation made at some point by Deputy
16 White.
17     Q.   So did -- do you read this to understand
18 that Captain White requested that Campbell write a
19 statement regarding a previous incident?
20     A.   Yes, Captain Watkins.
21     Q.   Okay.  And that that previous incident
22 occurred in January of 2018; is that correct?
23     A.   Yes, sometime back in January according to
24 this.
25     Q.   And does the document show that the

Page 145

1  statement was written in July of 2018?
2      A.   Yes, it's dated July 18, 2018.
3      Q.   According to the policy, aren't
4  investigations and documents and statements to be
5  drafted at the time of the incident?
6      A.   At the time or in close proxim- --
7  proximity to.  But I don't recall exactly when J.J.
8  White made his complaint to whoever he made it to
9  initially, but I became aware of when he submitted
10 this stuff to me.
11     Q.   And so you were -- you were saying that you
12 did respond to Mr. White's complaints, his -- his
13 complaints that were made --
14     A.   Yes, I believe I did.  If they were
15 addressed to me, I believe I did respond.
16     Q.   And you responded via letter, correct?
17     A.   Yes.  If I remember correctly, there were
18 two letters, but I don't remember which letter went
19 with what.  I would have to see the letter.
20          MS. ROBINSON:  Okay.  Michael, can you pull
21 up the letter?
22          MR. MCGURL:  (Complies.)
23          THE WITNESS:  Okay.
24 BY MS. ROBINSON:
25     Q.   Can you identify this document, Sheriff

AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

Pages 146..149

1  White?
2      A.   It's a letter written by me to Deputy
3  Justin J. White.
4      Q.   And is that -- is that your signature?
5      A.   Yes.
6           MS. ROBINSON:  Let's mark this as Exhibit
7  23.
8  (EXHIBIT NUMBER 23 WAS MARKED FOR IDENTIFICATION.)
9  BY MS. ROBINSON:
10     Q.   Can you tell me the date of that letter?
11     A.   July 19, 2018.
12     Q.   And what was your -- what was the ultimate
13 finding that you made in this letter?
14     A.   It would be in this letter.  I'd have to
15 read it right quick.
16          Okay.  Basically they were unfounded.
17     Q.   "They" as in -- for the record's purposes,
18 can you explain --
19     A.   Yes.
20     Q.   -- who "they" is?
21     A.   He -- he alleged several different things
22 in here.  And I remember speaking with Lieutenant
23 Campbell about this, and Lieutenant Campbell was
24 disciplined for using the word "ass" when talking
25 with Deputy White.  He -- and it also says that --

1  that -- that explains that his suspension was carried
2  out.
3      Q.   How was Lieuten- -- Lieutenant Campbell
4  disciplined?
5           MR. GEIS:  Objection.  He can't answer
6      that.
7           MS. ROBINSON:  What's the objection?
8           MR. GEIS:  It's a statutory objection,
9      153A-98.  It's a personnel record.
10 BY MS. ROBINSON:
11     Q.   What was the outcome of your Title VII
12 investigation, or did -- if you conducted one?
13     A.   Well, this is -- was included in the Title
14 VII Civil Rights Act of 1964.
15     Q.   So you concluded that there was no
16 discrimination?
17     A.   No.  None that I could see.
18     Q.   Okay.  And so who sent Mr. White that
19 letter?  How did Mr. White receive that letter?
20     A.   I don't know if this is the one that I gave
21 to him personally after talking to him.  Again, there
22 were two letters that I wrote in responding to him.
23 I remember one of them concerning the Title VII stuff
24 alleging discrimination.  I met with him myself and
25 Chief Deputy Lawrence Bullock.  And at the conclusion

1  of that meeting, I gave him a copy.  So I'm not sure
2  if this -- this may be the one or it may be the other
3  one.  I don't know.
4      Q.   So where did you meet with Mr. White at?
5  Was it....
6      A.   It would have been in my office.
7      Q.   And after you met with Mr. White and handed
8  him the letter, did you receive any other
9  complaints?
10     A.   I would have to look and see again.
11 There's another letter that I addressed to him
12 concerning some type of complaint or allegations, I
13 believe.  Well, no, this was on the --
14     Q.   So at -- at some --
15     A.   -- was on his performance appraisal as
16 well, and they came fairly close together.
17     Q.   At some point you received a -- the EEOC
18 complaint, correct?
19     A.   Yes, from HR.
20          MS. ROBINSON:  And we marked that as
21     Exhibit 20.
22          MR. GEIS:  Sheriff, right here.  I just
23     didn't put a number on it.
24 BY MS. ROBINSON:
25     Q.   And you said HR forwarded you this

1  complaint?
2      A.   Yes, I believe so.
3      Q.   Can you identify the date of this
4  complaint, again?
5      A.   I see the date, but I can't -- I can't read
6  it.  This is a copy.  It's faded.  I'm sorry.
7  There's a date at the bottom.
8      Q.   Yes.
9      A.   9/12/2018.
10     Q.   And what did you do when you received this
11 complaint?
12     A.   This is -- this was investigated.  I
13 believe that he filed two different complaints,
14 two -- he filed one, and there may be an amended one
15 or something with EEOC, is what I'm thinking.
16     Q.   So you said you investigated this
17 complaint?
18     A.   I believe so.  I don't recall.  Like I
19 said, he's filed several things all together.  But I
20 believe that I -- I believe this goes with this
21 letter I sent, but there's also another letter that I
22 sent concerning a complaint.  I don't remember
23 the details of it.  But in this one dated July 19th,
24 is when he talked about his suspension and traffic
25 stops and stuff like that.

1    Q.   Okay.  Well, let's focus on Exhibit 20, the
2  -- the September 12th, EEOC complaint.
3         And so I just would like to know what --
4  what steps did you take when you received this
5  complaint?
6    A.   The Exhibit 20?
7    Q.   Yes, sir.
8    A.   This was -- I believe this was what was
9  investigated by me.  And if it in fact was, then he
10  was given -- no.  Actually this -- this is what I
11  investigated right here.  This -- when he went to
12  EEOC, that complaint contained a lot of the stuff
13  that's in this memo that I gave him.
14    Q.   The memo -- the memo came before the
15  complaint?
16    A.   Yes, it did.
17    Q.   Okay.  So what did you do --
18    A.   From the EEOC.
19    Q.   Right.  Exactly.
20    A.   Yeah.
21    Q.   So what did you do when you received the
22  EEOC's complaint?
23    A.   I don't recall specifically what I did, but
24  I believe I conducted an investigation into his
25  allegations.

1    Q.   Did you interview witnesses?
2    A.   Yes.  If this is the same one, I believe I
3  interviewed everybody that was involved.  It was kind
4  of drawn out, and he talked about the different
5  supervisors that he was with during his training and
6  different squads and shifts that he was on, if this
7  is the same situation.
8    Q.   Did you solicit statements?
9    A.   Yes.
10    Q.   Who did you ask to write a statement?
11    A.   I believe -- again, if it's the same
12  complaint, then I believe it to be that was from
13  basically everybody that was involved in his
14  training.  If I remember correctly, Captain Watkins,
15  Lieutenant Campbell, Sergeant Martin, Deputy Wayne,
16  pretty much every -- the ones that were involved in
17  his training; again, if this is the situation I think
18  it is.
19    Q.   Would you say that you followed the policy,
20  the policies that we discussed?
21    A.   Yes, as best I could.  But, again, this --
22  I don't remember all the details, and I don't
23  remember which complaint came in at what time because
24  he -- there was several things filed by him right
25  together, and that's been a little bit over two years

1  ago.
2    Q.   That's fair enough.
3         So the Use of Force Report -- but then --
4  so after you conducted -- or you -- you may or may
5  not have done anything in response to the EEOC
6  complaint.  Is --
7    A.   I'm sure I gave some kind of response.
8    Q.   Would that have been a written response --
9    A.   Yes.
10    Q.   -- or would that have gone to Mr. White?
11    A.   Would that have gone to -- yes, at some
12  point.  I'm not sure if this is the one that I have
13  here or -- this is in response to your complaint
14  dated June 15th, 2018, received on June 26th,
15  whichever one that was.
16    Q.   Okay.  So did -- were you -- were you
17  shocked to see Mr. White's EEOC complaint?
18    A.   Well, I wouldn't say I was shocked, but I
19  was surprised.
20    Q.   You were surprised?
21    A.   Yes.
22    Q.   Why were you surprised?
23    A.   Because some of the stuff that he alleged
24  is included in this response that I gave him, and I
25  didn't see where that was discrimination.

1    Q.   Okay.  So did your relationship change with
2  Mr. White after the filing -- he filed the EEOC
3  complaint?
4    A.   Well, no.  I never had any relationship
5  other than same as with the rest of the members of
6  the sheriff's office deputies.
7    Q.   Is he the only employee who has ever filed
8  an EEOC complaint?
9    A.   Yes, to my knowledge.  Yes.
10    Q.   Under your tenure?
11    A.   Yes.
12    Q.   Did any of your superiors or anyone contact
13  you and ask about or inquire about the complaint?
14         MR. GEIS:  Objection to form.
15  BY MS. ROBINSON:
16    Q.   Did anyone inquire about this complaint?
17    A.   The EEOC complaint?
18    Q.   Yes.
19    A.   I believe the HR director may have inquired
20  about it.
21    Q.   And who is the HR director?
22    A.   Argretta Johen.
23    Q.   And she's the only one who inquired about
24  it?
25    A.   When you say -- when you say "superior,"

Page 154

1  really she's not -- you know, she doesn't supervise
2  me, but I know that she inquired about it.
3      Q.  Is she the only -- it doesn't even have to
4  be, you know, a superior.
5          Is she the only person who inquired about
6  it?  So we're just speaking generally now.
7      A.  Okay.  I don't recall anybody coming to me
8  and inquiring about the EEOC complaint, but....
9      Q.  Did Mr. White make any additional
10 complaints after the September 12th EEOC?
11     A.  He made several complaints.  He made more
12 than one that I recall, but I don't recall the
13 sequence in which they were made.  Again, it's been a
14 long time ago, near almost three years now.
15     Q.  After the September 12th EEOC complaint,
16 did Mr. White make any additional complaint?
17     A.  I don't know.
18     Q.  Do you recall when you terminated -- the
19 date you terminated Mr. White?
20     A.  I would have to look at whatever document
21 it's documented on.
22         MS. ROBINSON:  Let's pull up his
23 termination.
24         MR. MCGURL:  (Complies.)
25         MS. ROBINSON:  We pull -- we talked about

Page 155

1  that document earlier, and I'm looking for it.  I
2  thought we marked it.  I think it was Exhibit 10.
3  BY MS. ROBINSON:
4      Q.  Can you read in the record the date of
5  termination?
6      A.  Yes.  Date of separation, October 24, 2018.
7      Q.  Do you recall how close that was to the --
8  in time to the investigation of Mr. White's use of
9  force -- alleged use of force?
10     A.  No, I didn't calculate the time.
11     Q.  Let's -- let's do that now.
12         Can you turn to the -- the Use of Force
13 exhibit?
14         COURT REPORTER:  Turn to what?
15         MS. ROBINSON:  The Use of Force Report,
16 investigation report.
17 BY MS. ROBINSON:
18     Q.  Can you read for the record the date on
19 that document?
20     A.  The --
21         MR. GEIS:  What document are we talking
22 about?
23         MS. ROBINSON:  The Use of Force Report.
24         MR. GEIS:  Do you mean the investigation?
25         MS. ROBINSON:  Well, investigation.

Page 156

1          Michael, can you pull that up?
2          MR. MCGURL:  (Complies.)
3          THE WITNESS:  This is October 21st, 2018
4  when it occurred or when it began.
5  BY MS. ROBINSON:
6      Q.  Okay.  So, Sheriff White, I want to ask --
7  ask you about some behaviors that took place at the
8  sheriff's office when you were there.  And I want
9  to -- do you recall any rumors that were made about
10 Mr. White or said --
11     A.  No, I do not.
12     Q.  Do you -- do you recall an instance for
13 which comments were made about Mr. White's sexual
14 orientation?
15     A.  No, I do not.
16     Q.  Do -- do you recall Mr. White complaining
17 about the difference in treatment between the black
18 deputies and white deputies?
19     A.  Yes, at some point he alleged that.
20     Q.  How did -- how do -- so you don't recall
21 any statements about Mr. White's sexuality?
22     A.  No, none that I heard.
23     Q.  What about comments that others may have
24 made?
25     A.  He at some point made some allegations that

Page 157

1  that type of stuff may have happened, but I didn't --
2  and if I remember correctly, this was after -- it
3  surfaced long after he said that it happened.
4      Q.  What do you mean that it surfaced?
5      A.  It did not come to my attention when he
6  alleged that occurred.  It was later.
7      Q.  How did it come to your attention?
8      A.  I believe it came in his complaint.
9      Q.  Did anyone investigate these allegations?
10     A.  This may be the one I investigated.  I'm
11 not sure.
12     Q.  And we're specifically talking about
13 statements about his sexual orientation?
14     A.  Yeah, and these came out -- a lot of this
15 stuff came out in his EEOC complaint, if I remember
16 correctly.
17     Q.  Anyone admit to making those statements?
18     A.  No.
19     Q.  Did anyone say they heard those statements
20 being made?
21     A.  Excuse me.  I didn't hear you.
22     Q.  Did anyone say that they heard those
23 statements being made?
24     A.  No.  I believe Mr. White alleged that in
25 some of his complaint.

Page 158

1  Q.  Did you investigate those statements?
2  A.  Yes, I believe so.
3  Q.  What did you do?
4  A.  In this one, this -- I spoke to some of the
5  people that he said was involved, and then I believe
6  maybe a lieutenant, captain or somebody spoke to
7  somebody or something to that.  Again, this stuff
8  kind of runs together.  So it -- I would have to look
9  at my documents to refresh my memory.
10  Q.  Are there -- were there any openly gay
11  deputies?
12  A.  No, not to my knowledge.
13  Q.  And when you say not to your knowledge, are
14  we speaking about the entire -- your entire tenure --
15  A.  Yes, I -- I am.
16  Q.  -- as sheriff?
17  A.  Yes.
18  MS. ROBINSON:  Can I -- let's take a
19  five-minute break.  I think I'm almost done.
20  MR. GEIS:  Okay.
21  (BREAK TAKEN)
22  MS. ROBINSON:  At this point, Sheriff
23  White, I just want to thank you for your time.
24  Thank you for sitting through this long
25  deposition.  I don't have any further questions

Page 159

1  for you.
2  THE WITNESS:  Okay.
3  MR. GEIS:  Thank you.
4  (SIGNATURE RESERVED)
5  (DEPOSITION CONCLUDED AT 6:41 P.M.)

Page 160

1  STATE OF NORTH CAROLINA
   COUNTY OF CATAWBA
2
3  REPORTER'S CERTIFICATE
4  I, Dodie F. George, a Notary Public, do
5  hereby certify that there came before me on
6  Friday, February 26, 2021, the person
7  hereinbefore named who was by me duly sworn to
8  testify to the truth and nothing but the truth
9  of his or her knowledge concerning the matters in
10  controversy in this cause; that the witness was
11  thereupon examined under oath, the examination
12  reduced to typewriting under my direction, and the
13  deposition is a true record of the testimony given
14  by the witness.
15  I further certify that I am neither
16  attorney or counsel for, nor related to, or employed
17  by any attorney or counsel employed by the parties
18  hereto or financially interested in the action.
19  IN WITNESS WHEREOF, I have hereto set my
20  hand this 9th day of March, 2021.
21
22  Dodie F. George
23
24  _____
25  Dodie F. George, Notary Public
    Notary Public Number 201025200033

Page 161

1  Errata Sheet
2  NAME OF CASE:     5:19- JUSTIN J. WHITE vs PETER WHITE
3  DATE OF DEPOSITION: 02/26/2021
4  NAME OF WITNESS:    Peter White, 30(b)(6)
5  Reason Codes: 1. To clarify the record.
6              2. To conform to the facts.
7              3. To correct transcription errors.
8  Page _____ Line _____ Reason _____
9  From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25  PETER WHITE, 30(B)(6)



AdvancedONE LEGAL
(866) 715-7770
advancedONE.com

```
                                              Page 162
 1              WITNESS CERTIFICATION

 2

 3          I hereby certify that I have read the

 4     foregoing transcript of my deposition testimony,

 5     and that my answers to the questions propounded,

 6     with the attached corrections or changes, if

 7     any, are true and correct.

 8

 9

10

11

12

13     _____      _____
       DATE             PETER WHITE, 30(B)(6)
14

15

16

17                      _____
                        PRINT NAME
18

19

20     JOB 408577

21     5:19- JUSTIN J. WHITE vs PETER WHITE

22

23

24

25
```



EXHIBIT

12

I.    **ARTICLE 1 – PRIMARY RESPONSIBILITY OF JOB**

The primary responsibility of the police service and the individual officer is the protection of the people of the United States through the upholding of their laws; chief among these is the Constitution of the United States and its Amendments. The law enforcement officer always represents the whole of the community and its legally expressed will and is never the arm of any political party or clique.

II.   **ARTICLE 2 – LIMITATION OF AUTHORITY**

The first duty of a law enforcement officer, as upholder of the law, is to know its bounds upon him in enforcing it. Because he represents the legal will of the community, be it local, state or Federal, he must be aware of the limitations and proscriptions which the people, through law, have placed upon him. He must recognize the genius of the American system of government which gives to no man, groups of men or institutions absolute power; and he must insure that he, as a prime defender of that system, does not pervert its character.

III.  **ARTICLE 3 – DUTY TO BE FAMILIAR WITH THE LAW AND WITH RESPONSIBILITES OF SELF AND OTHER PUBLIC OFFICIALS**

The law enforcement officer shall assiduously apply himself to the study of the principles of the laws which he is sworn to uphold. He will make certain of his responsibilities in the particulars of their enforcement, seeking aid from his superiors in matters of technicality of principle when these are not clear to him; he will make special effort to fully understand his relationship to other public officials, particularly on matters of jurisdiction, both geographically and substantively.

IV.   **ARTICLE 4 – UTILIZATION OF PROPER MEANS TO GAIN PROPER ENDS**

The law enforcement officer shall be mindful of his responsibility to pay strict heed to the selection of means in discharging the duties of his office. Violations of the law or disregard for public safety and property on the part of the officer are intrinsically wrong; they are self-defeating in that they instill in the public mind a like disposition. The employment of illegal means, no matter how worthy the end, is certain to encourage disrespect for the law and its officers. If the law is to be honored, it must first be honored by those who enforce it.

V.    **ARTICLE 5 – COOPERATION WITH PUBLIC OFFICIALS IN THE DISCHARGE OF THEIR AUTHORIZED DUTIES**

The law enforcement officer shall cooperate fully with other public officials in the discharge of authorized duties regardless of party affiliation or personal prejudice. He shall be meticulous, however, in assuring himself of the propriety,

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 43 of 106

under the law, of such actions and shall guard against the use of his office or person, whether knowingly or unknowingly, in any improper or illegal action. In any situation open to question, he shall seek authority from his superior officer, giving him a full report of the proposed service or action.

## VI.    ARTICLE 6 – PRIVATE CONDUCT

The law enforcement officer shall be mindful of his special identification by the public as an upholder of the law. Laxity of conduct or manner in private life, expressing either disrespect for the law or seeking to gain special privilege, cannot but reflect upon the police officer and the police service. The community and the service require that the law enforcement officer lead the life of a decent and honorable man. Following the career of a policeman gives no man special perquisites. It does give the satisfaction and pride of following and furthering the unbroken tradition of safeguarding the American Republic. The officer who reflects upon this tradition will not degrade it. Rather, he will so conduct his private life that the public will regard him as an example of stability, fidelity and morality.

## VII.    ARTICLE 7 – CONDUCT TOWARDS THE PUBLIC

The law enforcement officer, mindful of his responsibility to the whole community, shall deal with individuals of the community in manner calculated to instill respect for its laws and its police service. The law enforcement officer shall conduct his official life in a manner such as will inspire confidence and trust. Thus, he will be neither overbearing nor subservient, as no individual citizen has an obligation to stand in awe of him or his right to command him. The officer will give service where he can and require compliance with the law. He will do neither from personal preference or prejudice but rather as a duly appointed office of the law discharging his sworn obligation.

## VIII.    ARTICLE 8 – CONDUCT IN ARRESTING AND DEALING WITH LAW VIOLATORS

The law enforcement officer shall use his powers of arrest strictly in accordance with the law and with due regard to the rights of the citizens concerned. His office gives him no right to neither persecute the violator nor mete out punishment of the offense. He shall, at all times, have a clear appreciation of his responsibilities and limitation regarding detention of the violator; he shall conduct himself in such a manner as will minimize the possibility of having the service of the people and the equitable upholding of their laws, whether in the handling of law violators or in dealing with the law-abiding.

## IX.    ARTICLE 9 – GIFTS AND FAVORS

The law enforcement officer, representing government, bears the heavy responsibility of maintaining in his own conduct, the honor and integrity of all government institutions. He shall, therefore guard against placing himself in a position in which any person can expect special consideration or in which the

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 44 of 106

public can reasonably assume that special consideration is being given. Thus, he should be firm in refusing gifts, favors or gratuities, large or small, which can, in the publics mind, be interpreted as capable of influencing his judgment in the discharge of his duties.

## X.    ARTICLE 10 – PRESENTATION OF EVIDENCE

The law enforcement officer shall be concerned equally in the prosecution of the wrongdoer and the defense of the innocent. He shall ascertain what constitutes evidence and shall present such evidence impartially and without malice. In so doing, he will ignore social, political and all other distinction among the persons involved, strengthening the tradition of the reliability and integrity of an officer's work.

The law enforcement officer shall take special pains to increase his perception and skill of observation, mindful that in many situations his is the sole impartial testimony to the facts of the case.

## XI.    ARTICLE 11 – ATTITUDE TOWARDS PROFESSION

The law enforcement officer shall regard the discharge of his duties as a public trust and recognize his responsibility as a public servant. By diligent study and sincere attention to self improvement, he shall strive to make the best possible application of science to the solution of crime and in the field of human relationships; he shall strive for effective leadership and public influence in matters affecting public safety. He shall appreciate the importance and responsibility of his office and hold police work to be an honorable profession rendering valuable service to his community and his country.

Peter White
Sheriff
Vance County

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 45 of 106

I.    **CODE OF ETHICS**

As a law enforcement officer, my fundamental duty is to serve mankind; to protect lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the Constitutional Rights of all men to "Liberty", "Equality," and "Justice".

I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and professional life, I will be exemplary in obeying the laws of the land and the regulations of my Office. Whatever I see or hear of a confidential nature that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear of favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession...law enforcement.

Peter White
Sheriff
Vance County

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 46 of 106

## Domestic Incidents

### I. POLICY

The purpose of this policy is to establish guidelines and procedures for deputies when dealing with domestic incidents.

The Vance County Sheriff's Office recognizes domestic incident calls as high priority and needing special attention due to the possibility of violence directed to an involved party.

### II. GENERAL

The goal of the Vance County Sheriff's Office is:

- To respond to domestic related incidents without delay;
- To prevent domestic homicides through proactive measures;
- To prevent domestic assaults;
- To reduce law enforcement call backs;
- To reduce liability risk to the Sheriff's Office; and
- To prevent injuries to deputies, victims, and other involved individuals.

### III. DOMESTIC STATUTES

#### Section 1. N.C.G.S. 50B-1

50B-1. Domestic Violence; definition

(a)  Domestic violence means the commission of one or more of the following acts upon an aggrieved party or upon a minor child resident with or in the custody of the aggrieved party by a person with whom the aggrieved party has or has had a personal relationship, but does not include acts of self defense:

    (1)  Attempting to cause bodily injury, or intentionally causing bodily injury; or

    (2)  Placing the aggrieved party or a member of the aggrieved party's family or household in fear of eminent serious bodily injury; or

    (3)  Committing any act defined in G.S. 14-27.2 through G.S. 144-27.6 (See list of statutes at the end of this policy).

Case 5:19-cv-00467-BO Document 67-5 Filed 03/30/21 Page 47 of 106

(b)    For purposes of this section, the term 'personal relationship' means a relationship wherein the parties involved:

    (1)    Are current or former spouses;

    (2)    Are persons of the opposite sex who live together or have lived together;

    (3)    Are related as parents and children, including others acting in loco parentis to a minor child, or as grandparents and grandchildren. For purposes of this subdivision, an aggrieved party may not obtain an order of protection against a child or grandchild under the age of 16;

    (4)    Have a child in common;

    (5)    Are current or former household members; or

    (6)    Are persons of the opposite sex who are in a dating relationship or have been in a dating relationship. For purposes of this subdivision, a dating relationship is one wherein the parties are romantically involved over time and on a continuous basis during the course of the relationship. A casual acquaintance or ordinary fraternization between persons in a business or social contact is not a dating relationship.

### Section 2. N.C.G.S. 50B-2(c1)

(c1)    Ex Parte Orders by Authorized Magistrate. - The chief district court Judge may authorize a magistrate or magistrates to hear any motions for emergency relief ex parte. Prior to the hearing, if the magistrate determines that at the time the party is seeking emergency relief ex parte, the district court is not in session and a district court judge is not and will not be available to hear the motion for a period of four or more hours, the motion may be heard by the magistrate. If it clearly appears to the magistrate from specific facts shown that there is a danger of acts of domestic violence against the aggrieved party or a minor child, the magistrate may enter such orders as it deems necessary to protect the aggrieved party or minor children from such acts, except that a temporary order for custody ex parte and prior to service of process and notice shall not be entered unless the magistrate finds that the child is exposed to a substantial risk of bodily injury or sexual abuse. An ex parte order entered under this subsection shall expire and the magistrate shall schedule an ex parte hearing before a district court judge within 72 hours of the filing for relief under this subsection, or by the end of the next day on which the district court is in session in the county in which the action was filed whichever occurs first.

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 48 of 106

**Section 3. Chapter 50B is amended by adding the following new section to read:**

50B-4A. Violation of valid protective order is Misdemeanor.

A person who knowingly violates a valid protective order pursuant to this Chapter shall be guilty of a Class A1 Misdemeanor.

As provided for in Chapter 50B-5(a) Emergency Assistance:

A.   A person who alleges that he or she or a minor child has been the victim of domestic violence may request the assistance of a local law-enforcement agency. The local law-enforcement agency shall respond to the request for assistance as soon as practicable; provided, however, a local law-enforcement agency shall not be required to respond in instances of multiple complaints from the same complainant if the multiple complaints are made within a 48 hour period and the local law-enforcement agency has reasonable cause to believe that immediate assistance is not needed. The law-enforcement officer responding to the request for assistance is authorized to take whatever steps are reasonably necessary to protect the complainant from harm and is authorized to advise the complainant of sources of shelter, medical care, counseling and other services. Upon request by the complainant and where feasible, the law enforcement officer is authorized to transport the complainant to appropriate facilities such as hospitals, magistrates' offices, or public or private facilities for shelter and accompany the complainant to his or her residence, within the jurisdiction in which the request for assistance was made, so that the complainant may remove food, clothing, medication and such other personal property as is reasonably necessary to enable the complainant and any minor children who are presently in the care of the complainant to remain elsewhere pending further proceedings.

B.   In providing the assistance authorized by subsection (a.), no officer may be held either criminally or civilly liable on account of reasonable measures taken under authority of subsection (a).

15A-401 (b)(2)(d) provides that an officer may arrest for a misdemeanor that occurred outside his presence, if the offense was a simple assault, or domestic criminal trespass. The offense must be committed by a person who is the spouse or former spouse of the alleged victim or by a person with whom the alleged victim is living or has lived as if married.

50B – 4 (b) provides an additional option for arrest. If there is a court order in effect, 50B-4 requires arrest if there is probable cause to believe that (1) The suspect violated a court order excluding the suspect from the residence; or (2) the suspect violated the court order prohibiting him from assaulting, threatening, abusing, following, harassing or interfering with the alleged victim, and if the victim or someone acting on the victim's behalf presents the law enforcement officer with a copy of the order or the officer determines that such an order exists

and can ascertain the contents thereof, through phone, radio or other communication with appropriate authorities.

2) A "domestic incident" is when members of any relationship described above in G.S. 50B-1(b), (1) through (6) do one or more of the listed:

    a. Attempt to cause bodily injury or intentionally cause bodily injury; or

    b. Place the aggrieved person or a member of his or her household or family in fear of imminent serious bodily injury; or

    c. Commit a sexual assault; or

    d. Intentionally destroy real or personal property; or

    e. Commit domestic criminal trespass (G.S. 14-134.3); or

    f. Violate a valid court order provided under 50B; or

    g. Request law enforcement intervention even though a crime may not have been committed.

C. Probable Cause

That amount of information that would cause a reasonable and prudent person to believe that certain allegations are correct; it must be more than mere suspicion but may fall short of actual proof.

The definition and/or the weight and degree of probable cause are consistent for any incident or occurrence, and do not change.

## IV. PROCEDURE

**Responding**

- The responding deputy(s) shall separate the parties involved, calm them and restore order, if possible.

- The deputy(s) may, if the situation allows, observe the situation for a brief period before approaching the parties. All normal precautions shall be taken during approach and upon entering any residence.

- It is important to separate the parties out of ear shot, and line of sight of each other in order that each will feel more comfortable with disclosing information without fear of retaliation.

- During discussions with the parties, deputy(s) must avoid drawing hasty conclusions.

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 50 of 106

- Whether or not an arrest is made, the deputy(s) shall provide the parties involved with information related to the problem at hand, by referring them to Community Resources for assistance.

- In cases where N.C.G.S. 50B applies, the responding deputy(s) shall inform the complainant of the availability of relief through the Clerk's office, which doesn't require an attorney.

**Assessment**

- In all cases, the deputy shall determine if:

  o All involved parties are safe;

  o Any injuries have occurred

  o A crime has been committed;

  o Any warrants are outstanding on involved parties;

  o Any civil process (such as 50B) is outstanding, or is in effect.

**Arrest**

- After the responding deputy(s) has finished his/her interviews, and weighed his/her information and observations, if grounds exist to make a warrant-less arrest as described in 15A-401 or 50B, the deputy(s) shall make the arrest.

- If the suspect has left the scene and an arrest is warranted as described is 15A-401 or 50B, the deputy(s) and the Sheriff's Office shall make a reasonable effort to locate the suspect as soon as possible, and make the arrest.

- If the suspect can not be immediately located, but there is probable cause to believe that the suspect has committed an offense, the deputy shall explain the procedure for obtaining a warrant to the victim and encourage the victim to seek a warrant. The deputy shall provide the victim with transportation to the magistrate's office if the victim so desires, or does not have transportation.

- If the suspect cannot be immediately located and there is probable cause to believe the suspect has committed an offense, but the victim refuses to get a warrant after the deputy has weighed all factors in the call, the deputy shall attempt to obtain a warrant from the magistrate on other grounds of 50B. In contemplating such a decision, the deputy will consider:

  o The existence of a protective order;

  o The history of previous calls involving the same parties;

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 51 of 106

o The likelihood that the crime will be repeated or violence against the victim continued;

o The magnitude of the victim's injuries.

- If an arrest is not made because the suspect can not be located, or due to the deputy's use of discretion to not make an arrest, the deputy shall initiate follow-up intervention with the appropriate state or county victim's services.

- The deputy shall perform a follow-up contact with the victim, in person, as soon as reasonable. If the deputy can not follow-up with the victim, he/she shall request their immediate supervisor, or on-coming duty officer make the necessary follow-up contact with the victim.

- At the discretion of the deputy, more than one follow-up contact visit may be warranted.

**On-Scene**

- The deputy shall remain on the scene long enough to determine if the victim will feel safe after the law enforcement leaves, or if the victim needs assistance to go to another location.

- If the victim decides to relocate, the deputy shall remain on the scene to preserve the peace, while the victim removes such items as food, clothing, medication, and other personal property as is reasonably necessary to enable the victim and/or minor children to relocate elsewhere. This does NOT include furniture or other household items.

- Unless both parties readily agree; or if there is a court order directing something else, only survival necessities may be removed with law enforcement assistance.

- Under no circumstances will the race, ethnic origin, social class or occupation of any party be factors in a deputy's initiative in handling the call, or decision to seek a warrant.

**Documentation**

- At the conclusion of each domestic incident call for service the responding deputy shall complete the appropriate incident report.

- Any follow-up visits by the deputy shall be documented on the appropriate follow-up report as well. The report will contain the date, time, complaint number of initial report, as well as the victim's name, address, and contact numbers. The report must also contain action taken or discussions conducted.

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 52 of 106

- The deputy responding to a domestic situation or conducting a follow up with a victim shall forward a completed copy of all reports pertaining to the incident to the Domestic Violence Coordinator or other appropriate person. All reports must be completed by the next business, unless extenuating circumstances prevents next day completion, and forwarded to the above mentioned personnel.

**Additional Assistance**

- If requests are made by either person involved in the domestic dispute for law enforcement assistance with removing personal belongings as described in 50 B-5, at times other than during a domestic call, the responding deputy may provide that assistance, without court order, to prevent a crime from occurring. The deputy may not intervene in any form to assist one party or another in removing household or personal items in dispute. The deputy may recommend the parties settle their property disputes in civil court. The deputy may only intervene in accordance with G.S. 15A-401, or 50B.

## V. SAME GENDER DISPUTES

Although 50B does not address specifically, the issue of same-sex domestic incidents, deputies are reminded that domestic disputes do occur with same-sex relationships. Personnel are to treat calls of this nature the same way and using the same methods as an opposite-sex call. HOWEVER, DO NOT APPLY THE SAME STANDARDS FOR EX-PARTE ORDERS UNDER 50B IF MAKING A WARRANTLESS ARREST

## VI. ASSISTING LEGISLATION

- North Carolina General Statue:

  o 15A-401 Arrest by law enforcement officer.

  o 15A-401(b)(2)(d) Warrant-less arrest powers of officers responding to domestic violence.

  o 50B-4(b) Arrest mandated when officers responding to domestic violence in some cases.

  o 14-27.2 First-degree rape.

  o 14-27.3 Second-degree rape.

  o 14-27.4 First-degree sexual offense.

  o 14-27.5 Second-degree sexual offense.

  o 14-27.6 Penalties for attempt.

- 14-33 Misdemeanor assaults, batteries, and affrays, simple and aggravated; punishments.

- 14-33.1 Evidence of former threats upon plea of self-defense.

- 14-277.3 Stalking

- 14-27.2 through 14-27.7 Committing or attempting to commit sex offenses.

- 14-134.3 Domestic Criminal Trespass.

- 15A-285 Allows for entry when an urgent necessity exists, when an officer reasonably believes entry is necessary to save a life or prevent serious bodily injury.

- Chapter 50B Domestic Violence.

- 50B-1 Domestic violence; definition.

- 50B-2 Institution of civil action; motion for emergency relief; temporary orders.

- 50B-3 Relief.

- 50B-4 Enforcement of orders.

- 50B-5 Emergency assistance.

- 50B-9 Domestic Violence Center Fund.

Peter White
Sheriff
Vance County

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 54 of 106

## I.  POLICY

This policy establishes guidelines related to the use of force, reporting, review, and analysis.

The Vance County Sheriff's Office recognizes and respects the value and special integrity of each human life. By vesting deputies the lawful authority to use force to protect the public welfare, a careful balancing of all human interests is required. Therefore, it is the policy of the Vance County Sheriff's Office that deputies shall use only that force which is reasonably necessary to effectively bring an incident under control while protecting the lives of the officer or another. Deputies shall use physical force in arrest and custody situations only in strict conformance with the United States Constitution, laws of North Carolina, and this policy.

### Approved Weapons

- A deputy shall, while on or off duty, only carry weapons and ammunition authorized or approved by the Sheriff.

### Impact Weapons

- The riot and expandable (ASP) batons are the only impact weapons issued to deputies of the Vance County Sheriff's Office. Deputies must complete the appropriate training prior to receiving authorization to carry or use these weapons.

### Chemical Agents

- Only Sheriff's Office issued chemical agents may be carried and used by deputies of the Vance County Sheriff's Office.

- Prior to the issuance of Oleoresin Capsicum Spray (OC Spray), all deputies shall receive training in its use, which will include instruction and actual application to afford the deputy an understanding of the effects. Any use of OC Spray other than in a training situation or spraying of animals for self-protection shall be reported as required by this policy.

### Use of Other Chemical Agents

- Authorization to employ tear gas or other chemical agents in riot situations or for other applications involving large numbers of people must be obtained from the Sheriff's Office Captain or higher authority or his/her designee. Any use of tear gas or chemical agents except in a training situation must be reported on the appropriate Incident Report.

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 55 of 106

**Electronic Control Device (ECD)**

- Prior to the issuance of an electronic control device, all deputies shall receive training in its use, which include demonstration and application to afford the deputy an understanding of the effects. Any use of an electronic control device other than in a training situation shall be reported as required by this policy.

**Issuance of Authorized Weapons**

- Prior to the issuance of any lethal or less than lethal weapon, the Sheriff's Office Operations Lieutenant, Amorer, Captain, or Firearms Coordinator shall review, inspect, and approve all weapons intended for use by deputies in the performance of their duties. Any weapon found to be unsafe shall be removed from service until such time it is repaired by a qualified technician. A record of each approved weapon issued by the Sheriff's Office shall be maintained by the Vance County Sheriff's Office Armorer.

**Issuance of Specialty Firearms**

- Prior to the issuance of any specialty firearm to a deputy, the Sheriff's Office Armorer or his/her designee shall conduct a pre-qualification pistol proficiency examination and an Internal Affairs review shall be requested of any prospective Specialty Firearm candidate alleging excessive force. The minimum duty handgun proficiency required to be considered for further participation and training is at least 80%. Specialty Firearm training and qualification shall also require completion with a score of at least 80% proficiency. Rifle candidates shall complete the approved Rifle Operators Course with a qualification score of at least 80% proficiency.

**Use of Weapons**

- Weapons shall be used in accordance with the deputy's training and Sheriff's Office policy. Careless or imprudent use of weapons is prohibited. The term deadly is synonymous with lethal and the term non-lethal and non-deadly are synonymous with less than lethal.

**Remedial Training**

- A deputy who fails to demonstrate required proficiency with either a lethal or non-lethal weapon shall receive remedial training with said weapon by a certified weapons instructor prior to resuming official duties.

II.  **DEFINITIONS**

**Display of Firearm.** Displaying the weapon includes the removal of the pistol or the pointing of any firearm at a suspect in order to control a situation. Displaying of the weapon does not include removal of the pistol while conducting a building

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 56 of 106

search, executing a search or arrest warrant or other non-traffic enforcement situation where no subject is located or controlled by the use of the firearm.

**Lethal Force.** The application of any instrument or technique which is likely to produce death or serious physical injury under the circumstances of its use. Such instruments include, but are not limited to: firearms, blackjacks, flashlights, riot batons, nightsticks, knives, or automobiles.

**Serious Bodily Injury.** Bodily injury that creates a substantial risk of death or is likely to cause permanent disfigurement, coma, protracted, or permanent condition. It is an injury that causes extreme pain, prolonged or permanent loss or impairment of the function of any bodily member or organ that result in prolonged hospitalization.

**Use of Firearm.** Discharging the weapon (i.e. pistol, shotgun, rifle, etc.) or using it as an impact weapon.

## III. USE OF LETHAL FORCE

### General Guidelines

- Deputies shall use **lethal** force only in conformance with the Constitution and laws of North Carolina.

- **Imminent** shall be synonymous with the term immediate.

### General Statute § 15A-401(d)(2) states, in pertinent part:

A law-enforcement officer is justified in using deadly physical force upon another person only when it is or appears to be reasonably necessary thereby:

- To defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force

- To effect an arrest or to prevent the escape from custody of a person who he reasonably believes is attempting to escape by means of a deadly weapon, or who by his conduct or any other means indicates that he presents an imminent threat of death or serious physical injury to others unless apprehended without delay

Nothing in this subdivision constitutes justification for willful, malicious, or criminally negligent conduct by any person which injures or endangers any person or property, nor shall it be construed to excuse or justify the use of unreasonable or excessive force.

### Warning Required

Prior to using lethal force, deputies must give a verbal warning if feasible.

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 57 of 106

## IV. USE OF LESS THAN LETHAL FORCE

### General Guidelines

Where **lethal** force is not authorized, a deputy should assess the situation in order to determine which less than lethal technique or weapon will best de-escalate the incident to bring it under control in a safe manner.

A deputy is authorized to use agency-approved less than lethal force techniques, issued equipment, and/or canine for resolution of incidents as follows:

- To protect the deputy or another from physical harm

- To restrain or subdue a resistant individual

- To bring an unlawful situation safely and effectively under control

- To effect an arrest or prevent escape from custody of a person whom the deputy reasonably believes has committed a criminal offense unless the deputy knows the arrest is not authorized

The amount of force, which may be used in attaining a lawful compliance, will be determined by the surrounding circumstances, including but not limited to:

- The nature of the offense

- The behavior of the subject against whom force is to be used

- Actions by third parties who may be present

- The feasibility or availability of alternative actions

Deputies are not permitted to use a less than lethal defensive weapon unless qualified in its proficient use as determined by training procedures. All proficiency training must be monitored by a certified defensive tactics instructor. All deputies authorized to carry weapons are required to receive in-service training at least annually on the agency's use of force policies and demonstrate proficiency with all approved lethal and less than lethal weapons including any restraint techniques that deputies are authorized to use. In-service training for lethal and less than lethal weapons will be documented either on the deputy's training record and/or on a Firearms Qualification Record (F-9A).

The following less than lethal defensive weapons are authorized for on and off duty use, expandable baton, riot baton, O.C. Spray, and other weapons which may be issued by the Sheriff's Office. Under **no** circumstances are deputies authorized to carry an electronic control device (ECD) while off duty. All personnel will follow proper reporting procedures as outlined in Section VIII of this policy).

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 58 of 106

## V.    MEDICAL ASSISTANCE

Deputies shall make the scene as safe as possible and shall afford medical assistance to injured persons considering:

- Amount and type of force used

- Any apparent or probable injuries

- Statements made by the person(s)

Medical assistance afforded shall be the same as for any other individual with similar injuries including:

- First aid administered by the deputy within the limits of the affected deputy's level of training

- Calling or offering to call emergency medical services as appropriate

Deputies may elect to transport injured suspects by patrol vehicle to a medical facility for examination or treatment based on potential security risks, danger presented by the suspect, and other explainable facts.

## VI.    ADMINISTRATIVE LEAVE AND REVIEW

Deputies whose actions or use of force results in a death or serious physical injury to anyone shall be removed from their normal duty assignment and assigned Administrative Duties by their Division Commander pending an administrative review. The Division Commander who places the affected deputy on Administrative Duties shall follow-up in writing in the form of a memorandum outlining the reason for the Administrative Duties and the deputy's limitations while on Administrative Duties. The memorandum shall be completed no later than the first scheduled workday after placing the deputy on Administrative Duties. The memorandum shall be immediately forwarded to the Sheriff's Office Captain. Administrative leave is not limited to shootings but shall include actions or uses of force, which result in a death or serious injury.

A supervisor shall order a deputy to take a drug test to eliminate the possibility that drug use may have affected the deputy's actions or judgment in any case where the deputy:

- Discharges his/her weapon resulting in bodily injury to himself/herself or another

- Is involved in a fatal motor vehicle collision

- Is involved in a motor vehicle collision which results in an apparent serious bodily injury

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 59 of 106

A deputy on Administrative Duties **may** be required to surrender his/her issued patrol vehicle, firearms, uniform badges, and identification credentials.

A deputy assigned Administrative Duties may not wear a uniform or drive or ride as a passenger in an assigned patrol vehicle to and from the work place. The deputy shall be responsible for providing personal transportation to and from the work place. Upon the approval of the appropriate supervisor, the affected deputy may be transported to a doctor's appointment, court, meal break, or any other administrative function. At **no time** will a deputy assigned Administrative Duties be allowed to ride as a passenger in an authorized patrol vehicle during non-work hours. Suitable business attire must be worn and all regulations in this manual must be complied with when performing these assignments. A deputy's Administrative Duties assignments shall not include enforcement action.

Deputies who are involved in any critical incidents shall be referred to a Licensed Physician, approved by the Office of the Sheriff for evaluation, and to determine his/her fitness-for-duty.

## VII.    WEAPONS AND AMMUNITION PROCEDURES

### Authorized Weapons – On and Off Duty

- On Duty

  - Service pistols and magazines shall be loaded to capacity with Sheriff's Office issued ammunition. Shotguns shall be loaded to magazine capacity with Sheriff's Office issued ammunition, with the firing chamber empty. Rifles shall be unloaded; with issued magazines loaded with Sheriff's Office issued ammunition in accordance with the deputy's training, and authorized weapons shall be readily available. Authorized weapons are only those, which have been issued by the Sheriff's Office. Deputies shall carry only Sheriff's Office-issued approved weapons and ammunition as their primary on-duty weapon.

  - Deputies while on/off duty, and operating an official patrol vehicle, while not wearing an approved Sheriff's Office uniform, shall have on their person his/her issued service pistol and official Sheriff's Office identification credentials. While wearing civilian clothing, the deputy shall not make a public display of his/her firearm or remove it from its holster except for lawful purposes. The only exception to this policy is when a deputy is attending a closed meeting, (i.e. Law Enforcement Only) the deputy may secure his/her service pistol in the trunk of his/her Patrol Vehicle while actively involved in the meeting.

  - A deputy's personally-owned firearm approved by the Sheriff for back-up or off duty use in compliance with this directive, may be carried as a back-up firearm. Deputies are not required to carry a back-up firearm while on duty, but may do so at their discretion after qualifying with said weapon in

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 60 of 106

accordance with NC Criminal Justice Training and Standards requirements by a certified firearms instructor.

- o When carried, shotguns and rifles shall be kept secured in the patrol vehicle except when removed in the line of duty. Deputies shall remain constantly aware of the type of ammunition loaded into their firearms. Shotguns and rifles shall be periodically checked for the type and variety of ammunition with which they are loaded. Deputies shall promptly replace any ammunition suspected to be faulty via their immediate supervisor.

- o Issued rifles shall be used when the deputy determines that a weapon capable of firing a single projectile at close range, extended range, or confined areas is necessary.

- o Deputies may purchase a spare magazine, meeting Sheriff's Office specifications, for the issued pistol.

- o The additional magazine may be carried in the Patrol vehicle for on-duty use, with prior approval of the affected deputy's immediate supervisor. Additional magazines shall be manufactured by a reputable firearms manufacturer.

- o The use of lead or cast bullets in firearms practice causes a build-up of lead in the feed ramp and barrel, which could result in a malfunction or a failure to feed properly. Therefore, deputies shall fire only jacketed ammunition in the issued and personally owned, back-up, or off-duty semiautomatic pistol.

- Off-Duty and Back-Up Firearms

  - o In strict conformance with federal and state law and this policy, deputies are authorized to possess and carry a concealed firearm (either their issued service firearm or an authorized personal firearm) while off duty. Use of off-duty weapons shall be reported immediately to a supervisor. The same reporting procedures will apply as an on-duty incident.

  - o Prior to carrying a personally-owned firearm off-duty or as a back-up weapon, the deputy shall have the weapon inspected by the Sheriff's Office Firearms Instructor. The Firearms Instructor may approve or reject the use, or the type and caliber of the firearm requested in accordance with Sheriff's Office policy. If the firearm is approved for off-duty or back-up use, the Firearms Instructor shall certify the qualification by the deputy with the personally-owned weapon, and forward the Firearms Qualification Record (F-9A) to the Sheriff's Office Armory Officer or designee to be placed in the deputy's personal firearms file.

  - o A deputy who elects to carry his/her Sheriff's Office-issued or personally owned firearm(s) while off duty will be required to have in his/her

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 61 of 106

possession the official badge and identification holder identifying him/her as a sworn deputy of the Vance County Sheriff's Office.

o Each personally owned firearm and ammunition approved for back-up or off duty use must be documented on a Firearms Qualification Record (F-9A) and maintained by the Armament Officer or designee, who shall place the Record in the deputy's personal firearms file. If at any time or for any reason a deputy elects to discontinue the use of a personally-owned firearm for back-up or off duty use, the deputy shall notify the Armament Officer immediately, via memorandum through the chain of command, indicating the effective date and reason for discontinued use.

o A deputy must qualify with the approved personally owned firearm that is intended to be used as an off-duty or back-up weapon on an annual basis. The course of fire for qualifying will be the same (or similar in nature as the type of firearm will allow), as currently required for the Sheriff's Office-issued firearm. A failure to qualify shall automatically suspend the authorization to carry the personally owned firearm. The deputy may not carry the firearm until satisfactory qualification and approval of the Firearms Instructor.

o Only those firearms and ammunition of the type and caliber approved by the designated Firearms Instructor will be carried as back-up or off-duty.

➢ Firearms carried as back-up or off-duty shall be no smaller than a .32 or.380 caliber and no larger than a .45 caliber. These weapons shall be of a good quality, produced by a recognized manufacturer, and appear to be in good working order, and the mechanisms shall not be modified except as provided in the manufacturer's owner's manual.

➢ Ammunition used for qualifying or while carrying personally owned, back-up, or off-duty firearms shall be provided by the individual deputy and must be from a commercial manufacturer, approved by the Firearms Instructor. Deputies must qualify with the ammunition they intend to carry in the firearm, which shall be documented on the Firearms Qualification Record (F-9A). **Ammunition must be service grade (not reloaded or remanufactured).**

➢ The size of the Sheriff's Office-issued pistol may prevent proper concealment; therefore, discretion must be used in carrying this weapon off duty.

➢ Deputies who practice while off duty with issued weapons shall comply with all policies regulating the use of firearms.

o A deputy shall not consume or have remaining in his/her body any alcohol previously consumed or be under the influence of alcoholic beverages or any impairing substance while handling a firearm or while possessing any firearm away from his/her own premises.

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 62 of 106

- Deputies shall not make a public display of a firearm or remove it from its holster while off duty except for lawful purposes.

- A deputy who has been relieved of duty pending an investigation, on disciplinary suspension, or is required to surrender his/her issued firearms for any reason, or is otherwise prohibited from exercising powers of arrest, is not authorized to carry a concealed, personally owned firearm while off duty during the period the deputy is relieved of duty, or on disciplinary suspension.

**Firearms Procedures**

- A deputy shall never fire warning shots.

- A deputy shall not remove side arms from holsters except for authorized use in accordance with this policy, for inspection by a superior officer, or for other authorized purposes.

- A deputy shall not permit any person, other than another deputy, to use Sheriff's Office firearms.

- The killing of an animal is justified:

  - For self-defense

  - To prevent harm to the deputy or another person

  - When the animal is so badly injured as to require that it not continue to suffer. In the case of livestock, a reasonable effort must be made to contact and notify the owner. If the owner cannot be contacted within a reasonable period, the deputy may take the necessary action. Incidents involving game and non-game animals under the jurisdiction of the Wildlife Resources Commission will be reported to that agency using the notification method established by the Sheriff's Office Captain or designee. Incidents involving domestic animals and livestock will be reported to the nearest animal control agency. Neither a Report of Investigation nor a Use of Force/Assault Report needs to be completed when an animal is shot; however, a memorandum outlining the deputy's actions shall be sent to the affected deputy's immediate supervisor within twenty-four (24) hours of the incident, and he/she shall request any used ammunition be replaced as soon as possible.

**Shooting at Moving Vehicles**

- Discharging a firearm at a moving vehicle involves a possible risk of death or serious injury. There may be a risk of harm to occupants of the suspect vehicle who may not be involved, or involved to a lesser extent, with the actions of the suspect creating the threat.

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 63 of 106

- Deputies shall not fire at unarmed violators in a moving vehicle unless the deputy reasonably believes that the oncoming vehicle presents an imminent threat of death or serious physical harm to him/her or third person, and no other means are available at that time to avoid or eliminate the danger.

- No deputy shall intentionally position him/herself into the path of a vehicle that is attempting to flee. Whenever possible, the effected deputy shall make a reasonable effort to get out of harm's way if a vehicle is moving toward him/her.

## Investigation and Reporting of Firearms Incidents

- A deputy shall immediately report to his/her supervisor every use of a firearm in the performance of his/her duty, either intentional or accidental not related to training. Any time a deputy removes his/her pistol from its holster during an enforcement contact, such action shall be deemed either *display of firearm* or *use of firearm*. For *display of firearm* cases, the deputy shall complete **only** a Use of Force Report, with a narrative that is brief, factual, and to the point. For *use of firearm* cases, the supervisor, in conference with the Division Commander or higher authority, shall carefully examine all the facts and circumstances surrounding the incident, and determine compliance with Sheriff's Office rules, policies, and procedures.

- A deputy involved in a shooting incident, which results in death, or serious personal injury to anyone shall immediately be relieved from normal duty and assigned to administrative duties by his/her Division Commander. The affected Division Commander shall follow the provisions set forth in Section VI (Administrative Leave and Review) of this Policy. The deputy shall be ordered to take a drug test to eliminate the possibility that drug use may have affected the deputy's actions or judgment. The appropriate Division Commander or his/her designee shall immediately begin to collect pertinent information necessary for a preliminary investigation and shall contact the Sheriff's Office Captain, who shall assume direction of the preliminary investigation at the earliest possible time.

- After debriefing of the deputy in accordance with Sheriff's Office policy, if it reasonably appears that the shooting was justified, the deputy may be re-assigned to normal duty by the Sheriff.

## Maintenance and Care of Firearms

- All deputies shall keep their Sheriff's Office issued and back-up or off-duty firearms in excellent condition.

- Deputies shall not in any manner alter or tamper with the internal working mechanisms of their Sheriff's Office-issued firearms.

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 64 of 106

- Deputies shall regularly clean and inspect all issued firearms according to instructions in the appropriate training manual.

- Any defects or malfunctions of any issued firearm shall be reported to the deputy's supervisor immediately. Defective weapons shall not be carried.

- Deputies shall regularly clean and inspect all approved back-up or off-duty firearms.

- Any defects or malfunctions of back-up or off-duty firearms shall be reported to the Sheriff's Office Firearms Instructor immediately. Deputies shall not carry such firearms until the defect or malfunction is corrected at the deputy's expense and inspected by the Sheriff's Office Firearms Instructor to insure it has been repaired. If any critical component of the firearm is repaired or replaced (sights, barrel, etc.) the Sheriff's Office Firearms Instructor must re-qualify the deputy with the firearm and document same on a Firearms Qualification Record (F-9A) to be forwarded to the Sheriff's Office Armament Officer, and placed in the deputy's personal firearms file.

## VIII. OLEORESIN CAPSICUM SPRAY PROCEDURES

### General Guidelines

- Use of O.C. Spray is a form of less than lethal force. When practical, O.C. Spray should be used in place of striking the subject with a fist, elbow, knee, or weapon in order to avoid injury to the subject and the deputy.

- No deputy shall use O.C. Spray on any person who knowingly is being subjected to the effects of an Electronic Control Device (ECD).

### Decontamination

- After spraying a subject the deputy **must monitor** the subject's physical condition for up to 45 minutes or until the subject is turned over to jail personnel.

- After handcuffing and searching the subject, the deputy should instruct the subject to remain still, not to rub his/her eyes, breathe normally, and relax as much as possible.

- When circumstances permit, deputies should wait a period of 15 minutes before transporting the subject to allow natural evaporation to reduce the effects of the O.C. Spray in the vehicle.

- A deputy **must** decontaminate the subject at the scene of the arrest when the deputy or subject's safety is not jeopardized.

- Decontamination includes:

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 65 of 106

- o Moving the subject into an uncontaminated area as soon as possible

- o Facing the subject into the wind

- o Spraying the subject's face and eyes utilizing the issued spray bottle and water

- o Patting the subject's face dry with paper towels

- A subject should be asked if he/she suffers from any medical problems.

- While transporting the subject, the deputy shall provide ventilation to the subject by opening the window and/or directing the air-conditioning vent toward the subject's face.

- Upon arrival at the detention facility or chemical analysis site, the deputy shall allow the subject to flush his/her face and eyes with cool water. A non oil-based soap or detergent should be used and will help remove the resin from the skin.

  - o Do not use **any** commercial eyewash during the decontamination process.

  - o Personnel at the jail **must** be informed that a prisoner has been sprayed with O.C. Spray.

**Medical Attention to Prisoners**

- Unless the detention facility requires a subject who has been sprayed with O.C. Spray to be checked by medical personnel, a prisoner who has been sprayed will not usually require medical attention.

- A prisoner who meets any of the following criteria **must** be taken for immediate medical attention:

  - o Gagging or breathing difficulties persist beyond 2-4 minutes

  - o Loses consciousness, sweats profusely without reason, appears very sick

  - o Suffers from the effects of O.C. Spray more than 45 minutes after use

  - o Displays signs of or declares an allergy to capsicum (pepper)

  - o Is autistic or suffers from a mental condition

- A prisoner who is known to meet the following criteria must be closely monitored for at least 45 minutes or until turned over to jail personnel. Closely monitored means the prisoner should not be left alone for any

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 66 of 106

significant periods of time, and the physical and mental condition of the prisoner should be observed:

- o Old or frail persons, diabetics, asthmatics

- o Have known history of heart or lung problems, seizure disorders

- o Are substantially impaired by drugs or alcohol

- o Have run or fought with officer or violently resisted arrest

- o Are breathing very rapidly, sweating heavily, or exhibiting pale skin

- o Engaging in deranged or irrational conduct or speech

- o Are very obese

- o Complain of dizziness or being lightheaded

## IX.  ELECTRONIC CONTROL DEVICE (ECD)

### General Guidelines

- Prior to the issuance of an electronic control device, all deputies shall receive training in its use, which will include demonstration and application to afford the deputy an understanding of the effects.

- No deputy is permitted to use an ECD unless qualified as determined by training procedures.

- All training and/or remediation sessions are to be administered by a certified ECD Instructor.

- All deputies authorized to carry an ECD are required to receive in-service training at least annually on the agency's use of force policies and demonstrate proficiency with the ECD.  In-service training for ECD's will be documented on the deputy's personal training record.

- Use of an ECD is a form of less than lethal force.  When practical, the electronic control device should be used in place of striking the subject with a fist, elbow, knee, or weapon in order to avoid injury to the subject and the deputy.

### Carrying and Deployment of an Electronic Control Device

- Deputies shall carry the ECD on the opposite side of their duty weapon in a cross draw fashion in a holster approved by the Sheriff..

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 67 of 106

- Deputies preparing to fire the device shall announce "Taser, Taser, Taser" when feasible, to warn the violator, to prevent sympathetic reflex shooting, and to alert other officers on scene.

- When the device is fired the target area is the body's center of mass or legs.

- The ECD shall not be used on a person who is in control of a vehicle that is in gear or in motion.

- No deputy shall use an ECD on any person(s) who is being actively sprayed or has knowingly been subjected to any chemical agents including any type of Oleoresin Capsicum spray (OC).

- The ECD will shall not be used in the proximity of flammable liquids, gases or any other highly combustible materials that may be ignited by the device including any individual that may have been exposed to highly combustible substances and / or liquids such as gasoline.

- Under no circumstances is a deputy authorized to carry an ECD while off duty.

- Deputies shall not tamper with the ECD in any manner which they are not authorized, unless instructed to do so by a certified ECD instructor.

**Medical Assistance**

- When the subject is under control, deputies may remove the ECD probes using universal precautions unless they are attached in a subject's vital tissue (eye, groin, face, neck, etc.) then seek immediate qualified medical attention.

- After the probes are removed, deputies will assess the subject for any condition or injury that may require medical attention and seek the appropriate medical treatment if needed.

- ECD probes are to be treated as a medical sharp. Universal precautions are to be used when handling a medical sharp.

- Personnel at the jail must be informed that an ECD has been utilized. However, unless a detention facility requires medical personnel check a subject who has been exposed to an ECD, a prisoner will not usually require medical attention.

**Remedial Training**

- Any deputy who fails to demonstrate the required proficiency with an ECD or requires remedial training as directed by the Sheriff's Office upon the recommendation of the Use of Force Review Board, may be required to

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 68 of 106

surrender their issued ECD to his/her immediate supervisor until he/she has satisfactory completed said training from a certified ECD Instructor.

### Documentation

- With the exception of training and remediation, and demonstrations all occurrences of ECD use including display, discharge, accidental discharges and deployment shall be reported to the deputy's immediate supervisor and documented on the Use of Force/Assault Incident report in compliance with this policy.

- All demonstrations shall be approved by the deputy's supervisor and will be conducted in the appropriate mode only with the cartridge removed from the ECD.

## X.    DOCUMENTATION ON USE OF FORCE

### Firearms

- Display and Use of a Firearm, as defined by the terms located in the Definition Section of this policy, shall be reported and documented on the Use of Force/Assault Report in accordance with this policy. In situations were the firearm is "Displayed Only," the deputy shall complete a brief, factual, to the point narrative

- In addition to the Use of Force/Assault Report, incidents involving discharge of a firearm requires a Report of Investigation, except when an animal is shot, which shall be forwarded via chain-of-command to the Sheriff.

### Other Use of Force

- A deputy shall complete the Use of Force/Assault Report on each occasion the he/she strikes a person with any part of his/her body (e.g. fist, elbow, knee, or neck restraint) or uses or displays any defensive weapon (O.C. Spray included) in order to control a subject. On those occasions where the deputy "Displayed Only" any defensive weapon, excluding the Electronic Control Device (ECD), a brief, factual, to the point narrative shall be completed. The Use of Force/Assault Report shall also be completed whenever a subject or a deputy is injured, complains of injury, or has visible injury or in any case where the subject is charged with assaulting the deputy.

- The removal and carrying of a shotgun/rifle by a deputy at manhunts, roadblocks, outside agency assists, etc., does not require the completion of a Use of Force/Assault Report if the weapon was not actually pointed at subjects in order to control their actions.

- A deputy involved in a Use of Force/Assault incident, if physically able, must notify his/her immediate supervisor as soon as feasible after the incident. The deputy shall submit the Use of Force/Assault Report to his/her immediate

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 69 of 106

supervisor within four (4) days of the incident. If the deputy is unable due to injuries, his/her immediate supervisor will complete the Use of Force/Assault Report within thirty (30) days, provided the supervisor has sufficient information.

- Detention services personnel must submit a report before the end of their tour of duty unless medically unable to do so, (and then a supervisor shall submit the report). In addition, whenever possible, alternative methods to resolve a conflict should be exhausted before force is used. Whenever the use of force is anticipated and the inmate does not pose an immediate threat, a superior shall be notified and all actions shall be under a supervisor's direction.

## XI. REVIEW AND CRITIQUE OF USE OF FORCE

### Review by Supervisor

- The deputy's supervisor shall review the Use of Force/Assault Report for completeness with the deputy prior to submission. In addition, the supervisor shall review any accompanying video(s) and this directive as it applies to the incident with the deputy, and make an initial determination about whether the deputy followed Sheriff's Office policy and established training practices. The supervisor performing the review shall indicate the following on the back of Use of Force/Assault Report, "This Report and the Use of Force Policy were reviewed with the deputy(s) involved." The supervisor performing the review and the affected deputy, shall initial the Use of Force/Assault Report below the above mentioned statement. A supervisor who is involved in the incident shall not conduct the review.

- The deputy's supervisor shall then sign the Use of Force/Assault Report and send it, along with a copy of the accompanying video(s), if applicable, directly to the Use of Force Board Liaison (Lieutenant). The Use of Force/Assault Report is not required to be submitted to the Sheriff's Office Captain but can be provided upon request.

- Training or policy issues identified during the supervisor's review shall not be addressed in the Use of Force/Assault Report, but instead shall be documented on the appropriate form (Performance Record, Official Complaint, etc.) and processed in accordance with procedures established by the Sheriff's Office. A copy of the form shall be attached to the Use of Force/Assault Report, and shall be forwarded to the Use of Force Review Board.

### Review by Board

- All Use of Force/Assault Reports and the accompanying video(s) will be reviewed and analyzed at least bi-monthly by the Use of Force Review Board. The Board may request, through the chain-of-command, additional information and clarification on any Use of Force/Assault Report.

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 70 of 106

- The Sheriff's Office Captain shall appoint Board members for three (3) years from the following sections, with one deputy holding the rank of Lieutenant who shall serve as the chairperson:

- 
  o Patrol Division – One member (Sergeant)

  o Internal Affairs – One member

  o Training Liaison – Member responsible for the coordination of training

  o Investigations Division – One Sergeant or Detective

  o Deputies – Two enforcement members (Road Deputies)

  o Operations Division – One Sergeant or Deputy

- The Use of Force Review Board shall submit a summary report of reviewed Use of Force/Assault Reports, which will reflect actions taken, and any recommendations to the Sheriff. Annually, the Use of Force Review Board Chairperson shall conduct an analysis to determine any training needs, equipment upgrades, and/or policy modifications and submit the analysis to the Sheriff for review.

- If a video of the incident is made, a copy of the video shall be routed, along with the Use of Force/Assault Report, to the Use of Force Board Liaison.

- The Review Board shall review only the specific Use of Force/Assault incident in question.

- If a deputy is involved in three or more Use of Force/Assault incidents in a quarter, or six or more within a consecutive twelve (12) month period, the Chairman of the Use of Force Review Board or his/her designee will obtain this information and assign it to the Review Board member from Internal Affairs who will review the reports and the deputy's Internal Affair's file to determine if a pattern of improper behavior is apparent.

Peter White
Sheriff
Vance County

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 71 of 106

**EXHIBIT**

**15**

**Grievance Procedure and Adverse Action Appeal**    **Directive D.7**
Effective 7/15/2009

## I.    POLICY

It is the policy of the County to provide a just and prompt procedure for the presentation, consideration, and disposition of employee grievances. The purpose of this article is to outline the procedure and to assure all employees that a response to their complaints and grievances will be prompt and fair.

Employees utilizing the grievance procedure shall not be subjected to retaliation or any form of harassment from supervisors or employees for exercising their rights under the grievance procedure. Supervisors or other employees who violate this policy shall be subject to disciplinary action up to and including dismissal.

## II.    GRIEVANCE DEFINED

A grievance is a claim or complaint by an employee based upon an event or condition which affects the circumstances under which an employee works, allegedly caused by misinterpretation, unfair application, or lack of established policy pertaining to employment conditions. Former employees may appeal their termination from County employment within required time frames.

## III.    PURPOSES OF THE GRIEVANCE PROCEDURE

The purposes of the grievance procedure include but are not limited to:

- Providing employees with a procedure by which their complaints can be considered promptly, fairly, and without reprisal

- Encouraging employees to express themselves about the conditions of work which affect them as employees

- Promoting better understanding of policies, practices, and procedures which affect employees

- Increasing employees' confidence that personnel actions taken are in accordance with established, fair, and uniform policies and procedures

- Increasing the sense of responsibility exercised by supervisors in dealing with their employees

- Encouraging conflicts to be resolved between employees and supervisors who must maintain an effective future working relationship, and therefore, encouraging conflicts to be resolved at the lowest level possible in the chain-of-command

Case 5:19-cv-00467-BO    Document 67-5    Filed 03/30/21    Page 72 of 106

- Creating a work environment free of continuing conflicts, disagreements, and negative feelings about the County or its leaders, thus freeing up employee motivation, productivity, and creativity

## IV. PROCEDURE

When an employee or group of employees has a grievance, the following successive steps are to be taken unless otherwise provided. The number of calendar days indicated for each step should be considered the maximum, unless otherwise provided, and every effort should be made to expedite the process. However, the time limits set forth may be extended by mutual consent. The last step initiated by an employee shall be considered to be the step at which the grievance is resolved. A decision to rescind a disciplinary suspension, demotion, or dismissal must be approved by the Hiring Authority before the decision becomes effective,

### Informal Resolution

- Prior to the submission of a formal grievance, the employee and supervisor should meet to discuss the problem and seek to resolve it informally. Either the employee or the supervisor may involve the Human Resources Office as a resource to help resolve the grievance. Mediation may be used at any step in the process and is encouraged. Mediation is the neutral facilitation of the conflict between or among parties where the facilitator helps the parties find a mutually agreeable outcome.

### Step 1

- If no resolution to the grievance is reached informally the employee who wishes to pursue a grievance shall present the grievance to the supervisor in writing. The grievance must be presented within fifteen calendar days of the event or within fifteen calendar days of learning of the event or condition. The supervisor shall respond to the grievance within five work days after receipt of the grievance. The supervisor should, and is encouraged to, consult with any employee of the County in order to reach a correct, impartial, fair and equitable determination or decision concerning the grievance. Any employee consulted by the supervisor is required to cooperate to the fullest extent possible.

- The response from each supervisory level for each step in the formal grievance process shall be in writing and signed and dated by the supervisor. In addition, the employee shall sign a ropy to acknowledge receipt thereof. The responder at each step shall send copies of the grievance and response to the Human Resources Director.

### Step 2

- If the grievance is not resolved to the satisfaction of the employee by the supervisor, the employee may appeal, in writing, to the Department Head

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 73 of 106

within five work days after receipt of the response from Step 1. The Department Head shall respond to the appeal, stating the determination of decision within five work days after receipt of the appeal.

**Step 3 (For General County Employees Only)**

- If the grievance is not resolved to the satisfaction of the employee by the Department Head, the employee may appeal, in writing, to the County Manager or Hiring Authority within five work days after receipt of the response from Step 2. The Hiring Authority shall respond to the appeal, may meet with the employee to discuss the grievance fully, and will make a decision within ten calendar days. The Hiring Authority's decision is final. However, the County Manager should inform the County Board of Commissioners of any possible legal actions. Any appeal of this decision must be made through the North Carolina Court System.

- **Special Note:** *The Sheriff and Register of Deeds will carry out the responsibilities designated as the County Manager in their respective departments.*

**Step 3 (For Employees Only in the Social Services Department)**

- If the grievance is not resolved to the satisfaction of the employee by the Department Head, the employee may appeal the decision to the North Carolina Office of Administrative Hearings (OAH) within thirty calendar days of the receipt of the Department Head's decision. The findings of the OAH will be forwarded to the State Personnel Commission. The decision of the State Personnel Commission shall be advisory only and the Department Head shall have the final decision. Discrimination cases may be appeal directly to the OAH.

- Department Heads. In the case of department heads or other employees where the Hiring Authority has been significantly involved in determining disciplinary action, including dismissal, the Hiring Authority may wish to obtain a neutral outside party to either:

  o Provide mediation between the grieving department head and the Hiring Authority (see definition of mediation in informal resolution above); or

  o Consider the appeal and make recommendations back to the Hiring Authority concerning the appeal. Such parties might consist of human resource professionals, attorneys, mediators, or other parties appropriate to the situation.

- Department heads may also request the application of these special provisions.

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 74 of 106

- The Hiring Authority's decision regarding the disposition of the grievance shall be the final decision. The County Manager would notify the Board of Commissioners of any impending legal action.

## V. ROLE OF THE HUMAN RESOURCES DIRECTOR

Throughout the grievance procedure, the roles of the Human Resources Director shall be as follows:

- To advise parties (including employee, supervisors, and County Manager) of their rights and responsibilities under this policy, including interpreting the grievance and other policies consistency of application

- To be a clearinghouse for information and decisions in the matter including maintaining files of all grievance documents.

- To give notices to parties concerning timetables of the process, etc.

- To assist employees and supervisors in drafting statements

- To facilitate the resolution of conflicts in the procedures or of the grievance at any step in the process

- To help locate mediation or other resources as needed.

The Human Resources Director shall also determine whether or not additional time shall be allowed to either side in unusual circumstances if the parties cannot agree upon extensions when needed or indicated.

## VI. GRIEVANCE AND ADVERSE ACTION APPEAL PROCEDURE FOR DISCRIMINATION

When an employee, former employee, or applicant believes that any employment action discriminates illegally (i.e. is based on age, sex, race, color, national origin, religion, creed, political affiliation, or disability), he or she has the right to appeal such action using the grievance procedure outlined in this policy. While such persons are encouraged to use the grievance procedure, they shall have the right to appeal directly to the Human Resources Director and the County Manager. An employee or applicant should appeal an alleged act of discrimination within thirty calendar days of the alleged discriminatory action, but may appeal for up to six months following the action.

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 75 of 106

Peter White
Sheriff
Vance County

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 76 of 106

EXHIBIT 16

## Investigation of Complaints and Charges Against Personnel

**Directive E.2**
Effective 7/15/2009

### I. POLICY

This policy provides guidelines for accepting, recording, resolving, and forwarding complaints.

### II. ACCEPTING, RECORDING, RESOLVING, AND FORWARDING COMPLAINTS

**Accepting Complaints**

- A complaint or charge against Sheriff's Office employees may originate from within the Sheriff's Office or from the general public. Charges from within the Sheriff's Office shall be processed as provided in this policy. Complaints from the general public shall be courteously accepted by any employee of the Sheriff's Office and shall be processed as hereinafter provided in this subchapter. No employee shall attempt to discourage any person from lodging a complaint. A supervisor has the obligation to investigate possible violations of policy even if the person providing the information does not want a complaint filed.

**Resolving Complaints Based on Misunderstanding of Sheriff's Office Policy**

- In the case of complaints involving a misunderstanding of laws, ordinances or policy on the part of the complainant, the employee receiving the complaint shall attempt to resolve the complaint by explaining the law, ordinance or policy to the complainant. If the employee is unable to resolve the complaint, he/she shall refer the complaint to his/her supervisor, who shall attempt to resolve it. If the supervisor is unable to resolve it, the supervisor shall refer the complaint on up the chain-of-command.

**Recording Complaints Alleging Violation of Code of Conduct**

- If the complaint involves a possible violation of the Rules of Personal Conduct, or Unsatisfactory Job Performance by any employee of the Sheriff's Office, the employee receiving the complaint shall accept the complaint, record the information and forward the information to his/her appropriate supervisor, who shall be responsible for completing a Personnel Complaint if warranted, after consultation with the appropriate ranking supervisor of the division or higher authority. Such a complaint shall be accepted and recorded even when the identity of the complainant and/or the employee is unknown.

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 77 of 106

- If the complainant indicates no desire to make a formal complaint but has indicated a violation of Sheriff's Office policy by an employee, this information must be transmitted to a supervisor. The supervisor must document the information and determine if such information warrants further inquiry to determine if a complaint should be filed by the supervisor. If the supervisor determines a violation of policy may have occurred, the supervisor shall complete the Personnel Complaint, after consultation with the ranking supervisor of the division or higher authority.

### Forwarding Complaints Alleging Violation of Code of Conduct

- After completing a Personnel Complaint, the supervisor shall immediately forward the original copy of the Personnel Complaint of the affected employee and any other appropriate documents to the Sheriff's Office Captain, the Sheriff's Office Captain shall acknowledge the receipt of all complaints to the complainant. Upon conclusion of the investigation, the complainant shall be notified that the investigation has been completed.

- If it appears that an internal investigation will exceed thirty (30) calendar days and after each extension granted by the Sheriff, a letter indicating the status shall be mailed to the complainant by the Sheriff's Office Captain.

### Classifying and Assigning Complaint Investigations

- The Sheriff's Office Captain shall classify the alleged complaint as a Personal Conduct, or Unsatisfactory Job Performance violation and direct or conduct an investigation. When an investigation is assigned to supervisors other than the Sheriff's Office Captain, the Division Commander shall designate the supervisory personnel to conduct the investigation.

## III. INVESTIGATION OF COMPLAINTS AT THE DIVISION OR EQUIVALENT STAFF LEVEL

### Designation of Investigator

- The supervisor responsible for imposing disciplinary action against an employee accused of a Personal Conduct, or Unsatisfactory Job Performance violation may designate a subordinate within the supervisor's command to investigate the complaint. In complex investigations, any supervisor may request that the Division Commander or higher authority take charge of, any specific investigation.

### Conduct of the Investigation

- Before permitting the investigation to begin, the supervisor of the employee being investigated shall notify the employee of the investigation, except in cases where such notification would jeopardize the investigation. Should the employee admit the conduct alleged and that such conduct is, in fact, a violation of policy, then the supervisor, after consulting with Division

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 78 of 106

Commander or higher authority, may impose the appropriate disciplinary action without further investigation! In the event the employee denies the violation with which he/she is charged, the investigation shall proceed as provided.

- The employee shall be given an opportunity to supply the investigator with evidence or witnesses favorable to the employee. No decision as to whether or not the employee violated the rules of Personal Conduct, or Unsatisfactory Job Performance shall be made against a charged employee until the employee has had a reasonable opportunity to produce evidence or witnesses, and has had an opportunity to explain the his/her actions.

- The supervisor chosen to investigate the complaint shall not go outside the jurisdiction of Vance County or neglect regular duties in order to carry out such investigation without the authority of their immediate supervisor or higher authority. No investigative action shall be taken in any case where it might jeopardize a simultaneous or subsequent investigation.

- The investigator shall make every effort to complete the investigation within thirty (30) calendar days. If the investigator will be unable to do so, he/she shall inform the supervisor requesting, and/or the Sheriff's Office Captain as to the reasons why the investigation cannot be completed within thirty (30) calendar days, and shall estimate the additional time needed to complete the investigation.

- If, upon completion of the investigation the supervisor authorized to impose disciplinary action determines that the employee should be exonerated or that the results of the investigation are inconclusive, the supervisor shall, after conferring with the Division Commander or higher authority, inform the employee and forward the Report of Investigation and all related documents to the Sheriff's Office for filing in the employee's personnel file.

- If, upon completion of the investigation and after allowing the charged employee an opportunity to explain his/her actions, the supervisor determines that the employee should be disciplined, the supervisor shall confer with the appropriate Division Commander or higher authority, and shall administer disciplinary action within the options authorized by the Sheriff.

## IV.  INVESTIGATION OF COMPLAINTS AT THE SHERIFF'S OFFICE LEVEL

The Sheriff Office Captain shall be responsible for the supervision of all complaints initiated at the request of the Sheriff.

### Investigation Procedures

- The Sheriff's Office Captain shall notify the employee to be investigated and the employee's Division Commander that an investigation is to be made except in cases where such notification would jeopardize the investigation. In the event the charged employee admits the violation with which he/she is

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 79 of 106

charged, the Sheriff's Office Captain shall prepare for the Sheriff a statement of the facts and submit their recommendation for disciplinary action to be taken, and shall give the entire file to the Sheriff for consideration, pursuant to the provisions of this policy. In the event the charged employee denies the violation(s) with which he/she is charged, then the investigation shall proceed as provided. With the approval of the Sheriff, a Division Commander may be assigned to investigate complaints at this level.

- The employee shall be given an opportunity to supply the investigator with evidence or witnesses favorable to him/her. No decision as to whether or not the employee violated the Rules of Personal Conduct, or Unsatisfactory Job Performance shall be made against a charged employee until the employee has had a reasonable opportunity to produce evidence or witnesses and has had an opportunity to explain his/her actions.

- If an investigation uncovers evidence of a possible criminal violation by an employee, Sheriff's Office Captain, shall immediately notify the Sheriff, who shall decide whether or not the appropriate authorities should be notified, or the appropriate law enforcement and/or take such other disciplinary or administrative action necessary consistent with the provisions of this policy.

- If an investigator uncovers evidence of additional violations of policy, an additional Personnel Complaint need not be completed. The employee must be informed of the allegations and must be given an opportunity to respond to the potential new charges.

- Upon completion of the investigation, the Sheriff's Office Captain or designee shall prepare for the Sheriff, a summary report of the investigation setting forth the facts of the case for review, and to determine the level of disciplinary action to be imposed.

**Responsibility and Rights of the Employee under Investigation**

- Employees under investigation for possible violations of the Rules of Personal Conduct, or Unsatisfactory Job Performance shall truthfully and fully answer all questions asked of them by the investigator concerning the incident being investigated.

- When a supervisor or investigator reasonably suspects that an employee has violated the Rules of Personal Conduct, or Unsatisfactory Job Performance, the supervisor or investigator may require the employee to submit to tests such as medical, ballistics, or chemical analysis or agree to participate in a lineup or be photographed. The employee may also be requested to furnish financial disclosure statements in connection with the case under investigation, after the approval of the Sheriff.

- When an employee is to be investigated for a non-criminal violation of the Rules of Personal Conduct, or Unsatisfactory Job Performance, the member

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 80 of 106

shall be notified that the investigation is to take place unless such notification would jeopardize the investigation.

- Any employee who is the subject of an internal investigation may be ordered by the assigned investigator to cooperate in the investigation and to appear before the investigator at a reasonable time and place to submit to questioning or other investigative procedures.

- Investigations conducted pursuant to this policy are for non-criminal violations or for violations that may be criminal but for which the purpose of the investigation is purely administrative in nature. Accordingly, the employee may be ordered to respond to questions which are narrowly and directly related to the matter under investigation. The employee shall not be permitted to have an attorney present during the questioning.

- County property under the control of the Vance County Sheriff's Office property may be searched at any time even if assigned to and used exclusively by an individual employee. An employee's personal property found on County-owned property or within a County owned vehicle may be searched at any time. All other personal property of an employee shall not be subjected to search and seizure except in accordance with law.

- An employee shall provide the investigator with any evidence and the names of witnesses who may have information about the matter under investigation.

Peter White
Sheriff
Vance County

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 81 of 106



## I. POLICY

To provide a safe and healthful working environment for all employees and to provide a means for preventing, reporting, investigating, and resolving issues relative to any kind of unlawful workplace harassment.

It is the policy of Vance County Sheriff's Office that no employee may engage in conduct that falls under the definition of unlawful harassment in the workplace. All employees are guaranteed the right to work in an environment free from unlawful harassment in the workplace and retaliation. The Sheriff's Office prohibits its personnel from harassing clients, supervisors, colleagues, community representatives, subordinates, or other persons or groups with whom they have contact as representatives of the organization. The Sheriff's Office will promptly and thoroughly investigate all complaints made by an employee and will take appropriate remedial or disciplinary action up to and including dismissal.

## II. DEFINITIONS

**Unlawful Workplace Harassment** is unlawful or unsolicited speech or conduct based on race, sex, creed, religion, national origin, age, color, or handicapping condition as defined by N.C.G.S. 168A-3 that creates a hostile work environment or circumstances involving quid pro quo. Action, words, jokes, or comments based on an individual's sex, race, color, national origin, disability, religion, age or other status protected by state or federal law will not be tolerated.

**Handicapping Condition** as defined by N.C.G.S. 168A-3 is "any condition or characteristic that renders a person a handicapped person".

**Sexual Harassment** is defined as unsolicited and unwelcome verbal and/or physical conduct of a sexual nature or with sexual implications by a supervisor or co-worker which:

- has or may have direct employment consequences resulting from the acceptance or rejection of such conduct;

- creates an intimidating, hostile, or offensive working environment; or

- interferes with an individual's work performance.

Sexual harassment does not include personal compliments welcomed by the recipient or relationships freely entered into by employees or prospective employees.

**Hostile Work Environment** is one that a reasonable person would find hostile or abusive and one that the particular person who is the object of the harassment

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 82 of 106

perceives to be hostile or abusive. Hostile work environment is determined by looking at all of the circumstances, including the frequency of the allegedly harassing conduct, its severity, whether it is physically threatening or humiliating and whether it unreasonably interferes with an employee's work performance.

**Quid Pro Quo Harassment** consists of unwelcome sexual advances; requests for sexual favors, or other verbal or physical conduct when:

- submission to such conduct is made either explicitly a term or condition of an individual's employment, or

- submission to or rejection of such conduct by an individual is the basis for employment decisions affecting such individual.

**Retaliation** is adverse treatment that occurs because of opposition to unlawful workplace harassment.

III. **OPERATING PROCEDURE**

Any employee or former employee who alleges unlawful workplace harassment or retaliation in violation of this policy may file a complaint through this section of this policy.

- This procedure applies to full-time or part-time employees with either a permanent, probationary, trainee or temporary appointment.

- Any employee who alleges unlawful workplace harassment must submit a written complaint to their Supervisor, Director of Human Resources, or the Sheriff within thirty (30) calendar days of the alleged harassing action.

- All of the following shall require investigation:

  o **Formal Complaints:** Formal complaints made either orally or in written form by any employee of the organization. Note that it should be considered as a legitimate complaint should an employee report harassing behavior directed not at him or herself but at others in the workplace. The complainant need not be the object of the alleged harassing activity.

  o **Informal Complaints:** Informal complaints are typically characterized by an employee who orally requests advice from a supervisor. These complaints may take the form of "I need advice" or "I don't want to file a complaint". Notwithstanding the employee's stated wishes, the supervisor/manager must consider this informal complaint as a "complaint" for purposes of Sheriff's Office policy. In this situation, it is necessary to thoroughly explain to the employee that the comments must be considered a complaint so as to ensure the eradication of any inappropriate behaviors and protection of the organization and other employees from this conduct.

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 83 of 106

o **Direct Observations:** Supervisors on all levels who directly observe potentially harassing conduct must consider these observations equivalent to any other form of "complaint". The investigation process is indicated where a supervisor or department head feels observed conduct may indeed represent prohibited behaviors.

## IV. DISCIPLINARY ACTION

Disciplinary action taken against the harasser would typically range from a written warning, counseling, suspension from work, transfer to a different position, or termination of employment.

Peter White
Sheriff
Vance County

Case 5:19-cv-00467-BO   Document 67-5   Filed 03/30/21   Page 84 of 106

# Fw: Justin Jamel White

EXHIBIT

**18**

### Weldon Bullock

Tue 6/5/2018 9:26 AM

To:Janie Martin <JMartin@vancecounty.org>; Peter White <pwhite@vancecounty.org>;

---

**From:** Konopka, Diane <dKonopka@ncdoj.gov>
**Sent:** Monday, June 4, 2018 1:46 PM
**To:** Weldon Bullock
**Subject:** RE: Justin Jamel White

Thanks Captain Bullock. I will put this before the Commission when they meet next week.

**From:** Weldon Bullock [mailto:WBullock@vancecounty.org]
**Sent:** Monday, June 04, 2018 12:56 PM
**To:** Konopka, Diane
**Subject:** Re: Justin Jamel White

Ms. Konopka,

I'm sending you this attachment per our conversation on Friday.

Weldon Bullock

---

**From:** Konopka, Diane <dKonopka@ncdoj.gov>
**Sent:** Monday, May 28, 2018 12:52:00 PM
**To:** Weldon Bullock
**Subject:** Justin Jamel White

Hello Captain Bullock,

I am reviewing a request from Justin Jamel White asking the Sheriffs' Commission to grant him a training waiver and credit him with the BLET he completed in December of 2015.

Can you tell me if the Vance County Sheriff's Office is also requesting (in support of) that waiver for Mr. White? Also, Mr. White stated you contacted Sheriffs' Standards on 6/5/2017 in regards to his certification. Do you remember who you spoke with and what specifically was discussed?

Please call me if we need to further discuss. Thank you for your help!
Diane



**Diane N. Konopka**
Director
Sheriffs' Standards Division
Phone: 919-662-4375
Fax: 919-662-4515
dkonopka@ncdoj.gov
1700 Tryon Park Drive, Raleigh, NC 27610
Post Office Box 629, Raleigh, NC 27602-0629
ncdoj.gov

Please note messages to or from this address may be public records.

PUBLIC RECORDS NOTICE: Please note that all emails, information and attachments sent to and from this address are subject to the North Carolina Public Records Act and, subject to certain statutory exceptions, may be disclosed to third parties.

# Office of the Sheriff
## Vance County

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone 252-738-2200
Fax 252-738-2220

## Sheriff Peter White

June 1, 2018

Diane Konopka, Director
North Carolina Sheriffs' Education Training & Standards Division
Post Office Drawer 629
Raleigh, NC 27602-8213

RE: Justin Jamel White

Dear Ms. Konopka,

This is a written request asking The Sheriff's Commission to grant Justin Jamel White a training waiver and credit him with the BLET he completed in 2015. The Vance County Sheriff's Office is in full support of a waiver for Deputy White. Deputy White has been sworn with the Vance County Sheriff's Office since June 2017.

If you have need of any further information regarding Deputy White, please do not hesitate to contact me. Thank you for your attention in this matter.

Sincerely,

Sheriff Peter White
Vance County

PW/jbm

Reply all          Delete    Junk

## Justin Jamel White

Konopka, Diane <dKonopka@ncdoj.gov>                         Reply all

Weldon Bullock

action items

Hello Captain Bullock,

I am reviewing a request from Justin Jamel White asking the Sheriffs' Commission to grant him a training waiver and credit him with the BLET he completed in December of 2015.

Can you tell me if the Vance County Sheriff's Office is also requesting (in support of) that waiver for Mr. White? Also, Mr. White stated you contacted Sheriffs' Standards on 6/5/2017 in regards to his certification. Do you remember who you spoke with and what specifically was discussed?

Please call me if we need to further discuss. Thank you for your help!
Diane



**Diane N. Konopka**
Director
Sheriffs' Standards Division
Phone: 919-662-4375
Fax: 919-662-4515
dkonopka@ncdoj.gov

ncdoj.gov

Please note messages to or from this address may be public records.

*left message  5/29/18 @ 2:38p*



EXHIBIT
19

## Vance County Human Resources
## 122 Young Street, Suite B
### Henderson, NC 27536

June 6, 2018

Justin White
Deputy Sheriff

Dear Mr. White;

On June 5, 2018, you satisfied the eligibility period to receive the first year law enforcement officer $1,500 salary adjustment. Your annual salary will be $34,764 effective June 5, 2018.

If you have any questions, please feel free to give me a call at the above number.

Sincerely,

Argretta R. Johen

c:    Sheriff Peter White

*Argretta R. Johen, HR Director*
*(252) 738-2014*
*(252) 430-0290 (Fax)*

*Johanna M. Torres, HR Specialist*
*(252) 738-2017*

# Notice of Charge of Discrimination



## U.S. Equal Employment Opportunity Commission <noreply@eeoc.gov>

Wed 9/12, 2018 10:15 AM

To: Argretta Johen <AReid@vancecounty.org>,

U.S. Equal Employment Opportunity Commission
Raleigh Area Office
434 Fayetteville Street, Suite 700
Raleigh, NC 27601

NOTICE OF CHARGE OF DISCRIMINATION
(This Notice replaces EEOC FORM 131)

DIGITAL CHARGE SYSTEM

September 12, 2018

To:
Mrs. Argretta Johen
Director, Human Resources
VANCE COUNTY
AJOHEN@vancecounty.org

This is notice that a charge of employment discrimination has been filed with the EEOC against your organization by Justin White , under Title VII of the Civil Rights Act (Title VII). The circumstances of the alleged discrimination are based on Retaliation, Race, and Sex, and involve issues of Harassment, Discipline, and Terms/Conditions that are alleged to have occurred on or about Feb 20, 2018 through Aug 10, 2018.

The Digital Charge System makes investigations and communications with charging parties and respondents more efficient by digitizing charge documents. The charge is available for you to download from the EEOC Respondent Portal, EEOC's secure online system.

Please follow these instructions to view the charge within ten (10) days of receiving this Notice:

1. Access EEOC's secure online system: https://nxg.eeoc.gov/rsp/login.jsf
2. Enter this EEOC Charge No.: 433-2018-03289
3. Enter this temporary password: nh5275qy

Once you log into the system, you can view and download the charge, and electronically submit documents to EEOC. The system will also advise you of possible actions or responses, and identify your EEOC point of contact for this charge.

If you are unable to log into the EEOC Respondent Portal or have any questions regarding the Digital Charge System, you can send an email to Raleigh@eeoc.gov.

Preservation of Records Requirement

EEOC regulations require respondents to preserve all payroll and personnel records relevant to the charge until final disposition of the charge or litigation. 29 CFR §1602.14. For more information on your obligation to preserve records, see http://eeoc.gov/employers/recordkeeping.cfm.

Non-Retaliation Requirements
The laws enforced by the EEOC prohibit retaliation against any individual because s/he has filed a charge, testified, assisted or participated in an investigation, proceeding or hearing under these laws. Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. For more information, see http://www.eeoc.gov/laws/types/facts-retal.cfm.

Legal Representation
Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please provide the attorney's contact information when you log in to the online system.

U.S. Equal Employment Opportunity Commission
FEDERAL INVESTIGATION,
REQUEST FOR POSITION STATEMENT
AND SUPPORTING DOCUMENTARY EVIDENCE

EEOC hereby requests that your organization submit within 30 days a Position Statement setting forth all facts which pertain to the allegations in the charge of discrimination under investigation, as well as any other facts which you deem relevant for EEOC's consideration.

We recommend you review EEOC's resource guide on **"Effective Position Statements"** as you prepare your response to this request.

Fact-Based Position Statement
This is your opportunity to raise any and all defenses, legal or factual, in response to each of the allegations of the charge. The position statement should set forth all of the facts relevant to respond to the allegations in the charge, as well as any other facts the Respondent deems pertinent to EEOC's consideration. The position statement should only refer to, but not identify, information that the Respondent asserts is sensitive medical information, or confidential commercial or financial information.

EEOC also requests that you submit all documentary evidence you believe is responsive to the allegations of the charge. If you submit only an advocacy statement, unsupported by documentary evidence, EEOC may conclude that Respondent has no evidence to support its defense to the allegations of the charge.

EEOC may release your position statement and non-confidential attachments to the Charging Party and her representative and allow them to respond to enable the EEOC to assess the credibility of the information provided by both parties. It is in the Respondent's interest to provide an effective position statement that focuses on the facts. EEOC will not release the Charging Party's response, if any, to the Respondent.

If no response is received to this request, EEOC may proceed directly to a determination on the merits of the charge based on the information at its disposal.

Signed by an Authorized Representative
The Position Statement should be signed by an officer, agent or representative of Respondent authorized to speak officially on its behalf in this federal investigation.

Segregate Confidential Information into Separately Designated Attachments
If you rely on confidential medical or commercial information in the position statement, you should provide such information in separate attachments to the position statement labeled "Sensitive Medical Information," "Confidential Commercial or Financial Information," or "Trade Secret Information" as applicable. Provide an explanation justifying the confidential nature of the information contained in the attachments. Medical information about the Charging Party is not sensitive or confidential medical

information in relation to EEOC's investigation. Segregate the following information into separate attachments and designate them as follows:

    a. Sensitive medical information (except for the Charging Party's medical information).
    b. Social Security Numbers
    c. Confidential commercial or financial information.
    d. Trade secrets information.
    e. Non-relevant personally identifiable information of witnesses, comparators or third parties, for example, social security numbers, dates of birth in non-age cases, home addresses, personal phone numbers and email addresses, etc.
    f. Any reference to charges filed against the Respondent by other charging parties.

Requests for an Extension

If Respondent believes it requires additional time to respond, it must, at the earliest possible time in advance of the due date, make a written request for extension, explain why an extension is necessary, and specify the amount of additional time needed to reply. Submitting a written request for extension of time does not automatically extend the deadline for providing the position statement.

Upload the Position Statement and Attachments into the Respondent Portal

You can upload your position statement and attachments into the Respondent Portal using the + Upload Documents button. Select the "Position Statement" Document Type and click the Save Upload button to send the Position Statement and attachments to EEOC. Once the Position Statement has been submitted, you will not be able to retract it via the Portal.

Please retain this notice for your records.

*Notice of Confidentiality: The information contained in this transmission may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact us at digital-support@eeoc.gov and destroy all copies of the original message and attachments.*



JuWh2ȼ18chg

ȼt18 JW chg

JWh 2O

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 433-2018-03289 |
| | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Mr. Justin White** | **(919) 961-3448** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **130 Chappell Lane, Kittrell, NC 27544** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **VANCE COUNTY – OFFICE OF THE SHERIFF** | **500 or More** | **(252) 738-2200** |

| Street Address | City, State and ZIP Code |
|---|---|
| **156 Church Street, Suite 004, Henderson, NC 27536** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **02-20-2018**   Latest **08-10-2018**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I. During my employment with the Respondent, I have been the victim of harassment and differential treatment as it pertains to the terms and condition of employment in comparison to that of my non-Black coworkers. This involves but not limited to the areas of: Discipline; Corrective Action; Treatment; Disrespect; Issuance of Safety Equipment; Subordinate Status and Retaliation.

II. I have not been provided with a reason for the differential treatment concerning the areas on the part of the Respondent.

III. I believe I have been discriminated against based on my Race-Black, Gender-Male and in retaliation for taking part in a protected activity. I believe Respondent's actions are in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| August 29th 2018    Justin J. White | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date          Charging Party Signature | |

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.   **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2.   **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.   **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.   **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.   **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

130 Chappel Lane • Kittrell, NC 27544 • (919) 961-3448 • Justinwhitencssd@yahoo.com

---

June 15th, 2018                     **Transmitted via Hand Delivery**

Sheriff Peter White                     **Personnel Sensitive, Confidential & Sworn File**
Vance County Sheriff's Office
156 Church Street, Suite 004
Henderson, NC 27536
Pwhite@vancecounty.org

### Re: Employee Performance Appraisal Rebuttal

Dear Sheriff

I, Justin J. White, deputy sheriff, hereby file rebuttal in reference to the aforementioned done by Sergeant Myron D. Alexander (S-12), Patrol Supervisor. Same was done on June 1st, 2018, 4 months approximately after I was transferred from his shift. I was notified of this document on June 8th, 2018, at 6 p.m. by Sgt. Chris M. Welborn (S-13), Patrol Supervisor & presented with same to sign in which I noted being in strong disagreement with. I shared my dissent with Sgt. Welborn, in which Sgt. Bobby Martin (S-11) was present & I was told to appeal it. Attached is a copy of my performance appraisal.

Sgt. Welborn advised me, JJ (me) you are a good employee, you work & you got some know how. Sgt. Welborn stated, this report is biased because Myron have personal issues with you. He advised me, you are a team player & professional with the citizens & us but I do get a little carried away from time to time but not too much. Sgt. Welborn claimed, JJ we all get a little carried away from time to time, it's going to happen. Sgt. Welborn stated, you are not insubordinate, you follow orders & do your job. Sgt. Welborn stated, go to the sheriff & talk to him.

**Sgt. Bobby Martin advised me to file a rebuttal with the High Sheriff so it can be reviewed & removed from my file & if it was not overturned then for the rebuttal to be attached to the performance evaluation. Also, Sgt. Martin advised me that he had the same situation happen with a supervisor in investigations. Sgt. Martin claimed to have prepared a rebuttal & presented same to you & asked to be transferred since he could not satisfy his supervisor. Sgt. Martin won his case.**

First & foremost, I am a stern & firm individual. I am shocked that Sgt. Alexander portrayed me negatively especially when he claimed that he did not have a problem with my job performance and or personal conduct in early January 2018 during a meeting with management, supervision & subordinates. Also, I have not been written up several times for my attitude & work ethics, nor have I been very insubordinate towards supervisors. Based on those deceptive & frivolous allegations, I request to view & copy my complete personnel file. It should be noted, I asked to see the file that Chief Bullock had when I was suspended in February 2018, in which I was denied & told, you have everything you need.

130 Chappel Lane ● Kittrell. NC 27544 ● (919) 961-3448 ● Justinwhitencssd@yahoo.com

**How can Sgt. Alexander adjudicate my performance or personal conduct when he does not show up to work on time & has been a no call no show on calls for service on various occasions with staff that have requested back up? He is the king of absenteeism & tardiness. In fact, he is the reason why a memo was issued 6-7 months ago for patrol to report to clock on at 5:30 and report to work at 5:45 & he does not adhere to same. Plenty of times, my supervisor & I waited for him to come to work & he would show up at 7 a.m. but his staff was on time. It is substantially rare for him to clock on on-time.**

For example, Sgt. Alexander failed to report to work on time for 1 ½ hrs approximately, leaving me to answer calls in county alone & without back up, he gave Deputy I. Greene (trainee at-the-time) & Deputy T. Terry permission to come in late by using comp time. A burglary call (10-62 in progress) was assigned to me which was later downgraded to a prowler (10-76). Both calls for service were/are priority. The caller stated someone was trying to break into her residence & hung up. Then, she called back saying someone was trying to come through her window & that she heard them outside. I determined it was not a burglary or prowler but the wind causing the metal antenna & electric wires on her trailer to mimic same. In fact, day shift who was already off provided back up without my request since I was by myself. Sgt. Alexander was not appropriately disciplined for lying to Lt. Campbell (insubordination) claiming he was at work, when he was not, neglecting duty and failing to report as scheduled.

Deputy Branch (S-34) went to the sheriff's office on his day off a few months ago & met with Chief Bullock & Captain Watkins in reference to complaining on Sgt. Alexander pertinent to him not answering calls, not backing up deputies & not being accessible. As a matter of fact, Deputy Branch reported to management, supervision & co-workers that Sgt. Alexander was clearing calls after riding past the house & not stopping. Deputy Branch requested to be transferred to another shift & management told him to tough it out until the guys were out of training in May.

Deputy Poole (S-40) complained on Sgt. Alexander & wanted to be moved. In fact, on a call in January 2018, in which we had a burglary in progress call during the winter storm & Sgt. Alexander & Deputy Greene (S-41) were closer. Deputy Poole & I were near U.S. 1 S by the Franklin & Vance county line & we got there first & handled same despite them being on Warrenton road near U.S. 1. That incident triggered Deputy Poole's 10 day suspension, however, no one got on Myron for threatening Deputy Poole on the radio, you want to put your life on it in reference to who was closer to Regina Lane. Also, Sgt. Alexander, told Deputy Poole on the phone, I don't have to answer call because I am the supervisor.

Deputy Burns had problems with Sgt. Alexander not working & was constantly complaining on him to the Chief Bullock & Capt. Watkins. Also, former Deputy Lauren Matthews had a host of problems with Sgt. Alexander & was complaining.

According to supervision, every person that goes to his shift, either gets transferred or quits.

**Justin Jamel White**                                                     3/3

130 Chappel Lane • Kittrell. NC 27544 • (919) 961-3448 •

As a matter of recent fact, Deputy Al-Wadeii (S-28) worked Sgt. Alexander's shift f & was complaining to supervision on the other shift that he called for backup on Vicksboro Road & no one came but Deputy Edwards (S-24), who was the Northside car. Deputy Edwards stated he diverted from a call (pending) because Deputy Al-Wadeii called for help. Deputy Al-Wadeii claimed that Sgt. Alexander & Deputy Greene are always together.

As you can see, Sgt. Alexander has a history of unacceptable personal conduct and or grossly inefficient job performance. These matters needed attention. It is to my recommendation that Sgt. Alexander be suspended for 15 days without pay & demoted.

I look forward in hearing from you & resolving this matter internally.

Sincerely,

6-20-18

Justin J. White, M.S., B.S.

Enclosures: (1)
Performance Appraisal

Cc: File
Argretta Johen, HR Director
Peter White, High Sheriff
Justin White, Deputy Sheriff
Chris Welborn, Sergeant
Bobby Martin, Sergeant

State of North Carolina
County of Vance

On this, the 20 day of June , 20 18 , before me a notary public, the undersigned party, personally appeared Justin J. White, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness hereof, I hereunto for the above-mentioned hereby set my hand and official seal.

Tiffany L. Ayscue
Notary Name

Tiffany L. Ayscue
Notary Signature

My commission expires: July 31, 2019

(Seal)

130 Chappel Lane • Kittrell. NC 27544 • (919) 961-3448 •

June 15th, 2018                    **Transmitted via Hand Delivery**

Sheriff Peter White                    **Personnel Sensitive, Confidential & Sworn File**
Vance County Sheriff's Office
156 Church Street, Suite 004
Henderson, NC 27536

**Re: Title VII Civil Rights Act of 1964-Race & Gender Discrimination**

Dear Sheriff

I, Justin Jamel White, deputy sheriff at the Vance County Sheriff's Office, hereby file written complaint pertinent to race and gender discrimination.

On February 20th, 2018, I was written up and suspended for 5 days without pay, publicly humiliated by the department, having to walk out of the sheriff's office without a gun and badge and being stripped of my law enforcement credentials. On my way out, I encountered several deputy sheriffs, who saw me after the issuance of corrective action. **I was heavily lied on by Lt. Durwood Campbell (S-7) and no member of management seemed to care.**

Lt. Campbell is a Caucasian male and I am an African American male. Jamie Goss, Caucasian female, called and complained which triggered this entire ordeal despite me being in the performance of my job duties and responsibilities. My main duty is to answer calls, patrol the county, observe and enforce violations of law/county ordinances. It should be noted, On June 5th, 2018, Ms. Goss pled guilty. **It is going to be too late to correct someone's action when he or she and innocent third parties are tragically killed as a result of a motorist illegally gross decisions under the wheel.** I am happy to discuss the incidents involving this in the near future.

**I was never given a chance to share my side in reference to providing verbal or written statement in reference to the deceptively egregious allegations by Lt. Durwood Campbell.** Per Sheriff White, Chief Lawrence Bullock and Captain Watkins were directed to get my side of the story before corrective action was issued. **That did not happen.** {It should be noted, this is not the first instance of insubordination with Chief Bullock and Captain Watkins as the Sheriff directed both of them to put me back on Sgt. Roberson's (S-10) shift in December 2017 and January 2018. This is because the shift transfer was not approved by the High Sheriff nor was it submitted to the Chief Deputy for review and submission for approval to the Sheriff. Also, the Sheriff did not delegate authority to Capt. Watkins or Lt. Campbell to transfer staff}. No one talked to me about anything. Out of the blue, I walk in and is suspended over hot lies. It should be noted, Chief Bullock and Capt. Watkins were insubordinate to the Sheriff by not getting my take on the situation. **Based on mere appearance, the County of Vance, NC and Sheriff Office took the white man's word over the black man.** Same is a civil rights violation.

Lt. Campbell cursed, fussed & threatened me in the presence of third parties. The first time, Deputy Poole was present in the patrol room & the second time, Sgt. Alexander & Deputy Poole were present (patrol room). I am happy to discuss the incidents involving this in the near future.

I have direct evidence of both situations and look forward to presenting same. I believe we may be able to rectify this situation administratively. My pay check was docked 911.00 dollars and 28 hours of overtime went down the drain over lies and errors by management. It should be noted. the sheriff's office nor HR will not receive copies of my evidence. If the situation goes to trial in a federal court of competent jurisdiction i.e. EEO and or state court of competent jurisdiction i.e defamation of character, libel and slander, negligence, then it will be provided during discovery as ordered by the courts.

It should be noted. there is a pattern of discrimination and negligence at the sheriff's office. Upon hire, I begged Lt. Ray Shearin (S-4) for a bullet proof vest for 3 weeks and was only given one after I approached the command staff while they were reading reports in late June 2017 and Captain W.W. Bullock (S-3) ordered him to find me a vest. I responded to emergency calls i.e. burglary in progress. no vest.

From late June 2018 until* August 2018, I begged for tires on my patrol vehicle to no avail for nearly 8 weeks. I followed the chain of command. Sgt. Roberson (S-10), Lt. Shearin and former Captain now Chief. L.D. Bullock (S-2) requesting tires. Sgt. Roberson eventually told me to stop asking and go to the sheriff because these people don't do their jobs. As I was going to see the Sheriff, Capt. Bullock asked what's wrong? (After I walked in his office for the third time) and where is your car? He saw the car and went to Lt. Shearin and I got some tires same day despite both of them knowing I needed tires prior to. The metal wires were showing on rear tires.

Last July 2017. Deputy Warren Durham (S-95) heard a bullet ricochet off of his vehicle on Breckenridge Street, near the jail and feared for his life. That was the same night that former Deputy Erik Sheftal (S-29) held a suspect at gun point in the city limits of Henderson by the library. Deputy Durham had previously asked Lt. Shearin for a vest to no avail.

In January 2018, Deputy Al-Wadeii (S-28) was responding to calls without a vest with Lt. Campbell and I questioned him being on the streets without a vest. Lt. Campbell called Lt. Shearin and he came to the sheriff's office and issued him a vest (speedily despite my sitation).

It should be noted. Lt. Shearin is a Caucasian male and the parties listed above are minorities. This is a civil rights issues. Also, Lt. Shearin was directed by the High Sheriff to issue me equipment i.e. in September 2018 twice to no avail

While I serve at the pleasure of, I contend these issue do not fit the criteria as they would reasonably violate county and or departmental policy. federal civil rights laws. NC Public Policy Doctrine, NC Tort Law, etc. Also, taking adverse action against someone after reporting the aforementioned is reprisal and or retaliation. How can one write up. suspend and dock pay of the black man but the same alleged offenses are being committed by white deputies? How can one

write up, suspend and dock pay of subordinate but allow other supervisory or managerial deputies to get away with it? How can the subordinate deputy be suspend for insubordination & the chief deputy, captain & lieutenant are not held to the same standard for being insubordinate?

*****SOMETHING IS WRONG WITH THIS PICTURE & NEEDS CORRECTING*****

It is to my recommendation that Chief Bullock be issued a corrective action and suspended for 10 days without pay in reference to insubordination by not returning me to Sgt. Roberson's shift and not obtaining statements for the allegations made by Lt. Campbell.

It is to my recommendation that Capt. Watkins receive a lesser sanction as the chief deputy had the overall responsibility as the manager with rank/seniority to ensure my transfer back to Sgt. Roberson's shift and that they met with me about the allegations by Lt. Campbell.

It is to my recommendation that Lt. Shearin be issued corrective action and suspended for 10 days without pay and demoted in reference to failing the issue the protective and necessary law enforcement equipment after being directed to do so by the Sheriff several times.

It is to my recommendation that Lt. Campbell be issued corrective action, suspended for 10 days without pay & demoted for his official misconduct & verbal/written deception pertinent to the write up.

I understand it will be difficult in disciplining members of your command staff but as you said in times past, we have to be fair.

There were no legitimate non-discriminatory reasons to issue corrective action and authorize adverse action. There are no bona-fide reasons and or business necessity for the abovementioned. Even if responsibility laid with me, then the mixed motive legal theory would apply.

I look forward in hearing from you and resolving this issue.

Sincerely.


Justin White, M.S., B.S
Jw  Jw. 4-22-2018

Cc: File
Argretta Johen, HR Director
Peter White. High Sheriff
Justin White, Deputy Sheriff

6/22/2018        2 Forms 6+

State of North Carolina
County of Vance

On this. the 22nd day of June . 20 18 . before me a notary public. the

undersigned party, personally appeared _____ , known to me (or

satisfactorily proven) to be the person whose name is subscribed to the within

instrument. and acknowledged that he executed the same for the purposes

therein contained.

In witness hereof, I hereunto for the above-mentioned hereby set my hand and official seal.

_____
Notary Name

My commission expires: July 2, 2020

_____
Notary Signature

(Seal)

# Status of Complaint

### Justin White

Wed 7/11/2018 11:39 AM

To:Peter White <pwhite@vancecounty.org>;

Cc:Argretta Johen <AReid@vancecounty.org>; Justin White <JWhite@vancecounty.org>;

Good morning,

The purpose of this e-mail is to determine the status of the race and gender discrimination inquiry. It has been approximately three weeks since filing same. Also, I have requested a meeting with you and Argretta not withstanding pertinent parties listed in the unlawful, wrongful and tortious corrective action initiated by Lt. Durwood Campbell as his signature is listed on the aforementioned.

While to the best of your knowledge designated members of your command staff met with me, same is not accurate nor truthful. Let me be clear, I walked into a trap, stripped of my law enforcement credentials and gear, escorted to Ray's vehicle without a gun (someone could have been waiting around the corner to hurt me and I would have been defenseless all because of the deception and discrimination of a white supervisor involving a white female citizen), suspended without pay and transferred shifts (adverse action). Since Lt. Campbell and both shifts sergeants are working today, I can find no reason for all us to meet between today and Friday. Once the dust settles, members of your command staff should be disciplined because of their insubordination, etc.

Sheriff White and Director Johen, we have to do what is right regardless of our constitutional and hired positions. We cannot unfairly treat people but we must embrace our co-workers in the spirit of truth. I look forward to confronting my accusers with factual basis in this administrative issue in order to arrive at an internal conclusion. Please advise the status of the investigation. I look forwarding in hearing from both of you.

Warm Regards,

Justin White, M.S.

**EXHIBIT**

**22**

July 18, 2018

Statement regarding accusation made by Dep. J.J. White.

On Monday July 16, 2018, I was contacted by Capt. Watkins and requested to write a statement in reference to the previous incident involving Dep. White and myself from back in January.

The specific accusation was that I told Dep. White "didn't I tell your ass not to do that anymore and I will take care of your ass when I get to work". This conversation took place about six months ago, and I did not copy down word for word what was said, but I do remember being quite angry with him that morning over continued defiance of instructions given to him to stop taking out criminal summons on people he encountered for every little thing he saw. I do not remember the specific wording I used during that conversation, nor can I deny that as upset as I was I did not say that either.

As for the incident in the Sheriff's office later in the day, I did not say anything initially. I overheard a conversation taking place in the patrol room that was getting heated between Dep. White, Poole and Sgt. Alexander. I stepped out into the room just to see what was going on and Dep. White then began making statements to me. Dep. White got up from his seat, and started walking toward me making verbal and hand gestures, but then stopped. There was a heated exchange between us as well, but I do not remember using any specific foul language toward him while addressing him.

Durwood Lee Campbell

*Durwood Lee Campbell*



Office of the Sheriff
Vance County

**EXHIBIT 23**

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone 252-738-2200
Fax 252-738-2220

## Sheriff Peter White

July 19, 2018

Deputy Justin J. White
156 Church Street, Suite 004
Henderson, NC 27536

Dear Deputy White:

This letter is being written in response to your complaint dated June 15, 2018 and received on June 26, 2018. In your complaint you reference "Title VII Civil Rights Act of 1964-Race & Gender Discrimination".

You were in fact suspended for five (5) days without pay beginning February 20, 2018, which included the working days February 20, 25, 26, 27 and 28 which is documented on the Personnel Action Form which you signed on February 20, 2018. This suspension as you know was for unbecoming conduct as listed on the Personnel/Payroll Action Form signed by you on February 20, 2018.

Yes, your gun and badge were kept here as well as your credentials (ID) which is customary during suspension periods. In this regard, you were treated no different than anyone else. There is no evidence that Lieutenant Campbell "heavily lied" on you as you stated in your complaint.

If you will recall, when you and I met after your suspension period ended, you admitted to saying the things to Lieutenant Campbell that he listed in the official written reprimand signed by you and he on February 20, 2018.

In regard to the Jamie Goss complaint, you had been told previously by Supervisors not to issue a criminal summons for a traffic violation or violations which was the basis of the Goss complaint, since she was served nearly 24 hours after the traffic stop. You had also been told not to focus on traffic stops since this is not your primary duty and you had not been issued a citation book. Ms. Goss was originally charged with Reckless Driving to Endanger, Driving Left of Center and a Seat Belt violation. On June 5, 2018, she pled guilty to one count of Improper Equipment while the other charges were dismissed. This is not a Caucasian/African American issue but simply you as a Deputy Sheriff with the Vance County Sheriff's Office doing what you are told and following instructions. When you made this vehicle stop knowing you were not able to issue a citation, you should have contacted a Supervisor on Duty instead of you issuing a criminal summons.

You were given a chance to "share your side" when you met with Chief L. D. Bullock, Captain L.Q. Watkins and Lieutenant D. Campbell. During this meeting, you denied making the statement listed in the reprimand dated January 27, 2018 and signed by you and Lieutenant Campbell.

In your capacity as a Deputy Sheriff, you do not get to say who on my Command Staff is "Insubordinate" to me and who is not. As Sheriff, that is my decision.

You began your Field Training on June 18, 2018 with the Sergeant Durwood Campbell. During your third week of training, you and two other trainees were rotated to different squads with you being assigned to Sergeant D. R. Roberson's squad to complete your training with Deputy Brian Wayne. You remained on this squad throughout your training and until November 2017. Due to issues within this squad you were then reassigned to the squad supervised by Sergeant Myron D. Alexander where you remained until your suspension on February 20, 2018. After returning from your suspension imposed by me, you were assigned to another squad supervised by Sergeant C. M. Welborn where you remain today.

The one rotation and two re-assignments to different squads had absolutely nothing to do with race, gender or anything else other than simply trying to place you where you would best fit and be of greater benefit to the Sheriff's Office.

Once again, this is not a RACE, SEX or GENDER ISSUE nor any other form of discrimination. Lieutenant Campbell has admitted that he was angry with you during the telephone conversation and does not deny using the word "ass" while speaking with you, which is obviously inappropriate on his part. This has been addressed by me with Lieutenant Campbell. However, this does not excuse your conduct displayed while addressing a Superior Officer (Lieutenant Campbell) in the Patrol Squad Room.

Your suspension was approved by me based on your conduct in the Patrol Squad Room in the presence of Lieutenant Campbell, whom you were addressing, Sergeant Alexander and Deputy Poole. The suspension was carried out and Nine Hundred Eleven Dollars ($911.00) was deducted from your pay.

I have not seen nor am I aware of any discrimination in the Vance County Sheriff's Office.

The incidents you alleged in your complaint involving other deputies and equipment issued is by no means discrimination. In addition, each of these deputies you mentioned is perfectly capable of speaking for themselves. In summary, I see nothing in your Complaint nor during this investigation to suggest discrimination in any shape, form or fashion.

Sincerely,

Sheriff Peter White
PW/jbm

On the date in question Lt.Campbell and Deputy White were arguing on the phone. Lt Campbell told Deputy White I done told your ass we do not give criminal summons for traffic issues. If you want to enforce traffic join the highway patrol but you are a sheriff your job is to answer calls and serve papers and then Lt. Campbell stated you know what I will deal with your ass at 12 when I come in.

Signed: Andre Poole

07.17-18