IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:19-cv-00467-BO

JUSTIN J. WHITE,

    Plaintiff,

v.

VANCE COUNTY, NORTH CAROLINA, VANCE COUNTY SHERIFF'S OFFICE, PETER WHITE, in his official and individual capacities, LAWRENCE D. BULLOCK, in his official and individual capacities, WELDON WALLACE BULLOCK, in his official and individual capacities, CURTIS R. BRAME, in his official and individual capacities, WESTERN SURETY COMPANY a division of CNA SURETY.

    Defendants.

**PLAINTIFF JUSTIN WHITE'S MOTION FOR SUMMARY JUDGMENT**

---

Comes Now Justin White, Plaintiff in the above-styled action, by and through counsel, to request a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I. Introduction

There is no dispute as to several material facts in this case as pleaded in the First Amended Complaint. In fact, there is no dispute that Defendants failed to follow their own policies and discriminated against Plaintiff when he reported workplace-discriminatory misconduct to his superiors. The record is replete with examples from Defendants as to whether they can recall either their policies or if their actions were consistent with their policies. What is clear is that weeks after reporting workplace-

discriminatory misconduct, Mr. White was instructed to drop his claim or face termination. The rampage did not end there, Defendants sought to destroy any future prospects that Mr. White would have in law enforcement and were successful. As such, Plaintiff seeks partial summary judgment on several of his federal and state law claims:

1. Counts I and IV: Section 1983 and Title VII Disparate Treatment (Sheriff White, VCSO, Defendant W. Bullock);

2. Counts II and V: Section 1983 and Title VII Hostile Work Environment (Sheriff White, VCSO, Defendant L. Bullock);

3. Counts III and VI: Section 1983 and Title VII Retaliation (All Defendants);

4. Count VII: Breach of Contract, inclusive of bad faith (Sheriff White, VCSO, Individual Defendants in their official capacities);

5. Counts VIII and IX: Tortious Interference (Sheriff White, VCSO, Individual Defendants in their official capacities and Defendant W. Bullock);

6. Counts X and XI: Infliction of Emotional Distress (All Defendants);

7. Count XII: Wrongful Discharge (All Defendants);

8. Count XIII: Negligent Retention and Supervision (All Defendants); and

Count XV: Defamation (All Defendants).

## II. Standard of Review

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bostic v. Schaefer*, 760 F.3d 352,

370 (4th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Libertarian Party of Va.*, 718 F.3d at 313 (internal quotation marks omitted). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[The Court is] required to view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party . . . ." *Id.* at 312. In doing so, [the Court] must not weigh evidence or make credibility determinations. *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam).

### III. Argument

<u>1. The Force Used by Plaintiff In In The Arrest of Latwanya Oliver Was Within Commonly Accepted Bounds</u>

Plaintiff applied a technique that was recognized by the VCSO as a soft-hands take-down maneuver. In the course of this maneuver, the suspect was injured. The record indicates that Plaintiff followed VCSO procedure in electing to use the a soft hands technique in this situation, and the Defendants' conclusory statements that injuries demonstrate per se excessive force have no basis in law nor in their own policy.

*De minimis* force is not required for a finding that a use of force was not excessive. In the Western District of North Carolina, one of the cases which discusses the use of force by police officers most extensively is *Givens v. Demaioribus* in which police officers were accused of using excessive force when arresting a suspected dealer of crack cocaine. The suspect was not resisting arrest at the time. The officers slammed the suspect to the ground, and were accused of injuring his shoulder in the process. The court concluded that use of some level of force was appropriate as "[a]n officer effectuating an on-the-street arrest, at night, of a person engaged in the sale of

crack cocaine could reasonably believe that the person presented an immediate threat to the safety of the officer." *Givens v. Demaioribus*, No. 3:09-cv-158-RJC, 2012 U.S. Dist. LEXIS 28292, at *21 (W.D.N.C. Mar. 2, 2012). All of these factors are not necessary to establish that a use of force was proportional, but they provide an indication of a level of danger to the arresting officer above which a similar use of force would be reasonable.

Factors relating to the suspect resisting arrest and the severity of the injury sustained by the plaintiff are also significant in this inquiry. In *Givens*, the plaintiff did not resist arrest at all, and received what was considered a relatively minor shoulder injury. *Givens* at *21-2. Still, the sprained shoulder was a legally cognizable injury indicating something greater than *de minimis* use of force and despite a lack of resistance on the part of the plaintiff, the court found that the arresting officers used a reasonable and appropriate amount of force in arresting him. *Givens* at *23. This stands in contrast to cases where there was no immediate threat to the arresting officer and, therefore, the use of force was found to not be justified (see *Johnson v. City of Fayetteville*, 91 F. Supp. 3d 775, (E.D.N.C. 2015)).

Importantly for the current case, "Injury and force...are only imperfectly correlated, and it is the latter that ultimately counts." *Wilkins v. Gaddy*, 559 U.S. 34, 38, 130 S. Ct. 1175, 1178 (2010). The courts have long recognized that excessive force may not leave a mark, whereas de minimis, or attempted de minimis force can, under certain circumstances, result in severe injury. Essentially, one cannot start from the conclusion that an injury is conclusive evidence of excessive force and build a case around that faulty premise. Nevertheless, as outlined before, that is exactly how Defendants proceeded in this case.

In Plaintiff's case, the subject of his arrest was in the process of assaulting him when he decided to perform the armbar takedown maneuver. It is uncontroverted that Mr. White attempted to verbally de-escalate the situation and took measures above and beyond what was

4

required of him in allowing Ms. Oliver to secure her home and prepare herself for her transportation to the VCSO. It is similarly uncontroverted that, when Plaintiff attempted to place handcuffs on her, Ms. Oliver threw her bodyweight against him and began kicking at his legs, leaving bruises (J. White Inv. 6 ¶1).

Mr. White, facing assault from a subject, took control of her arm in an armbar takedown to bare her to the ground and handcuff her. It is uncontroverted that a standing armbar is an appropriate takedown, with Capt. Bullock citing it as an example of an acceptable technique to bring a suspect under control (W. Bullock Dep. 60:4-6). It is further uncontroverted that Ms. Oliver assaulted Plaintiff. The record establishes that Mr. White had no authority to use OC/Pepper Spray on Ms. Oliver, and to do so would have been an escalation in the use of force, not to mention dangerous to Mr. White himself.

While Mr. White denies that he slammed Ms. Oliver to the ground, and while he had no previous history of excessive force, his superiors took Ms. Oliver at her word that she was "slammed" to the ground. Indeed, this was repeated by Weldon Bullock in his deposition (W. Bullock Dep. 60:20-4). Nevertheless, as noted in *Givens*, a slam and an injury is not per se excessive force. Whether or not Ms. Oliver was slammed, therefore, is not a material fact.

The testimony of Weldon Bullock and the VCSO's own investigation confirm that they concluded he had used excessive force and should be terminated as a result of the injury to Ms. Oliver's arm. A use of force injury is not determinative of whether force was excessive and, instead, must be looked at in light of the whole situation.

Mr. White has stated that he had not intention of hurting Ms. Oliver, and only attempted to control her while she was assaulting him (J. White Dep. 153:1-12). He has always maintained that her injury was an unfortunate accident that occurred in the context of an appropriate takedown maneuver. This does not, and cannot, serve as a sufficient reason for a finding of excessive force.

2. Plaintiff Received Disparate Treatment on Account of His Race and Gender While Employed at VCSO.

Very soon after his employment at the VCSO had commenced, Mr. White became aware of the discriminatory environment. Training and resources were given to white deputies which were not afforded to black deputies, including Plaintiff. Further, there was a record of disciplinary asymmetry when dealing with the infractions of white deputies as opposed to deputies of color. He observed black deputies less equipment than their white counterparts, including bullet proof vests, which he personally had to request multiple times (J. White Title VII Compl. p.2).

Defendants have addressed the fact that not all deputies had full access to necessary resources, citing that they are a "poor county" (W. Bullock Dep. 24:23-25:3). However, Defendants have not adequately explained the disparity in the distribution between white officers and officers of color as alleged by Plaintiff.

3. Defendants Subjected Plaintiff to a Hostile Work Environment

Plaintiff's work environment was pervasively hostile on account of his race and his perceived sexuality. Employees of Defendant Sheriff White used racial slurs in his presence and made racial jokes and comments at the expense of the minority deputies. Furthermore, Plaintiff was subjected to homophobic jokes and remarks on account of his perceived sexuality. At no point were his complaints investigated or even taken seriously

"To state a claim for hostile work environment, [a plaintiff] must show (1) unwelcome harassment; (2) based on race; (3) which is so severe and pervasive that it alters the conditions of employment and creates an abusive atmosphere; and (4) some basis for imputing liability to the employer." *Murphy v. Danzig*, 64 F. Supp. 2d 519, 522 (E.D.N.C. 1999). This standard similarly

applies to sex and gender discrimination. See *Jennings v. Univ. of N.C.*, 444 F.3d 255, 268 (4th Cir. 2006).

Mr. White heard white officers using racial slurs. He also heard them calling another deputy, of Indian descent, "Osama Bin Laden" (J. White Title VII Compl. p.2). Additionally, he was subjected to a more dangerous work environment due to his extreme difficulty in acquiring a bullet proof vest from the VCSO (Id.).

### 4. Defendants Retaliated Against Plaintiff For His Protected Activities

Plaintiff made multiple complaints about the culture, policies and actions of the VCSO and its employees during his tenure. As a result of his unwillingness to bow his head and accept a culture of disparate treatment, he was retaliated against and, ultimately, terminated for engaging in protected activities.

In order to demonstrate retaliation under the McDonnel-Douglas burden-shifting framework, the Plaintiff must first make a prima facie case "(1) that he engaged in a protected activity; (2) that his employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action." If the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nonretaliatory basis for the action." *Lewis v. Gibson*, 621 F. App'x 163, 165 (4th Cir. 2015) (citations omitted).

In the fourth circuit, to file a complaint with the EEOC is to "engag[e] in a protected activity." *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994). Further, the Eastern District, and indeed the Fourth Circuit writ large, have long held that "there can be no doubt that termination is an adverse employment action. *Moss v. Pasquotank Cty.*, No. 2:10-CV-56-BR, 2012 U.S. Dist. LEXIS 84491, at *8 (E.D.N.C. June 19, 2012).

"To fall under the protection of the opposition clause in § 704(a) [of Title VII], behavior need not rise to the level of formal charges of discrimination...The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981) (citations omitted).

It is undisputed that Plaintiff made complaints to the VCSO and the EEOC It is also undisputed that he was terminated on October 24, 2018 (F-5 p.1). However, the undisputed facts of this case also evidence the causal link between Mr. White's complaints and his termination.

On September 12, 2018, just forty-two (42) days before his termination, Vance County was given notice of Plaintiff's EEOC charge which he filed on August 10, 2018 (J. White EEOC Compl. p.1). Given that Defendants were not informed of Mr. White's EEOC complaint until the Notice of Charge was served on them on September 12, 2018 (EEOC Not., p.1), there was a relatively short timeframe between Mr. White's escalating complaints and his termination.

While his termination may have been the most dramatic act of retaliation, there is ample evidence of a causal link between Plaintiff's complaints and the ill will harbored against him by Defendants.

Plaintiff made numerous complaints to Defendants. He had complained of homophobic comments and finding a unicorn hat in his locker that was placed their by a coworker J. White Dep. pp. 239:7-240:2). He had also complained of the dangerous condition of the tires on his patrol car and the lack of bullet proof vests for afforded to him and other black officers (J. White Title VII Compl. p.2). As his complaints escalated over time he was subject to more and more retaliatory action, whispering behind his back, to a suspension, to an effort to generate statements relating to a six month old incident and ultimately to his termination.

Because Plaintiffs have demonstrated a prima facie case for retaliation under the *McDonnell-Douglas* standard, the burden now shifts to Defendants to demonstrate that their actions were not retaliatory in nature, nor a pretext for retaliation.

5. Defendant White Violated His Employment Contract with Plaintiff.

Plaintiff has consistently maintained the existence of a contract to which Defendants have not produced any contrary evidence.

Plaintiff has described, in detail, exchanges serve to show the existence of a contract between him and the VCSO. Although Plaintiff does not have a physical copy of his contract, as the paper has become lost over the course of several changes of address, Mr. White described the appearance of the contract, that it was for a term of two years, that it was signed by Sheriff White and the process by which he was asked to sign it (J. White Dep. 28:6-29:19).

The existence of a two year contract is further implied by Plaintiff's discussions with Weldon Bullock and Sheriff White, and by the VCSO's own hiring paperwork. Plaintiff had discussions with Weldon Bullock where Mr. Bullock asked him if he would be willing to commit to a two year term of service with the VCSO prior to Mr. White signing the contract (J. White Dep. 30:14-20). Plaintiff took this as Capt. Bullock presenting him with an "Opportunity" (Id.). Sheriff White echoed the idea that he was being offered a term of employment, rather than an employment at will opportunity, by telling Plaintiff "White, you're at home now" (Id. 30:24-5). Lastly, in Mr. White's application, the VCSO's own paperwork asked him whether he would be willing to commit to a two year contract with the VCSO (W. Bullock Dep. Ex. 1).

The evidence suggests the existence of a contract and, if Plaintiff was terminated prior to the end date of his contract and, in addition to not being for cause, Plaintiff is entitled to judgment in his favor on his breach of contract claim.

<u>6. The Record Establishes that Defendants Tortiously Interfered with Plaintiff's Employment.</u>

By creating a false and/or misleading employment record for Plaintiff, Defendants ensured that it would be much more difficult, if not impossible, for Plaintiff to ever have another career in law enforcement.

In order to plead case for tortious interference with prospective economic advantage, Plaintiff must show that Defendants, without justification, induced a third party to refrain from entering into a contract with Plaintiff, which would have been made absent the Defendants' interference. *MLC Auto., LLC v. Town of S. Pines*, 207 N.C. App. 555, 571, 702 S.E.2d 68, 79(2010). In determining whether the prospective advantage was sufficiently proximate, "a plaintiff's mere expectation of a continuing business relationship is insufficient to establish such a claim...Instead, a plaintiff must produce evidence that a contract would have resulted but for a defendant's malicious intervention." *Beverage Sys. of the Carolinas, LLC v. Associated Bev. Repair, LLC*, 368 N.C. 693, 701, 784 S.E.2d 457, 463 (2016) (internal citations omitted).

Plaintiff has elsewhere stated his case as to why his termination and the internal finding of excessive force were not justified. It was, in fact, his termination for an alleged case of excessive force which explicitly prevented him from being hired by numerous companies, including NC Special Police, LLC, and the Wake County Sheriff's Office and prevented him from obtaining employment in the law enforcement profession in general. (J. White Dep. 233:21-235:4) Plaintiff lost his law enforcement certification when it lapsed because he was not able to find employment within a year of his termination. (J. White Dep. 204:5-16).

Without the unjustified report of excessive force on his record, Plaintiff would have obtained employment with NC Special Police, LLC, the Wake County Sheriff's Office, or another

law enforcement agency. But for the actions of Defendant, he would not have lost his law enforcement certification, as obtaining law enforcement employment is necessary for maintaining certification. Plaintiff has retained expert witnesses to assess the impact of these actions on Plaintiff's career prospects and expected earnings and has calculated a loss of up to $1,596013.00. (White Econ. Analysis, p.1). Therefore, Defendants have tortiously interfered with Plaintiff's prospective economic advantage.

### 7. Negligent and Intentional Infliction of Emotional Distress

There is ample evidence in the record that Defendants, whether negligently or intentionally, caused severe emotional distress to Plaintiff through their outrageous conduct towards him.

A claim for intentional infliction of emotional distress requires "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another." *Dickens v. Puryear*, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). Negligent infliction of emotional distress requires similar criteria, consisting of "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress..., and (3) the conduct did in fact cause the plaintiff severe emotional distress." *Wilkerson v. Duke Univ.*, 229 N.C. App. 670, 675, 748 S.E.2d 154, 159 (2013).

Defendant's conduct was clearly outrageous. Even in an employment law context, where claims for emotional distress are often subject to a higher bar, the conduct endured by Plaintiff surpasses all bounds of normal decency. Plaintiff was subject to homophobic insults in front of senior staff of the VCSO without any action taken by his supervisors. (J. White Title VII Compl. p.2). Furthermore, equipment was distributed in an inequitable manner according to the race of the individuals involved (J. White Title VII Compl. p. 2).Plaintiff experienced severe emotional

distress due to Defendants' conduct. Defendants intended to cause, or were recklessly indifferent to causing, Plaintiff's emotional distress.

It was easily foreseeable that Plaintiff could suffer severe emotional distress as a result of Defendants' conduct. To be treated differently on account of one's race and/or perceived sexual orientation will cause emotional distress. Even worse, Defendants knew or should have known that their actions would permanently bar Plaintiff from his chosen profession, and after he had done his best to rectify an intolerant environment that no one else had had the courage to address.

### 8. Wrongful Discharge

Because Defendants violated their contract with Plaintiff, he is entitled to a judgment of wrongful discharge as relating to said contract.

Wrongful discharge does not have a single legal standard, as a plethora of facts can make a termination wrongful. It can come about due to the violation of a contract. "In order to enable the plaintiff to recover, he must show two things: (1) That he has complied with the contract; (2) that the defendant has violated the contract by wrongfully discharging him. *Johnson v. Mach. Works*, 130 N.C. 441, 442, 41 S.E. 882, 882 (1902). However, a contract is not necessary for a termination to be wrongful. In order to show such a discharge, one must demonstrate "that he participated in conduct protected by law or refused to participate in an unlawful act or an act that violated public policy and that his participation in such was a substantial factor in the discharge decision." *Carrington v. Carolina Day Sch., Inc.*, 269 N.C. App. 677, 837 S.E.2d 383, 383 (2020). This means that the analysis previously conducted regarding Plaintiff's retaliation claim is important to his wrongful discharge as well.

Case 5:19-cv-00467-BO    Document 68-2    Filed 03/31/21    Page 12 of 20

12

Under both theories of wrongful discharge, sufficient facts exist on the record, with no difference as to material fact, to support the notion that Plaintiff was wrongfully discharged. Plaintiff has previously demonstrated the existence of a contract in this matter. Such a contract ran for a period of two years (J. White Dep. 28:10-11 and W. Bullock Dep. 19:14-18). At no time in that period did Plaintiff violate the terms of his contract, as he abided by the standards of the Vance County Sheriff's Office Handbook and Vance County policies at all times relevant to his employment, and more stringently than other deputies of the VCSO who were retained following more severe policy violations than anything that Defendants have suggested Plaintiff did. Indeed, his evaluations indicate at least average performance by Defendants' own account (White Eval.). By discharging Plaintiff prior to the expiration of his contract, and for discriminatory and retaliatory reasons, Defendants wrongfully discharged Plaintiff.

Evidence in the record demonstrates that Plaintiff was terminated following, and in response to, his complaints both internal to the VCSO and to the Equal Employment Opportunity Commission (EEOC). Each time that Plaintiff complained, whether orally, in writing, or to an outside body, he was ignored, rebuffed, or Defendants marshaled their forces against him. However, at no point were his complaints investigated.

9. Deputies in The VCSO Were Negligently Supervised and/or Retained by Defendants.

It is clear from the record that the VCSO was not a well run institution under the leadership of Defendant Peter White. Much of the ill treatment suffered by Plaintiff, and leading directly to the actions in this lawsuit, are attributable to the poor supervision of the VCSO's deputies and the improper retention of individuals who were responsible for discriminatory, irresponsible and even dangerous behavior. The fact that such individuals were retained while Plaintiff was terminated speaks to further retaliation.

"North Carolina recognizes a cause of action for negligent supervision and retention as an independent tort based on the employer's liability to third parties. To support a claim of negligent retention and supervision against an employer, the plaintiff must prove that 'the incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the employer knew or had reason to know of the employee's incompetency.'" *Leftwich v. Gaines*, 134 N.C. App. 502, 513-14, 521 S.E.2d 717, 726 (1999) citing *Smith v. Privette*, 128 N.C. App. 490, 494-95, 495 S.E.2d 395, 398.

Plaintiff has adequately pleaded a case for negligent retention and/or supervision under the *Smith* standard. Plaintiff has alleged numerous torts against Defendants, as outlined in this motion. Plaintiff was injured by these actions, not only by having to tolerate a hostile work environment and the emotional distress that accompanied it, but by being barred from his chosen career and setting him back financially by years. All in all, Defendants cost Plaintiff as much as $1,596,013.00, according to the uncontested analysis by Plaintiff's expert. Such is a clear and cognizable harm to Plaintiff.

Defendants had reason to know of all of these actions. They were often carried out by Defendants themselves who reported directly to Peter White.

Plaintiff himself complained of the behavior of individuals withing the VCSO on numerous occasions, including when he was subject to homophobic insults and actions and when he was treated disrespectfully by Lt. Durwood Campbell. In the case of Campbell, Defendants previously knew of bad behavior on his part, such as when Campbell asked a woman whom he stopped in a car to expose her breasts to him. (P. White Dep. p.129:24-130:1). For this infraction, betraying the trust and care of the office he was sworn to uphold by soliciting sexual favors from citizens, resulted in Campbell being demoted, but not terminated.

Likewise, Plaintiffs had reason to know of Deputy Myron Alexander's unfitness for duty. It was known to members of the department, including Lt. Campbell that Mr. Alexander had committed violations of VCSO policy when he was members of the department were called to his home pursuant to a report of a domestic incident. J. White Dep. 93:1-94:13. Therefore, when Mr. Alexander gave Plaintiff a performance evaluation that unfairly maligned Plaintiff's performance, the VCSO should have already been on notice that Alexander was not of sufficient character to be a reliable deputy. Defendants affirmed the inaccuracy of his evaluation when they altered Plaintiff's performance evaluation after the fact when he challenged his score (P. White Resp. Appr. Rebut. pp.1-2).

10. Defamation/Libel

Defendants in this matter propagated malicious falsehoods about the circumstances surrounding Plaintiff's termination which prevented him from being able to pursue a career in his chosen field.

"In order to recover for defamation, a plaintiff must allege and prove that the defendant made false, defamatory statements of or concerning the plaintiff, which were published to a third person, causing injury to the plaintiff's reputation. Truth is a defense to a defamation claim. *Kingsdown, Inc. v. Hinshaw*, 2016 NCBC 16, 52 (citations omitted). North Carolina law recognizes three classes of libel: (1) publications obviously defamatory which are called libel per se; (2) publications susceptible of two interpretations one of which is defamatory and the other not; and (3) publications not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances become libelous, which are termed libels per quod. North Carolina law also recognizes two classes of slander: (i) slander per se and (ii) slander per quod." *Id.* at 54 (citations omitted).

15

"[l]ibel per se is a publication which, *when considered alone without explanatory circumstances*: (1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace." *Nucor Corp. v. Prudential Equity Grp., LLC*, 189 N.C. App. 731, 736, 659 S.E.2d 483, 486 (2008) (quoting *Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 29, 568 S.E.2d 893, 898 (2002)).

"North Carolina has long recognized the harm that can result from false statements that impeach a person in that person's trade or profession—such statements are deemed defamation per se." *Nguyen*, 219 N.C. App. at 8, 723 S.E.2d at 557-58. As described above, the mere saying or writing of the words is presumed to cause injury, and a plaintiff need not prove actual injury. *Id.* ":To fall within the class of slander per se as concerns a person's trade or profession, the defamatory statement "must do more than merely harm a person in [his] business. The false statement (1) must touch the plaintiff in [his] special trade or occupation, and (2) must contain an imputation necessarily hurtful in its effect on [his] business." *Market Am., Inc. v. Christman-Orth*, 135 N.C. App. 143, 151, 520 S.E.2d 570, 577 (1999) (citations omitted).

Plaintiff has been subject to defamation at the hands of Defendants, including libel per se. Under the *Boyce* standard, speech that tends to impeach one in one's trade or profession is libel per se. Presently, Plaintiff has been unable to work in law enforcement, his profession, due to the libelous charges brought against him by Defendants. Because Plaintiff used force which was properly within his discretion in the incident for which he was terminated, the report and F-5 form, stating that he was terminated pursuant to sustained charges of excessive force, are untrue. As they are untrue and directly state that he has committed a wrong in his chosen profession, and one for which his employment was terminated, they have committed libel per se.

Because Defendants have committed libel per se against Plaintiff, he damages are presumed. He is therefore entitled to recovery as a matter of law.

11. <u>Plaintiff is entitled to punitive damages under federal and state law.</u>

Defendants contend that no matter how egregious a defendant's actions are, punitive damages cannot be awarded in this matter under federal law because the suit is against officials in their individual and official capacities. First, Defendants cite to Section 1983 cases, and without explanation, attempt to link in Title VII. Such a position is concerning, because Defendants concede that Defendant White is an employer and that Plaintiff White is an employee of an employer. Because of that employment relationship, Title VII expressly provides for punitive damages.

Plaintiff is entitled to plead recovery for punitive damages under Title VII because punitive damages may be awarded if there is actual malice or reckless indifference on the part of the Defendants. *Kolstad v. ADA*, 527 U.S. 526, 529 119 S. Ct. 2118 (1999). Plaintiff alleges such malice and/or reckless indifference in his complaint and, therefore, the basic criteria for receiving punitive damages is met.

Plaintiff's case is distinguished from Defendants' argument because Defendant White is not a municipality. The fact that he is being sued in his individual capacity as Sheriff is not the same as suing a municipality.

Furthermore, and to the extend Defendants are asserting governmental immunity, per the Complaint, they are not entitled to it. First, Defendants abrogated any immunity by entering into a contract with Plaintiffs. *State v. Smith*, 289 NC 303 (1976) ("We agree with those courts which say the State, by entering into a contract, agrees to be answerable for its breach and waives its immunity from suit to that extent. To hold otherwise, these courts

say, is to ascribe bad faith and shoddy dealing to the sovereign. They are unwilling to do so; and we are too."). Defendants are liable for their breaches, even in their governmental capacities.

Moreover, and simply put, Defendants do not have immunity from their torts as a result of performing proprietary functions.[1] Immunity protects government employees who perform governmental functions. These were not governmental functions. Directly discriminating against someone because of race is not a government function. Falsely reporting employment activity is not a government function. Terminating an employee for a pretextual reason, is not a government function. Conducting bias investigations, is not a government function. Allowing homophobic conduct is not a government functions. These Defendants are not protected by immunity. Governmental immunity is not a bar to this action.

As a final matter, Defendants maintain that—despite the allegations in the Complaint—and although they provide no legal support for their position, Plaintiff is not entitled to punitive damages under state law. That is not true. North Carolina has a specific punitive-damages statute that provides for the recovery of punitive damages on the several state-law claims. Defendants attempt to make an immunity argument and conclude that these employees, in their official capacities are governmental entities, but at the same time, Defendants claim that they are not entities. Defendants cannot have it both ways. These Defendants are not municipalities. Nevertheless, such dismissal would not impact the fact that Plaintiff is entitled to recover punitive damages, the questions just becomes from whom.

### IV. Conclusion

---

[1] Immunity is waived with the purchase of insurance, too, even if the functions are governmental.

For the reasons identified above, Plaintiff requests that the Court **DENY** Defendants' Partial Motion to Dismiss. Respectfully submitted, this 31st day of March, 2021.

*/s/ Sharika M. Robinson*
Sharika M. Robinson
The Law Offices of Sharika M. Robinson
10230 Berkeley Place Drive, Suite 220
Charlotte, NC 28262
Telephone: (704) 561-6771
Telefax: (704): 561-6673
Email: srobinson@sharikamrobinsonlaw.com
*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day filed the foregoing **DEFENDANTS' PARTIAL MOTION TO DISMISS** with the Clerk of Court using the court's CM/ECF system, which will send electronic notice to all counsel of record, as follows:

Christopher J. Geis
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 721-3600
Facsimile: (336) 721-3660
Email: Chris.Geis@wbd-us.com

*Attorney for Defendants*

Respectfully submitted, this 31st day of March, 2021.

>*/s/Sharika M. Robinson*
>Sharika M. Robinson
>The Law Offices of Sharika M. Robinson
>10230 Berkeley Place Drive, Suite 220
>Charlotte, NC 28262
>Telephone: (704) 561-6771
>Telefax: (704): 561-6673
>Email: srobinson@sharikamrobinsonlaw.com
>*Attorney for Plaintiff*