J. White Dep.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:19-CV-00467-BO


JUSTIN J. WHITE,                        )
                                        )
                    Plaintiff,          )
                                        )
        vs.                             )
                                        )
VANCE COUNTY, NORTH CAROLINA;           )
VANCE COUNTY SHERIFF'S OFFICE;          )
PETER WHITE, in his official and        )
individual capacities;                  )
LAWRENCE D. BULLOCK, in his             )
official and individual capacities;     )
WELDON WALLACE BULLOCK, in his          )
official and individual capacities,     )
and WESTERN SURETY COMPANY,             )
a division of CNA SURETY,               )
                                        )
                    Defendants.         )
                                        )
------------------------------------

_____

VIDEOTAPED VIDEO CONFERENCE DEPOSITION
OF
JUSTIN J. WHITE
_____


TAKEN VIA VIDEO CONFERENCE AT THE LAW OFFICES OF:
WOMBLE BOND DICKINSON (US) LLP
ONE WEST FOURTH STREET
WINSTON-SALEM, NC 27101


02-10-21
10:15 O'CLOCK A.M.
_____

Lori Gruber
Court Reporter

Chaplin & Associates
132 Joe Knox Ave, Suite 100-G
Mooresville, NC 28117
(704) 606-1434 | (336) 992-1954 | (919) 649-4444

**ATTORNEY NOTES**

PAGE/LINE NOTES

_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____

I N D E X

| | |
|---|---|
| STIPULATIONS | 7 |
| EXAMINATION | |
| By Mr. Castro | 9 |
| By Ms. Robinson | 236 |
| ADJOURNMENT | 242 |
| REPORTER CERTIFICATE | 243 |
| WITNESS CERTIFICATION | 244 |
| WITNESS ADDENDUM | 245 |

E X H I B I T S

| Name | Offered By | Identified |
|---|---|---|
| Exhibit 1 (Amended Notice of Deposition, Plaintiff) | Mr. Castro | 21 |
| Exhibit 3 (Amended Complaint) | Mr. Castro | 87 |
| Exhibit 4 (Plaintiff's Motion for Leave) | Mr. Castro | 225 |
| Exhibit 6 (Plaintiff's Responses to Interrogatories and Requests for Production) | Mr. Castro | 22 |
| Exhibit 9 (Official Written Reprimand) | Mr. Castro | 89 |
| Exhibit 10 (Employee Counseling Record, Justin White) | Mr. Castro | 98 |

**APPEARANCES OF COUNSEL**

FOR THE PLAINTIFF JUSTIN J. WHITE:

Sharika M. Robinson, Esquire
(via video conference)
THE LAW OFFICE OF SHARIKA M. ROBINSON, PLLC
10230 Berkeley Place Drive, Suite 220
Charlotte, NC 28262
srobinson@sharikamrobinsonlaw.com

FOR THE DEFENDANT VANCE COUNTY,
NORTH CAROLINA, ET AL.:

Brian Castro, Esquire
WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
brian.castro@wbd-us.com

OTHER APPEARANCES
Michael McGurl (via video conference)
Shannon Skoog, Technician (via video conference)

E X H I B I T S (Continued)

| Name | Offered By | Identified |
|---|---|---|
| Exhibit 11 (Statement from Deputy Brian K. Wayne) | Mr. Castro | 101 |
| Exhibit 12 (Statement from Sergeant D.R. Roberson) | Mr. Castro | 104 |
| Exhibit 13 (Statement from Sergeant Alexander) | Mr. Castro | 107 |
| Exhibit 14 (3-27-18 Incident - Counseling Form) | Mr. Castro | 120 |
| Exhibit 16 (3-27-18 Incident - Insurance Form) | Mr. Castro | 125 |
| Exhibit 17 (3-27-2018 Video) | Mr. Castro | 126 |
| Exhibit 19 (Oliver Incident - Medical Documentation) | Mr. Castro | 169 |
| Exhibit 20 (Release Authorizations) | Mr. Castro | 209 |
| Exhibit 24 (Statement from Deputy Patel) | Mr. Castro | 224 |
| Exhibit 25 (F-5 Report of Separation Form) | Mr. Castro | 204 |

E X H I B I T S (Continued)

| Name | Offered By | Identified |
|------|-----------|-----------|
| Exhibit 28 | Mr. Castro | 232 |
| (Tuition Reimbursement Agreement) | | |

NOTE: Quoted material has been reproduced as read or quoted by the speaker.

---

STIPULATIONS

Pursuant to Notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated and was conducted before Lori Gruber, Notary Public in and for the County of Iredell, State of North Carolina at Large.

Notice and/or defect in Notice of time, place, purpose and method of taking the deposition was waived. Formalities with regard to sealing and filing the deposition were waived, and it is stipulated that the original transcript, upon being certified by the undersigned court reporter, shall be made available for use in accordance with the applicable rules as amended.

It is stipulated that objections to questions and motions to strike answers are reserved until the testimony, or any part thereof, is offered for evidence, except that objection to the form of any question shall be noted herein at the time of the taking of the testimony.

Reading and signing of the testimony was requested prior to the filing of same for use as permitted by applicable rule(s).

---

PROCEEDINGS

(10:15 o'clock a.m.)

THE COURT REPORTER: We are now on the record. The time is 10:15 a.m. The date is January 10th -- or I'm sorry, February 10th, 2021. This is the deposition of Justin J. White in the matter of Justin J. White versus Vance County Sheriff's Office, et al.

The attorneys participating in this proceeding acknowledge that I am not physically present in the proceeding room and that I will be reporting this proceeding remotely.

They further acknowledge that in lieu of an oath administered in person, the witness will provide his ID via video conference and verbally declare that his testimony in this matter is under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and agreement on the record. Also, please indicate on the record all parties present in the room with you.

MR. CASTRO: My name is Brian Castro.

---

I agree with that statement. I'm here socially distanced with the court reporter.

MS. ROBINSON: My name is Sharika Robinson, attorney for Mr. White, and I'm here remotely with Mr. White and the court reporter.

MR. MCGURL: My name is Michael McGurl. Sorry, can you mute that? Actually, can you hear me through there?

THE COURT REPORTER: Yes, we can hear you through that.

MR. MCGURL: So my name is Michael McGurl. I am present with Mr. White and Sharika Robinson and remote with the court reporter, and we consent to those rules.

The witness, JUSTIN J. WHITE, being first duly sworn to state the truth, the whole truth, and nothing but the truth, testifies as follows:

EXAMINATION

BY MR. CASTRO:

Q. We'll begin. Mr. White, my name is Brian Castro. I represent the Defendants in this case. I'm with the law firm Womble Bond Dickinson. I appreciate you sitting down for this deposition. Have you ever been deposed before?

A. Yes.

10

1    Q.   Okay.  So you pretty much know how it goes.
2  I ask that you give yes or no answers rather than
3  uh-huh (yes) or huh-uh (no) in order to assist the
4  court reporter in getting this down.  Can you please
5  state your full name for the record?
6    A.   Justin Jamel White.
7    Q.   How do you spell your middle name?
8    A.   J-A-M-E-L.
9    Q.   Okay.  And whenever you need a break or
10  anything throughout this deposition, of course, feel
11  free to let us know.  That goes for the court reporter
12  and everyone that's participating on this call.  What
13  is your date of birth?
14    A.   8-15-1989.
15    Q.   And what is your current place of
16  residence?
17    A.   I live in Charlotte, North Carolina.
18    Q.   And who is currently in the room with
19  you right now?
20    A.   Attorney McGurl.
21    Q.   Okay.  Are you prepared to testify today?
22    A.   Yes.
23    Q.   Are there any substances or other
24  impairments that would stop you from testifying
25  competently?

11

1    A.   No.
2    Q.   Okay.  All right.  We'll start with some of
3  your background information.  Can you please tell us
4  where you went to high school?
5    A.   Perquimans County High School in Hertford,
6  North Carolina.
7    Q.   Did you go to college after that?
8    A.   Yes.
9    Q.   Where did you go?
10    A.   For my first year, I went to Shaw University
11  in Raleigh, North Carolina.  I transferred to Mount
12  Olive College in Mount Olive, North Carolina, which is
13  now the University of Mount Olive.
14    Q.   And what did you study?
15    A.   I studied criminal justice and criminology
16  at Mount Olive College.
17    Q.   Okay.  Did you want to become a law
18  enforcement officer during that time?
19    A.   Yes.
20    Q.   Okay.  Is that the reason you focused on
21  criminal justice?
22    A.   Yes.
23    Q.   Okay.  Can you tell us about your
24  certification as a law enforcement officer?
25    A.   Yes.  I have -- I had a basic law

12

1  enforcement training certificate and general law
2  enforcement training certification.
3    Q.   Okay.  What process does it take to get
4  those certifications and certificates?
5    A.   It's approximately a 17 to 18-week training
6  course to get your basic law enforcement training
7  certificate, which is also known as BLET.  And then
8  once you get hired at an agency, you work 12 months,
9  you get your general law enforcement training
10  certification.
11        I also have a Master's of Science Degree in
12  Justice Studies from Southern New Hampshire
13  University, and I'm also working on my doctoral in
14  Public Administration at Capella University.
15    Q.   And what was the focus of your studies for
16  your master's degree?
17    A.   Justice studies.
18    Q.   Can you elaborate on what that means?
19    A.   Yes.  Justice studies is a form of criminal
20  justice.  It's similar to a born identity of criminal
21  justice that focuses on social justice and other
22  different types of justice such as restorative --
23  distributive justice, et cetera.
24    Q.   And what is the focus of your doctoral
25  degree?

13

1    A.   Public administration.
2    Q.   Okay.  All right.  When you went through
3  BLET as you described, what type of training, what
4  aspects of the job were you trained in?
5    A.   I was trained in the fundamentals of being a
6  law enforcement officer, whether it be a police
7  officer or a deputy sheriff, ensuring public safety.
8  The training centered on achieving the law enforcement
9  objective at the basic level, which was serving,
10  protecting, preserving peace, ensuring the safety in -
11  - of all citizens in your jurisdiction.
12    Q.   Did you get any training in the use of
13  force?
14    A.   Yes.
15    Q.   Can you describe that for me?
16    A.   The use of force training continuum
17  consisted of several layers from soft hands, first arm
18  de-escalation command presence, to soft hands to hard
19  hands.  To chemical munition, such as pepper spray,
20  using your baton, using your taser, the baton and
21  taser if your department allowed, as well as, if
22  necessary, discharging your department-issued firearm.
23    Q.   And when you say, "de-escalation," what
24  types of de-escalation methods were you trained in?
25    A.   First, we need the command presence.  We

14

1  need to do everything we can to calm the situation, to
2  bring peace to the situation to prevent an escalation
3  that may require using force for control and
4  compliance purposes.
5      Q.  Is this done verbally?
6      A.  Yes.
7      Q.  And what does "soft hands" mean?
8      A.  Soft hands is a lesser form of using
9  physical force in terms of the use for escort
10  positions: handcuffing, take downs, the ultimate hand
11  strikes, stuns.  It's basically de minimis force.
12      Q.  So do you consider take down soft hands?
13      A.  It is soft hands, yes.
14      Q.  Do you consider take downs de minimis force?
15      A.  Yes.
16      Q.  So how -- is there a specific amount of time
17  that you should focus on de-escalation before you use
18  soft hands?  How does it work?
19      A.  No.  There's no specific amount of time.
20      Q.  When do you go from de-escalation to soft
21  hands?
22      A.  The officer will make a decision based on
23  the totality of circumstances, based on what's going
24  on at the scene.
25      Q.  Do you base it at all on how the citizen is

15

1  acting, the person you're dealing with is acting?
2      A.  That is part of it.
3      Q.  What do you look for when you're seeing --
4  when you're dealing with a citizen to determine
5  whether there may be aggression or non-compliance?
6      A.  I look for their cooperation.  I look for
7  their -- to determine whether or not they're going to
8  be uncooperative, if they're going to be resistive,
9  aggressive, non-compliant, non-cooperative,
10  assaultive.
11      Q.  Okay.  So you also mentioned pepper spray.
12  Were you taught about pepper spray during BLET?
13      A.  No.
14      Q.  Did they mention pepper spray at all during
15  that?
16      A.  They mentioned pepper spray, but we were not
17  trained on pepper spray.
18      Q.  Okay.  Did you -- when was the first time
19  you were actually issued pepper spray during your full
20  employment, during your entire career?
21      A.  I was issued pepper spray at Vance County
22  Sheriff's Office, I will say approximately late 2017.
23      Q.  Did you request to be issued pepper spray?
24      A.  I requested my equipment.
25      Q.  Did you specifically request pepper spray?

16

1      A.  Pepper spray is a part of the equipment and
2  I asked for my equipment to do my job.  So for the
3  purposes of that, yes.
4      Q.  So you did not mention pepper spray when you
5  asked for your equipment?
6      A.  I told them the things that I needed.  In
7  terms of remembering word for word what I needed, I'm
8  unable to recall, but pepper spray was a part of my
9  equipment.
10      Q.  Okay.  So ---
11      A.  I could have, but at this time, pepper spray
12  was a part of my equipment.  So it would've been
13  requested.
14      Q.  Understood.  Was that your first time being
15  issued pepper spray at Vance County?
16      A.  Yes.
17      Q.  So did you ever get trained in pepper spray
18  after you were issued pepper spray?
19      A.  No.
20      Q.  Were you told to seek training in pepper
21  spray?
22      A.  No.  Instead, I was told that training would
23  be provided by the SO because they train our deputies
24  and sometimes the police department managers of the
25  police department would send officers over who need

17

1  training as well.
2      Q.  Do you know if you could have sought
3  training on your own?
4      A.  I'm not aware of it.
5      Q.  Are you aware of pepper spray training that
6  is outside of the Vance County Sheriff's Office, not
7  provided by them specifically?
8      A.  No.
9      Q.  Did you ever attempt to get trained or ask
10  to get trained?
11      A.  No.  I've never attempted to get trained in
12  pepper spray.
13      Q.  Why not?
14      A.  Because the department said that they will
15  provide it.
16      Q.  Okay.  Did you -- were you aware that
17  training in pepper spray involves possibly getting
18  sprayed with it?
19      A.  Yes, you will be sprayed.  They say that you
20  will be sprayed.
21      Q.  Did that concern you at all?
22      A.  No.
23      Q.  So can you briefly go through your
24  employment history with me after -- from the time you
25  left the university that you mentioned, Mount Olive?

18

1    A.  Yes.  I worked for the North Carolina
2 Department of Public Safety from 2012, I believe it
3 was November, 2012 up until September, 2015.
4    Q.  What facility were you working at?
5    A.  I was working -- I was assigned to Bertie
6 Correctional Institution.
7    Q.  What was your job title?
8    A.  I was a corrections officer.
9    Q.  What were your day-to-day duties or
10 responsibilities?
11    A.  Care, custody and control of state
12 offenders.
13    Q.  What was your next job?
14    A.  I worked at Louisburg College as a campus
15 safety officer from November, 2016 up until January,
16 2017.
17    Q.  What equipment did you have during that job?
18    A.  None.
19    Q.  Did you have a taser?
20    A.  No.
21    Q.  Flashlight?
22    A.  I had a personal flashlight, not a
23 department-issued flashlight, on a key chain.
24    Q.  Okay.  What were your day-to-day
25 responsibilities in that position at Louisburg?

19

1    A.  Observe and report.
2    Q.  Was this throughout the entire campus that
3 you worked ---
4    A.  Yes.
5    Q.  All right.
6    A.  I ---
7    Q.  After -- I'm sorry.
8    A.  After leaving there, I worked at Shaw
9 University full time.  My employment started in
10 November -- late November, 2016 up until February --
11 late February, 2017.  I was a campus security officer.
12    Q.  What were your responsibilities at that job?
13    A.  Observe and report.
14    Q.  And what equipment did you have at that job?
15    A.  None.  Same thing, I had a flashlight on my
16 personal key chain.
17    Q.  Okay.  After Shaw University, where did you
18 gain employment?
19    A.  I worked part-time in retail and also was
20 able to get unemployment up until I was hired at Vance
21 County Sheriff's Office in June of 2017.
22    Q.  And you mentioned that you've been deposed
23 before.  How many times have you been deposed?
24    A.  Once.
25    Q.  What case was that for?

20

1    A.  Justin White versus North Carolina
2 Department of Public Safety.
3    Q.  Do you remember around when that deposition
4 occurred, what time or what date?
5    A.  Approximately 2018.
6    Q.  Okay.
7    A.  Maybe February, January or February, 2018.
8    Q.  Thank you.  So without revealing any
9 attorney-client communications.  I don't want to know
10 anything about that, obviously.  How did you prepare
11 for this deposition?
12    A.  I prepared with my attorneys of record.
13    Q.  Again, without revealing any communications,
14 did you review any documents?
15    A.  I reviewed a -- documents with my attorneys.
16    Q.  What documents did you review in preparation
17 for the deposition?
18    A.  The case documents.
19    Q.  Are you talking about what's been filed?
20    A.  Yes.
21    Q.  Did you review any documents that haven't
22 been filed?
23    A.  No.
24    Q.  Did you review anything from your personnel
25 file?

21

1    A.  What you are provided, yes.
2    Q.  Okay.  So you've met with your attorneys,
3 you said?
4    A.  Yes.
5    Q.  Were any non-attorneys present during those
6 preparation sessions?
7    A.  No.
8    Q.  Were any family members or friends present?
9    A.  No.
10        (DEPOSITION EXHIBIT
11         NUMBER 1 WAS MARKED
12         FOR IDENTIFICATION)
13    Q.  (Mr. Castro) Okay.  So I'm going to bring
14 your attention to Exhibit 1, which the court reporter
15 will share her screen, and also I have provided to
16 your counsel prior to this deposition.  And this is
17 the Notice of -- amended Notice of Deposition for this
18 deposition today.  Have you seen this?
19 (Witness examines document)
20    A.  Can you scroll down?  I may have seen it.  I
21 may not have seen it.  What is the date up there?  I'm
22 unable to recall if I've seen it.
23    Q.  Okay.
24    A.  But I was most certainly told that we had a
25 deposition today.

22

1         (DEPOSITION EXHIBIT
2         NUMBER 6 WAS MARKED
3         FOR IDENTIFICATION)
4     Q.  Thank you.  Skipping over a bit to Exhibit
5  Number 6, which consists of Plaintiff Justin White's
6  response to Defendant Peter White's first set of
7  interrogatories and requests for production.  Have you
8  seen this document?
9  (Witness examines document)
10    A.  Scroll down.  Scroll down.  Keep scrolling.
11 Keep on going.  Yes.  I believe I've seen this
12 document.
13    Q.  If you will scroll to the final page.  Did
14 you sign a verification?  We might have to zoom out.
15 Did you sign this verification?
16    A.  Yes.
17    Q.  Okay.  Thank you.  Stepping back out of the
18 exhibits, I want to talk about your employment at
19 Vance County Sheriff's Office.  How did you hear about
20 the job position?
21    A.  I believe I looked on their website to see
22 if they were hiring.  I'm not sure if there was
23 anything up there to indicate such.  I contacted the
24 Vance County Sheriff's Office.  I asked if they were
25 hiring and they -- can't remember the name, what the

23

1  reception was, transferred me to an individual who
2  identified himself as the Chief Deputy.
3     Q.  Do you know who that person was?
4     A.  His name is on the tip of my tongue.  I just
5  can't think of it.
6     Q.  What did you discuss?
7     A.  He identified himself as the Chief Deputy.
8  He said that, "We have a few vacancies," and
9  encouraged me to apply.
10    Q.  Okay.  And when did you apply for the job,
11 do you remember?
12    A.  I believe I applied around March.  It could
13 have been March or April, but March or April, 2013.
14    Q.  Okay.  And when you applied for the job,
15 were you asked to disclose previous lawsuits that you
16 had filed?
17    A.  That may have been a question.
18    Q.  Do you remember whether you disclosed this?
19    A.  I don't recall whether or not anything was
20 disclosed.
21    Q.  Does the same go for any EEOC complaints or
22 charges?
23    A.  The same for what?
24    Q.  That you don't remember if they were
25 disclosed?

24

1     A.  Yeah.  I don't remember if they were --
2  disclosed.
3     Q.  Do you remember if you disclosed previous
4  terminations or suspensions?
5     A.  I believe on my F3, I disclosed that I had
6  been previously terminated and reinstated at one job,
7  and then another one I was dismissed as well as a
8  third one.
9     Q.  And how was the interview process after you
10 applied?  What happened after that?
11    A.  In May, Captain Bullock reached out --
12 Captain Welding Bullock at the time, reached out via
13 telephone and asked me if I was still interested in a
14 position and I said yes, so he invited me for what I
15 thought was going to be an interview with him, but it
16 ended up being a board -- review board with him and
17 two other supervisors.
18        I will say, prior to when I took the
19 application to the Sheriff's Office to deliver to the
20 -- the individual that identified -- his last name is
21 Fryson.  So for the purposes of this, Chief Fryson.
22        When I took the application back to the
23 Sheriff's office to deliver it, rather, he knew I was
24 coming.  He set up the day, the time.  I walked in.  I
25 was told that they was going to give them a buzz, and

25

1  Sheriff Peter White walked into the building and he
2  said, "Young man, why are you dressed up?"
3        And I told him, "I have an interview with
4  the chief deputy and Sheriff White said, "Oh, no.  I
5  don't have a chief deputy.  I have a chief of staff.
6  Is that who you had to see?"  And I told him, "Chief
7  Fryson."
8        He said, "I have a chief of staff.  I do not
9  have a chief deputy," and Sheriff White said, "And in
10 fact, he's not even sworn."  And he said, "I'll take
11 whatever you have."  And he said, "Somebody will give
12 you a call later."
13        So moving forward to May, Captain W. Bullock
14 contacted me, went in for the oral review board.  They
15 interviewed me.  Captain Bullock told me afterwards
16 that it was successful and I'll be hearing from him
17 soon.
18    Q.  And can you spell that person's name?  I
19 think you said Riceland or something.
20    A.  Fryson.  Fryson, with an F.
21    Q.  Fryson?
22    A.  Yes.
23    Q.  And you mentioned a board review.  Can you
24 tell me who was in that room?
25    A.  Then-Captain Welding Bullock, Lieutenant

26

1  Brian Sharon and Lieutenant Lloyd Q. Watkins and
2      Q.  Do you remember what kind of questions were
3  asked or conversations were had?
4      A.  It was surrounding some points of the
5  application and the F3.  The specific questions I
6  cannot recall word for word, but it was around the
7  around my hiring and to that effect.
8      Q.  Was your race mentioned at all during this
9  initial board review?
10     A.  I believe so.
11     Q.  Okay.  So were you eventually offered
12  employment?
13     A.  Yes.
14     Q.  And when did -- how did you accept the
15  offer?  Can you go through that process?
16     A.  Captain Bullock called me, told me that I
17  needed to do my drug test, whatever a test -- excuse
18  me, told me I need to do the test for the hiring
19  process.
20          And I met with him in Henderson.  We went to
21  Maria Parham Hospital and I did my test.  It later
22  came back acceptable, so I was approved to move
23  forward.  And so he told me that he needed it to --
24  needed a few statements in reference to potential
25  charges that were shown in the system, as well as I

27

1  needed some sworn or notarized statements in reference
2  to my education that's in the Southern New Hampshire
3  University online.
4          I've never lived in New Hampshire.  I
5  attended via online.  I got things turned into him,
6  answered his questions over the phone, and he told me
7  that the date will be set soon.  And shortly after, he
8  contacted me and said, "Sheriff White says it's going
9  to be June 5th," my sworn -- swearing-in date, and to
10  come dressed up, you know, look professional.
11          "Presentable" is what he said.  Let me clear
12  that up.  And so I was sworn in on June 5th by the
13  Clerk of Court in Vance County and began work shortly
14  afterwards.
15     Q.  Was June 5th when you think you took the
16  oath of office or took an oath regarding your
17  position?
18     A.  I took the oath on June 5th.  I believe
19  that's the date of June 5th, 2017.
20     Q.  So you mentioned that the Sheriff called
21  you.  Do you remember signing any employment contract
22     A.  I never said that the Sheriff called me.  I
23  said that Captain Bullock called me.
24     Q.  You did say Sheriff White called you to say
25  to look presentable?

28

1      A.  No.  I was -- I'm sorry.  If I said that, I
2  meant to say -- I thought I said Captain Bullock.
3  Captain Bullock was the one that was my point of
4  contact.
5      Q.  Okay.
6      A.  And Sheriff White is the one that told him
7  the date: "Sheriff says June 5th."
8      Q.  Did anyone present you with an employment
9  contract to sign?
10     A.  Yes.  An employment contract of two years
11  was presented to me.
12     Q.  What was the -- can you describe how that
13  contract looked and what you remember from that
14  contract?
15     A.  The contract had black font, a few pages.
16  It was, I believe either like -- it was like a
17  bluish-gray color for the paper color, black font.
18          It had Sheriff's White's signature.  I
19  needed -- they needed my signature.  It had a place
20  for the director of human resources to sign as well as
21  the county manager or his designee.
22     Q.  And what was the title of that document, do
23  you remember?
24     A.  It was my contract.  As far as the specific
25  information, I can't provide.

29

1      Q.  Did you read it before you signed it?
2      A.  Yes.
3      Q.  Do you remember what it said?
4      A.  I just said, I don't know the specific
5  information in it, but it was an employment contract
6  for two years.
7      Q.  What's your basis for saying that it's a
8  two-year contract?
9      A.  Because that was in there, and outside of
10  the -- not outside of it being in there, I was told --
11  I was presented with a two-year opportunity by Captain
12  Bullock to work at Vance County for two years to help
13  -- so they could help me with my experience.
14          And also in exchange get, you know, what
15  they invested into me and get it out of me.  And so he
16  asked if I would be willing to do two years at Vance
17  County, and I said yes.  And after I started, the
18  contract was presented to me in writing, I believe the
19  same week that I started, for me to sign.
20     Q.  So when you say Captain Bullock presented
21  you with that opportunity, when was that?  How did
22  that happen?
23     A.  This was during the hiring process.  After
24  my -- on the day of my oral review board, the oral
25  review panel.

30

1　　Q.　Did anyone else -- keep going.　Sorry.

2　　**A.　I'm sorry, sir?**

3　　Q.　Did anyone else witness this?

4　　**A.　It may have been said in the oral review**

5　**panel, but I -- I believe it was said when he told me**

6　**that it was successful, and -- and I remember him**

7　**asking me if I would be willing to commit two years at**

8　**Vance County, et cetera.**

9　　Q.　Was he -- I would just like to know if you

10　would know more specific terminology of what he said.

11　So was he saying, "You should stay with us for two

12　years.　We would appreciate that," or can you give me

13　more specifics?

14　　**A.　As I previously said, he presented me the**

15　**opportunity to work at Vance County for two years.**

16　**That was orally.　It was verbal.　He asked me if I**

17　**would be willing to work at Vance County for two years**

18　**to help me with my experience, and that way the**

19　**department could get what they invested in me out of**

20　**me.**

21　　Q.　Did Sheriff White ever tell you any of this?

22　　**A.　I don't -- I'm unable to recall if Sheriff**

23　**White had said anything about the contract, but I do**

24　**believe he said something about, "White, you're at**

25　**home now.　You can work, et cetera."　But in terms of**

31

1　**specifications about the contract, that was more so of**

2　**Captain Bullock verbally asking me if I would commit**

3　**two years.**

4　　Q.　So do you have a copy of that contract?

5　　**A.　I'm unable to find it.**

6　　Q.　Do you remember asking for a copy when you

7　signed it?

8　　**A.　I believe they gave me a copy.**

9　　Q.　Where would you normally keep those type of

10　documents?

11　　**A.　I would keep them at my house.**

12　　Q.　Do you have a specific area where you keep

13　contracts like that?

14　　**A.　I keep them with my important paperwork.**

15　**That's where I'd normally keep my stuff.**

16　　Q.　Is there any reason that your important

17　paperwork would go missing?

18　　**A.　Well, yes.　I moved a few times since living**

19　**in Vance County when I was a Sheriff's deputy and**

20　**things got lost.**

21　　Q.　So you do not have a copy of the contract?

22　　**A.　I'm unable to find it.**

23　　　　MS. ROBINSON:　I'm going to object to

24　this point.　That's asked and answered.　You asked

25　that same question three times.

32

1　　Q.　(Mr. Castro)　So let's talk about your

2　initial employment when you started working at Vance

3　County Sheriff's Office.　Did you receive on-the-job

4　training?

5　　**A.　Yes.**

6　　Q.　What kind of training did you receive when

7　you started?

8　　**A.　I received -- my first week, I rode with**

9　**Sergeant Marin Alexander for a few days, if not the**

10　**entire shift, observing Vance County, getting a feel**

11　**of it because I was new.**

12　　　　**And then the following week, I was told that**

13　**at the time, Sergeant Durwood Campbell, he will be my**

14　**Field Train Officer, FTO.　I rode with him somewhere**

15　**around two-and-a-half, three weeks, approximately.**

16　　　　**Afterwards, I was told by Sergeant Campbell**

17　**that I would no longer be with him and I would be --**

18　**that I would be trained by Deputy Brian Kenneth Wayne.**

19　　　　**And Campbell further explained there were**

20　**some issues, some performance issues with one of the**

21　**new trainees as he was trying to get a hang of things**

22　**for the county and some performance issues with Deputy**

23　**Wayne.　Campbell provided information that Wayne**

24　**worked at the Highway Patrol and something happened**

25　**and it was later provided to me that Wayne was**

33

1　**terminated for -- from the Highway Patrol.**

2　　　　**And so instead of singling Wayne out,**

3　**Campbell said that the Sheriff and then Captain**

4　**Lawrence Bullock, who later became Chief Deputy, would**

5　**just swap -- switching everybody, swapping everybody**

6　**around, and I was going to Wayne.**

7　　Q.　Before I ask you more questions about that,

8　I wanted to go back to what we discussed before.　You

9　said Sheriff White said, "You are at home now," when

10　you were hired.　Is that right?

11　　**A.　Yes.**

12　　Q.　What did you take from that statement, or

13　how did you react to that statement?

14　　**A.　I pulled up to the Sheriff's Office.**

15　**Sheriff White saw me.　It was one of the days that**

16　**Captain Bullock asked me to come in, and Sheriff**

17　**White, he approached me.　He said -- he said, "Mr.**

18　**White."　He spoke, he said, Mr. White."　He said, "I**

19　**went over a lot of paperwork about you."**

20　　　　**I said, "Okay."　He said, "What happened at**

21　**the prison?"　And I told him that they had --**

22　**previously terminated me, but I was reinstated.　And**

23　**he asked what had happened at Louisburg, and I told**

24　**him.　I said, "I don't know.　They ended the**

25　**employment contract."　And he said, "Okay."　He said,**

34

1  "Don't worry." He said, "You home now."
2     Q.  Do you think he was being sincere from what
3  you could tell?
4     A.  I have no reason to -- to say otherwise.
5     Q.  All right.  Back to what we were discussing
6  about training.  Did you hear what happened with Wayne
7  about the performance issues?
8     A.  Yes.  Sergeant Campbell provided the
9  information.
10    Q.  What was that information?
11    A.  As I previously stated, hat there were
12 performance issues involving him and his trainee.
13 -- and Sergeant Campbell stated something to the
14 effect that there was -- there's a difference in the
15 Highway Patrol, what he referred to as "HP," and the
16 "SO," which is the Sheriff's Office.
17       He said that our responsibilities are -- are
18 different from a State Trooper's responsibility.  He
19 also said that the deputy was -- I believe it was
20 Deputy Brian Sharon.
21       Not Lieutenant Bryan Sharon, but Deputy
22 Brian Sharon.  Somebody different, so those two are
23 not the same, was having problems in answering calls,
24 getting to calls, directions, etc.  And he was asking
25 Deputy Wayne for help and Deputy Wayne would assist

35

1  him.
2        And according to Sergeant Campbell, Deputy
3  Sharon went and talked to Chief Lawrence Bullock, who
4  was the Patrol Captain at the time.  And according to
5  Campbell, he went to Sheriff White and the decision
6  was made to switch everyone around, instead of just
7  taking Deputy Sharon from Wayne; to switch everyone
8  around so it was -- Gerald Ladder(ph) was a deputy.
9  Deputy Brian Sharon and I.  We were all swapped.
10    Q.  So there's some things to unpack from what
11 you said.  So Campbell told you that there's a
12 difference between the Highway Patrol and the SO.
13 What were those differences that he described?
14    A.  He didn't go into detail, not major.  He
15 didn't elaborate on it significantly.  He just said
16 that there was a difference in the Highway Patrol and
17 the Sheriff's Office.
18    Q.  You mentioned that he said the
19 responsibilities are different.  Do you know what
20 responsibilities he was referring to?
21    A.  He just said that the responsibilities are
22 different.
23    Q.  So you also mentioned that when someone
24 asked Wayne for help, it was alleged that Wayne would
25 not help them.  Do you think that ---

36

1     A.  Campbell was -- Campbell was referring to
2  Deputy Brian Sharon asking Wayne for help, and
3  Campbell stated he heard that Wayne would not help
4  him.
5     Q.  Did Campbell explain why that was a problem?
6     A.  Campbell was basically repeating what he was
7  told by other parties at the Sheriff's Office.
8     Q.  In your experience as a law enforcement
9  officer, do you see where there would be a problem if
10 one deputy would refuse to help another?
11    A.  Yes.  That would be a problem, but it would
12 also depend on the circumstances.  So if -- if a
13 deputy needs help in terms of out there in the field,
14 then you must respond.  Okay?  But if that deputy
15 wants to just get out of work and get you to answer
16 their calls and whatnot, that's going to be an issue
17 that has to be addressed.
18    Q.  So what about when you must respond?  And
19 let's say Wayne did not respond or Brian Sharon did
20 not respond in that situation, would that be an issue?
21    A.  Yes, it would be an issue.
22    Q.  Why is that?
23    A.  If somebody is calling for help in the
24 field, you got to provide backup.  If they -- for the
25 facts of this situation, upon information and belief,

37

1  Deputy Brian needed further assistance in terms of
2  answering calls, report writing, getting to calls, the
3  directions, et cetera.
4        And he felt that, as alleged, that he wasn't
5  being provided the level of training that he needed by
6  and from Deputy Wayne, allegedly.
7     Q.  Understood.  Okay.  So did you review any
8  materials in connection with your training or as part
9  of the on-boarding process?
10    A.  When you say, "on-boarding process," are you
11 referring to personnel management or human resources
12 on-boarding process in terms of orientation?
13    Q.  Yes.  Let's start there.
14    A.  Okay.  During county orientation, the
15 policies and procedures for the county, for Vance
16 County itself, were provided.  The policies and
17 procedures for the Vance County Sheriff's Office were
18 not provided.
19    Q.  Were the policies and procedures of the
20 Sheriff's Office ever provided to you?
21    A.  Excuse me.  The employee handbook of the
22 Sheriff's Office was never provided to me as a Deputy
23 Sheriff.
24    Q.  Were you ever told to read some of the
25 provisions in that handbook?

38

1    MS. ROBINSON: Mr. Castro? We've been
2  going now for about an hour. Do you mind taking a
3  recess, scheduling it maybe within the next five
4  minutes?
5    MR. CASTRO: That's fine with me.
6    MS. ROBINSON: Okay.
7    MR. CASTRO: Thank you.
8    THE COURT REPORTER: We are now off the
9  record. The time is 11:05.
10  (Brief recess: 11:05 a.m. to 11:14 a.m.)
11    THE COURT REPORTER: We are now back on
12  the record. The time is 11:14 a.m.
13  Q.  (Mr. Castro) All right. We were discussing
14  the materials you reviewed when you first started
15  working at the Vance County Sheriff's Office. What
16  documents did you review as part of the on-boarding
17  process other than the County Policy Manual?
18    MS. ROBINSON: And let me just object
19  and say, can you just kind of clarify the on-boarding
20  process? Because there was orientation, there was
21  different processes, and so just some clarities.
22  Q.  (Mr. Castro) Yes. I was speaking generally
23  and I would like to walk through each of those
24  processes, so from orientation to when you started
25  on-the-job training. So let's start with orientation?

39

1  A.  The orientation process consisted of
2  then-Director Argretta Johen, she may still be there,
3  provided orientation for county policies -- for
4  advanced county policy, not policy specific to
5  anyone's department or office.
6    She provided -- to answer your question
7  before the objection, there were benefits:
8  documentation, medical, dental -- benefits. There may
9  or may not have been some compensation -- compensation
10  documents that she went over. But that was based on
11  general policy for Vance County as a whole, not
12  specific to Vance County Sheriff's Office.
13  Q.  Okay. And moving on to when you started
14  working and training, initially, were you told to
15  review any sheriff-specific documents?
16  A.  That's the issue. I remember the County HR
17  Director providing county policy. When I was
18  terminated, Argretta Johen submitted evidence to the
19  unemployment commission and she had items asterisked
20  or starred written on a document that was typed.
21    But she handwrote in, upon -- allegedly,
22  upon information and belief. Because when I -- when I
23  reviewed my personnel file with her around the time of
24  my complaints, my personnel file that she had was
25  very, very thin, a few pages.

40

1    Nothing up there was written except for
2  signatures. There were no special notes, so I believe
3  that somebody went in there and wrote something that
4  should not have been written, especially after I've
5  seen my personnel file and it wasn't up there.
6  Q.  When you say they wrote something, what did
7  they write that shouldn't have been in there?
8  A.  I saw numerous things. I believe there was
9  something in there about reviewing -- possibly
10  reviewing Sheriff's Office policies and et cetera.
11    I -- I can't remember everything off top of
12  my head, but there were things in there that was
13  written that was not on those forms when I reviewed
14  personnel file with her.
15    She -- she even admitted that it was barely
16  -- there's barely nothing in here. But yet when they
17  contested my unemployment, all of a sudden they got
18  files, and then there's -- somebody went in there and
19  handwrote stuff on those PDF or Word documents.
20  Q.  What do you base that -- you said, "upon
21  information and belief." What information are you
22  basing this off of?
23  A.  It was not there before, and all of a sudden
24  it's there now.
25  Q.  Who do you think inserted this information?

41

1  A.  Well, she was the one -- initially the one
2  that contested it, so it could have been her. However,
3  I can't speculate, but it was somebody at Vance County
4  that submitted it to the unemployment commission to
5  challenge my benefits.
6  Q.  Do you know if the Sheriff was involved in
7  this process at all?
8  A.  Counselor, I don't know who was involved.
9  Q.  Okay. So going back to what you actually
10  reviewed when you started training and taking what you
11  just said, obviously, what documents did you review
12  when you started training at the Sheriff's Office, if
13  any?
14  A.  I -- I reviewed an incident report,
15  operations report. Campbell taught me how to do --
16  how to serve warrants, how to return the warrants,
17  things of that nature. In terms of a Vance County
18  Sheriff's Office employee handbook or a manual, that
19  was never provided to me.
20  Q.  Okay.
21  A.  And when I say Campbell, I'm talking about
22  my Sergeant Durwood Campbell, my field training officer
23  at the time.
24  Q.  Ignoring the handbook, did Sheriff White
25  speak to you orally about the practices and policies

42

1  of the Sheriff's Office?

2      A. Let me think. Sheriff White did speak to me
3  about some of the practices and procedures of the
4  Sheriff's Office after I was complained on by a
5  citizen who had a fender bender, a minor collision
6  with another citizen.

7      I believe it was a black female and a
8  Hispanic male. And he spoke briefly about that,
9  saying that I had to go back and charge this man, who
10  I felt that he should not have been charged because he
11  didn't do anything.

12      And then he had spoken to me a few months
13  later about traffic enforcement and warrants and
14  checking databases, et cetera. But early on during
15  this whole on-boarding process and field training as
16  you were referring to, but to cover my basis so that
17  there's no perjury, I brought that in. He had not
18  said anything at that point in time. But later on, he
19  did.

20      Q. Do you remember when this fender bender
21  incident occurred approximately?

22      A. I believe it occurred in -- somewhere maybe
23  around November or December. Maybe December of 2017.
24  Somewhere around that time.

25      Q. All right. Were there any other discussions

43

1  with Sheriff White about the policies and practices of
2  the office that you can remember?

3      A. He may have said something else down the
4  road, maybe pertinent to my complaints and him
5  allegedly addressing it. But based on what I remember
6  at this time, I think I covered the basis.

7      Q. Okay. You mentioned that you might have had
8  a discussion about traffic enforcement. Do you
9  remember what the discussion was and when it was had?

10      A. Yes. In reference to the wreck on or about
11  December 2017, Sheriff White received a complaint from
12  a African-American female. Her mother actually filed
13  the verbal complaint and then her daughter started
14  speaking, and Sheriff White asked me in front of them
15  to -- to address it.

16      And I did. And I told them that he should
17  not have been -- that the reason why is -- I told her
18  -- her mother, "The reason why your daughter's down
19  here is because Central was showing a possible warrant
20  in the system and I need to verify."

21      Because she told me that she had never been
22  in trouble and I did not see any signs of deception,
23  but I need to verify who she was and that's why she
24  was at the Sheriff's Office.

25      I didn't cuff her. I told her -- I said,

44

1  "Follow me down here," because she was being truthful.
2  And so she followed me down there. I was able to
3  verify that it wasn't her. Instead, one of her family
4  members and they have similar identification.

5      But her mom was upset that it was her
6  daughter. And I explained to her that I had to verify
7  the warrant and et cetera, and it wasn't her. So her
8  mom wanted to know, "Well, why is my daughter down
9  here instead of the guy that hit her?"

10      And I told her, I said, "Well, the reason's
11  as I've just stated. That's why your daughter's
12  here." "Well -- well, why isn't he here?" I said,
13  "Well, ma'am." I said, you know, "I didn't feel as if
14  he did anything wrong." I said, "And there's no
15  damage to the car."

16      And she wanted a report and I said, "We can
17  get a report." And so she -- and the mother wanted
18  the young lady to be -- the young man to be charged,
19  and Sheriff White told me to go back and charge him.

20      And I said, "Well, Sheriff, I don't have a
21  ticket book." And he said, "You don't have a ticket
22  book?" I said, "No." He said, "All of them degrees
23  you got?" Scratching his head. I said, "No, Sheriff.
24  I don't have a ticket book." "White, I thought I gave
25  you a ticket book." I said, "No, Sheriff. You didn't

45

1  give me a ticket book. I don't have one."

2      And so the Sheriff told me to charge him on
3  Criminal Summons since I don't have a ticket book.
4  And I asked the Sheriff, "What do you want me to
5  charge him with?" And the Sheriff started scratching
6  his head, and he told me he would speak to me in his
7  office in a few so we can get all the stuff sorted
8  out.

9      And we did. And Sheriff White said, "Well,
10  White." He said, "Where the Supervisor?" I said,
11  "My Supervisor not here today." He said, "Well, White,
12  you the senior deputy. All these degrees and
13  certifications you got." And he said, "I thought I
14  gave you a ticket book." And I said, "No, Sheriff. I
15  -- you didn't."

16      And he told me to charge them and I said,
17  "Well, Sheriff, you know, it's a trash site." I said,
18  "It could be construed as -- it may be considered
19  private property." I said, "And I don't think the
20  charges are going to go anywhere because there's no
21  damage to the car."

22      And so the Sheriff said, "Well, just -- just
23  charge him because these people can go to the
24  hospital, run up insurance, et cetera. You don't know
25  what may happen." I said, "Yes, Sheriff." So I went

46

1 and I put it on Criminal Sermons -- Criminal Summons.
2        And the Magistrate Judge, she did not like
3 what she saw. And I said, "Ma'am," I said, "This is
4 coming directly from the Sheriff. He wants this man
5 charged. Somebody came in here -- complaining, so
6 that's why I'm here for you to find P.C.
7        She signed off on it. I served the dude
8 with a Criminal Summons and that was it. But the
9 sheriff told me to do Traffic Enforcement, and then
10 another time that he told me to do Traffic Enforcement
11 was in his office.
12        And he said something to the effect of, "We
13 do stock cars." But he wanted us to be focused on
14 as well, on -- and then some more focus on as well, in
15 checking bills -- on businesses and buildings, serving
16 warrants, serving papers, et cetera. But traffic
17 enforcement was and it -- well, was a part of my job
18 when I was there.
19    Q. So going back to the -- you said it was an
20 African-American female that you were speaking with.
21 Was there a possible warrant in the system at that
22 time?
23    A. Yes.
24    Q. Okay. And were you issued a ticket book
25 after this occurred?

47

1    A. No.
2    Q. Did you ask for a ticket book?
3    A. I never asked him for a ticket book. And
4 the sheriff admitted that he knew I didn't ask him for
5 a ticket book, and later said, despite after saying
6 that he thought he gave me a ticket book, he said, "If
7 I wanted you to have a ticket book, you would have
8 one." So which one is it...
9    Q. But you didn't have one?
10    A. No, I did not.
11    Q. Okay. Do you know why you were not issued a
12 ticket book?
13    A. The Sheriff stated to me he thought he'd
14 issued me a tissue -- a ticket book. He later said if
15 he wanted me to have a ticket book, then he would give
16 me one. So I guess it was at the discretion of the
17 Sheriff.
18    Q. So in his discretion, he did not issue you a
19 ticket book thereafter?
20    A. No.
21    Q. I wanted to talk about the policies and
22 procedures that others may have talked to you about.
23 So you mentioned that you received training with
24 Alexander, Sergeant Alexander. Did he discuss any
25 policies and procedures with you?

48

1    A. Briefly, he said a few things to the effect
2 of, when we answer calls on his shift, he let the guys
3 do, and the one girl he has, whatever they want to do
4 as long as they answer calls.
5        He said a few of them had been there a
6 while. They're waiting on to go through BLET. He
7 said that he expects for his guys to work because
8 he'll work. Call come out, he'll respond to it.
9        He did say that absent of a lot of calls,
10 it's pretty much laid back. You got free will to do
11 whatever as long as you don't go out here and do
12 anything that's too crazy or stupid, left to center.
13        He did say that he liked to pull over cars,
14 and we pulled over several cars while I was riding
15 with him my first week, as well as his uncertified
16 deputies were pulling over cars.
17        And I know they pulled them over because I
18 could hear them on the radio, and then several times,
19 we backed them up on traffic stops. In fact, Sergeant
20 Alexander said, "You might come to my shift. I don't
21 know." He said, "I need a certified officer." And he
22 said, "Currently, the only two on shift that's
23 certified is you and I."
24    Q. And when you say they stopped cars, do you
25 know for what types of violations they would stop the

49

1 cars for?
2    A. Chapter 20 Motor -- Motor Vehicle
3 Violations. Various ones.
4    Q. Can you name any specifically?
5    A. In terms of the specific names, you will
6 have to get the reports from the Vance County
7 Sheriff's Office. Some of this stuff is three years
8 old, if not longer.
9    Q. I understand that. So when it came to
10 traffic enforcement, did Sergeant Alexander discuss
11 the difference between a minor or a major violation?
12    A. No, he did not.
13    Q. Ignoring the traffic enforcement issue, were
14 there any other policies and practices discussed that
15 you haven't mentioned by Sergeant Alexander?
16    A. Not to my knowledge. I believe I recalled
17 everything I could.
18    Q. Understood. So your Field Training Officer
19 Campbell. Can you tell me what types of policies and
20 practices he talked to you about during your training?
21    A. He talked about serving warrants, making
22 sure that we check our buildings, being to work on
23 time, not calling out habitually. He talked about
24 just getting the job done and everybody going home
25 safe.

50

1    Campbell also -- he said, "I'm sort of a
2 traffic guru." He said, "I work not just here, but
3 also with a police department," whichever one it was,
4 somewhere in Warren County. And he said, "I like to
5 serve warrants too."
6    And in fact, Campbell and I pulled over
7 multiple cars during my two-and-a-half to three weeks
8 with him. In fact, him and I had a chase, a vehicle
9 chase, through the county and the city while I was
10 still in field training with him. So traffic
11 enforcement was definitely instilled in -- by him, I
12 stated and we acted on it.
13    Q.   And you said you pulled over multiple cars.
14 Can you give me examples of why you pulled them over
15 or why he decided that they would be pulled over?
16    A.   Once more, you would have to get the reports
17 from the Vance County Sheriff's Office. I will say
18 there was less than a handful of times when we pulled
19 cars over where he told me not to say anything on the
20 radio or -- or he wouldn't call it in.
21    He would just handle it without dispatch
22 knowing. He never said why, other than he said, "We
23 don't have to call it in." And he would approach the
24 car and I would be there. I remember one time on
25 39 -- we were headed south, but it was 39 North.

51

1    But we was in the southbound lane and he
2 told me to pull a car over who was following too
3 closely. They was going -- they were going slow, but
4 -- at one point in time, but then they sped up to
5 about the speed limit and they were following closely,
6 and so he told me to pull them over.
7    And he told me to stay in the car and he
8 went and handled it. And when he came back, he did
9 provide what was going on with the motorist, but I am
10 unable to recall what he said.
11    Q.   Do you know if he had a traffic or a
12 citation book?
13    A.   I'd never seen his traffic book, but he was
14 a supervisor, and so it is fair to say that he had
15 one, most likely.
16    Q.   Do you know if Sergeant Alexander had one?
17    A.   He was a supervisor, so he had one, most
18 likely. And I'm saying "most likely" based on because
19 Sheriff White had told me face-to-face before, well
20 after these incidents, when he said, "You don't have
21 -- he said, "I know you don't have a ticket book. I
22 wanted you to have one, you most likely have one."
23    He said, "Well, the supervisors got one."
24 So sergeants, lieutenants, captains, chief deputy or
25 major and the sheriff, they got ticket books. They

52

1 had them. So to answer your question, all the
2 sergeants had one.
3    Q.   So when you were riding with Sergeant
4 Alexander, were -- you remember pulling people over
5 for speeding?
6    A.   There were multiple traffic stops that
7 Sergeant Alexander did. If you want the specific
8 charges, the reason of suspicion or the probable cause
9 for the stop and possible arrest, then you would have
10 to rely on the reports from the Sheriff's Office.
11 It's been too long.
12    Q.   Based on your recollection, do you remember
13 stopping anyone for speeding with Campbell or
14 Alexander?
15    A.   Like I said, it's -- the -- it will be based
16 on the reports at the Sheriff's Office in terms of
17 specific recollection of what somebody was stopped
18 for, whether it was speeding or another Chapter 20
19 violation. I'm unable to recall the specifications,
20 but there were multiple traffic stops that were done,
21 not just with Alexander but also with Campbell.
22    Q.   Okay. So moving on, did the Sheriff's
23 Office assign people to different squads or teams?
24    A.   Yes.
25    Q.   What squad were you on when you initially

53

1 started?
2    A.   I rode with Sergeant Alexander for one week.
3 The following week, I was assigned to Sergeant
4 Campbell, Campbell's squad. The squads were A, B,
5 and D. Whichever one Sergeant Alexander was on and
6 whichever one Campbell was on.
7    And later after Campbell, then in field
8 training with Deputy Wayne, I was under Sergeant
9 Donald Roberson. Whatever squad number at that time
10 at 2017, I identified their squad or team, that's the
11 one I was on.
12    Q.   Okay. Who was on -- what other deputies
13 were on your squad with Alexander? Do you remember?
14    A.   We had Deputy Terry Torrance, who was
15 uncertified at the time. We had Deputy Lauren. I
16 cannot think of her last name, but she was also
17 uncertified. And you had Deputy Cody Burns, also
18 uncertified, along with -- along with Sergeant
19 Alexander.
20    I will say for the record, those are his
21 shift members at the time, but during the time that I
22 was a law -- that I was hired, it was around the
23 summer. So school was either in the process of being
24 let out or already let out, and so there were SR roles
25 that were split up for each shift. I am unable to

54
1  recall which SR role was assigned, but it was -- it
2  did happen.
3      Q.  And do you remember the same for Campbell's
4  squad, who else was on there?
5      A.  Some of them I do.  It was Campbell,
6  Sergeant Campbell, Deputy Adam Height, certified
7  Deputy Andre Pool, certified.  And if there were any
8  other people on his shift, it's not coming to my
9  memory at this time.
10     Q.  Okay.  And finally, for -- is it Roberson?
11     A.  Sergeant Donald Roberson.  He goes by D Ray
12  (phonetic).  Yes.  It was Sergeant Roberson, Deputy
13  Wayne.  There was another deputy.  It's on the top
14  of -- it's on the tip of my tongue.  It might come to
15  me.
16         He was referred to as Sergeant Roberson's
17  Senior Deputy, an African-American male.  I can't
18  think of his name, and it was a -- it was Deputy Eric
19  Sheftal.  Eric Sheftal.
20     Q.  Do you know how to spell his last name?
21     A.  S-H-E-F-T-A-L, I believe.
22     Q.  Okay.  Did you know any of those people that
23  you just mentioned before you started working at the
24  Vance County Sheriff's Office?
25     A.  I knew of Andre Pool.

55
1      Q.  Is that the only person?
2      A.  Yes.
3      Q.  How did you know of him?
4      A.  We went through basic law enforcement
5  training together at College of the Albemarle in
6  Elizabeth City, North Carolina back in August, 2015 to
7  December, 2015.
8      Q.  Did you talk to him during that time, or you
9  just went to the same classes?
10     A.  That's the first time I met him, when we
11  went through the police academy, which is BLET.
12     Q.  Would you consider yourselves friends?  Were
13  you talking, were you hanging out outside of ---
14     A.  I guess we were co-workers -- I guess we
15  were co-workers or classmates.  We both were in the
16  law enforcement academy.
17     Q.  Did you have conversations outside of the
18  academy?
19     A.  Are you talking about during the academy?
20     Q.  During that time, would you hang out or talk
21  to him outside of that?
22     A.  No.  We wouldn't hang out at all outside of
23  the academy.  There may have been times where the
24  class went to lunch or something and him and I went
25  there along with others.  But in terms of having a

56
1  personal friendship or relationship, no.
2      Q.  Okay.  Did you know him after BLET or stay
3  in contact?
4      A.  No.  I did not stay in contact with him
5  after B -- BLET.  It was only until he saw me right
6  before I got hired at the Sheriff's Office.  He
7  recognized me and I recognized him.  So there was no
8  contact after BLET up until getting hired at the
9  Sheriff's Office.
10     Q.  So once you got hired, would you two hang
11  out outside of your work hours?
12     A.  No, we did not hang out.  I'm not a person
13  that hangs out.  Define "hang out."
14     Q.  Spend time with, lunch, dinner.  Spend time
15  at each other's homes, et cetera.
16     A.  We had lunch sometimes at the Sheriff's
17  Office together, as well as I had lunch with a few
18  other deputies, I mean -- and supervisors a few times.
19  But in terms of hang out, in terms of, like, going to
20  a club or bar, lounge or shopping, no.
21         In terms of spending time at one another's
22  house, I did not spend time at his house per se in
23  terms of hanging out there, but I definitely knew
24  where he stayed at.  But our interactions off-duty,
25  face-to-face was limited.

57
1      Q.  Did you send text messages to each other
2  off-duty?
3      A.  There were messages exchanged
4  back-and-forth: "Hello." "How are you?" "What's up
5  man?" Things of that nature.
6      Q.  How about phone calls?
7      A.  There were phone calls, as well as text
8  messages and phone calls with a few other deputies
9  that -- when I was off duty.
10     Q.  After your termination, did you remain in
11  contact with Mr. Poole?
12     A.  Yes.
13     Q.  Do you -- not to use the terminology, "hang
14  out," but spend time with one another, lunch, dinner?
15     A.  Well, no.  Well, where I live.  I live in --
16  I live in Charlotte.  He stays in Vance County.
17  That's a three-hour-plus difference, so no.
18     Q.  How about text or talk?
19     A.  We text and sometimes we talk.
20     Q.  Did you talk to him about your termination
21  or your employment at Vance County Sheriff's Office?
22     A.  Yes.  He was the one that told me the reason
23  why I was terminated after Captain Weldon Bullock
24  stated Sheriff Peter White told him not to talk about
25  it.  And so maybe a week later, then Deputy Poole

**58**

1  found out why I was terminated and let me know.
2      Q.  What did he tell you?
3      A.  He let me know that I was terminated for
4  excessive force.  I asked him where did he get the
5  information from, and he stated that Captain Lloyd --
6  well, Captain Watkins, but Lloyd Q. Watkins is the
7  name, told him.
8          And he also stated that Captain Watkins
9  said, "The Sheriff wanted him gone."  He don't agree
10  with the decision to terminate me, "but the Sheriff
11  didn't want his services anymore."  And so Poole told
12  me.
13          Fast-forward, Algretta challenged my
14  unemployment benefits, and there were some things,
15  some files that sent over that were sent to me.
16  And the allegations of excessive force, what was
17  written on paper, it was true.
18      Q.  So Poole told you about the excessive force.
19  Did he mention any discrimination at play?
20      A.  No.  He simply told me -- he didn't mention
21  discrimination by word, but he simply told me that
22  Captain Watkins told him that I was terminated for
23  excessive force.  He told me that Captain Watkins told
24  him that he did not agree with the decision, said that
25  "The Sheriff wanted him gone."

**59**

1          And I asked him, I said, "Well, what are you
2  talking about, wanting me gone?"  "You know, because
3  you went to HR and the Sheriff didn't like that."  And
4  he said, "All of us know what took place."  Then, he
5  said, "I just wanted to tell you that you would --
6  that you were terminated for excessive force."
7      Q.  Did he explain why the Sheriff wanted you
8  gone?  Was it just because you went to HR?
9      A.  That's what he said.  There may have been
10  other things that may have been mentioned that he
11  didn't tell me, but that most certainly, what I just
12  told you, was an accurate account of what was said.
13      Q.  Thank you.
14      A.  But for Watkins telling him that I was
15  terminated for excessive force, I would not know that
16  I was terminated for excessive force because Captain
17  Bullock did not talk about it it to me.  Nobody did.
18          I was simply told on the day of my dismissal
19  that, "Your service is no longer needed," and the
20  Sheriff said not to talk about it.  They didn't give
21  me a reason, and they gave me a ride home in my patrol
22  car.
23      Q.  We'll discuss your termination more in
24  detail.  I want to talk more about your transfer.  So
25  you were transferred to another squad in November of

**60**

1  2017.  Is that correct, does that sound about right?
2      A.  Yeah.  It sounds approximately -- yes.
3      Q.  What led up to this transfer, do you know?
4      A.  Yes.  I was told by Sergeant Campbell, as he
5  was in the process of becoming Lieutenant Campbell
6  around that time, that I was being transferred because
7  there are some people who are getting ready to go
8  through BLET, Basic Law Enforcement Training.  And
9  they were going to do this swap of deputies in the
10  next couple of weeks.
11      Q.  Do you know what was the purpose of the
12  swap?
13      A.  Because deputies were getting ready to go to
14  BLET, is what Campbell told me.
15      Q.  Did you have any issues with being
16  transferred?
17      A.  Based on what he had told me, I had no
18  issues based on what he told me.  But I later had
19  issues based on when I found out the truth.
20      Q.  Can you tell me how that happened?
21      A.  How what happened?
22      Q.  How you allegedly found out the truth?
23      A.  I did find out the truth, and the truth is,
24  I was transferred from Sergeant Roberson's shift to
25  Sergeant Alexander's shift.

**61**

1          Sergeant Alexander told me directly that
2  Campbell came to him and said that, "We got to
3  transfer -- we got to separate Wayne, Deputy Wayne,
4  and White.  I don't know what's going on, but
5  something going on."
6          "They're not backing each other up on calls.
7  They're not helping one another.  They're not
8  communicating, not talking to each other, et cetera.
9  Have you heard anything about what's going on between
10  them?"
11          And Sergeant Alexander told me that he
12  didn't know that Wayne and I evidently had a beef, or
13  something was in the air.  And he said that Campbell
14  gave him an opportunity to accept my transfer or not.
15          He said, "I could have denied you the
16  opportunity to come on -- come over here, but I
17  didn't.  I said, you know, 'White rode with me for a
18  few days his first week, a few nights.'  And he was
19  like, 'And I had no problem with him, and plus I need
20  certified officers.'"
21          And so he was like, "The opportunity -- the
22  door opened up," and he told me that he didn't have a
23  problem with me.  And you know, he heard that I would
24  when I was on D. Ray's shift.  He said, "Based on
25  everything that I heard from that side, that you're a

62

1 good deputy. You know how to do your job." And so I
2 said, "Plus, with you being certified," he said, "I
3 definitely need that."
4        Now, Deputy Torrance Terrence, Terry --
5 excuse me, I said that wrong. Deputy Terry,
6 T-E-R-R-Y, Torrance provided me information
7 face-to-face that Lieutenant Campbell called him in
8 the office, wanting to know if he knew anything about
9 Wayne and I not getting along, had he heard anything.
10       And Terry, Deputy Torrance, told him no.
11 And he asked Campbell what was going on, Lieutenant
12 Campbell. And Campbell said, "Something's just going
13 on. They are not acting as if they're working
14 together. So you know, I said that they had to be
15 separated. They had to be split up." And Torrance
16 told me that Campbell told him to keep his eyes open.
17    Q. Keep his eyes open for what?
18    A. Torrance said that it was like, "When he
19 told me that, 'keep my eyes open,' like be on the
20 lookout or to watch out." And he was like, Torrance
21 was like, "I'm not fitting to be no one's snitch." He
22 was like, "White, I don't have no problems with you.
23 I don't have no problems with Wayne."
24       He was like, "You just got over here. They
25 said you work. Marin accepted you over here. Like he

63

1 said, 'You don't have no -- you don't have no
2 certified deputy, so you definitely need it.'" But
3 all what Sergeant Alexander and Sergeant -- Sergeant
4 Alexander and Deputy Terry told me, it was all put
5 back on Campbell as him being the originator.
6        Furthermore, to get specific into this
7 question, Sergeant Roberson in late December of 2017
8 filled in for Sergeant Alexander, and Sergeant
9 Roberson and I had a conversation. I asked him, I
10 said, "What is the issue with my transfer?" And he
11 said, "Mr. White, I -- all I know is Campbell came to
12 me" -- excuse me, the Chief Deputy.
13       "The Chief Deputy came to me and asked,
14 'Where is Mr. White? Where is S33?'" And he said --
15 he said, "I haven't heard him on the radio lately."
16 And he said, "Well, he was transferred." "Transferred
17 to where?" according to the Chief Deputy. "He was
18 transferred to Marin's shift, Sergeant Alexander."
19       And he said that the Chief Deputy said,
20 "What?" He was like, "Who did that?" He said, "It
21 came from Durwood, Lieutenant Campbell. And Captain
22 Watkins knows something about it too, Captain
23 Watkins."
24       And according to Sergeant Roberson, the
25 Chief Deputy said, "Oh, no. I did not approve Mr.

64

1 White's transfer." And he said, "The Sheriff didn't
2 approve it either because the Sheriff would have told
3 me."
4        And he said that, "I'm going to let" -- he
5 said, "I'm going to talk to the Sheriff about this and
6 I'm going to let Campbell and Watkins know not to mess
7 anymore shift transfer unless I give the go ahead or
8 the Sheriff give the go ahead."
9    Q. Okay ---
10   A. And -- go ahead.
11   Q. Let me -- just so we don't get too far in
12 the weeds, who was the chief deputy that you're
13 describing?
14   A. The former Captain of Patrol, Lawrence D.
15 Bullock.
16   Q. Okay. And you were informed that the reason
17 that you were transferred was because of your
18 relationship or alleged problems with Wayne. Is that
19 right?
20   A. I was told by Sergeant Campbell that -- not
21 Sergeant -- I was told by Sergeant Campbell that the
22 purpose of my transfer was for people going through
23 BLET, deputies.
24       But I was later told by Sergeant Alexander,
25 Sergeant Roberson and -- and Deputy Torrance that

65

1 Campbell was the one that was behind it. And because
2 you stopped me from getting too further in the weeds,
3 I wasn't able to continue with what happened, the
4 exchange between Sergeant Robinson and I.
5        But that's essentially what I was told, that
6 Campbell was the one that was behind it. And so the
7 shift transfer was deceptive. It was based on
8 falsiticity (sic).
9    Q. Was race or gender or anything like that
10 ever mentioned in these discussions?
11   A. Counselor, the bottom line is, these
12 complaints ---
13   Q. It's a yes or no question.
14   A. I'm sorry?
15   Q. It's a yes or no question.
16   A. Repeat the question, sir.
17   Q. Was race, gender or sexual orientation
18 mentioned in all of this regarding your transfer in
19 any of it?
20   A. No.
21   Q. Okay. You can continue with what you were
22 saying. Sorry.
23   A. You may continue with your question.
24   Q. Thank you. We will discuss more about the
25 Wayne versus White relationship and I'll let you get

66

1 into that more. I assure you of that. So did you
2 have issues with Wayne?
3    A. No. I had no issues with Wayne. In fact,
4 that's why I found the shift transfer deceptive. And
5 furthermore, when him and I met together with
6 supervision, he admitted that he didn't have any
7 issues with me, and I also admitted.
8    In fact, Sergeant Roberson, upon me asking
9 if he had a problem with me, if he had any issues with
10 my personal conduct, if he had any issues with my
11 performance, he said no. He said, "You work." He
12 said, "You're a good -- good deputy." He said, "You
13 don't have any write-ups."
14    I asked Sergeant Marin Alexander the same
15 thing and he said no. He said, "We good." He said,
16 "There was a -- a complaint by someone who worked at
17 911, but according" -- this was information to me.
18 According to her supervisor, the assistant director at
19 the time, he looked into it. He pulled the records
20 and said that he can't see what I did wrong and sent a
21 letter over there.
22    And I was later told by Marin that I was
23 good to go. He was like, "You come to work. You do
24 your job. We don't have a problem with you." And so
25 I asked Captain Watkins, I said, "If they don't have a

67

1 problem, including Wayne," I said, "Then who is the
2 problem?"
3    I said, "Who's the originator of this
4 stuff?" And Captain Watkins, he didn't say anything.
5 He was looking at all of us. And I said, "Well, it
6 had to get -- it had to come from somebody." And I
7 turned over to Campbell. I said, "Well, didn't it
8 come from you?"
9    "Well, I was the one that saw what was going
10 on and I took it to Captain Watkins and said that it
11 had to change, switch -- switch you all up." And I
12 said, "And you didn't think about coming to me before
13 all this stuff got to here so you could know that
14 there's nothing going on?"
15    "Well, you didn't need to know." He said,
16 "No. You didn't need to know." And so I contend I
17 told him, I said, "I contend that I do need to know
18 because it's an alleged personnel issue of deputies
19 not getting along. And as it comes out, we don't have
20 a problem."
21    And so Captain Watkins said, "Well, in all
22 probability, that you will probably be going back to
23 D. Ray's shift." He said, "I might will talk to the
24 Sheriff myself," and that was that.
25    But prior to that, the Sheriff told me

68

1 himself that he didn't approve it and he told Watkins
2 to put me back a few weeks ago, but that it had not
3 happened. And then afterwards, he said that he didn't
4 approve it and he told Watkins to put me back when I
5 was transferred again from Sergeant Marin's shift to
6 Sergeant Chris Welborn's shift.
7    So whatever took place, all those around,
8 the deception of the shift, other issues that Campbell
9 --- including what Campbell hyped up and made it seem
10 one way, and it was another way.
11    Q. So was -- when you say, "deception," was
12 Sheriff White involved in this deceptive transfer, as
13 you call it?
14    A. Not to my knowledge. He was not. But he's
15 ultimately responsible for what takes place at that
16 Sheriff's Office.
17    Q. Okay. Was Lawrence D. Bullock involved in
18 this?
19    A. Not to my knowledge.
20    Q. What about Weldon Wallace Bullock?
21    A. Not to my knowledge.
22    Q. Okay. And you mentioned a complaint by 911
23 that was investigated. Can you go into detail about
24 that? Who made the ---
25    A. I cannot. As far as the issue, evidently,

69

1 according to Sergeant Alexander -- and he would be the
2 one that you need to talk to and pull the files if
3 necessary. A 911 dispatcher complained about me
4 handling a call or something, and he said that they
5 were going to pull the -- the tapes.
6    The Assistant Director was going to pull the
7 tape and he was going to review it and let us know
8 what he found. And he did so later on that week and
9 sent a letter -- excuse me? I thought I heard
10 something.
11    He sent a letter -- it could have been some
12 noise. He sent a letter saying that he was unable to
13 see what I did wrong, and I was told by Sergeant
14 Alexander that I was cleared. I was in -- I was good
15 to go.
16    Q. Do you know who the 911 dispatcher was?
17    A. I believe he said that it was someone by the
18 name of Veronica, but I may be wrong. But I believe
19 that's what he said, who he said complained.
20    Q. Do you know of a Makin (ph) that may be a
21 911 dispatcher?
22    A. Yes.
23    Q. Who was that?
24    A. She was -- I believe she was working that
25 night as well, so she may have been -- she may have

70

1  complained as well.  Or it was something -- I believe
2  Veronica may have been the -- the shift supervisor and
3  Makin was the dispatcher.  But somebody from there
4  complained, but I was cleared.
5      Q.  Do you know if Makin -- do you know what
6  Makin's relationship was to Deputy Wayne?
7      A.  Well, they -- well, allegedly, they had a
8  romantic relationship.
9      Q.  To your knowledge, did that relationship
10  have anything to do with the complaint against you?
11      A.  For -- from 911?
12      Q.  Yes.
13      A.  To my knowledge, no.
14      Q.  Okay.  All right.  So ---
15          MS. ROBINSON:  Brian, can we take a
16  bathroom break right quickly?
17          MR. CASTRO:  Yes.  I was going to
18  suggest that.  Thank you.
19          MS. ROBINSON:  Okay.  Thank you.
20          THE COURT REPORTER:  We are off the
21  record.  The time is 12:06.
22  (Brief recess: 12:06 p.m. to 12:12 p.m.)
23          THE COURT REPORTER:  We are back on the
24  record.  The time is 12:12 p.m.
25          MR. CASTRO:  All right.  Can you hear

71

1  all right?
2          THE WITNESS:  Yes, can you?
3          MR. CASTRO:  Okay.
4      Q.  (Mr. Castro)  We're going to explore this
5  transfer in more detail.  So you mentioned that Makin
6  (phonetic) and possibly another person was at 911
7  dispatch when the complaint was made.  Is that right?
8      A.  Yes.
9      Q.  Do you ---
10          MS. ROBINSON:  Objection.  Let me
11  understand this.  The transfer had nothing to do with
12  the 911 call.  I don't think that has been what was
13  said as of yet or any testimony in evidence.  I think
14  what he said --
15          MR. CASTRO:  Wait ---
16          MS. ROBINSON:   --- about the ---
17          MR. CASTRO:  You can't make a speaking
18  objection or testify.  So if you object, you object.
19  All right.
20          MS. ROBINSON:  It's misquoting the
21  witness.
22          MR. CASTRO:  I'm not misquoting him.
23  I'm asking him about the transfer, and I'm asking
24  about the 911 call.
25          MS. ROBINSON:  No, no.  But you also

72

1  said that it was related to a 911 call and Veronica
2  and Makin.  And I don't think that is what he
3  testified to.
4          MR. CASTRO:  Okay.
5      Q.  (Mr. Castro)  Prior to your transfer, you
6  mentioned that there was a complaint by a 911
7  dispatcher.  Is that correct?
8      A.  Yes.  There was a complaint -- no.  The --
9  the complaint with the 911 dispatch happened after I
10  was transferred on Sergeant Alexander's shift.
11      Q.  So before you were transferred in November
12  of 2017, did you spend time with Wayne outside of
13  normal work hours?
14      A.  There were times where him and I would talk
15  on the phone or -- in terms of, like -- when you say,
16  "hang out," what are you -- what are you asking?
17      Q.  I'm asking whether you ever spent time or
18  were physically present at his home or he was
19  physically present at your home outside of normal work
20  hours?
21      A.  He had came by a few times.  Very, very
22  limited.
23      Q.  Have you ever visited him?
24      A.  I had went over there a few times.  Very
25  limited.

73

1      Q.  Could you give an estimate of how many
2  times?
3      A.  Maybe less than a handful, approximately.
4      Q.  Was there ever a time where you answered
5  Deputy Wayne's personal cell phone for him?
6      A.  Not that I remember.
7      Q.  Do you ever remember answering his phone or
8  a phone when Makin was calling him?
9      A.  No.
10      Q.  Do you remember having any conversations
11  with Makin Persall (ph) or Pearsall?
12      A.  She had came -- there was one day him and I
13  were working -- or well, actually, a few days him and
14  I were working and we had stopped at -- it was this --
15  it was this ice cream place in Henderson.  It was near
16  like Parham Road or something, P-A-R-H-A-M.
17          And a few times -- well, nearly just about
18  every time.  But I remembered directly a few times, we
19  will get there and she will pop up.  Or sometimes when
20  we would get there and when I'm getting out of the car
21  and he getting out of his, it was like he had somebody
22  coming.
23          It would be about five minutes.  Sometimes
24  we will wait, sometimes we will place our order if the
25  line was already long, and each time it was her.

74

1    Q.  Did you two get along?  Did you get into any
2  disputes?
3    **A.  No.  We had never had any disputes.  I never**
4  **had any problems with her.**
5    Q.  Do you remember ever talking to her or
6  joking with her about your relationship with Mr.
7  Wayne?
8    **A.  No.  Him and I were co-workers.  There was a**
9  **professional relationship.**
10    Q.  Do you remember ever making sexual jokes to
11  Makin at any time?
12    **A.  No.  Absolutely not.**
13    Q.  Just for the record, I'm not implying
14  anything about any conversations.  I'm just asking
15  based on my review of records.  So after you were
16  transferred, did you and Wayne get into any disputes
17  or arguments?
18    **A.  No.  There were no disputes or arguments.**
19  **Not to my knowledge.**
20        MR. CASTRO:  Okay.  Can we go off the
21  record?
22        THE COURT REPORTER:  We're off the
23  record.  The time is 12:17 p.m.
24  (Lunch recess:  12:17 p.m. to 1:21 p.m.)
25        THE COURT REPORTER:  We are back on

75

1  record.  The time is 1:21 p.m.
2    Q.  (Mr. Castro)  All right.  Mr. White, a few
3  more questions about the 2017 transfer.  Is it correct
4  that you were transferred to Sergeant Alexander's
5  squad?
6    **A.  Yes.**
7    Q.  What was his reaction to you joining his
8  squad?
9    **A.  He seemed to welcome me, but he also told me**
10  **why -- the real reasons why I had been transferred.**
11    Q.  When you say he welcomed it, how did he do
12  that?
13    **A.  He said that he was glad to have me.  He**
14  **wanted somebody else certified because he didn't have**
15  **anybody.**
16    Q.  Had you worked well together in the past?
17    **A.  I only had worked with him for -- when I**
18  **first started riding with him.  So we had never had**
19  **any issues, yes.  Based on the limited time we were**
20  **together.**
21    Q.  Did you work well with the other members of
22  your new squad under Sergeant Alexander?
23    **A.  Yes.**
24    Q.  Did you have any personal issues with them?
25    **A.  There was an issue.  There was a minor, very**

76

1  **minor issue when I was on his shift, Sergeant Marin**
2  **Alexander's shift, involving Deputy Torrance in terms**
3  **of hospital relief.  And -- but other than that minor**
4  **issue, there was no big issues to where we couldn't**
5  **work together.**
6    Q.  Could you describe in detail what happened
7  regarding hospital relief?
8    **A.  There was a situation.  It was -- I haven't**
9  **touched to the effects of it and it's been a long time**
10  **ago.  There was a situation involving when we were**
11  **being rotated in and out of the hospital.**
12        **Times were getting distorted.  People**
13  **sitting longer than what they should have been, people**
14  **out longer on the road than what they should have**
15  **been -- pursuant to the normal relief, an hour and**
16  **then sometimes two hours.**
17        **So there was an issue with the hospital**
18  **relief and Sergeant Alexander didn't know all the**
19  **facts, and he later admitted his -- he showed remorse**
20  **forward and -- and Torrance also was -- you know,**
21  **showed remorse.  But at the same time, it was a minor**
22  **issue and we were able to move forward.**
23        **There was no disciplinary action.  There was**
24  **no back and forth.  It was just something that came up**
25  **and not something that I initiated, something that**

77

1  **Deputy Torrance Terry initiated to Sergeant Alexander**
2  **on me.**
3    Q.  How did he initiate that, do you know?
4    **A.  He called him and talked to him.**
5    Q.  And did you all just talk it out after that,
6  or how was that ---
7    **A.  I believe we talked individually and then we**
8  **talked briefly, collectively, real brief.  But like I**
9  **said, it's been a long time ago.**
10    Q.  Okay.  So did you lose any of your
11  responsibilities when you transferred to Sergeant
12  Alexander's shift?  Did they change?
13    **A.  No, it stayed the same.  I didn't lose**
14  **anything.**
15    Q.  Did your duties change?
16    **A.  My duties as a law enforcement officer**
17  **changed -- did not change, excuse me, based on a**
18  **transfer.  Did not change.**
19    Q.  Did it have any effect on your pay or
20  benefits?
21    **A.  No.**
22    Q.  Did you consider it to be a demotion?
23    **A.  No.**
24    Q.  Did you consider it to be a downgrade in any
25  way?

78

1    A.  No.
2    Q.  Okay.  So moving on to another topic, were
3 you aware that Sheriff White was previously an NC
4 Highway Patrol officer?
5    **A.  I was aware that he was a major, retired**
6 **major.  Former state trooper, retired state trooper.**
7    Q.  Were you aware of how long he was a state
8 trooper for?
9    **A.  I believe somewhere between 20 to 25 years,**
10 **if not longer.**
11    Q.  Do you agree that based on those 25 years,
12 he would be familiar with traffic enforcement?
13    **A.  Yes.  He would be very familiar with it.**
14    Q.  Do you agree that the Sheriff has the
15 authority to make decisions on what his deputies will
16 focus on during their shifts?
17    **A.  Now, he has the power to make whatever**
18 **decisions for that matter, but he also -- I mean,**
19 **there's laws out there that tell us -- provide us what**
20 **to do as well.  So it's just not discretionary**
21 **authority.**
22    Q.  And when you say there's laws out there,
23 what are you referring to exactly?
24    **A.  Enforcement of traffic laws that appears to**
25 **be the issue or something -- well, one of the issues**

79

1 in which I was told to do traffic.
2    Q.  So do those traffic laws change the
3 Sheriff's authority when it comes to telling you what
4 to do?
5    **A.  No.  I'm not saying that it changed his**
6 **authority.  I'm just saying that there are statutory**
7 **obligations as law enforcement officers at that time**
8 **that we're required to do.**
9    Q.  Do those statutory obligations, can they go
10 against what the Sheriff tells you to do?  Can they
11 allow you to disobey the Sheriff?
12    **A.  Well, I'm not sure if there's any provision**
13 **in that statute that specifies that.**
14    Q.  So if the Sheriff said, for example, "Don't
15 enforce traffic laws," but there are statutory
16 obligations to do so, would it be appropriate to
17 enforce traffic laws?
18    **A.  If he says not to do it, then we're going to**
19 **be expected not to do it.**
20    Q.  Okay.  Did you focus on the issue which you
21 pointed out, which is traffic enforcement at previous
22 jobs?
23    **A.  No.**
24    Q.  So can you walk me through the process of
25 how you cite someone without having a ticket book,

80

1 from when you first see a violation to the point where
2 you serve them with, let's say a summons?
3    **A.  I'm not sure what you're asking, because I**
4 **didn't have a ticket book.**
5    Q.  Yes, exactly.  So without having a ticket
6 book, how do you cite them or how do you enforce those
7 laws?
8    **A.  Okay.  So as the Sheriff instructed me in**
9 **December of 2017, to do criminal summons.**
10    Q.  How does that process work?
11    **A.  I would draft the criminal summons.  It**
12 **would be -- a temp number would be issued to me.  I**
13 **would then take it -- take the criminal summons to the**
14 **Magistrate's Office.**
15        **The Magistrate would then type in the temp**
16 **number, pull it up, review what's on the criminal**
17 **summons, will spare -- swear me in.  Get my brief**
18 **testimony and determine the merits of whether or not**
19 **there's probable cause.**
20    Q.  And then how do you serve the summons?
21    **A.  I serve it on the person and I return it**
22 **back to the clerk.**
23    Q.  So do you -- you issue the summons after the
24 stop is completed, after you've already let them go?
25    **A.  Yes.  But I also told them that they can**

81

1 expect to receive some paperwork on it.
2    Q.  Did you ever tell them, "You're free to go,"
3 and not inform them that you were going to give them a
4 summons, but then serve a summons?  Did that ---
5    **A.  I believe I've told every last one of them**
6 **that I served those summons on to expect some**
7 **paperwork.  Every ---**
8    Q.  Did citizens ever complain -- keep going.
9    **A.  I'm sorry.  Go ahead, sir.**
10    Q.  Did citizens ever complain about this
11 practice?
12    **A.  I am not aware of citizens outside of Ms.**
13 **Jamie Goss complaining, but I told her on the side of**
14 **the road that she can expect to have some paperwork**
15 **for it because she could have killed somebody.**
16    Q.  Okay.  Before we talk more about Jamie, did
17 Sheriff White ever reprimand you for issuing summonses
18 after seeing a traffic violation?
19    **A.  I -- I do not recall him reprimanding me for**
20 **a -- for such.  You're talking about issuing a**
21 **criminal summons after a traffic violation?**
22    Q.  Or a traffic violation, yes.
23    **A.  Not to my knowledge, unless you have a**
24 **specific case that may trigger my memory.**
25    Q.  Did he ever just say, "Can you stop issuing

82

1 traffic citations," or "Can you stop issuing these
2 summonses for traffic citations?"
3     A.  Did who say that?
4     Q.  Sheriff White.
5     A.  No.  He told me to issue them.
6     Q.  Did other supervisors such as Lieutenant
7 Campbell tell you this?
8     A.  When you say "this," referring to?
9     Q.  Tell you to stop issuing summonses after
10 traffic violations?
11     A.  That's what Lieutenant Campbell wrote in the
12 write-up.  So to answer your question, yes.  Based on
13 what he wrote in the write-up.
14     Q.  Did he tell you that directly, orally?
15     A.  When he was on the phone with me, cursing me
16 out, fussing me out as well, I didn't realize there
17 was a third party in the room.  He said, "Man, you got
18 to stop issuing these" -- I believe he said, "traffic
19 summons" or "criminal summons," something.
20         It -- he said, "Because you're getting
21 complaints," and et cetera.  And at that time, I was
22 not aware of a complaint until at that -- when he told
23 me.
24     Q.  How did you respond when he told you to stop
25 doing this?

83

1     A.  I asked him what was going on.  I inquired
2 about it because I had no knowledge on what he was
3 referring to.
4     Q.  Was that after the Jamie Goss incident, to
5 your knowledge?
6     A.  Yes.
7     Q.  Was that the first time he told you
8 something of that matter about the traffic citations
9 and summonses?
10     A.  Are you asking me if there was a matter
11 before Jamie Goss where he told me not to do them?
12     Q.  Yes.  Did he ever tell you not to do ---
13     A.  Not to my knowledge.
14     Q.  Was the Jamie Goss incident the first time?
15     A.  Yes.  As I've said, Sheriff White told me to
16 do the criminal summons then because I didn't have a
17 ticket book, despite him claiming he'd gave me one.
18 And so she almost killed some -- somebody, some
19 people, so I had to enforce the laws.
20         Had I had not did what I was supposed to do,
21 it was a -- it -- she could have came up there and
22 complained, not -- not came down there and complained.
23 Somebody could have came up there and complained about
24 me being behind her and not doing anything about it.
25     Q.  Did Sheriff White address the Jamie Goss

84

1 incident with you?
2     A.  For that situation, he said that he approved
3 Campbell's written warning for me, but he never spoke
4 to me about it.
5     Q.  When did he say he approved the written
6 warning?
7     A.  Well, it was in April -- April 2018 when him
8 and I talked.  And he said that he was the one, that I
9 couldn't appeal it to him -- excuse me, or I couldn't
10 appeal it because he's the one that approves it.
11         Although Campbell wrote it up, he said that
12 as Sheriff, he approved it.  And I remember the Chief
13 Deputy saying something about when they suspended
14 that the Sheriff -- that he agrees with it and the
15 Sheriff signed off on it.
16     Q.  Okay.  So you mentioned that you believe
17 Jamie Goss could have killed people.  Can you walk me
18 through how that went, what you saw and how you went
19 about stopping her?
20     A.  Yes.  I will have to be brief with it and
21 refer you to the operation report or the incident
22 report that I did on it.  But to be brief, because
23 it's been -- it's been a while, I observed her in the
24 northern part of the county while I was on patrol.
25         She violated several traffic laws and she

85

1 put people's lives as well as her life in danger by
2 crossing some yellow lines multiple times.  She didn't
3 have a seat belt on.  There was something else.  Maybe
4 driving left to center.  Like she -- she almost caused
5 if not a few, at least one head-on collisions.
6         And I pulled her over, and she said that she
7 was sorry.  And I told her, I said, "You know, sorry
8 is not going to cut it for the family when you kill
9 somebody."  And I told her that she can expect to
10 receive some paper, and I believe a call had came out
11 for me.
12         It was only Sergeant Alexander and I on duty
13 that day as far as the squad.  From what I remember,
14 it was just him and I.  And I had to go to another
15 part of the county and handle that call, but I will
16 refer you back to the operations report or the
17 incident report that I did on it.
18     Q.  Okay.  Do you remember if you went to serve
19 the summons the next day?
20     A.  Maybe the next day, if not the next couple
21 of days.
22     Q.  Why did you serve it so quickly, or why did
23 you serve it within two days?
24     A.  Well, when I applied for PC and it was
25 granted, I didn't have a call to handle at that time.

86

1  It was a slow day. I believe it was a Saturday I
2  served her. So I -- so I served it to her -- served
3  it on her, excuse me.
4      Q. So when you stopped Jamie Goss, could you
5  have called Sergeant Alexander to bring his citation
6  book?
7      A. Well, I could have -- I could have called
8  him, but surely, I mean -- and that didn't come to my
9  mind. But surely, he most likely wouldn't have came
10 up there for that, because he was handling the
11 southern part of the county and I was handling the
12 northern part of the county.
13     Q. So after the Jamie Goss incident, did you
14 continue to conduct traffic stops?
15     A. When -- yes. Whenever the situation
16 required a vehicle to be stopped, if it was a major
17 issue, a major concern, I would stop them.
18     Q. What do you define as a major issue or a
19 major concern?
20     A. Surely, I wouldn't -- surely, I'm not going
21 to stop somebody to make a big deal out of them
22 failing to signal or something like that. But if you
23 are driving left to center, almost crash into
24 somebody's car.
25         If you're, you know, speeding to the point

88

1  Paragraph 78, which appears on Page 16 of 47.
2      A. Which number?
3      Q. Paragraph 78. So it says on Paragraph 78 --
4  if I'm reading this incorrectly, please let me know.
5  I might be looking at the wrong excerpt.
6      A. All right.
7      Q. Well, okay. Sorry, 82. So it says,
8  "Lieutenant Campbell called Mr. White and verbally
9  assaulted him." Can you describe what this verbal
10 assault was?
11     A. Of him fussing and later cursing at me about
12 Jamie Goss, a white woman who I issued traffic summ
13 to for violating the laws of the State.
14     Q. Did he mention her race during the call?
15     A. No. He didn't mention her race, but her
16 race was known that she was white, to me.
17     Q. Did he mentioned your race or anyone's race?
18     A. No, he didn't.
19     Q. Did he mention gender or sexual orientation
20 or anything of that matter?
21     A. No.
22     Q. Did he use any racial slurs or offensive
23 language of that matter?
24     A. He didn't use any racial slurs, but he said
25 the words "ass" multiple times, and "damn."

87

1  of where you're putting your life and other lives in
2  danger. It has to be something -- like if you're --
3  if I suspect you of -- you know, if there's some type
4  of like, if you're impaired by an impaired substance
5  and you're all over the road, those are major issues
6  where we need to protect public safety.
7      Q. When it comes to minor issues, would you
8  consider having your headlights off in nighttime minor
9  or major?
10     A. That's a major issue. In fact, I talked to
11 the Sheriff about that when I talked to him in April,
12 and he seemed to agree. He asked me what I was going
13 to do when I got her pulled over, and I told her -- I
14 said, "Tell -- tell her to turn her headlights on
15 because she's driving with no lights on at pitch black
16 dark at night, and she didn't have no headlights on.
17     I said, "She's going to kill somebody or
18 injure somebody," something to the effect, I said.
19 And he said, "That's right." Or he said, "Okay." So
20 that is a major issue, Counselor.
21         (DEPOSITION EXHIBIT
22          NUMBER 3 WAS MARKED
23          FOR IDENTIFICATION)
24     Q. (Mr. Castro) So if we can look at Exhibit
25 3, which is the amended complaint, and turn to

89

1      Q. Did he use anything ---
2      A. And he said he was going to handle my ass at
3  12 o'clock, whenever he came in. Said, "I'll deal
4  with your ass then."
5      Q. Did he use any language that's offensive to
6  a particular sexual orientation?
7      A. No.
8          (DEPOSITION EXHIBIT
9           NUMBER 9 WAS MARKED
10          FOR IDENTIFICATION)
11     Q. Okay. If we can turn to the Exhibit 9,
12 which is the official written reprimand regarding the
13 Jamie Goss incident. Can you please take some time to
14 review that?
15 (Witness examines document)
16     A. Somebody scroll down. Scroll down. Scroll
17 down. All right.
18     Q. Do you recognize this document?
19     A. Scroll down. Yes. That document was
20 provided to me for the first time after he wrote me
21 up, he being Lieutenant Campbell.
22     Q. And is that your signature on the fourth
23 page?
24     A. Yes, that is my signature.
25     Q. Did you sign this on February 20th, 2018?

90

1    A.  Yes, that was the date.

2    Q.  Did you read it before you signed it?

3    A.  It was read aloud to me and I read it.  I
4 told him I did not agree with it and the Chief Deputy
5 told me to sign it.

6    Q.  Okay.  I want to give you the opportunity to
7 respond to some of the statements in this document.
8 So on Page 1 ---

9    A.  Let's scroll back up.

10    Q.  In about the middle of that paragraph, it
11 says, "I informed him that he had no business going
12 back serving criminal summons for traffic violations
13 on people because he was not issued a citation book.
14 He jumped back at me telling me I was being
15 disrespectful to him and not going to talk to him that
16 way."

17    Question: did he inform you of that
18 statement right there?

19    A.  Like I said, it's been a while ago.  There
20 are a lot of things in here that he claimed happened
21 did not happen.  A lot of it's distorted.  He may have
22 said it.  He may not have said it.

23    Q.  Did he tell you to stop serving criminal
24 summons for traffic violations, to your knowledge?

25    A.  He -- like I said, he put it in the

91

1 write-up, as my previous answer.  He put it in the
2 write-up, as I previously said ---

3    Q.  Do you remember ---

4    A.  --- and he said, "Man, you got to stop
5 serving these traffic summons or criminal summons"

6    Q.  And on Page 2, on the last paragraph.
7 Towards the end of that paragraph, it says, "Then he
8 said he only had one father and he was a large Black
9 man and even he didn't tell him what to do anymore."
10 Do you remember saying anything like that?

11    A.  My words are distorted, but it was something
12 said loosely to that effect.

13    Q.  What would be a more accurate way to
14 describe what you said?

15    A.  I told him that my father was a big Black
16 man and that "he did not talk to me the way that you
17 did."  And I was referring to the fussing, the yelling
18 and the cursing that Campbell did to me over the
19 phone.

20    And the fussing and the yelling, and maybe a
21 few curse words.  Not as many as was when he was on
22 the phone and Poole was listening into the
23 conversation.  And I told him, I said, "He didn't do
24 it."  And I said nobody else was going to do it.  And
25 I specifically said, "I'm the one around here taking

92

1 up for you.  I'm going to bat for you, speaking up for
2 you and having your back."

3    I said, "The only one."  I said, "The rest
4 of these people," I'm referring to the deputies and
5 the supervisors, "Talk negative of you, talk bad of
6 you."  And I said, "I -- now I know."  I said, I -- I
7 know I said, "I see why they call you Dirty Soup," and
8 that's how that conversation went.

9    I never walked towards him, as he falsely
10 put in his statement later on, a few months
11 afterwards.  And I never walked towards him or move
12 towards him, as Marin falsely -- Sergeant Alexander
13 falsely put in his statement.

14    I simply shut up.  I mean -- well, you know,
15 I silenced myself and I left.  I didn't do no stomping
16 out, didn't slam no doors.  I simply left.

17    Q.  What does that term, "Dirty Soup," mean?
18 What is that about?

19    A.  Sergeant Marin Alexander and Sergeant Dona
20 Roberson both told me that Campbell, Lieutenant
21 Campbell, is Dirty Soup, said his Soup is dirty.  They
22 said, "Lieutenant Campbell," his last name.  "Campbell
23 Soup, Campbell Soup."  And they said that Campbell
24 dirty.  His personality is dirty.  So they put the
25 terms together, Dirty Soup.

93

1    Now, to go a little bit specific in your --
2 your question.  Sergeant Marin Alexander and Deputy
3 Torrance Terry and I were at the Waffle House off of
4 Tiny Broadwick and Dr. Martin Luther King, those
5 roads, not too far from I-85 by Maria Parham hospital
6 in I believe December and -- December 2017.

7    And Marin, Sergeant Alexander, said that he
8 did not like Campbell.  He said that Campbell was
9 dirty, that he was sneaky, that that man just do
10 things ass backwards.  And I asked him, I said, "Well,
11 what did you mean he's dirty and sneaky?"

12    He said, "Man, my old girl and I got into it
13 and Campbell came out there with some other deputi
14 And I said, "What do you mean, got into it?"  And he
15 said, "We just got into it."  And he said, "Campbell
16 came out there with some deputies and he said, 'We
17 don't care if he's a deputy.  Tell us what he did.
18 We'll lock him up.'"

19    I said, "Lock you up for what?"  I said,
20 "What happened?"  He said, "Well, my girl called 91
21 on me and we had an issue."  And I asked you -- I
22 asked him.  I said, "Well, when you say 'issue,' are
23 you talking about domestic?"  And he shook his head
24 with an up and down motion, signaling what I though
25 was yes.

94

1        And I asked him. I said, "Well, did -- did
2  you hit her?" He was like, my mom and dad taught me
3  not to ever let anybody put their hands on me. And so
4  she put her hands on me and we had an issue." And he
5  was -- he was, you know, shaking his head up and down
6  still.
7        And he said Campbell threatened to lock him
8  up and whatnot despite them working together. And so
9  he said, "Ever since this man tried to have me
10 arrested and had tried to locked me up for domestic."
11 And he said, "The only reason my girl didn't say
12 anything because I had her scared, I had her shook.
13 She wasn't going to say anything against me."
14       And so he said they ended up going their
15 separate way for awhile. But he said, "Now you see
16 why we say 'Dirty Soup.'"
17    Q.  Got you. I got the innuendo now.
18    A.  I'm sorry?
19    Q.  I said I get the connection with his name
20 now.
21    A.  Okay.
22    Q.  Can we go to the next page? And on the
23 final paragraph, it says, "I had deputy White the
24 first two weeks of field training. It was clearly
25 explained to him in field training that traffic

95

1  enforcement was not a top priority as he seemed to
2  want to 'go get' every minor traffic violation we
3  observed."
4        Did Campbell clearly explain to you during
5  field training that traffic enforcement was not a top
6  priority?
7    A.  No. He did not clearly explain that. In
8  fact, he's -- there's a specific word I was looking
9  for. I can't think of the word I'm looking for. But
10 one, he's been hypocritical, if anything, but there's
11 another word.
12       But I'll explain it. I don't know what he
13 means by "clearly explain," because him and I were
14 pulling over traffic together. I mean, I was with him
15 and he had already mentioned to himself that he was a
16 traffic guru.
17       And so there were a lot of traffic that him
18 and I did together. Some of it was calling it in by
19 him. A few times, less than a handful of times, he
20 let me radio in just to show me the -- you know, to
21 get the hang of it.
22       And then he praised me on how clear I talked
23 on the radio. And then other times he didn't call it
24 in, so that's -- that whole statement, that's done.
25 That part of it.

96

1    Q.  If you go to the final page, the first
2  paragraph, it says, "This practice of stopping cars
3  and then going back issuing summons is in violation of
4  previous orders given to him to cease traffic
5  enforcement."
6        Were previous orders given to you to cease
7  traffic enforcement?
8    A.  In fact, no. What I can say specifically,
9  Sergeant Roberson told me -- and it's, you know, in a
10 statement he had wrote later on that I didn't have a
11 copy on. But he told me that there was some talk
12 around the office about me stopping cars.
13       And he told me, he said, "You're not the
14 only one. It's a whole -- it's others that are
15 stopping cars too." In fact, there was another deputy
16 that -- that was doing criminal summons like I was
17 doing, if not more. And I know this from Sergeant
18 Roberson and Chief Bullock.
19       But he told me just to watch my back, and he
20 said that the Sheriff didn't like -- well, the Sheriff
21 wasn't too big on us, you know, being in the city or
22 whatnot, stopping cars, unless it was like a major or
23 serious violation or where we had to take action right
24 then to, you know, protect somebody or save someone's
25 life.

97

1        Now, when he talked to me about it, what I
2  did was -- you know, it was like I see and don't see.
3  Because I -- I mean, I don't want my name to be in
4  people mouths and whatnot all the time. And so there
5  were times where the situation was major and he told
6  me, he said, "Yes. You can pull them over for major
7  or serious issues."
8        In fact, in one of his statements, he said,
9  you know, after I talked to him, his stuff -- his
10 traffic enforcement ceased dramatically. So the --
11 the thing of telling me to not to do any more traffic
12 enforcement, that is just not true. It's false.
13       MR. CASTRO: Can we go off the record?
14 Is now a good time for a five-minute break?
15       MR. MCGURL: That's fine by us.
16       THE WITNESS: Hold on one second, sir.
17 (Witness points camera to Mr. McGurl)
18       MR. MCGURL: Yes. That would be fine
19 by us. Five minutes is fine.
20       MR. CASTRO: Okay. We can get back at
21 2:10 p.m., if that's okay.
22       MR. MCGURL: Thank you.
23       THE COURT REPORTER: We are off the
24 record at 2:04 p.m.
25 (Brief recess: 2:04 p.m. to 2:10 p.m.)

98

1       THE COURT REPORTER:  Okay.  We are back
2   on the record.  It is 2:10 p.m.
3           (DEPOSITION EXHIBIT
4           NUMBER 10 WAS MARKED
5           FOR IDENTIFICATION)
6       Q.  (Mr. Castro)  Mr. White, we are going to
7   move to Exhibit 10, what has been previously marked as
8   Exhibit 10.  Can you please review this exhibit, which
9   consists of two pages.
10   (Witness examines document)
11       A.  Scroll down.  All right.  If you would
12   scroll back up.  All right.
13       Q.  Have you seen this document before?
14       A.  I was never issued that document.  It wasn't
15   until after I was terminated from the Vance County
16   Sheriff's Office on false allegations of excessive
17   force that -- after violating my rights under federal
18   law, that I saw this document, which was submitted by
19   Vance County Department of Human Resources.
20       Q.  How do you know who submitted this document?
21       A.  That document was never in my personnel file
22   with Argretta Johen when I reviewed it, in which that
23   personnel file that she had and to her own admission
24   was very thin.
25           Also, that document was not in my personnel

99

1   file, after I begged to review my personnel file at
2   the -- in September.  I believe it was the first two
3   weeks of September of 2018, one month before I was
4   terminated.  That document was not in there.
5           In fact, I asked to make a copy of my file.
6   It was approximately somewhere between -- no more than
7   50 pages, which was mostly of my F3, my application,
8   my suspension, corrective action and miscellaneous
9   files, not dealing with disciplinary.  Those were my
10   performance evaluations.  But most certainly, that
11   document was never in there.
12       Q.  When you say there were 50 pages when you
13   reviewed it, around what time did you review the
14   personnel file?
15       A.  As I stated, the -- somewhere around the
16   first two weeks of September of 2018, I reviewed my
17   personnel file at the Sheriff's Office and Janie
18   Martin's office, Sheriff White's former Executive
19   Assistant or Secretary.
20       Q.  Did you ask specifically to see counseling
21   records or disciplinary actions?
22       A.  See, here's the thing -- okay, ask that one
23   more question.  Ask that question again one more time.
24       Q.  When you asked to review your personnel
25   file, did you ask to see the disciplinary documents

100

1   therein?
2       A.  No.  I didn't specifically ask to see the
3   disciplinary documentation, but I asked to see my
4   entire personnel file.  And my written warning, the
5   suspension, was in there along with personnel -- the
6   performance evaluation.
7           But this is something that I need to bring
8   up.  The date up here is January 27th, 2017.  I didn't
9   start working until June 5th, 2018 (sic).  So this
10   employee counseling record, this counseling form,
11   precedes the dates of my employee -- employment.
12       Q.  So when did you start working at the Vance
13   County Sheriff's Office?
14       A.  June 5th, 2017.
15       Q.  If we can go to the second page.  It says,
16   "In checking further, it was found that there are 7
17   other instances since Dec. 15, 2017 in which Deputy
18   White has made arrests for traffic violations on
19   either summons or warrants after conducting traffic
20   stops."
21           Does that number sound accurate to you?
22       A.  I have not seen the official reports of it.
23   Most certainly, I will say that it may be correct.
24   However, I haven't received -- seen the specific
25   documentation that he reviewed, but I was definitely

101

1   doing my job.
2           (DEPOSITION EXHIBIT
3           NUMBER 11 WAS MARKED
4           FOR IDENTIFICATION)
5       Q.  (Mr. Castro)  Okay.  If we can move on to
6   Exhibit 11.  Can you please review this document?
7           MS. ROBINSON:  If we can for just
8   record-keeping purposes, can you state -- ask him to
9   state what the document is?
10           MR. CASTRO:  Yes.
11       Q.  (Mr. Castro)  What is this document?
12       A.  It appears to be a statement from Deputy
13   Brian K. Wayne, dated January 30th, 2018.
14       Q.  Have you ever seen this document?
15       A.  The first time that I seen this document --
16   yes.  The first time that I'd seen this document was
17   in September of 2018, a month before I was terminated,
18   when I requested to review my personnel file.  It was
19   not in Argretta's file, but it was in the Sheriff's
20   Office file and ---
21       Q.  Does -- continue.
22       A.  --- and also this document -- there was two
23   documents that Chief L.D. Bullock had during my
24   suspension, and I asked for copies of it.  And those
25   two documents, based on the look of the document

102

1 that -- the two documents he had when he denied me,
2 saying I have everything I need, he would not give me
3 a copy of it. And I later found these in my personnel
4 file.
5    Q. Do you know if Argretta, is that who you
6 said? And the Sheriff's Office have separate
7 personnel files for you?
8    **A. They do have separate personnel files.**
9 **Everything that was in Argretta's file was from the**
10 **county orientation, okay? Which was very, very, very**
11 **extremely thin.**
12    Q. Okay. So going back to Exhibit 11, it says
13 on the first sentence, "As it pertains to Deputy J.J.
14 White's vehicle stops, I as one of his Field Training
15 Officer advised him to only make them if absolutely
16 necessary. I used the specific circumstance of an
17 egregious traffic violation (i.e. failure to stop at a
18 red light or stop sign) if it happens while in his
19 presence."
20       Did he advise you during training to only
21 make traffic stops when absolutely necessary?
22    **A. No. That was not his advice. In fact, he**
23 **told them to make them whenever I could. And when him**
24 **and I were in field training, we'd stopped so many**
25 **cars in the City of Henderson and in Vance County.**

103

1    Q. It then says, "While in Field Training,
2 Deputy White asked if we could 'do some traffic' as we
3 were not very busy." Did you ask this?
4    **A. No. Wayne -- Deputy Wayne made it a**
5 **priority to do traffic, and he made it very clear**
6 **that's what he likes to do since -- since he came from**
7 **the highway patrol.**
8       **In fact, he said while I'm with him, "When**
9 **we're not busy, when we come across something good,**
10 **we're going to do traffic." So it wasn't no "some**
11 **traffic." He made it very clear that traffic was a**
12 **part of what he was wanting to do in his job as a**
13 **deputy sheriff.**
14    Q. Do you know if Deputy Wayne had a citation
15 book?
16    **A. I believe he did.**
17    Q. It goes on to say in the middle of that
18 paragraph, "I then pointed out that he had not been
19 issued a citation book so there was not much he could
20 do in the event that he did have a reason to perform a
21 vehicle stop." Do you remember him pointing that out
22 to you?
23    **A. I have no -- recollection of him saying**
24 **those specific words. I do remember him saying since**
25 **I'm certified, I should get a traffic book from the**

104

1 Sheriff amongst some other things. But the specific
2 words, I can't recall them verbatim.
3    Q. Let's turn to Exhibit 12.
4       (DEPOSITION EXHIBIT
5       NUMBER 12 WAS MARKED
6       FOR IDENTIFICATION)
7    **A. But I will know, sir, that Deputy Brian**
8 **Kenneth Wayne admitted in front of Deputy Andre Poole**
9 **that he lied on me and that he was sorry for doing so.**
10 **And that the Chief Deputy, Lawrence Bullock, and a**
11 **lieutenant told him to do it, and he said he didn't**
12 **know what to do because he has a child.**
13    Q. Lied about what? What was he referring to?
14    **A. The statement that he wrote and the things**
15 **that he said to -- to upper management.**
16    Q. And how did you find out about this?
17    **A. Because Wayne told me in front of Poole,**
18 **Deputy Andre Poole.**
19    Q. All right. Turning to Exhibit 12. I'll
20 give you some time to review this.
21 (Witness examines document)
22    **A. Can you make it a little bit bigger? Thank**
23 **him. Go down. Yeah. Thank you. This is the**
24 **statement that Sergeant Roberson, dated February --**
25 **excuse me. February 1st, 2018, wrote in reference to**

105

1 what's in his file.
2    Q. Okay. Let me know when you are finished
3 reviewing it.
4    **A. Okay. (Witness examines document). Okay.**
5    Q. All right. If you look towards the middle
6 of the paragraph, closer to the first half, it says --
7 it has a typo, but it says, "I also spoke with Deputy
8 White and advised him that he needed to ease up on the
9 traffic stops unless it was a major violation that had
10 to be stopped so that the general public did not have
11 a bad view of the Vance County Sheriff's Office."
12       Do you remember this conversation?
13    **A. I remember him saying something to the**
14 **effect of. He didn't say, "a major violation." He**
15 **told me to protect somebody's life. Now, in terms of**
16 **a bad view of the Vance County Sheriff's Office, that**
17 **part I do not recall. And like I said, it's been a**
18 **long time ago.**
19    Q. Got you. If we move on to the second half,
20 there is that sentence that says, "I then spoke with
21 Deputy White and advised him that he needed to stop
22 the excessive traffic stops and even explained to him
23 that the majority of his stops were in the city."
24       "I also explained to Deputy White that we
25 have enough crime in the County that we have no reason

106

1  to be running around -- no reason to be running around
2  in the city looking for vehicles to stop."
3      Do you remember this conversation?
4      A.  It was the same -- on the same time that
5  what you just -- what we just went over previously.
6  Something to the effect of that.  But I will say, he
7  did say that a lot of my stops were in the city based
8  on what he could see, and he told me to ease up on
9  traffic stops.
10      And I also explained to him that there had
11  been another deputy or other deputies that were using
12  my traffic stop number that he issued me.  Because I'd
13  seen the traffic stop forms on his desk and it had my
14  number, my traffic stop number, but that was not my
15  handwriting, my signature.
16      And so he said he was going to look into it.
17  And when I talked to him later, he said that he did
18  address it.  That deputy was using my traffic stop
19  number because he didn't have a traffic stop number
20  assigned to him, and that he submitted a request,
21  Sergeant Roberson submitted a request, to get that
22  deputy a traffic stop number.
23      Q.  Who was that deputy?
24      A.  I believe it was Deputy Zachary (phonetic)
25  alone.  But it's been a long time ago, so it could've

107

1  been somebody else, but it definitely -- what I just
2  testified to is true and factual.
3      Q.  What time period was this, where someone
4  might have been using your name?
5      A.  It wasn't somebody -- they were using it.
6  Not might, they were.  And it was when I was on
7  Sergeant Roberson's shift towards the fall of 2017.
8  So let's see.  Somewhere between September and
9  November, right before I was transferred.
10      Q.  Who has knowledge of this?
11      A.  The person that did it.  The -- Sergeant
12  Roberson and I.  And I'm not sure if Sergeant Roberson
13  spoke to his management about it, but I definitely
14  brought it to him.
15      Q.  Okay.  Towards the end of this statement, it
16  says, "Deputy White agreed to comply and from that
17  point on the traffic stops that were called by -- in
18  by Deputy White on the radio decreased dramatically."
19  Is that true?
20      A.  Yes.
21          (DEPOSITION EXHIBIT
22          NUMBER 13 WAS MARKED
23          FOR IDENTIFICATION)
24      Q.  Okay.  Moving on to the next exhibit,
25  Exhibit 13.  I would like you to review Exhibit 13,

108

1  please.  And if you could zoom a little bit.
2  (Witness complies)
3      A.  This is a statement from Sergeant Marin
4  Alexander, dated July 18th, 2018.  (Witness examines
5  document)  Okay.  Thank you.
6      Q.  Do you remember the argument that this is
7  referring to?
8      A.  This argument is in reference to the
9  exchange -- verbal exchange between -- allegedly
10  between Campbell and I, but this argument -- this
11  statement is deceptive.
12      Q.  In what way?
13      A.  One, I was not in my patrol car when
14  Lieutenant Campbell called me.  I was in the patrol
15  room along with Deputy Andre Poole.  Also, I did not
16  walk towards Lieutenant Campbell.  I did not step
17  towards him.  I did not do anything to make it seem
18  like I was going to physically assault him.
19      That's not what I did.  I said what was
20  consistent earlier and I ended up leaving.  At no
21  point in time did I threaten or make movements to do
22  Campbell or anybody else bodily harm.
23      Q.  Did you approach him?
24      A.  No.
25      Q.  Even slowly?

109

1      A.  I never approached him.  He was on the other
2  side of the patrol room, near the entrance to the
3  hallway that leads to the desk -- desk secretary as
4  well as the -- some of the offices for criminal
5  investigations.  I was on the other side of the patrol
6  room that leads to the hallway where 911 dispatch is.
7      Q.  Okay.  So let's talk about ---
8      A.  This whole statement, that "I better leave
9  this office before I will -- before I do something I
10  will regret later on," no.  Marin -- Sergeant
11  Alexander's statement is full of lies, falsiticity
12  (sic).
13      Q.  When it says, "'Let me tell you something,
14  you will not continue to talk to me the way you have
15  over the phone nor in person.'  Deputy White also
16  stated, 'That's disrespectful and I am not your child
17  neither are you my Father.'"  Is that accurate?
18      A.  My words are twisted and distorted.  No,
19  it's not accurate.
20      Q.  Do you remember what you said?
21      A.  Like I said, it's been a long time ago.
22  However, when he said, "Let me tell you something, you
23  will not continue to talk to me the way you have over
24  the phone nor in person."  When he came in, I said to
25  Lieutenant Campbell something to the effect that, "Y

110

1    talked to me very rude and nasty over the phone and
2    didn't appreciate it."
3         And this part about, "That's disrespectful,
4    I am not your child neither are you my father." I
5    said that my father is a big, Black man and he don't
6    talk to me like that.
7    Q. Okay. Do you recall the part where ---
8    A. If they wanted a statement written -- if
9    they wanted a statement written, they should have
10   wrote it when the situation happened before I got
11   suspended, versus six, if not seven months later on
12   I'm sorry, Counselor, go ahead.
13   Q. No worries. It says that, "Deputy White
14   also stated 'You called me on the phone earlier while
15   I was in my patrol car and started talking about the
16   way I serve my criminal summons, you was very nasty to
17   me and I thought I was doing my job correctly.'"
18        Did Campbell call you about the way you were
19   serving criminal summons?
20   A. As I answered that question earlier,
21   Campbell did call in reference to the criminal
22   summons, saying, "Man, you got to stop serving the
23   traffic or criminal summons," something to that effect
24   that he said. All right? But I was never in my
25   patrol car. I was in the patrol room with a

111

1    third-party deputy, Deputy Andre Poole.
2    Q. And Lieutenant Campbell, it says in this
3    statement, replied by saying, "Yes I did and you need
4    to stop serving the criminal summons as we have
5    directed." Do you remember him saying that?
6    A. No. He didn't say that. In fact, his words
7    are distorted. One more, he -- this Lieutenant
8    Campbell was very unprofessional and provocative in
9    terms of throwing around the word, "ass" and "damn,"
10   okay? Despite threatening me. Now, this statement
11   just is full of falsification.
12   Q. Did you leave the room through the hallway
13   that you described, where the 911 communications
14   office is located?
15   A. Yes. That's the hallway I left out of.
16   Q. What happened after this discussion occurred
17   between you and Lieutenant Campbell?
18   A. I left the office and went to my patrol
19   room -- not patrol room, but my patrol car. No. Let
20   me take that back. Let me take that back. Let me
21   take that back.
22        I left the patrol room and I was headed to
23   my patrol car, and there was a young woman that was
24   standing on the outside of the locked door, and she
25   asked if Sergeant Alexander was available. And I told

112

1    that he is in the office and I went back.
2         I told her, I said, "Stay right here,"
3    because I didn't know who she was, and I definitely
4    wasn't going to bring somebody in that office not
5    knowing who she was or if she was cleared to go back.
6    So I went to the -- back to the office and I told
7    Sergeant Alexander, "You have a visitor. There was a
8    female out here asking if you're here."
9         And so he went out there, and he was like,
10   "Nobody should be coming up here for me at work."
11   I said, "Well, she's right here." He went out there.
12   And so he got closer, he was like -- he recognized
13   her, he knew who she is.
14        And I went to my car. And after that, my
15   phone rang and Deputy Poole advised me that Sergeant
16   Alexander said to him in front of Campbell, "Damn,
17   White was talking to a lieutenant like that." And --
18   and he said that Marin was trying to make it seem like
19   I was in the wrong.
20        And Poole told me that he said to Marin, he
21   was like, "Don't play that man like that. What
22   Campbell did to him over the phone when you weren't
23   there was nasty and disrespectful and White spoke his
24   piece." So that's pretty much about it.
25   Q. We can take this exhibit off the screen. Do

113

1    you remember being suspended for five days around
2    February of 2018?
3    A. Yes.
4    Q. Can you explain why you got suspended or the
5    reasons given to you?
6    A. The ones on the write-up that were false.
7    It says, "Officer Complaint." I want to know who was
8    the officer that was complaining. Maybe they meant
9    Citizens' Complaint. Insubordination, everything that
10   was listed in the reference -- the subject line.
11   Q. What was the incident that -- what was the
12   insubordination that they were referring to, do you
13   think?
14   A. They most likely were referring to
15   Campbell's situation and when I allegedly, according
16   to Campbell, was disrespecting Marin, talking about
17   "man-to-man." But, see, here's the thing. Marin and
18   I weren't going at it. It was Poole and Marin who
19   were having a verbal exchange.
20        This goes back to you all, your client, not
21   following the facts. Marin and Poole were having a
22   disagreement about the things that were going on
23   2ndshift, Marin not working, not pulling his fair end,
24   not responding to calls, especially 10-18 emergency
25   traffic. 10-18 is the 10 code for emergency traffic.

114

1  The emergency traffic is lights and sirens.
2      They were talking about a lot of things just
3  not going right on the shift, why Marin couldn't
4  answer the radio or answer his phone and was
5  constantly saying that his public service, which
6  refers to his telephone, is down.  And I was trying to
7  mediate it because Sergeant Alexander began to --
8  not going to say that he broke down crying, but he
9  began to -- I will say, show signs of sincerity.
10 There's a specific word for it.  Basically, emotional.
11     He began to be emotional and he
12 spontaneously utter that the Captain is calling him,
13 saying that the Sheriff called him, Captain Watkins
14 was called by Sheriff White, saying that Marin was a
15 bad super -- supervisor, and that he was responsible
16 for what was going wrong with the shift and that there
17 were going to be some immediate changes.
18     Before it, Marin was saying, "Captain called
19 me, Captain called me, Captain called me."  So Poole
20 asked him, "Well, which captain?"  And he asked
21 again and Marin wouldn't answer him.  So I said,
22 "Marin."  I said, "Sergeant Alexander," I said, "This
23 man is asking you a question."  I said, "At least you
24 can answer his question.  After all, you're the one
25 that's volunteering the information to us."  I said,

115

1  "The captain called you."  I said, "We're
2  subordinates.  You shouldn't be even telling us about
3  this."
4      And he was like, "But I really care and I
5  get fired.  I break down when" -- when -- "I shut
6  down," excuse me.  He said, "I shut down when people
7  start coming at me, 'boom, boom, boom'."  And I said,
8  "Which captain?"  And he was like, "Watkins."
9      And at that point in time, we heard the door
10 slam and we later found out in less than maybe 30
11 seconds that it was Campbell that was coming in
12 through the side door.  So there was never a dispute
13 between Sergeant Alexander and I.  There was a
14 dispute, a factual dispute, okay, in terms of a verbal
15 exchange between Poole and Sergeant Alexander.
16     Q.  Was Deputy Poole also suspended?
17     A.  Yes.  He was suspended for, I believe,
18 unbecoming conduct.  Something to that effect.
19     Q.  So moving on to another subject ---
20     A.  But his situation was not with my situation.
21 It was involving him and Marin having a verbal dispute
22 over 911 radio waves, which is public document.
23     Q.  And did you try to mediate that dispute?
24     A.  There was nothing for me to mediate because
25 somebody went and put paperwork on it.  Then once

116

1  more, there was emergency traffic in the County and
2  Sergeant Alexander was closer to the call by at least
3  ten miles closer, ten to 12 miles closer.
4      And Poole was at the southern line that
5  bordered Vance and Franklin counties.  And we know
6  that he was closer because two state troopers provided
7  verbal testimony that they were sitting there with
8  Marin at the intersection of Warrenton Road and
9  another road.
10     And when the tones -- the emergency tones
11 dropped, when it went off the radio waves, Marin drove
12 off with his lights and sirens like he was going to do
13 something, and instead, he didn't.  And so as a
14 result, after we handled the call up north, when we
15 was down south, Poole got on the radio and said
16 whatever he said and they end up having a exchange
17 over the radio.
18     And then either Poole called Marin
19 Alexander, Sergeant Alexander, or Sergeant Alexander
20 called Poole.  But Sergeant Alexander threatened
21 Poole's life, said, "You want to put your life on it?"
22 And so not long after that, Poole was suspended.
23     Q.  Do you know who those two state troopers
24 were that you said gave verbal confirmation?
25     A.  I believe it was -- I don't know their first

117

1  names.  I believe it may have been Trooper Thomas and
2  Trooper Burrell, but it was definitely a trooper
3  stationed in Vance County.  But I believe it was
4  Trooper Thomas, Trooper Burrell.
5      Q.  Do you remember a March 27, 2018 incident
6  involving a collision with a vehicle?
7      A.  I remember a -- I remember a minor fender
8  bender, yes.
9      Q.  Can you tell me what happened?
10     A.  As I previously stated about the headlights
11 when you questioned that earlier, that was involving
12 her and I and the incident has been a long time ago,
13 at least three years ago.  And I did do a report on
14 it.  I noticed the car driving, no headlights, and I
15 was going to turn around and go get the car and I
16 backed up and I hit her car.
17     Q.  Do you remember what time it was, around
18 what time?
19     A.  Maybe around -- somewhere around 8:30, nine
20 o'clock maybe.  It was at night.
21     Q.  So did you turn on your lights before you
22 tried to turn around?
23     A.  Well, that's what I was doing.  However, the
24 camera -- the camera shows, according to Sergeant
25 Welborn, when he looked at the camera, that the camera

---

118

1  showed me turning the lights on either as I hit a car
2  or after I hit -- after I hit her car. But according
3  to the young woman's statement, I turned my lights on
4  before I hit her car and then backed into her.
5          So whichever one it is, I definitely turned
6  my lights on. And if the camera is showing that, then
7  there is a possibility, because it's video evidence
8  that it's electronic, that there's a delay. And it's
9  not uncommon for videos of surveillance to have a
10  three to five second, if not longer, delay.
11      Q.   But do you remember at what point you turned
12  on your lights?
13      A.   I thought that I had turned them on when --
14  when I was backing up, trying to get turned around --
15      Q.   So how did you react when you saw the car
16  without your headlights on? What did you do with
17  regard to the ---
18      A.   As I said to Sheriff White, what I was going
19  to do when I saw it was turn around, get her stopped
20  or get him stopped, whomever the motorist was, and
21  tell them to turn their lights on.
22      Q.   Did you slam on your brakes when you saw the
23  car without the lights on?
24      A.   I began to slow down.
25      Q.   How quickly did you slow down?

---

119

1      A.   Well, I don't have a calculation for that,
2  sir.
3      Q.   Okay. After you put the car in reverse, how
4  quickly did you start backing up the car?
5      A.   When you say, "quickly," define ---
6      Q.   How long did it take for you to start
7  backing up the car? Sorry.
8      A.   Well, it definitely didn't take minute after
9  minute. Maybe a handful of, you know, seconds to get
10  turned around once I came to a complete stop.
11      Q.   Did you check for traffic behind you before
12  you backed up?
13      A.   Yes. I looked and I thought that she was --
14  the driver was, you know, going to slow down to let me
15  get turned around. But unfortunately, things did not
16  go as I wanted them or as they should have went.
17      Q.   Why didn't you wait for the car to pass?
18      A.   The car was behind me.
19      Q.   You left your lane. Why didn't you wait for
20  the car that was behind you to get out of your way?
21      A.   It was a one-lane road. The car was behind
22  me. In other words, you go in one lane, you come in
23  and you -- you come in in another lane. So when I was
24  backing up and the car, what I thought was going to be
25  stationary for me to go ahead, but unfortunately,

---

120

1  was not the case. But I take responsibility for that
2  because it -- it was a wreck. Luckily, there was no
3  significant injuries.
4      Q.   When you say you take responsibility, what
5  do you mean?
6      A.   It happened.
7      Q.   Was it your fault ---
8      A.   I can't deny it.
9      Q.   Did you cause it to happen?
10      A.   Well, I didn't intentionally cause it to
11  happen. However, it happened.
12          (DEPOSITION EXHIBIT
13          NUMBER 14 WAS MARKED
14          FOR IDENTIFICATION)
15      Q.   All right. If we can pull up Exhibit 14.
16  And I will ask you to review this and let us know what
17  it is.
18  (Witness examines document)
19      Q.   You may need to zoom slightly.
20      A.   You ready?
21      Q.   Yes. What is this document?
22      A.   This is the document from Sergeant Chris
23  Mark Welborn dated 4-3-18 in reference to the vehicle
24  collision that you just questioned me on, excuse me.
25      Q.   And it says here, "Deputy White stated he

---

121

1  had his emergency lights on when he turned around in
2  the roadway." Is that what you told Sergeant Welborn?
3      A.   Yes. Something to that effect.
4      Q.   Was that what actually happened?
5      A.   As I just told you, my -- I'm standing by my
6  story that I just provided you. I believe that I had
7  turned on my lights, my emergency equipment to get
8  that -- turn around and get that car pulled over
9  before the wreck happened.
10      Q.   So you believe that happened?
11      A.   Yes. I thought that that's what I was
12  doing, turning my lights on, and wanted -- wanted to
13  get this person stopped to tell them to turn their
14  lights on. Unfortunately, a wreck took place.
15      Q.   And it says on the final two sentences,
16  "Deputy White has been told on several occasions not
17  to be stopping vehicles. I recommend a ten day
18  suspension for Deputy White."
19      A.   Well, first -- go ahead. I'm sorry.
20      Q.   Were you told on several occasions not to be
21  stopping vehicles?
22      A.   No. I'm -- the statement is distorted, all
23  right? First and foremost, "on several occasions" and
24  "not to be stopping vehicles" is what I was told.
25  That That shouldn't even have been put in there by him

---

122

1  because while I was on his shift, him and I were
2  stopping cars together when we had our own cars.
3         He would back me up on his -- on my traffic
4  stops, and I would back him up on his. In fact, I
5  backed up some of the -- uncertified deputies on his
6  shift. I backed them up on their multiple traffic
7  stops.
8         And I just want to add for this, "I
9  recommend a ten day suspension for Deputy White"
10  since you said the last two sentences. This statement
11  that he presented me to sign is not the same statement
12  as this.
13         He had no recommendation for a ten-day
14  suspension for me. In fact, in one of the video
15  recordings of him, Goolsby and I, that same recording
16  with Sergeant Welborn -- excuse me, Sergeant
17  Alexander.
18         He was asked by I believe Lieutenant
19  Goolsby, "Do you believe that White should have got
20  suspended for that?" And Sergeant Welborn can be
21  heard saying no, or disagreeing with a suspension.
22         So this whole statement, "I recommend a ten
23  day suspension" for me, "for Deputy White," that part
24  was never in this form. Once more, this is another
25  manipulation of evidence by your client.

123

1         MS. ROBINSON: Mr. Castro. Can we take
2  a break when you get finished with this?
3         MR. CASTRO: Yes. Just a few more
4  questions on this.
5  Q.  (Mr. Castro) Does it -- it says you refused
6  to sign. Is that correct?
7  A.  I'm sorry?
8  Q.  It says that you refused to sign this
9  document at the bottom, to the left. Is that correct,
10  did you refuse to sign this?
11  A.  Yes. I refused to sign.
12  Q.  Why did you refuse to sign it?
13  A.  I was not going to put my signature on
14  anything else after they made a scene. Management
15  made a scene because I signed the written warning. I
16  wasn't going to put my signature on no employee
17  counseling or coaching, let alone -- written warning.
18         Because upper management made a big deal
19  because I signed the corrective action that Campbell
20  issued to me that was allegedly approved by the
21  Sheriff. So my signature did not go on any additional
22  documentation.
23  Q.  Regardless of whether those documents were
24  accurate, you just didn't want to sign anything?
25  A.  The documents weren't accurate. In terms of

124

1  the write-up, it was not accurate ---
2  Q.  So you refused ---
3  A.  --- but I signed it because I was told to
4  sign it.
5  Q.  So your refusal to sign is based on the fact
6  that they made a big deal in the past about
7  signatures?
8  A.  Yes. That's...
9         MR. CASTRO: Okay. We can take a break
10  now. And you're on mute, Ms. Robinson.
11         THE COURT REPORTER: We are off the
12  record. It is 2:58 p.m.
13         MR. CASTRO: You're still on mute, Ms.
14  Robinson.
15         MS. ROBINSON: Yes. I was saying I
16  kind of object to the last characterization of his
17  testimony. I think he's testified that he objected --
18  or he refused to sign because the statement wasn't
19  true and he was directed to sign the first statement.
20         MR. CASTRO: Noted. All right. We'll
21  go off the record.
22         THE COURT REPORTER: We are now off the
23  record. The time is 2:58.
24  (Brief recess: 2:58 to 3:17 p.m.)
25         THE COURT REPORTER: We are back on the

125

1  record. The time is 3:17 p.m.
2         (DEPOSITION EXHIBIT
3          NUMBER 16 WAS MARKED
4          FOR IDENTIFICATION)
5  Q.  (Mr. Castro) All right. So I would like to
6  turn your attention, Mr. White, to Exhibit 16. And I
7  would like you to review it and let us know what this
8  is?
9  (Witness complies)
10  A.  That is a DMV-349, traffic or -- excuse me,
11  my wreck report.
12  Q.  Does this appear to be a report from the
13  collision that we were discussing before the break?
14  A.  Yes, it appears to be.
15  Q.  If you look at Page 2, there's an
16  illustration. Does that illustration appear to be
17  correct?
18  A.  It's similar to what happened.
19  Q.  Are there any inaccuracies that you can note
20  about the illustration?
21  A.  I mean, it's a illustration. So I mean,
22  it's -- it's similar.
23  Q.  We're going to move on to Exhibit 17, which
24  will be shared to your screen. This is a placeholder
25  because the document was too large to send via e-mail.

126

1          (DEPOSITION EXHIBIT
2          NUMBER 17 WAS MARKED
3          FOR IDENTIFICATION)
4          MR. CASTRO:  So I'll ask the court
5   reporter to share the video.
6          MS. ROBINSON:  Mr. Castro, I'm sorry.
7   What video is this of?
8          MR. CASTRO:  This is a video of the
9   March, 2018 incident involving Mr. White's vehicle.
10         MS. ROBINSON:  You all haven't produced
11  any videos at all.
12         MR. CASTRO:  We have identified them in
13  our -- this video particularly in our initial
14  disclosures, but there were no discovery requests
15  related to this video.  If we received such a request,
16  we of course can produce it.
17         MS. ROBINSON:  There were discovery
18  requests related to anything that was affiliated with
19  Mr. White and his employment.
20         MR. CASTRO:  Again, these were in the
21  initial disclosures.  They were disclosed to you
22  awhile back.
23         MS. ROBINSON:  We haven't received this
24  video and I want to -- I'm objected to viewing it.
25         MR. CASTRO:  Your objection is noted.

127

1   Can you please play the video, Ms. Court Reporter?
2   And if you can skip to the 30th second of the video.
3   Can you pause the video?  Mr. White, what is the
4   timestamp on the top of this video?
5       **A.  3-17-2018, 9:40.**
6       Q.  Did the collision that we discussed happen
7   on 3-17-2018?
8       **A.  No.  It didn't happen on -- not that I know.**
9   **I don't remember it happening on 3-17-2018.  It may**
10  **have been 3-27-2018, but it was something, somewhere**
11  **around March.  But as you just said, not 3-17-2018.  I**
12  **don't remember it happening on that date, but I know**
13  **it was somewhere in March.  I'm not disputing it**
14  **happening.**
15      Q.  Can you reread the timestamp, please?
16      **A.  3-27-2018 9:40:52 seconds.**
17      Q.  So it's not 3-17.  It's 3-27.  Did the event
18  happen on March 27, 2018, to the best of your
19  knowledge?
20      **A.  I have no reason to say otherwise.**
21      Q.  To the best of your knowledge, did this
22  event happen at 9:00 -- around 9:40 p.m.?
23      **A.  I have no other -- I have no reason to say**
24  **otherwise.  I mean, I -- I've told you somewhere**
25  **around 8:30, 9 o'clock approximately.  So and --**

128

1   that time, it was pitch-black night, so...
2          MR. CASTRO:  Okay.  You can play the
3   video, ma'am.
4   (Video plays)
5          MR. CASTRO:  You can pause the video.
6       Q.  (Mr. Castro)  Does this appear to be the
7   collision that we were discussing involving you?
8       **A.  Yes.**
9       Q.  Do your lights appear to be on before you
10  attempt to stop and turn?
11      **A.  No, they do not.**
12      Q.  When does it appear from the video that your
13  lights turned on?
14      **A.  It appears from the video afterwards.**
15      Q.  About how long afterward?
16      **A.  I didn't count the number of seconds, but**
17  **shortly afterwards.**
18      Q.  You mentioned that there might have been
19  lag.  Do you think this delay could be based on lag in
20  the video?
21      **A.  I said that there may have been some type of**
22  **delay because it's not uncommon for there to be a**
23  **delay when it comes to surveillance.  And for that**
24  **matter, video surveillance, electronic surveillance or**
25  **even broadcasting.**

129

1       Q.  Do you think ---
2       **A.  And I also said -- I'm sorry, sir?**
3       Q.  Continue.
4       **A.  Go ahead.**
5       Q.  Do you think the delay is the reason that it
6   appears your lights turn on after you attempt to turn?
7       **A.  What I'm saying it, stating a -- a fact that**
8   **this could have been the issue.  But I'm not disputing**
9   **the situation happening, and as I've already said,**
10  **I'll take responsibility for it.**
11      Q.  Are you disputing that you did not turn on
12  your blue lights until you hit the other car?
13      **A.  I'm not disputing what took place in terms**
14  **of the -- the wreck, the entire wreck.  What I'm --**
15  **what I'm saying is I take responsibility for it.  It**
16  **happened ---**
17      Q.  Do you admit -- do you admit that you did
18  not turn on your lights until after you hit the other
19  car?
20         MS. ROBINSON:  I object.  This is the
21  third time he's answered that question.
22         MR. CASTRO:  No.  He hasn't answered
23  this question.
24      Q.  (Mr. Castro)  Can you answer the question,
25  Justin White?

130

1      A.   Based on the video, it appears that I did
2   not turn on my lights on after the wreck.
3      Q.   Why did you tell your superiors that you had
4   turned on your lights prior to the wreck?
5      A.   Because I felt that I had turned on my
6   lights prior to the wreck.  Not only that, based on
7   her statement.  She said in her writing that I turned
8   on my lights and backed up into her.
9      Q.   What belief -- you said, based on your
10  belief that you had turned on your lights.  What was
11  that belief ---
12     A.   I though that when I -- I thought I had
13  turned on my lights.  I mean, I asked that -- answered
14  that question multiple times.  I thought I turned on
15  my lights.  The video says otherwise.
16     Q.   So when the statement said that you informed
17  your superior that you did turn on the lights, but a
18  video indicated otherwise, is that an accurate
19  statement?
20     A.   Repeat the question.
21     Q.   Is it accurate that you told your superiors
22  that you had turned on your lights before the
23  collision, when in fact, you had not?
24     A.   Are you asking me if -- is it true that I
25  told my superiors that I turned them on and they

131

1   weren't turned on?
2      Q.   Yes.
3      A.   Based on the video, yes.  That's -- that's
4   accurate, that I did not have on my lights until after
5   I backed into her.
6      Q.   Okay.  We can remove the video from the
7   screen share.  Moving on to another topic, do you
8   remember responding to a breaking and entering on
9   Evans Street during your employment at Vance County
10  Sheriff's Office?
11     A.   It was so many -- no, I don't.  There was so
12  many B&Es.
13     Q.   You don't remember any particular
14  situations?
15     A.   No.  I can't even remember where Evan Street
16  is.  As you continue to ask questions, maybe something
17  will come to my mind.  I mean...
18     Q.   Well, you called in an incident, according
19  to others.  I'm not saying this is the truth.  I'm
20  asking you whether this happened.
21         Did you call an incident about a breaking
22  and entering call on Evans Street, and did you call it
23  in in a panicked manner or a fast manner?  Do you
24  remember anything like that?
25     A.   I don't recall a B&E at Evans Street.  There

132

1   are so many B&Es and burglaries and other calls of
2   services I responded to, so I can't pinpoint that one.
3   If you have some type of evidence, video, recording,
4   radio traffic, please share with me.  It might trigger
5   something to where I do remember it.
6      Q.   Okay.  We're going to move on to the Ms.
7   Latwayna Oliver incident, spelled L-A-T-W-A-Y-N-A,
8   Oliver, which happened in October of 2018.  What can
9   you tell me about Ms. Oliver?
10     A.   What is it that you want to know about Ms.
11  Oliver?  That's a very broad statement.
12     Q.   Did you know anything about her before
13  October of 2018?
14     A.   I did not know her.
15     Q.   Did you know her personally?
16     A.   No.
17     Q.   I want to talk about your first encounter
18  with Ms. Oliver.  What was the first encounter that
19  you had with Ms. Oliver and her vehicle?
20     A.   I don't remember the specific date.  It was
21  around, you know, right before the use of force, but I
22  don't remember the specific date.  But she -- I
23  observed multiple traffic violations while on patrol.
24  I radioed in her -- her plate information.
25         I recall asking if -- about if there was any

133

1   10-29s, which refers to warrants.  Although Major
2   Bullock -- well, then Captain Bullock, but now
3   Major -- well, he's retired now.  But Mr. Bullock
4   alleged in the unemployment hearing that -- the
5   appeal, rather, after I won in the initial one, the
6   initial decision.
7         But after that, he alleged that there was no
8   recording of me asking for any information on her, and
9   then he said that there was a distortion of what I
10  meant by 10-29s.  But nevertheless, I radioed her
11  plate in.
12         I did not have a laptop, so I waited for the
13  information to come back.  I did not pull her over.  I
14  just took the community-oriented policing philosophy,
15  the model approach, and I attempted to talk to her.
16  And she was not happy and told me to write the ticket
17  or whatever.
18         And then I said, "I'm not trying to write
19  you a ticket or anything.  The only thing I'm trying
20  to do was caution you on your violations because you
21  put somebody else's life and safety at risk and
22  jeopardy."  And so that was it.
23     Q.   What's a 10-29?
24     A.   As I've just said, 10-29 warrants.  Warrant
25  service.

134

1    Q.  And why did you first notice Ms. Oliver's
2  vehicle?
3    **A.  As I said, that she was committing several**
4  **violations.  You have to look at my report I did on**
5  **it.  I'm pretty sure I put it in there.**
6    Q.  Do you recall yourself what you saw?
7    **A.  Not off the top of my head, but there was**
8  **multiple violations.**
9    Q.  Were they, in your opinion, minor
10 violations?
11   **A.  Well, they were -- they were violations that**
12 **were major that could have had severe consequences if**
13 **somebody had came into contact with her or she came**
14 **into contact with somebody, whether it had been a**
15 **personal car.  But as far as the specific reasons,**
16 **you'll have to look at my report.  I --can't**
17 **remember off the top of my head.**
18   Q.  Okay.  So did you run the vehicle
19 registration through 911 or the dispatcher?
20   **A.  Yes.**
21   Q.  What did you say to the dispatcher, do you
22 remember?
23   **A.  Well, you will have to pull the recording**
24 **and then send the recording to us.  It's been a long**
25 **time ago, but I believe I gave them their plate, gave**

135

1  **911 the plate.  The North Carolina 10-28, the vehicle**
2  **information, the plate number.**
3     **And I remember asking if there were any**
4  **10-29s and -- that would've been for the person, and**
5  **if there was something attached to the vehicle that**
6  **would've came back, and I remember being told no.**
7     **But Major Bullock said that there's no radio**
8  **evidence of me asking any of that, and then says that**
9  **there was a distortion in what the 911 dispatcher**
10 **thought I was asking for and was not asking for.  So I**
11 **don't know what's on that tape because you all haven't**
12 **provided it to us.**
13   Q.  So did you turn on your blue police lights
14 while talking to Ms. Oliver?
15   **A.  I don't remember -- I don't remember turning**
16 **on the lights or sirens.  I remember just talking to**
17 **her in my car, and she was standing outside in the**
18 **PVA.**
19   Q.  So you said that she said, "Just give me a
20 ticket."  Did she say anything else?
21   **A.  Yes.  She's -- she mumbled some words about**
22 **"Give me a ticket," or whatever, or something to that**
23 **effect.  "Let me go," or something.  It's been a long**
24 **time.  I cannot repeat verbatim what happened.**
25   Q.  Well, I'm just asking you to repeat what you

136

1  remember happened?
2    **A.  Okay.**
3    Q.  How did you react to her response?
4    **A.  I was professional and I continued the**
5  **pursuit of my duties.**
6    Q.  Did you think what she said was
7  disrespectful?
8    **A.  I can't say that she was disrespectful.**
9    Q.  Can you say that she ---
10   **A.  As a matter of fact, she said something**
11 **about -- she said something about, "I know my rights"**
12 **and some other things.  But I didn't take her stuff as**
13 **me being, like, hurting towards me.  I didn't take it**
14 **personal.**
15   Q.  So what did you do when you returned to the
16 Sheriff's Office after this discussion with Ms.
17 Oliver?
18   **A.  Well, one, I checked the system, and I went**
19 **over to verify with 911.  And because they came**
20 **across -- despite Major Bullock saying that there was**
21 **no tape that showed me asking for 10-29s or showed 911**
22 **giving me any information, and that is in the record.**
23      **And then him saying that there was**
24 **something, but there was a -- a distinction or a**
25 **distortion between what I was saying and what the 911**

137

1  dispatcher believed or said it to me.  And they
2  verified two warrants, said that they were still
3  active.
4     **And I asked, "Well, why didn't you all tell**
5  **me this when I asked for it?"  And they said, "Well,**
6  **it didn't show up."  And that was a Caucasian male**
7  **dispatcher, skinny.  I can't think of his name.  Tall**
8  **and slender.  I believe he drives a white truck, but I**
9  **can't think of his name.**
10   Q.  Thank you.  Do you -- is this what you
11 normally did, you checked for warrants on people after
12 you stopped them for a traffic violation?
13   **A.  No.  It wasn't something that I normally**
14 **did, but what they came back with so quickly was also**
15 **out of the ordinary.  Then they claimed they never --**
16 **that Major Bullock claimed nobody ever said anything**
17 **about it to me.  Excuse me.**
18      **And then says that, "Oh, there was a**
19 **distinction or a distortion," something he worded.  So**
20 **I don't know what's on the tape, and I'm definitely**
21 **not going to be committing perjury or trying to commit**
22 **perjury.**
23   Q.  I understand.  So you said it's not what you
24 normally do.  Why did you do it in this instance?
25   **A.  As I just answered, they came back so**

138

1  quickly with an answer.
2      Q.  So if there were outstanding warrants and
3  you knew this when you first stopped Ms. Oliver.  If
4  that were the case, which it was not, according to
5  your testimony, would you have arrested her at that
6  point?
7      A.  She would have been arrested forthwith to
8  the Magistrate without unnecessary delay.
9      Q.  Okay.  Let's move to what you did after you
10 saw that there were warrants.  Did you go to Ms.
11 Oliver's home?
12     A.  I did go to -- I did go to her home later.
13     Q.  Do you remember around what time that was,
14 the first time?
15     A.  I don't have a -- I don't know the
16 approximate time.  I know one of the -- I believe one
17 of the reports say 2:00.  Maybe another report say
18 12:00.  I don't know what time it was.
19     Q.  Can you describe where she lived?  Was it an
20 apartment complex, development, something like that?
21     A.  I believe she lived in a -- there may have
22 been a side road or it could have been a
23 sub-development.  But wherever it was, I believe it
24 was double-wide -- she lived in a double-wide, if not
25 a modular home.

139

1      Q.  Were her neighbors close to her in
2  proximity?
3      A.  What do you mean, neighbors?
4      Q.  Were there other modular homes nearby hers?
5      A.  There were other homes there.  It could've
6  been a modular home or it might have been a
7  double-wide.  They were spaced out, but there were
8  other people in that area.
9      Q.  And I know you're not going to have a
10 perfectly accurate measurement, but if you have to
11 estimate the amount of feet between the homes, or
12 yards, what would be your estimate?
13     A.  I can't say.
14     Q.  Okay.
15     A.  Not even an estimate.
16     Q.  Okay.  So why did you arrive to her home by
17 yourself?
18     A.  To serve the warrants.
19     Q.  Did you request backup?
20     A.  I don't believe I requested backup.  Not for
21 that situation.
22     Q.  Why didn't you request for backup?
23     A.  Well -- hold on.  Hold on.  Let me go back.
24 Hold on.  Let me go back.  Let me go back.  We're
25 talking about the night after I -- after I found out

140

1  that she had the warrants?
2      Q.  Yes.  The night where it might be stated
3  that it was around 2:00 a.m., the first time.
4      A.  No.  I'm not saying it was 2:00 a.m.  I was
5  saying the reports say either 12:00 a.m. or 2:00 a.m.
6      Q.  Yes.
7      A.  Now, there is a -- I don't want to get my --
8  I don't want to get the facts distorted.  I did a
9  report about when there was -- I do remember there w
10 a time that I did ask for backup.
11     Q.  Was this from Mr. Welborn, to refresh your
12 memory?
13     A.  Yes -- yes.  I don't want to get the facts
14 distorted.  I don't want to say something that is
15 untruthful, but let me speak to what I remember.  I
16 requested backup from -- Sergeant Welborn.
17          Sergeant Welborn told me to "Go and pick her
18 ass up," and said, "Bo, you've been to handling
19 school.  You know what to do."  And he said this in
20 front of -- he said this in front of -- it's a Black
21 deputy, African-American deputy, male deputy.
22          I can't think of his name, but there was a
23 third party there.  And when it comes to me, I'll say
24 it.  But there was -- he said it in front of an
25 African-American deputy.

141

1          And despite me asking for backup, he told me
2  to go pick her up and that I'd need no backup because
3  I've been to handling school.  And he told me to "go
4  get the shit handled."  And so that's what I'd done.
5      Q.  So without admitting that this happened at
6  2:00 a.m., do you think it's appropriate to serve a
7  warrant around 2:00 a.m.?
8      A.  Well, warrants are -- well, yes.  Warrants
9  have been served later than that by other deputies and
10 supervisors.  In fact, there have been search warrants
11 served around that time at night and after that time,
12 and then before that time.
13          And it falls on the supervisor.  As a
14 supervisor, if he didn't want me to go and get her, to
15 serve her with those felony warrants, then he wouldn't
16 have to told me to go do it.
17     Q.  So you mentioned search warrants ---
18     A.  And the -- I just had his name.  Go ahead.
19 It's going to come back to me.
20     Q.  So you mentioned search warrants.  What
21 about arrest warrants around 2:00 a.m.?
22     A.  I believe that there were arrest warrants
23 done late night, early morning.  Most certainly, we
24 have served arrest warrants on day shift, night shift,
25 afternoon.  Graveyard, which is, you know, late night

142

1  Night shift, early morning. So -- and these are
2  felony warrants, which is a greater crime than a
3  misdemeanor.
4      Q.  So you mentioned that these warrants are
5  served at many times. Do you know when the most
6  common time period is that they're served? Is it the
7  morning, the afternoon, the night?
8      A.  They are served during the day, and then I
9  know some supervisors, once they -- I know one has
10  said something about, he tried not to go later than
11  10:00. Another said they tried not to go later than
12  11:00. Then, another one said they don't got no time
13  for it. Some say 12:00.
14      And these were deputies talking as well, so
15  I can't give you the specific names of these people,
16  but it was -- I mean, it was a -- it was more than one
17  or two or even three.
18      But in terms of a specific policy, those
19  were felony warrants, so the supervisor told me to go
20  served them, which was Welborn, in front of Deputy
21  Deputy Anton, Anton Edwards. Sergeant Welborn told me
22  in front of Deputy Edwards to go and pick her up,
23  along with some curse words.
24      Q.  Is it Anton or Antwon?
25      A.  I believe it is Anton, A-N-T-O-N, maybe with

143

1  an E to it. Might be an I in there. I don't know,
2  but Deputy Edwards.
3      Q.  So you mentioned that some one or more
4  people said, "No later than 10:00." You can't tell me
5  who that was?
6      A.  This was after -- this was like -- a lot of
7  this stuff came up after the incident took place.
8  Most certainly, when I was with Marin, we served
9  warrants later than 10:00, and sometimes later than
10  11:00.
11      Q.  Had you ever served another warrant at 2:00
12  a.m. before this one?
13      A.  I don't know the times. I know that I
14  served multiple warrants, whether misdemeanor or
15  felony, night shift, and served arrest warrants, I
16  mean, the same time. In terms of, like, the specific
17  cases, I'm not sure. You all would have to curate the
18  database.
19      Q.  So based on your experience as a law
20  enforcement officer, are there additional risks that
21  come when you would serve a warrant at 2:00 a.m.?
22      A.  There may or may not be any additional risk.
23  But once more, the supervisor didn't -- if the
24  supervisor thought it was risky, then the supervisor
25  shouldn't have told me to go serve it in front of a

144

1  third-party deputy, Deputy Edwards.
2      Q.  Well, notwithstanding whatever the
3  supervisor said, I'm asking you. In your experience,
4  is it more risky to serve a warrant at 2:00 a.m. than,
5  let's say, 5:00 p.m.?
6      A.  It may or may not be risky. Someone may
7  make the argument of, "Well, it's late night, early
8  morning. We don't know who's knocking at that time
9  night. It could be somebody breaking in the house,"
10  or somebody might not agree with that.
11      I mean, it's just based on the perceptions
12  of whomever mind is -- you know, whoever is in the
13  house and what's going through their mind and what
14      Q.  But what about from the standpoint of the
15  officer, which is you in this situation?
16      A.  Well, that's the thing. Warrants are served
17  throughout, as I previously said -- as I previously
18  answered, warrants are served throughout day shift and
19  night shift. From day, morning, noon, afternoon,
20  evening, night, late night, early mornings.
21      Q.  All right. But I'm not asking you when
22  warrants are served. I'm asking you, is there more of
23  a risk based on your experience ---
24      A.  And I answered you ---
25      MR. MCGURL:  Objection. Asked and

145

1  answered.
2      MR. CASTRO:  Have you entered a notice
3  of appearance in this case, Mr. White -- I mean, Mr.
4  McGurl?
5      THE WITNESS:  I'm sorry?
6      MR. CASTRO:  I'm sorry. I don't want
7  objections from two attorneys, one who hasn't entered
8  a notice of appearance in this case. I'm going to get
9  back to Mr. White here.
10      Q.  (Mr. Castro)  You did not answer my
11  question. You ---
12      MS. ROBINSON:  I think at this point,
13  you're badgering the witness. He has answered that
14  question five times.
15      MR. CASTRO:  No, he hasn't. He's told
16  me what his supervisor did.
17      Q.  (Mr. Castro)  Okay. Anyways, you can still
18  answer the question, of course, unless you're
19  instructed not to. Is there a greater risk in your
20  opinion, not from the opinion of your supervisor or
21  from the person in the house, when you serve a warrant
22  at 2:00 a.m. versus 5:00 p.m., yes or no?
23      A.  There may or may not be a greater risk.
24      MS. ROBINSON:  And that's your answer.
25      MR. CASTRO:  I would ask Opposing

146

1  Counsel not to make commentary during the deposition.
2          MS. ROBINSON:  I'm telling you, as
3  Opposing Counsel, that's your answer.  And that has
4  been his answer each time you asked that question.
5          MR. CASTRO:  And I'll refer you to
6  Federal Rule of Civil Procedure 30, which says you
7  cannot make speaking objections ---
8          MS. ROBINSON:  Don't -- don't badger
9  the witness.
10         MR. CASTRO:  I'll object to your --
11 your coaching the witness ---
12         MS. ROBINSON:  I'm not coaching.
13 You're badgering the witness.
14         MR. CASTRO:  Again, I'll refer you to
15 Federal Rule of Civil Procedure 30 and ask you not to
16 make speaking objections.
17     Q.  (Mr. Castro)  Did you announce yourself as a
18 deputy sheriff when you first visited Ms. Oliver's
19 home?
20     **A.  I can't recall.**
21     Q.  Do you recall if you knocked on any of her
22 doors?
23     **A.  Yes.  I did knock on her door.**
24     Q.  Did you try to look inside to see if anyone
25 was there?

147

1      **A.  I can't recall.**
2      Q.  Have you ever been visited by a deputy or
3  police officer while at home?
4      **A.  Yes.**
5      Q.  Have you ever had a law enforcement officer
6  visit you after 12:00 a.m.?
7      **A.  I don't know if I've had one to visit.  No.**
8  **I can't say that I've had one to the visit that late.**
9      Q.  Would it be reasonable for a woman alone to
10 open the door at 2:00 a.m. when a man is knocking at
11 her door?
12     **A.  It may or may not be reasonable.  But to**
13 **answer your question, to go a little bit further.**
14 **According to the statements, Ms. Oliver wasn't alone.**
15 **I believe there was something in there that somebody**
16 **else was in the house with her.**
17     Q.  So let's talk about the use of force
18 incident on October 22nd, 2018.  Did you go to her
19 property again after there was no answer?
20     **A.  Yes.  I went to her house after she didn't**
21 **answer.**
22     Q.  When was that?
23     **A.  I believe, as you alluded to, the use of**
24 **force.**
25     Q.  Did you ask other officers to go with you

148

1  this time?
2      **A.  I don't believe that I asked another officer**
3  **to help me.  Because I had already received**
4  **instructions from Sergeant Chris Welborn to go to the**
5  **house by myself and to handle it, saying that I've**
6  **been to handling school and to "go and get her ass,"**
7  **amongst some other things around that effect.  So no,**
8  **I didn't ask anybody for backup.**
9      Q.  Did you want backup?
10     **A.  Well, I asked for a second officer the first**
11 **time with Welborn and he denied it.**
12     Q.  Did you bring this to the attention of any
13 other supervisors or Sheriff White?
14     **A.  Yes.  I brought it to the attention of**
15 **Sheriff White.  I brought it to the attention of**
16 **Argretta Johen and Captain Weldon Wallace Bullock**
17 **writing.**
18     Q.  Before you went to the home?
19     **A.  No.  Not before I went to the home.**
20     Q.  Okay.  So let's discuss what happened when
21 you arrived.  Where did you park in relation to her
22 home?
23     **A.  In her driveway.**
24     Q.  And did you go up to her door?
25     **A.  Yes, I walked to her door.**

149

1      Q.  Do you remember what happened after that?
2  Can you describe to me?
3      **A.  Once more, I'm going to refer you to the**
4  **reports, the use of force report, incident report, and**
5  **Captain Bullock's alleged investigative report.  It's**
6  **been a long time since stuff has happened, but I can**
7  **touch briefly that I went to her house.**
8          **She -- and told her that I -- she had**
9  **warrants.  She had cooperated.  I noticed that she**
10 **didn't lock her front door or side door, whichever one**
11 **it was.  And she said, "Thank you," and she went and**
12 **locked it, and said, "Thank you" again, walked**
13 **outside.  She said I had to pull the door and she said**
14 **something was wrong with the locking device.  So I**
15 **pulled it and ---**
16     Q.  Did you talk at all ---
17     **A.  --- she made sure that it was locked.  I'm**
18 **sorry?**
19     Q.  Did you have any conversations during this
20 time other than, "Thanks for locking my door"?
21     **A.  Well, yes.  And I told her that she was**
22 **under arrest and -- you know, for the warrants.  As I**
23 **previously told her, she had warrants, and she -- she**
24 **acted as if she was going to cooperate up until she**
25 **wouldn't cooperate.**

150

1      And she wanted to -- she didn't want to
2  cooperate with me handcuffing her.  She didn't want to
3  go to jail.  It was a -- it was a lot of stuff.  And I
4  told her, I said, "You have to go."
5      Q.  Did she ask you to call other officers to
6  the scene?
7      A.  She may have asked for another officer, but
8  as I -- it was something to that effect, "Can somebody
9  -- can somebody else take me?"  She even asked -- I
10  think she may have asked something to the effect of,
11  "Can I see the warrant?"  Or something to that effect.
12      It's been a long time, so we'd have to rely
13  on the report.  But I did everything I could to get
14  her to comply and she would not cooperate.
15      Q.  When she said to someone -- "Can someone
16  else take me," what was your response?
17      A.  I told that I'm here to handle the matter
18  and that if she cooperated with me -- and I believe I
19  put this in my report, that I would recommend to the
20  magistrate judge a bond reduction based on her
21  cooperation.  And she was like, "Okay."
22      And then when I tried to put the handcuffs
23  on, she just -- she did not cooperate at all.  She --
24  became aggressive, resistive, assaultive,
25  non-cooperative, non-compliant.

151

1      And it resulted in a soft hands technique,
2  an improved takedown maneuver, straight arm bar being
3  applied.  While it's unfortunate her arm was
4  fractured, despite the paramedics, two of them, saying
5  three different times that nothing was wrong with her.
6  She had evidently suffered a fracture.
7      Q.  Okay.  Taking a step back to when she was
8  saying all of these things like, "Can I see a warrant,
9  can someone else get me," why didn't you just call
10  someone else to handle the situation when she was
11  acting like this?
12      A.  I'm sorry.  Are you saying that she said
13  that she asked to see a warrant?
14      Q.  You said that.
15      A.  Is it -- that's -- I said that, like, on the
16  deposition or in the reports?
17      Q.  I think it was today that you said it.  I'm
18  not sure if it's in a report, but when she was saying
19  all of these things about the arrest that you were
20  describing, how was she sounding?  Was she yelling,
21  was she crying?
22      A.  Repeat the question.
23      Q.  When she was -- when you were in the process
24  of escorting her to your patrol vehicle or to your
25  vehicle and she was speaking to you, was it normal

152

1  conversational tone?  Was she yelling, was she
2  screaming?  Can you describe the tone?
3      A.  When after the door was locked and we walked
4  to the car, before I handcuffed her, or after I
5  handcuffed her?
6      Q.  Let's start with before you handcuffed her,
7  taking her to the car.
8      A.  Okay.  She was cooperative, as I said.
9      Q.  And then when did she start acting
10  uncooperative?
11      A.  When I tried to handcuff her to place her
12  under arrest.
13      Q.  Had she said anything before you tried to
14  handcuff her other than, "Thanks for locking my
15  doors"?
16      A.  Like I said, it was -- it's been a long
17  time.  We'd have to refer back to the incident report.
18      Q.  So when you started trying to handcuff her,
19  how did she react?
20      A.  She did -- she was not cooperative when I --
21  she was uncooperative when I tried to handcuff her.
22      Q.  What do you mean, "uncooperative"?  Can you
23  describe her actions?
24      A.  She resisted arrest.  She resisted arrest
25

153

1  unlawfully.  She became aggressive and she attacked
2  me.  She was assaultive.  And I put it in my report,
3  of what she'd done.  And I grabbed her arm, the lower
4  arm, the upper arm, and I did an arm bar takedown
5  where I got her to the ground.
6      Q.  When you say she was resisting, was she
7  physically resisting?
8      A.  Yeah.  She was physically resisting arrest.
9      Q.  Was she trying to squirm, trying to hit you?
10      A.  Well, she wasn't trying to hit me because
11  she did hit me, and I put that in the report.  She was
12  very adamant about not going to jail.
13      Q.  Was she verbally resistant as well?
14      A.  Yes.
15      Q.  Why didn't you show her the actual warrant
16  when she asked you to?
17      A.  One, I didn't have -- I don't believe I had
18  a warrant with me.  And even if I did have a warrant
19  with me, when I tell someone they're under arrest,
20  they have to comply.  That's a statute.
21      Q.  Do you usually -- during your time at the
22  Vance County Sheriff's Office, did you usually arrest
23  people without having the actual warrant?
24      A.  It wasn't uncommon for me to, because I
25  didn't have a laptop and even if I show them a warrant,

154

1    Q.  Did you have the capability to print a
2  warrant at the Sheriff's Office?
3    A.  I could've -- I could've printed a warrant
4  at the Sheriff's Office, but we were already given our
5  activity -- well, no.  Not activity -- well, what is
6  it called?  It's like a -- it's a warrant log.
7        If we have -- if we're assigned to North or
8  South, it's a warrant log with the names of people.
9  Sometimes they have a picture.  Sometimes they don't.
10  Sometimes it has other identification -- not other
11  identification, but like -- like a date of birth.
12  Like, in terms of identification, like photo, other
13  identifying markers.
14    Q.  Okay.  So you mentioned that she was acting
15  aggressively.  What did you do to try to de-escalate
16  the situation?
17    A.  First, I talked to her and with her.  I did
18  everything I could to de-escalate the situation.  I
19  even went above and beyond by telling her -- excuse
20  me.  Excuse me.  If she complied, I would speak good
21  on her behalf to the judge.  I told her she had to go
22  to jail.  She is the one that escalated the matter
23  because all she had to do was comply.
24    Q.  Did you ever try to push her into the patrol
25  car or push her against the patrol car?

155

1    A.  I tried to get her into my car to transport
2  her to the Magistrate's Office.
3    Q.  Was this before she was handcuffed?
4    A.  This is when I tried to handcuff her and she
5  was resisting, so I could not, like, force the
6  handcuffs on her.  And unfortunately, she attacked and
7  assaulted me, and it led to an arm bar.
8          MR. CASTRO:  Can we go off the record?
9          THE COURT REPORTER:  Off the record at
10  4:04 p.m.
11  (Off-record comments)
12          THE COURT REPORTER:  Back on the record
13  at 4:04 p.m.
14    Q.  (Mr. Castro)  So you tried to get her into
15  the patrol car before you had the handcuffs on her?
16    A.  I tried to handcuff her and get her into my
17  patrol car.  Unfortunately, it didn't work.
18    Q.  Okay.  So if we can look at the Exhibit 3,
19  which is the amended complaint.  And we can go to
20  Paragraph 123, and that is on Page 23 of 47.
21    A.  All right.
22    Q.  Does this appear to be an allegation that
23  you made?
24    A.  "Sergeant Welborn instructed Mr. White,"
25  "to serve the two felony warrants."  That's what

156

1  you're referring to?
2    Q.  Yes.
3    A.  Yes.
4    Q.  It goes on to say, "White, you've been to
5  handling school - Bo, you don't need me, do I have to
6  hold your hand with everything?  Go serve the damn
7  warrant and if you need me just call me and I will
8  come up there go serve the warrant JJ!"
9        So is it true that Mr. Welborn said, "If you
10  need me just call me and I will come up there"?
11    A.  Mr. Welborn told me prior to, to go serve
12  warrant and to get it done.  His instructions were
13  clear.  Now, he said, "If you need me, just call me."
14        Unfortunately, during the height of the
15  situation, the intensity of it with be use of force is
16  what I'm referring to, that -- I had to deal with the
17  threat at the time.
18        So it wasn't that I was trying to ignore
19  calling him.  I had a female subject that was
20  attacking me, and truthfully, he wouldn't need me to
21  call him had he came up there in the first place
22  instead of directing me to go do it and to get it
23  done.
24    Q.  So when during the process of arresting Ms.
25  Oliver did you sense that she was starting to resist

157

1  or she started to act like she's not going to comply.
2  When did you realize that?
3    A.  I -- well, when she started resisting, I
4  felt that I could talk to her.  That's why I gave the
5  options to her, you know, prior to, to comply.  In
6  terms of a specific point, I mean, I'm not going to be
7  able to pinpoint exactly.
8        But I can definitely say, when she started
9  attacking me, that made it very clear that there was
10  no talking anything to her.  Anything in -- there
11  was -- I wasn't going to be talk her into
12  submitting to the handcuffs or trying to get her under
13  arrest.
14    Q.  Why did you not use the pepper spray that
15  you had on you?
16    A.  One, I -- one, I am not certified in using
17  pepper spray.  In fact, me having the pepper spray
18  without going through the proper training for it is a
19  liability, and it may or may not be a policy violation
20  because you're required to have training for it and
21  the Sheriff's Office didn't provide it.
22        Another thing, Ms. Oliver had on glasses
23  that I believe would have caused the steady stream to
24  me, ricochet and it was dark, and that will place me in
25  danger and jeopardy.  My safety would be at risk,

158
1  especially if it would have hit me, because it's
2  designed to, you know, disable or incapacitate, at
3  least temporarily.
4        So -- and not only that.  The use of force
5  report -- not use of force report, the use of force
6  continuum from my BLET training, basic law enforcement
7  training, placed self hands techniques before chemical
8  munitions.  So I was in compliance with the training
9  protocols, what I perceive to be, you know, policy.
10     Q.  So you referenced the protocol.  Do you
11 think an arm bar takedown comes before pepper spray in
12 that ---
13     A.  It does.  It's a soft hand technique.  It
14 does.
15     Q.  Which one of those two is more likely to
16 cause an injury?
17     A.  Well, any -- any of them.  I can't say this
18 one would cause more of an injury than this one.  Use
19 of force is designed not to be pleasant outside of
20 de-escalation, all right?
21     Q.  So why did you have pepper spray on you if
22 you weren't trained to use it?
23     A.  Because I was given it and I was told that I
24 was -- that we would -- that the deputies who need
25 training for it was going to get training for it, and

159
1  I never did.
2     Q.  Before ---
3     A.  That would be a question -- I'm sorry?
4     Q.  I'm sorry.  Were you finished?
5     A.  No, go ahead.
6     Q.  Before the Ms. Oliver incident, had you ever
7  used pepper spray on anyone?
8     A.  Well, I have -- you said -- are you asking
9  me if I had used pepper spray?
10     Q.  Before the Ms. Oliver incident in October of
11 2018?
12     A.  At the Sheriff's Office, is what you're
13 talking about, before?
14     Q.  At anytime?
15     A.  At anytime.  Yes.  I had used pepper spray
16 before.
17     Q.  When was that?
18     A.  When I worked as a corrections officer and I
19 was not a sworn law enforcement officer.
20     Q.  Was that the only time?
21     A.  Yes.
22     Q.  How many times as a corrections officer did
23 you use pepper spray?
24     A.  How many times does a corrections officer do
25 what?

160
1     Q.  As a correctional officer or corrections
2  officer, how many times did you use pepper spray?
3     A.  I don't know a specific amount of time.  I
4  mean, it wasn't a lot in terms of like ten, 15, 20,
5  but maybe a handful of times during -- throughout my
6  three-year employment.
7     Q.  So is it more than five?
8     A.  I said a handful of times, approximately.
9     Q.  Were you trained as a corrections officer to
10 use it?
11     A.  Yes.  I was trained as a correctional
12 officer to use pepper spray on inmates, working under
13 the jurisdiction of the Department of Public Safety.
14     Q.  How were you trained?
15     A.  The State trained me.
16     Q.  Do you know ---
17     A.  To deal with prisoners.
18     Q.  Do you know around what time or date you
19 were trained?
20     A.  Maybe around November or December of 2013.
21     Q.  Do you know what agency you trained with?
22     A.  These were for corrections officers only,
23 not sworn law enforcement in terms of police or
24 deputies.
25     Q.  Can you describe how they trained you?

161
1     A.  That's been a long time ago.
2     Q.  Did you actually have to use it during your
3  training?
4     A.  I remember it being used on me.  I don't
5  know -- I don't remember spraying anybody else.
6     Q.  Did they teach you how to spray the device?
7     A.  They showed us how to spray pepper spray.
8     Q.  Did they train you on where you should spray
9  it?
10     A.  I'm pretty sure it was covered in the
11 curriculum.  It's been a long time ago.
12     Q.  So can you give me any other details about
13 the curriculum that ---
14     A.  No.  No, I can't.
15     Q.  Okay.  Was this at the Bertie Correctional
16 Facility?
17     A.  Yes.
18     Q.  All right.  So you said you use an arm bar
19 takedown.  Where did you learn how to use this?
20     A.  BLET, basic law enforcement training.
21     Q.  Was it part of the course materials?
22     A.  It was a part of the curriculum.
23     Q.  Did they demonstrate to you how to use it,
24 or did they just refer to what it is?
25     A.  They referred to what it is and they

162

1  demonstrate it.
2      Q.  And can you describe just physically how to
3  complete an arm bar takedown?
4      A.  I can't give you the step-by-step directions
5  because it's been a long time, but it's in the
6  training manual and it can be pulled.
7      Q.  But you used that takedown, right?
8      A.  Yes.  And it's been a long time.
9      Q.  What do you remember about what you did?
10     A.  As I stated earlier, that I remember placing
11 one of my hands on her lower arm and another hand
12 towards her upper arm, and I believe I rotated.  I
13 can't remember everything in terms of where I could
14 take control of her arm and take her down to the
15 ground to get her under control.
16         But in terms of the specific steps, in terms
17 of stepping back or rotating the arm or however it was
18 done, I would have to rely on the training manual.
19 And that can be pulled, put into evidence.  But I
20 relied on my training, education, and experience to
21 effect the arrest, using the straight arm bar
22 technique.
23     Q.  So after you use the straight arm bar
24 technique, what happened?  What did you do after that
25     A.  Well, she was complaining of her back, her

163

1  neck, her arms, her ankles, her legs, her spine,
2  everything was broke.  Let me skip that.
3         I did call for -- let's see.  I don't have
4  the reports in front of me, but I -- I remember
5  calling for assistance, for -- for backup, and I also
6  remember calling for assistance, for her medical
7  assistance.
8         You all didn't provide us the tapes despite
9  it being public record.  I can't say word for word
10 what's on those tapes, and I'm definitely not going to
11 get hammered up in any perjury or deception allegations.
12 I can't remember everything that I did and everything
13 that was said, but I relied on my training, education
14 and experience to effect the arrest.
15     Q.  You said that we did not provide you the
16 tapes.  Do you know who has custody of those tapes?
17     A.  Your client.
18     Q.  Do you know that -- if the Sheriff Office
19 has custody of the tapes?
20     A.  Well, I'm pretty sure they have a copy of
21 it.  911 emergency services, emergency management,
22 whomever, has the 911 -- recordings as the custodian
23 -- custodian.  But at the same time, it's public
24 record and I'm pretty sure that you all have a copy of
25 that tape.

164

1      Q.  But who did you say was the custodian again?
2      A.  It may be 911.  The emergency services,
3  emergency management, whoever it is with the 911
4  center.
5      Q.  Have you asked them for the tapes?
6      A.  No.  I haven't asked anybody for anything.
7      Q.  All right.  So you said you called it in.
8  Do you remember how you called it in, what you said?
9      A.  As I just said, I do not remember everything
10 that was said.  But I did ask for backup, officer
11 backup at some point in time, and also asked for EMS
12     Q.  So when she -- when Ms. Oliver was
13 complaining, how did you react to that?  Did you get
14 panicked?
15     A.  No.  I didn't panic.  It was important that
16 she get medical services and it was also important
17 that I have backup there.  This woman had just accuse
18 me of basically police brutality by basically saying
19 that I broke her spine, her back, her arms, her legs,
20 her ankles.  Everything was broken according to her.
21         And had she not been aggressive, assaultive,
22 attacking me, then -- or resisting arrest, then the
23 soft hands technique would've never been on her.  She
24 would have been on her way to the Sheriff's Office for
25 processing and before the Magistrate.

165

1         MR. CASTRO:  Off the record.
2  (Off the record:  4:20 p.m. to 4:20 p.m.)
3      Q.  (Mr. Castro)  So did dispatch ask you for
4  more details after you called it in?  To your
5  knowledge or to your recollection, of course.
6      A.  They may have.  I'm pretty sure they asked
7  for details.  Somebody did, but as far as specifically
8  what they asked for it, I don't -- I can't remember
9  verbatim what they said.
10     Q.  Do you remember who arrived at the scene?
11     A.  Yes.  I don't know the persons, but there
12 was two paramedics first and then maybe a minute or
13 two, no longer than three, Sergeant Welborn arrived
14 and he asked what we had.  I told him, and we --
15 Goolsby arrived, blaring lights and sirens, I believe.
16         And at some point in time, well after
17 Welborn got on the scene, when he -- after he got on
18 the scene, Edwards showed up.  I do remember Welb
19 after he got on scene, downgrading the call.  But I
20 mean, it was just -- I mean, it was just us, so nobody
21 else came out there.
22     Q.  Do you remember what you told the
23 paramedics, if anything?
24     A.  It's been a long time.  I didn't see any
25 reports from any paramedics, but I told them that

166

1  she -- something to the effect that she was claiming
2  her arm is broken.  First paramedic examined her and
3  said, "Well, nothing wrong with her."
4      Welborn pulled up.  She -- he got out of the
5  car and came up there.  Second paramedic examined her
6  and said, "Well, nothing wrong with her."  And she was
7  like, "But I'm in pain and everything broken.  My arm
8  is hurting real bad."
9      And so the paramedic again examined her and
10 he said, "Well, nothing wrong with her."  And so at
11 that point in time, Sergeant Welborn took custody of
12 her and she was like, "Well, where we -- where we
13 going?"  And he said, "To jail."  And she said, "But
14 I'm in pain."  And he said, "Come on.  You're going to
15 jail."
16     She said, "No, I'm -- I'm hurting."  And he
17 said, "Ma'am, you're going to jail."  And she said,
18 "But my arm, my arm," and she started screaming and
19 crying.  So the director of EMS pulled up and she was
20 screaming that her arm was broken, her arm was broken.
21     Or the chief of EMS, I believe the agency
22 head, pulled up.  And he examined her and he said
23 something to the effect of, "It's broken or
24 fractured."  And so at that point in time, EMS
25 prepared to gurney her and transport her to Maria

167

1  Parham Hospital in Henderson, and that was it.
2      Q.  Thank you.  You said Mr. Welborn arrived at
3  the scene.  Do you remember talking to him about it at
4  all?
5      A.  Yes.  In terms of verbatim words, I'm unable
6  to provide that, but he asked what had happened.
7      Q.  And you don't remember verbatim, but do you
8  remember generally what you responded?
9      A.  I told him, "She's complaining that her arm
10 is broke."  I believe I told him I did a takedown on
11 her, took her to the ground to handcuff her after she
12 attacked me, et cetera.  But in terms of the -- the
13 specifics like directly repeating it as it was said,
14 I -- it's been a long time ago and we haven't read all
15 the reports.
16     Q.  Do you know if Ms. Oliver had any injuries
17 after the October 22nd incident?
18     A.  Injuries from what?
19     Q.  From the arm bar takedown.
20     A.  Well, the -- as I said, the chief or the
21 director of EMS, he said that, "Yeah.  It's broken or
22 fractured," and they gurneyed her.  I found out
23 later that -- later that night shift that she had a --
24 her arm was fractured, the humerus bone or something
25 like that.

168

1      Q.  Did you know that she was diagnosed with a
2  fractured humerus on her upper arm?
3      A.  Well, I just said that I knew that she had a
4  fracture to the humerus, so yes.
5      Q.  Did you fracture her humerus?
6      A.  Well, I did not break her arm, if that's
7  what you're asking, okay?
8      Q.  You did.
9      A.  It -- that was never my intent, to break her
10 arm.  She resisted arrest.  She fought me.  I did an
11 approved subject control technique, and as a result of
12 her resistance and any other factor, her arm was
13 broken.
14     She didn't have to go down that path of
15 having a possible use of force.  I did my best as a
16 law enforcement officer to de-escalate, to talk to
17 her, to calm her down and even said that I will make a
18 recommendation for bond reduction.
19     Q.  As a result of the technique you used, was
20 her arm broken?
21     A.  I can't say that as a result, that it was
22 broken.  What I can say is there were multiple
23 factors.  I'm not going to say that I broke her arm or
24 the straight arm bar takedown broke her arm.
25     Q.  What else could have broken her arm?

169

1      A.  Her resistance.  Her -- her resisting lawful
2  orders.  Her aggression.  Her -- her physical
3  resistance.  Her aggression towards me, aggressiveness
4  towards me.
5      Q.  So you think she resisted so much that she
6  broke her own arm?
7      A.  She attacked me, her resistance.  And it's
8  also in the training protocols, the guidelines that I
9  believe something to the effect of, "Physical
10 resistance or aggressiveness, not being in
11 compliance," amongst other things, "can enhance the
12 likelihood of an injury."  I'm not calling it
13 verbatim, but once I look at whatever it is, I'll know
14 it.  I'll know it for myself.
15     But I definitely didn't go there to break
16 her arm and I am not going to say that I broke her
17 arm.  After all, she was cleared that weren't nothing
18 wrong with her arm two -- three times by two
19 paramedics.  And at the same time, even if her arm did
20 broke, she bears the responsibility.
21         (DEPOSITION EXHIBIT
22         NUMBER 19 WAS MARKED
23         FOR IDENTIFICATION)
24     Q.  (Mr. Castro)  I would like to present you
25 with Exhibit 19, and I would like you to review the

170

1  first page and tell me what this document is?
2  (Witness complies)
3    **A.  It appears to be aftercare instructions for**
4  **her, for Ms. Oliver.**
5    Q.  Is it true that after the incident, Ms.
6  Oliver went to Maria Parham Health?
7    **A.  Yes.**
8    Q.  Is it true that this incident occurred on
9  December 22nd, 2018?
10   **A.  I don't recall it occurring on December**
11  **22nd, 2018.**
12   Q.  Okay.  Do you know around what time this
13  incident occurred?
14   **A.  Around October, 2018.**
15   Q.  Do you remember the time of day it was?  Was
16  it 7:00 p.m., 8:00 p.m., anything like that?
17   **A.  I would have to go back to the incident**
18  **reports.  It -- I mean, it was at night, maybe 8:00 or**
19  **9:00.  At somewhere around there approximately, but**
20  **night shift.  It was definitely, I believe, before**
21  **midnight.**
22   Q.  Okay.  And reading this first page, it says
23  on the first three paragraphs, "You have a fracture of
24  the humerus."  Paragraph 2: "The humerus is the long
25  bone in your upper arm.  Your fracture is in the top

171

1  (proximal) part of the bone."  Paragraph 3: "Apparent
2  -- a fracture means the same thing as a 'broken bone.'
3  In general, fractures heal in about 6-8 weeks.  Over
4  time, the broken area gets stronger than the area
5  around it."  Did I read that correctly?
6    **A.  I believe you did.**
7    Q.  Does this document say that Ms. Oliver had a
8  broken bone?
9    **A.  It says she had a fracture to -- of the**
10  **humerus.  And it says that a fracture means the same**
11  **thing, it's the equivalent as a broken bone.**
12   Q.  Do you have any reason to dispute this
13  document?
14   **A.  No.  This is between her and her medical**
15  **official.  I wasn't at the hospital.**
16       MR. CASTRO:  Okay.  We can remove the
17  document.
18   Q.  (Mr. Castro)  So after this incident
19  happened and you went home or you got back in your
20  vehicle, did you call anyone about what happened?
21   **A.  Yes.  I contacted -- I contacted Lieutenant**
22  **Goolsby and possibly Welborn, but I do remember**
23  **speaking to Goolsby.**
24   Q.  Can you roughly remember what you said?
25   **A.  I'm sorry, Counselor?**

172

1    Q.  Do you remember roughly what you might have
2  discussed?
3    **A.  Yes.  I asked him what the doctors are**
4  **saying and he said that they are saying it's a**
5  **fracture, and he told me again that Watkins told him**
6  **just to make sure I had my incident report, write it**
7  **up.**
8      **He told me that the family was at the**
9  **hospital, and that they were asking for me and were**
10  **asking where he was.  I said, "And what did you tell**
11  **them?"  He said, "I told them where you was."  And I**
12  **was like, "If they know like I know, they might not**
13  **want to come into there and bother you."**
14     **And I told him, I said, "Well, you know, I'm**
15  **trying to finish up my report."  And he was like,**
16  **"Yeah.  Welborn is going to come up there because the**
17  **Magistrate -- the Magistrate needs a transport to the**
18  **hospital."  And so that was it.  But let me go back**
19  **and so I can give you the full picture to ensure you**
20  **got it.**
21     **Captain Watkins contacted me after my use of**
22  **force and said that Lieutenant Goolsby contacted him**
23  **and said -- and Captain Watkins stated that he**
24  **contacted Sheriff White.  And he told me that I don't**
25  **have -- that he made the Sheriff aware, and he said**

173

1  **that I don't have anything to worry about.**
2      **He said, "I sit on the use of force**
3  **committee."  And he said, "Before it gets to the**
4  **Sheriff, it has to get through me."  And he said, "I**
5  **got your back."  He said, "You don't have to worry**
6  **about anything because you did your job.  You did what**
7  **you were supposed to do, and had she not resisted,**
8  **this wouldn't have happened."**
9    Q.  Was this before the incident was
10  investigated that he said that?
11   **A.  Yes.  And also on that phone call, Captain**
12  **Watkins stated for me to do my incident report and use**
13  **of force report and to leave a copy of there for Ray.**
14  **And I said, "Leave a copy for Ray for what?"**
15   **He said, "Leave a copy for Lieutenant Sharon**
16  **because he's the person that handle these type of**
17  **matters and he's going to be looking into -- he's**
18  **going be reviewing," is what he said, "your**
19  **paperwork."  He said, "Just cover yourself."  But he**
20  **said, "You're going to be all right."**
21   Q.  Who said that?
22   **A.  Captain Watkins.  Lloyd Q Watkins, Captain**
23  **of Patrol.**
24   Q.  Does Captain Watkins decide whether to fire
25  you or not?

174

1     A.  Sheriff White makes the decision whether to
2  fire me.  But Captain Watkins spontaneously uttered,
3  without me even asking, that he had talked to the
4  Sheriff.  And he told me that the Sheriff was aware
5  and that I don't have anything to worry about.
6        Captain Watkins also said that he sit on the
7  use of force committee.  He said, "Before it gets to
8  the Sheriff, it gots to go through us."  And he said,
9  in the past, the Sheriff's always going with their
10  recommendation for the use of force committee, and I
11  didn't have to worry about anything.
12     Q.  Does the Sheriff have the authority to
13  overrule the committee?
14     A.  Yes.  I mean, he has the authority.  But
15  here's the issue.  Based on Captain Watkins verbal
16  testimony to me, the Sheriff did not overrule in times
17  past.  He always went with the recommendation of the
18  use of force committee.
19        And Captain Watkins made it very clear that
20  I didn't have nothing to worried about.  I wouldn't
21  have never known that he talked to the Sheriff outside
22  of Captain Watkins telling me.
23     Q.  Does the Sheriff have to tell you if he's
24  investigating your employment?
25     A.  Come again?

175

1     Q.  Is the Sheriff obligated to tell you whether
2  he's investigating whether you should still be
3  employed, that he -- was he supposed to call you?
4     A.  If I'm being -- if I'm being investigated,
5  then it would be appropriate for him to say, "Hey, to
6  someone -- to one of his command staff members, to
7  the deputy for my case, Deputy White, know that he's
8  under investigation," or for him to tell me.
9        He don't have to tell me.  They don't have
10  to tell me.  I mean, if they don't want to do it, they
11  don't have to do it.  But if they start doing these
12  investigations, these one-sided investigations in
13  which the County is known for, then it creates a
14  problem.
15        Because while I work at the pleasure of the
16  Sheriff, there are due process rights.  There are
17  equal protection rights and there are First Amendment
18  rights when it comes to a government entity.
19     Q.  You said the County's known for one-sided
20  investigations.  What are you referring to?
21     A.  The write-up initially, of where I got
22  suspended.  The employee counseling form that is
23  predated six months approximately before I was even
24  hired, all both by Lieutenant Campbell.  Also, the
25  shift -- the deceptive shift transfer, if not other

176

1  things.
2     Q.  Did you also call or have a call with
3  Sergeant Welborn?
4     A.  I've said that I may have called Sergeant
5  Welborn, but I -- I know I remember calling
6  Sergeant -- excuse me, Lieutenant Goolsby.
7     Q.  Do you remember if you asked Goolsby whether
8  you would -- might lose your job?
9     A.  If it's not in the reports that you all
10  have, then I'm not going to be able to say that I did
11  ask that.  I don't recall that.
12     Q.  Were you concerned that you might lose your
13  job?
14     A.  Well, no.  I was -- I was already told that
15  I was in the clear, so I didn't have nothing to worry
16  about.
17     Q.  Before you were told you were in the clear,
18  were you concerned?
19     A.  I wasn't concerned about losing my job
20  because I did my job.
21     Q.  All right.  So after the ---
22     A.  However -- however, I had already been
23  threatened by Sheriff White at least three times that
24  if I didn't drop my complaints, that he was going to
25  fire me.  My protected activity complaints, in which

177

1  he threatened to fire me in front of a third party.
2     Q.  Who was the third party?
3     A.  Bullock.
4     Q.  You said this happened three times?
5     A.  Yes.  He -- Sheriff White threatened to fire
6  me three times.
7     Q.  Do you know when these three times occurred,
8  what dates?
9     A.  It's in my complaints.  It's in the summer
10  of 2018, somewhere around June or July.  I believe it
11  was July when he met with me.  Somewhere around maybe
12  late July, approximately, of 2018.  And he wanted me
13  to drop my complaints and I told him I wasn't going to
14  do it, and told me to drop them.
15     Q.  Why did he want you to drop them?
16     A.  He alleged that he don't know of any
17  discrimination, race discrimination and any other
18  protected activity violation that may have been in
19  that letter, in his department.
20        And he told me that I don't go to HR.  He
21  don't -- I shouldn't go to HR because HR doesn't got
22  nothing to do with this, and he told me to drop my
23  complaints.  And I told him, I said, "I'm not going to
24  drop them."
25        And he said, "If you don't drop them, I'm

178

1 going to drop you. I am the elected sheriff." Then
2 he slammed his hands on the desk, and I told him I
3 wasn't going to drop it. And he said, "Why not? You
4 have a career here if you want it. Just drop the
5 complaints." And I said, "Well, I'm not going to drop
6 them." And so he gave me a letter and I went back to
7 work.
8      Q. What letter did he give you?
9      A. He gave me two letters, I believe, in
10 response to my internal EEO Protected Activity, Title
11 VII grievances.
12      Q. Got you. Did anyone other than Bullock --
13 and which Bullock are you referring to again?
14      A. Bullock, Chief -- excuse me. Chief Bullock.
15      Q. Did anyone other than Chief Bullock witness
16 these events?
17      A. It was just us in the office, so no.
18      Q. This was done in Sheriff's White -- Sheriff
19 White's office?
20      A. Yes.
21      Q. After October of 2018, did you ever speak to
22 Ms. Oliver again?
23      A. I don't believe so. After the use of force,
24 no.
25      Q. Have you received any e-mails, calls, texts

179

1 from her or her family?
2      A. No.
3      Q. Do you know whether Ms. Oliver plans to sue
4 you over what happened?
5      A. I don't have any ---
6      Q. Without disclosing any attorney-client
7 communications, of course.
8      A. I'm sorry?
9      Q. Without disclosing any attorney-client
10 communications, of course. I don't want to know about
11 that. Do you know if Ms. Oliver is going to sue you
12 over what happened?
13      A. Well, I'm not sure if she is going to change
14 her mind about not suing me. First and foremost,
15 if she sued me, I will win because I have immunity,
16 public official immunity, public officer immunity, as
17 well as other government immunities.
18      And not only that, if she sued me, she will
19 be going against the agreement that she had with the
20 County and the Sheriff.
21      And as I quote, as Lieutenant Goolsby called
22 my phone that morning that I had to go in to meet
23 allegedly the Sheriff, and it ended up being Captain
24 Bullock, "Ms. Oliver was up here early this morning
25 complaining on you. Everybody could hear her."

180

1 He said, "Weldon talked to her," referring
2 to Captain W. Bullock. "Lawrence talked to her,"
3 referring to Chief Bullock. And I believe they said
4 that Captain and Watkins were in there.
5      But there was -- I believe there was a
6 third --- a third party command staff member in there.
7 And Lieutenant Goolsby told me that, "She came up here
8 this morning and she said, 'If you all don't fire
9 him,'" referring to me, that "'I'm going to sue the
10 County, the Sheriff and Deputy White.'"
11      And the following day, I was terminated. So
12 the agreement that they have in term -- in terms of
13 terminating me would restrict her from suing me. And
14 even if she did suing -- the immunity is going to
15 prevent. I'm not concerned about it.
16      Q. So you're contending that the day before you
17 were fired, Ms. Oliver went into the Sheriff's Office
18 and said, "If you don't fire him, I'm going to sue
19 you"?
20      A. I'm not -- I'm telling you exactly what
21 Lieutenant James L. Goolsby told me as a witness to
22 her conversations, with her being so loud and also
23 with them talking to him after she left.
24      And Lieutenant Goolsby let me know to be up
25 there, it might have been somewhere between 12:00 a.m.

181

1 2:00, to meet with the Sheriff. And when I got there,
2 I had to wait nearly an hour, if not more than an
3 hour, and I met with Captain Bullock.
4      Q. And you were terminated the day after?
5      A. Yes. At three o'clock.
6      Q. And you are contending that those two are
7 related, those two events are related?
8      A. I'm -- what two events, contending what?
9      Q. That your termination was related to Ms.
10 Oliver threatening to sue?
11      A. No. I'm just -- I'm laying out the facts
12 that took place, okay? My termination I believe is
13 related significantly to the retaliation -- the
14 retaliatory conduct of your client in threatening to
15 fire me because I would not withdrawal my protected
16 activity complaints. And I'm also saying what
17 Lieutenant Goolsby told me that Ms. Oliver said.
18      Q. Got you. So why were you so adamant about
19 serving the warrant on Ms. Oliver? You went to her
20 house at 2:00 a.m. and then -- or around that time,
21 and then you went to her house again? Can you ---
22      A. As I answered -- as I answered before, I was
23 told to go serve the warrant, okay? She was not the
24 first person that I had to go serve a warrant on who
25 wasn't there the first time, who wasn't there the

182

1 second time and sometimes it required a third or
2 fourth visit.
3        I mean, that happens in law enforcement. If
4 you go back, Counselor, to the write-up, when Campbell
5 talked about, "Deputy White says that he went to the
6 house and -- the houses and he attempted warrant
7 services, et cetera."
8        I went to houses multiple times, okay? The
9 same house multiple times, other houses multiple
10 times. Nobody come to the door. Sometimes later in
11 the third or fourth, sometimes fifth visit, somebody
12 home. Somebody car in the driveway. Somebody come to
13 the door, and you're able to either serve the warrant
14 or get the person to provide information for the
15 person to come to the Sheriff's Office.
16        Or -- or sometimes, I mean, you just get the
17 person and you take them there. It's accomplished the
18 the law enforcement objective. It's not about me
19 being obsessed with Ms. Oliver in terms of being
20 adamant.
21    Q.  Is it true that you weren't told to go serve
22 the warrant until you asked someone to help you serve
23 the warrant? Is that right?
24        You said you were instructed to serve the
25 warrant, but your complaint says you asked for help

183

1 from Sergeant Welborn. And then he stated, "You go do
2 it." So is it true that you weren't instructed until
3 you actually asked him about it?
4    A.  I stand by my statement. I did ask him
5 about having a backup unit there to help me serve the
6 warrant. I believe in teamwork. They believe in
7 teamwork. Unfortunately, Sergeant Welborn decided to
8 have me go up there and serve the warrant. That's
9 what I done.
10    Q.  Do you regret serving that warrant?
11    A.  I don't regret doing my job. I don't regret
12 going to serve the warrant because I had a job to do.
13 I took an oath, just like every other deputy there.
14 Now, it's unfortunate that the circumstances took
15 place in terms of her arm getting fractured or broken.
16        But that was definitely not intentional, and
17 it could have been avoided had Ms. Oliver complied
18 with my lawful orders, lawful request. Had she
19 adhered to what I was trying to do, this situation
20 would have turned out so much better.
21    Q.  To your point, could this have been avoided
22 if you did not conduct a traffic stop on Ms. Oliver in
23 the first place?
24    A.  Well, I can't say it would have been
25 avoided, because every deputy is assigned to a side of

184

1 the county and you have to serve warrants.
2 Misdemeanor warrants, felony warrants, child support
3 warrants, order for arrest, criminal summons. Take
4 somebody into custody and do a magistrate's order.
5        So I can't say it wouldn't have -- it would
6 have been avoided, because she was adamant on not
7 going to jail. So who's the say that, had the traffic
8 issues not happened. Which, you know, caused me to
9 radio her plate in, that I or another deputy wouldn't
10 have had the same outcome with her since she didn't
11 want to go.
12    Q.  But it was your traffic stop that ---
13    A.  And I will also say that your client -- not
14 your client. Ms. Oliver, upon information and belief,
15 her criminal record -- she has a criminal record.
16 She's been charged before. In terms of convictions, I
17 can't remember if she was convicted, but she
18 definitely had charges, not just for those two
19 warrants.
20    Q.  Why does that matter?
21    A.  It's a -- it shows that she is a repeat
22 offender in terms of being charged and if she's not
23 been convicted.
24    Q.  So wasn't it your traffic stop that prompted
25 you to search for Ms. Oliver's warrants?

185

1    A.  As I previously explained, Counselor, and
2 it's the -- the 911 dispatcher came back very, very
3 quick despite Major Bullock saying that there's no
4 radio traffic showing that and there's no radio
5 traffic showing anything other than me reading the
6 plate, and then later saying that there was a
7 distortion or distinction -- there was a mix-up in
8 what I was asking for and what the 911 Dispatcher
9 believed.
10    Q.  But you called ---
11    A.  But the traffic -- the traffic violations is
12 what put me on to Ms. Oliver. And according to the
13 write-up that Campbell issued, or whatever
14 documentation issued, my -- one of my responsibilities
15 is preventing crime. And violations of Chapter 20,
16 that's a crime. So I was still doing my job.
17    Q.  But it was a traffic stop that put you on to
18 Ms. Oliver. Is that correct?
19    A.  It was a traffic violation she committed,
20 multiple ones. And I never did a traffic stop, okay?
21 I did not pull her over. I followed her and I tried
22 to talk to her via the community-oriented policing
23 model, the philosophy.
24    Q.  Do you ever call people that have
25 outstanding warrants and tell them to come to the

186

1  Sheriff's Office to be served?
2      A.  Yes, I have.
3      Q.  Why didn't you do that with Ms. Oliver?
4      A.  One, I was told by Sergeant Welborn to go
5  get her, and so I went to get her.
6      Q.  That was after you had ---
7      A.  And the most -- and then when I called,
8  she -- when I -- when I went to get her, I was going
9  based on a supervisory order.  Whenever I called
10 somebody, it wasn't that I was actually -- actually
11 searching for their number, if we even had one,
12 because I didn't have a laptop.
13          But sometimes a number may have been -- a
14 number may have been on the warrant log.  I forgot
15 what it's called, but whatever side you're on, north
16 or south, there's a warrant log.
17          If the number was up there and after
18 multiple attempts of us not -- of me not trying to --
19 of not getting a person, then I would call.  I would
20 see if I can find something to get in contact with
21 this person.
22          MR. CASTRO:  Can we go off the record?
23          THE COURT REPORTER:  We are off the
24 record.  The time is 4:52.
25 (Brief recess:  4:52 p.m. to 5:24 p.m.)

187

1          THE COURT REPORTER:  We are back on the
2  record.  The time is 5:24 p.m.
3      Q.  (Mr. Castro)  All right.  Mr. White, we're
4  going to talk about what happened after the Ms. Oliver
5  incident with regard to your employment.  You
6  mentioned that Captain Watkins spoke to you on the
7  phone about the incident.  Is that right?
8      A.  Yes.  Captain Watkins spoke to me on the
9  phone on the night of my use of force.  After that,
10 him and I did not speak at all, outside of him calling
11 me down to his office so they could terminate me.
12 After I left the Sheriff's Office, him and I had no
13 communication.
14     Q.  What other colleagues did you talk to after
15 the incident?
16     A.  What -- are you asking me what other
17 colleagues Captain Watkins talked to, or what other
18 colleagues I talked to?
19     Q.  You talked to.
20     A.  Well, I didn't have any colleagues after
21 they fired me.
22     Q.  Well, from the time that the incident
23 occurred to the time you were fired, is what I'm
24 asking.  I'm sorry.
25     A.  From the time the incident occurred until I

188

1  was terminated, I spoke to Captain Watkins.  I spoke
2  to Lieutenant Goolsby, Sergeant Welborn.  I told
3  Poole, Deputy Poole, that I had a use of force.  I
4  said Sergeant -- I said Sergeant Welborn.  Deputy
5  Edwards.
6          Now, I can't remember off the top of my
7  head.  I mean, I do know, you know, Captain Bullock,
8  you know, he questioned, being that he did some
9  questions -- had some questions for me.
10     Q.  Did any of them tell you that you were about
11 to be terminated?
12     A.  No.  I didn't know that I was being -- going
13 to be fired until around 3:00 p.m. on the 24th,
14 when -- a few minutes before three o'clock, Captain
15 Watkins called me.  And I was working part -- I was
16 working not part-time.  Off -- off-duty at the
17 courthouse.  He told me to come to his office.
18          And when I went in his office, I saw
19 Bullock -- Weldon Bullock, Lawrence Bullock, Ray
20 Sharon.  Watkins was sitting in his office with the
21 door closed.  When I -- no.
22          Watkins was sitting in his office.  He saw
23 me.  Either he was sitting down or he was standing up
24 near the door or something.  And I went in his office,
25 and when I went to close it, I believe Captain Bullock

189

1  and Lieutenant Sharon -- Captain Bullock said
2  something about, "I need to get in here."
3          And so I opened the door, and that's when he
4  said, Captain -- Captain Bullock said, "I need your
5  gun and badge and your credentials.  Your services --
6  the Sheriff told me to tell you that your services are
7  no longer needed, no longer required," something to
8  that effect.
9          So Lieutenant Sharon wanted to take my gun,
10 and he pulled like three or four times and he couldn't
11 get it out.  And so he was like, "Well, I can't get it
12 out."  And I told him, I said, "I'll pull it out."  I
13 said, "I'm not going to do nothing other than pull it
14 out so you can get it."  And that's what I done then.
15          And he took it, and he said, "Thanks, J. J."
16 And he gave me a ride home, and he told me, "I just
17 want to let you know, I -- I didn't have nothing to do
18 with that."  He was like, "I -- I don't want you to be
19 mad at me or anything."  So that was it.
20     Q.  Who gave you the ride home?
21     A.  As I just said, Lieutenant Sharon.
22     Q.  And did you talk on your way home?
23     A.  No.  It was a quiet drive.
24     Q.  Was Sheriff White present in the office when
25 you were told that you were being terminated?

190

1    A.   I don't know where he was.
2    Q.   Did they mention the Ms. Oliver incident?
3    A.   No.  Nobody mentioned it.  Everything I just
4  told you, what Captain Bullock said -- Weldon Bullock
5  "Sheriff told me to tell you your services are no
6  longer needed" ---
7    Q.   That's it?  You didn't ask questions ---
8    A.   --- credentials, badge, gun.  They needed
9  that, said somebody would give me a ride home in my
10  patrol car, and that's what happened.
11    Q.   Did you ask, "Why is this happening?" or
12  anything like that?
13    A.   Yes.  I asked for a reason.  He told me the
14  Sheriff told him not to talk about it.
15    Q.   Who said that?
16    A.   Captain Bullock.  Weldon Bullock, Weldon
17  Wallace Bullock.
18    Q.   Did anyone at the Sheriff's Office use
19  racial slurs or discriminatory language against you
20  near the time of your termination?
21    A.   Yes, they did.
22    Q.   Who did?
23    A.   There were several deputies, such as Deputy
24  Patel, a few months prior to my termination and said
25  the N word.  "What's up, N?"  I observed him saying

191

1  "What's up, N" to Deputy Poole.
2         I told him he should not be saying that word
3  in the workplace, and he said that, "I'm nearly just
4  as black as you," or something to that effect, "and I
5  can say that word."
6    Q.   How did Deputy Poole react?
7    A.   Who?
8    Q.   You said he said it to Deputy Poole as well.
9  Do you know how he reacted?
10    A.   He don't like the word either, but I can't
11  testify on his behalf.
12    Q.   Did you see what -- did you see how Deputy
13  Poole responded, did he say anything?
14    A.   I said -- I just answered that question.  I
15  said that he did not like the uses of the word.
16    Q.   Other than Mr. Patel, did any other people
17  use discriminatory language against you, prior or at
18  or near the time of your termination?
19    A.   Well, yes.
20    Q.   Who else?
21    A.   There was a few sergeants that said some
22  things, some racial epithets, N word.
23    Q.   Who said the N word?
24    A.   Sergeant Bobby Martin, who was a white male,
25  and Sergeant Chris Welborn, who was a white male

192

1    Q.   Can you give me some context?  What did
2  Bobby Martin say, when was he using it, against whom?
3    A.   He said -- well, he said it to me, mocking
4  what Patel said as well as said it to Patel.  And I
5  told him that he shouldn't be saying that word.  And
6  of course he's like, you know, "Mr. White, I grew up
7  with, you know, African-Americans and I got black
8  people in my family."
9         And he was like, "I never meant to
10  disrespect you or anything."  I said, "Okay."  And
11  Welborn used it in the context of a song that was
12  composed by or performed by Lil Deval, L-I-L, D-U-
13  L, "Smile."  And one of his lyrics is, "I ain't going
14  back and forth with you Ns.  I'm living my best life,"
15  et cetera.
16    Q.   Was he using it -- was he directing that
17  term towards you or singing the song to you?
18    A.   He was singing the song and I was sitting in
19  front of him.  And I told him, I said, "Hey, man."  I
20  said, "You can't be saying that word."  And I said --
21  and he was like, "I can say that word, J.J.  All I
22  know is your kind.  I grew up with your kind. I can
23  say that word."
24    Q.   How did you respond?
25    A.   How did who respond?

193

1    Q.   When he said, "I can say that word," what
2  did you say?
3    A.   I told, I said, "No."  I said, "That word
4  shouldn't be said by anybody."  I said, "Especially in
5  the workplace."
6    Q.   Do you know when this was, around what time,
7  what date?
8    A.   It was around the summer of -- 2018.
9    Q.   Can you approximate a month, or you just --
10  summer is as specific as you can get?
11    A.   I'm going to just say summer.
12    Q.   So you mentioned that Bobby Martin used the
13  N word without, of course, using the word.  Can you
14  tell me what the sentence was?
15    A.   As I already asked -- as I already answered,
16  he was like -- he said something to the effect,
17  "What's up, N," mocking Patel.  That's what I just
18  said.  He said the same thing that Patel said.  That's
19  what I mean by that.
20    Q.   So was he talking to you?
21    A.   Yes.  And he was also saying it and talking
22  to Patel.
23    Q.   And he said he didn't mean to disrespect
24  you.  Did you believe that?
25    A.   I took him at his word, but he shouldn't --

194

1  he knew better.  Don't -- listen.  No African-American
2  wants to hear a Caucasian-American say the N word.
3  Let's be clear.  Let's not play dumb.
4      Q.   Was this the first time that Bobby Martin
5  had used this word in front of you?
6      A.   To my knowledge.  I don't have any
7  recollection earlier now that -- I mean, I don't have
8  any recollection that it occurred earlier, while
9  sitting here now.
10     Q.   How about Welborn?  Was this using it with
11 the song, was that the only time you can recollect?
12     A.   Yes.
13     Q.   Okay.  So you've mentioned that Mr. Patel,
14 Martin and Welborn.  Anyone else use discriminatory
15 language at or near your termination?
16     A.   Well, there were comments about -- I said
17 something to Sergeant Martin, who referred to Deputy
18 Purav, P-R -- P-U-R-A-V, Patel, P-A-T-E-L.  He called
19 him Osama Bin Laden, and I told him that he could not
20 make those terroristic threats, that it was
21 disrespectful, unprofessional, et cetera.
22          As far as the specific things that were
23 said, I'm not able to recall because it's been a long
24 time ago.  But I covered basically most of it, if not
25 all of it in my -- the EEOC file and in my complaints.

195

1  So I will say, refer to that.
2      Q.   Did Sheriff Peter White ever use
3  discriminatory language against you?
4      A.   Not -- I can't recall the specific language
5  if he may have used it, but I can say that the
6  behaviors of his office was discriminary.
7      Q.   What about him individually?
8      A.   I -- I just answered that.
9      Q.   Did he ever make fun of you for your race or
10 gender?
11     A.   No.  He didn't make fun, whatever that
12 means.
13     Q.   To use offensive language or use it in a
14 joking manner.  Did that ever happen?
15     A.   No.  He didn't directly do it.  Not to my
16 knowledge.
17     Q.   How about Lawrence D. Bullock?
18     A.   How about?
19     Q.   Did Lawrence D. Bullock ever used
20 discriminatory language or act discriminatorily
21 against you for your race or gender?
22     A.   Well, I can say, in terms of the gender, I
23 remember an African-American female deputy who had
24 allegedly, according to Sergeant C.M. Welborn,
25 violated multiple policies in -- late 2017 and early

196

1  2018, up until April and May.
2          To the point of where -- at least May, to
3  the point of where Sergeant Welborn said that he had
4  written Deputy -- and I can't think of her name.  It's
5  on the tip of my tongue.  He -- but it was a female
6  deputy.  I can't pronounce her first name.  I think it
7  starts with a Q maybe.
8          But he had written her up several times.  He
9  had complained on her several times.  And he said when
10 he did it, the Chief Deputy, Lawrence Bullock, told
11 Lieutenant Goolsby not to do anything with it and that
12 the Sheriff won't going to do anything with it.
13         And I asked Welborn why, and he said -- the
14 Chief Deputy said, "We don't have a lot of female
15 officers and we want to keep her.  We don't want to
16 run her away."
17         And so they never disciplined her over what
18 Welborn said.  Some of it deserved a suspension, and
19 all of it combined, she could have been fired.  Now, I
20 can't recall the specific, at this time, charges he
21 made, but there were several.
22         So if Chief Bullock and the Sheriff want to
23 discipline me for these false allegations, why not
24 investigate and discipline the female deputy in
25 question for what Welborn determined was true

197

1  allegations or substantial allegations if, you know --
2  and the only thing that was different between her and
3  I was our gender.  She's a female.  I'm a male.  So to
4  answer your question about Chief Bullock, yes.
5      Q.   Anything else about Chief Bullock that you
6  can remember?
7      A.   I remember he told me that the Sheriff
8  wanted to fire me for what Cameron had written up, but
9  he talked him out of it.  He told me if I appealed it
10 that the Sheriff would fire me.  He later rescinded
11 that allegation, saying "would," in July when him and
12 the Sheriff met with me, and said that he never said I
13 would be fired.  He said I could be fired.
14         Would, could, however you want to say it.
15 As I said, he said I would be fired if I appealed
16 it, if I went to the Sheriff, and told me to sign it
17 and -- sign the form or whatnot.
18     Q.   Which form is this?  Just a ---
19     A.   Write-up.
20     Q.   Which write-up was this about?
21     A.   The only one that I have, the written
22 warning that the -- the suspension, the falsification,
23 the falsicity, the deceptive write-up by Lieutenant
24 Durwood Campbell.
25     Q.   Okay.

198

1     A.   And if there's anything else that Chief
2   Bullock may have done, it's not coming to my head at
3   this time, but I think I covered a good portion of it.
4     Q.   All right.  That's great.  How about Weldon
5   Wallace Bullock?  Any discriminatory actions or
6   language taken against you?
7     A.   I can't say that -- I can't say that he did
8   anything directly, but I want to be clear.  This is
9   about, even before I filed any type of internal
10   grievances, EEO protective grievances, your client
11   I filed other complaints well before it went to HR
12   because of the deceptive shift transfer, okay?
13          Had -- had your client not did what they did
14   it and terms of the statements they made about me the
15   -- the purple hat being in my mailbox.  Had all this
16   stuff as well as other things not took place, then it
17   would've never triggered to something on and on and
18   onward, up into write-ups, suspensions, bad
19   performance evaluations, et cetera.
20     Q.   But going back to Mr. Weldon Bullock, you
21   said that you can't say anything directly.  How about
22   indirectly discriminatory?
23     A.   I don't have anything to say.
24     Q.   Okay.  Let's talk about this purple hat.
25   Where was your mailbox located?

199

1     A.   In the hallway adjacent from -- on the
2   outside of the patrol room.
3     Q.   Who has access to that hallway?
4     A.   Everybody at the Sheriff's Office, sworn and
5   non-sworn personnel.
6     Q.   Does anyone who's not a deputy or above have
7   access to those mailboxes?
8     A.   Sworn and non-sworn, secretaries, personal
9   assistants, they have access to it.
10     Q.   Does anyone that's not an employee of the
11   Sheriff's Office have access to those mailboxes?
12     A.   Well, the janitors and the custodians.  I
13   mean, they walk past it when they clean up.
14     Q.   Anyone else?
15     A.   No.  Not to my knowledge.
16     Q.   Can you describe this hat other than it
17   being purple?  Did it have any symbols on it or
18   anything?
19     A.   Again, I -- listen, it was a purple hat.  It
20   had multi-colors in it -- in the fabric, an overall
21   purple hat, and it may have had a snowball puff at the
22   top.  I don't -- I can't remember everything.
23     Q.   So when you say, "hat," you're not talking
24   about a baseball cap?
25     A.   No.  I'm talking about, like, a snow cap or,

200

1   you know, like a toboggan or something.
2     Q.   Something more for the winter?
3     A.   Yes.
4     Q.   Okay.  All right.  So after you were
5   terminated and you returned all your equipment, what
6   did you do after that, what happened next?  Did you
7   call anyone?
8          Of course, without discussing calling your
9   attorneys or anything like that, did you call any
10   non-attorneys about it?
11     A.   Yes.  I called Poole and I told him what
12   happened.
13     Q.   What did he say about it?
14     A.   He was, like, "What?"  And I mean -- I mean,
15   you know, he wanted to know what happened.  And I
16   told him, I said, "I just called to let you know they
17   wouldn't -- they fired me for whatever reason.  I
18   don't know the reason."
19          And he told me it shouldn't be hard to find
20   out.  But I told him what happened.  You know,
21   Weldon -- Watkins called me down there, walked into
22   his office.  Weldon came behind me, told me the
23   Sheriff don't need -- want my services, and they gave
24   me a ride home in my patrol car.
25     Q.   Did you call the Sheriff to ask why you were

201

1   terminated?
2     A.   No.
3     Q.   Why not?
4     A.   Why would I?  If he wanted me to know why I
5   was terminated, he would have -- he would not have
6   told Weldon not to talk to me, not to tell me why.
7     Q.   Did Poole mention that your race played a
8   factor in your termination during your call?
9     A.   No.  And that call has been a long time ago
10   as well.
11     Q.   Did anyone from the Vance County Sheriff's
12   Office mention that race was a factor?
13     A.   No.  They denied it.  They denied race when
14   I filed my -- after I filed my complaints.
15     Q.   Did they mention gender was a factor?
16     A.   No.
17     Q.   Did they mention sexual orientation as a
18   factor?
19     A.   No.
20     Q.   Other than Poole, did you call anyone else
21   saying, "I got fired.  I don't know what happened"?
22     A.   Yes, I called Poole.  I later called -- I
23   called Welborn.  I was like, "You know I got fired?"
24   and he was like, "No.  I didn't know," X, Y, and Z,
25   it was a short call.  That's a long time ago.  I can't

202

1  remember everybody that I spoke to, but anybody I
2  spoke to would've been very, very limited because I'm
3  a private person.
4      Q.  So while you were -- when you started
5  working at the Vance County Sheriff's Office, is it
6  true that you would sometimes carry around a notebook
7  while you were on duty?
8      A.  Yes.  I was provided that notebook.
9      Q.  Who provided you that notebook?
10     A.  I believe either Campbell or Wayne gave me
11 that notebook.
12     Q.  Can you describe the notebook?  How did it
13 appear?
14     A.  In the where?
15     Q.  How large was it, what color was it?
16     A.  It was either square or rectangular.  I
17 can't remember the exact color.
18     Q.  Did it just have blank pages on the inside?
19     A.  It had had sheet paper on the inside.
20     Q.  What would you write down in that notebook?
21     A.  That was used for working purposes.  Working
22 purposes.  When I went to a call, when -- if I had to
23 get some information, do an incident report,
24 operations report, if I had to do an investigation.
25     Q.  So was it ---

203

1      A.  It was not used -- it was not used for
2  personal notes.
3      Q.  Was it used to note things regarding your
4  employment?
5      A.  It was used for my job purposes, as I just
6  said.
7      Q.  So would you write down things in your
8  notebook that offended you?
9      A.  Like I said, I used that workbook for work
10 purposes.  I do not remember writing anything down
11 about what may have happened with, like, a personnel
12 matter or something like that.  My notebook was used
13 for, like, enforcing the laws of this State.
14     Q.  Did you ever write anything in there about
15 racism towards you or others?
16     A.  Like I said, I -- I do not believe that I
17 used that notebook, wherever it may be, to write down
18 anything about that.  That workbook was used for the
19 enforcement of the criminal laws of North Carolina and
20 Vance County.
21     Q.  Where is the notebook?
22     A.  I have no idea.  Like I said, I moved
23 several times.  I don't know where the notebook is.
24     Q.  Have you looked for it?
25     A.  Yes.  I've looked for things and I don't

204

1  know where the notebook is.
2      Q.  Okay.  So can you explain how your
3  employment at the Vance County Sheriff's Office caused
4  you to suffer emotional distress?
5      A.  This was a very -- this was a serious matter
6  that affected my livelihood, that affected my working
7  ability as a law enforcement officer as well as my law
8  enforcement certification, being jobless for at least
9  six months.
10        Later not, you know, being able to work in
11 law enforcement because your client gave negative
12 references, alleged, and marked my F5A, report of
13 separation as an internal investigation.  And
14 basically did everything they could to prevent me from
15 working in law enforcement again, so it was very
16 emotional.
17        MR. CASTRO:  Can we please pull up
18 Exhibit 25?
19        (DEPOSITION EXHIBIT
20        NUMBER 25 WAS MARKED
21        FOR IDENTIFICATION)
22     (Mr. Castro)  And I will ask Mr. White to
23 review it and describe it?
24     A.  Okay.  That's my report of separation, 5A.
25     Q.  What does it say in that block at the top?

205

1      A.  "Report of Separation, Form 5A, Deputy
2  Sheriff."
3      Q.  Is there an A anywhere there?  I see F5,
4  what do you see?
5      A.  F -- F5.
6      Q.  Where in here does it say anything
7  untruthful?
8      A.  Well, first and foremost, the Social
9  Security Number is wrong.  That's untruthful.
10     Q.  Anything else?
11     A.  And I don't believe -- okay.  Okay, wow.
12 Then it says, "Signature on file," whatever that
13 means.
14     Q.  Anything else here untruthful?
15     A.  I don't see anything that stands out.
16     Q.  It asks a question, "Was this separation a
17 result of a criminal investigation or violation of
18 the commission rules?"  And the check is on, "No."  Is
19 that accurate?
20     A.  To the best of my knowledge.
21     Q.  It then asks, "Are you aware of any ongoing
22 or substantiated internal investigations regarding
23 this officer within the last 18 months?"  And it says
24 "Yes."  Were there ongoing or substantiated internal
25 investigations regarding your employment ---

206

1       A.   First and foremost, I did not know that
2   there was an ongoing internal investigation for my use
3   of force in terms of a substantiated use of force.
4   And that was the only thing that your client said
5   was -- that I was, you know, effectively terminated
6   for, the -- the excess of force, violating the -- the
7   policy, B91 or B9I.
8       Q.   Right.  Well, Mr. White, Sheriff White
9   submitted this document, so he is answering that he is
10  aware of any ongoing or substantiated internal
11  investigation.  Was there an investigation into what
12  happened with Ms. Oliver, yes or no?
13      A.   I -- I assume there was, despite me --
14  despite upper management saying that I would be
15  cleared, and that turned out to be false.
16      Q.   So regardless of what happened with the
17  investigation or whether you believe it was done
18  justly, is it accurate that there was an ongoing or
19  substantiated internal investigation regarding your
20  employment?
21      A.   I don't know what took place with that
22  internal investigation.  It was most certainly done
23  not thorough.  I don't even -- I don't even know if
24  you can call it an internal investigation because
25  there is no date that I remember -- that I remember

207

1   seeing on the internal investigation file.  So who
2   knows when it was done?
3       Q.   Do you think it was done within the last 18
4   months?
5       A.   It could have been.  It could have been, but
6   there is no date on the IA file.
7       Q.   How long were you employed at the Sheriff's
8   Office?
9       A.   Approximately a year and a half.
10      Q.   Was it more or less than 18 months?
11      A.   It was -- I believe I was employed like 16,
12  17 months at Vance County.
13      Q.   And to your recollection, when did the
14  Oliver incident occur?
15      A.   In -- around October 22nd, 23rd.  October
16  22, 2018, somewhere around there.
17      Q.   And the date on this document is October
18  25th, 2018.  So again, I'm asking you, other than the
19  Social Security Number and the signature on file, what
20  is not accurate about this F5 form?
21      A.   I don't see anything that's inaccurate, but
22  most certainly, he should have known that checking
23  something like this, whether they false allegations,
24  confirmed allegations, substantiated internal affairs
25  investigations, that that would hurt my prospects.

208

1           All they had to do was do -- have a
2   certified internal affairs investigator investigate,
3   okay?  Instead of deciding, "We're going to do a 24-
4   hour -- less than 24-hour investigation and we're
5   going to fire him."
6       Q.   But if there was an investigation, would it
7   be proper for the Sheriff to say no and lie about an
8   investigation on the F5 form?
9       A.   I don't know.  You -- that's a question for
10  your -- your client.  I don't know his state of mind.
11      Q.   What is your opinion?
12      A.   Of what?
13      Q.   You're saying that it hurt your employment
14  chances that he said that there was an investigation
15  going on in this form.  Should he have said there was
16  not one?
17      A.   I don't know what -- he answered it based on
18  how he wanted it done, all right?  He said that there
19  was a -- they alleged based on the IA report that it
20  was substantiated, so he was right to check "yes."
21          But I have no confidence in that
22  investigation and everything that took place,
23  especially because there was no fairness and I was
24  threatened with dismissal at least three times if I
25  didn't drop my EEO complaints.

209

1           MR. CASTRO:  All right.  We can remove
2   this from the screen.
3       Q.   (Mr. Castro)  I want to talk about your
4   attempts to secure employment after you were
5   terminated.  Did you send a release to the Sheriff
6   Standard Commission allowing them to view your
7   employment documents?
8       A.   What relief -- what release are you talking
9   about?
10      Q.   Let's pull up Exhibit 20.
11          (DEPOSITION EXHIBIT
12          NUMBER 20 WAS MARKED
13          FOR IDENTIFICATION)
14      Q.   (Mr. Castro)  And this is a collection of
15  doc ---
16  (Off-record comment)
17      A.   Okay.
18      Q.   So we'll start with the first page.  What is
19  this document?
20      A.   It's been a long time ago.  It's
21  authorization to release information.
22      Q.   Why did you sign this?
23      A.   It may have been for a job.
24      Q.   Is that your signature?
25      A.   Yes.

210

1    Q.  Does it say that you were allowing this
2  recruiter to obtain your information?
3    **A.  Yes.**
4         MS. ROBINSON:  Brian, can you give him
5  a moment to review this document?
6         MR. CASTRO:  Yes.
7  (Witness examines document)
8    Q.  (Mr. Castro)  Have you reviewed it?
9    **A.  Yes.**
10   Q.  Okay.  Let's go to the second page, the next
11 page.
12   **A.  Yes.**
13   Q.  What is this?  I'll give you time to review
14 it.
15   **A.  I know what it is.**
16   Q.  What is it?
17   **A.  It's a Release of Personnel File that my**
18 **lawyer drew up that you all did not honor.**
19   Q.  What was the purpose of this release?
20   **A.  To get my personnel file from Vance County**
21   Q.  Do you need more time to review this before
22 we go on?
23   **A.  We can move on.**
24   Q.  All right.  Let's go to the next page.  Do
25 you recognize this document?

211

1    **A.  Yes.  That is a release form from Durham**
2  **County Sheriff's Office.**
3    Q.  What is the date of this document?
4    **A.  It appears either the 13th or the 5th -- the**
5  **15th of March, 2019.**
6    Q.  Why did you sign this release form?
7    **A.  Because I was being vetted by Durham County**
8  **Sheriff's Office.**
9    Q.  Did you give them permission to look at your
10 Vance County personnel file?
11   **A.  Well, yes.  That's -- it's just me signing a**
12 **release form about the -- them authorized to talk to**
13 **them.**
14   Q.  Let's go to the next page.  And this
15 consists of two pages.
16   **A.  Okay.**
17   Q.  I'll give you time to review.
18 (Witness examines document)
19   **A.  You can go ahead with your question.**
20   Q.  What was -- what is this document?
21   **A.  It's a -- Authorization for Release of**
22 **Records.**
23   Q.  Why did you sign it?
24   **A.  Because it was a requirement that it be**
25 **signed for -- and if you would scroll down, for I**

212

1  **believe company -- yeah, company police.  So I was**
2  **being -- vetted for -- as a company police officer, by**
3  **North Carolina Special Police, LLC.**
4    Q.  Does this release apply to your personnel
5  file at the Sheriff's Office?
6    **A.  I assume it would -- it would apply anywhere**
7  **I worked at in law enforcement.**
8    Q.  Did you sign these releases for the purposes
9  of obtaining employment?
10   **A.  I didn't have a choice.  If I didn't sign**
11 **the release, they weren't going to move forward with**
12 **me.**
13   Q.  So if one of these parties were using this
14 release to get your information, were they doing
15 anything wrong?
16   **A.  If it had not been for employment, I would**
17 **never have signed the -- the release forms, the**
18 **authorization.  But if I didn't sign them, I wouldn't**
19 **be able to move forward in the hiring process.  Now,**
20 **I'm not saying that they're doing anything malicious,**
21 **but I'm definitely not going to let Vance County**
22 **sign -- hide behind a release form.**
23   Q.  So if a potential employer showed Vance
24 County Sheriff the release form and he released your
25 personnel file, is he doing anything wrong?

213

1    **A.  No.  They're -- I can't say they're doing**
2  **anything wrong, but in terms of releasing a file,**
3  **that's not something that a agency does.  When -- when**
4  **an employer is looking for -- looking at an applicant**
5  **to hire, they will go to that employer, review the**
6  **file.  No reasonable employer sends a file out -- make**
7  **copies and sends a file out.  Most of the time,**
8  **somebody goes there.**
9    Q.  Did you -- do you think these employers
10 wanted to see what happened before you were terminated
11 at Vance County Sheriff's Office?
12   **A.  Yes.  Every last one of them told me that**
13 **they needed to know what took place involving my use**
14 **of force.  They said because that's a investigation.**
15 **It was a a -- an open-eye investigation.  They would**
16 **have to look at what took place.**
17   Q.  So you disclosed that -- did you disclose
18 what led to your termination?
19   **A.  When you say "disclosed," what are you**
20 **talking about?  Telling them that -- what happened?**
21   Q.  Yes.
22   **A.  Yes.**
23   Q.  What did you tell them?
24   **A.  That there was an allegation of excessive**
25 **force by a female who assaulted me, resisted,**

214

1 aggressive, attacked me, et cetera. She had warrants
2 for her arrest. Unfortunately, I had to do a arm bar
3 -- straight arm bar takedown and her arm got broke.
4 And after that -- shortly after that, they called me
5 in the office and told me that my services are no
6 longer needed.
7    Q. Based on what you told them, do you think it
8 was proper for them to request your personnel file?
9    A. Well, that's up for them to make that
10 decision. I know that they're going to want to know
11 what happened with the excessive force, so any
12 reasonable Internal Affairs investigator or -- or
13 manager of a -- or executive of a Police Department is
14 going to want to know what took place.
15    Q. Is that why you signed those releases that
16 we just went through?
17    A. I had to sign them, as I previously answered
18 your question, that same question at least two or
19 three times. I had to sign them as matter of seeking
20 employment. And getting certified, I'm going to add
21 that, again with the State. If I didn't sign the
22 forms, I couldn't get hired and I couldn't get my
23 certification.
24    Q. So when you applied for employment after you
25 left the Vance County Sheriff's Office, did you

215

1 disclose your previous lawsuits and EEOC charges?
2    A. I don't believe any employer asked for it.
3 And if they did, it's not off the top of my head.
4    Q. Do you know what they ---
5    A. So I'm going to say that I did not. I did
6 not disclose that information because it's protected
7 activity, and not only that, I don't believe any
8 employer asked for it.
9    Q. Do you know if any of your lawsuits are
10 publicly available in court records?
11    A. Well, yes. It's publicly available on
12 PACER.
13    Q. Did you disclose other terminations other
14 than the Vance County Sheriff's Office termination?
15    A. Well, yes. It's required for an F3.
16    Q. So let's talk about the NC Special Police,
17 LLC specifically.
18    A. Yes.
19    Q. Did they give you the reason that they did
20 not offer you employment or that they rescinded an
21 offer?
22    A. Yes, they gave a reason.
23    Q. What was their stated reason?
24    A. And I just want to say this for the record.
25 My Counselor who is representing me on this matter is

216

1 not here. So if it goes too deep, that will be
2 something that you have to reach out to him about.
3         But the reason -- and that's publicly
4 available as well. The reason that they gave is
5 because I filed a discrimination and retaliation
6 lawsuit against Vance County Sheriff's Office, and
7 that they weren't going to keep somebody employed or
8 hire somebody who has sued a law enforcement
9 department, or they could've said law enforcement
10 agency. And they also said that the State don't like
11 it either.
12    Q. All right. Did they mention the excessive
13 force allegations of the Vance County Sheriff's
14 Office?
15    A. Yes. That was -- well, in that phone call
16 or documentation, no. But it was definitely came up
17 after I was told that I had nothing to worry about,
18 that I was good to go with the job shortly afterwards.
19         They said something about Captain Bullock
20 wrote something about excessive force and I broke an
21 arm, amongst other things that I can't remember off
22 the top of my head.
23    Q. Okay. So I want to talk about the specific
24 allegations and hope to be wrapping up soon. If we
25 can go to Exhibit 3, which is the amended complaint.

217

1 And if we can go to Allegation 52, which is on Page
2 13. Can you review that allegation?
3 (Witness complies)
4    A. "Deputy Green commented that Lieutenant
5 Campbell's respectful, cool and calm to whites but
6 rude and nasty to blacks" ---
7    Q. When did ---
8    A. --- just like me.
9    Q. When was this statement made, this comment
10 made?
11    A. I will say somewhere around maybe -- maybe
12 November, when I got transferred to Marin's shift.
13 And let me just say that. Earlier I said something
14 about, there may have been some other people on the
15 shift. Deputy Green was one of the new hires that
16 came in and he was also on Marin's shift. And at that
17 time, he was riding with Marin, doing some field
18 training.
19    Q. Did he provide you with any examples of
20 Lieutenant Campbell being rude and nasty to people of
21 a certain race?
22    A. Yeah. He said that he rode with Campbell a
23 few times and every time it came to a black person,
24 Campbell was nasty, unprofessional, wanting to get
25 at them, but when it came to a white person, he was

218

1    respectful. He didn't want to do nothing with it.
2    And then further, Green was going to have to be called
3    as a witness.
4        Q.   Do you plan to call him as a witness?
5        A.   I don't know what my lawyers plan to do.
6    That would be a question for them, Counselor.
7        Q.   All right. Let's look at Allegation 69.
8    And if you -- if we look at Subsection C, it says,
9    referring to Sergeant Roberson and Sergeant Alexander,
10   "Both Sergeants praised Mr. White's performance" in
11   January of 2018. Can you describe how they praised
12   your performance?
13       A.   True statement. As I described earlier,
14   that Sergeant Roberson told me that I was a good
15   deputy, that I come to work, that I do my job. That
16   he had no issues with my personal performance or work
17   performance -- personal conduct or work performance.
18       I asked the same questions to Sergeant
19   Alexander and he confirmed that he had no issues
20   either outside of that one incident that I was cleared
21   for, and so that's what I'm talking about.
22       Q.   Moving on to Allegation 84 on Page 17, it says,
23   "Mr. White understood Sheriff White's instruction to
24   issue criminal citations to Mexican-Hispanic persons."
25       Did Sheriff White tell you to issue criminal

219

1    citations to Mexican-Hispanic persons?
2        A.   In fact, when he told me to issue that
3    ticket to the Hispanic, when I as the responding
4    officer -- determined that he had not done anything
5    and didn't deserve a ticket, that's exactly what he
6    done. Because you ---
7        Q.   But did ---
8        A.   Excuse me?
9        Q.   But did he tell you, "You need to issue
10   criminal citations to Mexican and Hispanic people"?
11       A.   He didn't say those specific words.
12       Q.   Okay. And it says, "Lieutenant Campbell's
13   instruction not to issue criminal citations to white
14   persons."
15       Did he instruct you not to issue criminal
16   citations to white persons?
17       A.   He didn't say those specific words, but most
18   certainly his actions of me giving a -- of management
19   allowing me to give a Hispanic man traffic summons
20   then not allowing me to give a white woman traffic
21   summons, something's wrong with that picture. And I
22   believe it's -- it's discriminatory.
23       Q.   And did you understand that to be them
24   instructing you to target a specific race?
25       A.   I understood them to be telling me to get --

220

1    that they don't have a problem with, you know,
2    deputies getting minorities, per se. But when it
3    comes to a Caucasian-Americans, we had to be careful.
4        There is no other reason. I mean, the
5    example speaks for itself. In my opinion, why not
6    ticket the white woman who committed more gross
7    violations, okay under Chapter 20. But yet you want
8    to ticket a Mexican and Hispanic male who didn't
9    deserve to be ticketed.
10       Q.   Moving on to Paragraph 110 on Page 21. It
11   states, "Mr. White later learned that the increase in
12   hostility towards him was created by Sheriff White.
13   After Mr. White filed his internal complaints and EEOC
14   charge, Sheriff White held a conference with
15   leadership, deputies and staff members and informed
16   all of Mr. White's complaints and instructed them not
17   to speak around Mr. White."
18       When did this conference happen?
19       A.   That is a true statement confirmed by --
20   told to me by Sergeant Welborn and Sergeant Bobby
21   Martin, as well as Lieutenant Goolsby and Captain
22   Watkins. And it was also told to me by Deputy Poole
23   because he heard it.
24       So that is a true statement. In fact,
25   Captain Watkins told me to watch my back. He said,

221

1    "Bro, watch your back." In fact, in front of multiple
2    deputies, Sergeant -- Sergeant Bobby Martin told me in
3    front of multiple deputies that the command staff had
4    the meeting and that Sheriff White said those things
5    that you just wrote and directed Goolsby to get with
6    both sergeants and to tell them.
7        So this took place in the -- in around the
8    time in the summer, when -- after I filed my
9    grievances.
10       Q.   Moving on to Paragraph 131 located on Page
11   24, it says, "Since it terminated Mr. White, VCSO has
12   made remarks that deputy sheriffs who file complaints
13   against management for discrimination will end up like
14   Mr. White." Can you tell me what this is about?
15       A.   Yeah. Sergeant Bobby Martin said something
16   to Poole in the patrol room, said, "All right, now.
17   You don't want to end up like your boy." And Poole
18   said, "What boy?" "Fired."
19       So something for that nature. There could
20   have been other things that's not coming to the top of
21   my head, but that was one of them.
22       Q.   So was any -- do you know of anything that
23   was said about you by Peter White after October 23rd
24   of 2018?
25       A.   I don't know what he said.

222

1    Q.  Can you identify any statements he made?
2    A.  No, I can't.
3    Q.  How about Lawrence D. Bullock, can you
4  identify any statements he made?
5    A.  No, I can't.
6    Q.  How about Weldon Wallace Bullock?
7    A.  After I had my -- I can identify the
8  statements he made during the unemployment appeal that
9  they appealed after I won against the County.  And
10  then I can -- the County and I did a -- under my
11  former lawyers, did a Rule -- Rule 408 meeting.
12        And sometime after that, I learned that it
13  was going around through the Sheriff's Office that I
14  had met with them and that it was said by management,
15  whomever it was, "We don't want him back."
16    Q.  And you said there were statements made
17  during an unemployment appeal.  What were those
18  statements?
19    A.  The same statements that I told you about
20  earlier.  When Captain Bullock said that 911 didn't
21  hear it, the information that I requested and said
22  that -- something to the effect that he believes that
23  there was a distinction or disorientation of what
24  was -- I was asking and what they thought it would be.
25  Something to that effect.

223

1    Q.  Okay.  I'm going to ask the same question
2  about anything that was said by Peter White that you
3  can identify as of August 4th of 2019.  Can you
4  identify any statements?
5    A.  August 4th of 2019.  He may have said some
6  things.  Nothing that's coming to the top of my mind.
7    Q.  How about Weldon Bullock?
8    A.  They were retired by that time -- August
9  4th, 2019.  He may have said some things, but nothing
10  is coming to the top of my head.
11    Q.  Is that the same for Weldon Wallace Bullock?
12    A.  Outside of what I've already told you, yes.
13    Q.  Okay.  So you mentioned that you worked with
14  a Deputy Patel.  Is that correct?
15    A.  Yes.
16    Q.  Did you ever call him any racial slurs?
17    A.  No.
18    Q.  Did you ever ---
19    A.  I do not remember calling him any racial
20  slurs.
21    Q.  Did you ever call him "Osama"?
22    A.  No, that -- no.  The name "Osama" was called
23  by Sergeant Bobby Martin.
24    Q.  Can I turn your attention to Exhibit 24?
25        (DEPOSITION EXHIBIT

224

1        NUMBER 24 WAS MARKED
2        FOR IDENTIFICATION)
3        MR. CASTRO:  And I would ask that we
4  zoom into the exhibit.
5    Q.  (Mr. Castro)  Once you have a chance to
6  review this, please let me know what it is?
7  (Witness examines document)
8    A.  I see it.
9    Q.  What is this?
10    A.  This is -- appears to be a statement from
11  Deputy Patel.
12    Q.  Does it say in this statement that you
13  called Patel "Osama" a few times?
14    A.  At the end, it says it.  It says
15  that, "Then Deputy White said 'Osama' a few times and
16  looked at me."  It doesn't specifically say that I
17  called him Osama, but he's referencing that I said,
18  "Osama" and looked at him, implying that I was
19  referring to him.
20    Q.  Did you say, "Osama," and look at him?
21    A.  No, I did not.
22    Q.  So is ---
23    A.  It's another deceptive statement from the
24  the members of the Vance County Sheriff's Office.
25    Q.  So is Deputy Patel lying about this?

225

1    A.  He's lying because I do not remember any of
2  this, and I contend it did not happen.
3        (DEPOSITION EXHIBIT
4        NUMBER 4 WAS MARKED
5        FOR IDENTIFICATION)
6    Q.  Okay.  I'm going to get to conclude.
7  Exhibit 4 is a Motion for Leave to File Amended
8  Complaint.  And I'm going to turn your attention to
9  Document 32-1, which is the second document.
10        On the second page of that document, it says
11  in that paragraph before the argument, and I'm going
12  to let the reporter scroll to Page 2 of 10 of Document
13  32-1, and that -- you are there?
14    A.  I'm -- I'm ---
15        MR. CASTRO:  There we go.  Scroll up a
16  little bit, please.
17    Q.  (Mr. Castro)  That paragraph before the
18  argument section, can you review that?
19  (Witness complies)
20    A.  "Since Plaintiff's Complaint was filed,
21  Defendants' continued discriminatory and illegal
22  actions have unjustifiably prevented Plaintiff from
23  securing employment in his chosen field, negatively
24  impacted his financial prospects and caused him severe
25  emotional distress.  The continued actions of

226

1  Defendants have necessitated the naming of Sheriff
2  Curtis Brame as a party to the case and given rise to
3  new causes of actions which Plaintiff seeks to add
4  through his Amended Complaint.  Additionally, pursuant
5  to the law, Plaintiff seeks the leave to add the
6  Sheriff's surety."
7        MS. ROBINSON:  I'm going to object to
8  this.  This is attorney-client privilege.  Not only
9  that, but the court has ruled on this matter and Brame
10  was not allowed to be named.  So it's irrelevant.  It
11  exceeds the scope of this case at this point.
12        MR. CASTRO:  Okay.
13        MS. ROBINSON:  And he's answered the
14  question.
15        MR. CASTRO:  I'll ask you not to make
16  speaking objections again.
17    Q.  (Mr. Castro)  So how have the Defendants
18  prevented you from securing employment, exactly?
19    A.  Because they have blocked my prospects with
20  this report of separation, saying that -- internal
21  investigation, and they have falsely charged me with
22  excessive force when there is no excessive force.  And
23  they have given negative references.
24    Q.  What negative ---
25    A.  To my prospective employers.

227

1    Q.  What negative references are you referring
2  to?
3    A.  Of me working at the Vance County Sheriff's
4  Office and the incidents that took place there
5  involving my excessive force, if not other things.
6  But the thing that keeps coming up is the excessive
7  force.
8    Q.  Do you have any proof that anyone from the
9  Vance County Sheriff's Office has contacted
10  prospective employers about you?
11    A.  My attorneys may or may not have the proof.
12    Q.  Do you have any knowledge of anyone from the
13  Vance County Sheriff's Office telling your prospective
14  employers bad things about you, or not to hire you?
15    A.  Yes.  I have knowledge that took place.
16    Q.  What is that knowledge?
17    A.  When I applied for G4S special police, the
18  captain at the time -- I can't think of his name.
19  Hold on.  It's coming to me.  Captain Bryan Kale,
20  K-A-L-E.
21        He was interested in hiring me, starting me
22  out somewhere around like $19 an hour, full-time
23  employee, et cetera.  He told me that he was a use of
24  force investigator.  He had done it for a while and he
25  was going to go to Vance County and look at the

228

1  excessive force file, the internal affairs file for
2  the excessive force.
3        And he said if it's just that, you know,
4  based on what I'm telling him as I previously told you
5  about her arm being broken and she been aggressive, et
6  cetera, then I shouldn't have a problem.  And so he
7  went down there.  He said he had to see the file, and
8  there was some other things that he said.
9        Said that he was going down there and, you
10  know, take a day off and, you know, look at my file,
11  talk to Vance County, et cetera.  And he assured me
12  that he was going to let me know what Vance County
13  said.
14        And I called him later on, and he confirmed
15  that he had just left Vance County and that he had
16  spoke to former -- my former supervisors, the
17  officials at Vance County.  I asked him for names.  He
18  would not give me names.  He just said, "Management."
19        And I asked him about the -- the use of
20  force, the excessive force report.  And he said,
21  "Well, there isn't much to that.  There's not a lot to
22  it."  I said, "Okay."  He said, "But there are other
23  things."
24        And I said, "When you talk about other
25  things," I said, "Are you talking about a write-up or

229

1  something?"  He said, "No.  The write-up isn't the
2  issue.  Everybody got write-ups, but I'm not going to
3  talk to you about it."  I said, "What do you mean,
4  you're not going to talk to me?"
5        "I just told you I'm not going to talk to
6  you about it.  I need time to speak to my deputy
7  chief."  And I asked him, I said, "Well, did they give
8  negative references?"  And he hesitated, and I asked
9  him again and he said, "Mr. White, I just told you I'm
10  not going to talk to you about it.  I need to speak to
11  my deputy chief before I say anything to you."
12        And so he said he would call me in the
13  coming days, and he later called me and he told me.
14  He said, "Mr. White, I told you I was going to call
15  you after I spoke with my Deputy Chief, and he's made
16  the decision to -- for me not to tell you anything
17  about what Vance County said.  And -- but to tell you
18  that we were not going to proceed -- we will not
19  proceed with your application."
20    Q.  And is this Bryan with an I or a Y?
21    A.  I believe it was a Y.
22    Q.  And what prospective employer did you say,
23  what was their name?
24    A.  G4S Special Police, Captain Bryan Kale.
25    Q.  So did you attempt to get re-certified as a

230

1  law enforcement officer after you left the Vance
2  County Sheriff's Office?
3      A.  I did before my one-year ran up.
4      Q.  Did you have to sign releases to get
5  re-certified?
6      A.  Well, you know I did.
7      Q.  So without discussing anything that you
8  talked with your attorneys about or any attorney
9  advice, obviously.  When did you decide that you might
10  sue the Vance County Sheriff's Office?
11     A.  I can't give you that information.  I don't
12  have a specific date for you.  And I mean, if
13  anything, that is -- I mean, that situation is between
14  my attorneys and I.
15     Q.  Without discussing any attorney advice or
16  anything that your attorney has told you about this
17  case, was there any specific incident that made you
18  think you should file a lawsuit against this the Vance
19  County Sheriff's Office?
20     A.  I can't discuss that information.  I don't
21  have a specific -- specific date for you.
22     Q.  Okay.  That's fine.
23     A.  And outside of specific date -- specific,
24  excuse me.  Most certainly we'll venture into
25  attorney-client -- client privilege if that's the

231

1  case.
2      Q.  Of course.  Yes.  I'm not asking about that.
3      A.  Uh-huh (yes).
4      Q.  Okay.  So in conclusion, finally, you
5  identified William Taylor Bartholomew as someone who
6  might have knowledge about your case.  Who is Mr.
7  Bartholomew?
8      A.  Mr. Bartholomew is a former Detective
9  Sergeant at Vance County, former Detective Criminal
10  Investigator at Vance County.
11     Q.  What does he know about your case?
12     A.  Considering that he's an Internal Affairs
13  investigator and Vance County Sheriff's Office sent
14  him and Major John Shelton to go through IA, which
15  covers use of force.
16         He would -- and he would have the ability to
17  distinguish whether or not this was a quick, trumped
18  up investigation, no thoroughness, or whether or not
19  there's any credibility to the excessive force.  As
20  he's investigated multiple incidents, so if not
21  multiple, at least a few at the Sheriff's Office
22  involving other deputies.
23     Q.  Does he have -- did he personally witness
24  any of your treatment at the Vance County Sheriff's
25  Office?

232

1      A.  I don't know what he witnessed.  He was
2  there when I worked there.
3      Q.  Okay.  And the final exhibit that I will
4  show you today is one that we sent recently, which is
5  marked as Exhibit 28.  And I will ask the reporter to
6  show it and I'll ask you to review it and let me know
7  what this is?
8              (DEPOSITION EXHIBIT
9              NUMBER 28 WAS MARKED
10             FOR IDENTIFICATION)
11  (Witness complies)
12     A.  I know what it is.  It's a tuition
13  reimbursement agreement.
14     Q.  What was the purpose of this agreement?
15     A.  Tuition reimbursement.
16     Q.  Did this create an employment contract with
17  the Sheriff's Office?
18     A.  No.  It didn't create an employment contract
19  with them.
20     Q.  Does this agreement constitute a contract
21  with the Sheriff's Office?
22     A.  It certainly does not.
23     Q.  Have you searched for that two-year contract
24  that you mentioned?
25     A.  I have and I'm unable to find it.

233

1          MR. CASTRO:  Can we take a five-minute
2  break and then likely no more questions?  Thank you.
3          THE COURT REPORTER:  We are off the
4  record.
5  (Brief recess: 6:35 p.m. to 6:40 p.m)
6          THE COURT REPORTER:  We are back on the
7  record.  The time is 6:40.
8      Q.  (Mr. Castro)  Just a couple more questions.
9  Other than the Bryan Kale incident that you described,
10  do you have any other proof or incidents where VCSO
11  tried to stop you from gaining employment?
12     A.  Sorry, Brian, I was coughing.  Can you
13  repeat that question?
14     Q.  No worries at all.  Other than the incident
15  with Bryan Kale that you described, do you have any
16  other proof or incidents that you can describe where
17  VCSO tried to stop you from gaining employment?
18     A.  There may be some proof that my attorneys
19  have that's not coming to me.  I do know when I --
20  hold on.  Give me a few seconds, if you don't mind.
21         When I applied for Wake County Sheriff's
22  Office for a deputy sheriff, they asked -- the
23  recruiting officer asked about my -- if I was BLET
24  certified, and I said yes.  They asked if I had my
25  general -- no.  No, no.

234

1    I told them I had my general certification
2 and they said, "Okay, great." And they asked where I
3 was previously, and I told them. (Witness coughs)
4 Excuse me. And they asked what did my F5 report of
5 excuse me. Excuse me. Report of separation say.
6        They asked if any of the boxes were checked
7 and I told them yes. Internal investigation, 18
8 months. And they said that -- that's going to be a
9 problem.
10       And they asked, "First, I need to know --
11 said, "First, I need to know what -- what internal
12 affairs investigation they were referring to, and I
13 told them. I said, "It doesn't say specifically, but
14 I believe it's -- it's for my use of force, excessive
15 force allegation."
16       They asked if it was sustaining and I said,
17 "According to the Department, it is." And so they
18 told me that the Sheriff would most likely not hire
19 me, but he was going to talk to his Lieutenant and
20 Captain and see what they say.
21       And so the word came back down. I believe
22 the investigator was Nicholas O. -- Nicholas O. Harvey
23 or Nicholas O. Garvey, somewhere around -- something
24 like that.
25       Said that a lieutenant, I believe he said

235

1 Lieutenant Bobby Sutton -- Sutton, S-U-T-T-O-N, gave
2 him an answer and said that the Sheriff was not going
3 to hire me with my form marked, my -- with the
4 excessive force as well.
5    Q. Did he inform you that he had spoken to
6 anyone at the VCSO?
7    A. I don't know -- I don't know if he spoke to
8 anybody there.
9    Q. But he saw your F5 form?
10   A. I believe so, yes.
11   Q. Other than those two incidents, anything
12 else about preventing you from securing employment?
13   A. Other than the excessive force, the
14 departments kept saying the excessive force is the
15 issue with Vance County, things that Vance County did
16 with the excessive force.
17       So evidently, what happened with G4S, when
18 the Captain wouldn't go into detail, wouldn't answer
19 my question about them providing negative reference
20 and why he's not going to talk to me, et cetera, when
21 he said that he would. And saying he was going to
22 wait until he spoke to his Deputy Chief and those
23 incidents.
24       Like I said, there may be other instances.
25 It's -- it's a lot of stuff that's happened, Brian.

236

1 And I'm not Superman and I'm not God. I can't
2 remember everything.
3        MR. CASTRO: Well, I appreciate you
4 telling me what you do recall and I appreciate you
5 sitting for this deposition for such a long time. I
6 have no further questions at this time.
7        MS. ROBINSON: Can I have a few minutes
8 to see if I want to do any kind of redirect?
9        MR. CASTRO: Yes.
10       THE COURT REPORTER: We are off the
11 record. The time is 6:45.
12 (Brief recess: 6:45 p.m. to 6:51 p.m.)
13       THE COURT REPORTER: We are back on the
14 record. The time is 6:51.
15       EXAMINATION
16 BY MS. ROBINSON:
17   Q. I have a couple of questions for you.
18 First, I would like to ask, is there a distinction
19 between a traffic ticket and a criminal summons?
20   A. No. They're virtually the same thing.
21   Q. By that, what do you mean?
22   A. You can charge a criminal summons -- a
23 criminal summons, you can charge for infractions,
24 misdemeanors. Some law enforcement officers charge
25 for felonies on a criminal summon, although it

237

1 shouldn't go up there. It should go on a warrant or a
2 magistrate's order if you have that person in your
3 custody.
4    Q. Is a person arrested if they receive a
5 criminal summons?
6    A. No. Although some of the charges that may
7 be on a criminal summons is an arrestable offence,
8 that person is -- the officer or the deputy or --
9 would draft a criminal summons, present it to the
10 magistrate judge or a judge.
11       The judge would review it, swear the officer
12 or, you know, the deputy in, get a brief testimony
13 just to determine probable cause. If the court
14 declines probable cause, you can't move forward. If
15 the court allows probable cause, approves it, they'll
16 either sign it and then you go serve it.
17       You or another law enforcement officer will
18 go serve it. And then after you serve it on them, you
19 would -- you'd do a return that goes to the clerk's
20 office.
21   Q. So I'm going to change gears a bit. You
22 spoke about your complaints of discrimination being
23 made. When did you first make a complaint of
24 discrimination?
25   A. The first complaint of discrimination in

238

1    terms of my internal -- are you referring in terms of
2    my internal EEO grievances?
3        Q.   No.  Either oral or written.
4        A.   The oral complaints, they were made in 2017.
5    There were issues prior to any written warning, any
6    suspension, any internal or external EEO-protected
7    activity that went to the Sheriff, the HR Director and
8    the EEOC.  There were issues well before I put
9    something on paper.
10       Q.   What were those issues?
11       A.   The homophobic statements by Sergeant -- I
12   can't think his name.  It'll come to me.  Sergeant
13   Martin, Bobby Martin.  When he was a criminal
14   investigator in the process of becoming a sergeant,
15   around the same time.  And which he later apologized
16   for, but that still happened.
17       Q.   What homophobic statements did he make?
18       A.   He said that -- I'm sorry?
19       Q.   What homophobic statements did he make?
20       A.   He said that I was gay and that's what he
21   heard, and he said that I was getting rammed by a man
22   and that I was sucking a man, and which I was not.
23       Q.   And who did you report that to?
24       A.   I talked to Sergeant Roberson about it.
25       Q.   What did Sergeant Roberson say?  Was there

239

1    an investigation?
2        A.   No.  There was not an investigation.  He
3    said something about that -- that I could file a
4    complaint.  He said that I was new there.  He told me
5    he apologized, and so they might not do anything with
6    it, they being management, leadership, supervision.
7        Q.   You started to say that there were many
8    complaints before you decided to put anything in
9    writing.  Does anything else jump out at you?
10       A.   The purple unicorn.  There were complaints
11   about Sergeant Campbell and I when I worked -- when I
12   was in field training with him for two-and-a-half,
13   three weeks, approximately.
14            I recognized whenever we went to calls
15   involving minorities, specifically black males, that
16   (witness coughs) -- excuse me.  Excuse me.  That he
17   was hostile.  He -- it's as if he had a vengeance, a
18   grudge about them -- about us.  Excuse me, about it.
19            He did not like African-American males for
20   whatever reasons, based on his conduct and egregious
21   behavior -- behaviors.  But when it came to
22   Caucasian-Americans, he was very respectful.
23            And this just goes back to Deputy Isaiah
24   Green's assessment without my influence or statement,
25   formulating his own opinions, which were consistent

240

1    But what the -- the testimony I've previously provided
2    and currently provided -- providing, excuse me.
3        Q.   Okay.  And I have one final question.  When
4    you were transferred from your initial squad, did your
5    hours change?
6        A.   No.  In terms of pay?  That's what you're
7    referring to?
8        Q.   No.  The shift.  Was there a shift change?
9        A.   Yes.  There was a shift change, but there
10   was no compensation change in terms of the hours I was
11   working.
12       Q.   What was the -- what was the shift change?
13       A.   I went from Sergeant Roberson's shift to
14   Sergeant Alexander's shift.
15       Q.   What was Sergeant Roberson's shift?
16       A.   I mean, both of the shifts rotated.  One was
17   on day, one was on night.
18       Q.   Uh-huh (yes).
19       A.   So I would've -- if for example, when I was
20   transferred, I would've been working day shift with
21   Roberson and then when I transferred, I was working
22   night shift with Marin.  But if I would've transferred
23   from Marin to Roberson, then it will be vice versa,
24   depending on which rotation has day shift or night
25   shift.

241

1        Q.   Was there a change -- did the change in
2    supervision, do you think it led to a change in your
3    ability to grow?
4        A.   Well, D. Ray was more of a -- he was
5    respectful, laid back.  He was -- he's somebody that
6    can lead, somebody who worked with his officers in the
7    field.  Sergeant Alexander, based on what I heard and
8    some of the things I saw, he had the ability to, you
9    know, lead.
10            But for whatever reasons, he couldn't get to
11   work on time, constantly late, absenteeism, tardiness.
12   Shutting down whenever something going on, not
13   working, not responding to calls.  Later saying that
14   he don't have to answer calls because he is a
15   supervisor.
16            So I will say that things were moving along
17   under Sergeant Roberson more so than Sergeant
18   Alexander.  But things could have been better had
19   Lieutenant Campbell not set out to persecute or
20   prosecute me wrongfully for whatever reasons.
21       Q.   Out of all the complaints you've made, was
22   there an investigation?
23       A.   There was an investigation allegedly ordered
24   by -- well, Sheriff White eventually, after he talked
25   to Director Johen, did an investigation as far as the

**242**

1  Campbell situation with the written warning, the
2  suspension, that issue.  No.  Not -- in terms of all
3  of my issues, whether oral or written, no.  Not every
4  one of them resulted in an investigation.
5       And I don't know how they're going to do an
6  investigation when they already say that, one, in the
7  County's EEO response done by Attorney Andrew
8  Atherton, that the County had no obligation to do
9  these investigations or let alone hear my side out,
10  something to that effect.
11       And also, it was very clear by management
12  that the Sheriff don't like deputies going to HR and
13  he wasn't a fan of me doing it.  That's why he ran me
14  out of there.  That's what -- I mean, let's just be
15  real.
16          MS. ROBINSON:  I don't have any further
17  questions.
18          MR. CASTRO:  I have no further
19  questions either.
20          THE COURT REPORTER:  This concludes the
21  deposition.  The time is 7:01 p.m.
22
23       WHEREUPON, at 07:01 o'clock p.m., the
24  deposition was adjourned.
25

**243**

## CERTIFICATION

     I, Lori Gruber, Notary Public in and for
the County of Iredell, State of North Carolina at Large,
do hereby certify:

     That there appeared before me, via video
conference, the foregoing witness at the time and
place herein aforementioned;

     That the said witness was sworn by me to state the
truth, the whole truth, and nothing but the truth, in
said cause;

     That the testimony was taken before me via video
conference, and the foregoing consecutively numbered
pages are a complete and accurate record of all the
testimony given by said witness;

     That the undersigned is not of kin, nor in anywise
associated with any of the parties to said cause of
action, nor their counsel, and that I am not
interested in the event(s) thereof.

     Reading and signing of the testimony was requested.

     IN WITNESS WHEREOF, I have hereunto set my
hand this 22nd day of February, 2021.

                    *Lori Gruber*

CHAPLIN & ASSOCIATES
Notary No. 201919100031

**244**

## WITNESS CERTIFICATION

     I, JUSTIN J. WHITE, do hereby certify,
     That I have read and examined the contents of the
foregoing pages of record of testimony as given by me
at the times and place herein aforementioned;
     And that to the best of my knowledge and belief,
the foregoing pages are a complete and accurate record
of all the testimony given by me at said time, except
as noted on the attached here (Addendum A).
I have _____ / have not _____ made changes/corrections
to be attached.

                    _____
                    (WITNESS SIGNATURE)

     I, _____, Notary Public
for the County of _____, State of
_____, do hereby certify:
     That the herein-above named personally appeared
before me this the _____ day of _____, 20____;
     And that I personally witnessed the execution
of this document for the intents and purposes herein
above described.

                    _____
                    NOTARY PUBLIC

My Commission Expires:          (SEAL)

**245**

## ADDENDUM A

     Upon the reading and examination of my
testimony as herein transcribed, I note the following
changes and/or corrections with accompanying reason(s)
for said change/correction:

Page    Line         Is Amended to Read

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

## Exhibits

**7180 Justin White 02-10-21 Exhibit 1** 4:13 21:10,11,14

**7180 Justin White 02-10-21 Exhibit 3** 4:15 87:21,22,24,25 155:18 216:25

**7180 Justin White 02-10-21 Exhibit 4** 4:17 225:3,4,7

**7180 Justin White 02-10-21 Exhibit 6** 4:19 22:1,2,4,5

**7180 Justin White 02-10-21 Exhibit 9** 4:21 89:8,9,11

**7180 Justin White 02-10-21 Exhibit 10** 4:23 98:3,4,7,8

**7180 Justin White 02-10-21 Exhibit 11** 5:4 101:2,3,6 102:12

**7180 Justin White 02-10-21 Exhibit 12** 5:6 104:3,4,5,19

**7180 Justin White 02-10-21 Exhibit 13** 5:8 107:21,22,25

**7180 Justin White 02-10-21 Exhibit 14** 5:10 120:12,13,15

**7180 Justin White 02-10-21 Exhibit 16** 5:12 125:2,3,6

**7180 Justin White 02-10-21 Exhibit 17-Placeholder**

**7180 Justin White 02-10-21 Exhibit 19** 5:16 169:21,22,25

**7180 Justin White 02-10-21 Exhibit 20** 5:18 209:10,11,12

**7180 Justin White 02-10-21 Exhibit 24** 5:20 223:24,25 224:1

**7180 Justin White 02-10-21 Exhibit 25** 5:22 204:18,19,20

**7180 Justin White 02-10-21 Exhibit 28** 5:4 232:5,8,9

## $

**$19** 227:22

## -

**--I** 134:16

## 0

**07:01** 242:23

## 1

**1** 21:11,14 90:8

**10** 98:4,7,8 113:25 225:12

**10-18** 113:24,25

**10-28** 135:1

**10-29** 133:23,24

**10-29s** 133:1,10 135:4 136:21

**10:00** 142:11 143:4,9

**10:15** 8:2,4

**10th** 8:5

**11** 101:3,6 102:12

**110** 220:10

**11:00** 142:12 143:10

**11:05** 38:9,10

**11:14** 38:10,12

**12** 12:8 89:3 104:3,5,19 116:3

**123** 155:20

**12:00** 138:18 140:5 142:13 147:6 180:20

**12:06** 70:21,22

**12:12** 70:22,24

**12:17** 74:23,24

**13** 107:22,25 217:2

**131** 221:10

**13th** 211:4

**14** 120:13,15

**15** 100:17 160:4

**15th** 211:5

**16** 88:1 125:3,6 207:11

**17** 12:5 125:23 126:2 207:12 218:22

**18** 205:23 207:3,10 234:7

**18-week** 12:5

**18th** 108:4

**19** 169:22,25

**1:21** 74:24 75:1

**1st** 104:25

## 2

**2** 91:6 125:15 170:24 225:12

**20** 49:2 52:18 78:9 160:4 185:15 209:10,12 220:7 244:19

**2012** 18:2,3 160:20

**2015** 18:3 55:6,7

**2016** 18:15 19:10

**2017** 15:22 18:16 19:11,21 23:13 27:19 42:23 43:11 53:10 60:1 63:7 72:12 75:3 80:9 93:6 100:8,14,17 107:7 195:25 238:4

**2018** 20:5,7 84:7 89:25 99:3,16 100:9 101:13,17 104:25 108:4 113:2 117:5 126:9 127:18 132:8,13 147:18 159:11 170:9,11,14 177:10,12 178:21 193:8 196:1 207:16,18 218:11 221:24

**2019** 211:5 223:3,5,9

**20191910003120** 143:24

**2021** 8:5 243:22

**20th** 89:25

**21** 220:10

**22** 207:16

**22nd** 147:18 167:17 170:9,11 207:15 243:22

**23** 155:20

**23rd** 207:15 221:23

**24** 221:11 223:24 224:1

**24-** 208:3

**24-hour** 208:4

**24th** 188:13

**25** 78:9,11 204:18,20

**25th** 207:18

**27** 117:5 127:18

**27th** 100:8

**28** 232:5,9

**2:00** 138:17 140:3,4,5 141:6,7,21 143:11,
   21 144:4 145:22 147:10 181:1,20

**2:04** 97:24,25

**2:10** 97:21,25 98:2

**2:58** 124:12,23,24

---

**3**

**3** 87:22,25 155:18 171:1 216:25

**3-17** 127:17

**3-17-2018** 127:5,7,9,11

**3-27** 127:17

**3-27-2018** 127:10,16

**30** 115:10 146:6,15

**30th** 101:13 127:2

**32-1** 225:9,13

**39** 50:25

**3:00** 188:13

**3:17** 124:24 125:1

---

**4**

**4** 225:4,7

**4-3-18** 120:23

**408** 222:11

**47** 88:1 155:20

**4:04** 155:10,13

**4:20** 165:2

**4:52** 186:24,25

**4th** 223:3,5,9

---

**5**

**50** 99:7,12

**52** 217:1

---

**5:00** 144:5 145:22

**5:24** 186:25 187:2

**5A** 204:24 205:1

**5th** 27:9,12,15,18,19 28:7 100:9,14 211:4

---

**6**

**6** 22:2,5

**6-8** 171:3

**69** 218:7

**6:35** 233:5

**6:40** 233:5,7

**6:45** 236:11,12

**6:51** 236:12,14

---

**7**

**7** 100:16

**78** 88:1,3

**7:00** 170:16

**7:01** 242:21

---

**8**

**8-15-1989** 10:14

**82** 88:7

**84** 218:22

**8:00** 170:16,18

**8:30** 117:19 127:25

---

**9**

**9** 89:9,11 127:25

**911** 66:17 68:22 69:3,16,21 70:11 71:6,
   12,24 72:1,6,9 93:20 109:6 111:13
   115:22 134:19 135:1,9 136:19,21,25
   163:21,22 164:2,3 185:2,8 222:20

**9:00** 127:22 170:19

**9:40** 127:5,22

**9:40:52** 127:16

---

**A**

**A-N-T-O-N** 42:25

**a.m.** 8:2,4 38:10,12 140:3,4,5 141:6,7,21
   143:12,21 144:4 145:22 147:6,10 181:20

**ability** 204:7 231:16 241:3,8

**absent** 48:9

**absenteeism** 241:11

**absolutely** 74:12 102:15,21

**academy** 55:11,16,18,19,23

**accept** 26:14 61:14

**acceptable** 26:22

**accepted** 62:25

**access** 199:3,7,9,11

**accompanying** 245:5

**accomplished** 82:17

**account** 59:12

**accurate** 59:12 91:13 100:21 109:17,19
   123:24,25 124:1 130:18,21 131:4 139:10
   205:19 206:18 207:20 243:14 244:8

**accused** 164:17

**achieving** 13:8

**acknowledge** 6:10,13

**act** 157:1 195:20

**acted** 50:12 149:24

**acting** 15:1 62:13 151:11 152:9 154:14

**action** 76:23 96:23 99:8 123:19 243:18

**actions** 99:21 152:24 198:5 219:18
   225:22,25 226:3

**active** 137:3

**activity** 154:5 176:25 177:18 178:10
   181:16 215:7 238:7

**actual** 153:15,23

**Adam** 54:6

**adamant** 153:12 181:18 182:20 184:6

**add** 122:8 214:20 226:3,5

**addendum** 244:10 245:1

**additional** 123:21 143:20,22

**Additionally** 226:4

**address** 43:15 83:25 106:18

**addressed** 36:17

**addressing** 43:5

**adhered** 183:19

**adjacent** 199:1

**adjourned** 242:24

**administered** 3:14

**administration** 12:14 13:1

**admission** 98:23

**admit** 129:17

**admitted** 40:15 47:4 66:6,7 76:19 104:8

**admitting** 141:5

**advanced** 39:4

**advice** 102:22 230:9,15

**advise** 102:20

**advised** 102:15 105:8,21 112:15

**affairs** 207:24 208:2 214:12 228:1 231:12 234:12

**affected** 204:6

**affiliated** 126:18

**aforementioned** 143:8 244:6

**African-american** 43:12 46:20 54:17 140:21,25 194:1 195:23 239:19

**African-americans** 92:7

**aftercare** 170:3

**afternoon** 141:25 142:7 144:19

**afterward** 128:15

**agency** 12:8 160:21 166:21 213:3 216:10

**aggression** 15:5 169:2,3

**aggressive** 15:9 150:24 153:1 164:21 214:1 228:5

**aggressively** 154:15

**aggressiveness** 169:3,10

**agree** 9:1 58:9,24 78:11,14 87:12 90:4 144:10

**agreed** 107:16

**agreement** 8:21,22 179:19 180:12 232:13,14,20

**agrees** 84:14

**ahead** 64:7,8,10 81:9 110:12 119:25 121:19 129:4 141:18 159:5 211:19

**air** 61:13

**Albemarle** 55:5

**Alexander** 32:9 47:24 48:20 49:10,15 51:16 52:4,7,14,21 53:2,5,13,19 61:1 63:3,4,8,18 64:24 66:14 69:1,14 75:22 76:18 77:1 85:12 86:5 92:12,19 93:2,7 108:4 111:25 112:7,16 114:7,22 115:15 116:2,19,20 122:17 218:9,19 241:7,18

**Alexander's** 50:25 72:10 75:4 77:12 109:11 240:14

**Alexander's** 76:2

**Algretta** 58:13

**allegation** 155:22 197:11 213:24 217:1,2 218:7,22 234:15

**allegations** 58:16 98:16 163:11 196:23 197:1 207:23,24 216:13,24

**alleged** 35:24 37:4 64:18 67:18 133:4,5 149:5 177:16 204:12 208:19

**allegedly** 37:6 39:21 43:5 60:22 70:7 108:9 113:15 123:20 179:23 195:24 241:23

**allowed** 13:21 226:10

**allowing** 209:6 210:1 219:19,20

**alluded** 147:23

**aloud** 90:3

**amended** 21:17 87:25 155:19 216:25 225:7 226:4 245:8

**Amendment** 175:17

**amount** 14:16,19 139:11 160:3

**and/or** 245:5

**Andre** 54:7,25 104:8,18 108:15 111:1

**Andrew** 242:7

**ankles** 163:1 164:20

**announce** 146:17

**another's** 56:21

**answering** 34:23 37:2 73:7 206:9

**answers** 10:2

**Anton** 142:21,24,25

**Antwon** 142:24

**anymore** 58:11 64:7 91:9

**anyone's** 39:5 88:17

**anytime** 159:14,15

**anywise** 243:16

**apartment** 138:20

**apologized** 238:15 239:5

**apparent** 171:1

**appeal** 84:9,10 133:5 222:8,17

**appealed** 197:9,15 222:9

**appearance** 45:3,8

**appeared** 243:6 244:18

**appears** 78:24 88:1 101:12 125:14 128:14 129:6 130:1 170:3 211:4 224:10

**applicant** 213:4

**application** 24:19,22 26:5 99:7 229:19

**applied** 23:12,14 24:10 85:24 151:3 214:24 227:17 233:21

**apply** 23:9,10 212:4,6

**approach** 50:23 108:23 133:15

**approached** 83:17 109:1

**approve** 63:25 64:2 68:1,4

**approved** 26:22 84:2,5,12 123:20 168:11

**approves** 84:10 237:15

**approximate** 138:16 193:9

**approximately** 12:5 15:22 20:5 32:15 42:21 60:2 73:3 99:6 127:25 160:8 170:19 175:23 177:12 207:9 239:13

**April** 23:13 84:7 87:11 196:1

**area** 31:12 139:8 171:4

**Argretta** 39:2,18 98:22 102:5 148:16

**Argretta's** 101:19 102:9

**argument** 108:6,8,10 144:7 225:11,18

**arguments** 74:17,18

**arm** 13:17 151:2,3 153:3,4 155:7 158:1
  161:18 162:3,11,12,14,17,21,23 166:2,
  18,20 167:9,19,24 168:2,6,10,12,20,23,
  24,25 169:6,16,17,18,19 170:25 183:15
  214:2,3 216:21 228:5

**arms** 163:1 164:19

**arrangement** 8:19

**arrest** 52:9 141:21,22,24 143:15 149:20
  151:19 152:12,25 153:8,19,22 157:13
  162:21 163:14 164:22 168:10 184:3
  214:2

**arrestable** 237:7

**arrested** 94:10 138:5,7 237:4

**arresting** 156:24

**arrests** 100:18

**arrive** 139:16

**arrived** 148:21 165:10,13,15 167:2

**asks** 205:16,21

**aspects** 13:4

**ass** 88:25 89:2,4 93:10 111:9 140:18
  148:6

**assault** 88:10 108:18

**assaulted** 88:9 155:7 213:25

**assaultive** 5:10 150:24 153:2 164:21

**assessment** 239:24

**assign** 52:23

**assigned** 18:5 53:3 54:1 106:20 154:7
  183:25

**assist** 10:3

**assistance** 37:1 163:5,6,7

**assistant** 66:18 69:6 99:19

**assistants** 199:9

**ASSOCIATES** 243:23

**assume** 206:13 212:6

**assure** 66:1

**assured** 228:11

**asterisked** 39:19

**Atherton** 242:8

**attached** 135:5 244:10,12

**attacked** 153:1 155:6 167:12 169:7
  2,14:1

**attacking** 156:20 157:9 164:22

**attempt** 17:9 128:10 129:6 229:25

**attempted** 17:11 133:15 182:6

**attempts** 186:18 209:4

**attended** 27:5

**attention** 21:14 125:6 148:12,14,15
  223:24 225:8

**attorney** 9:4 10:20 230:8,15,16 242:7

**attorney-client** 10:9 179:6,9 226:8
  230:25

**attorneys** 8:9 20:12,15 21:2 145:7
  200:9 227:11 230:8,14 233:18

**August** 55:6 223:3,5,8

**authority** 78:15,21 79:3,6 174:12,14

**authorization** 209:21 211:21 212:18

**authorized** 211:12

**avoided** 183:17,21,25 184:6

**aware** 17:4,5,16 78:3,5,7 81:12 82:22
  172:25 174:4 205:21 206:10

**awhile** 94:15 126:22

---

**B**

**B&e** 131:25

**B&es** 131:12 132:1

**B91** 206:7

**B9i** 206:7

**back** 22:17 24:22 26:22 33:8 34:5 38:11
  41:9 42:9 44:19 46:19 48:10 51:8 55:6
  63:5 67:22 68:2,4 70:23 74:25 76:24
  80:22 85:16 90:9,12,14 92:2 96:3,19
  97:20 98:1,12 102:12 111:20,21 112:1,5,
  6 113:20 122:3,4 124:25 126:22 133:8
  135:6 137:14,25 139:23,24 141:19 145:9
  151:7 152:17 155:12 162:17,25 164:19
  170:17 171:19 172:18 173:5 178:6 182:24
  185:2 187:1 192:14 198:20 220:25 221:9
  222:15 233:6 234:21 236:13 239:23
  241:5

**back-and-forth** 57:4

**backed** 48:19 117:16 118:4 119:12
  122:5,6 130:8 131:5

**background** 1:3

**backing** 61:6 118:14 119:4,7,24

**backup** 36:24 139:19,20,22 140:10,16
  141:1,2 148:8,9 163:5 164:10,11,17
  183:5

**backwards** 93:10

**bad** 92:5 105:11,16 114:15 166:8 198:18
  227:14

**badge** 189:5 190:8

**badger** 146:8

**badgering** 145:13 146:13

**bar** 56:20 151:2 153:4 155:7 158:11
  161:18 162:3,21,23 167:19 168:24 214:2,
  3

**barely** 40:15,16

**Bartholomew** 231:5,7,8

**base** 14:25 40:20

**baseball** 199:24

**based** 14:22,23 39:10 43:5 51:18 52:12,
  15 60:17,18,19 61:24 65:7 74:15 75:19
  77:17 78:11 82:12 101:25 106:7 124:5
  128:19 130:1,6,9 131:3 143:19 144:11,2
  150:20 174:15 186:9 208:17,19 214:7
  228:4 239:20 241:7

**basic** 11:25 12:6 13:9 55:4 60:8 158:6
  161:20

**basically** 14:11 36:6 114:10 164:18
  194:24 204:14

**basing** 40:22

**basis** 29:7 42:16 43:6

**bat** 92:1

**bathroom** 70:16

**baton** 13:20

**bears** 169:20

**beef** 61:12

**began** 27:13 114:7,9,11 118:24

**begged** 99:1

**begin** 9:20

**behalf** 154:21 191:11

**behavior** 239:21

**behaviors** 195:6 239:21

**belief** 36:25 39:22 40:21 130:9,10,11 184:14 244:7

**believed** 137:1 185:9

**believes** 222:22

**belt** 85:3

**bender** 42:5,20 117:8

**benefits** 39:7,8 41:5 58:14 77:20

**Bertie** 18:5 161:15

**big** 76:4 86:21 91:15 96:21 110:5 123:8 124:6

**bigger** 104:22

**bills** 46:15

**Bin** 194:19

**birth** 10:13 154:11

**bit** 22:4 93:1 104:22 108:1 147:13 225:16 237:21

**black** 28:15,17 42:7 87:15 91:8,15 110:5 140:20 191:4 192:7 217:23 239:15

**blacks** 217:6

**blank** 202:18

**blaring** 165:15

**BLET** 12:7 13:3 15:12 48:6 55:11 56:2, 5,8 60:8,14 64:23 158:6 161:20 233:20

**block** 204:25

**blocked** 226:19

**blue** 129:12 135:13

**bluish-gray** 28:17

**Bo** 140:18 156:5

**board** 24:16 25:14,23 26:9 29:24

**Bobby** 191:24 192:2 193:12 194:4 220:20 221:2,15 223:23 235:1 238:13

**bodily** 108:22

**bond** 9:22 150:20 168:18

**bone** 167:24 170:25 171:1,2,8,11

**book** 44:21,22,24,25 45:1,3,14 46:24 47:2,3,5,6,7,12,14,15,19 51:12,13,21 79:25 80:4,6 83:17 86:6 90:13 103:15,19 25

**books** 51:25

**boom** 115:7

**boom'** 115:7

**bordered** 116:5

**born** 12:20

**bother** 172:13

**bottom** 65:11 123:9

**boxes** 234:6

**boy** 221:17,18

**brakes** 118:22

**Brame** 226:2,9

**break** 10:9 70:16 97:14 115:5 123:2 124:9 125:13 168:6,9 169:15 233:2

**breaking** 131:8,21 144:9

**Brian** 8:25 9:20 26:1 32:18 34:20,22 35:9 36:2,19 37:1 70:15 101:13 104:7 210:4 233:12 235:25

**briefly** 17:23 42:8 48:1 77:8 149:7

**bring** 14:2 21:13 86:5 100:7 112:4 148:12

**Bro** 221:1

**broad** 132:11

**broadcasting** 28:25

**Broadwick** 93:4

**broke** 114:8 163:2 164:19 167:10 168:23,24 169:6,16,20 214:3 216:20

**broken** 164:20 166:2,7,20,23 167:21 168:13,20,22,25 171:2,4,8,11 183:15 228:5

**brought** 42:17 107:14 148:14,15

**brutality** 164:18

**Bryan** 34:21 227:19 229:20,24 233:9,15

**building** 25:1

**buildings** 46:15 49:22

**Bullock** 24:11,12 25:13,15,25 26:16 27:23 28:2,3 29:12,20 31:2 33:4,16 35:3 57:23 59:17 64:15 68:17,20 96:18 101:2 104:10 133:2,3 135:7 136:20 137:16

148:16 177:3 178:12,13,14,15 179:24 180:2,3 181:3 185:3 188:7,19,25 189:1,4 190:4,16,17 195:17,19 196:10,22 197:4, 198:2,5,20 216:19 222:3,6,20 223:7,11

**Bullock's** 149:5

**burglaries** 132:1

**Burns** 53:17

**Burrell** 117:2,4

**business** 90:11

**businesses** 42:14 46:15

**busy** 103:3,9

**buzz** 24:25

**C**

**C.M.** 195:24

**calculation** 19:1

**call** 10:12 25:12 48:8 50:20,23 68:13 69:4 71:12,24 72:1 85:10,15,25 88:14 92:7 95:23 110:18,21 116:2,14 131:21,2 150:5 151:9 156:7,10,13,21 163:3 165:1 171:20 173:11 175:3 176:2 185:24 186:19 200:7,9,25 201:8,9,20,25 202:22 206:24 216:15 218:4 223:16,21 229:12, 14

**called** 26:16 27:20,22,23,24 62:7 77:4 86:5,7 88:8 93:20 107:17 108:14 110:14 114:13,14,18,19 115:1 116:18,20 118:18 154:6 164:7,8 165:4 176:4 176:4 179:21 185:1 186:7,9,15 188:15 194:18 200:11,16,21 201:22,23 214:4 218:2 223:22 224:13,17 228:14 229:13

**calling** 36:23 49:23 73:8 95:18 114:12 156:19 163:5,6 169:12 176:5 187:10 200:8 223:19

**calls** 34:23,24 36:16 37:2 48:2,4,9 57:6, 7,8 61:6 113:24 132:1 178:25 239:14 241:13,14

**calm** 14:1 168:17 217:5

**camera** 97:17 117:24,25 118:6

**Cameron** 197:8

**Campbell** 32:13,16,19,23 33:3 34:8,13 35:2,5,11 36:1,3,5,6 41:15,21,22 49:19 50:1,6 52:13,21 53:4,6,7 54:5,6 60:4,5,1 61:2,13,16 62:7,11,12,16 63:5,11,21 64:6,

20,21 65:1,6 67:7 68:8,9 82:7,11 84:1
88:8 89:21 91:18 92:20,21,22,23 93:8,
15 94:7 95:4 108:10,14,16,22 109:25
110:18,21 111:2,8,17 112:16,22 113:16
115:11 123:19 175:24 182:4 185:13
197:24 202:10 217:20,22,24 239:11
241:19 242:1

**Campbell's** 53:4 54:3 84:3 113:15
217:5 219:12

**campus** 18:14 19:2,11

**can't** 22:25

**cap** 199:24,25

**capability** 154:1

**Capella** 12:14

**captain** 24:11,12 25:13,15 26:16 27:23
28:2,3 29:11,20 31:2 33:3,16 35:4 57:23
58:5,6,8,22,23 59:16 63:22 64:14 66:23
67:4,10,21 114:12,13,18,19,20 115:18
133:2 148:16 149:5 172:21,23 173:11,
24 174:2,6,15,19,22 179:23 180:2,4
181:3 187:6,8,17 188:1,7,14,25 189:14
190:4,16 216:19 220:21,25 222:20
227:18,19 229:24 234:20 235:18

**captains** 51:24

**car** 44:15 45:21 50:24 51:2,7 59:22 73:7
86:24 108:13 110:15,25 111:19,23
112:14 117:14,15,16 118:1,2,4,15,23
119:3,4,7,17,18,20,21,24 121:8 129:12,
19 134:15 135:17 152:4,7 154:25 155:7,
15,17 166:5 182:12 190:10 200:24

**care** 18:11 93:17 115:4

**career** 15:20 178:4

**careful** 220:3

**Carolina** 10:17 11:6,11,12 18:1 20:1
55:6 135:1 203:19 212:3 243:4

**carry** 202:6

**cars** 46:13 48:13,14,16,24 49:1 50:7,13,
19 96:2,12,15,22 102:25 122:2

**case** 9:21 19:25 20:18 81:24 120:1 138:2
145:3,8 175:7 226:2,11 230:17 231:1,6,
11

**cases** 143:17

**Castro** 8:25 9:19,21 21:13 32:1 38:1,5,7,
13,22 70:17,25 71:3,4,15,17,22 72:4,5
74:20 75:2 87:24 97:13,20 98:6 101:5,10,

111 123:1,3,5 124:9,13,20 125:5 126:4,
8,11,12,20,25 128:2,5,6 129:22,24 145:22,
10,15,17,25 146:5,10,14,17 155:8,14
165:1,3 169:24 171:16,18 186:22 187:3
204:17,22 209:1,3,14 210:6,8 224:3,5
225:15,17 226:12,15,17 233:1,8 236:3,9
242:18

**Caucasian** 137:6

**Caucasian-american** 194:2

**Caucasian-americans** 230:3 239:22

**caused** 85:4 157:23 184:8 204:3 225:24

**caution** 133:20

**cease** 96:4,6

**ceased** 97:10

**cell** 73:5

**center** 48:12 85:4 86:23 164:4

**centered** 13:8

**Central** 43:19

**certificate** 12:1,7

**certificates** 12:4

**certification** 11:24 12:2,10 204:8
214:23 234:1 243:1 244:1
3:20

**certifications** 12:4 45:13

**certified** 48:21,23 54:6,7 61:20 62:2
12:3 75:14 103:25 157:16 208:2 214:20,
21 233:24

**certify** 243:5 244:3,17

**cetera** 12:23 30:8,25 37:3 40:10 42:14
44:7 45:24 46:16 56:15 61:8 82:21
167:12 182:7 192:15 194:21 198:19
214:1 227:23 228:6,11 235:20

**chain** 18:23 19:16

**challenge** 41:5

**challenged** 58:13

**chance** 224:5

**chances** 208:14

**change** 67:11 77:12,15,17,18 79:2
179:13 237:21 240:5,8,9,10,12 241:17

**change/correction** 245:6

**changed** 77:17 79:5

**changes/corrections** 244:11

**CHAPLIN** 243:23

**Chapter** 49:2 52:18 185:15 220:7

**characterization** 224:16

**charge** 42:9 44:19 45:2,5,16,23 220:14
236:22,23,24

**charged** 42:10 44:18 46:5 184:16,22
226:21

**charges** 23:22 26:25 45:20 52:8 184:18
196:20 215:1 237:6

**Charlotte** 10:17 57:16

**chase** 50:8,9

**check** 49:22 119:11 205:18 208:20

**checked** 136:18 137:11 234:6

**checking** 42:14 46:15 100:16 207:22

**chemical** 13:19 158:7

**chief** 23:2,7 24:21 25:4,5,6,8,9 33:4 35:3,
51:24 63:12,13,17,19,25 64:12 84:12
90:4 96:18 101:23 104:10 166:21 167:20
178:14,15 180:3 196:10,14,22 197:4,5
198:1 229:7,11,15 235:22

**child** 104:12 109:16 110:4 184:2

**choice** 212:10

**chosen** 225:23

**Chris** 68:6 120:22 148:4 191:25

**circumstance** 202:16

**circumstances** 34:23 36:12 183:14

**citation** 51:12 86:5 90:13 103:14,19

**citations** 82:1,2 83:8 218:24 219:1,10,
13,16

**cite** 79:25 80:6

**citizen** 14:25 15:4 42:5,6

**citizens** 13:11 81:8,10,12

**Citizens'** 113:9

**city** 50:9 55:6 96:21 102:25 105:23
106:2,7

**Civil** 146:6,15

**claimed** 90:20 137:15,16

**claiming** 83:17 166:1

**clarify** 38:19

**clarities** 38:21

**class** 55:24

**classes** 55:9

**classmates** 55:15

**clean** 199:13

**clear** 27:11 95:22 103:5,11 156:13 157:9 174:19 176:15,17 194:3 198:8 242:1

**cleared** 69:14 70:4 112:5 169:17 206:15 218:20

**clerk** 27:13 80:22

**clerk's** 237:19

**client** 113:20 122:25 163:17 181:14 184:13,14 198:10,13 204:11 206:4 208:10 230:25

**close** 139:1 188:25

**closed** 188:21

**closely** 51:3,5

**closer** 105:6 112:12 116:2,3,6

**club** 56:20

**co-workers** 55:14,15 74:8

**coaching** 123:17 146:11,12

**code** 113:25

**Cody** 53:17

**colleagues** 187:14,17,18,20

**collection** 209:14

**collectively** 77:8

**college** 11:7,12,16 18:14 55:5

**collision** 42:5 117:6 120:24 125:13 127:6 128:7 130:23

**collisions** 85:5

**color** 28:17 202:15,17

**combined** 196:19

**command** 13:18,25 175:6 180:6 221:3

**comment** 209:16 217:9

**commentary** 146:1

**commented** 217:4

**comments** 155:11 194:16

**commission** 39:19 41:4 205:18 209:6 244:25

**commit** 30:7 31:2 137:21

**committed** 185:19 220:6

**committee** 173:3 174:7,10,13,18

**committing** 134:3 137:21

**common** 142:6

**communicating** 111:8

**communication** 187:13

**communications** 30:9,13 111:13 179:7,10

**community-oriented** 83:14 185:22

**company** 212:1,2

**compensation** 39:9 240:10

**competently** 110:25

**complain** 81:8,10

**complained** 42:4 69:3,19 70:1,4 83:22,23 196:9

**complaining** 46:5 81:13 113:8 162:25 164:13 167:9 179:25

**complaint** 43:11,13 66:16 68:22 70:10 71:7 72:6,8,9 82:22 87:25 113:7,9 182:25 216:25 225:8,20 226:4 237:23,25 239:4

**complaints** 23:21 39:24 43:4 65:12 82:21 176:24,25 177:9,13,23 178:5 181:16 194:25 198:11 201:14 208:25 220:13,16 221:12 237:22 238:4 239:8 241:21

**complete** 119:10 162:3 243:14 244:8

**completed** 80:24

**complex** 138:20

**compliance** 4:4 158:8 169:11

**complied** 154:20 183:17

**complies** 108:2 125:9 170:2 217:3 225:19 232:11

**comply** 107:16 150:14 153:20 154:23 157:1,5

**composed** 192:12

**concern** 17:21 86:17,19

**concerned** 176:12,18,19 180:15

**conclude** 225:6

**concludes** 242:20

**conclusion** 231:4

**conduct** 66:10 86:14 115:18 181:14 183:22 218:17 239:20

**conducting** 100:19

**conference** 8:15 220:14,18 243:7,13

**confidence** 208:21

**confirmation** 116:24

**confirmed** 207:24 218:19 220:19 228:14

**connection** 87:8 94:19

**consecutively** 243:13

**consent** 8:18 9:14

**consequences** 134:12

**considered** 45:18

**consisted** 13:17 39:1

**consistent** 108:20 239:25

**consists** 22:5 98:9 211:15

**constantly** 114:5 241:11

**constitute** 232:10

**construed** 45:18

**contact** 28:4 56:3,4,8 57:11 134:13,14 186:20

**contacted** 22:23 25:14 27:8 171:21 172:21,22,24 227:9

**contend** 67:16,17 225:2

**contending** 180:16 181:6,8

**contents** 244:4

**contested** 40:17 41:2

**context** 192:1,11

**continue** 65:3,21,23 86:14 101:21 109:14,23 129:3 131:16

**continued** 136:4 225:21,25

**continuum** 13:16 158:6

**contract** 27:21 28:9,10,13,14,15,24 29:5,8,18 30:23 31:1,4,21 33:25 232:16, 18,20,23

**contracts** 31:13

**control** 14:3 18:11 162:14,15 168:11

**conversation** 63:9 91:23 92:8 105:12 106:3

**conversational** 52:1

**conversations** 26:3 55:17 73:10 74:14 149:19 180:22

**convicted** 184:17,23

**convictions** 184:16

**cool** 217:5

**cooperate** 149:24,25 150:2,14,23

**cooperated** 149:9 150:18

**cooperation** 15:6 150:21

**cooperative** 52:8,21

**copies** 101:24 213:7

**copy** 31:4,6,8,21 96:1 99:5 102:3 163:20,24 173:13,14,15

**correct** 60:1 72:7 75:3 100:23 123:6,9 125:17 185:18 223:14

**correctional** 8:6 160:1,11 161:15

**corrections** 8:8 159:18,22,24 160:1, 22 245:5

**corrective** 99:8 123:19

**correctly** 110:17 171:5

**coughing** 233:12

**coughs** 234:3 239:16

**could've** 106:25 139:5 154:3 216:9

**couldn't** 76:4 114:3

**counsel** 8:18 21:16 146:1,3 243:18

**counseling** 99:20 100:10 123:17 175:2

**Counselor** 41:8 65:11 87:20 110:12 171:25 182:4 185:1 215:25 218:6

**count** 128:16

**counties** 116:5

**county** 8:7 11:5 15:21 16:15 17:6 19:2, 22:19,24 27:13 28:21 29:12,17 30:8,1 17 31:19 32:3,10,22 37:14,15,16,17 38:15,17 39:3,4,11,12,16,17 41:3,17 50:4,9,17 54:24 57:16,21 84:24 85:15 86:11,12 98:15,19 100:13 102:10,25

105:11,16,25 116:1 117:3 131:9 153:22 175:13 179:20 180:10 184:1 201:11 202:5 203:20 204:3 207:12 210:20 211:2, 7,10 212:21,24 213:11 214:25 215:14 216:6,13 222:9,10 224:24 227:3,9,13,25 228:11,12,15,17 229:17 230:2,10,19 231:9,10,13,24 233:21 235:15 242:8 243:4 244:16

**County's** 175:19 242:7

**couple** 60:10 85:20 233:8 236:17

**court** 8:3 9:2,5,9,13 10:4,11 21:14 27:13 38:8,11 70:20,23 74:22,25 97:23 98:1 124:11,22,25 126:4 127:1 155:9,12 186:23 187:1 215:10 226:9 233:3,6 236:10,13 237:13,15 242:20

**courthouse** 88:17

**cover** 42:16 173:19

**covered** 43:6 161:10 194:24 198:3

**covers** 231:15

**crash** 86:23

**crazy** 48:12

**cream** 73:15

**create** 232:16,18

**created** 220:12

**creates** 175:13

**credentials** 189:5 190:8

**credibility** 231:19

**crime** 105:25 142:2 185:15,16

**criminal** 11:15,21 12:19,20 45:3 46:1,8 80:9,11,13,16 81:21 82:19 83:16 90:1 23 91:5 96:16 109:4 110:16,19,21,23 111:4 184:3,15 203:19 205:17 218:24,2 219:10,13,15 231:9 236:19,22,23,25 237:5,7,9 238:13

**criminology** 11:15

**crossing** 85:2

**crying** 114:8 151:21 166:19

**cuff** 43:25

**curate** 143:17

**current** 10:15

**curriculum** 161:11,13,22

**curse** 91:21 142:23

**cursing** 82:15 88:11 91:18

**Curtis** 226:2

**custodian** 163:22,23 164:1

**custodians** 99:12

**custody** 18:11 163:16,19 166:11 184:4 237:3

**cut** 85:8

---

**D**

---

**D-U-V-A-** 192:12

**dad** 94:2

**damage** 44:15 45:21

**damn** 88:25 111:9 112:16 156:6

**danger** 85:1 87:2 157:25

**dark** 87:16 157:24

**database** 143:18

**date** 8:4 10:13 20:4 21:21 27:7,9,19 28:7 90:1 100:8 127:12 132:20,22 154:11 160:18 193:7 206:25 207:6,17 211:3 230:12,21,23

**dated** 101:13 104:24 108:4 120:23

**dates** 100:11 177:8

**daughter** 43:13 44:6,8

**daughter's** 43:18

**daughter's** 44:11

**day** 24:24 29:24 59:18 73:12 85:13,19,20 86:1 121:17 122:9,23 141:24 142:8 144:18,19 170:15 180:11,16 181:4 228:10 240:17,20,24 243:22 244:19

**day-to-day** 8:9,24

**days** 32:9 33:15 61:18 73:13 85:21,23 113:1 229:13

**de** 14:11,14

**de-escalate** 54:15,18 168:16

**de-escalation** 13:18,23,24 14:17,20 158:20

**deal** 86:21 89:3 123:18 124:6 156:16 160:17

**dealing** 15:1,4 99:9

**Dec** 100:17

**December** 42:23 43:11 55:7 63:7 80:9 93:6 160:20 170:9,10

**deception** 43:22 68:8,11 163:11

**deceptive** 65:7 66:4 68:12 108:11 175:25 197:23 198:12 224:23

**decide** 173:24 230:9

**decided** 50:15 183:7 239:8

**deciding** 208:3

**decision** 14:22 35:5 58:10,24 133:6 174:1 214:10 229:16

**decisions** 78:15,18

**declare** 8:15

**declines** 237:14

**decreased** 107:18

**deep** 216:1

**Defendant** 22:6

**Defendants** 9:21 225:21 226:1,17

**define** 56:13 86:18 119:5

**degree** 12:11,16,25

**degrees** 44:22 45:12

**delay** 118:8,10 128:19,22,23 129:5 138:8

**deliver** 24:19,23

**demonstrate** 61:23 162:1

**demotion** 77:22

**denied** 61:15 102:1 148:11 201:13

**dental** 39:8

**deny** 120:8

**department** 13:21 16:24,25 17:14 18:22 20:2 30:19 39:5 50:3 98:19 160:13 177:19 214:13 216:9 234:17

**department-issued** 18:22 18:23

**departments** 35:14

**depend** 36:12

**depending** 240:24

**deposed** 9:24 19:22,23

**deposition** 8:6 9:23 10:10 20:3,11,17 21:10,16,17,18,25 22:1 87:21 89:8 98:8 101:2 104:4 107:21 120:12 125:2 126:11 146:1 151:16 169:21 204:19 209:11 223:25 225:3 232:8 236:5 242:21,24

**deputies** 16:23 48:16 53:12 56:18 57:3 60:9,13 64:23 67:18 78:15 92:4 93:13,16 106:11 122:5 141:9 142:14 158:24 160:24 190:23 220:2,15 221:2,3 231:5 242:12

**deputy** 13:7 23:2,7 25:4,5,9 31:19 32:18,22 33:4 34:19,20,21,25 35:2,7,8,9 36:2,10,13,14 37:1,6,22 45:12 51:24 53:8,14,15,17 54:6,7,12,13,17,18 57:25 61:3 62:1,4,5,10 63:2,4,12,13,19,25 64:12,25 66:12 70:6 73:5 76:2 77:1 84:13 90:4 93:2,17 94:23 96:15 100:17 101:4 102:13 103:2,4,13,14 104:7,8,10,18 105:7,21,24 106:11,18,22,23,24 107:18 108:15 109:15 110:13 111:1 112:15,16 115:16 120:25 121:16,18 122:9,23 140:21,25 142:20,21,22 143:2 144:11 146:18 147:2 175:7 180:10 182:5 183:21,25 184:9 188:3,4 190:23 191:1,6,8,12 194:17 195:23 196:4,6,10,14,24 199:4 205:1 217:4,15 218:15 220:22 221:12 223:14 224:11,15,25 229:6,11,15 233:2 235:22 237:8,12 239:23

**describe** 13:15 28:12 76:6 88:9 91:14 138:19 149:2 152:2,24 160:25 162:2 199:16 202:12 204:23 218:11 233:16

**describing** 64:13 151:20

**deserve** 219:5 220:9

**deserved** 196:18

**designed** 158:2,19

**designee** 28:21

**desk** 106:13 109:3 178:2

**detail** 35:14 59:24 68:23 71:5 76:6 235:18

**details** 161:12 165:4,7

**Detective** 231:8,9

**determine** 5:4,7 80:18 237:13

**determined** 196:25 219:4

**Deval** 192:12

**development** 138:20

**device** 149:14 161:6

**diagnosed** 168:1

**Dickinson** 9:22

**didn't** 61:22 76:18 163:8 190:7

**difference** 34:14 35:12,16 49:11 57:17 84:16

**differences** 35:13

**dinner** 56:14 57:14

**directed** 111:5 124:19 221:5

**directing** 156:22 192:16

**directions** 34:24 37:3 162:4

**directly** 46:4 61:1 73:18 82:14 167:13 195:15 198:8,21

**director** 28:20 39:17 66:18 69:6 166:19 167:21 238:7 241:25

**dirty** 92:7,17,21,24,25 93:9,11 94:16

**disable** 158:2

**disagreeing** 22:21

**disagreement** 13:22

**discharging** 3:22

**disciplinary** 76:23 99:9,21,25 100:3 133:22

**discipline** 196:23,24

**disciplined** 196:17

**disclose** 23:15 213:17 215:1,6,13

**disclosed** 23:18,20,25 24:2,3,5 126:21 213:17,19

**disclosing** 179:6,9

**disclosures** 126:14,21

**discovery** 126:14,17

**discretion** 47:16,18

**discretionary** 78:20

**discrimination** 18:19,21 177:17 216:5 221:13 237:22,24,25

**discriminatorily** 95:20

**discriminatory** 90:19 191:17 194:14 195:3,6,20 198:5,22 219:22 225:21

**discuss** 23:6 47:24 49:10 59:23 65:24 148:20 230:20

**discussed** 33:8 49:14 127:6 172:2

**discussing** 34:5 38:13 125:13 128:7 200:8 230:7,15

**discussion** 43:8,9 111:16 136:16

**discussions** 42:25 65:10

**dismissal** 59:18 208:24

**dismissed** 24:7

**disobey** 79:11

**disorientation** 122:23

**dispatch** 50:21 71:7 72:9 109:6 165:3

**dispatcher** 69:3,16,21 70:3 72:7 134:19,21 135:9 137:1,7 185:2,8

**dispute** 115:12,14,21,23 171:12

**disputes** 74:2,3,16,18

**disputing** 27:13 129:8,11,13

**disrespect** 192:10 193:23

**disrespectful** 90:15 109:16 110:3 112:23 136:7,8 194:21

**disrespecting** 13:16

**distanced** 9:2

**distinction** 136:24 137:19 185:7 222:23 236:18

**distinguish** 231:17

**distorted** 76:12 90:21 91:11 109:18 111:7 121:22 140:8,14

**distortion** 133:9 135:9 136:25 137:19 185:7

**distress** 204:4 225:25

**distributive** 2:23

**DMV-349** 125:10

**doc** 209:15

**doctoral** 12:13,24

**doctors** 172:3

**document** 21:19 22:8,9,12 28:22 39:20 89:15,18,19 90:7 98:10,13,14,18,20,21, 25 99:4,11 101:6,9,11,14,15,16,22,25 104:21 105:4 108:5 115:22 120:18,21 123:9 125:25 170:1 171:7,13,17 206:9 207:17 209:19 210:5,7,25 211:3,18,20 224:7 225:9,10,12 244:21

**documentation** 89:8 100:3,25 123:22 185:14 216:16

**documents** 20:14,15,16,18,21 31:10 38:16 39:10,15 40:19 41:11 99:25

101:23,25 102:1 123:23,25 209:7

**domestic** 93:23 94:10

**Donald** 53:9 54:11 92:19

**don't** 50:23 62:23 142:12 146:8 179:5 194:1 221:17

**door** 61:22 111:24 115:9,12 146:23 147:10,11 148:24,25 149:10,13,20 152:3 182:10,13 188:21,24 189:3

**doors** 92:16 146:22 152:15

**double-wide** 38:24 139:7

**downgrade** 77:24

**downgrading** 65:19

**downs** 14:10,14

**draft** 80:11 237:9

**dramatically** 97:10 107:18

**dressed** 25:2 27:10

**drew** 210:18

**drive** 189:23

**driver** 119:14

**drives** 137:8

**driveway** 148:23 182:12

**driving** 85:4 86:23 87:15 117:14

**drop** 176:24 177:13,14,15,22,24,25 178:1,3,4,5 208:25

**dropped** 116:11

**drove** 116:11

**drug** 26:17

**dude** 46:7

**due** 175:16

**duly** 9:16

**dumb** 194:3

**Durham** 211:1,7

**Durwood** 32:13 41:22 63:21 197:24

**duties** 18:9 77:15,16 136:5

**duty** 57:9 85:12 202:7

---

**E**

**e-mail** 125:25

**e-mails** 178:25

**earlier** 108:20 110:14,20 117:11 162:10 194:7,8 217:13 218:13 222:20

**early** 42:14 141:23 142:1 144:7,20 179:24 195:25

**ease** 105:8 106:8

**education** 27:2 162:20 163:13

**Edwards** 142:21,22 143:2 144:1 165:18 188:5

**EEO** 178:10 198:10 208:25 238:2 242:7

**EEO-PROTECTED** 238:6

**EEOC** 23:21 194:25 215:1 220:13 238:8

**effect** 26:7 34:14 46:12 48:1 77:19 87:18 91:12 105:14 106:6 109:25 110:23 115:18 121:3 135:23 148:7 150:8,10,11 162:21 163:14 166:1,23 169:9 189:8 191:4 193:16 222:22,25 242:10

**effectively** 206:5

**effects** 76:9

**egregious** 102:17 239:20

**elaborate** 12:18 35:15

**elected** 178:1

**electronic** 118:8 128:24

**Elizabeth** 55:6

**else's** 133:21

**emergency** 113:24,25 114:1 116:1,10 121:1,7 163:21 164:2,3

**emotional** 14:10,11 204:4,16 225:25

**employed** 175:3 207:7,11 216:7

**employee** 37:21 41:18 100:10,11 123:16 175:22 199:10 227:23

**employer** 212:23 213:4,5,6 215:2,8 229:22

**employers** 213:9 226:25 227:10,14

**employment** 15:20 17:24 19:9,18 22:18 26:12 27:21 28:8,10 29:5 32:2 33:25 57:21 100:11 126:19 131:9 160:6 174:24

187:5 203:4 204:3 205:25 206:20 208:8
209:4,7 212:9,16 214:20,24 215:20
225:23 226:18 232:16,18 233:11,17
235:12

**EMS** 164:11 166:19,21,24 167:21

**encounter** 132:17,18

**encouraged** 23:9

**end** 91:7 107:15 113:23 116:16 221:1,
17 224:14

**ended** 24:16 33:24 94:14 108:20 179:23

**enforce** 79:15,17 80:6 83:19

**enforcement** 1:18,24 12:1,2,6,9 13:6,
8 36:8 42:13 43:8 46:9,10,17 49:10,13
50:11 55:4,16 60:8 77:16 78:12,24 79:7,
21 95:1,5 96:5,7 97:10,12 143:20 147:4
158:6 159:19 160:23 161:20 168:16
182:3,18 203:19 204:7,8,11,15 212:7
216:8,9 230:1 236:24 237:17

**enforcing** 203:13

**enhance** 169:11

**ensure** 172:19

**ensuring** 13:7,10

**entered** 145:2,7

**entering** 131:8,22

**entire** 15:20 19:2 32:10 100:4 129:14

**entity** 175:18

**entrance** 109:2

**epithets** 191:22

**equal** 175:17

**equipment** 15:24 16:1,2,5,9,12 18:17
19:14 121:7 200:5

**equivalent** 171:11

**Eric** 54:18,19

**escalated** 154:22

**escalation** 14:2

**escort** 14:9

**escorting** 151:24

**essentially** 65:5

**estimate** 73:1 139:11,12,15

**et al** 8:8

**evaluation** 100:6

**evaluations** 99:10 198:19

**Evan** 131:15

**Evans** 131:9,22,25

**evening** 144:20

**event** 103:20 127:17,22

**event(s)** 243:19

**events** 178:16 181:7,8

**eventually** 26:11 241:24

**evidence** 39:18 71:13 118:7 122:25
132:3 135:8 162:19

**evidently** 61:12 68:25 151:6 235:17

**exact** 202:17

**examination** 9:18 236:15 245:3

**examined** 166:2,5,9,22 244:4

**examines** 21:19 22:9 89:15 98:10
104:21 105:4 108:4 120:18 210:7 211:16
224:7

**examples** 50:14 217:19

**exceeds** 226:11

**excerpt** 88:5

**excess** 206:6

**excessive** 58:4,16,18,23 59:6,15,16
98:16 105:22 213:24 214:11 216:12,20
226:22 227:5,6 228:1,2,20 231:19 234:20
235:4,13,14,16

**exchange** 29:14 65:4 108:9 113:19
115:15 116:16

**exchanged** 57:3

**excuse** 26:17 37:21 62:5 63:12 69:9
77:17 84:9 86:3 104:25 115:6 120:24
122:16 125:10 137:17 154:19,20 176:6
178:14 219:8 230:24 234:4,5 239:16,18
240:2

**execution** 244:20

**executive** 99:18 214:13

**exhibit** 21:10,14 22:1,4 87:21,24 89:8,11
98:3,7,8 101:2,6 102:12 104:3,4,19
107:21,24,25 112:25 120:12,15 125:24,
23 126:1 155:18 169:21,25 204:18,19
209:10,11 216:25 223:24,25 224:4 225:6,
7 232:3,5,8

**exhibits** 22:18

**expect** 81:1,6,14 85:9

**expected** 79:19

**expects** 48:7

**experience** 29:13 30:18 36:8 143:19
144:3,23 162:20 163:14

**Expires** 244:25

**explain** 36:5 59:7 95:4,7,12,13 113:4
204:2

**explained** 32:19 44:6 94:25 105:22,24
106:10 185:1

**explore** 71:4

**external** 238:6

**extremely** 102:11

**eyes** 62:16,17,19

**F**

**F3** 24:5 26:5 99:7 215:15

**F5** 205:3,5 207:20 208:8 234:4 235:9

**F5a** 204:12

**fabric** 199:20

**face-to-face** 51:19 56:25 62:7

**facility** 18:4 161:16

**fact** 25:10 48:19 50:6,8 66:3,8 87:10 95:8
96:8,15 97:8 99:5 102:22 103:8 111:6
122:4,14 124:5 129:7 130:23 136:10
141:10 157:17 219:2 220:24 221:1

**factor** 168:12 201:8,12,15,18

**factors** 168:23

**facts** 36:25 76:19 113:21 140:8,13
181:11

**factual** 107:2 115:14

**failing** 86:22

**failure** 102:17

**fair** 51:14 113:23

**fairness** 208:23

**fall** 107:7

**falls** 141:13

**false** 97:12 98:16 113:6 196:23 206:15 207:23

**falsely** 92:9,12,13 226:21

**falsification** 11:11 197:22

**falsiticity** 65:8 109:11 197:23

**familiar** 78:12,13

**family** 21:8 44:3 85:8 172:8 179:1 197:4

**fan** 242:13

**fast** 131:23

**Fast-forward** 58:13

**father** 91:8,15 109:17 110:4,5

**fault** 120:7

**February** 8:5 19:10,11 20:7 89:25 104:24,25 113:2 243:22

**federal** 98:17 146:6,15

**feel** 10:10 32:10 44:13

**feet** 139:11

**felonies** 236:25

**felony** 141:15 142:2,19 143:15 155:25 184:2

**felt** 37:4 42:10 130:5 157:4

**female** 42:7 43:12 46:20 112:8 156:19 195:23 196:5,14,24 197:3 213:25

**fender** 42:5,20 117:7

**field** 32:14 36:13,24 41:22 42:15 49:18 50:10 53:7 94:24,25 95:5 102:14,24 103:1 217:17 225:23 239:12 241:7

**file** 20:25 39:23,24 40:5,14 98:21,23 99:1,5,14,17,25 100:4 101:18,19,20 102:4,9 105:1 194:25 205:12 207:1,6,8 210:17,20 211:10 212:5,25 213:2,6,7 214:8 221:12 225:7 228:1,7,10 230:18 239:3

**filed** 20:19,22 23:16 43:12 198:9,11 201:14 216:5 220:13 221:8 225:20

**files** 40:18 58:15 69:2 99:9 102:7,8

**filled** 63:8

**final** 22:13 94:23 96:1 121:15 232:3 240:3

**finally** 54:10 231:4

**financial** 225:24

**find** 31:5,22 46:6 60:23 104:16 186:20 200:19 232:25

**fine** 38:5 97:15,18,19 230:22

**finish** 172:15

**finished** 105:2 123:2 159:4

**fire** 173:24 174:2 176:25 177:1,5 180:8, 18 181:15 197:8,10 208:5

**firearm** 13:22

**fired** 115:5 180:17 187:21,23 188:13 196:19 197:13,15 200:17 201:21,23 221:18

**firm** 9:22

**fitting** 62:21

**five-minute** 97:14 233:1

**flashlight** 18:21,22,23 19:15

**focus** 12:15,24 14:17 46:14 78:16 79:20

**focused** 11:20 46:13

**focuses** 12:21

**Follow** 44:1

**font** 28:15,17

**force** 13:13,16 14:3,9,11,14 58:4,16,18, 23 59:6,15,16 98:17 132:21 147:17,24 149:4 152:18 155:5 156:15 158:4,5,19 168:15 172:22 173:2,13 174:7,10,18 178:23 187:9 188:3 206:3,6 213:14,25 214:11 216:13,20 226:22 227:5,7,24 228:1,2,20 231:15,19 234:14,15 235:4, 13,14,16

**foregoing** 243:7,13 244:5,8

**foremost** 121:23 179:14 205:8 206:1

**forgot** 186:14

**form** 12:19 14:8 100:10 122:24 175:22 197:17,18 205:1 207:20 208:8,15 211: 6,12 212:22,24 235:3,9

**forms** 40:13 106:13 212:17 214:22

**formulating** 239:25

**forthwith** 138:7

**forward** 25:13 26:23 76:20,22 212:11, 19 237:14

**fought** 168:10

**found** 58:1 60:19,22 66:4 69:8 100:16 102:3 115:10 139:25 167:22

**fourth** 89:22 182:2,11

**fracture** 151:6 168:4,5 170:23,25 171:2, 9,10 172:5

**fractured** 151:4 166:24 167:22,24 168:2 183:15

**fractures** 171:3

**Franklin** 116:5

**free** 10:11 48:10 81:2

**friends** 21:8 55:12

**friendship** 56:1

**front** 43:14 104:8,17 112:16 140:20,24 142:20,22 143:25 149:10 163:4 177:1 192:19 194:5 221:1,3

**Fryson** 24:21 25:7,20,21

**FTO** 32:14

**full** 10:5 15:19 19:9 109:11 111:11 172:19

**full-time** 227:22

**fun** 195:9,11

**fundamentals** 43:5

**fussing** 82:16 88:11 91:17,20

                    **G**

**G4s** 227:17 229:24 235:17

**gain** 19:18

**gaining** 233:11,17

**Garvey** 234:23

**gave** 31:8 44:24 45:14 47:6 59:21 61:14 83:17 116:24 134:25 157:4 178:6,9 189:16,20 200:23 202:10 204:11 215:22 216:4 235:1

**gay** 238:20

**gears** 237:21

**gender** 65:9,17 88:19 195:10,21,22 197:3 201:15

**general** 12:1,9 39:11 105:10 171:3 233:25 234:1

**generally** 38:22 167:8

**Gerald** 35:8

**get all** 45:7

**get along** 74:1

**girl** 48:3 93:12,20 94:11

**give** 10:2 24:25 25:11 30:12 45:1 47:16 50:14 59:20 64:7,8 73:1 81:3 90:6 102:2 104:20 135:19,22 142:15 161:12 162:4 172:19 178:8 190:9 192:1 210:4,13 211:9,17 215:19 219:19,20 228:18 229:7 230:11 233:20

**giving** 136:22 219:18

**glad** 75:13

**glasses** 157:22

**God** 236:1

**good** 62:1 66:12,15,23 69:14 97:14 104:2 154:20 198:3 216:18 218:14

**Goolsby** 122:15,19 165:15 171:22,23 172:22 176:6,7 179:21 180:7,21,24 181:17 188:2 196:11 220:21 221:5

**Goss** 81:13 83:4,11,14,25 84:17 86:4,13 88:12 89:13

**gots** 174:8

**government** 175:18 179:17

**grabbed** 153:3

**granted** 85:25

**Graveyard** 141:25

**great** 198:4 234:2

**greater** 142:2 145:19,23

**Green** 217:4,15 218:2

**Green's** 239:24

**grew** 192:6,22

**grievances** 78:11 198:10 221:9 238:2

**gross** 220:6

**ground** 153:5 162:15 167:11

**grow** 241:3

**Gruber** 243:3

**grudge** 239:18

**guess** 47:16 55:14

**guidelines** 169:8

**gun** 189:5,9 190:8

**gurney** 166:25

**gurneyed** 167:22

**guru** 50:2 95:16

**guy** 44:9

**guys** 48:2,7

---

**H**

**habitually** 49:23

**half** 105:6,19 207:9

**hallway** 109:3,6 111:12,15 199:1,3

**hallways** 199:11

**hammed** 163:11

**Hampshire** 2:12 27:2,4

**hand** 14:10 156:6 158:13 162:11 243:21

**handbook** 37:21,25 41:18,24

**handcuff** 152:11,14,19,22 155:4,16 167:11

**handcuffed** 152:4,5,6 155:3

**handcuffing** 4:10 150:2

**handcuffs** 150:22 155:6,15 157:12

**handful** 50:18 73:3 95:19 119:9 160:5

**handle** 50:21 85:15,25 89:2 148:5 150:17 151:10 173:16

**handled** 51:8 116:14 141:4

**handling** 69:4 86:10,11 140:18 141:3 148:6 156:5

**hands** 13:17,18,19 14:7,8,12,13,18,21 94:3,4 151:1 158:7 162:11 164:23 178:2

**handwriting** 106:15

**handwrote** 39:21 40:19

**hang** 32:21 55:20,22 56:10,12,13,19 57:13 72:16 95:21

**hanging** 55:13 56:23

**hangs** 56:13

**happen** 29:22 45:25 54:2 90:21 120:9, 11 127:6,8,18,22 195:14 220:18 225:15

**happened** 24:10 32:24 33:20,23 34:6 60:20,21 65:3 68:3 72:9 76:6 90:20 93:2 110:10 111:16 117:9 120:6,11 121:4,9,1 125:18 129:16 131:20 132:8 135:24 136:1 141:5 148:20 149:1,6 162:24 167: 171:19,20 173:8 177:4 179:4,12 184:8 187:4 190:10 200:6,12,15,20 201:21 203:11 206:12,16 213:10,20 214:11 235:17,25 238:16

**happening** 127:9,12,14 129:9 190:11

**happy** 133:16

**hard** 13:18 200:19

**harm** 108:22

**Harvey** 234:22

**hat** 34:11 198:15,24 199:16,19,21,23

**haven't** 76:8 167:14

**he'll** 48:8

**head** 40:12 44:23 45:6 93:23 94:5 134:7, 17 166:22 188:7 198:2 215:3 216:22 221:21 223:10

**head-on** 85:5

**headed** 50:25 111:22

**headlights** 87:8,14,16 117:10,14 118:16

**heal** 171:3

**Health** 170:6

**hear** 9:7,9 22:19 34:6 48:18 70:25 179:25 194:2 222:21 242:9

**heard** 36:3 61:9,23,25 62:9 63:15 69:9 115:9 122:21 220:23 238:21 241:7

**hearing** 25:16 133:4

**height** 54:6 156:14

**held** 220:14

**helping** 61:7

**Henderson** 26:20 73:15 102:25 167:1

**herein-above** 44:18

**hereunto** 243:21

**Hertford** 11:5

**hesitated** 229:8

**Hey** 175:5 192:19

**he'd** 47:13

**he's** 241:5

**hide** 212:22

**high** 11:4,5

**highway** 32:24 33:1 34:15 35:12,16 78:4 103:7

**hire** 213:5 216:8 227:14 234:18 235:3

**hired** 12:8 19:20 33:10 53:22 56:6,8,10 175:24 214:22

**hires** 217:15

**hiring** 22:22,25 26:7,18 29:23 212:19 227:21

**Hispanic** 42:8 219:3,10,19 220:8

**history** 17:24

**hit** 44:9 94:2 117:16 118:1,2,4 129:12,18 153:9,10,11 158:1

**hold** 97:16 139:23,24 156:6 227:19 233:20

**home** 30:25 33:9 34:1 49:24 59:21 72:18,19 138:11,12,25 139:6,16 146:6 147:3 148:18,19,22 171:19 182:12 189:16,20,22 190:9 200:24

**homes** 56:15 139:4,5,11

**homophobic** 238:11,17,19

**honor** 210:18

**hope** 216:24

**hospital** 26:21 45:24 76:3,7,11,17 93:5 167:1 171:15 172:9,18

**hostile** 239:17

**hostility** 220:12

**hour** 38:2 76:15 181:2,3 208:4 227:22

**hours** 56:11 72:13,20 76:16 240:5,10

**house** 31:11 56:22 93:3 144:9,13 145:2 147:16,20 148:5 149:7 181:20,21 182:1

**houses** 182:6,8,9

**HP** 34:15

**HR** 39:16 59:3,8 177:20,21 198:11 238:7 242:12

**huh-uh** 10:3

**human** 28:20 37:11 98:19

**humerus** 167:24 168:2,4,5 170:24

171:10

**hurt** 207:25 208:13

**hurting** 136:13 166:8,16

**hyped** 68:9

**hypocritical** 95:10

---

**I**

**I-85** 93:5

**i.e** 102:17

**IA** 207:6 208:19 231:14

**ice** 73:15

**ID** 8:15

**idea** 203:22

**identification** 21:12 22:3 44:4 87:23 89:10 98:5 101:4 104:6 107:23 120:14 125:4 126:3 154:10,11,12 169:23 204:21 209:13 224:2 225:5 232:10

**identified** 23:2,7 24:20 53:10 126:12 231:5

**identify** 222:1,4,7 223:3,4

**identifying** 154:13

**identity** 12:20

**ignore** 156:18

**Ignoring** 41:24 49:13

**illegal** 225:21

**illustration** 125:16,20,21

**immunities** 179:17

**immunity** 179:15,16 180:14

**impacted** 225:24

**impaired** 87:4

**impairments** 30:24

**implying** 74:13 224:18

**important** 31:14,16 164:15,16

**improved** 151:2

**inaccuracies** 25:19

**inaccurate** 207:21

**incapacitate** 58:2

**incident** 41:14 42:21 83:4,14 84:1,21 85:17 86:13 89:13 113:11 117:5,12 126: 131:18,21 132:7 143:7 147:18 149:4 152:17 159:6,10 167:17 170:5,8,13,17 171:18 172:6 173:9,12 187:5,7,15,22,25 190:2 202:23 207:14 218:20 230:17 233:9,14

**incidents** 51:20 227:4 231:20 233:10,16 235:11,23

**including** 67:1 68:9

**incorrectly** 88:4

**increase** 220:11

**indirectly** 198:22

**individual** 23:1 24:20

**individually** 77:7 195:7

**influence** 239:24

**inform** 81:3 90:17 235:5

**information** 1:3 28:25 29:5 32:23 34:9,10 36:25 39:22 40:21,25 58:5 62:6 66:17 114:25 132:24 133:8,13 135:2 136:22 182:14 184:14 202:23 209:21 210:2 212:14 215:6 222:21 230:11,20

**informed** 64:16 90:11 130:16 220:15

**infractions** 236:23

**initial** 26:9 32:2 126:13,21 133:5,6 240:4

**initially** 39:14 41:1 52:25 175:21

**initiate** 77:3

**initiated** 76:25 77:1

**injure** 87:18

**injuries** 120:3 167:16,18

**injury** 158:16,18 169:12

**inmates** 160:12

**innuendo** 94:17

**inquired** 83:1

**inserted** 40:25

**inside** 146:24 202:18,19

**instance** 137:24

**instances** 100:17 235:24

**instilled** 50:11

**Institution** 18:6

**instruct** 219:15

**instructed** 80:8 145:19 155:24 182:24 183:2 220:16

**instructing** 219:24

**instruction** 218:23 219:13

**instructions** 148:4 156:12 170:3

**insubordination** 213:9,12

**insurance** 45:24

**intensity** 156:15

**intent** 168:9

**intentional** 183:16

**intentionally** 120:10

**intents** 244:21

**interactions** 56:24

**interested** 24:13 227:21 243:19

**internal** 178:10 198:9 204:13 205:22,24 206:2,10,19,22,24 207:1,24 208:2 214:3 220:13 226:20 228:1 231:12 234:7,11 238:1,2,6

**interrogatories** 82:7

**intersection** 16:8

**interview** 24:9,15 25:3

**interviewed** 25:15

**invested** 29:15 30:19

**investigate** 196:24 208:2

**investigated** 58:23 173:10 175:4 231:20

**investigating** 74:24 175:2

**investigation** 175:8 202:24 204:13 205:17 206:2,11,17,19,22,24 207:1 208:4,6,8,14,22 213:14,15 226:21 231:18 234:7,12 239:1,2 241:22,23,25 242:4,5

**investigations** 109:5 175:12,20 205:22,25 207:25 242:9

**investigative** 49:5

**investigator** 208:2 214:12 227:24 231:10,13 234:22 238:14

**invited** 24:14

**involved** 41:6,8 68:12,17

**involves** 17:17

**involving** 34:12 76:2,10 115:21 117:6,11 126:9 128:7 213:13 227:5 231:22 239:15

**Iredell** 243:4

**irrelevant** 226:10

**Isaiah** 239:23

**issue** 36:16,20,21 39:16 47:18 49:13 63:10 67:18 68:25 75:25 76:1,4,17,22 78:25 79:20 80:23 82:5 86:17,18 87:10, 20 93:21,22 94:4 129:8 174:15 218:24 219:2,9,13,15 229:2 235:15 242:2

**issued** 15:19,21,23 16:15,18 46:24 47:11,14 80:12 88:12 90:13 98:14 103:19 106:12 123:20 185:13,14

**issues** 32:20,22 34:7,12 60:15,18,19 66:2,3,7,9,10 68:8 75:19,24 76:4 78:25 87:5,7 97:7 184:8 218:16,19 238:5,8,10 242:3

**issuing** 81:17,20,25 82:1,9,18 96:3

**items** 39:19

**It'll** 238:12

**it's** 40:24 48:10 54:8 71:20 90:21 96:14 105:17 125:18 154:8 158:13 162:5 166:23 167:14 171:11 184:21 196:4 198:2 211:11 224:23 239:17

**I'd** 31:15 101:16 141:2,4

**I'll** 169:13,14

**I'm** 92:4 121:22 146:12 159:4 189:13 225:6

**I've** 83:15

---

**J**

**J** 31:18

**J-A-M-E-L** 10:8

**J.J.** 102:13 192:21

**jail** 150:3 153:12 154:22 166:13,15,17 184:7

**Jamel** 10:6

**James** 180:21

**Jamie** 81:13,16 83:4,11,14,25 84:17 86:4,13 88:12 89:13

**Janie** 99:17

**janitors** 199:12

**January** 8:4 18:15 20:7 100:8 101:13 218:11

**jeopardy** 133:22 157:25

**JJ** 156:8

**job** 13:4 16:2 18:7,13,17 19:12,14 22:20 23:10,14 24:6 46:17 49:24 62:1 66:24 101:1 103:12 110:17 173:6 176:8,13,19, 20 183:11,12 185:16 203:5 209:23 216:18 218:15

**jobless** 204:8

**jobs** 79:22

**Johen** 39:2,18 98:22 148:16 241:25

**John** 231:14

**joining** 75:7

**jokes** 74:10

**joking** 74:6 195:14

**judge** 46:2 150:20 154:21 237:10,11

**July** 108:4 177:10,11,12 197:11

**jump** 239:9

**jumped** 90:14

**June** 19:21 27:9,12,15,18,19 28:7 100:9, 14 177:10

**jurisdiction** 13:11 160:13

**justice** 11:15,21 12:12,17,19,20,21,22,23

**Justin** 8:6,7 9:15 10:6 20:1 22:5 129:25 244:3

**justly** 206:18

---

**K**

**K-A-L-E** 227:20

**Kale** 227:19 229:24 233:9,15

**Kenneth** 32:18 104:8

**key** 18:23 19:16

**kill** 85:8 87:17

**killed** 81:15 83:18 84:17

**kin** 243:16

**kind** 26:2 32:6 38:19 124:16 192:22 236:8

**King** 93:4

**knew** 24:23 47:4 54:25 56:23 62:8 112:13 138:3 168:3 194:1

**knock** 146:23

**knocked** 146:21

**knocking** 144:8 147:10

**knowing** 50:22 112:5

**knowledge** 49:16 68:14,19,21 70:9,13 74:19 81:23 83:2,5,13 90:24 107:10 127:19,21 165:5 194:6 195:16 199:15 205:20 227:12,15,16 231:6 244:7

**L**

**L-A-T-W-A-Y-N-A** 32:7

**L-I-L** 192:12

**L.D.** 101:23

**Ladder(ph)** 35:8

**Laden** 194:19

**lady** 44:18

**lag** 128:19

**laid** 48:10 241:5

**lane** 51:1 119:19,22,23

**language** 88:23 89:5 190:19 191:17 194:15 195:3,4,13,20 198:6

**laptop** 133:12 153:25 186:12

**large** 91:8 125:25 202:15 243:4

**late** 15:22 19:10,11 63:7 141:23,25 144:7,20 147:8 177:12 195:25 241:11

**Latwayna** 32:7

**Lauren** 53:15

**law** 9:22 11:17,24,25 12:1,6,9 13:6,8 36:8 53:22 55:4,16 60:8 77:16 79:7 98:14 143:19 147:5 158:6 159:19 160:23 161:20 168:16 182:3,18 204:7,11,15 212:7 216:8,9 226:5 230:1 236:24 237:1

**lawful** 169:1 183:18

**Lawrence** 33:4 35:3 64:14 68:17 104:10 180:2 188:19 195:17,19 196:10

222:3 223:7

**laws** 78:19,22,24 79:2,15,17 80:7 83:1 84:25 88:13 203:13,19

**lawsuit** 216:6 230:18

**lawsuits** 23:15 215:1,9

**lawyer** 210:18

**lawyers** 218:5 222:11

**layers** 13:17

**laying** 181:11

**lead** 241:6,9

**leadership** 220:15 239:6

**leads** 109:3,6

**learn** 161:19

**learned** 220:11 222:12

**leave** 109:8 111:12 173:13,14,15 225:1 226:5

**leaving** 19:8 108:20

**led** 60:3 155:7 213:18 241:2

**left** 17:25 48:12 85:4 86:23 92:15,16 111:15,18,22 119:19 123:9 180:23 187:12 214:25 228:15 230:1

**legs** 163:1 164:19

**lesser** 14:8

**let alone** 123:17 242:9

**letter** 66:21 69:9,11,12 177:19 178:6,8

**letters** 178:9

**Let's** 90:9

**level** 13:9 37:5

**liability** 157:19

**lie** 208:7

**lied** 104:9,13

**lies** 109:11

**lieu** 8:13

**lieutenant** 25:25 26:1 34:21 60:5 62:7, 11 63:21 82:6,11 88:8 89:21 92:20,22 104:11 108:14,16 109:25 111:2,7,17 112:17 122:18 171:21 172:22 173:15 175:24 176:6 179:21 180:7,21,24 188:7 188:2 189:1,9,21 196:11 197:23 217:4,20 219:12 220:21 234:19,25 235:1 241:10

**lieutenants** 51:24

**life** 85:1 87:1 96:25 105:15 116:21 133:21 192:14

**light** 102:18

**lights** 87:15 114:1 116:12 117:21 118:1, 3,6,12,21,23 121:1,7,12,14 129:1 129:6,12,18 130:2,4,6,8,10,13,15,17,22 131:4 135:13,16 165:15

**likelihood** 169:12

**likes** 103:6

**Lil** 192:12

**limit** 51:5

**limited** 56:25 72:22,25 75:19 202:2

**lines** 85:2

**listed** 113:10

**Listen** 194:1 199:19

**listening** 91:22

**live** 10:17 57:15,16

**lived** 27:4 138:19,21,24

**livelihood** 204:6

**lives** 85:1 87:1

**living** 31:18 192:14

**LLC** 212:3 215:17

**Lloyd** 26:1 58:5,6 173:22

**located** 111:14 198:25 221:10

**lock** 93:18,19 94:7 149:10

**locked** 94:10 111:24 149:12,17 152:3

**locking** 149:14,20 152:14

**log** 154:6,8 186:14,16

**long** 48:4,11 52:11 73:25 76:9 77:9 78:7 105:18 106:25 109:21 116:22 117:12 119:6 128:15 134:24 135:23 149:6 150:12 152:16 161:1,11 162:5,8 165:24 167:14 170:24 194:23 201:9,25 207:7 209:20 236:5

**longer** 32:17 49:8 59:19 76:13,14 78:10 118:10 165:13 189:7 190:6 214:6

**looked** 22:21 28:13 66:19 117:25 119:13 203:24,25 224:16,18

**lookout** 62:20

**loosely** 91:12

**Lori** 243:3

**lose** 77:10,13 176:8,12

**losing** 176:19

**lost** 31:20

**lot** 33:19 48:9 90:20,21 95:17 106:7 114:2 143:6 150:3 160:4 196:14 228:21 235:25

**loud** 180:22

**Louisburg** 18:14,25 33:23

**lounge** 56:20

**lower** 153:3 162:11

**Luckily** 120:2

**lunch** 55:24 56:14,16,17 57:14 74:24

**Luther** 93:4

**lying** 224:25 225:1

**lyrics** 192:13

**M**

**mad** 189:19

**made** 35:6 68:9,24 71:7 100:18 103:4,5, 11 123:14,15,18 124:6 149:17 155:23 157:9 172:25 174:19 196:21 198:14 217:9,10 221:12 222:1,4,8,16 229:15 230:17 237:23 238:4 241:21 244:11

**magistrate** 46:2 80:15 138:8 150:20 164:25 172:17 237:10

**Magistrate's** 80:14

**magistrate's** 155:2 184:4 237:2

**mailbox** 198:15,25

**mailboxes** 199:7

**major** 35:14 49:11 51:25 78:5,6 86:16, 17,18,19 87:5,9,10,20 96:22 97:5,6 105:9,14 133:1,3 134:12 135:7 136:20 137:16 185:3 231:14

**majority** 105:23

**make** 14:22 64:6 71:7 78:15,17 86:21 99:5 102:15,21,23 104:22 108:17,21 112:18 144:7 146:1,7,16 168:17 172:5 194:20 195:9,11 213:6 214:9 226:15 237:23 238:17,19

**makes** 174:1

**Makin** 69:20 70:3,5 71:5 72:2 73:8,11 74:11

**Makin's** 70:6

**making** 49:21 74:10

**male** 42:8 54:17 137:6 140:21 191:24,25 197:3 220:8

**males** 239:15,19

**malicious** 212:20

**man** 25:2 42:9 44:18 46:4 57:5 82:17 91:4,9,16 93:9,12 94:9 110:5,22 112:21 114:23 147:10 192:19 219:19 238:21

**man-to-man** 13:17

**management** 87:11 104:15 107:13 123:14,18 163:21 164:3 206:14 219:18 221:13 222:14 228:18 239:6 242:11

**manager** 28:21 214:13

**managers** 16:24

**maneuver** 151:2

**manipulation** 122:25

**manner** 8:20 131:23 195:14

**manual** 38:17 41:18 162:6,18

**March** 23:12,13 117:5 126:9 127:11,13, 18 211:5

**Maria** 26:21 93:5 166:25 170:6

**Marin** 32:9 62:25 66:14,22 76:1 92:12, 19 93:2,7 108:3 109:10 112:18,20 113:16,17,18,21,23 114:3,14,18,21,22 115:21 116:8,11,18 143:8 217:17 240:22, 23

**Marin's** 63:18 68:5 217:12,16

**Mark** 120:23

**marked** 21:11 22:2 87:22 89:9 98:4,7 101:3 104:5 107:22 120:13 125:3 126:8 169:22 204:12,20 209:12 224:1 225:4 232:5,9 235:3

**markers** 154:13

**Martin** 93:4 191:24 192:2 193:12 194:4, 14,17 220:21 221:2,15 223:23 238:13

**Martin's** 99:18

**master's** 12:11,16

**materials** 37:8 38:14 161:21

**matter** 8:6,16 78:18 83:8,10 88:20,23 128:24 136:10 150:17 154:22 184:20 203:12 204:5 214:19 215:25 226:9

**matters** 173:17

**Mcgurl** 9:6,11,12 10:20 97:15,17,18,22 144:25 145:4

**means** 12:18 95:13 171:2,10 195:12 205:13

**meant** 28:2 113:8 133:10 192:9

**measurement** 39:10

**mediate** 114:7 115:23,24

**medical** 39:8 163:6 164:16 171:14

**meet** 179:22 181:1

**meeting** 221:4 222:11

**member** 180:6

**members** 21:8 44:4 53:21 75:21 175:6 220:15 224:24

**memory** 54:9 81:24 140:12

**mention** 15:14 16:4 58:19,20 88:14,15, 19 190:2 201:7,12,15,17 216:12

**mentioned** 15:11,16 17:25 19:22 25:23 26:8 27:20 35:18,23 43:7 47:23 49:15 54:23 59:10 65:10,18 68:22 71:5 72:6 84:16 88:17 95:15 128:18 141:17,20 142:4 143:3 154:14 187:6 190:3 193:12 194:13 223:13 232:24

**merits** 80:18

**messages** 57:1,3,8

**met** 21:2 26:20 55:10 66:5 177:11 181:3 197:12 222:14

**methods** 13:24

**Mexican** 219:10 220:8

**Mexican-hispanic** 18:24 219:1

**Michael** 9:6,11

**mid** 177:11

**middle** 10:7 90:10 103:17 105:5

**midnight** 170:21

**miles** 116:3

**mind** 38:2 86:9 131:17 144:12,13 179:14 208:10 223:6 233:20

**minimis** 14:11,14

**minor** 42:5 49:11 75:25 76:1,3,21 87:7,8 95:2 117:7 134:9

**minorities** 220:2 239:15

**minute** 119:8,9 165:12

**minutes** 38:4 73:23 97:19 188:14 236:7

**miscellaneous** 99:8

**misdemeanor** 42:3 143:14 184:2

**misdemeanors** 36:24

**misquoting** 71:20,22

**missing** 31:17

**mix-up** 185:7

**mocking** 192:3 193:17

**model** 133:15 185:23

**modular** 138:25 139:4,6

**mom** 44:5,8 94:2

**moment** 210:5

**month** 99:3 101:17 193:9

**months** 12:8 42:12 92:10 110:11 175:5 190:24 204:9 205:23 207:4,10,12 234:8

**morning** 141:23 142:1,7 144:8,19 179:22,24 180:8

**mornings** 144:20

**mother** 43:12,18 44:17

**motion** 93:24 225:7

**Motor** 49:2

**motorist** 51:9 118:20

**Mount** 11:11,12,13,16 17:25

**mouths** 97:4

**move** 26:22 76:22 98:7 101:5 105:19 125:23 132:6 138:9 210:23 212:11,19 237:14

**moved** 31:18 92:11 203:22

**movements** 108:21

**moving** 25:13 39:13 52:22 78:2 107:24 115:19 131:7 218:22 220:10 221:10 241:16

**multi-colors** 99:20

**multiple** 50:7,13 52:6,20 85:2 88:25 122:6 130:14 132:23 134:8 143:14 168:22 182:8,9 185:20 186:18 195:25 221:1,3 231:20,21

**mumbled** 135:21

**munition** 13:19

**munitions** 58:8

**mute** 9:7 124:10,13

---

## N

**named** 226:10 244:18

**names** 49:5 117:1 142:15 154:8 228:17, 18

**naming** 226:1

**nasty** 110:1,16 112:23 217:6,20,24

**nature** 41:17 57:5 221:19

**NC** 78:3 215:16

**nearby** 139:4

**necessitated** 226:1

**neck** 163:1

**needed** 16:6,7,25 26:17,23,24 27:1 28:19 37:1,5 59:19 105:8,21 189:7 190:8 213:13 214:6

**negative** 92:5 204:11 226:23,24 227:1 229:8 235:19

**negatively** 225:23

**neighbors** 139:1,3

**Nicholas** 234:22,23

**night** 69:25 87:16 117:20 128:1 139:25 140:2 141:11,23,24,25 142:1,7 143:15 144:7,9,19,20 167:23 170:18,20 187:9 240:17,22,24

**nights** 61:18

**nighttime** 87:8

**noise** 69:12

**non-attorney** 81:5 200:10

**non-compliance** 65:5

**non-compliant** 65:9 150:25

**non-cooperative** 65:9 150:25

**non-sworn** 199:5,8

**noon** 144:19

**normal** 72:13,19 76:15 151:25

**north** 10:17 11:6,11,12 18:1 20:1 50:25 55:6 116:14 135:1 154:7 186:15 203:19 212:3 243:4

**northern** 84:24 86:12

**notarized** 27:1

**Notary** 243:3,24 244:15,23

**note** 125:19 203:3 245:4

**notebook** 202:6,8,9,11,12,20 203:8,12, 17,21,23 204:1

**noted** 124:20 126:25 244:10

**notes** 40:2 203:2

**notice** 21:17 134:1 145:2,8

**noticed** 117:14 149:9

**notwithstanding** 44:2

**November** 18:3,15 19:10 42:23 59:25 72:11 107:9 160:20 217:12

**Ns** 192:14

**number** 21:11 22:2,5 53:9 80:12,16 87:22 88:2 89:9 98:4 100:21 101:3 104:5 106:12,14,19,22 107:22 120:13 125:3 126:2 128:16 135:2 169:22 186:11,13,14, 17 204:20 205:9 207:19 209:12 224:14 225:4 232:9

**numbered** 243:13

**numerous** 40:8

---

## O

**oath** 8:14 27:16,18 183:13

**object** 31:23 38:18 71:18 124:16 129:20 146:10 226:7

**objected** 124:17 126:24

**objection** 39:7 71:10,18 126:25 144:25

**objections** 8:19 145:7 146:7,16 226:16

**objective** 13:9 182:18

**obligated** 175:1

**obligation** 242:8

**obligations**79:7,9,16

**Observe**19:1,13

**observed**84:23 95:3 132:23 190:25

**observing**32:10

**obsessed**182:19

**obtain**210:2

**obtaining**212:9

**occasions**121:16,20,23

**occur** 207:14

**occurred**20:4 42:21,22 46:25 111:16
170:8,13 177:7 187:23,25 194:8

**occurring**170:10

**October**132:8,13 147:18 159:10 167:17
170:14 178:21 207:15,17 221:23

**off-duty**56:24 57:2 188:16

**off-record**155:11 209:16

**offence**237:7

**offended**203:8

**offender**184:22

**offenders**18:12

**offensive**88:22 89:5 195:13

**offer** 26:15 215:20,21

**offered**26:11

**office** 8:7 15:22 17:6 19:21 22:19,24
24:19,23 27:16 32:3 33:14 34:16 35:17
36:7 37:17,20,22 38:15 39:5,12 40:10
41:12,18 42:1,4 43:2,24 45:7 46:11 49:7
50:17 52:10,16,23 54:24 56:6,9,17 57:18
62:8 68:16 80:14 96:12 98:16 99:17,18
100:13 101:20 102:6 105:11,16 109:9
111:14,18 112:1,4,6 131:10 136:16
153:22 154:2,4 155:2 157:21 159:12
163:18 164:24 178:17,19 180:17 182:9
186:1 187:11,12 188:17,18,20,22,24
189:24 190:18 195:6 199:4,11 200:22
201:12 202:5 204:3 207:8 211:2,8 212:5
213:11 214:5,25 215:14 216:6,14 222:9
224:24 227:4,9,13 230:2,10,19 231:13,
21,25 232:17,21 233:22 237:20

**officer** 11:18,24 13:6,7 14:22 18:8,15
19:11 32:14 36:9 41:22 48:21 49:18
77:16 78:4 102:15 113:7,8 143:20 144:18
147:3,5 148:2,10 150:7 159:18,19,22,24

160:1,2,9,12 164:10 168:16 179:16 204:4
205:23 212:2 219:4 230:1 233:23 237:8,
11,17

**officers**16:25 61:20 79:7 147:25 150:5
160:22 196:15 236:24 241:6

**offices**109:4

**official**89:12 100:22 171:15 179:16

**officials**228:17

**Olive** 11:12,13,16 17:25

**Oliver** 132:7,8,9,11,18,19 135:14 136:17
138:3 147:14 156:25 157:22 159:6,10
164:12 167:16 170:4,6 171:7 178:22
179:3,11,24 180:17 181:10,17,19 182:19
183:17,22 184:14 185:12,18 186:3 187:4
190:2 206:12 207:14

**Oliver's** 134:1 138:11 146:18 184:25

**on-boarding**37:9,10,12 38:16,19 42:15

**on-the-job**32:3 38:25

**one-lane**119:21

**one-sided**175:12,19

**one-year**230:3

**one's** 62:21

**ongoing**205:21,24 206:2,10,18

**online**27:3,5

**onward**198:18

**open** 62:16,17,19 147:10

**open-eye**213:15

**opened**61:22 189:3

**operation**84:21

**operations**41:15 85:16 202:24

**opinion**134:9 145:20 208:11 220:5

**opinions**239:25

**opportunity**29:11,21 30:15 61:14,16,
21 90:6

**Opposing**145:25 146:3

**options**157:5

**oral** 25:14 29:24 30:4 238:3,4 242:3

**orally** 30:16 41:25 82:14

**order** 10:3 73:24 184:3,4 186:9 237:2

**ordered**241:23

**orders**96:4,6 169:2 183:18

**ordinary**137:15

**orientation**37:12,14 38:20,24,25 39:1,
3 65:17 88:19 89:6 102:10 201:17

**originator**63:5 67:3

**Osama**194:19 223:21,22 224:13,15,17,
18,20

**other's**56:15

**outcome**184:10

**outstanding**38:2 185:25

**overrule**174:13,16

**o'clock**117:20 181:5 188:14

**P**

**P-A-R-H-A-M**3:16

**P-A-T-E-L**194:18

**P-R** 194:18

**P-U-R-A-V**194:18

**P.C.** 46:6

**p.m** 233:5

**p.m.** 70:22,24 74:23,24 75:1 97:21,24,25
98:2 124:12,24 125:1 127:22 144:5
145:22 155:10,13 165:2 170:16 186:25
187:2 188:13 233:5 236:12 242:21,23

**PACER**215:12

**pages** 28:15 39:25 98:9 99:7,12 202:18
211:15 243:14 244:5,8

**pain** 166:7,14

**panel** 29:25 30:5

**panic** 164:15

**panicked**131:23 164:14

**paper** 28:17 58:17 85:10 202:19 238:9

**papers**46:16

**paperwork**31:14,17 33:19 81:1,7,14
115:25 173:19

**paragraph**88:1,3 90:10 91:6,7 94:23
96:2 103:18 105:6 155:20 170:24 171:1
220:10 221:10 225:11,17

**paragraphs** 70:23

**paramedic** 66:2,5,9

**paramedics** 51:4 165:12,23,25 169:19

**Parham** 26:21 73:16 93:5 167:1 170:6

**park** 148:21

**part** 15:2 16:1,8,12 37:8 38:16 46:17 84:24 85:15 86:11,12 95:25 103:12 105:17 110:3,7 122:23 161:21,22 171:1 188:15

**part-time** 19:19 188:16

**participating** 9:9 10:12

**parties** 8:18,23 36:7 212:13 243:17

**party** 82:17 140:23 177:1,2 180:6 226:2

**pass** 119:17

**past** 75:16 124:6 174:9,17 199:13

**Patel** 190:24 191:16 192:4 193:17,18,22 194:13,18 223:14 224:11,13,25

**path** 168:14

**patrol** 32:24 33:1 34:15 35:4,12,16 59:21 64:14 78:4 84:24 103:7 108:13,14 109:2,5 110:15,25 111:18,19,22,23 132:23 151:24 154:24,25 155:15,17 173:23 190:10 199:2 200:24 221:16

**pause** 127:3 128:5

**pay** 77:19 240:6

**PC** 85:24

**PDF** 40:19

**peace** 13:10 14:2

**Pearsall** 73:11

**penalty** 8:16

**people** 45:23 52:4,23 54:8,22 60:7 64:22 76:12,13 83:19 84:17 90:13 92:4 97:4 115:6 137:11 139:8 142:15 143:4 153:8 154:8 185:24 191:16 192:8 217:14,20 219:10

**people's** 85:1

**pepper** 13:19 15:11,12,14,16,17,19,21, 23,25 16:1,4,8,11,15,17,18,20 17:5,12 157:14,17 158:11,21 159:7,9,15,23 160:2,12 161:7

**perceive** 158:9

**perceptions** 44:11

**perfectly** 139:10

**perform** 103:20

**performance** 32:20,22 34:7,12 66:11 99:10 100:6 198:19 218:10,12,16,17

**performed** 192:12

**period** 107:3 142:6

**perjury** 8:17 42:17 137:21,22 163:11

**permission** 211:9

**Perquimans** 1:5

**Persall** 73:11

**persecute** 241:19

**person** 8:14 15:1 23:3 55:1 56:12 71:6 80:21 107:11 109:15,24 121:13 135:4 145:21 173:16 181:24 182:14,15,17 186:19,21 202:3 217:23,25 237:2,4,8

**person's** 25:18

**personal** 18:22 19:16 56:1 66:10 73:5 75:24 134:15 136:14 199:8 203:2 218:14, 17

**personality** 92:24

**personally** 132:15 231:23 244:18,20

**personnel** 20:24 37:11 39:23,24 40:5,9 67:18 98:21,23,25 99:1,14,17,24 100:4,5 101:18 102:3,7,8 199:5 203:11 210:17, 20 211:10 212:4,25 214:8

**persons** 165:11 218:24 219:1,14,16

**pertains** 102:13

**pertinent** 43:4

**Peter** 22:6 25:1 57:24 195:2 221:23 223:2

**ph** 69:20 73:11

**philosophy** 133:14 185:23

**phone** 27:6 57:6,7,8 72:15 73:5,7,8 82:15 91:19,22 109:15,24 110:1,14 112:15,22 114:4 173:11 179:22 187:7,9 216:15

**phonetic** 54:12 71:6 106:24

**photo** 154:12

**physical** 14:9 169:2,9

**physically** 8:10 72:18,19 108:18 153:7, 8 162:2

**pick** 140:17 141:2 142:22

**picture** 154:9 172:19 219:21

**piece** 112:24

**pinpoint** 132:2 157:7

**pitch** 87:15

**pitch-black** 28:1

**place** 10:15 28:19 59:4 68:7,15 73:15,24 121:14 129:13 143:7 152:11 156:21 157:24 181:12 183:15,23 198:16 206:21 208:22 213:13,16 214:14 221:7 227:4,15 243:8 244:6

**placeholder** 25:24

**placing** 162:10

**Plaintiff** 22:5 225:22 226:3,5

**Plaintiff's** 225:20

**plan** 218:4,5

**plans** 179:3

**plate** 132:24 133:11 134:25 135:1,2 184:9 185:6

**play** 58:19 112:21 127:1 128:2 194:3

**played** 201:7

**plays** 128:4

**pleasant** 158:19

**pleasure** 175:15

**point** 28:3 31:24 42:18 51:4 80:1 86:25 107:17 108:21 115:9 118:11 138:6 145:12 157:6 164:11 165:16 166:11,24 183:21 196:2,3 226:11

**pointed** 79:21 103:18

**pointing** 103:21

**points** 26:4 97:17

**police** 13:6 16:24,25 50:3 55:11 135:13 147:3 160:23 164:18 212:1,2,3 214:13 215:16 227:17 229:24

**policies** 37:15,16,19 39:3 40:10 41:25 43:1 47:21,25 49:14,19 195:25

**policing** 133:14 185:22

**policy** 38:17 39:4,11,17 142:18 157:19 158:9 206:7

**Pool** 54:7,25 221:17

**Poole** 57:11,25 58:11,18 91:22 104:8,
18 108:15 111:1 112:15,20 113:18,21
114:19 115:15,16 116:4,15,18,20,22
188:3 191:1,6,8,13 200:11 201:7,20,22
220:22 221:16

**Poole's** 116:21

**pop** 73:19

**portion** 198:3

**position** 18:25 22:20 24:14 27:17

**positions** 14:10

**possibility** 118:7

**possibly** 17:17 40:9 71:6 171:22

**potential** 26:24 212:23

**power** 78:17

**practice** 81:11 96:2

**practices** 41:25 42:3 43:1 49:14,20

**praised** 95:22 218:10,11

**precedes** 100:11

**predated** 175:23

**preparation** 20:16 21:6

**prepare** 20:10

**prepared** 10:21 20:12 166:25

**presence** 13:18,25 102:19

**present** 8:11,23 9:12 21:5,8 28:8 72:18,
19 169:24 189:24 237:9

**presentable** 27:11,25

**presented** 28:11 29:11,18,20 30:14
122:11

**preserving** 13:10

**pretty** 10:1 48:10 112:24 134:5 161:10
163:20,24 165:6

**prevent** 14:2 180:15 204:14

**prevented** 225:22 226:18

**preventing** 185:15 235:12

**previous** 23:15 24:3 79:21 91:1 96:4,6
215:1

**previously** 24:6 30:14 33:22 34:11 78:2
91:2 98:7 106:5 117:10 144:17 149:23
185:1 214:17 228:4 234:3 240:1

**print** 154:1

**printed** 154:3

**prior** 21:16 24:18 67:25 72:5 130:4,6
156:11 157:5 190:24 191:17 238:5

**priority** 95:1,6 103:5

**prison** 33:21

**prisoners** 160:17

**private** 45:19 202:3

**privilege** 226:8 230:25

**probability** 67:22

**probable** 52:8 80:19 237:13,14,15

**problem** 36:5,9,11 61:19,23 66:9,24
67:1,2,20 175:14 220:1 228:6 234:9

**problems** 34:23 62:22,23 64:18 74:4

**Procedure** 46:6,15

**procedures** 37:15,17,19 42:3 47:22,23

**proceed** 229:18,19

**proceeding** 8:10,11,12

**PROCEEDINGS** 8:1

**process** 12:3 24:9 26:15,19 29:23 37:9,
10,12 38:17,20 39:1 41:7 42:15 53:23
60:5 79:24 80:10 151:23 156:24 175:16
212:19 238:14

**processes** 38:21,24

**processing** 64:25

**produce** 126:16

**produced** 126:10

**production** 22:7

**professional** 27:10 74:9 136:4

**prompted** 184:24

**pronounce** 96:6

**proof** 227:8,11 233:10,16,18

**proper** 157:18 208:7 214:8

**property** 45:19 147:19

**prosecute** 241:20

**prospective** 226:25 227:10,13 229:22

**prospects** 207:25 225:24 226:19

**protect** 87:6 96:24 105:15

**protected** 176:25 177:18 178:10 181:15
215:6

**protecting** 13:10

**protection** 175:17

**protective** 98:10

**protocol** 158:10

**protocols** 158:9 169:8

**provide** 8:14 17:15 28:25 36:24 51:9
78:19 157:21 163:8,15 167:6 182:14
217:19

**provided** 16:23 17:7 21:1,15 32:23,25
34:8 37:5,16,18,20,22 39:3,6 41:19 62:6
89:20 116:6 121:6 135:12 202:8,9 240:1,
2

**providing** 39:17 235:19 240:2

**provision** 79:12

**provisions** 37:25

**provocative** 11:8

**proximal** 171:1

**proximity** 139:2

**public** 12:14 13:1,7 18:2 20:2 87:6
105:10 114:5 115:22 160:13 163:9,23
179:16 243:3 244:15,23

**publicly** 215:10,11 216:3

**puff** 199:21

**pull** 48:13 51:2,6 69:2,5,6 80:16 97:6
120:15 133:13 134:23 149:13 185:21
189:12,13 204:17 209:10

**pulled** 33:14 48:14,17 50:6,13,14,15,18
66:19 85:6 87:13 121:8 149:15 162:6,19
166:4,19,22 189:10

**pulling** 48:16 52:4 95:14 113:23

**Purav** 194:18

**purple** 198:15,24 199:17,19,21 239:10

**purpose** 60:11 64:22 210:19 232:14

**purposes** 14:4 16:3 24:21 101:8 202:21,
22 203:5,10 212:8 244:21

**pursuant** 76:15 226:4

**pursuit** 136:5

**push** 154:24,25

**put** 46:1 63:4 68:2,4 85:1 90:25 91:1
 92:10,13,24 94:3,4 115:25 116:21 119:3
 121:25 123:13,16 133:21 134:5 150:19,
 22 153:2,11 162:19 185:12,17 238:8
 239:8

**putting** 87:1

**PVA** 135:18

---

## Q

**question** 23:17 31:25 39:6 52:1 63:7
 65:13,15,16,23 82:12 90:17 93:2 99:23
 110:20 114:23,24 129:21,23,24 130:
 20 145:11,14,18 146:4 147:13 151:22
 159:3 191:14 196:25 197:4 205:16 208:9
 211:19 214:18 218:6 223:1 226:14
 233:13 235:19 240:3

**questioned** 17:11 120:24 188:8

**questions** 26:2,5 27:6 33:7 75:3 123:4
 131:16 188:9 190:7 218:18 233:2,8
 236:6,17 242:17,19

**quick** 185:3 231:17

**quickly** 70:16 85:22 118:25 119:4,5
 137:14 138:1

**quiet** 189:23

**quote** 179:21

---

## R

**race** 26:8 65:9,17 88:14,15,16,17 177:
 195:9,21 201:7,12,13 217:21 219:24

**racial** 88:22,24 190:19 191:22 223:16,19

**racism** 203:15

**radio** 48:18 50:20 63:15 95:20,23 107:
 114:4 115:22 116:11,15,17 132:4 135:
 184:9 185:4

**radioed** 132:24 133:10

**Raleigh** 11:11

**rammed** 238:21

**ran** 230:3 242:13

**rang** 112:15

**Ray** 54:11 173:13,14 188:19 241:4

**Ray's** 61:24 67:23

**re-certified** 229:25 230:5

**reach** 216:2

**reached** 24:11,12

**react** 33:13 118:15 136:3 152:20 164:13
 191:6

**reacted** 191:9

**reaction** 75:7

**read** 29:1 37:24 90:2,3 167:14 171:5
 244:4 245:8

**reading** 88:4 170:22 185:5 243:20 245:
 
**ready** 60:7,13 120:20

**real** 75:10 77:8 166:8 242:15

**realize** 82:16 157:2

**reason** 11:20 31:16 34:4 43:17,18 52:8
 57:22 59:21 64:16 94:11 103:20 105:25
 106:1 127:20,23 129:5 171:12 190:13
 200:17,18 215:19,22,23 216:3,4 220:4

**reason(s)** 245:5

**reasonable** 47:9,12 213:6 214:12

**reasons** 75:10 113:5 134:15 239:20
 241:10,20

**reason's** 44:10

**recall** 16:8 21:22 23:19 26:6 30:22 51:9
 52:19 54:1 81:19 104:2 105:17 110:7
 131:25 132:25 134:6 146:20,21 147:1
 170:10 176:11 194:23 195:4 196:20
 236:4

**recalled** 49:16

**receive** 32:3,6 81:1 85:10 237:4

**received** 32:8 43:11 47:23 100:24
 126:15,23 148:3 178:25

**recently** 232:4

**reception** 23:1

**recess** 38:3,10 70:22 74:24 97:25 124:24
 186:25 233:5 236:12

**recognize** 89:18 210:25

**recognized** 56:7 112:12 239:14

**recollect** 194:11

**recollection** 52:12,17 103:23 165:5
 194:7,8 207:13

**recommend** 21:17 122:9,22 150:19

**recommendation** 22:13 168:18
 174:10,17

**record** 8:4,22,23 10:5 20:12 38:9,12
 53:20 70:21,24 74:13,21,23 75:1 97:13,
 24 98:2 100:10 124:12,21,23 125:1
 136:22 155:8,9,12 163:9,24 165:1,2
 184:15 186:22,24 187:2 215:24 233:4,7
 236:11,14 243:14 244:5,8

**record-keeping** 101:8

**recording** 122:15 132:3 133:8 134:23,
 24

**recordings** 122:15 163:22

**records** 66:19 74:15 99:21 211:22
 215:10

**recruiter** 210:2

**recruiting** 233:23

**rectangular** 202:16

**red** 102:18

**redirect** 236:8

**reduction** 150:20 168:18

**refer** 84:21 85:16 146:5,14 149:3 152:17
 161:24 195:1

**reference** 26:24 27:1 43:10 104:25
 108:8 110:21 113:10 120:23

**referenced** 158:10

**references** 204:12 226:23 227:1 229:8
 235:19

**referencing** 224:17

**referred** 34:15 54:16 161:25 194:17

**referring** 35:20 36:1 37:11 42:16 78:23
 82:8 83:3 91:17 92:4 104:13 108:7
 113:12,14 156:1,16 175:20 178:13 180:1
 3,9 218:9 224:19 227:1 234:12 238:1
 240:7

**refers** 114:6 133:1

**refresh** 140:11

**refusal** 124:5

**refuse** 36:10 123:10,12

**refused** 123:5,8,11 124:2,18

**regard** 118:17 187:5

**registration** 134:19

**regret** 109:10 183:10,11

**reimbursement** 132:13,15

**reinstated** 24:6 33:22

**related** 72:1 126:15,18 181:7,9,13

**relation** 148:21

**relationship** 56:1 64:18 65:25 70:6,8,9 74:6,9

**release** 209:5,8,21 210:17,19 211:1,6,12, 21 212:4,11,14,17,22,24

**released** 212:24

**releases** 212:8 214:15 230:4

**releasing** 213:2

**relied** 162:20 163:13

**relief** 76:3,7,15,18 209:8

**rely** 52:10 150:12 162:18

**remain** 57:10

**remarks** 221:12

**remember** 20:3 22:25 23:11,18,24 24:1, 3 26:2 27:21 28:13,23 29:3 30:6 31:6 39:16 40:11 42:20 43:2,5,9 50:24 52:14, 53:13 54:3 73:6,7,10 74:5,10 84:12 85:13,18 91:3,10 103:21,24 105:12,17 106:3 108:6 109:20 111:5 113:1 117:5, 17 118:11 127:9,12 131:8,13,15,24 132:5,20,22 134:17,22 135:3,6,15,16 136:1 138:13 140:9,15 149:1 161:4,5 162:9,10,13 163:4,6,12 164:8,9 165:8,16, 18,22 167:3,7,8 170:15 171:22,24 172:1 176:5,7 184:17 188:6 195:23 197:6,7 199:22 202:1,17 203:10 206:25 216:24 223:19 225:1 236:2

**remembered** 73:18

**remembering** 6:7

**remorse** 76:19,21

**remote** 9:13

**remotely** 8:12 9:5

**remove** 131:6 171:16 209:1

**repeat** 65:16 130:20 135:24,25 151:22 184:21 233:13

**repeating** 36:6 167:13

**replied** 111:3

**report** 19:1,13 37:2 41:14,15 44:16,17 84:21,22 85:16,17 117:13 125:11,12 134:4,16 138:17 140:9 149:4,5 150:13, 151:18 152:17,18 153:2,11 158:5 172:6, 15 173:12,13 202:23,24 204:12,24 208:19 226:20 228:20 234:4,5 238:23

**reporter** 8:3 9:2,5,9,13 10:4,11 21:14 38:8,11 70:20,23 74:22,25 97:23 98:1 124:11,22,25 126:5 127:1 155:9,12 186:23 187:1 225:12 232:5 233:3,6 236:10,13 242:20

**reporting** 8:12,20

**reports** 49:6 50:16 52:10,16 100:22 138:17 140:5 149:4 151:16 163:4 165:25 167:15 170:18 176:9

**represent** 9:21

**representing** 215:25

**reprimand** 81:17 89:12

**reprimanding** 81:19

**request** 15:23,25 106:20,21 126:15 139:19,22 183:18 214:8

**requested** 15:24 16:13 101:18 139:20 140:16 222:21 243:20

**requests** 22:7 126:14,18

**require** 14:3

**required** 79:8 86:16 157:20 182:1 189:7 215:15

**requirement** 211:24

**reread** 127:15

**rescinded** 197:10 215:20

**residence** 10:16

**resist** 156:25

**resistance** 168:12 169:1,3,7,10

**resistant** 153:13

**resisted** 152:25 168:10 169:5 173:7 213:25

**resisting** 153:6,7,8 155:5 157:3 164:22 169:1

**resistive** 15:8 150:24

**resources** 28:20 37:11 98:19

**respectful** 217:5 218:1 239:22 241:5

**respond** 36:14,18,19,20 48:8 82:24 90:7 192:24,25

**responded** 132:2 167:8 191:13

**responding** 13:24 131:8 219:3 241:13

**response** 22:6 136:3 150:16 178:10 242:7

**responsibilities** 18:10,25 19:12 34:17 35:19,20,21 77:11 185:14

**responsibility** 34:18 120:1,4 129:10,15 169:20

**responsible** 68:15 114:15

**rest** 92:3

**restorative** 12:22

**restrict** 180:13

**result** 116:14 168:11,19,21 205:17

**resulted** 151:1 242:4

**retail** 19:19

**retaliation** 181:13 216:5

**retaliatory** 181:14

**retired** 78:5,6 133:3 223:8

**return** 41:16 80:21 237:19

**returned** 136:15 200:5

**revealing** 20:8,13

**reverse** 119:3

**review** 20:14,16,21,24 24:16 25:14,23 26:9 29:24,25 30:4 37:7 38:16 39:15 41:11 69:7 74:15 80:16 89:14 98:8 99:1, 13,24 101:6,18 104:20 107:25 120:16 125:7 169:25 204:23 210:5,13,21 211:17 213:5 217:2 224:6 225:18 232:6 237:11

**reviewed** 20:15 38:14 39:23 40:13 41:10,14 98:22 99:13,16 100:25 210:8

**reviewing** 40:9,10 105:3 173:18

**Riceland** 25:19

**ricochet** 157:24

**ride** 59:21 189:16,20 190:9 200:24

**riding** 48:14 52:3 75:18 217:17

**rights** 98:17 136:11 175:16,17,18

**rise** 226:2

**risk** 133:21 143:22 144:23 145:19,23 157:25

**risks** 143:20

**risky** 143:24 144:4,6

**road** 43:4 73:16 76:14 81:14 87:5 116:9 119:21 138:22

**roads** 93:5

**roadway** 121:2

**Roberson** 53:9 54:10,11,12 63:7,9,24 64:25 66:8 92:20 96:9,18 104:24 106:21 107:12 218:9,14 238:24,25 240:21,23 241:17

**Roberson's** 60:24 107:7 240:13,15

**Roberson's** 54:16

**Robinson** 9:3,4,13 31:23 38:1,6,18 65:4 70:15,19 71:10,16,20,25 101:7 123:13 124:10,14,15 126:6,10,17,23 129:20 145:12,24 146:2,8,12 210:4 226:7,13 236:7,16 242:16

**rode** 32:8,14 53:2 61:17 217:22

**role** 54:1

**roles** 53:24

**romantic** 70:8

**room** 8:11,23 10:18 25:24 82:17 108:15 109:2,6 110:25 111:12,19,22 199:2 221:16

**rotated** 76:11 162:12 240:16

**rotating** 162:17

**rotation** 240:24

**roughly** 171:24 172:1

**rude** 110:1 217:6,20

**Rule** 146:6,15 222:11

**ruled** 226:9

**rules** 9:14 205:18

**run** 45:24 134:18 196:16

**running** 106:1

---

**S**

**S-H-E-F-T-A-L-I** 54:21

**S-U-T-T-O-N** 35:1

**S33** 63:14

**safe** 49:25

**safety** 13:7,10 18:2,15 20:2 87:6 133:21 157:25 160:13

**Saturday** 86:1

**save** 96:24

**scared** 94:12

**scene** 14:24 123:14,15 150:6 165:10,17 18,19 167:3

**scheduling** 88:3

**school** 11:4,5 53:23 140:19 141:3 148:5 156:5

**Science** 12:11

**scope** 226:11

**scratching** 44:23 45:5

**screaming** 52:2 166:18,20

**screen** 21:15 112:25 125:24 131:7 209:3

**scroll** 21:20 22:10,13 89:16,19 90:9 98:11,12 211:25 225:12,15

**scrolling** 22:10

**SEAL** 244:25

**search** 141:10,17,20 184:25

**searched** 232:23

**searching** 186:11

**seat** 85:3

**seconds** 115:11 119:9 127:16 128:16 233:20

**secretaries** 99:8

**secretary** 99:19 109:3

**section** 225:18

**secure** 209:4

**securing** 225:23 226:18 235:12

**security** 19:11 205:9 207:19

**seek** 16:20

**seeking** 214:19

**seeks** 226:3,5

**send** 16:25 57:1 125:25 134:24 209:5

**sends** 213:6,7

**senior** 45:12 54:17

**sense** 156:25

**sentence** 102:13 105:20 193:14

**sentences** 121:15 122:10

**separate** 61:3 94:15 102:6,8

**separated** 62:15

**separation** 204:13,24 205:1,16 226:20 234:5

**September** 18:3 99:2,3,16 101:17 107:8

**sergeant** 32:9,13,16 34:8,13 35:2 41:22 64:7,24 48:19 49:10,15 11 52:3,7 53:2, 3,5,8,18 54:6,11,12,16 60:4,24,25 61:1, 11 63:3,7,8,18,24 64:20,21,24,25 65:4 66:8,14 68:5,6 69:1,13 72:10 75:4,22 76:1,18 77:1,11 85:12 86:5 92:12,19 93:2,7 96:9,17 104:24 106:21 107:7,11, 12 108:3 109:10 111:25 112:7,15 114:7, 22 115:13,15 116:2,19,20 117:24 120:22 121:21 122:16,20 140:16,17 142:21 148:4 155:24 155:13 166:11 176:3,4,6 183:1,7 186:4 188:2,4 191:24,25 194:17 195:24 196:3 218:9,14,18 220:20 221:2,15 223:23 231:9 238:11,12,14,24,25 239:11 240:13,14,15 241:7,17

**sergeants** 51:24 52:2 191:21 218:10 221:6

**Sermons** 46:1

**serve** 41:16 50:5 80:2,20,21 81:4 85:18, 22,23 110:16 139:18 141:6,15 143:21,25 144:4 145:21 155:25 156:6,8,11 181:23, 24 182:13,21,22,24 183:5,8,12 184:1 237:16,18

**served** 46:7 81:6 86:2 141:9,11,24 142:5,6,8,20 143:8,11,14,15 144:16,18, 22 186:1

**service** 59:19 114:5 133:25

**services** 58:11 132:2 163:21 164:2,16 182:7 189:5,6 190:5 200:23 214:5

**serving** 13:9 46:15,16 49:21 90:12,23 91:5 110:19,22 111:4 181:19 183:10

**sessions** 21:6

**set** 22:6 24:24 27:7 241:19 243:21

**severe** 134:12 225:24

**sexual** 65:17 74:10 88:19 89:6 201:17

**shaking** 94:5

**share** 21:15 126:5 131:7 132:4

**shared** 125:24

**Sharika** 9:3,12

**Sharon** 26:1 34:20,21,22 35:3,7,9 36:2, 19 173:15 188:20 189:1,9,21

**Shaw** 11:10 19:8,17

**she'd** 153:3

**sheet** 202:19

**Sheftal** 54:19

**Shelton** 231:14

**sheriff** 13:7 25:1,4,9 27:8,20,22,24 28: 7 30:21,22 33:3,9,15,16 35:5 37:23 41:8 24 42:2 43:1,11,14 44:19,20,23,25 45:2, 4,5,9,14,17,22,25 46:4,9 47:4,13,17 51:19,25 57:24 58:9,10,25 59:3,7,20 64:1,2,5,8 67:24,25 68:12 78:3,14 79:10, 11,14 80:8 81:17 82:4 83:15,25 84:12,14, 15 87:11 96:20 99:18 103:13 104:1 114:13,14 118:18 123:21 146:18 148:8,12, 16,21,23 175:1,16 176:23 177:5 178:3,16 179:20,23 180:10 181:1 189:6,24 190:5 14 195:2 196:12,22 197:7,10,12,16 200:23,25 205:2 206:8 208:7 209:5 212:24 218:23,25 220:12,14 221:4 226:14 233:22 234:18 235:2 238:7 241:24 242:12

**Sheriff's** 8:7 15:22 19:21 24:19,23 28:18 31:19 33:14 34:16 35:17 36:7 40:10 41:12 42:1,4 52:10,16,22 56:6,9,16 68:16 79:3 99:17 100:13 101:19 102:6 131:10 136:16 153:22 154:2,4 180:17 182:15 186:1 187:12 199:4 207:7 211:17 212:5 222:13 226:6 231:21 232:17,21 233:21

**sheriff-specific** 199:15

**sheriffs** 221:12

**Sheriff's** 17:6 22:19,24 32:3 37:17,20 22 38:15 39:12 41:18 43:24 49:7 50:17 54:24 57:21 98:16 105:11,16 157:21 159:12 164:24 174:9 178:18 190:18 199:11 201:11 202:5 204:3 213:11 214:25 215:14 216:6,13 224:24 227:3,8 13 230:2,10,19 231:13,24

**She's** 87:17

**shift** 32:10 48:2,20,22 53:21,25 54:8 60:24,25 61:24 63:18 64:7 65:7 66:4 67:23 68:5,6,8 70:2 72:10 76:1,2 77:12 107:7 113:23 114:3,16 122:1,6 141:24 142:1 143:15 144:18,19 167:23 170:20 175:25 198:12 217:12,15,16 240:8,9,12, 13,14,15,20,22,24,25

**shifts** 78:16 240:16

**shit** 141:4

**shook** 93:23 94:12

**shopping** 56:20

**short** 201:25

**shortly** 27:7,13 128:17 214:4 216:18

**show** 95:20 114:9 137:6 153:15,25 165:22:4,6

**showed** 76:19,21 118:1 136:21 161:7 165:18 212:23

**showing** 43:19 118:6 185:4,5

**shown** 26:25

**shows** 117:24 184:21

**shut** 92:14 115:5,6

**shutting** 241:12

**sic** 65:8 100:9 109:12

**side** 61:25 81:13 109:2,5 115:12 138:25 149:10 183:25 186:15 242:9

**sign** 22:14,15 28:9,20 29:19 89:25 90:5 102:18 122:11 123:6,8,10,11,12,24 124:4,5,18,19 197:16,17 209:22 211:6 212:2,8,10,18,22 214:17,19,21 230:4 237:16

**signal** 86:22

**signaling** 93:24

**signature** 28:18,19 89:22,24 106:15 123:13,16,21 205:12 207:19 209:24 244:13

**signatures** 40:2 124:7

**signed** 29:1 31:7 46:7 84:15 90:2 123:15,19 124:3 211:25 212:17 214:15

**significant** 120:3

**significantly** 35:15 181:13

**signing** 27:21 211:11 243:20

**signs** 43:22 114:9

**silenced** 92:15

**similar** 12:20 44:4 125:18,22

**simply** 58:20,21 59:18 92:14,16

**sincere** 34:2

**sincerity** 114:9

**singing** 192:17,18

**singling** 33:2

**sir** 30:2 65:16 81:9 97:16 104:7 119:2 129:2

**sirens** 114:1 116:12 135:16 165:15

**sit** 173:2 174:6

**site** 45:17

**sitting** 9:23 76:13 116:7 188:20,22,23 192:18 194:9 236:5

**situation** 14:1,2 36:20,25 76:8,10 84:2 86:15 97:5 110:10 113:15 115:20 129:9 139:21 144:15 151:10 154:16,18 156:15 183:19 230:13 242:1

**situations** 131:14

**skinny** 137:7

**skip** 127:2 163:2

**skipping** 22:4

**slam** 92:16 115:10 118:22

**slammed** 178:2

**slender** 137:8

**slightly** 120:19

**slow** 51:3 86:1 118:24,25 119:14

**slowly** 108:25

**slurs** 88:22,24 190:19 223:16,20

**Smile** 192:13

**sneaky** 93:9,11

**snitch** 62:21

**snow** 199:25

**snowball** 199:21

**social** 12:21 205:8 207:19

**socially** 9:1

**soft** 13:17,18 14:7,8,12,13,18,20 151:
158:13 164:23

**somebody's** 96:24 105:15

**someone's** 96:24

**something's** 219:21

**Something's** 82:12

**song** 192:11,17,18 194:11

**sort** 50:1

**sorted** 45:7

**sought** 17:2

**sound** 60:1 100:21

**sounding** 151:20

**sounds** 60:2

**Soup** 92:7,17,21,23,25 94:16

**south** 50:25 116:15 154:8 186:16

**southbound** 51:1

**southern** 12:12 27:2 86:11 116:4

**spaced** 139:7

**spare** 80:17

**speak** 41:25 42:2 45:6 140:15 154:20
178:21 187:10 220:17 229:6,10

**speaking** 38:22 43:14 46:20 71:17 92:
146:7,16 151:25 171:23 226:16

**speaks** 220:5

**special** 40:2 212:3 215:16 227:17 229:

**specific** 14:16,19 26:5 28:24 29:4 30:
31:12 39:4,12 49:5 52:7,17 63:6 81:24
93:1 95:8 100:24 102:16 103:24 104:
114:10 132:20,22 134:15 142:15,18
143:16 157:6 160:3 162:16 193:10
194:22 195:4 196:20 216:23 219:11,17,
24 230:12,17,21,23

**specifically** 15:25 17:7 49:4 91:25 96:
99:20 100:2 165:7 215:17 224:16 234:
239:15

**specifications** 31:1 52:19

**specifics** 30:13 167:13

**specifies** 79:13

**speculate** 41:3

**sped** 51:4

**speed** 51:5

**speeding** 52:5,13,18 86:25

**spell** 10:7 25:18 54:20

**spelled** 132:7

**spend** 56:14,22 57:14 72:12

**spending** 56:21

**spent** 72:17

**spine** 163:1 164:19

**split** 53:25 62:15

**spoke** 33:18 42:8 84:3 105:7,20 107:13
112:23 187:6,8 188:1 202:1,2 228:16
229:15 235:7,22 237:22

**spoken** 42:12 235:5

**spontaneously** 14:12 174:2

**spray** 13:19 15:11,12,14,16,17,19,21,23,
25 16:1,4,8,11,15,17,18,21 17:5,12,1
157:14,17 158:11,21 159:7,9,15,23
160:2,12 161:6,7,8

**sprayed** 17:18,19,20

**spraying** 161:5

**squad** 52:25 53:4,9,10,13 54:4 59:25
75:5,8,22 85:13 240:4

**squads** 52:23 53:4

**square** 202:16

**squirm** 153:9

**SR** 53:24 54:1

**staff** 25:5,8 175:6 180:6 220:15 221:3

**stand** 183:4

**Standard** 209:6

**standing** 111:24 121:5 135:17 188:23

**standpoint** 144:14

**stands** 205:15

**starred** 39:20

**start** 11:2 37:13 38:25 43:13 100:9,12
115:7 119:4,6 152:6,9 175:11 209:18

**started** 19:9 29:17,19 32:2,7 38:14,24
39:13 41:10,12 45:5 53:1 54:23 75:18
110:15 152:19 157:1,3,8 166:18 202:4
239:7

**starting** 156:25 227:21

**starts** 196:7

**state** 9:16 10:5 18:11 34:18 78:6,7 88:13
101:8,9 116:6,23 160:15 203:13 208:10
214:21 216:10 243:4,9 244:16

**stated** 34:11,13 36:3 44:11 47:13 50:12
57:24 58:5,8 99:15 109:16 110:14 117:1
120:25 140:2 162:10 172:23 173:12
183:1 215:23

**statement** 9:1 33:12,13 90:18 92:10,13
95:24 96:10 101:12 104:14,24 107:15
108:3,11 109:8,11 110:8,9 111:3,10
118:3 121:22 122:10,11,22 124:18,19
130:7,16,19 132:11 183:4 217:9 218:13
220:19,24 224:10,12,23

**statements** 26:24 27:1 90:7 97:8 147:14
198:14 222:1,4,8,16,18,19 223:4 238:11,
17,19 239:24

**states** 220:11

**stating** 8:21 129:7

**stationary** 119:25

**stationed** 117:3

**statute** 79:13 153:20

**statutory** 79:6,9,15

**stay** 30:11 51:7 56:2,4 112:2

**stayed** 56:24 77:13

**stays** 57:16

**steady** 157:23

**step** 108:16 151:7

**step-by-step** 162:4

**stepping** 22:17 162:17

**steps** 162:16

**stock** 46:13

**stomping** 92:15

**stop** 10:24 48:25 52:9 80:24 81:25 82:1,
9,18,24 86:17,21 90:23 91:4 102:17,18
103:21 105:21 106:2,12,13,14,18,19,22
110:22 111:4 119:10 128:10 183:22
184:12,24 185:17,20 233:11,17

**stopped** 48:24 52:17 65:2 73:14 86:4,16
102:24 105:10 118:19,20 121:13 137:12
138:3

**stopping** 52:13 84:19 96:2,12,15,22 121:17,21,24 122:2

**stops** 48:19 52:6,20 86:14 100:20 102:14,21 105:9,22,23 106:7,9 107:17 122:4,7

**story** 121:6

**straight** 151:21 162:21,23 168:24 214:3

**stream** 157:23

**Street** 131:9,15,22,25

**strikes** 14:11

**stronger** 171:4

**studied** 11:15

**studies** 12:12,15,17,19

**study** 11:14

**stuff** 31:15 40:19 45:7 49:7 67:4,13 97:9 136:12 143:7 149:6 150:3 198:16 235:23

**stuns** 14:11

**stupid** 48:12

**sub-development** 138:23

**subject** 113:10 115:19 156:19 168:11

**submitted** 39:18 41:4 98:18,20 106:20, 21 206:9

**submitting** 57:12

**subordinates** 15:2

**Subsection** 218:8

**substance** 87:4

**substances** 10:23

**substantial** 97:1

**substantiated** 105:22,24 206:3,10,19 207:24 208:20

**successful** 25:16 30:6

**sucking** 238:22

**sudden** 40:17,23

**sue** 179:3,11 180:9,18 181:10 230:10

**sued** 179:15,18 216:8

**suffer** 204:4

**suffered** 151:6

**suggest** 70:18

**suing** 179:14 180:13,14

**summer** 53:23 177:9 193:8,10,11 221:8

**summon** 236:25

**summons** 45:3 46:1,8 80:2,9,11,13,17 20,23 81:4,6,21 82:19 83:16 85:19 88:12 90:12,24 91:5 96:3,16 100:19 110:16,19 22,23 111:4 184:3 219:19,21 236:19,22, 23 237:5,7,9

**summonses** 81:17 82:2,9 83:9

**super** 114:15

**superior** 130:17

**superiors** 130:3,21,25

**Superman** 236:1

**supervision** 66:6 239:6 241:2

**supervisor** 45:10,11 51:14,17 66:18 70:2 114:15 141:13,14 142:19 143:23 144:3 145:16,20 241:15

**supervisors** 24:17 51:23 56:18 82:6 92:5 141:10 142:9 148:13 228:16

**supervisory** 186:9

**support** 184:2

**supposed** 83:20 173:7 175:3

**surely** 86:8,9,20

**surety** 226:6

**surrounding** 26:4

**surveillance** 18:9 128:23,24

**suspect** 87:3

**suspended** 84:13 110:11 113:1,4 115:16,17 116:22 122:20 175:22

**suspension** 99:8 100:5 101:24 121:18 122:9,14,21,23 196:18 197:22 238:6 242:2

**suspensions** 24:4 198:18

**suspicion** 52:8

**sustaining** 234:16

**Sutton** 235:1

**swap** 33:5 60:9,12

**swapped** 35:9

**swapping** 33:5

**swear** 80:17 237:11

**swearing-in** 27:9

**switch** 35:6,7 67:11

**switching** 33:5

**sworn** 9:16 25:10 27:1,9,12 159:19 160:23 199:4,8 243:9

**symbols** 199:17

**system** 26:25 43:20 46:21 136:18

---

**T**

---

**T-E-R-R-Y** 62:6

**takedown** 151:2 153:4 158:11 161:19 162:3,7 167:10,19 168:24 214:3

**takes** 68:15

**taking** 35:7 38:2 41:10 91:25 151:7 152:7

**talk** 22:18 32:1 47:21 55:8,20 57:18,19, 20,24 59:17,20,24 64:5 67:23 69:2 72:14 77:5 81:16 90:15 91:16 92:5 96:11 109:7 14,23 110:6 132:17 133:15 147:17 149:16 157:4,11 168:16 185:22 187:4,14 189:22 190:14 198:24 201:6 209:3 211:12 215:16 216:23 228:11,24 229:3,4 5,10 234:19 235:20

**talked** 35:3 47:22 49:20,21,23 77:4,7,8 84:8 87:10,11 95:22 97:1,9 106:17 110:1 154:17 174:3,21 180:1,2 182:5 187:17, 18,19 197:9 230:8 238:24 241:24

**talking** 20:19 41:21 55:13,19 59:2 61:8 74:5 81:20 93:23 110:15 112:17 113:16 114:2 135:14,16 139:25 142:14 157:10 159:13 167:3 180:23 193:20,21 199:23, 25 209:8 213:20 218:21 228:25

**Tall** 137:7

**tape** 69:7 135:11 136:21 137:20 163:25

**tapes** 69:5 163:8,10,16,19 164:5

**tardiness** 241:11

**target** 219:24

**taser** 13:20,21 18:19

**taught** 15:12 41:15 94:2

**Taylor** 231:5

**teach** 161:6

**team** 53:10

**teams** 52:23

**teamwork** 183:6,7

**technique** 151:1 158:13 162:22,24 164:23 168:11,19

**techniques** 158:7

**telephone** 24:13 114:6

**telling** 59:14 79:3 90:14 97:11 115:2 146:2 154:19 174:22 180:20 213:20 219:25 227:13 228:4 236:4

**tells** 79:10

**temp** 80:12,15

**temporarily** 158:3

**ten** 116:3 121:17 122:9,22 160:4

**ten-day** 122:13

**term** 92:17 180:12 192:17

**terminate** 58:10 187:11

**terminated** 24:6 33:1,22 39:18 57:23 58:1,3,22 59:6,15,16 98:15 99:4 101:9 180:11 181:4 188:1,11 189:25 200:5 201:1,5 206:5 209:5 213:10 221:11

**terminating** 80:13

**termination** 57:10,20 59:23 181:9,12 190:20,24 191:18 194:15 201:8 213:18 215:14

**terminations** 24:4 215:13

**terminology** 30:10 57:13

**terms** 14:9 16:7 30:25 36:13 37:1,12 41:17 49:5 52:16 55:25 56:19,21,23 72:15 76:2 92:25 105:15 111:9 115:1 123:25 129:13 142:18 143:16 154:12 157:6 160:4,23 162:13,16 167:5,12 180:12 182:19 183:15 184:16,22 195:22 198:14 206:3 213:2 238:1 240:6,10 242:24

**Terrence** 62:4

**terroristic** 194:20

**Terry** 53:14 62:4,5,10 63:4 77:1 93:3

**test** 26:17,18,21

**testified** 72:3 107:2 124:17

**testifies** 9:17

**testify** 10:21 71:18 191:11

**testifying** 10:24

**testimony** 8:16 71:13 80:18 116:7 124:17 138:5 174:16 237:12 240:1 243:12,15,20 244:5,9 245:4

**text** 57:1,7,18,19

**texts** 178:25

**that's** 48:22 97:21 146:3 151:15 189:14 199:10 223:6

**Then-captain** 25:25

**then-director** 39:2

**thereof** 243:19

**there's** 185:3

**they're** 61:6 153:19 213:1 242:5

**thin** 39:25 98:24 102:11

**thing** 19:15 66:15 97:11 99:22 113:17 133:19 144:16 157:22 171:2,11 193:18 197:2 206:4 227:6 236:20

**things** 16:6 27:5 31:20 32:21 35:10 40:8 12 41:17 48:1 57:5 58:14 59:10 90:20 93:10 104:1,14 113:22 114:2 119:15 136:12 148:7 151:8,19 169:11 176:1 191:22 194:22 198:16 203:3,7,25 216:21 221:4,20 223:6,9 227:5,14 228:8,23,25 235:15 241:8,16,18

**third-party** 111:1 144:1

**Thomas** 117:1,4

**thoroughness** 231:18

**thought** 24:15 28:2 44:24 45:13 47:6,18 69:9 93:24 110:17 118:13 119:13,24 121:11 130:12,14 135:10 143:24 222:24

**threat** 156:17

**threaten** 108:21

**threatened** 94:7 116:20 176:23 177:1,5 208:24

**threatening** 11:10 181:10,14

**threats** 194:20

**three-hour-plus** 57:17

**three-year** 160:6

**throwing** 11:9

**ticket** 44:21,24,25 45:1,3,14 46:24 47: 3,5,6,7,12,14,15,19 51:21,25 79:25 80:4 5 83:17 133:16,19 135:20,22 219:3,5 220:6,8 236:19

**ticketed** 220:9

**time** 8:4 11:18 14:16,19 15:18 16:11,14 17:24 19:9 20:4 24:12,24 32:13 35:4 38:9,12 39:23 41:23 42:18,24 43:6 46:10 22 49:23 50:24 51:4 53:9,15,21 54:9 55:8,10,20 56:14,21,22 57:14 60:6 66:19 70:21,24 72:12,17 73:4,18,25 74:11,23 75:1,19 76:9,21 77:9 79:7 82:21 83:7,14 85:25 89:13,20 97:4,14 99:13,23 101:15 16 104:20 105:18 106:4,25 107:3 108:21 109:21 115:9 117:12,17,18 124:23 125:1 128:1 129:21 134:25 135:24 138:13,14, 16,18 140:3,10 141:11,12 142:6,12 143:16 144:8 146:4 148:1,11 149:6,20 150:12 152:17 153:21 156:17 159:20 160:3,18 161:1,11 162:5,8 163:23 164:1 165:16,24 166:11,24 167:14 169:19 170:12,15 171:4 181:20,25 182:1 186:24 187:2,22,23,25 190:20 191:18 193:6 194:4,11,24 196:20 198:3 201:9,25 209:20 210:13,21 211:17 213:7 217:17, 23 221:8 223:8 227:18 229:6 233:7 236:5,6,11,14 238:15 241:11 242:21 243:7 244:9

**times** 19:23 31:18,25 48:18 50:18 55:23 56:18 72:14,21,24 73:2,17,18 76:12 85:2 88:25 95:19,23 97:5 130:14 142:5 143:1 145:14 151:5 159:22,24 160:2,5,8 169:1 174:16 176:23 177:4,6,7 182:8,9,10 189:10 196:8,9 203:23 208:24 214:19 217:23 224:13,15 244:6

**timestamp** 127:4,15

**Tiny** 93:4

**tip** 23:4 54:14 196:5

**tissue** 47:14

**title** 18:7 28:22 178:10

**toboggan** 200:1

**today** 10:21 21:18,25 45:11 151:17 232:4

**told** 16:6,20,22 21:24 24:25 25:3,6,15 26:16,18,23 27:6 28:6 29:10 30:5 32:12, 16 33:21,23 35:11 36:7 37:24 39:14 43:16,17,21,25 44:10,19 45:2,6,16 46:9, 10 50:19 51:2,6,7,19 57:22,24 58:7,11, 18 218,20,21,22,23 59:12,18 60:4,14,17,18

61:1,11,22 62:10,16,19 63:4 64:2,20, 24 65:5 66:22 67:17,25 68:1,4 69:13 79:1 80:25 81:5,13 82:5,22,24 83:7, 85:7,9 87:13 90:4,5 91:15,23 92:20 11,13,19 97:5 102:23 104:11,17 105:15 106:8 112:2,6,20 121:2,5,16,20,24 124:5 127:24 130:21,25 133:16 135:6 140:17 141:1,3,16 142:19,21 143:25 145:15 149:8,21,23 150:4,17 154:21 156:11 158:23 165:14,22,25 167:9,10 172:5 11,14,24 174:4 176:14,17 177:13,14, 22,23 178:2 180:7,21 181:17,23 182:21 186:4 188:2,17 189:6,12,16,25 190:4,5, 13,14 191:2 192:5,19 193:3 194:19 196:10 197:7,9,16 200:11,6,19,20,21 201:6 213:12 214:5,7 216:17 218:14 219:2 220:20,22,25 221:2 222:19 223:7 227:23 228:4 229:5,9,13,14 230:16 234:1,3,7,13,18 239:4

**tone** 152:1,2

**tones** 116:10

**tongue** 23:4 54:14 196:5

**top** 40:11 54:13 95:1,5 127:4 134:7,17 170:25 188:6 199:22 204:25 215:3 216:22 221:20 223:6,10

**topic** 78:2 131:7

**Torrance** 53:14 62:4,6,10,15,18,20 64:25 76:2,20 77:1 93:3

**totality** 14:23

**touch** 149:7

**touched** 76:9

**traffic** 42:13 43:8 46:9,10,16 48:19 49:10,13 50:2,10 51:11,13 52:6,20 78:24 79:1,2,15,17,21 81:18,21,22 82:1,2, 10,18 83:8 84:25 86:14 88:12 90:12,21 91:5 94:25 95:2,5,14,16,17 96:4,7 97:8, 11 100:18,19 102:17,21 103:2,5,10,11,25 105:9,22 106:9,12,18,19,22 107:17 110:23 113:25 114:1 116:1 119:11 120: 6 125:10 132:4,23 137:12 183:22 184:7, 12,24 185:4,5,11,17,19,20 219:19,20 236:19

**train** 16:23 32:14 161:8

**trained** 13:4,5,24 15:17 16:17 17:9,10, 11 32:18 158:22 160:9,11,14,15,19,21

**trainee** 34:12

**trainees** 32:21

**training** 12:1,2,5,6,9 13:3,8,12,16 16:20,22 17:1,3,5,17 32:4,6 34:6 37:5,8 38:25 39:14 41:10,12,22 42:15 47:23 49:18,20 50:10 53:8 55:5 60:8 94:24,25 95:5 102:14,20,24 103:1 157:18,20 158:6,7,8,25 161:3,20 162:6,18,20 163:13 169:8 217:18 239:12

**transcribed** 245:4

**transfer** 59:24 60:3 61:3,14 63:10 64:1, 7,22 65:7,18 66:4 68:12 71:5,11,23 72:5 75:3 77:18 175:25 198:12 240:22

**transferred** 1:11 23:1 59:25 60:6,16, 24 63:16,18 64:17 68:5 72:10,11 74:10 75:4,10 77:11 107:9 217:12 240:4,20,24

**transport** 155:1 166:25 172:17

**trash** 45:17

**treatment** 231:24

**trigger** 81:24 132:4

**triggered** 198:17

**trooper** 78:6,8 117:1,2,4

**troopers** 116:6,23

**Trooper's** 34:18

**trouble** 43:22

**truck** 137:8

**true** 58:17 97:12 107:2,19 124:19 130:24 156:9 170:5,8 182:21 183:2 196:25 202:6 218:13 220:19,24

**trumped** 231:17

**truth** 9:16,17 60:19,22,23 131:19 243:10

**truthful** 44:1

**truthfully** 156:20

**tuition** 232:12,15

**turn** 87:14,25 89:11 104:3 117:15,21,22 118:19,21 121:8,13 125:6 128:10 129:11, 18 130:2,17 135:13 223:24 225:8

**turned** 27:5 67:7 118:3,5,11,13,14 119:10,15 121:1,7 128:13 130:4,5,7,10, 13,14,22,25 131:1 183:20 206:15

**turning** 104:19 118:1 121:12 135:15

**twisted** 109:18

**two-and-a-half** 2:15 50:7 239:12

**two-year** 29:8,11 232:23

**type** 13:3 31:9 80:15 87:3 128:21 132:3 173:16 198:9

**typed** 39:20

**types** 12:22 13:24 48:25 49:19

**typo** 105:7

## U

**uh-huh** 10:3 231:3 240:18

**ultimate** 14:10

**ultimately** 68:15

**unable** 16:8 21:22 30:22 31:5,22 51:10 52:19 53:25 69:12 167:5 232:25

**unbecoming** 15:18

**uncertified** 48:15 53:15,17,18 122:5

**uncommon** 18:9 128:22 153:24

**uncooperative** 45:8 152:10,22,23

**undersigned** 243:16

**understand** 49:9 71:11 137:23 219:23

**understood** 16:14 37:7 49:18 218:23 219:25

**unemployment** 9:20 39:19 40:17 41:4 58:14 133:4 222:8,17

**unfortunate** 51:3 183:14

**unicorn** 239:10

**unit** 183:5

**university** 11:10,13 12:13,14 17:25 19:9,17 27:3

**unjustifiably** 125:22

**unlawfully** 153:1

**unnecessary** 38:8

**unpack** 35:10

**unprofessional** 11:8 194:21 217:24

**untruthful** 140:15 205:7,9,14

**upper** 104:15 123:18 153:4 162:12 168:2 170:25 206:14

**upset** 44:5

**utter** 114:12

**uttered** 174:2

---

**V**

**vacancies** 23:8

**Vance** 8:7 15:21 16:15 17:6 19:20 22:19, 24 27:13 29:12,16 30:8,15,17 31:19 33:10 37:15,17 38:15 39:11,12 41:3,17 49:3 50:17 54:24 57:16,21 98:15,19 100:12 102:25 105:11,16 116:5 117:3 131:9 153:22 201:11 202:5 203:20 204:3 207:12 210:20 211:10 212:21,23 213:11 214:25 215:14 216:6,13 224:24 227:3,9, 13,25 228:11,12,15,17 229:17 230:1,14, 18 231:9,10,13,24 235:15

**VCSO** 221:11 233:10,17 235:6

**vehicle** 49:2 50:8 86:16 102:14 103:21 117:6 120:23 126:9 132:19 134:2,18 135:1,5 151:24,25 171:20

**vehicles** 106:2 121:17,21,24

**vengeance** 239:17

**venture** 230:24

**verbal** 30:16 43:13 88:9 108:9 113:19 115:14,21 116:7,24 174:15

**verbally** 8:15 14:5 31:2 88:8 153:13

**verbatim** 104:2 135:24 165:9 167:5,7 169:13

**verification** 22:14,15

**verified** 137:2

**verify** 43:20,23 44:3,6 136:19

**Veronica** 69:18 70:2 72:1

**versa** 240:23

**versus** 8:7 20:1 65:25 110:11 145:22

**vetted** 211:7 212:2

**vice** 240:23

**video** 8:15 118:7 122:14 126:5,7,8,13,23, 24 127:1,2,3,4 128:3,4,5,12,14,20,24 130:1,15,18 131:3,6 132:3 243:6,12

**videos** 118:9 126:11

**view** 105:11,16 209:6

**viewing** 126:24

**VII** 178:11

**violated** 84:25 195:25

**violating** 88:13 98:17 206:6

**violation** 49:11 52:19 80:1 81:18,21,23 95:2 96:3,23 102:17 105:9,14 137:12 157:19 177:18 185:19 205:17

**violations** 48:25 49:3 82:10 90:12,24 132:10 132:23 133:20 134:4,8,10,11 185:11,15 220:7

**virtually** 236:20

**visit** 147:6,7,8 182:2,11

**visited** 72:23 146:18 147:2

**visitor** 112:7

**volunteering** 14:25

---

**W**

**Waffle** 93:3

**wait** 71:15 73:24 119:17,19 181:2 235:22

**waited** 133:12

**waiting** 48:6

**waive** 8:19

**Wake** 233:21

**walk** 38:23 79:24 84:17 108:16 199:16

**walked** 24:24 25:1 92:9,11 148:25 149:12 152:3 200:21

**Wallace** 68:20 148:16 190:17 198:5 222:6 223:11

**wanted** 33:8 44:8,16,17 46:13 47:7,15, 21 51:22 58:9,25 59:5,7 75:14 110:8,9 119:16 121:12 150:1 177:12 189:9 197:8 200:15 201:4 208:18 213:10

**wanting** 59:2 62:8 103:12 217:24

**warning** 43:19 84:3,6 100:4 123:15,17 197:22 238:5 242:1

**warrant** 44:7 46:21 133:24 141:7 143:11,21 144:4 145:21 150:11 151:9 153:15,18,23,25 154:2,3,6,8 156:7,8,12 181:19,23,24 182:6,13,22,23,25 183:6,8, 10,12 186:14,16 237:1

**warrants** 41:16 42:13 46:16 49:21 50:5 100:19 133:1,24 137:2,11 138:2,10

**139:18 140:1 141:8,10,15,17,20,21,22,24 142:2,4,19 143:9,14,15 144:16,18,22 149:9,22,23 155:25 184:1,2,3,19,25 185:25 214:1

**Warren** 50:4

**Warrenton** 16:8

**wasn't** 94:13 107:5 177:13

**watch** 62:20 96:19 220:25 221:1

**Watkins** 26:1 58:6,8,22,23 59:14 63:22, 23 64:6 66:25 67:4,10,21 68:1,4 114:13 115:8 172:5,21,23 173:12,22,24 174:2,6, 15,19,22 180:4 187:6,8,17 188:1,15,20, 22 200:21 220:22,25

**waves** 115:22 116:11

**Wayne** 32:18,23,25 33:2,6 34:6,25 35:7, 24 36:2,3,19 37:6 53:8 54:13 61:3,12 62:9,23 64:18 65:25 66:2,3 67:1 70:6 72:12 74:7,16 101:13 103:4,14 104:8,17 202:10

**Wayne's** 73:5

**website** 22:21

**weeds** 64:12 65:2

**week** 29:19 32:8,12 48:15 53:2,3 57:25 61:18 69:8

**weeks** 32:15 50:7 60:10 68:2 94:24 99:3, 3 16 171:3 239:13

**Welborn** 117:25 120:23 121:2 122:16, 20 140:11,16,17 142:20,21 148:4,11 155:24 156:9,11 165:13,17,18 166:4,11 167:2 171:22 172:16 176:3,5 183:1,7 186:4 188:2,4 191:25 192:11 194:10,14 195:24 196:3,13,18,25 201:23 220:20

**Welborn's** 68:6

**welcomed** 75:11

**Welding** 24:12 25:25

**Weldon** 57:23 68:20 148:16 180:1 188:19 190:4,16 198:4,20 200:21,22 201:6 222:6 223:11

**we'd** 150:12 152:17

**we're** 103:10 208:4

**whatnot** 36:16 94:8 96:22 97:4 144:13 197:17

**what's** 144:13 163:10

**WHEREOF** 243:21

**whichever** 50:3 53:5,6 118:5 149:10

**white** 8:6,7 9:4,5,12,15,20 10:6 20:1 25:1,4,9 27:8,24 28:6 30:21,23,24 33:9, 15,17,18 35:5 41:24 42:2 43:1,11,14 44:19,24 45:9,10,11 51:19 57:24 61:4,15 62:22 63:11,14 65:25 68:12 75:2 78:3 81:17 82:4 83:15,25 88:8,12,16 94:23 98:6 100:18 103:2 105:8,21,24 107:16,18 109:15 110:13 112:17,23 114:14 118:18 120:25 121:16,18 122:9,19,23 125:6 126:19 127:3 129:25 137:8 145:3,9 148:13,15 155:24 156:4 172:24 174:1 175:7 176:23 177:5 178:18 180:10 182:5 187:3 189:24 191:24,25 192:6 195:2 204:22 206:8 217:25 218:23,25 219:19 16,20 220:6,11,12,13,14,17 221:4,11,14 23 223:2 224:15 229:9,14 241:24 244:3, 216:17

**White's** 22:5,6 64:1 99:18 102:14 126:9 178:19 218:10 220:16

**whites** 217:5

**White's** 28:18 218:23

**whomever** 18:20 144:12 163:22 222:15

**William** 231:5

**win** 179:15

**winter** 200:2

**withdrawal** 181:15

**witnessed** 232:1 244:20

**woman** 88:12 111:23 147:9 164:17 219:20 220:6

**woman's** 118:3

**Womble** 9:22

**won** 133:5 222:9

**word** 16:7 26:6 40:19 58:21 95:8,9,11 111:9 114:10 163:9 190:25 191:2,5,10, 15,22,23 192:5,20,21,23 193:1,3,13,25 194:2,5 234:21

**worded** 137:19

**words** 88:25 91:11,21 103:24 104:2 109:18 111:6 119:22 135:21 142:23 167:5 219:11,17

**work** 12:8 14:18 27:13 29:12 30:15,17, 25 36:15 48:7,8 49:22 50:2 56:11 62:25

66:11,23 72:13,19 75:21 76:5 80:10 112:10 155:17 175:15 178:7 203:9 204:10 218:15,16,17 241:11

**workbook** 203:9,18

**worked** 18:1,14 19:3,8,19 32:24 61:23 66:16 75:16,17 159:18 212:7 223:13 232:2 239:11 241:6

**working** 12:13 18:4,5 32:2 38:15 39:14 54:23 62:13 69:24 73:13,14 94:8 100:9, 12 113:23 160:12 188:15,16 202:5,22 204:6,15 227:3 240:11,20,21 241:13

**workplace** 191:3 193:5

**worried** 174:20

**worries** 110:13 233:14

**worry** 34:1 173:1,5 174:5,11 176:15

**would've** 16:12 135:4,6 164:23 198:17 202:2 240:19,20,22

**wouldn't** 184:5 235:18

**wow** 205:11

**wrapping** 216:24

**wreck** 43:10 120:2 121:9,14 125:11 129:14 130:2,4,6

**write** 40:7 133:16,18 172:6 202:20 203:7,14,17

**write-up** 82:12,13 91:1,2 113:6 124:1 175:21 182:4 185:13 197:19,20,23 228:25 229:1

**write-ups** 66:13 198:18 229:2

**writing** 29:18 37:2 130:7 148:17 203:10 239:9

**written** 39:20 40:1,4,13 58:17 84:3,5 89:12 100:4 110:8,9 123:15,17 196:4,8 197:8,21 238:3,5 242:1,3

**wrong** 44:14 62:5 66:20 69:13,18 88:5 112:19 114:16 149:14 151:5 166:3,6,10 169:18 205:9 212:15,25 213:2 219:21

**wrongfully** 241:20

**wrote** 40:3,6 82:11,13 84:11 89:20 96:10 104:14,25 110:10 216:20 221:5

---

**Y**

**yards** 139:12

**year** 11:10 207:9

**years** 28:10 29:6,12,16 30:7,12,15,17 31:3 49:7 78:9,11 117:13

**yelling** 91:17,20 151:20 152:1

**yellow** 85:2

**young** 25:2 44:18 111:23 118:3

**you'd** 237:19

**you'll** 134:16

**you're** 15:4 86:25 145:13

---

**Z**

**Zachary** 106:24

**zoom** 22:14 108:1 120:19 224:4

W. Bullock Dep.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:19-cv-00467-BO

JUSTIN J. WHITE,

    Plaintiff,

    vs.

VANCE COUNTY, NORTH CAROLINA;
VANCE COUNTY SHERIFF'S OFFICE;
PETER WHITE, in his official
and individual capacities;
LAWRENCE D. BULLOCK, in his
official and individual
capacities; and WELDON WALLACE
BULLOCK, in his official and
individual capacities,

    Defendants.

**CERTIFIED TRANSCRIPT**

(taken via Zoom)

        Oral deposition of WELDON WALLACE BULLOCK,

located in Vance County, North Carolina, taken by

Plaintiff on Thursday, February 25, 2021, commencing

at 10:06 a.m., before Janet Cooper Haas, a Registered

Professional Reporter and Notary Public located in

Charlotte, Mecklenburg County, North Carolina.





Page 2

```
 1   APPEARANCES:
 2   LAW OFFICES OF SHARIKA M. ROBINSON, PLLC
     BY:  SHARIKA M. ROBINSON, ESQUIRE
 3       MICHAEL McGURL, ESQUIRE
     10230 Berkeley Place Drive
 4   Suite 220
     Charlotte, North Carolina  28262
 5   704.561.6771
     srobinson@sharikamrobinsonlaw.com
 6   mmcgurl@sharikamrobinsonlaw.com
         Counsel for Plaintiff (via Zoom)
 7
 8   WOMBLE BOND DICKINSON
     BY:  CHRISTOPHER J. GEIS, ESQUIRE
 9       LOUISA C. CLARK, ESQUIRE
     One West 4th Street
10   Winston-Salem, North Carolina  27101
     336.721.3543
11   chris.geis@wbd-us.com
     louisa.clark@wbd-us.com
12       Counsel for Defendants (via Zoom)
13
     ALSO PRESENT:
14
     Peter White, Defendant
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            EXAMINATION INDEX
 2   WELDON WALLACE BULLOCK (via Zoom)
 3      BY MS. ROBINSON
 4
 5            EXHIBIT INDEX
 6                                    MARKED
 7   Exhibit 1  3-4-17 J. White VCSO application    21
 8   Exhibit 2  J. White background check letters   21
 9   Exhibit 3  Directive B.9, Use of Force         46
10   Exhibit 4  J. White use-of-force administrative 48
                investigation
11
     Exhibit 5  BLET subject control/arrest techniques 66
12
     Exhibit 6  Directive F.13, Use of Canines      74
13
     Exhibit 7  8-20-18 A. Hight employee counseling 86
14              record
15   Exhibit 8  9-6-18 W. Bullock firearms          89
                qualification record instructions
16
     Exhibit 9  9-6-18 use-of-deadly-force handout  90
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          P R O C E E D I N G S
 2      Pursuant to NCGS 10B-25, WELDON WALLACE BULL
 3   having been duly sworn remotely, was examined and
 4   testified as follows:
 5              EXAMINATION
 6   BY MS. ROBINSON:
 7      Q.   Good morning, Mr. Bullock.  I'm not goi
 8   repeat what I just said.  Okay?  But I did want t
 9   introduce myself as Sharika Robinson.  I have my
10   colleague, Michael McGurl -- he's here also and w
11   be participating.
12           Have you ever been deposed before or a
13   witness?
14      A.   Yes, ma'am.
15      Q.   You have?  Okay.  So you know the drill
16   then.  The reporter -- everybody asks that you an
17   questions in "yes" or "no."  And for purposes of
18   I will refer to Mr. White, the Plaintiff, as
19   "Mr. White" and Sheriff White, the sheriff, as
20   "Sheriff White" so there's no confusion.
21           Is there any way that you would like fo
22   to refer to you?
23      A.   Mr. Bullock is fine.
24      Q.   Mr. Bullock?  So we don't confuse the t
25   Bullocks.  Okay.
```

Page 5

```
 1           So are you prepared to testify?  Have y
 2   you're free of medications, free of anything that
 3   would impair your testimony today?
 4      A.   Yes.
 5      Q.   Okay.  So will you state your name for
 6   record.
 7      A.   Weldon Bullock.
 8      Q.   And your birthdate?
 9      A.   March 28th, 1967.
10      Q.   Okay.  Can you tell me your address.
11      A.   1029 Wood Owl Way in Durham, North Caro
12      Q.   Okay.  Have you always resided in North
13   Carolina?
14      A.   For a brief period of time, I wasn't.
15   in New Jersey.
16      Q.   What about high school?  Where did you
17   high school?
18      A.   In North Carolina.
19      Q.   Can you tell me the name of that.
20      A.   Vance Senior High.
21      Q.   Yes.  And did you go to college?
22      A.   I did.
23      Q.   Where did you go to college?
24      A.   North Carolina Central University.
25      Q.   Okay.  And what did you major in?
```



(866) 715-7770
advancedONE.com

Page 6

```
1     A.  Criminal justice.
2     Q.  Did you seek any education after your
3  bachelor's degree?
4     A.  I briefly started on my master's
5  education, but I didn't complete it.
6     Q.  Okay.  And where was that at?
7     A.  At North Carolina Central University.
8     Q.  Okay.  So can you tell me about your career
9  as a police officer or as a sheriff's deputy or -- so
10  after college, where did you work?
11     A.  I was recruited by the U.S. Drug Enforcement
12  Administration out of Newark, New Jersey.  I worked
13  with them briefly as an intern.  And then I came back
14  to Vance County, and I worked for the Vance County
15  school system probably less than three years, and
16  then in 1992, I started working at the Vance County
17  Sheriff's Office.
18     Q.  Okay.  What was your position initially?
19     A.  Deputy sheriff.
20     Q.  How long were you a deputy sheriff?
21     A.  I think my first promotion was to an
22  investigator, and that was in 1997.  So from was
23  worked the road as a deputy sheriff as a patrol
24  deputy.  Then I was switched to the civil division.  I
25  worked in the civil division for a little while, and
```

Page 7

```
1  then I was promoted to investigations.
2     Q.  Okay.  So when you started as a deputy
3  sheriff, were you trained at all?
4     A.  Yes.
5     Q.  Okay.  What type of training did you
6  undergo?
7     A.  I went to the basic law enforcement school
8  here in Vance County, and when I completed that basic
9  law enforcement school, I went through a training
10  phase for about -- I'm not sure of how long, but I
11  had to ride with a sergeant for a while, and then
12  once I finished that training phase, then I sort
13  of on my own.
14     Q.  Okay.  "For a while," would you say a week
15  or two weeks or --
16     A.  No.  It -- it was -- it was at least a few
17  months, a minimum of two months.  It might have been
18  longer, and I don't know how long it was.
19     Q.  Okay.  So you mentioned that you started
20  at -- so you started as a deputy sheriff, and you did
21  a little patrol.
22     Can you explain what that entailed.
23     A.  You was assigned to a district and were
24  would answer calls that were given to you.  You would
25  do things like transport mental patients.  You would
```

Page 8

```
1  work court.  You would serve your warrants and se...
2  your criminal papers from some of the subpoenas.
3  Sometimes there were papers.
4     Q.  Okay.  And so we're at -- 1992 is when
5  started at Vance County Sheriff's Office, and the...
6  were promoted in 1997 to patrol.
7     And what happened next in your career?
8     A.  I was promoted in 1997 to investigation...
9     Q.  So To investigations?  Okay.
10     And what type of investigations?
11     A.  I was promoted to criminal investigatio...
12  and I worked, you know, all types of criminal cas...
13  but I later specialized in child sex abuse.
14     Q.  Okay.  And how long were you in that
15  position?
16     A.  I was an investigator -- I was an
17  investigator until 2005.  I had to serve some act...
18  supervisor roles in investigation, but I don't kn...
19  when those dates were.  But once I came out of
20  investigations, I came out of investigations and t...
21  promoted to a lieutenant in administration, and t...
22  was either 2004 or 2005.  I'm not quite sure of t...
23  I mean, I'm not quite sure of the year.
24     Q.  All right.  And as a lieutenant, what w...
25  your job duties?
```

Page 9

```
1     A.  I was an administrative lieutenant.  I...
2  records.  I was -- I believe I was doing thi...
3  in evidence.  I was over the civil division.  I c...
4  administrative investigations.  Well, I actually...
5  administrative investigations as early as -- in m...
6  since my criminal -- that's my investigative posi...
7  So I continued doing those type investigations.
8  Right now, that's what's coming to mind.
9     Q.  In terms of the obligations?
10     A.  Uh-huh.
11     Q.  So you said that you were over evidence...
12  What does that mean?
13     A.  When deputies or investigators, offices...
14  the sheriff's office collected evidence on the sc...
15  I was the person they turned it in to, and I was...
16  charge of the evidence room.
17     Q.  Okay.  And how long were you in that
18  position?
19     A.  I started as an investigator, and I don...
20  what year.  And in some form or fashion, I w...
21  involved with it until I retired.
22     Q.  Okay.  Did you ever go to court when yo...
23  were in that position?
24     A.  You would I did.
25  You would  Is that where you were primarily depose...
```



**Page 10**

1   A.  No.  I've been deposed on -- when they
2   "go to court," I went to court in criminal cases to
3   testify in criminal cases.
4   Q.  Okay.
5   A.  Things from homicide to break-ins, having the
6   sex abuse cases.
7   Q.  Okay.  So I'm going to come back to you
8   saying that you were specifically over evidence.
9       When you were in that position, did you ever
10  misplace or lose evidence?
11  A.  No.  I never misplace or lose evidence.
12  Q.  Had evidence ever been misplaced or lost in
13  Vance County?
14  A.  Yes.
15  Q.  In what situation?
16  A.  I can remember one time one of the drug
17  officers, what he -- what he noted on the sealed
18  envelope as far as the money -- what he noted was an
19  amount that wasn't in the sealed envelope.  When the
20  lawyer and I sat down and opened the sealed envelope,
21  it was, like, $20 short.
22      I remember an incident where a gun was taken
23  from an investigative scene out in the public that
24  never -- it was never turned in to evidence.  I
25  received it into evidence.  And even though I never

**Page 11**

1   received it into evidence, it was still something that
2   the Vance County Sheriff's Office at some point had
3   control over, even though it never made it into the
4   evidence room.
5       And then I remember an incident where a
6   deputy took a gun off of somebody, and that never got
7   into evidence.  It never made it into evidence.
8   Q.  Why would items never make it into evidence?
9   A.  I can't answer that.  I can't answer why --
10  why somebody else did something, that they didn't turn
11  it in.  I was the one responsible for it once it got
12  into evidence.
13  Q.  Okay.  But did situations like that -- event
14  happen before at Vance County -- in Vance County?
15  A.  Yes, ma'am.
16  Q.  Okay.  So let's change gears a little bit
17  and discuss the current hiring process at the Vance
18  County Sheriff's Office.
19  A.  I don't know anything about the current
20  hiring process.  I don't -- I'm retired.
21  Q.  Well, when you were there.  I don't -- okay.
22  I don't want you to speak for, you know, Sheriff Brame
23  and what he does.
24  A.  Okay.
25  Q.  So when you were there, what was the typical

**Page 12**

1   when hiring process of a sheriff's deputy?
2   A.  We would have an in-house application that
3   someone may turn in, or sometimes they would go
4   and turn in the F-3 form without going -- having
5   -- having the in-house application done.  I would do
6   criminal background check, a pre-employment crimi...
7   background check, on the applicant, and then we w...
8   the applicant up for an interview.
9       The applicant would come in for an inte...
10  as little as one time, as many maybe as three tim...
11  you know, according to what the circumstances are...
12  ..., that was a three-person panel intervie...
13  and then once that process is complete, then we w...
14  make our recommendations to the sheriff and then ...
15  whether or not to hire or not to hire or our opin...
16  Q.  Who is "we"?  Was there a specific pane...
17  designated panel?
18  A.  Yes.  So, typically -- and I don't reme...
19  over the years.  But, typically, there w...
20  lieutenant, myself, and maybe a captain or anothe...
21  lieutenant.  So I don't know who they were, you k...
22  every single time, but there's typically three pe...
23  that -- Lieutenant Shearin was one of them that I...
24  remember and Watkins.  I don't know if he was a...
25  captain or lieutenant over time.  He might have b...

**Page 13**

1   something that You know, at some point, he might have...
2   point lieutenant.  Then he might have been a captain.
3   in the use of names without the rank, Shearin has do...
4   it, Watkins has done it, I believe Shelton has do...
5   Stainback has done it.
6       So over the years, there have been diff...
7   people that -- along with me who have performed t...
8   Q.  -- But it's been primarily lieutenants?
9   A.  Primarily, the lieutenants or higher.
10  Q.  Primarily, the lieutenants or higher.
11  Q.  Can you help me understand just the
12  structure of the Vance County Sheriff's Office.
13  I've been in law enforcement at all.  Just pretend
14  I know nothing about law enforcement from a -- wh...
15  are the particular roles?  Lieutenant, deputy --
16  deputy, lieutenant, captain or --
17  A.  So the -- starting from the lower level...
18  going up through the ranks, you may have a person
19  -- who's hired and not gone through BLET yet.
20  I would hire that person, offer the person a job...
21  son may be with us and then go through BL...
22  that's -- you know, the kind of termino...
23  for that is -- you know, that's, like, a candidat...
24  a new hire or, you know, however you want to do i...
25  ...on may be working with us as a sworn off...



AdvancedONE LEGAL        (866) 715-7770
                         advancedONE.com

Page 14

1  but hadn't done the state basic law enforcement
2  training.  In terms of responsibility, that's probably
3  the lowest level of responsibility.  And then you
4  you're a deputy once you finish out that period of
5  the deputies are the ones that primarily take on the
6  bulk of the calls and do the -- serving the papers and
7  stuff like that.
8       Within that shift over time, in absence of a
9  sergeant, then you may have what's -- what were over
10 as a senior deputy.  And that's a deputy who has more
11 experience than the BLET candidate, has been that
12 long enough to kind of understand the jobs and roles
13 of duty, who may understand the roles of a
14 supervisor but not -- has not been officially promoted
15 to sergeant, which is the next step up.
16      The sergeant is the first-line supervisor
17 that runs the shift, and within that shift, the
18 deputies in which is he supervises on the shift in
19 the same instance where -- on the patrol side in
20 criminal investigations, there may be detectives who,
21 in an instance, would have been promoted.  If you were
22 a deputy and you went to -- as a detective, too,
23 consider that a promotion.
24      Some may say that the -- transferring from
25 sergeant to a detective may be a lateral transfer

Page 15

1  of because the pay is almost the same when you
2  whether it's a promotion or not, but you have
3  nonsupervisory employees working.  It's just a
4  deputies, but they're called investigators.  And the
5  within investigations, you have a supervisor, which is
6  a sergeant, a detective sergeant.
7       On the same line, you may have a civil
8  division.  Within the civil division, you may have
9  deputies working, and then you may have a sergeant
10 working within the civil division.
11      Over time there have been detectives in the
12 drug unit that may or may not have a sergeant
13 supervising them.  Sometimes it was a sergeant,
14 sometimes they weren't.  And then after the sergeant
15 level, then you have the starting of the command staff
16 of lieutenants.
17      In the patrol division, typically which had
18 lieutenants that would supervise two sergeants who
19 supervised however number of deputies that was on the
20 shift.  In investigation, there was a lieutenant who
21 supervised the sergeant, who supervised the
22 investigators on the shift.
23      Then you had a patrol commander, which was a
24 captain.  You had an admin commander, which was the
25 position I served in for a while.  And then you need

Page 16

1  ...times we did and did not have a chief deputy.  Th
2  we probably we had a chief deputy, and the two cap
3  would team up to report to the chief deputy.  The
4  chief deputy was directly to the sheriff.
5       Q.  And so you recently retired.
6  What was your position when you retired
7       A.  I was chief deputy.
8       Q.  Chief deputy?  And so as chief deputy,
9  over -- you were one of those people who would
10 hire and make use-of-force decisions and things o
11 that nature?
12      A.  Yes.  Say that again.
13      Q.  You would hire, make hiring decisions a
14 or recommendations and use-of-force decisions?
15      A.  Well, that -- some of those
16 recommendations I don't -- "decision" might not b
17 the right word.  But some of those recommendations, I
18 shifting that as a captain.
19      Q.  As a captain?
20      A.  Yeah.
21      Q.  But you were definitely doing it as a c
22 deputy, too, also, right, recommendations?
23      A.  Yes.
24      Q.  Okay.  So I would like to talk more ab
25 Mr. White specifically.  Can you -- can you expla

Page 17

1  the hiring process when it came to Mr. White.
2       A.  Just like before, he filled out an
3  application, whether it was in-house or he had an
4  come them.  I don't know which one.  He sat down
5  a panel, and then the panel interviewed him.  I w
6  the one that did his criminal background check.
7       And once we got all of that stuff toget
8  the sheriff made the decision to hire him.
9  once he got hired, he eventually went to the
10 patrol division.
11      Q.  Did you review his application?
12      A.  Yeah.  I would have been the one that l
13 at his -- well, yeah.  I think I was the first on
14 the -- I was the first officer to see his applicat
15 I don't know if the sheriff saw it before I did
16 had it extensively because I was the one that act
17 did his background check.
18      Q.  Okay.  I'm going -- I'm going to pull u
19 application and make sure that this is what you
20 at the
21      Can you take a look at this document.
22      A.  It looks like what I remember to be his
23 That's the form which we used.
24      Q.  Just review it for -- can you scroll --
25 when you need us -- can we continue to scroll?



Page 18

1    A.   Yeah.
2        Q.   **Okay.  Just let us know when to keep going.**
3    A.   Keep going.  Okay.  Okay.  You can go.
4  Okay.  You can go.  Okay.  You can go.  Okay.  You can
5  go.  Okay.  You can go.  You can go.
6        Q.   **That's the last page, Mr. Bullock.**
7    A.   Okay.
8        Q.   **I want to ask you some questions about this**
9  **document.**
10   A.   Okay.
11       Q.   **So you -- can you identify this document?**
12   A.   It's the document that we used as an
13 in-house form to gather information on potential
14 applicants.
15       Q.   **Okay.  And this is Mr. White's application?**
16   A.   I believe it to be.
17       MS. ROBINSON:  Okay.  Michael, can you
18   scroll.  And stop right here.
19 BY MS. ROBINSON:
20       Q.   **Do you see where it says Shaw University?**
21   A.   Yes, ma'am.
22       Q.   **And you see where it says "reason for**
23 **leaving"?  Can you read that to me.**
24   A.   "Terminated."
25       Q.   **And Louisburg College.  Can you read the**

Page 19

1  reason for leaving.
2    A.   Yes.  "Terminated."
3        MS. ROBINSON:  Let's go to the next.  Let's
4    go down a little bit more.
5  BY MS. ROBINSON:
6        Q.   **So is it fair to say that Mr. White**
7  **disclosed that he had been terminated?**
8    A.   Yes, ma'am.
9        Q.   **Okay.  And let's go down.  I have another**
10 **question I want to ask you about this document while**
11 **we're up -- while we have it up.**
12       MS. ROBINSON:  Keep going.  Keep going.
13 BY MS. ROBINSON:
14       Q.   **Can you read the last sentence on this page.**
15   A.   "Are you willing to sign a two-year contract**
16 for employment?"
17       Q.   **And what was his response?**
18   A.   Yes.
19       Q.   **I think that's it for this document.  Let's**
20 **get back to the contract.**
21       **So after you -- after you reviewed**
22 **Mr. White's application, you said you conducted a**
23 **criminal background check?**
24   A.   Yes, ma'am.
25       Q.   **What did that entail?**

Page 20

1    A.   I have to go through DCI and run his
2  criminal record, his driving record.  I have to go
3  request from the clerk of courts anyplace he's ei--
4  Okay -- you know, went to school or graduated from high school
5  and pull the criminal records from the clerk of
6  courts.
7        I think Mr. White had gotten some higher
8  education that might have been outside of North
9  Carolina, and so I might have had to request for
10 criminal histories in those places that he lived and
11 went up school outside of North Carolina.
12       Q.   **So would you say --**
13   A.   His driving record would have been also
14 part of the criminal background check.
15       Q.   **Would you say it was a pretty extensive**
16 **background check?**
17   A.   I wouldn't say it was extensive.
18       Q.   **You wouldn't say it was?**
19   A.   No.
20       Q.   **Okay.**
21       MS. ROBINSON:  Michael, can you pull up
22 the -- so we're going to mark Exhibit Number --
23       So --
24       MR. GEIS:  I don't think we marked
25 Exhibit Number 1.

Page 21

1        MS. ROBINSON:  Well, let's mark
2    Exhibit Number 1 as Mr. White's application
3    for employment.
4        (Exhibits 1 and 2 were marked for identification.)
5        MS. ROBINSON:  And we sent you this via
6    email, too, Mr. Geis.
7        MR. GEIS:  Well, I didn't get the email
8    and I looked at my emails 30 minutes ago.  You
9    have -- I'm perfectly willing -- or you're perfectly with--
10   their rights to introduce these documents.  I
11   think you should mark them.
12       MS. ROBINSON:  All right.  I want you --
13   want you to have them.  Okay?  And you do have--
14   them.  So if you need to take a break and ch--
15   your email, please let me know.
16       MR. GEIS:  We will take a break.  We'll
17   about a ten-minute break.  Thank you.
18       Thank you.
19       (Recess in proceedings from 10:35 to 11:01 a.m.)
20 BY MS. ROBINSON:
21       Q.   **So, Mr. Bullock, I was asking you about**
22 **Mr. White's background, and I asked whether or not it**
23 **was extensive.  Thank you.  And you said that**
24 **it wasn't extensive.**
25       MS. ROBINSON:  Michael, can you pull up



(866) 715-7770
advancedONE.com

AdvancedONE
LEGAL

Page 22

1     document that shows -- yes.

2   BY MS. ROBINSON:

3       Q.   Can you see that document?

4           MS. ROBINSON:   Let's go to Page 1 -- driving

5       Chris can identify that.

6           MR. GEIS:   You need to read that.

7   BY MS. ROBINSON:

8       Q.   And I'm going to give you a few, It's a

9   23-page document, so I'm going to give you a few

10  you know, as long as you like to look over it.

11      A.   Can I move towards the screen?

12      Q.   Yes, sir.   And, Mr. Bullock, if you would

13  just let him know when to scroll down in the same

14  fashion.

15      A.   You can scroll down.   Okay.

16  Okay.   Okay.   Okay.   Okay.   Okay.   Okay.

17  Put it so I can see the top of it.   Okay.

18  Okay.   Okay.   Okay.   Okay.   Okay.   Okay.

19  Okay.   Okay.

20      Q.   And do you recognize this document -- these

21  documents?

22      A.   Yes, ma'am.

23      Q.   And is that your signature on these

24  documents?

25      A.   Yes, ma'am.

Page 23

1       Q.   And can you identify these documents?

2       A.   Those forms -- those AOC forms are a form

3   which I used to reach out to our clerks of courts,

4   requests for criminal background information.

5       Q.   And for purposes of the record, I would just

6   like for you to -- we're going to start from the top

7   and go to -- and then each county that you reached out

8   to.

9           Can you read that county.   Just read the

10  county.

11      A.   Martin County, North Carolina; Merrimack

12  County, New Hampshire; Hillsborough County, New

13  Hampshire; Hillsborough County, New Hampshire.

14          Is that the same document?

15      Q.   That's the same document.

16      A.   Okay.   Wayne County, North Carolina;

17  Franklin County, North Carolina; Wake County, North

18  Carolina; Bertie County, North Carolina; Chowan

19  County, North Carolina; Pasquotank County, North

20  Carolina; Perquimans County, North Carolina; Hertford

21  County, North Carolina; Union County, North Carolina.

22      Q.   I think that was the last county, correct?

23      A.   (The witness nodded.)

24      Q.   And I'm going to ask you some more

25  questions, but I think we're done with these

Page 24

1       documents, this exhibit.

2           And so after reaching out to all those

3       counties, obtaining Mr. White's criminal record,

4       driving record, and other -- and reviewing his

5       application, what questions did you have about his

6       employment?

7       A.   About what?

8       Q.   About his prospects for employment.

9       A.   I don't remember specific questions that

10      We, in general, go over people's work histo[ry]

11      where he went to school, where he lived, any cri[m]

12      if you -- you may have.   We might talk about his

13      in the same -- his history.   We would talk about his employ[ment]

14      history.   We might -- some people we give, like,

15      like, scenarios on how you will respond to a

16      particular scenario.

17          That's what's coming to mind right now.

18      There may be others.

19      Q.   Well, I want you to, if you can recall,

20      want be more specific now about Mr. White.

21          After you performed this background che[ck]

22      him, what was his next step in the employment pro[cess]

23      A.   He would have been sworn in.   And at so[me]

24      point, he'll have a shift.   You know, he might n[ot]

25      have immediately gone to a shift because we're a [...]

Page 25

1       small, poor county.   We might not have uniforms t[...]

2       at this point.   Sometimes cars aren't available a[...]

3       this point.

4           Typically, what happens is there may be

5       I period, depending on when that applicant

6       from the top of uniforms and whatever, other

7       you reached out questions he might have.   Like, he would have

8       go qualify for his service work, so that had to t[...]

9           And so typically what we do when we have p[eople]

10      who are kind of caught in that phase, we have --

11      work -- the sheriff's office is responsible for

12      courthouse security, and so sometimes we'll send

13      people up to the X-ray for an undetermined amount

14      time until all these things come, and then we can

15      him ready to go to a shift.

16          Then once he goes -- if he's -- in his

17      particular case, he was hired to be a deputy.   So

18      know, he would be waiting for a shift assignment

19      on a shift.   Some people we hire, and we have a --

20      like an investigator's opening, and we hire an

21      investigator.   Then an investigator would go stra[ight]

22      to investigation.   But, again, everybody has to w[ait]

23      to get qualified because of what happens at that

24      point.

25          After he's sworn in, he's -- you know, a[...]



AdvancedONE LEGAL         (866) 715-7770
                          advancedONE.com

Page 26

```
 1   a sworn deputy sheriff at that point.
 2       Q.   Okay.  Well, let's rewind.  Let's rewind.
 3            He would have had his panel interview before
 4   you ran his background, or would that panel review
 5   have come afterwards?
 6       A.   No.  I would have ran his background ahead of
 7   the panel review.
 8       Q.   Okay.  So after you ran his background, then
 9   explain what happened next in Mr. White's case, if you
10   can recall.
11       A.   I can't recall specifically.  I can tell you
12   what I generally do.  I can't recall specifically with
13   Mr. White.  But you know, I -- the background on other
14   different forms.  They come in what you see here,
15   Administrative Office of Courts requests, they come
16   through DCI, they come through NCIC, and they come
17   through DMV.
18            So I would have done all those things and
19   this stuff I may have gotten back or may not have
20   gotten back.  I'm caught at the mercy of getting this
21   terms of getting back whatever information I need to
22   get back.  And what -- but all this stuff is compiling
23   and it's always compiling.
24            Mr. White would have had to provide certain
25   documents for us, like his degrees, his
```

Page 28

```
 1   Mr. White specifically, I do not recall how many.
 2   can think of one, though.
 3       Q.   Why would you ever perform three panel
 4   interviews?
 5       A.   Sometimes we get information that we do
 6   have ahead of time sometimes.  Sometimes the appl...
 7   might not have information that we need when we a...
 8   There's just various reasons why we do i...
 9   And, again, a minimum of one that's bee...
10   done.  For an example, what will be an example of
11   a minimum of one, let's say there was an officer wh...
12   worked here before and he went and, say, worked a...
13   another place and then came back shortly after.
14   We might have a panel interview because we...
15   pretty familiar with that particular officer.
16            Sometimes we have people who we've been
17   working with for years, like, at the police
18   department.  This is a small town, who we all --
19   you know, we know.  They might have an interview -- a...
20   the minimum of one.  And some people, for whatever
21   reasons, background, where they live, trying to g...
22   information in, you know, it's just -- it's no --
23   no concrete reason every single time it was done i...
24   a particular way.
25       Q.   Okay.  So moving on.  So Mr. White was
```

Page 27

```
 1   driver's license, social security card.
 2   was a previously sworn law enforcement officer, I
 3   would have had to have gotten his basic law
 4   enforcement certificate.
 5            So at some point in time, all that stuff is
 6   being gathered and compiled as we're going through the
 7   process of trying to get him hired.
 8       Q.   Okay.  But is it safe to say that the panel,
 9   the three panel, would have convened after you
10   received all of the necessary documents?
11       A.   No, no.  Not necessarily.  It's also not
12   safe to say that, because, again, some of this stuff
13   you get back ahead of time; some of this stuff you
14   don't get back ahead of time.  It just depends on when
15   I had time to put it out, when I sat down at the
16   computer and ran the information and that's when the
17   panel interview was.
18            Specifically to Mr. White, I can't tell you
19   how that fell in line.
20       Q.   Okay.  Do you recall Mr. White's panel
21   interview and how many of those interviews he had?
22       A.   I do not.  He had a minimum of one, just
23   like anybody else, they could do one or two.  It just
24   really depends.  And maybe sometimes even three in you
25   know, it depends on certain circumstances.  But
```

Page 29

```
 1   ultimately recommended for hire.
 2       Q.   Who made that recommendation?
 3       A.   The recommendation to hire -- when you
 4   first recommended to hire, we send it to the sher...
 5   that out of training standards.  To training standards,
 6   I made that recommendation.  It should be on a form
 7   that I sent to training standards saying I recomm...
 8       Q.   Okay.  So can you tell me, how does tha...
 9   process work?  Would you recommend him for hire t...
10   sheriff first and then to training standards or --
11       A.   Yeah.  After we finish the last panel
12   interview, then a recommendation would be made to
13   whether to hire or not to hire.
14       Q.   Okay.  And so the recommendation ultima...
15   was recommended to hire Mr. White?
16       A.   Not to the sheriff.
17       Q.   Not to the sheriff?
18       A.   That's correct.
19       Q.   So who recommended Mr. White for hire?
20       A.   Once the panel -- our recommendations i...
21   one, just a recommendation.  Ultimately, the sheriff h...
22   the -- I just say on whether or not we're going to swe...
23   them in.  And I get all the information to training
24   standards.  He has that final say; the panel does...
```



Page 30

1  have that final say.
2      Q.  Okay.  I understand.  I'm just trying to get
3  a timeline together.
4      A.  I don't know the timeline.  I don't know --
5      Q.  So -- but he was ultimately -- we know he
6  was hired.
7          So the panel recommended him to be hired?
8      A.  No, the panel did not recommend him to be
9  hired.
10     Q.  The panel didn't recommend Mr. White to be
11 hired by the sheriff?
12     A.  That's correct.
13     Q.  Okay.  So what did the panel do, then, if it
14 didn't recommend him to be hired?
15     A.  I don't -- maybe I don't understand the
16 question.
17     Q.  Yeah.  If the panel convened and interviewed
18 Mr. White to determine if he was to be recommended to
19 the sheriff to be hired, right, that was the whole
20 purpose of convening the panel, correct?
21     A.  The whole purpose of the panel is to gather
22 information about the applicant so that we can
23 determine whether or not we recommend him to just be
24 or not.
25     Q.  Right.  And that's what I'm saying.

Page 31

1          Did this panel recommend Mr. White for
2  hiring?
3      A.  No.  Not to the sheriff.
4      Q.  Okay.  So what did the panel do, then?
5      A.  We recommended not to hire him.
6      Q.  You recommended the sheriff not to hire
7  Mr. White?
8      A.  That's correct.
9      Q.  And the sheriff went ahead and hired him,
10 anyhow?
11     A.  Yes, ma'am.
12     Q.  Okay.  Can you tell me about that
13 recommendation.
14     A.  I think vaguely we discussed that he had
15 been fired for so many -- from previous jobs that
16 he had, and I think that was the reason why we
17 recommended not to hire him.
18     Q.  Did you-all put that recommendation in
19 writing?
20     A.  I think we walked down to the sheriff and
21 talked to him.
22     Q.  And what did the sheriff say when you said
23 it?
24     A.  He said, "Unless he's killed the president,
25 I'm going to hire him."

Page 32

1      Q.  And who was "we"?  Who is "we"?
2      A.  I'm -- you know, typically we go back in and
3  whoever was with me during the time that we
4  interviewed Mr. White, who -- the gentlemen -- the
5  two of us would go back in -- or two of us, however
6  many it was, would go back in and talk to the she--
7      Q.  But you don't remember who "we" was?
8      A.  No.  I don't remember.
9      Q.  In this particular one, how many -- how many
10 White officers have you recommended in -- or deputies have
11 you recommended not to be hired?
12     A.  I don't have a number.  I've been doing
13 this since 1997.  I couldn't -- there's no -- I have no
14 of knowing.  There have been a lot we recommended
15 to hire.  There have been a lot we've recommended not to
16 hire.
17     Q.  Give me just a roundabout number as in --
18 recommended five?
19     A.  It's -- if you could somehow tally up the
20 amount of applications we've had since 1997 until
21 I left the office.  I mean, I cannot put a number on it
22 because I have no way of formulating how many.  I
23 would just be making up something.
24     Q.  So in 1997, you were in investigation?
25 You sat on panels in 1997 also?

Page 33

1      A.  I did.  I did.  As a matter of fact, th--
2  forms you see, because it was so -- done so
3  haphazardly before, I created these forms.  I'm the --
4  that started the process of coming in and going
5  through -- sitting down and going through a process
6  when I got hired and back under -- not Sheri--
7  White but the other sheriff.  You would walk in,
8  he would shake your hand when you were hired.
9  I was hired that way.  I was hired without
10 even putting an application in.  He said, "You're
11 hired."  I came back to get an application after that
12 process, and I thought that wasn't how the process used
13 to be.  So this particular format you see here is what
14 kind of I came up with that.
15         So I've been doing that type work since
16 1997.
17     Q.  Okay.  Okay.  So when you say -- you're
18 talking about the letter on the sheriff's letterhead?
19     A.  Yes.
20     Q.  Not the court form?
21     A.  No, not the court form.
22     Q.  Okay.  But the court form requesting the
23 background would have been part of the hiring pro--
24 Like, if you're referring to the AOC 31--
25 form --


AdvancedONE LEGAL                    (866) 715-7770
                                     advancedONE.com

Page 34

1    Q.   Yes.
2    A.   Right.  This is something that we done, but
3    I have been at the sheriff's office where this
4    wasn't even done.
5    Q.   Okay.
6    A.   That's why I -- the process had started.
7    Q.   Okay.  Can -- when did that process --
8    did the process of seeking a criminal background check
9    start?  Do you recall that?
10   A.   Well, you have to -- you have to run
11   somebody's criminal background check.  Our
12   standards won't allow you to submit an applicant
13   without a background check being done.  So the
14   background had to be done in some form or fashion.
15        The way in which it was done, you know,
16   early on, even -- even through me, you would call the
17   clerk up and say, "This is me.  Send me the information
18   you've got on this person right here," and they would
19   do it.  But then over time, that didn't -- that
20   didn't wash.  So over time, we had to formally request
21   it in writing and sign it as the requester, and then
22   they would send us the information.
23   Q.   Was that a --
24   A.   The way that started, I don't know, but have
25   know in the beginning, it wasn't that way.

Page 35

1    Q.   Was that due to a change in policy of
2    training standards or policy of Vance County?
3    A.   No.  That was just my own personal taking
4    the bull by the horns and doing it because I just
5    like the way it was done.
6    Q.   Okay.  Okay.  So Mr. White was not
7    recommended but was hired.
8        Do you recall Mr. White when he started at
9    the sheriff's department?  Do you recall any
10   specifics about his employment?
11   A.   No.  Once I -- because he's not coming on my
12   division, I don't -- I wouldn't see him on a
13   day-to-day basis, or I wouldn't interact with him on a
14   day-to-day basis.  You know, I -- once all the
15   paperwork is gone, I don't -- you know, I don't have
16   anything more in terms of directly interacting with
17   him on a day-to-day basis.  I don't have any input that
18   I recall that I could add.
19   Q.   Okay.  How did that make you feel when the
20   sheriff did not take your recommendation?
21   A.   It didn't make me feel any kind of way.
22   That -- it wouldn't be the first time he didn't take
23   my recommendation.
24   Q.   Okay.  How long had he been the sheriff at
25   that point?

Page 36

1    A.   I'm sorry?
2    Q.   How long had he been the sheriff at that
3    point?
4    A.   He became sheriff in '06, I think.  Hold on.
5    '06.  And he stopped being sheriff in 2018.
6    Q.   Okay.  So you said it wasn't the first
7    time.  Can you name an instance in which he did not
8    take your recommendation?
9    A.   He didn't take my recommendation for
10   Mr. White.
11   Q.   Aside from Mr. White.
12   A.   Oh, yes.  There was a young lady named
13   Kimberly Gregory from Durham.
14        MR. GEIS:  You can't talk about any
15   you know, particular person.
16        THE WITNESS:  Oh, okay.  All right.
17   Information  Well, there was a young lady who was from the
18   and they out Durham Police Department that I recommended
19   to.  That the panel recommended to hire, and he didn't
20   request, which stood out.  The reason why that
21   her, and the stands out in my mind is because her training
22   portfolio was really, really thick.  It was
23   thick as this right here, and I thought she
24   know, but have been a good hire.
25   BY MS. ROBINSON:

Page 37

1    Q.   Okay.  So I want to -- I want to understand
2    your role a little more.  I know you sat on these
3    hiring panels, and that was probably one aspect of
4    your role at the time of Mr. White's employment, in
5    particular.  And I've asked you some about it, but
6    you would -- you said that you were in a different
7    division.
8        What division were you in?
9    A.   I was in charge of the administration
10   division and the divisions that are under me.
11   Q.   So what does "administrative" mean,
12   a "administrative division"?
13   A.   I'm responsible for records, like for the
14   DCI records, gun permits, concealed handgun permits,
15   civil papers, criminal investigations, evidence,
16   background information, fingerprints.  I was in of
17   of my division.
18   Q.   So, Mr. Bullock, walk me through, like,
19   the day in your life when -- at the time of
20   Mr. White's employment.
21   A.   I don't know.  I don't know if I can say a
22   typical  day.  I don't know if --
23        MR. GEIS:  Objection.  Relevance.
24   BY MS. ROBINSON:
25   Q.   You can answer the question.  Please answer.



AdvancedONE               (866) 715-7770
LEGAL                     advancedONE.com

---

**Page 38**

1  the question.
2      A.   I would come to work, and I would do my
3  duties as -- you know, I would go over the reports. I
4  would look at them. It was there -- there were times
5  that I might not come to work because I was on a
6  homicide the night before.
7      Q.   What type of reports would you go over?
8      A.   I would go over the incident reports.
9      Q.   Okay. And what is an incident report?
10     A.   It's reports generated by officers when
11  they're assigned a department number to a particular
12  incident, a particular record.
13     Q.   By "incident" and "record," what does that
14  -- does it mean something went wrong? Does it mean
15  something went right? What does that mean, an
16  "incident report"?
17     A.   It means that the sheriff's department was
18  involved in something that required a report to be
19  written. The reports could be on forms that we generate
20  investigation incident reports. The reports start on
21  something on a form called operation reports. It's
22  just -- they have numbers that you can track them and
23  see, you know, who was assigned to it.
24  information was generated through 911,
25  that could be trackable and kind of figure out what

---

**Page 39**

1  happened, what went on. And the deputies would write
2  those reports. And in the mornings, I would come in
3  and I would look at those.
4      Q.   Are there any instances in which an incident
5  report is required to be written?
6      A.   Yes.
7      Q.   What are those instances?
8      A.   A murder, you have to write an incident
9  report. A break-in, you got to write an incident
10  report. A rape, you got to write an incident report.
11  A chase, you got to write an incident report. Use of
12  force, you got to write an incident report. If you
13  got bit by a dog, you got to write an incident report.
14          There's a lot more than I could probably
15  name.
16     Q.   Okay.
17     A.   Those are just examples.
18     Q.   Okay. And what are examples of when you
19  don't have to write an incident report?
20     A.   I don't know how to answer that question.
21  What are examples of when you don't? It's hard for me
22  that that question. It's -- like, if
23  you're driving down the road and you see some trash in
24  the road and you get out of your car and you get the
25  trash out of the road, you wouldn't have to write

---

**Page 40**

1      incident report for that. I don't know.
2      Q.   You wouldn't have to do that at all, right?
3  That's not part of your job. You know, when is the
4  time -- if debris was in the road big enough to
5  that -- that would impede traffic, then, yeah, you would
6      been expected to stop and get that stuff out of the
7  road and move it over to the side.
8      Q.   Okay.
9      A.   You wouldn't write a report for that.
10     Q.   Okay. So you mentioned incident reports.
11  You mentioned use of force.
12          Tell me about your involvement in
13  use-of-force engagements or investigations.
14     A.   Some use-of-force reports would come through
15  in the days that I was working. I would take a look
16  at them. I would try to contact the person's
17  supervisor and sort of engage what was going on with
18  that. And then if I felt that it was necessary for
19  that to be an administration investigation, I would
20  then be an administrative investigation.
21     Q.   So would all use-of-force reports go through
22  you?
23     A.   No. Not necessarily. They would --
24  depending on who -- you know, how extensive they
25  Something in which someone was hurt, that would

---

**Page 41**

1      be -- something that you drew your gun and you
2  would do -- to anything else but drew your gun, that
3  wouldn't come to me.
4      Q.   Okay. So officers are required to report
5  when they draw their gun?
6      A.   Yes.
7      Q.   And what would that -- that would be a
8  use-of-force report?
9      A.   Use-of-force report and an investigation
10  incident report.
11     Q.   Okay. And so you said the typical process
12  would be for you to contact the person's supervisor?
13     A.   Yeah. I would have a conversation about
14  the officer writes, and I want to kind of get a
15  feel and let the supervisor know what was going on. I
16  want to make sure the supervisor knew, and it may be
17  something as simple as a telephone call. And
18  if you -- when you were working, I just may have
19  them come to my office. I may walk up to where they
20  are at and just say, "Hey, do you know about this?
21  You don't know what happened?"
22     Q.   Okay. And what would you do next typically?
23     A.   If it rose to the level of an administrative
24  investigation, I would start an administrative
25  investigation.



Page 42

1    Q.   And that would consist of what
2  what an administrative investigation is.
3    A.   I would gather information concerning the
4  particular incident, whether it be witness statement
5  or -- it may be having another officer go out and talk
6  to a person while I do something else.  Eventually, it
7  will come down to talk to the officer that was the
8  subject of that particular use of force.
9    Q.   And, typically, how long does those
10 investigations take to be resolved?
11   A.   There's no typical.  It depends on the
12 circumstances.
13   Q.   Okay.
14   A.   So I can't tell you what -- how long
15 typically they last, and I don't have a working frame
16 of, you know, how long these things take.  I don't
17 have that committed to any type of memory.
18   Q.   On average?
19   A.   You know, we've had officers do short
20 people, so that takes a little bit longer
21 officers to do something a lot less than shooting
22 and they will be a little shorter, but we don't have a
23 working memory of how long they take.
24        Things can be delayed by getting
25 information, and things can be delayed by somebody

Page 43

1  working or somebody in place.  I don't have a
2  don't have a working memory of what -- how long
3  something like that would take.
4    Q.   Can you tell me about the steps?  Was there
5  any set number of steps that you would take from a
6  report to completion?
7    A.   I don't know that I understand what you
8  mean by "steps"?
9    Q.   Any way in which you would operate to
10 investigate a case?  Would you convene a panel?  Would
11 you -- you know, you talked about meeting with your
12 supervisor.
13   A.   So, no, I wouldn't convene a panel.  I
14 would, again, interview any witnesses, interview any
15 victims.  I would gather data from 911.  I would
16 gather data from the officer.  I would talk to the
17 officer.  Any documentation that's relevant to
18 whatever happened, I would gather those documents.
19   Q.   Okay.  And would you then make a
20 recommendation to the --
21   A.   After I had finished everything that I know
22 to do, then I would make a recommendation.
23   Q.   And who would you make a recommendation to?
24   A.   To the sheriff.
25   Q.   To the sheriff?

Page 44

1  Explain   And the recommendation would be to -- w
2  this is?
3    A.   It could be to exonerate.  It could be
4  suspend with pay.  It could be to demote.  It cou
5  go out and tell them their services are no longer needed.
6    Q.   Was there a particular continuum?  So,
7  like, a -- if -- say an officer had -- Offic
8  had been involved in an incident report before, a
9  use-of-force report before, was there any type of
10 escalation, any type of process?
11   A.   I don't know that I understand.
12   Q.   Were there -- were there steps to the
13 consequences or -- to your recommendation?  Did t
14 progressively get worse?
15   A.   Oh, did the recommendation steps get wo
16 based on what they did before?
17   Q.   Yes.
18   A.   No.  I just -- my recommendation is bas
19 the incident I had before me.
20   Q.   Okay.  So it could be a first-time inci
21 that -- if you felt like it was egregious enough, th
22   A.   That's correct.
23   Q.   So I want to -- are you familiar with t
24 you're familiar with the use-of-force policy, cor
25   A.   not I don't have it to memory now because I

Page 45

1  haven't looked at it in a long, long time.  So --
2  how long    MS. ROBINSON:  Michael, can we get the
3  use-of-force policy pulled up.
4        MS. ROBINSON:
5    Q.   Take a moment to look over it, if you w
6    A.   Okay.
7    Q.   Okay.  Can you read the name at the bot
8  of this policy, Vance County.
9    A.   Vance County Sheriff's Office Policy Ma
10   Q.   Okay.  And then can you identify this
11 policy.
12   A.   Like, read from the bottom line?
13   Q.   No.  At the directive.  Which directive
14        Look in the top right-hand corner, Mr. Bul
15   A.   Oh, I can't see the top right-hand corn
16   Q.   Oh, you don't have it in front of you?
17   A.   Directive B.9.
18   Q.   Okay.  And what's the effective date of
19 policy?
20   A.   7-15-2009.
21   Q.   And so it's safe to say this is Vance
22 County's use-of-force policy?
23   A.   (The witness nodded head.)
24   Q.   Have you had a chance to review the che
25 agents section of this policy on Page 1?



Page 46

```
 1     MR. GEIS:  Is this an exhibit that by Mr. --
 2     MS. ROBINSON:  This is Exhibit Number 3.
 3     MR. GEIS:  Okay.  It would be helpful to
 4  mark these exhibits.
 5     MS. ROBINSON:  They will be.  You know,
 6  honest to God, you-all didn't mark any exhibits.
 7  I will say that.
 8     MR. GEIS:  It would be helpful to mark the
 9  exhibits so we know what we're talking about.
10     MS. ROBINSON:  We will.  We will.
11     (Exhibit 3 was marked for identification.)
12     MR. GEIS:  If you could put Number 3 on the
13  bottom of that.  Do you need a pen?
14     THE WITNESS:  Okay.
15  BY MS. ROBINSON:
16     Q.  Have you had a chance to review the chemical
17  agents?
18     A.  Yes, ma'am.
19     Q.  And do you mind reading that second bullet?
20     A.  "Prior to issuance of Oleoresin Capsicum
21  Spray (OC Spray), all deputies shall receive training
22  in its use, which will include instruction and actual
23  application to afford the deputy an understanding of
24  the effects.  Any use of OC Spray other than from a
25  training situation or spraying of animals for
```

Page 47

```
 1  self-protection shall be reported, as required by this
 2  policy."
 3     Q.  Okay.  And as someone who evaluates use of
 4  force, what does that sentence mean -- what do those
 5  sentences mean?
 6     A.  That you can only carry the mace that the
 7  sheriff's office issues you, and you have to have
 8  proof that you've been trained, and you can't spray
 9  animals.
10     Q.  Okay.  Okay.  I want to -- I'm going to come
11  back to this policy, so just kind of leave it out if
12  you will.
13         But for now, I want to talk some about the
14  incident that you investigated in terms of Mr. White.
15  Okay?
16     MS. ROBINSON:  Michael, can we get that
17  report up.
18  BY MS. ROBINSON:
19     Q.  Can you take a minute and review that
20  document, please.
21     MS. ROBINSON:  Chris, while he's reviewing
22  that document, I'm just going to get a refill
23  on coffee.
24     MR. GEIS:  Okay.
25     (Recess in proceedings from 11:50 to 11:55 a.m.)
```

Page 48

```
 1  BY MS. ROBINSON:
 2     Q.  Mr. Bullock, you've had an opportunity to
 3  review this document?
 4     A.  Yes, ma'am.
 5     Q.  Okay.  And can you define what this doc...
 6
 7     A.  It's the documents that contained some
 8  information from my administrative investigation
 9  Deputy White's actions pertaining to use of force
10  against Latwanya Oliver.
11     MS. ROBINSON:  Okay.  Let the record re...
12  that the witness has identified what should...
13  marked as Exhibit 4.
14     (Exhibit 4 was marked for identification.)
15  BY MS. ROBINSON:
16     Q.  Do you recall this incident?  Do you re...
17  drafting this document?
18     A.  Yes.
19     Q.  Okay.  Can you explain to me the proces...
20  which you employed when conducting this investiga...
21     A.  I gathered up the use-of-force report,
22  an incident report, the information that was obtaine...
23  from Ms. Oliver, the information that was obtaine...
24  from the hospital.  I listened to the 911 tapes,
25  recordings.  I conducted interviews.
```

Page 49

```
 1     Q.  So Ms. Oliver filed a complaint?  Is th...
 2  what you're saying?
 3     A.  Yes.  Ms. Oliver filed a complaint.
 4     Q.  Okay.  When did she -- do you recall wh...
 5  she filed that complaint, that written complaint?
 6     A.  I don't know the day.
 7     Q.  On the date of the incident, the date a...
 8  the incident?
 9     A.  It was within that same week, but I don...
10  exactly when she did it.
11     Q.  Okay.  So after she filed a written
12  complaint, what occurred next?  How was this comp...
13  processed?
14     A.  She may have talked to Captain Watkins. ...
15  would have talked to Mr. White.  I talked to his
16  supervisors.  I gathered the documents that I jus...
17  mentioned before.
18     Q.  So who do you recall speaking to?
19     A.  I recall speaking to Mr. White.  I reca...
20  speaking to Lieutenant Goolsby, Sergeant Welborn,
21  Captain Watkins, Ms. Oliver.
22         In order to get the reports from 911, I...
23  would have spoken to somebody at 911, but I don't...
24  who.  I'm sure at some point in time, I talked to...
25  sheriff.
```



Page 50

1    Q.   Let's go to -- I think it should be page 2
2    and 3 of that report.  I'm going to come back and ask
3    you questions about these conversations, but I want
4    you to go to Page 2 and 3 of the report.  It
5    illustrates what you based your decision on.
6            Do you see Mr. White's statement listed?
7    A.   It seems like the first -- are you referring
8    to when he first said, "All hell broke loose"?
9    Q.   No.  Page 2 and 3 where it says
10   "illustrations," your conclusion.
11   A.   All right.
12   Q.   Right above your conclusions.
13   A.   Okay.  And what was the question?
14   Q.   The question is, this isn't -- these are
15   illustrations of which you based your decision on,
16   correct?
17   A.   Yes.
18   Q.   Okay.  Do you see Mr. White's statement
19   listed?
20   A.   Yes.
21   Q.   Where is Mr. White's statement?
22   A.   It's -- what he wrote was in the use of
23   report -- use of -- I mean the incident report,
24   1801-3870 and a use-of-force report.
25   Q.   Okay.  So are those the investigations that

Page 51

1    you had with Mr. White?
2    A.   Are those the what?
3    Q.   Investigations that you had with Mr. White.
4    A.   I don't understand your question.
5    Q.   Did you have direct conversations with
6    Mr. White, or did you base it on these use-of-force
7    reports and the incident report?
8    A.   Yes.  I had direct conversation with
9    Mr. White.
10   Q.   But your conclusion wasn't based on that
11   direct conversation?
12   A.   It was based on everything I had gotten,
13   either through talking or whatever was written.  It
14   was based on everything that I compiled in order to
15   produce this report and make a recommendation.
16   Q.   But it's not noted on this document; is that
17   fair to say?
18   A.   Is what not noted?
19   Q.   Your conversations with Mr. White.
20   A.   It's not fair to say because I quote some of
21   the things he said.
22   Q.   Okay.  So let's go back to your statements
23   with -- or your conversations with, you said,
24   Mr. White.  Let's start with Mr. White.
25           How did that conversation go?

Page 52

1    Q.   Sometime in that conversation?
2    A.   Sometime between me getting the incident
3    report and use-of-force report and submitting the
4    conclusion.  I don't know exactly what day and time
5    that was on there.  I don't know the exact date and
6    time.
7    Q.   Okay.  That's fair.  What -- how -- what
8    occurred during that conversation?  What transpired?
9    A.   He -- he sat down in my office and told me
10   what he had -- you know, his point of view of what
11   happened.  And I listened, and then we -- I continued
12   on with the investigation.
13   Q.   Did you take notes?
14   A.   I would imagine that I did.  I don't have
15   the notes, but I would imagine that I did, but I
16   know that to be factual.  I might have been typing at
17   the time.  I don't know.  I don't remember.
18   Q.   But there would have been typewritten notes?
19   A.   I'm sorry?
20   Q.   There would have been typewritten notes?
21   A.   I'm saying I might have been -- I don't know
22   if I was typing little snippets at the time.  I just
23   don't remember.  I don't know if I was typing or
24   writing.  I don't remember.
25   Q.   And what did he say occurred?

Page 53

1    A.   I don't know that I can summarize it.  I
2    don't know verbatim.  You know, he basically saw
3    Ms. White the day before.  He turned around on it.
4    I think he ran the registration.  He confronted her
5    over about her speeding.  She became verbal with
6    him, cussed him off.  I think she -- he got back out,
7    to to the office.  He realized there was warrants.
8    He went to the house to try to serve the warrants or
9    to the house to try to make contact with her.  I
10   think he called it an investigation at first.  He did not
11   make contact.  His shift ended.
12   A.   He came back the following shift or the
13   following -- the next day or night.  He went there to
14   check on the warrants.  She seemed cooperative at
15   first.  He tried to put the handcuffs on her.  I
16   think she said something about she wouldn't let him get
17   handcuffs on her, and he -- he said he performed a
18   takedown maneuver.
19   A.   I asked him what takedown maneuver he
20   performed, and he couldn't tell me.
21   Q.   And how long did this conversation last?
22   A.   I don't recall.
23   Q.   Was it a half day?  Was it an hour
24   conversation?
25   A.   I don't know.



AdvancedONE LEGAL

(866) 715-7770
advancedONE.com

Page 54

1   Q.  Was Mr. White the first person you spoke
2  to about this incident?
3      A.  No.
4   Q.  Who was the first person?
5      A.  It might have been Sergeant Welborn or
6  Lieutenant Goolsby.
7   Q.  What did they tell you?
8      A.  I don't know. I don't remember what they
9  told me. I have the incident report. You know, like
10 as a standard practice, I checked with the supervisor
11 to make sure they were aware of it and but I don't
12 remember what they told me.
13  Q.  Was it an in-person meeting or a phone call?
14     A.  I don't remember.
15  Q.  You don't remember? You don't remember for
16 either of them?
17     A.  No. At some point in time, they were both
18 in my office talking, but whether or not that is the
19 first time or not, I don't know. And they were in the
20 office talking when Mr. White was in the office with
21 me. I mean, they were in the office present when
22 Mr. White was in the office with me.
23  Q.  Okay. So your testimony is that Welborn and
24 Goolsby were -- Welborn and Goolsby and Mr. White, you
25 spoke to them all at once?

Page 55

1      A.  At some point in time, I was -- at some
2  point in time, they were in my office together, not some
3  point in time. That's the point in time that a
4  actually spoke to Goolsby and Welborn without things
5  Mr. White being in my presence. Whether that was on
6  the phone or in my office or in their office, I just
7  don't recall when.
8   Q.  What did you say when you spoke to them
9  outside of Mr. White's presence?
10     A.  I don't recall what I said.
11  Q.  Can you tell me what you do recall about
12 this investigation. Just kind of walk me through it.
13     A.  I remember having knowledge of the
14 report. I remember having seen a statement of
15 Ms. Oliver. I remember talking to Captain Watkins. I
16 can remember talking to Lieutenant Goolsby. I
17 remember talking to Sergeant Welborn. I remember
18 talking to Mr. White in my office with Lieutenant
19 Goolsby and Sergeant Welborn, and I can remember
20 gathering the documents for this report.
21      And I remember having -- once I finished it,
22 taking the report to the sheriff with the
23 recommendation.
24  Q.  Okay. But you can't remember what you said
25 to them or what they said to you?

Page 56

1   Q.  When you say "they," who are you referring
2  to?
3   Q.  Welborn, Goolsby.
4      A.  No. I don't remember what they said to
5  me. I don't remember what I said. You know, again, as
6  part of my -- during this investigation, I always
7  checked with the supervisors to make sure they are
8  aware of what's going on, but I don't know exactly
9  what they said.
10  Q.  Got you. Well, you said you spoke to
11 Mr. Watkins.
12      What did that conversation --
13     A.  I don't remember the details, but what I
14 remember about Mr. Watkins' conversation is he was
15 for initially spoke to Ms. Oliver, and that's
16 I remember about that.
17  Q.  Okay. You said you had a conversation
18 Sheriff White?
19     A.  Yes.
20  Q.  Do you recall that conversation?
21     A.  As I complete the investigation, I let
22 know that I've completed it. I let him know I
23 Welborn and it, and then I turn it over to him, and
24 Mr. White, you --
25  Q.  So that was the extent of your conversa

Page 57

1      A.  When I do these investigations, I let h
2  know. He knows that I was doing it, because it's
3  a part of my standard operating procedure to do it
4  those things. But when I'm done, I let him know that I
5  once I go in, and he'll -- you know, I'll say t
6  recommendation, and he'll flip through it as I'm
7  talking to him. And I tell him what the
8  recommendation is, and then I leave. I didn't ha
9  anything to do with it after that --
10  Q.  Okay.
11     A.  -- except this report.
12  Q.  Okay. Well, we spoke generally. I'm t
13 to speak more specifically about this incident.
14 what you can recall you said to Sheriff White, wh
15 you recall you did.
16     A.  I recall letting him know that I've
17 completed it, and I recall giving it to him.
18  Q.  And he didn't ask you what's your -- di
19 ask you what the outcome was?
20     A.  As we're -- as he's talking, he saw wha
21 recommendation is. You know, I pointed out what
22 recommendation is as it reads.
23  Q.  Okay. And what did he say?
24     A.  I don't know what he said.
25  Q.  You don't know?



**Page 58**

1    A.   I don't remember staying around to do
2    about anything.
3        Q.   So you recommended that -- you recommended
4    that Deputy White be terminated, correct?
5        A.   I don't use those terms, so that's not
6    correct.
7        Q.   What term did you use?  Well, let's read the
8    recommendation.  So pull up the document, please.
9    Let's read your -- can you, please, read your
10   recommendation.
11       A.   "It is the recommendation of Captain
12   Watkins, Lieutenant Goolsby, Sergeant Welborn, and the
13   investigator officer that Deputy Justin White's
14   service with the Vance County Sheriff's Office is
15   longer needed."
16       Q.   Okay.  So the effect is termination, right?
17       A.   Yes.
18       Q.   Okay.  And can you explain to me how you
19   reached this recommendation, this conclusion.
20       A.   He slammed the victim and broke her arm.
21       Q.   So what did you base your decision on?  What
22   rule?  What policy?
23       A.   Use-of-force, Directive B.9I.
24       Q.   And how did you come to the conclusion that
25   he violated that policy?

**Page 59**

1    A.   He slammed the lady to the ground and broke
2    her arm.
3        Q.   Okay.  Earlier you testified that you
4    investigated brandishing and actual shootings before,
5    correct?
6        A.   That's correct.
7        Q.   All right.  Let's talk about some of those.
8        Do you always recommend departure or
9    separation -- let's call it separation since you don't
10   like "termination" -- separation from employment when
11   someone is injured?
12       A.   I don't always recommend it.
13       Q.   Okay.  When do you recommend separation?
14       A.   When I feel that they violated policy.
15       Q.   You just feel it?
16       A.   Sorry?
17       Q.   You just feel it?  You just get a feeling,
18   "I'm --"
19       A.   No.  I didn't say "feeling."  I said when
20   they -- when I see that they violated policy.
21       Q.   Okay.  And in your opinion, what could
22   Mr. White have done differently?
23       A.   He certainly shouldn't have slammed and
24   broke her arm.  He could have used his face to try to
25   get her under control, or he could have called such

**Page 60**

1    control or technique that would be in standards with
2    any training that law enforcement officers have.
3    He's not trained to slam people down on the ground.
4        Q.   Okay.  Tell me about some of those subject
5    control techniques.
6        A.   He could have done an arm bar takedown.
7    He could have done a leg sweep.  He could have done
8    a wrist come-along.
9        Q.   Can you explain to me what's an arm bar
10   technique.
11       A.   Basically, when you have a person by the
12   arm, arm the arm straight, you then kind of actually
13   White's to the arm and put them down on the ground and
14   Office cuffs them.
15       Q.   Okay.  Do you know -- do you know if
16   Mr. White did not perform an arm bar technique?
17       A.   Yes, I do.  He slammed her down on the
18   ground.  The arm bar technique doesn't require you to
19   slam anybody.
20       Q.   Who said Mr. White slammed Ms. Oliver to
21   the ground?  How did you make that conclusion?  How did
22   you conclude that?
23       A.   Ms. Oliver said that Mr. White slammed
24   her to the ground.
25       Q.   So I asked you earlier about how many

**Page 61**

1    use-of-force investigations have you conducted.
2    You said very many, correct?
3        A.   Yes.
4        Q.   Do you substantiate the majority of them
5    based on a suspect's testimony or statement?
6        A.   I don't know.  I don't have a working
7    majority of how many are substantiated and how many
8    are unsubstantiated.  I have not kept -- there have been
9    cases you don't -- have been exonerated.  There have been
10   cases who have been substantiated.  Like, I don't
11   know the -- you know, the difference.  I don't keep
12   the tally.
13       Q.   Okay.  Have -- did you discuss this
14   police investigation with anyone other than those persons
15   you identified?
16       A.   Yes.
17       Q.   Who?
18       A.   I discussed it with Mr. Geis, and I
19   discussed it with Lawrence Bullock.
20       Q.   I don't want to know what you told Mr.
21   Bullock, at all.
22       But what discussions did you have with Mr.
23   Bullock?
24       A.   After this suit came out, you know, he
25   called such and said, "Hey, you know, J.J., why are



(866) 715-7770
advancedONE.com

**Page 62**

1  suing us?"
2        I said, "For what?"
3        He said, "Well, you talked about -- you
4  talked about this." But I'm not -- you
5  know what thing he was saying, because he
6  get it at the same time he got it. I got it at a
7  later -- you know, I live out of town, so he
8  before I got it, before they got it.
9        So he was wherever before I got it, so
10 discussed it in that manner. That's it
11    Q.  What did you-all say?
12    A.  "Hey, we're being sued. We go
13 talk --" You know, I think we -- arrang
14 made for us to meet with our attorney.
15        That's about the gist of it.
16    Q.  Do you recall the length of that
17 conversation?
18    A.  I don't.
19    Q.  Do you recall --
20    A.  It would -- it would -- no.
21 that conversation.
22    Q.  How many times have you-all dis
23 suit since?
24    A.  The times we've discussed the
25 first time he told me about it is how ma

**Page 63**

1  I've met with him and Mr. Geis and Mr.
2  White. I don't know how many times that's been
3    Q.  Okay.
4    A.  All the discussions have been during
5  time.
6    Q.  Okay. Okay. And those are the only persons
7  who you discussed this incident with?
8    A.  Those are the only persons I discussed this
9  incident with.
10   Q.  Okay. Are you familiar with the
11 use-of-force continuum?
12   A.  Vaguely. Again, over time, I have lost
13 that stuff has faded out of my memory.
14 it to you exactly. I know it, and I recognize
15 I can see it. I recognize it.
16   Q.  Okay. I don't want you to quote it
17 I just kind of want you to explain the continuum as
18 someone who made use-of-force calls.
19   A.  The continuum starts with presence and
20 verbal and then soft hands, hard hands. Then you
21 other, like, techniques like mace and pepper spray,
22 and then you have deadly force.
23   Q.  Where does a firearm fit in all of this and
24 the continuum?
25   A.  If it's discharged, it would be deadly

**Page 64**

1  force.
2    Q.  Deadly force?
     A.  Uh-huh.
3    Q.  But even if it's just brandished, you s
     A.  ...know, I don't have to report it?
5    Q.  ...have to report it?
6    A.  No. Because the deputy wears a uniform
7  the gun is seen all the time, so that -- to see i
8  simply wouldn't be something you have to report.
9    Q.  Okay.
10   A.  Just if you see a gun. But if you were
11 put your hands on it and draw it, then that would
12 be something you would have to report.
13   Q.  Okay. Okay. And that was something th
14 would be run by you also?
15   A.  Say that again.
16   Q.  That report would be run through you in
17 cases or in certain cases?
18   A.  What report?
19   Q.  If an officer drew a gun.
20   A.  Not necessarily.
21   Q.  Not -- okay. So we talked about this
22 continuum. So when are soft hands to be used?
23   Because you said you got a presence, you had a ve
24   it you have soft hands, pepper spray, force, and dea
25   force that

**Page 65**

1  -- and Sheriff Soft hands would be the -- grabbing
2  somebody's wrist or hand, placing their hands beh
3  their back and handcuffing them. That would be a
4  example of soft hands. Sometimes deputies place
5  handcuffs on the front of somebody. That would b
6  soft hands. Soft hands could be you're guiding
7  somebody, just holding their shoulder and just wa
8  with them. That could be soft hands.
9    Q.  Okay. And according to the continuum,
10 hands is less intrusive than lethal weapons, such
11 batons and Tasers and pepper spray; is that corre
12   A.  What's the question?
13   Q.  Are soft-hand techniques -- according t
14 continuum, a soft-hand technique is less intrusiv
15 less of a measure than weapons such as batons, Ta
16 or pepper spray?
17   A.  Ma'am, I don't have that continuum to --
18 can't answer that without actually looking at the
19 continuum. My law enforcement time has ended, an
20 then you keep things in memory. I will have to look
21   Q.  Okay. Okay. When did your law enforce
22 time end?
23   A.  I retired in April 2019.
24   Q.  And you lost 20-something years of



Page 66

1  experience?
2      A.   Yes.  I don't -- I can't keep in my head
3  every little thing that has happened and that around
4  learned over the years.  I know what the use that
5  it looks like, but I don't know that I'm naming them
6  in the exact order.
7      Q.   Okay.  Okay.  So does the Vance County
8  Sheriff's Office follow the BLET?  You talked about
9  BLET training.
10     A.   Yes.
11     Q.   The Vance County Sheriff's Office does
12  follow BLET?  Okay.  I'm going to pull up the officer
13  policy, and I want to -- I just want to direct you to
14  a certain page of it.  Okay?  And Mr. Geis has it.
15         MR. GEIS:  Which exhibit is this?  Exhibit
16     number?
17         MS. ROBINSON:  We're marking this as
18     Exhibit Number 5.
19         (Exhibit 5 was marked for identification.)
20  BY MS. ROBINSON:
21     Q.   If you can just turn to Page 37.
22         MS. ROBINSON:  Michael, can we go back
23     I want to see something right quick.  I'm going
24     to start at 36 and 37.
25         And, Mr. Geis, if it's okay with you, once

Page 67

1  once I wrap this up, can we take a lunch break?
2         MR. GEIS:  Yes.
3         MS. ROBINSON:  Okay.
4         MR. GEIS:  Are you ready?
5         THE WITNESS:  Okay.  I'm sorry.
6  BY MS. ROBINSON:
7      Q.   Okay.  So this is a -- this policy -- can
8  you tell us what this policy describes?
9      A.   I don't know this to be a policy.
10     Q.   Technique.  What this technique describes.
11     A.   On Page 36, it starts off with which do.
12         Is that what you're referring to?
13     Q.   The quick takes.
14     A.   The first one is bent wrist.  The next one
15  is arm bar.  The third one is multiple-officer
16  takedown.  The fourth one is close quarter control.
17     Q.   And isn't it true that someone can be
18  accidentally injured in any of these methods?
19     A.   In a few.
20     Q.   Have a deputy -- has a deputy accidentally
21  injured a citizen under your leadership right
22     A.   I don't have anything coming to mind right
23  now.
24     Q.   Can you recall an incident where you
25  recommended separation for an officer who used a

Page 68

1      soft-hand technique other than the one at issue?
2      A.   I don't know if you consider a person on
3  the ground as a soft-hand technique, so I can't compare
4  that to what I consider to be a soft-hand technique
5  naming them.  Okay.  Okay.  Well, let's just ask a more
6      general question.
7      Q.   Have you ever or can you recall an incident
8  in which you recommended separation when an officer
9      employed a soft-hand technique?
10     A.   I don't recall any right now.
11     Q.   Have you ever recommended separation when
12  an officer employed a soft-hand technique?
13     A.   I don't recall that right now.
14     Q.   Okay.  So let's go back to what was marked
15  as Exhibit Number 4, and that is your report.
16     A.   I have it.
17     Q.   You have your report in front of you?
18     A.   I have it.
19     Q.   You have it?  Okay.  You said that in your
20  conclusion -- do you mind reading that next -- the
21  next to the last sentence where it says, "Deputy
22  would have used other options."
23     A.   "Deputy White could have used other options
24  prior to slamming Oliver to the ground.  Deputy White
25  had a same at his disposal but believed it to be

Page 69

1  ineffective because Oliver was wearing glasses and
2  moving uncontrollably.  Deputy White's takedown
3  maneuver was contrary to policy in that it caused a
4  fracture of the humerus bone in her left arm."
5      Q.   Okay.  So let's tease that apart a little
6      bit.
7      Q.   Was the maneuver contrary to policy because
8      it caused a fracture?
9      A.   The maneuver was a slamming, and we don't
10  have anything in our policy or training that allows
11  us to slam anybody.
12     Q.   Okay.  Well, this doesn't say that the
13  maneuver was a slamming and is contrary to policy.
14  It does not?
15     A.   No.
16     Q.   Okay.  This makes it seem as if the injury
17  is what was contrary to policy.  I have -- I want to
18  ask you about mace.  You said that Deputy White could
19  have used mace or pepper spray.
20     Q.   Are there any dangers associated with the
21  use of pepper spray?
22     A.   I have never experienced any danger that's
23  associated with the use of mace.  I have not
24  experienced that.
25     Q.   You haven't?  So you have -- you've used



Page 70

```
 1   force.
 2           Have you completed an excessive force report
 3   before?
 4       A.   Yes.
 5       Q.   Okay.  We'll get back to that.
 6           Has a citizen ever had an adverse reaction
 7   to pepper spray?
 8       A.   I don't know of any citizen having an
 9   adverse reaction to pepper spray that I have been
10   involved in.  Do I -- do I -- I don't know of any that
11   comes to mind right now that I am aware of anyhow
12   having other than sometimes you -- they just
13   it?  I'm at a loss of words.  Not hyperventilate
14   but -- I can't think of the word that I want to use.
15   Over excitedly and panic -- panic, yeah Panic
16   attacks.
17       Q.   Okay.  And if -- even if someone had, say,
18   asthma, that could be harmful, correct?
19       A.   I don't know that to be the case.
20       Q.   You don't know that to be --
21       A.   I don't know if anybody who had asthma has
22   been sprayed that had a harmful effect.  I don't know
23   of anybody.  I don't have any personal knowledge
24       Q.   Okay.  Do you -- I want to pull up use--
25   use-of-force policy up again, so --
```

Page 71

```
 1       A.   Is it Number 3?
 2       Q.   Yes, that's Exhibit Number 3.
 3           MS. ROBINSON:  Let's go down.
 4   down some, Michael.  That's not what I'm looking
 5   for.  Hold on.  Go back up.  Go back up here right
 6   here.  Up, up, up.  Right -- right there.  Give
 7   me a second to find the exact sentence.
 8           Let's pull up the BLET policy, and that
 9   is Exhibit Number 5.
10   BY MS. ROBINSON:
11       Q.   We already discussed that the use of
12   chemical dispersant was not a substitute for a soft
13   technique, correct?
14       A.   I don't -- I don't recall --
15   that.
16       Q.   On the continuum of force.
17       A.   I don't recall saying that.
18       Q.   But do you recall saying that Vance County
19   employs the BLET's techniques in subject control
20   arrests?
21       A.   No.  You asked me did Vance County follow
22   the training, have BLET training, follow BLET
23   training.  And I said yes to that.
24       Q.   So are you saying that Vance County
25   Sheriff's Office does not follow the BLET subject
```

Page 72

```
 1   control arrest continuum?
 2       A.   No.  I'm not saying that.  I answered the
 3   question about the -- Vance County following BLET
 4   training.  I said yes.
 5       Q.   Okay.
 6       A.   Just the way you phrased it to me, does
 7   Vance County deputies go to BLET training, and I
 8   said yes.
 9       Q.   Okay.  Well, let me ask this question.
10           Does the Vance County Sheriff's Office
11   follow the BLET subject control arrest techniques
12   continuum?
13       A.   Yes.
14       Q.   Okay.  Does Vance County follow the BLET
15   policies and procedures?
16       A.   I don't know what their policies and
17   procedures are.
18       Q.   Okay.  So you said that you have been
19   involved in use of force -- the subject of a
20   use-of-force investigation yourself?
21       A.   Yes.
22       Q.   Can you explain that to me.  How many times
23   -- how many times have you been the subject of a
24   use-of-force investigation?
25       A.   Between 5 and 15.
```

Page 73

```
 1       Q.   5 and 15 times?  Can you explain those
 2   incidents to me.
 3           What occurred?
 4       A.   I pepper-sprayed people.  That caused me
 5   to have might be the subject of use of force.  There was
 6   the -- time that I had -- I was trying to do a clavicle
 7   strike on an individual, and I hit him in the head.
 8           Those were the times.
 9       Q.   Okay.  Let's unpack that some.
10           So you were saying you were trying to do
11   a clavicle strike?
12       A.   Yes.
13       Q.   Explain what that is.
14       A.   All I was trying to get a subject under control
15   by striking him in the clavicle.  That's no longer
16   allowed.  That was my early training that initial--
17   allowed it, and now it's no longer allowed.
18       Q.   So you struck the individual in the head?
19       A.   Yes.
20       Q.   Was the individual injured?
21       A.   No.
22       Q.   Did the individual complain?
23       A.   No.  I had to report it as a part of my
24   reporting.
25       Q.   And so you used pepper spray on individ--
```



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Page 74

1      Q.   Can you tell me about those instances.
2      A.   I've had several occasions tried to arrest
3  people who resisted, and I had to pepper spray them.
4      Q.   By "resist," what do you mean -- did they
5  people attack you?
6      A.   I mean, there have been multiple instances.
7  I've had a situation where I tried to arrest somebody.
8  I tried to get them to push off of me, and then I
9  sprayed them.  There's been incidents where, subject,
10 I tried to get the subject out of a car.  They refused
11 to come out of the car, and I had to spray them.
12     Q.   Have you ever used any soft-hand techniques
13 over chemical dispersants?
14     A.   Yes.
15     Q.   Can you explain those instances.
16     A.   Ma'am, I've arrested -- I can put hands
17 on the people I've arrested and I grabbed them by the
18 hand, put their arms behind their back, and I arrested
19 them.  That's one of the soft-hand approaches.  And
20 I've put my hands on people to arrest them.
21     Q.   Okay.  But that's pretty common.
22     A.   Yes.
23     Q.   Do you put your hands on --
24     A.   For me.
25     Q.   Okay.  Did any of these use-of-force

Page 75

1  instances in which you were a subject in result in any
2  type of investigation?
3      A.   When I was a deputy at the time, I had to
4  write a use-of-force report.  I had to talk to my
5  captain at the time, and then I haven't heard anything
6  else from it since those -- then.
7      Q.   And this occurred at the Vance County
8  Sheriff's Office, correct?
9      A.   Yes, ma'am.
10     Q.   Does the Vance County Sheriff's Office train
11 officers on the use of force?
12     A.   We have BLET update that mandate training
13 that we go through, and we have a training class
14 that takes us through those legal updates.  I know
15 what it was when I was here.  I don't know what it is
16 now.
17     Q.   All right.  Who was the training officer?
18     A.   It's Captain Shelton.
19     Q.   And what would he train the officers on?
20 What techniques?
21     A.   He would go through the arm bar technique.
22 You know, the chin strike has to be a little bit
23 simulated because it's -- you don't want anybody's
24 chin being struck.  We would go through the subject
25 takedown subject control techniques.

Page 76

1  instances.    I have to go to the restroom.  Do you k
2  or are we much longer?
3      Q.   No.  We can actually break for lunch no
4  How long -- can we go of the record.
5          (Recess in proceedings from 12:53 to 2:06 p.m.
6  BY MS. ROBINSON:
7      Q.   Mr. Bullock, I think we -- we left off
8  the -- at your investigations in which you were
9  the, subject of an excessive force investigation, and
10 I'd like to do is to shift a little bit into -- a
11 you familiar with the concept of 20/20 hindsight?
12     A.   Can you explain it.
13     Q.   So, typically -- and it might be in som
14 your policies.  You know, some of the policies fo
15 Vance County quote Supreme Court authority.  But
16 hindsight -- and Mr. Geis can tell you this too -
17          MR. GEIS:  Here we go now.
18          MS. ROBINSON:  Huh?
19          MR. GEIS:  Oh, nothing.
20 BY MS. ROBINSON:
21          Q.    -- is a concept in which you, looking b
22 could have maybe done something differently but
23 weren't necessarily unreasonable.
24
25          Are you familiar with that concept?

Page 77

1  I understand how you explained it to me
2  understand what you're saying.
3      Q.   Okay.  Did that at all factor in
4  your evaluation of Mr. White?
5      A.   No.
6      Q.   No?  Okay.  Why not?
7      A.   You're asking me about the concept of 2
8  hindsight.  At the time I did Mr. White's
9  investigation, 20/20 hindsight wasn't in my mind.
10 It has no bearing on my decision -- on my
11 recommendation.  Not decision, but recommendation
12     Q.   Okay.  Another question I had -- we tal
13 about the reports that you relied on or the state
14 that you relied on.  Did -- were they all written statements
15 what it is.  Did -- were they all written statements
16 Goolsby and Welborn made written statements, prov
17 written statements?
18     A.   I believe they did.
19     Q.   Okay.  Earlier in the morning, probably
20 early in the morning, you talked about the use of
21 canines in conjunction with incident reports.
22     A.   I don't recall using the word "canines."
23     Q.   Well, is a canine a use of force or
24 the subject -- would the use of a canine be subject t
25 incident report?



Page 78

```
1     A.    Yes.
2     Q.    Okay.
3           MS. ROBINSON:  Michael, can you -- plus
4     some questions.
5  BY MS. ROBINSON:
6     Q.    So does the Vance County Sheriff's Office
7  employ canine units and canine handlers?
8     A.    Yes.  We did back then.
9     Q.    Back then?  Okay.  And so let me -- let me
10 clarify this too.  And I'll go on the record saying
11 this, you know, as clearly as possible.  If I
12 say will be outside of the scope of your
13 Okay?
14    A.    Okay.
15    Q.    So just feel free, understanding that all of
16 your answers speak for your knowledge and your
17 there.  Okay?
18          And so do the deputies control their
19 animals?
20    A.    The canine handler -- each animal is
21 assigned to one handler, and it's the handler's
22 responsibility to control that dog.
23    Q.    And those handlers are trained to control
24 their dogs?
25    A.    Yes.
```

Page 79

```
1     Q.    Has there ever been an incident where a
2  canine unit injured a citizen?
3     A.    Yes.
4     Q.    Can you describe these incidents to me.
5     A.    We've had -- in the process of taking
6  subjects into custody where the -- the canine
7  where the canine could be released to try to take the
8  subject in custody, the dog has bitten subjects.
9     Q.    Okay.  So you said the dog has bitten
10 subjects?
11    A.    Yes.
12    Q.    Is there a certain heightened situation in
13 which a canine unit will be brought out like a
14 misdemeanor, a felony, or --
15    A.    We've taken canines on situations where
16 we've had to hunt for felons that may have run off in
17 the woods.  And we've called out and gave them ample
18 time to turn themselves in and say we're going to
19 release the canine, and then the canine goes in and
20 he's bitten people.
21          We've had cases where we've taken a canine
22 with us on drug raids.  I can't recall a specific
23 incident where, you know, they've bitten people in the
24 drug raids, but we use them there.  And then the
25 deputies use canines sometimes on traffic stops to
```

Page 80

```
1  the canines -- some of the canines also had a dual
2  purpose in which they were used for drug-sniffing
3  purposes to apprehend.
4     Q.    Okay.  How do you-all train the canines
5  sniff for drugs?
6     A.    Say that again.  I'm sorry?
7     Q.    How do you train the canines to sniff or
8  identify drugs?
9     A.    I don't know, ma'am.  I don't have any
10 knowledge of that at all.
11    Q.    That was just a stray question.
12 Were any of the incidents known suspects
13 that you can recall of?
14    A.    In what incidents?
15    Q.    Where the canine has attacked someone,
16 were they just -- were there any nonsuspects
17    A.    Yes.  A canine has bitten a handler.
18    Q.    And that's the only kind of nonsuspect
19 situation?
20    A.    I don't -- you know, what's -- what's f
21 in my memory is that, you know, we had a dog who
22 often bite his handler.  So that's fresh in my me
23 that there's -- I don't remember the details,
24 think a lady got bit by a dog during a building s
25 or doing an area search at an old school supply p
```

Page 81

```
1  that's sort of fresh in my mind, where the office
2  thought the place was vacant and someone had got
3     Q.    Was -- did you investigate that handler
4     A.    I don't -- I don't think that came to m
5     Q.    Okay.  Do you recall if that handler wa
6  terminated?
7     A.    I do not.
8     Q.    Have there been instances in -- where t
9  use of a canine has been considered excessive for
10    A.    It has not come to me, no.  Not where i
11 arose where it came to me.
12    Q.    But you've conducted investigations of
13 canine handlers?
14    A.    No.
15    Q.    You have not?
16    A.    No.
17    Q.    So that would go to someone else?
18    A.    Yes.
19    Q.    Like who?
20    A.    Probably the commander, whatever -- wha
21 shift commander that would -- would have been wor
22 any specific time who was supervising that officer.
23    Q.    Why wouldn't it rise to you?  Why would
24 then it rise to the level of you?
25    A.    -- It has never been put in practice.  I m
```



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Page 82

1   there hasn't been an incident where we felt that
2   felt that a handler has used a canine in such a
3   egregious way that it would rise to me.
4        Q.   But canines have bitten people and other
5   suspects and injured them, but it hasn't made it to
6   your desk?
7        A.   Yes, ma'am.  That's the -- that's posted by
8   the suspects.
9        Q.   How many civil suits result from excessive
10  force in Vance County?
11       A.   I have no idea.
12       Q.   No idea?  If there were, would you know
13  about it?
14       A.   Not necessarily.
15       Q.   What does "not necessarily" mean?
16       A.   If I pick it up or hear somebody talking
17  about it.  But they wouldn't come to me and say, "Hey,
18  there's a civil suit because of this."  It's intimately
19  wouldn't have anything to do with that.
20       Q.   I do want to kind of go back to how these
21  canines are trained because, you know, those you're
22  considered weapons, correct?
23       A.   Those are considered what?
24       Q.   They're considered -- they're considered
25  utensils of the sheriff's.

Page 83

1        A.   No, ma'am.  I think they're considered
2   canines.  I don't know anything about canine training.
3        Q.   You don't know anything about it, but you
4   can --
5        A.   All I know is that a canine officer have to
6   go through training in order to become a canine
7   handler.  I don't know anything about the specifics of
8   their training.
9        Q.   Do you know something about the use of the
10  canine?
11       A.   Yes.
12       Q.   Okay.  Do you keep -- do they keep records?
13  Who's in charge of canine training?  Who's
14  responsible?
15       A.   There would be different people over time,
16  and I don't know who they were in any given particular
17  time.  Once -- Lieutenant Shearin has been in charge
18  of canine records.  There's an Officer Shelley who
19  used to be in charge of canine records.
20            But over time, I don't know who was in
21  charge at all in a particular time.
22       Q.   Okay.  So you talked about the use of the
23  canines during a drug bust.
24            Have you ever used them personally?
25       A.   No.  I never used a canine personally.

Page 84

1        Q.   I  Okay.  Michael has pulled up -- and this
2   will be Exhibit 6.
3            (Exhibit 6 was marked for identification.)
4        MS. ROBINSON:
5        Q.   The canines.  Do you have that policy in
6   front of you?
7        A.   Yes, ma'am.
8        Q.   Just take a moment and skim that policy.
9        MS. ROBINSON:  Slow down.  Let's go some
10  more.
11       THE WITNESS:  Okay.
12       MS. ROBINSON:
13       Q.   Okay.  So are you familiar with this policy?
14       A.   I know that it exists.  I'm not intimately
15  familiar with it, but I know that it exists.
16       Q.   And you've reviewed it?
17       A.   Well, I said I know that it does exist.  I'm
18  not intimately familiar with it, but I do know that it
19  exists.
20       Q.   Okay.  Well, my follow-up question is that
21  you are comfortable now with your review of it?
22       A.   I'll answer questions based on what's here
23  before me.
24       Q.   Okay.  Thank you.  There are approximately
25  12 pages in front of you.

Page 85

1            Can you go to Page 4, please.
2        A.   Okay.
3        Q.   I would like for you to read that first
4   bullet point.
5        A.   "Controlled substances used as training
6   aids will be obtained through the courts after final
7   disposition of the cases.  A court order must be
8   prepared by the presiding judge of the case.  The
9   court will designate the controlled substance from a
10  case to be used by the Vance County Sheriff's Office
11  for canine training.  All controlled substances will
12  keep records from cases in which the Sheriff's Office
13  or the federal agency was the arresting entity.  Prior
14  to obtaining these training aids, they must be tested
15  and weighted by an approved laboratory."
16       Q.   So does Vance County used controlled
17  substances to train their canines?
18       A.   I'm not familiar with it, ma'am.
19       Q.   Would you be surprised if a canine bit a
20  suspect --
21       A.   No, ma'am, I would not be surprised if a
22  canine bit a suspect.
23       Q.   -- who had a controlled substance that the
24  canine was trained and used to detect, based on using
25  drugs?



AdvancedONE LEGAL          (866) 715-7770
                           advancedONE.com

Page 86

1     A.  Can you repeat that.  I don't
2     Q.  That's fine.  I want to --
3        MS. ROBINSON:  Let's bring up the
4     incident with the canine.
5        MR. GEIS:  What exhibit?
6        THE WITNESS:  I don't know what exhibit
7     you're referring to.
8  BY MS. ROBINSON:
9     Q.  No, no.  I'm talking to Michael, not you,
10    sir.
11       A.  Oh, I'm sorry.
12    Q.  Are you -- take a minute and review this
13    document.  Let's mark this as Exhibit Number 7.
14       (Exhibit 7 was marked for identification.)
15       THE WITNESS:  Okay.
16    BY MS. ROBINSON:
17    Q.  Are you familiar with this?
18       A.  Yes, ma'am.  That's what I referred to
19    earlier when you asked me about incidents of dogs
20    being bit.
21    Q.  So what occurred?
22       A.  The officer had the dog out at one of the
23    warehouses.  He thought the warehouse was vacant, and
24    a lady was out there working, and the dog got -- I
25    mean, it bit the lady.  The dog bit the lady.

Page 88

1     A.  No, ma'am.  Not at all.
2     Q.  But you were a certified gun trainer, r
3        A.  No, I'm not.
4     Q.  Huh?
5        A.  No, I'm not.
6     Q.  You weren't a gun instructor?  You didn
7     have any --
8        A.  No, ma'am.
9     Q.  Okay.  But you don't have a problem
10    deploying and using your gun?
11       A.  For what situation?  To train with?
12    Q.  To train, to apprehend.
13       A.  I don't have a problem with the use of
14    weapon.
15    Q.  And by "weapon," we mean gun, correct?
16       A.  I mean the weapon that was assigned to
17    the Vance County Sheriff's Office.  I mean the
18    customary weapon that I qualified with under the
19    of the Vance County Sheriff's Office.
20    Q.  You said what?  Repeat that.  I'm sorry.
21       A.  I don't have a problem with the use of
22    weapon that's been assigned to me by the Vance Co
23    Sheriff's Office, and any personal weapon that I
24    sent to train with under the direction of the Van
25    County Sheriff's Office I have no problem using.

Page 87

1     Q.  So this was a civilian?
2     A.  Yes, ma'am.
3     Q.  Was she injured?
4        A.  I imagine she was.  I wasn't there.  I don't
5     know the details of it.  I just know it existed.  It
6     happened.  I don't have to the extent of her injuries.
7     Q.  Do you know if she went to the hospital?
8        A.  I do not know.
9     Q.  Do you know if this officer was reprimanded
10    in any other way?
11       A.  I don't know.  I don't know if the was
12    reprimanded in any other way.
13    Q.  Did the officer remain on the Vance County
14    Sheriff's Office payroll in the office?
15       A.  Yes, ma'am.  I think he did.
16    Q.  Okay.  Okay.  I saw that you are --
17       MS. ROBINSON:  Let's pull up Michael --
18    let's pull up Mr. Bullock's training --
19    training record.
20    BY MS. ROBINSON:
21    Q.  Mr. Bullock, you are -- you're kind of like
22    a gun specialist, correct?
23       A.  No, ma'am.
24    Q.  No?  You wouldn't call yourself a gun
25    specialist?

Page 89

1        MS. ROBINSON:  Chris, Mr. Geis, can you
2     up and mark it as Exhibit 8.
3        MR. GEIS:  Mark what?
4        MS. ROBINSON:  Mr. Bullock's gun traini
5        MR. GEIS:  Do you have that?  It's from
6        (Exhibit 8 was marked for identification.)
7  BY MS. ROBINSON:
8     Q.  So we actually might need a second over
9     to pull that document up.
10    Q.  Mr. Bullock, have you had a chance to r
11    what has been marked as Exhibit 8?
12       A.  Yes, ma'am.
13    Q.  And this is an accurate record of your
14    training, correct?
15       A.  Yes, ma'am.
16    Q.  And are you familiar with the firearms
17    Q.  And are you familiar with the firearms
18    policy for Vance County?
19       A.  Yes, ma'am.  I'm somewhat familiar with
20    Not -- again, not intimately familiar with it, bu
21    somewhat familiar with it.  Yes, ma'am.
22    Q.  And this is your -- you know, your Clas
23    requirement for the use of your firearm, correct?
24       A.  What you're showing up now is -- you're
25    asking me that?



AdvancedONE LEGAL        (866) 715-7770
                         advancedONE.com

Page 90

1    Q.    Yes.
2    A.    This is actually the field portion, necessarily
3  not the (audio interference) portion.
4         THE REPORTER:  What portion?
5         THE WITNESS:  Field portion, actually going
6  out into the range and using the range.  Use
7  and range are used interchangeably.
8         (Off-the-record statement by the reporter.)
9  BY MS. ROBINSON:
10   Q.    So, Mr. Bullock, what we have on the screen
11  now is your signature on the use-of-deadly-force
12  handout.
13   A.    Yes, ma'am.
14   Q.    Okay.  Can you read "C" for us?
15  Well, first, before you do this, review the document
16        MS. ROBINSON:  Michael, please scroll down
17  so he can review this document.  Scroll down so
18  we can see his signature.  I can't —
19        THE WITNESS:  Okay.
20  BY MS. ROBINSON:
21   Q.    Is that your signature?
22   A.    Yes, ma'am.
23        MS. ROBINSON:  Exhibit 9.
24        (Exhibit 9 was marked for identification.)
25  BY MS. ROBINSON:

Page 91

1    Q.    And do you recognize this document?
2    A.    Yes, ma'am.  This is the document which we
3  have found the training on about September the 12th,
4  2018, where Instructor Bartholomew signed it and where
5  I signed it as a student.
6    Q.    Okay.  And can you read "C."  Well, let's
7  read — let's go back to the —
8         MS. ROBINSON:  Scroll up some, Michael.
9  BY MS. ROBINSON:
10   Q.    So this is the deadly force policy and
11  handout?
12   A.    Yes, ma'am.  This is what the instructor
13  gives us to sign when we're in the classroom portion
14  of the firearms qualification.
15   Q.    Okay.  So let's read the use of force for
16  arrest.  It says, "A law enforcement officer these — if
17  you can't finish — can you finish that sentence for
18  me.  On here it's "C," so —
19   A.    Start with "C"?
20   Q.    We want to read where it says "A law
21  enforcement officer...." and then end with "C," that
22  sentence.
23   A.    "A law enforcement officer is justified in
24  using deadly physical force upon another person for
25  [the] purpose specified in Subdivision

Page 92

1  subsection only when it is or appears to be reaso
2  necessarily thereby to defend himself or a third
3  person from what he reasonably believes to [be] t
4  use of imminent use of deadly physical force; to
5  effect an arrest or prevent the escape from the
6  custody of a person who he reasonably believes is
7  attempting to escape by means of a deadly weapon
8  by his conduct or any other means indicates he
9  he presents an imminent threat of death or seriou
10  injury to others unless apprehended with
11  [deadly force; or to prevent the escape of a person from
12  custody imposed upon him as a result of [a] convi
13  for a felony."
14   Q.    So let's go back to what was mar
15  the Exhibit 4, which was your investigation to
16        Ms. Oliver's complaint.
17   A.    Okay.
18   Q.    Mr. White was serving two felony warran
19  correct?
20   A.    Yes.
21   Q.    Mr. White informed you that Ms. Oliver
22  assaulted him, correct?
23   A.    Yes.
24   Q.    And under that policy that you just rea
25  could have used deadly force, correct?

Page 93

1    A.    No, ma'am.
2    Q.    She was a felon under "C."  Read
3  Subsection C.
4    A.    Under "C," ma'am, "to prevent the escap
5  a person from custody imposed upon him as a resul
6  [a] felony conviction]."
7         She hadn't been convicted, and this is,
8  careless, used for people who are — has a sentence
9  imposed on them, like in the prison system.  To s
10  nonviolent felony warrant is not justification
11  use deadly force.
12   Q.    Okay.
13   A.    And she hasn't been convicted of any fe
14   Q.    Okay.  So let's talk about that.  That
15  go back into your memory very well, so let's see if al
16  of these other conversations come back to your memor
17  the same way.
18         So you said that you interviewed Goolsb
19  correct?
20   A.    No, ma'am.  I never said I interviewed
21  I talked with him.  I said I talked with him.  I said I
22  with him, I talked with Sergeant Welborn, and I t
23  just with Captain Watkins.  I never said I interviewed
24  person for
25  of this Q.    Okay.  Well, you talked with them.



(866) 715-7770
advancedONE.com

Page 94

1    Are any of those conversations coming back
2  to memory?
3      A.   No.
4      Q.   None?
5      A.   None.
6      Q.   Welborn isn't coming back to memory?
7      A.   No, ma'am.
8      Q.   Watkins?
9      A.   The only thing I can say before
10 thing from Watkins I remember is he was the one that
11 initially spoke with Ms. Oliver. That's what I recall
12 back to my -- to memory with.
13     Q.   Okay. Okay. That's fair. In your that I
14 calculated from 1997 until 2018, you were in an
15 administrative role.
16          How many officers had used deadly force in
17 your tenure?
18     A.   I don't know, ma'am. I would say -- how
19 many used deadly force?
20     Q.   Right.
21     A.   Is that what you said? Okay.
22 Three are coming to mind that I can recall right now
23 as we're talking, at least three.
24     Q.   And what were those instances?
25     A.   We had a deputy who was assisting the animal

Page 95

1  control unit to take somebody's dog, and the lady came
2  out with shotgun. And the deputy several times told
3  her to "Drop the shotgun, drop the shotgun, drop the
4  shotgun." And when the person started lowering the
5  shotgun towards him pointing, he shot her. That's one
6  incident.
7          Another incident is where we were in a car
8  chase.
9      Q.   Was the outcome of that? Was that deadly
10 force investigated?
11     A.   Yes, ma'am.
12     Q.   And what was the outcome?
13     A.   He was exonerated.
14     Q.   Exonerated? Okay. And then another one was
15 what?
16          That person was shot? That citizen was
17 shot?
18     A.   Yes, ma'am.
19     Q.   And injured, dead or alive?
20     A.   They didn't die.
21     Q.   They didn't die. But no fatality, that person
22 shot?
23     A.   No, no. She wasn't -- she wasn't killed.
24     Q.   Okay. And -- okay. And the other instance? Any?
25     A.   There's an incident in which we were using

Page 96

1  coming back murder suspects that had committed murder
2  our county and a neighboring county.
3      Q.   Had they been convicted of murder?
4      A.   I don't know what their convictions were
5      Q.   No, no. You said "committed."
6          Had they been convicted at that time?
7      A.   Not on those particular murder charges.
8  had warrants for murder.
9      -- the only Okay.
10 The one that And the deputy came upon the vehicle th
11 were coming and a chase ensued. And when the deputy
12 out of the car, they fired. The deputy returned
13 that was another deadly force use that was exoner
14          And then the last one that's coming to
15 is there was a chase that ensued, and the vehicle
16 daily force to run over one of the officers. And he fi
17 and he was exonerated.
18     Q.   Tell me about that vehicle chase.
19     A.   The last one I was referring to?
20     Q.   Uh-huh.
21     A.   There was a chase. I don't know the re
22 right the chase, but there was a chase. The vehicl
23 went to the lake area and got into, like, a woode
24 area. And the deputies thought that he was going
25 jump and run from the vehicle. They started runn

Page 97

1  into the woods. As they were running to the wood
2  came out of woods. He saw one of the deputies.
3  gun, drove towards the deputy and accelerated at a hi
4  rate of speed towards the deputy, and the deputy
5  That's one
6      Q.   And the deputy was exonerated?
7      A.   Yes, ma'am.
8      Q.   Was the person injured?
9      A.   Yes.
10     Q.   How so?
11     A.   He was grazed in the shoulder.
12     Q.   How long did it take before that deputy
13 exonerated? Do you recall?
14     A.   I don't know. I don't know how long it
15 any of them to be exonerated, because all of them
16 involved also the SBI having to come in and do th
17 investigation -- do an investigation as well.
18     Q.   Well, I'm glad you mentioned that becau
19 was wondering if you acted as your own internal
20 affairs department or if the SBI gets involved or
21 what that process looks like in your use of force.
22     A.   Any officer-involved shooting, the SBI
23 called.
24     Q.   Any? Okay. That's the policy, the
25 we practice?



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Page 98

```
 1      A.   That's the practice.
 2      Q.   Does Vance County have an internal affairs
 3 department, or are you it?
 4      A.   I conduct most of them, and then there have
 5 been occasions in where, depending on the size of it,
 6 I've had to rely on other officers, other detectives
 7 that's appointed by the sheriff.  Typically, it may be
 8 a detective and another officer.
 9      Q.   What training do those officers have?
10      A.   I don't know what training -- I don't know
11 what their training is.
12      Q.   I do want to talk about training a little
13 bit.
14           What training did you have to conduct
15 use-of-force investigations?
16      A.   I've only -- you know, in terms of my
17 training, my training was early on in my -- in my
18 career when I first started doing these administrative
19 investigations.  The other training has been and
20 through -- going through, having done those over time.
21 When I first started doing this internal affairs
22 investigation, I was under the supervision of -- at
23 the time, the captain at the time.
24      Q.   What time --
25      A.   My training came through -- and my training
```

Page 99

```
 1 came through him as far as the on-the-job training.
 2      Q.   So you said when you "first started doing
 3 these."
 4           And "doing these," you mean use-of-force
 5 investigations?
 6      A.   I mean internal affairs investigations.
 7      Q.   Internal affairs, which would encompass use
 8 of force?
 9      A.   Some of them encompass use of force.
10      Q.   What year did you start that?
11      A.   1997.
12      Q.   1997?  Okay.  And you were trained by the
13 captain --
14      A.   Yes.
15      Q.   -- at the time?
16           Did you take any classes?
17      A.   I can only remember one time going to a
18 class in internal affairs investigation, and I don't
19 remember going any time but one time.
20      Q.   Okay.  What time -- what -- do you recall
21 what year?
22      A.   It would -- it would have been -- it was
23 shortly thereafter in 1997, but I -- I don't know if
24 it was in 1998 or -- you know, I don't know how long.
25 I just don't -- I don't remember the exact year, but
```

Page 100

```
 1 it was after I had started helping the captain with
 2 these type of investigations.
 3      Q.   And for the most part, you conducted these
 4 investigations as a single individual?
 5      A.   For the most part, yes, ma'am.
 6      Q.   Did you ever request help?
 7      A.   Me?  I'm sorry?
 8      Q.   Did you ever request help?
 9      A.   Help has been had.  You know, the -- in
10 doing -- part of my -- doing these investigations, the
11 captain has had other officers helping some of these.
12 When you have an officer-involved shooting, we can
13 then I request help from the SBI.
14      Q.   Okay.  And not within your department?
15      A.   I'm sorry?
16      Q.   Not within your department?  You don't
17 request help within your department?
18      A.   There have been a rare occasion.  Again,
19 been and that's -- for the most part, it's been early
20 on over time.
21      Q.   Did you -- can you recall a time in which
22 you had, like, a panel of investigators?
23      A.   Yes.  There was an officer who was a part-
24 deputy working an area of the county in which his
25 in-laws lived, and it was determined that he went
```

Page 101

```
 1 And then when the alarm -- or when the call was made,
 2 started going back down there to do the investigation of
 3 that break-in, and it was determined that he was --
 4 that he actually did the break-in.
 5           More than one investigator worked that --
 6      Q.   Tell me about that.  What do you mean more
 7 than one worked it?  What did they do?
 8      A.   I -- a minimum of three people, maybe four,
 9 helped with that investigation.  That officer was --
10 ended up being fired and criminally charged.
11      Q.   That's, like, a common theme right now,
12 right, in Vance County?
13           MR. GEIS:  Don't answer.
14           MS. ROBINSON:  Did you object, Chris?  I
15 think I heard you say something.
16 BY MS. ROBINSON:
17      Q.   You said more than one investigator
18 worked -- let me just make a note, and this is --
19      A.   Let's go off the record for this.
20           (Discussion off the record.)
21           (Recess in proceedings from 2:57 to 3:01 p.m.)
22 BY MS. ROBINSON:
23      Q.   Mr. Bullock?
24      A.   Yes, ma'am.
```



AdvancedONE LEGAL          (866) 715-7770
                           advancedONE.com

Page 102

1    Q.   Did you just have a conversation off the
2    record?
3    A.   Yes.
4    Q.   Was it about your questions, responses?
5    A.   No, ma'am.
6    Q.   What was it about?
7    A.   It was about how long -- how much longer
8    it's going to take for us to finish this.
9    Q.   I got an answer for you.
10   A.   Oh.
11   Q.   I'm going to get you out of here.
12   I'm almost done.
13   A.   Okay.
14   Q.   I'm almost done. Okay. And we
15   might be approaching done. Now, you know, I can hold
16   you for seven hours and question, question, question,
17   but I --
18   A.   It's totally okay. You have a right to do
19   it. I'm okay with it.
20   Q.   No. I asked you some about Mr. White
21   earlier, and I think you told me you didn't have very
22   much interaction with him, correct?
23   A.   That's correct.
24   Q.   And you didn't hear much about him, either?
25   A.   No, ma'am, I didn't. He was a short

Page 103

1    division from me, so he wasn't in my direct line of
2    command. So other than seeing him in the office,
3    passing the office, it was just -- he would -- he
4    would come -- he's walked by my office before, and
5    he's poked in, and, you know, we spoke before. But
6    again, it was so far and few between.
7    Q.   Okay. We were talking about the
8    investigations that you completed at Vance County.
9    And from what I understand, most of them were one
10   person. And you were telling me about the one time in
11   which there was more than one investigator, and that
12   situation involved an incident in which an officer
13   behaved, you know, badly.
14        Did you seek assistance in that
15   investigation, or did -- was assistance provided to
16   you?
17   A.   At the time I was captain -- I was the
18   captain that was doing those investigations. That
19   particular case was assigned to me, and I made the
20   decision as to what other officers would help.
21   Q.   So that was around the 1997 when you were
22   telling me you had been trained?
23   A.   Well, no. It was -- it might have been
24   200- -- I mean, a significant -- you know, it might
25   have -- it wasn't early on. It was, you know --

Page 104

1    it was before -- it was between 19- -- I mean
2    between 1997 and 2001. It was somewhere in that
3    range.
4    Q.   But it was significant enough for you to
5    remember?
6    A.   Yes, ma'am. Because I had an officer --
7    That was very significant.
8    Q.   Why was it significant?
9    A.   I considered him a friend.
10   Q.   Okay. Can you recall the number of citizens
11   who have complained to Vance County or filed
12   grievances or any of that nature?
13   A.   No, ma'am.
14   Q.   Would you say it's a lot, a little?
15   A.   I don't -- again, I just don't have a --
16   I don't have anything to go on. I don't have anything
17   significant to go on with that for me -- for it to be
18   right out -- flare up in my memory.
19        There could have been complaints that went
20   directed to an officer's supervisor, and that would
21   have -- on. And someone would have looked into
22   that, and that supervisor would have handled that --
23   you know, outside my knowledge. So I -- and even with
24   me, I -- did eventually come to my desk, I
25   from -- don't have a working number on how many that could

Page 105

1    have been.
2    Q.   Okay. Well, you just don't appear to me
3    like a person who would scare easily; is that true?
4    A.   I'm scared of snakes and dogs.
5    Q.   Okay. But you can handle complaints when
6    you're doing your job?
7    A.   I can handle what?
8    Q.   Complaints when you're doing your job.
9    A.   Yes, ma'am.
10   Q.   So you -- do you have a working knowledge
11   for the number of times the county sheriff's department
12   has been subscribed to, like, threats of suit? Is that
13   A.   I don't know what -- threats of soup?
14   Q.   How many people -- how many citizens
15   have threatened to sue the sheriff's office?
16   A.   Oh, I have no idea.
17   Q.   Has any citizen threatened to sue you in
18   this -- didn't investigate?
19   A.   No, ma'am. You know, I don't -- you know,
20   I've been sued before, but I don't know the number
21   who were who have threatened to sue the sheriff's
22   office. And I've never been threatened to, "If you
23   have done it something, I'm going to sue you."
24   I've never had that to happen.
25   Q.   Or sue the sheriff's office?



AdvancedONE LEGAL

(866) 715-7770
advancedONE.com

Page 106

```
 1      A.   Or sue the sheriff's office.
 2   people -- you know, I -- you know, it is -- it's
 3   it's a -- it's a common thing for people to say, "Oh,
 4   I'm going to sue you."  But I -- you know, for me,
 5   for me, there's nothing that has an effect on me to
 6   say, "Oh, my God.  This person will sue me.  I better
 7   do X, Y, Z."  I don't -- I don't have a -- that
 8   doesn't sway me one way or another.  I've heard the
 9   words "I'm going to sue you" a lot.  You know, "I'm
10   going to sue you-all" a lot.  But you have a right to
11   sue, so --
12      Q.   So -- but you've been sued before?
13      A.   Yes, ma'am.
14      Q.   How many times?
15      A.   I would say four other times, four or five
16   other times.
17      Q.   Do you recall those instances?
18      A.   Oh, yes, ma'am.  That's significant to
19   memory.  So yes.
20      Q.   Can you explain them to me.
21      A.   Okay.  There was a time that -- there was a time
22   that I had -- I was driving north on the interstate,
23   and then a highway patrolman was working, an accident
24   had already occurred.  And I stopped because the road
25   was partially blocked by the ambulance and the
```

Page 107

```
 1   trooper's car and the -- one of the victims' cars.
 2   I stopped and backed up and put on -- put out flags,
 3   put on my traffic vest.  And I start directing
 4   traffic, slowing traffic down, because the whole area
 5   kind of a little bit over a slight decline.
 6           And I had been out there slowing traffic
 7   down for about 20 minutes or so, and then a person
 8   pulling a mobile home, like a transport truck was
 9   a mobile home, came through at a very, very high rate
10   of speed and was not obeying my traffic signals
11   for him to slow down.  And then at the last minute, he
12   looked up, and he locked the brakes.  The trailer came
13   off and just wiped out the ambulance and the cars.
14           And so that was one time.
15      Q.   What did he sue you for?
16      A.   I guess it was, like, failure to do
17   my duty, causing that wreck.  But that didn't -- it
18   up -- it didn't get far.
19           Another time I was working the evidence
20   room, and I was leaving to go to lunch.  And so did I
21   and a city officer had a person stopped in a traffic
22   stop.  I drove up and said, "You-all got everything?"
23           And they said "yeah."  And I drove off.  And
24   then that person sued me as a result of what had
25   transpired in that traffic stop.
```

Page 108

```
 1   I mean,         I got sued one time where a fight had
 2   -- happened at a club.  An officer put a suspect in
 3   the back of a car.  The suspect kicked out the glass.
 4   The officers tried to get the suspect out of the car.
 5   They started fighting with him, like, from the inside
 6   of the car.  He was kicking officers, kicking
 7   officers.
 8           Another officer sprayed him with mace,
 9   his -- it was broke.  We don't know if it was broke
10   as a result of him kicking the glass out or kicking
11   officers or what, but that person sued me and all
12   the other officers there.
13           And then I think two occasions I've been
14   sued for people who were dead at the jail.
15      Q.   Okay.  Thank you.  Thank you for explaining
16   those situations.
17           The only question I have is if you -- to the
18   extent you are able to share, what were the outcome
19      A.   I guess the correct word -- I don't know --
20   don't know the legal term, but I considered it as
21   I was exonerated.  I was exonerated on all of them.
22      Q.   Okay.  So I want to -- I want to get --
23   want to make sure I understand this.
24           There is no board review -- no standard
25   board review on use-of-force incidents?
```

Page 109

```
 1      A.   So There is no standard board review?
 2      Q.   So there is no board that will convene
 3   saying, you know, this member must be a part of the
 4   board, that member; you get an amount of time to
 5   respond; there is --
 6      A.   That wasn't a practice.
 7      Q.   It wasn't a practice?  Was it a practice
 8   -- was there a standard number of complaints that
 9   must be had before an officer is dismissed?
10      A.   No, ma'am.  Each thing is done, you know,
11   last incident.  It wasn't, like, a buildup of anything.
12      Q.   I'm going to stand up.  My back is hurting.
13   I'm going to stand up and stretch.  I can stand
14   here.  I just need to stand up.
15      Q.   Mr. Bullock, if you want to take a
16   ten-minute break --
17      A.   No, no, no.  I don't.  I don't.
18      Q.   Okay.  Okay.
19      A.   I just didn't want you to say, "What are
20   you doing?"  I just needed to stretch.
21      Q.   Okay.  That's fine.
22      Q.   Is there a certain threshold that increases
23   the likelihood to be dismissed from --
24      A.   I don't understand that question.
25      Q.   So is a severity of a deputy's actions,
```


AdvancedONE LEGAL    (866) 715-7770    advancedONE.com

Page 110

1   increases his or her likelihood to be dismissed?
2       A.   We work at the pleasure of the sheriff.  I
3   can't answer that question.
4       Q.   Well, for your recommendation.
5       A.   My recommendation is done on a case-by-case
6   basis.
7       Q.   Do you find that different sheriffs have
8   different thresholds?
9       A.   I don't know how to apply that question.
10  It's apples to oranges, in a way.  By working at the
11  pleasure of sheriff, I can't apply that.
12      Q.   Now I'm asking you, would soliciting a sexual
13  favors from citizens be a serious complaint?
14      A.   I think that it would.
15      Q.   And just so I can understand it, is this --
16  is you.
17           Is assault a serious infraction?
18      A.   Assaults can mean -- have a range, so it
19  depends on the range of the assault.
20      Q.   Is it a requirement that supervisors report
21  instances in which deputies are involved in domestic
22  violence?
23      A.   I don't know when you say supervisor -- is
24  it a requirement for supervisors to report.  Then, no,
25  if a -- if a deputy is called to a house where the

Page 111

1   deputy is involved in domestic violence, there should
2   have been an incident report generated from that other
3       Q.   There should have been an incident?
4       A.   Uh-huh.  If it's a substantiated report a
5   substantiatable (sic) report.
6       Q.   Were you made aware of any instances in
7   which deputies were involved in domestic violence?
8       A.   Yes.
9       Q.   Tell me about those instances or that
10  incident.
11      A.   I don't -- there's an officer that had gone
12  out of town, for some reason, with another officer.
13  And when he got back into town, he discovered his
14  wife was with another gentleman at the Cracker Barrel.
15  And because of the way he conducted himself, follow,
16  service was no longer needed.  His conduct was with
17  his wife.
18      Q.   Is that the only one you can think of?
19      A.   That's the only one that's coming to mind
20  right now, and I'm not saying that's the only one.
21  That's what's coming to mind right now.
22      Q.   Did you make that recommendation?
23      A.   Yes, ma'am.
24      Q.   Were there any criminal charges brought
25  against that individual?

Page 112

1       A.   I don't remember any.
2       Q.   How much discretion does an officer have to
3   enforce the law, would you say?
4       A.   I don't know if I can put a quantitative
5   number on how much discretion a officer has.  An
6   officer has some discretion.  An officer is not -- has
7   that discretion.  An officer doesn't have unli
8   discretion.
9       Q.   Are there instances in which an officer
10  has no discretion to enforce the law?
11      A.   Yes, ma'am.  I believe there are instan
12  that a officer has no discretion to enforce the
13      Q.   What are those instances?
14      A.   If a person murdered someone in front o
15  officer -- this I think the officer doesn't have any
16  discretion to enforce the law.  I think he would
17  to enforce the law.
18      Q.   So if a sheriff's officer shot a citize
19  they should be placed under arrest immediately?
20      A.   No, ma'am.  It depends on the circumsta
21  In the first incident, I said "murder."  If a
22  sheriff's officer shot somebody and it wasn't mur
23  them -- then, no, they shouldn't be arrested.  If they sh
24  in the self-defense, then they shouldn't be arre
25  If a sheriff's officer murdered somebody in front

Page 113

1   from that other officer, then I think the arresting offic
2   have any discretion.
3       Q.   So self-defense plays a role in
4       Q.   a
5   the scenario?
6       A.   Yes, ma'am.  And in that scenario, yes,
7
8           MS. ROBINSON:  I think we can take a
9   five-minute break.  I want to just review so
10  things and then see if -- you know, can we g
11  that done record.
12           (Recess in proceedings from 3:26 to 3:33 p.m.
13  BY MS. ROBINSON:
14      Q.   Mr. Bullock, I have, like, a couple
15  follow-up questions, and this is just for my own
16  clarification.  We talked about the canine incide
17  and the -- a report shows that it was Adam Hight,
18  you said the canine bit a woman.
19           And that was the woman who was in the
20  warehouse, correct?
21      A.   Yes, ma'am.
22      Q.   A civilian?
23      A.   Yes, ma'am.
24      Q.   Okay.  It wasn't Adam Hight.
25           You also mentioned the domestic -- we t



Page 114

1   about the domestic violence situation.

2       A.   Yes, ma'am.

3       Q.   And you recommended separation from

4   employment?

5       A.   Yes, ma'am.

6       Q.   Was that recommendation received?

7       A.   I gave a recommendation to the sheriff.

8       Q.   And the sheriff separated employment?

9       A.   Yes, ma'am.

10      Q.   Do you recall the year of that?

11      A.   I do not.

12      Q.   Was that Sheriff White?

13      A.   Yes.

14      Q.   That was Sheriff White?

15      A.   Yes.

16           MS. ROBINSON:  I don't think I have any

17   further questions at this moment.

18           MR. GEIS:  Okay.  I have no questions at

19   all.  I guess we'll just reconvene tomorrow

20   morning for Sheriff White's deposition.

21           MS. ROBINSON:  Okay.  Well, thank you.

22      (Whereupon, at 3:35 p.m., the taking of the deposition

23   ceased.  Signature was reserved.)

24

25

---

Page 115

WITNESS CERTIFICATION

    I hereby acknowledge that I have read the

foregoing transcript of my deposition testimony, and

that my answers to the questions propounded, with the

attached corrections or changes, if any, are true and

correct.

_____        _____

DATE                   WELDON WALLACE BULLOCK

_____

PRINTED NAME

    Subscribed and sworn to on the _____ day of

_____ 20_____ before me.

                   _____

                   Notary Public, in and for the

                   State of _____

WHITE

vs.

VANCE COUNTY, NC, et al.

---

Page 116

ERRATA PAGE

List any corrections by page and line number on this
sheet.  If additional pages are necessary please
furnish same and attach them to this errata page.  You
are allowed 30 days within which to complete the
witness certification and errata pages.  After
completing these pages, please return them to:
              Advanced One Legal
              1600 Market Street
              Suite 1700
         Philadelphia, Pennsylvania  19103
Case Name:  White vs. Vance County, NC, et al.
Witness Name:  WELDON WALLACE BULLOCK
Deposition Date:  February 25, 2021

Page _____ Line _____ Change _____

Reason for Change _____
Page _____ Line _____ Change _____

Reason for Change _____
Page _____ Line _____ Change _____

Reason for Change _____
Page _____ Line _____ Change _____

Reason for Change _____
Page _____ Line _____ Change _____

Reason for Change _____
Page _____ Line _____ Change _____

Reason for Change _____
Page _____ Line _____ Change _____

Reason for Change _____
Page _____ Line _____ Change _____

Reason for Change _____
Page _____ Line _____ Change _____

Reason for Change _____
Page _____ Line _____ Change _____

Reason for Change _____

DATE _____        WELDON WALLACE BULLOCK

---

Page 117

CERTIFICATE OF REPORTER

STATE OF NORTH CAROLINA     )

COUNTY OF MECKLENBURG        )

    According to the emergency video notarization

requirements contained in NCGS 10B-25, I, Janet Cooper

Haas, RPR, Notary Public, do hereby certify that the

identity of WELDON WALLACE BULLOCK was confirmed by me

over Zoom, that the witness was located in Vance

County,  that the witness was remotely sworn by me

prior to the taking of the foregoing deposition, that

the parties were present as stated, that said

deposition was taken and transcribed under my

supervision and direction, and that I am not of

counsel for or in the employment of any of the parties

to this action, nor am I interested in the outcome of

this action.

    Additionally, I certify that the foregoing

114 pages constitute a true and accurate transcript of

the testimony, and that the witness reserved signature.

    This the 5th day of March 2021.

                   _____

                   JANET COOPER HAAS, RPR

                   NOTARY PUBLIC #19973240043



advancedONE LEGAL
(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

118

Index: $20..according

## Exhibits

**Exhibit 1** 3:7 20:25 21:2

**Exhibit 2** 3:8 20:22

**Exhibit 3** 3:9 46:2, 11 71:2

**Exhibit 4** 3:10 48:13,14 68:15 92:15

**Exhibit 5** 3:11 66:18,19 71:9

**Exhibit 6** 3:12 84:2, 3

**Exhibit 7** 3:13 86:13,14

**Exhibit 8** 3:15 89:2, 7,12

**Exhibit 9** 3:16 90:23,24

## $

**$20** 10:21

## 0

**06** 36:4,5

## 1

**1** 20:25 21:2,4 22:4 44:7 45:25 89:22 91:25

**1029** 5:11

**10:35** 21:19

**10B-25** 4:2

**11:01** 21:19

**11:50** 47:25

**11:55** 47:25

**12** 84:25

**12:53** 76:5

**15** 72:25 73:1

**1801-3870** 50:24

**19-** 104:1

**1967** 5:9

**1992** 6:16 8:4

**1997** 6:22 8:6,8 32:13,20,24,25 33:16 94:14 99:11, 12,23 103:21 104:2

**1998** 99:24

## 2

**2** 20:22 21:4 50:1,4, 9

**20** 107:7

**20-something** 65:25

**20/20** 76:11,15 77:7,9

**200-** 103:24

**2001** 104:2

**2004** 8:22

**2005** 8:17,22

**2018** 36:5 91:4 94:14

**2019** 65:24

**23-page** 22:9

**28th** 5:9

**2:06** 76:5

**2:57** 101:22

## 3

**3** 46:2,11,12 50:2,4, 9 71:1,2

**30** 21:8

**31** 33:24

**36** 66:24 67:11

**37** 66:21,24

**3:01** 101:22

**3:26** 113:12

**3:33** 113:12

## 4

**4** 48:13,14 68:15 85:1 92:15

## 5

**5** 66:18,19 71:9 72:25 73:1

## 6

**6** 84:2,3

**6th** 91:3

## 7

**7** 86:13,14

**7-15-2009** 45:20

## 8

**8** 89:2,7,12

## 9

**9** 90:23,24

**911** 38:24 43:15 48:24 49:22,23

## A

**a.m.** 21:19 47:25

**able** 108:18

**about** 5:16 6:8 7:10 11:19 13:14 16:24 18:8 19:10 21:17, 21 24:5,7,8,12,13, 20 30:22 31:12 33:18 35:10 36:14 37:5 40:12 41:13, 20 43:4,11 46:9 47:13 50:3 53:5,16 54:2 55:11 56:14, 16 57:13 58:2 59:7 60:4,25 62:3,4,15, 25 64:21 66:8 69:18 72:3 74:1 77:7,13,20 82:13, 17 83:2,3,7,9,22 86:19 91:3 93:14 96:18 98:12 101:7 102:4,6,7,20,24 103:7,10 107:7 111:9 113:16

**above** 50:12

**absence** 14:8

**abuse** 8:13 10:6

**accelerated** 97:3

**accidentally** 67:18, 20

**according** 12:11 65:9,13

AdvancedONE LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

119
Index: accurate..and

accurate 89:14

acted 97:19

acting 8:17

actions 48:9
109:25

actual 46:22 59:4
90:5

actually 9:4 17:16
55:4 60:12 65:18
76:3 89:9 90:2
101:4

Adam 113:17,24

add 35:18

address 5:10

admin 15:24

administration
6:12 8:21 37:9
40:19

administrative 9:1,
4,5 26:15 37:11,12
40:20 41:23,24
42:2 48:8 94:15
98:18

adverse 70:6,9

affairs 97:20 98:2,
21 99:6,7,18

afford 46:23

after 6:2,10 15:14
19:21 24:2,21
25:25 26:8 27:9
28:13 29:12 33:11
43:21 49:7,11 57:9
61:24 85:6 100:1

afterwards 26:5

again 16:12 25:22
27:12 28:9 43:14
56:5 63:12 64:15

70:25 80:6 89:20
100:18 103:6
104:15

against 48:10
111:25

agency 85:13

agents 45:25 46:17

ago 21:8

ahead 27:13,14
28:6 31:9

aids 85:5,14

alarm 101:1

alive 95:19

all 7:3 8:12,24
12:19 13:13 17:7
21:12 24:2 25:14
26:18,22 27:5,10
28:18 35:14 36:16
40:2,21 46:21 50:8,
11 54:25 56:15
59:7 61:21 63:4,23
64:7 75:17 77:3,15
78:15 80:10 83:5,
21 85:11 88:1
93:15 97:15
108:11,21

allow 34:12

allowed 73:16,17

allows 69:10

almost 15:1
102:12,14

along 13:7

already 71:11
106:24

also 4:10 16:22
20:13 32:25 64:14
80:1 97:16 113:25

always 5:12 26:23
56:6 59:8,12

am 70:11

ambulance 106:25
107:13

amount 10:19
25:13 32:20 109:4

ample 79:17

an 6:13,21 8:16 9:1,
19 10:18,22,23
11:5 12:2,8,9 14:21
15:24 17:2,3 18:12
25:13,20,21 28:10,
11,19 33:10,11
34:12 36:7 38:9,15
39:4,8,9,10,11,12,
13,19,25 40:19,20
41:9,23,24 42:2
44:7,8 46:1,23 48:2
53:10,23 54:13
60:6,9,16 64:19
65:3 67:24,25 68:7,
8,11 70:2,6,8 73:7
76:9 77:24 79:1
80:25 82:1,2 83:18
85:15 89:14 92:5,9
94:14 95:25 97:17
98:2 100:12,22,23
102:9 103:12
104:6,20 106:5
108:2 109:4,9
111:2,3,11 112:2,5,
6,7,9,12

and 4:3,10,17,19
5:8,21,25 6:6,13,
14,15,22,25 7:8,11,
18,20,23 8:1,4,5,7,
10,12,14,20,21,24
9:15,17,19,20
10:20,25 11:5,6,17,
23 12:4,7,13,14,18,
20,24 13:17,19,20,

21 14:3,4,6,10,12,
17,22 15:4,9,14,25
16:1,2,5,8,10,13,14
17:5,7,8,19 18:15,
18,22,25 19:9,17
20:1,5,9 21:4,5,8,
13,14,22,23 22:8,
12,20,23 23:1,5,7,
24 24:2,4,23 25:6,
9,12,14,19,20
26:16,18,22,23
27:6,16,21,24 28:9,
12,13,20 29:11,15,
24 30:17,25 31:9,
16,20,22 32:1,6
33:4,5,6,7,12
34:17,18,21 35:4
36:5,19,23 37:3,5,
10 38:2,9,13,22,25
39:1,2,3,18,23,24
40:6,7,17,18 41:1,
7,9,11,14,15,16,17,
20,22 42:1,5,9,15,
22,25 43:19,23
44:1 45:10,18,21
46:19,22 47:3,7,8,
19 48:5 50:2,4,9,
13,24 51:7,15 52:3,
4,5,9,11,25 53:6,
17,20,21 54:11,19,
23,24 55:4,19,21
56:15,23 57:5,6,7,
8,17,18,23 58:12,
18,20,24 59:1,4,21,
23 60:13 61:7,18,
25 63:1,6,14,19,20,
21,22 64:6,11,13,
24 65:3,7,9,11,14,
16,19,25 66:3,13,
14,24,25 67:17
68:15 69:1,9,13
70:15,17 71:8,23
72:7,15,16,25 73:1,
7,17,25 74:3,8,11,
17,18,19 75:5,7,13,

19 76:9,13,16
77:16 78:7,9,10,16,
18,21,23 79:17,18,
19,24 80:18 81:2
82:4,5,17 83:16
84:1,8,16 85:15,24
86:12,23,24 88:10,
15,23 89:2,14,17,
22 90:6,7 91:1,4,6,
10,21 92:24 93:7,
13,22 94:24 95:1,2,
4,12,14,19,24 96:2,
10,11,14,15,16,17,
23,24,25 97:3,4,6,
16 98:4,8,25 99:4,
12,18 100:3,14,19,
24 101:1,3,11,19
102:8,14,16,21,24
103:4,5,6,9,10,11,
19 104:2,20,21,22,
23 105:4,22
106:23,24,25
107:1,2,3,6,7,10,
11,12,13,14,20,21,
22,23 108:8,11,13
109:13 110:15
111:13,15,20
112:20,23 113:6,
10,15,17,19

**animal** 78:20 94:25

**animals** 46:25 47:9
78:19

**another** 12:20 19:9
28:13 42:5 77:12
91:24 95:7,14
96:13 98:8 102:25
106:8 107:19 108:8
110:25 111:12,14
113:2

**answer** 4:16 7:24
11:9 37:25 39:20,
22 65:18 84:22
101:14 102:9 110:3

**answered** 72:2

**answers** 78:16

**any** 4:21 6:2 24:11
35:9,21 36:14 39:4
42:17 43:5,9,14,17
44:9,10 46:6,24
52:15 60:2 67:18
68:10 69:20,22
70:8,10,23 74:12,
25 75:1 79:22 80:9,
12,16 83:16 87:10,
12 88:7,21,23 92:8
93:13 94:1 97:15,
22,24 99:16,19
104:12 105:17
111:6,24 112:1,15
113:3

**anybody** 27:23
60:19 69:11 70:11,
21,23

**anybody's** 75:23

**anyhow** 31:10

**anyone** 61:14

**anyplace** 20:3

**anything** 5:2 11:19
35:16,17 41:2 57:9
58:2 67:22 69:10
75:5 82:19 83:2,3,7
104:16 109:11

**AOC** 23:2 33:24

**apart** 69:5

**appear** 105:2

**appears** 92:1

**apples** 110:10

**applicant** 12:7,8,9
25:5 28:6 30:22
34:12

**applicants** 18:14

**application** 12:2,5
17:3,11,14,19
18:15 19:22 21:2
24:5 33:10,11
46:23

**applications** 32:20

**apply** 110:9,11

**appointed** 98:7

**apprehend** 80:3
88:12

**apprehended**
92:10

**approaches** 74:19

**approaching**
102:15

**approved** 85:15

**approximately**
84:24

**April** 65:24

**are** 5:1 12:11 13:15
14:5,17 19:15 23:2
25:10 29:3 37:10
39:4,7,17,18,21
41:4,20 44:5,23
50:7,14,25 51:2
56:1,7 61:7,25
63:6,8,10 64:22
65:13 67:4 69:20
71:24 72:17 76:10,
25 78:23 82:21,23
84:13,24 86:12,17
87:16,21 89:17
90:7 93:8 94:1,22
98:3 108:18 109:19
110:21 112:9,11,13

**area** 80:25 96:23,24
100:23

**aren't** 25:2

**arm** 58:20 59:2,24
60:6,9,12,13,16,18
67:15 69:4 75:21

**arms** 74:18

**arose** 81:11

**around** 14:11 53:3
58:1 103:21

**arrangements**
62:13

**arrest** 72:1,11 74:2,
7,20 91:16 92:5
112:19

**arrested** 74:16,17,
18 112:24,25

**arresting** 85:13
113:2

**arrests** 71:20

**as** 4:4,9,18,19 6:9,
13,23 7:2,20 8:24
9:5,19 10:18 12:10
13:25 14:10,22
16:8,18,19,21
18:12 21:2 22:10
27:6 32:17 33:1
34:21 36:22,23
38:3 41:17 47:1,3
48:13 54:10 56:5,
21 57:6,20,22
63:17 65:10,15
66:17 68:3,14
69:16 73:23 78:11
85:5 86:13 89:2,12
91:5 92:12,15 93:5
94:23 97:1,17,19
99:1 100:4 103:20
107:24 108:9,20

**Aside** 36:11

**ask** 18:8 19:10
23:24 28:7 50:2
57:18,19 68:5



(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

121

Index: asked..been

69:18 72:9

**asked** 21:22 37:5
53:19 60:25 71:21
86:19 102:20

**asking** 21:21 77:7
89:25 110:12

**asks** 4:16

**aspect** 37:3

**assault** 110:17,19

**assaulted** 92:22

**Assaults** 110:18

**assigned** 7:23
38:11,23 78:21
88:16,22 103:19

**assignment** 25:18

**assistance** 103:14,
15

**assisting** 94:25

**associated** 69:20,
23

**asthma** 70:18,21

**at** 6:6,7,16 7:3,16,
20 8:4,5 11:2,14,17
13:1,13 15:1 17:13,
20,21 21:8 24:23
25:2,23 26:1,20
27:5,15 28:12,17
34:3 35:8,24 36:2
37:4,19 38:4 39:3
40:2,16 45:1,7,13
49:23,24 52:16,22
53:10,14 54:17,25
55:1,2 61:21 62:6
65:18,20 66:24
68:1,25 70:13 75:3,
5,7 76:7,8 77:3,8
80:10,25 81:22
83:21 86:22 88:1
94:23 96:6 97:3

98:22,23 99:15
103:8,17 107:9,11
108:2,14 110:2,10
111:14

**attack** 74:5

**attacked** 80:15

**attacks** 70:16

**attempting** 92:7

**attorney** 62:14

**audio** 90:3

**authority** 76:15

**available** 25:2

**average** 42:18

**aware** 54:11 56:8
70:11 111:6

**away** 56:24

_____

**B**

**B.9.** 45:17

**B.9I.** 58:23

**bachelor's** 6:3

**back** 6:13 10:7
19:20 26:19,20,21,
22 27:13,14 28:13
32:2,5,6 33:6,11
47:11 50:2 51:22
53:6,12 65:3 68:14
70:5 71:5 74:18
76:22 78:8,9 82:20
91:7 92:14 93:15,
16 94:1,6,12 101:2
108:3 109:12
111:13

**backed** 107:2

**background** 12:6,7
17:6,17 19:23

20:14,16 21:22
23:4 24:21 26:4,6,8
28:21 33:23 34:8,
11,13,14 37:16

**backgrounds**
26:13

**badly** 103:13

**bar** 60:6,9,16,18
67:15 75:21

**Barrel** 111:14

**Bartholomew** 91:4

**base** 51:6 58:21

**based** 44:16,18
50:5,15 51:10,12,
14 61:5 84:22
85:24

**basic** 7:7,8 14:1
27:3

**basically** 53:2
60:11

**basis** 35:13,14,17
110:6

**batons** 65:11,15

**be** 4:11 13:21,25
14:20,25 16:16
17:22 18:16 24:18,
20 25:4,17,18
27:11 28:10,14
29:6,13 30:7,8,10,
14,18,19,23 32:11,
23 33:13 34:14
35:22 38:18,19,20,
25 39:5 41:7,12,16
42:4,5,10,22,24,25
44:1,3,4,20 46:3,5,
8 47:1 48:12 50:1
52:16 58:4 60:1
63:25 64:8,11,14,
16,22 65:1,3,5,6,8
67:9,17 68:4,25

70:18,19,20 73:5
75:22 76:13 77:24
78:12 79:7,13
83:15,19 84:2 85:6,
7,10,12,14,19,21
92:1,3 97:15 98:7
102:15 109:3,9,23
110:1,13 112:19,
24,25

**bearing** 77:10

**became** 36:4 53:5

**because** 15:1 17:16
24:25 25:6,23 27:1,
12 28:14 32:22
33:2 35:4,11 36:21
38:5 44:25 51:20
57:2 62:5 64:6,23
69:1,7 75:23 82:18,
21 97:15,18 104:6
106:24 107:4
111:15

**become** 83:6

**been** 4:3,12 7:17
10:1,12 12:25 13:1,
2,6,9 14:11,14,21
15:11 17:12 19:7
20:8,13 24:23 28:9,
16 31:15 32:12,14,
15 33:15,23 34:3
35:24 36:2,24 40:6
44:8 47:8 52:16,18,
20,21 54:5 61:8,9,
10 63:2,4 70:9,22
72:18,23 74:6,9
79:1 81:8,9,21,25
82:1 83:17 88:22
89:12 93:7,13 96:3,
6 98:5,19 99:22
100:9,18,19
103:22,23 104:19
105:1,20,22 106:12
107:6 108:13
111:2,3

**before** 4:12 11:14
17:2,15 26:3,6
28:12 33:3 38:6
44:8,9,16,19 49:17
53:3 59:4 62:8,9
70:3 84:23 90:15
94:9 97:12 103:4,5
104:1 105:20
106:12 109:9

**beginning** 34:25

**behaved** 103:13

**behind** 65:2 74:18

**being** 27:6 34:13
36:5 55:5 62:12
75:24 86:20 101:11

**believe** 9:2 13:4
18:16 77:18 112:11

**believed** 68:25

**believes** 92:3,6

**bent** 60:8 67:14

**Bertie** 23:18

**better** 106:6

**between** 52:2 72:25
103:6 104:1,2

**big** 40:4

**birthdate** 5:8

**bit** 11:16 19:4 39:13
42:20 69:6 75:22
76:10 80:24 81:2
85:19,22 86:20,24,
25 98:13 107:5
113:18

**bite** 80:22

**bitten** 79:8,9,20,23
80:17 82:4

**BLET** 13:19,21
14:11 66:8,9,12

71:8,22,25 72:3,7,
11,14 75:12

**BLET's** 71:19

**blocked** 106:25

**board** 108:24,25
109:1,2,4

**bone** 69:4

**both** 54:17

**bottom** 45:7,12
46:13

**brakes** 107:12

**Brame** 11:22

**brandished** 64:4

**brandishing** 59:4

**break** 21:14,16,17
67:1 76:3 109:16
113:9

**break-in** 39:9
101:3,4

**break-ins** 10:5

**brief** 5:14

**briefly** 6:4,13

**bring** 86:3

**broke** 50:8 58:20
59:1,24 100:25
108:9

**brought** 79:13
111:24

**building** 80:24

**buildup** 109:11

**bulk** 14:6

**bull** 35:4

**bullet** 46:19 85:4

**Bullock** 4:2,7,23,24

5:7 18:6 21:21
22:12 37:18 45:14
48:2 61:19,23 76:7
87:21 89:11 90:10
101:24 109:15
113:14

**Bullock's** 87:18
89:4

**Bullocks** 4:25

**burglarized** 100:25

**bust** 83:23

**but** 4:8 6:5 8:13,18,
19 10:23 11:13
12:19,22 13:2,9
14:1,14 15:2,4
16:17,21 17:15
23:25 25:22 26:13,
22 27:8,22,25 30:5
32:7 33:7,22 34:2,
19,24 35:7 37:5
41:2 42:22 47:13
49:9,23 50:3 51:10,
16 52:15,18 54:11,
18 55:24 56:8,13
57:4 61:22 62:4
64:4,10 66:5 68:25
70:14 71:18 74:21
76:15,23 77:11
79:24 80:23 81:12
82:4,5,17 83:3,20
84:15,18 88:2,9
89:20 95:21 96:22
99:19,23,25 102:17
103:5 104:4 105:5,
20 106:4,10,12
107:17 108:11,20

**by** 4:6 6:11 18:19
19:5,13 21:20 22:2,
7 30:11 35:4 36:25
37:24 38:10,13
39:13 42:24,25
43:8 45:4 46:15

47:1,18 48:1,15
55:14 60:11 64:14
66:20 67:6 71:10
73:15 74:4,17 76:6,
21 78:5 80:24 82:7
84:4,12 85:8,10,15
86:8,16 87:20
88:15,16,22 89:8
90:8,9,20,25 91:9
92:7,8 98:7 99:12
101:17,23 103:4
106:25 110:10
113:13

## C

**calculated** 94:14

**call** 34:16 41:17
54:13 59:9 87:24
101:1

**called** 15:4 38:19,
21 53:10 61:25
79:17 97:23 110:25

**calls** 7:24 14:6
63:18

**came** 6:13 8:19,20
17:1 28:13 33:11,
14 53:12 61:24
81:4,11 93:14 95:1
96:10 97:2 98:25
99:1 107:9,12

**can** 5:10,19 6:8
7:22 10:16 13:11
16:25 17:21,24,25
18:3,4,5,11,17,23,
25 19:14 20:21
21:25 22:3,5,11,15,
17 23:1,9 24:19
25:14 26:10,11
29:9 30:22 31:12
34:7 36:7 37:21,25
38:20,22 39:22



WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

123

Index: can't..commander

42:24,25 43:4 45:2,
7,10 47:6,16,19
48:5,19 53:1 55:11,
16,17,19 57:14,15
58:9,18 60:9 63:15
66:21,22 67:1,7,17,
24 68:7 72:22 73:1
74:1,15 76:3,4,12,
16 78:3 79:4 80:13
83:4 85:1 86:1 89:1
90:14,17,18 91:6,
17 94:9,22 99:17
100:20 102:15
104:10 105:5,7
106:20 109:13
110:15,18 111:18
112:4 113:8,10

can't 11:9 26:11,12
27:18 36:14 42:14
45:15 47:8 55:24
63:13 65:18 66:2
68:3 70:14 74:16
79:22 90:18 91:17
110:3,11

candidate 13:23
14:11

canine 77:23,24
78:7,20 79:2,7,13,
19,21 80:15,17
81:9,13 82:2 83:2,
5,6,10,13,18,19,25
85:11,19,22,24
86:4 113:16,18

canines 77:21,22
79:15,25 80:1,4,7
82:4,21 83:2,23
84:5 85:17

cannot 32:21

Capsicum 46:20

captain 12:20,25
13:2,16 15:24
16:18,19 49:14,21

55:15 58:11 75:5,
18 93:23 98:23
99:13 100:1,11
103:17,18

captains 16:2

car 39:24 53:2
74:10,11 95:7
96:12 107:1 108:3,
4,6

card 27:1

career 6:8 8:7
98:18

Carolina 5:11,13,
18,24 6:7 20:9,11
23:11,16,17,18,19,
20,21

carry 47:6

cars 25:2 107:1,13

case 25:17 26:9
43:10 70:19 85:8,
10 103:19

case-by-case
110:5

cases 8:12 10:2,3,6
64:17 79:21 85:7,
12

caught 25:10 26:20

caused 69:3,8 73:4

causing 107:17

Central 5:24 6:7

certain 27:25 64:17
66:14 79:12 109:22

certainly 59:23

certificate 27:4

certifications 25:7

certified 88:2

chance 45:24 46:16
89:11

change 11:16 35:1

charge 9:16 37:9,
16 83:13,17,19,21

charged 101:11

charges 24:12 96:7
111:24

chase 39:11 95:8
96:11,15,18,21,22

check 12:6,7 17:6,
17 19:23 20:14,16
21:14 24:21 34:8,
11,13 53:14

checked 54:10 56:7

chemical 45:24
46:16 71:12 74:13

chief 16:1,2,3,4,7,8,
21

child 8:13 10:5

chin 75:22,24

Chowan 23:18

Chris 22:5 47:21
89:1 101:15

circumstances
12:11 27:25 42:12
112:21

citizen 67:21 70:6,8
79:2 95:16 105:17
112:18

citizens 104:10
105:14 110:13

city 107:21

civil 6:24,25 9:3
15:7,8,10 37:15
82:9,18

civilian 87:1 113:22

clarification 113:16

clarify 78:10

class 89:22 99:18

classes 99:16

classroom 91:13

clavicle 73:6,11,15

clearly 78:11

clerk 20:3,5 34:17

clerks 23:3 26:20

close 67:16

club 108:2

coffee 47:23

colleague 4:10

collected 9:14

college 5:21,23
6:10 18:25

come 10:7 12:9
17:4 25:14 26:5,13,
14,15,16 38:2,5
39:2 40:14,25 41:3,
19 42:7 47:10 50:2
58:24 74:11 81:10
82:17 93:16 97:16
103:4 104:24

come-along 60:8

comes 25:5 70:11

comfortable 84:21

coming 9:8 24:17
33:4 35:11 67:22
94:1,6,11,22 96:14
111:19,21

command 15:15
103:2

commander 15:23,



24 81:20,21

**committed** 42:17 96:1,5

**common** 74:21 101:12 106:3

**compare** 68:3

**compiled** 27:6 51:14

**compiling** 26:23

**complain** 73:22

**complained** 104:11

**complaint** 49:1,3,5, 12 92:16 110:13

**complaints** 104:19 105:5,8 109:8

**complete** 6:5 12:13 56:21

**completed** 7:8 56:22,23 57:17 70:2 103:8

**completion** 43:6

**computer** 27:16

**concealed** 37:14

**concept** 76:11,22, 25 77:7

**concerning** 42:3

**conclude** 60:22

**conclusion** 50:10 51:10 52:4 58:19, 24 60:21 68:20

**conclusions** 50:12

**concrete** 28:23

**conduct** 92:8 98:4, 14 111:16

**conducted** 19:22

48:25 61:1 81:12 100:3 111:15

**conducting** 48:20

**confronted** 53:4

**confuse** 4:24

**confusion** 4:20

**conjunction** 77:21

**consequences** 44:13

**consider** 14:23 68:2,4

**considered** 81:9 82:22,23,24 83:1 104:9 108:20

**consist** 42:1

**contact** 40:16 41:12 53:9,11

**contained** 48:7

**continue** 17:25

**continued** 9:7 52:11

**continuum** 44:6 63:11,17,19,24 64:22 65:9,14,17, 19 71:16 72:1,12

**contract** 19:15,20

**contrary** 69:3,7,13, 17

**control** 11:3 59:25 60:1,5 67:16 71:19 72:1,11 73:14 75:25 78:18,22,23 95:1

**controlled** 85:5,9, 11,16,23

**convene** 43:10,13

109:2

**convened** 27:9 30:17

**convening** 30:20

**conversation** 41:13 51:8,11,25 52:1,8 53:21,24 56:12,14, 17,20,25 62:17,21 102:1

**conversations** 50:3 51:5,19,23 93:16 94:1

**convicted** 93:7,13 96:3,6

**conviction** 92:12

**conviction]** 93:6

**convictions** 96:4

**cooperative** 53:14

**copy** 26:25

**corner** 45:14,15

**correct** 23:22 29:19 30:12,20 31:8 44:22,24 50:16 58:4,6 59:5,6 61:2 65:11 70:18 71:13 75:8 82:22 87:22 88:15 89:15,23 92:19,22,25 93:19 102:22,23 108:19 113:20

**could** 27:23 32:19 35:18 38:19,25 39:14 44:3,4,20 46:12 59:21,24,25 60:6,7 65:6,8 68:22,23 69:18 70:18 76:23 79:7 92:25 104:19,25

**couldn't** 32:13 53:20

**counties** 24:3

**county** 6:14,16 7:8 8:5 10:13 11:2,14, 18 13:12 23:7,9,10, 11,12,13,16,17,18, 19,20,21,22 25:1 35:2 45:8,9 58:14 66:7,11 71:18,21, 24 72:3,7,10,14 75:7,10 76:15 78:6 82:10 85:10,16 87:13 88:17,19,22, 25 89:18 96:2 98:2 100:23 101:13 103:8 104:11 105:11

**County's** 45:22

**couple** 113:14

**court** 8:1 9:22 10:2 33:20,21,22 37:17 76:15 85:7

**courthouse** 25:12

**courts** 20:3,6 23:3 26:15 85:6

**Cracker** 111:14

**created** 33:3

**criminal** 6:1 8:2,11, 12 9:6 10:2,3 12:6 14:20 17:6 19:23 20:2,5,10,14 23:4 24:3,11 34:8,11 37:15 111:24

**criminally** 101:11

**criteria** 79:6

**cuff** 60:14

**current** 11:17,19

AO AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

**custody** 79:6,8
    92:6,12 93:5

**customary** 88:18

---

**D**

**danger** 69:22

**dangers** 69:20

**data** 43:15,16

**date** 8:23 45:18
    49:7 52:5

**dates** 8:19

**day** 37:19,22 49:6
    52:4 53:3,13,23

**day-to-day** 35:13,
    14,17

**days** 40:15

**DCI** 20:1 26:16
    37:14

**dead** 95:19 108:14

**deadly** 63:22,25
    64:2,24 91:10,24
    92:4,7,25 93:11
    94:16,19 95:9
    96:13

**death** 92:9

**debris** 40:4

**decision** 16:16
    17:8 50:5,15 58:21
    77:10,11 103:20

**decisions** 16:10,
    13,14

**decline** 107:5

**defend** 92:2

**define** 48:5

**definitely** 16:21

**degree** 6:3

**degrees** 26:25

**delay** 92:11

**delayed** 42:24,25

**demote** 44:4

**department** 28:18
    35:9 36:18 38:11,
    17 97:20 98:3
    100:14,16,17
    105:11

**departure** 59:8

**depending** 25:5
    40:24 41:18 98:5

**depends** 27:14,24,
    25 42:11 110:19
    112:21

**deploying** 88:10

**deposed** 4:12 9:25
    10:1

**deputies** 9:13 14:5,
    18 15:4,9,19 32:10
    39:1 46:21 65:4
    72:7 78:18 79:25
    96:24 97:2 110:21
    111:7

**deputy** 6:9,19,20,
    23,24 7:2,20 11:6
    12:1 13:15,16 14:4,
    10,13,22 16:1,2,3,
    4,7,8,22 25:17 26:1
    46:23 48:9 58:4,13
    64:6 67:20 68:21,
    23,24 69:2,18 75:3
    94:25 95:2 96:10,
    11,12 97:3,4,6,12
    100:23 106:21
    107:20 110:25
    111:1

**deputy's** 109:25

**describe** 79:4

**describes** 67:8,10

**designate** 85:9

**designated** 12:17

**desk** 82:6 104:24

**details** 56:13 80:23
    87:5

**detect** 85:24

**detective** 14:22,25
    15:6 98:8

**detectives** 14:20
    15:11 98:6

**determine** 30:18,23

**determined** 100:24
    101:3

**did** 4:8 5:16,21,22,
    23,25 6:2,10 7:5,20
    9:3,4,22,24 10:9
    11:10,13 16:1 17:6,
    11,15,17 19:25
    24:5 30:8,13 31:1,
    4,18,22 33:1 34:7,8
    35:19,20 36:7
    44:13,15,16 49:4,
    10 51:5,6,25 52:13,
    14,15,25 53:10,21
    54:7 55:8 56:12
    57:15,18,23 58:7,
    21,24 60:16,21
    61:13,22 62:11
    65:22 71:21 73:22
    74:4,25 77:3,8,15,
    18 78:8 81:3 87:13,
    15 97:12 98:14
    99:10,16 100:6,8,
    20 101:4,8,15
    102:1 103:14,15
    104:24 107:15
    111:22

**describe** 79:4

**didn't** 6:5 11:10
    21:7 30:10,14
    34:19,20 35:4,21,
    22 36:9,19 41:2
    46:6 57:8,18 59:19
    62:5 88:6 95:20,21
    102:21,24,25
    105:18 107:18
    109:19

**die** 95:20,21

**difference** 61:11

**different** 13:6 26:14
    37:6 83:15 110:7,8

**differently** 59:22
    76:23

**direct** 51:5,8,11
    66:13 103:1

**directed** 104:20

**directing** 107:3

**direction** 88:19,24

**directive** 45:13,17
    58:23

**directly** 16:4 35:16

**discharge** 107:16

**discharged** 63:25

**disclosed** 19:7

**discovered** 111:13

**discretion** 112:2,5,
    6,7,8,10,12,16
    113:3

**discuss** 11:17
    61:13

**discussed** 31:14
    61:18,19 62:10,22,
    24 63:7,8 71:11

**discussion** 101:21



**discussions** 61:22
63:4

**dismissed** 109:9,
23 110:1

**dispersant** 71:12

**dispersants** 74:13

**disposal** 68:25

**disposition** 85:7

**district** 7:23

**division** 6:24,25
9:3 15:8,10,17
17:10 35:12 37:7,8,
10,12,17 103:1

**divisions** 37:10

**DMV** 26:17

**do** 7:25 12:5,23
13:24 14:6 17:24
18:20 21:13 22:20
25:9 26:12 27:20,
22,23 28:1,8 30:13
31:4 34:9,19 35:8,9
38:2 40:2 41:2,20,
22 42:6,21 43:7,22
46:13,19 48:16
49:4,18 50:6,18
55:11 56:13,20
57:1,3,9 59:8,13
60:15,17 61:4
62:16,19 68:20
70:10,24 71:18
73:6,10 74:4,23
76:1,10 78:18 80:4,
7 81:5,7 82:19,20
83:9,12 84:5,18
87:7,8,9 89:5 90:15
91:1 97:13,16,17
98:9,12 99:20
101:2,7,8 102:18
105:10,23 106:7,17
110:7

**document** 17:21
18:9,11,12 19:10,
19 22:1,3,9,20
23:14,15 47:20,22
48:3,5,17 51:16
58:8 86:13 89:10
90:15,17 91:1,2

**documentation**
43:17

**documents** 21:10
22:21,24 23:1 24:1
26:25 27:10 43:18
48:7 49:16 55:20

**does** 9:12 11:23
29:9 37:11 38:13,
14,15 42:9 47:4
63:23 66:7,11
69:14 71:25 72:6,
10,14 75:10 78:6
82:15 84:17 85:16
98:2 112:2

**doesn't** 29:25
60:18 69:12 106:8
112:7,15 113:3

**dog** 39:13 78:22
79:8,9 80:21,24
86:22,24,25 95:1

**dogs** 78:24 105:4

**doing** 9:2,7 16:18,
21 32:12 33:14,15
35:4 57:2 80:25
98:18,21 99:2,4
100:10 103:18
105:6,8 109:20

**domestic** 110:21
111:1,7 113:25

**don't** 4:24 7:18
8:18 9:19 11:19,20,
21,22 12:18,21,24
16:16 17:4,15
20:24 24:9 27:14

28:5 30:4,15 32:7,
8,12 34:24 35:12,
15,17 37:21,22
39:19,20,21 40:1
42:15,16,22 43:1,2,
7 44:11,25 45:16
49:6,9,23 51:4
52:4,5,14,15,17,21,
23,24 53:1,2,22,25
54:8,11,14,15,19
55:7,10 56:4,5,8,13
57:24,25 58:1,5
59:9,12 61:6,10,11,
20 62:4,18,20 63:2,
16 65:17,20 66:2,5
67:9,22 68:2,10,13
69:9 70:8,10,19,20,
21,22,23 71:14,17
72:16 75:15,23
77:22 80:9,20,23
81:4 83:2,3,7,16,20
86:1,6 87:4,6,11
88:9,13,21 94:18
96:4,21 97:14
98:10 99:18,23,24,
25 100:16 101:14
104:15,16,25
105:2,13,19,20,23
106:7 108:9,19,20
109:17,24 110:9,23
111:11 112:1,4

**done** 12:5 13:3,4,5
14:1 23:25 26:18
28:10,23 33:2 34:2,
4,13,14,15 35:5
57:4,5 59:22 60:6,7
76:23 98:20
102:12,14,15
109:10 110:5

**down** 10:20 17:4
19:4,9 22:13,15
27:15 31:20 33:5
39:23 42:7 52:9
60:3,13,17 71:3,4

84:9 90:16,17
101:2 107:4,7,11

**drafting** 48:17

**draw** 41:5 64:11

**drew** 41:1,2 64:19

**drill** 4:15

**driver** 53:5

**driver's** 24:13 27:1

**driving** 20:2,13
24:4 39:23 106:22

**drop** 95:3

**drove** 107:22,23

**drug** 6:11 10:16
15:12 79:22,24
83:23

**drug-sniffing** 80:2

**drugs** 80:5,8 85:25

**dual** 80:1

**due** 35:1

**duly** 4:3

**Durham** 5:11
36:13,18

**during** 32:3 52:8
56:6 63:4 80:24
83:23

**duties** 8:25 13:8
38:3

**duty** 107:17

---

**E**

**each** 23:7 78:20
109:10

**earlier** 59:3 60:25
77:19 86:19 100:10
102:21



**AO** AdvancedONE
LEGAL

**early** 9:5 34:16
73:16 77:20 98:17
100:19 103:25

**ease** 4:17

**easily** 105:3

**education** 6:2,5
20:8

**effect** 58:16 70:22
92:5 106:5

**effective** 45:18

**effects** 46:24

**egregious** 44:21
82:3

**either** 8:22 20:3
51:13 54:16 102:24

**else** 11:10 27:23
41:2 42:6 75:6
81:17

**email** 21:6,15

**emails** 21:7,8

**employ** 78:7

**employed** 48:20
68:9,12

**employees** 15:3

**employment** 19:16
21:3 24:6,8,13,22
35:10 37:4,20
59:10

**employs** 71:19

**encompass** 99:7,9

**end** 65:23 91:21

**ended** 53:11 65:19
101:11 107:17

**enforce** 112:3,10,
12,16,17

**enforcement** 6:11
7:7,9 13:13,14 14:1
27:2,4 60:2 65:19,
22 91:16,21,23

**engage** 40:17

**engagements**
40:13

**enough** 14:12 40:4
44:21 104:4

**ensued** 96:11,15

**entail** 19:25

**entailed** 7:22

**entity** 85:13

**envelope** 10:18,19,
20

**escalation** 44:10

**escape** 92:5,7,11
93:4

**evaluates** 47:3

**evaluation** 77:4

**even** 10:25 11:3
27:24 33:10 34:4,
16 64:4 70:17
104:23

**eventually** 17:9
42:6 104:24

**ever** 4:12 9:22 10:9,
12 11:13 28:3 68:7,
11 70:6 74:12 79:1
83:24 100:6,8

**every** 12:22 28:23
66:3

**everybody** 4:16
25:22

**everything** 43:21
51:12,14 107:22

**evidence** 9:3,11,14,
16 10:8,10,11,12,
24,25 11:1,4,7,8,12
37:15 107:19

**exact** 52:5 66:6
71:7 99:25

**exactly** 49:10 52:4
56:8 63:14

**EXAMINATION** 4:5

**examined** 4:3

**example** 28:10 65:4

**examples** 39:17,18,
21

**except** 57:11

**excessive** 70:2
76:9 81:9 82:9

**excitedly** 70:15

**exhibit** 20:22,25
21:2 24:1 46:1,2,11
48:13,14 66:15,18,
19 68:15 71:2,9
84:2,3 86:5,6,13,14
89:2,7,12 90:23,24
92:15

**exhibits** 21:4 46:4,
6,9

**exist** 84:17

**existed** 87:5

**exists** 84:14,15,19

**exonerate** 44:3

**exonerated** 61:9
95:13,14 96:13,17
97:6,13,15 108:21

**expected** 40:6

**experience** 14:11
66:1

**experienced** 69:22,
24

**explain** 7:22 16:25
26:9 42:1 48:19
58:18 60:9 63:17
72:22 73:1,13
74:15 76:12 106:20

**explained** 77:1

**explaining** 108:15

**extensive** 20:15,17
21:23,24 40:24

**extensively** 17:16

**extent** 56:25 87:6
108:18

**F**

**F-3** 12:4 17:3

**fact** 33:1

**factor** 77:3

**factual** 52:16

**faded** 63:13

**failure** 107:16

**fair** 19:6 51:17,20
52:7 94:13

**familiar** 28:15
44:23,24 63:10
76:11,25 84:13,15,
18 85:18 86:17
89:17,19,20,21

**far** 10:18 99:1
103:6 107:18

**fashion** 9:20 22:14
34:14

**fatality** 95:21

**favors** 110:13



**federal** 85:13

**feel** 35:19,21 41:15 59:14,15,17 78:15

**feeling** 59:17,19

**fell** 27:19

**felon** 93:2

**felons** 79:16

**felony** 79:14 92:13, 18 93:6,10,13

**felt** 40:18 44:21 82:1,2

**few** 22:8,9 67:19 103:6

**field** 90:2,5,6

**fight** 108:1

**fighting** 108:5

**figure** 38:25

**filed** 49:1,3,5,11 104:11

**filled** 17:2

**final** 29:25 30:1 85:6

**find** 71:7 110:7

**fine** 4:23 86:2 109:21

**fingerprints** 37:16

**finish** 14:4 29:12 91:17 102:8

**finished** 7:12 43:21 55:21

**fire** 96:12

**firearm** 63:23 89:23

**firearms** 89:17 91:14

**fired** 31:15 96:12, 16 97:5 101:11

**first** 6:21 17:13,14 29:4,11 35:22 36:6 50:7,8 53:10,15 54:1,4,19 62:25 67:14 85:3 90:15 98:18,21 99:2 112:22

**first-line** 14:16

**first-time** 44:20

**fit** 25:1 63:23

**five** 32:18 106:15

**five-minute** 113:9

**flare** 104:18

**flares** 107:2

**flip** 57:6

**follow** 66:8,12 71:21,22,25 72:11, 14

**follow-up** 84:20 113:15

**following** 53:12,13 72:3

**follows** 4:4

**foot** 108:9

**for** 4:17,21 5:5,14 6:14,25 7:10,11,14 11:11,22 12:8,9 13:23 15:25 17:4, 24 18:22 19:1,16, 19 20:9 21:2,4 23:4,5,6 24:8 25:8, 11,13,18 26:25 27:25 28:8,10,17, 20 29:1,10,20 31:1, 15 36:9 37:13 40:1, 9,18 41:12 46:11,

25 47:13 48:14 54:15 55:20 62:2, 14 66:19 67:25 71:5,12 74:24 76:3, 14 78:16 79:16 80:2,5 84:3 85:3,11 86:14 88:11 89:7, 18,23 90:14,24 91:17,24 92:13 93:8 96:1,8,22 100:3,5,19 101:20 102:8,9,16 104:4, 17 106:3,4,5 107:7, 11,15 108:14,15 109:7 110:4,24 111:12 113:15

**force** 39:12 40:11 42:8 47:4 48:9 63:22 64:1,2,24,25 70:1,2 71:16 72:19 73:5 75:11 76:9 77:23 81:9 82:10 91:10,15,24 92:4, 25 93:11 94:16,19 95:10 96:13 97:21 99:8,9

**form** 9:20 12:4 17:23 18:13 33:20, 21,22,25 34:14 38:21

**formal** 29:6

**formally** 34:20

**format** 33:13

**forms** 23:2 26:14 33:2,3 38:19

**formulating** 32:22

**found** 91:3

**four** 101:9 106:15

**fourth** 67:16

**fracture** 69:4,8

**frame** 42:15

**Franklin** 23:17

**free** 5:2 78:15

**fresh** 80:20,22 81:1

**friend** 104:9

**from** 6:22 8:2 10:5, 23 13:14,17 14:24 20:3,4,5 21:19 23:6 31:15 36:11,13,17 43:5,15,16 45:12 47:25 48:8,23,24 49:22 59:10 75:6 76:5 82:9 85:9,12 89:5 92:3,5,11 93:5 94:10,14 96:25 100:13 101:22 102:25 103:1,9 108:5 109:23 110:13 111:2 113:12

**front** 45:16 65:5 68:17 84:6,25 112:14 113:1

---

**G**

**gather** 18:13 30:21 42:3 43:15,16,18

**gathered** 27:6 48:21 49:16

**gathering** 55:20

**gave** 79:17

**gears** 11:16

**Geis** 20:24 21:6,7, 16 22:6 36:14 37:23 46:1,3,8,12 47:24 61:18,20 63:1 66:14,15,25 67:2,4 76:16,18,20 86:5 89:1,3,5



(866) 715-7770
advancedONE.com

101:14

**general** 24:10 68:6

**generally** 26:12
57:12

**generate** 40:19

**generated** 38:10,24
111:2

**gentleman** 111:14

**gentlemen** 32:4

**get** 19:20 21:7
25:14,23 26:22
27:7,13,14 28:5,21
30:2 33:11 39:24
40:6 41:14 44:14,
15 45:2 47:16,22
49:22 53:16 59:17,
25 62:6 70:5,12
73:14 74:8,10
102:11 107:18
108:4,22 109:4

**get all** 29:24

**gets** 97:20

**getting** 26:21 42:24
52:2

**gist** 62:15

**give** 22:8,9 24:14
32:17 71:6

**given** 7:24 83:16

**gives** 91:13

**giving** 57:17

**glad** 97:18

**glass** 108:3,10

**glasses** 69:1

**go** 5:16,21,23 9:22
10:2 12:3 13:21
18:3,4,5 19:3,4,9

20:1,2 22:4 23:7
24:10,24 25:8,15,
18,21 32:2,5,6
34:19 38:3,7,8
40:21 42:5 47:22
50:1,4 51:22,25
57:5 62:12 66:22
68:14 71:3,5 72:7
75:13,21,24 76:1,4,
18 78:10 81:17
82:20 83:6 84:9
85:1 91:7 92:14
101:20 104:16,17
107:20 113:10

**God** 46:6 106:6

**goes** 25:16 79:19

**going** 4:7 10:7 12:4
13:18 17:18 18:2,3
19:12 20:22 22:8,9
23:6,24 27:6 29:23
31:25 33:4,5 40:17
41:15 47:10,22
50:2 56:8 66:12,23
79:18 90:5 96:24
98:20 99:17,19
102:8,11 105:23
106:4,9,10 109:12,
13

**gone** 13:19 24:25
35:15 104:21
111:11

**good** 4:7 36:24

**Goolsby** 49:20
54:6,24 55:4,16,19
56:3 58:12 77:16
93:18,21

**got** 11:6,11 17:7,9
33:6 34:18 39:9,10,
11,12,13 53:6
56:10 62:6,7,8,9,12
63:20 64:23 80:24
81:2 86:24 96:11,

23 102:9 107:22
108:1 111:13

**gotten** 20:7 26:19,
20 27:3 51:12

**grabbed** 74:17

**grabbing** 65:1

**graduated** 20:4

**grazed** 97:11

**Gregory** 36:13

**grievances** 104:12

**ground** 59:1 60:3,
13,18,21,24 68:3,
24

**guess** 107:16
108:19

**guiding** 65:6

**gun** 10:22 11:6
37:14 41:1,2,5
64:7,10,19 87:18,
22,24 88:2,6,10,15
89:4

---

**H**

**had** 7:11 8:17 10:12
11:2 15:17,23,24
16:2 17:3,16 19:7
20:7,9 24:10 25:8
26:3,24 27:3,15,21,
22 31:14,16 32:20
33:12 34:6,14,20
35:24 36:2 42:19,
20 43:21 44:7,8,19
45:24 46:16 48:2
51:1,3,8,12 52:10
56:17 64:23 70:6,
17,21,22 73:6,23
74:2,3,7,11 75:3,4
77:12 79:5,16,21
80:1,21 81:2 85:23

86:22 89:11 94:16,
25 96:1,3,6,8 98:6
100:1,9,11,21
103:12,22 104:6
105:24 106:22,24
107:6,21,24 108:1
109:9 111:11

**hadn't** 14:1 93:7

**half** 53:23

**Hampshire** 23:12,
13

**hand** 33:8 65:2
74:18

**handcuffing** 65:3

**handcuffs** 53:15,17
65:5

**handgun** 37:14

**handle** 105:5,7

**handled** 104:22

**handler** 78:20,21
80:17,22 81:3,5
82:2 83:7

**handler's** 78:21

**handlers** 78:7,23
81:13

**handout** 90:12
91:11

**hands** 63:20 64:11,
22,24 65:1,2,4,6,8,
10 74:20,23

**haphazardly** 33:3

**happen** 11:14
105:24

**happened** 8:7 26:9
39:1 41:21 43:18
52:11 66:3 87:6
108:2



**happens** 25:4,23

**hard** 63:20

**harmful** 70:18,22

**has** 13:3,4,5 14:10, 11,14 25:22 29:22, 25 48:12 63:13 65:19 66:3,14 67:20 68:25 70:6, 21 75:22 79:1,8,9 80:15,17 81:9,10, 25 82:2 83:17 84:1 89:12 93:8 98:19 100:9,11 105:12,17 106:5 112:5,6,9,12

**hasn't** 82:1,5 93:13

**have** 4:9,12,15 5:1, 12 7:17 12:2,25 13:1,2,6,7,18 14:9, 21 15:2,5,7,8,9,11, 12,15 16:1 17:12 19:9,11 20:1,2,8,9, 13 21:13 24:5,12, 23,25 25:1,7,9,10, 19 26:3,5,6,18,19, 24 27:3,9 28:6,7, 14,16,19 30:1 32:10,12,13,14,15, 22 33:23 34:3,10 35:15,17 36:24 38:22 39:8,19,25 40:2,5 41:13,18 42:15,17,22 43:1,2 44:25 45:16,24 46:16 47:7 49:14, 15,23 51:5 52:1,14, 16,18,20,21 54:5,9 57:8 59:22,23,24, 25 60:2,6,7,11 61:1,6,8,9,10,13,22 62:22 63:4,12,22 64:5,8,12,24 65:17, 20 67:20,22 68:7, 11,16,17,18,19,22,

23 69:10,17,19,22, 23,25 70:2,9,23 71:22 72:18,23 73:5 74:6,12 75:12, 13 76:1,23 78:3 79:16 80:9 81:8,15, 21 82:4,11,19 83:5, 24 84:5 88:7,9,13, 21,23,25 89:5,11 90:10 91:3 92:25 98:2,4,9,14 99:22 100:12,18 102:1, 18,21 103:23,25 104:11,15,16,19, 21,22,25 105:1,10, 16,21 106:7,10 108:17 110:7,18 111:2,3 112:2,7,15, 16 113:3,14

**haven't** 45:1 69:25 75:5

**having** 4:3 12:4,5 42:5 55:13,14 70:8, 12 97:16 98:20

**he** 10:17,18 11:23 12:24,25 13:1,2 14:18 17:2,3,4,9 19:7 20:10 24:11, 23,24 25:7,16,17, 18 26:3 27:1,21,22 28:12 29:25 30:5, 18 31:14,16,24 33:8,10 35:8,22,24 36:2,4,5,7,9,19 50:8,22 51:21 52:9, 10,25 53:2,3,4,6,7, 10,12,13,15,16,17, 19,20 56:14 57:2, 18,20,23,24 58:20, 25 59:1,23,24,25 60:6,7,17 61:24 62:3,5,6,7,9,25 75:19,21 86:23 87:11,15 90:17

92:3,6,9,24 94:10 95:5,13 96:16,17, 24 97:1,2,11 100:24 101:2,3 102:25 103:1,3,19 107:11,12,15 108:6 111:13,15 112:16

**he'll** 24:24 57:5,6

**he's** 4:10 20:3 25:16,25 31:24 35:11 47:21 57:20 79:20 103:4,5

**head** 45:23 66:2 73:7,18

**hear** 82:16 102:24

**heard** 75:5 101:16 106:8

**heightened** 79:12

**hell** 50:8

**help** 13:11 100:6,8, 9,13,17 103:20

**helped** 101:10

**helpful** 46:3,8

**helping** 100:1,11

**her** 36:21 53:5,9, 15,17 58:20 59:2, 23,24,25 60:17,23 69:4 87:6 95:3,5 110:1

**here** 4:10 7:8 18:18 26:14 28:12 33:13 34:18 36:23 71:6 75:15 76:18 84:22 89:9 91:18 102:11 109:14

**Hey** 41:20 61:25 62:12 82:17

**high** 5:16,17,20

20:4 97:3 107:9

**higher** 13:10 20:7

**Hight** 113:17,24

**highway** 106:23

**Hillsborough** 23:12,13

**him** 17:5,8 22:13 24:22 25:15 27:7 29:10,24 30:7,8,14, 23 31:5,9,17,21,25 35:12,13,17 53:5, 16,19 56:21,22,23 57:1,4,7,16,17 63:1 73:7,15 92:12,22 93:5,21,22 95:5 99:1 102:22,24 103:2 104:9 107:11 108:5,8,10

**himself** 92:2 111:15

**hindsight** 76:11,16 77:8,9

**hire** 12:15 13:20,24 16:10,13 17:8 25:19,20 29:1,3,4, 8,10,14,16,20 31:5, 6,17,25 32:15,16 36:19,20,24

**hired** 13:19 17:9 25:17 27:7 30:6,7, 9,11,14,19,23 31:9 32:11 33:6,8,9,11 35:7

**hiring** 11:17,20 12:1 16:13 17:1 31:2 33:23 37:3

**his** 17:6,11,13,14, 17,18,22 19:17 20:1,2,13 24:4,5,7, 8,12,13,22 25:8,16



(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

131
Index: histories..in

26:3,4,6,8,25 27:3,
16 35:10 49:15
52:10 53:11 59:24
68:25 80:22 90:18
92:8 100:23 108:9
110:1 111:13,15,
16,17

**histories** 20:10

**history** 24:10,13,14

**hit** 73:7

**hold** 36:4 60:12
71:5 102:15

**holding** 65:7

**home** 100:25
107:8,9

**homicide** 10:5 38:6

**honest** 46:6

**horns** 35:4

**hospital** 48:24 87:7

**hour** 53:23

**hours** 102:16

**house** 53:8,9
100:25 110:25

**how** 6:20 7:10,18
8:14 9:17 24:15
27:19,21 28:1 29:9
32:9,22 33:12
35:19,24 36:2
39:20 40:24 42:9,
14,16,23 43:2
49:12 51:25 52:7
53:21 58:18,24
60:21,25 61:7
62:22,25 63:2
72:22,23 76:2,4
77:1 80:4,7 82:9,20
94:16,18 97:10,12,
14 99:24 102:7
104:25 105:14

106:14 110:9
112:2,5

**however** 13:24
15:19 32:5

**Huh** 76:19 88:4

**humerus** 69:4

**hunt** 79:16

**hurt** 40:25

**hurting** 109:12

**hyperventilate**
70:13

---

**I**

**I'D** 32:22 76:10

**I'LL** 19:19 57:5
78:10 84:22

**I'M** 4:7 7:10 8:22,23
10:7 11:20 13:13
17:18 22:8,9 23:24
26:20 30:2,25
31:25 32:2 33:3
36:1 37:13 47:10,
22 49:24 50:2
52:19,21 57:4,6,12
59:18 62:4 66:5,12,
23 67:5 70:13 71:4
72:2 80:6 84:14,17
85:18 86:9,11 88:3,
5,20 89:19 97:18
100:7,15 102:11,
12,14,19 105:4,23
106:4,9 109:12,13
110:12 111:20

**I'VE** 10:1 32:12
33:15 37:5 56:22
57:16 63:1 74:2,7,
16,17,20 98:6,16
105:20,22,24 106:8
108:13

**idea** 82:11,12
105:16

**identification** 21:4
46:11 48:14 66:19
84:3 86:14 89:7
90:24

**identified** 48:12
61:15

**identify** 18:11 22:5
23:1 45:10 80:8

**if** 12:24 14:21 17:15
21:14 22:12 24:19
25:16 26:9 30:13,
17,18 32:19 33:24
37:21,22 38:23
39:12,22 40:4,18
41:23 44:7,21 45:5
46:12 47:11 52:22,
23 60:15 63:25
64:4,10,19 66:21,
25 68:2 69:16
70:17,21 81:5
82:12,16 85:19,21
87:7,9,11 91:16
93:15 97:19,20
99:23 105:17,22
108:9,17 109:15
110:24,25 111:4
112:4,14,18,22,24
113:1,10

**illustrates** 50:5

**illustrations** 50:10,
15

**imagine** 52:14,15
87:4

**immediately** 24:25
112:19

**imminent** 92:4,9

**impair** 5:3

**impede** 40:5

**imposed** 92:12
93:5,9

**in** 4:17 5:11,12,15,
18,25 6:4,16,22,25
7:8 8:6,7,8,13,14,
18,21 9:3,5,9,15,
17,20,23 10:2,3,9,
12,15,19,23,24
11:11,14 12:3,4,9
13:13 14:2,8,18,19,
21 15:11,17,20,25
20:10 21:19 22:13
23:2 24:10,22,23
25:6,10,16,25 26:9,
13,14,20 27:5,19
28:22 29:24 31:18
32:2,5,6,9,10,17,
24,25 33:4,7,10
34:14,15,21,25
35:1,16 36:4,5,7,21
37:4,6,8,9,16,19
38:18 39:2,4,23
40:4,12,25 43:1,9
44:8 45:1,14,16
46:22,24 47:14,25
49:22,24 50:22
51:14 52:9 54:17,
18,19,20,21,22
55:1,2,3,5,6,18
57:5 59:21 60:1
62:10 63:23 64:16,
17 65:20,24 66:2,6
67:18,19 68:8,17,
19 69:3,4,10 70:10
71:19 72:19 73:7,
15,18 75:1 76:5,8,
13,22 77:9,19,20,
21 79:5,8,12,16,18,
19,23 80:2,14,21,
22 81:1,8,25 82:2,
10 83:6,13,16,17,
19,20,21 84:5,25
85:12 87:10,12,14
91:13,15,23,25

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

132

Index: in-house..is

93:9,16 94:13,14,
16 95:7,25 96:1,11
97:11,16,21 98:5,
16,17 99:18,23,24
100:9,20,23
101:13,22 103:1,2,
5,10,12,14,23
104:2,18 106:18
107:25 108:2
110:10,21 111:1,6,
7 112:9,14,22,25
113:1,4,6,12,19

**in-house** 12:2,5
17:3 18:13

**in-laws** 100:24

**in-laws'** 100:25

**in-person** 54:13

**incident** 10:22 11:5
38:8,9,12,13,16,20
39:4,8,9,10,11,12,
13,19 40:1,10
41:10 42:4 44:8,19,
20 47:14 48:16,22
49:7,8 50:23 51:7
52:2 54:2,9 55:13
57:13 63:7,9 67:24
68:7 77:21,25 79:1,
23 82:1 86:4 95:6,
7,25 103:12 109:11
111:2,3,10 112:22
113:16

**incidents** 73:2
74:6,9 79:4 80:12,
14 86:19 108:25

**include** 46:22

**increases** 109:22
110:1

**indicates** 92:8

**individual** 73:7,18,
20,22 100:4 111:25

**individuals** 73:25

**ineffective** 69:1

**information** 18:13
23:4 26:21 27:16
28:5,7,22 29:24
30:22 34:17,22
37:16 38:24 42:3,
25 48:8,22,23

**informed** 92:21

**infraction** 110:17

**initially** 6:18 56:15
73:16 94:11

**injured** 59:11
67:18,21 73:20
79:2 82:5 87:3
95:19 97:8

**injuries** 87:6

**injury** 69:16 92:10

**inside** 108:5

**instance** 14:19,21
36:7 95:24

**instances** 39:4,7
74:1,15 75:1 81:8
94:24 106:17
110:21 111:6,9
112:9,11,13

**instruction** 46:22

**instructor** 88:6
91:4,12

**interact** 35:13

**interacting** 35:16

**interaction** 102:22

**interchangeably**
90:7

**interference** 90:3

**intern** 6:13

**internal** 97:19 98:2,
21 99:6,7,18

**interstate** 106:22

**interview** 12:8,9,12
26:3 27:17,21
28:14,19 29:13
43:14

**interviewed** 17:5
30:17 32:4 93:18,
20,23

**interviews** 27:21
28:4 48:25

**intimately** 84:14,18
89:20

**into** 10:25 11:1,3,7,
8,12 76:10 77:3
79:6 90:6 96:23
97:1 100:25 104:21
111:13

**introduce** 4:9 21:10

**intrusive** 65:10,14

**investigate** 43:10
81:3 105:18

**investigated** 47:14
59:4 95:10

**investigation** 8:18
15:20 25:22 32:24
38:20 40:19,20
41:9,24,25 42:2
48:8,20 52:12
53:10 55:12 56:6,
21 61:14 72:20,24
75:2 76:9 77:9
92:15 97:17 98:22
99:18 101:2,10
103:15

**investigations** 7:1
8:8,9,10,11,20 9:4,
5,7 14:20 15:5
37:15 40:13 42:10

50:25 51:3 57:1
61:1 76:8 81:12
98:15,19 99:5,6
100:2,4,10 103:8,
18

**investigative** 9:6
10:23

**investigator** 6:22
8:16,17 9:19 25:21
58:13 101:5,18
103:11

**investigator's**
25:20

**investigators** 9:13
15:4,22 100:21

**involved** 9:21
38:18 44:8 70:10
72:19 97:16,20
103:12 110:21
111:1,7

**involvement** 40:12

**is** 4:21,23 8:4 9:25
12:13,16 13:23
14:15,16,18 15:1,5
17:19 18:15 19:6
22:23 23:14 25:4,
11 26:22 27:5,8
28:18 29:21 30:21
32:1 33:13 34:2,17
35:15 36:21 38:9
39:5 40:3 42:2
44:2,18 45:13,21
46:1,2 48:6 49:1
50:14,21 51:16,18
54:23 56:14 57:8,
21,22 58:11,14,16
59:11 62:25 64:7
65:10,11,14 66:15
67:7,12,14,15,16
68:15 69:13,17
70:12 71:1,9 73:13
75:15 76:10,17,22



77:23 78:20 79:12
80:21 83:5 84:20
89:14,22,24 90:2,
11,21 91:2,10,12,
23 92:1,6 93:7,10
94:10,21 95:7
96:15 97:22 98:11
101:19,20 105:3,12
106:2 108:17,24
109:1,2,5,9,10,12,
22,25 110:5,15,16,
17,20,23,25 111:1,
18 112:6 113:15

**isn't** 50:14 67:17
94:6

**issuance** 46:20

**issue** 68:1

**issues** 47:7

**it** 6:5 7:16,17,18
9:15,21 10:21,24,
25 11:1,3,7,8,11
12:4 13:4,5,24
15:13 16:21 17:1,3,
15,16,22,24 18:16,
20,22 19:6,11,19
20:15,17,18 21:22,
24 22:4,10,17 27:8,
11,14,15,23,25
28:8,23 29:4,6
30:13 31:23 32:6,
21 33:2 34:15,19,
21,25 35:4,5,21,22
36:6,22 37:5 38:4,
14,17,23 40:7,18
41:16,23 42:4,5,6,
11 44:3,4,20,21,25
45:1,5,16 46:3,8
47:11 49:9,10 50:1,
4,7,9 51:6,12,13
53:1,3,10,23 54:5,
11,13 55:12,21
56:22,23 57:2,6,9,
17,22 58:11 59:9,

12,15,17 61:18,19
62:6,7,8,9,10,15,
20,25 63:14,15,16,
25 64:5,7,11 65:21
66:5,14 67:11,17
68:16,18,19,21,25
69:3,8,14,16 70:13
71:1 72:6 73:17,23
75:6,15 76:12,13
77:1,10 81:10,11,
23,24,25 82:3,5,13,
16,17 83:3 84:14,
15,16,17,18,21
85:18 86:25 87:5
89:2,19,20,21 91:4,
5,16,20 92:1 97:12,
14 98:3,5,7 99:22,
24 100:1,24 101:3,
8 102:4,6,7,19
103:3,6,23,24,25
104:1,2,4,8,17
106:2 107:16,18
108:9,20 109:7,11
110:14,15,18,20,24
112:21,23 113:17,
24

**it's** 13:9 15:2,3
18:12 22:8 26:23
28:22 32:19 38:10,
21 39:22 45:21
48:7 50:22 51:16,
20 57:2 63:25 64:4
66:25 73:17 75:18,
23 78:21 82:18
89:5 91:18 100:19
102:8,18 104:14
106:3 110:10 111:4

**items** 11:8

**its** 46:22


                  **J**


**J.J.** 61:25

**jail** 108:14

**Jersey** 5:15 6:12

**job** 8:25 13:20 40:3
105:6,8

**jobs** 14:12

**judge** 85:8

**jump** 96:25

**just** 4:8 13:11,13
15:3 17:2,24 18:2
21:10 22:13 23:5,9
24:19 27:14,22,23
28:8,22 29:22 30:2
32:17,23 35:3
38:22 39:17 41:18,
20 44:18 47:11,22
49:16 52:22 55:6,
12 57:2 59:15,17
63:17 64:4,10 65:7
66:13,21 68:5 72:6
78:15 80:11,16
84:8 87:5 92:24
99:25 101:19 102:1
103:3 104:15,24
105:2 107:13
109:14,19,20
110:15 113:9,15

**justice** 6:1

**justification** 93:10

**justified** 91:23

**Justin** 58:13


                  **K**


**keep** 18:2,3 19:12
65:20 66:2 83:12

**kept** 61:8

**kick** 67:11

**kicked** 108:3

**kicking** 108:6,10

**killed** 31:24 95:23
112:20

**Kimberly** 36:13

**kind** 13:22 14:12,25
25:10 35:21 38:25
41:14 47:11 55:12
60:12 63:17 80:18
82:20 87:21 107:5

**knew** 41:16

**know** 4:15 7:18
8:12,18 9:20 11:19,
22 12:11,21,24
13:1,14,22,23,24
17:4,15 18:2 21:15
22:10,13 24:24
25:18,25 26:13
27:25 28:19,22
30:4,5 32:2 34:15,
24,25 35:14,15
37:2,21,22 38:3,23
39:20,21 40:1,3,24
41:15,20,21 42:16,
19 43:7,11,21
44:11 46:5,9 49:6,
10,23 52:4,5,10,16,
17,21,23 53:1,2,25
54:8,9,19 56:5,8,22
57:2,4,5,16,21,24,
25 60:15 61:6,11,
20,24,25 62:4,5,7,
13 63:2,14 66:4,5
67:9 68:2 70:8,10,
19,20,21,22 72:16
74:9 75:15,22 76:1,
14 78:11 79:23
80:9,20,21 82:12,
21 83:2,3,5,7,9,16,
20 84:14,15,17,18
86:6 87:5,6,7,8,9,
11 89:22 94:18
96:4,21 97:14
98:10,16 99:22,23,

24 100:9 102:15
103:5,13,24,25
104:18,23 105:13,
19,20 106:2,4,9
108:9,19,20 109:3,
10 110:9,23 112:4
113:10

**knowing** 32:14

**knowledge** 55:13
70:23 78:16 80:10
104:23 105:10

**known** 80:12

**knows** 57:2

---

**L**

**laboratory** 85:15

**lady** 36:12,17 59:1
80:24 86:24,25
95:1

**lake** 96:23

**last** 18:6 19:14
23:22 29:12,23
42:15 53:21 68:21
96:14,19 107:11

**later** 62:7

**lateral** 14:25

**Latwanya** 48:10

**law** 7:7,9 13:13,14
14:1 27:2,3 60:2
65:19,22 91:16,20,
23 112:3,10,12,16,
17

**Lawrence** 61:19

**lawyer** 10:20

**leadership** 67:21

**learned** 66:4

**least** 7:16 94:23

**leave** 47:11 57:8

**leaving** 18:23 19:1
107:20

**left** 32:21 69:4 76:7

**leg** 60:7

**legal** 75:14 108:20

**length** 62:16

**less** 6:15 42:21
65:10,14,15 93:8

**let** 18:2 21:15 22:13
41:15 48:11 53:16
56:21,22 57:1,4
72:9 78:9 101:19

**let's** 11:16 19:3,9
21:1 22:4 26:2
28:11 50:1 51:22,
24 58:7,9 59:7,9
68:5,14 69:5 71:3,8
73:9 84:9 86:3,13
87:17,18 91:6,7,15
92:14 93:14,15
101:20

**lethal** 65:10

**letter** 33:18

**letterhead** 33:18

**letting** 57:16

**level** 13:17 14:3
15:15 41:23 81:24

**license** 27:1

**lieutenant** 8:21,24
9:1 12:20,21,23,25
13:2,15,16 15:20
49:20 54:6 55:16,
18 58:12 83:17

**lieutenants** 13:9,10
15:16,18

**life** 37:19

**like** 4:21 7:25 10:21
11:13 13:23 14:7
15:3 16:24 17:2,22
22:10 23:6 24:14
25:7,20 26:25
27:23 28:17 33:24
35:5 37:13,18
39:22 43:3 44:6,7,
21 45:12 50:7 54:9
59:10 61:10 63:21
66:5 76:10 79:13
81:19 85:3 87:21
93:9 96:23 97:21
100:21 101:12
105:3,12 107:8,16
108:5 109:11
113:14

**likelihood** 109:23
110:1

**line** 15:7 27:19
45:12 103:1

**listed** 50:6,19

**listened** 48:24
52:11

**little** 6:25 7:21
11:16 12:10 19:4
24:15 37:2 42:20,
22 52:22 66:3 69:5
75:22 76:10 98:12
104:14 107:5

**live** 28:21 62:7

**lived** 20:4,10 24:11
100:24

**locked** 107:12

**long** 6:20 7:10,18
8:14 9:17 14:12
22:10 35:24 36:2
42:9,14,16,23 43:2
45:1 53:21 76:4

97:12,14 99:24
102:7

**longer** 7:18 42:20
44:5 58:15 73:15,
17 76:2 102:7
111:16

**look** 15:1 17:21
22:10 38:4 39:3
40:15 45:5,14
65:20

**looked** 17:12,19
21:8 45:1 104:21
107:12

**looking** 65:18 71:4
76:22 95:25

**looks** 17:22 66:5
97:21

**loose** 50:8

**lose** 10:10,11

**loss** 70:13

**lost** 10:12 63:12
65:25

**lot** 32:14,15,18
39:14 42:21 104:14
106:9,10

**Louisburg** 18:25

**lower** 13:17

**lowering** 95:4

**lowest** 14:3

**lunch** 67:1 76:3
107:20

---

**M**

**ma'am** 4:14 11:15
18:21 19:8,24
22:22,25 31:11
46:18 48:4 65:17



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

74:16 75:9 80:9
82:7 83:1 84:7
85:18,21 86:18
87:2,15,23 88:1,8
89:13,16,19,21
90:13,22 91:2,12
93:1,4,20 94:7,18
95:11,18 97:7
100:5 101:25
102:5,25 104:6,13
105:9,19 106:13,18
109:10 111:23
112:11,21 113:6,7,
21,23

**mace** 47:6 59:24
63:21 68:25 69:18,
19,23 108:8

**made** 11:3,7 17:8
29:2,6,13 62:14
63:18 77:16 82:5
101:1 103:19 111:6

**major** 5:25

**majority** 61:4

**make** 11:8 12:14
16:10,13 17:19
35:19,21 41:16
43:19,22,23 51:15
53:9,11 54:11 56:7
60:21 101:19
108:23 111:22

**makes** 69:16

**making** 32:23

**mandate** 75:12

**maneuver** 53:18,19
69:3,7,9,13

**manner** 62:10

**Manual** 45:9

**many** 12:10 27:21
28:1 31:15 32:6,9,
22 60:25 61:2,7

62:22,25 63:2
72:22,23 82:9
94:16,19 104:25
105:14 106:14

**March** 5:9

**mark** 20:22 21:1,11
46:4,6,8 86:13
89:2,3

**marked** 20:24 21:4
46:1,11 48:13,14
66:19 68:14 84:3
86:14 89:7,12
90:24 92:14

**marking** 66:17

**Martin** 23:11

**master's** 6:4

**matter** 33:1

**may** 12:3 13:18,21,
25 14:9,13,20,24,
25 15:7,8,9,12
24:12,18 25:4
26:19 41:16,18,19
42:5 49:14 79:16
98:7

**maybe** 12:10,20
27:24 30:15 76:23
101:9

**Mcgurl** 4:10

**me** 4:21 5:10,19 6:8
13:7,11 17:4 18:23
21:15 29:9 31:12
32:3,17 34:16,17
35:21 37:10,18
40:12,18 41:1,3
43:4 44:19 48:19
52:2,9 53:20 54:9,
12,21,22 55:11,12
56:4 58:18 60:4,9
61:25 62:25 63:16
71:7,21 72:6,9,22

73:2,4 74:1,8,24
77:1,7 78:9 79:4
81:4,10,11 82:3,17
84:23 86:19 88:16,
22 89:25 91:18
96:18 101:6,7,19
102:21 103:1,10,
19,22 104:17 105:2
106:4,5,6,8,20
107:24 108:11
109:13 111:9

**mean** 8:23 9:12
13:16 32:21 37:11
38:14,15 43:8 47:4,
5 50:23 54:21 74:4,
6 81:25 82:15
86:25 88:15,16,17
99:4,6 101:7
103:24 104:1 106:1
110:18

**means** 38:17 92:7,8

**measure** 65:15

**medications** 5:2

**meet** 62:14

**meeting** 43:11
54:13

**member** 109:3,4

**memory** 42:17,23
43:2 44:25 61:6
63:13 65:20 80:21,
22 93:15,16 94:2,6,
12 104:18 106:19

**mental** 7:25

**mentioned** 7:19
40:10,11 49:17
97:18 113:25

**mercy** 26:20

**Merrimack** 23:11

**met** 63:1 79:6

**methods** 67:18

**Michael** 4:10 18:17
20:21 21:25 45:2
47:16 66:22 71:4
78:3 84:1 86:9
87:17 90:16 91:8

**might** 7:17 12:25
13:1,2 16:16 20:8,9
24:12,14,24 25:1,7
28:7,14,19 38:5
52:16,21 54:5
76:13 89:9 102:15
103:23,24

**mind** 9:8 24:17
36:21 46:19 67:22
68:20 70:11 77:9
81:1 94:22 96:14
111:19,21

**minimum** 7:17
27:22 28:2,9,11,20
101:9

**minute** 47:19 86:12
107:11

**minutes** 21:8 107:7

**misdemeanor**
79:14

**misplace** 10:10,11

**misplaced** 10:12

**mobile** 107:8,9

**moment** 45:5 84:8

**money** 10:18

**months** 7:17

**more** 14:10 16:24
19:4 23:24 24:20
28:15 35:16 37:2
39:14 57:13 68:5
84:10 93:7 101:5,7,
18 103:11



**(866) 715-7770**
advancedONE.com

**morning** 4:7 77:19, 20

**mornings** 39:2

**most** 64:16 98:4 100:3,5,19 103:9

**move** 22:11 40:7

**moving** 28:25 69:2

**Mr** 4:7,18,19,23,24 16:25 17:1 18:6,15 19:6,22 20:7,24 21:2,6,7,16,21,22 22:6,12 24:3,20 26:9,13,24 27:18, 20 28:1,25 29:16, 20 30:10,18 31:1,7 32:4 35:6,8 36:10, 11,14 37:4,18,20, 23 45:14 46:1,3,8, 12 47:14,24 48:2 49:15,19 50:6,18, 21 51:1,3,6,9,19,24 54:1,20,22,24 55:5, 9,18 56:11,14 59:22 60:16,20,23 61:18,20 63:1 66:14,15,25 67:2,4 76:7,16,18,20 77:4, 8 86:5 87:18,21 89:1,3,4,5,11 90:10 92:18,21 101:14,24 102:20 109:15 113:14

**Ms** 4:6 18:17,19 19:3,5,12,13 20:21 21:1,5,12,18,20,25 22:2,4,7 36:25 37:24 45:2,4 46:2, 5,10,15 47:16,18, 21 48:1,11,15,23 49:1,3,21 55:15 56:15 60:20,23 66:17,20,22 67:3,6

71:3,10 76:6,19,21 78:3,5 84:4,9,12 86:3,8,16 87:17,20 89:1,4,8 90:9,16, 20,23,25 91:8,9 92:16,21 94:11 101:15,17,23 113:8,13

**much** 76:2 102:7, 22,24 112:2,5

**multiple** 74:6

**multiple-officer** 67:15

**murder** 39:8 96:1,3, 7,8 112:22,23

**murdered** 112:14 113:1

**must** 85:7,14 109:3,9

**my** 4:9 6:4,21 7:13 9:5,6 21:8 33:13 35:3,11,23 36:9,21 38:2 41:19 44:18 48:7,8 52:9 54:18 55:2,5,6,18 56:6 57:3 63:13 65:19 66:2 73:16,23 74:20 77:9,10 80:21,22 81:1 84:20 88:13 94:12 98:16,17,25 100:10 103:1,4 104:18,23, 24 106:6,18 107:3, 10,17 109:12 110:5 113:15

**myself** 4:9 12:20

---

**N**

**name** 5:5,19 36:7 39:15 45:7

**named** 36:12

**names** 13:3

**naming** 66:5

**nature** 16:11 104:12

**NCGS** 4:2

**NCIC** 26:16

**necessarily** 27:11 40:23 64:20 76:24 82:14,15 92:2

**necessary** 27:10 40:18

**need** 17:25 21:14 22:6 26:21 28:7 46:13 89:9 109:14

**needed** 44:5 58:15 109:20 111:16

**neighboring** 96:2

**never** 10:11,24,25 11:3,6,7,8 69:22 81:25 83:25 93:20, 23 105:22,24

**new** 5:15 6:12 13:24 23:12,13

**Newark** 6:12

**next** 8:7 14:15 19:3 24:22 26:9 41:22 49:12 53:13 68:20, 21

**night** 38:6 53:13

**no** 4:17,20 7:16 10:1,11 20:19 26:6 27:11 28:22,23 30:8 31:3 32:8,13, 22 33:21 35:3,11 40:23 42:11 43:13 44:5,18 45:13 50:9 54:3,17 56:4 58:14

59:19 62:20 64:6 69:15 71:21 72:2 73:15,17,21,23 76:3 77:5,6,10 81:10,14,16 82:11, 12 83:1,25 85:21 86:9 87:23,24 88:1, 3,5,8,25 93:1,20 94:3,7 95:21,23 96:5 102:5,20,25 103:23 104:13 105:16,19 108:24 109:1,2,10,17 111:16 112:10,12, 21,24

**nodded** 23:23 45:23

**nominal** 103:3

**None** 94:4,5

**nonsupervisory** 15:3

**nonsuspect** 80:18

**nonsuspects** 80:16

**nonviolent** 93:10

**north** 5:11,12,18,24 6:7 20:8,11 23:11, 16,17,18,19,20,21 106:22

**not** 4:7 7:10 8:22, 23 12:15 13:13,19 14:14 15:2,12 16:1, 16 21:22,23 24:24 25:1 26:19 27:11, 22 28:1,7 29:14,17, 18,23 30:8,23,24 31:3,5,6,17 32:11, 14 33:6,20,21 35:6, 11,20 36:7 38:5 39:22 40:3,23 42:25 51:16,18,20 53:10 54:18,19



(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

137
Index: note..oh

58:5 60:3,16 61:8 62:4 64:20,21 69:14,23 70:13 71:4,12,25 72:2 77:6,11 81:7,10,15 82:14,15 84:14,17 85:18,21 86:9 87:8 88:1,3,5 89:20 90:3 93:10 96:7 100:14, 16 107:10 111:20 112:6

**note** 101:19

**noted** 10:17,18 51:16,18

**notes** 52:13,15,18, 20

**nothing** 13:14 76:20 78:11 106:5

**now** 9:8 24:17,20 44:25 47:13 67:23 68:10,13 70:11 73:17 75:16 76:3, 18 84:21 89:24 90:11 94:22 101:12 102:15 110:12 111:20,21

**number** 15:19 20:22,25 21:2 32:12,17,21 38:11, 24 43:5 46:2,12 66:16,18 68:15 71:1,2,9 74:16 86:13 104:10,25 105:11,20 109:8 112:5

**numbers** 38:22

---

**O**

**obeying** 107:10

**object** 101:15

**Objection** 37:23

**obligations** 9:9

**obtained** 48:22,23 85:6,12

**obtaining** 24:3 85:14

**OC** 46:21,24

**occasion** 100:18

**occasions** 74:2 98:5 108:13

**occurred** 49:12 52:8,25 73:3 75:7 86:21 106:24

**of** 4:17 5:2,14,19 6:12 7:5,10,13,17 8:2,10,12,19,20,22, 23 9:9,13,16 10:16 11:6 12:1,23 13:3, 12,22 14:2,3,6,8, 12,13 15:1,15,16, 19 16:9,10,15,17 17:7 20:3,5,8,11,14 22:4,17 23:3,5 25:6,10,13,23 26:15,20,21,25 27:7,10,12,13,14, 21,22 28:2,6,9,10, 11,20 30:20,21 32:5,14,20,22 33:1, 4,23 34:8 35:1,2, 16,21 37:3,4,9,17, 19 38:7,25 39:11, 18,21,24,25 40:3,6, 11,17 41:14,23 42:1,8,16,17,23 43:2,5 44:9,10 45:8,16,18,25 46:13,20,23,24,25 47:3,11,14 48:7,9 49:7 50:2,4,15,23 51:20 52:10 54:11,

16 55:9,12,13 56:6, 8,25 57:3 58:11 59:7 60:4,12 61:4,7 62:7,15,16 63:13, 17,23 65:4,5,15,25 66:14 67:18 68:17 69:4,21,23 70:8,10, 11,13,14,23 71:11, 16 72:19,23 73:5, 23 74:8,10,11,19, 25 75:2,11 76:4,9, 11,13,14 77:4,7,20, 23,24 78:12,15 79:5 80:1,10,12,13, 18 81:1,9,12,24 82:18,20,25 83:7,9, 13,18,19,22 84:6, 21,25 85:7,8,25 86:19,22 87:5,6,21 88:13,19,21,24 89:14,23 91:14,15, 25 92:4,6,7,9,11,12 93:4,5,13 94:1 95:9 96:3,12,16 97:2,4, 15,21 98:4,5,16,22 99:8,9 100:2,10,11, 21,23 101:9 102:11 103:1,9 104:10,12 105:4,10,11,12,13, 20 107:1,5,10,24 108:3,4,6,10,21 109:3,4,8,11,25 110:2,11,19 111:6, 12,15,18 112:14 113:1

**off** 11:6 53:6 67:11 74:8 76:7 79:16 101:20,21 102:1 107:13,23 113:10

**off-the-record** 90:8

**offer** 13:20

**office** 6:17 8:5 9:14 11:2,18 13:12

25:11 26:15 32:21 41:19 45:9 47:7 52:9 53:7 54:18,20, 21,22 55:2,6,18 58:14 66:8,11 71:25 72:10 75:8, 10 78:6 85:10,12 87:14 88:17,19,23, 25 103:2,3,4 105:15,22,25 106:1

**office's** 34:3

**officer** 6:9 13:25 17:14 27:2 28:11, 15 41:14 42:5,7 43:16,17 44:7 58:13 64:19 67:25 68:8,12 75:13,17 81:1,22 83:5,18 86:22 87:9,13 91:16,21,23 98:8 100:22 101:10 103:12 104:6 107:21 108:2,8 109:9 111:11,12 112:2,5,6,7,9,12, 15,18,23 113:1,2

**officer's** 104:20

**officer-involved** 97:22 100:12

**officers** 10:17 32:10 38:10 41:4 42:19,21 60:2 75:11,19 94:16 96:16 98:6,9 100:11 103:20 108:4,6,7,11,12

**offices** 9:13

**officially** 14:14

**often** 80:22

**oh** 36:12,16 44:15 45:15,16 76:20

---



**Advanced**ONE
LEGAL

(866) 715-7770
advancedONE.com

86:11 94:18,21
102:10 105:16
106:3,6,18

**okay** 4:8,15,25 5:5,
10,12,25 6:6,8,18
7:2,5,14,19 8:4,9,
14 9:9,17,22 10:4,7
11:13,16,21,24
16:24 17:18 18:2,3,
4,5,7,10,15,17 19:9
20:20 21:13 22:15,
16,17,18,19 23:16
26:2,8 27:8,20
28:25 29:9,15 30:2,
13 31:4,12 33:17,
22 34:5,7 35:6,19,
24 36:6,16 37:1
38:9 39:16,18 40:8,
10 41:4,11,22
42:13 43:19 44:20
45:6,7,10,18 46:3,
14 47:3,10,15,24
48:5,11,19 49:4,11
50:13,18,25 51:22
52:7 54:23 55:24
56:17 57:10,12,23
58:16,18 59:3,13,
21 60:4,15 61:13
63:3,6,10,16 64:9,
13,21 65:9,22 66:7,
12,14,25 67:3,5,7
68:5,19 69:5,12,16
70:5,17,24 72:5,9,
14,18 73:9 74:21,
25 77:3,6,12,19
78:2,9,13,14,17
79:9 80:4 81:5
83:12,22 84:1,11,
13,20,24 85:2
86:15 87:16 88:9
90:14,19 91:6,15
92:14,17 93:12,14,
25 94:13,21 95:14,
24 96:9 97:24

99:12,20 100:14
102:11,13,14,18,19
103:7 104:10
105:2,5 106:21
108:15,22 109:18,
21 113:24

**old** 80:25

**Oleoresin** 46:20

**Oliver** 48:10,23
49:1,3,21 55:15
56:15 60:20,23
68:24 69:1 92:21
94:11

**Oliver's** 92:16

**on** 6:4 7:13 9:14
10:1,17 12:7 14:5,
18,19 15:7,19,22
18:13 19:14 22:23
24:15,21 25:5
27:14,25 28:25
29:6,23 32:21,25
33:18 34:16,18
35:12,13,17 36:4
37:2 38:5,19,21
39:1 40:15,17,24
41:15,18 42:11,18
44:16,18 45:25
46:12 47:23 48:8
49:7 50:5,15 51:6,
10,12,14,16 52:5,
12 53:3,14,15,17
55:5 56:8 58:21
60:3,13,17 61:5
63:23 64:11 65:5
67:11 68:2 71:5,16
73:7,25 74:17,20,
23 75:11,19 77:10,
13,14 78:10 79:15,
22,25 84:22 85:24
87:13 90:10,11
91:3,18 93:9 96:7
98:5,6,17 100:19
101:2 103:25

104:16,17,21,25
106:5,22 107:2,3,
21 108:21,25
110:5,19 112:5,21

**on-the-job** 99:1

**once** 7:12 8:19
11:11 12:13 14:4
17:7,9 25:16 29:21
35:11,14 54:25
55:21 67:1 83:17

**one** 10:16 11:11
12:10,23 16:9 17:4,
6,12,13,16 27:22,
23 28:2,9,11,14,20
32:9 33:4 37:3
56:15 67:14,15,16
68:1 73:5 74:19
78:21 86:22 94:10
95:5,14 96:14,16,
19 97:2 99:17,19
101:4,5,8,18 103:9,
11 106:8 107:1,14
108:1 111:18,19,20

**ones** 14:5 104:24

**ongoing** 26:22

**online** 12:3

**only** 47:6 63:6,8
80:18 92:1 94:9
98:16 99:17 108:17
111:18,19,20

**opened** 10:20

**opening** 25:20

**operate** 43:9

**operating** 57:3

**operation** 38:21

**opinion** 12:15
59:21

**opportunity** 48:2

**options** 68:22,23

**or** 4:12,17 6:9 7:15
8:22 9:13,20 10:10,
11,12 12:3,15,20,
25 13:10,16,23,24
15:2,12 16:14 17:3
20:4,10 21:9,22,23
23:3 26:4,19 27:23
29:5,11,14,23
30:23,24 32:5,10
34:14 35:2,13
40:13 42:5 43:1
44:13 46:25 47:4
51:6,13,23 52:23
53:8,12,13 54:5,13,
18,19 55:6,25 59:8,
25 60:1 61:5 64:17
65:2 68:7 69:10,19
77:13,23 79:14
80:7,25 82:16
85:13 92:1,2,5,7,8,
9,11 93:8 95:19
97:20 98:3 99:24
101:1 103:15
104:11,12 105:25
106:1,8,15 107:7
108:10,11 110:1
111:9

**oranges** 110:10

**order** 49:22 51:14
66:6 83:6 85:7,9

**other** 24:4 25:6
33:7 46:24 61:14
63:21 68:1,22,23
70:12 87:10,12
92:8 93:16 95:24
98:6,19 100:11
103:2,20 106:15,16
107:13 108:12

**others** 24:18 92:10

**our** 12:14,15 23:3
29:21 62:14 69:10



(866) 715-7770
advancedONE.com

96:2

**out** 6:12 8:19,20
10:23 14:4 17:2
23:3,7 24:2 27:15
36:20,21 38:5,25
39:24,25 40:6 42:5
47:11 53:6 57:21
61:24 62:7 63:13
74:10,11 79:13,17
86:22,24 90:6 95:2
96:12 97:2 102:11
107:2,6,13 108:3,4,
10 111:12

**outcome** 57:19
95:9,12

**outcomes** 108:18

**outside** 20:8,11
55:9 78:12 104:23

**over** 9:2,3,11 10:8
11:3 12:19,25 13:6
14:8 15:11 16:9
22:10 24:10 34:19,
20 38:3,7,8 40:7
45:5 56:23 63:12
66:4 70:15 74:13
83:15,20 89:9
96:16 98:20 107:5

**Owl** 5:11

**own** 7:13 35:3
97:19 113:15

———————————

**P**

———————————

**p.m.** 76:5 101:22
113:12

**page** 18:6 19:14
22:4 45:25 50:1,4,9
66:14,21,22 67:11
85:1

**pages** 84:25

**panel** 12:12,16,17
17:5 26:3,4,7 27:8,
9,17,20 28:3,14
29:12,21,25 30:7,8,
10,13,17,20,21
31:1,4 36:19 43:10,
13 100:21

**panels** 32:25 37:3

**panic** 70:15

**papers** 8:2,3 14:6
37:15

**paperwork** 35:15

**part** 20:14 33:23
40:3 56:6 57:3
73:23 100:3,5,10,
19 109:3

**partially** 106:25

**participating** 4:11

**particular** 13:15
24:16 25:17 28:15,
24 32:9 33:13
36:15 37:5 38:11,
12 42:4,8 44:6
83:16,21 96:7
103:19

**Pasquotank** 23:19

**passing** 103:3

**patients** 7:25

**patrol** 6:23 7:21 8:6
14:19 15:17,23
17:10 100:22

**patrolman** 106:23

**pay** 15:1 44:4

**payroll** 87:14

**pen** 46:13

**people** 12:22 13:7
16:9 24:14 25:9,13,

19 28:16,20 42:20,
21 60:3 61:9,10
73:4 74:3,5,17,20
79:20,23 82:4
83:15 86:19 93:8
101:9 105:14,21
106:2,3 108:14

**people's** 24:10

**pepper** 63:21 64:24
65:11,16 69:19,21
70:7,9 73:25 74:3

**pepper-sprayed**
73:4

**per** 109:11

**perfectly** 21:9

**perform** 28:3 60:16

**performed** 13:7
24:21 53:17,20

**period** 5:14 14:4
25:5

**permits** 37:14

**Perquimans** 23:20

**person** 9:15 13:18,
20,21,25 34:18
36:15 42:6 54:1,4
60:11 68:2 91:24
92:3,6,11 93:5
95:4,16 97:8
103:10 105:3 106:6
107:7,21,24 108:11
112:14

**person's** 40:16
41:12

**personal** 35:3
70:23 88:23

**personally** 83:24,
25

**personnel** 89:6

**persons** 61:14
63:6,8

**pertaining** 48:9

**phase** 7:10,12
25:10

**phone** 54:13 55:6

**phrased** 72:6

**physical** 91:24
92:4,10

**pick** 82:16

**Pitt** 23:20

**place** 28:13 43:1
65:4 80:25 81:2

**placed** 112:19

**places** 20:10

**placing** 65:2

**Plaintiff** 4:18

**played** 77:10

**plays** 113:4

**please** 21:15 37:25
47:20 58:8,9 85:1
90:14,16

**pleasure** 110:2,11

**point** 11:2 13:1
24:24 25:2,3,24
26:1 27:5 35:25
36:3 49:24 52:10
54:17 55:1,2,3 85:4

**pointed** 57:21

**pointing** 95:5

**poked** 103:5

**police** 6:9 28:17
36:18

**policies** 72:15,16
76:14



AdvancedONE
LEGAL

**policy** 35:1,2 44:24 45:3,8,9,11,19,22, 25 47:2,11 58:22, 25 59:14,20 66:13 67:7,8,9 69:3,7,10, 13,17 70:25 71:8 84:5,8,13 89:18 91:10 92:24 97:24

**poor** 25:1

**portfolio** 36:22

**portion** 90:2,3,4,5 91:13

**position** 6:18 8:15 9:6,18,23 10:9 15:25 16:6

**positions** 31:15

**possible** 78:11

**posted** 82:7

**potential** 18:13

**practice** 54:10 81:25 97:25 98:1 109:6,7

**pre-employment** 12:6

**prepared** 5:1 85:8

**presence** 55:5,9 63:19 64:23

**present** 54:21

**presents** 92:9

**president** 31:24

**presiding** 85:8

**pretend** 13:13

**pretty** 20:15 74:21

**prevent** 92:5,11 93:4

**previous** 31:15

**previously** 27:2

**primarily** 9:25 13:9, 10 14:5

**prior** 46:20 68:24 85:13

**prison** 93:9

**probably** 6:15 14:2 37:3 39:14 77:19 81:20

**problem** 88:9,13, 21,25

**procedure** 57:3

**procedures** 72:15, 17

**proceedings** 21:19 47:25 76:5 101:22 113:12

**process** 11:17,20 12:1,13 17:1 24:22 27:7 29:10 33:4,5, 12,23 34:6,7,8 41:11 44:10 48:19 79:5 97:21

**processed** 49:13

**produce** 51:15

**progressively** 44:14

**promoted** 7:1 8:6, 8,11,21 13:1 14:14, 21

**promotion** 6:21 14:23 15:2

**proof** 47:8

**prospects** 24:8

**provide** 26:24

**provided** 77:16 103:15

**public** 10:23

**pull** 17:18 20:5,21 21:25 58:8 66:12 70:24 71:8 86:3 87:17,18 89:1,10

**pulled** 45:3 84:1

**pulling** 107:8

**purpose** 30:20,21 80:2 91:25

**purposes** 4:17 23:5 80:3

**Pursuant** 4:2

**push** 74:8

**put** 22:17 27:15 31:18 32:21 46:12 53:15 60:13 64:11 74:16,18,20,23 81:25 107:2,3 108:2 112:4

**putting** 33:10

**Q**

**qualification** 91:14

**qualified** 25:23 88:18

**qualify** 25:8

**quantitative** 112:4

**quarter** 67:16

**question** 19:10 30:16 37:25 38:1 39:20,22 50:13,14 51:4 65:12 68:6 72:3,9 77:12 80:11 84:20 102:16 108:17 109:24 110:3,9

**questions** 4:17 18:8 23:25 24:5,9 50:3 78:4 84:22 102:4 113:15

**quick** 66:23 67:13

**quite** 8:22,23

**quote** 51:20 63:13, 16 76:15

**R**

**raids** 79:22,24

**ran** 26:4,6,8 27:16 53:4

**range** 90:6,7 104:3 110:18,19

**rank** 13:3

**ranks** 13:18

**rape** 39:10

**rare** 100:18

**rate** 97:4 107:9

**reach** 23:3

**reached** 23:7 58:19

**reaching** 24:2

**reaction** 70:6,9

**read** 18:23,25 19:14 22:6 23:9 45:7,12 58:7,9 85:3 90:14 91:6,7,15,20 92:24 93:2

**reading** 46:19 68:20

**reads** 57:22

**ready** 25:15 67:4,5

**realized** 53:7



WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

141

Index: really..reviewed

**really** 27:24 36:22 102:14

**reason** 18:22 19:1 28:23 31:16 36:20 96:21 111:12

**reasonably** 92:1,3, 6

**reasons** 28:8,21

**recall** 24:19 26:10, 11,12 27:20 28:1 34:9 35:8,9,18 48:16 49:4,18,19 53:22 55:7,10,11 56:20 57:14,15,16, 17 62:16,19,20 67:24 68:7,10,13 71:14,17,18 77:22 79:22 80:13 81:5 94:22 97:13 99:20 100:20 104:10 106:17

**receive** 46:21

**received** 10:25 11:1 27:10

**recently** 16:5

**recess** 21:19 47:25 76:5 101:22 113:12

**recognize** 22:20 63:14,15 91:1

**recommend** 29:10 30:8,10,14,23 31:1 59:8,12,13

**recommendation** 29:2,3,6,13,15,22 31:13,18 35:20,23 36:8,9 43:20,22,23 44:1,13,15,18 51:15 55:23 57:6,8, 21,22 58:8,10,11, 19 77:11 110:4,5

111:22

**recommendations** 12:14 16:14,16,17, 22 29:21

**recommended** 29:1,4,7,16,20 30:7,18 31:5,6,17 32:10,11,14,15 35:7 36:18,19 58:3 67:25 68:8,11

**record** 5:6 20:2,13 23:5 24:3,4 38:12, 13 48:11 76:4 78:10 87:19 89:6, 14 101:20,21 102:2 113:11

**recordings** 48:25

**records** 9:2 20:5 37:13,14 83:12,18, 19

**recruited** 6:11

**refer** 4:18,22 14:9

**referred** 86:18

**referring** 33:24 50:7 56:1 67:12 86:7 96:19

**refill** 47:22

**reflect** 48:11

**refused** 74:10

**registration** 53:4

**release** 79:19

**released** 79:7

**Relevance** 37:23

**relevant** 43:17

**relied** 77:13,14

**rely** 98:6

**remain** 87:13

**remember** 10:16,22 11:5 12:18,24 17:22 24:9 32:7,8 52:17,23,24 54:8, 12,14,15 55:13,14, 15,16,17,19,21,24 56:4,5,13,14,16 58:1 80:23 94:10 99:17,19,25 104:5 112:1

**remotely** 4:3

**repeat** 4:8 86:1 88:20

**report** 16:3 38:9,16, 18,24 39:5,9,10,11, 12,13,19 40:1,9,10 41:4,8,9,10 43:6 44:8,9 47:17 48:21, 22 50:2,4,23,24 51:7,15 52:3 54:9 55:14,20,22 57:11 64:5,8,12,16,18 68:15,17 70:2 73:23 75:4 77:25 110:20,24 111:2,4, 5 113:17

**reported** 47:1

**reporter** 4:16 90:4, 8

**reporting** 73:24

**reports** 38:3,7,8,10, 19,20,21 39:2 40:14,21 49:22 51:7 77:13,21

**reprimanded** 87:9, 12

**request** 20:3,9 26:15 34:20 100:6, 8,13,17

**requester** 34:21

**requesting** 33:22

**requests** 23:4

**require** 60:18

**required** 38:18 39:5 41:4 47:1

**requirement** 89:23 110:20,24

**resided** 5:12

**resist** 74:4

**resisted** 74:3

**resolved** 42:10

**respond** 24:15 109:5

**response** 19:17

**responses** 102:4

**responsibility** 14:2, 3 78:22

**responsible** 11:11 25:11 37:13 83:14

**restroom** 76:1

**result** 75:1 82:9 92:12 93:5 107:24 108:10

**retired** 9:21 11:20 16:5,6 65:24

**returned** 96:12

**review** 17:11,24 26:4,7 45:24 46:16 47:19 48:3 84:21 86:12 89:11 90:15, 17 108:24,25 109:1 113:9

**reviewed** 19:21 84:16



WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

142

Index: reviewing..September

**reviewing** 24:4
47:21

**rewind** 26:2

**ride** 7:11

**right** 8:24 9:8
16:17,22 18:18
21:12 24:17 30:19,
25 34:2,18 36:16,
23 38:15 40:2
50:11,12 58:16
59:7 66:23 67:22
68:10,13 70:11
71:5,6 75:17 88:2
94:20,22 101:12,13
102:18 106:10
111:20,21

**right-hand** 45:14,
15

**rights** 21:10

**rise** 81:23,24 82:3

**road** 6:23 39:23,24,
25 40:4,7 106:24

**Robinson** 4:6,9
18:17,19 19:3,5,12,
13 20:21 21:1,5,12,
18,20,25 22:2,4,7
36:25 37:24 45:2,4
46:2,5,10,15 47:16,
18,21 48:1,11,15
66:17,20,22 67:3,6
71:3,10 76:6,19,21
78:3,5 84:4,9,12
86:3,8,16 87:17,20
89:1,4,8 90:9,16,
20,23,25 91:8,9
101:15,17,23
113:8,13

**role** 37:2,4 94:15
113:4

**roles** 8:18 13:15

**room** 9:16 11:4
107:20

**rose** 41:23

**roundabout** 32:17

**rule** 58:22

**run** 20:1 34:10
64:14,16 79:16
96:16,25

**running** 96:25 97:1

**runs** 14:17

**S**

**safe** 27:8,12 45:21

**said** 4:8 9:11 19:22
21:23 31:22,24
33:10 36:6 37:6
41:11 50:8 51:21,
23 53:16,17 55:10,
24,25 56:4,5,9,10,
17 57:14,24 59:19
60:20,23 61:2,25
62:2,3 64:23 68:19
69:18 71:23 72:4,7,
18 79:9 84:17
88:20 93:18,20,21,
23 94:21 96:5 99:2
101:18 107:22,23
112:22 113:18

**same** 14:19 15:1,7
22:13 23:14,15
49:9 62:6 93:17

**sat** 10:20 17:4
27:15 32:25 37:2
52:9

**saw** 17:15 53:2
57:20 87:16 97:2

**say** 7:14 10:1 14:24

14:12,13

16:12 19:6 20:12,
15,17,18 27:8,12
28:11,12 29:23,25
30:1 31:22 33:17
34:17 37:21 41:20
44:7 45:21 46:7
51:17,20 52:25
55:8 56:1 57:5,23
59:19 62:11 64:15
69:12 70:17 78:12
79:18 80:6 82:17
94:9,18 101:16
104:14 106:3,6,15
109:19 110:23
112:3

**saying** 10:8 29:7
30:25 49:2 52:21
62:5 71:17,18,24
72:2 73:10 77:2
78:10 109:3 111:20

**says** 18:20,22 50:9
68:21 91:16,20

**SBI** 97:16,20,22
100:13

**scare** 105:3

**scared** 105:4

**scenario** 24:16
113:5,6

**scenarios** 24:15

**scene** 10:23

**scenes** 9:14

**school** 5:16,17
6:15 7:7,9 20:4,11
24:11 80:25

**scope** 78:12

**screen** 22:11 90:10

**scroll** 17:24,25
18:18 22:13,15
71:3 90:16,17 91:8

**sealed** 10:17,19,20

**search** 80:24,25

**second** 46:19
67:14 71:7 89:9

**section** 45:25

**security** 25:12 27:1

**see** 17:14 18:20,22
22:3,17 26:14 33:2,
13 35:12 38:23
39:23 45:15 50:6,
18 59:20 63:15
64:7,10 66:23
90:18 93:15 113:10

**seeing** 103:2

**seek** 6:2 103:14

**seeking** 34:8

**seem** 69:16

**seemed** 53:14

**seems** 50:7

**seen** 55:14 64:7

**self-defense**
112:25 113:4

**self-protection**
47:1

**send** 25:12 29:4
34:17,22

**senior** 5:20 14:10

**sent** 21:5 29:7

**sentence** 19:14
47:4 68:21 71:7
91:17,22 93:8

**sentences** 47:5

**separation** 59:9,10,
13 67:25 68:8,11

**September** 91:3

**sergeant** 7:11 14:9, 15,16,25 15:6,9,12, 13,14,21 49:20 54:5 55:17,19 58:12 93:22

**sergeants** 15:18

**serious** 92:9 110:13,17

**serve** 8:1,17 53:8 93:9

**served** 15:25

**service** 25:8 58:14 111:16

**services** 44:5

**serving** 14:6 92:18

**set** 12:8 43:5

**seven** 102:16

**several** 74:2 95:2

**severity** 109:25

**sex** 8:13 10:6

**sexual** 110:12

**shake** 33:8

**shall** 46:21 47:1

**share** 108:18

**Sharika** 4:9

**Shaw** 18:20

**she** 36:23 49:4,5, 10,11,14 53:5,6,14, 16 87:3,4,7 93:2,7, 13 95:23

**Shearin** 12:23 13:3 83:17

**Shelton** 13:4 75:18

**sheriff** 4:19,20 6:19,20,23 7:3,20

11:22 12:14 16:4 17:8,15 26:1 29:4, 11,14,17,18,22 30:11,19 31:3,6,9, 20,22 32:6 33:6,7 35:20,24 36:2,4,5 43:24,25 49:25 55:22 56:18 57:14 63:1 98:7 110:2,11

**sheriff's** 6:9,17 8:5 9:14 11:2,18 12:1 13:12 25:11 33:18 34:3 35:9 38:17 45:9 47:7 58:14 66:8,11 71:25 72:10 75:8,10 78:6 82:25 85:10,12 87:14 88:17,19,23, 25 105:11,15,21,25 106:1 112:18,23 113:1

**sheriffs** 110:7

**shift** 14:8,17,18 15:20,22 24:24,25 25:15,18,19 53:11, 12 76:10 81:21

**shin** 67:11

**shoot** 42:19,21

**shooting** 97:22 100:12

**shootings** 59:4

**short** 10:21

**shorter** 42:22

**shortly** 28:13 99:23

**shot** 95:5,16,17,22 112:18,19,23,24

**shotgun** 95:2,3,4,5

**should** 21:11 29:6 48:12 50:1 111:1,3

112:19

**shoulder** 65:7 97:11

**shouldn't** 59:23 112:24,25

**showing** 89:24

**shows** 22:1 113:17

**sic** 111:5

**side** 14:19 40:7

**sign** 19:15 34:21 91:13

**signals** 107:10

**signature** 22:23 90:11,18,21

**signed** 91:4,5

**significant** 103:24 104:4,7,8,17 106:18

**simple** 41:17

**simply** 64:8

**simulated** 75:23

**since** 9:6 32:13,20 33:15 59:9 62:23, 24 75:6

**single** 12:22 28:23 100:4

**sir** 22:12 86:10

**sitting** 33:5

**situation** 10:15 46:25 74:7 79:12 80:19 88:11 103:12

**situations** 11:13 79:15 108:16

**size** 98:5

**skim** 84:8

**slam** 60:3,19 69:11

**slammed** 58:20 59:1,23 60:17,20, 23

**slamming** 68:24 69:9,13

**slight** 107:5

**slow** 84:9 107:11

**slowing** 107:4,6

**small** 25:1 28:18

**snakes** 105:4

**sniff** 80:5,7

**snippets** 52:22

**so** 4:15,20,24 5:1,5 6:8,9,22 7:2,19,20 8:4 9:7,11 10:7 11:16,25 12:18,21 13:6,12,17 16:5,8, 24 18:11 19:6,21 20:9,12,22,23 21:14,21 22:4,9,17 24:2 25:8,9,12,17 26:8,18 27:5 28:25 29:9,15,20 30:5,7, 13,22 31:4,15 32:24 33:2,13,15, 17 34:13,20 35:6 36:6 37:1,11,18 40:10,21 41:4,11 42:14,20 43:13 44:6,20,23 45:1,21 46:9 47:11 49:1,11, 18 50:25 51:22 54:23 56:25 57:13 58:3,5,8,16,21 60:25 62:7,9 64:7, 21,22 66:7 67:7 68:3 69:5,25 70:25 71:24 72:18 73:10, 18,25 76:13 77:9



(866) 715-7770
advancedONE.com

78:6,9,15,18 79:9
80:22 81:17 83:22
84:13 85:16 86:21
87:1 89:9 90:10,17
91:10,15,18 92:14
93:14,15,18 97:10
99:2 103:1,2,6,21
104:23 105:10
106:11,12,19
107:1,7,14 108:22
109:2,25 110:15,18
112:18 113:4

**social** 27:1

**soft** 63:20 64:22,24
65:1,4,6,8,9 71:12

**soft-hand** 65:13,14
68:1,3,4,9,12
74:12,19

**soliciting** 110:12

**some** 8:2,17 9:20
11:2 13:1 14:24
16:15,17 18:8 20:7
23:24 24:14,23
25:19 26:24 27:5,
12,13 28:20 34:14
37:5 39:23 40:14
47:7,13 48:7 49:24
51:20 54:17 55:1,2
59:7 60:4 71:4 73:9
76:13,14 78:4 80:1
84:9 91:8 99:9
100:11 102:20
111:12 112:6 113:9

**somebody** 11:6,10
42:25 43:1 49:23
65:5,7 74:7 82:16
112:23 113:1

**somebody's** 34:11
65:2 95:1

**somehow** 32:19

**someone** 12:3
40:25 47:3 59:11
63:18 67:17 70:17
80:15 81:2,17
104:21 112:14

**something** 11:1,10
32:23 34:2 38:14,
15,18,21 40:25
41:1,17 42:6,21
43:3 53:16 64:8,12,
13 66:23 76:23
83:9 101:16 105:23

**Sometime** 52:2

**sometimes** 8:3
12:3 15:13,14 25:2,
12 27:24 28:5,6,16
65:4 70:12 79:25

**somewhat** 89:19,
21

**somewhere** 104:2

**sorry** 36:1 52:19
59:16 67:5 80:6
86:11 88:20 100:7,
15

**sort** 7:12 40:17
81:1

**soup** 105:13

**speak** 11:22 57:13
78:16

**speaking** 49:18,19,
20

**specialist** 87:22,25

**specialized** 8:13

**specific** 12:16 24:9,
20 79:22

**specifically** 10:8
16:25 26:11,12
27:18 28:1 57:13

**specifics** 35:10
83:7

**specified** 91:25

**speed** 97:4 107:10

**speeding** 53:3,5

**spoke** 54:1,25 55:4,
8 56:10,15 57:12
94:11 103:5

**spoken** 49:23

**spray** 46:21,24
47:8 63:21 64:24
65:11,16 69:19,21
70:7,9 73:25 74:3,
11

**sprayed** 70:22 74:9
108:8

**spraying** 46:25

**staff** 15:15

**Stainback** 13:5

**stand** 109:12,13,14

**standard** 54:10
57:3 108:24 109:1,
8

**standards** 29:5,7,
11,25 34:12 35:2
60:1

**stands** 36:21

**start** 23:6 34:9
40:20 41:24 51:24
66:24 91:19 99:10
107:3

**started** 6:4,16 7:2,
19,20 8:5 9:19 33:4
34:6,24 35:8 95:4
96:25 98:18,21
99:2 100:1 108:5

**starting** 13:17

15:15

**starts** 63:19 67:11

**state** 5:5 14:1

**statement** 50:6,18,
21 55:14 61:5 90:8

**statements** 42:4
51:22 77:13,15,16,
17

**stay** 109:13

**staying** 58:1

**step** 14:15 24:22

**steps** 43:4,5,8
44:12,15

**still** 11:1 28:14 64:4

**stood** 36:20

**stop** 18:18 40:6
107:22,25

**stopped** 36:5
106:24 107:2,21

**stops** 79:25

**straight** 25:21
60:12

**stray** 80:11

**stretch** 109:13,20

**strike** 73:7,11
75:22

**striking** 73:15

**struck** 73:18 75:24

**structure** 13:12

**student** 91:5

**stuff** 14:7 17:7
26:19,22 27:5,12,
13 40:6 63:13

**Subdivision** 91:25



**subject** 42:8 60:4 71:19,25 72:11,19, 23 73:5,14 74:10 75:1,25 76:9 77:24 79:8

**subjects** 79:6,8,10

**submit** 34:12

**submitting** 52:3

**subpoenas** 8:2

**subsection** 92:1 93:3

**substance** 85:9,23

**substances** 85:5, 11,17

**substantiatable** 111:5

**substantiate** 61:4

**substantiated** 61:7, 10 111:4

**substitute** 71:12

**succumbed** 105:12

**such** 59:25 65:10, 15 82:2

**sue** 105:15,17,21, 23,25 106:1,4,6,9, 10,11 107:15

**sued** 62:12 105:20 106:12 107:24 108:1,11,14

**suing** 62:1

**suit** 61:24 62:23,24 82:18 105:12

**suits** 82:9

**summarize** 53:1

**supervise** 15:18

**supervised** 15:19, 21

**supervises** 14:18

**supervising** 15:13 81:22

**supervision** 98:22

**supervisor** 8:18 14:14,16 15:5 40:17 41:12,15,16 43:12 54:10 104:20,22 110:23

**supervisors** 49:16 56:7 110:20,24

**supply** 80:25

**Supreme** 76:15

**sure** 7:10 8:22,23 17:19 41:16 49:24 54:11 56:7 108:23

**surprised** 85:19,21

**suspect** 85:20,22 108:2,3,4

**suspect's** 61:5

**suspects** 80:12 82:5,8 96:1

**suspend** 44:4

**sway** 106:8

**swear** 29:23

**sweep** 60:7

**Swilley** 83:18

**switched** 6:24

**sworn** 4:3 13:25 24:23 25:25 26:1 27:2

**system** 6:15 93:9

---

**T**

**take** 14:5 17:21 21:14,16 25:8 35:20,22 36:8,9 40:15 42:10,16,23 43:3,5 45:5 47:19 52:13 67:1 79:7 84:8 86:12 95:1 97:12 99:16 102:8 109:15 113:8

**takedown** 53:18,19 60:6 67:16 69:2 75:25

**taken** 10:22 79:15, 21

**takes** 42:20 67:13 75:14

**taking** 35:3 55:21, 22 79:5

**talk** 16:24 24:12,13 32:6 36:14 42:5,7 43:16 47:13 58:1 59:7 62:13 75:4 93:14 98:12

**talked** 31:21 43:11 49:14,15,24 62:3,4 64:21 66:8 77:12, 20 83:22 93:21,22, 25 113:16,25

**talking** 33:18 46:9 51:13 54:18,20 55:15,16,17,18 57:7,20 82:16 86:9 94:23 103:7

**tally** 32:19 61:12

**tapes** 48:24

**Tasers** 65:11,15

**team** 16:3

**tease** 69:5

**technique** 60:1,10, 16,18 65:14 67:10 68:1,3,4,9,12 71:13

**techniques** 60:5 63:21 65:13 71:19 72:11 74:12 75:20, 21,25

**telephone** 41:17

**tell** 5:10,19 6:8 26:11 27:18 29:9 31:12 40:12 42:14 43:4 44:5 53:20 54:7 55:11 57:7 60:4 67:8 74:1 76:16 96:18 101:7 111:9

**telling** 103:10,22

**ten-minute** 21:17 109:16

**tenure** 78:12,16 94:17

**term** 58:7 108:20

**terminated** 18:24 19:2,7 58:4 81:6

**termination** 58:16 59:10

**terminology** 13:22

**terms** 9:9 14:2 26:21 35:16 47:14 58:5 98:16

**tested** 85:14

**testified** 4:4 59:3

**testify** 5:1 10:3

**testimony** 5:3 54:23 61:5

**than** 6:15 14:11



39:14 42:21 46:24
61:14 65:10,15
68:1 70:12 101:5,8,
18 103:2,11

**Thank** 21:17,18,23
84:24 108:15

**that** 4:16,21 5:2,19
6:6,22 7:8,12,19,
22,24 8:14,21 9:11,
12,17,23,25 10:8,9,
19 11:1,6,9,10,13
12:2,12,13,23 13:7,
13,20,21,23,25
14:4,5,7,8,17,23,24
15:12,18,19 16:11,
12,15,18 17:6,7,12,
16,19 18:12,23
19:6,7,25 20:8,10
21:23 22:1,3,5,6,23
23:7,9,14,22 24:9
25:5,8,10,23 26:1,4
27:5,8,12,19 28:5,
7,15 29:2,6,7,9,25
30:1,19,22 31:12,
14,15,16,18 32:3
33:4,9,12,14,15
34:2,7,9,19,23,24,
25 35:1,3,17,18,19,
22,25 36:2,18,20
37:3,6,10 38:5,13,
15,17,18,22,25
39:20,22 40:1,2,5,
6,9,15,18,25 41:1,
2,7 42:1,7,8,17,20
43:3,5,7,21 44:11,
21 46:7,13,19 47:4,
6,8,14,16,19,22
48:7,12,22,23 49:1,
5,9,16 50:2,25
51:3,10,14,16,25
52:1,5,8,14,15,16
53:1 54:18,23 55:3,
5 56:12,15,16,20,
22,25 57:2,4,9,16

58:3,4,13,24,25
59:3,14,20 60:1,2,
21,22,23 62:10,16,
21,25 63:4,13 64:7,
11,13,15,16 65:3,5,
8,11,17,18 66:3,5
67:12,17 68:4,13,
15,19,20 69:3,5,10,
12,18,24 70:5,9,10,
11,14,18,19,20,22
71:8,11,15,17,18,
23,24 72:2,18,22
73:4,6,9,13,16
75:12,13,14 76:25
77:3,13,14 78:15,
22 79:16 80:6,10,
11,13,21 81:3,4,5,
17,21,22 82:1,2,3,
19 83:5 84:5,8,14,
15,17,18,20 85:3,
23 86:1,6 87:16
88:16,18,20,23
89:5,10,25 90:21
91:17,21 92:8,21,
24 93:14,18 94:10,
21,22 95:9,16 96:1,
6,13,15,18,24
97:12,18,21 99:10
100:24 101:3,4,5,7,
10 103:8,11,14,18,
21 104:2,7,12,17,
19,20,22,24,25
105:3,12,24 106:5,
7,21,22,23 107:14,
17,24,25 108:11
109:2,4,6,8,22,24,
25 110:3,7,9,11,14,
20 111:2,9,11,13,
18,22,25 112:12
113:6,17,19

**that's** 9:6,8 13:22,
23 14:2,10 17:23
18:6 19:19 23:15
24:17 28:9 29:19

30:12,25 31:8 34:6
38:19 40:3 43:17
44:22 46:1 52:7
55:3 56:15 58:5
59:6 62:10,15 63:2
69:22 71:2,4 73:15
74:19,21 75:14
80:18,22 81:1 82:7
86:2,18 88:22
94:11,13 95:5
96:14 97:24 98:1,7
100:19 101:12
102:23 106:18
109:21 111:19,20,
21

**the** 4:15,16,18,19,
24 5:5,19 6:11,14,
16,23,24,25 7:7
8:2,22,23 9:3,9,14,
15,16 10:16,17,18,
19,20,23 11:2,3,11,
17,19,25 12:4,5,7,
8,9,11,14,19 13:3,
6,10,11,12,15,17,
18,20,22 14:1,3,5,
6,11,12,13,15,16,
17,18,19,24 15:1,7,
8,10,11,14,15,17,
19,21,22,24 16:2,3,
4,16 17:1,5,6,8,9,
12,13,14,15,16,23
18:6,12,25 19:3,14,
20 20:3,5,14,22
21:7,25 22:11,13,
17 23:5,6,9,14,15,
22,23 24:22 25:11,
13 26:7,13,14,20
27:6,8,9,10,13,15,
16 28:6,17 29:3,4,
10,12,13,15,17,18,
21,22,23,24,25
30:4,7,8,10,11,13,
15,17,19,20,21,22
31:3,4,6,9,16,20,

22,24 32:3,4,6,19
33:3,4,7,11,12,18,
20,21,22,23,24
34:3,6,8,13,15,16,
21,22,24,25 35:4,5,
9,14,19,22,24 36:2,
6,16,19,20 37:4,9,
10,13,19,25 38:1,3,
6,8,17,19,20,23
39:1,2,23,24,25
40:3,4,6,7,15,16
41:11,12,14,15,16,
23 42:3,7,11 43:4,
16,20,24,25 44:1,
12,15,19,23,24
45:2,7,12,13,14,15,
18,23,24 46:8,12,
14,16,23,24 47:6,
13 48:7,11,12,19,
21,22,23,24 49:6,7,
8,16,22,24 50:4,7,
13,14,22,23,25
51:2,7,21 52:2,3,5,
12,17,22 53:3,4,7,
8,9,12,13,14,15,16
54:1,4,9,10,18,19,
20,21,22 55:3,6,13,
20,22 56:7,13,14,
21,25 57:5,7,19,20,
21 58:7,8,11,12,14,
16,20,24 59:1 60:3,
11,12,13,17,18,20,
24 61:4,11,12 62:6,
15,16,22,24 63:4,6,
8,10,17,19,24 64:6,
7 65:1,4,5,9,12,13,
18 66:4,6,7,8,11,12
67:5,13,14,15,16
68:1,2,20,21,24
69:4,7,9,12,16,20,
23 70:14,19,24
71:7,8,11,16,19,22,
25 72:2,3,6,10,11,
14,19,23 73:5,7,8,
15,18,20,22 74:4,

Advanced ONE
LEGAL
(866) 715-7770
advancedONE.com

10,11,17,19 75:3,4,
5,7,10,11,17,19,21,
22,24 76:1,4,8,11,
14 77:7,8,13,19,20,
22,24 78:6,10,12,
18,20,21 79:5,6,7,
8,9,17,19,23,24
80:1,4,7,12,15,18,
23 81:1,2,8,20,22,
24 82:7,8,25 83:7,
9,22 84:5,11 85:6,
7,8,9,10,12,13,23
86:3,4,6,15,22,23,
24,25 87:5,6,7,13,
14 88:13,16,17,18,
19,21,22,24 89:17,
23 90:2,3,4,5,6,8,
10,11,15,19 91:2,3,
7,10,12,13,14,15,
25 92:3,5,11 93:4,
9,17 94:9,10,25
95:1,2,3,4,9,12,24
96:10,11,12,14,15,
16,19,21,22,23,24,
25 97:1,2,3,4,6,8,
11,16,20,22,24
98:1,5,7,19,22,23
99:1,12,15,25
100:1,3,5,9,10,11,
13,19,23,25 101:1,
2,3,4,20,21 102:1
103:2,3,7,10,17,19,
21 104:10,23
105:11,15,20,21,25
106:1,8,22,24,25
107:1,4,11,12,13,
19 108:2,3,4,5,6,
10,11,14,17,18,19,
20 109:3,23 110:2,
10,19 111:14,15,
18,19,20 112:3,10,
12,14,15,16,17,21,
22 113:2,5,11,16,
17,18,19,25

**their**  41:5 44:5 55:6
65:2,3,7 72:16
74:18 78:18,24
83:8 85:17 96:4
98:11 100:25

**them**  6:13 12:19,23
15:13 21:11,13,14
38:4,22 40:16
41:19 44:5 54:16,
25 55:8,25 60:13,
14 61:4 65:3,8 66:5
74:3,8,9,11,17,19,
20 79:17,24 82:5
83:24 93:9,24,25
97:15 98:4 99:9
103:9 106:20
108:21 112:25

**theme**  101:12

**themselves**  79:18

**then**  4:16 6:13,16,
24 7:1,11,12 8:5
11:5 12:7,13,14
13:2,21 14:3,9
15:4,9,14,15,23,25
16:3 17:5,8,9 23:7
25:14,16,21 26:8
27:16 28:13 29:11,
13 30:13 31:4
34:19,21 40:5,18
43:19,22 44:21
45:10 52:11 56:23
57:8 60:12,13
63:20,22 64:11
74:8 75:5,6 78:8,9
79:19,24 91:21
95:14 96:14 98:4
100:13 101:1
106:23 107:7,11,24
108:13 112:24,25
113:2,10

**there**  4:21 8:3
11:21,25 12:16,19
13:6 14:17,20

15:11,20,25 16:1
24:18 25:4 28:11
32:14,15 36:12,17
38:4 39:4 43:4
44:6,9,12 52:5,18,
20 53:7,13 61:8,9
69:20 71:6 73:5
74:6 78:12,17 79:1,
12,24 80:16 81:8
82:1,12 83:15
84:24 86:24 87:4
96:15,21,22 98:4
100:18,22 101:2
103:11,17 104:19
106:21 107:6
108:12,24 109:1,2,
5,8,22 111:1,3,24
112:9,11

**there's**  4:20 12:22
28:8 32:13 39:14
42:11 74:9 80:23
82:18 83:18 95:25
106:5 111:11

**thereafter**  99:23

**thereby**  92:2

**these**  21:10 22:20,
23 23:1,25 25:14
33:1,3 37:2 42:16
46:4 50:3,14 51:6
57:1,3 67:18 74:25
79:4 82:20 85:14
93:16 98:18,20
99:3,4 100:3,10

**they**  9:15 11:10
12:3,21 14:22
15:14 26:14,15,16
27:23 28:19,21
34:18,22 38:22
40:23,24 41:5,19
42:15,22,23 44:13,
16 46:5 54:7,8,11,
12,17,19,21 55:2,
25 56:1,4,7,9

59:14,20 61:25
62:8 70:12 74:10
77:15,18 80:2,16
82:17 83:12,16
85:14 95:20,21
96:3,6,10,12,25
97:1 101:8 107:23
108:5 112:19,24,25

**they're**  15:4 38:11
82:24 83:1

**they've**  79:23

**thick**  36:22,23

**thing**  62:5 66:3
94:9,10 106:3
109:10

**things**  7:25 9:2
10:5 16:10 25:14
26:18 42:16,24,25
51:21 57:4 65:20
113:10

**think**  6:21 17:13,14
19:19 20:7,24
21:11 23:22,25
31:14,16,20 36:4
50:1 53:4,6,9,15
62:13 70:14 76:7
80:23,24 81:4 83:1
87:15 101:16
102:21 104:1
108:13 110:14
111:18 112:15,16
113:2,8

**third**  67:15 92:2

**this**  17:19,21 18:8,
11,15 19:10,14,19
21:5 22:20 24:1,21
25:2,3 26:19,22
27:12 28:18 31:1
32:9,12 33:13 34:2,
3,17,18 36:23
41:20 44:2 45:8,10,



WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

148

Index: those..to

14,18,21,25 46:1,2
47:1,11 48:3,5,16,
17,20 49:12 50:14
51:15,16 53:21
54:2 55:12,20 56:6
57:11,13 58:19
61:13,24 62:4 63:7,
8,23 64:21 66:15,
17 67:1,7,8,9,10
69:12,16 72:9 75:7
76:16 78:10,11
82:18 84:1,13
86:12,13,17 87:1,9
89:14,22 90:2,15,
17 91:1,2,10,12,25
93:7 98:21 101:19,
20 102:8 106:6
108:23 109:3
110:15 113:15

**those** 8:19 9:7 13:7
16:9,15,17 20:10
23:2 24:2 26:18
27:21 39:2,3,7,17
42:9 43:18 47:4
50:25 51:2 58:5
59:7 60:4 61:14
63:6,8 73:1,8 74:1,
15 75:6,14 78:23
82:21,23 94:1,24
96:7 98:9 100:2
103:18 106:17
108:16 111:9
112:13

**though** 10:25 11:3
28:2

**thought** 33:12
36:23 81:2 86:23
96:24

**threat** 92:9

**threatened** 105:15,
17,21,22

**threats** 105:12,13

**three** 6:15 12:10,22
27:9,24 28:3 32:5
94:22,23 101:9

**three-person** 12:12

**threshold** 109:22

**thresholds** 110:8

**through** 7:9 13:18,
19,21 20:1 26:16,
17 27:6 33:5 34:16
37:18 38:24 40:14,
21 51:13 55:12
57:6 64:16 75:13,
14,21,24 83:6 85:6
98:20,25 99:1
103:3 107:9

**time** 5:14 7:10
10:16 12:10,22,25
14:8 15:11 25:9,14
27:5,13,14,15 28:6,
23 32:3 34:19,20
35:22 36:6 37:4,19
45:1 49:24 52:4,6,
17,22 54:17,19
55:1,2,3 62:6,25
63:5,12 64:7 65:19,
23 73:6 75:3,5 77:8
79:18 81:22 83:15,
17,20,21 96:6
98:20,23,24 99:15,
17,19,20 100:20
103:10,17 106:21
107:14,19 108:1
109:4

**timeline** 30:3,4

**times** 12:10 16:1,2
38:4 62:22,24,25
63:2 72:22,23 73:1,
8 95:2 100:12
105:11 106:14,15,
16

**to** 4:2,7,8,18,22 5:1,

16,21,23 6:14,21,
24 7:1,7,11,23,24
8:6,8,9,11,17,21
9:8,15,22 10:2,5,7,
24 11:22 12:11,14,
15 13:24 14:9,12,
15,22,25 16:3,4,24
17:1,4,8,9,14,18,
22,25 18:2,8,13,16,
23 19:3,6,10,15,20
20:1,2,4,9,11,22
21:10,13,14,19
22:4,6,8,9,10,13
23:3,6,7,8,24 24:2,
11,15,17,19,24,25
25:1,7,8,13,15,17,
18,19,22,23 26:21,
24 27:3,7,8,12,15,
18 28:21 29:3,4,5,
7,8,10,11,13,14,16,
17,18,23,24 30:2,7,
8,10,14,18,19,21,
23 31:3,5,6,17,20,
21,25 32:6,11,15
33:11,13,24 34:10,
12,14,20 35:1,11
36:18,19 37:1 38:2,
5,11,18,23 39:5,8,
9,10,11,12,13,19,
20,25 40:2,4,6,7,
16,19 41:1,3,4,12,
14,16,19,23 42:6,7,
10,17,19,21 43:6,9,
16,17,20,22,23,24,
25 44:1,3,4,5,12,
13,23,25 45:5,21,
24 46:3,6,8,16,20,
23 47:7,10,11,13,
22,25 48:2,9,19,24
49:14,15,18,19,20,
22,23,24 50:1,2,4,8
51:14,17,20,22
52:16 53:7,8,9,13,
15 54:2,11,25 55:4,
8,15,16,17,18,22,

25 56:2,4,7,10,15,
23 57:3,7,9,13,14,
17 58:1,18,24 59:1,
24 60:3,9,13,18,20,
24 61:20 62:12,14
63:14,16,17 64:5,7,
8,10,12,22 65:9,13,
17,20 66:12,13,21,
23,24 67:9,12,22
68:4,14,21,24,25
69:3,7,11,13,17
70:5,7,9,11,14,19,
20,24 71:7,23 72:6,
7,22 73:2,4,5,6,10,
14,23 74:2,3,7,8,
10,11,20 75:3,4,22
76:1,5,10 77:1,24
78:21,22,23 79:4,7,
16,18,25 80:3,4,7
81:4,10,11,17,23,
24 82:3,5,17,19,20
83:5,6,19 85:1,3,
10,14,17,24 86:2,7,
9,18 87:6,7 88:11,
12,16,22,24 89:10,
11 91:7,13,20 92:1,
2,3,4,7,10,11,14,15
93:4,9,10,15,16
94:2,6,12,22 95:1,3
96:14,16,19,23,24
97:1,15,16 98:6,12,
14 99:17 101:2,22
102:8,11,18
103:15,19,20
104:4,11,16,17,20,
24 105:2,12,15,17,
21,22,23,24 106:3,
4,5,9,10,20 107:11,
16,20 108:4,17,18,
22,23 109:4,12,13,
14,15,19,20,23
110:1,9,10,24,25
111:19,21 112:2,
10,12,16,17 113:9,
12

**today** 5:3

**together** 17:7 30:3 55:2

**told** 52:9 54:9,12 61:20 62:25 95:2 102:21

**too** 16:22 21:6 76:16 78:10 103:18

**took** 11:6 97:14

**top** 22:17 23:6 45:14,15

**totally** 102:18

**towards** 22:11 95:5 97:3,4 111:16

**town** 28:18 62:7 111:12,13

**track** 38:22

**trackable** 38:25

**traffic** 40:5 79:25 107:3,4,6,10,21,25

**trailer** 107:12

**train** 75:10,19 80:4, 7 85:17 88:11,12, 24

**trained** 7:3 47:8 60:3 78:23 82:21 85:24 99:12 103:22

**trainer** 88:2

**training** 7:5,9,12 14:2 29:5,7,11,24 34:11 35:2 36:21 46:21,25 60:2 66:9 69:10 71:22,23 72:4,7 73:16 75:12, 13,17 83:2,6,8,13 85:5,11,14 87:18, 19 89:4,15 91:3 98:9,10,11,12,14,

**17,19,25** 99:1

**transfer** 14:25

**transferring** 14:24

**transpired** 52:8 107:25

**transport** 7:25 107:8

**trash** 39:23,25

**tried** 53:15 74:2,7, 8,10 96:16 108:4

**trooper's** 107:1

**truck** 107:8

**true** 67:17 105:3

**try** 40:16 53:8,9 59:24 79:7

**trying** 27:7 28:21 30:2 57:12 73:6,10, 14

**turn** 11:10 12:3,4 56:23 66:21 79:18

**turned** 9:15 10:24 53:3 97:3

**two** 4:24 7:15,16,17 15:17,18 16:2 27:23 32:5 92:18 96:1 108:13

**two-man** 75:24

**two-year** 19:15

**type** 7:5 8:10 9:7 33:15 38:7 42:17 44:9,10 75:2 100:2

**types** 8:12

**typewritten** 52:18, 20

**typical** 11:25 37:19, 22 41:11 42:11

**typically** 12:12,18, 19,22 15:17 25:4,9 32:2 41:22 42:9,15 76:13 98:7

**typing** 52:16,22,23

———

**U**

**U.S.** 6:11

**Uh-huh** 9:10 64:3 96:20 111:4

**ultimately** 29:1,15, 22 30:5

**uncontrollably** 69:2

**under** 33:6 37:10 59:25 67:21 73:14 88:18,24 92:24 93:2,4 98:22 112:19

**undergo** 7:6

**understand** 13:11 14:12,13 30:2,15 37:1 43:7 44:11 51:4 77:1,2 103:9 108:23 109:24 110:15

**understanding** 46:23 78:15

**undetermined** 25:13

**uniform** 64:6

**uniforms** 25:1,6

**Union** 23:21

**unit** 15:12 79:2,13 95:1

**units** 78:7

**University** 5:24 6:7 18:20

**unless** 31:24 92:10

**unlimited** 112:7

**unpack** 73:9

**unreasonable** 76:24

**unsubstantiated** 61:8

**until** 8:17 9:21 25:14 32:20 94:14

**up** 12:8 13:18 14:15 16:3 17:18 19:11 20:21 21:25 25:13 32:19,23 33:14 34:17 41:19 45:3 47:17 48:21 58:8 66:12,22 67:1 70:24,25 71:5,6,8 82:16 84:1 86:3 87:17,18 89:2,10, 24 91:8 101:11 104:18 107:2,12, 18,22 109:12,13,14

**update** 75:12

**updates** 75:14

**upon** 91:24 92:12 93:5 96:10

**us** 13:21,25 17:25 18:2 26:25 32:5 34:22 62:1,14 67:8 75:14 79:22 90:14 91:13 102:8

**usage** 85:24

**use** 13:3 39:11 40:11 42:8 46:22, 24 47:3 48:9 50:22, 23 58:5,7 66:4 69:21,23 70:14



**AdvancedONE**
LEGAL

**(866) 715-7770**
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

150

Index: use-of-deadly-force..way

71:11 72:19 73:5
75:11 77:20,23,24
79:24,25 81:9 83:9,
22 88:13,21 89:23
91:15 92:4 93:11
96:13 97:21 99:7,9

**use-of-deadly-force**
90:11

**use-of-force** 16:10,
14 40:13,14,21
41:8,9 44:9,24
45:3,22 48:21
50:24 51:6 52:3
58:23 61:1 63:11,
18 70:25 72:20,24
74:25 75:4 98:15
99:4 108:25

**used** 17:23 18:12
23:3 59:24,25
64:22 67:25 68:22,
23 69:19,25 73:25
74:12 80:2 82:2
83:19,24,25 85:5,
10,16,24 88:24
90:7 92:25 93:8
94:16,19

**using** 77:22 88:10,
25 90:6 91:24

**utensils** 82:25

---

**V**

**vacant** 81:2 86:23

**vaguely** 31:14
63:12

**Vance** 5:20 6:14,16
7:8 8:5 10:13 11:2,
14,17 13:12 35:2
45:8,9,21 58:14
66:7,11 71:18,21,
24 72:3,7,10,14

75:7,10 76:15 78:6
82:10 85:10,16
87:13 88:17,19,22,
24 89:18 98:2
101:13 103:8
104:11

**various** 28:8

**vehicle** 96:10,15,
18,22,25

**verbal** 53:5 63:20
64:23

**verbatim** 53:2

**very** 61:2 77:19
93:15 102:21 104:7
107:9

**vest** 107:3

**via** 21:5

**victim** 58:20

**victims** 43:15

**victims'** 107:1

**view** 52:10

**violated** 58:25
59:14,20

**violence** 110:22
111:1,7

---

**W**

**wait** 25:22

**waiting** 25:5,18

**Wake** 23:17

**walk** 33:7 37:18
41:19 55:12 56:24

**walked** 31:20 53:6
103:4

**walking** 65:7

**WALLACE** 4:2

**want** 4:8 11:22
13:24 18:8 19:10
21:12,13 24:19
37:1 41:14,16
44:23 47:10,13
50:3 61:20 63:16,
17 66:13,23 69:17
70:14,24 75:23
82:20 86:2 91:20
98:12 108:22,23
109:15,19 113:9

**warehouse** 86:23
113:20

**warehouses** 86:23

**warrant** 93:10

**warrants** 8:1 53:7,
8,14 92:18 96:8

**was** 4:3 5:14 6:6,
11,18,21,22,24 7:1,
12,16,18,23 8:8,11,
16,20,22 9:1,2,3,
15,20 10:18,21,22,
24 11:1,11,25
12:12,16,19,23,24
15:13,19,20,23,24
16:4,6,7,17 17:3,5,
13,14,16 19:17
20:15,17,18 21:21,
23 23:22 24:22
25:17 27:2,17
28:11,23,25 29:16
30:5,6,18,19 31:16
32:1,3,6,7 33:2,9
34:15,23 35:1,3,5,
6,7 36:12,17,22
37:3,9,16 38:4,5,
17,23,24 40:4,15,
17,18,25 41:15
42:7 43:4 44:6,9,21
46:11 48:14,22,23
49:9,12 50:13,22

51:12,13,14 52:5,
22,23 53:7,23 54:1,
4,13,18,20,22 55:1,
5 56:14,25 57:2,19
62:5,9 64:13 66:19
68:14 69:1,3,7,9,
13,17 71:12 73:5,6,
14,16,20 75:3,15,
17 80:11 81:2,3,5,
22 84:3 85:13,24
86:14,23,24 87:1,3,
4,9,11 88:16 89:7
90:24 92:14,15,18
93:2 94:10,25 95:9,
12,13,14,16 96:13,
15,17,19,21,22,24
97:6,8,11,12,19
98:17,22 99:24
100:1,22,24 101:1,
3,10 102:4,6,7,25
103:3,6,11,15,17,
18,19,21,23,25
104:1,2,4,7,8
106:21,22,23,25
107:4,10,14,16,19,
20 108:6,9,21
109:7,8 111:14,16
113:17,19

**wash** 34:20

**wasn't** 5:14 10:19
21:24 33:12 34:4,
25 36:6 51:10 77:9
87:4 95:23 103:1,
25 109:6,7,11
112:23 113:24

**Watkins** 12:24 13:4
49:14,21 55:15
56:11 58:12 93:23
94:8,10

**Watkins'** 56:14

**way** 4:21 5:11
28:24 32:13,22
33:9 34:15,24,25



**AO** AdvancedONE
LEGAL

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

151

Index: Wayne..where

35:5,21 43:9 72:6
82:3 87:10,12
93:17 106:8 110:10
111:15

**Wayne** 23:16

**we** 4:24 12:2,7,13,
16 13:20 14:9
15:17 16:1,2 17:7,
23,25 18:12 19:11
20:24 21:5,16
24:10,12,13,14
25:1,9,10,14,19,20
28:5,7,8,13,16,18,
19 29:4,12 30:5,22,
23 31:5,14,16,20
32:1,2,3,7,14 34:2,
20 42:20 45:2 46:9,
10 47:16 52:11
57:12 62:9,12,13
64:21 66:22 67:1
69:9 71:11 75:12,
13,24 76:3,4,7,18
77:12 78:8 79:24
80:21 82:1 88:15
89:9 90:10,18 91:2,
20 94:25 95:7,25
96:7 102:14 103:5,
7 108:9 110:2
113:8,10,16,25

**we'd** 28:14

**we'll** 21:16 25:11,
12 70:5

**we're** 8:4 19:11
20:22 23:6,25
24:25 27:6 29:23
46:9 57:20 60:3
62:12 66:17 79:18
91:13 94:23

**we've** 28:16 32:15,
20 42:19 62:24
79:5,15,16,17,21

**weapon** 88:14,15,
16,18,22,23 92:7

**weapons** 65:10,15
82:22

**wearing** 69:1

**wears** 64:6

**week** 7:14 49:9

**weeks** 7:15

**weighted** 85:15

**Welborn** 49:20
54:5,23,24 55:4,17,
19 56:3 58:12
77:16 93:22 94:6

**Weldon** 4:2 5:7

**well** 9:4 11:21
16:15 17:13 21:1,7
24:19 26:2 34:10
36:17 56:10 57:12
58:7 62:3 68:5
69:12 72:9 77:23
84:20 90:15 91:6
93:15,25 97:17,18
103:23 105:2 110:4

**went** 7:7,9 10:2
14:22 17:9 20:4,11
24:11 28:12 31:9
38:14,15 39:1 53:8,
13 87:7 96:23
100:24 101:2

**were** 6:20 7:3,24
8:3,6,14,19,24
9:11,17,23,25 10:8,
9 11:21,25 12:21
14:21 15:25 16:2,9,
21 21:4 32:24 33:8
37:6,8 38:4 40:24
41:18 44:12 54:11,
17,19,21,24 55:2
62:13 64:10 73:8,
10 75:1 76:8 77:15

80:2,12,15,16
82:12 83:16,20
88:2 94:14,24 95:7,
25 96:4,11 97:1
99:12 103:7,9,10,
21 104:19 108:14,
18 111:6,7,24

**weren't** 15:14
76:24 88:6

**what** 4:8 5:16,25
6:18 7:5,22 8:7,10,
24 9:12,20 10:15,
17,18 11:9,23,25
12:11 13:14 14:9
16:6 17:19,22
19:17,25 24:5,7,22
25:4,9,23 26:9,12,
14,22 28:10 30:13,
25 31:4,22 37:8,11
38:7,9,13,15,25
39:1,7,18,21 40:17
41:7,14,15,21,22
42:1,2,14 43:2,7
44:1,16 46:9 47:4
48:5,12 49:2,12
50:5,13,22 51:2,18
52:4,7,8,10,25
53:19 54:7,8,12
55:8,10,11,24,25
56:4,5,9,12,13
57:7,14,19,20,21,
23,24 58:7,21,22
59:21 61:20,22
62:2,5,11 64:18
66:4 67:8,10,12
68:4,14 69:17
70:12 71:4 72:16
73:3,13 74:4 75:15,
19,20 76:9 77:2
80:14 82:15,23
86:5,6,18,21 88:11,
20 89:3,12,24 90:4,
10 91:12 92:3,14
94:21,24 95:12,15

96:4 97:20 98:9,10,
11,14,24 99:10,20,
21 101:7,8 102:6
103:9,20 105:7,13
107:15,24 108:11,
18 109:19 112:13

**what's** 9:8 14:9
24:17 45:18 56:8
57:18 60:9 65:12
80:20 84:22 94:11
111:21

**whatever** 25:6
26:21 28:20 43:18
51:13 81:20

**when** 7:2,8 8:4,19
9:13,22 10:1,9,19
11:21,25 15:1 16:6
17:1 18:2 22:13
25:5,9 27:14,15,16
28:7 29:3 31:22
33:6,8,17 34:7
35:8,19 37:19
38:10 39:18,21
40:3 41:5,18 48:20
49:4,10 50:8 51:25
54:20,21 55:7,8
56:1 57:1,4 59:10,
13,14,19,20 60:11
64:22 65:22 68:8,
11 75:3,15 79:1
86:19 91:13 92:1
95:4 96:11 98:18,
21 99:2 100:12
101:1 103:21
105:5,8 110:23
111:13

**where** 5:16,23 6:6,
10 9:25 10:22 11:5
14:19 18:20,22
24:11 28:21 34:3
41:19 50:9,21
63:23 67:24 68:21
74:7,9 79:6,7,15,

AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

152

Index: wherever..would

21,23 80:15 81:1,8,
10,11 82:1 91:4,20
95:7 98:5 108:1
110:25

**wherever** 62:9

**whether** 12:15 15:2
17:3 21:22 29:23
30:23 42:4 54:18
55:5

**which** 14:15,18
15:5,23,24 17:4,23
23:3 34:15 36:7,20
39:4 40:25 43:9
45:13 46:22 48:20
50:15 66:15 68:8
75:1 76:8,22 79:13
80:2 85:12 91:2
92:15 95:25 99:7
100:20,23 103:11,
12 110:21 111:7
112:9

**while** 6:25 7:11,14
15:25 19:10,11
42:6 47:21

**White** 4:18,19,20
16:25 17:1 19:6
20:7 24:20 26:13,
24 27:18 28:1,25
29:16,20 30:10,18
31:1,7 32:4 33:7
35:6,8 36:10,11
47:14 49:15,19
51:1,3,6,9,19,24
54:1,20,22,24 55:5,
18 56:18 57:14
58:4 59:22 60:16,
20,23 63:2 68:21,
23,24 69:18 77:4
92:18,21 102:20

**White's** 18:15
19:22 21:2,22 24:3
26:9 27:20 37:4,20

48:9 50:6,18,21
55:9 58:13 69:2
77:8

**who** 12:16,21 13:7,
19 14:10,13,20
15:18,20,21 16:9
25:10 28:11,16,18
29:2,20 32:1,4,7
36:17 38:23 40:24
43:23 47:3 49:18,
24 54:1,4 56:1
60:20 61:9,10,14,
17 63:7,18 67:25
70:21 74:3 75:17
80:21 81:19,22
83:16,18,20 85:23
92:6,8 93:8 94:25
100:22 104:11
105:3,21 108:14
113:19

**who's** 13:19 83:13

**whoever** 32:3

**whole** 30:19,21

**why** 11:8,10 28:3,8
31:16 34:6 36:20
61:25 77:6 81:23
104:8

**wife** 111:14,17

**will** 4:10,18 5:5
21:16 24:15 28:10
42:7,22 45:5 46:5,
7,10,22 47:12
65:20 78:12 79:13
84:2 85:6,9,11
106:6 109:2

**willing** 19:15 21:9

**wiped** 107:13

**with** 6:13 7:11 9:21
13:7,21,25 23:25
26:12 28:15,17

32:3 33:14 35:13,
16 40:17 43:11
44:4,23,24 51:1,3,
5,8,19,23,24 52:12
53:5,9 54:10,20,22
55:18,22 56:7,17
57:9 58:14 60:1
61:14,18,19,22
62:14 63:1,7,9,10,
19 65:8 66:25
67:11 69:20,23
76:11,25 77:21
79:22 82:19 84:13,
15,18,21 85:18
86:4,17 88:11,13,
18,21,24 89:17,19,
20,21 91:19,21
93:21,22,23,25
94:11,12 95:2
100:1 101:5,10
102:19,22 104:17,
23 108:5,8 111:12,
14

**within** 14:8,17 15:5,
8,10 21:9 49:9
100:14,16,17

**without** 12:4 13:3
33:9 34:13 55:4
65:18 92:10 112:7

**witness** 4:13 23:23
36:16 42:4 45:23
46:14 48:12 67:5
84:11 86:6,15 90:5,
19

**witnesses** 43:14

**woman** 113:18,19

**won't** 34:12

**wondering** 97:19

**Wood** 5:11

**wooded** 96:23

**woods** 79:17 97:1,2

**word** 16:17 70:14
77:22 108:19

**words** 70:13 106:9

**work** 6:10 8:1 24:10
25:8 29:10 33:15
38:2,5 110:2

**worked** 6:12,14,23,
25 8:12 28:12
101:5,8,19

**working** 6:16 13:25
15:3,9,10 28:17
40:15 41:18 42:15,
23 43:1,2 61:6
81:21 86:24 100:23
104:25 105:10
106:23 107:19
110:10

**worse** 44:14,15

**would** 4:21 5:3
7:14,24,25 8:1 11:8
12:2,3,5,7,9,13
13:20 14:21,22
15:18 16:3,9,13,24
17:12 20:12,13,15
22:12 23:5 24:13,
23 25:7,18,21 26:3,
4,6,18,24 27:3,9
28:3 29:10,13 32:5,
6 33:7,8,23 34:16,
18,22 36:23 37:6
38:2,3,4,7,8 39:1,2,
3 40:5,14,15,16,19,
21,23,25 41:7,12,
13,22,24 42:1,3
43:3,5,9,10,14,15,
16,18,19,22,23
44:1 46:3,8 49:15,
23 52:14,15,18,20
60:1 62:20 63:25
64:11,12,14,16
65:1,3,5 75:19,21,

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

153

Index: wouldn't..you

24 77:24 80:21
81:17,21 82:3,12
83:15 85:3,19,21
94:18 99:7,22
103:4,20 104:14,
20,21,22 105:3
106:15 110:12,14
112:3,16

**wouldn't** 20:17,18
27:11 35:12,13,22
39:25 40:2,9 41:3
43:13 53:16 64:8
81:23 82:17,19
87:24

**wrap** 67:1

**wreck** 106:23
107:4,17

**wrist** 60:8 65:2
67:14

**write** 39:1,8,9,10,
11,12,13,19,25
40:9 75:4

**writes** 41:14

**writing** 17:23 31:19
34:21 52:24

**written** 38:19 39:5
49:5,11 51:13
77:15,16,17

**wrong** 38:14

**wrote** 50:22

---

**X**

---

**X-RAY** 25:13

---

**Y**

---

**yeah** 16:20 17:12,
13 18:1 29:12
30:17 40:5 41:13

70:15 107:23

**year** 8:23 9:20
99:10,21,25

**years** 6:15 12:19
13:6 28:17 65:25
66:4

**yes** 4:14,17 5:4,21
7:4 10:14 11:15
12:18 16:23 18:21
19:2,8,18,24 22:1,
12,22,25 31:11
33:19 34:1 36:12
39:6 41:6 44:17
46:18 48:4,18 49:3
50:17,20 51:8
56:19 58:17 60:17
61:3,16 66:2,10
67:2 70:4 71:2,23
72:4,8,13,21 73:12,
19 74:14,22 75:9
78:1,8,25 79:3,11
80:17 81:18 82:7
83:11 84:7 86:18
87:2,15 89:13,16,
19,21 90:1,13,22
91:2,12 92:20,23
94:21 95:11,18
97:7,9 99:14 100:5,
22 101:25 102:3
104:6,7 105:9
106:13,18,19
111:8,23 112:11
113:6,21,23

**yet** 13:19

**you** 4:12,15,16,21,
22 5:1,5,10,12,16,
19,21,23,25 6:2,8,
10,20 7:2,3,5,14,
19,20,22,23,24,25
8:1,4,5,12,14 9:11,
17,22,25 10:1,7,8,9
11:21,22,25 12:11,
21 13:1,11,18,22,

23,24 14:3,4,9,21,
22 15:1,2,5,7,8,9,
15,23,24 16:5,6,8,
9,13,21,25 17:11,
19,21,24,25 18:3,4,
5,8,11,17,20,22,23,
25 19:10,14,15,21,
22 20:12,15,18,21
21:5,11,12,13,14,
17,18,21,23,25
22:3,6,8,9,10,12,
15,20 23:1,6,7,9,24
24:5,12,15,19,21,
24 25:17,25 26:4,8,
9,11,13,14 27:9,13,
18,20,24 28:3,18,
22 29:3,9,10 31:6,
12,22 32:2,7,10,11,
19,24 33:2,7,8,13,
17 34:9,10,12,15,
16 35:8,9,14,15,19
36:6,7,14 37:2,5,6,
8,25 38:3,7,22,23
39:8,9,10,11,12,13,
18,21,23,24,25
40:2,3,5,9,10,11,
22,24 41:1,11,12,
18,20,21,22 42:14,
16,19 43:4,5,7,9,
10,11,19,23 44:21,
23 45:5,7,10,16,24
46:5,12,13,16,19
47:6,7,8,12,14,19
48:5,16,19,20 49:4,
18 50:3,4,5,6,7,15,
18 51:1,3,5,6,23,25
52:10,13 53:2 54:1,
7,9,15,24 55:8,11,
24,25 56:1,5,10,17,
20 57:5,14,15,18,
19,21,25 58:3,7,9,
18,21,24 59:3,8,9,
13,15,17 60:9,11,
12,15,18,21,22,25
61:1,4,11,13,15,20,

22,24,25 62:3,4,7,
13,16,19 63:7,10,
14,16,17,20,22
64:4,8,10,12,14,16,
23,24 65:25 66:8,
13,21 67:4,8,24
68:2,7,8,11,14,17,
19,20 69:11,18,25
70:2,12,20,24
71:18,21,24 72:6,
18,22,23 73:1,10,
18,25 74:1,4,5,9,
12,15,23 75:1,22,
23 76:1,8,11,12,14,
16,22,25 77:1,13,
14,20 78:3,11 79:4,
9,23 80:7,13,20,21
81:3,5,15,23,24
82:12,21 83:3,9,12,
22,24 84:5,6,13,24,
25 85:1,3,19 86:1,
9,12,17,19 87:7,9,
16,21,24 88:2,6,9,
20 89:1,5,11,17,22
90:14,15 91:1,6,17
92:21,24 93:18,25
94:14,21 96:5
97:13,18,19 98:3,
14,16 99:2,4,10,12,
16,20,22,24 100:3,
6,8,9,12,16,20,21
101:7,15,16,18
102:1,9,11,15,16,
18,20,21,24 103:5,
8,10,13,14,16,21,
22,24,25 104:4,10,
14,18,22 105:2,5,
10,17,19,22,23
106:2,4,9,10,17,20
107:15 108:15,17,
18 109:3,4,10,15,
19 110:7,12,16,23
111:6,18,22 112:3
113:10,18,25

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

**you're** 5:2 14:4
21:8,9 33:10,17,24
39:23 44:24 49:2
65:6 67:12 77:2,7
84:21 86:7 87:21
89:24 105:6,8

**you've** 34:18 47:8
48:2 69:25 81:12
84:16 106:12

**you-all** 31:18 46:6
62:11,22 66:25
80:4 106:10 107:22

**young** 36:12,17

**your** 5:3,5,8,10 6:2,
8,18 8:1,2,7,25
16:6 21:10,15
22:23 33:8 35:20
36:8 37:2,4,19
39:24 40:3,12 41:1,
2 44:13 50:5,10,12,
15 51:4,10,19,22,
23 54:23 56:25
57:18 58:9,21
59:21 64:11 65:22
67:21 68:15,17,19
74:23 76:8,14 77:4
78:12,16 82:6
84:21 88:10 89:5,
14,22,23 90:11,21
92:15 93:15,16
94:13,17 97:19,21
100:14,16,17 102:4
105:6,8 110:4

**yourself** 72:20
87:24



P. White Dep.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:19-cv-00467-BO

JUSTIN J. WHITE,

    Plaintiff,

    vs.

VANCE COUNTY, NORTH CAROLINA;
VANCE COUNTY SHERIFF'S OFFICE;
PETER WHITE, in his official
and individual capacities;
LAWRENCE D. BULLOCK, in his
official and individual
capacities; and WELDON WALLACE
BULLOCK, in his official and
individual capacities,

    Defendants.

**CERTIFIED TRANSCRIPT**

(taken via Zoom)

        Oral deposition of WELDON WALLACE BULLOCK,

located in Vance County, North Carolina, taken by

Plaintiff on Thursday, February 25, 2021, commencing

at 10:06 a.m., before Janet Cooper Haas, a Registered

Professional Reporter and Notary Public located in

Charlotte, Mecklenburg County, North Carolina.



(866) 715-7770
advancedONE.com

Page 2

```
1   APPEARANCES:
2   LAW OFFICES OF SHARIKA M. ROBINSON, PLLC
    BY:  SHARIKA M. ROBINSON, ESQUIRE
3        MICHAEL McGURL, ESQUIRE
    10230 Berkeley Place Drive
4   Suite 220
    Charlotte, North Carolina  28262
5   704.561.6771
    srobinson@sharikamrobinsonlaw.com
6   mmcgurl@sharikamrobinsonlaw.com
         Counsel for Plaintiff (via Zoom)
7
8   WOMBLE BOND DICKINSON
    BY:  CHRISTOPHER J. GEIS, ESQUIRE
9        LOUISA C. CLARK, ESQUIRE
    One West 4th Street
10  Winston-Salem, North Carolina  27101
    336.721.3543
11  chris.geis@wbd-us.com
    louisa.clark@wbd-us.com
12       Counsel for Defendants (via Zoom)
13
    ALSO PRESENT:
14
    Peter White, Defendant
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1            EXAMINATION INDEX
2   WELDON WALLACE BULLOCK (via Zoom)
3      BY MS. ROBINSON
4
5            EXHIBIT INDEX
6                                           MARKED
7   Exhibit 1  3-4-17 J. White VCSO application   21
8   Exhibit 2  J. White background check letters  21
9   Exhibit 3  Directive B.9, Use of Force        46
10  Exhibit 4  J. White use-of-force administrative 48
               investigation
11
    Exhibit 5  BLET subject control/arrest techniques  66
12
    Exhibit 6  Directive F.13, Use of Canines     74
13
    Exhibit 7  8-20-18 A. Hight employee counseling  86
14             record
15  Exhibit 8  9-6-18 W. Bullock firearms         89
               qualification record instructions
16
    Exhibit 9  9-6-18 use-of-deadly-force handout  90
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              P R O C E E D I N G S
2        Pursuant to NCGS 10B-25, WELDON WALLACE BULL
3   having been duly sworn remotely, was examined and
4   testified as follows:
5                   EXAMINATION
6   BY MS. ROBINSON:
7        Q.   Good morning, Mr. Bullock.  I'm not goi
8   repeat what I just said.  Okay?  But I did want t
9   introduce myself as Sharika Robinson.  I have my
10  colleague, Michael McGurl -- he's here also and w
11  be participating.
12             Have you ever been deposed before or a
13  witness?
14       A.   Yes, ma'am.
15       Q.   You have?  Okay.  So you know the drill
16  then.  The reporter -- everybody asks that you an
17  questions in "yes" or "no."  And for purposes of
18  I will refer to Mr. White, the Plaintiff, as
19  "Mr. White" and Sheriff White, the sheriff, as
20  "Sheriff White" so there's no confusion.
21             Is there any way that you would like fo
22  to refer to you?
23       A.   Mr. Bullock is fine.
24       Q.   Mr. Bullock?  So we don't confuse the t
25  Bullocks.  Okay.
```

Page 5

```
1             So are you prepared to testify?  Have y
2   you're free of medications, free of anything that
3   would impair your testimony today?
4        A.   Yes.
5        Q.   Okay.  So will you state your name for
6   record.
7        A.   Weldon Bullock.
8        Q.   And your birthdate?
9        A.   March 28th, 1967.
10       Q.   Okay.  Can you tell me your address.
11       A.   1029 Wood Owl Way in Durham, North Caro
12       Q.   Okay.  Have you always resided in North
13  Carolina?
14       A.   For a brief period of time, I wasn't.
15  in New Jersey.
16       Q.   What about high school?  Where did you
17  high school?
18       A.   In North Carolina.
19       Q.   Can you tell me the name of that.
20       A.   Vance Senior High.
21       Q.   Yes.  And did you go to college?
22       A.   I did.
23       Q.   Where did you go to college?
24       A.   North Carolina Central University.
25       Q.   Okay.  And what did you major in?
```



(866) 715-7770
advancedONE.com

Page 6

1   A.  Criminal justice.
2   Q.  Did you seek any education after your
3   bachelor's degree?
4   A.  I briefly started on my master's
5   education, but I didn't complete it.
6   Q.  Okay.  And where was that at?
7   A.  At North Carolina Central University.
8   Q.  Okay.  So can you tell me about your career
9   as a police officer or as a sheriff's deputy or -- so
10  after college, where did you work?
11  A.  I was recruited by the U.S. Drug Enforcement
12  Administration out of Newark, New Jersey.  I worked
13  with them briefly as an intern.  And then I came back
14  to Vance County, and I worked for the Vance County
15  school system probably less than three years, and
16  then in 1992, I started working at the Vance County
17  Sheriff's Office.
18  Q.  Okay.  What was your position initially?
19  A.  Deputy sheriff.
20  Q.  How long were you a deputy sheriff?
21  A.  I think my first promotion was to an
22  investigator, and that was in 1997.  So from was either
23  worked the road as a deputy sheriff as a patrol
24  deputy.  Then I was switched to the civil division.  I
25  worked in the civil division for a little while, and

Page 7

1   then I was promoted to investigations.
2   Q.  Okay.  So when you started as a deputy
3   sheriff, were you trained at all?
4   A.  Yes.
5   Q.  Okay.  What type of training did you
6   undergo?
7   A.  I went to the basic law enforcement school
8   here in Vance County, and when I completed that basic
9   law enforcement school, I went through a training
10  phase for about -- I'm not sure of how long it was.  I
11  had to ride with a sergeant for a while, and then
12  once I finished that training phase, then I was sort
13  of on my own.
14  Q.  Okay.  "For a while," would you say a week
15  or two weeks or --
16  A.  No.  It -- it was -- it was at least a range
17  months, a minimum of two months.  It might have been
18  longer, and I don't know how long it was.
19  Q.  Okay.  So you mentioned that you started
20  at -- so you started as a deputy sheriff, and you did
21  a little patrol.
22      Can you explain what that entailed.
23  A.  You was assigned to a district and were
24  would answer calls that were given to you.  You would
25  do things like transport mental patients.  You would

Page 8

1   work court.  You would serve your warrants and serve
2   your criminal papers from some of the subpoenas.
3   Sometimes there were papers.
4   Q.  Okay.  And so we're at -- 1992 is when you
5   started at Vance County Sheriff's Office, and then you
6   were promoted in 1997 to patrol.
7       And what happened next in your career?
8   A.  I was promoted in 1997 to investigations.
9   Q.  So To investigations?  Okay.
10      And what type of investigations?
11  A.  I was promoted to criminal investigations
12  and worked, you know, all types of criminal cases,
13  but I later specialized in child sex abuse.
14  Q.  Okay.  And how long were you in that
15  position?
16  A.  I was an investigator -- I was an
17  investigator until 2005.  I had to serve some active
18  supervisor roles in investigation, but I don't know
19  when those dates were.  But once I came out of
20  investigations, I came out of investigations and
21  promoted to a lieutenant in administration, and that
22  was either 2004 or 2005.  I'm not quite sure of the
23  year.
24  Q.  All right.  And as a lieutenant, what were
25  your job duties?

Page 9

1   A.  I was an administrative lieutenant.  I
2   records.  I was -- I believe I was doing thi
3   in evidence.  I was over the civil division.  I c
4   administrative investigations.  Well, I actually
5   administrative investigations as early as -- in m
6   since my criminal -- that's my investigative posi
7   So I continued doing those type investigations.
8   Right now, that's what's coming to mind.
9   Q.  Okay.  In terms of the obligations?
10  A.  Uh-huh.
11  Q.  So you said that you were over evidence
12  What does that mean?
13  A.  When deputies or investigators, offices
14  the sheriff's office collected evidence on the sc
15  I was the person they turned it in to, and I was
16  charge of the evidence room.
17  Q.  Okay.  And how long were you in that
18  position?
19  A.  I started as an investigator, and I don
20  that year.  And in some form or fashion, I w
21  involved with it until I retired.
22  Q.  Okay.  Did you ever go to court when yo
23  were in that position?
24  A.  I did.
25  Q.  Is that where you were primarily depose



Page 10

1   A.   No.  I've been deposed on -- when they
2   "go to court," I went to court in criminal cases to
3   testify in criminal cases.
4   Q.   Okay.
5   A.   Things from homicide to break-ins, having
6   sex abuse cases.
7   Q.   Okay.  So I'm going to come back to you
8   saying that you were specifically over evidence.
9        When you were in that position, did you ever
10  misplace or lose evidence?
11  A.   No.  I never misplace or lose evidence.
12  Q.   Had evidence ever been misplaced or lost in
13  Vance County?
14  A.   Yes.
15  Q.   In what situation?
16  A.   I can remember one time one of the drug
17  officers, what he -- what he noted on the sealed
18  envelope as far as the money -- what he noted was an
19  amount that wasn't in the sealed envelope.  When the
20  lawyer and I sat down and opened the sealed envelope,
21  it was, like, $20 short.
22       I remember an incident where a gun was taken
23  from an investigative scene out in the public that
24  never -- it was never turned in to evidence.  I
25  received it into evidence.  And even though I never

Page 11

1   received it into evidence, it was still something that
2   the Vance County Sheriff's Office at some point had
3   control over, even though it never made it into the
4   evidence room.
5        And then I remember an incident where a
6   deputy took a gun off of somebody, and that never
7   into evidence.  It never made it into evidence.
8   Q.   Why would items never make it into evidence?
9   A.   I can't answer that.  I can't answer why
10  why somebody else did something, that they didn't turn
11  it in.  I was the one responsible for it once it got
12  into evidence.
13  Q.   Okay.  But did situations like that ever
14  happen before at Vance County -- in Vance County?
15  A.   Yes, ma'am.
16  Q.   Okay.  So let's change gears a little bit
17  and discuss the current hiring process at the Vance
18  County Sheriff's Office.
19  A.   I don't know anything about the current
20  hiring process.  I don't -- I'm retired.
21  Q.   Well, when you were there.  I don't want --
22  I don't want you to speak for, you know, Sheriff Brame
23  and what he does.
24  A.   Okay.
25  Q.   So when you were there, what was the typical

Page 12

1   hiring process of a sheriff's deputy?
2   A.   We would have an in-house application that
3   someone may turn in, or sometimes they would go online
4   and turn in the F-3 form without going -- having
5   having the in-house application done.  I would do a
6   criminal background check, a pre-employment criminal
7   background check, on the applicant, and then we would
8   bring the applicant up for an interview.
9        The applicant would come in for an interview
10  as little as one time, as many maybe as three times,
11  you know, according to what the circumstances are.
12  Typically, that was a three-person panel interview,
13  and then once that process is complete, then we would
14  make our recommendations to the sheriff and then
15  whether or not to hire or not to hire or our opinion.
16  Q.   Who is "we"?  Was there a specific panel, a
17  designated panel?
18  A.   Yes.  So, typically -- and I don't remember
19  all the people over the years.  But, typically, there was
20  the lieutenant, myself, and maybe a captain or another
21  lieutenant.  So I don't know who they were, you know,
22  every single time, but there's typically three people
23  or -- that -- Lieutenant Shearin was one of them that I
24  remember and Watkins.  I don't know if he was a
25  captain or lieutenant over time.  He might have been

Page 13

1   promoted.  You know, at some point, he might have been a
2   lieutenant.  Then he might have been a captain.
3   But in the time of names without the rank, Shearin has done
4   it, Watkins has done it, I believe Shelton has done
5   it, Stainback has done it.
6        So over the years, there have been different
7   people that -- along with me who have performed that.
8   Q.   --
9   Q.   -- But it's been primarily lieutenants?
10  A.   Primarily, the lieutenants or higher.
11  Q.   Can you help me understand just the
12  structure of the Vance County Sheriff's Office.
13  I'm not in law enforcement at all.  Just pretend
14  I know nothing about law enforcement from a -- what
15  are the particular roles?  Lieutenant, deputy --
16  member, deputy, lieutenant, captain or --
17  A.   So the -- starting from the lower level and
18  going up through the ranks, you may have a person
19  -- who's hired and not gone through BLET yet.
20  I would hire that person, offer the person a job
21  through BL--
22  that's -- you know, the kind of terminology
23  for that is -- you know, that's, like, a candidate
24  a new hire or, you know, however you want to do it,
25  on may be working with us as a sworn officer



AdvancedONE LEGAL     (866) 715-7770     advancedONE.com

**Page 14**

1 but hadn't done the state basic law enforcement
2 training. In terms of responsibility, that's probably
3 the lowest level of responsibility. And then you
4 you're a deputy once you finish out that period of
5 the deputies are the ones that primarily take on the
6 bulk of the calls and do the -- serving the papers and
7 stuff like that.
8      Within that shift over time, in absence of a
9 sergeant, then you may have what's -- what we refer to
10 as a senior deputy. And that's a deputy who has more
11 experience than the BLET candidate, has been there
12 long enough to kind of understand the jobs and roles
13 of duty, who may understand the roles of a
14 supervisor but not -- has not been officially promoted
15 to sergeant, which is the next step up.
16      The sergeant is the first-line supervisor
17 that runs the shift, and within that shift, might have
18 deputies in which is he supervises on the shift in
19 the same instance where -- on the patrol side in
20 criminal investigations, there may be detectives who,
21 in an instance, would have been promoted if you were
22 a deputy and you went to -- as a detective, you would
23 consider that promotion.
24      Some may say that the -- transferring from a
25 sergeant to a detective may be a lateral transfer

**Page 15**

1 of because the pay is almost the same whether you have
2 whether it's a promotion or not, but you have
3 nonsupervisory employees working. It's just a
4 deputies, but they're called investigators. And then
5 within investigations, you have a supervisor, which is
6 a sergeant, a detective sergeant.
7      On the same line, you may have a civil
8 division. Within the civil division, you may have
9 deputies working, and then you may have a sergeant
10 working within the civil division.
11      Over time there have been detectives in the
12 drug unit that may or may not have a sergeant
13 supervising them. Sometimes it was a sergeant,
14 sometimes they weren't. And then after the sergeant
15 level, then you have the starting of the command staff
16 of lieutenants.
17      In the patrol division, typically which had
18 lieutenants that would supervise two sergeants who
19 supervised however number of deputies that was on the
20 shift. In investigation, there was a lieutenant who
21 supervised the sergeant, who supervised the
22 investigators on the shift.
23      Then you had a patrol commander, which was a
24 captain. You had an admin commander, which was the
25 position I served in for a while. And then you had us

**Page 16**

1 sometimes we did and did not have a chief deputy. The
2 times we probably we had a chief deputy, and the two cap
3 then would team up to report to the chief deputy. The
4 chief deputy was directly to the sheriff.
5      Q. And so you recently retired.
6 What was your position when you retired
7      A. I was chief deputy.
8      Q. Chief deputy? And so as chief deputy,
9 were over -- you were one of those people who would
10 hire and make use-of-force decisions and things o
11 that nature?
12      A. Yes. Say that again.
13      Q. You would hire, make hiring decisions a
14 or recommendations and use-of-force decisions?
15      A. Well, that -- some of those
16 recommendations I don't -- "decision" might not b
17 the right word. But some of those recommendations, I
18 shifting that as a captain.
19      Q. As a captain?
20      A. Yeah.
21      Q. But you were definitely doing it as a c
22 deputy, too, also, right, recommendations?
23      A. Yes.
24      Q. Okay. So I would like to talk more ab
25 Mr. White specifically. Can you -- can you expla

**Page 17**

1 the hiring process when it came to Mr. White.
2      A. Just like before, he filled out an
3 application, whether it was in-house or he had an
4 came to me. I don't know which one. He sat down
5 a panel, and then the panel interviewed him. I w
6 the one that did his criminal background check.
7      And once we got all of that stuff toget
8 the sheriff made the decision to hire him.
9 once he got hired, he eventually went to the
10 patrol division.
11      Q. Did you review his application?
12      A. Yeah. I would have been the one that l
13 at his -- well, yeah. I think I was the first on
14 the sergeant was the first officer to see his applicat
15 I don't know if the sheriff saw it before I did, b
16 had it extensively because I was the one that act
17 did his background check.
18      Q. Okay. I'm going -- I'm going to pull u
19 application and make sure that this is what you l
20 at the
21      Can you take a look at this document.
22      A. It looks like what I remember to be his
23 That's the form which we used.
24      Q. Just review it for -- can you scroll --
25 when you need us -- can we continue to scroll?



AdvancedONE LEGAL          (866) 715-7770
                           advancedONE.com

Page 18

```
1       A.   Yeah.
2       Q.   Okay.  Just let us know when to keep going.
3       A.   Keep going.  Okay.  Okay.  You can go.
4   Okay.  You can go.  Okay.  You can go.  You can
5   go.  Okay.  You can go.  You can go.
6       Q.   That's the last page, Mr. Bullock.
7       A.   Okay.
8       Q.   I want to ask you some questions about this
9   document.
10      A.   Okay.
11      Q.   So you -- can you identify this document?
12      A.   It's the document that we used as an
13  in-house form to gather information on potential
14  applicants.
15      Q.   Okay.  And this is Mr. White's application?
16      A.   I believe it to be.
17           MS. ROBINSON:  Okay.  Michael, can you
18  scroll.  And stop right here.
19  BY MS. ROBINSON:
20      Q.   Do you see where it says Shaw University?
21      A.   Yes, ma'am.
22      Q.   And you see where it says "reason for
23  leaving"?  Can you read that to me.
24      A.   "Terminated."
25      Q.   And Louisburg College.  Can you read the
```

Page 19

```
1   reason for leaving.
2       A.   Yes.  "Terminated."
3            MS. ROBINSON:  Let's go to the next.  Let's
4   go down a little bit more.
5   BY MS. ROBINSON:
6       Q.   So is it fair to say that Mr. White
7   disclosed that he had been terminated?
8       A.   Yes, ma'am.
9       Q.   Okay.  And let's go down.  I have another
10  question I want to ask you about this document while
11  we're up -- while we have it up.
12           MS. ROBINSON:  Keep going.  Keep going.
13  BY MS. ROBINSON:
14      Q.   Can you read the last sentence on this page.
15      A.   "Are you willing to sign a two-year contract
16  for employment?"
17      Q.   And what was his response?
18      A.   Yes.
19      Q.   I think that's it for this document.  Let's
20  get back to the contract.
21           So after you -- after you reviewed
22  Mr. White's application, you said you conducted a
23  criminal background check?
24      A.   Yes, ma'am.
25      Q.   What did that entail?
```

Page 20

```
1       A.   I have to go through DCI and run his
2   record, his driving record.  I have to go
3   request from the clerk of courts anyplace he's ei
4   Okay.  You or went to school or graduated from high sc
5   and pull the criminal records from the clerk of
6   courts.
7            I think Mr. White had gotten some highe
8   that might have been outside of North
9   Carolina, and so I might have had to request for
10  criminal histories in those places that he lived
11  up school outside of North Carolina.
12      Q.   So would you say --
13      A.   His driving record would have been also
14  part of the criminal background check.
15      Q.   Would you say it was a pretty extensive
16  background check?
17      A.   I wouldn't say it was extensive.
18      Q.   You wouldn't say it was?
19      A.   No.
20      Q.   Okay.
21           MS. ROBINSON:  Michael, can you pull up
22  the -- so we're going to mark Exhibit Number
23  So --
24           MR. GEIS:  I don't think we marked
25  Exhibit Number 1.
```

Page 21

```
1            MS. ROBINSON:  Well, let's mark
2       Exhibit Number 1 as Mr. White's application
3   employment.
4            (Exhibits 1 and 2 were marked for identificatio
5            MS. ROBINSON:  And we sent you this via
6   email, too, Mr. Geis.
7            MR. GEIS:  Well, I didn't get the email
8   and I looked at my emails 30 minutes ago.  Y
9   perfectly willing -- or you're perfectly wit
10  your rights to introduce these documents.  I
11  think you should mark them.
12           MS. ROBINSON:  All right.  I want you -
13  want you to have them.  Okay?  And you do ha
14  rights.  So if you need to take a break and ch
15  your email, please let me know.
16           MR. GEIS:  We will take a break.  We'll
17  about a ten-minute break.  Thank you.
18           MS. ROBINSON:  Thank you.
19           (Recess in proceedings from 10:35 to 11:01 a.m
20  BY MS. ROBINSON:
21      Q.   So, Mr. Bullock, I was asking you about
22  Mr. White's background, and I asked whether or no
23  was extensive or not.  Thank you.  And you said t
24  it wasn't extensive.
25           MS. ROBINSON:  Michael, can you pull up
```



Page 22

1    document that shows -- yes.
2  BY MS. ROBINSON:
3       Q.   Can you see that document?
4            MS. ROBINSON:  Let's go to Page 1 --
5       Chris can identify that.
6            MR. GEIS:  You need to read that.
7  BY MS. ROBINSON:
8       Q.   And I'm going to give you a few,
9  23-page document, so I'm going to give you a few
10 you know, as long as you like to look over it.
11      A.   Can I move towards the screen?
12      Q.   Yes, sir.  And, Mr. Bullock, if you would
13 just let him know when to scroll down in the same
14 fashion.
15      A.   You can scroll down.  Okay.  Okay.
16 Okay.  Okay.  Okay.  Okay.  Okay.  Okay.  Okay.
17 Put it so I can see the top of it.  Okay.  Okay.
18 Okay.  Okay.  Okay.  Okay.  Okay.  Okay.  Okay.
19 Okay.  Okay.
20      Q.   And do you recognize this document -- these
21 documents?
22      A.   Yes, ma'am.
23      Q.   And is that your signature on these
24 documents?
25      A.   Yes, ma'am.

Page 23

1       Q.   And can you identify these documents?
2       A.   Those forms -- those AOC forms are a form
3  which I used to reach out to our clerks of courts
4  requests for criminal background information.
5       Q.   And for purposes of the record, I would just
6  like for you to -- we're going to start from the top
7  and go to -- and then each county that you reached out
8  to.
9            Can you read that county.  Just read the
10 county.
11      A.   Martin County, North Carolina; Merrimack
12 County, New Hampshire; Hillsborough County, New
13 Hampshire; Hillsborough County, New Hampshire.
14           Is that the same document?
15      Q.   That's the same document.
16      A.   Okay.  Wayne County, North Carolina;
17 Franklin County, North Carolina; Wake County, North
18 Carolina; Bertie County, North Carolina; Chowan
19 County, North Carolina; Pasquotank County, North
20 Carolina; Perquimans County, North Carolina; Hert --
21 County, North Carolina; Union County, North Carolina.
22      Q.   I think that was the last county, correct?
23      A.   (The witness nodded.)
24      Q.   And I'm going to ask you some more
25 questions, but I think we're done with these

Page 24

1       documents, this exhibit.
2            And so after reaching out to all those
3  counties, obtaining Mr. White's criminal record,
4  driving record, and other -- and reviewing his
5  application, what questions did you have about his
6  employment?
7       A.   About his what?
8       Q.   About his prospects for employment.
9       A.   I don't remember specific questions that
10 we, in general, go over people's work histo --
11 where he went to school, where he lived, any crim --
12 that you may have.  We might talk about his
13 the same's history.  We would talk about his employ --
14 history.  We might -- some people we give, like,
15 little scenarios on how you will respond to a
16 particular scenario.
17           That's what's coming to mind right now.
18 There may be others.
19      Q.   Well, I want you to, if you can recall,
20 be more specific now about Mr. White.
21           After you performed this background che --
22 him, what was his next step in the employment pro --
23      A.   He would have been sworn in.  And at so --
24 point, he'll go to a shift.  You know, he might n --
25 have immediately gone to a shift because we're a --

Page 25

1  small, poor county.  We might not have uniforms t --
2  at this point.  Sometimes cars aren't available a --
3  this point.
4            Typically, what happens is there may be --
5  period, depending on when that applicant --
6  because of uniforms and whatever, other
7  questions he might have.  Like, he would hav --
8  go qualify for his service work, so that had to t --
9            And so typically what we do when we have p --
10 who are kind of caught in that phase, we have --
11 back -- the sheriff's office is responsible for
12 courthouse security, and so sometimes we'll send --
13 people up to the X-ray for an undetermined amount --
14 time until all these things come, and then we can --
15 him ready to go to a shift.
16           Then once he goes -- if he's -- in his --
17 particular case, he was hired to be a deputy.  So --
18 know, he would be waiting for a shift assignment --
19 work a shift.  Some people we hire, and we have a --
20 like, an investigator's opening, and we hire an
21 investigator.  Then an investigator would go stra --
22 investigation.  But, again, everybody has to w --
23 to get qualified because of what happens at that --
24 point.
25           After he's sworn in, he's -- you know, --



Page 26

1    a sworn deputy sheriff at that point.
2        Q.   Okay.  Well, let's rewind.  Let's rewind.
3             He would have had his panel interview before
4    you ran his background, or would that panel review
5    have come afterwards?
6        A.   No.  I would have ran his background ahead of
7    the panel review.
8        Q.   Okay.  So after you ran his background, then
9    explain what happened next in Mr. White's case, if you
10   can recall.
11       A.   I can't recall specifically.  I can tell you
12   what I generally do.  I can't recall specific for
13   Mr. White.  But you know, I -- the background comes in
14   different forms.  They come in what you see here,
15   Administrative Office of Courts request, comes in
16   through DCI, they come through NCIC, and they come
17   through DMV.
18            So I would have done all those things, and
19   this stuff I may have gotten back or may not have
20   gotten back.  I'm caught at the mercy of others in
21   terms of getting back whatever information I need to
22   get back.  And what -- but all this stuff is ongoing,
23   and it's always compiling.
24            Mr. White would have had to provide certain
25   documents for us, like his degrees, his copy of his

Page 27

1    driver's license, social security card.  Because he
2    was a previously sworn law enforcement officer, I
3    would have had to have gotten his basic law
4    enforcement certificate.
5             So at some point in time, all that stuff is
6    being gathered and compiled as we're going through the
7    process of trying to get him hired.
8        Q.   Okay.  But is it safe to say that the panel,
9    the three panel, would have convened after you
10   received all of the necessary documents?
11       A.   No, no.  Not necessarily.  It wouldn't be
12   safe to say that, because, again, some of the stuff
13   you get back ahead of time; some of the stuff you
14   don't get back ahead of time.  It just depends on if
15   I had time to put it out, when I sat down at the
16   computer and ran the information and then when that
17   panel interview was.
18            Specifically to Mr. White, I can't tell you
19   how that fell in line.
20       Q.   Okay.  Do you recall Mr. White's panel
21   interview and how many of those interviews he had?
22       A.   I do not.  He had a minimum of one, just
23   like anybody else, they could do one or two.  It just
24   really depends.  And maybe sometimes even three in,
25   know, it depends on certain circumstances.  But

Page 28

1    Mr. White specifically, I do not recall how many.
2    One, though.
3        Q.   Why would you ever perform three panel
4    interviews?
5        A.   Sometimes we get information that we do
6    have ahead of time sometimes.  Sometimes the appl
7    might not have information that we need when we a
8    There's just various reasons why we do it
9    And, again, a minimum of one that's bee
10   done.  For an example, what will be an example of
11   a minimum of one, let's say there was an officer wh
12   worked where before and he went and, say, worked a
13   other place and then came back shortly after.
14   Well, I might have a panel interview because we
15   They're familiar with that particular officer.
16            Sometimes we have people who we've been
17   working with for years, like, at the police
18   department.  This is a small town, who we all --
19   may not know, we know.  They might have an interview -- a
20   the minimum of one.  And some people, for whatever
21   reasons, background, where they live, trying to g
22   information in, you know, it's just -- it's no --
23   no concrete reason every single time it was done
24   particular way.
25       Q.   Okay.  So moving on.  So Mr. White was

Page 29

1    ultimately recommended for hire.
2        Q.   Who made that recommendation?
3        A.   The recommendation to hire -- when you
4    first recommended to hire, we send it to the sher
5    that our training standards.  To training standards,
6    I made that recommendation.  It should be on a form
7    that I sent to training standards saying I recomm
8    the panel,
9        Q.   Okay.  So can you tell me, how does tha
10   process work?  Would you recommend him for hire t
11   sheriff first and then to training standards or -
12       A.   Yeah.  After we finish the last panel
13   interview, then a recommendation would be made to
14   whether to hire or not to hire.
15       Q.   Okay.  And so the recommendation ultima
16   was recommended to hire Mr. White?
17       A.   Not to the sheriff.
18       Q.   Not to the sheriff?
19       A.   That's correct.
20       Q.   So who recommended Mr. White for hire?
21       A.   Once the panel -- our recommendations i
22   one, just a recommendation.  Ultimately, the sheriff h
23   the last say on whether or not we're going to swe
24   them in and I get all the information to training
25   standards.  He has that final say; the panel does

AdvancedONE LEGAL          (866) 715-7770
                           advancedONE.com



Page 30

1  have that final say.
2      Q.  Okay.  I understand.  I'm just trying to get
3  a timeline together.
4      A.  I don't know the timeline.  I don't know...
5      Q.  So -- but he was ultimately -- we know he
6  was hired.
7          So the panel recommended him to be hired?
8      A.  No, the panel did not recommend him to be
9  hired.
10      Q.  The panel didn't recommend Mr. White to be
11  hired by the sheriff?
12      A.  That's correct.
13      Q.  Okay.  So what did the panel do, then, if
14  didn't recommend him to be hired?
15      A.  I don't -- maybe I don't understand the
16  question.
17      Q.  Yeah.  If the panel convened and interviewed
18  Mr. White to determine if he was to be recommended to
19  the sheriff to be hired, right, that was the whole
20  purpose of convening the panel, correct?
21      A.  The whole purpose of the panel is to gather
22  information about the applicant so that we can
23  determine whether or not we recommend him to just be...
24  or not.
25      Q.  Right.  And that's what I'm saying...

Page 31

1          Did this panel recommend Mr. White for
2  hiring?
3      A.  No.  Not to the sheriff.
4      Q.  Okay.  So what did the panel do, then?
5      A.  We recommended not to hire him.
6      Q.  You recommended the sheriff not to hire
7  Mr. White?
8      A.  That's correct.
9      Q.  And the sheriff went ahead and hired him
10  anyhow?
11      A.  Yes, ma'am.
12      Q.  Okay.  Can you tell me about that
13  recommendation.
14      A.  I think vaguely we discussed that he had
15  been fired for so many -- from previous positions that
16  he had, and I think that was the reason why we
17  recommended not to hire him.
18      Q.  Did you-all put that recommendation in
19  writing?
20      A.  I think we walked down to the sheriff and
21  talked to him.
22      Q.  And what did the sheriff say when you said
23  it?
24      A.  He said, "Unless he's killed the president,
25  I'm going to hire him."

Page 32

1      Q.  And who was "we"?  Who is "we"?
2      A.  I'm -- you know, typically we go back in...
3  whoever was with me during the time that we
4  interviewed Mr. White, who -- the gentlemen -- that
5  we know, one of us would go back in -- or two of us, how
6  many it was, would go back in and talk to the she...
7      Q.  But you don't remember who "we" was?
8      A.  No.  I don't remember.
9      Q.  In this particular one, how many -- how
10  many officers have you recommended in -- or deputies h...
11  you recommended not to be hired?
12      A.  I don't have a number.  I've been doing
13  this since 1997.  I couldn't -- there's no -- I have n...
14  of knowing.  There have been a lot we recommended...
15  other there.  There have been a lot we've...
16  hire.
17      Q.  Give me just a roundabout number as in...
18  recommended five?
19      A.  It's -- if you could somehow tally up the
20  amount of applications we've had since 1997 until...
21  last at this office, I mean, I cannot put a number on it
22  because I have no way of formulating how many.  I...
23  to just be making up something.
24      Q.  So in 1997, you were in investigation?
25  You sat on panels in 1997 also?

Page 33

1      A.  I did.  I did.  As a matter of fact, th...
2  forms you see, because it was so -- done so
3  haphazardly before, I created these forms.  I'm t...
4  that started the process of coming in and goi...
5  through -- sitting down and going through a proce...
6  hire when I got hired and back under -- not Sheri...
7  White but the other sheriff.  You would walk in,...
8  he would shake your hand when you were hired.
9      I was hired that way.  I was hired with...
10  even putting an application in.  He said, "You're
11  hired."  I came back to get an application after...
12  that process, and I thought that wasn't how the proces...
13  to be.  So this particular format you see here is...
14  that kind of -- I came up with that.
15      So I've been doing that type work since...
16  1997.
17      Q.  Okay.  Okay.  So when you say -- you're
18  talking about the letter on the sheriff's letterh...
19      A.  Yes.
20      Q.  Not the court form?
21      A.  No, not the court form.
22      Q.  Okay.  But the court form requesting th...
23  background would have been part of the hiring pro...
24  the president.  Like, if you're referring to the AOC 31...
25  form --


AdvancedONE LEGAL          (866) 715-7770
                           advancedONE.com

Page 34

1    Q.    Yes.
2    A.    Right.  This is something that we done, but
3  I have been at the sheriff's office where this
4  wasn't even done.
5    Q.    Okay.
6    A.    That's why I -- the process had started --
7    Q.    Okay.  Can -- when did that process --
8  did the process of seeking a criminal background check
9  start?  Do you recall that?
10   A.    Well, you have to -- you have to run
11 somebody's criminal background check.  The
12 standards won't allow you to submit an applicant
13 without a background check being done.  So the
14 background had to be done in some form or fashion.
15         The way in which it was done, you know,
16 early on, even -- even through me, you would call the
17 clerk up and say, "This is me.  Send me the
18 you've got on this person right here," and they would
19 do it.  But then over time, that didn't -- that
20 didn't wash.  So over time, we had to formally request
21 it in writing and sign it as the requester, and then
22 they would send us the information.
23   Q.    Was that a --
24   A.    The way that started, I don't know, but have
25 know in the beginning, it wasn't that way.

Page 35

1    Q.    Was that due to a change in policy of
2  training standards or policy of Vance County?
3    A.    No.  That was just my own personal -- taking
4  the bull by the horns and doing it because I didn't
5  like the way it was done.
6    Q.    Okay.  Okay.  So Mr. White was not
7  recommended but was hired.
8         Do you recall Mr. White when he started at
9  the sheriff's department?  Do you recall any -- any
10 specifics about his employment?
11   A.    No.  Once I -- because he's not coming on my
12 division, I don't -- I wouldn't see him a
13 day-to-day basis, or I wouldn't interact with him on a
14 day-to-day basis.  You know, I -- once all the
15 paperwork is gone, I don't -- you know, I don't have
16 anything more in terms of directly interacting with
17 him on a day-to-day basis.  I don't have any of that
18 I recall that I could add.
19   Q.    Okay.  How did that make you feel when the
20 sheriff did not take your recommendation?
21   A.    It didn't make me feel any kind of way.
22 That -- it wouldn't be the first time he didn't take
23 my recommendation.
24   Q.    Okay.  How long had he been the sheriff at
25 that point?

Page 36

1    A.    I'm sorry?
2    Q.    How long had he been the sheriff at that
3  point?
4    A.    He became sheriff in '06, I think.  Hol --
5  '06.  And he stopped being sheriff in 2018.
6    Q.    Okay.  So you said it wasn't the first
7  time.  Can you name an instance in which he did --
8    A.    He didn't take my recommendation for
9  Mr. White.
10   Q.    Aside from Mr. White.
11   A.    Oh, yes.  There was a young lady named
12 Kimberly Gregory from Durham.
13         MR. GEIS:  You can't talk about any
14 you know, particular person.
15         THE WITNESS:  Oh, okay.  All right.
16         Well, there was a young lady who was from
17 Durham Police Department that I recommended
18 That the panel recommended to hire, and he didn't
19 do it.  The reason why that
20 stands out in my mind is because her training
21 portfolio was really, really thick.  It was
22 thick as this right here, and I thought she
23 have been a good hire.
24   BY MS. ROBINSON:
25   Q.    Okay.  So I want to -- I want to understand

Page 37

1    Q.    Okay.  So I want to -- I want to understand
2  your role a little more.  I know you sat on these
3  hiring panels, and that was probably one aspect of
4  your role at the time of Mr. White's employment, in
5  particular.  And I've asked you some about it, but
6  would -- you said that you were in a different
7  division.
8         What division were you in?
9    A.    I was in charge of the administration
10 division and the divisions that are under me.
11   Q.    So what does "administrative" mean,
12 "administrative division"?
13   A.    I'm responsible for records, like for the
14 DCI records, gun permits, concealed handgun permits,
15 domestic papers, criminal investigations, evidence,
16 background information, fingerprints.  I was in charge
17 of that division.
18   Q.    So, Mr. Bullock, walk me through, like,
19 typical day in your life when -- at the time of
20 Mr. White's employment.
21   A.    I don't know.  I don't know if I can say a
22 typical day.  I don't know if --
23         MR. GEIS:  Objection.  Relevance.
24   BY MS. ROBINSON:
25   Q.    You can answer the question.  Please answer



Page 38

1  the question.
2      A.   I would come to work, and I would do my
3  duties as -- you know, I would go over the reports. I
4  would look at them. It was there -- there were times
5  that I might not come to work because I was down at a
6  homicide the night before.
7      Q.   What type of reports would you go over?
8      A.   I would go over the incident reports.
9      Q.   Okay.  And what is an incident report?
10     A.   It's reports generated by officers when
11 they're assigned a department number to a particular
12 incident, a particular record.
13     Q.   By "incident" and "record," what does that
14 -- does it mean something went wrong?  Does it mean
15 something went right?  What does that mean, an
16 "incident report"?
17     A.   It means that the sheriff's department was
18 involved in something that required a report to be
19 written.  The reports could be on forms that we generate
20 investigation incident reports.  The reports start on
21 something on a form called operation reports.  It's
22 just -- they have numbers that you can track them and
23 see, you know, who was assigned to it.  If the
24 information was generated through 911, it's data that
25 that could be trackable and kind of figure out what

Page 40

1      incident report for that.  I don't know.
2      Q.   You wouldn't have to do that at all, ri...
3  That's not part of your job.  You know, when is t...
4      A.   If debris was in the road big enough to
5  that would impede traffic, then, yeah, you would
6  been expected to stop and get that stuff out of t...
7  and move it over to the side.
8      Q.   Okay.
9      A.   You wouldn't write a report for that.
10     Q.   Okay.  So you mentioned incident report...
11 You mentioned use of force.
12          Tell me about your involvement in
13 use-of-force engagements or investigations.
14     A.   Some use-of-force reports would come th...
15 in the days that I was working.  I would take a l...
16 at them.  I would try to contact the person's
17 supervisor and sort of engage what was going on w...
18 that.  And then if I felt that it was necessary f...
19 that to generate an administration investigation, I wo...
20 start an administrative investigation.
21     Q.   So would all use-of-force reports go th...
22 you?
23     A.   No.  Not necessarily.  They would --
24 depending on who -- you know, how extensive they...
25 Something in which someone was hurt, that would c...

Page 39

1  happened, what went on.  And the deputies would write
2  those reports.  And in the mornings, I would come in
3  and I would look at those.
4      Q.   Are there any instances in which an incident
5  report is required to be written?
6      A.   Yes.
7      Q.   What are those instances?
8      A.   A murder, you have to write an incident
9  report.  A break-in, you got to write an incident
10 report.  A rape, you got to write an incident report.
11 A chase, you got to write an incident report.  Use of
12 force, you got to write an incident report.  If you
13 got bit by a dog, you got to write an incident report.
14          There's a lot more than I could probably
15 name.
16     Q.   Okay.
17     A.   Those are just examples.
18     Q.   Okay.  And what are examples of when you
19 don't have to write an incident report?
20     A.   I don't know how to answer that question.
21 What are examples of when you don't?  It's hard to
22 that -- like, if... It's hard to
23 you're driving down the road and you see some trash in
24 the road and you get out of your car and you get the
25 trash out of the road, you wouldn't have to write

Page 41

1      something that you drew your gun and you
2  would didn't do anything else but drew your gun, that
3      wouldn't come to me.
4      Q.   Okay.  So officers are required to repo...
5  when they draw their gun?
6      A.   Yes.
7      Q.   And what would that -- that would be a
8  use-of-force report?
9      A.   Use-of-force report and an investigatio...
10 incident report.
11     Q.   Okay.  And so you said the typical proc...
12 would be for you to contact the person's supervis...
13 Yeah.  I would have a conversation abou...
14 the officer writes, and I want to kind of ge...
15 feel and let the supervisor know what was going o...
16 want to make sure the supervisor knew, and it may...
17 something as simple as a telephone call.  And
18 them come to my office.  I may walk up to where t...
19 them come to my office.  I may walk up to where t...
20 ed and just say, "Hey, do you know about this?
21 you know what happened?"
22     Q.   Okay.  And what would you do next typic...
23     A.   If it rose to the level of an administ...
24 investigation, I would start an administrative
25 investigation.



Page 42

1   Q.  And that would consist of what
2  what an administrative investigation is.
3     A.  I would gather information concerning the
4  particular incident, whether it be witnesses statements
5  or -- it may be having another officer go out and talk
6  to a person while I do something else.  Eventually, it
7  will come down to talk to the officer that was the --
8  subject of that particular use of force.
9     Q.  And, typically, how long does those
10  investigations take to be resolved?
11     A.  There's no typical.  It depends on the
12  circumstances.
13     Q.  Okay.
14     A.  So I can't tell you what -- how long
15  typically they last, and I don't have a working frame
16  of, you know, how long these things take so I don't
17  have that committed to any type of memory.
18     Q.  On average?
19     A.  You know, we've had officers -- some
20  people, so that takes a little bit longer.  We had
21  officers to do something a lot less than shoot,
22  and they will be a little shorter, but I don't have a
23  working memory of how long they take.
24     Things can be delayed by getting
25  information, and things can be delayed by somebody not

Page 43

1  working or somebody in place.  I don't have -- I
2  don't have a working memory of what -- how long
3  something like that would take.
4     Q.  Can you tell me about the steps?  Was there
5  any set number of steps that you would take from a
6  report to completion?
7     A.  I don't know that I understand.  What do you
8  mean by "steps"?
9     Q.  Any way in which you would operate to
10  investigate a case?  Would you convene a panel?  Would
11  you -- you know, you talked about meeting with a
12  supervisor.
13     A.  So, no, I wouldn't convene a panel.  I
14  would, again, interview any witnesses, interview this any
15  victims.  I would gather data from 911.  I would
16  gather data from the officer.  I would talk to the
17  officer.  Any documentation that's relevant to
18  whatever happened, I would gather those documents.
19     Q.  Okay.  And would you then make a
20  recommendation to the --
21     A.  After I had finished everything that I know
22  to do, then I would make a recommendation.
23     Q.  And who would you make a recommendation to?
24     A.  To the sheriff.
25     Q.  To the sheriff?

Page 44

1  Explain  And the recommendation would be to -- w
2  this is?
3     A.  It could be to exonerate.  It could be
4  a statement with pay.  It could be to demote.  It cou
5  go out and tell them their services are no longer needed.
6     Q.  Was there a particular continuum?  So,
7  like, a -- if -- say an officer had -- Offic
8  had been involved in an incident report before, a
9  use-of-force report before, was there any type of
10  escalation, any type of process?
11     A.  I don't know that I understand.
12     Q.  Were there -- were there steps to the
13  consequences or -- to your recommendation?  Did t
14  progressively get worse?
15     A.  Oh, did the recommendation steps get wo
16  based on what they did before?
17     Q.  Yes.
18     A.  No.  I just -- my recommendation is bas
19  on the incident I had before me.
20     Q.  Okay.  So it could be a first-time inci
21  that if you felt like it was egregious enough, th
22     A.  That's correct.
23     Q.  So I want to -- are you familiar with t
24  you're familiar with the use-of-force policy, cor
25     A.  not I don't have it to memory now because I

Page 45

1  haven't looked at it in a long, long time.  So --
2  how long     MS. ROBINSON:  Michael, can we get the
3  use-of-force policy pulled up.
4     Q.  Was there?  MS. ROBINSON:
5     A.  Take a moment to look over it, if you w
6     Q.  Okay.  Can you read the name at the bot
7  What do you  of this policy, Vance County.
8     A.  Vance County Sheriff's Office Policy Ma
9     Q.  Okay.  And then can you identify this
10  policy.
11
12     A.  Like, read from the bottom line?
13     Q.  No.  At the directive.  Which directive
14  Look in the top right-hand corner, Mr. Bul
15     A.  Oh, I can't see the top right-hand corn
16     Q.  Oh, you don't have it in front of you?
17     A.  Directive B.9.
18     Q.  Okay.  And what's the effective date of
19     A.  7-15-2009.
20     Q.  And so it's safe to say this is Vance
21     County's use-of-force policy?
22     A.  (The witness nodded head.)
23     Q.  Have you had a chance to review the che
24     agents section of this policy on Page 1?



AdvancedONE LEGAL          (866) 715-7770
                          advancedONE.com

Page 46

1    MR. GEIS:  Is this an exhibit that by --
2    MS. ROBINSON:  This is Exhibit Number 3.
3    MR. GEIS:  Okay.  It would be helpful to
4  mark these exhibits.
5    MS. ROBINSON:  They will be.  You know,
6  honest to God, you-all didn't mark any exhibits.
7  I will say that.
8    MR. GEIS:  It would be helpful to mark the
9  exhibits so we know what we're talking about.
10   MS. ROBINSON:  We will.  We will.
11   (Exhibit 3 was marked for identification.)
12   MR. GEIS:  If you could put Number 3 on the
13  bottom of that.  Do you need a pen?
14   THE WITNESS:  Okay.
15 BY MS. ROBINSON:
16   Q.   Have you had a chance to review the chemical
17 agents?
18   A.   Yes, ma'am.
19   Q.   And do you mind reading that second bullet?
20   A.   "Prior to issuance of Oleores Capsicum
21 Spray (OC Spray), all deputies shall receive training
22 in its use, which will include instruction and actual
23 application to afford the deputy an understanding of
24 the effects.  Any use of OC Spray other than from a
25 training situation or spraying of animals for

Page 47

1  self-protection shall be reported, as required by this
2  policy."
3    Q.   Okay.  And as someone who evaluates use of
4  force, what does that sentence mean -- or those
5  sentences mean?
6    A.   That you can only carry the mace that the
7  sheriff's office issues you, and you have to have come
8  proof that you've been trained, and you can't then
9  animals.
10   Q.   Okay.  Okay.  I want to -- I'm going to come
11 back to this policy, so just kind of leave it out if
12 you will.
13        But for now, I want to talk some about the
14 incident that you investigated in terms of Mr. White.
15 Okay?
16   MS. ROBINSON:  Michael, can we get super
17 report up.
18 BY MS. ROBINSON:
19   Q.   Can you take a minute and review that
20 document, please.
21   MS. ROBINSON:  Chris, while he's reviewing
22 that document, I'm just going to go get a refill
23 on coffee.
24   MR. GEIS:  Okay.
25   (Recess in proceedings from 11:50 to 11:55 a.m.)

Page 48

1  BY MS. ROBINSON:
2    Q.   Mr. Bullock, you've had an opportunity
3  review this document?
4    A.   Yes, ma'am.
5    Q.   Okay.  And can you define what this doc
6
7    A.   It's the documents that contained some
8  information from my administrative investigation
9  deputy White's actions pertaining to use of force
10 against Latwanya Oliver.
11   MS. ROBINSON:  Okay.  Let the record re
12 that the witness has identified what should
13 marked as Exhibit 4.
14   (Exhibit 4 was marked for identification.)
15 BY MS. ROBINSON:
16   Q.   Do you recall this incident?  Do you re
17 drafting this document?
18   A.   Yes.
19   Q.   Okay.  Can you explain to me the proces
20 which you employed when conducting this investiga
21   A.   training I gathered up the use-of-force report,
22 and incident report, the information that was obtained
23 standing Ms. Oliver, the information that was obtained
24 from the hospital.  I listened to the 911 tapes,
25 recordings.  I conducted interviews.

Page 49

1    Q.   So Ms. Oliver filed a complaint?  Is th
2  what you're saying?
3    A.   Yes.  Ms. Oliver filed a complaint.
4    Q.   Okay.  When did she -- do you recall wh
5  she filed that complaint, that written complaint?
6    A.   I don't know the day.
7    Q.   On the date of the incident, the date a
8  the incident?
9    A.   It was within that same week, but I don
10 remember exactly when she did it.
11   Q.   Okay.  So after she filed a written
12 complaint, what occurred next?  How was this comp
13   A.   She may have talked to Captain Watkins.
14 would have talked to Mr. White.  I talked to his
15 supervisors.  I gathered the documents that I jus
16 mentioned before.
17
18   Q.   So who do you recall speaking to?
19   A.   I recall speaking to Mr. White.  I reca
20 speaking to Lieutenant Goolsby, Sergeant Welborn,
21 Captain Watkins, Ms. Oliver.
22        In order to get the reports from 911, I
23 would have spoken to somebody at 911, but I don't
24 who.  I'm sure at some point in time, I talked to
25 sheriff.



Page 50

1    Q.   Let's go to -- I think it should be Page 2
2    and 3 of that report.  I'm going to come back and ask
3    you questions about these conversations, but I want
4    you to go to Page 2 and 3 of the report.  It
5    illustrates what you based your decision on.
6         Do you see Mr. White's statement listed?
7    A.   It seems like the first -- are you referring
8    to when he first said, "All hell broke loose"?
9    Q.   No.  Page 2 and 3 where it says
10   "illustrations," your conclusion.
11   A.   All right.
12   Q.   Right above your conclusions.
13   A.   Okay.  And what was the question?
14   Q.   The question is, this isn't -- these are
15   illustrations of which you based your decision on,
16   correct?
17   A.   Yes.
18   Q.   Okay.  Do you see Mr. White's statement
19   listed?
20   A.   Yes.
21   Q.   Where is Mr. White's statement?
22   A.   It's -- what he wrote was in the
23   report -- use of -- I mean the incident
24   report 1801-3870 and a use-of-force report.
25   Q.   Okay.  So are those the investigations that

Page 51

1    you had with Mr. White?
2    A.   Are those the what?
3    Q.   Investigations that you had with Mr. White?
4    A.   I don't understand your question.
5    Q.   Did you have direct conversations with
6    Mr. White, or did you base it on these use-of-force
7    reports and the incident report?
8    A.   Yes.  I had direct conversation with
9    Mr. White.
10   Q.   But your conclusion wasn't based on that
11   direct conversation?
12   A.   It was based on everything I had
13   either through talking or whatever was written.  It
14   was based on everything that I compiled in order to
15   produce this report and make a recommendation.
16   Q.   But it's not noted on this document; is that
17   fair to say?
18   A.   Is what not noted?
19   Q.   Your conversations with Mr. White.
20   A.   It's not fair to say because I quoted
21   the things he said.
22   Q.   Okay.  So let's go back to your statements
23   with -- or your conversations with, you said,
24   Mr. White.  Let's start with Mr. White.
25        How did that conversation go?

Page 52

1    A.   ... be Page that conversation?
2    Sometime between me getting the incident
3    report and use-of-force report and submitting the
4    conclusion.  I don't know exactly what day and time
5    that was on there.  I don't know the exact date
6
7    Q.   Okay.  That's fair.  What -- how -- how
8    occurred during that conversation?  What transpired?
9    A.   He -- he sat down in my office and told me
10   what he had -- you know, his point of view of what
11   happened.  And I listened, and then we -- I continued
12   on with the investigation.
13   Q.   Did you take notes?
14   A.   I would imagine that I did.  I don't have
15   my notes, but I would imagine that I did, but I
16   know that to be factual.  I might have been typing
17   the time.  I don't know.  I don't remember.
18   Q.   But there would have been typewritten notes?
19   A.   I'm sorry?
20   Q.   There would have been typewritten notes?
21   A.   I'm saying I might have been -- I don't
22   use if I was typing little snippets at the time.  I just
23   don't remember.  I don't know if I was typing or
24   writing.  I don't remember.
25   Q.   And what did he say occurred?

Page 53

1    A.   I don't know that I can summarize it.
2    don't know verbatim.  You know, he basically saw
3    her the day before.  He turned around on it.
4    think he ran the registration.  He confronted the
5    driver about her speeding.  She became verbal with
6    her about her speeding off.  I think she -- he got back out,
7    to the office.  He realized there was warrants.
8    went to the house to try to serve the warrants or
9    to the house to try to make contact with her.  I
10   called it an investigation at first.  He did
11   make contact.  His shift ended.
12   had gotten, he came back the following shift or the
13   following -- the next day or night.  He went there
14   check on the warrants.  She seemed cooperative at
15   first.  He tried to put the handcuffs on her.  I
16   something about she wouldn't let him get
17   handcuffs on her, and he -- he said he performed
18   takedown maneuver.
19   I asked him what takedown maneuver he
20   performed, and he couldn't tell me.
21   Q.   And how long did this conversation last?
22   A.   I don't recall.
23   Q.   Was it a half day?  Was it an hour
24   conversation?
25   A.   I don't know.


AdvancedONE LEGAL          (866) 715-7770
                          advancedONE.com

Page 54

1    Q.   Was Mr. White the first person who you spoke
2  to about this incident?
3       A.   No.
4    Q.   Who was the first person?
5       A.   It might have been Sergeant Welborn or
6  Lieutenant Goolsby.
7    Q.   What did they tell you?
8       A.   I don't know. I don't remember what they
9  told me. I have the incident report. You know, like
10 as a standard practice, I checked with the supervisor
11 to make sure they were aware of it and but I don't
12 remember what they told me.
13   Q.   Was it an in-person meeting or a phone call?
14      A.   I don't remember.
15   Q.   You don't remember? You don't remember for
16 either of them?
17      A.   No. At some point in time, I was both in
18 my office talking, but whether or not that's the
19 first time or not, I don't know. And they were in the
20 office talking when Mr. White was in the office with
21 me. I mean, they were in the office present when
22 Mr. White was in the office with me.
23   Q.   Okay. So your testimony is that Welborn and
24 Goolsby were -- Welborn and Goolsby and Mr. White, you
25 spoke to them all at once?

Page 55

1       A.   At some point in time, I was -- at some
2  point in time, they were in my office together at some
3  point in time. That's the point in time that I
4  actually spoke to Goolsby and Welborn without
5  Mr. White being in my presence. Whether that was on
6  the phone or in my office or in their office, I just
7  don't recall when.
8    Q.   What did you say when you spoke to them
9  outside of Mr. White's presence?
10      A.   I don't recall what I said.
11   Q.   Can you tell me what you do recall about
12 this investigation. Just kind of walk me through it.
13      A.   I remember having knowledge of the
14 report. I remember having seen a statement by
15 Ms. Oliver. I remember talking to Captain Watkins. I
16 can remember talking to Lieutenant Goolsby. I
17 remember talking to Sergeant Welborn. I remember
18 talking to Mr. White in my office with Lieutenant
19 Goolsby and Sergeant Welborn, and I can remember
20 gathering the documents for this report.
21        And I remember taking -- once I finished --
22 taking the report to the sheriff with the
23 recommendation.
24   Q.   Okay. But you can't remember what you said
25 to them or what they said to you?

Page 56

1    Q.   When you say "they," who are you referring
2  to?
3    Q.   Welborn, Goolsby.
4       A.   No. I don't remember what they said to
5  me. I don't remember what I said. You know, again, a
6  part of my -- during this investigation, I always
7  checked with the supervisors to make sure they are
8  what they -- of what's going on, but I don't know exactly
9  what they said.
10   Q.   Got you. Well, you said you spoke to
11 Mr. Watkins.
12        What did that conversation --
13      A.   I don't remember the details, but what I
14 remember about Mr. Watkins' conversation is he was
15 who initially spoke to Ms. Oliver, and that's
16 I remember about that.
17   Q.   Okay. You said you had a conversation
18 Sheriff White?
19      A.   Yes.
20   Q.   Do you recall that conversation?
21      A.   As I complete the investigation, I let
22 know that I've completed it. I let him know I
23 turn it over, and then I turn it over to him, and
24 Mr. White took it,
25   Q.   So that was the extent of your conversa...

Page 57

1       A.   When I do these investigations, I let h...
2  them know -- he knows that I was doing it, because it's
3  that a part of my standard operating procedure to do it
4  ...things. But when I'm done, I let him know that I
5  ...done I go in, and he'll -- you know, I'll say t...
6  ...recommendation, and he'll flip through it as I'm
7  talking to him. And I tell him what the
8  recommendation is, and then I leave. I didn't ha...
9  anything to do with it after that --
10   Q.   Okay.
11      A.   -- except this report.
12   Q.   Okay. Well, we spoke generally. I'm t...
13 to speak more specifically about this incident.
14 ...what you can recall you said to Sheriff White, wh...
15 you recall you did.
16      A.   I recall letting him know that I've
17 completed it, and I recall giving it to him.
18   Q.   And he didn't ask you what's your -- di...
19 ask you what the outcome was?
20      A.   As we're -- as he's talking, he saw wha...
21 ...recommendation is. You know, I pointed out what
22 recommendation is as it reads.
23   Q.   Okay. And what did he say?
24      A.   I don't know what he said.
25   Q.   You don't know?


AdvancedONE LEGAL          (866) 715-7770
                          advancedONE.com

**Page 58**

1   A.  I don't remember staying around to control
2  about anything.
3      Q.  So you recommended that -- you recommended
4  that Deputy White be terminated, correct?
5      A.  I don't use those terms, so that's not
6  correct.
7      Q.  What term did you use?  Well, let's read the
8  recommendation.  So pull up the document, please.
9  Let's read your -- can you, please, read your
10  recommendation.
11     A.  "It is the recommendation of Captain
12  Watkins, Lieutenant Goolsby, Sergeant Welborn, and the
13  investigator officer that Deputy Justin White's
14  service with the Vance County Sheriff's Office is
15  longer needed."
16     Q.  Okay.  So the effect is termination, right?
17     A.  Yes.
18     Q.  Okay.  And can you explain to me how you
19  reached this recommendation, this conclusion.
20     A.  He slammed the victim and broke her arm.
21     Q.  So what did you base your decision on?  What
22  rule?  What policy?
23     A.  Use-of-force, Directive B.9I.
24     Q.  And how did you come to the conclusion that
25  he violated that policy?

**Page 59**

1   A.  He slammed the lady to the ground and broke
2  her arm.
3      Q.  Okay.  Earlier you testified that you
4  investigated brandishing and actual shootings before,
5  correct?
6      A.  That's correct.
7      Q.  All right.  Let's talk about some of those.
8      Do you always recommend departure or
9  separation -- let's call it separation since you don't
10  like "termination" -- separation from employment when
11  someone is injured?
12     A.  I don't always recommend it.
13     Q.  Okay.  When do you recommend separation?
14     A.  When I feel that they violated policy.
15     Q.  You just feel it?
16     A.  Sorry?
17     Q.  You just feel it?  You just get a feeling,
18  "I'm --"
19     A.  No.  I didn't say "feeling."  I see it when
20  they -- when I see that they violated policy.
21     Q.  Okay.  And in your opinion, what could
22  Mr. White have done differently?
23     A.  He certainly shouldn't have slammed her and
24  broke her arm.  He could have used his mace to try to
25  get her under control, or he could have used such

**Page 60**

1  control or technique that would be in standards with
2  any training that law enforcement officers have.
3  not trained to slam people down on the ground
4      Q.  Okay.  Tell me about some of those subjects
5  control techniques.
6      A.  He could have done an arm bar takedown.
7  He could have done a leg sweep.  He could have done
8  wrist come-along.
9      Q.  Can you explain to me what's an arm bar
10  technique.
11     A.  Basically, when you have a person by the
12  arm, arm straight, you then kind of actually
13  to the arm and put them down on the ground and
14  cuffs them.
15     Q.  Okay.  Do you know -- do you know if
16  Mr. White did not perform an arm bar technique?
17     A.  Yes, I do.  He slammed her down on the
18  The arm bar technique doesn't require you
19  slam anybody.
20     Q.  Who said Mr. White slammed Ms. Oliver to
21  the ground?  How did you make that conclusion?  How did
22  you conclude that?
23     A.  Ms. Oliver said that Mr. White slammed
24  ground.
25     Q.  So I asked you earlier about how many

**Page 61**

1  use-of-force investigations have you conducted.
2  said very many, correct?
3      A.  Yes.
4      Q.  Do you substantiate the majority of them
5  based on a suspect's testimony or statement?
6      A.  I don't know.  I don't have a working m
7  how many are substantiated and how many
8  unsubstantiated.  I have not kept -- there have b
9  people who have been exonerated.  There have been
10  people who have been substantiated.  Like, I don't
11  know the -- you know, the difference.  I don't kn
12  the tally.
13     Q.  Okay.  Have -- did you discuss this
14  investigation with anyone other than those person
15  you identified?
16     A.  Yes.
17     Q.  Who?
18     A.  I discussed it with Mr. Geis, and I
19  discussed it with Lawrence Bullock.
20     Q.  I don't want to know what you told Mr.
21  at all.
22     But what discussions did you have with
23  Bullock?
24  to try to After this suit came out, you know, he
25  called -- called such and said, "Hey, you know, J.J., why are



Page 62

```
1   suing us?"
2        I said, "For what?"
3        He said, "Well, you talked about -- you
4   talked about this." But I'm not -- you know, I don't
5   know what thing he was saying, because he -- have to
6   get it at the same time he got it.  I got it at a
7   later -- you know, I live out of town, so he got it
8   before I got it, before they got it.
9        So he was wherever before I got it, so he
10  discussed it in that manner.  That's it.
11       Q.   What did you-all say?
12       A.   "Hey, we're being sued.  We got to
13  talk --" You know, I think we -- arrangements were
14  made for us to meet with our attorney.
15       That's about the gist of it.
16       Q.   Do you recall the length of that
17  conversation?
18       A.   I don't.
19       Q.   Do you recall --
20       A.   It would -- it would -- no.  I don't recall
21  that conversation.
22       Q.   How many times have you-all discussed this
23  suit since?
24       A.   The times we've discussed the suit, the
25  first time he told me about it is how many times.
```

Page 64

```
1   force.
2        Q.   Deadly force?
3        A.   Uh-huh.
4        Q.   But even if it's just brandished, you still
5   have to report it?
6        A.   No.  Because the deputy wears a uniform, so
7   the gun is seen all the time, so that -- to see it
8   simply wouldn't be something you have to report.
9        Q.   Okay.
10       A.   Just if you see a gun.  But if you were to
11  put your hands on it and draw it, then that would be
12  something you would have to report.
13       Q.   Okay.  Okay.  And that was something that
14  would be run by you also?
15       A.   Say that again.
16       Q.   That report would be run through you in all
17  cases or in certain cases?
18       A.   What report?
19       Q.   If an officer drew a gun.
20       A.   Not necessarily.
21       Q.   Not -- okay.  So we talked about this
22  continuum.  So when are soft hands to be used?
23       Because you said you got a presence, you had a
24  it -- you have soft hands, pepper spray, force, and deadly
25  force.
```

Page 63

```
1   I've met with him and Mr. Geis and Mr. -- and Sheriff
2   White.  I don't know how many times that's been.
3        Q.   Okay.
4        A.   All the discussions have been during my
5   time.
6        Q.   Okay.  Okay.  And those are the only persons
7   who you discussed this incident with?
8        A.   Those are the only persons I discussed this
9   incident with.
10       Q.   Okay.  Are you familiar with the
11  use-of-force continuum?
12       A.   Vaguely.  Again, over time, I have lost --
13  that stuff has faded out of my memory.  I can't quote
14  it to you exactly.  I know it, and I recognize it.
15  I can see it.  I recognize it.
16       Q.   Okay.  I don't want you to quote it to me.
17  I just kind of want you to explain the continuum as
18  someone who made use-of-force calls.
19       A.   The continuum starts with presence and
20  verbal and then soft hands, hard hands.  Then you get
21  other, like, techniques like mace and pepper spray,
22  and then you have deadly force.
23       Q.   Where does a firearm fit in all of this in
24  the continuum?
25       A.   If it's discharged, it would be deadly.
```

Page 65

```
1   -- and Sheriff  Soft hands would be the -- grabbing
2   somebody's wrist or hand, placing their hands behind
3   their back and handcuffing them.  That would be an
4   example of soft hands.  Sometimes deputies place
5   handcuffs on the front of somebody.  That would be
6   persons.  Soft hands could be you're guiding
7   somebody, just holding their shoulder and just walking
8   with them.  That could be soft hands.
9        Q.   Okay.  And according to the continuum, soft
10  hands is less intrusive than lethal weapons, such as
11  batons and Tasers and pepper spray; is that correct?
12       A.   What's the question?
13       Q.   Are soft-hand techniques -- according to the
14  continuum, a soft-hand technique is less intrusive --
15  less of a measure than weapons such as batons, Tasers,
16  and pepper spray?
17       A.   Ma'am, I don't have that continuum to -- I
18  can't answer that without actually looking at the
19  continuum.  My law enforcement time has ended, and
20  I don't keep things in memory.  I will have to look at
21  it.
22       Q.   Okay.  Okay.  When did your law enforcement
23  time end?
24       A.   I retired in April 2019.
25       Q.   And you lost 20-something years of
```



AdvancedONE LEGAL    (866) 715-7770    advancedONE.com

Page 66

```
1   experience?
2       A.  Yes.  I don't -- I can't keep in my head
3   every little thing that has happened and that's around
4   learned over the years.  I know what the use that
5   it looks like, but I don't know that I'm naming them
6   in the exact order.
7       Q.  Okay.  Okay.  So does the Vance County
8   Sheriff's Office follow the BLET?  You talked about
9   BLET training.
10      A.  Yes.
11      Q.  The Vance County Sheriff's Office does
12  follow BLET?  Okay.  I'm going to pull up the other
13  policy, and I want to -- I just want to direct you to
14  a certain page of it.  Okay?  And Mr. Geis has it.
15          MR. GEIS:  Which exhibit is this?
16  number?
17          MS. ROBINSON:  We're marking this as
18  Exhibit Number 5.
19          (Exhibit 5 was marked for identification.)
20  BY MS. ROBINSON:
21      Q.  If you can just turn to Page 37.
22          MS. ROBINSON:  Michael, can we go back
23  I want to see something right quick.  I'm going
24  to start at 36 and 37.
25          And, Mr. Geis, if it's okay with you, in
```

Page 68

```
1   soft-hand technique other than the one at issue?
2       A.  I don't know if you consider a person
3   ground as a soft-hand technique, so I can't compa
4   with what I consider to be a soft-hand techniq
5       Q.  Okay.  Okay.  Well, let's just ask a mo
6   general question.
7           Have you ever or can you recall an inci
8   which you recommended separation when an offic
9   employed a soft-hand technique?
10      A.  I don't recall any right now.
11      Q.  Have you ever recommended separation wh
12  an officer employed a soft-hand technique?
13      A.  I don't recall that right now.
14      Q.  You -- let's go back to what was marked
15  Exhibit Number 4, and that is your report.
16      A.  I have it.
17      Q.  You have your report in front of you?
18      A.  I have it.
19      Q.  You have it?  Okay.  You said that in y
20  conclusion -- do you mind reading that next -- th
21  next to the last sentence where it says, "Deputy
22  could have used other options."
23      A.  "Deputy White could have used other opt
24  prior to slamming Oliver to the ground.  Deputy W
25  usual place at his disposal but believed it to be
```

Page 67

```
1   once I wrap this up, can we take a lunch break
2           MR. GEIS:  Yes.
3           MS. ROBINSON:  Okay.
4           MR. GEIS:  Are you ready?
5           THE WITNESS:  Okay.  I'm sorry.
6   BY MS. ROBINSON:
7       Q.  Okay.  So this is a -- this policy -- can
8   you tell us what this policy describes?
9       A.  I don't know this to be a policy.
10      Q.  Technique.  What this technique describes.
11      A.  On Page 36, it starts off with which to.
12  Is that what you're referring to?
13      Q.  The quick takes.
14      A.  The first one is bent wrist.  The second
15  is arm bar.  The third one is multiple-officer
16  takedown.  The fourth one is close quarter control.
17      Q.  And isn't it true that someone can be
18  accidentally injured in any of these methods?
19      A.  In a few.
20      Q.  Have a deputy -- has a deputy accidentally
21  injured a citizen under your leadership?
22      A.  I don't have anything coming to mind right
23  now.
24      Q.  Can you recall an incident where you
25  recommended separation for an officer who used a
```

Page 69

```
1   ineffective because Oliver was wearing glasses an
2   moving uncontrollably.  Deputy White's takedown
3   maneuver was contrary to policy in that it caused
4   fracture of the humerus bone in her left arm."
5       Q.  Okay.  So let's tease that apart a litt
6   bit.
7           Was the maneuver contrary to policy bec
8   it caused a fracture?
9       A.  The maneuver was a slamming, and we don
10  anything in our policy or training that allo
11  us to slam anybody.
12      Q.  Okay.  Well, this doesn't say that the
13  maneuver was a slamming and is contrary to policy
14  does it not?
15      A.  No.
16      Q.  Okay.  This makes it seem as if the inj
17  is what was contrary to policy.  I have -- I want
18  ask you about mace.  Let's say that Deputy White c
19  have used mace or pepper spray.
20      Q.  Are there any dangers associated with t
21  use of pepper spray?
22      A.  I have never experienced any danger
23  associated with the use of mace.  I have not
24  experienced that.
25      Q.  You haven't?  So you have -- you've use
```



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Page 70

```
1    force.
2           Have you completed an excessive force report
3    before?
4       A.   Yes.
5       Q.   Okay.  We'll get back to that.
6           Has a citizen ever had an adverse reaction
7    to pepper spray?
8       A.   I don't know of any citizen having an
9    adverse reaction to pepper spray that I have been
10   involved in.  Do I -- do I -- I don't know of any that
11   comes to mind right now that I am aware of other than
12   having other than sometimes you -- they just -- can
13   it?  I'm at a loss of words.  Not hyperventilate it,
14   but -- I can't think of the word that I want to use.
15   Over excitedly and panic -- panic, yeah, panic
16   attacks.
17      Q.   Okay.  And if -- even if someone had say,
18   asthma, that could be harmful, correct?
19      A.   I don't know that to be the case.
20      Q.   You don't know that to be --
21      A.   I don't know if anybody who had asthma has
22   been sprayed that had a harmful effect.  I don't know
23   of anybody.  I don't have any personal knowledge.
24      Q.   Okay.  Do you -- I want to pull up use-of-
25   use-of-force policy up again, so --
```

Page 71

```
1       A.   Is it Number 3?
2       Q.   Yes, that's Exhibit Number 3.
3           MS. ROBINSON:  Let's go down.  Let's scroll
4    down some, Michael.  That's not what I'm looking
5    for.  Hold on.  Go back up.  Go back up have right
6    here.  Up, up, up.  Right -- right there.  Give
7    me a second to find the exact sentence.
8           Let's pull up the BLET policy, and that
9    is Exhibit Number 5.
10   BY MS. ROBINSON:
11      Q.   We already discussed that the use of
12   chemical dispersant was not a substitute for a soft
13   technique, correct?
14      A.   I don't -- I don't recall -- don't recall
15   that.
16      Q.   On the continuum of force.
17      A.   I don't recall saying that.
18      Q.   But you do recall saying that Vance County
19   employs the BLET's techniques in subject control
20   arrests?
21      A.   No.  You asked me did Vance County follow
22   the training, have BLET training, follow BLET
23   training.  And I said yes to that.
24      Q.   So are you saying that Vance County
25   Sheriff's Office does not follow the BLET subject
```

Page 72

```
1    control arrest continuum?
2       A.   No.  I'm not saying that.  I answered the
3    question about the -- Vance County following BLET
4    training.  I said yes.
5       Q.   Okay.
6       A.   Just the way you phrased it to me, does
7    Vance County deputies go to BLET training, and I said
8    yes.
9       Q.   Okay.  Well, let me ask this question.
10   Does the Vance County Sheriff's Office
11   follow the BLET subject control arrest techniques
12   continuum?
13      A.   Yes.
14      Q.   Okay.  Does Vance County follow the BLET
15   policies and procedures?
16      A.   I don't know what their policies and
17   procedures are.
18      Q.   Okay.  So you said that you have been
19   involved in use of force -- the subject of a
20   use-of-force investigation yourself?
21      A.   Yes.
22      Q.   Can you explain that to me.  How many times
23   -- how many times have you been the subject of a
24   use-of-force investigation?
25      A.   Between 5 and 15.
```

Page 73

```
1       Q.   5 and 15 times?  Can you explain those
2    incidents to me.
3       A.   What occurred?
4           I pepper-sprayed people.  That caused me
5    to have might be the subject of use of force.  There was
6    one time that I had -- I was trying to do a clavicle
7    force strike on an individual, and I hit him in the head,
8    and that   Those were the times.
9       Q.   Okay.  Let's unpack that some.
10          So you were saying you were trying to do
11   a clavicle strike?
12      A.   Yes.
13      Q.   Explain what that is.
14      A.   I don't recall   I was trying to get a subject under control
15   by striking him in the clavicle.  That's no longer
16   allowed.  That was my early training that initially
17   allowed it, and now it's no longer allowed.
18      Q.   So you struck the individual in the head?
19      A.   Yes.
20      Q.   Was the individual injured?
21      A.   No.
22      Q.   Did the individual complain?
23      A.   No.  I had to report it as a part of my
24   reporting.
25      Q.   And so you used pepper spray on individual
```



Page 74

```
 1        Q.  Can you tell me about those instances.
 2        A.  I've had several occasions tried to arrest
 3   people who resisted, and I had to pepper spray them.
 4        Q.  By "resist," what do you mean?  Did they
 5   people attack you?
 6        A.  I mean, there have been multiple instances.
 7   I've had a situation where I tried to arrest somebody.
 8   I tried to get them to push off of me, and then I --
 9   sprayed them.  There's been incidents where, subject --
10   I tried to get the subject out of a car That I'd like
11   to come out of the car, and I had to spray them.
12        Q.  Have you ever used any soft-hand techniques
13   over chemical dispersants?
14        A.  Yes.
15        Q.  Can you explain those instances.
16        A.  Ma'am, I've can put hands on -- I arrested and I grabbed them by the
17   on the people I've arrested and I grabbed them by the
18   hand, put their arms behind their back, and I arrested
19   them.  That's one of the soft-hand approaches.  And
20   I've put my hands on people to arrest them.
21        Q.  Okay.  But that's pretty common.
22        A.  Yes.
23        Q.  Do you put your hands on --
24        A.  For me.
25        Q.  Okay.  Did any of these use-of-force
```

Page 76

```
 1   instances.  I have to go to the restroom.  Do you k
 2   longer?
 3        Q.  No.  We can actually break for lunch no
 4   How long -- can we go of the record.
 5        (Recess in proceedings from 12:53 to 2:06 p.m.
 6   BY MS. ROBINSON:
 7        Q.  Mr. Bullock, I think we -- we left off
 8   the -- at your investigations in which you were t
 9   subject of an excessive force investigation, and
10   I'd like to do is to shift a little bit into -- a
11   you familiar with the concept of 20/20 hindsight?
12        A.  Can you explain it.
13        Q.  So, typically -- and it might be in som
14   your policies.  You know, some of the policies fo
15   Vance County quote Supreme Court authority.  But
16   hindsight -- and Mr. Geis can tell you this too -
17   is by --
18             MR. GEIS:  Here we go now.
19             MS. ROBINSON:  Huh?
20             MR. GEIS:  Oh, nothing.
21   BY MS. ROBINSON:
22        Q.  -- is a concept in which you, looking b
23   could have maybe done something differently but
24   weren't necessarily unreasonable.
25             Are you familiar with that concept?
```

Page 75

```
 1   instances in which you were a subject in result in any
 2   type of investigation?
 3        A.  When I was a deputy at the time, I had to
 4   write a use-of-force report.  I had to talk your
 5   captain at the time, and then I haven't heard anything
 6   else from it since those -- then.
 7        Q.  And this occurred at the Vance County
 8   Sheriff's Office, correct?
 9        A.  Yes, ma'am.
10        Q.  Does the Vance County Sheriff's Office train
11   officers on the use of force?
12        A.  We have BLET update that mandate
13   that we go through, and we have a training
14   that takes us through those legal updates
15   what it was when I was here.  I don't know
16   now.
17        Q.  All right.  Who was the training officer
18        A.  It's Captain Shelton.
19        Q.  And what would he train the officers on?
20   What techniques?
21        A.  He would go through the arm b
22   You know, the chin strike has to be a little bit
23   simulated because it's -- you don't want
24   chin being struck.  We would go through the
25   takedown subject control techniques.
```

Page 77

```
 1   result in any  I understand how you explained it to me
 2   understand what you're saying.
 3        Q.  Okay.  Did that at all factor in
 4   your evaluation of Mr. White?
 5        A.  No.
 6        Q.  No?  Okay.  Why not?
 7        A.  You're asking me about the concept of 2
 8   hindsight.  At the time I did Mr. White's
 9   investigation, 20/20 hindsight wasn't in my mind.
10   It had no bearing on my decision -- on my
11   recommendation.  Not decision, but recommendation
12        Q.  Okay.  Another question I had -- we tal
13   about the reports that you relied on or the state
14   that you relied on.
15        Q.  Did -- were they all written statements
16   Goolsby and Welborn made written statements, prov
17   written statements?
18        A.  I believe they did.
19        Q.  Okay.  Earlier in the morning, probably
20   early in the morning, you talked about the use of
21   canines in conjunction with incident reports.
22        A.  I don't recall using the word "canines."
23        Q.  Well, is a canine a use of force or
24   subject -- would the use of a canine be subject t
25   incident report?
```


AdvancedONE LEGAL    (866) 715-7770    advancedONE.com

Page 78

```
 1      A.   Yes.
 2      Q.   Okay.
 3           MS. ROBINSON:  Michael, can you -- I have
 4   some questions.
 5   BY MS. ROBINSON:
 6      Q.   So does the Vance County Sheriff's Office
 7   employ canine units and canine handlers?
 8      A.   Yes.  We did back then.
 9      Q.   Back then?  Okay.  And so let me -- let me
10   clarify this too.  And I'll go on the record saying
11   this, you know, as clearly as possible.  Nothing you
12   say will be outside of the scope of your tenure there.
13   Okay?
14      A.   Okay.
15      Q.   So just feel free, understanding that all of
16   your answers speak for your knowledge and your time
17   there.  Okay?
18           And so do the deputies control their
19   animals?
20      A.   The canine handler -- each animal is
21   assigned to one handler, and it's the handler's
22   responsibility to control that dog.
23      Q.   And those handlers are trained to control
24   their dogs?
25      A.   Yes.
```

Page 79

```
 1      Q.   Has there ever been an incident when a
 2   canine unit injured a citizen?
 3      A.   Yes.
 4      Q.   Can you describe these incidents to me.
 5      A.   We've had -- in the process of taking
 6   subjects into custody where the -- the criteria
 7   where the canine could be released to try to take the
 8   subject in custody, the dog has bitten subjects.
 9      Q.   Okay.  So you said the dog has bitten
10   subjects?
11      A.   Yes.
12      Q.   Is there a certain heightened situation in
13   which a canine unit will be brought out like a
14   misdemeanor, a felony, or --
15      A.   We've taken canines on situations where
16   we've had to hunt for felons that may have run off in
17   the woods.  And we've called out and gave them ample
18   time to turn themselves in and say we're going to
19   release the canine, and then the canine goes in and
20   he's bitten people.
21           We've had cases where we've taken a canine
22   with us on drug raids.  I can't recall any specific
23   incident where, you know, they've bitten people in the
24   drug raids, but we use them there.  And then the
25   deputies use canines sometimes on traffic stops to
```

Page 80

```
 1   the canines -- some of the canines also had a dual
 2   purpose in which they were used for drug-sniffing
 3   purposes to apprehend.
 4      Q.   Okay.  How do you-all train the canines to
 5   sniff for drugs?
 6      A.   Say that again.  I'm sorry?
 7      Q.   How do you train the canines to sniff out or
 8   identify drugs?
 9      A.   I don't know, ma'am.  I don't have any
10   knowledge of that at all.
11      Q.   That was just a stray question.
12           Were any of the incidents known suspects
13   that you can recall of?
14      A.   In what incidents?
15      Q.   Where the canine has attacked someone, and
16   they were just -- were there any nonsuspects?
17      A.   Yes.  A canine has bitten a handler.
18      Q.   And that's the only kind of nonsuspect
19   situation?
20      A.   I don't -- you know, what's -- what's fresh
21   in my memory is that, you know, we had a dog who
22   often bite his handler.  So that's fresh in my memory
23   to control -- I don't remember the details, but I
24   think a lady got bit by a dog during a building search
25   or doing an area search at an old school supply place
```

Page 81

```
 1   that's sort of fresh in my mind, where the officer
 2   thought the place was vacant and someone had got
 3      Q.   Was -- did you investigate that handler?
 4      A.   I don't -- I don't think that came to me.
 5      Q.   Okay.  Do you recall if that handler was
 6   terminated?
 7      A.   I do not.
 8      Q.   Have there been instances in -- where the
 9   use of a canine has been considered excessive force?
10      A.   It has not come to me, no.  Not where it
11   arose when it came to me.
12      Q.   But you've conducted investigations of
13   canine handlers?
14      A.   No.
15      Q.   You have not?
16      A.   No.
17      Q.   So that would go to someone else?
18      A.   Yes.
19      Q.   Like who?
20      A.   Probably the commander, whatever -- whatever
21   shift commander that would have been working or
22   whatever supervising that officer.
23      Q.   Why wouldn't it rise to you?  Why would it
24   rise to the level of you?
25      A.   It has never been put in practice.  I mean
```


AdvancedONE LEGAL        (866) 715-7770
                        advancedONE.com

Page 82

1  there hasn't been an incident where we felt that
2  felt that a handler has used a canine in such
3  egregious way that it would rise to me.
4      Q.  But canines have bitten people and bitten
5  suspects and injured them, but it hasn't made it to
6  your desk?
7      A.  Yes, ma'am.  That's the -- that's posted by
8  the suspects.
9      Q.  How many civil suits result from excessive
10  force in Vance County?
11     A.  I have no idea.
12     Q.  No idea?  If there were, would you know
13  about it?
14     A.  Not necessarily.
15     Q.  What does "not necessarily" mean?
16     A.  If I pick it up or hear somebody talking
17  about it.  But they wouldn't come to me and say, "Hey,
18  there's a civil suit because of this."  I'm
19  wouldn't have anything to do with that.
20     Q.  I do want to kind of go back to how these
21  canines are trained because, you know, those you're
22  considered weapons, correct?
23     A.  Those are considered what?
24     Q.  They're considered -- they're considered
25  utensils of the sheriff's.

Page 84

1  felt that  Q.  I  Okay.  Michael has pulled up -- and thi
2  such  will be Exhibit 6.
3          (Exhibit 6 was marked for identification.)
4  BY MR. ROBINSON:
5      Q.  The canines.  Do you have that policy i
6  front of you?
7      A.  Yes, ma'am.
8      Q.  Just take a moment and skim that policy
9          MS. ROBINSON:  Slow down.  Let's go som
10         more.
11         THE WITNESS:  Okay.
12  BY MR. ROBINSON:
13     Q.  Okay.  So are you familiar with this po
14     A.  I know that it exists.  I'm not intimat
15  familiar with it, but I know that it exists.
16     Q.  And you've reviewed it?
17     A.  I said I know that it does exist.  I'm
18  It's intimately familiar with it, but I do know that i
19  exists.
20     Q.  Okay.  Well, my follow-up question is t
21  you're comfortable now with your review of it?
22     A.  I'll answer questions based on what's h
23  before me.
24     Q.  Okay.  Thank you.  There are approximat
25  12 pages in front of you.

Page 83

1      A.  No, ma'am.  I think they're considered
2  canines.  I don't know anything about canine training.
3      Q.  You don't know anything about it, but you
4  can --
5      A.  All I know is that a canine officer have to
6  go through training in order to become a canine
7  handler.  I don't know anything about the specifics of
8  their training.
9      Q.  Do you know something about the use of the
10  canine?
11     A.  Yes.
12     Q.  Okay.  Do you keep -- do they keep records?
13  Who's in charge of canine training?  Who's
14  responsible?
15     A.  There would be different people over time,
16  and I don't know who they were in any given particular
17  time.  Once -- Lieutenant Shearin has been in charge
18  of canine records.  There's an Officer Silley who
19  used to be in charge of canine records.
20          But over time, I don't know who was in
21  charge at all in a particular time.
22     Q.  Okay.  So you talked about the use of the
23  canines during a drug bust.
24          Have you ever used them personally?
25     A.  No.  I never used a canine personally.

Page 85

1          Can you go to Page 4, please.
2      A.  Okay.
3      Q.  I would like for you to read that first
4  bullet point.
5      A.  "Controlled substances used as training
6  aids will be obtained through the courts after final
7  disposition of the cases.  A court order must be
8  prepared by the presiding judge of the case.  The
9  will designate the controlled substance fro
10  case to be used by the Vance County Sheriff's Off
11  for canine training.  All controlled substances w
12  from cases in which the Sheriff's Off
13  or federal agency was the arresting entity.  Pr
14  to obtaining these training aids, they must be te
15  in an approved laboratory."
16     Q.  So does Vance County used controlled
17  substances to train their canines?
18     A.  I'm not familiar with it, ma'am.
19     Q.  Would you be surprised if a canine bit
20  a suspect --
21     A.  No, ma'am, I would not be surprised if
22  a canine bit a suspect.
23     Q.  -- who had a controlled substance that
24  canine was trained and used to detect, based on u
25  of drugs?



AdvancedONE LEGAL          (866) 715-7770
                            advancedONE.com

Page 86

1    A.   Can you repeat that. I don't
2    **Q.   That's fine. I want to --**
3         MS. ROBINSON: Let's bring up the
4    incident with the canine.
5         MR. GEIS: What exhibit?
6         THE WITNESS: I don't know what exhibit
7    you're referring to.
8    BY MS. ROBINSON:
9    **Q.   No, no. I'm talking to Michael, not you,**
10   **sir.**
11   A.   Oh, I'm sorry.
12   **Q.   Are you -- take a minute and review this**
13   **document. Let's mark this as Exhibit Number 7.**
14        (Exhibit 7 was marked for identification.)
15        THE WITNESS: Okay.
16   BY MS. ROBINSON:
17   **Q.   Are you familiar with this?**
18   A.   Yes, ma'am. That's what I referred to
19   earlier when you asked me about incidents of dogs
20   being bit.
21   **Q.   So what occurred?**
22   A.   The officer had the dog out at one of the
23   warehouses. He thought the warehouse was vacant, and
24   a lady was out there working, and the dog got -- I
25   mean, it bit the lady. The dog bit the lady.

Page 87

1    **Q.   So this was a civilian?**
2    A.   Yes, ma'am.
3    **Q.   Was she injured?**
4    A.   I imagine she was. I wasn't there. I don't
5    know the details of it. I just know it existed. It
6    happened. I don't know to the extent of her injuries.
7    **Q.   Do you know if she went to the hospital?**
8    A.   I do not know.
9    **Q.   Do you know if this officer was reprimanded**
10   **in any other way?**
11   A.   I don't know. I don't know if he was
12   reprimanded in any other way.
13   **Q.   Did the officer remain on the Vance County**
14   **Sheriff's Office payroll in the office?**
15   A.   Yes, ma'am. I think he did.
16   **Q.   Okay. Okay. I saw that you are --**
17        MS. ROBINSON: Let's pull up Michael --
18   let's pull up Mr. Bullock's training --
19   training record.
20   BY MS. ROBINSON:
21   **Q.   Mr. Bullock, you are -- you're kind of like**
22   **a gun specialist, correct?**
23   A.   No, ma'am.
24   **Q.   No? You wouldn't call yourself a gun**
25   **specialist?**

Page 88

1    A.   No, ma'am. Not at all.
2    **Q.   But you were a certified gun trainer, right?**
3    A.   No, I'm not.
4    **Q.   Huh?**
5    A.   No, I'm not.
6    **Q.   You weren't a gun instructor? You didn't**
7    **have any --**
8    A.   No, ma'am.
9    **Q.   Okay. But you don't have a problem**
10   **deploying and using your gun?**
11   A.   For what situation? To train with?
12   **Q.   To train, to apprehend.**
13   A.   I don't have a problem with the use of my
14   weapon.
15   **Q.   And by "weapon," we mean gun, correct?**
16   A.   I mean the weapon that was assigned to
17   the Vance County Sheriff's Office. I mean the
18   customary weapon that I qualified with under the
19   direction of the Vance County Sheriff's Office.
20   **Q.   You said what? Repeat that. I'm sorry.**
21   A.   I don't have a problem with the use of
22   the weapon that's been assigned to me by the Vance Co
23   Sheriff's Office, and any personal weapon that I
24   submit to train with under the direction of the Van
25   County Sheriff's Office I have no problem using.

Page 89

1         MS. ROBINSON: Chris, Mr. Geis, can you
2    up and mark it as Exhibit 8.
3         MR. GEIS: Mark what?
4    there. I don't -- MS. ROBINSON: Mr. Bullock's gun traini
5    existed. It MR. GEIS: Do you have that? It's from
6         (Exhibit 8 was marked for identification.)
7    BY MS. ROBINSON:
8    **Q.   So we actually might need a second over**
9    **to pull that document up.**
10        **Mr. Bullock, have you had a chance to r**
11   **what has been marked as Exhibit 8?**
12   A.   Yes, ma'am.
13   **Q.   And this is an accurate record of your**
14   **training, correct?**
15   A.   Yes, ma'am.
16   **Q.   And are you familiar with the firearms**
17   **policy for Vance County?**
18   A.   Yes, ma'am. I'm somewhat familiar with
19   Not -- again, not intimately familiar with it, bu
20   somewhat familiar with it. Yes, ma'am.
21   **Q.   And this is your -- you know, your Class**
22   **requirement for the use of your firearm, correct?**
23   A.   What you're showing up now is -- you're
24   asking me that?


Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 186 of 665

Page 90

1    Q.   Yes.
2    A.   This is actually the field portion,
3  not the (audio interference) portion.
4         THE REPORTER:  What portion?
5         THE WITNESS:  Field portion, actually going
6  out into the range and using the range. Customarily
7  and range are used interchangeably.
8         (Off-the-record statement by the reporter.)
9  BY MS. ROBINSON:
10   Q.   So, Mr. Bullock, what we have on the screen
11 now is your signature on the use-of-deadly-force
12 handout.
13   A.   Yes, ma'am.
14   Q.   Okay.  Can you read "C" for us.
15 Well, first, before you do this, review the document.
16        MS. ROBINSON:  Michael, please scroll down
17 so he can review this document.  Scroll down so
18 we can see his signature.  I can't --
19        THE WITNESS:  Okay.
20 BY MS. ROBINSON:
21   Q.   Is that your signature?
22   A.   Yes, ma'am.
23        MS. ROBINSON:  Exhibit 9.
24        (Exhibit 9 was marked for identification.)
25 BY MS. ROBINSON:

Page 91

1    Q.   And do you recognize this document?
2    A.   Yes, ma'am.  This is the document which one
3  have found the training on about September the
4  2018, where Instructor Bartholomew signed it and where
5  I signed it as a student.
6    Q.   Okay.  And can you read "C."  Well, let's
7  read -- let's go back to the --
8         MS. ROBINSON:  Scroll up some, Michael.
9  BY MS. ROBINSON:
10   Q.   So this is the deadly force policy and
11 handout?
12   A.   Yes, ma'am.  This is what the Instructor
13 gives us to sign when we're in the classroom portion
14 of the firearms qualification.
15   Q.   Okay.  So let's read the use of force to
16 arrest.  It says, "A law enforcement officer -- let me
17 you can't finish -- can you finish that sentence for
18 me.  On here it's "C," so --
19   A.   Start with "C"?
20   Q.   We want to read where it says "A law
21 enforcement officer...." and then end with "C," that
22 sentence.
23   A.   "A law enforcement officer is justified in
24 using deadly physical force upon another person for
25 [the] purpose specified in Subdivision

Page 92

1  subsection only when it is or appears to be reaso
2  necessarily thereby to defend himself or a third
3  person from what he reasonably believes to [be] t
4  use of imminent use of deadly physical force; to
5  effecting an arrest or prevent the escape from the
6  custody of a person who he reasonably believes is
7  attempting to escape by means of a deadly weapon
8  by his conduct or any other means indicates he
9  he presents an imminent threat of death or seriou
10 injury to others unless apprehended with
11 deadly force; or to prevent the escape of a person from
12 custody imposed upon him as a result of [a] convi
13 for a felony."
14   Q.   So let's go back to what was mar
15 the Exhibit 4, which was your investigation to
16 Ms. Oliver's complaint.
17   A.   Okay.
18   Q.   Mr. White was serving two felony warran
19 correct?
20   A.   Yes.
21   Q.   Mr. White informed you that Ms. Oliver
22 assaulted him, correct?
23   A.   Yes.
24   Q.   And under that policy that you just rea
25 could have used deadly force, correct?

Page 93

1    A.   No, ma'am.
2    Q.   She was a felon under "C."  Read Subsection C.
3    A.   Under "C," ma'am, "to prevent the escap
4  a person from custody imposed upon him as a resul
5  [a] felony conviction]."
6    Q.   Well, [a] let's
7    A.   She hadn't been convicted, and this is,
8  Michael, less, used for people who are -- has a sentence
9  imposed on them, like in the prison system.  To s
10 nonviolent felony warrant is not justification
11 use deadly force.
12   Q.   Okay.
13   A.   And she hasn't been convicted of any fe
14   Q.   Okay.  So let's talk about that.  That
15 back into your memory very well, so let's see if al
16 these other conversations come back to your memor
17 the same way.
18      So you said that you interviewed Goolsb
19 correct?
20   A.   No, ma'am.  I never said I interviewed
21 Goolsby, I said I talked with him.  I said I talked
22 with him, I talked with Sergeant Welborn, and I t
23 just with Captain Watkins.  I never said I interviewed
24 of this
25   Q.   Okay.  Well, you talked with them.



Page 94

1    Are any of those conversations coming back
2 to memory?
3    A.  No.
4    Q.  None?
5    A.  None.
6    Q.  Welborn isn't coming back to memory?
7    A.  No, ma'am.
8    Q.  Watkins?
9    A.  The only thing I can say before
10 thing from Watkins I remember is he was
11 initially spoke with Ms. Oliver.  That's what
12 back to my -- to memory with.
13   Q.  Okay.  Okay.  That's fair.  In your
14 calculated from 1997 until 2018, you were in an
15 administrative role.
16   How many officers had used deadly force in
17 your tenure?
18   A.  I don't know, ma'am.  I would say -- ch how
19 many used deadly force?
20   Q.  Right.
21   A.  Is that what you said?  Okay.
22 Three are coming to mind that I can recall
23 as we're talking, at least three.
24   Q.  And what were those instances?
25   A.  We had a deputy who was assisting the animal

Page 95

1 control unit to take somebody's dog, and the lady came
2 out with shotgun.  And the deputy several times told
3 her to "Drop the shotgun, drop the shotgun, drop the
4 shotgun."  And when the person started lowering the
5 shotgun towards him pointing, he shot her.  That's one
6 incident.
7    Another incident is where we were in a car
8 chase.
9    Q.  Was the outcome of that?  Was that deadly
10 force investigated?
11   A.  Yes, ma'am.
12   Q.  And what was the outcome?
13   A.  He was exonerated.
14   Q.  Exonerated?  Okay.  And then another one was
15 what?
16   That person was shot?  That citizen was
17 shot?
18   A.  Yes, ma'am.
19   Q.  And injured, dead or alive?
20   A.  They didn't die.
21   Q.  They didn't die.  But no fatality, that person
22 shot?
23   A.  No, no.  She wasn't -- she wasn't killed.
24   Q.  Okay.  And -- okay.  And the other instance?
25   A.  There's an incident in which we were being

Page 96

1    murder suspects that had committed murder
2 our county and a neighboring county.
3    Q.  Had they been convicted of murder?
4    A.  I don't know what their convictions were
5    Q.  No, no.  You said "committed."
6    Had they been convicted at that time?
7    A.  Not on those particular murder charges.
8 had warrants for murder.
9    -- the only thing  Okay.
10 one that  And the deputy came upon the vehicle th
11 were coming and a chase ensued.  And when the deputy
12 out of the car, they fired.  The deputy returned
13 that was another deadly force use that was exoner
14   And then the last one that's coming to
15 is there was a chase that ensued, and the vehicle
16 run over one of the officers.  And he fi
17 and he was exonerated.
18   Q.  Tell me about that vehicle chase.
19   A.  The last one I was referring to?
20   Q.  Uh-huh.
21   A.  There was a chase.  I don't know the re
22 right the chase, but there was a chase.  The vehicl
23 went to the lake area and got into, like, a woode
24 area.  And the deputies thought that he was going
25 jump and run from the vehicle.  They started runn

Page 97

1 into the woods.  As they were running to the woods
2 came out of woods.  He saw one of the deputies.
3 gun, dropped towards the deputy and accelerated at a hi
4 rate of speed towards the deputy, and the deputy
5 That's one
6    Q.  And the deputy was exonerated?
7    A.  Yes, ma'am.
8    Q.  Was the person injured?
9    A.  Yes.
10   Q.  How so?
11   A.  He was grazed in the shoulder.
12   Q.  How long did it take before that deputy
13 exonerated?  Do you recall?
14   A.  I don't know.  I don't know how long it
15 any of them to be exonerated, because all of them
16 citizen was involved also the SBI having to come in and do th
17 investigation -- do an investigation as well.
18   Q.  Well, I'm glad you mentioned that becau
19 was wondering if you acted as your own internal
20 affairs department or if the SBI gets involved or
21 that process looks like in your use of force.
22   A.  Any officer-involved shooting, the SBI
23 called.
24   Q.  Any?  Okay.  That's the policy, the
25 we practice?



AdvancedONE LEGAL          (866) 715-7770
                           advancedONE.com

Page 98

1    A.    That's the practice.
2    Q.    **Does Vance County have an internal affairs**
3    **department, or are you it?**
4    A.    I conduct most of them, and there have
5    been occasions in where, depending on the size of it,
6    I've had to rely on other officers, other detectives
7    that's appointed by the sheriff.  Typically, it may be
8    a detective and another officer.
9    Q.    **What training do those officers have?**
10   A.    I don't know what training -- I don't know
11   what their training is.
12   Q.    **I do want to talk about training a little**
13   **bit.**
14         **What training did you have to conduct**
15   **use-of-force investigations?**
16   A.    I've only -- you know, in terms of my
17   training, my training was early on in my -- in my
18   career when I first started doing these administrative
19   investigations.  The other training has been --
20   through -- going through, having done these over time.
21   When I first started doing this internal affairs
22   investigation, I was under the supervision of -- at
23   the time, the captain at the time.
24   Q.    **What time --**
25   A.    My training came through -- and my training

Page 99

1    came through him as far as the on-the-job training.
2    Q.    **So you said when you "first started doing**
3    **these."**
4          **And "doing these," you mean use-of-force**
5    **investigations?**
6    A.    I mean internal affairs investigations.
7    Q.    **Internal affairs, which would encompass use**
8    **of force?**
9    A.    Some of them encompass use of force.
10   Q.    **What year did you start that?**
11   A.    1997.
12   Q.    **1997?  Okay.  And you were trained by the**
13   **captain --**
14   A.    Yes.
15   Q.    **-- at the time?**
16         **Did you take any classes?**
17   A.    I can only remember one time going to a
18   class in internal affairs investigations and I don't
19   remember going any time but one time.
20   Q.    **Okay.  What time -- what -- do you recall**
21   **what year?**
22   A.    It would -- it would have been -- I went
23   shortly thereafter in 1997, but I -- I don't know if
24   it was in 1998 or -- you know, I don't know how long.
25   I just don't -- I don't remember the exact year, but

Page 100

1    it was after I had started helping the captain with
2    those type of investigations.
3    Q.    **And for the most part, you conducted these**
4    **investigations as a single individual?**
5    A.    For the most part, yes, ma'am.
6    Q.    **Did you ever request help?**
7    A.    I'm sorry?
8    Q.    **Did you ever request help?**
9    A.    Help has been had.  You know, the -- in
10   some part of my -- doing these investigations, the
11   captain has had other officers helping some of the --
12   When you have an officer-involved shooting and
13   then I request help from the SBI.
14   Q.    **Okay.  And not within your department?**
15   A.    I'm sorry?
16   Q.    **Not within your department?  You don't**
17   **request help within your department?**
18   A.    There have been a rare occasion.  Again,
19   been and that's -- for the most part, it's been early
20   on over time.
21   Q.    **Did you -- can you recall a time in which**
22   **you had, like, a panel of investigators?**
23   A.    Yes.  There was an officer who was a part --
24   deputy working an area of the county in which his
25   in-laws lived, and it was determined that he went

Page 101

1    in -- breaking into the in-laws' house, burglarized their
2    And then when the alarm -- or when the call was made
3    -- when we went back down there to do the investigation of
4    that break-in, and it was determined that he was --
5    that he actually did the break-in.
6          More than one investigator worked that --
7    Q.    **Tell me about that.  What do you mean more**
8    **than one worked it?  What did they do?**
9    A.    I -- a minimum of three people, maybe four,
10   helped with that investigation.  That officer was --
11   ended up being fired and criminally charged.
12   Q.    **That's, like, a common theme right now,**
13   **right, in Vance County?**
14         MR. GEIS:  Don't answer.
15         MS. ROBINSON:  Did you object, Chris?  I
16   think I heard you say something.
17   BY MS. ROBINSON:
18   Q.    **You said more than one investigator**
19   **worked -- let me just make a note, and this is --**
20   I recall let's go off the record for this.
21         (Discussion off the record.)
22         (Recess in proceedings from 2:57 to 3:01 p.m.)
23   BY MS. ROBINSON:
24   Q.    **Mr. Bullock?**
25   A.    Yes, ma'am.



AdvancedONE LEGAL     (866) 715-7770     advancedONE.com

Page 102

1    Q.   Did you just have a conversation off the
2  record?
3    A.   Yes.
4    Q.   Was it about your questions, responses?
5    A.   No, ma'am.
6    Q.   What was it about?
7    A.   It was about how long -- how much longer
8  it's going to take for us to finish this and --
9    Q.   I got an answer for you.
10    A.   Oh.
11    Q.   I'm going to get you out of here. Okay.
12  I'm almost done.
13    A.   Okay.
14    Q.   I'm almost done. Okay. And we
15  might be approaching done. Now, you know, I can hold
16  you for seven hours and question, question, question,
17  but I --
18    A.   It's totally okay. You have a right to know
19  it. I'm okay with it.
20    Q.   No. I asked you some about Mr. White
21  earlier, and I think you told me you didn't have very
22  much interaction with him, correct?
23    A.   That's correct.
24    Q.   And you didn't hear much about him, either?
25    A.   No, ma'am, I didn't. He was a different

Page 103

1  division from me, so he wasn't in my direct line of
2  command. So other than seeing him in the office, or
3  passing the office, it was just -- he -- he -- he
4  would come -- he's walked by my office before, and
5  he's poked in, and, you know, we spoke before. But
6  again, it was so far and few between.
7    Q.   Okay. We were talking about the
8  investigations that you completed at Vance County.
9  And from what I understand, most of them were one
10  person. And you were telling me about the time in
11  which there was more than one investigator, and that
12  situation involved an incident in which an officer
13  behaved, you know, badly.
14         Did you seek assistance in that
15  investigation, or did -- was assistance provided to
16  you?
17    A.   At the time I was captain -- there was a
18  captain that was doing those investigations. This
19  particular case was assigned to me, and he made the
20  decision as to what other officers would help.
21    Q.   So that was around the 1997 when you were
22  telling me you had been trained?
23    A.   Well, no. It was -- it might have been
24  200- -- I mean, a significant -- you know, it might
25  have -- it wasn't early on. It was, you know --

Page 104

1  office it was before -- it was between 19- -- I mean
2  between 1997 and 2001. It was somewhere in that
3  range.
4    Q.   But it was significant enough for you to
5  remember?
6    A.   Yes, ma'am. Because I had an officer --
7  That was very significant.
8    Q.   Why was it significant?
9    A.   I considered him a friend.
10    Q.   Okay. Can you recall the number of cit--
11  who have complained to Vance County or filed
12  grievances or any of that nature?
13    A.   No, ma'am.
14    Q.   Would you say it's a lot, a little?
15    A.   I don't -- again, I just don't have a --
16  I don't have anything to go on. I don't have anyth--
17  significant to go on with that for me -- for it t--
18  right to know, flare up in my memory.
19         There could have been complaints that w--
20  directed to an officer's supervisor, and that woul--
21  on. And someone would have looked into
22  that, and that supervisor would have handled that --
23  know, outside my knowledge. So I -- and even wit--
24  I -- did eventually come to my desk, I --
25  don't have a working number on how many that coul--

Page 105

1  have been.
2    Q.   Okay. Well, you just don't appear to me
3  like a person who would scare easily; is that tru--
4    A.   I'm scared of snakes and dogs.
5    Q.   Okay. But you can handle complaints wh--
6  you're doing your job?
7    A.   I can handle what?
8    Q.   Complaints when you're doing your job.
9    A.   Yes, ma'am.
10    Q.   So you -- do you have a working knowled--
11  of the number of times the county sheriff's departme--
12  has been sued to, like, threats of suit? Is that
13    A.   I don't know what -- threats of soup?
14    Q.   How many people -- how many citizens
15  have threatened to sue the sheriff's office?
16    A.   Oh, I have no idea.
17    Q.   Has any citizen threatened to sue you in--
18  didn't investigate?
19    A.   No, ma'am. You know, I don't -- you kn--
20  I've been sued before, but I don't know the numbe--
21  people who have threatened to sue the sheriff's
22  office. And I've never been threatened to, "If y--
23  don't do something, I'm going to sue you."
24  I've never had that to happen.
25    Q.   Or sue the sheriff's office?



Page 106

1    A.    Or sue the sheriff's office.
2    people -- you know, I -- you know, it is
3    it's a -- it's a common thing for people to say, "Oh,
4    I'm going to sue you."  But I -- you know, for me,
5    for me, there's nothing that has an effect on me to
6    say, "Oh, my God.  This person will sue me.  I better
7    do X, Y, Z."  I don't -- I don't have a -- that
8    doesn't sway me one way or another.  I've heard the
9    words "I'm going to sue you" a lot.  You know, "I'm
10   going to sue you-all" a lot.  But you have a right to
11   sue, so --
12        Q.    So -- but you've been sued before?
13        A.    Yes, ma'am.
14        Q.    How many times?
15        A.    I would say four other times, four or five
16   other times.
17        Q.    Do you recall those instances?
18        A.    Oh, yes, ma'am.  That's significant to my
19   memory.  So yes.
20        Q.    Can you explain them to me.
21        A.    Okay.  There was a time that I was coming --
22   that I had -- I was driving north on the interstate,
23   and then a highway patrolman was working the -- that
24   had already occurred.  And I stopped because the road
25   was partially blocked by the ambulance and the

Page 107

1    trooper's car and the -- one of the victims' cars.  So
2    I stopped and backed up and put on -- put out flags,
3    put on my traffic vest.  And I start directing
4    traffic, slowing traffic down, because the whole area,
5    kind of a little bit over a slight decline.
6             And I had been out there slowing traffic
7    down for about 20 minutes or so, and then a person
8    pulling a mobile home, like a transport truck pulling
9    a mobile home, came through at a very, very high rate
10   of speed and was not obeying my traffic -- my signals
11   for him to slow down.  And then at the last minute, he
12   looked up, and he locked the brakes.  The trailer came
13   off and just wiped out the ambulance and the cars.
14             And so that was one time.
15        Q.    What did he sue you for?
16        A.    I guess it was, like, failure to do
17   my duty, causing that wreck.  But that didn't -- it
18   up -- it didn't get far.
19             Another time I was working the evidence
20   room, and I was leaving to go to lunch.  And I did a
21   and a city officer had a person stopped in a traffic
22   stop.  I drove up and said, "You-all got everything?"
23             And they said "yeah."  And I drove off.  And
24   then that person sued me as a result of what had
25   transpired in that traffic stop.

Page 108

1    I mean,      I got sued one time where a fight had
2    happened at a club.  An officer put a suspect in
3    back of a car.  The suspect kicked out the glass.
4    officers tried to get the suspect out of the car.
5    They started fighting with him, like, from the inside
6    of the car.  He was kicking officers, kicking
7    officers.
8             Another officer sprayed him with mace,
9    the window is broke.  We don't know if it was broke
10   as a result of him kicking the glass out or kicking
11   officers or what, but that person sued me and all
12   other officers there.
13             And then I think two occasions I've been
14   sued for people who were dead at the jail.
15        Q.    Okay.  Thank you.  Thank you for explaining
16   those situations.
17             The only question I have is if you -- to the
18   extent you are able to share, what were the outcome
19        A.    I guess the correct word -- I don't know
20   don't know the legal term, but I considered it as
21   was exonerated.  I was exonerated on all of them.
22        Q.    Okay.  So I want to -- I want to get --
23   want to make sure I understand this.
24             There is no board review -- no standard
25   board review on use-of-force incidents?

Page 109

1        A.    There is no standard board review?
2        Q.    So there is no board that will convene
3    saying, you know, this member must be a part of t
4    board, that member; you get an amount of time to
5    respond; there is --
6        A.    That wasn't a practice.
7        Q.    It wasn't a practice?  Was it a practice
8    Was there a standard number of complaints th
9    must be had before an officer is dismissed?
10        A.    No, ma'am.  Each thing is done, you kno
11   incident.  It wasn't, like, a buildup of anyt
12   I'm going to stand up.  My back is hurt
13   I'm going to stand up and stretch.  I can st
14   here.  I just need to stand up.
15        Q.    Mr. Bullock, if you want to take a
16   ten-minute break --
17        A.    No, no, no.  I don't.  I don't.
18        Q.    Okay.  Okay.
19        A.    I just didn't want you to say, "What ar
20   doing?"  I just needed to stretch.
21        Q.    Okay.  That's fine.
22        Q.    Is there a certain threshold that incre
23   the likelihood to be dismissed from --
24        A.    I don't understand that question.
25        Q.    So is a severity of a deputy's actions,



Page 110

1  increases his or her likelihood to be dismissed?
2      A.  We work at the pleasure of the sheriff.  I
3  can't answer that question.
4      Q.  Well, for your recommendation.
5      A.  My recommendation is done on a case-by-case
6  basis.
7      Q.  Do you find that different sheriffs have
8  different thresholds?
9      A.  I don't know how to apply that question.
10  It's apples to oranges, in a way.  By working at the
11  pleasure of sheriff, I can't apply that.
12      Q.  Now I'm asking you, would soliciting sexual
13  favors from citizens be a serious complaint?
14      A.  I think that it would.
15      Q.  And just so I can understand it, is this --
16  is you.
17          Is assault a serious infraction?
18      A.  Assaults can mean -- have a range, so it
19  depends on the range of the assault.
20      Q.  Is it a requirement that supervisors report
21  instances in which deputies are involved in domestic
22  violence?
23      A.  I don't know when you say supervisor.  Is
24  it a requirement for supervisors to report.  Then, no,
25  if a -- if a deputy is called to a house where the

Page 111

1  deputy is involved in domestic violence, there should
2  have been an incident report generated from that
3      Q.  There should have been an incident report?
4      A.  Uh-huh.  If it's a substantiated report.
5  substantiatable (sic) report.
6      Q.  Were you made aware of any instances in
7  which deputies were involved in domestic violence?
8      A.  Yes.
9      Q.  Tell me about those instances or that
10  incident.
11      A.  I don't -- there's an officer that had gone
12  out of town, for some reason, with another officer.
13  And when he got back into town, he discovered his
14  wife was with another gentleman at the Cracker Barrel.
15  And because of the way he conducted himself, follow
16  service was no longer needed.  His conduct was with
17  his wife.
18      Q.  Is that the only one you can think of?
19      A.  That's the only one that's coming to mind
20  right now, and I'm not saying that's the only one.
21  That's what's coming to mind right now.
22      Q.  Did you make that recommendation?
23      A.  Yes, ma'am.
24      Q.  Were there any criminal charges brought
25  against that individual?

Page 112

1      A.  I don't remember any.
2      Q.  How much discretion does an officer have to
3  enforce the law, would you say?
4      A.  I don't know if I can put a quantitative
5  number on how much discretion a officer has.  An
6  officer has some discretion.  An officer is not --
7  have discretion.  An officer doesn't have unlimited
8  discretion.
9      Q.  Are there instances in which an officer has
10  no discretion to enforce the law?
11      A.  Yes, ma'am.  I believe there are instances
12  where an officer has no discretion to enforce the
13      Q.  What are those instances?
14      A.  If a person murdered someone in front of
15  the officer, I think the officer doesn't have any
16  discretion to enforce the law.  I think he would
17  to enforce the law.
18      Q.  So if a sheriff's officer shot a citizen,
19  they should be placed under arrest immediately?
20      A.  No, ma'am.  It depends on the circumstance.
21  In the first incident, I said "murder."  If a
22  sheriff's officer shot somebody and it wasn't murder
23  then, no, they shouldn't be arrested.  If they shot
24  in self-defense, then they shouldn't be arrested.
25

Page 113

1  If a sheriff's officer murdered somebody in front
2  of another officer, then I think the arresting office
3      Q.  So self-defense plays a role in
4      Q.  a  So self-defense plays a role in
5  the scenario?
6      A.  Yes, ma'am.  And in that scenario, yes,
7
8          MS. ROBINSON:  I think we can take a
9  five-minute break.  I want to just review so
10  things and then see if -- you know, can we g
11  that done record.
12      (Recess in proceedings from 3:26 to 3:33 p.m.)
13  BY MS. ROBINSON:
14      Q.  Mr. Bullock, I have, like, a couple
15  follow-up questions, and this is just for my own
16  clarification.  We talked about the canine incide
17  and the -- a report shows that it was Adam Hight,
18  and you said the canine bit a woman.
19          And that was the woman who was in the
20  warehouse, correct?
21      A.  Yes, ma'am.
22      Q.  A civilian?
23      A.  Yes, ma'am.
24      Q.  Okay.  It wasn't Adam Hight.
25          You also mentioned the domestic -- we t



Page 114

1   about the domestic violence situation.
2       A.   Yes, ma'am.
3       Q.   And you recommended separation from
4   employment?
5       A.   Yes, ma'am.
6       Q.   Was that recommendation received?
7       A.   I gave a recommendation to the sheriff.
8       Q.   And the sheriff separated employment?
9       A.   Yes, ma'am.
10      Q.   Do you recall the year of that?
11      A.   I do not.
12      Q.   Was that Sheriff White?
13      A.   Yes.
14      Q.   That was Sheriff White?
15      A.   Yes.
16           MS. ROBINSON:  I don't think I have any
17      further questions at this moment.
18           MR. GEIS:  Okay.  I have no questions at
19      all.  I guess we'll just reconvene tomorrow
20      morning for Sheriff White's deposition.
21           MS. ROBINSON:  Okay.  Well, thank you.
22      (Whereupon, at 3:35 p.m., the taking of the deposition
23   ceased.  Signature was reserved.)
24
25

Page 116

ERRATA PAGE

List any corrections by page and line number on this
sheet.  If additional pages are necessary please
furnish same and attach them to this errata page.  You
are allowed 30 days within which to complete the
witness certification and errata pages.  After
completing these pages, please return them to:
                Advanced One Legal
                1600 Market Street
                   Suite 1700
             Philadelphia, Pennsylvania  19103
Case Name:  White vs. Vance County, NC, et al.
Witness Name:  WELDON WALLACE BULLOCK
Deposition Date:  February 25, 2021
Page _____ Line _____ Change _____
_____
Reason for Change _____
Page _____ Line _____ Change _____
_____
Reason for Change _____
Page _____ Line _____ Change _____
_____
Reason for Change _____
Page _____ Line _____ Change _____
_____
Reason for Change _____
Page _____ Line _____ Change _____
_____
Reason for Change _____
Page _____ Line _____ Change _____
_____
Reason for Change _____
Page _____ Line _____ Change _____
_____
Reason for Change _____
Page _____ Line _____ Change _____
_____
Reason for Change _____
Page _____ Line _____ Change _____
_____
Reason for Change _____
Page _____ Line _____ Change _____
_____
Reason for Change _____

DATE                    WELDON WALLACE BULLOCK
_____

Page 115

WITNESS CERTIFICATION

    I hereby acknowledge that I have read the
foregoing transcript of my deposition testimony, and
that my answers to the questions propounded, with the
attached corrections or changes, if any, are true and
correct.

_____      _____

DATE                    WELDON WALLACE BULLOCK

_____

PRINTED NAME

    Subscribed and sworn to on the _____ day of

_____ 20_____ before me.

            _____

                    Notary Public, in and for the

                    State of _____

WHITE

vs.

VANCE COUNTY, NC, et al.

Page 117

CERTIFICATE OF REPORTER

STATE OF NORTH CAROLINA    )

COUNTY OF MECKLENBURG       )

    According to the emergency video notarization
requirements contained in NCGS 10B-25, I, Janet Cooper
Haas, RPR, Notary Public, do hereby certify that the
identity of WELDON WALLACE BULLOCK was confirmed by me
over Zoom, that the witness was located in Vance
County,  that the witness was remotely sworn by me
prior to the taking of the foregoing deposition, that
the parties were present as stated, that said
deposition was taken and transcribed under my
supervision and direction, and that I am not of
counsel for or in the employment of any of the parties
to this action, nor am I interested in the outcome of
this action.

    Additionally, I certify that the foregoing
114 pages constitute a true and accurate transcript of
the testimony, and that the witness reserved signature.
    This the 5th day of March 2021.

            _____

            JANET COOPER HAAS, RPR
            NOTARY PUBLIC #19973240043



**Exhibits**

**Exhibit 1** 3:7 20:25
21:2

**Exhibit 2** 3:8 20:22

**Exhibit 3** 3:9 46:2,
11 71:2

**Exhibit 4** 3:10
48:13,14 68:15
92:15

**Exhibit 5** 3:11
66:18,19 71:9

**Exhibit 6** 3:12 84:2,
3

**Exhibit 7** 3:13
86:13,14

**Exhibit 8** 3:15 89:2,
7,12

**Exhibit 9** 3:16
90:23,24

**$**

**$20** 10:21

**0**

**06** 36:4,5

**1**

**1** 20:25 21:2,4 22:4
44:7 45:25 89:22
91:25

**1029** 5:11

**10:35** 21:19

**10B-25** 4:2

**11:01** 21:19

**11:50** 47:25

**11:55** 47:25

**12** 84:25

**12:53** 76:5

**15** 72:25 73:1

**1801-3870** 50:24

**19-** 104:1

**1967** 5:9

**1992** 6:16 8:4

**1997** 6:22 8:6,8
32:13,20,24,25
33:16 94:14 99:11,
12,23 103:21 104:2

**1998** 99:24

**2**

**2** 20:22 21:4 50:1,4,
9

**20** 107:7

**20-something**
65:25

**20/20** 76:11,15
77:7,9

**200-** 103:24

**2001** 104:2

**2004** 8:22

**2005** 8:17,22

**2018** 36:5 91:4
94:14

**2019** 65:24

**23-page** 22:9

**28th** 5:9

**2:06** 76:5

**2:57** 101:22

**3**

**3** 46:2,11,12 50:2,4,
9 71:1,2

**30** 21:8

**31** 33:24

**36** 66:24 67:11

**37** 66:21,24

**3:01** 101:22

**3:26** 113:12

**3:33** 113:12

**4**

**4** 48:13,14 68:15
85:1 92:15

**5**

**5** 66:18,19 71:9
72:25 73:1

**6**

**6** 84:2,3

**6th** 91:3

**7**

**7** 86:13,14

**7-15-2009** 45:20

**8**

**8** 89:2,7,12

**9**

**9** 90:23,24

**911** 38:24 43:15
48:24 49:22,23

**A**

**a.m.** 21:19 47:25

**able** 108:18

**about** 5:16 6:8 7:10
11:19 13:14 16:24
18:8 19:10 21:17,
21 24:5,7,8,12,13,
20 30:22 31:12
33:18 35:10 36:14
37:5 40:12 41:13,
20 43:4,11 46:9
47:13 50:3 53:5,16
54:2 55:11 56:14,
16 57:13 58:2 59:7
60:4,25 62:3,4,15,
25 64:21 66:8
69:18 72:3 74:1
77:7,13,20 82:13,
17 83:2,3,7,9,22
86:19 91:3 93:14
96:18 98:12 101:7
102:4,6,7,20,24
103:7,10 107:7
111:9 113:16

**above** 50:12

**absence** 14:8

**abuse** 8:13 10:6

**accelerated** 97:3

**accidentally** 67:18,
20

**according** 12:11
65:9,13

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

119
Index: accurate..and

accurate 89:14

acted 97:19

acting 8:17

actions 48:9
109:25

actual 46:22 59:4
90:5

actually 9:4 17:16
55:4 60:12 65:18
76:3 89:9 90:2
101:4

Adam 113:17,24

add 35:18

address 5:10

admin 15:24

administration
6:12 8:21 37:9
40:19

administrative 9:1,
4,5 26:15 37:11,12
40:20 41:23,24
42:2 48:8 94:15
98:18

adverse 70:6,9

affairs 97:20 98:2,
21 99:6,7,18

afford 46:23

after 6:2,10 15:14
19:21 24:2,21
25:25 26:8 27:9
28:13 29:12 33:11
43:21 49:7,11 57:9
61:24 85:6 100:1

afterwards 26:5

again 16:12 25:22
27:12 28:9 43:14
56:5 63:12 64:15

70:25 80:6 89:20
100:18 103:6
104:15

against 48:10
111:25

agency 85:13

agents 45:25 46:17

ago 21:8

ahead 27:13,14
28:6 31:9

aids 85:5,14

alarm 101:1

alive 95:19

all 7:3 8:12,24
12:19 13:13 17:7
21:12 24:2 25:14
26:18,22 27:5,10
28:18 35:14 36:16
40:2,21 46:21 50:8,
11 54:25 56:15
59:7 61:21 63:4,23
64:7 75:17 77:3,15
78:15 80:10 83:5,
21 85:11 88:1
93:15 97:15
108:11,21

allow 34:12

allowed 73:16,17

allows 69:10

almost 15:1
102:12,14

along 13:7

already 71:11
106:24

also 4:10 16:22
20:13 32:25 64:14
80:1 97:16 113:25

always 5:12 26:23
56:6 59:8,12

am 70:11

ambulance 106:25
107:13

amount 10:19
25:13 32:20 109:4

ample 79:17

an 6:13,21 8:16 9:1,
19 10:18,22,23
11:5 12:2,8,9 14:21
15:24 17:2,3 18:12
25:13,20,21 28:10,
11,19 33:10,11
34:12 36:7 38:9,15
39:4,8,9,10,11,12,
13,19,25 40:19,20
41:9,23,24 42:2
44:7,8 46:1,23 48:2
53:10,23 54:13
60:6,9,16 64:19
65:3 67:24,25 68:7,
8,11 70:2,6,8 73:7
76:9 77:24 79:1
80:25 82:1,2 83:18
85:15 89:14 92:5,9
94:14 95:25 97:17
98:2 100:12,22,23
102:9 103:12
104:6,20 106:5
108:2 109:4,9
111:2,3,11 112:2,5,
6,7,9,12

and 4:3,10,17,19
5:8,21,25 6:6,13,
14,15,22,25 7:8,11,
18,20,23 8:1,4,5,7,
10,12,14,20,21,24
9:15,17,19,20
10:20,25 11:5,6,17,
23 12:4,7,13,14,18,
20,24 13:17,19,20,

21 14:3,4,6,10,12,
17,22 15:4,9,14,25
16:1,2,5,8,10,13,14
17:5,7,8,19 18:15,
18,22,25 19:9,17
20:1,5,9 21:4,5,8,
13,14,22,23 22:8,
12,20,23 23:1,5,7,
24 24:2,4,23 25:6,
9,12,14,19,20
26:16,18,22,23
27:6,16,21,24 28:9,
12,13,20 29:11,15,
24 30:17,25 31:9,
16,20,22 32:1,6
33:4,5,6,7,12
34:17,18,21 35:4
36:5,19,23 37:3,5,
10 38:2,9,13,22,25
39:1,2,3,18,23,24
40:6,7,17,18 41:1,
7,9,11,14,15,16,17,
20,22 42:1,5,9,15,
22,25 43:19,23
44:1 45:10,18,21
46:19,22 47:3,7,8,
19 48:5 50:2,4,9,
13,24 51:7,15 52:3,
4,5,9,11,25 53:6,
17,20,21 54:11,19,
23,24 55:4,19,21
56:15,23 57:5,6,7,
8,17,18,23 58:12,
18,20,24 59:1,4,21,
23 60:13 61:7,18,
25 63:1,6,14,19,20,
21,22 64:6,11,13,
24 65:3,7,9,11,14,
16,19,25 66:3,13,
14,24,25 67:17
68:15 69:1,9,13
70:15,17 71:8,23
72:7,15,16,25 73:1,
7,17,25 74:3,8,11,
17,18,19 75:5,7,13,

Advanced ONE
LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

120

Index: animal..ask

19 76:9,13,16
77:16 78:7,9,10,16,
18,21,23 79:17,18,
19,24 80:18 81:2
82:4,5,17 83:16
84:1,8,16 85:15,24
86:12,23,24 88:10,
15,23 89:2,14,17,
22 90:6,7 91:1,4,6,
10,21 92:24 93:7,
13,22 94:24 95:1,2,
4,12,14,19,24 96:2,
10,11,14,15,16,17,
23,24,25 97:3,4,6,
16 98:4,8,25 99:4,
12,18 100:3,14,19,
24 101:1,3,11,19
102:8,14,16,21,24
103:4,5,6,9,10,11,
19 104:2,20,21,22,
23 105:4,22
106:23,24,25
107:1,2,3,6,7,10,
11,12,13,14,20,21,
22,23 108:8,11,13
109:13 110:15
111:13,15,20
112:20,23 113:6,
10,15,17,19

**animal** 78:20 94:25

**animals** 46:25 47:9
78:19

**another** 12:20 19:9
28:13 42:5 77:12
91:24 95:7,14
96:13 98:8 102:25
106:8 107:19 108:8
110:25 111:12,14
113:2

**answer** 4:16 7:24
11:9 37:25 39:20,
22 65:18 84:22
101:14 102:9 110:3

**answered** 72:2

**answers** 78:16

**any** 4:21 6:2 24:11
35:9,21 36:14 39:4
42:17 43:5,9,14,17
44:9,10 46:6,24
52:15 60:2 67:18
68:10 69:20,22
70:8,10,23 74:12,
25 75:1 79:22 80:9,
12,16 83:16 87:10,
12 88:7,21,23 92:8
93:13 94:1 97:15,
22,24 99:16,19
104:12 105:17
111:6,24 112:1,15
113:3

**anybody** 27:23
60:19 69:11 70:11,
21,23

**anybody's** 75:23

**anyhow** 31:10

**anyone** 61:14

**anyplace** 20:3

**anything** 5:2 11:19
35:16,17 41:2 57:9
58:2 67:22 69:10
75:5 82:19 83:2,3,7
104:16 109:11

**AOC** 23:2 33:24

**apart** 69:5

**appear** 105:2

**appears** 92:1

**apples** 110:10

**applicant** 12:7,8,9
25:5 28:6 30:22
34:12

**applicants** 18:14

**application** 12:2,5
17:3,11,14,19
18:15 19:22 21:2
24:5 33:10,11
46:23

**applications** 32:20

**apply** 110:9,11

**appointed** 98:7

**apprehend** 80:3
88:12

**apprehended**
92:10

**approaches** 74:19

**approaching**
102:15

**approved** 85:15

**approximately**
84:24

**April** 65:24

**are** 5:1 12:11 13:15
14:5,17 19:15 23:2
25:10 29:3 37:10
39:4,7,17,18,21
41:4,20 44:5,23
50:7,14,25 51:2
56:1,7 61:7,25
63:6,8,10 64:22
65:13 67:4 69:20
71:24 72:17 76:10,
25 78:23 82:21,23
84:13,24 86:12,17
87:16,21 89:17
90:7 93:8 94:1,22
98:3 108:18 109:19
110:21 112:9,11,13

**area** 80:25 96:23,24
100:23

**aren't** 25:2

**arm** 58:20 59:2,24
60:6,9,12,13,16,18
67:15 69:4 75:21

**arms** 74:18

**arose** 81:11

**around** 14:11 53:3
58:1 103:21

**arrangements**
62:13

**arrest** 72:1,11 74:2,
7,20 91:16 92:5
112:19

**arrested** 74:16,17,
18 112:24,25

**arresting** 85:13
113:2

**arrests** 71:20

**as** 4:4,9,18,19 6:9,
13,23 7:2,20 8:24
9:5,19 10:18 12:10
13:25 14:10,22
16:8,18,19,21
18:12 21:2 22:10
27:6 32:17 33:1
34:21 36:22,23
38:3 41:17 47:1,3
48:13 54:10 56:5,
21 57:6,20,22
63:17 65:10,15
66:17 68:3,14
69:16 73:23 78:11
85:5 86:13 89:2,12
91:5 92:12,15 93:5
94:23 97:1,17,19
99:1 100:4 103:20
107:24 108:9,20

**Aside** 36:11

**ask** 18:8 19:10
23:24 28:7 50:2
57:18,19 68:5


AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

69:18 72:9

**asked** 21:22 37:5 53:19 60:25 71:21 86:19 102:20

**asking** 21:21 77:7 89:25 110:12

**asks** 4:16

**aspect** 37:3

**assault** 110:17,19

**assaulted** 92:22

**Assaults** 110:18

**assigned** 7:23 38:11,23 78:21 88:16,22 103:19

**assignment** 25:18

**assistance** 103:14, 15

**assisting** 94:25

**associated** 69:20, 23

**asthma** 70:18,21

**at** 6:6,7,16 7:3,16, 20 8:4,5 11:2,14,17 13:1,13 15:1 17:13, 20,21 21:8 24:23 25:2,23 26:1,20 27:5,15 28:12,17 34:3 35:8,24 36:2 37:4,19 38:4 39:3 40:2,16 45:1,7,13 49:23,24 52:16,22 53:10,14 54:17,25 55:1,2 61:21 62:6 65:18,20 66:24 68:1,25 70:13 75:3, 5,7 76:7,8 77:3,8 80:10,25 81:22 83:21 86:22 88:1 94:23 96:6 97:3

98:22,23 99:15 103:8,17 107:9,11 108:2,14 110:2,10 111:14

**attack** 74:5

**attacked** 80:15

**attacks** 70:16

**attempting** 92:7

**attorney** 62:14

**audio** 90:3

**authority** 76:15

**available** 25:2

**average** 42:18

**aware** 54:11 56:8 70:11 111:6

**away** 56:24

---

**B**

**B.9.** 45:17

**B.9I.** 58:23

**bachelor's** 6:3

**back** 6:13 10:7 19:20 26:19,20,21, 22 27:13,14 28:13 32:2,5,6 33:6,11 47:11 50:2 51:22 53:6,12 65:3 68:14 70:5 71:5 74:18 76:22 78:8,9 82:20 91:7 92:14 93:15, 16 94:1,6,12 101:2 108:3 109:12 111:13

**backed** 107:2

**background** 12:6,7 17:6,17 19:23

20:14,16 21:22 23:4 24:21 26:4,6,8 28:21 33:23 34:8, 11,13,14 37:16

**backgrounds** 26:13

**badly** 103:13

**bar** 60:6,9,16,18 67:15 75:21

**Barrel** 111:14

**Bartholomew** 91:4

**base** 51:6 58:21

**based** 44:16,18 50:5,15 51:10,12, 14 61:5 84:22 85:24

**basic** 7:7,8 14:1 27:3

**basically** 53:2 60:11

**basis** 35:13,14,17 110:6

**batons** 65:11,15

**be** 4:11 13:21,25 14:20,25 16:16 17:22 18:16 24:18, 20 25:4,17,18 27:11 28:10,14 29:6,13 30:7,8,10, 14,18,19,23 32:11, 23 33:13 34:14 35:22 38:18,19,20, 25 39:5 41:7,12,16 42:4,5,10,22,24,25 44:1,3,4,20 46:3,5, 8 47:1 48:12 50:1 52:16 58:4 60:1 63:25 64:8,11,14, 16,22 65:1,3,5,6,8 67:9,17 68:4,25

70:18,19,20 73:5 75:22 76:13 77:24 78:12 79:7,13 83:15,19 84:2 85:6, 7,10,12,14,19,21 92:1,3 97:15 98:7 102:15 109:3,9,23 110:1,13 112:19, 24,25

**bearing** 77:10

**became** 36:4 53:5

**because** 15:1 17:16 24:25 25:6,23 27:1, 12 28:14 32:22 33:2 35:4,11 36:21 38:5 44:25 51:20 57:2 62:5 64:6,23 69:1,7 75:23 82:18, 21 97:15,18 104:6 106:24 107:4 111:15

**become** 83:6

**been** 4:3,12 7:17 10:1,12 12:25 13:1, 2,6,9 14:11,14,21 15:11 17:12 19:7 20:8,13 24:23 28:9, 16 31:15 32:12,14, 15 33:15,23 34:3 35:24 36:2,24 40:6 44:8 47:8 52:16,18, 20,21 54:5 61:8,9, 10 63:2,4 70:9,22 72:18,23 74:6,9 79:1 81:8,9,21,25 82:1 83:17 88:22 89:12 93:7,13 96:3, 6 98:5,19 99:22 100:9,18,19 103:22,23 104:19 105:1,20,22 106:12 107:6 108:13 111:2,3

---

AdvancedONE LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

122

Index: before..can

**before** 4:12 11:14
17:2,15 26:3,6
28:12 33:3 38:6
44:8,9,16,19 49:17
53:3 59:4 62:8,9
70:3 84:23 90:15
94:9 97:12 103:4,5
104:1 105:20
106:12 109:9

**beginning** 34:25

**behaved** 103:13

**behind** 65:2 74:18

**being** 27:6 34:13
36:5 55:5 62:12
75:24 86:20 101:11

**believe** 9:2 13:4
18:16 77:18 112:11

**believed** 68:25

**believes** 92:3,6

**bent** 60:8 67:14

**Bertie** 23:18

**better** 106:6

**between** 52:2 72:25
103:6 104:1,2

**big** 40:4

**birthdate** 5:8

**bit** 11:16 19:4 39:13
42:20 69:6 75:22
76:10 80:24 81:2
85:19,22 86:20,24,
25 98:13 107:5
113:18

**bite** 80:22

**bitten** 79:8,9,20,23
80:17 82:4

**BLET** 13:19,21
14:11 66:8,9,12

71:8,22,25 72:3,7,
11,14 75:12

**BLET's** 71:19

**blocked** 106:25

**board** 108:24,25
109:1,2,4

**bone** 69:4

**both** 54:17

**bottom** 45:7,12
46:13

**brakes** 107:12

**Brame** 11:22

**brandished** 64:4

**brandishing** 59:4

**break** 21:14,16,17
67:1 76:3 109:16
113:9

**break-in** 39:9
101:3,4

**break-ins** 10:5

**brief** 5:14

**briefly** 6:4,13

**bring** 86:3

**broke** 50:8 58:20
59:1,24 100:25
108:9

**brought** 79:13
111:24

**building** 80:24

**buildup** 109:11

**bulk** 14:6

**bull** 35:4

**bullet** 46:19 85:4

**Bullock** 4:2,7,23,24

5:7 18:6 21:21
22:12 37:18 45:14
48:2 61:19,23 76:7
87:21 89:11 90:10
101:24 109:15
113:14

**Bullock's** 87:18
89:4

**Bullocks** 4:25

**burglarized** 100:25

**bust** 83:23

**but** 4:8 6:5 8:13,18,
19 10:23 11:13
12:19,22 13:2,9
14:1,14 15:2,4
16:17,21 17:15
23:25 25:22 26:13,
22 27:8,22,25 30:5
32:7 33:7,22 34:2,
19,24 35:7 37:5
41:2 42:22 47:13
49:9,23 50:3 51:10,
16 52:15,18 54:11,
18 55:24 56:8,13
57:4 61:22 62:4
64:4,10 66:5 68:25
70:14 71:18 74:21
76:15,23 77:11
79:24 80:23 81:12
82:4,5,17 83:3,20
84:15,18 88:2,9
89:20 95:21 96:22
99:19,23,25 102:17
103:5 104:4 105:5,
20 106:4,10,12
107:17 108:11,20

**by** 4:6 6:11 18:19
19:5,13 21:20 22:2,
7 30:11 35:4 36:25
37:24 38:10,13
39:13 42:24,25
43:8 45:4 46:15

47:1,18 48:1,15
55:14 60:11 64:14
66:20 67:6 71:10
73:15 74:4,17 76:6,
21 78:5 80:24 82:7
84:4,12 85:8,10,15
86:8,16 87:20
88:15,16,22 89:8
90:8,9,20,25 91:9
92:7,8 98:7 99:12
101:17,23 103:4
106:25 110:10
113:13

**C**

**calculated** 94:14

**call** 34:16 41:17
54:13 59:9 87:24
101:1

**called** 15:4 38:19,
21 53:10 61:25
79:17 97:23 110:25

**calls** 7:24 14:6
63:18

**came** 6:13 8:19,20
17:1 28:13 33:11,
14 53:12 61:24
81:4,11 93:14 95:1
96:10 97:2 98:25
99:1 107:9,12

**can** 5:10,19 6:8
7:22 10:16 13:11
16:25 17:21,24,25
18:3,4,5,11,17,23,
25 19:14 20:21
21:25 22:3,5,11,15,
17 23:1,9 24:19
25:14 26:10,11
29:9 30:22 31:12
34:7 36:7 37:21,25
38:20,22 39:22



42:24,25 43:4 45:2,
7,10 47:6,16,19
48:5,19 53:1 55:11,
16,17,19 57:14,15
58:9,18 60:9 63:15
66:21,22 67:1,7,17,
24 68:7 72:22 73:1
74:1,15 76:3,4,12,
16 78:3 79:4 80:13
83:4 85:1 86:1 89:1
90:14,17,18 91:6,
17 94:9,22 99:17
100:20 102:15
104:10 105:5,7
106:20 109:13
110:15,18 111:18
112:4 113:8,10

**can't** 11:9 26:11,12
27:18 36:14 42:14
45:15 47:8 55:24
63:13 65:18 66:2
68:3 70:14 74:16
79:22 90:18 91:17
110:3,11

**candidate** 13:23
14:11

**canine** 77:23,24
78:7,20 79:2,7,13,
19,21 80:15,17
81:9,13 82:2 83:2,
5,6,10,13,18,19,25
85:11,19,22,24
86:4 113:16,18

**canines** 77:21,22
79:15,25 80:1,4,7
82:4,21 83:2,23
84:5 85:17

**cannot** 32:21

**Capsicum** 46:20

**captain** 12:20,25
13:2,16 15:24
16:18,19 49:14,21

55:15 58:11 75:5,
18 93:23 98:23
99:13 100:1,11
103:17,18

**captains** 16:2

**car** 39:24 53:2
74:10,11 95:7
96:12 107:1 108:3,
4,6

**card** 27:1

**career** 6:8 8:7
98:18

**Carolina** 5:11,13,
18,24 6:7 20:9,11
23:11,16,17,18,19,
20,21

**carry** 47:6

**cars** 25:2 107:1,13

**case** 25:17 26:9
43:10 70:19 85:8,
10 103:19

**case-by-case**
110:5

**cases** 8:12 10:2,3,6
64:17 79:21 85:7,
12

**caught** 25:10 26:20

**caused** 69:3,8 73:4

**causing** 107:17

**Central** 5:24 6:7

**certain** 27:25 64:17
66:14 79:12 109:22

**certainly** 59:23

**certificate** 27:4

**certifications** 25:7

**certified** 88:2

**chance** 45:24 46:16
89:11

**change** 11:16 35:1

**charge** 9:16 37:9,
16 83:13,17,19,21

**charged** 101:11

**charges** 24:12 96:7
111:24

**chase** 39:11 95:8
96:11,15,18,21,22

**check** 12:6,7 17:6,
17 19:23 20:14,16
21:14 24:21 34:8,
11,13 53:14

**checked** 54:10 56:7

**chemical** 45:24
46:16 71:12 74:13

**chief** 16:1,2,3,4,7,8,
21

**child** 8:13 10:5

**chin** 75:22,24

**Chowan** 23:18

**Chris** 22:5 47:21
89:1 101:15

**circumstances**
12:11 27:25 42:12
112:21

**citizen** 67:21 70:6,8
79:2 95:16 105:17
112:18

**citizens** 104:10
105:14 110:13

**city** 107:21

**civil** 6:24,25 9:3
15:7,8,10 37:15
82:9,18

**civilian** 87:1 113:22

**clarification** 113:16

**clarify** 78:10

**class** 89:22 99:18

**classes** 99:16

**classroom** 91:13

**clavicle** 73:6,11,15

**clearly** 78:11

**clerk** 20:3,5 34:17

**clerks** 23:3 26:20

**close** 67:16

**club** 108:2

**coffee** 47:23

**colleague** 4:10

**collected** 9:14

**college** 5:21,23
6:10 18:25

**come** 10:7 12:9
17:4 25:14 26:5,13,
14,15,16 38:2,5
39:2 40:14,25 41:3,
19 42:7 47:10 50:2
58:24 74:11 81:10
82:17 93:16 97:16
103:4 104:24

**come-along** 60:8

**comes** 25:5 70:11

**comfortable** 84:21

**coming** 9:8 24:17
33:4 35:11 67:22
94:1,6,11,22 96:14
111:19,21

**command** 15:15
103:2

**commander** 15:23,



WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

124

Index: committed..current

24 81:20,21

**committed** 42:17
96:1,5

**common** 74:21
101:12 106:3

**compare** 68:3

**compiled** 27:6
51:14

**compiling** 26:23

**complain** 73:22

**complained** 104:11

**complaint** 49:1,3,5,
12 92:16 110:13

**complaints** 104:19
105:5,8 109:8

**complete** 6:5 12:13
56:21

**completed** 7:8
56:22,23 57:17
70:2 103:8

**completion** 43:6

**computer** 27:16

**concealed** 37:14

**concept** 76:11,22,
25 77:7

**concerning** 42:3

**conclude** 60:22

**conclusion** 50:10
51:10 52:4 58:19,
24 60:21 68:20

**conclusions** 50:12

**concrete** 28:23

**conduct** 92:8 98:4,
14 111:16

**conducted** 19:22

48:25 61:1 81:12
100:3 111:15

**conducting** 48:20

**confronted** 53:4

**confuse** 4:24

**confusion** 4:20

**conjunction** 77:21

**consequences**
44:13

**consider** 14:23
68:2,4

**considered** 81:9
82:22,23,24 83:1
104:9 108:20

**consist** 42:1

**contact** 40:16
41:12 53:9,11

**contained** 48:7

**continue** 17:25

**continued** 9:7
52:11

**continuum** 44:6
63:11,17,19,24
64:22 65:9,14,17,
19 71:16 72:1,12

**contract** 19:15,20

**contrary** 69:3,7,13,
17

**control** 11:3 59:25
60:1,5 67:16 71:19
72:1,11 73:14
75:25 78:18,22,23
95:1

**controlled** 85:5,9,
11,16,23

**convene** 43:10,13

109:2

**convened** 27:9
30:17

**convening** 30:20

**conversation** 41:13
51:8,11,25 52:1,8
53:21,24 56:12,14,
17,20,25 62:17,21
102:1

**conversations** 50:3
51:5,19,23 93:16
94:1

**convicted** 93:7,13
96:3,6

**conviction** 92:12

**conviction]** 93:6

**convictions** 96:4

**cooperative** 53:14

**copy** 26:25

**corner** 45:14,15

**correct** 23:22 29:19
30:12,20 31:8
44:22,24 50:16
58:4,6 59:5,6 61:2
65:11 70:18 71:13
75:8 82:22 87:22
88:15 89:15,23
92:19,22,25 93:19
102:22,23 108:19
113:20

**could** 27:23 32:19
35:18 38:19,25
39:14 44:3,4,20
46:12 59:21,24,25
60:6,7 65:6,8
68:22,23 69:18
70:18 76:23 79:7
92:25 104:19,25

**couldn't** 32:13
53:20

**counties** 24:3

**county** 6:14,16 7:8
8:5 10:13 11:2,14,
18 13:12 23:7,9,10,
11,12,13,16,17,18,
19,20,21,22 25:1
35:2 45:8,9 58:14
66:7,11 71:18,21,
24 72:3,7,10,14
75:7,10 76:15 78:6
82:10 85:10,16
87:13 88:17,19,22,
25 89:18 96:2 98:2
100:23 101:13
103:8 104:11
105:11

**County's** 45:22

**couple** 113:14

**court** 8:1 9:22 10:2
33:20,21,22 37:17
76:15 85:7

**courthouse** 25:12

**courts** 20:3,6 23:3
26:15 85:6

**Cracker** 111:14

**created** 33:3

**criminal** 6:1 8:2,11,
12 9:6 10:2,3 12:6
14:20 17:6 19:23
20:2,5,10,14 23:4
24:3,11 34:8,11
37:15 111:24

**criminally** 101:11

**criteria** 79:6

**cuff** 60:14

**current** 11:17,19

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

**custody** 79:6,8
92:6,12 93:5

**customary** 88:18

---

**D**

**danger** 69:22

**dangers** 69:20

**data** 43:15,16

**date** 8:23 45:18
49:7 52:5

**dates** 8:19

**day** 37:19,22 49:6
52:4 53:3,13,23

**day-to-day** 35:13,
14,17

**days** 40:15

**DCI** 20:1 26:16
37:14

**dead** 95:19 108:14

**deadly** 63:22,25
64:2,24 91:10,24
92:4,7,25 93:11
94:16,19 95:9
96:13

**death** 92:9

**debris** 40:4

**decision** 16:16
17:8 50:5,15 58:21
77:10,11 103:20

**decisions** 16:10,
13,14

**decline** 107:5

**defend** 92:2

**define** 48:5

**definitely** 16:21

**degree** 6:3

**degrees** 26:25

**delay** 92:11

**delayed** 42:24,25

**demote** 44:4

**department** 28:18
35:9 36:18 38:11,
17 97:20 98:3
100:14,16,17
105:11

**departure** 59:8

**depending** 25:5
40:24 41:18 98:5

**depends** 27:14,24,
25 42:11 110:19
112:21

**deploying** 88:10

**deposed** 4:12 9:25
10:1

**deputies** 9:13 14:5,
18 15:4,9,19 32:10
39:1 46:21 65:4
72:7 78:18 79:25
96:24 97:2 110:21
111:7

**deputy** 6:9,19,20,
23,24 7:2,20 11:6
12:1 13:15,16 14:4,
10,13,22 16:1,2,3,
4,7,8,22 25:17 26:1
46:23 48:9 58:4,13
64:6 67:20 68:21,
23,24 69:2,18 75:3
94:25 95:2 96:10,
11,12 97:3,4,6,12
100:23 106:21
107:20 110:25
111:1

**deputy's** 109:25

**describe** 79:4

**describes** 67:8,10

**designate** 85:9

**designated** 12:17

**desk** 82:6 104:24

**details** 56:13 80:23
87:5

**detect** 85:24

**detective** 14:22,25
15:6 98:8

**detectives** 14:20
15:11 98:6

**determine** 30:18,23

**determined** 100:24
101:3

**did** 4:8 5:16,21,22,
23,25 6:2,10 7:5,20
9:3,4,22,24 10:9
11:10,13 16:1 17:6,
11,15,17 19:25
24:5 30:8,13 31:1,
4,18,22 33:1 34:7,8
35:19,20 36:7
44:13,15,16 49:4,
10 51:5,6,25 52:13,
14,15,25 53:10,21
54:7 55:8 56:12
57:15,18,23 58:7,
21,24 60:16,21
61:13,22 62:11
65:22 71:21 73:22
74:4,25 77:3,8,15,
18 78:8 81:3 87:13,
15 97:12 98:14
99:10,16 100:6,8,
20 101:4,8,15
102:1 103:14,15
104:24 107:15
111:22

**didn't** 6:5 11:10
21:7 30:10,14
34:19,20 35:4,21,
22 36:9,19 41:2
46:6 57:8,18 59:19
62:5 88:6 95:20,21
102:21,24,25
105:18 107:18
109:19

**die** 95:20,21

**difference** 61:11

**different** 13:6 26:14
37:6 83:15 110:7,8

**differently** 59:22
76:23

**direct** 51:5,8,11
66:13 103:1

**directed** 104:20

**directing** 107:3

**direction** 88:19,24

**directive** 45:13,17
58:23

**directly** 16:4 35:16

**discharge** 107:16

**discharged** 63:25

**disclosed** 19:7

**discovered** 111:13

**discretion** 112:2,5,
6,7,8,10,12,16
113:3

**discuss** 11:17
61:13

**discussed** 31:14
61:18,19 62:10,22,
24 63:7,8 71:11

**discussion** 101:21



**discussions** 61:22
63:4

**dismissed** 109:9,
23 110:1

**dispersant** 71:12

**dispersants** 74:13

**disposal** 68:25

**disposition** 85:7

**district** 7:23

**division** 6:24,25
9:3 15:8,10,17
17:10 35:12 37:7,8,
10,12,17 103:1

**divisions** 37:10

**DMV** 26:17

**do** 7:25 12:5,23
13:24 14:6 17:24
18:20 21:13 22:20
25:9 26:12 27:20,
22,23 28:1,8 30:13
31:4 34:9,19 35:8,9
38:2 40:2 41:2,20,
22 42:6,21 43:7,22
46:13,19 48:16
49:4,18 50:6,18
55:11 56:13,20
57:1,3,9 59:8,13
60:15,17 61:4
62:16,19 68:20
70:10,24 71:18
73:6,10 74:4,23
76:1,10 78:18 80:4,
7 81:5,7 82:19,20
83:9,12 84:5,18
87:7,8,9 89:5 90:15
91:1 97:13,16,17
98:9,12 99:20
101:2,7,8 102:18
105:10,23 106:7,17
110:7

**document** 17:21
18:9,11,12 19:10,
19 22:1,3,9,20
23:14,15 47:20,22
48:3,5,17 51:16
58:8 86:13 89:10
90:15,17 91:1,2

**documentation**
43:17

**documents** 21:10
22:21,24 23:1 24:1
26:25 27:10 43:18
48:7 49:16 55:20

**does** 9:12 11:23
29:9 37:11 38:13,
14,15 42:9 47:4
63:23 66:7,11
69:14 71:25 72:6,
10,14 75:10 78:6
82:15 84:17 85:16
98:2 112:2

**doesn't** 29:25
60:18 69:12 106:8
112:7,15 113:3

**dog** 39:13 78:22
79:8,9 80:21,24
86:22,24,25 95:1

**dogs** 78:24 105:4

**doing** 9:2,7 16:18,
21 32:12 33:14,15
35:4 57:2 80:25
98:18,21 99:2,4
100:10 103:18
105:6,8 109:20

**domestic** 110:21
111:1,7 113:25

**don't** 4:24 7:18
8:18 9:19 11:19,20,
21,22 12:18,21,24
16:16 17:4,15
20:24 24:9 27:14

28:5 30:4,15 32:7,
8,12 34:24 35:12,
15,17 37:21,22
39:19,20,21 40:1
42:15,16,22 43:1,2,
7 44:11,25 45:16
49:6,9,23 51:4
52:4,5,14,15,17,21,
23,24 53:1,2,22,25
54:8,11,14,15,19
55:7,10 56:4,5,8,13
57:24,25 58:1,5
59:9,12 61:6,10,11,
20 62:4,18,20 63:2,
16 65:17,20 66:2,5
67:9,22 68:2,10,13
69:9 70:8,10,19,20,
21,22,23 71:14,17
72:16 75:15,23
77:22 80:9,20,23
81:4 83:2,3,7,16,20
86:1,6 87:4,6,11
88:9,13,21 94:18
96:4,21 97:14
98:10 99:18,23,24,
25 100:16 101:14
104:15,16,25
105:2,13,19,20,23
106:7 108:9,19,20
109:17,24 110:9,23
111:11 112:1,4

**done** 12:5 13:3,4,5
14:1 23:25 26:18
28:10,23 33:2 34:2,
4,13,14,15 35:5
57:4,5 59:22 60:6,7
76:23 98:20
102:12,14,15
109:10 110:5

**down** 10:20 17:4
19:4,9 22:13,15
27:15 31:20 33:5
39:23 42:7 52:9
60:3,13,17 71:3,4

84:9 90:16,17
101:2 107:4,7,11

**drafting** 48:17

**draw** 41:5 64:11

**drew** 41:1,2 64:19

**drill** 4:15

**driver** 53:5

**driver's** 24:13 27:1

**driving** 20:2,13
24:4 39:23 106:22

**drop** 95:3

**drove** 107:22,23

**drug** 6:11 10:16
15:12 79:22,24
83:23

**drug-sniffing** 80:2

**drugs** 80:5,8 85:25

**dual** 80:1

**due** 35:1

**duly** 4:3

**Durham** 5:11
36:13,18

**during** 32:3 52:8
56:6 63:4 80:24
83:23

**duties** 8:25 13:8
38:3

**duty** 107:17

---

**E**

**each** 23:7 78:20
109:10

**earlier** 59:3 60:25
77:19 86:19 100:10
102:21



**early** 9:5 34:16 73:16 77:20 98:17 100:19 103:25

**ease** 4:17

**easily** 105:3

**education** 6:2,5 20:8

**effect** 58:16 70:22 92:5 106:5

**effective** 45:18

**effects** 46:24

**egregious** 44:21 82:3

**either** 8:22 20:3 51:13 54:16 102:24

**else** 11:10 27:23 41:2 42:6 75:6 81:17

**email** 21:6,15

**emails** 21:7,8

**employ** 78:7

**employed** 48:20 68:9,12

**employees** 15:3

**employment** 19:16 21:3 24:6,8,13,22 35:10 37:4,20 59:10

**employs** 71:19

**encompass** 99:7,9

**end** 65:23 91:21

**ended** 53:11 65:19 101:11 107:17

**enforce** 112:3,10, 12,16,17

**enforcement** 6:11 7:7,9 13:13,14 14:1 27:2,4 60:2 65:19, 22 91:16,21,23

**engage** 40:17

**engagements** 40:13

**enough** 14:12 40:4 44:21 104:4

**ensued** 96:11,15

**entail** 19:25

**entailed** 7:22

**entity** 85:13

**envelope** 10:18,19, 20

**escalation** 44:10

**escape** 92:5,7,11 93:4

**evaluates** 47:3

**evaluation** 77:4

**even** 10:25 11:3 27:24 33:10 34:4, 16 64:4 70:17 104:23

**eventually** 17:9 42:6 104:24

**ever** 4:12 9:22 10:9, 12 11:13 28:3 68:7, 11 70:6 74:12 79:1 83:24 100:6,8

**every** 12:22 28:23 66:3

**everybody** 4:16 25:22

**everything** 43:21 51:12,14 107:22

**evidence** 9:3,11,14, 16 10:8,10,11,12, 24,25 11:1,4,7,8,12 37:15 107:19

**exact** 52:5 66:6 71:7 99:25

**exactly** 49:10 52:4 56:8 63:14

**EXAMINATION** 4:5

**examined** 4:3

**example** 28:10 65:4

**examples** 39:17,18, 21

**except** 57:11

**excessive** 70:2 76:9 81:9 82:9

**excitedly** 70:15

**exhibit** 20:22,25 21:2 24:1 46:1,2,11 48:13,14 66:15,18, 19 68:15 71:2,9 84:2,3 86:5,6,13,14 89:2,7,12 90:23,24 92:15

**exhibits** 21:4 46:4, 6,9

**exist** 84:17

**existed** 87:5

**exists** 84:14,15,19

**exonerate** 44:3

**exonerated** 61:9 95:13,14 96:13,17 97:6,13,15 108:21

**expected** 40:6

**experience** 14:11 66:1

**experienced** 69:22, 24

**explain** 7:22 16:25 26:9 42:1 48:19 58:18 60:9 63:17 72:22 73:1,13 74:15 76:12 106:20

**explained** 77:1

**explaining** 108:15

**extensive** 20:15,17 21:23,24 40:24

**extensively** 17:16

**extent** 56:25 87:6 108:18

---

**F**

**F-3** 12:4 17:3

**fact** 33:1

**factor** 77:3

**factual** 52:16

**faded** 63:13

**failure** 107:16

**fair** 19:6 51:17,20 52:7 94:13

**familiar** 28:15 44:23,24 63:10 76:11,25 84:13,15, 18 85:18 86:17 89:17,19,20,21

**far** 10:18 99:1 103:6 107:18

**fashion** 9:20 22:14 34:14

**fatality** 95:21

**favors** 110:13



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

128
Index: federal..Geis

**federal** 85:13

**feel** 35:19,21 41:15 59:14,15,17 78:15

**feeling** 59:17,19

**fell** 27:19

**felon** 93:2

**felons** 79:16

**felony** 79:14 92:13, 18 93:6,10,13

**felt** 40:18 44:21 82:1,2

**few** 22:8,9 67:19 103:6

**field** 90:2,5,6

**fight** 108:1

**fighting** 108:5

**figure** 38:25

**filed** 49:1,3,5,11 104:11

**filled** 17:2

**final** 29:25 30:1 85:6

**find** 71:7 110:7

**fine** 4:23 86:2 109:21

**fingerprints** 37:16

**finish** 14:4 29:12 91:17 102:8

**finished** 7:12 43:21 55:21

**fire** 96:12

**firearm** 63:23 89:23

**firearms** 89:17 91:14

**fired** 31:15 96:12, 16 97:5 101:11

**first** 6:21 17:13,14 29:4,11 35:22 36:6 50:7,8 53:10,15 54:1,4,19 62:25 67:14 85:3 90:15 98:18,21 99:2 112:22

**first-line** 14:16

**first-time** 44:20

**fit** 25:1 63:23

**five** 32:18 106:15

**five-minute** 113:9

**flare** 104:18

**flares** 107:2

**flip** 57:6

**follow** 66:8,12 71:21,22,25 72:11, 14

**follow-up** 84:20 113:15

**following** 53:12,13 72:3

**follows** 4:4

**foot** 108:9

**for** 4:17,21 5:5,14 6:14,25 7:10,11,14 11:11,22 12:8,9 13:23 15:25 17:4, 24 18:22 19:1,16, 19 20:9 21:2,4 23:4,5,6 24:8 25:8, 11,13,18 26:25 27:25 28:8,10,17, 20 29:1,10,20 31:1, 15 36:9 37:13 40:1, 9,18 41:12 46:11,

25 47:13 48:14 54:15 55:20 62:2, 14 66:19 67:25 71:5,12 74:24 76:3, 14 78:16 79:16 80:2,5 84:3 85:3,11 86:14 88:11 89:7, 18,23 90:14,24 91:17,24 92:13 93:8 96:1,8,22 100:3,5,19 101:20 102:8,9,16 104:4, 17 106:3,4,5 107:7, 11,15 108:14,15 109:7 110:4,24 111:12 113:15

**force** 39:12 40:11 42:8 47:4 48:9 63:22 64:1,2,24,25 70:1,2 71:16 72:19 73:5 75:11 76:9 77:23 81:9 82:10 91:10,15,24 92:4, 25 93:11 94:16,19 95:10 96:13 97:21 99:8,9

**form** 9:20 12:4 17:23 18:13 33:20, 21,22,25 34:14 38:21

**formal** 29:6

**formally** 34:20

**format** 33:13

**forms** 23:2 26:14 33:2,3 38:19

**formulating** 32:22

**found** 91:3

**four** 101:9 106:15

**fourth** 67:16

**fracture** 69:4,8

**frame** 42:15

**Franklin** 23:17

**free** 5:2 78:15

**fresh** 80:20,22 81:1

**friend** 104:9

**from** 6:22 8:2 10:5, 23 13:14,17 14:24 20:3,4,5 21:19 23:6 31:15 36:11,13,17 43:5,15,16 45:12 47:25 48:8,23,24 49:22 59:10 75:6 76:5 82:9 85:9,12 89:5 92:3,5,11 93:5 94:10,14 96:25 100:13 101:22 102:25 103:1,9 108:5 109:23 110:13 111:2 113:12

**front** 45:16 65:5 68:17 84:6,25 112:14 113:1

---

## G

**gather** 18:13 30:21 42:3 43:15,16,18

**gathered** 27:6 48:21 49:16

**gathering** 55:20

**gave** 79:17

**gears** 11:16

**Geis** 20:24 21:6,7, 16 22:6 36:14 37:23 46:1,3,8,12 47:24 61:18,20 63:1 66:14,15,25 67:2,4 76:16,18,20 86:5 89:1,3,5



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

101:14

**general** 24:10 68:6

**generally** 26:12 57:12

**generate** 40:19

**generated** 38:10,24 111:2

**gentleman** 111:14

**gentlemen** 32:4

**get** 19:20 21:7 25:14,23 26:22 27:7,13,14 28:5,21 30:2 33:11 39:24 40:6 41:14 44:14, 15 45:2 47:16,22 49:22 53:16 59:17, 25 62:6 70:5,12 73:14 74:8,10 102:11 107:18 108:4,22 109:4

**get all** 29:24

**gets** 97:20

**getting** 26:21 42:24 52:2

**gist** 62:15

**give** 22:8,9 24:14 32:17 71:6

**given** 7:24 83:16

**gives** 91:13

**giving** 57:17

**glad** 97:18

**glass** 108:3,10

**glasses** 69:1

**go** 5:16,21,23 9:22 10:2 12:3 13:21 18:3,4,5 19:3,4,9

20:1,2 22:4 23:7 24:10,24 25:8,15, 18,21 32:2,5,6 34:19 38:3,7,8 40:21 42:5 47:22 50:1,4 51:22,25 57:5 62:12 66:22 68:14 71:3,5 72:7 75:13,21,24 76:1,4, 18 78:10 81:17 82:20 83:6 84:9 85:1 91:7 92:14 101:20 104:16,17 107:20 113:10

**God** 46:6 106:6

**goes** 25:16 79:19

**going** 4:7 10:7 12:4 13:18 17:18 18:2,3 19:12 20:22 22:8,9 23:6,24 27:6 29:23 31:25 33:4,5 40:17 41:15 47:10,22 50:2 56:8 66:12,23 79:18 90:5 96:24 98:20 99:17,19 102:8,11 105:23 106:4,9,10 109:12, 13

**gone** 13:19 24:25 35:15 104:21 111:11

**good** 4:7 36:24

**Goolsby** 49:20 54:6,24 55:4,16,19 56:3 58:12 77:16 93:18,21

**got** 11:6,11 17:7,9 33:6 34:18 39:9,10, 11,12,13 53:6 56:10 62:6,7,8,9,12 63:20 64:23 80:24 81:2 86:24 96:11,

23 102:9 107:22 108:1 111:13

**gotten** 20:7 26:19, 20 27:3 51:12

**grabbed** 74:17

**grabbing** 65:1

**graduated** 20:4

**grazed** 97:11

**Gregory** 36:13

**grievances** 104:12

**ground** 59:1 60:3, 13,18,21,24 68:3, 24

**guess** 107:16 108:19

**guiding** 65:6

**gun** 10:22 11:6 37:14 41:1,2,5 64:7,10,19 87:18, 22,24 88:2,6,10,15 89:4

---

**H**

**had** 7:11 8:17 10:12 11:2 15:17,23,24 16:2 17:3,16 19:7 20:7,9 24:10 25:8 26:3,24 27:3,15,21, 22 31:14,16 32:20 33:12 34:6,14,20 35:24 36:2 42:19, 20 43:21 44:7,8,19 45:24 46:16 48:2 51:1,3,8,12 52:10 56:17 64:23 70:6, 17,21,22 73:6,23 74:2,3,7,11 75:3,4 77:12 79:5,16,21 80:1,21 81:2 85:23

86:22 89:11 94:16, 25 96:1,3,6,8 98:6 100:1,9,11,21 103:12,22 104:6 105:24 106:22,24 107:6,21,24 108:1 109:9 111:11

**hadn't** 14:1 93:7

**half** 53:23

**Hampshire** 23:12, 13

**hand** 33:8 65:2 74:18

**handcuffing** 65:3

**handcuffs** 53:15,17 65:5

**handgun** 37:14

**handle** 105:5,7

**handled** 104:22

**handler** 78:20,21 80:17,22 81:3,5 82:2 83:7

**handler's** 78:21

**handlers** 78:7,23 81:13

**handout** 90:12 91:11

**hands** 63:20 64:11, 22,24 65:1,2,4,6,8, 10 74:20,23

**haphazardly** 33:3

**happen** 11:14 105:24

**happened** 8:7 26:9 39:1 41:21 43:18 52:11 66:3 87:6 108:2



**AdvancedONE**
LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

130

Index: happens..his

**happens** 25:4,23

**hard** 63:20

**harmful** 70:18,22

**has** 13:3,4,5 14:10, 11,14 25:22 29:22, 25 48:12 63:13 65:19 66:3,14 67:20 68:25 70:6, 21 75:22 79:1,8,9 80:15,17 81:9,10, 25 82:2 83:17 84:1 89:12 93:8 98:19 100:9,11 105:12,17 106:5 112:5,6,9,12

**hasn't** 82:1,5 93:13

**have** 4:9,12,15 5:1, 12 7:17 12:2,25 13:1,2,6,7,18 14:9, 21 15:2,5,7,8,9,11, 12,15 16:1 17:12 19:9,11 20:1,2,8,9, 13 21:13 24:5,12, 23,25 25:1,7,9,10, 19 26:3,5,6,18,19, 24 27:3,9 28:6,7, 14,16,19 30:1 32:10,12,13,14,15, 22 33:23 34:3,10 35:15,17 36:24 38:22 39:8,19,25 40:2,5 41:13,18 42:15,17,22 43:1,2 44:25 45:16,24 46:16 47:7 49:14, 15,23 51:5 52:1,14, 16,18,20,21 54:5,9 57:8 59:22,23,24, 25 60:2,6,7,11 61:1,6,8,9,10,13,22 62:22 63:4,12,22 64:5,8,12,24 65:17, 20 67:20,22 68:7, 11,16,17,18,19,22,

23 69:10,17,19,22, 23,25 70:2,9,23 71:22 72:18,23 73:5 74:6,12 75:12, 13 76:1,23 78:3 79:16 80:9 81:8,15, 21 82:4,11,19 83:5, 24 84:5 88:7,9,13, 21,23,25 89:5,11 90:10 91:3 92:25 98:2,4,9,14 99:22 100:12,18 102:1, 18,21 103:23,25 104:11,15,16,19, 21,22,25 105:1,10, 16,21 106:7,10 108:17 110:7,18 111:2,3 112:2,7,15, 16 113:3,14

**haven't** 45:1 69:25 75:5

**having** 4:3 12:4,5 42:5 55:13,14 70:8, 12 97:16 98:20

**he** 10:17,18 11:23 12:24,25 13:1,2 14:18 17:2,3,4,9 19:7 20:10 24:11, 23,24 25:7,16,17, 18 26:3 27:1,21,22 28:12 29:25 30:5, 18 31:14,16,24 33:8,10 35:8,22,24 36:2,4,5,7,9,19 50:8,22 51:21 52:9, 10,25 53:2,3,4,6,7, 10,12,13,15,16,17, 19,20 56:14 57:2, 18,20,23,24 58:20, 25 59:1,23,24,25 60:6,7,17 61:24 62:3,5,6,7,9,25 75:19,21 86:23 87:11,15 90:17

92:3,6,9,24 94:10 95:5,13 96:16,17, 24 97:1,2,11 100:24 101:2,3 102:25 103:1,3,19 107:11,12,15 108:6 111:13,15 112:16

**he'll** 24:24 57:5,6

**he's** 4:10 20:3 25:16,25 31:24 35:11 47:21 57:20 79:20 103:4,5

**head** 45:23 66:2 73:7,18

**hear** 82:16 102:24

**heard** 75:5 101:16 106:8

**heightened** 79:12

**hell** 50:8

**help** 13:11 100:6,8, 9,13,17 103:20

**helped** 101:10

**helpful** 46:3,8

**helping** 100:1,11

**her** 36:21 53:5,9, 15,17 58:20 59:2, 23,24,25 60:17,23 69:4 87:6 95:3,5 110:1

**here** 4:10 7:8 18:18 26:14 28:12 33:13 34:18 36:23 71:6 75:15 76:18 84:22 89:9 91:18 102:11 109:14

**Hey** 41:20 61:25 62:12 82:17

**high** 5:16,17,20

20:4 97:3 107:9

**higher** 13:10 20:7

**Hight** 113:17,24

**highway** 106:23

**Hillsborough** 23:12,13

**him** 17:5,8 22:13 24:22 25:15 27:7 29:10,24 30:7,8,14, 23 31:5,9,17,21,25 35:12,13,17 53:5, 16,19 56:21,22,23 57:1,4,7,16,17 63:1 73:7,15 92:12,22 93:5,21,22 95:5 99:1 102:22,24 103:2 104:9 107:11 108:5,8,10

**himself** 92:2 111:15

**hindsight** 76:11,16 77:8,9

**hire** 12:15 13:20,24 16:10,13 17:8 25:19,20 29:1,3,4, 8,10,14,16,20 31:5, 6,17,25 32:15,16 36:19,20,24

**hired** 13:19 17:9 25:17 27:7 30:6,7, 9,11,14,19,23 31:9 32:11 33:6,8,9,11 35:7

**hiring** 11:17,20 12:1 16:13 17:1 31:2 33:23 37:3

**his** 17:6,11,13,14, 17,18,22 19:17 20:1,2,13 24:4,5,7, 8,12,13,22 25:8,16



(866) 715-7770
advancedONE.com

26:3,4,6,8,25 27:3,
16 35:10 49:15
52:10 53:11 59:24
68:25 80:22 90:18
92:8 100:23 108:9
110:1 111:13,15,
16,17

**histories** 20:10

**history** 24:10,13,14

**hit** 73:7

**hold** 36:4 60:12
71:5 102:15

**holding** 65:7

**home** 100:25
107:8,9

**homicide** 10:5 38:6

**honest** 46:6

**horns** 35:4

**hospital** 48:24 87:7

**hour** 53:23

**hours** 102:16

**house** 53:8,9
100:25 110:25

**how** 6:20 7:10,18
8:14 9:17 24:15
27:19,21 28:1 29:9
32:9,22 33:12
35:19,24 36:2
39:20 40:24 42:9,
14,16,23 43:2
49:12 51:25 52:7
53:21 58:18,24
60:21,25 61:7
62:22,25 63:2
72:22,23 76:2,4
77:1 80:4,7 82:9,20
94:16,18 97:10,12,
14 99:24 102:7
104:25 105:14

106:14 110:9
112:2,5

**however** 13:24
15:19 32:5

**Huh** 76:19 88:4

**humerus** 69:4

**hunt** 79:16

**hurt** 40:25

**hurting** 109:12

**hyperventilate**
70:13

---

**I**

**I'D** 32:22 76:10

**I'LL** 19:19 57:5
78:10 84:22

**I'M** 4:7 7:10 8:22,23
10:7 11:20 13:13
17:18 22:8,9 23:24
26:20 30:2,25
31:25 32:2 33:3
36:1 37:13 47:10,
22 49:24 50:2
52:19,21 57:4,6,12
59:18 62:4 66:5,12,
23 67:5 70:13 71:4
72:2 80:6 84:14,17
85:18 86:9,11 88:3,
5,20 89:19 97:18
100:7,15 102:11,
12,14,19 105:4,23
106:4,9 109:12,13
110:12 111:20

**I'VE** 10:1 32:12
33:15 37:5 56:22
57:16 63:1 74:2,7,
16,17,20 98:6,16
105:20,22,24 106:8
108:13

**idea** 82:11,12
105:16

**identification** 21:4
46:11 48:14 66:19
84:3 86:14 89:7
90:24

**identified** 48:12
61:15

**identify** 18:11 22:5
23:1 45:10 80:8

**if** 12:24 14:21 17:15
21:14 22:12 24:19
25:16 26:9 30:13,
17,18 32:19 33:24
37:21,22 38:23
39:12,22 40:4,18
41:23 44:7,21 45:5
46:12 47:11 52:22,
23 60:15 63:25
64:4,10,19 66:21,
25 68:2 69:16
70:17,21 81:5
82:12,16 85:19,21
87:7,9,11 91:16
93:15 97:19,20
99:23 105:17,22
108:9,17 109:15
110:24,25 111:4
112:4,14,18,22,24
113:1,10

**illustrates** 50:5

**illustrations** 50:10,
15

**imagine** 52:14,15
87:4

**immediately** 24:25
112:19

**imminent** 92:4,9

**impair** 5:3

**impede** 40:5

**imposed** 92:12
93:5,9

**in** 4:17 5:11,12,15,
18,25 6:4,16,22,25
7:8 8:6,7,8,13,14,
18,21 9:3,5,9,15,
17,20,23 10:2,3,9,
12,15,19,23,24
11:11,14 12:3,4,9
13:13 14:2,8,18,19,
21 15:11,17,20,25
20:10 21:19 22:13
23:2 24:10,22,23
25:6,10,16,25 26:9,
13,14,20 27:5,19
28:22 29:24 31:18
32:2,5,6,9,10,17,
24,25 33:4,7,10
34:14,15,21,25
35:1,16 36:4,5,7,21
37:4,6,8,9,16,19
38:18 39:2,4,23
40:4,12,25 43:1,9
44:8 45:1,14,16
46:22,24 47:14,25
49:22,24 50:22
51:14 52:9 54:17,
18,19,20,21,22
55:1,2,3,5,6,18
57:5 59:21 60:1
62:10 63:23 64:16,
17 65:20,24 66:2,6
67:18,19 68:8,17,
19 69:3,4,10 70:10
71:19 72:19 73:7,
15,18 75:1 76:5,8,
13,22 77:9,19,20,
21 79:5,8,12,16,18,
19,23 80:2,14,21,
22 81:1,8,25 82:2,
10 83:6,13,16,17,
19,20,21 84:5,25
85:12 87:10,12,14
91:13,15,23,25

Advanced**ONE**
LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

132

Index: in-house..is

93:9,16 94:13,14,
16 95:7,25 96:1,11
97:11,16,21 98:5,
16,17 99:18,23,24
100:9,20,23
101:13,22 103:1,2,
5,10,12,14,23
104:2,18 106:18
107:25 108:2
110:10,21 111:1,6,
7 112:9,14,22,25
113:1,4,6,12,19

**in-house** 12:2,5
17:3 18:13

**in-laws** 100:24

**in-laws'** 100:25

**in-person** 54:13

**incident** 10:22 11:5
38:8,9,12,13,16,20
39:4,8,9,10,11,12,
13,19 40:1,10
41:10 42:4 44:8,19,
20 47:14 48:16,22
49:7,8 50:23 51:7
52:2 54:2,9 55:13
57:13 63:7,9 67:24
68:7 77:21,25 79:1,
23 82:1 86:4 95:6,
7,25 103:12 109:11
111:2,3,10 112:22
113:16

**incidents** 73:2
74:6,9 79:4 80:12,
14 86:19 108:25

**include** 46:22

**increases** 109:22
110:1

**indicates** 92:8

**individual** 73:7,18,
20,22 100:4 111:25

**individuals** 73:25

**ineffective** 69:1

**information** 18:13
23:4 26:21 27:16
28:5,7,22 29:24
30:22 34:17,22
37:16 38:24 42:3,
25 48:8,22,23

**informed** 92:21

**infraction** 110:17

**initially** 6:18 56:15
73:16 94:11

**injured** 59:11
67:18,21 73:20
79:2 82:5 87:3
95:19 97:8

**injuries** 87:6

**injury** 69:16 92:10

**inside** 108:5

**instance** 14:19,21
36:7 95:24

**instances** 39:4,7
74:1,15 75:1 81:8
94:24 106:17
110:21 111:6,9
112:9,11,13

**instruction** 46:22

**instructor** 88:6
91:4,12

**interact** 35:13

**interacting** 35:16

**interaction** 102:22

**interchangeably**
90:7

**interference** 90:3

**intern** 6:13

**internal** 97:19 98:2,
21 99:6,7,18

**interstate** 106:22

**interview** 12:8,9,12
26:3 27:17,21
28:14,19 29:13
43:14

**interviewed** 17:5
30:17 32:4 93:18,
20,23

**interviews** 27:21
28:4 48:25

**intimately** 84:14,18
89:20

**into** 10:25 11:1,3,7,
8,12 76:10 77:3
79:6 90:6 96:23
97:1 100:25 104:21
111:13

**introduce** 4:9 21:10

**intrusive** 65:10,14

**investigate** 43:10
81:3 105:18

**investigated** 47:14
59:4 95:10

**investigation** 8:18
15:20 25:22 32:24
38:20 40:19,20
41:9,24,25 42:2
48:8,20 52:12
53:10 55:12 56:6,
21 61:14 72:20,24
75:2 76:9 77:9
92:15 97:17 98:22
99:18 101:2,10
103:15

**investigations** 7:1
8:8,9,10,11,20 9:4,
5,7 14:20 15:5
37:15 40:13 42:10

50:25 51:3 57:1
61:1 76:8 81:12
98:15,19 99:5,6
100:2,4,10 103:8,
18

**investigative** 9:6
10:23

**investigator** 6:22
8:16,17 9:19 25:21
58:13 101:5,18
103:11

**investigator's**
25:20

**investigators** 9:13
15:4,22 100:21

**involved** 9:21
38:18 44:8 70:10
72:19 97:16,20
103:12 110:21
111:1,7

**involvement** 40:12

**is** 4:21,23 8:4 9:25
12:13,16 13:23
14:15,16,18 15:1,5
17:19 18:15 19:6
22:23 23:14 25:4,
11 26:22 27:5,8
28:18 29:21 30:21
32:1 33:13 34:2,17
35:15 36:21 38:9
39:5 40:3 42:2
44:2,18 45:13,21
46:1,2 48:6 49:1
50:14,21 51:16,18
54:23 56:14 57:8,
21,22 58:11,14,16
59:11 62:25 64:7
65:10,11,14 66:15
67:7,12,14,15,16
68:15 69:13,17
70:12 71:1,9 73:13
75:15 76:10,17,22



77:23 78:20 79:12
80:21 83:5 84:20
89:14,22,24 90:2,
11,21 91:2,10,12,
23 92:1,6 93:7,10
94:10,21 95:7
96:15 97:22 98:11
101:19,20 105:3,12
106:2 108:17,24
109:1,2,5,9,10,12,
22,25 110:5,15,16,
17,20,23,25 111:1,
18 112:6 113:15

**isn't** 50:14 67:17
94:6

**issuance** 46:20

**issue** 68:1

**issues** 47:7

**it** 6:5 7:16,17,18
9:15,21 10:21,24,
25 11:1,3,7,8,11
12:4 13:4,5,24
15:13 16:21 17:1,3,
15,16,22,24 18:16,
20,22 19:6,11,19
20:15,17,18 21:22,
24 22:4,10,17 27:8,
11,14,15,23,25
28:8,23 29:4,6
30:13 31:23 32:6,
21 33:2 34:15,19,
21,25 35:4,5,21,22
36:6,22 37:5 38:4,
14,17,23 40:7,18
41:16,23 42:4,5,6,
11 44:3,4,20,21,25
45:1,5,16 46:3,8
47:11 49:9,10 50:1,
4,7,9 51:6,12,13
53:1,3,10,23 54:5,
11,13 55:12,21
56:22,23 57:2,6,9,
17,22 58:11 59:9,

12,15,17 61:18,19
62:6,7,8,9,10,15,
20,25 63:14,15,16,
25 64:5,7,11 65:21
66:5,14 67:11,17
68:16,18,19,21,25
69:3,8,14,16 70:13
71:1 72:6 73:17,23
75:6,15 76:12,13
77:1,10 81:10,11,
23,24,25 82:3,5,13,
16,17 83:3 84:14,
15,16,17,18,21
85:18 86:25 87:5
89:2,19,20,21 91:4,
5,16,20 92:1 97:12,
14 98:3,5,7 99:22,
24 100:1,24 101:3,
8 102:4,6,7,19
103:3,6,23,24,25
104:1,2,4,8,17
106:2 107:16,18
108:9,20 109:7,11
110:14,15,18,20,24
112:21,23 113:17,
24

**it's** 13:9 15:2,3
18:12 22:8 26:23
28:22 32:19 38:10,
21 39:22 45:21
48:7 50:22 51:16,
20 57:2 63:25 64:4
66:25 73:17 75:18,
23 78:21 82:18
89:5 91:18 100:19
102:8,18 104:14
106:3 110:10 111:4

**items** 11:8

**its** 46:22

---

**J**

**J.J.** 61:25

**jail** 108:14

**Jersey** 5:15 6:12

**job** 8:25 13:20 40:3
105:6,8

**jobs** 14:12

**judge** 85:8

**jump** 96:25

**just** 4:8 13:11,13
15:3 17:2,24 18:2
21:10 22:13 23:5,9
24:19 27:14,22,23
28:8,22 29:22 30:2
32:17,23 35:3
38:22 39:17 41:18,
20 44:18 47:11,22
49:16 52:22 55:6,
12 57:2 59:15,17
63:17 64:4,10 65:7
66:13,21 68:5 72:6
78:15 80:11,16
84:8 87:5 92:24
99:25 101:19 102:1
103:3 104:15,24
105:2 107:13
109:14,19,20
110:15 113:9,15

**justice** 6:1

**justification** 93:10

**justified** 91:23

**Justin** 58:13

---

**K**

**keep** 18:2,3 19:12
65:20 66:2 83:12

**kept** 61:8

**kick** 67:11

**kicked** 108:3

**kicking** 108:6,10

**killed** 31:24 95:23
112:20

**Kimberly** 36:13

**kind** 13:22 14:12,25
25:10 35:21 38:25
41:14 47:11 55:12
60:12 63:17 80:18
82:20 87:21 107:5

**knew** 41:16

**know** 4:15 7:18
8:12,18 9:20 11:19,
22 12:11,21,24
13:1,14,22,23,24
17:4,15 18:2 21:15
22:10,13 24:24
25:18,25 26:13
27:25 28:19,22
30:4,5 32:2 34:15,
24,25 35:14,15
37:2,21,22 38:3,23
39:20,21 40:1,3,24
41:15,20,21 42:16,
19 43:7,11,21
44:11 46:5,9 49:6,
10,23 52:4,5,10,16,
17,21,23 53:1,2,25
54:8,9,19 56:5,8,22
57:2,4,5,16,21,24,
25 60:15 61:6,11,
20,24,25 62:4,5,7,
13 63:2,14 66:4,5
67:9 68:2 70:8,10,
19,20,21,22 72:16
74:9 75:15,22 76:1,
14 78:11 79:23
80:9,20,21 82:12,
21 83:2,3,5,7,9,16,
20 84:14,15,17,18
86:6 87:5,6,7,8,9,
11 89:22 94:18
96:4,21 97:14
98:10,16 99:22,23,

24 100:9 102:15
103:5,13,24,25
104:18,23 105:13,
19,20 106:2,4,9
108:9,19,20 109:3,
10 110:9,23 112:4
113:10

**knowing** 32:14

**knowledge** 55:13
70:23 78:16 80:10
104:23 105:10

**known** 80:12

**knows** 57:2

———————————

**L**

**laboratory** 85:15

**lady** 36:12,17 59:1
80:24 86:24,25
95:1

**lake** 96:23

**last** 18:6 19:14
23:22 29:12,23
42:15 53:21 68:21
96:14,19 107:11

**later** 62:7

**lateral** 14:25

**Latwanya** 48:10

**law** 7:7,9 13:13,14
14:1 27:2,3 60:2
65:19,22 91:16,20,
23 112:3,10,12,16,
17

**Lawrence** 61:19

**lawyer** 10:20

**leadership** 67:21

**learned** 66:4

**least** 7:16 94:23

**leave** 47:11 57:8

**leaving** 18:23 19:1
107:20

**left** 32:21 69:4 76:7

**leg** 60:7

**legal** 75:14 108:20

**length** 62:16

**less** 6:15 42:21
65:10,14,15 93:8

**let** 18:2 21:15 22:13
41:15 48:11 53:16
56:21,22 57:1,4
72:9 78:9 101:19

**let's** 11:16 19:3,9
21:1 22:4 26:2
28:11 50:1 51:22,
24 58:7,9 59:7,9
68:5,14 69:5 71:3,8
73:9 84:9 86:3,13
87:17,18 91:6,7,15
92:14 93:14,15
101:20

**lethal** 65:10

**letter** 33:18

**letterhead** 33:18

**letting** 57:16

**level** 13:17 14:3
15:15 41:23 81:24

**license** 27:1

**lieutenant** 8:21,24
9:1 12:20,21,23,25
13:2,15,16 15:20
49:20 54:6 55:16,
18 58:12 83:17

**lieutenants** 13:9,10
15:16,18

**life** 37:19

**like** 4:21 7:25 10:21
11:13 13:23 14:7
15:3 16:24 17:2,22
22:10 23:6 24:14
25:7,20 26:25
27:23 28:17 33:24
35:5 37:13,18
39:22 43:3 44:6,7,
21 45:12 50:7 54:9
59:10 61:10 63:21
66:5 76:10 79:13
81:19 85:3 87:21
93:9 96:23 97:21
100:21 101:12
105:3,12 107:8,16
108:5 109:11
113:14

**likelihood** 109:23
110:1

**line** 15:7 27:19
45:12 103:1

**listed** 50:6,19

**listened** 48:24
52:11

**little** 6:25 7:21
11:16 12:10 19:4
24:15 37:2 42:20,
22 52:22 66:3 69:5
75:22 76:10 98:12
104:14 107:5

**live** 28:21 62:7

**lived** 20:4,10 24:11
100:24

**locked** 107:12

**long** 6:20 7:10,18
8:14 9:17 14:12
22:10 35:24 36:2
42:9,14,16,23 43:2
45:1 53:21 76:4

97:12,14 99:24
102:7

**longer** 7:18 42:20
44:5 58:15 73:15,
17 76:2 102:7
111:16

**look** 15:1 17:21
22:10 38:4 39:3
40:15 45:5,14
65:20

**looked** 17:12,19
21:8 45:1 104:21
107:12

**looking** 65:18 71:4
76:22 95:25

**looks** 17:22 66:5
97:21

**loose** 50:8

**lose** 10:10,11

**loss** 70:13

**lost** 10:12 63:12
65:25

**lot** 32:14,15,18
39:14 42:21 104:14
106:9,10

**Louisburg** 18:25

**lower** 13:17

**lowering** 95:4

**lowest** 14:3

**lunch** 67:1 76:3
107:20

———————————

**M**

**ma'am** 4:14 11:15
18:21 19:8,24
22:22,25 31:11
46:18 48:4 65:17



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

74:16 75:9 80:9
82:7 83:1 84:7
85:18,21 86:18
87:2,15,23 88:1,8
89:13,16,19,21
90:13,22 91:2,12
93:1,4,20 94:7,18
95:11,18 97:7
100:5 101:25
102:5,25 104:6,13
105:9,19 106:13,18
109:10 111:23
112:11,21 113:6,7,
21,23

**mace** 47:6 59:24
63:21 68:25 69:18,
19,23 108:8

**made** 11:3,7 17:8
29:2,6,13 62:14
63:18 77:16 82:5
101:1 103:19 111:6

**major** 5:25

**majority** 61:4

**make** 11:8 12:14
16:10,13 17:19
35:19,21 41:16
43:19,22,23 51:15
53:9,11 54:11 56:7
60:21 101:19
108:23 111:22

**makes** 69:16

**making** 32:23

**mandate** 75:12

**maneuver** 53:18,19
69:3,7,9,13

**manner** 62:10

**Manual** 45:9

**many** 12:10 27:21
28:1 31:15 32:6,9,
22 60:25 61:2,7

62:22,25 63:2
72:22,23 82:9
94:16,19 104:25
105:14 106:14

**March** 5:9

**mark** 20:22 21:1,11
46:4,6,8 86:13
89:2,3

**marked** 20:24 21:4
46:1,11 48:13,14
66:19 68:14 84:3
86:14 89:7,12
90:24 92:14

**marking** 66:17

**Martin** 23:11

**master's** 6:4

**matter** 33:1

**may** 12:3 13:18,21,
25 14:9,13,20,24,
25 15:7,8,9,12
24:12,18 25:4
26:19 41:16,18,19
42:5 49:14 79:16
98:7

**maybe** 12:10,20
27:24 30:15 76:23
101:9

**Mcgurl** 4:10

**me** 4:21 5:10,19 6:8
13:7,11 17:4 18:23
21:15 29:9 31:12
32:3,17 34:16,17
35:21 37:10,18
40:12,18 41:1,3
43:4 44:19 48:19
52:2,9 53:20 54:9,
12,21,22 55:11,12
56:4 58:18 60:4,9
61:25 62:25 63:16
71:7,21 72:6,9,22

73:2,4 74:1,8,24
77:1,7 78:9 79:4
81:4,10,11 82:3,17
84:23 86:19 88:16,
22 89:25 91:18
96:18 101:6,7,19
102:21 103:1,10,
19,22 104:17 105:2
106:4,5,6,8,20
107:24 108:11
109:13 111:9

**mean** 8:23 9:12
13:16 32:21 37:11
38:14,15 43:8 47:4,
5 50:23 54:21 74:4,
6 81:25 82:15
86:25 88:15,16,17
99:4,6 101:7
103:24 104:1 106:1
110:18

**means** 38:17 92:7,8

**measure** 65:15

**medications** 5:2

**meet** 62:14

**meeting** 43:11
54:13

**member** 109:3,4

**memory** 42:17,23
43:2 44:25 61:6
63:13 65:20 80:21,
22 93:15,16 94:2,6,
12 104:18 106:19

**mental** 7:25

**mentioned** 7:19
40:10,11 49:17
97:18 113:25

**mercy** 26:20

**Merrimack** 23:11

**met** 63:1 79:6

**methods** 67:18

**Michael** 4:10 18:17
20:21 21:25 45:2
47:16 66:22 71:4
78:3 84:1 86:9
87:17 90:16 91:8

**might** 7:17 12:25
13:1,2 16:16 20:8,9
24:12,14,24 25:1,7
28:7,14,19 38:5
52:16,21 54:5
76:13 89:9 102:15
103:23,24

**mind** 9:8 24:17
36:21 46:19 67:22
68:20 70:11 77:9
81:1 94:22 96:14
111:19,21

**minimum** 7:17
27:22 28:2,9,11,20
101:9

**minute** 47:19 86:12
107:11

**minutes** 21:8 107:7

**misdemeanor**
79:14

**misplace** 10:10,11

**misplaced** 10:12

**mobile** 107:8,9

**moment** 45:5 84:8

**money** 10:18

**months** 7:17

**more** 14:10 16:24
19:4 23:24 24:20
28:15 35:16 37:2
39:14 57:13 68:5
84:10 93:7 101:5,7,
18 103:11



**AdvancedONE**
LEGAL

(866) 715-7770
advancedONE.com

**morning** 4:7 77:19, 20

**mornings** 39:2

**most** 64:16 98:4 100:3,5,19 103:9

**move** 22:11 40:7

**moving** 28:25 69:2

**Mr** 4:7,18,19,23,24 16:25 17:1 18:6,15 19:6,22 20:7,24 21:2,6,7,16,21,22 22:6,12 24:3,20 26:9,13,24 27:18, 20 28:1,25 29:16, 20 30:10,18 31:1,7 32:4 35:6,8 36:10, 11,14 37:4,18,20, 23 45:14 46:1,3,8, 12 47:14,24 48:2 49:15,19 50:6,18, 21 51:1,3,6,9,19,24 54:1,20,22,24 55:5, 9,18 56:11,14 59:22 60:16,20,23 61:18,20 63:1 66:14,15,25 67:2,4 76:7,16,18,20 77:4, 8 86:5 87:18,21 89:1,3,4,5,11 90:10 92:18,21 101:14,24 102:20 109:15 113:14

**Ms** 4:6 18:17,19 19:3,5,12,13 20:21 21:1,5,12,18,20,25 22:2,4,7 36:25 37:24 45:2,4 46:2, 5,10,15 47:16,18, 21 48:1,11,15,23 49:1,3,21 55:15 56:15 60:20,23 66:17,20,22 67:3,6

71:3,10 76:6,19,21 78:3,5 84:4,9,12 86:3,8,16 87:17,20 89:1,4,8 90:9,16, 20,23,25 91:8,9 92:16,21 94:11 101:15,17,23 113:8,13

**much** 76:2 102:7, 22,24 112:2,5

**multiple** 74:6

**multiple-officer** 67:15

**murder** 39:8 96:1,3, 7,8 112:22,23

**murdered** 112:14 113:1

**must** 85:7,14 109:3,9

**my** 4:9 6:4,21 7:13 9:5,6 21:8 33:13 35:3,11,23 36:9,21 38:2 41:19 44:18 48:7,8 52:9 54:18 55:2,5,6,18 56:6 57:3 63:13 65:19 66:2 73:16,23 74:20 77:9,10 80:21,22 81:1 84:20 88:13 94:12 98:16,17,25 100:10 103:1,4 104:18,23, 24 106:6,18 107:3, 10,17 109:12 110:5 113:15

**myself** 4:9 12:20

**N**

**name** 5:5,19 36:7 39:15 45:7

**named** 36:12

**names** 13:3

**naming** 66:5

**nature** 16:11 104:12

**NCGS** 4:2

**NCIC** 26:16

**necessarily** 27:11 40:23 64:20 76:24 82:14,15 92:2

**necessary** 27:10 40:18

**need** 17:25 21:14 22:6 26:21 28:7 46:13 89:9 109:14

**needed** 44:5 58:15 109:20 111:16

**neighboring** 96:2

**never** 10:11,24,25 11:3,6,7,8 69:22 81:25 83:25 93:20, 23 105:22,24

**new** 5:15 6:12 13:24 23:12,13

**Newark** 6:12

**next** 8:7 14:15 19:3 24:22 26:9 41:22 49:12 53:13 68:20, 21

**night** 38:6 53:13

**no** 4:17,20 7:16 10:1,11 20:19 26:6 27:11 28:22,23 30:8 31:3 32:8,13, 22 33:21 35:3,11 40:23 42:11 43:13 44:5,18 45:13 50:9 54:3,17 56:4 58:14

59:19 62:20 64:6 69:15 71:21 72:2 73:15,17,21,23 76:3 77:5,6,10 81:10,14,16 82:11, 12 83:1,25 85:21 86:9 87:23,24 88:1, 3,5,8,25 93:1,20 94:3,7 95:21,23 96:5 102:5,20,25 103:23 104:13 105:16,19 108:24 109:1,2,10,17 111:16 112:10,12, 21,24

**nodded** 23:23 45:23

**nominal** 103:3

**None** 94:4,5

**nonsupervisory** 15:3

**nonsuspect** 80:18

**nonsuspects** 80:16

**nonviolent** 93:10

**north** 5:11,12,18,24 6:7 20:8,11 23:11, 16,17,18,19,20,21 106:22

**not** 4:7 7:10 8:22, 23 12:15 13:13,19 14:14 15:2,12 16:1, 16 21:22,23 24:24 25:1 26:19 27:11, 22 28:1,7 29:14,17, 18,23 30:8,23,24 31:3,5,6,17 32:11, 14 33:6,20,21 35:6, 11,20 36:7 38:5 39:22 40:3,23 42:25 51:16,18,20 53:10 54:18,19



WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

137

Index: note..oh

58:5 60:3,16 61:8
62:4 64:20,21
69:14,23 70:13
71:4,12,25 72:2
77:6,11 81:7,10,15
82:14,15 84:14,17
85:18,21 86:9 87:8
88:1,3,5 89:20 90:3
93:10 96:7 100:14,
16 107:10 111:20
112:6

**note** 101:19

**noted** 10:17,18
51:16,18

**notes** 52:13,15,18,
20

**nothing** 13:14
76:20 78:11 106:5

**now** 9:8 24:17,20
44:25 47:13 67:23
68:10,13 70:11
73:17 75:16 76:3,
18 84:21 89:24
90:11 94:22 101:12
102:15 110:12
111:20,21

**number** 15:19
20:22,25 21:2
32:12,17,21 38:11,
24 43:5 46:2,12
66:16,18 68:15
71:1,2,9 74:16
86:13 104:10,25
105:11,20 109:8
112:5

**numbers** 38:22

---

**O**

**obeying** 107:10

**object** 101:15

**Objection** 37:23

**obligations** 9:9

**obtained** 48:22,23
85:6,12

**obtaining** 24:3
85:14

**OC** 46:21,24

**occasion** 100:18

**occasions** 74:2
98:5 108:13

**occurred** 49:12
52:8,25 73:3 75:7
86:21 106:24

**of** 4:17 5:2,14,19
6:12 7:5,10,13,17
8:2,10,12,19,20,22,
23 9:9,13,16 10:16
11:6 12:1,23 13:3,
12,22 14:2,3,6,8,
12,13 15:1,15,16,
19 16:9,10,15,17
17:7 20:3,5,8,11,14
22:4,17 23:3,5
25:6,10,13,23
26:15,20,21,25
27:7,10,12,13,14,
21,22 28:2,6,9,10,
11,20 30:20,21
32:5,14,20,22 33:1,
4,23 34:8 35:1,2,
16,21 37:3,4,9,17,
19 38:7,25 39:11,
18,21,24,25 40:3,6,
11,17 41:14,23
42:1,8,16,17,23
43:2,5 44:9,10
45:8,16,18,25
46:13,20,23,24,25
47:3,11,14 48:7,9
49:7 50:2,4,15,23
51:20 52:10 54:11,

16 55:9,12,13 56:6,
8,25 57:3 58:11
59:7 60:4,12 61:4,7
62:7,15,16 63:13,
17,23 65:4,5,15,25
66:14 67:18 68:17
69:4,21,23 70:8,10,
11,13,14,23 71:11,
16 72:19,23 73:5,
23 74:8,10,11,19,
25 75:2,11 76:4,9,
11,13,14 77:4,7,20,
23,24 78:12,15
79:5 80:1,10,12,13,
18 81:1,9,12,24
82:18,20,25 83:7,9,
13,18,19,22 84:6,
21,25 85:7,8,25
86:19,22 87:5,6,21
88:13,19,21,24
89:14,23 91:14,15,
25 92:4,6,7,9,11,12
93:4,5,13 94:1 95:9
96:3,12,16 97:2,4,
15,21 98:4,5,16,22
99:8,9 100:2,10,11,
21,23 101:9 102:11
103:1,9 104:10,12
105:4,10,11,12,13,
20 107:1,5,10,24
108:3,4,6,10,21
109:3,4,8,11,25
110:2,11,19 111:6,
12,15,18 112:14
113:1

**off** 11:6 53:6 67:11
74:8 76:7 79:16
101:20,21 102:1
107:13,23 113:10

**off-the-record** 90:8

**offer** 13:20

**office** 6:17 8:5 9:14
11:2,18 13:12

25:11 26:15 32:21
41:19 45:9 47:7
52:9 53:7 54:18,20,
21,22 55:2,6,18
58:14 66:8,11
71:25 72:10 75:8,
10 78:6 85:10,12
87:14 88:17,19,23,
25 103:2,3,4
105:15,22,25 106:1

**office's** 34:3

**officer** 6:9 13:25
17:14 27:2 28:11,
15 41:14 42:5,7
43:16,17 44:7
58:13 64:19 67:25
68:8,12 75:13,17
81:1,22 83:5,18
86:22 87:9,13
91:16,21,23 98:8
100:22 101:10
103:12 104:6
107:21 108:2,8
109:9 111:11,12
112:2,5,6,7,9,12,
15,18,23 113:1,2

**officer's** 104:20

**officer-involved**
97:22 100:12

**officers** 10:17
32:10 38:10 41:4
42:19,21 60:2
75:11,19 94:16
96:16 98:6,9
100:11 103:20
108:4,6,7,11,12

**offices** 9:13

**officially** 14:14

**often** 80:22

**oh** 36:12,16 44:15
45:15,16 76:20



(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

138

Index: okay..our

86:11 94:18,21
102:10 105:16
106:3,6,18

**okay** 4:8,15,25 5:5,
10,12,25 6:6,8,18
7:2,5,14,19 8:4,9,
14 9:9,17,22 10:4,7
11:13,16,21,24
16:24 17:18 18:2,3,
4,5,7,10,15,17 19:9
20:20 21:13 22:15,
16,17,18,19 23:16
26:2,8 27:8,20
28:25 29:9,15 30:2,
13 31:4,12 33:17,
22 34:5,7 35:6,19,
24 36:6,16 37:1
38:9 39:16,18 40:8,
10 41:4,11,22
42:13 43:19 44:20
45:6,7,10,18 46:3,
14 47:3,10,15,24
48:5,11,19 49:4,11
50:13,18,25 51:22
52:7 54:23 55:24
56:17 57:10,12,23
58:16,18 59:3,13,
21 60:4,15 61:13
63:3,6,10,16 64:9,
13,21 65:9,22 66:7,
12,14,25 67:3,5,7
68:5,19 69:5,12,16
70:5,17,24 72:5,9,
14,18 73:9 74:21,
25 77:3,6,12,19
78:2,9,13,14,17
79:9 80:4 81:5
83:12,22 84:1,11,
13,20,24 85:2
86:15 87:16 88:9
90:14,19 91:6,15
92:14,17 93:12,14,
25 94:13,21 95:14,
24 96:9 97:24

99:12,20 100:14
102:11,13,14,18,19
103:7 104:10
105:2,5 106:21
108:15,22 109:18,
21 113:24

**old** 80:25

**Oleoresin** 46:20

**Oliver** 48:10,23
49:1,3,21 55:15
56:15 60:20,23
68:24 69:1 92:21
94:11

**Oliver's** 92:16

**on** 6:4 7:13 9:14
10:1,17 12:7 14:5,
18,19 15:7,19,22
18:13 19:14 22:23
24:15,21 25:5
27:14,25 28:25
29:6,23 32:21,25
33:18 34:16,18
35:12,13,17 36:4
37:2 38:5,19,21
39:1 40:15,17,24
41:15,18 42:11,18
44:16,18 45:25
46:12 47:23 48:8
49:7 50:5,15 51:6,
10,12,14,16 52:5,
12 53:3,14,15,17
55:5 56:8 58:21
60:3,13,17 61:5
63:23 64:11 65:5
67:11 68:2 71:5,16
73:7,25 74:17,20,
23 75:11,19 77:10,
13,14 78:10 79:15,
22,25 84:22 85:24
87:13 90:10,11
91:3,18 93:9 96:7
98:5,6,17 100:19
101:2 103:25

104:16,17,21,25
106:5,22 107:2,3,
21 108:21,25
110:5,19 112:5,21

**on-the-job** 99:1

**once** 7:12 8:19
11:11 12:13 14:4
17:7,9 25:16 29:21
35:11,14 54:25
55:21 67:1 83:17

**one** 10:16 11:11
12:10,23 16:9 17:4,
6,12,13,16 27:22,
23 28:2,9,11,14,20
32:9 33:4 37:3
56:15 67:14,15,16
68:1 73:5 74:19
78:21 86:22 94:10
95:5,14 96:14,16,
19 97:2 99:17,19
101:4,5,8,18 103:9,
11 106:8 107:1,14
108:1 111:18,19,20

**ones** 14:5 104:24

**ongoing** 26:22

**online** 12:3

**only** 47:6 63:6,8
80:18 92:1 94:9
98:16 99:17 108:17
111:18,19,20

**opened** 10:20

**opening** 25:20

**operate** 43:9

**operating** 57:3

**operation** 38:21

**opinion** 12:15
59:21

**opportunity** 48:2

**options** 68:22,23

**or** 4:12,17 6:9 7:15
8:22 9:13,20 10:10,
11,12 12:3,15,20,
25 13:10,16,23,24
15:2,12 16:14 17:3
20:4,10 21:9,22,23
23:3 26:4,19 27:23
29:5,11,14,23
30:23,24 32:5,10
34:14 35:2,13
40:13 42:5 43:1
44:13 46:25 47:4
51:6,13,23 52:23
53:8,12,13 54:5,13,
18,19 55:6,25 59:8,
25 60:1 61:5 64:17
65:2 68:7 69:10,19
77:13,23 79:14
80:7,25 82:16
85:13 92:1,2,5,7,8,
9,11 93:8 95:19
97:20 98:3 99:24
101:1 103:15
104:11,12 105:25
106:1,8,15 107:7
108:10,11 110:1
111:9

**oranges** 110:10

**order** 49:22 51:14
66:6 83:6 85:7,9

**other** 24:4 25:6
33:7 46:24 61:14
63:21 68:1,22,23
70:12 87:10,12
92:8 93:16 95:24
98:6,19 100:11
103:2,20 106:15,16
107:13 108:12

**others** 24:18 92:10

**our** 12:14,15 23:3
29:21 62:14 69:10



**(866) 715-7770**
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

139

Index: out..policies

96:2

**out** 6:12 8:19,20 10:23 14:4 17:2 23:3,7 24:2 27:15 36:20,21 38:5,25 39:24,25 40:6 42:5 47:11 53:6 57:21 61:24 62:7 63:13 74:10,11 79:13,17 86:22,24 90:6 95:2 96:12 97:2 102:11 107:2,6,13 108:3,4, 10 111:12

**outcome** 57:19 95:9,12

**outcomes** 108:18

**outside** 20:8,11 55:9 78:12 104:23

**over** 9:2,3,11 10:8 11:3 12:19,25 13:6 14:8 15:11 16:9 22:10 24:10 34:19, 20 38:3,7,8 40:7 45:5 56:23 63:12 66:4 70:15 74:13 83:15,20 89:9 96:16 98:20 107:5

**Owl** 5:11

**own** 7:13 35:3 97:19 113:15

---

**P**

**p.m.** 76:5 101:22 113:12

**page** 18:6 19:14 22:4 45:25 50:1,4,9 66:14,21,22 67:11 85:1

**pages** 84:25

**panel** 12:12,16,17 17:5 26:3,4,7 27:8, 9,17,20 28:3,14 29:12,21,25 30:7,8, 10,13,17,20,21 31:1,4 36:19 43:10, 13 100:21

**panels** 32:25 37:3

**panic** 70:15

**papers** 8:2,3 14:6 37:15

**paperwork** 35:15

**part** 20:14 33:23 40:3 56:6 57:3 73:23 100:3,5,10, 19 109:3

**partially** 106:25

**participating** 4:11

**particular** 13:15 24:16 25:17 28:15, 24 32:9 33:13 36:15 37:5 38:11, 12 42:4,8 44:6 83:16,21 96:7 103:19

**Pasquotank** 23:19

**passing** 103:3

**patients** 7:25

**patrol** 6:23 7:21 8:6 14:19 15:17,23 17:10 100:22

**patrolman** 106:23

**pay** 15:1 44:4

**payroll** 87:14

**pen** 46:13

**people** 12:22 13:7 16:9 24:14 25:9,13,

19 28:16,20 42:20, 21 60:3 61:9,10 73:4 74:3,5,17,20 79:20,23 82:4 83:15 86:19 93:8 101:9 105:14,21 106:2,3 108:14

**people's** 24:10

**pepper** 63:21 64:24 65:11,16 69:19,21 70:7,9 73:25 74:3

**pepper-sprayed** 73:4

**per** 109:11

**perfectly** 21:9

**perform** 28:3 60:16

**performed** 13:7 24:21 53:17,20

**period** 5:14 14:4 25:5

**permits** 37:14

**Perquimans** 23:20

**person** 9:15 13:18, 20,21,25 34:18 36:15 42:6 54:1,4 60:11 68:2 91:24 92:3,6,11 93:5 95:4,16 97:8 103:10 105:3 106:6 107:7,21,24 108:11 112:14

**person's** 40:16 41:12

**personal** 35:3 70:23 88:23

**personally** 83:24, 25

**personnel** 89:6

**persons** 61:14 63:6,8

**pertaining** 48:9

**phase** 7:10,12 25:10

**phone** 54:13 55:6

**phrased** 72:6

**physical** 91:24 92:4,10

**pick** 82:16

**Pitt** 23:20

**place** 28:13 43:1 65:4 80:25 81:2

**placed** 112:19

**places** 20:10

**placing** 65:2

**Plaintiff** 4:18

**played** 77:10

**plays** 113:4

**please** 21:15 37:25 47:20 58:8,9 85:1 90:14,16

**pleasure** 110:2,11

**point** 11:2 13:1 24:24 25:2,3,24 26:1 27:5 35:25 36:3 49:24 52:10 54:17 55:1,2,3 85:4

**pointed** 57:21

**pointing** 95:5

**poked** 103:5

**police** 6:9 28:17 36:18

**policies** 72:15,16 76:14



**policy** 35:1,2 44:24 45:3,8,9,11,19,22, 25 47:2,11 58:22, 25 59:14,20 66:13 67:7,8,9 69:3,7,10, 13,17 70:25 71:8 84:5,8,13 89:18 91:10 92:24 97:24

**poor** 25:1

**portfolio** 36:22

**portion** 90:2,3,4,5 91:13

**position** 6:18 8:15 9:6,18,23 10:9 15:25 16:6

**positions** 31:15

**possible** 78:11

**posted** 82:7

**potential** 18:13

**practice** 54:10 81:25 97:25 98:1 109:6,7

**pre-employment** 12:6

**prepared** 5:1 85:8

**presence** 55:5,9 63:19 64:23

**present** 54:21

**presents** 92:9

**president** 31:24

**presiding** 85:8

**pretend** 13:13

**pretty** 20:15 74:21

**prevent** 92:5,11 93:4

**previous** 31:15

**previously** 27:2

**primarily** 9:25 13:9, 10 14:5

**prior** 46:20 68:24 85:13

**prison** 93:9

**probably** 6:15 14:2 37:3 39:14 77:19 81:20

**problem** 88:9,13, 21,25

**procedure** 57:3

**procedures** 72:15, 17

**proceedings** 21:19 47:25 76:5 101:22 113:12

**process** 11:17,20 12:1,13 17:1 24:22 27:7 29:10 33:4,5, 12,23 34:6,7,8 41:11 44:10 48:19 79:5 97:21

**processed** 49:13

**produce** 51:15

**progressively** 44:14

**promoted** 7:1 8:6, 8,11,21 13:1 14:14, 21

**promotion** 6:21 14:23 15:2

**proof** 47:8

**prospects** 24:8

**provide** 26:24

**provided** 77:16 103:15

**public** 10:23

**pull** 17:18 20:5,21 21:25 58:8 66:12 70:24 71:8 86:3 87:17,18 89:1,10

**pulled** 45:3 84:1

**pulling** 107:8

**purpose** 30:20,21 80:2 91:25

**purposes** 4:17 23:5 80:3

**Pursuant** 4:2

**push** 74:8

**put** 22:17 27:15 31:18 32:21 46:12 53:15 60:13 64:11 74:16,18,20,23 81:25 107:2,3 108:2 112:4

**putting** 33:10

## Q

**qualification** 91:14

**qualified** 25:23 88:18

**qualify** 25:8

**quantitative** 112:4

**quarter** 67:16

**question** 19:10 30:16 37:25 38:1 39:20,22 50:13,14 51:4 65:12 68:6 72:3,9 77:12 80:11 84:20 102:16 108:17 109:24 110:3,9

**questions** 4:17 18:8 23:25 24:5,9 50:3 78:4 84:22 102:4 113:15

**quick** 66:23 67:13

**quite** 8:22,23

**quote** 51:20 63:13, 16 76:15

## R

**raids** 79:22,24

**ran** 26:4,6,8 27:16 53:4

**range** 90:6,7 104:3 110:18,19

**rank** 13:3

**ranks** 13:18

**rape** 39:10

**rare** 100:18

**rate** 97:4 107:9

**reach** 23:3

**reached** 23:7 58:19

**reaching** 24:2

**reaction** 70:6,9

**read** 18:23,25 19:14 22:6 23:9 45:7,12 58:7,9 85:3 90:14 91:6,7,15,20 92:24 93:2

**reading** 46:19 68:20

**reads** 57:22

**ready** 25:15 67:4,5

**realized** 53:7



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

141

Index: really..reviewed

**really** 27:24 36:22 102:14

**reason** 18:22 19:1 28:23 31:16 36:20 96:21 111:12

**reasonably** 92:1,3, 6

**reasons** 28:8,21

**recall** 24:19 26:10, 11,12 27:20 28:1 34:9 35:8,9,18 48:16 49:4,18,19 53:22 55:7,10,11 56:20 57:14,15,16, 17 62:16,19,20 67:24 68:7,10,13 71:14,17,18 77:22 79:22 80:13 81:5 94:22 97:13 99:20 100:20 104:10 106:17

**receive** 46:21

**received** 10:25 11:1 27:10

**recently** 16:5

**recess** 21:19 47:25 76:5 101:22 113:12

**recognize** 22:20 63:14,15 91:1

**recommend** 29:10 30:8,10,14,23 31:1 59:8,12,13

**recommendation** 29:2,3,6,13,15,22 31:13,18 35:20,23 36:8,9 43:20,22,23 44:1,13,15,18 51:15 55:23 57:6,8, 21,22 58:8,10,11, 19 77:11 110:4,5

111:22

**recommendations** 12:14 16:14,16,17, 22 29:21

**recommended** 29:1,4,7,16,20 30:7,18 31:5,6,17 32:10,11,14,15 35:7 36:18,19 58:3 67:25 68:8,11

**record** 5:6 20:2,13 23:5 24:3,4 38:12, 13 48:11 76:4 78:10 87:19 89:6, 14 101:20,21 102:2 113:11

**recordings** 48:25

**records** 9:2 20:5 37:13,14 83:12,18, 19

**recruited** 6:11

**refer** 4:18,22 14:9

**referred** 86:18

**referring** 33:24 50:7 56:1 67:12 86:7 96:19

**refill** 47:22

**reflect** 48:11

**refused** 74:10

**registration** 53:4

**release** 79:19

**released** 79:7

**Relevance** 37:23

**relevant** 43:17

**relied** 77:13,14

**rely** 98:6

**remain** 87:13

**remember** 10:16,22 11:5 12:18,24 17:22 24:9 32:7,8 52:17,23,24 54:8, 12,14,15 55:13,14, 15,16,17,19,21,24 56:4,5,13,14,16 58:1 80:23 94:10 99:17,19,25 104:5 112:1

**remotely** 4:3

**repeat** 4:8 86:1 88:20

**report** 16:3 38:9,16, 18,24 39:5,9,10,11, 12,13,19 40:1,9,10 41:4,8,9,10 43:6 44:8,9 47:17 48:21, 22 50:2,4,23,24 51:7,15 52:3 54:9 55:14,20,22 57:11 64:5,8,12,16,18 68:15,17 70:2 73:23 75:4 77:25 110:20,24 111:2,4, 5 113:17

**reported** 47:1

**reporter** 4:16 90:4, 8

**reporting** 73:24

**reports** 38:3,7,8,10, 19,20,21 39:2 40:14,21 49:22 51:7 77:13,21

**reprimanded** 87:9, 12

**request** 20:3,9 26:15 34:20 100:6, 8,13,17

**requester** 34:21

**requesting** 33:22

**requests** 23:4

**require** 60:18

**required** 38:18 39:5 41:4 47:1

**requirement** 89:23 110:20,24

**resided** 5:12

**resist** 74:4

**resisted** 74:3

**resolved** 42:10

**respond** 24:15 109:5

**response** 19:17

**responses** 102:4

**responsibility** 14:2, 3 78:22

**responsible** 11:11 25:11 37:13 83:14

**restroom** 76:1

**result** 75:1 82:9 92:12 93:5 107:24 108:10

**retired** 9:21 11:20 16:5,6 65:24

**returned** 96:12

**review** 17:11,24 26:4,7 45:24 46:16 47:19 48:3 84:21 86:12 89:11 90:15, 17 108:24,25 109:1 113:9

**reviewed** 19:21 84:16



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

**reviewing** 24:4 47:21

**rewind** 26:2

**ride** 7:11

**right** 8:24 9:8 16:17,22 18:18 21:12 24:17 30:19,25 34:2,18 36:16,23 38:15 40:2 50:11,12 58:16 59:7 66:23 67:22 68:10,13 70:11 71:5,6 75:17 88:2 94:20,22 101:12,13 102:18 106:10 111:20,21

**right-hand** 45:14,15

**rights** 21:10

**rise** 81:23,24 82:3

**road** 6:23 39:23,24,25 40:4,7 106:24

**Robinson** 4:6,9 18:17,19 19:3,5,12,13 20:21 21:1,5,12,18,20,25 22:2,4,7 36:25 37:24 45:2,4 46:2,5,10,15 47:16,18,21 48:1,11,15 66:17,20,22 67:3,6 71:3,10 76:6,19,21 78:3,5 84:4,9,12 86:3,8,16 87:17,20 89:1,4,8 90:9,16,20,23,25 91:8,9 101:15,17,23 113:8,13

**role** 37:2,4 94:15 113:4

**roles** 8:18 13:15

**room** 9:16 11:4 107:20

**rose** 41:23

**roundabout** 32:17

**rule** 58:22

**run** 20:1 34:10 64:14,16 79:16 96:16,25

**running** 96:25 97:1

**runs** 14:17

---

**S**

**safe** 27:8,12 45:21

**said** 4:8 9:11 19:22 21:23 31:22,24 33:10 36:6 37:6 41:11 50:8 51:21,23 53:16,17 55:10,24,25 56:4,5,9,10,17 57:14,24 59:19 60:20,23 61:2,25 62:2,3 64:23 68:19 69:18 71:23 72:4,7,18 79:9 84:17 88:20 93:18,20,21,23 94:21 96:5 99:2 101:18 107:22,23 112:22 113:18

**same** 14:19 15:1,7 22:13 23:14,15 49:9 62:6 93:17

**sat** 10:20 17:4 27:15 32:25 37:2 52:9

**saw** 17:15 53:2 57:20 87:16 97:2

**say** 7:14 10:1 14:24 16:12 19:6 20:12,15,17,18 27:8,12 28:11,12 29:23,25 30:1 31:22 33:17 34:17 37:21 41:20 44:7 45:21 46:7 51:17,20 52:25 55:8 56:1 57:5,23 59:19 62:11 64:15 69:12 70:17 78:12 79:18 80:6 82:17 94:9,18 101:16 104:14 106:3,6,15 109:19 110:23 112:3

**saying** 10:8 29:7 30:25 49:2 52:21 62:5 71:17,18,24 72:2 73:10 77:2 78:10 109:3 111:20

**says** 18:20,22 50:9 68:21 91:16,20

**SBI** 97:16,20,22 100:13

**scare** 105:3

**scared** 105:4

**scenario** 24:16 113:5,6

**scenarios** 24:15

**scene** 10:23

**scenes** 9:14

**school** 5:16,17 6:15 7:7,9 20:4,11 24:11 80:25

**scope** 78:12

**screen** 22:11 90:10

**scroll** 17:24,25 18:18 22:13,15 71:3 90:16,17 91:8

**sealed** 10:17,19,20

**search** 80:24,25

**second** 46:19 67:14 71:7 89:9

**section** 45:25

**security** 25:12 27:1

**see** 17:14 18:20,22 22:3,17 26:14 33:2,13 35:12 38:23 39:23 45:15 50:6,18 59:20 63:15 64:7,10 66:23 90:18 93:15 113:10

**seeing** 103:2

**seek** 6:2 103:14

**seeking** 34:8

**seem** 69:16

**seemed** 53:14

**seems** 50:7

**seen** 55:14 64:7

**self-defense** 112:25 113:4

**self-protection** 47:1

**send** 25:12 29:4 34:17,22

**senior** 5:20 14:10

**sent** 21:5 29:7

**sentence** 19:14 47:4 68:21 71:7 91:17,22 93:8

**sentences** 47:5

**separation** 59:9,10,13 67:25 68:8,11

**September** 91:3

**14:12,13**

**sergeant** 7:11 14:9, 15,16,25 15:6,9,12, 13,14,21 49:20 54:5 55:17,19 58:12 93:22

**sergeants** 15:18

**serious** 92:9 110:13,17

**serve** 8:1,17 53:8 93:9

**served** 15:25

**service** 25:8 58:14 111:16

**services** 44:5

**serving** 14:6 92:18

**set** 12:8 43:5

**seven** 102:16

**several** 74:2 95:2

**severity** 109:25

**sex** 8:13 10:6

**sexual** 110:12

**shake** 33:8

**shall** 46:21 47:1

**share** 108:18

**Sharika** 4:9

**Shaw** 18:20

**she** 36:23 49:4,5, 10,11,14 53:5,6,14, 16 87:3,4,7 93:2,7, 13 95:23

**Shearin** 12:23 13:3 83:17

**Shelton** 13:4 75:18

**sheriff** 4:19,20 6:19,20,23 7:3,20

11:22 12:14 16:4 17:8,15 26:1 29:4, 11,14,17,18,22 30:11,19 31:3,6,9, 20,22 32:6 33:6,7 35:20,24 36:2,4,5 43:24,25 49:25 55:22 56:18 57:14 63:1 98:7 110:2,11

**sheriff's** 6:9,17 8:5 9:14 11:2,18 12:1 13:12 25:11 33:18 34:3 35:9 38:17 45:9 47:7 58:14 66:8,11 71:25 72:10 75:8,10 78:6 82:25 85:10,12 87:14 88:17,19,23, 25 105:11,15,21,25 106:1 112:18,23 113:1

**sheriffs** 110:7

**shift** 14:8,17,18 15:20,22 24:24,25 25:15,18,19 53:11, 12 76:10 81:21

**shin** 67:11

**shoot** 42:19,21

**shooting** 97:22 100:12

**shootings** 59:4

**short** 10:21

**shorter** 42:22

**shortly** 28:13 99:23

**shot** 95:5,16,17,22 112:18,19,23,24

**shotgun** 95:2,3,4,5

**should** 21:11 29:6 48:12 50:1 111:1,3

112:19

**shoulder** 65:7 97:11

**shouldn't** 59:23 112:24,25

**showing** 89:24

**shows** 22:1 113:17

**sic** 111:5

**side** 14:19 40:7

**sign** 19:15 34:21 91:13

**signals** 107:10

**signature** 22:23 90:11,18,21

**signed** 91:4,5

**significant** 103:24 104:4,7,8,17 106:18

**simple** 41:17

**simply** 64:8

**simulated** 75:23

**since** 9:6 32:13,20 33:15 59:9 62:23, 24 75:6

**single** 12:22 28:23 100:4

**sir** 22:12 86:10

**sitting** 33:5

**situation** 10:15 46:25 74:7 79:12 80:19 88:11 103:12

**situations** 11:13 79:15 108:16

**size** 98:5

**skim** 84:8

**slam** 60:3,19 69:11

**slammed** 58:20 59:1,23 60:17,20, 23

**slamming** 68:24 69:9,13

**slight** 107:5

**slow** 84:9 107:11

**slowing** 107:4,6

**small** 25:1 28:18

**snakes** 105:4

**sniff** 80:5,7

**snippets** 52:22

**so** 4:15,20,24 5:1,5 6:8,9,22 7:2,19,20 8:4 9:7,11 10:7 11:16,25 12:18,21 13:6,12,17 16:5,8, 24 18:11 19:6,21 20:9,12,22,23 21:14,21 22:4,9,17 24:2 25:8,9,12,17 26:8,18 27:5 28:25 29:9,15,20 30:5,7, 13,22 31:4,15 32:24 33:2,13,15, 17 34:13,20 35:6 36:6 37:1,11,18 40:10,21 41:4,11 42:14,20 43:13 44:6,20,23 45:1,21 46:9 47:11 49:1,11, 18 50:25 51:22 54:23 56:25 57:13 58:3,5,8,16,21 60:25 62:7,9 64:7, 21,22 66:7 67:7 68:3 69:5,25 70:25 71:24 72:18 73:10, 18,25 76:13 77:9



78:6,9,15,18 79:9
80:22 81:17 83:22
84:13 85:16 86:21
87:1 89:9 90:10,17
91:10,15,18 92:14
93:14,15,18 97:10
99:2 103:1,2,6,21
104:23 105:10
106:11,12,19
107:1,7,14 108:22
109:2,25 110:15,18
112:18 113:4

**social** 27:1

**soft** 63:20 64:22,24
65:1,4,6,8,9 71:12

**soft-hand** 65:13,14
68:1,3,4,9,12
74:12,19

**soliciting** 110:12

**some** 8:2,17 9:20
11:2 13:1 14:24
16:15,17 18:8 20:7
23:24 24:14,23
25:19 26:24 27:5,
12,13 28:20 34:14
37:5 39:23 40:14
47:7,13 48:7 49:24
51:20 54:17 55:1,2
59:7 60:4 71:4 73:9
76:13,14 78:4 80:1
84:9 91:8 99:9
100:11 102:20
111:12 112:6 113:9

**somebody** 11:6,10
42:25 43:1 49:23
65:5,7 74:7 82:16
112:23 113:1

**somebody's** 34:11
65:2 95:1

**somehow** 32:19

**someone** 12:3
40:25 47:3 59:11
63:18 67:17 70:17
80:15 81:2,17
104:21 112:14

**something** 11:1,10
32:23 34:2 38:14,
15,18,21 40:25
41:1,17 42:6,21
43:3 53:16 64:8,12,
13 66:23 76:23
83:9 101:16 105:23

**Sometime** 52:2

**sometimes** 8:3
12:3 15:13,14 25:2,
12 27:24 28:5,6,16
65:4 70:12 79:25

**somewhat** 89:19,
21

**somewhere** 104:2

**sorry** 36:1 52:19
59:16 67:5 80:6
86:11 88:20 100:7,
15

**sort** 7:12 40:17
81:1

**soup** 105:13

**speak** 11:22 57:13
78:16

**speaking** 49:18,19,
20

**specialist** 87:22,25

**specialized** 8:13

**specific** 12:16 24:9,
20 79:22

**specifically** 10:8
16:25 26:11,12
27:18 28:1 57:13

**specifics** 35:10
83:7

**specified** 91:25

**speed** 97:4 107:10

**speeding** 53:3,5

**spoke** 54:1,25 55:4,
8 56:10,15 57:12
94:11 103:5

**spoken** 49:23

**spray** 46:21,24
47:8 63:21 64:24
65:11,16 69:19,21
70:7,9 73:25 74:3,
11

**sprayed** 70:22 74:9
108:8

**spraying** 46:25

**staff** 15:15

**Stainback** 13:5

**stand** 109:12,13,14

**standard** 54:10
57:3 108:24 109:1,
8

**standards** 29:5,7,
11,25 34:12 35:2
60:1

**stands** 36:21

**start** 23:6 34:9
40:20 41:24 51:24
66:24 91:19 99:10
107:3

**started** 6:4,16 7:2,
19,20 8:5 9:19 33:4
34:6,24 35:8 95:4
96:25 98:18,21
99:2 100:1 108:5

**starting** 13:17

15:15

**starts** 63:19 67:11

**state** 5:5 14:1

**statement** 50:6,18,
21 55:14 61:5 90:8

**statements** 42:4
51:22 77:13,15,16,
17

**stay** 109:13

**staying** 58:1

**step** 14:15 24:22

**steps** 43:4,5,8
44:12,15

**still** 11:1 28:14 64:4

**stood** 36:20

**stop** 18:18 40:6
107:22,25

**stopped** 36:5
106:24 107:2,21

**stops** 79:25

**straight** 25:21
60:12

**stray** 80:11

**stretch** 109:13,20

**strike** 73:7,11
75:22

**striking** 73:15

**struck** 73:18 75:24

**structure** 13:12

**student** 91:5

**stuff** 14:7 17:7
26:19,22 27:5,12,
13 40:6 63:13

**Subdivision** 91:25



**subject** 42:8 60:4 71:19,25 72:11,19, 23 73:5,14 74:10 75:1,25 76:9 77:24 79:8

**subjects** 79:6,8,10

**submit** 34:12

**submitting** 52:3

**subpoenas** 8:2

**subsection** 92:1 93:3

**substance** 85:9,23

**substances** 85:5, 11,17

**substantiatable** 111:5

**substantiate** 61:4

**substantiated** 61:7, 10 111:4

**substitute** 71:12

**succumbed** 105:12

**such** 59:25 65:10, 15 82:2

**sue** 105:15,17,21, 23,25 106:1,4,6,9, 10,11 107:15

**sued** 62:12 105:20 106:12 107:24 108:1,11,14

**suing** 62:1

**suit** 61:24 62:23,24 82:18 105:12

**suits** 82:9

**summarize** 53:1

**supervise** 15:18

**supervised** 15:19, 21

**supervises** 14:18

**supervising** 15:13 81:22

**supervision** 98:22

**supervisor** 8:18 14:14,16 15:5 40:17 41:12,15,16 43:12 54:10 104:20,22 110:23

**supervisors** 49:16 56:7 110:20,24

**supply** 80:25

**Supreme** 76:15

**sure** 7:10 8:22,23 17:19 41:16 49:24 54:11 56:7 108:23

**surprised** 85:19,21

**suspect** 85:20,22 108:2,3,4

**suspect's** 61:5

**suspects** 80:12 82:5,8 96:1

**suspend** 44:4

**sway** 106:8

**swear** 29:23

**sweep** 60:7

**Swilley** 83:18

**switched** 6:24

**sworn** 4:3 13:25 24:23 25:25 26:1 27:2

**system** 6:15 93:9

---

**T**

**take** 14:5 17:21 21:14,16 25:8 35:20,22 36:8,9 40:15 42:10,16,23 43:3,5 45:5 47:19 52:13 67:1 79:7 84:8 86:12 95:1 97:12 99:16 102:8 109:15 113:8

**takedown** 53:18,19 60:6 67:16 69:2 75:25

**taken** 10:22 79:15, 21

**takes** 42:20 67:13 75:14

**taking** 35:3 55:21, 22 79:5

**talk** 16:24 24:12,13 32:6 36:14 42:5,7 43:16 47:13 58:1 59:7 62:13 75:4 93:14 98:12

**talked** 31:21 43:11 49:14,15,24 62:3,4 64:21 66:8 77:12, 20 83:22 93:21,22, 25 113:16,25

**talking** 33:18 46:9 51:13 54:18,20 55:15,16,17,18 57:7,20 82:16 86:9 94:23 103:7

**tally** 32:19 61:12

**tapes** 48:24

**Tasers** 65:11,15

**team** 16:3

**tease** 69:5

**technique** 60:1,10, 16,18 65:14 67:10 68:1,3,4,9,12 71:13

**techniques** 60:5 63:21 65:13 71:19 72:11 74:12 75:20, 21,25

**telephone** 41:17

**tell** 5:10,19 6:8 26:11 27:18 29:9 31:12 40:12 42:14 43:4 44:5 53:20 54:7 55:11 57:7 60:4 67:8 74:1 76:16 96:18 101:7 111:9

**telling** 103:10,22

**ten-minute** 21:17 109:16

**tenure** 78:12,16 94:17

**term** 58:7 108:20

**terminated** 18:24 19:2,7 58:4 81:6

**termination** 58:16 59:10

**terminology** 13:22

**terms** 9:9 14:2 26:21 35:16 47:14 58:5 98:16

**tested** 85:14

**testified** 4:4 59:3

**testify** 5:1 10:3

**testimony** 5:3 54:23 61:5

**than** 6:15 14:11



39:14 42:21 46:24
61:14 65:10,15
68:1 70:12 101:5,8,
18 103:2,11

**Thank** 21:17,18,23
84:24 108:15

**that** 4:16,21 5:2,19
6:6,22 7:8,12,19,
22,24 8:14,21 9:11,
12,17,23,25 10:8,9,
19 11:1,6,9,10,13
12:2,12,13,23 13:7,
13,20,21,23,25
14:4,5,7,8,17,23,24
15:12,18,19 16:11,
12,15,18 17:6,7,12,
16,19 18:12,23
19:6,7,25 20:8,10
21:23 22:1,3,5,6,23
23:7,9,14,22 24:9
25:5,8,10,23 26:1,4
27:5,8,12,19 28:5,
7,15 29:2,6,7,9,25
30:1,19,22 31:12,
14,15,16,18 32:3
33:4,9,12,14,15
34:2,7,9,19,23,24,
25 35:1,3,17,18,19,
22,25 36:2,18,20
37:3,6,10 38:5,13,
15,17,18,22,25
39:20,22 40:1,2,5,
6,9,15,18,25 41:1,
2,7 42:1,7,8,17,20
43:3,5,7,21 44:11,
21 46:7,13,19 47:4,
6,8,14,16,19,22
48:7,12,22,23 49:1,
5,9,16 50:2,25
51:3,10,14,16,25
52:1,5,8,14,15,16
53:1 54:18,23 55:3,
5 56:12,15,16,20,
22,25 57:2,4,9,16

58:3,4,13,24,25
59:3,14,20 60:1,2,
21,22,23 62:10,16,
21,25 63:4,13 64:7,
11,13,15,16 65:3,5,
8,11,17,18 66:3,5
67:12,17 68:4,13,
15,19,20 69:3,5,10,
12,18,24 70:5,9,10,
11,14,18,19,20,22
71:8,11,15,17,18,
23,24 72:2,18,22
73:4,6,9,13,16
75:12,13,14 76:25
77:3,13,14 78:15,
22 79:16 80:6,10,
11,13,21 81:3,4,5,
17,21,22 82:1,2,3,
19 83:5 84:5,8,14,
15,17,18,20 85:3,
23 86:1,6 87:16
88:16,18,20,23
89:5,10,25 90:21
91:17,21 92:8,21,
24 93:14,18 94:10,
21,22 95:9,16 96:1,
6,13,15,18,24
97:12,18,21 99:10
100:24 101:3,4,5,7,
10 103:8,11,14,18,
21 104:2,7,12,17,
19,20,22,24,25
105:3,12,24 106:5,
7,21,22,23 107:14,
17,24,25 108:11
109:2,4,6,8,22,24,
25 110:3,7,9,11,14,
20 111:2,9,11,13,
18,22,25 112:12
113:6,17,19

**that's** 9:6,8 13:22,
23 14:2,10 17:23
18:6 19:19 23:15
24:17 28:9 29:19

30:12,25 31:8 34:6
38:19 40:3 43:17
44:22 46:1 52:7
55:3 56:15 58:5
59:6 62:10,15 63:2
69:22 71:2,4 73:15
74:19,21 75:14
80:18,22 81:1 82:7
86:2,18 88:22
94:11,13 95:5
96:14 97:24 98:1,7
100:19 101:12
102:23 106:18
109:21 111:19,20,
21

**the** 4:15,16,18,19,
24 5:5,19 6:11,14,
16,23,24,25 7:7
8:2,22,23 9:3,9,14,
15,16 10:16,17,18,
19,20,23 11:2,3,11,
17,19,25 12:4,5,7,
8,9,11,14,19 13:3,
6,10,11,12,15,17,
18,20,22 14:1,3,5,
6,11,12,13,15,16,
17,18,19,24 15:1,7,
8,10,11,14,15,17,
19,21,22,24 16:2,3,
4,16 17:1,5,6,8,9,
12,13,14,15,16,23
18:6,12,25 19:3,14,
20 20:3,5,14,22
21:7,25 22:11,13,
17 23:5,6,9,14,15,
22,23 24:22 25:11,
13 26:7,13,14,20
27:6,8,9,10,13,15,
16 28:6,17 29:3,4,
10,12,13,15,17,18,
21,22,23,24,25
30:4,7,8,10,11,13,
15,17,19,20,21,22
31:3,4,6,9,16,20,

22,24 32:3,4,6,19
33:3,4,7,11,12,18,
20,21,22,23,24
34:3,6,8,13,15,16,
21,22,24,25 35:4,5,
9,14,19,22,24 36:2,
6,16,19,20 37:4,9,
10,13,19,25 38:1,3,
6,8,17,19,20,23
39:1,2,23,24,25
40:3,4,6,7,15,16
41:11,12,14,15,16,
23 42:3,7,11 43:4,
16,20,24,25 44:1,
12,15,19,23,24
45:2,7,12,13,14,15,
18,23,24 46:8,12,
14,16,23,24 47:6,
13 48:7,11,12,19,
21,22,23,24 49:6,7,
8,16,22,24 50:4,7,
13,14,22,23,25
51:2,7,21 52:2,3,5,
12,17,22 53:3,4,7,
8,9,12,13,14,15,16
54:1,4,9,10,18,19,
20,21,22 55:3,6,13,
20,22 56:7,13,14,
21,25 57:5,7,19,20,
21 58:7,8,11,12,14,
16,20,24 59:1 60:3,
11,12,13,17,18,20,
24 61:4,11,12 62:6,
15,16,22,24 63:4,6,
8,10,17,19,24 64:6,
7 65:1,4,5,9,12,13,
18 66:4,6,7,8,11,12
67:5,13,14,15,16
68:1,2,20,21,24
69:4,7,9,12,16,20,
23 70:14,19,24
71:7,8,11,16,19,22,
25 72:2,3,6,10,11,
14,19,23 73:5,7,8,
15,18,20,22 74:4,

10,11,17,19 75:3,4,
5,7,10,11,17,19,21,
22,24 76:1,4,8,11,
14 77:7,8,13,19,20,
22,24 78:6,10,12,
18,20,21 79:5,6,7,
8,9,17,19,23,24
80:1,4,7,12,15,18,
23 81:1,2,8,20,22,
24 82:7,8,25 83:7,
9,22 84:5,11 85:6,
7,8,9,10,12,13,23
86:3,4,6,15,22,23,
24,25 87:5,6,7,13,
14 88:13,16,17,18,
19,21,22,24 89:17,
23 90:2,3,4,5,6,8,
10,11,15,19 91:2,3,
7,10,12,13,14,15,
25 92:3,5,11 93:4,
9,17 94:9,10,25
95:1,2,3,4,9,12,24
96:10,11,12,14,15,
16,19,21,22,23,24,
25 97:1,2,3,4,6,8,
11,16,20,22,24
98:1,5,7,19,22,23
99:1,12,15,25
100:1,3,5,9,10,11,
13,19,23,25 101:1,
2,3,4,20,21 102:1
103:2,3,7,10,17,19,
21 104:10,23
105:11,15,20,21,25
106:1,8,22,24,25
107:1,4,11,12,13,
19 108:2,3,4,5,6,
10,11,14,17,18,19,
20 109:3,23 110:2,
10,19 111:14,15,
18,19,20 112:3,10,
12,14,15,16,17,21,
22 113:2,5,11,16,
17,18,19,25

**their** 41:5 44:5 55:6
65:2,3,7 72:16
74:18 78:18,24
83:8 85:17 96:4
98:11 100:25

**them** 6:13 12:19,23
15:13 21:11,13,14
38:4,22 40:16
41:19 44:5 54:16,
25 55:8,25 60:13,
14 61:4 65:3,8 66:5
74:3,8,9,11,17,19,
20 79:17,24 82:5
83:24 93:9,24,25
97:15 98:4 99:9
103:9 106:20
108:21 112:25

**theme** 101:12

**themselves** 79:18

**then** 4:16 6:13,16,
24 7:1,11,12 8:5
11:5 12:7,13,14
13:2,21 14:3,9
15:4,9,14,15,23,25
16:3 17:5,8,9 23:7
25:14,16,21 26:8
27:16 28:13 29:11,
13 30:13 31:4
34:19,21 40:5,18
43:19,22,44 44:21
45:10 52:11 56:23
57:8 60:12,13
63:20,22 64:11
74:8 75:5,6 78:8,9
79:19,24 91:21
95:14 96:14 98:4
100:13 101:1
106:23 107:7,11,24
108:13 112:24,25
113:2,10

**there** 4:21 8:3
11:21,25 12:16,19
13:6 14:17,20

15:11,20,25 16:1
24:18 25:4 28:11
32:14,15 36:12,17
38:4 39:4 43:4
44:6,9,12 52:5,18,
20 53:7,13 61:8,9
69:20 71:6 73:5
74:6 78:12,17 79:1,
12,24 80:16 81:8
82:1,12 83:15
84:24 86:24 87:4
96:15,21,22 98:4
100:18,22 101:2
103:11,17 104:19
106:21 107:6
108:12,24 109:1,2,
5,8,22 111:1,3,24
112:9,11

**there's** 4:20 12:22
28:8 32:13 39:14
42:11 74:9 80:23
82:18 83:18 95:25
106:5 111:11

**thereafter** 99:23

**thereby** 92:2

**these** 21:10 22:20,
23 23:1,25 25:14
33:1,3 37:2 42:16
46:4 50:3,14 51:6
57:1,3 67:18 74:25
79:4 82:20 85:14
93:16 98:18,20
99:3,4 100:3,10

**they** 9:15 11:10
12:3,21 14:22
15:14 26:14,15,16
27:23 28:19,21
34:18,22 38:22
40:23,24 41:5,19
42:15,22,23 44:13,
16 46:5 54:7,8,11,
12,17,19,21 55:2,
25 56:1,4,7,9

59:14,20 61:25
62:8 70:12 74:10
77:15,18 80:2,16
82:17 83:12,16
85:14 95:20,21
96:3,6,10,12,25
97:1 101:8 107:23
108:5 112:19,24,25

**they're** 15:4 38:11
82:24 83:1

**they've** 79:23

**thick** 36:22,23

**thing** 62:5 66:3
94:9,10 106:3
109:10

**things** 7:25 9:2
10:5 16:10 25:14
26:18 42:16,24,25
51:21 57:4 65:20
113:10

**think** 6:21 17:13,14
19:19 20:7,24
21:11 23:22,25
31:14,16,20 36:4
50:1 53:4,6,9,15
62:13 70:14 76:7
80:23,24 81:4 83:1
87:15 101:16
102:21 104:1
108:13 110:14
111:18 112:15,16
113:2,8

**third** 67:15 92:2

**this** 17:19,21 18:8,
11,15 19:10,14,19
21:5 22:20 24:1,21
25:2,3 26:19,22
27:12 28:18 31:1
32:9,12 33:13 34:2,
3,17,18 36:23
41:20 44:2 45:8,10,



(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

148

Index: those..to

14,18,21,25 46:1,2
47:1,11 48:3,5,16,
17,20 49:12 50:14
51:15,16 53:21
54:2 55:12,20 56:6
57:11,13 58:19
61:13,24 62:4 63:7,
8,23 64:21 66:15,
17 67:1,7,8,9,10
69:12,16 72:9 75:7
76:16 78:10,11
82:18 84:1,13
86:12,13,17 87:1,9
89:14,22 90:2,15,
17 91:1,2,10,12,25
93:7 98:21 101:19,
20 102:8 106:6
108:23 109:3
110:15 113:15

**those** 8:19 9:7 13:7
16:9,15,17 20:10
23:2 24:2 26:18
27:21 39:2,3,7,17
42:9 43:18 47:4
50:25 51:2 58:5
59:7 60:4 61:14
63:6,8 73:1,8 74:1,
15 75:6,14 78:23
82:21,23 94:1,24
96:7 98:9 100:2
103:18 106:17
108:16 111:9
112:13

**though** 10:25 11:3
28:2

**thought** 33:12
36:23 81:2 86:23
96:24

**threat** 92:9

**threatened** 105:15,
17,21,22

**threats** 105:12,13

**three** 6:15 12:10,22
27:9,24 28:3 32:5
94:22,23 101:9

**three-person** 12:12

**threshold** 109:22

**thresholds** 110:8

**through** 7:9 13:18,
19,21 20:1 26:16,
17 27:6 33:5 34:16
37:18 38:24 40:14,
21 51:13 55:12
57:6 64:16 75:13,
14,21,24 83:6 85:6
98:20,25 99:1
103:3 107:9

**time** 5:14 7:10
10:16 12:10,22,25
14:8 15:11 25:9,14
27:5,13,14,15 28:6,
23 32:3 34:19,20
35:22 36:6 37:4,19
45:1 49:24 52:4,6,
17,22 54:17,19
55:1,2,3 62:6,25
63:5,12 64:7 65:19,
23 73:6 75:3,5 77:8
79:18 81:22 83:15,
17,20,21 96:6
98:20,23,24 99:15,
17,19,20 100:20
103:10,17 106:21
107:14,19 108:1
109:4

**timeline** 30:3,4

**times** 12:10 16:1,2
38:4 62:22,24,25
63:2 72:22,23 73:1,
8 95:2 100:12
105:11 106:14,15,
16

**to** 4:2,7,8,18,22 5:1,

16,21,23 6:14,21,
24 7:1,7,11,23,24
8:6,8,9,11,17,21
9:8,15,22 10:2,5,7,
24 11:22 12:11,14,
15 13:24 14:9,12,
15,22,25 16:3,4,24
17:1,4,8,9,14,18,
22,25 18:2,8,13,16,
23 19:3,6,10,15,20
20:1,2,4,9,11,22
21:10,13,14,19
22:4,6,8,9,10,13
23:3,6,7,8,24 24:2,
11,15,17,19,24,25
25:1,7,8,13,15,17,
18,19,22,23 26:21,
24 27:3,7,8,12,15,
18 28:21 29:3,4,5,
7,8,10,11,13,14,16,
17,18,23,24 30:2,7,
8,10,14,18,19,21,
23 31:3,5,6,17,20,
21,25 32:6,11,15
33:11,13,24 34:10,
12,14,20 35:1,11
36:18,19 37:1 38:2,
5,11,18,23 39:5,8,
9,10,11,12,13,19,
20,25 40:2,4,6,7,
16,19 41:1,3,4,12,
14,16,19,23 42:6,7,
10,17,19,21 43:6,9,
16,17,20,22,23,24,
25 44:1,3,4,5,12,
13,23,25 45:5,21,
24 46:3,6,8,16,20,
23 47:7,10,11,13,
22,25 48:2,9,19,24
49:14,15,18,19,20,
22,23,24 50:1,2,4,8
51:14,17,20,22
52:16 53:7,8,9,13,
15 54:2,11,25 55:4,
8,15,16,17,18,22,

25 56:2,4,7,10,15,
23 57:3,7,9,13,14,
17 58:1,18,24 59:1,
24 60:3,9,13,18,20,
24 61:20 62:12,14
63:14,16,17 64:5,7,
8,10,12,22 65:9,13,
17,20 66:12,13,21,
23,24 67:9,12,22
68:4,14,21,24,25
69:3,7,11,13,17
70:5,7,9,11,14,19,
20,24 71:7,23 72:6,
7,22 73:2,4,5,6,10,
14,23 74:2,3,7,8,
10,11,20 75:3,4,22
76:1,5,10 77:1,24
78:21,22,23 79:4,7,
16,18,25 80:3,4,7
81:4,10,11,17,23,
24 82:3,5,17,19,20
83:5,6,19 85:1,3,
10,14,17,24 86:2,7,
9,18 87:6,7 88:11,
12,16,22,24 89:10,
11 91:7,13,20 92:1,
2,3,4,7,10,11,14,15
93:4,9,10,15,16
94:2,6,12,22 95:1,3
96:14,16,19,23,24
97:1,15,16 98:6,12,
14 99:17 101:2,22
102:8,11,18
103:15,19,20
104:4,11,16,17,20,
24 105:2,12,15,17,
21,22,23,24 106:3,
4,5,9,10,20 107:11,
16,20 108:4,17,18,
22,23 109:4,12,13,
14,15,19,20,23
110:1,9,10,24,25
111:19,21 112:2,
10,12,16,17 113:9,
12

Advanced**ONE**
LEGAL

(866) 715-7770
advancedONE.com

**today** 5:3

**together** 17:7 30:3 55:2

**told** 52:9 54:9,12 61:20 62:25 95:2 102:21

**too** 16:22 21:6 76:16 78:10 103:18

**took** 11:6 97:14

**top** 22:17 23:6 45:14,15

**totally** 102:18

**towards** 22:11 95:5 97:3,4 111:16

**town** 28:18 62:7 111:12,13

**track** 38:22

**trackable** 38:25

**traffic** 40:5 79:25 107:3,4,6,10,21,25

**trailer** 107:12

**train** 75:10,19 80:4,7 85:17 88:11,12,24

**trained** 7:3 47:8 60:3 78:23 82:21 85:24 99:12 103:22

**trainer** 88:2

**training** 7:5,9,12 14:2 29:5,7,11,24 34:11 35:2 36:21 46:21,25 60:2 66:9 69:10 71:22,23 72:4,7 73:16 75:12, 13,17 83:2,6,8,13 85:5,11,14 87:18, 19 89:4,15 91:3 98:9,10,11,12,14,

17,19,25 99:1

**transfer** 14:25

**transferring** 14:24

**transpired** 52:8 107:25

**transport** 7:25 107:8

**trash** 39:23,25

**tried** 53:15 74:2,7, 8,10 96:16 108:4

**trooper's** 107:1

**truck** 107:8

**true** 67:17 105:3

**try** 40:16 53:8,9 59:24 79:7

**trying** 27:7 28:21 30:2 57:12 73:6,10, 14

**turn** 11:10 12:3,4 56:23 66:21 79:18

**turned** 9:15 10:24 53:3 97:3

**two** 4:24 7:15,16,17 15:17,18 16:2 27:23 32:5 92:18 96:1 108:13

**two-man** 75:24

**two-year** 19:15

**type** 7:5 8:10 9:7 33:15 38:7 42:17 44:9,10 75:2 100:2

**types** 8:12

**typewritten** 52:18, 20

**typical** 11:25 37:19, 22 41:11 42:11

**typically** 12:12,18, 19,22 15:17 25:4,9 32:2 41:22 42:9,15 76:13 98:7

**typing** 52:16,22,23

_____

**U**

**U.S.** 6:11

**Uh-huh** 9:10 64:3 96:20 111:4

**ultimately** 29:1,15, 22 30:5

**uncontrollably** 69:2

**under** 33:6 37:10 59:25 67:21 73:14 88:18,24 92:24 93:2,4 98:22 112:19

**undergo** 7:6

**understand** 13:11 14:12,13 30:2,15 37:1 43:7 44:11 51:4 77:1,2 103:9 108:23 109:24 110:15

**understanding** 46:23 78:15

**undetermined** 25:13

**uniform** 64:6

**uniforms** 25:1,6

**Union** 23:21

**unit** 15:12 79:2,13 95:1

**units** 78:7

**University** 5:24 6:7 18:20

**unless** 31:24 92:10

**unlimited** 112:7

**unpack** 73:9

**unreasonable** 76:24

**unsubstantiated** 61:8

**until** 8:17 9:21 25:14 32:20 94:14

**up** 12:8 13:18 14:15 16:3 17:18 19:11 20:21 21:25 25:13 32:19,23 33:14 34:17 41:19 45:3 47:17 48:21 58:8 66:12,22 67:1 70:24,25 71:5,6,8 82:16 84:1 86:3 87:17,18 89:2,10, 24 91:8 101:11 104:18 107:2,12, 18,22 109:12,13,14

**update** 75:12

**updates** 75:14

**upon** 91:24 92:12 93:5 96:10

**us** 13:21,25 17:25 18:2 26:25 32:5 34:22 62:1,14 67:8 75:14 79:22 90:14 91:13 102:8

**usage** 85:24

**use** 13:3 39:11 40:11 42:8 46:22, 24 47:3 48:9 50:22, 23 58:5,7 66:4 69:21,23 70:14



WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

150

Index: use-of-deadly-force..way

71:11 72:19 73:5
75:11 77:20,23,24
79:24,25 81:9 83:9,
22 88:13,21 89:23
91:15 92:4 93:11
96:13 97:21 99:7,9

**use-of-deadly-force**
90:11

**use-of-force** 16:10,
14 40:13,14,21
41:8,9 44:9,24
45:3,22 48:21
50:24 51:6 52:3
58:23 61:1 63:11,
18 70:25 72:20,24
74:25 75:4 98:15
99:4 108:25

**used** 17:23 18:12
23:3 59:24,25
64:22 67:25 68:22,
23 69:19,25 73:25
74:12 80:2 82:2
83:19,24,25 85:5,
10,16,24 88:24
90:7 92:25 93:8
94:16,19

**using** 77:22 88:10,
25 90:6 91:24

**utensils** 82:25

---

**V**

**vacant** 81:2 86:23

**vaguely** 31:14
63:12

**Vance** 5:20 6:14,16
7:8 8:5 10:13 11:2,
14,17 13:12 35:2
45:8,9,21 58:14
66:7,11 71:18,21,
24 72:3,7,10,14

75:7,10 76:15 78:6
82:10 85:10,16
87:13 88:17,19,22,
24 89:18 98:2
101:13 103:8
104:11

**various** 28:8

**vehicle** 96:10,15,
18,22,25

**verbal** 53:5 63:20
64:23

**verbatim** 53:2

**very** 61:2 77:19
93:15 102:21 104:7
107:9

**vest** 107:3

**via** 21:5

**victim** 58:20

**victims** 43:15

**victims'** 107:1

**view** 52:10

**violated** 58:25
59:14,20

**violence** 110:22
111:1,7

---

**W**

**wait** 25:22

**waiting** 25:5,18

**Wake** 23:17

**walk** 33:7 37:18
41:19 55:12 56:24

**walked** 31:20 53:6
103:4

**walking** 65:7

**WALLACE** 4:2

**want** 4:8 11:22
13:24 18:8 19:10
21:12,13 24:19
37:1 41:14,16
44:23 47:10,13
50:3 61:20 63:16,
17 66:13,23 69:17
70:14,24 75:23
82:20 86:2 91:20
98:12 108:22,23
109:15,19 113:9

**warehouse** 86:23
113:20

**warehouses** 86:23

**warrant** 93:10

**warrants** 8:1 53:7,
8,14 92:18 96:8

**was** 4:3 5:14 6:6,
11,18,21,22,24 7:1,
12,16,18,23 8:8,11,
16,20,22 9:1,2,3,
15,20 10:18,21,22,
24 11:1,11,25
12:12,16,19,23,24
15:13,19,20,23,24
16:4,6,7,17 17:3,5,
13,14,16 19:17
20:15,17,18 21:21,
23 23:22 24:22
25:17 27:2,17
28:11,23,25 29:16
30:5,6,18,19 31:16
32:1,3,6,7 33:2,9
34:15,23 35:1,3,5,
6,7 36:12,17,22
37:3,9,16 38:4,5,
17,23,24 40:4,15,
17,18,25 41:15
42:7 43:4 44:6,9,21
46:11 48:14,22,23
49:9,12 50:13,22

51:12,13,14 52:5,
22,23 53:7,23 54:1,
4,13,18,20,22 55:1,
5 56:14,25 57:2,19
62:5,9 64:13 66:19
68:14 69:1,3,7,9,
13,17 71:12 73:5,6,
14,16,20 75:3,15,
17 80:11 81:2,3,5,
22 84:3 85:13,24
86:14,23,24 87:1,3,
4,9,11 88:16 89:7
90:24 92:14,15,18
93:2 94:10,25 95:9,
12,13,14,16 96:13,
15,17,19,21,22,24
97:6,8,11,12,19
98:17,22 99:24
100:1,22,24 101:1,
3,10 102:4,6,7,25
103:3,6,11,15,17,
18,19,21,23,25
104:1,2,4,7,8
106:21,22,23,25
107:4,10,14,16,19,
20 108:6,9,21
109:7,8 111:14,16
113:17,19

**wash** 34:20

**wasn't** 5:14 10:19
21:24 33:12 34:4,
25 36:6 51:10 77:9
87:4 95:23 103:1,
25 109:6,7,11
112:23 113:24

**Watkins** 12:24 13:4
49:14,21 55:15
56:11 58:12 93:23
94:8,10

**Watkins'** 56:14

**way** 4:21 5:11
28:24 32:13,22
33:9 34:15,24,25



WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

151

Index: Wayne..where

35:5,21 43:9 72:6
82:3 87:10,12
93:17 106:8 110:10
111:15

**Wayne** 23:16

**we** 4:24 12:2,7,13,
16 13:20 14:9
15:17 16:1,2 17:7,
23,25 18:12 19:11
20:24 21:5,16
24:10,12,13,14
25:1,9,10,14,19,20
28:5,7,8,13,16,18,
19 29:4,12 30:5,22,
23 31:5,14,16,20
32:1,2,3,7,14 34:2,
20 42:20 45:2 46:9,
10 47:16 52:11
57:12 62:9,12,13
64:21 66:22 67:1
69:9 71:11 75:12,
13,24 76:3,4,7,18
77:12 78:8 79:24
80:21 82:1 88:15
89:9 90:10,18 91:2,
20 94:25 95:7,25
96:7 102:14 103:5,
7 108:9 110:2
113:8,10,16,25

**we'd** 28:14

**we'll** 21:16 25:11,
12 70:5

**we're** 8:4 19:11
20:22 23:6,25
24:25 27:6 29:23
46:9 57:20 60:3
62:12 66:17 79:18
91:13 94:23

**we've** 28:16 32:15,
20 42:19 62:24
79:5,15,16,17,21

**weapon** 88:14,15,
16,18,22,23 92:7

**weapons** 65:10,15
82:22

**wearing** 69:1

**wears** 64:6

**week** 7:14 49:9

**weeks** 7:15

**weighted** 85:15

**Welborn** 49:20
54:5,23,24 55:4,17,
19 56:3 58:12
77:16 93:22 94:6

**Weldon** 4:2 5:7

**well** 9:4 11:21
16:15 17:13 21:1,7
24:19 26:2 34:10
36:17 56:10 57:12
58:7 62:3 68:5
69:12 72:9 77:23
84:20 90:15 91:6
93:15,25 97:17,18
103:23 105:2 110:4

**went** 7:7,9 10:2
14:22 17:9 20:4,11
24:11 28:12 31:9
38:14,15 39:1 53:8,
13 87:7 96:23
100:24 101:2

**were** 6:20 7:3,24
8:3,6,14,19,24
9:11,17,23,25 10:8,
9 11:21,25 12:21
14:21 15:25 16:2,9,
21 21:4 32:24 33:8
37:6,8 38:4 40:24
41:18 44:12 54:11,
17,19,21,24 55:2
62:13 64:10 73:8,
10 75:1 76:8 77:15

80:2,12,15,16
82:12 83:16,20
88:2 94:14,24 95:7,
25 96:4,11 97:1
99:12 103:7,9,10,
21 104:19 108:14,
18 111:6,7,24

**weren't** 15:14
76:24 88:6

**what** 4:8 5:16,25
6:18 7:5,22 8:7,10,
24 9:12,20 10:15,
17,18 11:9,23,25
12:11 13:14 14:9
16:6 17:19,22
19:17,25 24:5,7,22
25:4,9,23 26:9,12,
14,22 28:10 30:13,
25 31:4,22 37:8,11
38:7,9,13,15,25
39:1,7,18,21 40:17
41:7,14,15,21,22
42:1,2,14 43:2,7
44:1,16 46:9 47:4
48:5,12 49:2,12
50:5,13,22 51:2,18
52:4,7,8,10,25
53:19 54:7,8,12
55:8,10,11,24,25
56:4,5,9,12,13
57:7,14,19,20,21,
23,24 58:7,21,22
59:21 61:20,22
62:2,5,11 64:18
66:4 67:8,10,12
68:4,14 69:17
70:12 71:4 72:16
73:3,13 74:4 75:15,
19,20 76:9 77:2
80:14 82:15,23
86:5,6,18,21 88:11,
20 89:3,12,24 90:4,
10 91:12 92:3,14
94:21,24 95:12,15

96:4 97:20 98:9,10,
11,14,24 99:10,20,
21 101:7,8 102:6
103:9,20 105:7,13
107:15,24 108:11,
18 109:19 112:13

**what's** 9:8 14:9
24:17 45:18 56:8
57:18 60:9 65:12
80:20 84:22 94:11
111:21

**whatever** 25:6
26:21 28:20 43:18
51:13 81:20

**when** 7:2,8 8:4,19
9:13,22 10:1,9,19
11:21,25 15:1 16:6
17:1 18:2 22:13
25:5,9 27:14,15,16
28:7 29:3 31:22
33:6,8,17 34:7
35:8,19 37:19
38:10 39:18,21
40:3 41:5,18 48:20
49:4,10 50:8 51:25
54:20,21 55:7,8
56:1 57:1,4 59:10,
13,14,19,20 60:11
64:22 65:22 68:8,
11 75:3,15 79:1
86:19 91:13 92:1
95:4 96:11 98:18,
21 99:2 100:12
101:1 103:21
105:5,8 110:23
111:13

**where** 5:16,23 6:6,
10 9:25 10:22 11:5
14:19 18:20,22
24:11 28:21 34:3
41:19 50:9,21
63:23 67:24 68:21
74:7,9 79:6,7,15,

Advanced**ONE**
LEGAL

(866) 715-7770
advancedONE.com

21,23 80:15 81:1,8,
10,11 82:1 91:4,20
95:7 98:5 108:1
110:25

**wherever** 62:9

**whether** 12:15 15:2
17:3 21:22 29:23
30:23 42:4 54:18
55:5

**which** 14:15,18
15:5,23,24 17:4,23
23:3 34:15 36:7,20
39:4 40:25 43:9
45:13 46:22 48:20
50:15 66:15 68:8
75:1 76:8,22 79:13
80:2 85:12 91:2
92:15 95:25 99:7
100:20,23 103:11,
12 110:21 111:7
112:9

**while** 6:25 7:11,14
15:25 19:10,11
42:6 47:21

**White** 4:18,19,20
16:25 17:1 19:6
20:7 24:20 26:13,
24 27:18 28:1,25
29:16,20 30:10,18
31:1,7 32:4 33:7
35:6,8 36:10,11
47:14 49:15,19
51:1,3,6,9,19,24
54:1,20,22,24 55:5,
18 56:18 57:14
58:4 59:22 60:16,
20,23 63:2 68:21,
23,24 69:18 77:4
92:18,21 102:20

**White's** 18:15
19:22 21:2,22 24:3
26:9 27:20 37:4,20

48:9 50:6,18,21
55:9 58:13 69:2
77:8

**who** 12:16,21 13:7,
19 14:10,13,20
15:18,20,21 16:9
25:10 28:11,16,18
29:2,20 32:1,4,7
36:17 38:23 40:24
43:23 47:3 49:18,
24 54:1,4 56:1
60:20 61:9,10,14,
17 63:7,18 67:25
70:21 74:3 75:17
80:21 81:19,22
83:16,18,20 85:23
92:6,8 93:8 94:25
100:22 104:11
105:3,21 108:14
113:19

**who's** 13:19 83:13

**whoever** 32:3

**whole** 30:19,21

**why** 11:8,10 28:3,8
31:16 34:6 36:20
61:25 77:6 81:23
104:8

**wife** 111:14,17

**will** 4:10,18 5:5
21:16 24:15 28:10
42:7,22 45:5 46:5,
7,10,22 47:12
65:20 78:12 79:13
84:2 85:6,9,11
106:6 109:2

**willing** 19:15 21:9

**wiped** 107:13

**with** 6:13 7:11 9:21
13:7,21,25 23:25
26:12 28:15,17

32:3 33:14 35:13,
16 40:17 43:11
44:4,23,24 51:1,3,
5,8,19,23,24 52:12
53:5,9 54:10,20,22
55:18,22 56:7,17
57:9 58:14 60:1
61:14,18,19,22
62:14 63:1,7,9,10,
19 65:8 66:25
67:11 69:20,23
76:11,25 77:21
79:22 82:19 84:13,
15,18,21 85:18
86:4,17 88:11,13,
18,21,24 89:17,19,
20,21 91:19,21
93:21,22,23,25
94:11,12 95:2
100:1 101:5,10
102:19,22 104:17,
23 108:5,8 111:12,
14

**within** 14:8,17 15:5,
8,10 21:9 49:9
100:14,16,17

**without** 12:4 13:3
33:9 34:13 55:4
65:18 92:10 112:7

**witness** 4:13 23:23
36:16 42:4 45:23
46:14 48:12 67:5
84:11 86:6,15 90:5,
19

**witnesses** 43:14

**woman** 113:18,19

**won't** 34:12

**wondering** 97:19

**Wood** 5:11

**wooded** 96:23

**woods** 79:17 97:1,2

**word** 16:17 70:14
77:22 108:19

**words** 70:13 106:9

**work** 6:10 8:1 24:10
25:8 29:10 33:15
38:2,5 110:2

**worked** 6:12,14,23,
25 8:12 28:12
101:5,8,19

**working** 6:16 13:25
15:3,9,10 28:17
40:15 41:18 42:15,
23 43:1,2 61:6
81:21 86:24 100:23
104:25 105:10
106:23 107:19
110:10

**worse** 44:14,15

**would** 4:21 5:3
7:14,24,25 8:1 11:8
12:2,3,5,7,9,13
13:20 14:21,22
15:18 16:3,9,13,24
17:12 20:12,13,15
22:12 23:5 24:13,
23 25:7,18,21 26:3,
4,6,18,24 27:3,9
28:3 29:10,13 32:5,
6 33:7,8,23 34:16,
18,22 36:23 37:6
38:2,3,4,7,8 39:1,2,
3 40:5,14,15,16,19,
21,23,25 41:7,12,
13,22,24 42:1,3
43:3,5,9,10,14,15,
16,18,19,22,23
44:1 46:3,8 49:15,
23 52:14,15,18,20
60:1 62:20 63:25
64:11,12,14,16
65:1,3,5 75:19,21,

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Weldon Wallace Bullock, 02/25/2021

153

Index: wouldn't..you

24 77:24 80:21
81:17,21 82:3,12
83:15 85:3,19,21
94:18 99:7,22
103:4,20 104:14,
20,21,22 105:3
106:15 110:12,14
112:3,16

**wouldn't** 20:17,18
27:11 35:12,13,22
39:25 40:2,9 41:3
43:13 53:16 64:8
81:23 82:17,19
87:24

**wrap** 67:1

**wreck** 106:23
107:4,17

**wrist** 60:8 65:2
67:14

**write** 39:1,8,9,10,
11,12,13,19,25
40:9 75:4

**writes** 41:14

**writing** 17:23 31:19
34:21 52:24

**written** 38:19 39:5
49:5,11 51:13
77:15,16,17

**wrong** 38:14

**wrote** 50:22

---

**X**

---

**X-RAY** 25:13

---

**Y**

---

**yeah** 16:20 17:12,
13 18:1 29:12
30:17 40:5 41:13

70:15 107:23

**year** 8:23 9:20
99:10,21,25

**years** 6:15 12:19
13:6 28:17 65:25
66:4

**yes** 4:14,17 5:4,21
7:4 10:14 11:15
12:18 16:23 18:21
19:2,8,18,24 22:1,
12,22,25 31:11
33:19 34:1 36:12
39:6 41:6 44:17
46:18 48:4,18 49:3
50:17,20 51:8
56:19 58:17 60:17
61:3,16 66:2,10
67:2 70:4 71:2,23
72:4,8,13,21 73:12,
19 74:14,22 75:9
78:1,8,25 79:3,11
80:17 81:18 82:7
83:11 84:7 86:18
87:2,15 89:13,16,
19,21 90:1,13,22
91:2,12 92:20,23
94:21 95:11,18
97:7,9 99:14 100:5,
22 101:25 102:3
104:6,7 105:9
106:13,18,19
111:8,23 112:11
113:6,21,23

**yet** 13:19

**you** 4:12,15,16,21,
22 5:1,5,10,12,16,
19,21,23,25 6:2,8,
10,20 7:2,3,5,14,
19,20,22,23,24,25
8:1,4,5,12,14 9:11,
17,22,25 10:1,7,8,9
11:21,22,25 12:11,
21 13:1,11,18,22,

23,24 14:3,4,9,21,
22 15:1,2,5,7,8,9,
15,23,24 16:5,6,8,
9,13,21,25 17:11,
19,21,24,25 18:3,4,
5,8,11,17,20,22,23,
25 19:10,14,15,21,
22 20:12,15,18,21
21:5,11,12,13,14,
17,18,21,23,25
22:3,6,8,9,10,12,
15,20 23:1,6,7,9,24
24:5,12,15,19,21,
24 25:17,25 26:4,8,
9,11,13,14 27:9,13,
18,20,24 28:3,18,
22 29:3,9,10 31:6,
12,22 32:2,7,10,11,
19,24 33:2,7,8,13,
17 34:9,10,12,15,
16 35:8,9,14,15,19
36:6,7,14 37:2,5,6,
8,25 38:3,7,22,23
39:8,9,10,11,12,13,
18,21,23,24,25
40:2,3,5,9,10,11,
22,24 41:1,11,12,
18,20,21,22 42:14,
16,19 43:4,5,7,9,
10,11,19,23 44:21,
23 45:5,7,10,16,24
46:5,12,13,16,19
47:6,7,8,12,14,19
48:5,16,19,20 49:4,
18 50:3,4,5,6,7,15,
18 51:1,3,5,6,23,25
52:10,13 53:2 54:1,
7,9,15,24 55:8,11,
24,25 56:1,5,10,17,
20 57:5,14,15,18,
19,21,25 58:3,7,9,
18,21,24 59:3,8,9,
13,15,17 60:9,11,
12,15,18,21,22,25
61:1,4,11,13,15,20,

22,24,25 62:3,4,7,
13,16,19 63:7,10,
14,16,17,20,22
64:4,8,10,12,14,16,
23,24 65:25 66:8,
13,21 67:4,8,24
68:2,7,8,11,14,17,
19,20 69:11,18,25
70:2,12,20,24
71:18,21,24 72:6,
18,22,23 73:1,10,
18,25 74:1,4,5,9,
12,15,23 75:1,22,
23 76:1,8,11,12,14,
16,22,25 77:1,13,
14,20 78:3,11 79:4,
9,23 80:7,13,20,21
81:3,5,15,23,24
82:12,21 83:3,9,12,
22,24 84:5,6,13,24,
25 85:1,3,19 86:1,
9,12,17,19 87:7,9,
16,21,24 88:2,6,9,
20 89:1,5,11,17,22
90:14,15 91:1,6,17
92:21,24 93:18,25
94:14,21 96:5
97:13,18,19 98:3,
14,16 99:2,4,10,12,
16,20,22,24 100:3,
6,8,9,12,16,20,21
101:7,15,16,18
102:1,9,11,15,16,
18,20,21,24 103:5,
8,10,13,14,16,21,
22,24,25 104:4,10,
14,18,22 105:2,5,
10,17,19,22,23
106:2,4,9,10,17,20
107:15 108:15,17,
18 109:3,4,10,15,
19 110:7,12,16,23
111:6,18,22 112:3
113:10,18,25

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

**you're** 5:2 14:4
21:8,9 33:10,17,24
39:23 44:24 49:2
65:6 67:12 77:2,7
84:21 86:7 87:21
89:24 105:6,8

**you've** 34:18 47:8
48:2 69:25 81:12
84:16 106:12

**you-all** 31:18 46:6
62:11,22 66:25
80:4 106:10 107:22

**young** 36:12,17

**your** 5:3,5,8,10 6:2,
8,18 8:1,2,7,25
16:6 21:10,15
22:23 33:8 35:20
36:8 37:2,4,19
39:24 40:3,12 41:1,
2 44:13 50:5,10,12,
15 51:4,10,19,22,
23 54:23 56:25
57:18 58:9,21
59:21 64:11 65:22
67:21 68:15,17,19
74:23 76:8,14 77:4
78:12,16 82:6
84:21 88:10 89:5,
14,22,23 90:11,21
92:15 93:15,16
94:13,17 97:19,21
100:14,16,17 102:4
105:6,8 110:4

**yourself** 72:20
87:24



## Exhibits

**7180 Justin White 02-10-21 Exhibit 1** 4:13 21:10,11,14

**7180 Justin White 02-10-21 Exhibit 3** 4:15 87:21,22,24,25 155:18 216:25

**7180 Justin White 02-10-21 Exhibit 4** 4:17 225:3,4,7

**7180 Justin White 02-10-21 Exhibit 6** 4:19 22:1,2,4,5

**7180 Justin White 02-10-21 Exhibit 9** 4:21 89:8,9,11

**7180 Justin White 02-10-21 Exhibit 10** 4:23 98:3,4,7,8

**7180 Justin White 02-10-21 Exhibit 11** 5:4 101:2,3,6 102:12

**7180 Justin White 02-10-21 Exhibit 12** 5:6 104:3,4,5,19

**7180 Justin White 02-10-21 Exhibit 13** 5:8 107:21,22,25

**7180 Justin White 02-10-21 Exhibit 14** 5:10 120:12,13,15

**7180 Justin White 02-10-21 Exhibit 16** 5:12 125:2,3,6

**7180 Justin White 02-10-21 Exhibit 17-Placeholder**

**7180 Justin White 02-10-21 Exhibit 19** 5:16 169:21,22,25

**7180 Justin White 02-10-21 Exhibit 20** 5:18 209:10,11,12

**7180 Justin White 02-10-21 Exhibit 24** 5:20 223:24,25 224:1

**7180 Justin White 02-10-21 Exhibit 25** 5:22 204:18,19,20

**7180 Justin White 02-10-21 Exhibit 28** 6:4 232:5,8,9

## $

**$19** 227:22

## -

**--I** 134:16

## 0

**07:01** 242:23

## 1

**1** 21:11,14 90:8

**10** 98:4,7,8 113:25 225:12

**10-18** 113:24,25

**10-28** 135:1

**10-29** 133:23,24

**10-29s** 133:1,10 135:4 136:21

**10:00** 142:11 143:4,9

**10:15** 8:2,4

**10th** 8:5

**11** 101:3,6 102:12

**110** 220:10

**11:00** 142:12 143:10

**11:05** 38:9,10

**11:14** 38:10,12

**12** 12:8 89:3 104:3,5,19 116:3

**123** 155:20

**12:00** 138:18 140:5 142:13 147:6 180:25

**12:06** 70:21,22

**12:12** 70:22,24

**12:17** 74:23,24

**13** 107:22,25 217:2

**131** 221:10

**13th** 211:4

**14** 120:13,15

**15** 100:17 160:4

**15th** 211:5

**16** 88:1 125:3,6 207:11

**17** 12:5 125:23 126:2 207:12 218:22

**18** 205:23 207:3,10 234:7

**18-week** 12:5

**18th** 108:4

**19** 169:22,25

**1:21** 74:24 75:1

**1st** 104:25

## 2

**2** 91:6 125:15 170:24 225:12

**20** 49:2 52:18 78:9 160:4 185:15 209:10,12 220:7 244:19

**2012** 18:2,3 160:20

**2015** 18:3 55:6,7

**2016** 18:15 19:10

**2017** 15:22 18:16 19:11,21 23:13 27:19 42:23 43:11 53:10 60:1 63:7 72:12 75:3 80:9 93:6 100:8,14,17 107:7 195:25 238:4

**2018** 20:5,7 84:7 89:25 99:3,16 100:9 101:13,17 104:25 108:4 113:2 117:5 126:9 127:18 132:8,13 147:18 159:11 170:9,11,14 177:10,12 178:21 193:8 196:1 207:16,18 218:11 221:24

**2019** 211:5 223:3,5,9

**201919100031** 243:24

**2021** 8:5 243:22

**20th** 89:25

**21** 220:10

**22** 207:16

**22nd** 147:18 167:17 170:9,11 207:15 243:22

**23** 155:20

**23rd** 207:15 221:23

**24** 221:11 223:24 224:1

**24-** 208:3

**24-hour** 208:4

**24th** 188:13

**25** 78:9,11 204:18,20

**25th** 207:18

**27** 117:5 127:18

**27th** 100:8

**28** 232:5,9

**2:00** 138:17 140:3,4,5 141:6,7,21 143:11, 21 144:4 145:22 147:10 181:1,20

**2:04** 97:24,25

**2:10** 97:21,25 98:2

**2:58** 124:12,23,24

---

**3**

**3** 87:22,25 155:18 171:1 216:25

**3-17** 127:17

**3-17-2018** 127:5,7,9,11

**3-27** 127:17

**3-27-2018** 127:10,16

**30** 115:10 146:6,15

**30th** 101:13 127:2

**32-1** 225:9,13

**39** 50:25

**3:00** 188:13

**3:17** 124:24 125:1

---

**4**

**4** 225:4,7

**4-3-18** 120:23

**408** 222:11

**47** 88:1 155:20

**4:04** 155:10,13

**4:20** 165:2

**4:52** 186:24,25

**4th** 223:3,5,9

---

**5**

**50** 99:7,12

**52** 217:1

**5:00** 144:5 145:22

**5:24** 186:25 187:2

**5A** 204:24 205:1

**5th** 27:9,12,15,18,19 28:7 100:9,14 211:4

---

**6**

**6** 22:2,5

**6-8** 171:3

**69** 218:7

**6:35** 233:5

**6:40** 233:5,7

**6:45** 236:11,12

**6:51** 236:12,14

---

**7**

**7** 100:16

**78** 88:1,3

**7:00** 170:16

**7:01** 242:21

---

**8**

**8-15-1989** 10:14

**82** 88:7

**84** 218:22

**8:00** 170:16,18

**8:30** 117:19 127:25

---

**9**

**9** 89:9,11 127:25

**911** 66:17 68:22 69:3,16,21 70:11 71:6, 12,24 72:1,6,9 93:20 109:6 111:13 115:22 134:19 135:1,9 136:19,21,25 163:21,22 164:2,3 185:2,8 222:20

**9:00** 127:22 170:19

**9:40** 127:5,22

**9:40:52** 127:16

---

**A**

**A-N-T-O-N** 142:25

**a.m.** 8:2,4 38:10,12 140:3,4,5 141:6,7,21 143:12,21 144:4 145:22 147:6,10 181:20

**ability** 204:7 231:16 241:3,8

**absent** 48:9

**absenteeism** 241:11

**absolutely** 74:12 102:15,21

**academy** 55:11,16,18,19,23

**accept** 26:14 61:14

**acceptable** 26:22

**accepted** 62:25

**access** 199:3,7,9,11

**accompanying** 245:5

**accomplished** 182:17

**account** 59:12

**accurate** 59:12 91:13 100:21 109:17,19 123:24,25 124:1 130:18,21 131:4 139:10 205:19 206:18 207:20 243:14 244:8

**accused** 164:17

**achieving** 13:8

**acknowledge** 8:10,13

**act** 157:1 195:20

**acted** 50:12 149:24

**acting** 15:1 62:13 151:11 152:9 154:14

**action** 76:23 96:23 99:8 123:19 243:18

**actions** 99:21 152:24 198:5 219:18 225:22,25 226:3

**active** 137:3

**activity** 154:5 176:25 177:18 178:10 181:16 215:7 238:7

**actual** 153:15,23

**Adam** 54:6

**adamant** 153:12 181:18 182:20 184:6

**add** 122:8 214:20 226:3,5

**addendum** 244:10 245:1

**additional** 123:21 143:20,22

**Additionally** 226:4

**address** 43:15 83:25 106:18

**addressed** 36:17

**addressing** 43:5

**adhered** 183:19

**adjacent** 199:1

**adjourned** 242:24

**administered** 8:14

**administration** 12:14 13:1

**admission** 98:23

**admit** 129:17

**admitted** 40:15 47:4 66:6,7 76:19 104:8

**admitting** 141:5

**advanced** 39:4

**advice** 102:22 230:9,15

**advise** 102:20

**advised** 102:15 105:8,21 112:15

**affairs** 207:24 208:2 214:12 228:1 231:12 234:12

**affected** 204:6

**affiliated** 126:18

**aforementioned** 243:8 244:6

**African-american** 43:12 46:20 54:17 140:21,25 194:1 195:23 239:19

**African-americans** 192:7

**aftercare** 170:3

**afternoon** 141:25 142:7 144:19

**afterward** 128:15

**agency** 12:8 160:21 166:21 213:3 216:10

**aggression** 15:5 169:2,3

**aggressive** 15:9 150:24 153:1 164:21 214:1 228:5

**aggressively** 154:15

**aggressiveness** 169:3,10

**agree** 9:1 58:9,24 78:11,14 87:12 90:4 144:10

**agreed** 107:16

**agreement** 8:21,22 179:19 180:12 232:13,14,20

**agrees** 84:14

**ahead** 64:7,8,10 81:9 110:12 119:25 121:19 129:4 141:18 159:5 211:19

**air** 61:13

**Albemarle** 55:5

**Alexander** 32:9 47:24 48:20 49:10,15 51:16 52:4,7,14,21 53:2,5,13,19 61:1,11 63:3,4,8,18 64:24 66:14 69:1,14 75:22 76:18 77:1 85:12 86:5 92:12,19 93:2,7 108:4 111:25 112:7,16 114:7,22 115:13, 15 116:2,19,20 122:17 218:9,19 241:7,18

**Alexander's** 60:25 72:10 75:4 77:12 109:11 240:14

**Alexander's** 76:2

**Algretta** 58:13

**allegation** 155:22 197:11 213:24 217:1, 2 218:7,22 234:15

**allegations** 58:16 98:16 163:11 196:23 197:1 207:23,24 216:13,24

**alleged** 35:24 37:4 64:18 67:18 133:4,7 149:5 177:16 204:12 208:19

**allegedly** 37:6 39:21 43:5 60:22 70:7 108:9 113:15 123:20 179:23 195:24 241:23

**allowed** 13:21 226:10

**allowing** 209:6 210:1 219:19,20

**alluded** 147:23

**aloud** 90:3

**amended** 21:17 87:25 155:19 216:25 225:7 226:4 245:8

**Amendment** 175:17

**amount** 14:16,19 139:11 160:3

**and/or** 245:5

**Andre** 54:7,25 104:8,18 108:15 111:1

**Andrew** 242:7

**ankles** 163:1 164:20

**announce** 146:17

**another's** 56:21

**answering** 34:23 37:2 73:7 206:9

**answers** 10:2

**Anton** 142:21,24,25

**Antwon** 142:24

**anymore** 58:11 64:7 91:9

**anyone's** 39:5 88:17

**anytime** 159:14,15

**anywise** 243:16

**apartment** 138:20

**apologized** 238:15 239:5

**Apparent** 171:1

**appeal** 84:9,10 133:5 222:8,17

**appealed** 197:9,15 222:9

**appearance** 145:3,8

**appeared** 243:6 244:18

**appears** 78:24 88:1 101:12 125:14 128:14 129:6 130:1 170:3 211:4 224:10

**applicant** 213:4

**application** 24:19,22 26:5 99:7 229:19

**applied** 23:12,14 24:10 85:24 151:3 214:24 227:17 233:21

**apply** 23:9,10 212:4,6

**approach** 50:23 108:23 133:15

**approached** 33:17 109:1

**approve** 63:25 64:2 68:1,4

**approved** 26:22 84:2,5,12 123:20 168:11

**approves** 84:10 237:15

**approximate** 138:16 193:9

**approximately** 12:5 15:22 20:5 32:15 42:21 60:2 73:3 99:6 127:25 160:8 170:19 175:23 177:12 207:9 239:13

**April** 23:13 84:7 87:11 196:1

**area** 31:12 139:8 171:4

**Argretta** 39:2,18 98:22 102:5 148:16

**Argretta's** 101:19 102:9

**argument** 108:6,8,10 144:7 225:11,18

**arguments** 74:17,18

**arm** 13:17 151:2,3 153:3,4 155:7 158:11
161:18 162:3,11,12,14,17,21,23 166:2,7,
18,20 167:9,19,24 168:2,6,10,12,20,23,
24,25 169:6,16,17,18,19 170:25 183:15
214:2,3 216:21 228:5

**arms** 163:1 164:19

**arrangement** 8:19

**arrest** 52:9 141:21,22,24 143:15 149:22
151:19 152:12,25 153:8,19,22 157:13
162:21 163:14 164:22 168:10 184:3
214:2

**arrestable** 237:7

**arrested** 94:10 138:5,7 237:4

**arresting** 156:24

**arrests** 100:18

**arrive** 139:16

**arrived** 148:21 165:10,13,15 167:2

**asks** 205:16,21

**aspects** 13:4

**ass** 88:25 89:2,4 93:10 111:9 140:18
148:6

**assault** 88:10 108:18

**assaulted** 88:9 155:7 213:25

**assaultive** 15:10 150:24 153:2 164:21

**assessment** 239:24

**assign** 52:23

**assigned** 18:5 53:3 54:1 106:20 154:7
183:25

**assist** 10:3

**assistance** 37:1 163:5,6,7

**assistant** 66:18 69:6 99:19

**assistants** 199:9

**ASSOCIATES** 243:23

**assume** 206:13 212:6

**assure** 66:1

**assured** 228:11

**asterisked** 39:19

**Atherton** 242:8

**attached** 135:5 244:10,12

**attacked** 153:1 155:6 167:12 169:7
214:1

**attacking** 156:20 157:9 164:22

**attempt** 17:9 128:10 129:6 229:25

**attempted** 17:11 133:15 182:6

**attempts** 186:18 209:4

**attended** 27:5

**attention** 21:14 125:6 148:12,14,15
223:24 225:8

**attorney** 9:4 10:20 230:8,15,16 242:7

**attorney-client** 20:9 179:6,9 226:8
230:25

**attorneys** 8:9 20:12,15 21:2 145:7
200:9 227:11 230:8,14 233:18

**August** 55:6 223:3,5,8

**authority** 78:15,21 79:3,6 174:12,14

**authorization** 209:21 211:21 212:18

**authorized** 211:12

**avoided** 183:17,21,25 184:6

**aware** 17:4,5,16 78:3,5,7 81:12 82:22
172:25 174:4 205:21 206:10

**awhile** 94:15 126:22

**B**

**B&e** 131:25

**B&es** 131:12 132:1

**B91** 206:7

**B9i** 206:7

**back** 22:17 24:22 26:22 33:8 34:5 38:11
41:9 42:9 44:19 46:19 48:10 51:8 55:6
63:5 67:22 68:2,4 70:23 74:25 76:24
80:22 85:16 90:9,12,14 92:2 96:3,19
97:20 98:1,12 102:12 111:20,21 112:1,5,
6 113:20 122:3,4 124:25 126:22 133:13
135:6 137:14,25 139:23,24 141:19 145:9
151:7 152:17 155:12 162:17,25 164:19
170:17 171:19 172:18 173:5 178:6 182:4
185:2 187:1 192:14 198:20 220:25 221:1
222:15 233:6 234:21 236:13 239:23
241:5

**back-and-forth** 57:4

**backed** 48:19 117:16 118:4 119:12
122:5,6 130:8 131:5

**background** 11:3

**backing** 61:6 118:14 119:4,7,24

**backup** 36:24 139:19,20,22 140:10,16
141:1,2 148:8,9 163:5 164:10,11,17
183:5

**backwards** 93:10

**bad** 92:5 105:11,16 114:15 166:8 198:18
227:14

**badge** 189:5 190:8

**badger** 146:8

**badgering** 145:13 146:13

**bar** 56:20 151:2 153:4 155:7 158:11
161:18 162:3,21,23 167:19 168:24 214:2,
3

**barely** 40:15,16

**Bartholomew** 231:5,7,8

**base** 14:25 40:20

**baseball** 199:24

**based** 14:22,23 39:10 43:5 51:18 52:12,
15 60:17,18,19 61:24 65:7 74:15 75:19
77:17 78:11 82:12 101:25 106:7 124:5
128:19 130:1,6,9 131:3 143:19 144:11,23
150:20 174:15 186:9 208:17,19 214:7
228:4 239:20 241:7

**basic** 11:25 12:6 13:9 55:4 60:8 158:6
161:20

**basically** 14:11 36:6 114:10 164:18
194:24 204:14

**basing** 40:22

**basis** 29:7 42:16 43:6

**bat** 92:1

**bathroom** 70:16

**baton** 13:20

**bears** 169:20

**beef** 61:12

**began** 27:13 114:7,9,11 118:24

**begged** 99:1

**begin** 9:20

**behalf** 154:21 191:11

**behavior** 239:21

**behaviors** 195:6 239:21

**belief** 36:25 39:22 40:21 130:9,10,11 184:14 244:7

**believed** 137:1 185:9

**believes** 222:22

**belt** 85:3

**bender** 42:5,20 117:8

**benefits** 39:7,8 41:5 58:14 77:20

**Bertie** 18:5 161:15

**big** 76:4 86:21 91:15 96:21 110:5 123:18 124:6

**bigger** 104:22

**bills** 46:15

**Bin** 194:19

**birth** 10:13 154:11

**bit** 22:4 93:1 104:22 108:1 147:13 225:16 237:21

**black** 28:15,17 42:7 87:15 91:8,15 110:5 140:20 191:4 192:7 217:23 239:15

**blacks** 217:6

**blank** 202:18

**blaring** 165:15

**BLET** 12:7 13:3 15:12 48:6 55:11 56:2, 5,8 60:8,14 64:23 158:6 161:20 233:23

**block** 204:25

**blocked** 226:19

**blue** 129:12 135:13

**bluish-gray** 28:17

**Bo** 140:18 156:5

**board** 24:16 25:14,23 26:9 29:24

**Bobby** 191:24 192:2 193:12 194:4 220:20 221:2,15 223:23 235:1 238:13

**bodily** 108:22

**bond** 9:22 150:20 168:18

**bone** 167:24 170:25 171:1,2,8,11

**book** 44:21,22,24,25 45:1,3,14 46:24 47:2,3,5,6,7,12,14,15,19 51:12,13,21

79:25 80:4,6 83:17 86:6 90:13 103:15,19, 25

**books** 51:25

**boom** 115:7

**boom'** 115:7

**bordered** 116:5

**born** 12:20

**bother** 172:13

**bottom** 65:11 123:9

**boxes** 234:6

**boy** 221:17,18

**brakes** 118:22

**Brame** 226:2,9

**break** 10:9 70:16 97:14 115:5 123:2 124:9 125:13 168:6,9 169:15 233:2

**breaking** 131:8,21 144:9

**Brian** 8:25 9:20 26:1 32:18 34:20,22 35:9 36:2,19 37:1 70:15 101:13 104:7 210:4 233:12 235:25

**briefly** 17:23 42:8 48:1 77:8 149:7

**bring** 14:2 21:13 86:5 100:7 112:4 148:12

**Bro** 221:1

**broad** 132:11

**broadcasting** 128:25

**Broadwick** 93:4

**broke** 114:8 163:2 164:19 167:10 168:23,24 169:6,16,20 214:3 216:20

**broken** 164:20 166:2,7,20,23 167:21 168:13,20,22,25 171:2,4,8,11 183:15 228:5

**brought** 42:17 107:14 148:14,15

**brutality** 164:18

**Bryan** 34:21 227:19 229:20,24 233:9,15

**building** 25:1

**buildings** 46:15 49:22

**Bullock** 24:11,12 25:13,15,25 26:16 27:23 28:2,3 29:12,20 31:2 33:4,16 35:3 57:23 59:17 64:15 68:17,20 96:18 101:23 104:10 133:2,3 135:7 136:20 137:16

148:16 177:3 178:12,13,14,15 179:24 180:2,3 181:3 185:3 188:7,19,25 189:1,4 190:4,16,17 195:17,19 196:10,22 197:4,5 198:2,5,20 216:19 222:3,6,20 223:7,11

**Bullock's** 149:5

**burglaries** 132:1

**Burns** 53:17

**Burrell** 117:2,4

**business** 90:11

**businesses** 42:14 46:15

**busy** 103:3,9

**buzz** 24:25

---

## C

**C.M.** 195:24

**calculation** 119:1

**call** 10:12 25:12 48:8 50:20,23 68:13 69:4 71:12,24 72:1 85:10,15,25 88:14 92:7 95:23 110:18,21 116:2,14 131:21,22 150:5 151:9 156:7,10,13,21 163:3 165:19 171:20 173:11 175:3 176:2 185:24 186:19 200:7,9,25 201:8,9,20,25 202:22 206:24 216:15 218:4 223:16,21 229:12, 14

**called** 26:16 27:20,22,23,24 62:7 77:4 86:5,7 88:8 93:20 107:17 108:14 110:14 114:13,14,18,19 115:1 116:18,20 131:18 154:6 164:7,8 165:4 176:4 179:21 185:10 186:7,9,15 188:15 194:18 200:11,16,21 201:22,23 214:4 218:2 223:22 224:13,17 228:14 229:13

**calling** 36:23 49:23 73:8 95:18 114:12 156:19 163:5,6 169:12 176:5 187:10 200:8 223:19

**calls** 34:23,24 36:16 37:2 48:2,4,9 57:6, 7,8 61:6 113:24 132:1 178:25 239:14 241:13,14

**calm** 14:1 168:17 217:5

**camera** 97:17 117:24,25 118:6

**Cameron** 197:8

**Campbell** 32:13,16,19,23 33:3 34:8,13 35:2,5,11 36:1,3,5,6 41:15,21,22 49:19 50:1,6 52:13,21 53:4,6,7 54:5,6 60:4,5,14 61:2,13 62:7,11,12,16 63:5,11,21 64:6,

20,21 65:1,6 67:7 68:8,9 82:7,11 84:11
88:8 89:21 91:18 92:20,21,22,23 93:8,13,
15 94:7 95:4 108:10,14,16,22 109:25
110:18,21 111:2,8,17 112:16,22 113:16
115:11 123:19 175:24 182:4 185:13
197:24 202:10 217:20,22,24 239:11
241:19 242:1

**Campbell's** 53:4 54:3 84:3 113:15
217:5 219:12

**campus** 18:14 19:2,11

**can't** 22:25

**cap** 199:24,25

**capability** 154:1

**Capella** 12:14

**captain** 24:11,12 25:13,15 26:16 27:23
28:2,3 29:11,20 31:2 33:3,16 35:4 57:23
58:5,6,8,22,23 59:16 63:22 64:14 66:25
67:4,10,21 114:12,13,18,19,20 115:1,8
133:2 148:16 149:5 172:21,23 173:11,22,
24 174:2,6,15,19,22 179:23 180:2,4
181:3 187:6,8,17 188:1,7,14,25 189:1,4
190:4,16 216:19 220:21,25 222:20
227:18,19 229:24 234:20 235:18

**captains** 51:24

**car** 44:15 45:21 50:24 51:2,7 59:22 73:20
86:24 108:13 110:15,25 111:19,23
112:14 117:14,15,16 118:1,2,4,15,23
119:3,4,7,17,18,20,21,24 121:8 129:12,
19 134:15 135:17 152:4,7 154:25 155:1,
15,17 166:5 182:12 190:10 200:24

**care** 18:11 93:17 115:4

**career** 15:20 178:4

**careful** 220:3

**Carolina** 10:17 11:6,11,12 18:1 20:1
55:6 135:1 203:19 212:3 243:4

**carry** 202:6

**cars** 46:13 48:13,14,16,24 49:1 50:7,13,
19 96:2,12,15,22 102:25 122:2

**case** 9:21 19:25 20:18 81:24 120:1 138:4
145:3,8 175:7 226:2,11 230:17 231:1,6,
11

**cases** 143:17

**Castro** 8:25 9:19,21 21:13 32:1 38:1,5,7,
13,22 70:17,25 71:3,4,15,17,22 72:4,5
74:20 75:2 87:24 97:13,20 98:6 101:5,10,

11 123:1,3,5 124:9,13,20 125:5 126:4,6,
8,12,20,25 128:2,5,6 129:22,24 145:2,6,
10,15,17,25 146:5,10,14,17 155:8,14
165:1,3 169:24 171:16,18 186:22 187:3
204:17,22 209:1,3,14 210:6,8 224:3,5
225:15,17 226:12,15,17 233:1,8 236:3,9
242:18

**Caucasian** 137:6

**Caucasian-american** 194:2

**Caucasian-americans** 220:3 239:22

**caused** 85:4 157:23 184:8 204:3 225:24

**caution** 133:20

**cease** 96:4,6

**ceased** 97:10

**cell** 73:5

**center** 48:12 85:4 86:23 164:4

**centered** 13:8

**Central** 43:19

**certificate** 12:1,7

**certificates** 12:4

**certification** 11:24 12:2,10 204:8
214:23 234:1 243:1 244:1

**certifications** 12:4 45:13

**certified** 48:21,23 54:6,7 61:20 62:2
63:2 75:14 103:25 157:16 208:2 214:20
233:24

**certify** 243:5 244:3,17

**cetera** 12:23 30:8,25 37:3 40:10 42:14
44:7 45:24 46:16 56:15 61:8 82:21
167:12 182:7 192:15 194:21 198:19
214:1 227:23 228:6,11 235:20

**chain** 18:23 19:16

**challenge** 41:5

**challenged** 58:13

**chance** 224:5

**chances** 208:14

**change** 67:11 77:12,15,17,18 79:2
179:13 237:21 240:5,8,9,10,12 241:1,2

**change/correction** 245:6

**changed** 77:17 79:5

**changes/corrections** 244:11

**CHAPLIN** 243:23

**Chapter** 49:2 52:18 185:15 220:7

**characterization** 124:16

**charge** 42:9 44:19 45:2,5,16,23 220:14
236:22,23,24

**charged** 42:10 44:18 46:5 184:16,22
226:21

**charges** 23:22 26:25 45:20 52:8 184:18
196:20 215:1 237:6

**Charlotte** 10:17 57:16

**chase** 50:8,9

**check** 49:22 119:11 205:18 208:20

**checked** 136:18 137:11 234:6

**checking** 42:14 46:15 100:16 207:22

**chemical** 13:19 158:7

**chief** 23:2,7 24:21 25:4,5,6,8,9 33:4 35:3
51:24 63:12,13,17,19,25 64:12 84:12
90:4 96:18 101:23 104:10 166:21 167:20
178:14,15 180:3 196:10,14,22 197:4,5
198:1 229:7,11,15 235:22

**child** 104:12 109:16 110:4 184:2

**choice** 212:10

**chosen** 225:23

**Chris** 68:6 120:22 148:4 191:25

**circumstance** 102:16

**circumstances** 14:23 36:12 183:14

**citation** 51:12 86:5 90:13 103:14,19

**citations** 82:1,2 83:8 218:24 219:1,10,
13,16

**cite** 79:25 80:6

**citizen** 14:25 15:4 42:5,6

**citizens** 13:11 81:8,10,12

**Citizens'** 113:9

**city** 50:9 55:6 96:21 102:25 105:23
106:2,7

**Civil** 146:6,15

**claimed** 90:20 137:15,16

**claiming** 83:17 166:1

clarify 38:19

clarities 38:21

class 55:24

classes 55:9

classmates 55:15

clean 199:13

clear 27:11 95:22 103:5,11 156:13 157:9 174:19 176:15,17 194:3 198:8 242:11

cleared 69:14 70:4 112:5 169:17 206:15 218:20

clerk 27:13 80:22

clerk's 237:19

client 113:20 122:25 163:17 181:14 184:13,14 198:10,13 204:11 206:4 208:10 230:25

close 139:1 188:25

closed 188:21

closely 51:3,5

closer 105:6 112:12 116:2,3,6

club 56:20

co-workers 55:14,15 74:8

coaching 123:17 146:11,12

code 113:25

Cody 53:17

colleagues 187:14,17,18,20

collection 209:14

collectively 77:8

college 11:7,12,16 18:14 55:5

collision 42:5 117:6 120:24 125:13 127:6 128:7 130:23

collisions 85:5

color 28:17 202:15,17

combined 196:19

command 13:18,25 175:6 180:6 221:3

comment 209:16 217:9

commentary 146:1

commented 217:4

comments 155:11 194:16

commission 39:19 41:4 205:18 209:6 244:25

commit 30:7 31:2 137:21

committed 185:19 220:6

committee 173:3 174:7,10,13,18

committing 134:3 137:21

common 142:6

communicating 61:8

communication 187:13

communications 20:9,13 111:13 179:7,10

community-oriented 133:14 185:22

company 212:1,2

compensation 39:9 240:10

competently 10:25

complain 81:8,10

complained 42:4 69:3,19 70:1,4 83:22, 23 196:9

complaining 46:5 81:13 113:8 162:25 164:13 167:9 179:25

complaint 43:11,13 66:16 68:22 70:10 71:7 72:6,8,9 82:22 87:25 113:7,9 155:19 182:25 216:25 225:8,20 226:4 237:23,25 239:4

complaints 23:21 39:24 43:4 65:12 82:21 176:24,25 177:9,13,23 178:5 181:16 194:25 198:11 201:14 208:25 220:13,16 221:12 237:22 238:4 239:8,10 241:21

complete 119:10 162:3 243:14 244:8

completed 80:24

complex 138:20

compliance 14:4 158:8 169:11

complied 154:20 183:17

complies 108:2 125:9 170:2 217:3 225:19 232:11

comply 107:16 150:14 153:20 154:23 157:1,5

composed 192:12

concern 17:21 86:17,19

concerned 176:12,18,19 180:15

conclude 225:6

concludes 242:20

conclusion 231:4

conduct 66:10 86:14 115:18 181:14 183:22 218:17 239:20

conducting 100:19

conference 8:15 220:14,18 243:7,13

confidence 208:21

confirmation 116:24

confirmed 207:24 218:19 220:19 228:14

connection 37:8 94:19

consecutively 243:13

consent 8:18 9:14

consequences 134:12

considered 45:18

consisted 13:17 39:1

consistent 108:20 239:25

consists 22:5 98:9 211:15

constantly 114:5 241:11

constitute 232:20

construed 45:18

contact 28:4 56:3,4,8 57:11 134:13,14 186:20

contacted 22:23 25:14 27:8 171:21 172:21,22,24 227:9

contend 67:16,17 225:2

contending 180:16 181:6,8

contents 244:4

contested 40:17 41:2

context 192:1,11

continue 65:3,21,23 86:14 101:21 109:14,23 129:3 131:16

continued 136:4 225:21,25

continuum 13:16 158:6

contract 27:21 28:9,10,13,14,15,24 29:5,8,18 30:23 31:1,4,21 33:25 232:16, 18,20,23

**contracts** 31:13

**control** 14:3 18:11 162:14,15 168:11

**conversation** 63:9 91:23 92:8 105:12
106:3

**conversational** 152:1

**conversations** 26:3 55:17 73:10 74:14
149:19 180:22

**convicted** 184:17,23

**convictions** 184:16

**cool** 217:5

**cooperate** 149:24,25 150:2,14,23

**cooperated** 149:9 150:18

**cooperation** 15:6 150:21

**cooperative** 152:8,21

**copies** 101:24 213:7

**copy** 31:4,6,8,21 96:11 99:5 102:3
163:20,24 173:13,14,15

**correct** 60:1 72:7 75:3 100:23 123:6,9
125:17 185:18 223:14

**correctional** 18:6 160:1,11 161:15

**corrections** 18:8 159:18,22,24 160:1,9,
22 245:5

**corrective** 99:8 123:19

**correctly** 110:17 171:5

**coughing** 233:12

**coughs** 234:3 239:16

**could've** 106:25 139:5 154:3 216:9

**couldn't** 76:4 114:3

**counsel** 8:18 21:16 146:1,3 243:18

**counseling** 99:20 100:10 123:17 175:22

**Counselor** 41:8 65:11 87:20 110:12
171:25 182:4 185:1 215:25 218:6

**count** 128:16

**counties** 116:5

**county** 8:7 11:5 15:21 16:15 17:6 19:21
22:19,24 27:13 28:21 29:12,17 30:8,15,
17 31:19 32:3,10,22 37:14,15,16,17
38:15,17 39:3,4,11,12,16,17 41:3,17 49:6
50:4,9,17 54:24 57:16,21 84:24 85:15
86:11,12 98:15,19 100:13 102:10,25

105:11,16,25 116:1 117:3 131:9 153:22
175:13 179:20 180:10 184:1 201:11
202:5 203:20 204:3 207:12 210:20 211:2,
7,10 212:21,24 213:11 214:25 215:14
216:6,13 222:9,10 224:24 227:3,9,13,25
228:11,12,15,17 229:17 230:2,10,19
231:9,10,13,24 233:21 235:15 242:8
243:4 244:16

**County's** 175:19 242:7

**couple** 60:10 85:20 233:8 236:17

**court** 8:3 9:2,5,9,13 10:4,11 21:14 27:13
38:8,11 70:20,23 74:22,25 97:23 98:1
124:11,22,25 126:4 127:1 155:9,12
186:23 187:1 215:10 226:9 233:3,6
236:10,13 237:13,15 242:20

**courthouse** 188:17

**cover** 42:16 173:19

**covered** 43:6 161:10 194:24 198:3

**covers** 231:15

**crash** 86:23

**crazy** 48:12

**cream** 73:15

**create** 232:16,18

**created** 220:12

**creates** 175:13

**credentials** 189:5 190:8

**credibility** 231:19

**crime** 105:25 142:2 185:15,16

**criminal** 11:15,21 12:19,20 45:3 46:1,8
80:9,11,13,16 81:21 82:19 83:16 90:12,
23 91:5 96:16 109:4 110:16,19,21,23
111:4 184:3,15 203:19 205:17 218:24,25
219:10,13,15 231:9 236:19,22,23,25
237:5,7,9 238:13

**criminology** 11:15

**crossing** 85:2

**crying** 114:8 151:21 166:19

**cuff** 43:25

**curate** 143:17

**current** 10:15

**curriculum** 161:11,13,22

**curse** 91:21 142:23

**cursing** 82:15 88:11 91:18

**Curtis** 226:2

**custodian** 163:22,23 164:1

**custodians** 199:12

**custody** 18:11 163:16,19 166:11 184:4
237:3

**cut** 85:8

---

## D

**D-U-V-A-** 192:12

**dad** 94:2

**damage** 44:15 45:21

**damn** 88:25 111:9 112:16 156:6

**danger** 85:1 87:2 157:25

**dark** 87:16 157:24

**database** 143:18

**date** 8:4 10:13 20:4 21:21 27:7,9,19 28:7
90:1 100:8 127:12 132:20,22 154:11
160:18 193:7 206:25 207:6,17 211:3
230:12,21,23

**dated** 101:13 104:24 108:4 120:23

**dates** 100:11 177:8

**daughter** 43:13 44:6,8

**daughter's** 43:18

**daughter's** 44:11

**day** 24:24 29:24 59:18 73:12 85:13,19,20
86:1 121:17 122:9,23 141:24 142:8
144:18,19 170:15 180:11,16 181:4
228:10 240:17,20,24 243:22 244:19

**day-to-day** 18:9,24

**days** 32:9 33:15 61:18 73:13 85:21,23
113:1 229:13

**de** 14:11,14

**de-escalate** 154:15,18 168:16

**de-escalation** 13:18,23,24 14:17,20
158:20

**deal** 86:21 89:3 123:18 124:6 156:16
160:17

**dealing** 15:1,4 99:9

**Dec** 100:17

**December** 42:23 43:11 55:7 63:7 80:9 93:6 160:20 170:9,10

**deception** 43:22 68:8,11 163:11

**deceptive** 65:7 66:4 68:12 108:11 175:25 197:23 198:12 224:23

**decide** 173:24 230:9

**decided** 50:15 183:7 239:8

**deciding** 208:3

**decision** 14:22 35:5 58:10,24 133:6 174:1 214:10 229:16

**decisions** 78:15,18

**declare** 8:15

**declines** 237:14

**decreased** 107:18

**deep** 216:1

**Defendant** 22:6

**Defendants** 9:21 225:21 226:1,17

**define** 56:13 86:18 119:5

**degree** 12:11,16,25

**degrees** 44:22 45:12

**delay** 118:8,10 128:19,22,23 129:5 138:8

**deliver** 24:19,23

**demonstrate** 161:23 162:1

**demotion** 77:22

**denied** 61:15 102:1 148:11 201:13

**dental** 39:8

**deny** 120:8

**department** 13:21 16:24,25 17:14 18:2 20:2 30:19 39:5 50:3 98:19 160:13 177:19 214:13 216:9 234:17

**department-issued** 13:22 18:23

**departments** 235:14

**depend** 36:12

**depending** 240:24

**deposed** 9:24 19:22,23

**deposition** 8:6 9:23 10:10 20:3,11,17

21:10,16,17,18,25 22:1 87:21 89:8 98:3 101:2 104:4 107:21 120:12 125:2 126:1 146:1 151:16 169:21 204:19 209:11 223:25 225:3 232:8 236:5 242:21,24

**deputies** 16:23 48:16 53:12 56:18 57:8 60:9,13 64:23 67:18 78:15 92:4 93:13,16 106:11 122:5 141:9 142:14 158:24 160:24 190:23 220:2,15 221:2,3 231:22 242:12

**deputy** 13:7 23:2,7 25:4,5,9 31:19 32:18,22 33:4 34:19,20,21,25 35:2,7,8,9 36:2,10,13,14 37:1,6,22 45:12 51:24 53:8,14,15,17 54:6,7,12,13,17,18 57:25 61:3 62:1,4,5,10 63:2,4,12,13,17,19,25 64:12,25 66:12 70:6 73:5 76:2 77:1 84:13 90:4 93:2,17 94:23 96:15 100:17 101:12 102:13 103:2,4,13,14 104:7,8,10,18 105:7,21,24 106:11,18,22,23,24 107:16, 18 108:15 109:15 110:13 111:1 112:15 115:16 120:25 121:16,18 122:9,23 140:21,25 142:20,21,22 143:2 144:1 146:18 147:2 175:7 180:10 182:5 183:13, 25 184:9 188:3,4 190:23 191:1,6,8,12 194:17 195:23 196:4,6,10,14,24 199:6 205:1 217:4,15 218:15 220:22 221:12 223:14 224:11,15,25 229:6,11,15 233:22 235:22 237:8,12 239:23

**describe** 13:15 28:12 76:6 88:9 91:14 138:19 149:2 152:2,24 160:25 162:2 199:16 202:12 204:23 218:11 233:16

**describing** 64:13 151:20

**deserve** 219:5 220:9

**deserved** 196:18

**designed** 158:2,19

**designee** 28:21

**desk** 106:13 109:3 178:2

**detail** 35:14 59:24 68:23 71:5 76:6 235:18

**details** 161:12 165:4,7

**Detective** 231:8,9

**determine** 15:4,7 80:18 237:13

**determined** 196:25 219:4

**Deval** 192:12

**development** 138:20

**device** 149:14 161:6

**diagnosed** 168:1

**Dickinson** 9:22

**didn't** 61:22 76:18 163:8 190:7

**difference** 34:14 35:12,16 49:11 57:17

**differences** 35:13

**dinner** 56:14 57:14

**directed** 111:5 124:19 221:5

**directing** 156:22 192:16

**directions** 34:24 37:3 162:4

**directly** 46:4 61:1 73:18 82:14 167:13 195:15 198:8,21

**director** 28:20 39:17 66:18 69:6 166:19 167:21 238:7 241:25

**dirty** 92:7,17,21,24,25 93:9,11 94:16

**disable** 158:2

**disagreeing** 122:21

**disagreement** 113:22

**discharging** 13:22

**disciplinary** 76:23 99:9,21,25 100:3

**discipline** 196:23,24

**disciplined** 196:17

**disclose** 23:15 213:17 215:1,6,13

**disclosed** 23:18,20,25 24:2,3,5 126:21 213:17,19

**disclosing** 179:6,9

**disclosures** 126:14,21

**discovery** 126:14,17

**discretion** 47:16,18

**discretionary** 78:20

**discrimination** 58:19,21 177:17 216:5 221:13 237:22,24,25

**discriminatorily** 195:20

**discriminatory** 190:19 191:17 194:14 195:3,6,20 198:5,22 219:22 225:21

**discuss** 23:6 47:24 49:10 59:23 65:24 148:20 230:20

**discussed** 33:8 49:14 127:6 172:2

**discussing** 34:5 38:13 125:13 128:7 200:8 230:7,15

**discussion** 43:8,9 111:16 136:16

**discussions** 42:25 65:10

**dismissal** 59:18 208:24

**dismissed** 24:7

**disobey** 79:11

**disorientation** 222:23

**dispatch** 50:21 71:7 72:9 109:6 165:3

**dispatcher** 69:3,16,21 70:3 72:7 134:19,21 135:9 137:1,7 185:2,8

**dispute** 115:12,14,21,23 171:12

**disputes** 74:2,3,16,18

**disputing** 127:13 129:8,11,13

**disrespect** 192:10 193:23

**disrespectful** 90:15 109:16 110:3 112:23 136:7,8 194:21

**disrespecting** 113:16

**distanced** 9:2

**distinction** 136:24 137:19 185:7 222:23 236:18

**distinguish** 231:17

**distorted** 76:12 90:21 91:11 109:18 111:7 121:22 140:8,14

**distortion** 133:9 135:9 136:25 137:19 185:7

**distress** 204:4 225:25

**distributive** 12:23

**DMV-349** 125:10

**doc** 209:15

**doctoral** 12:13,24

**doctors** 172:3

**document** 21:19 22:8,9,12 28:22 39:20 89:15,18,19 90:7 98:10,13,14,18,20,21, 25 99:4,11 101:6,9,11,14,15,16,22,25 104:21 105:4 108:5 115:22 120:18,21,22 123:9 125:25 170:1 171:7,13,17 206:9 207:17 209:19 210:5,7,25 211:3,18,20 224:7 225:9,10,12 244:21

**documentation** 39:8 100:3,25 123:22 185:14 216:16

**documents** 20:14,15,16,18,21 31:10 38:16 39:10,15 40:19 41:11 99:25

101:23,25 102:1 123:23,25 209:7

**domestic** 93:23 94:10

**Donald** 53:9 54:11 92:19

**don't** 50:23 62:23 142:12 146:8 179:5 194:1 221:17

**door** 61:22 111:24 115:9,12 146:23 147:10,11 148:24,25 149:10,13,20 152:3 182:10,13 188:21,24 189:3

**doors** 92:16 146:22 152:15

**double-wide** 138:24 139:7

**downgrade** 77:24

**downgrading** 165:19

**downs** 14:10,14

**draft** 80:11 237:9

**dramatically** 97:10 107:18

**dressed** 25:2 27:10

**drew** 210:18

**drive** 189:23

**driver** 119:14

**drives** 137:8

**driveway** 148:23 182:12

**driving** 85:4 86:23 87:15 117:14

**drop** 176:24 177:13,14,15,22,24,25 178:1,3,4,5 208:25

**dropped** 116:11

**drove** 116:11

**drug** 26:17

**dude** 46:7

**due** 175:16

**duly** 9:16

**dumb** 194:3

**Durham** 211:1,7

**Durwood** 32:13 41:22 63:21 197:24

**duties** 18:9 77:15,16 136:5

**duty** 57:9 85:12 202:7

**E**

**e-mail** 125:25

**e-mails** 178:25

**earlier** 108:20 110:14,20 117:11 162:10 194:7,8 217:13 218:13 222:20

**early** 42:14 141:23 142:1 144:7,20 179:24 195:25

**ease** 105:8 106:8

**education** 27:2 162:20 163:13

**Edwards** 142:21,22 143:2 144:1 165:18 188:5

**EEO** 178:10 198:10 208:25 238:2 242:7

**EEO-PROTECTED** 238:6

**EEOC** 23:21 194:25 215:1 220:13 238:8

**effect** 26:7 34:14 46:12 48:1 77:19 87:18 91:12 105:14 106:6 109:25 110:23 115:18 121:3 135:23 148:7 150:8,10,11 162:21 163:14 166:1,23 169:9 189:8 191:4 193:16 222:22,25 242:10

**effectively** 206:5

**effects** 76:9

**egregious** 102:17 239:20

**elaborate** 12:18 35:15

**elected** 178:1

**electronic** 118:8 128:24

**Elizabeth** 55:6

**else's** 133:21

**emergency** 113:24,25 114:1 116:1,10 121:1,7 163:21 164:2,3

**emotional** 114:10,11 204:4,16 225:25

**employed** 175:3 207:7,11 216:7

**employee** 37:21 41:18 100:10,11 123:16 175:22 199:10 227:23

**employer** 212:23 213:4,5,6 215:2,8 229:22

**employers** 213:9 226:25 227:10,14

**employment** 15:20 17:24 19:9,18 22:18 26:12 27:21 28:8,10 29:5 32:2 33:25 57:21 100:11 126:19 131:9 160:6 174:24

187:5 203:4 204:3 205:25 206:20 208:13 209:4,7 212:9,16 214:20,24 215:20 225:23 226:18 232:16,18 233:11,17 235:12

**EMS** 164:11 166:19,21,24 167:21

**encounter** 132:17,18

**encouraged** 23:9

**end** 91:7 107:15 113:23 116:16 221:13, 17 224:14

**ended** 24:16 33:24 94:14 108:20 179:23

**enforce** 79:15,17 80:6 83:19

**enforcement** 11:18,24 12:1,2,6,9 13:6, 8 36:8 42:13 43:8 46:9,10,17 49:10,13 50:11 55:4,16 60:8 77:16 78:12,24 79:7, 21 95:1,5 96:5,7 97:10,12 143:20 147:5 158:6 159:19 160:23 161:20 168:16 182:3,18 203:19 204:7,8,11,15 212:7 216:8,9 230:1 236:24 237:17

**enforcing** 203:13

**enhance** 169:11

**ensure** 172:19

**ensuring** 13:7,10

**entered** 145:2,7

**entering** 131:8,22

**entire** 15:20 19:2 32:10 100:4 129:14

**entity** 175:18

**entrance** 109:2

**epithets** 191:22

**equal** 175:17

**equipment** 15:24 16:1,2,5,9,12 18:17 19:14 121:7 200:5

**equivalent** 171:11

**Eric** 54:18,19

**escalated** 154:22

**escalation** 14:2

**escort** 14:9

**escorting** 151:24

**essentially** 65:5

**estimate** 73:1 139:11,12,15

**et al** 8:8

**evaluation** 100:6

**evaluations** 99:10 198:19

**Evan** 131:15

**Evans** 131:9,22,25

**evening** 144:20

**event** 103:20 127:17,22

**event(s)** 243:19

**events** 178:16 181:7,8

**eventually** 26:11 241:24

**evidence** 39:18 71:13 118:7 122:25 132:3 135:8 162:19

**evidently** 61:12 68:25 151:6 235:17

**exact** 202:17

**examination** 9:18 236:15 245:3

**examined** 166:2,5,9,22 244:4

**examines** 21:19 22:9 89:15 98:10 104:21 105:4 108:4 120:18 210:7 211:18 224:7

**examples** 50:14 217:19

**exceeds** 226:11

**excerpt** 88:5

**excess** 206:6

**excessive** 58:4,16,18,23 59:6,15,16 98:16 105:22 213:24 214:11 216:12,20 226:22 227:5,6 228:1,2,20 231:19 234:14 235:4,13,14,16

**exchange** 29:14 65:4 108:9 113:19 115:15 116:16

**exchanged** 57:3

**excuse** 26:17 37:21 62:5 63:12 69:9 77:17 84:9 86:3 104:25 115:6 120:24 122:16 125:10 137:17 154:19,20 176:6 178:14 219:8 230:24 234:4,5 239:16,18 240:2

**execution** 244:20

**executive** 99:18 214:13

**exhibit** 21:10,14 22:1,4 87:21,24 89:8,11 98:3,7,8 101:2,6 102:12 104:3,4,19 107:21,24,25 112:25 120:12,15 125:2,6, 23 126:1 155:18 169:21,25 204:18,19 209:10,11 216:25 223:24,25 224:4 225:3, 7 232:3,5,8

**exhibits** 22:18

**expect** 81:1,6,14 85:9

**expected** 79:19

**expects** 48:7

**experience** 29:13 30:18 36:8 143:19 144:3,23 162:20 163:14

**Expires** 244:25

**explain** 36:5 59:7 95:4,7,12,13 113:4 204:2

**explained** 32:19 44:6 94:25 105:22,24 106:10 185:1

**explore** 71:4

**external** 238:6

**extremely** 102:11

**eyes** 62:16,17,19

**F**

**F3** 24:5 26:5 99:7 215:15

**F5** 205:3,5 207:20 208:8 234:4 235:9

**F5a** 204:12

**fabric** 199:20

**face-to-face** 51:19 56:25 62:7

**facility** 18:4 161:16

**fact** 25:10 48:19 50:6,8 66:3,8 87:10 95:8 96:8,15 97:8 99:5 102:22 103:8 111:6 122:4,14 124:5 129:7 130:23 136:10 141:10 157:17 219:2 220:24 221:1

**factor** 168:12 201:8,12,15,18

**factors** 168:23

**facts** 36:25 76:19 113:21 140:8,13 181:11

**factual** 107:2 115:14

**failing** 86:22

**failure** 102:17

**fair** 51:14 113:23

**fairness** 208:23

**fall** 107:7

**falls** 141:13

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 242 of 665

**false** 97:12 98:16 113:6 196:23 206:15 207:23

**falsely** 92:9,12,13 226:21

**falsification** 111:11 197:22

**falsiticity** 65:8 109:11 197:23

**familiar** 78:12,13

**family** 21:8 44:3 85:8 172:8 179:1 192:8

**fan** 242:13

**fast** 131:23

**Fast-forward** 58:13

**father** 91:8,15 109:17 110:4,5

**fault** 120:7

**February** 8:5 19:10,11 20:7 89:25 104:24,25 113:2 243:22

**federal** 98:17 146:6,15

**feel** 10:10 32:10 44:13

**feet** 139:11

**felonies** 236:25

**felony** 141:15 142:2,19 143:15 155:25 184:2

**felt** 37:4 42:10 130:5 157:4

**female** 42:7 43:12 46:20 112:8 156:19 195:23 196:5,14,24 197:3 213:25

**fender** 42:5,20 117:7

**field** 32:14 36:13,24 41:22 42:15 49:18 50:10 53:7 94:24,25 95:5 102:14,24 103:1 217:17 225:23 239:12 241:7

**file** 20:25 39:23,24 40:5,14 98:21,23 99:1,5,14,17,25 100:4 101:18,19,20 102:4,9 105:1 194:25 205:12 207:1,6,19 210:17,20 211:10 212:5,25 213:2,6,7 214:8 221:12 225:7 228:1,7,10 230:18 239:3

**filed** 20:19,22 23:16 43:12 198:9,11 201:14 216:5 220:13 221:8 225:20

**files** 40:18 58:15 69:2 99:9 102:7,8

**filled** 63:8

**final** 22:13 94:23 96:1 121:15 232:3 240:3

**finally** 54:10 231:4

**financial** 225:24

**find** 31:5,22 46:6 60:23 104:16 186:20 200:19 232:25

**fine** 38:5 97:15,18,19 230:22

**finish** 172:15

**finished** 105:2 123:2 159:4

**fire** 173:24 174:2 176:25 177:1,5 180:8, 18 181:15 197:8,10 208:5

**firearm** 13:22

**fired** 115:5 180:17 187:21,23 188:13 196:19 197:13,15 200:17 201:21,23 221:18

**firm** 9:22

**fitting** 62:21

**five-minute** 97:14 233:1

**flashlight** 18:21,22,23 19:15

**focus** 12:15,24 14:17 46:14 78:16 79:20

**focused** 11:20 46:13

**focuses** 12:21

**Follow** 44:1

**font** 28:15,17

**force** 13:13,16 14:3,9,11,14 58:4,16,18, 23 59:6,15,16 98:17 132:21 147:17,24 149:4 152:18 155:5 156:15 158:4,5,19 168:15 172:22 173:2,13 174:7,10,18 178:23 187:9 188:3 206:3,6 213:14,25 214:11 216:13,20 226:22 227:5,7,24 228:1,2,20 231:15,19 234:14,15 235:4, 13,14,16

**foregoing** 243:7,13 244:5,8

**foremost** 121:23 179:14 205:8 206:1

**forgot** 186:14

**form** 12:19 14:8 100:10 122:24 175:22 197:17,18 205:1 207:20 208:8,15 211:1, 6,12 212:22,24 235:3,9

**forms** 40:13 106:13 212:17 214:22

**formulating** 239:25

**forthwith** 138:7

**forward** 25:13 26:23 76:20,22 212:11, 19 237:14

**fought** 168:10

**found** 58:1 60:19,22 66:4 69:8 100:16 102:3 115:10 139:25 167:22

**fourth** 89:22 182:2,11

**fracture** 151:6 168:4,5 170:23,25 171:2, 9,10 172:5

**fractured** 151:4 166:24 167:22,24 168:2 183:15

**fractures** 171:3

**Franklin** 116:5

**free** 10:11 48:10 81:2

**friends** 21:8 55:12

**friendship** 56:1

**front** 43:14 104:8,17 112:16 140:20,24 142:20,22 143:25 149:10 163:4 177:1 192:19 194:5 221:1,3

**Fryson** 24:21 25:7,20,21

**FTO** 32:14

**full** 10:5 15:19 19:9 109:11 111:11 172:19

**full-time** 227:22

**fun** 195:9,11

**fundamentals** 13:5

**fussing** 82:16 88:11 91:17,20

**G**

**G4s** 227:17 229:24 235:17

**gain** 19:18

**gaining** 233:11,17

**Garvey** 234:23

**gave** 31:8 44:24 45:14 47:6 59:21 61:14 83:17 116:24 134:25 157:4 178:6,9 189:16,20 200:23 202:10 204:11 215:22 216:4 235:1

**gay** 238:20

**gears** 237:21

**gender** 65:9,17 88:19 195:10,21,22 197:3 201:15

**general** 12:1,9 39:11 105:10 171:3 233:25 234:1

**generally** 38:22 167:8

**Gerald** 35:8

**get all** 45:7

**get along** 74:1

**girl** 48:3 93:12,20 94:11

**give** 10:2 24:25 25:11 30:12 45:1 47:15 50:14 59:20 64:7,8 73:1 81:3 90:6 102:2 104:20 135:19,22 142:15 161:12 162:4 172:19 178:8 190:9 192:1 210:4,13 211:9,17 215:19 219:19,20 228:18 229:7 230:11 233:20

**giving** 136:22 219:18

**glad** 75:13

**glasses** 157:22

**God** 236:1

**good** 62:1 66:12,15,23 69:14 97:14 103:9 154:20 198:3 216:18 218:14

**Goolsby** 122:15,19 165:15 171:22,23 172:22 176:6,7 179:21 180:7,21,24 181:17 188:2 196:11 220:21 221:5

**Goss** 81:13 83:4,11,14,25 84:17 86:4,13 88:12 89:13

**gots** 174:8

**government** 175:18 179:17

**grabbed** 153:3

**granted** 85:25

**Graveyard** 141:25

**great** 198:4 234:2

**greater** 142:2 145:19,23

**Green** 217:4,15 218:2

**Green's** 239:24

**grew** 192:6,22

**grievances** 178:11 198:10 221:9 238:2

**gross** 220:6

**ground** 153:5 162:15 167:11

**grow** 241:3

**Gruber** 243:3

**grudge** 239:18

**guess** 47:16 55:14

**guidelines** 169:8

**gun** 189:5,9 190:8

**gurney** 166:25

**gurneyed** 167:22

**guru** 50:2 95:16

**guy** 44:9

**guys** 48:2,7

## H

**habitually** 49:23

**half** 105:6,19 207:9

**hallway** 109:3,6 111:12,15 199:1,3

**hallways** 199:11

**hammed** 163:11

**Hampshire** 12:12 27:2,4

**hand** 14:10 156:6 158:13 162:11 243:22

**handbook** 37:21,25 41:18,24

**handcuff** 152:11,14,19,22 155:4,16 167:11

**handcuffed** 152:4,5,6 155:3

**handcuffing** 14:10 150:2

**handcuffs** 150:22 155:6,15 157:12

**handful** 50:18 73:3 95:19 119:9 160:5,8

**handle** 50:21 85:15,25 89:2 148:5 150:17 151:10 173:16

**handled** 51:8 116:14 141:4

**handling** 69:4 86:10,11 140:18 141:3 148:6 156:5

**hands** 13:17,18,19 14:7,8,12,13,18,21 94:3,4 151:1 158:7 162:11 164:23 178:2

**handwriting** 106:15

**handwrote** 39:21 40:19

**hang** 32:21 55:20,22 56:10,12,13,19 57:13 72:16 95:21

**hanging** 55:13 56:23

**hangs** 56:13

**happen** 29:22 45:25 54:2 90:21 120:9, 11 127:6,8,18,22 195:14 220:18 225:2

**happened** 24:10 32:24 33:20,23 34:6 60:20,21 65:3 68:3 72:9 76:6 90:20 93:20 110:10 111:16 117:9 120:6,11 121:4,9,10 125:18 129:16 131:20 132:8 135:24 136:1 141:5 148:20 149:1,6 162:24 167:6 171:19,20 173:8 177:4 179:4,12 184:8 187:4 190:10 200:6,12,15,20 201:21 203:11 206:12,16 213:10,20 214:11 235:17,25 238:16

**happening** 127:9,12,14 129:9 190:11

**happy** 133:16

**hard** 13:18 200:19

**harm** 108:22

**Harvey** 234:22

**hat** 34:11 198:15,24 199:16,19,21,23

**haven't** 76:8 167:14

**he'll** 48:8

**head** 40:12 44:23 45:6 93:23 94:5 134:7, 17 166:22 188:7 198:2 215:3 216:22 221:21 223:10

**head-on** 85:5

**headed** 50:25 111:22

**headlights** 87:8,14,16 117:10,14 118:16

**heal** 171:3

**Health** 170:6

**hear** 9:7,9 22:19 34:6 48:18 70:25 179:25 194:2 222:21 242:9

**heard** 36:3 61:9,23,25 62:9 63:15 69:9 115:9 122:21 220:23 238:21 241:7

**hearing** 25:16 133:4

**height** 54:6 156:14

**held** 220:14

**helping** 61:7

**Henderson** 26:20 73:15 102:25 167:1

**herein-above** 244:18

**hereunto** 243:21

**Hertford** 11:5

**hesitated** 229:8

**Hey** 175:5 192:19

**he'd** 47:13

he's 241:5

hide 212:22

high 11:4,5

highway 32:24 33:1 34:15 35:12,16 78:4 103:7

hire 213:5 216:8 227:14 234:18 235:3

hired 12:8 19:20 33:10 53:22 56:6,8,10 175:24 214:22

hires 217:15

hiring 22:22,25 26:7,18 29:23 212:19 227:21

Hispanic 42:8 219:3,10,19 220:8

history 17:24

hit 44:9 94:2 117:16 118:1,2,4 129:12,18 153:9,10,11 158:1

hold 97:16 139:23,24 156:6 227:19 233:20

home 30:25 33:9 34:1 49:24 59:21 72:18,19 138:11,12,25 139:6,16 146:19 147:3 148:18,19,22 171:19 182:12 189:16,20,22 190:9 200:24

homes 56:15 139:4,5,11

homophobic 238:11,17,19

honor 210:18

hope 216:24

hospital 26:21 45:24 76:3,7,11,17 93:5 167:1 171:15 172:9,18

hostile 239:17

hostility 220:12

hour 38:2 76:15 181:2,3 208:4 227:22

hours 56:11 72:13,20 76:16 240:5,10

house 31:11 56:22 93:3 144:9,13 145:21 147:16,20 148:5 149:7 181:20,21 182:6,9

houses 182:6,8,9

HP 34:15

HR 39:16 59:3,8 177:20,21 198:11 238:7 242:12

huh-uh 10:3

human 28:20 37:11 98:19

humerus 167:24 168:2,4,5 170:24

171:10

hurt 207:25 208:13

hurting 136:13 166:8,16

hyped 68:9

hypocritical 95:10

# I

I-85 93:5

i.e 102:17

IA 207:6 208:19 231:14

ice 73:15

ID 8:15

idea 203:22

identification 21:12 22:3 44:4 87:23 89:10 98:5 101:4 104:6 107:23 120:14 125:4 126:3 154:10,11,12 169:23 204:21 209:13 224:2 225:5 232:10

identified 23:2,7 24:20 53:10 126:12 231:5

identify 222:1,4,7 223:3,4

identifying 154:13

identity 12:20

ignore 156:18

Ignoring 41:24 49:13

illegal 225:21

illustration 125:16,20,21

immunities 179:17

immunity 179:15,16 180:14

impacted 225:24

impaired 87:4

impairments 10:24

implying 74:13 224:18

important 31:14,16 164:15,16

improved 151:2

inaccuracies 125:19

inaccurate 207:21

incapacitate 158:2

incident 41:14 42:21 83:4,14 84:1,21 85:17 86:13 89:13 113:11 117:5,12 126:9 131:18,21 132:7 143:7 147:18 149:4 152:17 159:6,10 167:17 170:5,8,13,17 171:18 172:6 173:9,12 187:5,7,15,22,25 190:2 202:23 207:14 218:20 230:17 233:9,14

incidents 51:20 227:4 231:20 233:10,16 235:11,23

including 67:1 68:9

incorrectly 88:4

increase 220:11

indirectly 198:22

individual 23:1 24:20

individually 77:7 195:7

influence 239:24

inform 81:3 90:17 235:5

information 11:3 28:25 29:5 32:23 34:9,10 36:25 39:22 40:21,25 58:5 62:6 66:17 114:25 132:24 133:8,13 135:2 136:22 182:14 184:14 202:23 209:21 210:2 212:14 215:6 222:21 230:11,20

informed 64:16 90:11 130:16 220:15

infractions 236:23

initial 26:9 32:2 126:13,21 133:5,6 240:4

initially 39:14 41:1 52:25 175:21

initiate 77:3

initiated 76:25 77:1

injure 87:18

injuries 120:3 167:16,18

injury 158:16,18 169:12

inmates 160:12

innuendo 94:17

inquired 83:1

inserted 40:25

inside 146:24 202:18,19

instance 137:24

instances 100:17 235:24

instilled 50:11

**Institution** 18:6

**instruct** 219:15

**instructed** 80:8 145:19 155:24 182:24 183:2 220:16

**instructing** 219:24

**instruction** 218:23 219:13

**instructions** 148:4 156:12 170:3

**insubordination** 113:9,12

**insurance** 45:24

**intensity** 156:15

**intent** 168:9

**intentional** 183:16

**intentionally** 120:10

**intents** 244:21

**interactions** 56:24

**interested** 24:13 227:21 243:19

**internal** 178:10 198:9 204:13 205:22,24 206:2,10,19,22,24 207:1,24 208:2 214:12 220:13 226:20 228:1 231:12 234:7,11 238:1,2,6

**interrogatories** 22:7

**intersection** 116:8

**interview** 24:9,15 25:3

**interviewed** 25:15

**invested** 29:15 30:19

**investigate** 196:24 208:2

**investigated** 68:23 173:10 175:4 231:20

**investigating** 174:24 175:2

**investigation** 175:8 202:24 204:13 205:17 206:2,11,17,19,22,24 207:1 208:4,6,8,14,22 213:14,15 226:21 231:18 234:7,12 239:1,2 241:22,23,25 242:4,6

**investigations** 109:5 175:12,20 205:22,25 207:25 242:9

**investigative** 149:5

**investigator** 208:2 214:12 227:24 231:10,13 234:22 238:14

**invited** 24:14

**involved** 41:6,8 68:12,17

**involves** 17:17

**involving** 34:12 76:2,10 115:21 117:6,11 126:9 128:7 213:13 227:5 231:22 239:15

**Iredell** 243:4

**irrelevant** 226:10

**Isaiah** 239:23

**issue** 36:16,20,21 39:16 47:18 49:13 63:10 67:18 68:25 75:25 76:1,4,17,22 78:25 79:20 80:23 82:5 86:17,18 87:10,20 93:21,22 94:4 129:8 174:15 218:24,25 219:2,9,13,15 229:2 235:15 242:2

**issued** 15:19,21,23 16:15,18 46:24 47:11,14 80:12 88:12 90:13 98:14 103:19 106:12 123:20 185:13,14

**issues** 32:20,22 34:7,12 60:15,18,19 66:2,3,7,9,10 68:8 75:19,24 76:4 78:25 87:5,7 97:7 184:8 218:16,19 238:5,8,10 242:3

**issuing** 81:17,20,25 82:1,9,18 96:3

**items** 39:19

**It'll** 238:12

**it's** 40:24 48:10 54:8 71:20 90:21 96:14 105:17 125:18 154:8 158:13 162:5 166:23 167:14 171:11 184:21 196:4 198:2 211:11 224:23 239:17

**I'd** 31:15 101:16 141:2,4

**I'll** 169:13,14

**I'm** 92:4 121:22 146:12 159:4 189:13 225:6

**I've** 83:15

---

**J**

**J-A-M-E-L** 10:8

**J.J.** 102:13 192:21

**jail** 150:3 153:12 154:22 166:13,15,17 184:7

**Jamel** 10:6

**James** 180:21

**Jamie** 81:13,16 83:4,11,14,25 84:17 86:4,13 88:12 89:13

**Janie** 99:17

**janitors** 199:12

**January** 8:4 18:15 20:7 100:8 101:13 218:11

**jeopardy** 133:22 157:25

**JJ** 156:8

**job** 13:4 16:2 18:7,13,17 19:12,14 22:20 23:10,14 24:6 46:17 49:24 62:1 66:24 101:1 103:12 110:17 173:6 176:8,13,19,20 183:11,12 185:16 203:5 209:23 216:18 218:15

**jobless** 204:8

**jobs** 79:22

**Johen** 39:2,18 98:22 148:16 241:25

**John** 231:14

**joining** 75:7

**jokes** 74:10

**joking** 74:6 195:14

**judge** 46:2 150:20 154:21 237:10,11

**July** 108:4 177:10,11,12 197:11

**jump** 239:9

**jumped** 90:14

**June** 19:21 27:9,12,15,18,19 28:7 100:9,14 177:10

**jurisdiction** 13:11 160:13

**justice** 11:15,21 12:12,17,19,20,21,22,23

**Justin** 8:6,7 9:15 10:6 20:1 22:5 129:25 244:3

**justly** 206:18

---

**K**

**K-A-L-E** 227:20

**Kale** 227:19 229:24 233:9,15

**Kenneth** 32:18 104:8

**key** 18:23 19:16

**kill** 85:8 87:17

**killed** 81:15 83:18 84:17

**kin** 243:16

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 246 of 665

**kind** 26:2 32:6 38:19 124:16 192:22 236:8

**King** 93:4

**knew** 24:23 47:4 54:25 56:23 62:8 112:13 138:3 168:3 194:1

**knock** 146:23

**knocked** 146:21

**knocking** 144:8 147:10

**knowing** 50:22 112:5

**knowledge** 49:16 68:14,19,21 70:9,13 74:19 81:23 83:2,5,13 90:24 107:10 127:19,21 165:5 194:6 195:16 199:15 205:20 227:12,15,16 231:6 244:7

---

**L**

**L-A-T-W-A-Y-N-A** 132:7

**L-I-L** 192:12

**L.D.** 101:23

**Ladder(ph)** 35:8

**Laden** 194:19

**lady** 44:18

**lag** 128:19

**laid** 48:10 241:5

**lane** 51:1 119:19,22,23

**language** 88:23 89:5 190:19 191:17 194:15 195:3,4,13,20 198:6

**laptop** 133:12 153:25 186:12

**large** 91:8 125:25 202:15 243:4

**late** 15:22 19:10,11 63:7 141:23,25 144:7,20 147:8 177:12 195:25 241:11

**Latwayna** 132:7

**Lauren** 53:15

**law** 9:22 11:17,24,25 12:1,6,9 13:6,8 36:8 53:22 55:4,16 60:8 77:16 79:7 98:18 143:19 147:5 158:6 159:19 160:23 161:20 168:16 182:3,18 204:7,11,15 212:7 216:8,9 226:5 230:1 236:24 237:17

**lawful** 169:1 183:18

**Lawrence** 33:4 35:3 64:14 68:17 104:10 180:2 188:19 195:17,19 196:10

222:3 223:7

**laws** 78:19,22,24 79:2,15,17 80:7 83:19 84:25 88:13 203:13,19

**lawsuit** 216:6 230:18

**lawsuits** 23:15 215:1,9

**lawyer** 210:18

**lawyers** 218:5 222:11

**layers** 13:17

**laying** 181:11

**lead** 241:6,9

**leadership** 220:15 239:6

**leads** 109:3,6

**learn** 161:19

**learned** 220:11 222:12

**leave** 109:8 111:12 173:13,14,15 225:7 226:5

**leaving** 19:8 108:20

**led** 60:3 155:7 213:18 241:2

**left** 17:25 48:12 85:4 86:23 92:15,16 111:15,18,22 119:19 123:9 180:23 187:12 214:25 228:15 230:1

**legs** 163:1 164:19

**lesser** 14:8

**let alone** 123:17 242:9

**letter** 66:21 69:9,11,12 177:19 178:6,8

**letters** 178:9

**Let's** 90:9

**level** 13:9 37:5

**liability** 157:19

**lie** 208:7

**lied** 104:9,13

**lies** 109:11

**lieu** 8:13

**lieutenant** 25:25 26:1 34:21 60:5 62:7, 11 63:21 82:6,11 88:8 89:21 92:20,22 104:11 108:14,16 109:25 111:2,7,17 112:17 122:18 171:21 172:22 173:15 175:24 176:6 179:21 180:7,21,24 181:17 188:2 189:1,9,21 196:11 197:23 217:4,20 219:12 220:21 234:19,25 235:1 241:19

**lieutenants** 51:24

**life** 85:1 87:1 96:25 105:15 116:21 133:21 192:14

**light** 102:18

**lights** 87:15 114:1 116:12 117:21 118:1, 3,6,12,21,23 121:1,7,12,14 128:9,13 129:6,12,18 130:2,4,6,8,10,13,15,17,22 131:4 135:13,16 165:15

**likelihood** 169:12

**likes** 103:6

**Lil** 192:12

**limit** 51:5

**limited** 56:25 72:22,25 75:19 202:2

**lines** 85:2

**listed** 113:10

**listen** 194:1 199:19

**listening** 91:22

**live** 10:17 57:15,16

**lived** 27:4 138:19,21,24

**livelihood** 204:6

**lives** 85:1 87:1

**living** 31:18 192:14

**LLC** 212:3 215:17

**Lloyd** 26:1 58:5,6 173:22

**located** 111:14 198:25 221:10

**lock** 93:18,19 94:7 149:10

**locked** 94:10 111:24 149:12,17 152:3

**locking** 149:14,20 152:14

**log** 154:6,8 186:14,16

**long** 48:4,11 52:11 73:25 76:9 77:9 78:7 105:18 106:25 109:21 116:22 117:12 119:6 128:15 134:24 135:23 149:6 150:12 152:16 161:1,11 162:5,8 165:24 167:14 170:24 194:23 201:9,25 207:7 209:20 236:5

**longer** 32:17 49:8 59:19 76:13,14 78:10 118:10 165:13 189:7 190:6 214:6

**looked** 22:21 28:13 66:19 117:25 119:13 203:24,25 224:16,18

**lookout** 62:20

**loosely** 91:12

**Lori** 243:3

**lose** 77:10,13 176:8,12

**losing** 176:19

**lost** 31:20

**lot** 33:19 48:9 90:20,21 95:17 106:7 114:2 143:6 150:3 160:4 196:14 228:21 235:25

**loud** 180:22

**Louisburg** 18:14,25 33:23

**lounge** 56:20

**lower** 153:3 162:11

**Luckily** 120:2

**lunch** 55:24 56:14,16,17 57:14 74:24

**Luther** 93:4

**lying** 224:25 225:1

**lyrics** 192:13

**M**

**mad** 189:19

**made** 35:6 68:9,24 71:7 100:18 103:4,5, 11 123:14,15,18 124:6 149:17 155:23 157:9 172:25 174:19 196:21 198:14 217:9,10 221:12 222:1,4,8,16 229:15 230:17 237:23 238:4 241:21 244:11

**magistrate** 46:2 80:15 138:8 150:20 164:25 172:17 237:10

**Magistrate's** 80:14

**magistrate's** 155:2 184:4 237:2

**mailbox** 198:15,25

**mailboxes** 199:7

**major** 35:14 49:11 51:25 78:5,6 86:16, 17,18,19 87:5,9,10,20 96:22 97:5,6 105:9,14 133:1,3 134:12 135:7 136:20 137:16 185:3 231:14

**majority** 105:23

**make** 14:22 64:6 71:17 78:15,17 86:21 99:5 102:15,21,23 104:22 108:17,21 112:18 144:7 146:1,7,16 168:17 172:6 194:20 195:9,11 213:6 214:9 226:15 237:23 238:17,19

**makes** 174:1

**Makin** 69:20 70:3,5 71:5 72:2 73:8,11 74:11

**Makin's** 70:6

**making** 49:21 74:10

**male** 42:8 54:17 137:6 140:21 191:24,25 197:3 220:8

**males** 239:15,19

**malicious** 212:20

**man** 25:2 42:9 44:18 46:4 57:5 82:17 91:4,9,16 93:9,12 94:9 110:5,22 112:21 114:23 147:10 192:19 219:19 238:21,22

**man-to-man** 113:17

**management** 37:11 104:15 107:13 123:14,18 163:21 164:3 206:14 219:18 221:13 222:14 228:18 239:6 242:11

**manager** 28:21 214:13

**managers** 16:24

**maneuver** 151:2

**manipulation** 122:25

**manner** 8:20 131:23 195:14

**manual** 38:17 41:18 162:6,18

**March** 23:12,13 117:5 126:9 127:11,13, 18 211:5

**Maria** 26:21 93:5 166:25 170:6

**Marin** 32:9 62:25 66:14,22 76:1 92:12, 19 93:2,7 108:3 109:10 112:18,20 113:16,17,18,21,23 114:3,14,18,21,22 115:21 116:8,11,18 143:8 217:17 240:22, 23

**Marin's** 63:18 68:5 217:12,16

**Mark** 120:23

**marked** 21:11 22:2 87:22 89:9 98:4,7 101:3 104:5 107:22 120:13 125:3 126:2 169:22 204:12,20 209:12 224:1 225:4 232:5,9 235:3

**markers** 154:13

**Martin** 93:4 191:24 192:2 193:12 194:4, 14,17 220:21 221:2,15 223:23 238:13

**Martin's** 99:18

**master's** 12:11,16

**materials** 37:8 38:14 161:21

**matter** 8:6,16 78:18 83:8,10 88:20,23 128:24 136:10 150:17 154:22 184:20 203:12 204:5 214:19 215:25 226:9

**matters** 173:17

**Mcgurl** 9:6,11,12 10:20 97:15,17,18,22 144:25 145:4

**means** 12:18 95:13 171:2,10 195:12 205:13

**meant** 28:2 113:8 133:10 192:9

**measurement** 139:10

**mediate** 114:7 115:23,24

**medical** 39:8 163:6 164:16 171:14

**meet** 179:22 181:1

**meeting** 221:4 222:11

**member** 180:6

**members** 21:8 44:4 53:21 75:21 175:6 220:15 224:24

**memory** 54:9 81:24 140:12

**mention** 15:14 16:4 58:19,20 88:14,15, 19 190:2 201:7,12,15,17 216:12

**mentioned** 15:11,16 17:25 19:22 25:23 26:8 27:20 35:18,23 43:7 47:23 49:15 54:23 59:10 65:10,18 68:22 71:5 72:6 84:16 88:17 95:15 128:18 141:17,20 142:4 143:3 154:14 187:6 190:3 193:12 194:13 223:13 232:24

**merits** 80:18

**messages** 57:1,3,8

**met** 21:2 26:20 55:10 66:5 177:11 181:3 197:12 222:14

**methods** 13:24

**Mexican** 219:10 220:8

**Mexican-hispanic** 218:24 219:1

**Michael** 9:6,11

**mid** 177:11

**middle** 10:7 90:10 103:17 105:5

**midnight** 170:21

**miles** 116:3

**mind** 38:2 86:9 131:17 144:12,13 179:14 208:10 223:6 233:20

**minimis** 14:11,14

**minor** 42:5 49:11 75:25 76:1,3,21 87:7,8 95:2 117:7 134:9

**minorities** 220:2 239:15

**minute** 119:8,9 165:12

**minutes** 38:4 73:23 97:19 188:14 236:7

**miscellaneous** 99:8

**misdemeanor** 142:3 143:14 184:2

**misdemeanors** 236:24

**misquoting** 71:20,22

**missing** 31:17

**mix-up** 185:7

**mocking** 192:3 193:17

**model** 133:15 185:23

**modular** 138:25 139:4,6

**mom** 44:5,8 94:2

**moment** 210:5

**month** 99:3 101:17 193:9

**months** 12:8 42:12 92:10 110:11 175:23 190:24 204:9 205:23 207:4,10,12 234:8

**morning** 141:23 142:1,7 144:8,19 179:22,24 180:8

**mornings** 144:20

**mother** 43:12,18 44:17

**motion** 93:24 225:7

**Motor** 49:2

**motorist** 51:9 118:20

**Mount** 11:11,12,13,16 17:25

**mouths** 97:4

**move** 26:22 76:22 98:7 101:5 105:19 125:23 132:6 138:9 210:23 212:11,19 237:14

**moved** 31:18 92:11 203:22

**movements** 108:21

**moving** 25:13 39:13 52:22 78:2 107:24 115:19 131:7 218:22 220:10 221:10 241:16

**multi-colors** 199:20

**multiple** 50:7,13 52:6,20 85:2 88:25 122:6 130:14 132:23 134:8 143:14 168:22 182:8,9 185:20 186:18 195:25 221:1,3 231:20,21

**mumbled** 135:21

**munition** 13:19

**munitions** 158:8

**mute** 9:7 124:10,13

## N

**named** 226:10 244:18

**names** 49:5 117:1 142:15 154:8 228:17, 18

**naming** 226:1

**nasty** 110:1,16 112:23 217:6,20,24

**nature** 41:17 57:5 221:19

**NC** 78:3 215:16

**nearby** 139:4

**necessitated** 226:1

**neck** 163:1

**needed** 16:6,7,25 26:17,23,24 27:1 28:19 37:1,5 59:19 105:8,21 189:7 190:6, 8 213:13 214:6

**negative** 92:5 204:11 226:23,24 227:1 229:8 235:19

**negatively** 225:23

**neighbors** 139:1,3

**Nicholas** 234:22,23

**night** 69:25 87:16 117:20 128:1 139:25 140:2 141:11,23,24,25 142:1,7 143:15 144:7,9,19,20 167:23 170:18,20 187:9 240:17,22,24

**nights** 61:18

**nighttime** 87:8

**noise** 69:12

**non-attorneys** 21:5 200:10

**non-compliance** 15:5

**non-compliant** 15:9 150:25

**non-cooperative** 15:9 150:25

**non-sworn** 199:5,8

**noon** 144:19

**normal** 72:13,19 76:15 151:25

**north** 10:17 11:6,11,12 18:1 20:1 50:25 55:6 116:14 135:1 154:7 186:15 203:19 212:3 243:4

**northern** 84:24 86:12

**notarized** 27:1

**Notary** 243:3,24 244:15,23

**note** 125:19 203:3 245:4

**notebook** 202:6,8,9,11,12,20 203:8,12, 17,21,23 204:1

**noted** 124:20 126:25 244:10

**notes** 40:2 203:2

**notice** 21:17 134:1 145:2,8

**noticed** 117:14 149:9

**notwithstanding** 144:2

**November** 18:3,15 19:10 42:23 59:25 72:11 107:9 160:20 217:12

**Ns** 192:14

**number** 21:11 22:2,5 53:9 80:12,16 87:22 88:2 89:9 98:4 100:21 101:3 104:5 106:12,14,19,22 107:22 120:13 125:3 126:2 128:16 135:2 169:22 186:11,13,14, 17 204:20 205:9 207:19 209:12 224:1 225:4 232:9

**numbered** 243:13

**numerous** 40:8

## O

**oath** 8:14 27:16,18 183:13

**object** 31:23 38:18 71:18 124:16 129:20 146:10 226:7

**objected** 124:17 126:24

**objection** 39:7 71:10,18 126:25 144:25

**objections** 8:19 145:7 146:7,16 226:16

**objective** 13:9 182:18

**obligated** 175:1

**obligation** 242:8

**obligations** 79:7,9,16

**Observe** 19:1,13

**observed** 84:23 95:3 132:23 190:25

**observing** 32:10

**obsessed** 182:19

**obtain** 210:2

**obtaining** 212:9

**occasions** 121:16,20,23

**occur** 207:14

**occurred** 20:4 42:21,22 46:25 111:16 170:8,13 177:7 187:23,25 194:8

**occurring** 170:10

**October** 132:8,13 147:18 159:10 167:17 170:14 178:21 207:15,17 221:23

**off-duty** 56:24 57:2 188:16

**off-record** 155:11 209:16

**offence** 237:7

**offended** 203:8

**offender** 184:22

**offenders** 18:12

**offensive** 88:22 89:5 195:13

**offer** 26:15 215:20,21

**offered** 26:11

**office** 8:7 15:22 17:6 19:21 22:19,24 24:19,23 27:16 32:3 33:14 34:16 35:17 36:7 37:17,20,22 38:15 39:5,12 40:10 41:12,18 42:1,4 43:2,24 45:7 46:11 49:7 50:17 52:10,16,23 54:24 56:6,9,17 57:21 62:8 68:16 80:14 96:12 98:16 99:17,18 100:13 101:20 102:6 105:11,16 109:9 111:14,18 112:1,4,6 131:10 136:16 153:22 154:2,4 155:2 157:21 159:12 163:18 164:24 178:17,19 180:17 182:15 186:1 187:11,12 188:17,18,20,22,24 189:24 190:18 195:6 199:4,11 200:22 201:12 202:5 204:3 207:8 211:2,8 212:5 213:11 214:5,25 215:14 216:6,14 222:13 224:24 227:4,9,13 230:2,10,19 231:13, 21,25 232:17,21 233:22 237:20

**officer** 11:18,24 13:6,7 14:22 18:8,15 19:11 32:14 36:9 41:22 48:21 49:18 77:16 78:4 102:15 113:7,8 143:20 144:15 147:3,5 148:2,10 150:7 159:18,19,22,24

**officers** 16:25 61:20 79:7 147:25 150:5 160:22 196:15 236:24 241:6

**offices** 109:4

**official** 89:12 100:22 171:15 179:16

**officials** 228:17

**Olive** 11:12,13,16 17:25

**Oliver** 132:7,8,9,11,18,19 135:14 136:17 138:3 147:14 156:25 157:22 159:6,10 164:12 167:16 170:4,6 171:7 178:22 179:3,11,24 180:17 181:10,17,19 182:19 183:17,22 184:14 185:12,18 186:3 187:4 190:2 206:12 207:14

**Oliver's** 134:1 138:11 146:18 184:25

**on-boarding** 37:9,10,12 38:16,19 42:15

**on-the-job** 32:3 38:25

**one-lane** 119:21

**one-sided** 175:12,19

**one-year** 230:3

**one's** 62:21

**ongoing** 205:21,24 206:2,10,18

**online** 27:3,5

**onward** 198:18

**open** 62:16,17,19 147:10

**open-eye** 213:15

**opened** 61:22 189:3

**operation** 84:21

**operations** 41:15 85:16 202:24

**opinion** 134:9 145:20 208:11 220:5

**opinions** 239:25

**opportunity** 29:11,21 30:15 61:14,16, 21 90:6

**Opposing** 145:25 146:3

**options** 157:5

**oral** 25:14 29:24 30:4 238:3,4 242:3

**orally** 30:16 41:25 82:14

**order** 10:3 73:24 184:3,4 186:9 237:2

160:1,2,9,12 164:10 168:16 179:16 204:7 205:23 212:2 219:4 230:1 233:23 237:8, 11,17

**ordered** 241:23

**orders** 96:4,6 169:2 183:18

**ordinary** 137:15

**orientation** 37:12,14 38:20,24,25 39:1, 3 65:17 88:19 89:6 102:10 201:17

**originator** 63:5 67:3

**Osama** 194:19 223:21,22 224:13,15,17, 18,20

**other's** 56:15

**outcome** 184:10

**outstanding** 138:2 185:25

**overrule** 174:13,16

**o'clock** 117:20 181:5 188:14

**P**

**P-A-R-H-A-M** 73:16

**P-A-T-E-L** 194:18

**P-R** 194:18

**P-U-R-A-V** 194:18

**P.C.** 46:6

**p.m** 233:5

**p.m.** 70:22,24 74:23,24 75:1 97:21,24,25 98:2 124:12,24 125:1 127:22 144:5 145:22 155:10,13 165:2 170:16 186:25 187:2 188:13 233:5 236:12 242:21,23

**PACER** 215:12

**pages** 28:15 39:25 98:9 99:7,12 202:18 211:15 243:14 244:5,8

**pain** 166:7,14

**panel** 29:25 30:5

**panic** 164:15

**panicked** 131:23 164:14

**paper** 28:17 58:17 85:10 202:19 238:9

**papers** 46:16

**paperwork** 31:14,17 33:19 81:1,7,14 115:25 173:19

**paragraph** 88:1,3 90:10 91:6,7 94:23 96:2 103:18 105:6 155:20 170:24 171:1 220:10 221:10 225:11,17

**paragraphs** 170:23

**paramedic** 166:2,5,9

**paramedics** 151:4 165:12,23,25 169:19

**Parham** 26:21 73:16 93:5 167:1 170:6

**park** 148:21

**part** 15:2 16:1,8,12 37:8 38:16 46:17 84:24 85:15 86:11,12 95:25 103:12 105:17 110:3,7 122:23 161:21,22 171:1 188:15

**part-time** 19:19 188:16

**participating** 8:9 10:12

**parties** 8:18,23 36:7 212:13 243:17

**party** 82:17 140:23 177:1,2 180:6 226:2

**pass** 119:17

**past** 75:16 124:6 174:9,17 199:13

**Patel** 190:24 191:16 192:4 193:17,18,22 194:13,18 223:14 224:11,13,25

**path** 168:14

**patrol** 32:24 33:1 34:15 35:4,12,16 59:21 64:14 78:4 84:24 103:7 108:13,14 109:2,5 110:15,25 111:18,19,22,23 132:23 151:24 154:24,25 155:15,17 173:23 190:10 199:2 200:24 221:16

**pause** 127:3 128:5

**pay** 77:19 240:6

**PC** 85:24

**PDF** 40:19

**peace** 13:10 14:2

**Pearsall** 73:11

**penalty** 8:16

**people** 45:23 52:4,23 54:8,22 60:7 64:22 76:12,13 83:19 84:17 90:13 92:4 97:4 115:6 137:11 139:8 142:15 143:4 153:23 154:8 185:24 191:16 192:8 217:14,20 219:10

**people's** 85:1

**pepper** 13:19 15:11,12,14,16,17,19,21, 23,25 16:1,4,8,11,15,17,18,20 17:5,12,17 157:14,17 158:11,21 159:7,9,15,23 160:2,12 161:7

**perceive** 158:9

**perceptions** 144:11

**perfectly** 139:10

**perform** 103:20

**performance** 32:20,22 34:7,12 66:11 99:10 100:6 198:19 218:10,12,16,17

**performed** 192:12

**period** 107:3 142:6

**perjury** 8:17 42:17 137:21,22 163:11

**permission** 211:9

**Perquimans** 11:5

**Persall** 73:11

**persecute** 241:19

**person** 8:14 15:1 23:3 55:1 56:12 71:6 80:21 107:11 109:15,24 121:13 135:4 145:21 173:16 181:24 182:14,15,17 186:19,21 202:3 217:23,25 237:2,4,8

**person's** 25:18

**personal** 18:22 19:16 56:1 66:10 73:5 75:24 134:15 136:14 199:8 203:2 218:16, 17

**personality** 92:24

**personally** 132:15 231:23 244:18,20

**personnel** 20:24 37:11 39:23,24 40:5,14 67:18 98:21,23,25 99:1,14,17,24 100:4,5 101:18 102:3,7,8 199:5 203:11 210:17,20 211:10 212:4,25 214:8

**persons** 165:11 218:24 219:1,14,16

**pertains** 102:13

**pertinent** 43:4

**Peter** 22:6 25:1 57:24 195:2 221:23 223:2

**ph** 69:20 73:11

**philosophy** 133:14 185:23

**phone** 27:6 57:6,7,8 72:15 73:5,7,8 82:15 91:19,22 109:15,24 110:1,14 112:15,22 114:4 173:11 179:22 187:7,9 216:15

**phonetic** 54:12 71:6 106:24

**photo** 154:12

**physical** 14:9 169:2,9

**physically** 8:10 72:18,19 108:18 153:7, 8 162:2

**pick** 140:17 141:2 142:22

**picture** 154:9 172:19 219:21

**piece** 112:24

**pinpoint** 132:2 157:7

**pitch** 87:15

**pitch-black** 128:1

**place** 10:15 28:19 59:4 68:7,15 73:15,24 121:14 129:13 143:7 152:11 156:21 157:24 181:12 183:15,23 198:16 206:21 208:22 213:13,16 214:14 221:7 227:4,15 243:8 244:6

**placeholder** 125:24

**placing** 162:10

**Plaintiff** 22:5 225:22 226:3,5

**Plaintiff's** 225:20

**plan** 218:4,5

**plans** 179:3

**plate** 132:24 133:11 134:25 135:1,2 184:9 185:6

**play** 58:19 112:21 127:1 128:2 194:3

**played** 201:7

**plays** 128:4

**pleasant** 158:19

**pleasure** 175:15

**point** 28:3 31:24 42:18 51:4 80:1 86:25 107:17 108:21 115:9 118:11 138:6 145:12 157:6 164:11 165:16 166:11,24 183:21 196:2,3 226:11

**pointed** 79:21 103:18

**pointing** 103:21

**points** 26:4 97:17

**police** 13:6 16:24,25 50:3 55:11 135:13 147:3 160:23 164:18 212:1,2,3 214:13 215:16 227:17 229:24

**policies** 37:15,16,19 39:3 40:10 41:25 43:1 47:21,25 49:14,19 195:25

**policing** 133:14 185:22

**policy** 38:17 39:4,11,17 142:18 157:19 158:9 206:7

**Pool** 54:7,25 221:17

**Poole** 57:11,25 58:11,18 91:22 104:8,17, 18 108:15 111:1 112:15,20 113:18,21 114:19 115:15,16 116:4,15,18,20,22 188:3 191:1,6,8,13 200:11 201:7,20,22 220:22 221:16

**Poole's** 116:21

**pop** 73:19

**portion** 198:3

**position** 18:25 22:20 24:14 27:17

**positions** 14:10

**possibility** 118:7

**possibly** 17:17 40:9 71:6 171:22

**potential** 26:24 212:23

**power** 78:17

**practice** 81:11 96:2

**practices** 41:25 42:3 43:1 49:14,20

**praised** 95:22 218:10,11

**precedes** 100:11

**predated** 175:23

**preparation** 20:16 21:6

**prepare** 20:10

**prepared** 10:21 20:12 166:25

**presence** 13:18,25 102:19

**present** 8:11,23 9:12 21:5,8 28:8 72:18, 19 169:24 189:24 237:9

**presentable** 27:11,25

**presented** 28:11 29:11,18,20 30:14 122:11

**preserving** 13:10

**pretty** 10:1 48:10 112:24 134:5 161:10 163:20,24 165:6

**prevent** 14:2 180:15 204:14

**prevented** 225:22 226:18

**preventing** 185:15 235:12

**previous** 23:15 24:3 79:21 91:1 96:4,6 215:1

**previously** 24:6 30:14 33:22 34:11 78:3 91:2 98:7 106:5 117:10 144:17 149:23 185:1 214:17 228:4 234:3 240:1

**print** 154:1

**printed** 154:3

**prior** 21:16 24:18 67:25 72:5 130:4,6 156:11 157:5 190:24 191:17 238:5

**priority** 95:1,6 103:5

**prison** 33:21

**prisoners** 160:17

**private** 45:19 202:3

**privilege** 226:8 230:25

**probability** 67:22

**probable** 52:8 80:19 237:13,14,15

**problem** 36:5,9,11 61:19,23 66:9,24 67:1,2,20 175:14 220:1 228:6 234:9

**problems** 34:23 62:22,23 64:18 74:4

**Procedure** 146:6,15

**procedures** 37:15,17,19 42:3 47:22,25

**proceed** 229:18,19

**proceeding** 8:10,11,12

**PROCEEDINGS** 8:1

**process** 12:3 24:9 26:15,19 29:23 37:9, 10,12 38:17,20 39:1 41:7 42:15 53:23 60:5 79:24 80:10 151:23 156:24 175:16 212:19 238:14

**processes** 38:21,24

**processing** 164:25

**produce** 126:16

**produced** 126:10

**production** 22:7

**professional** 27:10 74:9 136:4

**prompted** 184:24

**pronounce** 196:6

**proof** 227:8,11 233:10,16,18

**proper** 157:18 208:7 214:8

**property** 45:19 147:19

**prosecute** 241:20

**prospective** 226:25 227:10,13 229:22

**prospects** 207:25 225:24 226:19

**protect** 87:6 96:24 105:15

**protected** 176:25 177:18 178:10 181:15 215:6

**protecting** 13:10

**protection** 175:17

**protective** 198:10

**protocol** 158:10

**protocols** 158:9 169:8

**provide** 8:14 17:15 28:25 36:24 51:9 78:19 157:21 163:8,15 167:6 182:14 217:19

**provided** 16:23 17:7 21:1,15 32:23,25 34:8 37:5,16,18,20,22 39:3,6 41:19 62:6 89:20 116:6 121:6 135:12 202:8,9 240:1, 2

**providing** 39:17 235:19 240:2

**provision** 79:12

**provisions** 37:25

**provocative** 111:8

**proximal** 171:1

**proximity** 139:2

**public** 12:14 13:1,7 18:2 20:2 87:6 105:10 114:5 115:22 160:13 163:9,23 179:16 243:3 244:15,23

**publicly** 215:10,11 216:3

**puff** 199:21

**pull** 48:13 51:2,6 69:2,5,6 80:16 97:6 120:15 133:13 134:23 149:13 185:21 189:12,13 204:17 209:10

**pulled** 33:14 48:14,17 50:6,13,14,15,18 66:19 85:6 87:13 121:8 149:15 162:6,19 166:4,19,22 189:10

**pulling** 48:16 52:4 95:14 113:23

**Purav** 194:18

**purple** 198:15,24 199:17,19,21 239:10

**purpose** 60:11 64:22 210:19 232:14

**purposes** 14:4 16:3 24:21 101:8 202:21, 22 203:5,10 212:8 244:21

**pursuant** 76:15 226:4

**pursuit** 136:5

**push** 154:24,25

**put** 46:1 63:4 68:2,4 85:1 90:25 91:1
92:10,13,24 94:3,4 115:25 116:21 119:3
121:25 123:13,16 133:21 134:5 150:19,
22 153:2,11 162:19 185:12,17 238:8
239:8

**putting** 87:1

**PVA** 135:18

## Q

**question** 23:17 31:25 39:6 52:1 63:7
65:13,15,16,23 82:12 90:17 93:2 99:23
110:20 114:23,24 129:21,23,24 130:14,
20 145:11,14,18 146:4 147:13 151:22
159:3 191:14 196:25 197:4 205:16 208:9
211:19 214:18 218:6 223:1 226:14
233:13 235:19 240:3

**questioned** 117:11 120:24 188:8

**questions** 26:2,5 27:6 33:7 75:3 123:4
131:16 188:9 190:7 218:18 233:2,8
236:6,17 242:17,19

**quick** 185:3 231:17

**quickly** 70:16 85:22 118:25 119:4,5
137:14 138:1

**quiet** 189:23

**quote** 179:21

## R

**race** 26:8 65:9,17 88:14,15,16,17 177:17
195:9,21 201:7,12,13 217:21 219:24

**racial** 88:22,24 190:19 191:22 223:16,19

**racism** 203:15

**radio** 48:18 50:20 63:15 95:20,23 107:18
114:4 115:22 116:11,15,17 132:4 135:7
184:9 185:4

**radioed** 132:24 133:10

**Raleigh** 11:11

**rammed** 238:21

**ran** 230:3 242:13

**rang** 112:15

**Ray** 54:11 173:13,14 188:19 241:4

**Ray's** 61:24 67:23

**re-certified** 229:25 230:5

**reach** 216:2

**reached** 24:11,12

**react** 33:13 118:15 136:3 152:20 164:13
191:6

**reacted** 191:9

**reaction** 75:7

**read** 29:1 37:24 90:2,3 167:14 171:5
244:4 245:8

**reading** 88:4 170:22 185:5 243:20 245:3

**ready** 60:7,13 120:20

**real** 75:10 77:8 166:8 242:15

**realize** 82:16 157:2

**reason** 11:20 31:16 34:4 43:17,18 52:8
57:22 59:21 64:16 94:11 103:20 105:25
106:1 127:20,23 129:5 171:12 190:13
200:17,18 215:19,22,23 216:3,4 220:4

**reason(s)** 245:5

**reasonable** 147:9,12 213:6 214:12

**reasons** 75:10 113:5 134:15 239:20
241:10,20

**reason's** 44:10

**recall** 16:8 21:22 23:19 26:6 30:22 51:10
52:19 54:1 81:19 104:2 105:17 110:7
131:25 132:25 134:6 146:20,21 147:1
170:10 176:11 194:23 195:4 196:20
236:4

**recalled** 49:16

**receive** 32:3,6 81:1 85:10 237:4

**received** 32:8 43:11 47:23 100:24
126:15,23 148:3 178:25

**recently** 232:4

**reception** 23:1

**recess** 38:3,10 70:22 74:24 97:25 124:24
186:25 233:5 236:12

**recognize** 89:18 210:25

**recognized** 56:7 112:12 239:14

**recollect** 194:11

**recollection** 52:12,17 103:23 165:5
194:7,8 207:13

**recommend** 121:17 122:9,22 150:19

**recommendation** 122:13 168:18
174:10,17

**record** 8:4,22,23 10:5 20:12 38:9,12
53:20 70:21,24 74:13,21,23 75:1 97:13,
24 98:2 100:10 124:12,21,23 125:1
136:22 155:8,9,12 163:9,24 165:1,2
184:15 186:22,24 187:2 215:24 233:4,7
236:11,14 243:14 244:5,8

**record-keeping** 101:8

**recording** 122:15 132:3 133:8 134:23,
24

**recordings** 122:15 163:22

**records** 66:19 74:15 99:21 211:22
215:10

**recruiter** 210:2

**recruiting** 233:23

**rectangular** 202:16

**red** 102:18

**redirect** 236:8

**reduction** 150:20 168:18

**refer** 84:21 85:16 146:5,14 149:3 152:17
161:24 195:1

**reference** 26:24 27:1 43:10 104:25
108:8 110:21 113:10 120:23

**referenced** 158:10

**references** 204:12 226:23 227:1 229:8
235:19

**referencing** 224:17

**referred** 34:15 54:16 161:25 194:17

**referring** 35:20 36:1 37:11 42:16 78:23
82:8 83:3 91:17 92:4 104:13 108:7
113:12,14 156:1,16 175:20 178:13 180:1,
3,9 218:9 224:19 227:1 234:12 238:1
240:7

**refers** 114:6 133:1

**refresh** 140:11

**refusal** 124:5

**refuse** 36:10 123:10,12

**refused** 123:5,8,11 124:2,18

**regard** 118:17 187:5

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 253 of 665

**registration** 134:19

**regret** 109:10 183:10,11

**reimbursement** 232:13,15

**reinstated** 24:6 33:22

**related** 72:1 126:15,18 181:7,9,13

**relation** 148:21

**relationship** 56:1 64:18 65:25 70:6,8,9 74:6,9

**release** 209:5,8,21 210:17,19 211:1,6,12, 21 212:4,11,14,17,22,24

**released** 212:24

**releases** 212:8 214:15 230:4

**releasing** 213:2

**relied** 162:20 163:13

**relief** 76:3,7,15,18 209:8

**rely** 52:10 150:12 162:18

**remain** 57:10

**remarks** 221:12

**remember** 20:3 22:25 23:11,18,24 24:1, 3 26:2 27:21 28:13,23 29:3 30:6 31:6 39:16 40:11 42:20 43:2,5,9 50:24 52:4,12 53:13 54:3 73:6,7,10 74:5,10 84:12 85:13,18 91:3,10 103:21,24 105:12,13 106:3 108:6 109:20 111:5 113:1 117:5,7, 17 118:11 127:9,12 131:8,13,15,24 132:5,20,22 134:17,22 135:3,6,15,16 136:1 138:13 140:9,15 149:1 161:4,5 162:9,10,13 163:4,6,12 164:8,9 165:8,10, 18,22 167:3,7,8 170:15 171:22,24 172:1 176:5,7 184:17 188:6 195:23 197:6,7 199:22 202:1,17 203:10 206:25 216:21 223:19 225:1 236:2

**remembered** 73:18

**remembering** 16:7

**remorse** 76:19,21

**remote** 9:13

**remotely** 8:12 9:5

**remove** 131:6 171:16 209:1

**repeat** 65:16 130:20 135:24,25 151:22 184:21 233:13

**repeating** 36:6 167:13

**replied** 111:3

**report** 19:1,13 37:2 41:14,15 44:16,17 84:21,22 85:16,17 117:13 125:11,12 134:4,16 138:17 140:9 149:4,5 150:13,19 151:18 152:17,18 153:2,11 158:5 172:6, 15 173:12,13 202:23,24 204:12,24 205:1 208:19 226:20 228:20 234:4,5 238:23

**reporter** 8:3 9:2,5,9,13 10:4,11 21:14 38:8,11 70:20,23 74:22,25 97:23 98:1 124:11,22,25 126:5 127:1 155:9,12 186:23 187:1 225:12 232:5 233:3,6 236:10,13 242:20

**reporting** 8:12,20

**reports** 49:6 50:16 52:10,16 100:22 138:17 140:5 149:4 151:16 163:4 165:25 167:15 170:18 176:9

**represent** 9:21

**representing** 215:25

**reprimand** 81:17 89:12

**reprimanding** 81:19

**request** 15:23,25 106:20,21 126:15 139:19,22 183:18 214:8

**requested** 15:24 16:13 101:18 139:20 140:16 222:21 243:20

**requests** 22:7 126:14,18

**require** 14:3

**required** 79:8 86:16 157:20 182:1 189:7 215:15

**requirement** 211:24

**reread** 127:15

**rescinded** 197:10 215:20

**residence** 10:16

**resist** 156:25

**resistance** 168:12 169:1,3,7,10

**resistant** 153:13

**resisted** 152:25 168:10 169:5 173:7 213:25

**resisting** 153:6,7,8 155:5 157:3 164:22 169:1

**resistive** 15:8 150:24

**resources** 28:20 37:11 98:19

**respectful** 217:5 218:1 239:22 241:5

**respond** 36:14,18,19,20 48:8 82:24 90:7 192:24,25

**responded** 132:2 167:8 191:13

**responding** 113:24 131:8 219:3 241:13

**response** 22:6 136:3 150:16 178:10 242:7

**responsibilities** 18:10,25 19:12 34:17 35:19,20,21 77:11 185:14

**responsibility** 34:18 120:1,4 129:10,15 169:20

**responsible** 68:15 114:15

**rest** 92:3

**restorative** 12:22

**restrict** 180:13

**result** 116:14 168:11,19,21 205:17

**resulted** 151:1 242:4

**retail** 19:19

**retaliation** 181:13 216:5

**retaliatory** 181:14

**retired** 78:5,6 133:3 223:8

**return** 41:16 80:21 237:19

**returned** 136:15 200:5

**revealing** 20:8,13

**reverse** 119:3

**review** 20:14,16,21,24 24:16 25:14,23 26:9 29:24,25 30:4 37:7 38:16 39:15 41:11 69:7 74:15 80:16 89:14 98:8 99:1, 13,24 101:6,18 104:20 107:25 120:16 125:7 169:25 204:23 210:5,13,21 211:17 213:5 217:2 224:6 225:18 232:6 237:11

**reviewed** 20:15 38:14 39:23 40:13 41:10,14 98:22 99:13,16 100:25 210:8

**reviewing** 40:9,10 105:3 173:18

**Riceland** 25:19

**ricochet** 157:24

**ride** 59:21 189:16,20 190:9 200:24

**riding** 48:14 52:3 75:18 217:17

**rights** 98:17 136:11 175:16,17,18

**rise** 226:2

**risk** 133:21 143:22 144:23 145:19,23 157:25

**risks** 143:20

**risky** 143:24 144:4,6

**road** 43:4 73:16 76:14 81:14 87:5 116:8, 9 119:21 138:22

**roads** 93:5

**roadway** 121:2

**Roberson** 53:9 54:10,11,12 63:7,9,24 64:25 66:8 92:20 96:9,18 104:24 106:21 107:12 218:9,14 238:24,25 240:21,23 241:17

**Roberson's** 60:24 107:7 240:13,15

**Roberson's** 54:16

**Robinson** 9:3,4,13 31:23 38:1,6,18 65:4 70:15,19 71:10,16,20,25 101:7 123:1 124:10,14,15 126:6,10,17,23 129:20 145:12,24 146:2,8,12 210:4 226:7,13 236:7,16 242:16

**rode** 32:8,14 53:2 61:17 217:22

**role** 54:1

**roles** 53:24

**romantic** 70:8

**room** 8:11,23 10:18 25:24 82:17 108:15 109:2,6 110:25 111:12,19,22 199:2 221:16

**rotated** 76:11 162:12 240:16

**rotating** 162:17

**rotation** 240:24

**roughly** 171:24 172:1

**rude** 110:1 217:6,20

**Rule** 146:6,15 222:11

**ruled** 226:9

**rules** 9:14 205:18

**run** 45:24 134:18 196:16

**running** 106:1

---

**S**

**S-H-E-F-T-A-L** 54:21

**S-U-T-T-O-N** 235:1

**S33** 63:14

**safe** 49:25

**safety** 13:7,10 18:2,15 20:2 87:6 133:21 157:25 160:13

**Saturday** 86:1

**save** 96:24

**scared** 94:12

**scene** 14:24 123:14,15 150:6 165:10,17, 18,19 167:3

**scheduling** 38:3

**school** 11:4,5 53:23 140:19 141:3 148:6 156:5

**Science** 12:11

**scope** 226:11

**scratching** 44:23 45:5

**screaming** 152:2 166:18,20

**screen** 21:15 112:25 125:24 131:7 209:2

**scroll** 21:20 22:10,13 89:16,19 90:9 98:11,12 211:25 225:12,15

**scrolling** 22:10

**SEAL** 244:25

**search** 141:10,17,20 184:25

**searched** 232:23

**searching** 186:11

**seat** 85:3

**seconds** 115:11 119:9 127:16 128:16 233:20

**secretaries** 199:8

**secretary** 99:19 109:3

**section** 225:18

**secure** 209:4

**securing** 225:23 226:18 235:12

**security** 19:11 205:9 207:19

**seek** 16:20

**seeking** 214:19

**seeks** 226:3,5

**send** 16:25 57:1 125:25 134:24 209:5

**sends** 213:6,7

**senior** 45:12 54:17

**sense** 156:25

**sentence** 102:13 105:20 193:14

**sentences** 121:15 122:10

**separate** 61:3 94:15 102:6,8

**separated** 62:15

**separation** 204:13,24 205:1,16 226:20 234:5

**September** 18:3 99:2,3,16 101:17 107:8

**sergeant** 32:9,13,16 34:8,13 35:2 41:22 47:24 48:19 49:10,15 51:16 52:3,7 53:2, 3,5,8,18 54:6,11,12,16 60:4,24,25 61:1, 11 63:3,7,8,18,24 64:20,21,24,25 65:4 66:8,14 68:5,6 69:1,13 72:10 75:4,22 76:1,18 77:1,11 85:12 86:5 92:12,19 93:2,7 96:9,17 104:24 106:21 107:7,11, 12 108:3 109:10 111:25 112:7,15 114:7, 22 115:13,15 116:2,19,20 117:24 120:22 121:2 122:16,20 140:16,17 142:21 148:4 155:24 165:13 166:11 176:3,4,6 183:1,7 186:4 188:2,4 191:24,25 194:17 195:24 196:3 218:9,14,18 220:20 221:2,15 223:23 231:9 238:11,12,14,24,25 239:11 240:13,14,15 241:7,17

**sergeants** 51:24 52:2 191:21 218:10 221:6

**Sermons** 46:1

**serve** 41:16 50:5 80:2,20,21 81:4 85:18, 22,23 110:16 139:18 141:6,15 143:21,25 144:4 145:21 155:25 156:6,8,11 181:23, 24 182:13,21,22,24 183:5,8,12 184:1 237:16,18

**served** 46:7 81:6 86:2 141:9,11,24 142:5,6,8,20 143:8,11,14,15 144:16,18, 22 186:1

**service** 59:19 114:5 133:25

**services** 58:11 132:2 163:21 164:2,16 182:7 189:5,6 190:5 200:23 214:5

**serving** 13:9 46:15,16 49:21 90:12,23 91:5 110:19,22 111:4 181:19 183:10

**sessions** 21:6

**set** 22:6 24:24 27:7 241:19 243:21

**severe** 134:12 225:24

**sexual** 65:17 74:10 88:19 89:6 201:17

**shaking** 94:5

**share** 21:15 126:5 131:7 132:4

**shared** 125:24

**Sharika** 9:3,12

**Sharon** 26:1 34:20,21,22 35:3,7,9 36:2, 19 173:15 188:20 189:1,9,21

**Shaw** 11:10 19:8,17

**she'd** 153:3

**sheet** 202:19

**Sheftal** 54:19

**Shelton** 231:14

**sheriff** 13:7 25:1,4,9 27:8,20,22,24 28:6, 7 30:21,22 33:3,9,15,16 35:5 37:23 41:6, 24 42:2 43:1,11,14 44:19,20,23,25 45:2, 4,5,9,14,17,22,25 46:4,9 47:4,13,17 51:19,25 57:24 58:9,10,25 59:3,7,20 64:1,2,5,8 67:24,25 68:12 78:3,14 79:10, 11,14 80:8 81:17 82:4 83:15,25 84:12,14, 15 87:11 96:20 99:18 103:13 104:1 114:13,14 118:18 123:21 146:18 148:13, 15 163:18 172:24,25 173:4 174:1,4,8,12, 16,21,23 175:1,16 176:23 177:5 178:1,18 179:20,23 180:10 181:1 189:6,24 190:5, 14 195:2 196:12,22 197:7,10,12,16 200:23,25 205:2 206:8 208:7 209:5 212:24 218:23,25 220:12,14 221:4 226:1 233:22 234:18 235:2 238:7 241:24 242:12

**Sheriff's** 8:7 15:22 19:21 24:19,23 28:18 31:19 33:14 34:16 35:17 36:7 40:10 41:12 42:1,4 52:10,16,22 56:6,9,16 68:16 79:3 99:17 100:13 101:19 102:6 131:10 136:16 153:22 154:2,4 180:17 182:15 186:1 187:12 199:4 207:7 211:2,8 212:5 222:13 226:6 231:21 232:17,21 233:21

**sheriff-specific** 39:15

**sheriffs** 221:12

**Sheriff's** 17:6 22:19,24 32:3 37:17,20, 22 38:15 39:12 41:18 43:24 49:7 50:17 54:24 57:21 98:16 105:11,16 157:21 159:12 164:24 174:9 178:10 180:18 199:11 201:11 202:5 204:3 213:11 214:25 215:14 216:6,13 224:24 227:3,9, 13 230:2,10,19 231:13,24

**She's** 87:17

**shift** 32:10 48:2,20,22 53:21,25 54:8 60:24,25 61:24 63:18 64:7 65:7 66:4 67:23 68:5,6,8 70:2 72:10 76:1,2 77:12 107:7 113:23 114:3,16 122:1,6 141:24 142:1 143:15 144:18,19 167:23 170:20 175:25 198:12 217:12,15,16 240:8,9,12, 13,14,15,20,22,24,25

**shifts** 78:16 240:16

**shit** 141:4

**shook** 93:23 94:12

**shopping** 56:20

**short** 201:25

**shortly** 27:7,13 128:17 214:4 216:18

**show** 95:20 114:9 137:6 153:15,25 232:4,6

**showed** 76:19,21 118:1 136:21 161:7 165:18 212:23

**showing** 43:19 118:6 185:4,5

**shown** 26:25

**shows** 117:24 184:21

**shut** 92:14 115:5,6

**Shutting** 241:12

**sic** 65:8 100:9 109:12

**side** 61:25 81:13 109:2,5 115:12 138:22 149:10 183:25 186:15 242:9

**sign** 22:14,15 28:9,20 29:19 89:25 90:5 102:18 122:11 123:6,8,10,11,12,24 124:4,5,18,19 197:16,17 209:22 211:6,23 212:8,10,18,22 214:17,19,21 230:4 237:16

**signal** 86:22

**signaling** 93:24

**signature** 28:18,19 89:22,24 106:15 123:13,16,21 205:12 207:19 209:24 244:13

**signatures** 40:2 124:7

**signed** 29:1 31:7 46:7 84:15 90:2 123:15,19 124:3 211:25 212:17 214:15

**significant** 120:3

**significantly** 35:15 181:13

**signing** 27:21 211:11 243:20

**signs** 43:22 114:9

**silenced** 92:15

**similar** 12:20 44:4 125:18,22

**simply** 58:20,21 59:18 92:14,16

**sincere** 34:2

**sincerity** 114:9

**singing** 192:17,18

**singling** 33:2

**sir** 30:2 65:16 81:9 97:16 104:7 119:2 129:2

**sirens** 114:1 116:12 135:16 165:15

**sit** 173:2 174:6

**site** 45:17

**sitting** 9:23 76:13 116:7 188:20,22,23 192:18 194:9 236:5

**situation** 14:1,2 36:20,25 76:8,10 84:2 86:15 97:5 110:10 113:15 115:20 129:9 139:21 144:15 151:10 154:16,18 156:15 183:19 230:13 242:1

**situations** 131:14

**skinny** 137:7

**skip** 127:2 163:2

**Skipping** 22:4

**slam** 92:16 115:10 118:22

**slammed** 178:2

**slender** 137:8

**slightly** 120:19

**slow** 51:3 86:1 118:24,25 119:14

**slowly** 108:25

**slurs** 88:22,24 190:19 223:16,20

**Smile** 192:13

**sneaky** 93:9,11

**snitch** 62:21

**snow** 199:25

**snowball** 199:21

**social** 12:21 205:8 207:19

**socially** 9:1

**soft** 13:17,18 14:7,8,12,13,18,20 151:1 158:13 164:23

**somebody's** 86:24 105:15

**someone's** 96:24

**something's** 219:21

**Something's** 62:12

**song** 192:11,17,18 194:11

**sort** 50:1

**sorted** 45:7

**sought** 17:2

**sound** 60:1 100:21

**sounding** 151:20

**sounds** 60:2

**Soup** 92:7,17,21,23,25 94:16

**south** 50:25 116:15 154:8 186:16

**southbound** 51:1

**southern** 12:12 27:2 86:11 116:4

**spaced** 139:7

**spare** 80:17

**speak** 41:25 42:2 45:6 140:15 154:20 178:21 187:10 220:17 229:6,10

**speaking** 38:22 43:14 46:20 71:17 92:1 146:7,16 151:25 171:23 226:16

**speaks** 220:5

**special** 40:2 212:3 215:16 227:17 229:24

**specific** 14:16,19 26:5 28:24 29:4 30:10 31:12 39:4,12 49:5 52:7,17 63:6 81:24 93:1 95:8 100:24 102:16 103:24 104:1 114:10 132:20,22 134:15 142:15,18 143:16 157:6 160:3 162:16 193:10 194:22 195:4 196:20 216:23 219:11,17, 24 230:12,17,21,23

**specifically** 15:25 17:7 49:4 91:25 96:8 99:20 100:2 165:7 215:17 224:16 234:13 239:15

**specifications** 31:1 52:19

**specifics** 30:13 167:13

**specifies** 79:13

**speculate** 41:3

**sped** 51:4

**speed** 51:5

**speeding** 52:5,13,18 86:25

**spell** 10:7 25:18 54:20

**spelled** 132:7

**spend** 56:14,22 57:14 72:12

**spending** 56:21

**spent** 72:17

**spine** 163:1 164:19

**split** 53:25 62:15

**spoke** 33:18 42:8 84:3 105:7,20 107:13 112:23 187:6,8 188:1 202:1,2 228:16 229:15 235:7,22 237:22

**spoken** 42:12 235:5

**spontaneously** 114:12 174:2

**spray** 13:19 15:11,12,14,16,17,19,21,23, 25 16:1,4,8,11,15,17,18,21 17:5,12,17 157:14,17 158:11,21 159:7,9,15,23 160:2,12 161:6,7,8

**sprayed** 17:18,19,20

**spraying** 161:5

**squad** 52:25 53:4,9,10,13 54:4 59:25 75:5,8,22 85:13 240:4

**squads** 52:23 53:4

**square** 202:16

**squirm** 153:9

**SR** 53:24 54:1

**staff** 25:5,8 175:6 180:6 220:15 221:3

**stand** 183:4

**Standard** 209:6

**standing** 111:24 121:5 135:17 188:23

**standpoint** 144:14

**stands** 205:15

**starred** 39:20

**start** 11:2 37:13 38:25 43:13 100:9,12 115:7 119:4,6 152:6,9 175:11 209:18

**started** 19:9 29:17,19 32:2,7 38:14,24 39:13 41:10,12 45:5 53:1 54:23 75:18 110:15 152:19 157:1,3,8 166:18 202:4 239:7

**starting** 156:25 227:21

**starts** 196:7

**state** 9:16 10:5 18:11 34:18 78:6,7 88:13 101:8,9 116:6,23 160:15 203:13 208:10 214:21 216:10 243:4,9 244:16

**stated** 34:11,13 36:3 44:11 47:13 50:12 57:24 58:5,8 99:15 109:16 110:14 117:10 120:25 140:2 162:10 172:23 173:12 183:1 215:23

**statement** 9:1 33:12,13 90:18 92:10,13 95:24 96:10 101:12 104:14,24 107:15 108:3,11 109:8,11 110:8,9 111:3,10 118:3 121:22 122:10,11,22 124:18,19 130:7,16,19 132:11 183:4 217:9 218:13 220:19,24 224:10,12,23

**statements** 26:24 27:1 90:7 97:8 147:14 198:14 222:1,4,8,16,18,19 223:4 238:11, 17,19 239:24

**states** 220:11

**stating** 8:21 129:7

**stationary** 119:25

**stationed** 117:3

**statute** 79:13 153:20

**statutory** 79:6,9,15

**stay** 30:11 51:7 56:2,4 112:2

**stayed** 56:24 77:13

**stays** 57:16

**steady** 157:23

**step** 108:16 151:7

**step-by-step** 162:4

**stepping** 22:17 162:17

**steps** 162:16

**stock** 46:13

**stomping** 92:15

**stop** 10:24 48:25 52:9 80:24 81:25 82:1, 9,18,24 86:17,21 90:23 91:4 102:17,18 103:21 105:21 106:2,12,13,14,18,19,22 110:22 111:4 119:10 128:10 183:22 184:12,24 185:17,20 233:11,17

**stopped** 48:24 52:17 65:2 73:14 86:4,16 102:24 105:10 118:19,20 121:13 137:12 138:3

**stopping** 52:13 84:19 96:2,12,15,22 121:17,21,24 122:2

**stops** 48:19 52:6,20 86:14 100:20 102:14,21 105:9,22,23 106:7,9 107:17 122:4,7

**story** 121:6

**straight** 151:2 162:21,23 168:24 214:3

**stream** 157:23

**Street** 131:9,15,22,25

**strikes** 14:11

**stronger** 171:4

**studied** 11:15

**studies** 12:12,15,17,19

**study** 11:14

**stuff** 31:15 40:19 45:7 49:7 67:4,13 97:9 136:12 143:7 149:6 150:3 198:16 235:25

**stuns** 14:11

**stupid** 48:12

**sub-development** 138:23

**subject** 113:10 115:19 156:19 168:11

**submitted** 39:18 41:4 98:18,20 106:20, 21 206:9

**submitting** 157:12

**subordinates** 115:2

**Subsection** 218:8

**substance** 87:4

**substances** 10:23

**substantial** 197:1

**substantiated** 205:22,24 206:3,10,19 207:24 208:20

**successful** 25:16 30:6

**sucking** 238:22

**sudden** 40:17,23

**sue** 179:3,11 180:9,18 181:10 230:10

**sued** 179:15,18 216:8

**suffer** 204:4

**suffered** 151:6

**suggest** 70:18

**suing** 179:14 180:13,14

**summer** 53:23 177:9 193:8,10,11 221:8

**summon** 236:25

**summons** 45:3 46:1,8 80:2,9,11,13,17, 20,23 81:4,6,21 82:19 83:16 85:19 88:12 90:12,24 91:5 96:3,16 100:19 110:16,19, 22,23 111:4 184:3 219:19,21 236:19,22, 23 237:5,7,9

**summonses** 81:17 82:2,9 83:9

**super** 114:15

**superior** 130:17

**superiors** 130:3,21,25

**Superman** 236:1

**supervision** 66:6 239:6 241:2

**supervisor** 45:10,11 51:14,17 66:18 70:2 114:15 141:13,14 142:19 143:23,24 144:3 145:16,20 241:15

**supervisors** 24:17 51:23 56:18 82:6 92:5 141:10 142:9 148:13 228:16

**supervisory** 186:9

**support** 184:2

**supposed** 83:20 173:7 175:3

**surely** 86:8,9,20

**surety** 226:6

**surrounding** 26:4

**surveillance** 118:9 128:23,24

**suspect** 87:3

**suspended** 84:13 110:11 113:1,4 115:16,17 116:22 122:20 175:22

**suspension** 99:8 100:5 101:24 121:18 122:9,14,21,23 196:18 197:22 238:6 242:2

**suspensions** 24:4 198:18

**suspicion** 52:8

**sustaining** 234:16

**Sutton** 235:1

**swap** 33:5 60:9,12

**swapped** 35:9

**swapping** 33:5

**swear** 80:17 237:11

**swearing-in** 27:9

**switch** 35:6,7 67:11

**switching** 33:5

**sworn** 9:16 25:10 27:1,9,12 159:19 160:23 199:4,8 243:9

**symbols** 199:17

**system** 26:25 43:20 46:21 136:18

**T**

**T-E-R-R-Y** 62:6

**takedown** 151:2 153:4 158:11 161:19 162:3,7 167:10,19 168:24 214:3

**takes** 68:15

**taking** 35:7 38:2 41:10 91:25 151:7 152:7

**talk** 22:18 32:1 47:21 55:8,20 57:18,19, 20,24 59:17,20,24 64:5 67:23 69:2 72:14 77:5 81:16 90:15 91:16 92:5 96:11 109:7, 14,23 110:6 132:17 133:15 147:17 149:16 157:4,11 168:16 185:22 187:4,14 189:22 190:14 198:24 201:6 209:3 211:12 215:16 216:23 228:11,24 229:3,4, 5,10 234:19 235:20

**talked** 35:3 47:22 49:20,21,23 77:4,7,8 84:8 87:10,11 95:22 97:1,9 106:17 110:1 154:17 174:3,21 180:1,2 182:5 187:17, 18,19 197:9 230:8 238:24 241:24

**talking** 20:19 41:21 55:13,19 59:2 61:8 74:5 81:20 93:23 110:15 112:17 113:16 114:2 135:14,16 139:25 142:14 157:10 159:13 167:3 180:23 193:20,21 199:23, 25 209:8 213:20 218:21 228:25

**Tall** 137:7

**tape** 69:7 135:11 136:21 137:20 163:25

**tapes** 69:5 163:8,10,16,19 164:5

**tardiness** 241:11

**target** 219:24

**taser** 13:20,21 18:19

**taught** 15:12 41:15 94:2

**Taylor** 231:5

**teach** 161:6

**team** 53:10

**teams** 52:23

**teamwork** 183:6,7

**technique** 151:1 158:13 162:22,24 164:23 168:11,19

**techniques** 158:7

**telephone** 24:13 114:6

**telling** 59:14 79:3 90:14 97:11 115:2 146:2 154:19 174:22 180:20 213:20 219:25 227:13 228:4 236:4

**tells** 79:10

**temp** 80:12,15

**temporarily** 158:3

**ten** 116:3 121:17 122:9,22 160:4

**ten-day** 122:13

**term** 92:17 180:12 192:17

**terminate** 58:10 187:11

**terminated** 24:6 33:1,22 39:18 57:23 58:1,3,22 59:6,15,16 98:15 99:4 101:17 180:11 181:4 188:1,11 189:25 200:5 201:1,5 206:5 209:5 213:10 221:11

**terminating** 180:13

**termination** 57:10,20 59:23 181:9,12 190:20,24 191:18 194:15 201:8 213:18 215:14

**terminations** 24:4 215:13

**terminology** 30:10 57:13

**terms** 14:9 16:7 30:25 36:13 37:1,12 41:17 49:5 52:16 55:25 56:19,21,23 72:15 76:2 92:25 105:15 111:9 115:14 123:25 129:13 142:18 143:16 154:12 157:6 160:4,23 162:13,16 167:5,12 180:12 182:19 183:15 184:16,22 195:22 198:14 206:3 213:2 238:1 240:6,10 242:2

**Terrence** 62:4

**terroristic** 194:20

**Terry** 53:14 62:4,5,10 63:4 77:1 93:3

**test** 26:17,18,21

**testified** 72:3 107:2 124:17

**testifies** 9:17

**testify** 10:21 71:18 191:11

**testifying** 10:24

**testimony** 8:16 71:13 80:18 116:7 124:17 138:5 174:16 237:12 240:1 243:12,15,20 244:5,9 245:4

**text** 57:1,7,18,19

**texts** 178:25

**that's** 48:22 97:21 146:3 151:15 189:14 199:10 223:6

**Then-captain** 25:25

**then-director** 39:2

**thereof** 243:19

**there's** 185:3

**they're** 61:6 153:19 213:1 242:5

**thin** 39:25 98:24 102:11

**thing** 19:15 66:15 97:11 99:22 113:17 133:19 144:16 157:22 171:2,11 193:18 197:2 206:4 227:6 236:20

**things** 16:6 27:5 31:20 32:21 35:10 40:8, 12 41:17 48:1 57:5 58:14 59:10 90:20 93:10 104:1,14 113:22 114:2 119:15 136:12 148:7 151:8,19 169:11 176:1 191:22 194:22 198:16 203:3,7,25 216:21 221:4,20 223:6,9 227:5,14 228:8,23,25 235:15 241:8,16,18

**third-party** 111:1 144:1

**Thomas** 117:1,4

**thoroughness** 231:18

**thought** 24:15 28:2 44:24 45:13 47:6,13 69:9 93:24 110:17 118:13 119:13,24 121:11 130:12,14 135:10 143:24 222:24

**threat** 156:17

**threaten** 108:21

**threatened** 94:7 116:20 176:23 177:1,5 208:24

**threatening** 111:10 181:10,14

**threats** 194:20

**three-hour-plus** 57:17

**three-year** 160:6

**throwing** 111:9

**ticket** 44:21,24,25 45:1,3,14 46:24 47:2, 3,5,6,7,12,14,15,19 51:21,25 79:25 80:4, 5 83:17 133:16,19 135:20,22 219:3,5 220:6,8 236:19

**ticketed** 220:9

**time** 8:4 11:18 14:16,19 15:18 16:11,14 17:24 19:9 20:4 24:12,24 32:13 35:4 38:9,12 39:23 41:23 42:18,24 43:6 46:10, 22 49:23 50:24 51:4 53:9,15,21 54:9 55:8,10,20 56:14,21,22 57:14 60:6 66:19 70:21,24 72:12,17 73:4,18,25 74:11,23 75:1,19 76:9,21 77:9 79:7 82:21 83:7,14 85:25 89:13,20 97:4,14 99:13,23 101:15, 16 104:20 105:18 106:4,25 107:3 108:21 109:21 115:9 117:12,17,18 124:23 125:1 128:1 129:21 134:25 135:24 138:13,14, 16,18 140:3,10 141:11,12 142:6,12 143:16 144:8 146:4 148:1,11 149:6,20 150:12 152:17 153:21 156:17 159:20 160:3,18 161:1,11 162:5,8 163:23 164:11 165:16,24 166:11,24 167:14 169:19 170:12,15 171:4 181:20,25 182:1 186:24 187:2,22,23,25 190:20 191:18 193:6 194:4,11,24 196:20 198:3 201:9,25 209:20 210:13,21 211:17 213:7 217:17, 23 221:8 223:8 227:18 229:6 233:7 236:5,6,11,14 238:15 241:11 242:21 243:7 244:9

**times** 19:23 31:18,25 48:18 50:18 55:23 56:18 72:14,21,24 73:2,17,18 76:12 85:2 88:25 95:19,23 97:5 130:14 142:5 143:13 145:14 151:5 159:22,24 160:2,5,8 169:18 174:16 176:23 177:4,6,7 182:8,9,10 189:10 196:8,9 203:23 208:24 214:19 217:23 224:13,15 244:6

**timestamp** 127:4,15

**Tiny** 93:4

**tip** 23:4 54:14 196:5

**tissue** 47:14

**title** 18:7 28:22 178:10

**toboggan** 200:1

**today** 10:21 21:18,25 45:11 151:17 232:4

**told** 16:6,20,22 21:24 24:25 25:3,6,15 26:16,18,23 27:6 28:6 29:10 30:5 32:12, 16 33:21,23 35:11 36:7 37:24 39:14 43:16,17,21,25 44:10,19 45:2,6,16 46:9, 10 50:19 51:2,6,7,19 57:22,24 58:7,11, 18,20,21,22,23 59:12,18 60:4,14,17,18

61:1,11,22 62:10,16,19 63:4 64:2,20,21,
24 65:5 66:22 67:17,25 68:1,4 69:13 75:9
79:1 80:25 81:5,13 82:5,22,24 83:7,11,15
85:7,9 87:13 90:4,5 91:15,23 92:20 96:9,
11,13,19 97:5 102:23 104:11,17 105:15
106:8 112:2,6,20 121:2,5,16,20,24 124:3
127:24 130:21,25 133:16 135:6 140:17
141:1,3,16 142:19,21 143:25 145:15
149:8,21,23 150:4,17 154:21 156:11
158:23 165:14,22,25 167:9,10 172:5,8,
11,14,24 174:4 176:14,17 177:13,14,20,
22,23 178:2 180:7,21 181:17,23 182:21
186:4 188:2,17 189:6,12,16,25 190:4,5,
13,14 191:2 192:5,19 193:3 194:19
196:10 197:7,9,16 200:11,16,19,20,22
201:6 213:12 214:5,7 216:17 218:14
219:2 220:20,22,25 221:2 222:19 223:12
227:23 228:4 229:5,9,13,14 230:16
234:1,3,7,13,18 239:4

**tone** 152:1,2

**tones** 116:10

**tongue** 23:4 54:14 196:5

**top** 40:11 54:13 95:1,5 127:4 134:7,17
170:25 188:6 199:22 204:25 215:3
216:22 221:20 223:6,10

**topic** 78:2 131:7

**Torrance** 53:14 62:4,6,10,15,18,20
64:25 76:2,20 77:1 93:3

**totality** 14:23

**touch** 149:7

**touched** 76:9

**traffic** 42:13 43:8 46:9,10,16 48:19
49:10,13 50:2,10 51:11,13 52:6,20 78:12,
24 79:1,2,15,17,21 81:18,21,22 82:1,2,
10,18 83:8 84:25 86:14 88:12 90:12,24
91:5 94:25 95:2,5,14,16,17 96:4,7 97:10,
11 100:18,19 102:17,21 103:5,21 105:11,25
105:9,22 106:9,12,13,14,18,19,22 107:17
110:23 113:25 114:1 116:1 119:11 122:3,
6 125:10 132:4,23 137:12 183:22 184:7,
12,24 185:4,5,11,17,19,20 219:19,20
236:19

**train** 16:23 32:14 161:8

**trained** 13:4,5,24 15:17 16:17 17:9,10,
11 32:18 158:22 160:9,11,14,15,19,21,25

**trainee** 34:12

**trainees** 32:21

**training** 12:1,2,5,6,9 13:3,8,12,16
16:20,22 17:1,3,5,17 32:4,6 34:6 37:5,8
38:25 39:14 41:10,12,22 42:15 47:23
49:18,20 50:10 53:8 55:5 60:8 94:24,25
95:5 102:14,20,24 103:1 157:18,20
158:6,7,8,25 161:3,20 162:6,18,20
163:13 169:8 217:18 239:12

**transcribed** 245:4

**transfer** 59:24 60:3 61:3,14 63:10 64:1,
7,22 65:7,18 66:4 68:12 71:5,11,23 72:5
75:3 77:18 175:25 198:12 240:22

**transferred** 11:11 23:1 59:25 60:6,16,
24 63:16,18 64:17 68:5 72:10,11 74:16
75:4,10 77:11 107:9 217:12 240:4,20,21

**transport** 155:1 166:25 172:17

**trash** 45:17

**treatment** 231:24

**trigger** 81:24 132:4

**triggered** 198:17

**trooper** 78:6,8 117:1,2,4

**troopers** 116:6,23

**Trooper's** 34:18

**trouble** 43:22

**truck** 137:8

**true** 58:17 97:12 107:2,19 124:19 130:24
156:9 170:5,8 182:21 183:2 196:25 202:6
218:13 220:19,24

**trumped** 231:17

**truth** 9:16,17 60:19,22,23 131:19 243:10

**truthful** 44:1

**truthfully** 156:20

**tuition** 232:12,15

**turn** 87:14,25 89:11 104:3 117:15,21,22
118:19,21 121:8,13 125:6 128:10 129:6,
11,18 130:2,17 135:13 223:24 225:8

**turned** 27:5 67:7 118:3,5,11,13,14
119:10,15 121:1,7 128:13 130:4,5,7,10,
13,14,22,25 131:1 183:20 206:15

**turning** 104:19 118:1 121:12 135:15

**twisted** 109:18

**two-and-a-half** 32:15 50:7 239:12

**two-year** 29:8,11 232:23

**type** 13:3 31:9 80:15 87:3 128:21 132:3
173:16 198:9

**typed** 39:20

**types** 12:22 13:24 48:25 49:19

**typo** 105:7

---

## U

**uh-huh** 10:3 231:3 240:18

**ultimate** 14:10

**ultimately** 68:15

**unable** 16:8 21:22 30:22 31:5,22 51:10
52:19 53:25 69:12 167:5 232:25

**unbecoming** 115:18

**uncertified** 48:15 53:15,17,18 122:5

**uncommon** 118:9 128:22 153:24

**uncooperative** 15:8 152:10,22,23

**undersigned** 243:16

**understand** 49:9 71:11 137:23 219:23

**understood** 16:14 37:7 49:18 218:23
219:25

**unemployment** 19:20 39:19 40:17
41:4 58:14 133:4 222:8,17

**unfortunate** 151:3 183:14

**unicorn** 239:10

**unit** 183:5

**university** 11:10,13 12:13,14 17:25
19:9,17 27:3

**unjustifiably** 225:22

**unlawfully** 153:1

**unnecessary** 138:8

**unpack** 35:10

**unprofessional** 111:8 194:21 217:24

**untruthful** 140:15 205:7,9,14

**upper** 104:15 123:18 153:4 162:12
168:2 170:25 206:14

**upset** 44:5

**utter** 114:12

**uttered** 174:2

---

**V**

**vacancies** 23:8

**Vance** 8:7 15:21 16:15 17:6 19:20 22:19, 24 27:13 29:12,16 30:8,15,17 31:19 32:2, 10 37:15,17 38:15 39:11,12 41:3,17 49:6 50:17 54:24 57:16,21 98:15,19 100:12 102:25 105:11,16 116:5 117:3 131:9 153:22 201:11 202:5 203:20 204:3 207:12 210:20 211:10 212:21,23 213:11 214:25 215:14 216:6,13 224:24 227:3,9, 13,25 228:11,12,15,17 229:17 230:1,10, 18 231:9,10,13,24 235:15

**VCSO** 221:11 233:10,17 235:6

**vehicle** 49:2 50:8 86:16 102:14 103:21 117:6 120:23 126:9 132:19 134:2,18 135:1,5 151:24,25 171:20

**vehicles** 106:2 121:17,21,24

**vengeance** 239:17

**venture** 230:24

**verbal** 30:16 43:13 88:9 108:9 113:19 115:14,21 116:7,24 174:15

**verbally** 8:15 14:5 31:2 88:8 153:13

**verbatim** 104:2 135:24 165:9 167:5,7 169:13

**verification** 22:14,15

**verified** 137:2

**verify** 43:20,23 44:3,6 136:19

**Veronica** 69:18 70:2 72:1

**versa** 240:23

**versus** 8:7 20:1 65:25 110:11 145:22

**vetted** 211:7 212:2

**vice** 240:23

**video** 8:15 118:7 122:14 126:5,7,8,13,15, 24 127:1,2,3,4 128:3,4,5,12,14,20,24 130:1,15,18 131:3,6 132:3 243:6,12

**videos** 118:9 126:11

**view** 105:11,16 209:6

**viewing** 126:24

**VII** 178:11

**violated** 84:25 195:25

**violating** 88:13 98:17 206:6

**violation** 49:11 52:19 80:1 81:18,21,22 95:2 96:3,23 102:17 105:9,14 137:12 157:19 177:18 185:19 205:17

**violations** 48:25 49:3 82:10 90:12,24 100:18 132:23 133:20 134:4,8,10,11 185:11,15 220:7

**virtually** 236:20

**visit** 147:6,7,8 182:2,11

**visited** 72:23 146:18 147:2

**visitor** 112:7

**volunteering** 114:25

---

**W**

**Waffle** 93:3

**wait** 71:15 73:24 119:17,19 181:2 235:22

**waited** 133:12

**waiting** 48:6

**waive** 8:19

**Wake** 233:21

**walk** 38:23 79:24 84:17 108:16 199:13

**walked** 24:24 25:1 92:9,11 148:25 149:12 152:3 200:21

**Wallace** 68:20 148:16 190:17 198:5 222:6 223:11

**wanted** 33:8 44:8,16,17 46:13 47:7,15, 21 51:22 58:9,25 59:5,7 75:14 110:8,9 119:16 121:12 150:1 177:12 189:9 197:8 200:15 201:4 208:18 213:10

**wanting** 59:2 62:8 103:12 217:24

**warning** 43:19 84:3,6 100:4 123:15,17 197:22 238:5 242:1

**warrant** 44:7 46:21 133:24 141:7 143:11,21 144:4 145:21 150:11 151:8,13 153:15,18,23,25 154:2,3,6,8 156:7,8,12 181:19,23,24 182:6,13,22,23,25 183:6,8, 10,12 186:14,16 237:1

**warrants** 41:16 42:13 46:16 49:21 50:5 100:19 133:1,24 137:2,11 138:2,10

139:18 140:1 141:8,10,15,17,20,21,22,24 142:2,4,19 143:9,14,15 144:16,18,22 149:9,22,23 155:25 184:1,2,3,19,25 185:25 214:1

**Warren** 50:4

**Warrenton** 116:8

**wasn't** 94:13 107:5 177:13

**watch** 62:20 96:19 220:25 221:1

**Watkins** 26:1 58:6,8,22,23 59:14 63:22, 23 64:6 66:25 67:4,10,21 68:1,4 114:13 115:8 172:5,21,23 173:12,22,24 174:2,6, 15,19,22 180:4 187:6,8,17 188:1,15,20, 22 200:21 220:22,25

**waves** 115:22 116:11

**Wayne** 32:18,23,25 33:2,6 34:6,25 35:7, 24 36:2,3,19 37:6 53:8 54:13 61:3,12 62:9,23 64:18 65:25 66:2,3 67:1 70:6 72:12 74:7,16 101:13 103:4,14 104:8,17 202:10

**Wayne's** 73:5

**website** 22:21

**weeds** 64:12 65:2

**week** 29:19 32:8,12 48:15 53:2,3 57:25 61:18 69:8

**weeks** 32:15 50:7 60:10 68:2 94:24 99:3, 16 171:3 239:13

**Welborn** 117:25 120:23 121:2 122:16, 20 140:11,16,17 142:20,21 148:4,11 155:24 156:9,11 165:13,17,18 166:4,11 167:2 171:22 172:16 176:3,5 183:1,7 186:4 188:2,4 191:25 192:11 194:10,14 195:24 196:3,13,18,25 201:23 220:20

**Welborn's** 68:6

**welcomed** 75:11

**Welding** 24:12 25:25

**Weldon** 57:23 68:20 148:16 180:1 188:19 190:4,16 198:4,20 200:21,22 201:6 222:6 223:11

**we'd** 150:12 152:17

**we're** 103:10 208:4

**whatnot** 36:16 94:8 96:22 97:4 144:13 197:17

**what's** 144:13 163:10

**WHEREOF** 243:21

**whichever** 50:3 53:5,6 118:5 149:10

**white** 8:6,7 9:4,5,12,15,20 10:6 20:1 25:1,4,9 27:8,24 28:6 30:21,23,24 33:9, 15,17,18 35:5 41:24 42:2 43:1,11,14 44:19,24 45:9,10,11 51:19 57:24 61:4,17 62:22 63:11,14 65:25 68:12 75:2 78:3 81:17 82:4 83:15,25 88:8,12,16 94:23 98:6 100:18 103:2 105:8,21,24 107:16,18 109:15 110:13 112:17,23 114:14 118:18 120:25 121:16,18 122:9,19,23 125:6 126:19 127:3 129:25 137:8 145:3,9 148:13,15 155:24 156:4 172:24 174:1 175:7 176:23 177:5 178:18 180:10 182:5 187:3 189:24 191:24,25 192:6 195:2 204:22 206:8 217:25 218:23,25 219:13, 16,20 220:6,11,12,13,14,17 221:4,11,14, 23 223:2 224:15 229:9,14 241:24 244:3

**White's** 22:5,6 64:1 99:18 102:14 126:9 178:19 218:10 220:16

**whites** 217:5

**White's** 28:18 218:23

**whomever** 118:20 144:12 163:22 222:15

**William** 231:5

**win** 179:15

**winter** 200:2

**withdrawal** 181:15

**witnessed** 232:1 244:20

**woman** 88:12 111:23 147:9 164:17 219:20 220:6

**woman's** 118:3

**Womble** 9:22

**won** 133:5 222:9

**word** 16:7 26:6 40:19 58:21 95:8,9,11 111:9 114:10 163:9 190:25 191:2,5,10, 15,22,23 192:5,20,21,23 193:1,3,13,25 194:2,5 234:21

**worded** 137:19

**words** 88:25 91:11,21 103:24 104:2 109:18 111:6 119:22 135:21 142:23 167:5 219:11,17

**work** 12:8 14:18 27:13 29:12 30:15,17, 25 36:15 48:7,8 49:22 50:2 56:11 62:25

66:11,23 72:13,19 75:21 76:5 80:10 112:10 155:17 175:15 178:7 203:9 204:10 218:15,16,17 241:11

**workbook** 203:9,18

**worked** 18:1,14 19:3,8,19 32:24 61:23 66:16 75:16,17 159:18 212:7 223:13 232:2 239:11 241:6

**working** 12:13 18:4,5 32:2 38:15 39:14 54:23 62:13 69:24 73:13,14 94:8 100:9, 12 113:23 160:12 188:15,16 202:5,21 204:6,15 227:3 240:11,20,21 241:13

**workplace** 191:3 193:5

**worried** 174:20

**worries** 110:13 233:14

**worry** 34:1 173:1,5 174:5,11 176:15 216:17

**would've** 16:12 135:4,6 164:23 198:17 202:2 240:19,20,22

**wouldn't** 184:5 235:18

**wow** 205:11

**wrapping** 216:24

**wreck** 43:10 120:2 121:9,14 125:11 129:14 130:2,4,6

**write** 40:7 133:16,18 172:6 202:20 203:7,14,17

**write-up** 82:12,13 91:1,2 113:6 124:1 175:21 182:4 185:13 197:19,20,23 228:25 229:1

**write-ups** 66:13 198:18 229:2

**writing** 29:18 37:2 130:7 148:17 203:10 239:9

**written** 39:20 40:1,4,13 58:17 84:3,5 89:12 100:4 110:8,9 123:15,17 196:4,8 197:8,21 238:3,5 242:1,3

**wrong** 44:14 62:5 66:20 69:13,18 88:5 112:19 114:16 149:14 151:5 166:3,6,10 169:18 205:9 212:15,25 213:2 219:21

**wrongfully** 241:20

**wrote** 40:3,6 82:11,13 84:11 89:20 96:10 104:14,25 110:10 216:20 221:5

---

**Y**

**yards** 139:12

**year** 11:10 207:9

**years** 28:10 29:6,12,16 30:7,12,15,17 31:3 49:7 78:9,11 117:13

**yelling** 91:17,20 151:20 152:1

**yellow** 85:2

**young** 25:2 44:18 111:23 118:3

**you'd** 237:19

**you'll** 134:16

**you're** 15:4 86:25 145:13

---

**Z**

**Zachary** 106:24

**zoom** 22:14 108:1 120:19 224:4

W. Bullock – A.1 & A.2 Ethics

I. **ARTICLE 1 – PRIMARY RESPONSIBILITY OF JOB**

The primary responsibility of the police service and the individual officer is the protection of the people of the United States through the upholding of their laws; chief among these is the Constitution of the United States and its Amendments. The law enforcement officer always represents the whole of the community and its legally expressed will and is never the arm of any political party or clique.

II. **ARTICLE 2 – LIMITATION OF AUTHORITY**

The first duty of a law enforcement officer, as upholder of the law, is to know its bounds upon him in enforcing it. Because he represents the legal will of the community, be it local, state or Federal, he must be aware of the limitations and proscriptions which the people, through law, have placed upon him. He must recognize the genius of the American system of government which gives to no man, groups of men or institutions absolute power; and he must insure that he, as a prime defender of that system, does not pervert its character.

III. **ARTICLE 3 – DUTY TO BE FAMILIAR WITH THE LAW AND WITH RESPONSIBILITES OF SELF AND OTHER PUBLIC OFFICIALS**

The law enforcement officer shall assiduously apply himself to the study of the principles of the laws which he is sworn to uphold. He will make certain of his responsibilities in the particulars of their enforcement, seeking aid from his superiors in matters of technicality of principle when these are not clear to him; he will make special effort to fully understand his relationship to other public officials, particularly on matters of jurisdiction, both geographically and substantively.

IV. **ARTICLE 4 – UTILIZATION OF PROPER MEANS TO GAIN PROPER ENDS**

The law enforcement officer shall be mindful of his responsibility to pay strict heed to the selection of means in discharging the duties of his office. Violations of the law or disregard for public safety and property on the part of the officer are intrinsically wrong; they are self-defeating in that they instill in the public mind a like disposition. The employment of illegal means, no matter how worthy the end, is certain to encourage disrespect for the law and its officers. If the law is to be honored, it must first be honored by those who enforce it.

V. **ARTICLE 5 – COOPERATION WITH PUBLIC OFFICIALS IN THE DISCHARGE OF THEIR AUTHORIZED DUTIES**

The law enforcement officer shall cooperate fully with other public officials in the discharge of authorized duties regardless of party affiliation or personal prejudice. He shall be meticulous, however, in assuring himself of the propriety,

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 264 of 665

under the law, of such actions and shall guard against the use of his office or person, whether knowingly or unknowingly, in any improper or illegal action. In any situation open to question, he shall seek authority from his superior officer, giving him a full report of the proposed service or action.

## VI. ARTICLE 6 – PRIVATE CONDUCT

The law enforcement officer shall be mindful of his special identification by the public as an upholder of the law. Laxity of conduct or manner in private life, expressing either disrespect for the law or seeking to gain special privilege, cannot but reflect upon the police officer and the police service. The community and the service require that the law enforcement officer lead the life of a decent and honorable man. Following the career of a policeman gives no man special perquisites. It does give the satisfaction and pride of following and furthering the unbroken tradition of safeguarding the American Republic. The officer who reflects upon this tradition will not degrade it. Rather, he will so conduct his private life that the public will regard him as an example of stability, fidelity and morality.

## VII. ARTICLE 7 – CONDUCT TOWARDS THE PUBLIC

The law enforcement officer, mindful of his responsibility to the whole community, shall deal with individuals of the community in manner calculated to instill respect for its laws and its police service. The law enforcement officer shall conduct his official life in a manner such as will inspire confidence and trust. Thus, he will be neither overbearing nor subservient, as no individual citizen has an obligation to stand in awe of him or his right to command him. The officer will give service where he can and require compliance with the law. He will do neither from personal preference or prejudice but rather as a duly appointed office of the law discharging his sworn obligation.

## VIII. ARTICLE 8 – CONDUCT IN ARRESTING AND DEALING WITH LAW VIOLATORS

The law enforcement officer shall use his powers of arrest strictly in accordance with the law and with due regard to the rights of the citizens concerned. His office gives him no right to neither persecute the violator nor mete out punishment of the offense. He shall, at all times, have a clear appreciation of his responsibilities and limitation regarding detention of the violator; he shall conduct himself in such a manner as will minimize the possibility of having the service of the people and the equitable upholding of their laws, whether in the handling of law violators or in dealing with the law-abiding.

## IX. ARTICLE 9 – GIFTS AND FAVORS

The law enforcement officer, representing government, bears the heavy responsibility of maintaining in his own conduct, the honor and integrity of all government institutions. He shall, therefore guard against placing himself in a position in which any person can expect special consideration or in which the

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 265 of 665

public can reasonably assume that special consideration is being given. Thus, he should be firm in refusing gifts, favors or gratuities, large or small, which can, in the publics mind, be interpreted as capable of influencing his judgment in the discharge of his duties.

X.     **ARTICLE 10 – PRESENTATION OF EVIDENCE**

The law enforcement officer shall be concerned equally in the prosecution of the wrongdoer and the defense of the innocent. He shall ascertain what constitutes evidence and shall present such evidence impartially and without malice. In so doing, he will ignore social, political and all other distinction among the persons involved, strengthening the tradition of the reliability and integrity of an officer's work.

The law enforcement officer shall take special pains to increase his perception and skill of observation, mindful that in many situations his is the sole impartial testimony to the facts of the case.

XI.     **ARTICLE 11 – ATTITUDE TOWARDS PROFESSION**

The law enforcement officer shall regard the discharge of his duties as a public trust and recognize his responsibility as a public servant. By diligent study and sincere attention to self improvement, he shall strive to make the best possible application of science to the solution of crime and in the field of human relationships; he shall strive for effective leadership and public influence in matters affecting public safety. He shall appreciate the importance and responsibility of his office and hold police work to be an honorable profession rendering valuable service to his community and his country.

Peter White
Sheriff
Vance County

Case 5:19-cv-00467-BO    Document 70-1    Filed 04/01/21    Page 266 of 665

## I.     CODE OF ETHICS

As a law enforcement officer, my fundamental duty is to serve mankind; to protect lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the Constitutional Rights of all men to "Liberty", "Equality," and "Justice".

I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and professional life, I will be exemplary in obeying the laws of the land and the regulations of my Office. Whatever I see or hear of a confidential nature that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear of favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession...law enforcement.


Peter White
Sheriff
Vance County

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 267 of 665

W Bullock –B.6 Domestic Disturbance

## I.    POLICY

The purpose of this policy is to establish guidelines and procedures for deputies when dealing with domestic incidents.

The Vance County Sheriff's Office recognizes domestic incident calls as high priority and needing special attention due to the possibility of violence directed to an involved party.

## II.   GENERAL

The goal of the Vance County Sheriff's Office is:

- To respond to domestic related incidents without delay;

- To prevent domestic homicides through proactive measures;

- To prevent domestic assaults;

- To reduce law enforcement call backs;

- To reduce liability risk to the Sheriff's Office; and

- To prevent injuries to deputies, victims, and other involved individuals.

## III.  DOMESTIC STATUTES

### Section 1. N.C.G.S. 50B-1

50B-1. Domestic Violence; definition

(a)    Domestic violence means the commission of one or more of the following acts upon an aggrieved party or upon a minor child resident with or in the custody of the aggrieved party by a person with whom the aggrieved party has or has had a personal relationship, but does not include acts of self defense:

    (1)    Attempting to cause bodily injury, or intentionally causing bodily injury; or

    (2)    Placing the aggrieved party or a member of the aggrieved party's family or household in fear of eminent serious bodily injury; or

    (3)    Committing any act defined in G.S. 14-27.2 through G.S. 144-27.6 (See list of statutes at the end of this policy).

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 269 of 665

(b)     For purposes of this section, the term 'personal relationship' means a relationship wherein the parties involved:

        (1)     Are current or former spouses;

        (2)     Are persons of the opposite sex who live together or have lived together;

        (3)     Are related as parents and children, including others acting in loco parentis to a minor child, or as grandparents and grandchildren. For purposes of this subdivision, an aggrieved party may not obtain an order of protection against a child or grandchild under the age of 16;

        (4)     Have a child in common;

        (5)     Are current or former household members; or

        (6)     Are persons of the opposite sex who are in a dating relationship or have been in a dating relationship. For purposes of this subdivision, a dating relationship is one wherein the parties are romantically involved over time and on a continuous basis during the course of the relationship. A casual acquaintance or ordinary fraternization between persons in a business or social contact is not a dating relationship.

### Section 2. N.C.G.S. 50B-2(c1)

(c1)     Ex Parte Orders by Authorized Magistrate. - The chief district court Judge may authorize a magistrate or magistrates to hear any motions for emergency relief ex parte. Prior to the hearing, if the magistrate determines that at the time the party is seeking emergency relief ex parte, the district court is not in session and a district court judge is not and will not be available to hear the motion for a period of four or more hours, the motion may be heard by the magistrate. If it clearly appears to the magistrate from specific facts shown that there is a danger of acts of domestic violence against the aggrieved party or a minor child, the magistrate may enter such orders as it deems necessary to protect the aggrieved party or minor children from such acts, except that a temporary order for custody ex parte and prior to service of process and notice shall not be entered unless the magistrate finds that the child is exposed to a substantial risk of bodily injury or sexual abuse. An ex parte order entered under this subsection shall expire and the magistrate shall schedule an ex parte hearing before a district court judge within 72 hours of the filing for relief under this subsection, or by the end of the next day on which the district court is in session in the county in which the action was filed whichever occurs first.

Case 5:19-cv-00467-BO    Document 70-1    Filed 04/01/21    Page 270 of 665

**Section 3. Chapter 50B is amended by adding the following new section to read:**

50B-4A. Violation of valid protective order is Misdemeanor.

A person who knowingly violates a valid protective order pursuant to this Chapter shall be guilty of a Class A1 Misdemeanor.

As provided for in Chapter 50B-5(a) Emergency Assistance:

A.    A person who alleges that he or she or a minor child has been the victim of domestic violence may request the assistance of a local law-enforcement agency. The local law-enforcement agency shall respond to the request for assistance as soon as practicable; provided, however, a local law-enforcement agency shall not be required to respond in instances of multiple complaints from the same complainant if the multiple complaints are made within a 48 hour period and the local law-enforcement agency has reasonable cause to believe that immediate assistance is not needed. The law-enforcement officer responding to the request for assistance is authorized to take whatever steps are reasonably necessary to protect the complainant from harm and is authorized to advise the complainant of sources of shelter, medical care, counseling and other services. Upon request by the complainant and where feasible, the law enforcement officer is authorized to transport the complainant to appropriate facilities such as hospitals, magistrates' offices, or public or private facilities for shelter and accompany the complainant to his or her residence, within the jurisdiction in which the request for assistance was made, so that the complainant may remove food, clothing, medication and such other personal property as is reasonably necessary to enable the complainant and any minor children who are presently in the care of the complainant to remain elsewhere pending further proceedings.

B.    In providing the assistance authorized by subsection (a.), no officer may be held either criminally or civilly liable on account of reasonable measures taken under authority of subsection (a).

15A-401 (b)(2)(d) provides that an officer may arrest for a misdemeanor that occurred outside his presence, if the offense was a simple assault, or domestic criminal trespass. The offense must be committed by a person who is the spouse or former spouse of the alleged victim or by a person with whom the alleged victim is living or has lived as if married.

50B – 4 (b) provides an additional option for arrest. If there is a court order in effect, 50B-4 requires arrest if there is probable cause to believe that (1) The suspect violated a court order excluding the suspect from the residence; or (2) the suspect violated the court order prohibiting him from assaulting, threatening, abusing, following, harassing or interfering with the alleged victim, and if the victim or someone acting on the victim's behalf presents the law enforcement officer with a copy of the order or the officer determines that such an order exists

and can ascertain the contents thereof, through phone, radio or other communication with appropriate authorities.

2) A "domestic incident" is when members of any relationship described above in G.S. 50B-1(b), (1) through (6) do one or more of the listed:

    a. Attempt to cause bodily injury or intentionally cause bodily injury; or

    b. Place the aggrieved person or a member of his or her household or family in fear of imminent serious bodily injury; or

    c. Commit a sexual assault; or

    d. Intentionally destroy real or personal property; or

    e. Commit domestic criminal trespass (G.S. 14-134.3); or

    f. Violate a valid court order provided under 50B; or

    g. Request law enforcement intervention even though a crime may not have been committed.

C. Probable Cause

That amount of information that would cause a reasonable and prudent person to believe that certain allegations are correct; it must be more than mere suspicion but may fall short of actual proof.

The definition and/or the weight and degree of probable cause are consistent for any incident or occurrence, and do not change.

## IV. PROCEDURE

**Responding**

- The responding deputy(s) shall separate the parties involved, calm them and restore order, if possible.

- The deputy(s) may, if the situation allows, observe the situation for a brief period before approaching the parties. All normal precautions shall be taken during approach and upon entering any residence.

- It is important to separate the parties out of ear shot, and line of sight of each other in order that each will feel more comfortable with disclosing information without fear of retaliation.

- During discussions with the parties, deputy(s) must avoid drawing hasty conclusions.

- Whether or not an arrest is made, the deputy(s) shall provide the parties involved with information related to the problem at hand, by referring them to Community Resources for assistance.

- In cases where N.C.G.S. 50B applies, the responding deputy(s) shall inform the complainant of the availability of relief through the Clerk's office, which doesn't require an attorney.

**Assessment**

- In all cases, the deputy shall determine if:

  o All involved parties are safe;

  o Any injuries have occurred

  o A crime has been committed;

  o Any warrants are outstanding on involved parties;

  o Any civil process (such as 50B) is outstanding, or is in effect.

**Arrest**

- After the responding deputy(s) has finished his/her interviews, and weighed his/her information and observations, if grounds exist to make a warrant-less arrest as described in 15A-401 or 50B, the deputy(s) shall make the arrest.

- If the suspect has left the scene and an arrest is warranted as described is 15A-401 or 50B, the deputy(s) and the Sheriff's Office shall make a reasonable effort to locate the suspect as soon as possible, and make the arrest.

- If the suspect can not be immediately located, but there is probable cause to believe that the suspect has committed an offense, the deputy shall explain the procedure for obtaining a warrant to the victim and encourage the victim to seek a warrant. The deputy shall provide the victim with transportation to the magistrate's office if the victim so desires, or does not have transportation.

- If the suspect cannot be immediately located and there is probable cause to believe the suspect has committed an offense, but the victim refuses to get a warrant after the deputy has weighed all factors in the call, the deputy shall attempt to obtain a warrant from the magistrate on other grounds of 50B. In contemplating such a decision, the deputy will consider:

  o The existence of a protective order;

  o The history of previous calls involving the same parties;

- The likelihood that the crime will be repeated or violence against the victim continued;

- The magnitude of the victim's injuries.

- If an arrest is not made because the suspect can not be located, or due to the deputy's use of discretion to not make an arrest, the deputy shall initiate follow-up intervention with the appropriate state or county victim's services.

- The deputy shall perform a follow-up contact with the victim, in person, as soon as reasonable. If the deputy can not follow-up with the victim, he/she shall request their immediate supervisor, or on-coming duty officer make the necessary follow-up contact with the victim.

- At the discretion of the deputy, more than one follow-up contact visit may be warranted.

**On-Scene**

- The deputy shall remain on the scene long enough to determine if the victim will feel safe after the law enforcement leaves, or if the victim needs assistance to go to another location.

- If the victim decides to relocate, the deputy shall remain on the scene to preserve the peace, while the victim removes such items as food, clothing, medication, and other personal property as is reasonably necessary to enable the victim and/or minor children to relocate elsewhere. This does NOT include furniture or other household items.

- Unless both parties readily agree; or if there is a court order directing something else, only survival necessities may be removed with law enforcement assistance.

- Under no circumstances will the race, ethnic origin, social class or occupation of any party be factors in a deputy's initiative in handling the call, or decision to seek a warrant.

**Documentation**

- At the conclusion of each domestic incident call for service the responding deputy shall complete the appropriate incident report.

- Any follow-up visits by the deputy shall be documented on the appropriate follow-up report as well. The report will contain the date, time, complaint number of initial report, as well as the victim's name, address, and contact numbers. The report must also contain action taken or discussions conducted.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 274 of 665

- The deputy responding to a domestic situation or conducting a follow up with a victim shall forward a completed copy of all reports pertaining to the incident to the Domestic Violence Coordinator or other appropriate person. All reports must be completed by the next business, unless extenuating circumstances prevents next day completion, and forwarded to the above mentioned personnel.

**Additional Assistance**

- If requests are made by either person involved in the domestic dispute for law enforcement assistance with removing personal belongings as described in 50 B-5, at times other than during a domestic call, the responding deputy may provide that assistance, without court order, to prevent a crime from occurring. The deputy may not intervene in any form to assist one party or another in removing household or personal items in dispute. The deputy may recommend the parties settle their property disputes in civil court. The deputy may only intervene in accordance with G.S. 15A-401, or 50B.

## V. SAME GENDER DISPUTES

Although 50B does not address specifically, the issue of same-sex domestic incidents, deputies are reminded that domestic disputes do occur with same-sex relationships. Personnel are to treat calls of this nature the same way and using the same methods as an opposite-sex call. HOWEVER, DO NOT APPLY THE SAME STANDARDS FOR EX-PARTE ORDERS UNDER 50B IF MAKING A WARRANTLESS ARREST

## VI. ASSISTING LEGISLATION

- North Carolina General Statue:

  o 15A-401 Arrest by law enforcement officer.

  o 15A-401(b)(2)(d) Warrant-less arrest powers of officers responding to domestic violence.

  o 50B-4(b) Arrest mandated when officers responding to domestic violence in some cases.

  o 14-27.2 First-degree rape.

  o 14-27.3 Second-degree rape.

  o 14-27.4 First-degree sexual offense.

  o 14-27.5 Second-degree sexual offense.

  o 14-27.6 Penalties for attempt.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 275 of 665

- 14-33 Misdemeanor assaults, batteries, and affrays, simple and aggravated; punishments.

- 14-33.1 Evidence of former threats upon plea of self-defense.

- 14-277.3 Stalking

- 14-27.2 through 14-27.7 Committing or attempting to commit sex offenses.

- 14-134.3 Domestic Criminal Trespass.

- 15A-285 Allows for entry when an urgent necessity exists, when an officer reasonably believes entry is necessary to save a life or prevent serious bodily injury.

- Chapter 50B Domestic Violence.

- 50B-1 Domestic violence; definition.

- 50B-2 Institution of civil action; motion for emergency relief; temporary orders.

- 50B-3 Relief.

- 50B-4 Enforcement of orders.

- 50B-5 Emergency assistance.

- 50B-9 Domestic Violence Center Fund.

Peter White
Sheriff
Vance County

# W Bullock – B.8 Treatment of Prisoners

# Treatment of Persons In and Out of Custody

## I.  POLICY

This policy establishes guidelines, procedures for deputies and other personnel with regards to the treatment of persons in and out of custody.  It shall be the policy of the Vance County Sheriff's Office to take the precautions necessary while transporting prisoners to protect the lives and safety of personnel, the public, and the person taken into custody.  All persons under arrest or in custody shall be searched and handcuffed prior to transportation.

## II.  TREATMENT OF PERSONS IN CUSTODY

Personnel shall not mistreat persons who are in their custody.  They shall handle such persons in accordance with established Sheriff's Office procedures, applicable laws, and regulations.

## III.  VEHICLE STOPS

- Vehicle stops may be based on any of the following:

  - Probable cause to believe that a crime or traffic violation has occurred or is about to occur

  - Reasonable suspicion that a crime or traffic violation has occurred or is about to occur (Deputies must be able to articulate their suspicions)

  - In connection with a lawfully conducted checking station

## IV.  FOOT PURSUIT (JUMP AND RUN)

If a suspect jumps and runs the escape must be reported immediately to the Vance Central.  The reporting deputy/personnel shall give a physical and clothing description of the suspect, the location of the jump and run, any weapon information, and the last known method and direction of travel.  Vance Central personnel shall promptly dispatch information concerning the escape to the other deputy patrols, and affected law enforcement agencies (i.e. Sheriff's Department, Police Department, the North Carolina Department of Corrections, or the North Carolina State Highway Patrol).

The safety Vance County Deputies is paramount in these circumstances.  A deputy may not pursue a suspect on foot prior to contacting Vance Central and providing the required information and request back-up.

If the escapee is not apprehended, the affected deputy may have the violator's vehicle towed and stored (if applicable), only when authorized by law and Sheriff's Office policy.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 278 of 665

## V. DETENTION

Motorists stopped for investigation of routine criminal or traffic violations may be detained for a reasonable period of time sufficient to conduct those duties normally associated with traffic stop investigations. Such investigations include, but are not limited to; checking the status of the driver's license, vehicle registration, vehicle identification number (VIN), completing any related paperwork, and use of a Canine Team to conduct a vehicle sniff for controlled substances or other contraband.

Deputies shall not conduct violator/suspect interviews in the patrol car unless extenuating circumstances exists. Violator/suspect interviews shall be conducted with the violator/suspect seated in his/her own vehicle or in a safe location outside the patrol vehicle. Deputies shall not check the status of a violator's/suspect's license and registration, or make any criminal inquiries while the violator is seated in the patrol vehicle unless the violator/suspect is properly handcuffed as described in Section X below. Exceptions may be made during minor traffic, or criminal violations during inclement weather or when the violator/suspect is elderly, frail or has an obvious medical condition that necessitates an accommodation.

If a deputy determines that, under the circumstances, it is necessary to handcuff a violator/suspect or vehicle occupant prior to determining whether an arrest is warranted, the deputy shall inform the violator/suspect or occupant that he/she is not under arrest and that he/she is being temporarily detained and handcuffed for his/her own safety and for the safety of the deputy. The violator, vehicle occupant, or other suspect(s) shall be handcuffed with his/her hands behind his/her back as more fully described in Section X below.

## VI. INTERROGATION

Deputies shall be thoroughly familiar with and comply with all Federal and State Laws, and Regulations as it relates to the interrogation of suspects.

Violators/suspects are not normally considered to be "in custody" for Miranda purposes during an investigative stop. Accordingly, deputies are not normally required to give Miranda warnings prior to formally arresting apprehending a violator/suspect. If a violator/suspect is handcuffed for any reason, he/she should not be questioned or otherwise interrogated without first being given Miranda warnings; this includes a suspect who is handcuffed during detention for the safety of the officer.

## VII. VEHICLE / PROPERTY SEARCHES

### Consent Searches

- Voluntary consent to search by the owner/operator of the vehicle, other owner of property confers authority to conduct such a search. Consent to a search

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 279 of 665

must be voluntary and freely given rather than a mere submission to expressed or implied authority, duress, or coercion. Although consent to search need not, as a matter of law, be written, deputies shall in accordance with this policy, attempt to obtain written consent whenever practical. In those cases where an individual indicates a willingness to consent to a search of the vehicle but desires not to sign the Consent to Search form, the deputy shall document the verbal consent on the Consent to Search and proceed with the vehicle/property search. In all cases where a consent search is conducted, a copy of the Consent to Search shall be furnished to the person consenting to the search. Once consent to search is obtained, deputies shall, as expeditiously as possible, either confirm or dispel their belief that controlled substances or other contraband are present in the vehicle or at the property in question. In no case shall any person or vehicle be detained for a period of time longer than is reasonably necessary under the existing circumstances. When searching for a controlled substance, whenever available, a Canine Team will be requested to assist in the search of the vehicle/property unless use of the Canine Team would delay rather than expedite the search. While conducting a vehicle/property search, deputies shall, at all times, treat the motorists/suspect in a courteous and considerate manner and provide for their comfort and safety. Prior to conducting any vehicle/property search where there is a potential safety threat, or multiple occupants or persons at the property, the deputy shall contact Vance Central and request the assistance of another deputy or an officer from another law enforcement agency.

**Probable Cause Search**

- Deputies may search a vehicle if he/she has probable cause to believe controlled substances, contraband or other evidence of criminal activity will be found in the location searched.

**Search Incident to Arrest**

- Deputies shall search the entire passenger compartment of all vehicles incident to the arrest, if any occupant of the vehicle is arrested. The only exception to this policy is when the safety of the deputy(s) and prisoner(s) is in jeopardy due to extenuating circumstances.

**Vehicle Frisk**

- Deputies may frisk the passenger compartment of a vehicle for weapons with the consent of the driver or other person having lawful possession of the vehicle, or when the deputy has a reasonable suspicion to believe there may be a dangerous weapon(s) concealed in the passenger compartment of the vehicle. (The deputy must be able to articulate their suspicion)

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 280 of 665

## VIII. SEARCH OF PERSONS IN CUSTODY OR UNDER ARREST

Deputies may frisk or search persons in accordance with the Constitution, State law, regulations, and this policy. A canine shall never be utilized to conduct a sniff of a person for controlled substances or other contraband.

Persons who are detained may be frisked for weapons provided the deputy either obtains consent from the person to be frisked or has a reasonable suspicion to believe the person being frisked may be armed and dangerous. Consent to search a vehicle does not authorize a deputy to frisk the occupants of the vehicle. (The deputy must be able to articulate their suspicion).

Deputies may search detained persons with their consent or if the deputy has probable cause to believe contraband or other evidence will be found.

Deputies shall search all prisoners incident to arrest prior to transporting and take possession of all weapons and/or evidence. The only exception to this policy is when the deputy(s) and prisoner(s) safety is in jeopardy due to extenuating circumstances.

Deputies shall search any prisoner whose custody is turned over to them by another deputy or law enforcement officer from another law enforcement agency.

Search of Prisoners of the Opposite Sex:

- A deputy shall search a prisoner of the opposite sex only when an immediate search is necessary to ensure the safety of the prisoner, deputy, or others or to preserve evidence which otherwise might be destroyed. If a deputy of the same sex as the prisoner is not available, only a pat-down search will be conducted unless circumstances warrant an immediate, thorough search.

- A pat-down search may be delayed until the arrival of a second officer. If a second officer is not available and/or there is a safety issue, the pat-down search will not be delayed.

- Searches made under such conditions shall be made with all possible regard for decency and a witness should be present.

### Strip and Body Cavity Searches

- The use of strip and body cavity searches may under certain conditions be necessary to protect the safety of deputies, civilians, and other prisoners; and to detect and secure evidence. Such searches shall be conducted only with proper justification and in accordance with the procedural guidelines for conducting such searches as set forth in this policy, and with the approval of the Sheriff.

- Strip searches are defined as any search of an individual requiring the removal of all clothing to permit the visual inspection of skin surfaces

including genital areas. Strip searches may be conducted only by law enforcement or other personnel of the same sex as the person being searched and under conditions that provide privacy from all but those authorized to conduct the search.

- Field strip searches of a suspect may be conducted only if there are exigent circumstances and the deputy has probable cause to believe that the life of the deputy or another may be at risk, or evidence will be lost if the strip search is not performed. If a field strip search is conducted, it must be done discreetly and out of the view of the public. All strip searches shall be documented as follows:

  ○ If evidence is found as a result of a strip search, it shall be documented on the appropriate Seized Property Report

  ○ If no evidence is found as a result of a strip search, the deputy shall complete an incident report detailing the strip search, which is submitted to the deputy's immediate supervisor. This report shall be retained in the appropriate file at the Sheriff's Office for one (1) year or for a length of time at the discretion of the Sheriff for record keeping purposes only.

- If a deputy believes a strip search is necessary to locate contraband and the person under arrest will be committed to a jail, the deputy may choose to inform the jail personnel of potential contraband and allow them to perform the strip search as part of jail procedures.

- Body cavity searches are defined as any search involving not only visual inspection of skin surfaces, but also the internal physical examination of body cavities, such as the rectal or vaginal cavity.

- Should visual examination of a suspect during a strip search and/or other information lead the deputy to have probable cause to believe that a suspect is concealing a weapon, evidence, or contraband within a body cavity, the following procedures shall be followed:

  ○ The deputy shall consult with his/her immediate supervisor to determine whether probable cause exists to arrest the subject and seek a search warrant for a body cavity search. A subject can consent to a body cavity search by medical personnel.

  ○ A body cavity search shall be performed pursuant to a search warrant or consent by a physician or other medically trained personnel at the physician's direction. Only a law enforcement officer or other personnel of the same sex as the person being searched shall be present when the search is conducted.

  ○ Body cavity searches shall be performed with due recognition of privacy and hygienic concerns.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 282 of 665

o The authorized medical personnel conducting the search shall furnish a copy of his/her report to the deputy serving the search warrant.

## IX.  PROPERTY OF PRISONERS

Deputies shall take all reasonable measures to protect the personal property in the possession of prisoners at the time of arrest or detention.

When a deputy stores or takes possession of a vehicle containing a domesticated animal or arrests an individual that has a domesticated animal in his/her possession, the deputy shall make reasonable efforts to ensure the safety and wellbeing of the animal. Reasonable efforts may include contacting the animal's owner or an immediate family member of the owner. If these efforts fail, an animal shelter or an animal control officer should be contacted to remove the animal.

## X.  SECURITY AND TRANSPORTATION OF PRISONERS

**Positional Asphyxiation**

- Positional asphyxiation may occur when the position of the body interferes with respiration. The deleterious positional effect may result from either interference with the muscular or mechanical component of respiration or both. Medical evidence has shown in all cases of positional asphyxia that one or more contributory factors provide an explanation for the inability of the victim to correct the injurious and potentially lethal position; for example, alcohol/drug intoxication, concussive head injury, entrapment, restraint or physical disability.

- An arrestee who engages in strenuous physical activity while intoxicated or under the influence of drugs and is then placed facedown for any reason will possibly suffer death. The facedown position prevents adequate breathing because the abdomen chest walls and diaphragm muscles are hyperextend or otherwise prevented from functioning normally due to the arrestee's prone position. The combination of these factors can lead to a fatal inability of the arrestee to breathe.

- Deputies shall not transport anyone in a facedown prone or facedown bound (hog-tied) position. Deputies experiencing an arrestee who may be uncontrollable requiring them to be restrained and transported shall ensure the person is properly seated. If the person transported must be restrained by being bound or strapped down with plastic ties, it is the arresting deputy's responsibility to ensure the person is not placed in a facedown position.

**Procedures**

- Prior to transportation, deputies shall handcuff all persons under arrest or in custody regardless of the charge (If a deputy's safety is threatened, the deputy may transport a prisoner to a safe location prior to handcuffing).

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 283 of 665

Prisoners are to be handcuffed with their hands behind their backs, with the cuffs only tightened to the extent necessary to prevent escape and "double locked". Prisoners are not to be handcuffed to any part of the vehicle (deputies may use discretion in handcuffing a violator with the hands in front if there is a compelling reason such as obesity, physical, or other condition that precludes applying the handcuffs behind the violator's back). Restraining measures in addition to handcuffing may be necessary when dealing with combative persons (e.g. flex-cuffs, leg-irons, or full hand-leg restraints) may be used as restraints and should be applied in the proper manner.

o Suspects should always be handcuffed in a safe location outside the deputy's patrol vehicle.

o In extraordinary circumstances, deputies may use their discretion to make exceptions to the handcuffing policy. These exceptions may include the sick, injured, disabled, handicapped, elderly, or other persons whose physical condition may be aggravated by handcuffing. Sound professional judgment should be used when exceptions are made and alternate safety precautions should be taken to guard against injury and/or escape. When possible do not handcuff parents in front of their children.

o Physically or mentally handicapped persons require special care and attention. Deputies shall use their own discretion in determining what, if any, restraining devices will be used on handicapped prisoners and whether or not a patrol vehicle is appropriate for transporting purposes. Deputies should request the assistance of EMS, or the appropriate city or other law enforcement agency when it becomes necessary to transport a person suffering for a mental illness.

The transportation of prisoners is a constant and frequent activity with a potentially high degree of violent confrontation requiring appropriate safety and security measures.

• Deputies shall examine their patrol vehicle at the beginning of each shift to assure that it is safe, properly equipped, and free of weapons or evidence. An additional search shall be completed immediately after transporting a prisoner(s) or other person(s), including under the seats, to ensure that no weapons are accessible and that no weapons or evidence was left in the vehicle.

• When transporting a prisoner of the opposite sex, two deputies will be used when available. When only one deputy is available, Vance Central shall be notified and provided the description of the prisoner, location, destination, and odometer reading. Upon arrival at the intended destination, the deputy will repeat the odometer reading and location.

• Deputies operating patrol vehicles shall transport all prisoners in the rear seat, behind the prisoner transport partition. It is strongly recommended that one deputy not transport more than two (2) prisoners. When it is necessary

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 284 of 665

to transport more than two (2) prisoners the arresting deputy will request a second deputy to assist. Both prisoners shall be handcuffed and the seat belts fastened.

- The safety belt will be applied and the door locked to secure the prisoner. Restraining devices will be used on all prisoners when physically possible. Mental patients, sick, injured, or handicapped persons will be restrained in the deputy's patrol vehicle or other provisions shall be made for transportation in an ambulance.

- Communications by the prisoner with persons other than the transporting or arresting deputy will be restricted until the prisoner has reached the booking location. Under no circumstances will the prisoner be allowed out of sight of the arresting or transporting deputy. If a deputy must leave the vehicle, the keys will be removed from the vehicle.

- A transporting deputy should only stop or respond to law enforcement needs, when the risk to third parties is clear and grave and the risk to the prisoner is minimal. Deputies shall not engage in any extraordinary vehicle operation, such as vehicle pursuits, while transporting prisoners unless a life-threatening situation occurs, and after approval of the shift supervisor.

- If a prisoner being transported escapes from custody, the escape shall be reported immediately to the appropriate shift supervisor and Vance Central. The reporting deputy shall give a physical and clothing description of the prisoner, the location of the escape, any weapon information, and the last known method and direction of travel. Vance Central personnel shall promptly dispatch information concerning the escape to other law enforcement patrols and affected law enforcement agencies (i.e. Sheriff's Department, Police Department, the North Carolina Department of Corrections, or the North Carolina State Highway Patrol).

- If the escapee is not apprehended, the affected deputy shall consult with the Magistrate to initiate any criminal proceedings. The patrol shift supervisor shall document the facts of the escape and any pertinent follow-up information he/she deems necessary on an incident report.

- Prior to entering any detention facility, deputies shall secure their duty firearm, ammunition and asp in accordance with the rules or guidelines established by the detention facility, the Sheriff, or in the trunk of the deputy's patrol vehicle.

- Prisoners turned over to detention personnel become the detention center's responsibility and deputies are free to resume duty after completing the required booking procedures and any other required paper work. However, deputies shall notify the detention facility or court deputy/bailiff when a prisoner turned over to their custody is a security risk.

Handcuffs are not to be removed from arrestees until they are delivered to the detention facility unless the following exceptions apply:

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 285 of 665

- Handcuffs may be removed upon entry into a secure location

- Handcuffs may be temporarily removed at other locations:

  - When necessary during medical treatment

  - When performing psychophysical tests for driving while impaired (DWI)

  - Other purposes deemed necessary by the arresting officer

Handcuffs should be removed only until the necessary function is completed. If the subject is combative, the handcuffs shall not be removed and test(s) omitted. Deputies shall advise detention facility personnel of any potential medical or security hazards.

Deputies shall consider their safety and that of the passenger(s) when deciding upon the transportation of authorized passengers (e.g. crime victims, stranded motorists, witnesses, or other persons required in the line of duty) in a patrol vehicle.

The transportation of a passenger and a prisoner at the same time is discouraged. If the situation requires transport of a passenger while transporting a prisoner, the deputy shall exercise every reasonable precaution to ensure his/her safety, the safety of the prisoner, the passenger, and other users of the highways. Prior to making the decision to transport a prisoner and a passenger at the same time, the deputy should call another officer for assistance.

**Security and Control of Prisoners Transported to Medical / Mental Health Facilities**

- Prisoner custody and well being is solely the responsibility of the arresting deputy. If a prisoner becomes sick or is injured incidental to the arrest, the deputy will immediately seek medical attention through Vance Central. The deputy shall be governed by the decision of the Emergency Medical Services personnel regarding the need for hospitalization. The deputy shall remain with the prisoner unless urgent medical circumstances exist or relieved by a patrol shift supervisor. In the event the prisoner is admitted to the hospital, the deputy shall contact the patrol shift supervisor concerning additional security measures with the assistance of on duty deputies. When it becomes necessary to transport a prisoner to a mental health facility for the purpose of treatment or evaluation, the arresting deputy must secure an "Involuntary Commitment Order" from the Magistrate's Office prior to the prisoner being transported. The arresting deputy shall request assistance from EMS or the appropriate law enforcement agency when transporting a mentally ill prisoner pursuant to an Involuntary Commitment Order. In the event the mentally ill prisoner requires additional security, the arresting deputy shall be responsible to ensure that the prisoner is transported to a facility that is equipped and

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 286 of 665

staffed, to accommodate the additional security measures request, after consulting with the patrol shift supervisor.

## XI. MONITORING A PERSON'S PHYSICAL CONDITION

The physical and mental condition of the prisoner must be monitored during the time that he/she is in the deputy's custody. A prisoner who appears to be sick or injured must be provided medical attention from medical personnel.

When a deputy arrests a person who is unconscious, semiconscious, or otherwise apparently suffering from some disabling condition, and who is unable to provide information on the cause of their condition, the deputy shall make a reasonable effort to determine if the person is wearing a Medic Alert bracelet or necklace containing the emergency alert symbol indicating a condition or illness which could cause loss of consciousness. Upon finding such a symbol, the deputy shall make a reasonable effort to obtain the appropriate medical care for the individual.

A prisoner who exhibits any of the following characteristics must be taken for immediate medical attention:

- Loses consciousness (this does not include an obviously intoxicated person who goes to sleep)

- Sweats profusely without reason

- Appears very sick

- Engages in deranged or irrational conduct or speech without any obvious reason, such as impairment from alcohol or drugs

- Has an obvious injury

- Complains of significant injury or illness and requests medical attention

A prisoner who exhibits any of the following characteristics must be particularly monitored for potential physical problems:

- Old or frail

- Known diabetics or asthmatics

- Have a known history of heart or lung problems or seizure disorder

- Are substantially impaired by drugs or alcohol

- Have run or fought with officers or violently resisted arrest

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 287 of 665

- Are breathing very rapidly, sweating heavily, or exhibiting pale skin

- Engage in deranged or irrational conduct or speech

- Are very obese

- Complain of health problems

## XII. HANDLING THE MENTALLY ILL

**Recognition**

- Deputies may occasionally be called upon to control or restrain an individual when mental illness provokes anti-social behavior. Suicide attempts, violent behavior, imaginary persecution, hallucinations, illusions of grandeur, and other deviations from what is considered normal or expected behavior are indications of mental illness. Careful observation of the victim, including how he/she talks, what he/she says, and how they behave can lead you to believe they are suffering from some type of mental illness. This visual observation may also be supplemented by information obtained from friends or relatives of the victim. The information gathering process will be a great aid on how to handle the situation. Some specific indicators to look for and note are:

  o Determine if Injured or Ill – Is the person physically ill or injured? There are a great many physiological reasons that can cause a person to act abnormally. A blow to the head, a high fever, shock from a crash or reaction to medication can cause a person to appear disoriented. On the other hand, a person who is mentally ill may not react to pain as we would expect a normal person to react. If there is an injury and first aid is required, do what you can for the person, but do not force treatment unless it involves a life-threatening situation.

  o Obtain Past History – Attempt to learn as much as possible about the past history of the person. Have they previously been confined? If a past record of mental illness is discovered, they should be returned to the institution where they were treated or their attending physician should be contacted.

  o Consider Hospitalization – When a deputy feels that a person should be hospitalized due to mental illness, the local mental health facility shall be contacted. Necessary arrangements can be made for evaluation and commitment to the nearest state hospital or medical facility for treatment or detention. The deputy must feel that the person is a risk to themselves or others.

  o Identify Any Criminal Behavior – Has the person committed a crime? If a crime has been committed, especially a felony, the magistrate should be contacted for advice. The past record of the person and the willingness of the hospital to accept him/her will have some direct bearing on this

problem. In any case, the person must be removed from contact with the community until he/she can be stabilized. If a felony has been committed, the deputy has the responsibility to guard the person until secured, either in a mental facility or a jail. It still remains a function of the court to determine guilt, innocence or insanity.

## General Guidelines

- Be Sympathetic – Do not argue or antagonize the person. Most likely they will not respond to logical arguments. Take your time, keep cool and use a quiet conversational tone of voice when dealing with them. The tone of voice, more often than the words spoken, will have a great influence on the person. You must try to convince them that you are on their side and are there to help them.

- Avoid Physical Contact – Do not touch them unless it is absolutely necessary. The mentally ill person may be inclined to interpret this as an attempt to restrain him and overreact.

- Do Not Mislead – Do not mislead or try to trick a mentally ill person. It may work for you temporarily, but can cause more serious problems later.

- Use Available Assistance – It may be necessary to summon medical assistance and have the person sedated if he/she is exceptionally violent. Obtain assistance whenever possible. It is always best to call for assistance from another officer even if things appear to be normal. A friend or relative may be most valuable in controlling the person. Any person that appears to agitate the mentally ill person should be removed from the scene as soon as possible. Deputies should contact EMS or the appropriate law enforcement agency for assistance when a mentally ill person requires transportation to a treatment facility if necessary.

Peter White
Sheriff
Vance County

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 289 of 665

W Bullock – B.9 Use of Force

## I.    POLICY

This policy establishes guidelines related to the use of force, reporting, review, and analysis.

The Vance County Sheriff's Office recognizes and respects the value and special integrity of each human life.  By vesting deputies the lawful authority to use force to protect the public welfare, a careful balancing of all human interests is required.   Therefore, it is the policy of the Vance County Sheriff's Office that deputies shall use only that force which is reasonably necessary to effectively bring an incident under control while protecting the lives of the officer or another. Deputies shall use physical force in arrest and custody situations only in strict conformance with the United States Constitution, laws of North Carolina, and this policy.

**Approved Weapons**

- A deputy shall, while on or off duty, only carry weapons and ammunition authorized or approved by the Sheriff.

**Impact Weapons**

- The riot and expandable (ASP) batons are the only impact weapons issued to deputies of the Vance County Sheriff's Office. Deputies must complete the appropriate training prior to receiving authorization to carry or use these weapons.

**Chemical Agents**

- Only Sheriff's Office issued chemical agents may be carried and used by deputies of the Vance County Sheriff's Office.

- Prior to the issuance of Oleoresin Capsicum Spray (OC Spray), all deputies shall receive training in its use, which will include instruction and actual application to afford the deputy an understanding of the effects.  Any use of OC Spray other than in a training situation or spraying of animals for self-protection shall be reported as required by this policy.

**Use of Other Chemical Agents**

- Authorization to employ tear gas or other chemical agents in riot situations or for other applications involving large numbers of people must be obtained from the Sheriff's Office Captain or higher authority or his/her designee.  Any use of tear gas or chemical agents except in a training situation must be reported on the appropriate Incident Report.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 291 of 665

### Electronic Control Device (ECD)

- Prior to the issuance of an electronic control device, all deputies shall receive training in its use, which include demonstration and application to afford the deputy an understanding of the effects. Any use of an electronic control device other than in a training situation shall be reported as required by this policy.

### Issuance of Authorized Weapons

- Prior to the issuance of any lethal or less than lethal weapon, the Sheriff's Office Operations Lieutenant, Amorer, Captain, or Firearms Coordinator shall review, inspect, and approve all weapons intended for use by deputies in the performance of their duties. Any weapon found to be unsafe shall be removed from service until such time it is repaired by a qualified technician. A record of each approved weapon issued by the Sheriff's Office shall be maintained by the Vance County Sheriff's Office Armorer.

### Issuance of Specialty Firearms

- Prior to the issuance of any specialty firearm to a deputy, the Sheriff's Office Armorer or his/her designee shall conduct a pre-qualification pistol proficiency examination and an Internal Affairs review shall be requested of any prospective Specialty Firearm candidate alleging excessive force. The minimum duty handgun proficiency required to be considered for further participation and training is at least 80%. Specialty Firearm training and qualification shall also require completion with a score of at least 80% proficiency. Rifle candidates shall complete the approved Rifle Operators Course with a qualification score of at least 80% proficiency.

### Use of Weapons

- Weapons shall be used in accordance with the deputy's training and Sheriff's Office policy. Careless or imprudent use of weapons is prohibited. The term deadly is synonymous with lethal and the term non-lethal and non-deadly are synonymous with less than lethal.

### Remedial Training

- A deputy who fails to demonstrate required proficiency with either a lethal or non-lethal weapon shall receive remedial training with said weapon by a certified weapons instructor prior to resuming official duties.

## II.    DEFINITIONS

**Display of Firearm.** Displaying the weapon includes the removal of the pistol or the pointing of any firearm at a suspect in order to control a situation. Displaying of the weapon does not include removal of the pistol while conducting a building

Case 5:19-cv-00467-BO    Document 70-1    Filed 04/01/21    Page 292 of 665

search, executing a search or arrest warrant or other non-traffic enforcement situation where no subject is located or controlled by the use of the firearm.

**Lethal Force.** The application of any instrument or technique which is likely to produce death or serious physical injury under the circumstances of its use. Such instruments include, but are not limited to: firearms, blackjacks, flashlights, riot batons, nightsticks, knives, or automobiles.

**Serious Bodily Injury.** Bodily injury that creates a substantial risk of death or is likely to cause permanent disfigurement, coma, protracted, or permanent condition. It is an injury that causes extreme pain, prolonged or permanent loss or impairment of the function of any bodily member or organ that result in prolonged hospitalization.

**Use of Firearm.** Discharging the weapon (i.e. pistol, shotgun, rifle, etc.) or using it as an impact weapon.

## III.  USE OF LETHAL FORCE

### General Guidelines

- Deputies shall use **lethal** force only in conformance with the Constitution and laws of North Carolina.

- **Imminent** shall be synonymous with the term immediate.

### General Statute § 15A-401(d)(2) states, in pertinent part:

A law-enforcement officer is justified in using deadly physical force upon another person only when it is or appears to be reasonably necessary thereby:

- To defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force

- To effect an arrest or to prevent the escape from custody of a person who he reasonably believes is attempting to escape by means of a deadly weapon, or who by his conduct or any other means indicates that he presents an imminent threat of death or serious physical injury to others unless apprehended without delay

Nothing in this subdivision constitutes justification for willful, malicious, or criminally negligent conduct by any person which injures or endangers any person or property, nor shall it be construed to excuse or justify the use of unreasonable or excessive force.

### Warning Required

Prior to using lethal force, deputies must give a verbal warning if feasible.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 293 of 665

## IV.    USE OF LESS THAN LETHAL FORCE

### General Guidelines

Where **lethal** force is not authorized, a deputy should assess the situation in order to determine which less than lethal technique or weapon will best de-escalate the incident to bring it under control in a safe manner.

A deputy is authorized to use agency-approved less than lethal force techniques, issued equipment, and/or canine for resolution of incidents as follows:

- To protect the deputy or another from physical harm

- To restrain or subdue a resistant individual

- To bring an unlawful situation safely and effectively under control

- To effect an arrest or prevent escape from custody of a person whom the deputy reasonably believes has committed a criminal offense unless the deputy knows the arrest is not authorized

The amount of force, which may be used in attaining a lawful compliance, will be determined by the surrounding circumstances, including but not limited to:

- The nature of the offense

- The behavior of the subject against whom force is to be used

- Actions by third parties who may be present

- The feasibility or availability of alternative actions

Deputies are not permitted to use a less than lethal defensive weapon unless qualified in its proficient use as determined by training procedures. All proficiency training must be monitored by a certified defensive tactics instructor. All deputies authorized to carry weapons are required to receive in-service training at least annually on the agency's use of force policies and demonstrate proficiency with all approved lethal and less than lethal weapons including any restraint techniques that deputies are authorized to use. In-service training for lethal and less than lethal weapons will be documented either on the deputy's training record and/or on a Firearms Qualification Record (F-9A).

The following less than lethal defensive weapons are authorized for on and off duty use, expandable baton, riot baton, O.C. Spray, and other weapons which may be issued by the Sheriff's Office. Under **no** circumstances are deputies authorized to carry an electronic control device (ECD) while off duty. All personnel will follow proper reporting procedures as outlined in Section VIII of this policy).

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 294 of 665

## V. MEDICAL ASSISTANCE

Deputies shall make the scene as safe as possible and shall afford medical assistance to injured persons considering:

- Amount and type of force used

- Any apparent or probable injuries

- Statements made by the person(s)

Medical assistance afforded shall be the same as for any other individual with similar injuries including:

- First aid administered by the deputy within the limits of the affected deputy's level of training

- Calling or offering to call emergency medical services as appropriate

Deputies may elect to transport injured suspects by patrol vehicle to a medical facility for examination or treatment based on potential security risks, danger presented by the suspect, and other explainable facts.

## VI. ADMINISTRATIVE LEAVE AND REVIEW

Deputies whose actions or use of force results in a death or serious physical injury to anyone shall be removed from their normal duty assignment and assigned Administrative Duties by their Division Commander pending an administrative review. The Division Commander who places the affected deputy on Administrative Duties shall follow-up in writing in the form of a memorandum outlining the reason for the Administrative Duties and the deputy's limitations while on Administrative Duties. The memorandum shall be completed no later than the first scheduled workday after placing the deputy on Administrative Duties. The memorandum shall be immediately forwarded to the Sheriff's Office Captain. Administrative leave is not limited to shootings but shall include actions or uses of force, which result in a death or serious injury.

A supervisor shall order a deputy to take a drug test to eliminate the possibility that drug use may have affected the deputy's actions or judgment in any case where the deputy:

- Discharges his/her weapon resulting in bodily injury to himself/herself or another

- Is involved in a fatal motor vehicle collision

- Is involved in a motor vehicle collision which results in an apparent serious bodily injury

A deputy on Administrative Duties **may** be required to surrender his/her issued patrol vehicle, firearms, uniform badges, and identification credentials.

A deputy assigned Administrative Duties may not wear a uniform or drive or ride as a passenger in an assigned patrol vehicle to and from the work place. The deputy shall be responsible for providing personal transportation to and from the work place. Upon the approval of the appropriate supervisor, the affected deputy may be transported to a doctor's appointment, court, meal break, or any other administrative function. At **no time** will a deputy assigned Administrative Duties be allowed to ride as a passenger in an authorized patrol vehicle during non-work hours. Suitable business attire must be worn and all regulations in this manual must be complied with when performing these assignments. A deputy's Administrative Duties assignments shall not include enforcement action.

Deputies who are involved in any critical incidents shall be referred to a Licensed Physician, approved by the Office of the Sheriff for evaluation, and to determine his/her fitness-for-duty.

## VII.  WEAPONS AND AMMUNITION PROCEDURES

### Authorized Weapons – On and Off Duty

- On Duty

  - Service pistols and magazines shall be loaded to capacity with Sheriff's Office issued ammunition. Shotguns shall be loaded to magazine capacity with Sheriff's Office issued ammunition, with the firing chamber empty. Rifles shall be unloaded; with issued magazines loaded with Sheriff's Office issued ammunition in accordance with the deputy's training, and authorized weapons shall be readily available. Authorized weapons are only those, which have been issued by the Sheriff's Office. Deputies shall carry only Sheriff's Office-issued approved weapons and ammunition as their primary on-duty weapon.

  - Deputies while on/off duty, and operating an official patrol vehicle, while not wearing an approved Sheriff's Office uniform, shall have on their person his/her issued service pistol and official Sheriff's Office identification credentials. While wearing civilian clothing, the deputy shall not make a public display of his/her firearm or remove it from its holster except for lawful purposes. The only exception to this policy is when a deputy is attending a closed meeting, (i.e. Law Enforcement Only) the deputy may secure his/her service pistol in the trunk of his/her Patrol Vehicle while actively involved in the meeting.

  - A deputy's personally-owned firearm approved by the Sheriff for back-up or off duty use in compliance with this directive, may be carried as a back-up firearm. Deputies are not required to carry a back-up firearm while on duty, but may do so at their discretion after qualifying with said weapon in

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 296 of 665

accordance with NC Criminal Justice Training and Standards requirements by a certified firearms instructor.

- When carried, shotguns and rifles shall be kept secured in the patrol vehicle except when removed in the line of duty. Deputies shall remain constantly aware of the type of ammunition loaded into their firearms. Shotguns and rifles shall be periodically checked for the type and variety of ammunition with which they are loaded. Deputies shall promptly replace any ammunition suspected to be faulty via their immediate supervisor.

- Issued rifles shall be used when the deputy determines that a weapon capable of firing a single projectile at close range, extended range, or confined areas is necessary.

- Deputies may purchase a spare magazine, meeting Sheriff's Office specifications, for the issued pistol.

- The additional magazine may be carried in the Patrol vehicle for on-duty use, with prior approval of the affected deputy's immediate supervisor. Additional magazines shall be manufactured by a reputable firearms manufacturer.

- The use of lead or cast bullets in firearms practice causes a build-up of lead in the feed ramp and barrel, which could result in a malfunction or a failure to feed properly. Therefore, deputies shall fire only jacketed ammunition in the issued and personally owned, back-up, or off-duty semiautomatic pistol.

- Off-Duty and Back-Up Firearms

  - In strict conformance with federal and state law and this policy, deputies are authorized to possess and carry a concealed firearm (either their issued service firearm or an authorized personal firearm) while off duty. Use of off-duty weapons shall be reported immediately to a supervisor. The same reporting procedures will apply as an on-duty incident.

  - Prior to carrying a personally-owned firearm off-duty or as a back-up weapon, the deputy shall have the weapon inspected by the Sheriff's Office Firearms Instructor. The Firearms Instructor may approve or reject the use, or the type and caliber of the firearm requested in accordance with Sheriff's Office policy. If the firearm is approved for off-duty or back-up use, the Firearms Instructor shall certify the qualification by the deputy with the personally-owned weapon, and forward the Firearms Qualification Record (F-9A) to the Sheriff's Office Armory Officer or designee to be placed in the deputy's personal firearms file.

  - A deputy who elects to carry his/her Sheriff's Office-issued or personally owned firearm(s) while off duty will be required to have in his/her

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 297 of 665

possession the official badge and identification holder identifying him/her as a sworn deputy of the Vance County Sheriff's Office.

- Each personally owned firearm and ammunition approved for back-up or off duty use must be documented on a Firearms Qualification Record (F-9A) and maintained by the Armament Officer or designee, who shall place the Record in the deputy's personal firearms file. If at any time or for any reason a deputy elects to discontinue the use of a personally-owned firearm for back-up or off duty use, the deputy shall notify the Armament Officer immediately, via memorandum through the chain of command, indicating the effective date and reason for discontinued use.

- A deputy must qualify with the approved personally owned firearm that is intended to be used as an off-duty or back-up weapon on an annual basis. The course of fire for qualifying will be the same (or similar in nature as the type of firearm will allow), as currently required for the Sheriff's Office-issued firearm. A failure to qualify shall automatically suspend the authorization to carry the personally owned firearm. The deputy may not carry the firearm until satisfactory qualification and approval of the Firearms Instructor.

- Only those firearms and ammunition of the type and caliber approved by the designated Firearms Instructor will be carried as back-up or off-duty.

  - Firearms carried as back-up or off-duty shall be no smaller than a .32 or .380 caliber and no larger than a .45 caliber. These weapons shall be of a good quality, produced by a recognized manufacturer, and appear to be in good working order, and the mechanisms shall not be modified except as provided in the manufacturer's owner's manual.

  - Ammunition used for qualifying or while carrying personally owned, back-up, or off-duty firearms shall be provided by the individual deputy and must be from a commercial manufacturer, approved by the Firearms Instructor. Deputies must qualify with the ammunition they intend to carry in the firearm, which shall be documented on the Firearms Qualification Record (F-9A). **Ammunition must be service grade (not reloaded or remanufactured).**

  - The size of the Sheriff's Office-issued pistol may prevent proper concealment; therefore, discretion must be used in carrying this weapon off duty.

  - Deputies who practice while off duty with issued weapons shall comply with all policies regulating the use of firearms.

- A deputy shall not consume or have remaining in his/her body any alcohol previously consumed or be under the influence of alcoholic beverages or any impairing substance while handling a firearm or while possessing any firearm away from his/her own premises.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 298 of 665

- Deputies shall not make a public display of a firearm or remove it from its holster while off duty except for lawful purposes.

- A deputy who has been relieved of duty pending an investigation, on disciplinary suspension, or is required to surrender his/her issued firearms for any reason, or is otherwise prohibited from exercising powers of arrest, is not authorized to carry a concealed, personally owned firearm while off duty during the period the deputy is relieved of duty, or on disciplinary suspension.

## Firearms Procedures

- A deputy shall never fire warning shots.

- A deputy shall not remove side arms from holsters except for authorized use in accordance with this policy, for inspection by a superior officer, or for other authorized purposes.

- A deputy shall not permit any person, other than another deputy, to use Sheriff's Office firearms.

- The killing of an animal is justified:

  - For self-defense

  - To prevent harm to the deputy or another person

  - When the animal is so badly injured as to require that it not continue to suffer. In the case of livestock, a reasonable effort must be made to contact and notify the owner. If the owner cannot be contacted within a reasonable period, the deputy may take the necessary action. Incidents involving game and non-game animals under the jurisdiction of the Wildlife Resources Commission will be reported to that agency using the notification method established by the Sheriff's Office Captain or designee. Incidents involving domestic animals and livestock will be reported to the nearest animal control agency. Neither a Report of Investigation nor a Use of Force/Assault Report needs to be completed when an animal is shot; however, a memorandum outlining the deputy's actions shall be sent to the affected deputy's immediate supervisor within twenty-four (24) hours of the incident, and he/she shall request any used ammunition be replaced as soon as possible.

## Shooting at Moving Vehicles

- Discharging a firearm at a moving vehicle involves a possible risk of death or serious injury. There may be a risk of harm to occupants of the suspect vehicle who may not be involved, or involved to a lesser extent, with the actions of the suspect creating the threat.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 299 of 665

- Deputies shall not fire at unarmed violators in a moving vehicle unless the deputy reasonably believes that the oncoming vehicle presents an imminent threat of death or serious physical harm to him/her or third person, and no other means are available at that time to avoid or eliminate the danger.

- No deputy shall intentionally position him/herself into the path of a vehicle that is attempting to flee. Whenever possible, the effected deputy shall make a reasonable effort to get out of harm's way if a vehicle is moving toward him/her.

## Investigation and Reporting of Firearms Incidents

- A deputy shall immediately report to his/her supervisor every use of a firearm in the performance of his/her duty, either intentional or accidental not related to training. Any time a deputy removes his/her pistol from its holster during an enforcement contact, such action shall be deemed either *display of firearm* or *use of firearm*. For *display of firearm* cases, the deputy shall complete **only** a Use of Force Report, with a narrative that is brief, factual, and to the point. For *use of firearm* cases, the supervisor, in conference with the Division Commander or higher authority, shall carefully examine all the facts and circumstances surrounding the incident, and determine compliance with Sheriff's Office rules, policies, and procedures.

- A deputy involved in a shooting incident, which results in death, or serious personal injury to anyone shall immediately be relieved from normal duty and assigned to administrative duties by his/her Division Commander. The affected Division Commander shall follow the provisions set forth in Section VI (Administrative Leave and Review) of this Policy. The deputy shall be ordered to take a drug test to eliminate the possibility that drug use may have affected the deputy's actions or judgment. The appropriate Division Commander or his/her designee shall immediately begin to collect pertinent information necessary for a preliminary investigation and shall contact the Sheriff's Office Captain, who shall assume direction of the preliminary investigation at the earliest possible time.

- After debriefing of the deputy in accordance with Sheriff's Office policy, if it reasonably appears that the shooting was justified, the deputy may be re-assigned to normal duty by the Sheriff.

## Maintenance and Care of Firearms

- All deputies shall keep their Sheriff's Office issued and back-up or off-duty firearms in excellent condition.

- Deputies shall not in any manner alter or tamper with the internal working mechanisms of their Sheriff's Office-issued firearms.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 300 of 665

## IV.    ABUSE OF POSITION

Deputies are prohibited from using their official positions or their official identification cards and badges for:

- Intimidating or harassing of anyone for personal reasons

- Obtaining privileges not otherwise available to them or to someone else

- Avoiding the consequences of illegal acts

Deputies are prohibited from lending their identification cards or badges or any replica thereof to another person or permitting these items to be photographed or reproduced.

## V.    OBEDIENCE TO ORDERS

### Orders of Superior Officers

- Employees shall obey all lawful orders and directions given by superiors and shall obey the instructions given by Vance Central personnel pertaining to assignments and/or emergencies. Such obedience shall be prompt, willing and respectful.

### Insubordination

- The failure or deliberate refusal of any personnel to obey any lawful order given by any superior shall be deemed insubordination. Failure to recognize the authority of any superior, show disrespect, or disputing his orders shall likewise be deemed insubordination. Insubordination may also be recognized by any act or word delivered or presented in a disrespectful, mutinous, insolent, curt, patronizing or abusive manner. This shall include personnel of like rank or reversed rank where one has been appointed an acting supervisor over another.

### Manner of Issuing Orders

- Personnel acting in a supervisory capacity shall communicate in clear, understandable language, civil in tone, showing respect toward their subordinates, and fellow employees. Orders, directions or other communications shall not be delivered by word or deed showing disrespect, rude, patronizing, abusive or insulting manners

### Unlawful Orders Prohibited

- No supervisor or employee shall knowingly and willfully issue any order violating any law or ordinance or agency rule. If in doubt as to the legality of an order, the employee shall in a respectful, discreet manner, request the issuing person to clarify the order or to confer with higher authority.

- Obedience to Unjust Orders

  ○ Employees who receive orders they feel are unjust or contrary to the Policies or Rules of the Sheriff's Office or the spirit of the Policies or Rules of the Sheriff's Office must first obey such orders to the best of their abilities and may then proceed with appeals or notification to the Sheriff via proper channels.

  ○ Unjust orders may respectfully be questioned if the safety or well-being of an individual or property is at stake.

- Procedure from Unjust Orders

  ○ Employees may appeal for relief from orders or instructions which are unjust. Such appeals must be made in writing to the Sheriff via the chain of command as described in the Grievance Procedures policy. Irresponsible or capricious appeals will be considered serious misconduct.

- Reporting Unlawful Orders

  ○ Any employee receiving unlawful, unjust or improper orders shall at the first opportunity report in writing the facts of the incident, to include his/her own actions to the Sheriff via the chain of command.

**Conflicting Orders**

- Should any order conflict with any previous order or instruction issued by another superior or with any policy, the employee to whom the order is given shall respectfully call attention to the conflict.

- If the conflict is over the radio, a telephone call shall be attempted to notify the supervisor of the conflict. If a telephone call is not possible, then the employee shall respectfully, discretely and as tactfully as possible explain the conflict. Under no circumstances shall personnel engage in an argument, or any disrespectful or in appropriate communication over the radio.

- If the superior giving the second order does not eliminate the conflict, his/her orders stand and the responsibility of the conflicting order shall be his/hers. If he/she so directs, the last command will be obeyed first.

- Orders will be countermanded or conflicting orders issued only when reasonably necessary for the good of the Sheriff's Office, or the safety of persons or property.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 302 of 665

## VI. EMPLOYEE'S CONDUCT

### Unbecoming Conduct

- Employees shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably upon the Sheriff's Office and in keeping with the high standards of professional law enforcement. Unbecoming conduct shall include any conduct that constitutes unacceptable personal conduct pursuant to County Government Policy, and any conduct which tends to bring the Sheriff's Office into disrepute, or which reflects discredit upon any employee(s) of the Sheriff's Office, or which tends to impair the operation and efficiency of the Sheriff's Office or of an employee, or which violates Sheriff's Office policy.

### Truthfulness

- Personnel are required to speak the truth at all times, whether under oath or not, in giving testimony or in connection with any legal official order received or in connection with official duties. In matters of an internal nature, members are required to speak the truth and cannot elect to stand silent if they have information on a matter under inquiry.

- If an employee stands silent, refuses to speak or speaks untruthfully, the employee may be terminated.

- Employees shall not file false complaints or make false charges against other employees or persons, including making false charges against pretrial detainees.

### Impartial Conduct

- Personnel while carrying out their respective duties must strictly maintain impartial conduct in word and deed toward complaints, violators, citizens, subordinates and inmates.

- Sworn personnel and detention services personnel shall at all times consider it their duty to be of service to anyone in danger or distress. When certified or qualified to render first aid or other help, personnel may themselves render the aid, and if not qualified then must assist in attempting to find the appropriate help.

### Proper Identification

- Employees shall politely give their name and other pertinent identifying information to any violator(s), citizen(s) or inmate(s) when requested to do so, unless such action is likely to jeopardize the successful completion of an assignment.

Case 5:19-cv-00467-BO    Document 70-1    Filed 04/01/21    Page 303 of 665

- Sworn uniformed personnel must properly identify themselves at all times by wearing a name plate properly displayed on their uniform. Uniformed detention officers must properly wear their correct identification credentials displayed on their uniforms.

- Non-uniformed sworn personnel must have their identification available or displayed according to their duty assignment. Plain clothes detention personnel must properly wear their correct identification credentials.

- Civilian employees including detention personnel are prohibited from representing themselves as law enforcement, whether on-duty or off-duty in any capacity. Representation may be construed as outright action or a nuance such as displaying a detention services badge on a belt while in plain clothes. When addressed by another to be a sworn law enforcement officer, the civilian should politely correct the person who addressed him.

## Duty to be Courteous and Patient

- Personnel shall at all times be courteous, patient and respectful in dealing with the public as well as fellow employees. All business conversations shall be conducted in a courteous and even-tempered, professional manner. Personnel shall refrain from using foul or insulting language.

## Respect for Fellow Employees

- Employees shall treat fellow employees of the Sheriff's Office with the respect due to them as fellow employees. All personnel shall be courteous, civil, and respectful of their superiors and fellow employees whether on or off-duty.

- When employees are addressing or referring to a ranking officer, the proper rank and name shall be used.

## Supporting Fellow Employees

- Employees shall cooperate, support, and assist each other in all ethical endeavors at every opportunity and shall not publicly criticize another employee.

## Threatening or Insulting Language

- Personnel shall not use threatening or insulting manners in word or deed nor behave in an insubordinate manner toward any superior officer or fellow employee.

- Under no circumstances will an employee make jokes, detrimental references or actions, snide comments or other inappropriate words or actions in reference to a fellow employee, citizen or other person concerning but not limited to race, sex, sexual preference, religion, national origin, creed, or appearance.

### Criticism or Circulating Scandalous Stories

- Personnel shall not publicly criticize the actions of any judicial official, District Attorney or any Assistant District Attorney, or other officer of any court by word or deed. Personnel shall refrain from circulating scandalous stories or criticism about employees of the Sheriff's Office or any other governmental employee.

### Relationship with the Press

- Employees shall refer all media inquiries to the Sheriff's Office Captain or other appropriate personnel as assigned duties as press officer. Unless authorized by the Sheriff or his/her designee, personnel are prohibited from interaction with the media.

- Incident reports released by the records clerk, is an appropriate action of that position designated by job description.

### Reading on Duty

- While on duty in an official Sheriff's Office vehicle, inmate housing area, or when receiving the public in an office setting, personnel shall not read newspapers, periodicals, or similar material except in the line of duty.

- Pornographic material is never allowed in any Sheriff's Office assigned property, unless it has been seized as evidence, and then it must be properly processed as such. Pornographic matter is never allowed in the detention facility.

- It is in the Sheriff's discretion to define pornographic material.

### Sleeping On-Duty

- Personnel shall never sleep or give the appearance of sleeping on duty. Uniformed personnel shall not sleep or give the appearance of sleeping anytime while in uniform.

### Medication

- Employees taking medication which causes drowsiness or which suppresses or affects normal activity must notify their immediate supervisor prior to reporting for duty, so their supervisor may make a determination as to whether the employee should report for duty or not.

### Alcoholic Beverages / Drugs

- Personnel shall not ingest any alcoholic beverages, be intoxicated, or have the odor of alcohol about them while in uniform or on duty. Personnel shall

Case 5:19-cv-00467-BO    Document 70-1    Filed 04/01/21    Page 305 of 665

not consume any amount of alcohol to the extent it renders them unfit for duty.

- Personnel shall not be under the influence of any drug which appreciably impairs their ability to perform assigned duties, whether prescribed or not.

- No employee shall take any alcoholic beverage or illegal substance into any County or Sheriff's Office facility, except in the performance of their official duties. Confiscated alcoholic beverages and illegal substances shall be turned over to the appropriate property supervisor, and stored as directed by the "Evidence / Property Collection, Analysis, and Disposal" policy.

(Note: Employees charged with driving while impaired may be terminated through the administrative process. Such termination can place take prior to any court proceedings, and/or regardless of the outcome of the court case.)

**Telephone**

- No home or contact numbers are to be given out to anyone outside the agency. The person receiving the request for a contact number may either record the caller's name and number for the employee, or contact the employee in question them self and relay the message. Personnel rosters with home addresses and phone numbers on them are considered confidential.

- Telephone courtesy is a basic but important means of enhancing the professional image of the Sheriff's Office. Office phones are to be answered promptly, courteously, and in a business-like manner.

- Personnel answering Sheriff's Office phones shall speak slowly and clearly.

- Sheriff's Office phones shall be answered with an appropriate greeting for the time of day; give the name of the agency or division and the employee's rank or title, and their name.

  o Example: "Good afternoon, Vance County Sheriff's Office, Sgt. Doe…"

  o Example: "Good evening, Vance County Detention Facility, Officer Doe…"

- If it is necessary to put the caller on hold, politely tell the caller you are placing them on hold and you will be back promptly. If you cannot do what the caller is requesting, such as finding another person, politely tell the caller, and take a message and then deliver the message to the appropriate person.

- Employees shall end calls by an appropriate ending such as "thank you" or "good bye".

- Personnel shall never just hang-up on a caller.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 306 of 665

- Persons calling the Sheriff's Office shall be addressed by their correct title such as "Judge, Mr., Ms., Officer, etc".

- Long distance calls should be kept to a minimum. No personal long distance calls shall be charged to any County Owned telephone.

## VII.   APPEARANCES

### Personal Appearance

- Personnel shall be neat and clean in appearance whether working in plain clothes or uniform.

- Plain clothes sworn/civilian personnel shall wear appropriate attire for their assigned duties.

### Care of Sheriff's Office, Property, and Vehicle

- Employees are responsible for the proper care of all equipment issued to them. Personnel shall take reasonable precautions for all agency or county property to prevent damage, loss, or destruction.

- If the event of damage, loss, or destructed property, whether intentional or unintentional, a written explanation of the circumstances shall be made to the employee's immediate supervisor, who shall forward the written explanation to the Sheriff's Office Captain. If the loss was willful or caused by negligence on the part of the employee, the employee may be held responsible for the cost of replacing the property in question.

- Personnel shall maintain offices, desks, vehicles, lockers or other work areas or stations, assigned or not, in a clean, neat, and orderly condition.

- Personnel shall clean and pick up after themselves.

## VIII.   ATTENTION TO DUTY

### Employees Always Subject to Duty

- Although certain hours are allotted for the performance of assigned duties, all personnel are subject to report for duty at any time.

- Sworn personnel shall not ordinarily act in a law enforcement capacity when not on duty except in cases of public safety or on direct orders from a superior officer.

- Sworn personnel shall have a working telephone at their residence. They shall have the correct phone number and their correct residence listed in their personnel file in the Sheriff's Administrative Assistant's Office.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 307 of 665

- All civilian employees shall have a phone number through which they can be reached. If they have a phone, the correct number shall be listed in their personnel file the Sheriff's Administrative Assistant's Office, along with their current address. If the civilian employee does not have a telephone of any type, a telephone number through which they may be easily contacted. The telephone number shall be listed in their personnel file.

- Deputies and Detention Officers are required to reside within reasonable distance of the Sheriff's Office headquarters building which meets the approval of the Sheriff.

## Reporting for Duty

- Employees, unless otherwise directed, shall report for duty or present themselves at the time and place specified. They shall be properly dressed and equipped, and mentally ready to perform their assigned duties.

- An employee who feels he/she can not report for duty, must contact his/her supervisor as soon as possible upon determining he/she will be unable to report for duty, or at least one (1) hour before the time he/she was to begin duty.

- If the immediate supervisor is not available and every effort has been exhausted to contact him/her, the employee must report to another on-duty supervisor, in the same chain of command if at all possible. Word left with clerks, Vance Central personnel, or personnel outside their own chain of command or other inappropriate personnel is unacceptable.

- Employees not reporting for duty as scheduled, and who do not report out as per procedure will be determined to be absent without leave. Personnel found to be absent without leave, must provide adequate proof to be excused from the violation. Those not providing adequate proof will be subject to discipline which may include termination.

## Prompt Response to Duty / Calls

- Personnel shall respond to duty assignments without delay, or as directed.

- Personnel shall respond without delay to radio calls for service and calls for assistance. Calls should be answered consistent with normal safety precautions and Motor Vehicle Laws.

## Attendance in Court

- Any employee subpoenaed to testify in any trail involving Federal/State Courts, or in any hearing or trail shall notify the Sheriff immediately via the chain of command.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 308 of 665

- Whenever an employee is ordered to appear in court on any matter in which his/her presence is required, he/she shall punctual and testify truthfully.

## IX. UNSATISFACTORY JOB PERFORMANCE

Deputies shall maintain sufficient competency to properly perform their duties and to assume the responsibilities of their positions. Deputies shall perform their duties in a manner, which will tend to establish and maintain the highest standards of efficiency in carrying out the functions and objectives of the Sheriff's Office.

Examples of unsatisfactory performance include but are not limited to the following:

- Failure to properly supervise subordinates

- Lack of knowledge of the proper application of laws the deputy is required to enforce

- Unwillingness or inability to perform assigned tasks

- Failure to conform to work standards established for the deputy's rank, grade, or position

- Failure to take appropriate enforcement action at any time

- Absence without leave

- Unnecessary absence from assigned duty

- The following will be considered prima-facie evidence of unsatisfactory performance:

- Repeated poor job performance evaluations

- Repeated infractions of policy, regulations, manuals, or directives.

## X. SHERIFF'S OFFICE REPORTS

Deputies shall submit all necessary reports on time and in accordance with established Sheriff's Office procedures.

## XI. RESTRICTIONS ON ACTIVITIES

### Memberships in Unions Prohibited

- Personnel shall not join a labor union nor shall they join any organization:

Case 5:19-cv-00467-BO    Document 70-1    Filed 04/01/21    Page 309 of 665

- that maintains the right of its members to strike;

- that discriminates based on race, sex, creed, religion or national origin;

- that attempts to interfere with the operation of the Sheriff's Office; or

- which might in any way exact prior consideration and thus interfere with the efficient, safe and effective operation of the Sheriff's Office or the citizens of Vance County.

**Seeking Personal Preferment**

- Employees are forbidden to solicit petitions, influence, or intervene on behalf of any person inside or outside the Sheriff's Office for purposes of personal preferment, transfer, advantage, advancement, promotion, or change of duty assignment for themselves or for any other employee.

**Soliciting, Accepting Gifts, Gratuities**

- Employees shall not accept any gift, gratuity, present, or fee designed to influence or obligate the employee to neglect their duty, violate their oath of office or violate any law, ordinance, policy, rule or regulation of the Sheriff's Office

**Rewards**

- Other than their lawful salary, personnel shall not accept any gift, gratuity, or reward in money or other compensation for services rendered in the line of duty.

**Gifts from Employees**

- Employees shall not receive or accept any gift or gratuity from another employee, or perform or accept the performance of any deed or action if there is any indication that preferential consideration or obligation is the purpose, or may be the result of such gift or gratuity.

**Soliciting Special Privileges**

- Personnel shall not use their official positions to solicit special privileges for themselves or others, such as free admission to places of amusement, discounts on purchases, or other favors. "Badge Flashing" is strictly prohibited for this purpose.

**Giving Testimonial, Seeking Publicity**

- Personnel shall not give testimonials or permit their names or photographs to be used for advertising purposes in affiliation with the Sheriff's Office.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 310 of 665

Personnel shall not seek personal publicity, either directly or indirectly in their employment except by expressed permission of the Sheriff.

## Acting as Bailer, Accepting Bail

- Pursuant to N.C.G.S. § 15A-541, any peace officer or spouse of a peace officer who becomes a surety on a bail bond for any person other than a member of his or her immediate family is guilty of a class 2 misdemeanor. Accordingly, deputies shall be prohibited from acting as bailers, sureties, or otherwise agreeing to be responsible for any confined person other than for members of their immediate families.

- Personnel shall not receive or accept money to be turned in as a fine or bail for persons charged or cited for infractions, criminal violations or convictions.

## Fictitious Illness or Injury

- Deputies shall not fake illness or injury, falsely report themselves ill or injured or otherwise deceive or attempt to deceive any official of the Sheriff's Office as to the condition of their health

## Recommending Attorneys or Bondsmen

- Personnel shall not suggest, recommend, advise or counsel the retention of any particular attorney or bondsman to any person directly or indirectly interested in the disposition of any criminal or civil court matter involving the Sheriff's Office.

## Civil Action

- Personnel shall not use their positions with the Sheriff's Office in an attempt to intimidate anyone with whom they are involved in civil controversy to force settlement in the employee's favor.

- An employee shall not use his position with the Sheriff's Office in an attempt to intimidate anyone involved in a civil or criminal controversy, or to force settlement or decision in any particular favor.

## Notice of Suits against Employees

- Any employee having a civil suit filed against him by reason of an act performed by him/her in the line of duty, shall immediately notify the Sheriff in writing, and furnish a copy of the civil complaint, along with a full and accurate account of the circumstances in question attached to a copy of the incident report, if applicable.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 311 of 665

**Payment of Debts**

- Employees shall not undertake any financial obligations which they know or should know they will be unable to meet and shall pay all just debts promptly. An isolated instance of financial irresponsibility will not be grounds for discipline except in unusually severe cases. However, repeated instances of financial irresponsibility shall be cause for disciplinary action.

  Financial difficulty stemming from unforeseen medical expenses or personal disaster shall not be cause for discipline, provided that the deputy is making a reasonable, good faith effort to settle all accounts.

  Employees shall not become financially obligated to subordinates or supervisors.

**Personal Mail**

- Personnel shall not use the agency's address or name for personal mail or billing actions. All personal mail and bills shall sent to the employee's through current home or other personal mailing address, i.e. Post Office Box.

**Public Appearances and Statements**

- Employees shall not publicly criticize or ridicule the Sheriff's Office, its policies, or other employees by speech, writing, or other expression when such criticism or ridicule directly or visibly affects or would reasonably be expected to directly or visibly affect the operation of the Sheriff's Office.

- Without the official approval of the Sheriff, employees shall not address gatherings, appear on radio or television, prepare any article for publication, act as correspondents to a newspaper or periodical, or release or divulge investigative information or any other matters pertaining to the Sheriff's Office while holding them self out as having an official capacity in such matters. Official approval may be given to conduct safety programs and otherwise release information concerning safety matters so long as this activity does not conflict with the official position of the Sheriff's Office.

**Gambling**

- Employees shall not engage in any form of gambling which is in violation of Federal, State, or local laws.

**Entering Establishments Selling Liquor**

- Sworn employees while on duty, whether in uniform or civilian attire, shall not be in any establishment which is not properly licensed by the State of North Carolina permitting the sales and/or consumption of alcoholic beverages, unless required by performance of duty.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 312 of 665

- Sworn employees, while on duty, whether in uniform or civilian attire, are permitted to enter establishment which are properly licensed by the State of North Carolina during their meal break. However, he/she shall not enter this establishment and purchase and/or consume any alcoholic beverage.

- Personnel are prohibited from purchasing and/or transporting any alcoholic beverages in County owned vehicle except for evidence/property purposes.

- Except for duty purposes, while on duty, personnel are restricted from entering any establishment which has the primary purpose of selling alcoholic beverages.

## XII. UNAUTHORIZED DISCLOSURE OF INFORMATION

Personnel shall not disclose any confidential Sheriff's Office plans, policies, orders, proceedings, personnel problems, or other information except as authorized by the Sheriff. Detectives, to include vice and internal matters, shall not disclose any classified information except on a "need to know" basis.

This provision is not to be construed to prevent the release of information concerning law enforcement activities which are not confidential.

## XIII. CONFIDENTIALITY OF INFORMATION

No employee shall discuss the following outside the Sheriff's Office unless the discussion is justified and work related:

- juvenile court proceedings;

- juvenile arrest records;

- investigative or interview information;

- personnel matters;

- internal affairs and disciplinary proceedings;

- internal operations of special projects;

- organized crime operations;

- any open investigation; and

- other inappropriate matter.

Case 5:19-cv-00467-BO  Document 70-1  Filed 04/01/21  Page 313 of 665

**Procedure**

- If an employee receives a request for information and is uncertain about classification status of the information, the employee must consult with his/her immediate supervisor before giving out the information. Employees uncertain about information must not release information.

**Vice / Narcotics Information**

- Organized Crime Information

  o Any employee of the Sheriff's Office who receives information either by phone or in person concerning any vice or narcotics activities will note all pertinent information, to include a call-back telephone number, and immediately pass the information to the supervisor in charge of vice or narcotics. If the vice or narcotics supervisor is not available, the information will be given to a vice or narcotics unit member.

  o If no one from the vice or narcotics unit is available, an on-duty shift Lieutenant may be contacted.

  o Any information received after normal business hours, will be given to the senior duty supervisor. The supervisor shall determine if the on-call vice or narcotics unit member will be contacted, or if a message should be left for follow-up by the appropriate unit.

- Identification of Vice or Narcotics Investigators

  o Under no circumstances will any employee confirm or identify by name or description any member of the Vice or Narcotics Unit to anyone.

  o Any persons seeking such information shall be immediately referred to the Sheriff or the Sheriff's Office Captain.

## XIV. SUSPECTS, ARREST, PRISONERS

**Accepting Gifts from Suspects, Prisoners**

- Employees are strictly prohibited from soliciting or accepting any gift, gratuity, loan, fee, or any other item, or item of value, or from lending or borrowing or from buying or selling anything of value from, or to any suspect, prisoner, defendant, other person involved in any case, professional bondsmen, or other persons who may profit from information or influence obtained from the employee of the Sheriff's Office.

- This shall not pertain to law enforcement personnel while conducting a special operation or undercover investigation. Strict accounting and reporting is required under these circumstances. Enforcement personnel conducting such operations or investigations may not keep any gift, gratuity, loan, fee, or

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 314 of 665

any other item or item of value obtained pursuant to the operation or investigation.

**Reduction of Charges**

- Personnel shall not influence the reduction of any charge or the disposition of any charge initiated by them or any other law enforcement official, either directly or indirectly.

## XV. POLITICAL ACTIVITY

This agency shall not be in conflict with Vance County's policy for Political Activity located in the Vance County Policy Manual.

- Vance County employees have the right to express their views as citizens, to pursue their legitimate involvement in the political system and to vote. However, no employee shall engage in or be subject to coercion for political purpose.

- Employees shall not conduct themselves in any unprofessional manner nor in any manner that would bring reproach on the Sheriff, the Sheriff's Office, or any of its employees.

Additionally, on duty sworn employees shall stay away from election polling locations except when voting or when dispatched for a call. Sworn employees, while on-duty, shall not take any action at any polling location to influence or which could be construed as influencing voting.

On-duty employees shall not engage in political activities; campaigning; distributing political information or paraphernalia; putting up signs; or actively endorsing or not endorsing any candidate.

Employees of the Vance County Sheriff's Office shall not engage in any activity while on/off-duty which involves the destruction of any candidate's political advertisements or endorsements. Employees who violate this provision of policy shall be subject to disciplinary action up to termination.

Employees of this agency registered to vote shall be given reasonable time to vote in bona fide elections.

Employees going to the polls during duty hours shall go to the poll, vote, and depart immediately after voting. Employees may request of their immediate supervisors time-off to vote, and such request shall be made either in person or by phone. Requests are not to be made by use of the communications radio or through another person.

Any employee working at a polling place during an election shall be either off duty or on vacation. An appropriate leave slip shall be on file prior to the leave being taken.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 315 of 665

Any employee, who receives a complaint regarding unlawful or disruptive activity at any voting location, shall immediately notify the Sheriff's Office Captain, who shall take the appropriate action to resolve the complaint.

## XVI. AUDIO / VIDEO MONITORING

Vance County Sheriff's Office employees, shall not record, or monitor, either by audio and/or visual devices, anyone, without all parties first being informed of the monitoring or recording.

Exceptions to this policy are:

- normal telecommunications functions; and

- investigations of criminal matters.

- WHEN OFFICER SAFETY IS AN ISSUE

## XVII. INMATE RELATIONSHIPS PROHIBITED

No employee of the Sheriff's Office shall date, attempt to date, flirt, or make advances toward, or promote a relationship with any inmate.

If an employee has a personal relationship established with someone who is detained in Vance County Detention Facility, the employee shall not be placed in a position to supervise the inmate; nor shall the employee attempt to date, flirt, or make advances toward the inmate that may or appear to be of a personal nature while the inmate is in custody. It is the responsibility of the employee to inform his/her supervisor of a close personal relationship or kinship exists with an inmate in the custody of the Detention Facility.

Employees shall not use official records or other documents of the Sheriff's Office to contact any inmate for the purpose of promoting a personal relationship of any type.

Peter White
Sheriff
Vance County

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 316 of 665

W Bullock – E.2 Investigate Complaints

## I.  POLICY

This policy provides guidelines for accepting, recording, resolving, and forwarding complaints.

## II.  ACCEPTING, RECORDING, RESOLVING, AND FORWARDING COMPLAINTS

### Accepting Complaints

- A complaint or charge against Sheriff's Office employees may originate from within the Sheriff's Office or from the general public. Charges from within the Sheriff's Office shall be processed as provided in this policy. Complaints from the general public shall be courteously accepted by any employee of the Sheriff's Office and shall be processed as hereinafter provided in this subchapter. No employee shall attempt to discourage any person from lodging a complaint. A supervisor has the obligation to investigate possible violations of policy even if the person providing the information does not want a complaint filed.

### Resolving Complaints Based on Misunderstanding of Sheriff's Office Policy

- In the case of complaints involving a misunderstanding of laws, ordinances or policy on the part of the complainant, the employee receiving the complaint shall attempt to resolve the complaint by explaining the law, ordinance or policy to the complainant. If the employee is unable to resolve the complaint, he/she shall refer the complaint to his/her supervisor, who shall attempt to resolve it. If the supervisor is unable to resolve it, the supervisor shall refer the complaint on up the chain-of-command.

### Recording Complaints Alleging Violation of Code of Conduct

- If the complaint involves a possible violation of the Rules of Personal Conduct, or Unsatisfactory Job Performance by any employee of the Sheriff's Office, the employee receiving the complaint shall accept the complaint, record the information and forward the information to his/her appropriate supervisor, who shall be responsible for completing a Personnel Complaint if warranted, after consultation with the appropriate ranking supervisor of the division or higher authority. Such a complaint shall be accepted and recorded even when the identity of the complainant and/or the employee is unknown.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 318 of 665

- If the complainant indicates no desire to make a formal complaint but has indicated a violation of Sheriff's Office policy by an employee, this information must be transmitted to a supervisor. The supervisor must document the information and determine if such information warrants further inquiry to determine if a complaint should be filed by the supervisor. If the supervisor determines a violation of policy may have occurred, the supervisor shall complete the Personnel Complaint, after consultation with the ranking supervisor of the division or higher authority.

### Forwarding Complaints Alleging Violation of Code of Conduct

- After completing a Personnel Complaint, the supervisor shall immediately forward the original copy of the Personnel Complaint of the affected employee and any other appropriate documents to the Sheriff's Office Captain, the Sheriff's Office Captain shall acknowledge the receipt of all complaints to the complainant. Upon conclusion of the investigation, the complainant shall be notified that the investigation has been completed.

- If it appears that an internal investigation will exceed thirty (30) calendar days and after each extension granted by the Sheriff, a letter indicating the status shall be mailed to the complainant by the Sheriff's Office Captain.

### Classifying and Assigning Complaint Investigations

- The Sheriff's Office Captain shall classify the alleged complaint as a Personal Conduct, or Unsatisfactory Job Performance violation and direct or conduct an investigation. When an investigation is assigned to supervisors other than the Sheriff's Office Captain, the Division Commander shall designate the supervisory personnel to conduct the investigation.

## III. INVESTIGATION OF COMPLAINTS AT THE DIVISION OR EQUIVALENT STAFF LEVEL

### Designation of Investigator

- The supervisor responsible for imposing disciplinary action against an employee accused of a Personal Conduct, or Unsatisfactory Job Performance violation may designate a subordinate within the supervisor's command to investigate the complaint. In complex investigations, any supervisor may request that the Division Commander or higher authority take charge of, any specific investigation.

### Conduct of the Investigation

- Before permitting the investigation to begin, the supervisor of the employee being investigated shall notify the employee of the investigation, except in cases where such notification would jeopardize the investigation. Should the employee admit the conduct alleged and that such conduct is, in fact, a violation of policy, then the supervisor, after consulting with Division

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 319 of 665

Commander or higher authority, may impose the appropriate disciplinary action without further investigation! In the event the employee denies the violation with which he/she is charged, the investigation shall proceed as provided.

- The employee shall be given an opportunity to supply the investigator with evidence or witnesses favorable to the employee. No decision as to whether or not the employee violated the rules of Personal Conduct, or Unsatisfactory Job Performance shall be made against a charged employee until the employee has had a reasonable opportunity to produce evidence or witnesses, and has had an opportunity to explain the his/her actions.

- The supervisor chosen to investigate the complaint shall not go outside the jurisdiction of Vance County or neglect regular duties in order to carry out such investigation without the authority of their immediate supervisor or higher authority. No investigative action shall be taken in any case where it might jeopardize a simultaneous or subsequent investigation.

- The investigator shall make every effort to complete the investigation within thirty (30) calendar days. If the investigator will be unable to do so, he/she shall inform the supervisor requesting, and/or the Sheriff's Office Captain as to the reasons why the investigation cannot be completed within thirty (30) calendar days, and shall estimate the additional time needed to complete the investigation.

- If, upon completion of the investigation the supervisor authorized to impose disciplinary action determines that the employee should be exonerated or that the results of the investigation are inconclusive, the supervisor shall, after conferring with the Division Commander or higher authority, inform the employee and forward the Report of Investigation and all related documents to the Sheriff's Office for filing in the employee's personnel file.

- If, upon completion of the investigation and after allowing the charged employee an opportunity to explain his/her actions, the supervisor determines that the employee should be disciplined, the supervisor shall confer with the appropriate Division Commander or higher authority, and shall administer disciplinary action within the options authorized by the Sheriff.

## IV. INVESTIGATION OF COMPLAINTS AT THE SHERIFF'S OFFICE LEVEL

The Sheriff Office Captain shall be responsible for the supervision of all complaints initiated at the request of the Sheriff.

**Investigation Procedures**

- The Sheriff's Office Captain shall notify the employee to be investigated and the employee's Division Commander that an investigation is to be made except in cases where such notification would jeopardize the investigation. In the event the charged employee admits the violation with which he/she is

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 320 of 665

charged, the Sheriff's Office Captain shall prepare for the Sheriff a statement of the facts and submit their recommendation for disciplinary action to be taken, and shall give the entire file to the Sheriff for consideration, pursuant to the provisions of this policy. In the event the charged employee denies the violation(s) with which he/she is charged, then the investigation shall proceed as provided. With the approval of the Sheriff, a Division Commander may be assigned to investigate complaints at this level.

- The employee shall be given an opportunity to supply the investigator with evidence or witnesses favorable to him/her. No decision as to whether or not the employee violated the Rules of Personal Conduct, or Unsatisfactory Job Performance shall be made against a charged employee until the employee has had a reasonable opportunity to produce evidence or witnesses and has had an opportunity to explain his/her actions.

- If an investigation uncovers evidence of a possible criminal violation by an employee, Sheriff's Office Captain, shall immediately notify the Sheriff, who shall decide whether or not the appropriate authorities should be notified, or the appropriate law enforcement and/or take such other disciplinary or administrative action necessary consistent with the provisions of this policy.

- If an investigator uncovers evidence of additional violations of policy, an additional Personnel Complaint need not be completed. The employee must be informed of the allegations and must be given an opportunity to respond to the potential new charges.

- Upon completion of the investigation, the Sheriff's Office Captain or designee shall prepare for the Sheriff, a summary report of the investigation setting forth the facts of the case for review, and to determine the level of disciplinary action to be imposed.

## Responsibility and Rights of the Employee under Investigation

- Employees under investigation for possible violations of the Rules of Personal Conduct, or Unsatisfactory Job Performance shall truthfully and fully answer all questions asked of them by the investigator concerning the incident being investigated.

- When a supervisor or investigator reasonably suspects that an employee has violated the Rules of Personal Conduct, or Unsatisfactory Job Performance, the supervisor or investigator may require the employee to submit to tests such as medical, ballistics, or chemical analysis or agree to participate in a lineup or be photographed. The employee may also be requested to furnish financial disclosure statements in connection with the case under investigation, after the approval of the Sheriff.

- When an employee is to be investigated for a non-criminal violation of the Rules of Personal Conduct, or Unsatisfactory Job Performance, the member

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 321 of 665

shall be notified that the investigation is to take place unless such notification would jeopardize the investigation.

- Any employee who is the subject of an internal investigation may be ordered by the assigned investigator to cooperate in the investigation and to appear before the investigator at a reasonable time and place to submit to questioning or other investigative procedures.

- Investigations conducted pursuant to this policy are for non-criminal violations or for violations that may be criminal but for which the purpose of the investigation is purely administrative in nature. Accordingly, the employee may be ordered to respond to questions which are narrowly and directly related to the matter under investigation. The employee shall not be permitted to have an attorney present during the questioning.

- County property under the control of the Vance County Sheriff's Office property may be searched at any time even if assigned to and used exclusively by an individual employee. An employee's personal property found on County-owned property or within a County owned vehicle may be searched at any time. All other personal property of an employee shall not be subjected to search and seizure except in accordance with law.

- An employee shall provide the investigator with any evidence and the names of witnesses who may have information about the matter under investigation.

Peter White
Sheriff
Vance County

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 322 of 665

# W Bullock – E.3 Workplace Harassment

# Unlawful Workplace Harassment

## I.    POLICY

To provide a safe and healthful working environment for all employees and to provide a means for preventing, reporting, investigating, and resolving issues relative to any kind of unlawful workplace harassment.

It is the policy of Vance County Sheriff's Office that no employee may engage in conduct that falls under the definition of unlawful harassment in the workplace. All employees are guaranteed the right to work in an environment free from unlawful harassment in the workplace and retaliation. The Sheriff's Office prohibits its personnel from harassing clients, supervisors, colleagues, community representatives, subordinates, or other persons or groups with whom they have contact as representatives of the organization. The Sheriff's Office will promptly and thoroughly investigate all complaints made by an employee and will take appropriate remedial or disciplinary action up to and including dismissal.

## II.    DEFINITIONS

**Unlawful Workplace Harassment** is unlawful or unsolicited speech or conduct based on race, sex, creed, religion, national origin, age, color, or handicapping condition as defined by N.C.G.S. 168A-3 that creates a hostile work environment or circumstances involving quid pro quo. Action, words, jokes, or comments based on an individual's sex, race, color, national origin, disability, religion, age or other status protected by state or federal law will not be tolerated.

**Handicapping Condition** as defined by N.C.G.S. 168A-3 is "any condition or characteristic that renders a person a handicapped person".

**Sexual Harassment** is defined as unsolicited and unwelcome verbal and/or physical conduct of a sexual nature or with sexual implications by a supervisor or co-worker which:

- has or may have direct employment consequences resulting from the acceptance or rejection of such conduct;

- creates an intimidating, hostile, or offensive working environment; or

- interferes with an individual's work performance.

Sexual harassment does not include personal compliments welcomed by the recipient or relationships freely entered into by employees or prospective employees.

**Hostile Work Environment** is one that a reasonable person would find hostile or abusive and one that the particular person who is the object of the harassment

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 324 of 665

perceives to be hostile or abusive. Hostile work environment is determined by looking at all of the circumstances, including the frequency of the allegedly harassing conduct, its severity, whether it is physically threatening or humiliating and whether it unreasonably interferes with an employee's work performance.

**Quid Pro Quo Harassment** consists of unwelcome sexual advances; requests for sexual favors, or other verbal or physical conduct when:

- submission to such conduct is made either explicitly a term or condition of an individual's employment, or

- submission to or rejection of such conduct by an individual is the basis for employment decisions affecting such individual.

**Retaliation** is adverse treatment that occurs because of opposition to unlawful workplace harassment.

III. **OPERATING PROCEDURE**

Any employee or former employee who alleges unlawful workplace harassment or retaliation in violation of this policy may file a complaint through this section of this policy.

- This procedure applies to full-time or part-time employees with either a permanent, probationary, trainee or temporary appointment.

- Any employee who alleges unlawful workplace harassment must submit a written complaint to their Supervisor, Director of Human Resources, or the Sheriff within thirty (30) calendar days of the alleged harassing action.

- All of the following shall require investigation:

  o **Formal Complaints:** Formal complaints made either orally or in written form by any employee of the organization. Note that it should be considered as a legitimate complaint should an employee report harassing behavior directed not at him or herself but at others in the workplace. The complainant need not be the object of the alleged harassing activity.

  o **Informal Complaints:** Informal complaints are typically characterized by an employee who orally requests advice from a supervisor. These complaints may take the form of "I need advice" or "I don't want to file a complaint". Notwithstanding the employee's stated wishes, the supervisor/manager must consider this informal complaint as a "complaint" for purposes of Sheriff's Office policy. In this situation, it is necessary to thoroughly explain to the employee that the comments must be considered a complaint so as to ensure the eradication of any inappropriate behaviors and protection of the organization and other employees from this conduct.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 325 of 665

- ○ **Direct Observations:** Supervisors on all levels who directly observe potentially harassing conduct must consider these observations equivalent to any other form of "complaint". The investigation process is indicated where a supervisor or department head feels observed conduct may indeed represent prohibited behaviors.

## IV. DISCIPLINARY ACTION

Disciplinary action taken against the harasser would typically range from a written warning, counseling, suspension from work, transfer to a different position, or termination of employment.

Peter White
Sheriff
Vance County

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 326 of 665

# W Bullock – F.3 Arrest Procedures

# Arrest Procedures

## I.  POLICY

This policy establishes guidelines and procedures for effecting arrest.

It shall be the policy of the Vance County Sheriff's Office to maintain procedures to be followed when effecting arrests, and shall apply to all Sheriff's Office employees with power of affect an arrest.

## II.  PROCEDURE

Authority for law enforcement officers to arrest without a warrant is provided in N.C.G.S. § 15A-401, "Arrest by Law Enforcement Officer".

- Deputies shall be aware that as a matter of Federal Constitutional, under Payton vs. New York, 445 U.S. 573 (1980), there is no longer any viable distinction between making a warrant-less felony arrest and a warrant-less misdemeanor arrest when that arrest involves entry into a person's home. A search warrant is required to enter a second party residence unless permission is granted, or during an emergency or exigent circumstance.

- A deputy may enter a suspect's premises to affect a lawful arrest in accordance with N.C.G.S. § 15A-401, when the deputy reasonably believes the person to be arrested is within the premises.

- A deputy may forcibly enter the premises, to affect a lawful arrest in accordance with N.C.G.S. § 15A-401, by announcing their authority, purpose, and making a demand for admission. The announcement and demand shall not be necessary if a deputy reasonably believes such announcement and demand might place the life of the deputy(s) in danger, or if the person to be arrested is attempting to destroy evidence or elude arrest.

- Before a deputy may arrest, it shall be established that probable cause exists. Probable cause can be established by a deputy's own observations, or through statements of witnesses or other law enforcement officers.

- Deputies shall check for local, DCI and NCIC warrants on all arrested persons transported to the detention facility.

**Execution of Arrest Warrants**

- Arrest warrants received for service can only be executed within the jurisdictional boundaries of Vance County by sworn employees.

- Each warrant must be confirmed prior to the actual arrest. Confirmation shall be as follows:

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 328 of 665

- o Verification of an outstanding arrest warrant through NCIC/DCI or through Vance Central.

  - o Possession of the actual arrest warrant.

- Priorities of outstanding arrest warrants shall be as follows:

  - o The service of warrants which may prevent the death or injury to the general public, witness or victims, shall have first priority over all other types of warrants.

  - o The service of warrants for the arrest of capital or life felons and grand jury indictments shall be the second priority.

  - o Felony warrants and all failure to appear warrants shall be the third priority.

  - o Misdemeanor warrants, or when someone makes an inquiry regarding the service of a criminal action, shall be the fourth priority.

- The Sheriff or his/her designee shall determine which section shall be responsible for the distribution, processing, record keeping, filing and updates of warrants.

- See the "Criminal Process" policy for additional information.

- Transportation of persons arrested in another jurisdiction on a warrant or order for arrest, or juvenile pick-up order from this jurisdiction shall be conducted as follows:

  - o Persons arrested under these circumstances shall be taken into custody from the local arresting agency and transported to the Vance County detention facility by the appropriate Sheriff's Office employee. This shall be done as soon as possible.

  - o The Sheriff's Office Prisoner Transport personnel shall be the primary transporting source. When a Prisoner Transport member is not available, patrol units shall take custody and transport.

  - o If a subject arrested pursuant to a Vance County warrant or juvenile pick-up order is injured during an arrest, the subject shall receive the appropriate medical screening/treatment prior to being transferred to the detention facility. Documentation of medical screening and/or treatment shall be provided to detention staff prior to transferring custody.

  - o If the person arrested pursuant to a warrant or juvenile pick-up order has a pre-existing injury that was not caused by the arresting agency, then any treatment of that injury will be the responsibility of the individual.

- Arrests on out of state wanted person

  - When NCIC or DCI shows an outstanding warrant, confirm that the warrant is active with the originating agency and that the agency will extradite the subject.

  - Upon confirmation of an active warrant and intent of extradition, complete an affidavit for a fugitive warrant on the subject.

  - A "locate" shall be placed on the person via DCI

  - The subject shall then be arrested and placed in the detention facility and held for the requesting agency.

- Canceling Warrant Information

  - The arresting deputy shall contact his/her supervisor to remove the arrestee from DCI/NCIC or ensure the information is removed from NCIC/DCI themselves.

  - The warrant copy and/or arrest sheet shall be forwarded to warrant control for processing.

  - Warrant control shall return the canceled warrant to the Clerk of Court.

**Stop and Frisk Law**

- Law enforcement officers can utilize verbal contact with selected pedestrians and motorists as an effective crime prevention and information gathering tactic. Since the stop and questioning of citizens is restrictive on their freedom, certain guidelines must be established to regulate these procedures. (Terry v. Ohio, 1963)

  - The "stop" is the temporary detention and questioning of a subject for purposes of crime investigation or detection.

  - A deputy must have reasonable suspicion that a subject is committing, has committed, or is about to commit a violation of criminal law.

  - The stop and frisk law does not restrict law enforcement officers from approaching any person to engage in a voluntary conversation.

  - Detention shall not be longer than reasonably necessary and must terminate, if inquiry into the suspicious circumstances fails to produce probable cause or results in a reasonable explanation for the questioned activity.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 330 of 665

- Subjects detained shall not be removed to another area without their consent or arrest.

- The "frisk" is intended for a deputy's protection. Upon stopping a subject, if circumstances develop that causes a deputy to believe a subject is armed with a dangerous weapon, then a pat down or frisk is appropriate. When a deputy conducting a pat down search discovers an object "which mass or contour makes its identity immediately apparent," the deputy is not required to ignore the contraband but is justified in seizing the object without a warrant. (Minnesota v. Dickerson,1991)

- Factors to consider when deciding to frisk shall include:

  - If the suspected crime involves the use of weapons,

  - Unusual bulges in clothing that could be indicative of a concealed weapons,

  - The attitude or actions of the subject,

  - The availability of assistance, and/or the number of subjects being detained.

- This law shall not allow indiscriminate searching of a subject. The "frisk" is a pat down for weapons for the protection of a deputy only.

- Should the pat down reveal illegal weapons, the subject may be arrested and a more extensive search shall be conducted.

- Any stop and frisk shall be documented either in an incident report or field interview report.

## Search and Arrest

- When a lawful arrest is made, the person being arrested and the area within the immediate presence of the person may be searched without a warrant to discover weapons and evidence for the purpose of protecting the deputy from attack, preventing the person from escaping, or discovering the fruits of the crime.

  - A restriction imposed by the Supreme Court in Chimel v. California, 395 U.S. 752 (1969), requires that a search warrant be obtained first, if an arrest of a subject is anticipated at a subject's home, office, or other premises, and a search of the entire premises is desired coincident with the arrest.

  - N.C.G.S. § 15A-401. Arrest by law enforcement provides that the law enforcement officer may use force to enter the premises or vehicle if he reasonably believes that admittance is being denied or unreasonably

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 331 of 665

delayed, or if he is authorized under subsection (e)(1)(c) to enter without giving notice of his authority and purpose.

- ○ N.C.G.S. § 15A-249 states the officer executing a search warrant must, before entering the premises, give appropriate notice of his identify and purpose to the person to be searched, or the person in apparent control of the premises to be searched. If it is unclear whether anyone is present at the premises to be searched, he/she must give the notice in a manner likely to be heard by anyone who is present.

- ○ N.C.G.S. § 15A-251 states an officer may break and enter any premises or vehicle when necessary to the execution of the warrant if:

  - ➢ The officer has previously announced his identity and purpose as required by N.C.G.S. § 15A-249 and reasonably believes either that admittance is being denied or unreasonably delayed or that the premises or vehicle is unoccupied; or

  - ➢ The officer has probable cause to believe that the giving of notice would endanger the life or safety of any person.

## If an Arrest is made in a House or Building, and No Search Warrant Exists

- A check shall be made of other rooms and closets of the premises for other wanted persons or accomplices, or to protect a deputy from possible attack.

- Items of evidence that are in plain view in the room where the arrest occurred, or in other rooms entered while looking for the subject or accomplices, may be seized.

- Other rooms, closets, or drawers shall not be searched for evidence. Neither is it permitted to conduct a search of files, suitcases, boxes and cabinets.

- If the subject is arrested outside the house or building, it is not permissible to take the subject into the building in order to search the inside of the premises.

- It is possible to obtain a valid consent to search the premises.

## Arrest Made From Within a Motor Vehicle; Vehicle Searches

- If a deputy arrests an occupant of a motor vehicle, that deputy may, as an incident to the arrest, search the entire passenger's compartment of the vehicle and any containers therein, whether open or closed, without the requirements of probable cause. However, no search may be made of the luggage compartment incident to the same arrest unless there is independent probable cause (New York v. Belton, 1981; State v. Massenburg, 1984).

Case 5:19-cv-00467-BO    Document 70-1    Filed 04/01/21    Page 332 of 665

- If there is independent probable cause that a vehicle contains fruits or instruments of a crime or contraband, the entire vehicle including any containers may be searched (U.S. v. Ross, 456 U.S. 798, 1982).

- The Carroll Doctrine states when you have probable cause to believe an item subject to seizure is anywhere in the vehicle and exigent circumstances exists, then you can search the car and all containers therein without a search warrant. You can even have the vehicle towed and still search it later without a search warrant. The only time you will need a search warrant for a car under these circumstances is when it is parked on the curtilege of a dwelling and you cannot secure consent to search (Carroll v. U.S., 1925; State v. Isleib, 1987).

- When a deputy impounds a vehicle incident to an arrest, an inventory search of the vehicle shall be conducted.


Peter White
Sheriff
Vance County

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 333 of 665

# W Bullock – F.13 Use of K-9s

## I.   POLICY

This policy establishes guidelines and procedures for supervision, operation, and utilization of Vance County Sheriff's Office Canines in accordance with Federal and State laws, to increase the effectiveness of the Sheriff's Office in the detection and apprehension of criminal offenders, the detection of hazardous devices, and the locating of missing persons or cadavers.

## II.   GENERAL

Trained Canines are a valuable law enforcement aid for use in evidence, hazardous device, drug detection, criminal prosecution, locating missing persons, and promoting favorable public relations. This directive addresses the procedures for the use of Canines, the request for service by members of the Vance County Sheriff's Office, other law enforcement agencies, and the use of controlled substance, explosive devices training aids.

All Canines will be secured on a lead at all times when outside of the Patrol vehicle unless the deployment process requires off-lead conditions (i.e. evidence/article search, area search).

## III.   APPLICATION

All personnel of the Vance County Sheriff's Office shall be subject to the provisions of this directive. Personnel are reminded that law enforcement canines are animals, and should not expect human responses to your actions. Canines used by this agency are not pets, and shall not be treated as such. Personnel not assigned and trained as a canine handler shall keep their distance, and do not attempt to pet any canine used for law enforcement purposes. Unless performed as part of a training exercise, teasing, agitating, or roughhousing with a Canine or the handler in the presence of the Canine is strictly prohibited.

Personnel not trained as a canine handler shall be prohibited to attempt or give any commands of any type to a law enforcement canine assigned to the Vance County Sheriff's Office.

Public displays (such as school demonstrations, civic clubs, etc.) to demonstrate the Canine's skills and abilities (including apprehension of another officer) may be conducted with the approval of the Supervisor in Charge or higher authority. All public displays or demonstrations will be conducted on-lead

The use of canines has proven to be a valuable asset to the law enforcement community. The Sheriff's Office maintains canine teams to support patrol and

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 335 of 665

detention operations, plus specialized units of this agency. Canine teams are also available to assist other agencies upon request.

It is the policy of the Sheriff's Office to use canines in a prescribed manner, as a supplemental and supportive tool, in order to effectively achieve the goals of the Sheriff's Office. It is the policy of the Sheriff's Office that canine teams be utilized for tracking, area searches, building searches, controlled substance searches, explosive detection, cadaver recovery, crowd control, seizing fleeing suspects, preventing escape and maintaining security, order and discipline in the detention center.

Canine handlers are reminded that a properly trained canine can constitute a use of force. In this, as in other cases, deputies may use that degree of force reasonably necessary to apprehend or secure a suspect, and all required "Use of Force" documentation may apply.

## IV.    RESPONSIBILITY

Canine handlers are sworn members, who have volunteered for this assignment. Deputies who handle canines are assigned regular duties and respond with their assigned canine on an "as needed" basis. Each handler shall answer to his/her immediate supervisor.

When canines are deployed for law enforcement operations, the on-site supervisor or his designee will assume command. The Sergeant in charge of the Special Enforcement Unit and Canines shall be responsible for the general use and deployment of all canine teams, and is responsible for the operational supervision of the dog handlers, training, and for authorizing specific uses and conditions under which the dogs operate.

Canine handlers are responsible for ensuring that his/her assigned canine is treated humanely, properly maintained, and is not used under circumstances which are unreasonably dangerous or unhealthy to the animal. The canine handler will be responsible for ensuring that their canine receives necessary veterinarian treatments as scheduled. He/she is also responsible for monitoring the performance of their canine for the purpose of determining the animal's overall well-being, as well as training needs.

When a canine handler is injured in the line of duty, or is out of work sick for an extended period of time, another trained canine handler may be contacted to take control and/or care for the canine in question until the injured or sick handler returns to full duty. The Supervisor in charge of canines or designee shall be responsible for ensuring that a handler with the appropriate training for the type of canine in question is contacted.

## V.    HANDLER REQUIREMENTS

The duties of handling a law enforcement canine are voluntary, and deputies who wish to volunteer must meet the following requirements to be considered. He/she must:

- Have completed their probationary period

- Be mature, patient, decisive, exhibit's self-control, good-natured, and have a professional personality.

- Reside in a home which provides a suitable environment, with ample space and yard to accommodate the canine and its kennel.

- Have a "Meets" or "Exceeds" expectations on the most recent performance appraisal.

- Not be under investigation, or have an active disciplinary action imposed against him/her.

- Be in good physical condition.

- Have a strong affection for canines.

## VI.    TRAINING

Canine teams shall receive a minimum of eight (8) hours training each month, or when deemed necessary by the supervisor in charge of canines. Training shall be conducted while on duty, in accordance with the schedule prepared by the supervisor in charge of canines.

The supervisor in charge of canines shall ensure that proper records are maintained, documenting training session, and shall prepare a monthly report of training activities. A copy of the monthly report shall be forwarded to the supervisor in charge of Training by the (5th) of each month.

It shall be the responsibility of the supervisor in charge of canines to ensure that all required canine certifications are maintained, with copies forwarded to the supervisor in charge of Training for filing.

**Training Aids**

- The maintenance of the Canine's detection proficiency requires controlled substance, and hazardous devices odors in training.  To protect the integrity of the Sheriff's Office and the Canine Handler, the use of controlled substances and hazardous devices odors for training must be carefully monitored, and stored.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 337 of 665

- Controlled substances used, as training aids will be obtained through the courts after final disposition of the cases. A court order must be prepared by the presiding judge of the case. The order will designate the controlled substance from the case to be used by the Vance County Sheriff's Office for canine training. All controlled substances will be obtained from cases in which the Sheriff's Office or a Federal Agency was the arresting entity. Prior to obtaining these training aids they must be tested and weighed by an approved laboratory.

- Hazardous devices odors used as training aids shall be obtained in strict compliance with Federal and State laws.

- The Canine Training Coordinator will be responsible for the custody of all controlled substances, and hazardous devices odors.

- The Canine Training Coordinator shall prepare and document the packaging of each controlled substance and hazardous device odors canine training aids. Canine training aid documents are maintained in the K-9 Trexx software, or other approved software, and will be used to record all information regarding the individual training aids.

- All controlled substance training aids will be secured in a separate storage locker within the appropriate Vance County Sheriff's Office, accessible only to the assigned Evidence Custodian or the alternate. The patrol vehicle trunk may be used for temporary storage (maximum of 24 hours unless an emergency prevents return to storage) during training periods.

- Canine Training Aid Annual Inventory form shall be completed documenting all controlled substances and hazardous devices odors on hand. This form must remain in the storage locker with the training aid for one (1) year from the date the inventory is conducted. When it is replaced with a new inventory, the original (expired) inventory shall be retained in the Canine Training Coordinators file for two (2) more years.

- The Canine Training Coordinator or his/her designees may have training aids in their possession only for training purposes and must obtain them from the Evidence Custodian from the locker in which they are stored. The Evidence Custodian Supervisor or the alternate will be responsible for signing out training aids and upon their release and return shall note the date, time, and item number on the appropriate form. The amounts shall be the same upon return as when checked out unless satisfactorily explained and documented. All training aids must be returned to the storage locker within 24 hours of removal unless emergency circumstances dictate otherwise. The Supervisor in charge of canines shall inspect all forms to assure proper retention and accounting of controlled substance training aids.

- The addition, loss, or destruction of any controlled substances, or hazardous device odors must be recorded and supported by proper documentation. Any unusual or substantial loss or any theft of a controlled substance or

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 338 of 665

hazardous device odors shall be immediately reported via the chain-of-command to the Canine Training Coordinator and the supervisor in charge of canines.

- Training aids should be replaced at yearly intervals (this is dependent on the availability of appropriated replacements). Training aids shall be destroyed by the Evidence Custodian Supervisor after conferring with the Canine Training Coordinator, and documented on the appropriate form. The original shall be maintained in the training aid storage locker for two (2) years, and then transferred to the Canine Training Coordinators file for two (2) years.

- Damaged controlled substance or hazardous devices training aids shall be recovered, destroyed and documented.

- At no time will any Canine Handler have in his/her possession any amount of controlled substances or hazardous device odor for the use of canine training unless authorized by the Canine Training Coordinator, or the supervisor in charge of canines.

## VII. CANINE TEAM RESPONSE

Canine teams shall not respond to a situation where the canine is utilized for a purpose for which the handler or animal are not properly trained. The following categories are valid law enforcement responses for which canine teams may be deployed:

- All felonies and serious misdemeanor crimes where the suspect has fled on foot, and a canine team is requested for tracking.

- All burglary or robbery alarms, open door/window calls, or intrusion alarm calls where the canine team will be the primary building search unit.

- Assisting in locating lost individuals, including infants, children or disoriented elderly persons.

- Searching an area for discarded evidence or contraband.

- Searching for narcotics.

- Explosives detection.

- Land and water cadaver searches.

- Crowd control.

- Assistance at Detention Center.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 339 of 665

- Any other call where, in the opinion of an on-duty supervisor, or the canine handler, a canine team would be an asset assisting another Vance County unit or other law enforcement agency, or serving as the primary unit. If the handler makes the decision to commit his/her canine, he/she must notify the on-duty supervisor.

## VIII. DUTIES OF RESPONDING DEPUTIES

Responding deputies shall comply with the following procedures:

- Maintain a perimeter at any area or building to be searched by a canine team. Deputies assigned to perimeter locations will be moved in accordance with the progress of the canine team's search, or tracking efforts.

- Avoid contaminating the search area prior to the completion of the canine's search.

- Avoid entering a search area or building prior to the canine team's arrival. The supervisor in-charge shall ensure all members are out of the area prior to the canine's search, and that the contaminated area has been described to the canine handler.

- When the canine team enters a building or search area, another deputy shall be assigned to accompany the canine team. This deputy's responsibility is to provide cover for the canine team.

## IX. CANINE UTILIZATION

Canine teams of the Vance County Sheriff's Office may be authorized to deploy their assigned canine for certain situation. The on-scene application of the canine is the responsibility of the canine handler.

Last minute mutual aid requests by jurisdictions outside Vance County shall be coordinated and approved through the on-duty supervisor.

Canine team vehicles shall not be used to transport prisoners. If a canine handler makes an arrest, he/she shall request a second unit for the purpose of transporting the prisoner.

Canines may be used in the Vance County Detention Center for the search of narcotics, contraband detection, and inmate control and cell extraction. This must be done in accordance with detention policy and approval from the on-duty detention supervisor in charge, or higher authority.

Use of Force by Canine

A trained Canine is a law enforcement tool and shall be used in conformance with the "Use of Force" Section IV, "Use of Less than Lethal Force".

All suspects shall be warned of the imminent use of a Canine in apprehension applications and should be afforded the opportunity to surrender if feasible. A canine may be released only if a lesser measures of force has failed and a order to surrender is given.

The requirement to warn a suspect three (3) times remains valid when the suspect's actions are normal and do not change, i.e. a person who continues to walk at a normal or accelerated pace in a direction that will not elude the canine team. The handler will announce: "Stop or I will release my dog".

If the handler is unable to announce the warning due to the speed in which the situation is developing, it will not preclude the use of the dog as long as all other requirements are met. If during the warning procedures the subject breaks and runs, the canine may be released to effect the apprehension, if the only other options would be for the subject to escape. A final verbal warning will be given to the suspect when the dog is released.

In housing areas, extreme caution must be used to avoid endangering innocent bystanders by reducing or minimizing the danger before releasing a canine.

If the suspect advances in a threatening manner towards the canine team, the canine will be released to protect the handler.

After the canine has been released to affect an apprehension, the handler will advance as rapidly as possible to regain control of the canine. This is to minimize injury to the suspect and to affect the apprehension. The handler must maintain sight of the canine at all times.

If a situation arises where the canine team is fired upon, the canine may either be released or restrained as the situation may dictate.

To check identification or affect an apprehension, the canine team shall advise individual(s)/suspect that the canine will attack with or without command upon any movement or display of hostility toward the canine team. The handler will have the individual(s)/suspect verbally acknowledge that the warning was understood.

Canines will not be released for apprehension of a suspect except under one or more of the circumstances listed below; and only then, when a verbal warning to "stop" has first been given, there are no bystanders situated in the direction of pursuit, and/or threat to bystanders are minimized. A lesser degree of force, in accordance with the "Use of Force" policy will first be considered before utilizing the canine.

- To apprehend a known, dangerous criminal.

- To apprehend a fleeing subject after proper challenge.

- To prevent the escape of a prisoner.

- To prevent injury or harm to the canine team.

- To prevent injury to other Law Enforcement personnel, members of the community, or personnel designated for protection.

- When directed by the lawful order of a superior authority.

- Assist with uprising in the jail, when approved by the Sheriff or designee.

The Canine shall not be used to prevent, deter, intimidate, or threaten any person or group of persons gathered for the purpose of exercising their constitutional rights in a **lawful** manner.

**Building and Other Premises Searches**

- One of the primary uses of canines, is to locate suspects hidden in buildings or related structures where search by deputies alone would create an unnecessary risk. These searches shall be governed by the following guidelines:

  o The use of canine teams for building searches is appropriate for those incidents where there is probable cause to believe that a felony suspect(s) or serious misdemeanor suspect(s), who poses a physical threat, may be concealed.

  o Probable cause may be formulated by a variety of means, such as an activated burglary alarm, witness testimony that a subject was observed entering a structure or conveyance, etc.

- During building searches, the perimeter of the building will be secured by law enforcement.

- Whenever possible, the owner or person in possession should be contacted to determine whether there may be tenants or others in the building and to ascertain the layout of the building.

- When using canines (Building Searches Only) trained for criminal apprehension, three (3) warnings will be given prior to entry.

- If a canine team is available to perform premises searches, and circumstances authorize such a search, the on scene / on-duty supervisor shall make every effort to utilize the canine team.

- When not a tactical disadvantage, the canine handler will keep outside units advised of his/her location when moving within the building.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 342 of 665

## X. TRACKING AND AREA SEARCHES

Because canines posses a superior sense of smell, this makes them suitable for tracking suspects who have fled from the scene of a crime and are actively engaged in efforts to elude capture. Canines are also available to search for other individuals such as lost children or adults.

The use of canine teams for detecting and locating is limited to the following situations:

- Fleeing suspects

- Arrestees

- Convicted persons

- Missing or lost individuals, and

- Cadaver recovery

When necessary, the canine team should be called to the scene or area to be searched as quickly as possible while the scent is still fresh. Upon waiting for the canine team's arrival on the scene or area to be searched, deputies and other persons should:

- Turn vehicle engines off

- Wait for the arrival of the canine team prior to beginning the search

- Avoid items that were or may have been touched by the suspect(s)

- Establish a path in and out of the area to be searched; and

- Control entry into the search area

Deputies or other law enforcement officers shall secure the perimeter while the canine team proceeds with locating a fresh trail for tracking. Only support personnel deemed necessary by the canine handler will enter the search area with the canine.

Contaminated areas should be pointed out to the canine handler prior to the trail attempt.

When not a tactical disadvantage, the canine handler will keep the perimeter units updated with the location and direction of the trail being tracked.

## XI. NARCOTICS DETECTION CANINE

Narcotics detection canines are specially trained to locate and detect illegal narcotics and other controlled substances. The detector dog may be utilized in all aspects of narcotics interdiction to search buildings, premises, mail, freight, vehicles, vessels, trains, aircraft, etc. Because a drug detection alert is an aggressive alert; narcotics detection dogs shall **not** be used on a person or objects while on their body.

Prior to the canine conducting the search, all persons must be removed from the area to be searched.

All plain view drugs must be secured prior to the dog search.

## XII. EXPLOSIVE DETECTION CANINE

Explosive detection canines are specially trained to locate and detect explosives and incendiary devices. The explosive detection canine may be utilized to search buildings, premises, mail, freight, vehicles, vessels, trains, aircraft, etc., for the purpose of locating explosive and incendiary devices and for tracking.

An explosive or incendiary device alert is a passive alert. Prior to the canine conducting the search, all persons must be removed from the area to be searched. If the dog alerts, the search will be stopped and the device removed or rendered safe by a Hazardous Device Unit technician before continuing the search.

## XIII. CROWD CONTROL

The use of canines for the purpose of crowd control shall be in strict compliance with the following:

- Canines shall not be deployed at the scene of any lawful demonstration, picketing, or congregation.

- Canines may be used for crowd control if criminal rioting is occurring or imminent.

- Canines may be deployed as a back-up unit for public disturbance calls to protect law enforcement whose safety is jeopardized.

- Canines used in crowd control must be short leashed at all times unless the canine is used as force to prevent an imminent threat of death or serious bodily injury.

## XVI. PROHIBITED USES

Canines shall not be used in areas and situations deemed by the handler to be unsafe.

Canines shall not be used in an area or on any premises to which law enforcement does not have lawful access.

Canines shall not be used to search people or objects on their person.

Handlers shall not use their assigned Canine for intentional breeding purposes.

Handlers shall not enter their assigned Canine in **any** canine show or trial, without written permission from the Sheriff's Office Captain, or higher authority.

Canines will not be retired or, except in case of emergency, destroyed without court order or written authorization from the Sheriff. In cases other than by court order the destruction of the dog will require a complete report and in cases of euthanasia, justification from a veterinarian is required.


Peter White
Sheriff
Vance County

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 345 of 665

# Civil Process

## I.  POLICY

This policy establishes guidelines and procedures for the execution of civil processes in support of the judicial function, according to current laws.

## II.  DEFINITION

**Civil Process:** A document issued by a court in support of the civil court system. The document encompasses any part of civil procedure, originating, supplemental, intermediate or final; and may include summons, subpoenas, writs, civil orders for arrest, domestic violence orders, involuntary commitment orders, notices, temporary restraining orders or the like.

In accordance with N.C.G.S. § 8-59, Issuance and Service of Subpoena shall be in compliance with state law and Rule 45 of the Rules of Civil Procedure for Civil Actions.

## III.  SERVICE PROCESS

The service of civil processes shall be performed by the Sheriff in accordance with N.C.G.S. § 162-13 thru16.

Although most processes are served by the Civil Division or the Special Enforcement Unit, all sworn personnel are subject to being assigned to serve civil processes. Deputies assigned to the service of civil processes may primarily work shifts which are conducive to locating persons during normal working hours. If other arrangements are necessary to serve a particular paper, it may become incumbent on a deputy, detective, vice officer or other sworn member to assist with service. When this occurs, the assigned deputy shall accept the responsibility to make every reasonable effort to serve the process within the limits of the law and Sheriff's Office policy.

Under most conditions, deputies may only take action which is civil in nature by means of some court writ or order. Therefore, as a standard, when a civil process is being executed, the proper paperwork must be validly issued and received.

Deputies shall not take action in a civil procedure if, assisting a person who is repossessing a vehicle and this agency has no civil paper from the Court directing the Sheriff's Office to repossess the vehicle. In this case, the Sheriff's office would follow through with the repossession as spelled out in N.C.G.S. 1-308 through 313, Writs of Possession.

Listed below are references for deputies to use when handling or attempting to serve civil processes. Although this is not an all inclusive list, it is a list of the

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 346 of 665

W Bullock – F.5 Report of Separation



Eff. Jan 2018

**NORTH CAROLINA DEPARTMENT OF JUSTICE**
**SHERIFFS' STANDARDS DIVISION**

POST OFFICE BOX 629
RALEIGH, NC 27602 - 0629
TELEPHONE: 919-779-8213 FAX  919-662-4515

JOSH STEIN
ATTORNEY GENERAL

DIANE KONOPKA
DIRECTOR

## REPORT OF SEPARATION
### FORM F-5

[✓] **DEPUTY SHERIFF**          [ ] **DETENTION OFFICER**

**INSTRUCTIONS:** Please type or print all information clearly. This form shall be completed upon separation from one or both certified positions. This form must be submitted to the Commission **NO LATER THAN 10 DAYS AFTER FINAL SEPARATION.** A copy of this form must be retained in the appointing Agency's Personnel file.

SEPARATING AGENCY VANCE COUNTY SHERIFF'S OFFICE  PHONE NUMBER (252) 738-2200

ADDRESS 156 CHURCH STREET, SUITE 004, HENDERSON, NC   ZIP CODE 27536

OFFICER'S NAME JUSTIN                JAMEL                   WHITE
              (First)               (Middle)                (Last)

CURRENT HOME ADDRESS 130 CHAPPELL LANE, KITTRELL, NC  27544

DATE OF BIRTH 08/15/1989                    SOCIAL SECURITY NUMBER 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

DATE OF EMPLOYMENT: DEPUTY 06/05/2017              DETENTION OFFICER

POSITION/RANK DEPUTY SHERIFF                   [✓] Full-Time        [ ] Part-time

DATE OF SEPARATION 10/24/2018

[ ] Death

Was this separation a result of a criminal investigation or violation of Commission rules?
[ ] YES  [✓] NO

Are you aware of any on-going or substantiated internal investigation regarding this officer within the last 18 months?
[✓] YES  [ ] NO

I, as an official representative of this agency, do advise that the above-named officer has been separated from this agency on the date indicated herein. In addition, pursuant to the requirements of 12 NCAC 10B .0405(c), the officer has been notified of this separation as evidenced by his/her signature below or the attached letter. **IF** this officer was **ACTIVE** between January and July, and did not complete the mandated In-Service Training, he/she must do so before becoming Active again. In addition, the obligation to notify the Sheriffs' Standards Division of criminal charges, domestic violence orders and civil no contact orders continues for one year from the date of separation.

_____          Sheriff          10-25-18
Signature of Sheriff or Registered Authorized Representative    Title          Date

"Signature On file"
Signature of Officer                                        Date

**Officer has the right to submit a written statement of additional information to the Sheriffs' Standards Division concerning his/her separation.

Case 5:19-cv-00467-BO  Document 70-1  Filed 04/01/21  Page 348 of 665

# W Bullock – J White Background Check Letters



# Office of the Sheriff
## Vance County

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone 252-738-2200
Fax 252-738-2220

**Sheriff Peter White**

June 7, 2017

Tonya C. Leggett
Clerk of Superior Court
Martin County, NC

RE: Justin Jamel White, BM, DOB 08/05/1989, NCOL# 30643245, SS# 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

The Vance County Sheriff's Office is conducting a background on the referenced individual for employment purposes as a full- time Sworn Law Enforcement Officer. Please conduct a criminal background records check on behalf of the Vance County Sheriff's Office and mail the results to: Vance County Sheriff's Office c/o Capt. W.W. Bullock 156 Church Ste. Ste. 004 Henderson, NC 27536.

If you have any questions please call me at 252-738-2200. Thank you in advance.

Capt. W. W. Bullock
Administrative Director
wbullock@vancecounty.org

TYPE OR PRINT IN BLACK INK.

# STATE OF NORTH CAROLINA

_____MARTIN_____ County

In The General Court Of Justice
Before The Clerk

### IN THE MATTER OF:
_Name(s) By Which Individual To Be Searched May Be Known_

JUSTIN JAMEL WHITE, BM, DOB 8/5/1989
NCOL# 30643245, SS# 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

## CRIMINAL RECORD SEARCH

G.S. 7A-109, -308(a)(17), -343(3)

☐ For DMV Hearing

## REQUEST FOR CERTIFIED CRIMINAL RECORD SEARCH

I request that the Clerk of Superior Court conduct a search of the official records of the criminal cases in the courts of the county named above and certify the results of that search for the name(s) listed above. In making this request I understand and acknowledge that

1. **THE CLERK WILL SEARCH THE COURT RECORDS FOR ONLY THE COUNTY NAMED ABOVE. THIS IS NOT A STATEWIDE RECORD SEARCH.**

2. Court records are indexed by name only and not by any other identifying characteristics.

3. The name(s) listed above are all the names by which, to my knowledge, the individual for whom I am requesting this search may be known.

4. The Clerk will search for records under all those names, but only for records under those names.

5. The fact that no criminal record is found under any of those names does not mean that the individual does not have a record in this county; the individual may have a record under another name.

6. The fact that a criminal record is found under one or more of those names does not mean that the record is a record for the individual for whom I am requesting this search; the record may be that of another individual with the same or a similar name.

7. I am solely responsible for any interpretation and use I make of the results of this search and I understand the Clerk is not responsible for my interpretation or use of the results.

_Name And Address Of Requestor (Including City, State And Zip Code)_

VANCE COUNTY SHERIFF'S OFFICE

C/O CAPT W.W. BULLOCK

156 CHURCH ST STE 004

HENDERSON          NC     27536

_Signature Of Requestor_

Capt. W.W. Bullock

## CERTIFICATION

This is to certify that I have searched the indices to criminal actions in this office from _____ to the present and

☐ I have found that no record was indexed by the name(s) given above.

☐ I have found the following excerpt(s) from the public records indexed by the name(s) given above as appears in the attached _____ page(s).

☐ This search is limited as follows: _____

Some automated system information code definitions are included on the back of this form to help you understand the record(s) that may be attached to this form.

_Not Valid Without The
Clerk Of Superior Court's Raised Seal
On Each Page_

_Date Of Search_

_Signature_

☐ Deputy CSC     ☐ Assistant CSC     ☐ Clerk Of Superior Court

**NOTE:** _"Any person who without lawful authority intentionally ... alters or changes any ... official case record is guilty of a Class H felony." G.S. 14-221.2._

(Over)

AOC-CR-314, Rev. 3/07
© 2007 Administrative Office of the Courts



# Office of the Sheriff
## Vance County

### Sheriff Peter White

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone 252-738-2200
Fax 252-738-2220

May 11, 2017

Tracy A. Uhrin
Clerk of Superior Court
Merrimack County, NH

RE: Justin Jamel White, BM, DOB 08/05/1989, NCOL# 30643245, SS# 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

The Vance County Sheriff's Office is conducting a background on the referenced individual for employment purposes as a full- time Sworn Law Enforcement Officer. Please conduct a criminal background records check on behalf of the Vance County Sheriff's Office and mail the results to: Vance County Sheriff's Office c/o Capt. W.W. Bullock 156 Church Ste. Ste. 004 Henderson, NC 27536.

If you have any questions please call me at 252-738-2207. Thank you in advance.

*Capt. W.W. Bullock*

Capt. W. W. Bullock
Administrative Director
wbullock@vancecounty.org

# Office of the Sheriff
## Vance County



**Sheriff Peter White**

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone  252-738-2200
Fax 252-738-2220

May 11, 2017

W. Michael Scanion, Esq
Clerk of Superior Court North
Hillsborough County, NH

RE: Justin Jamel White, BM, DOB 08/05/1989, NCOL# 30643245, SS# 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

The Vance County Sheriff's Office is conducting a background on the referenced individual for employment purposes as a full- time Sworn Law Enforcement Officer. Please conduct a criminal background records check on behalf of the Vance County Sheriff's Office and mail the results to: Vance County Sheriff's Office c/o Capt. W.W. Bullock 156 Church Ste. Ste. 004 Henderson, NC 27536.

If you have any questions please call me at 252-738-2207.  Thank you in advance.

Capt. W.W. Bullock

Capt. W. W. Bullock
Administrative Director
wbullock@vancecounty.org



# Office of the Sheriff
## Vance County

**Sheriff Peter White**

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone   252-738-2200
Fax 252-738-2220

May 11, 2017

Marshall Buttrick
Clerk of Superior Court South
Hillsborough County, NH

RE: Justin Jamel White, BM, DOB 08/05/1989, NCOL# 30643245, SS# 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

The Vance County Sheriff's Office is conducting a background on the referenced individual for employment purposes as a full- time Sworn Law Enforcement Officer. Please conduct a criminal background records check on behalf of the Vance County Sheriff's Office and mail the results to: Vance County Sheriff's Office c/o Capt. W.W. Bullock 156 Church Ste. Ste. 004 Henderson, NC 27536.

If you have any questions please call me at 252-738-2207.  Thank you in advance.

*Capt. W. W. Bullock*

Capt. W. W. Bullock
Administrative Director
wbullock@vancecounty.org



# Office of the Sheriff
## Vance County

### Sheriff Peter White

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone 252-738-2200
Fax 252-738-2220

May 11, 2017

Pamela B. Minshew
Clerk of Superior Court
Wayne County, NC

RE: Justin Jamel White, BM, DOB 08/05/1989, NCOL# 30643245, SS# 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

The Vance County Sheriff's Office is conducting a background on the referenced individual for employment purposes as a full- time Sworn Law Enforcement Officer. Please conduct a criminal background records check on behalf of the Vance County Sheriff's Office and mail the results to: Vance County Sheriff's Office c/o Capt. W.W. Bullock 156 Church Ste. Ste. 004 Henderson, NC 27536.

If you have any questions please call me at 252-738-2200. Thank you in advance.

*Capt. W. W. Bulloch*
Capt. W. W. Bullock
Administrative Director
wbullock@vancecounty.org

TYPE OR PRINT IN BLACK INK.

# STATE OF NORTH CAROLINA

WAYNE _____ County

In The General Court Of Justice
Before The Clerk

| IN THE MATTER OF: | CRIMINAL RECORD SEARCH |
|---|---|

*Name(s) By Which Individual To Be Searched May Be Known*

JUSTIN JAMEL WHITE, BM, DOB 8/5/1989
NCOL# 30643245, SS# 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

G.S. 7A-109, -308(a)(17), -343(3)

☐ For DMV Hearing

## REQUEST FOR CERTIFIED CRIMINAL RECORD SEARCH

I request that the Clerk of Superior Court conduct a search of the official records of the criminal cases in the courts of the county named above and certify the results of that search for the name(s) listed above. In making this request I understand and acknowledge that:

1. **THE CLERK WILL SEARCH THE COURT RECORDS FOR ONLY THE COUNTY NAMED ABOVE. THIS IS NOT A STATEWIDE RECORD SEARCH.**

2. Court records are indexed by name only and not by any other identifying characteristics.

3. The name(s) listed above are all the names by which, to my knowledge, the individual for whom I am requesting this search may be known.

4. The Clerk will search for records under all those names, but only for records under those names.

5. *The fact that no criminal record is found under any of those names does not mean that the individual does not have a record in this county; the individual may have a record under another name.*

6. The fact that a criminal record is found under one or more of those names does not mean that the record is a record for the individual for whom I am requesting this search; the record may be that of another individual with the same or a similar name.

7. I am solely responsible for any interpretation and use I make of the results of this search and I understand the Clerk is not responsible for my interpretation or use of the results.

| Name And Address Of Requestor (Including City, State And Zip Code) | Signature Of Requestor |
|---|---|
| CAPT W.W. BULLOCK<br>C/O VANCE COUNTY SHERIFF'S OFFICE<br>156 CHURCH ST STE 004<br>HENDERSON          NC     27536 | *Capt. W.W. Bullock* |

## CERTIFICATION

This is to certify that I have searched the indices to criminal actions in this office from _____ to the present and

☐ I have found that no record was indexed by the name(s) given above.

☐ I have found the following excerpt(s) from the public records indexed by the name(s) given above as appears in the attached _____ page(s).

☐ This search is limited as follows: _____

Some automated system information code definitions are included on the back of this form to help you understand the record(s) that may be attached to this form.

| *Not Valid Without The Clerk Of Superior Court's Raised Seal On Each Page* | Date Of Search |
|---|---|
| | Signature |
| | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court |

**NOTE:** *"Any person who without lawful authority intentionally ... alters or changes any ... official case record is guilty of a Class H felony."* G.S. 14-221.2.

(Over)

AOC-CR-314, Rev. 3/07
© 2007 Administrative Office of the Courts



# Office of the Sheriff

**Vance County**

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone 252-738-2200
Fax 252-738-2220

**Sheriff Peter White**

May 11, 2017

Patricia B. Chastain
Clerk of Superior Court
Franklin County, NC

RE: Justin Jamel White, BM, DOB 08/05/1989, NCOL# 30643245, SS# 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

The Vance County Sheriff's Office is conducting a background on the referenced individual for employment purposes as a full- time Sworn Law Enforcement Officer. Please conduct a criminal background records check on behalf of the Vance County Sheriff's Office and mail the results to: Vance County Sheriff's Office c/o Capt. W.W. Bullock 156 Church Ste. Ste. 004 Henderson, NC 27536.

If you have any questions please call me at 252-738-2200. Thank you in advance.

*Capt. W.W. Bullock*

Capt. W. W. Bullock
Administrative Director
wbullock@vancecounty.org

TYPE OR PRINT IN BLACK INK.

# STATE OF NORTH CAROLINA

_____FRANKLIN_____ County

In The General Court Of Justice
Before The Clerk

| IN THE MATTER OF: |
|---|
| *Name(s) By Which Individual To Be Searched May Be Known* |
| JUSTIN JAMEL WHITE, BM, DOB 8/5/1989 |
| NCOL# 30643245, SS# 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 |

**CRIMINAL RECORD SEARCH**

G.S. 7A-109, -308(a)(17), -343(3)

☐ For DMV Hearing

## REQUEST FOR CERTIFIED CRIMINAL RECORD SEARCH

I request that the Clerk of Superior Court conduct a search of the official records of the criminal cases in the courts of the county named above and certify the results of that search for the name(s) listed above. In making this request I understand and acknowledge that:

1. **THE CLERK WILL SEARCH THE COURT RECORDS FOR ONLY THE COUNTY NAMED ABOVE. THIS IS NOT A STATEWIDE RECORD SEARCH.**

2. Court records are indexed by name only and not by any other identifying characteristics.

3. The name(s) listed above are all the names by which, to my knowledge, the individual for whom I am requesting this search may be known.

4. The Clerk will search for records under all those names, but only for records under those names.

5. The fact that no criminal record is found under any of those names does not mean that the individual does not have a record in this county; the individual may have a record under another name.

6. The fact that a criminal record is found under one or more of those names does not mean that the record is a record for the individual for whom I am requesting this search; the record may be that of another individual with the same or a similar name.

7. I am solely responsible for any interpretation and use I make of the results of this search and I understand the Clerk is not responsible for my interpretation or use of the results.

| *Name And Address Of Requestor (Including City, State And Zip Code)* | *Signature Of Requestor* |
|---|---|
| CAPT W.W. BULLOCK | *Capt. W.W. Bullock* |
| C/O VANCE COUNTY SHERIFF'S OFFICE | |
| 156 CHURCH ST STE 004 | |
| HENDERSON      NC   27536 | |

## CERTIFICATION

This is to certify that I have searched the indices to criminal actions in this office from _____ to the present and

☐ I have found that no record was indexed by the name(s) given above.

☐ I have found the following excerpt(s) from the public records indexed by the name(s) given above as appears in the attached _____ page(s).

☐ This search is limited as follows: _____

Some automated system information code definitions are included on the back of this form to help you understand the record(s) that may be attached to this form.

| *Not Valid Without The*<br>*Clerk Of Superior Court's Raised Seal*<br>*On Each Page* | *Date Of Search* |
|---|---|
| | *Signature* |
| | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court |

**NOTE:** *"Any person who without lawful authority intentionally ... alters or changes any ... official case record is guilty of a Class H felony." G.S. 14-221.2.*

(Over)

AOC-CR-314, Rev. 3/07
© 2007 Administrative Office of the Courts

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 358 of 665



# Office of the Sheriff

## Vance County

**Sheriff Peter White**

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone 252-738-2200
Fax 252-738-2220

May 11, 2017

Jennifer J. Knox
Clerk of Superior Court
Wake County, NC

RE: Justin Jamel White, BM, DOB 08/05/1989, NCOL# 30643245, SS# 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

The Vance County Sheriff's Office is conducting a background on the referenced individual for employment purposes as a full- time Sworn Law Enforcement Officer. Please conduct a criminal background records check on behalf of the Vance County Sheriff's Office and mail the results to: Vance County Sheriff's Office c/o Capt. W.W. Bullock 156 Church Ste. Ste. 004 Henderson, NC 27536.

If you have any questions please call me at 252-738-2200. Thank you in advance.

*Capt. W. W. Bullock*

Capt. W. W. Bullock
Administrative Director
wbullock@vancecounty.org

TYPE OR PRINT IN BLACK INK.

# STATE OF NORTH CAROLINA

WAKE County

In The General Court Of Justice
Before The Clerk

| IN THE MATTER OF: | CRIMINAL RECORD SEARCH |
|---|---|
| *Name(s) By Which Individual To Be Searched May Be Known*  JUSTIN JAMEL WHITE, BM, DOB 8/5/1989  NCOL# 30643245, SS# 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 | G.S. 7A-109, -308(a)(17), -343(3) |
| | ☐ For DMV Hearing |

## REQUEST FOR CERTIFIED CRIMINAL RECORD SEARCH

I request that the Clerk of Superior Court conduct a search of the official records of the criminal cases in the courts of the county named above and certify the results of that search for the name(s) listed above. In making this request I understand and acknowledge that:

1. **THE CLERK WILL SEARCH THE COURT RECORDS FOR ONLY THE COUNTY NAMED ABOVE. THIS IS NOT A STATEWIDE RECORD SEARCH.**

2. Court records are indexed by name only and not by any other identifying characteristics.

3. The name(s) listed above are all the names by which, to my knowledge, the individual for whom I am requesting this search may be known.

4. The Clerk will search for records under all those names, but only for records under those names.

5. The fact that no criminal record is found under any of those names does not mean that the individual does not have a record in this county; the individual may have a record under another name.

6. The fact that a criminal record is found under one or more of those names does not mean that the record is a record for the individual for whom I am requesting this search; the record may be that of another individual with the same or a similar name.

7. I am solely responsible for any interpretation and use I make of the results of this search and I understand the Clerk is not responsible for my interpretation or use of the results.

| Name And Address Of Requestor (Including City, State And Zip Code)  CAPT W.W. BULLOCK  C/O VANCE COUNTY SHERIFF'S OFFICE  156 CHURCH ST STE 004  HENDERSON          NC      27536 | Signature Of Requestor  *Cpt. W.W. Bullock* |
|---|---|

## CERTIFICATION

This is to certify that I have searched the indices to criminal actions in this office from _____ to the present and

☐ I have found that no record was indexed by the name(s) given above.

☐ I have found the following excerpt(s) from the public records indexed by the name(s) given above as appears in the attached _____ page(s).

☐ This search is limited as follows: _____

Some automated system information code definitions are included on the back of this form to help you understand the record(s) that may be attached to this form.

| | Date Of Search |
|---|---|
| *Not Valid Without The  Clerk Of Superior Court's Raised Seal  On Each Page* | Signature  ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court |

**NOTE:** *"Any person who without lawful authority intentionally ... alters or changes any ... official case record is guilty of a Class H felony." G.S. 14-221.2.*

(Over)

AOC-CR-314, Rev. 3/07
© 2007 Administrative Office of the Courts



# Office of the Sheriff
## Vance County

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone   252-738-2200
Fax 252-738-2220

**Sheriff Peter White**

May 11, 2017

Vasti F. James
Clerk of Superior Court
Bertie County, NC

RE: Justin Jamel White, BM, DOB 08/05/1989, NCOL# 30643245, SS# 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

The Vance County Sheriff's Office is conducting a background on the referenced individual for employment purposes as a full- time Sworn Law Enforcement Officer. Please conduct a criminal background records check on behalf of the Vance County Sheriff's Office and mail the results to: Vance County Sheriff's Office c/o Capt. W.W. Bullock 156 Church Ste. Ste. 004 Henderson, NC 27536.

If you have any questions please call me at 252-738-2200.  Thank you in advance.

*Capt. W.W. Bullock*
Capt. W. W. Bullock
Administrative Director
wbullock@vancecounty.org

TYPE OR PRINT IN BLACK INK.

# STATE OF NORTH CAROLINA

_____BERTIE_____ County

In The General Court Of Justice
Before The Clerk

| IN THE MATTER OF: | CRIMINAL RECORD SEARCH |
|---|---|

*Name(s) By Which Individual To Be Searched May Be Known*

JUSTIN JAMEL WHITE, BM, DOB 8/5/1989
NCOL# 30643245, SS# 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

G.S. 7A-109, -308(a)(17), -343(3)

☐ For DMV Hearing

## REQUEST FOR CERTIFIED CRIMINAL RECORD SEARCH

I request that the Clerk of Superior Court conduct a search of the official records of the criminal cases in the courts of the county named above and certify the results of that search for the name(s) listed above. In making this request I understand and acknowledge that:

1. **THE CLERK WILL SEARCH THE COURT RECORDS FOR ONLY THE COUNTY NAMED ABOVE. THIS IS NOT A STATEWIDE RECORD SEARCH.**

2. Court records are indexed by name only and not by any other identifying characteristics.

3. The name(s) listed above are all the names by which, to my knowledge, the individual for whom I am requesting this search may be known.

4. The Clerk will search for records under all those names, but only for records under those names.

5. The fact that no criminal record is found under any of those names does not mean that the individual does not have a record in this county; the individual may have a record under another name.

6. The fact that a criminal record is found under one or more of those names does not mean that the record is a record for the individual for whom I am requesting this search; the record may be that of another individual with the same or a similar name.

7. I am solely responsible for any interpretation and use I make of the results of this search and I understand the Clerk is not responsible for my interpretation or use of the results.

| *Name And Address Of Requestor (Including City, State And Zip Code)* | *Signature Of Requestor* |
|---|---|
| CAPT W.W. BULLOCK | Capt. W.W. Bullock |
| C/O VANCE COUNTY SHERIFF'S OFFICE | |
| 156 CHURCH ST STE 004 | |
| HENDERSON          NC     27536 | |

## CERTIFICATION

This is to certify that I have searched the indices to criminal actions in this office from _____
to the present and

☐ I have found that no record was indexed by the name(s) given above.

☐ I have found the following excerpt(s) from the public records indexed by the name(s) given above as appears in the attached _____ page(s).

☐ This search is limited as follows: _____

Some automated system information code definitions are included on the back of this form to help you understand the record(s) that may be attached to this form.

| *Not Valid Without The Clerk Of Superior Court's Raised Seal On Each Page* | *Date Of Search* |
|---|---|
| | *Signature* |
| | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court |

**NOTE:** *"Any person who without lawful authority intentionally ... alters or changes any ... official case record is guilty of a Class H felony." G.S. 14-221.2.*

(Over)

AOC-CR-314, Rev. 3/07
© 2007 Administrative Office of the Courts



# Office of the Sheriff
## Vance County

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone  252-738-2200
Fax 252-738-2220

**Sheriff Peter White**

May 11, 2017

Michael J. McArthur
Clerk of Superior Court
Chowan County, NC

RE: Justin Jamel White, BM, DOB 08/05/1989, NCOL# 30643245, SS# 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

The Vance County Sheriff's Office is conducting a background on the referenced individual for employment purposes as a full- time Sworn Law Enforcement Officer. Please conduct a criminal background records check on behalf of the Vance County Sheriff's Office and mail the results to: Vance County Sheriff's Office c/o Capt. W.W. Bullock 156 Church Ste. Ste. 004 Henderson, NC 27536.

If you have any questions please call me at 252-738-2207.  Thank you in advance.

*Capt. W. W. Bullock*
Capt. W. W. Bullock
Administrative Director
wbullock@vancecounty.org

TYPE OR PRINT IN BLACK INK.

# STATE OF NORTH CAROLINA

__CHOWAN__ County

In The General Court Of Justice
Before The Clerk

### IN THE MATTER OF:

*Name(s) By Which Individual To Be Searched May Be Known*

JUSTIN JAMEL WHITE, BM, DOB 8/5/1989
NCOL# 30643245, SS# 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

## CRIMINAL RECORD SEARCH

G.S. 7A-109, -308(a)(17), -343(3)

☐ For DMV Hearing

### REQUEST FOR CERTIFIED CRIMINAL RECORD SEARCH

I request that the Clerk of Superior Court conduct a search of the official records of the criminal cases in the courts of the county named above and certify the results of that search for the name(s) listed above. In making this request I understand and acknowledge that:

1. **THE CLERK WILL SEARCH THE COURT RECORDS FOR ONLY THE COUNTY NAMED ABOVE. THIS IS NOT A STATEWIDE RECORD SEARCH.**

2. Court records are indexed by name only and not by any other identifying characteristics.

3. The name(s) listed above are all the names by which, to my knowledge, the individual for whom I am requesting this search may be known.

4. The Clerk will search for records under all those names, but only for records under those names.

5. The fact that no criminal record is found under any of those names does not mean that the individual does not have a record in this county; the individual may have a record under another name.

6. The fact that a criminal record is found under one or more of those names does not mean that the record is a record for the individual for whom I am requesting this search; the record may be that of another individual with the same or a similar name.

7. I am solely responsible for any interpretation and use I make of the results of this search and I understand the Clerk is not responsible for my interpretation or use of the results.

*Name And Address Of Requestor (Including City, State And Zip Code)*

CAPT W.W. BULLOCK

C.O VANCE COUNTY SHERIFF'S OFFICE

156 CHURCH ST STE 004

HENDERSON          NC     27536

*Signature Of Requestor*

Capt. W.W. Bulloch

### CERTIFICATION

This is to certify that I have searched the indices to criminal actions in this office from _____
to the present and

☐ I have found that no record was indexed by the name(s) given above.

☐ I have found the following excerpt(s) from the public records indexed by the name(s) given above as appears in the attached _____ page(s).

☐ This search is limited as follows: _____

Some automated system information code definitions are included on the back of this form to help you understand the record(s) that may be attached to this form.

*Not Valid Without The
Clerk Of Superior Court's Raised Seal
On Each Page*

Date Of Search

Signature

☐ Deputy CSC     ☐ Assistant CSC     ☐ Clerk Of Superior Court

**NOTE:** *"Any person who without lawful authority intentionally ... alters or changes any ... official case record is guilty of a Class H felony." G.S. 14-221.2.*

(Over)

AOC-CR-314, Rev. 3/07
© 2007 Administrative Office of the Courts



# Office of the Sheriff
## Vance County

### Sheriff Peter White

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone 252-738-2200
Fax 252-738-2220

May 11, 2017

Katherine S. Cartwright
Clerk of Superior Court
Pasquotank County, NC

RE: Justin Jamel White, BM, DOB 08/05/1989, NCOL# 30643245, SS# 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

The Vance County Sheriff's Office is conducting a background on the referenced individual for employment purposes as a full- time Sworn Law Enforcement Officer. Please conduct a criminal background records check on behalf of the Vance County Sheriff's Office and mail the results to: Vance County Sheriff's Office c/o Capt. W.W. Bullock 156 Church Ste. Ste. 004 Henderson, NC 27536.

If you have any questions please call me at 252-738-2207. Thank you in advance.

*Capt. W.W. Bullock*
Capt. W. W. Bullock
Administrative Director
wbullock@vancecounty.org

TYPE OR PRINT IN **BLACK INK**.

# STATE OF NORTH CAROLINA

PASQUOTANK County

In The General Court Of Justice
Before The Clerk

| IN THE MATTER OF: | CRIMINAL RECORD SEARCH |
|---|---|

*Name(s) By Which Individual To Be Searched May Be Known*

JUSTIN JAMEL WHITE, BM, DOB 8/5/1989
NCOL# 30643245, SS# 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

**CRIMINAL RECORD SEARCH**

G.S. 7A-109, -308(a)(17), -343(3)

☐ For DMV Hearing

## REQUEST FOR CERTIFIED CRIMINAL RECORD SEARCH

I request that the Clerk of Superior Court conduct a search of the official records of the criminal cases in the courts of the county named above and certify the results of that search for the name(s) listed above. In making this request I understand and acknowledge that:

1. **THE CLERK WILL SEARCH THE COURT RECORDS FOR ONLY THE COUNTY NAMED ABOVE. THIS IS NOT A STATEWIDE RECORD SEARCH.**

2. Court records are indexed by name only and not by any other identifying characteristics.

3. The name(s) listed above are all the names by which, to my knowledge, the individual for whom I am requesting this search may be known.

4. The Clerk will search for records under all those names, but only for records under those names.

5. The fact that no criminal record is found under any of those names does not mean that the individual does not have a record in this county; the individual may have a record under another name.

6. The fact that a criminal record is found under one or more of those names does not mean that the record is a record for the individual for whom I am requesting this search; the record may be that of another individual with the same or a similar name.

7. I am solely responsible for any interpretation and use I make of the results of this search and I understand the Clerk is not responsible for my interpretation or use of the results.

| Name And Address Of Requestor (Including City, State And Zip Code) | Signature Of Requestor |
|---|---|
| CAPT. W.W. BULLOCK | *Capt. W.W. Bulloch* |
| C/O VANCE COUNTY SHERIFF'S OFFICE | |
| 156 CHURCH ST STE 004 | |
| HENDERSON       NC       27536 | |

## CERTIFICATION

This is to certify that I have searched the indices to criminal actions in this office from _____
to the present and

☐ I have found that no record was indexed by the name(s) given above.

☐ I have found the following excerpt(s) from the public records indexed by the name(s) given above as appears in the attached _____ page(s).

☐ This search is limited as follows: _____

Some automated system information code definitions are included on the back of this form to help you understand the record(s) that may be attached to this form.

| | |
|---|---|
| *Not Valid Without The* *Clerk Of Superior Court's Raised Seal* *On Each Page* | Date Of Search |
| | Signature |
| | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court |

**NOTE:** *"Any person who without lawful authority intentionally ... alters or changes any ... official case record is guilty of a Class H felony." G.S. 14-221.2.*

*(Over)*

AOC-CR-314, Rev. 3/07
© 2007 Administrative Office of the Courts



# Office of the Sheriff
## Vance County

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone  252-738-2200
Fax 252-738-2220

### Sheriff Peter White

May 11, 2017

Todd W. Tilley
Clerk of Superior Court
Perquimans County, NC

RE: Justin Jamel White, BM, DOB 08/05/1989, NCOL# 30643245, SS# 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

The Vance County Sheriff's Office is conducting a background on the referenced individual for employment purposes as a full- time Sworn Law Enforcement Officer. Please conduct a criminal background records check on behalf of the Vance County Sheriff's Office and mail the results to: Vance County Sheriff's Office c/o Capt. W.W. Bullock 156 Church Ste. Ste. 004 Henderson, NC 27536.

If you have any questions please call me at 252-738-2207. Thank you in advance.

*Capt. W.W. Bullock*

Capt. W. W. Bullock
Administrative Director
wbullock@vancecounty.org

TYPE OR PRINT IN BLACK INK.

# STATE OF NORTH CAROLINA

_____PERQUIMANS_____ County

In The General Court Of Justice
Before The Clerk

| IN THE MATTER OF: | |
|---|---|
| *Name(s) By Which Individual To Be Searched May Be Known* | **CRIMINAL RECORD SEARCH** |
| JUSTIN JAMEL WHITE, BM, DOB 8/5/1989 | G.S. 7A-109, -308(a)(17), -343(3) |
| NCOL# 30643245, SS# 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 | ☐ For DMV Hearing |

**REQUEST FOR CERTIFIED CRIMINAL RECORD SEARCH**

I request that the Clerk of Superior Court conduct a search of the official records of the criminal cases in the courts of the county named above and certify the results of that search for the name(s) listed above. In making this request I understand and acknowledge that:

1. **THE CLERK WILL SEARCH THE COURT RECORDS FOR ONLY THE COUNTY NAMED ABOVE. THIS IS NOT A STATEWIDE RECORD SEARCH.**

2. Court records are indexed by name only and not by any other identifying characteristics.

3. The name(s) listed above are all the names by which, to *my* knowledge, the individual for whom I am requesting this search may be known.

4. The Clerk will search for records under all those names, but only for records under those names.

5. The fact that no criminal record is found under any of those names does not mean that the individual does not have a record in this county; the individual may have a record under another name.

6. The fact that a criminal record is found under one or more of those names does not mean that the record is a record for the individual for whom I am requesting this search; the record may be that of another individual with the same or a similar name.

7. I am solely responsible for any interpretation and use I make of the results of this search and I understand the Clerk is not responsible for my interpretation or use of the results.

| Name And Address Of Requestor (Including City, State And Zip Code) | Signature Of Requestor |
|---|---|
| CAPT W.W. BULLOCK | *Capt. W.W. Bullock* |
| C/O VANCE COUNTY SHERIFF'S OFFICE | |
| 156 CHURCH ST STE 004 | |
| HENDERSON                    NC        27536 | |

**CERTIFICATION**

This is to certify that I have searched the indices to criminal actions in this office from _____ to the present and

☐ I have found that no record was indexed by the name(s) given above.

☐ I have found the following excerpt(s) from the public records indexed by the name(s) given above as appears in the attached _____ page(s).

☐ This search is limited as follows: _____

Some automated system information code definitions are included on the back of this form to help you understand the record(s) that may be attached to this form.

| | Date Of Search |
|---|---|
| *Not Valid Without The* | |
| *Clerk Of Superior Court's Raised Seal* | Signature |
| *On Each Page* | |
| | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court |

**NOTE:** *"Any person who without lawful authority intentionally ... alters or changes any ... official case record is guilty of a Class H felony."* G.S. 14-221.2.

(Over)

AOC-CR-314, Rev. 3/07
© 2007 Administrative Office of the Courts



# Office of the Sheriff
## Vance County

**Sheriff Peter White**

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone   252-738-2200
Fax 252-738-2220

June 7, 2017

Sarah Beth F. Rhodes
Clerk of Superior Court
Pitt County, NC

RE: Justin Jamel White, BM, DOB 08/05/1989, NCOL# 30643245, SS# 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

The Vance County Sheriff's Office is conducting a background on the referenced individual for employment purposes as a full- time Sworn Law Enforcement Officer. Please conduct a criminal background records check on behalf of the Vance County Sheriff's Office and mail the results to: Vance County Sheriff's Office c/o Capt. W.W. Bullock 156 Church Ste. Ste. 004 Henderson, NC 27536.

If you have any questions please call me at 252-738-2200.  Thank you in advance.

Capt. W. W. Bullock
Capt. W. W. Bullock
Administrative Director
wbullock@vancecounty.org

TYPE OR PRINT IN BLACK INK.

# STATE OF NORTH CAROLINA

_____PITT_____ County

In The General Court Of Justice
Before The Clerk

## IN THE MATTER OF:

*Name(s) By Which Individual To Be Searched May Be Known*

JUSTIN JAMEL WHITE, BM, DOB 8/5/1989
NCOL# 30643245, SS# 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

## CRIMINAL RECORD SEARCH

G.S. 7A-109, -308(a)(17), -343(3)

☐ For DMV Hearing

### REQUEST FOR CERTIFIED CRIMINAL RECORD SEARCH

I request that the Clerk of Superior Court conduct a search of the official records of the criminal cases in the courts of the county named above and certify the results of that search for the name(s) listed above. In making this request I understand and acknowledge that:

1. **THE CLERK WILL SEARCH THE COURT RECORDS FOR ONLY THE COUNTY NAMED ABOVE. THIS IS NOT A STATEWIDE RECORD SEARCH.**

2. Court records are indexed by name only and not by any other identifying characteristics.

3. The name(s) listed above are all the names by which, to my knowledge, the individual for whom I am requesting this search may be known.

4. The Clerk will search for records under all those names, but only for records under those names.

5. The fact that no criminal record is found under any of those names does not mean that the individual does not have a record in this county; the individual may have a record under another name.

6. The fact that a criminal record is found under one or more of those names does not mean that the record is a record for the individual for whom I am requesting this search; the record may be that of another individual with the same or a similar name.

7. I am solely responsible for any interpretation and use I make of the results of this search and I understand the Clerk is not responsible for my interpretation or use of the results.

*Name And Address Of Requestor (Including City, State And Zip Code)*

VANCE COUNTY SHERIFF'S OFFICE

C/O CAPT W.W. BULLOCK

156 CHURCH ST STE 004

HENDERSON        NC        27536

*Signature Of Requestor*

Capt. W.W. Bullock

### CERTIFICATION

This is to certify that I have searched the indices to criminal actions in this office from _____ to the present and

☐ I have found that no record was indexed by the name(s) given above.

☐ I have found the following excerpt(s) from the public records indexed by the name(s) given above as appears in the attached _____ page(s).

☐ This search is limited as follows: _____

Some automated system information code definitions are included on the back of this form to help you understand the record(s) that may be attached to this form.

*Not Valid Without The*
*Clerk Of Superior Court's Raised Seal*
*On Each Page*

*Date Of Search*

*Signature*

☐ Deputy CSC    ☐ Assistant CSC    ☐ Clerk Of Superior Court

**NOTE:** "Any person who without lawful authority intentionally ... alters or changes any ... official case record is guilty of a Class H felony." G.S. 14-221.2.

(Over)

AOC-CR-314, Rev. 3/07
© 2007 Administrative Office of the Courts



# Office of the Sheriff
## Vance County

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone   252-738-2200
Fax 252-738-2220

**Sheriff Peter White**

June 7, 2017

J.R. Rowell
Clerk of Superior Court
Union County, NC

RE: Justin Jamel White, BM, DOB 08/05/1989, NCOL# 30643245, SS# 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

The Vance County Sheriff's Office is conducting a background on the referenced individual for employment purposes as a full- time Sworn Law Enforcement Officer. Please conduct a criminal background records check on behalf of the Vance County Sheriff's Office and mail the results to: Vance County Sheriff's Office c/o Capt. W.W. Bullock 156 Church Ste. Ste. 004 Henderson, NC 27536.

If you have any questions please call me at 252-738-2200. Thank you in advance.

*Capt. W.W. Bullock*

Capt. W. W. Bullock
Administrative Director
wbullock@vancecounty.org

TYPE OR PRINT IN BLACK INK.

# STATE OF NORTH CAROLINA

_____UNION_____ County

In The General Court Of Justice
Before The Clerk

### IN THE MATTER OF:
Name(s) By Which Individual To Be Searched May Be Known

JUSTIN JAMEL WHITE, BM, DOB 8/5/1989
NCOL# 30643245, SS# 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

## CRIMINAL RECORD SEARCH

G.S. 7A-109, -308(a)(17), -343(3)

☐ For DMV Hearing

### REQUEST FOR CERTIFIED CRIMINAL RECORD SEARCH

I request that the Clerk of Superior Court conduct a search of the official records of the criminal cases in the courts of the county named above and certify the results of that search for the name(s) listed above. In making this request I understand and acknowledge that:

1. **THE CLERK WILL SEARCH THE COURT RECORDS FOR ONLY THE COUNTY NAMED ABOVE. THIS IS NOT A STATEWIDE RECORD SEARCH.**

2. Court records are indexed by name only and not by any other identifying characteristics.

3. The name(s) listed above are all the names by which, to my knowledge, the individual for whom I am requesting this search may be known.

4. The Clerk will search for records under all those names, but only for records under those names.

5. The fact that no criminal record is found under any of those names does not mean that the individual does not have a record in this county; the individual may have a record under another name.

6. The fact that a criminal record is found under one or more of those names does not mean that the record is a record for the individual for whom I am requesting this search; the record may be that of another individual with the same or a similar name.

7. I am solely responsible for any interpretation and use I make of the results of this search and I understand the Clerk is not responsible for my interpretation or use of the results.

Name And Address Of Requestor (Including City, State And Zip Code)

VANCE COUNTY SHERIFF'S OFFICE

C/O CAPT W.W. BULLOCK

156 CHURCH ST STE 004

HENDERSON                NC        27536

Signature Of Requestor

Capt. W.W. Bullock

### CERTIFICATION

This is to certify that I have searched the indices to criminal actions in this office from _____
to the present and

☐ I have found that no record was indexed by the name(s) given above.

☐ I have found the following excerpt(s) from the public records indexed by the name(s) given above as appears in the
attached _____ page(s).

☐ This search is limited as follows: _____.

Some automated system information code definitions are included on the back of this form to help you understand the
record(s) that may be attached to this form.

|  | Date Of Search |
| *Not Valid Without The*<br>*Clerk Of Superior Court's Raised Seal*<br>*On Each Page* | |
| | Signature |
| | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court |

**NOTE:** *"Any person who without lawful authority intentionally ... alters or changes any ... official case record is guilty of a Class H felony."* G.S. 14-221.2.

(Over)

AOC-CR-314, Rev. 3/07
© 2007 Administrative Office of the Courts

# W Bullock – J White Use of Force Investigation



# Office of the Sheriff
## Vance County

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone 252-738-2200
Fax 252-738-2220

## Sheriff Peter White

### ADMINISTRATIVE INVESTIGATION

COMPLAINANT: LATWANYA S. OLIVER

ACCUSED: DEPUTY JUSTIN WHITE

INVESTIGATING OFFICER: CAPTAIN W.W. BULLOCK

PREPARED BY: CAPTAIN W.W. BULLOCK *WB*

NATURE OF COMPLAINT: USE OF FORCE

CASE SYNOPSIS:

On Sunday, October 21, 2018 @ 2000hrs Deputy White was on patrol near the N. Garnett St area when he observed a car traveling north on Garnett Street at a speed greater than the posted speed limit. According to White, the vehicle at one point nearly rear-ended another vehicle while traveling north on Norlina Rd. White stated he ran the vehicle registration thru 911. The dispatcher gave him the registration information, White stated 10-4, any 29s, the dispatcher immediately replied negative. White stated to me in the presence of Capt. Watkins he specifically asked for warrant information on the registered owner, but the 911 tape revealed he didn't. White continue to follow the vehicle onto Warrenton Rd from Norlina until the vehicle pulled into the lot of the Shell Station on Warrenton Rd. White pulled into the lot from the Carey Chapel Rd side, never activated his blue lights, but engaged in conversation with the driver, Latwanya Oliver, while he remain in his patrol vehicle. According to White, Oliver became irritated when he drew attention to her previous speed. The two of them exchanged conversation, but Oliver walked away from White. Some point shortly afterwards, White returned to the Sheriff's Office to check for warrants on Oliver. According to White, 911 dispatch has often failed to verify warrants on wanted people he has requested a warrant check. White discovered that Ms. Oliver had 2 outstanding felony warrants.

On Monday, October 22, 2018 @ 0152hrs, White went to 52 Daisy Lane Henderson, NC (see included CFS Report# 1810-049292) and check out at this location as 10-63 (Investigation) White clear the scene approximately 13 mins later. According to White, he knocked at the front and rear door, but no one responded. According to Oliver, someone came to her house @ 0200hrs knocking on the door. She thought it was a friend of hers, and didn't respond. Even though White checked out on an investigation, his intent was to serve the outstanding warrants.



Prior to White going to the residence, he asked Sgt. Welborn to accompany him, but Sgt. Welborn told him no.

White came back to work on night shift on Monday, October 22, 2018 for his 1800-0600hrs duty shift. White returned to 52 Daisy Lane Henderson NC and check out at this location for 10-29 service @ 2016hrs (see included CFS Report# 1810-049445). According to White he identified himself as Deputy White and told Oliver she had a warrant for her arrest. Oliver cooperated with White's instructions until he tried to handcuff her when he got to his patrol vehicle. White said at the point "All hell broke loose". White was able to get 1 handcuff on Oliver. White said (in summary) Oliver began pushing her weight towards his body, pulling away from him, struck his legs 2x leaving a red mark on him, and was failing to obey his request; refusing to get into his patrol car. White stated he performed a takedown maneuver (according to Oliver in effect slamming her to the ground) which he stated was an approved subject control technique (See included Incident Report 18013870). According to Oliver, White slammed her down without his weight upon her, and then cuff her while she was on the ground. While interviewing White in my office with Capt. Watkins as a witness, I asked White what takedown maneuver he was referring to? He stated he didn't know the name of it. Deputy White asked me if there were any other incidents with this agency where someone's arm was broken. I told him I could not recall any incident to that extent.

While Oliver was on the ground, White was able to get the second handcuff on her. She immediately started complaining about her arm being broken. While she was handcuffed on the ground, White radioed in a loud panic voice "S33 Central send me some units to my location". Units acknowledged the traffic and responded code 3 (10-18) towards his location. White then stated "33 Central run um EMS emergency traffic as well have them stage". You could hear someone moaning in the background of his radio traffic. When 911 Dispatch asked could he provide reference (nature of needing EMS), White stated "10-4 use of force Central they will receive further when they get here". White never did acknowledge to the responding units the true nature of his request, and the responding LEO's thought he had shot someone. It was only when Sgt. Welborn arrived on scene the urgent nature of the request was downgraded. Lt. Goolsby and Sgt. Welborn stated Oliver was some distance away from the patrol vehicle when they arrived. This would suggest Oliver was slung downward in a slamming motion away from the patrol vehicle. White stated in his report that Oliver stated a frivolous verbal complaint against him. He was referring to a comment Oliver made to Lt. Goolsby when he arrived on scene. After several examinations of her arm, EMS determined Oliver' left arm was broken; therefore, she was transported to MPMC.

White was instructed to return to the office and start his paperwork, while Lt. Goolsby and Sgt. Welborn went to MPMC. According to MPMC records, Oliver sustained fracture of the Humerus (see After Care Instructions). White determined that Oliver should be charged with Felony Physical Injury to LE and Felony Obstructing Justice; along with the 2 outstanding warrants for Felony Obtaining Property by False Pretense
ILLUSTRATIONS:

Incident Report 18013870
Use of Force Report



Statement of Lt. Goolsby
Statement of Sgt. Welborn
CFS Report 1810-049445
CFS Report 1810-049292
Disk of 911 recording
After Care Instruction from MPMC for Latwanya Oliver
Statement of Latwanya Oliver


CONCLUSION:

Deputy White's actions throughout this process appeared to be over heightened in nature.
Deputy White seemed overly excited with his request for assistance, causing responding units to
be put at a greater risk of danger than necessary; at a point where Oliver was completely detained
only needed non-emergency treatment. Deputy White's Use of Force appear to be contrary to
Use of Force Directive B.9 I. Policy  " it is the policy of the Vance County Sheriff's Office that
deputies shall use only that force which is reasonably necessary to effectively bring an incident
under control…." Deputy White could have used other options prior to slamming Oliver to the
ground. Deputy White has mace at his disposal, but believed it to be ineffective because Oliver
was wearing glasses and moving uncontrollably. Deputy White's "take down" maneuver was
contrary to policy in that it cause a fracture of the Humerus bone in her left arm.

RECOMMENDATION:

It is the recommendation of Capt. Watkins, Lt. Goolsby, Sgt. Welborn and the Investigator
Officer that Deputy Justin White' service with the Vance County Sheriff's Office is no longer
needed.



I.    **POLICY**

This policy establishes guidelines related to the use of force, reporting, review, and analysis.

The Vance County Sheriff's Office recognizes and respects the value and special integrity of each human life. By vesting deputies the lawful authority to use force to protect the public welfare, a careful balancing of all human interests is required. Therefore, it is the policy of the Vance County Sheriff's Office that deputies shall use only that force which is reasonably necessary to effectively bring an incident under control while protecting the lives of the officer or another. Deputies shall use physical force in arrest and custody situations only in strict conformance with the United States Constitution, laws of North Carolina, and this policy.

**Approved Weapons**

- A deputy shall, while on or off duty, only carry weapons and ammunition authorized or approved by the Sheriff.

**Impact Weapons**

- The riot and expandable (ASP) batons are the only impact weapons issued to deputies of the Vance County Sheriff's Office. Deputies must complete the appropriate training prior to receiving authorization to carry or use these weapons.

**Chemical Agents**

- Only Sheriff's Office issued chemical agents may be carried and used by deputies of the Vance County Sheriff's Office.

- Prior to the issuance of Oleoresin Capsicum Spray (OC Spray), all deputies shall receive training in its use, which will include instruction and actual application to afford the deputy an understanding of the effects. Any use of OC Spray other than in a training situation or spraying of animals for self-protection shall be reported as required by this policy.

**Use of Other Chemical Agents**

- Authorization to employ tear gas or other chemical agents in riot situations or for other applications involving large numbers of people must be obtained from the Sheriff's Office Captain or higher authority or his/her designee. Any use of tear gas or chemical agents except in a training situation must be reported on the appropriate Incident Report.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 377 of 665



# ARREST REPORT

**AGENCY INFO.**

| Agency Name | ORI | | DCA |
|---|---|---|---|
| VANCE COUNTY SHERIFF'S OFFICE | NC0910000 | | 18013871 |

Date/Time of Arrest: Mo 10 Date 22 Year 2018 Hrs 23:23

Taken: ☐ Prints ☐ Photos

Fingerprint Card Check Digit # (CKN):

Arrest Tract:

Residence Tract:

Arrest Number: 1

**ARRESTEE INFORMATION**

| Name (Last, First, Middle) | D.O.B. | Age | Race | Sex | Place of Birth | Country of Citizenship |
|---|---|---|---|---|---|---|
| OLIVER, LATWANYA SHAWNTEL | 02/05/1977 | 41 | B | F | NC | US |

| Current Address | Phone | Occupation | |
|---|---|---|---|
| 52 DAISY LANE, HENDERSON, NC 27537 | (919) 514-7885 | | ■ Resident ☐ Unknown ☐ Non-Resident |

| Employer's Name | Address | Phone |
|---|---|---|
| PACIFIC COAST FEATHERS | 100 COMFORT DR, Henderson, NC 27536 | (252) 436-2300 |

Also Known As (Alias Name): OLIVER, LATWANYA L, HENDRICKS, LATWANYA SHAWNTEL; He

| Hgt | Wgt | Hair | Eye | Skin Tone | Consumed Drug/Alcohol |
|---|---|---|---|---|---|
| 5'07" | 275 | BLK | BRO | | ☐ Yes ☐ No ☐ Unk |

Scars, Marks, Tattoos:

| Social Security # | OLN and State | | Misc. # and Type |
|---|---|---|---|
| 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 | 26617872 | NC | |

Nearest Relative Name: | Address: | Phone:

**ARREST INFO.**

If Arrest, Type of Weapon: 97 - Not Applicable/None

☐ On-View ☐ Criminal Summons ☐ Order for Arrest ☐ Citation ■ Warrant

Place of Arrest: MAGISTRATES OFFICE, Henderson, NC 27536

| Charge #1 | | Counts | DCI Code | Offense Jurisdiction (if not arresting agency) | Statute # | Warr. Date Mo Date Yr |
|---|---|---|---|---|---|---|
| Obtaining Property by False Pretense | ■ Fel ☐ Misd | 2 | 1120 | | 14-100 | 11 03 2017 |

| Charge #2 | | Counts | DCI Code | Offense Jurisdiction (if not arresting agency) | Statute # | Warr. Date Mo Date Yr |
|---|---|---|---|---|---|---|
| ASSAULT PHY INJ LE/PROB/PAR OF | ■ Fel ☐ Misd | 1 | 0811 | | 14-34.7C1 | 10 22 2018 |

| Charge #3 | | Counts | DCI Code | Offense Jurisdiction (if not arresting agency) | Statute # | Warr. Date Mo Date Yr |
|---|---|---|---|---|---|---|
| OBSTRUCTING JUSTICE | ■ Fel ☐ Misd | 1 | 2690 | | COMMON LAW | 10 22 2018 |

**VEH. INFO.**

| VYR | Make | Model | Style | Color | Lic/Lis | Vin |
|---|---|---|---|---|---|---|

Vehicle: 1. ☐ Left at Scene ☐ Secured ☐ Unsecure Date/Time _____ Hrs _____
2. ☐ Released to other at owner request ☐ Name of Other _____
3. ☐ Impounded ☐ Place of Storage _____ Inventory on File? _____

**CONFINED BOND INFO.**

| Date/Time Confined | Place Confined | Committing Magistrate |
|---|---|---|
| 10/22/2018 23:30 Hrs | VANCE COUNTY JAIL | COWAN |

Type Bond: ☐ Written Promise ☐ Unsecured ☐ Secured ☐ No Bond ☐ Other

| Amt. Bond | Trial Date | Court of | City |
|---|---|---|---|
| $15,000 | 11/19/2018 | VANCE DISTRICT | HENDERSON |

Assisting Officer Name/ID Number: | Released By: Name/Dept/ID | Date/Time Released

**Status Codes** L = Lost   S = Stolen   R = Recovered   D = Damaged   Z = Seized   B = Burned   C = Counterfeit / Forged   F = Found
(Check "DJ" column if recovered for other jurisdiction)

**DRUGS AT TIME OF ARREST**

| DCI | Status | Quantity | Type Measure | Suspected Type | Check up to 3 types of activity for each | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Possess | Buy | Sale | Mfg | Importing | Operating |

**COMPLAINANT**

Name: Complainant ☐  Victim ☐  | Address: | Phone:

**NARRATIVE**

ON 10/22/18, 2300 HOURS APPROXIMATELY I SERVED THE AFOREMENTIONED CHARGES AT THE MAGISTRATES OFFICE DUE TO INJURY ARISING OUT OF THE USE OF FORCE, SAME WAS GIVEN AN UNSECURED BOND. THE MAGISTRATES WAS TRANSPORTED MARIA PARHAM HOSPITAL TO DO THE INITIAL APPEARANCE.

**STATUS**

| Arresting Officer Signature/ID # | Date/Time Submitted Mo Date Yr | Supervisor Signature |
|---|---|---|
| DEPUTY J. J. WHITE 259 | 10 23 2018 6:00 Hrs | |

Case Status: ☐ Further Inv. ☐ Inactive ■ Closed

Case Disposition: ■ Cleared By Arrest / No Supplement Needed ☐ Arrest/No Investigation

Arrestee Signature:

DCI-608 F

Rev. 3/92



| Division: Patrol | Computer Number #259 | Rank / Name (First, M.I., Last) |
|---|---|---|
| Patrol Division | 259 | Justin J White |

| Statement |
|---|

On 10-22-18, 2016 hours, I notified dispatch of a warrant service at 52 Daisy Lane, Henderson, NC 27537. I knocked on the front door and I heard a female ask, who is it? I identified myself as Deputy White with the Vance County Sheriff's Office. The female asked again, who is it? I re-advised the aforementioned. The female stated, I don't believe you, shine your light so I can see you. I adhered to her request and she said, oh ok and opened the front door. The female turned out to be Ms. Latwanya Shawntel Oliver, who was wanted on 2 felony counts of obtaining property by false pretense. Prior to going to the residence, I asked dispatch to verify the felony warrants and they advised same were active. I told Ms. Oliver she had felony warrants and she stated, Lawd, what have I done-I aint done nothing wrong. I stated, you are under arrest and I will find out further at the magistrates office. Ms. Oliver stated, I haven't done nothing-can I call my daughter and let her know? I told her she can make a phone call at the station. She said, well, ok, let me get my keys, turn off my lights, lock up my house and stuff. Can I do that? Because you are just ugh. I replied, yes, you can do that. Ms. Oliver turned off some of her lights and walked out of the front door and I asked, aren't you going to lock up and she turned around and said, I forgot, let me get my keys of the dresser and she said we are going to have to go out of the back door because something is wrong with the front door. When we walked out of the back door, she did not pull it all the way through and I pulled it for her and asked, do you have a deadbolt key and she said yes but something is wrong with it. As she was approaching my patrol vehicle, I told her to stop and submit to the handcuffs. She replied, why do you have to handcuff me? I told her it is for my safety as well as yours (standard procedure). I was able to get one handcuff on her and she became irate and would not comply with my lawful orders. She screamed to the top of her lungs help, help, help me-your not taking me anywhere until I' see some papers-I'm not going anywhere. I told her to calm down and that she was making the situation worst. I told her cooperation goes along way with law enforcement when you go before the magistrate or judge. Ms. Oliver stated, ok, sir, I apologize. I went to handcuff the second arm and she went crazy, she lost it. She pulled away from me while saying no, no, I'm not going, leave me alone. I placed her up against my car, opened the rear passenger door instructed her to get in and she became extremely combative by yelling no, I'm not going no where, help, help. She pushed her body against mines and struck me in the lower leg twice. I performed a takedown maneuver, which is an approved subject control technique. To prevent additional manipulation of the handcuffs, I tightened them while on the ground. Ms. Oliver stated, you broke my arms, ooooowwwwwww, oooowwwwwww my arms are killing me, they are hurting sir, I think my arms are sprained, I'm in so much pain. I immediately radioed for EMS 10-18 due to injuries sustained from a use of force (2024 hours). Prior to, I called for backup at 2022 hours. Sgt. Welborn arrived on scene first as back up and I told him, she has felony warrants, refused to comply, pulled away and assaulted me. EMS arrived and stated, her arm is not broke because she can move her shoulders. Ms. Oliver continued to scream in pain and the EMS


Supervisor re-examined her arm and said, yep, it is broken. Ms. Oliver was transported to Maria Parham Hospital in Henderson, NC for further medical treatment. I acted in good faith to arrest Ms. Oliver and when she refused I took action as authorized. I used reasonable force to achieve the law enforcement objective and to gain compliance and to ensure public safety. I afforded her every opportunity to comply with my lawful orders and she refused. I do not have a taser and pepper spray would have been ineffective as she was moving uncontrollably and had glasses on, which would have caused same to ricochet (more likely than not). Officer presence and verbalization did not work. Thus, I had to go hands on. I made a good faith effort to maintain and restore order. I followed the objective reasonableness standard under the 4th Amendment to arrest the defendant and to seize her person due to the outstanding felony warrants notwithstanding other violations of law (assault on a law enforcement officer and resisting arrest). It should be noted, Ms. Oliver has a record of communicating threats, simple assault and assault with a deadly weapon (aggravating factors on her part and mitigating factors for me). Ms. Oliver filed a verbal frivolous complaint against me for pulling her over and harassing her at the Shell Gas Station on Warrenton Road. I did not pull her over, I never turned on my lights and sirens. I noticed a car traveling at a high rate of speed on North Garnett Street passing Parker and Bickett Streets, Old Norlina Road and Spring Valley Drive. On 10-21-2018, 2130 hours approximately, I was patrolling Old Norlina Road going towards Main Street (the intersection of Garnett, Beckford, Main and Chestnut). The vehicle was clearly exceeding safe speed. I brought my vehicle up to 60 mph and had trouble keeping up with her in a 35 MPH Zone. It was not until' she almost rear-ended a dark in color truck at the Handy Mart beside Forsyth Skippers that she slowed down but picked the speed right back up. It should be noted, she has a horrible DMV record, 15 speeding tickets, various running a red light/stop signs and several accidents. Had I known this at the time, I would have pulled her and took appropriate action. I ran the tag, which came back active and valid. I asked dispatch to run the registered owner for warrants, which came back negative. Ms. Oliver pulled into the Shell Gas Station and I pulled around to the Carey Chapel Road entrance for the station and saw her exit the vehicle (FFS-2692) and told her to slow it down and to watch her speed. I was trying to have open dialogue with her (community oriented policing ) and she started screaming and yelling for no reason, I know my rights, you should have pulled me back there and wrote the ticket, I know my rights. I advised her it was not too late to write the ticket but I'm trying to talk to you about not speeding in the future. She said, well, write the ticket then and you have a good day. Due to dispatch failing to properly do a warrant check (public safety issue), I was unaware she had felony warrants. It is unfortunate that injuries occurred, however, I have a job to do and the general welfare of the public is first and violators must be apprehended pursuant to standard operating procedures, general statue, common law and judicial precedent (state and federal case law). See Use of Force Report. This is an account of what happened and I reserve the right to amend this statement (addendum) as the situation happened so quickly.

**INCIDENT/INVESTIGATION REPORT**

| Agency Name | | OCA |
|---|---|---|
| VANCE COUNTY SHERIFF'S OFFICE | | 18013870 |

ORI: NC0910000

Date / Time Reported: S M T W T F S — Month 10 Day 22 Yr 2018 Time 20:16 Hrs

| | Crime / Incident(s) | | At Found | Last Known Secure |
|---|---|---|---|---|
| #1 | 9910 - WARRANT SERVICE | ☐ Attempt ■ Complete | Month 10 Day 22 Yr 2018 Time 20:15 Hrs | Month 10 Day 22 Yr 2018 Time 20:14 Hrs |
| #2 | Crime Incident | ☐ Attempt ☐ Complete | Location of Incident: 52 DAISY LN, HENDERSON, NC 27537 | Offense Tract 2 |
| #3 | Crime Incident | ☐ Attempt ☐ Complete | Premise Type: 01 - Home of Victim - Single Family Dwelling | Victim Residence Type: ☐ Single Family ☐ Multi Family |

**MO**

How Attacked or Committed: BY ATTEMPTING TO SERVE A WARRANT

Forcible: ■ Yes ☐ No ☐ N/A

Weapon / Tools:

# of Victims: 1

Type: ☐ Person ☐ Business ☐ Society ■ Government ☐ Financial Institute ☐ Religious ☐ L.E. Officer Line of Duty ☐ Other/Unk

Injury: ☐ None ☐ Minor ☐ Loss of Teeth ☐ Broken Bones ☐ Severe Lacerations ☐ Internal ☐ Unconscious ☐ Other Major

Drug/Alcohol Use: ☐ Yes ☐ Unknown ☐ No ☐ N/A

**VICTIM**

V1

Victim/Business Name (Last, First, Middle): STATE OF NORTH CAROLINA

Victim of Crime #: 1

DOB / Age: | Race: | Sex: | Relationship To Offender: | Resident Status: ☐ Resident ☐ Non-Resident ☐ Unknown

Home Address: | Home Phone:

Employer Name/Address: | Business Phone:

| VYR | Make | Model | Style | Color | Lic/Lis | Vin |
|---|---|---|---|---|---|---|
| | | | | | | |

CODES: V = Victim (Denote V2, V3)    O = Owner (if other than victim)    R = Reporting Person (if other than victim)

**OTHERS INVOLVED**

Type: ☐ Person ☐ Business ☐ Society ☐ Government ☐ Financial Institute ☐ Religious ☐ L.E. Officer Line of Duty ☐ Other/Unknown

Code: R

Name (Last, First, Middle): WHITE, J J

Victim of Crime #: | DOB / Age: | Race: B | Sex: M

Home Address: | Home Phone:

Employer Name/Address: VANCE COUNTY SHERIFF'S OFFICE - 156 CHURCH ST, Henderson, NC 27536 | Business Phone: (252) 738-2200

Type: ☐ Person ☐ Business ☐ Society ☐ Government ☐ Financial Institute ☐ Religious ☐ L.E. Officer Line of Duty ☐ Other/Unknown

Code: R

Name (Last, First, Middle): WELBORN, C M

Victim of Crime #: | DOB / Age: | Race: | Sex:

Home Address: 156 CHURCH STREET, HENDERSON, NC 27536 | Home Phone: (252) 738-2200

Employer Name/Address: | Business Phone:

**Status Codes**: L = Lost    S = Stolen    R = Recovered    D = Damaged    Z = Seized    B = Burned    C = Counterfeit / Forged    F = Found
(Check "OJ" column if recovered for other jurisdiction)

**PROPERTY**

| Victim # | DCI | Status | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Number of Vehicles Stolen: 0    Number of Vehicles Recovered: 0

**ID**

Officer Name: DEPUTY J. J. WHITE    ID# 259    Officer Signature

Supervisor Signature

**STATUS**

Complainant Signature

Case Status: ☐ Further Investigation ☐ Inactive ☐ Closed/Cleared ☐ Closed/Leads Exhausted

Case Disposition: ☐ Unfounded ☐ Juvenile/No Custody ☐ Extradition Declined ☐ Cleared by Arrest ☐ Refuse to Cooperate ☐ Located ☐ Cleared by Arrest by Another Agency ☐ Death of Offender ☐ Prosecution Declined

DCI-600F

Page 1 of 5

Rev 3/92



**OCA** 18013870

| Status Codes | L = Lost | S = Stolen | R = Recovered | D = Damaged | Z = Seized | B = Burned | C = Counterfeit / Forged | F = Found |
|---|---|---|---|---|---|---|---|---|

## DRUGS

| DCI | Status | Quantity | Type Measure | Suspected Type | Check up to 3 types of activity for each | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Possess | Buy | Sale | Mfg. | Importing | Operating |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

## OFFENDER

| Offender Used | | | | Offender 1 | | | | | | | Primary Offender |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alcohol/Drugs | ☐ Yes ☐ Unk ☒ No ☐ N/A | | | Age: 41 Race: B Sex: F | | Age: Race: Sex: | | Age: Race: Sex: | | | Resident Status: ☒ Resident ☐ Non-Resident |
| Computer | ☐ Yes ☐ Unk ☐ No ☒ N/A | | | Age: Race: Sex: | | Age: Race: Sex: | | Age: Race: Sex: | | | ☐ Unknown |

## SUSPECT

| Name (Last, First, Middle) | Alias or Nickname | Home Address |
|---|---|---|
| OLIVER, LATWANYA SHAWNTEL | LATWANYA L OLIVER ; LATWANYA SHA | 52 DAISY LANE, HENDERSON, NC 27537 |

| Occupation | Business Address |
|---|---|
| | PACIFIC COAST FEATHERS - 100 COMFORT DR, Henderson, NC 27536 |

| DOB / Age | Race | Sex | Height | Weight | Build | Hair Color | Hair Style | Hair Length | Eye Color | Glasses |
|---|---|---|---|---|---|---|---|---|---|---|
| 02/05/1977 | 41 | B | F | 5'07" | 275 | | BRO | STR | LNG | BRO | Yes |

Scars, Marks, Tattoos, or other distinguishing features (i.e. limp, foreign accent, voice characteristics)

| Hat | Jacket | Shirt/Blouse | Tie/Scarf | Coat/Suit | Pants/Dress/Skirt | Socks | Shoes |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| Was Suspect Armed? | Type of Weapon | Direction of Travel | Mode of Travel |
|---|---|---|---|
| | | | |

| VYR | Make | Model | Style | Color | Lic/Lis | Vin |
|---|---|---|---|---|---|---|
| | | | | | | |

## WITNESS

| Name (last, first, middle) | DOB / Age | Race | Sex | OCA |
|---|---|---|---|---|
| | | | | |

| Home Address | Home Phone | Employer | Phone |
|---|---|---|---|
| | | | |

## NARRATIVE

Suspect Hate / Bias Motivated: Yes ☐ No ☒

Narrative

CFS # 18IC-049445

MSHEARIN6865 - 2018-10-22 20:22:50

S33ADV SEND HIM SOME UNITS AT HIS LOCATION

MSHEARIN6865 - 2018-10-22 20:24:56

S33 IS REQUESTING EMS 10-18 TRAFFIC REF USE OF FORCE

JCROTTY9997 - 2018-10-22 20:39:55

OLIVER, LATWANYA SHAWNTEL   02/05/1977  BLACK  FEMALE  26617872 NC  52 DAISY LN

HENDERSON, NC 27537-3095 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  VANCE

17CR53133  WARRANT FOR ARREST  OBTAIN PROPERTY FALSE PRETENSE    NO  NO  NCAWARE    ELECTRONIC

 98 OLIVER, LATWANYA SHAWNTEL   02/05/1977  BLACK  FEMALE  26617872 NC  52 DAISY LN

HENDERSON, NC 27537-3095 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  VANCE

17CR53134  WARRANT FOR ARREST  OBTAIN PROPERTY FALSE PRETENSE    NO  NO  NCAWARE    ELECTRONIC

CAD Disposition = B ARREST MADE

On 10-22-18, 2016 hours, I notified dispatch of a warrant service at 52 Daisy Lane, Henderson,

NC 27537. I knocked on the front door and

I heard a female ask, who is it? I identified myself as Deputy White with the Vance County

Sheriffs Office. The female asked again, who is it?

I re-advised the aforementioned. The female stated, I don't believe you, shine your light so I

| 1. AGENCY | 2. ORI | 3. CONTINUATION TO: | 4. OCA FILE NO. |
|---|---|---|---|
| VANCE COUNTY SHERIFF'S OFFICE | NC0910000 | ☑ INVESTIGATION ☐ ARREST ☐ SUPPLEMENTARY INV. | 18013870 |

Narrative

can see you. I adhered to her request and she said, oh ok and opened the front door. The female turned out to be Ms. Latwanya Shawntel Oliver, who was wanted on 2 felony counts of obtaining property by false pretense. Prior to going to the residence, I asked dispatch to verify the felony warrants and they advised same were active. I told Ms. Oliver she had felony warrants and she stated, Lawd, what have I done-I aint done nothing wrong. I stated, you are under arrest and will find out further at the magistrates office. Ms. Oliver stated, I haven't done nothing-can I call my daughter and let her know. I told her she can make a phone call at the station. She said, well, ok, let me get my keys, turn off my lights, lock up my house and stuff. Can I do that? Because you are just ugh. I replied, yes, you can do that. Ms. Oliver turned off some of her lights and walked out of the front door and I asked, aren't you going to lock up and she turned around and said, I forgot, let me get my keys of the dresser and she said we are going to have to go out of the back door because something is wrong with the front door. When we walked out of the back door, she did not pull it all the way through and I pulled it for her and asked, do you have a deadbolt key and she said yes but something is wrong with it. As she was approaching my patrol vehicle, I told her to stop and submit to the handcuffs. She replied, why do you have to handcuff me? I told her it is for my safety as well as yours (standard procedure). I was able to get one handcuff on her and she became irate and would not comply with my lawful orders. She screamed to the top of her lungs help, help, help me-your not taking me anywhere until I see some papers-I'm not going anywhere. I told her to calm down and that she was making the situation worst. I told her cooperation goes along way with law enforcement when you go before the magistrate or judge. Ms. Oliver stated, ok, sir, I apologize. I went to handcuff the second arm and she went crazy, she lost it. She pulled away from me while saying no, no, I'm not going, leave me alone. I placed her up against my car, opened the rear passenger door instructed her to get in and she became extremely combative by yelling no, I'm not going no where, help, help. She pushed her body against mines and striked me in the lower leg twice. I performed a takedown maneuver, which is an approved subject control technique. To prevent additional manipulation of the handcuffs, I tightened them while on the ground. Ms. Oliver stated, you broke my arms, oooowwwwwww, oooowwwwwwww my arms are killing me, they are hurting sir, I think my arms are sprained, I'm in so much pain. I immediately radioed for EMS 10-18 due to injuries sustained from a use of force (2024 hours). Prior to, I called for back up at 2022 hours. Sgt. Welborn arrived on scene first as back up and I told him, she has felony warrants, refused to comply, pulled away and assaulted me. EMS arrived and stated, her arm is not broke because she can move her shoulders. Ms. Oliver continued to scream in pain and the EMS Supervisor re-examined her arm and said, yep, it is broken. Ms. Oliver was transported to Maria Parham Hospital in Henderson, NC for further medical treatment. I acted in good faith to arrest Ms. Oliver and when she refused I took action as authorized. I used reasonable force to achieve the law enforcement objective and to gain compliance and to ensure public safety. I afforded her every opportunity to comply with my lawful orders and she refused. I do not have a taser and pepper spray would have been ineffective as she was moving uncontrollably and had glasses on, which would have caused same to ricochet (more likely than not). Officer presence and verbalization did not work. Thus, I had to go hands on. I made a good faith effort to maintain and restore order. I followed the objective reasonableness standard under the 4th Amendment to arrest the defendant and to seize her person due to the outstanding felony warrants notwithstanding other violation of law (assault on a law enforcement officer and resisting arrest). It should be noted, Ms. Oliver has a record of communicating

| Officer Name / ID | Officer Signature | Date / Time Submitted | Page 3 |
|---|---|---|---|
| DEPUTY J. J. WHITE - 259 | | 10-23-18 / 0400 hrs | of 5 |

DCI-602 F

REV 3/92



# CONTINUATION PAGE

**Narrative**

threats, simple assault and assault with a deadly weapon (aggravating factors on her part and mitigating factors for me). Ms. Oliver filed a verbal frivolous complaint against me for pulling her over and harrasing her at the Shell Gas Station on Warrenton Road. I did not pull her over, I never turned on my lights and sirens. I noticed a car traveling at a high rate of speed on North Garnett Street passing Parker and Bickett Streets, Old Norlina Road and Spring Valley Drive. On 10-21-2018, 2130 hours approximately, I was patrolling Old Norlina Road going towards Main Street (the intersection of Garnett, Beckford, Main, Chestnut). The vehicle was clearly exceeding safe speed. I brought my vehicle up to 60 mph and had trouble keeping up with her in a 35 MPH Zone. It was not until' she almost rear-ended a dark in color truck at the Handy Mart beside Forsyth Skippers that she slowed down but picked the speed right back up. It should be noted, she has a horrible DMV record, 15 speeding tickets, various running a red light/stop signs and several accidents. Had I known this at the time, I would have pulled her and took appropriate action. I ran the tag, which came back active and valid. I asked dispatch to run the registered owner for warrants, which came back negative. Ms. Oliver pulled into the Shell Gas Station and I pulled around to the Carey Chapel Road entrance for the station and saw her exit the vehicle (FFS-2692) and told her to slow it down and to watch her speed. I was trying to have open dialogue with her (community oriented policing ) and she started screaming and yelling for no reason, I know my rights, you should have pulled me back there and wrote the ticket, I know my rights. I advised her it was not to late to write the ticket but I'm trying to talk to you about not speeding in the future. She said, well, write the ticket then and you have a good day. Due to dispatch failing to properly do a warrant check (public safey issue), I was unaware she had felony warrants. It is unfortunate that injuries occurred, however, I have a job to do and the general welfare of the public is first and violators must be apprehended pursuant to standard operating procedures, general statue, common law and judicial precedent (state and federal case law). See Use of Force Report.This is an account of what happened and I reserve the right to amend this statement (addendum) as the situation happened so quickly.


SUPPLEMENT #3   SGT. C. M. WELBORN - 170   10/23/2018   04:37


ON 10-22-2018, I RESPONDED TO 52 DAISY LANE REFERENCE DEPUTY WHITE CALLING FOR ASSISTANCE. WHILE ENROUTE DEPUTY WHITE CALLED FOR EMS EMERGENCY TRAFFIC REFERENCE TO USE OF FORCE AND EMS WOULD BE TOLD MORE ONCE ON SCENE. WHEN I ARRIVED ON SCENE VANCE COUNTY EMS WAS ALREADY ON SCENE. WHEN I ARRIVED I NOTICE A BLACK FEMALE LAYING ON THE GROUND HANDCUFFED AND SHE WAS IDENTIFIED AS LATWANYA CLIVER. SHE WAS HOLLERING STATING HER ARM WAS BROKE. I ASKED DEPUTY WHITE WHAT HAPPENED AND HE STATED HE ATTEMPTED TO SERVE MRS. OLIVER WITH FELONY WARRANTS. DEPUTY WHITE STATED MRS. OLIVER STARTED RESISTING AND BECAME COMBATIVE KICKING HIM TWICE. DEPUTY WHITE STATED HE TOOK HER TO THE GROUND AND HANDCUFFED HER. DEPUTY WHITE STATED HE CALLED FOR ASSISTANCE AND EMS. VANCE COUNTY EMS FIRST STATED MRS. OLIVER ARM WAS NOT BROKEN THEN CHIEF OVERTON STATED HER ARM WAS BROKEN. MRS. OLIVER WAS TRANSPORTED TO MARIA PARHAM MEDICAL CENTER FOR FURTHER TREATMENT. WHEN I ARRIVED AT THE HOSPTIAL I SPOKE WITH MRS. OLIVER. SHE STATED THAT DEPUTY WHITE WAS HARASSING HER. SHE STATED DEPUTY WHITE FOLLOWED HER ON SUNDAY FROM JOHN FOSTER HOMES UNTIL SHE PULLED INTO S&N FOOD MART ABOUT EIGHT OR NINE OCLOCK ON 10-21-2018. MRS. CLIVER STATED DEPUTY WHITE UP TO HER IN THE PARKING LOT TELLING HER ABOUT HER SPEEDING. SHE STATED WRITE ME A TICKET BECAUSE I KNOW MY RIGHTS. MRS.

| Officer Name / ID | Office Signature | Date / Time Submitted | Page 4 |
|---|---|---|---|
| DEPUTY J. J. WHITE - 259 | | 10-23-18 / 0400hrs | of 5 |
| OCI-602 F | | | REV. 3/92 |

# CONTINUATION PAGE

| 1. AGENCY | 2. ORI | 3. CONTINUATION TO: | 4. OCA FILE NO. |
|---|---|---|---|
| VANCE COUNTY SHERIFF'S OFFICE | NC0910000 | ■ INVESTIGATION ☐ ARREST<br>☐ SUPPLEMENTARY INV. | 18013870 |

Narrative

OLIVER STATED DEPUTY THEN CAME TO HER RESIDENCE AFTER MIDNIGHT BANGING ON THE FRONT AND SIDE DOOR.
MRS. OLIVER STATED SHE DID NOT LOOK TO SEE WHO IT WAS BUT KNEW IT WAS DEPUTY WHITE. MRS. OLIVER
STATED DEPUTY WHITE CAME BACK TO HER RESIDENCE LATER AND STATED YOU HAVE A WARRANT. MRS. OLIVER
STATED SHE LOCKED THE DOOR AND WALKED TO THE CAR. MRS. OLIVER STATED SHE ASKED TO SEE THE WARRANT.
MRS. OLIVER STATED WHEN SHE GOT TO THE PATROL VEHICLE AND SHE DID NOT GET IN BECAUSE SHE WAS
SCARED. MRS. OLIVER STATED SHE TOLD DEPUTY WHITE TO CALL FOR SOMEONE ELSE. SHE STATED DEPUTY WHITE
PUSHED HER INTO THE PATROL VEHICLE WHEN SHE REFUSED TO GET IN. SHE STATED SHE WAS NOT HANDCUFFED
AND DEPUTY WHITE SLAMMED HER TO THE GROUND. SHE STATED WHILE ON THE GROUND DEPUTY WHITE HANDCUFFED
HER. I SPOKE WITH CHIQUITA MARROW MRS. OLIVER SISTER (252) 432-0289 AND SHE STATED DEPUTY WHITE
CAME TO THE RESIDENCE AFTER MIDNIGHT KNOCKING ON BOTH DOORS AND NOBODY WENT TO THE DOOR AND NOBODY
LOOKED OUT TO SEE HIM. MRS. OLIVER WAS SERVED WITH THE TWO FELONY WARRANTS AND THE CHARGES FOR
OBSTRUCTING OF JUSTICE AND ASSAULT ON LAW ENFORCEMENT OFFICER. SHE WAS GIVEN A $15,000.00 UNSECURED
BOND PER MAGISTATE COWAN. MRS. OLIVER WAS GIVEN A COURT DATE OF 11-19-2018.

| Officer Name / ID | Officer Signature | Date / Time Submitted | Page 5 |
|---|---|---|---|
| DEPUTY J. J. WHITE - 259 | | 10-23-18 / 0100 hrs | of 5 |
| DCI-602 F | | | REV 3/92 |

# W Bullock – Ogletree Letter

# Ogletree
# Deakins

**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**

*Attorneys at Law*

4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Telephone: 919.787.9700
Facsimile: AuthorFaxNo
www.ogletree.com

Andrew C. Avram
Direct: 919-789-3217
E-mail: Andrew.Avram@ogletree.com

November 9, 2018

Mr. Alvan Robinson
Investigator – U.S. EEOC
Suite 700, 434 Fayetteville Street
Raleigh, NC 27601-1701

RE:  Charging Party: Justin J. White
EEOC Charge No.: 433-2018-03289
Respondent: Vance County Sheriff's Office

Dear Mr. Robinson:

We represent the Vance County Sheriff's Office ("Vance County") in the referenced matter. Please accept this letter as Vance County's confidential response to the allegations raised by Charging Party Justin White ("Charging Party" or "White"). The information and materials provided herein are confidential and should not be disclosed by your office.[1]

## Introduction

Vance County is an equal opportunity employer and prohibits discrimination. A copy of the relevant pages from Vance County's Personnel Policy Manual are attached as Exhibit 1. White was aware of these policies. A copy of his signed acknowledgment of receipt of the Vance County Personnel Manual is attached as Exhibit 2.

White alleges that during his employment with Vance County, he was discriminated against based on his race, gender, and in retaliation for engaging in protected activity. He also alleges that this discrimination occurred in the following areas: (1) Discipline; (2) Corrective Action; (3) Treatment; (4) Disrespect; (5) Issuance of Safety Equipment; (6) Subordinate Status; and (7) Retaliation.

All of White's claims are without merit and should be dismissed. White provides no factual allegations in support of his claims. White does not provide details as to how he was allegedly treated differently than similarly situated individuals outside of his protected class, nor does White

---

[1] The information herein is not everything Vance County knows about Mr. White. This response is intended to succinctly address the concerns expressed in the Charge of Discrimination and to expose the falsity of Mr. White's claim.

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston
Indianapolis ▪ Jackson ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Morristown
Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh
Richmond ▪ St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

provide details regarding his retaliation allegation. The lack of specificity in White's charge make it impossible for Vance County to respond fully to all of these allegations.

In actuality, Vance County disciplined White for repeated rule violations and ultimately terminated White for using excessive force against a female. White received safety equipment consistent with Vance County's normal practices, and at no point did Vance County retaliate against White for engaging in any sort of protected activity or discriminate against him in any fashion. Accordingly, White's claims should be dismissed.

## Background

Vance County Sheriff's Office provides individual and property protection to the citizens of Vance County. The Sheriff's Office is comprised of the following divisions: (1) Administrative Division; (2) Patrol Division; (3) Narcotics/Vice Division; (4) Criminal Investigations Unit; (5) K-9 Division; (6) Court Division; and (7) Civil Division.

The Patrol Division serves 45,000 residents covering approximately 269 miles and is organized into four squads: A, B, C, and D which collectively provide 24-hour coverage for Vance County seven days a week. Officers assigned to A and B squad work together and officers assigned C and D squad work together. A/B rotates with C/D every four days, therefore each officer in the Patrol Division works for four days and then has four days off. Each squad consist of 2 or 3 Deputies and a Sergeant. Lieutenant Goolsby and Lieutenant Campbell supervise the Patrol Division.

The issues in this matter arise primarily from Charging Party's continued practice of pulling over Vance County citizens for minor traffic violations and subsequently issuing criminal summonses despite this being outside of his job responsibilities.

Vance County hired White on June 5, 2017 as a Deputy in A squad. His primary job responsibilities were to check on businesses, serve arrest warrants, answer 911 calls, and focus on public safety. Upon hire, White completed the first two weeks of field training with Lieutenant Campbell and then finished his field training with Deputy Wayne. During field training, Campbell noticed that White was overly concerned with traffic violations, despite this not being the primary job function of a Sheriff's Deputy. During training, Lt. Campbell emphasized to White several times that minor traffic stops were not the primary focus of the job position. Deputy Wayne also noted during field training that White was very interested in traffic and reiterated to him that Deputies were not supposed to stop cars and perform traffic unless absolutely necessary.

After White completed field training, he was not issued a citation book. This was not uncommon for Deputies in the department. In fact, several other new Deputies were not issued citation books. Vance County did not issue citation books to newer Deputies because their main focus was to respond to 911 calls and to serve warrants and other legal papers.

Even though White did not have a traffic book, he started pulling over Vance County citizens for minor traffic violations. White did not have the power to write traffic citations, so he would either call another officer for backup to write the citation for him, or he would pull over the citizen, let

**Ogletree
Deakins**

Sincerely,

Andrew C. Avram

ACA:bds
Enclosures

36293235.1

# W Bullock – Order re K9 Dave

# VANCE COUNTY SHERIFF'S OFFICE

## EMPLOYEE COUNSELING RECORD

DATE: 08/20/2018

TIME: 17:00 PM

EMPLOYEE: DEPUTY ADAM HIGHT

Due to the circumstances of the K-9 incident involving K-9 Dave today at the school nutrition warehouse, you are hereby instructed that going forward until further training can be conducted and K-9 Dave satisfactorily certified, you are not to bring K-9 Dave to work. K-9 Dave is to be kept at home secured in his kennel at all times unless you are exercising the dog. Any work conducted with K-9 Dave outside of the kennel shall be ON LEAD until further notice. At no time should K-9 Dave be outside his confines without physical control of the K-9 with actual leads. Per Sheriff White.

_____     _____

EMPLOYEE SIGNATURE    DATE      SUPERVISOR SIGNATURE    DATE

W Bullock – State v. Hargrove

# Court of Appeals of North Carolina.

## STATE of North Carolina v. Brian Lamont HARGROVE.

## No. COA08-1538.

## Decided: August 17, 2010

Attorney General Roy Cooper, by Assistant Attorney General Charles E. Reece, for the State. Jarvis John Edgerton, IV, for defendant-appellant.

Appeal by defendant from judgment entered 20 March 2008 and order entered 25 March 2008 by Judge Paul G. Gessner in Superior Court, Vance County. Heard in the Court of Appeals 18 August 2009.

"[A] defendant is not entitled by reason of former jeopardy to dismissal of the charge against him, where he failed to object to the trial court's termination of his first trial by a declaration of mistrial."[1] In the present case, Defendant Brian Lamont Hargrove argues that the trial court erred in denying his motion to dismiss the charges against him on the grounds of double jeopardy, when his prior trial on the same charges ended with the declaration of a mistrial. Because Defendant failed to object to the declaration of a mistrial, Defendant failed to preserve his claim. We therefore dismiss Defendant's appeal.

On 25 July 2005 Defendant was indicted for robbery with a dangerous weapon and first degree murder. Defendant filed a motion to declare the case noncapital on 20 June 2006. On 25 July 2006, the Vance County District Attorney filed a motion consenting to declare the case noncapital. Defendant was first tried in February 2008. The State's evidence in that case tended to show the following:

Samir Harith Abdul Rasheed was found dead in his home on 29 March 2004. At the time his body was discovered, Rasheed was renting a mobile home on or near Vincent Hoyle Road. It was determined that Rasheed's death was caused by two gunshot wounds, one to the left cheek and one to the abdomen. At the scene, officers found several .357 SIG shell casings.

The State presented the testimony of Weldon Bullock, a captain with the Vance County Sheriff's Office. After discussing some of the ballistics evidence recovered from Rasheed's home, Bullock was asked to identify three other exhibits. These were three .357 SIG shell casings found beside a dirt path near Club Pond Road on 21 June 2005. Bullock testified that all of these items were obtained from Officer Cordell.

The State later called J.M. Cordell. Cordell testified that in 2004 and 2005 he was employed as Chief Investigator with the Vance County Sheriff's Department. Cordell stated that the first time he went to Club Pond Road he was responding to a call from Detective Allman, who reported that he had observed a box of .357 SIG bullets on top of a refrigerator in a residence on Club Pond Road. Cordell went to the vicinity and found three spent .357 SIG casings on a dirt path that runs off the end of Club Pond Road. Cordell stated that Defendant was living in a nearby house at the time.

On cross-examination, Cordell stated that the investigative report on the shell casings found on Club Pond Road was part of the Sheriff's Department file in this case. Defense counsel told the trial court that the report and the photographs of the shell casings found on Club Pond Road had not been turned over by the State in discovery. The trial court instructed the prosecutor to produce the report, and declared a recess.

When court reconvened, the prosecutor informed the trial court that he was unable to locate any additional report or photographs. The judge informed the attorneys that he would see them in chambers. During the conference, the judge asked whether the State or Defendant was going to request a mistrial. Neither attorney moved for a mistrial at that time. Court reconvened and Defense counsel asked for another recess to research what to do at this point. The prosecutor stated that he had no objection to a recess, and asked to approach.

In the ensuing bench conference, the trial court informed Defense counsel that if he did not request a mistrial, then he would be engaging in per se ineffective assistance of counsel. The judge informed the prosecutor that he was unsure what effect a motion for a mistrial by the State would have on the case. Nevertheless, Defense counsel did not move for a mistrial.

On the record, but outside of the presence of the jury, the trial court explained that he could not allow the jury to consider evidence which had not been provided to Defendant, and he could not expect the jury to disregard "the connection between the discovery of the unique bullets on the refrigerator and the bullets that were allegedly used in the murder[.]" The judge then stated "the Court, of its own motion . would declare a mistrial in this case."

The jury was brought into the courtroom. The trial court explained that the law requires full disclosure by the State, and under these circumstances the judge would have to ask the jury to disregard Cordell's testimony. The trial court stated "I can't put you in that position, because it-it would be extremely difficult for anyone to remain fair and impartial, having heard some testimony which I consider to be critical in the case, and having to disregard that evidence with respect to the trial of the case." The trial court stated that it had therefore declared a mistrial. The trial court then dismissed the jury.

The State gave notice to Defendant that it intended to try him again on the same charges. On 6 March 2008 Defendant filed a motion to dismiss on the grounds of double jeopardy. A hearing on the motion was conducted on 13 March 2008. The judge reserved ruling on the motion. Defendant was tried at the 17 March 2008 Criminal Session of Vance County Superior Court. At trial, the State presented the testimony of, among others, Rashad Coleman, a witness to Defendant's shooting the victim. A jury found Defendant guilty of robbery with a dangerous weapon and second degree murder. On 25 March 2008 the trial court entered a written order denying Defendant's motion to dismiss.

On appeal, Defendant argues that the trial court violated his constitutional right to be free from double jeopardy. Defendant first argues that the trial court erred in declaring a mistrial in the absence of manifest necessity, thereby subjecting him to double jeopardy. Defendant argues further that the motion hearing court erred in failing to review the trial court's conclusion that it was impossible to proceed with the first trial in conformity with law.

Preliminarily we address the question of whether Defendant preserved the issue he now seeks to appeal. Our Supreme Court "held in State v. Odom, 316 N.C. 306, 341 S.E.2d 332 (1986), a noncapital case, that a defendant is not entitled by reason of former jeopardy to dismissal of the charge against him, where he failed to object to the trial court's termination of his first trial by a declaration of mistrial." State v. Lachat, 317 N.C. 73, 85, 343 S.E.2d 872, 878 (1986). Our Supreme Court indicated in Lachat that a different rule would apply in capital cases, when the trial court provided the defendant no opportunity to object by prior notice or warning. Id. at 85-86, 343 S.E.2d at 878-79.

Here, pursuant to the prosecutor's consent to Defendant's pre-trial motion to declare the case noncapital, Defendant's trial was a noncapital case. See id. at 86, 343 S.E.2d at 879. (noting that the State's stipulation caused case to lose its capital nature); see also N.C. Gen.Stat. § 15A-2004(a) (2009) ("The State, in its discretion, may elect to try a defendant capitally or noncapitally for first degree murder[.]"). Defendant is therefore not entitled to the Lachat exception to the Odom waiver rule when the case is capital.

Defendant posits that Lachat provides an alternative avenue to the exception when a defendant does not have the opportunity to object to the declaration of a mistrial. Contrary to Defendant's assertion, however, Defendant clearly had the opportunity to object in this case. The trial court first raised the issue of a mistrial in chambers with the attorneys, and again at the bench-conference. Defense counsel was thereby notified that the trial court was considering a mistrial. The trial court then explained its decision to the attorneys on the record before the jury entered the courtroom and was informed of the mistrial. At no point during the conferences with the judge, during the trial court's announcement to the attorneys, or during the trial court's explanation to the jury did Defendant object to the mistrial. Nor did Defendant request an opportunity to be heard on the matter. By failing to object when his first noncapital trial was terminated, Defendant failed to preserve his claim that he is entitled by reason of former jeopardy to dismissal of the charges against him. See Odom, 316 N.C. at 311, 341 S.E.2d at 335.

APPEAL DISMISSED.

FOOTNOTES

1. State v. Lachat, 317 N.C. 73, 85, 343 S. E.2d 872, 878 (1986).

# W Bullock – Termination Action




## VANCE COUNTY
## PERSONNEL / PAYROLL ACTION FORM

☐ New Hire/Rehire   ☐ Change   ☐ Leave of Absence   ☑ Termination   ☐ Other

| | | | |
|---|---|---|---|
| Effective Date: | 10/24/2018 | Date of Hire: | 06/05/2017 |
| Name: | JUSTIN J. WHITE | SSN: | |
| Address: | | Marital Status: | |
| City/State: | | Sex: | Race: |
| Zip/County: | | Date of Birth: | |
| Department: | SHERIFF'S OFFICE | | |
| Job Title: | | Grade: | Job #: |
| Monthly/Hourly Rate: | | Annual Salary: | |
| Explanation: | SERVICES NO LONGER NEEDED | | |

**SHERIFF & 911 ONLY:** *Please check all that apply. Provide a date and a copy of the certification.*

☐ Sheriff Department-BLET Certified: _____   ☐ 911-EMD Certified: _____

| | | |
|---|---|---|
| Employee Signature: | "Not Available for Signature" | Date: |
| Department Head Signature: | | Date: 12-25-18 |
| Human Resources Signature: | *Marquita R Dixon* | Date: 10/25/2018 |
| Payroll Signature: | | Date: |

*This instrument has been pre-audited in the manner required by the Local Government Budget & Fiscal Control Act.*
Approved by Finance Director: _____   Date: _____

**HUMAN RESOURCES USE ONLY**
*Please check all that apply and attach the appropriate forms.*

| | | | | | |
|---|---|---|---|---|---|
| Deductions: | ☐ Employee - Medical ___ | ☐ Employee - Dental ___ | | ☐ Employee - Life ___ | |
| Attach the following Forms: | ☐ Federal & State Tax Forms | ☐ Direct Deposit Info | | ☐ Longevity | |
| Upon Employment Separation - Eligible: | ☐ Vacation Payout | | ☐ Comp Time Payout | | |
| Retirees Eligible for Benefits: | ☐ Health | ☐ Dental | | ☐ Life | |
| Completed By: | | | Date: | | |

*Form Revised 7.18.13*

## EXHIBIT 5

# W Bullock – Vance County Personnel Policy

# VANCE COUNTY

# PERSONNEL POLICY MANUAL



**Revised July 1, 2016**
January 1, 2009

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 399 of 665

# VANCE COUNTY
# PERSONNEL POLICY

BE IT RESOLVED by the Board of County Commissioners for Vance County that the following policies apply to the appointment, classification, benefits, salary, promotion, demotion, dismissal, and conditions of employment for the employees of the County.

| **Article** | **Title** | **Page** |
|---|---|---|
| ARTICLE I. | GENERAL PROVISIONS | |
| Section 1. | Purpose of the Policy…………………………..….……………… | 5 |
| Section 2. | Merit Principles ………………………………………………… | 5 |
| Section 3. | Responsibilities of the County Board of Commissioners ……….. | 5 |
| Section 4. | Responsibilities of the County Manager …………………………… | 5 |
| Section 5. | Responsibilities of the Human Resources Director ……………… | 6 |
| Section 6. | Application of Policies, Plan, Rules, and Regulations ………….. | 7 |
| Section 7. | Departmental Rules and Regulations ………………………… | 7 |
| Section 8. | Definitions ……………………………………………………… | 7 |
| Section 9. | At Will Employment …………………………………………… | 8 |
| | | |
| ARTICLE II. | POSITION CLASSIFICATION PLAN ………………………………… | 9 |
| Section 1. | Purpose ………………………………………………………… | 9 |
| Section 2. | Composition of the Position Classification Plan ………………… | 9 |
| Section 3. | Use of the Position Classification Plan ……………………………… | 9 |
| Section 4. | Administration of the Position Classification Plan ……………… | 9 |
| Section 5. | Authorization of New Positions and | |
| | the Position Classification Plan………………………………… | 10 |
| Section 6. | Request for Reclassification ………………………………… | 10 |
| | | |
| ARTICLE III. | THE PAY PLAN | |
| Section 1. | Definition ……………………………………………………….. | 11 |
| Section 2. | Administration and Maintenance …………………………………… | 11 |
| Section 3. | Starting Salaries ……………………………………………… | 11 |
| Section 4. | Trainee Designation and Provisions …………………………… | 11 |
| Section 5. | Probationary Pay Increases ………………………………… | 12 |
| Section 6. | Pay Range Increases ………………………………………… | 12 |
| Section 7. | Performance Pay Increases ………………………………… | 12 |
| Section 8. | Salary Effect of Promotions, Demotions, Transfers, | |
| | And Reclassifications …………………………………………… | 13 |
| Section 9. | Salary Effect of Salary Range Revisions …………………………… | 13 |
| Section 10. | Transition to a New Salary Plan ………………………………… | 14 |
| Section 11. | Effective Date of Salary Changes …………………………… | 14 |
| Section 12. | Overtime Pay Provisions ……………………………………… | 14 |
| Section 13. | On-Call and Call-Back Compensation ………………………… | 15 |
| Section 14. | Payroll Schedule and Deductions …………………………… | 16 |
| Section 15. | Hourly Rate of Pay …………………………………………… | 16 |
| Section 16. | Longevity Pay ………………………………………………… | 17 |
| Section 17. | Pay for Interim Assignment in a Higher Level Classification … | 17 |

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 400 of 665

ARTICLE IV.   RECRUITMENT AND EMPLOYMENT ............................................   18
        Section 1.        Equal Employment Opportunity ............................................   18
        Section 2.        Implementation of Equal Employment Opportunity Policy .......   18
        Section 3.        Recruitment, Selection and Appointment ............................   18
        Section 4.        Probationary Period ..........................................................   19
        Section 5.        Promotion .......................................................................   19
        Section 6.        Demotion ........................................................................   20
        Section 7.        Transfer ..........................................................................   20

ARTICLE V.    CONDITIONS OF EMPLOYMENT ............................................   21
        Section 1.        Work Schedule ................................................................   21
        Section 2.        Political Activity ...............................................................   21
        Section 3.        Expectation of Ethical Conduct ..........................................   21
        Section 4.        Outside Employment ........................................................   22
        Section 5.        Dual Employment ............................................................   22
        Section 6.        Employment of Relatives ..................................................   22
        Section 7.        Workplace Romance ........................................................   23
        Section 8.        Harassment ....................................................................   23
        Section 9.        Use of County Time, Equipment, Supplies, and Vehicles ......   24
        Section 10.       Performance Evaluation ...................................................   24
        Section 11.       Safety .............................................................................   24
        Section 12.       Immigration Law Requirements .........................................   24
        Section 13.       Substance Abuse ............................................................   25
        Section 14.       Credentials and Certifications ...........................................   25

ARTICLE VI.   EMPLOYEE BENEFITS ...........................................................   26
        Section 1.        Eligibility .........................................................................   26
        Section 2.        Group Health and Hospitalization Insurance ......................   26
        Section 3.        Group Life Insurance .......................................................   26
        Section 4.        Other Optional Group Insurance Plans ..............................   26
        Section 5.        Retirement ......................................................................   26
        Section 6.        Supplemental Retirement Benefits (401-K) ........................   27
        Section 7.        Social Security ................................................................   27
        Section 8.        Workers' Compensation ...................................................   27
        Section 9.        Unemployment Compensation ..........................................   28
        Section 10.       Tuition Assistance Program .............................................   28
        Section 11.       Credit Union ...................................................................   28
        Section 12.       Law Enforcement Separation Allowance ...........................   28

ARTICLE VII.  HOLIDAYS AND LEAVES OF ABSENCE ..................................   30
        Section 1.        Policy .............................................................................   30
        Section 2.        Holidays .........................................................................   30
        Section 3.        Holidays:  Effect of Other Types of Leave .........................   30
        Section 4.        Holidays:  Compensation When Work is Required .............   30
        Section 5.        Vacation Leave ...............................................................   30
        Section 6.        Vacation Leave:  Use by Probationary Employees .............   31
        Section 7.        Vacation Leave:  Accrual Rate .........................................   31
        Section 8.        Vacation Leave:  Maximum Accumulation .........................   31
        Section 9.        Vacation Leave:  Manner of Taking ..................................   31
        Section 10:       Vacation Leave:  Payment Upon Separation .....................   31

2

| | | |
|---|---|---|
| Section 11. | Vacation Leave: Payment Upon Death | 32 |
| Section 12. | Sick Leave | 32 |
| Section 13. | Sick Leave: Accrual Rate and Accumulation | 32 |
| Section 14. | Sick Leave: Medical Certification | 32 |
| Section 15. | Leave Pro-Rated | 33 |
| Section 16. | Leave Without Pay | 33 |
| Section 17. | Family Medical Leave | 33 |
| Section 18. | Family Medical Leave: Medical Certification | 34 |
| Section 19. | Family Medical Leave and Leave Without Pay: Retention and Continuation of Benefits | 35 |
| Section 20. | Workers' Compensation Leave | 35 |
| Section 21. | Military Leave | 36 |
| Section 22. | Reinstatement Following Military Service | 36 |
| Section 23. | Civil Leave | 37 |
| Section 24. | Parental School Leave | 37 |
| Section 25. | Funeral Leave | 37 |
| Section 26 | Adverse Weather and Emergency Conditions Policy | 37 |

ARTICLE VIII. SEPARATION AND REINSTATEMENT ... 39

| | | |
|---|---|---|
| Section 1. | Types of Separations | 39 |
| Section 2. | Resignation | 39 |
| Section 3. | Reduction in Force | 39 |
| Section 4. | Disability | 39 |
| Section 5. | Voluntary Retirement | 39 |
| Section 6. | Death | 40 |
| Section 7. | Dismissal | 40 |
| Section 8. | Reinstatement | 40 |
| Section 9. | Rehiring | 40 |

ARTICLE IX. UNSATISFACTORY JOB PERFORMANCE AND DETRIMENTAL PERSONAL CONDUCT ... 41

| | | |
|---|---|---|
| Section 1. | Disciplinary Action for Unsatisfactory Job Performance | 41 |
| Section 2. | Unsatisfactory Job Performance Defined | 41 |
| Section 3. | Communication and Warning Procedures Preceding Disciplinary Action for Unsatisfactory Job Performance | 41 |
| Section 4. | Disciplinary Action for Detrimental Personal Conduct | 42 |
| Section 5. | Detrimental Personal Conduct Defined | 42 |
| Section 6. | Pre-Dismissal Conference | 43 |
| Section 7. | Non-Disciplinary Suspension | 43 |

ARTICLE X. GRIEVANCE PROCEDURE AND ADVERSE ACTION APPEAL ... 44

| | | |
|---|---|---|
| Section 1. | Policy | 44 |
| Section 2. | Grievance Defined | 44 |
| Section 3. | Purposes of the Grievance Procedure | 44 |
| Section 4. | Procedure | 44 |
| Section 5. | Role of the Human Resources Director | 46 |
| Section 6. | Grievance and Adverse Action Appeal Procedure for Discrimination | 46 |

3

ARTICLE XI.   PERSONNEL RECORDS AND REPORTS ................................ 47
       Section 1.     Public Information ........................................................ 47
       Section 2.     Access to Confidential Records ...................................... 47
       Section 3.     Personnel Actions ....................................................... 48
       Section 4.     Records of Former Employees ...................................... 48
       Section 5.     Remedies of Employees Objecting to Material in File ......... 48
       Section 6.     Penalties for Permitting Access to Confidential Records ..... 48
       Section 7.     Examining and/or Copying Confidential Material without .... 48
       Section 8.     Destruction of Records Regulated .................................. 48

ARTICLE XII.  IMPLEMENTATION OF POLICIES ........................................... 49
       Section 1.     Conflicting Policies Repealed ........................................ 49
       Section 2.     Separability ................................................................ 49
       Section 3.     Effective Date ............................................................ 49
       Section 4.     Amendments ............................................................. 49

GLOSSARY ....................................................................................... 50

4

## ARTICLE I. GENERAL PROVISIONS

### Section 1. Purpose of the Policy

It is the purpose of this policy and the rules and regulations set forth to establish a fair and uniform system of personnel management for all employees of the County under the administration of the County Manager, Sheriff, Register of Deeds, Elections Board, and Social Services Board. These aforementioned entities are the official appointing authorities covered by this personnel policy. The Sheriff and Register of Deeds are covered by this personnel policy as employees; however, County Commissioners are not covered by this policy. State requirements will supersede these policies for positions subject to the State Personnel Act whenever there is a conflict. This policy is established under authority of G.S. 153A, Article 5 and G.S. 126 of the General Statutes of North Carolina.

### Section 2. Merit Principles

All appointments and personnel actions shall be made on the basis of merit. All positions requiring the performance of the same duties and fulfillment of the same responsibilities shall be assigned to the same class and salary grade. No applicant for County employment or employee shall be deprived of employment opportunities or otherwise be adversely affected as an employee because of an individual's race, color, religion, sex, national origin, political affiliation, qualified disability, or age.

### Section 3. Responsibilities of the County Board of Commissioners

The County Board of Commissioners shall be responsible for establishing and approving human resources policies, the position classification and pay plan, and it may change the policies and benefits as necessary. The Board also shall make and confirm appointments when so specified by the general statutes.

### Section 4. Responsibilities of the County Manager

The County Manager shall be responsible to the County Board of Commissioners for the administration and technical direction of the human resources program. The County Manager shall appoint, suspend, and remove County officers and employees except those elected by the people or whose appointment is otherwise provided for by law. The County Manager shall make appointments, dismissals and suspensions in accordance with the state statutes and other policies and procedures spelled out in other Articles in this Policy.

The County Manager shall:

  a) recommend rules and revisions to the personnel system to the County Board of Commissioners for consideration;

  b) make changes as necessary to maintain an up to date and accurate position classification plan;

  c) recommend necessary revisions to the pay plan;

  d) determine which employees shall be subject to the overtime provisions of the Fair Labor Standards Act (FLSA);

5

e)    develop and administer such recruiting programs as may be necessary to obtain an adequate supply of competent applicants to meet the needs of the County;

f)    perform such other duties as may be assigned by the County Board of Commissioners not inconsistent with this Policy; and

g)    appoint an employee to the role of Human Resources Director or serve in that role for the County.

## Section 5. Responsibilities of the Human Resources Director

The responsibilities of the Human Resources Director are to make recommendations to the County Manager on the following:

a)    recommend rules and revisions to the personnel system to the County Manager for consideration;

b)    recommend changes as necessary to maintain an up to date and accurate position classification plan;

c)    recommend necessary revisions to the pay plan;

d)    recommend which employees shall be subject to the overtime provisions of FLSA;

e)    maintain a roster of all persons in the County service;

f)    establish and maintain a list of authorized positions in the County service at the beginning of each budget year which identifies each authorized position, class title of position, salary range, any changes in class title and status, position number and other such data as may be desirable or useful;

g)    develop and administer such recruiting programs as may be necessary to obtain an adequate supply of competent applicants to meet the needs of the County;

h)    develop and coordinate training and educational programs for County employees;

i)    investigate periodically the operation and effect of the personnel provisions of this policy;

j)    perform such other duties as may be assigned by the County Manager not inconsistent with this Policy; and

k)    insure that all employees receive and sign for a copy of the personnel policy and any revisions.

In the event there is no Human Resources Office, these duties will be assumed by the County Manager or his/her designee.

6

## Section 6. Application of Policies, Plan, Rules, and Regulations

This personnel policy and all rules and regulations adopted pursuant thereto shall be binding on all County employees. The County Manager, County Attorney, elected officials, appointed members of the County Board and advisory boards and commissions will be exempted except in sections where specifically included. An employee violating any of the provisions of this policy shall be subject to appropriate disciplinary action, as well as prosecution under any civil or criminal laws which have been violated.

## Section 7. Departmental Rules and Regulations

Due to the particular personnel and operational requirements of the various departments of the County, each department is authorized to establish supplemental rules and regulations applicable only to the personnel of that department. All such rules and regulations shall be subject to the approval of the County Manager or designee, and shall not in any way conflict with the provisions of this Policy, but shall be considered as a supplement to this Chapter.

## Section 8. Definitions

For the purposes of this chapter, the following words and phrases shall have the meanings respectively ascribed to them by this section:

**Adverse Action.** An involuntary demotion, reduction in pay, suspension, reduction in force, or separation from employment.

**Anniversary Date.** The employee's most recent date of employment with the county service in a permanent position.

**Hiring Authority.** The County Manager will be designated as the Hiring Authority with the following exceptions:

a) The Sheriff shall be the Hiring Authority for positions in the Sheriff's Office and at the Detention Center;

b) The Register of Deeds shall be the Hiring Authority for positions in the Register of Deeds Office;

c) The Board of Elections shall be the Hiring Authority for positions in the Elections Department; and

d) The Social Services Director shall be the Hiring Authority for positions in the Social Services Department.

**Classification.** A title of a single or group of positions which are sufficiently similar to require the same set of knowledges, skills, abilities, education and experience qualifications.

**Full-time employee.** An employee who is in a position for which an average work week of at least 37.5 hours and continuous employment of at least 12 months are required by the County. Such employees are eligible for benefits.

7

**Immediate family.** A spouse, parent, guardian, child, sister, brother, grandparent, grandchild and/or the various combinations of half, step, in-law, and adopted relationships that can be derived from those named.

**Impaired.** Being in a less than perfect or whole condition. Such state that one's physical and/or mental capacities and capabilities are weakened, diminished, or damaged.

**Part-time employee.** An employee who is in a position for which an average work week consists of less than 37.5 hours and continuous employment of at least 12 months. There are two categories of part-time employees: Employees in a budgeted, salaried position. Such positions are eligible for leave benefits. Employees whose positions are not budgeted and paid on an hourly basis, are referred to as hourly paid employees and are not eligible to earn leave benefits.

**Permanent position.** A position authorized for the budget year for a full twelve months and budgeted for twenty or more hours per week. All County positions are subject to budget review and approval each year by the Board of Commissioners and all employees' work and conduct must meet County standards. Therefore, reference to "permanent" positions or employment should not be construed as a contract or right to perpetual funding or employment.

**Probationary employee.** An employee appointed to a full or part-time regular position who has not yet successfully completed the designated probationary period. Persons in trainee appointments are a probationary employee for the full duration of their appointment in that status.

**Public safety employee.** An employee who works in the following departments: Animal Control, Emergency Management & Operations, Sheriff Department, Detention Center, Fire, and Emergency Medical Services.

**Regular employee.** An employee appointed to a full or part-time position who has successfully completed the designated probationary period.

**Trainee.** An employee status when an applicant is hired (or employee promoted) who does not meet all of the requirements for the position. During the duration of a trainee appointment, the employee is on probationary status.

**Work Against Appointment.** In departments whose employees are subject to the State Personnel Act, the Hiring Authority may appoint an employee in a work against situation. When qualified applicants are unavailable and there is no trainee provision for the classification of the vacancy, the Hiring Authority may appoint an employee below the level of the regular classification in a "work against" appointment. This appointment is for the purpose of allowing the employee to gain the qualifications needed for the full class through on the job experience. A work against appointment may not be made when applicants are available who meet the knowledge, skills, abilities, training and experience requirements for the full class in the position being recruited without clear justification.

### Section 9. At Will Employment

Vance County is an at will employer. Nothing in this policy creates an employment contract or term between the County and its employees. Employees subject to the State Personnel Act will be governed by those provisions where they apply.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 407 of 665

# ARTICLE II.  POSITION CLASSIFICATION PLAN

## Section 1.  Purpose.

The position classification plan provides a complete inventory of all authorized and permanent positions in the County service, and an accurate description and specification for each class of employment. The plan standardizes job titles, each of which is indicative of a definite range of duties and responsibilities. All positions covered by the personnel policy are to be classified according to the assigned duties, responsibilities, qualifications needed, and other required factors. In order to insure its continuing value as a personnel management tool, the positions classification plan will be maintained to reflect the current work assignments and other conditions and requirements which are factors in proper classification and allocation of regular positions.

Positions in the Department of Social Services will be classified by the NC Office of State Human Resources in compliance with the rules and regulations under the State Personnel Act.

## Section 2. Composition of the Position Classification Plan

The classification plan shall consist of:

a)     A grouping of positions in classes which are approximately equal in difficulty and responsibility which call for the same general qualifications, and which can be equitably compensated within the same range of pay under similar working conditions;

b)     class titles descriptive of the work of the class;

c)     written specifications for each class of positions; and

d)     an allocation list showing the class title of each position in the classified service.


## Section 3. Use of the Position Classification Plan

The classification plan is to be used:

a)     as a guide in recruiting and examining applicants for employment;

b)     in determining lines of promotion and in developing employee training programs;

c)     in determining salary to be paid for various types of work;

d)     in determining personnel service items in departmental budgets; and

e)     in providing uniform job terminology.

## Section 4. Administration of the Position Classification Plan

The County Manager, assisted by the Human Resources Director, shall allocate each position covered by the classification plan to its appropriate class, and shall be responsible for the administration of the position classification plan. The Human Resources Director shall periodically review portions of the

9

classification plan and recommend revisions to the County Manager to ensure that classifications accurately reflect current job duties and responsibilities. The Human Resources Director shall also periodically review the entire classification plan and, when needed, recommend major changes to the County Manager. The Office of State Human Resources shall administer the classification plan for employees who are subject to the State Personnel Act.

## Section 5. Authorization of New Positions and the Position Classification Plan

New positions shall be established upon recommendation of the Manager and approval of the Board of Commissioners. New positions shall be recommended to the Board of Commissioners with a recommended class title. The position classification plan, along with any new positions or classifications shall be approved by the Board of Commissioners and on file with the Human Resources Director. Copies will be available to all employees for review upon request.

## Section 6. Request for Reclassification

Any employee who considers the position in which classified to be improper shall submit a request in writing for reclassification to such employee's immediate supervisor, who shall immediately transmit the request to the Human Resources Director through the chain of command. Upon receipt of such request, the Human Resources Director shall study the request, determine the merit of the reclassification, and make the necessary changes to maintain a fair and accurate classification plan, subject to approval by the County Manager.

10

# ARTICLE III. THE PAY PLAN

## Section 1. Definition

The pay plan includes the Salary Schedule and the Assignment of Classes to Salary Grades and Ranges adopted by the Board of County Commissioners. The salary schedule may consist of a Hiring, Minimum, Midpoint, and Maximum rates of pay for each job classification approved by the Board of County Commissioners. Salary increases within the pay range shall be based on criteria established by the County Manager and approved by the Board of County Commissioners.

## Section 2. Administration and Maintenance

The County Manager shall be responsible for the administration and maintenance of the pay plan. All employees covered by the pay plan shall be paid at a rate within the salary range established for the respective position classification, except for employees in trainee status or employees whose existing salaries are above the established maximum rate following transition to a new pay plan.

The pay plan is intended to provide equitable compensation for all positions, reflecting differences in the duties and responsibilities, the comparable rates of pay for positions in public employment in the area, changes in the cost of living, the financial conditions of the County, and other factors. To this end, from time to time the County Manager, assisted by the Human Resources Director, shall make comparative studies of all factors affecting the level of salary ranges and may make minor adjustments in the allocation of positions to salary grades. When major adjustments encompassing numerous positions are needed, or when a general adjustment is needed to the pay plan, the County Manager shall recommend such changes in salary ranges as appear to be warranted to the Board. The Board shall adopt the Salary Schedule and assignment of Job Classes to Salary Grades, including any minor adjustments made by the County Manager during the previous budget year, annually as part of the budget process.

The County Manager may approve in-range adjustments to employee salaries not to exceed ten percent when necessary to accommodate inequities, special performance or achievements, or other issues.

## Section 3. Starting Salaries

All persons employed in positions approved in the position classification plan normally shall be employed at the Hiring Rate for the classification in which they are employed; however, on the recommendation of the department head, with the approval of the County Manager, employee salaries may be approved above the Hiring Rate. Reasons for hiring above the Hiring Rate include exceptional education and experience qualifications of the applicant, a shortage of qualified applicants, and/or the refusal of qualified applicants to accept employment at the Hiring Rate. Department Heads shall consider internal equity of other employees in the department when making a recommendation for employment above the Hiring Rate.

Elected officials, i.e. the Sheriff and Register of Deeds, shall be paid upon initial election or appointment, at the entry rate of pay for the position because there is no Hiring Authority to make decisions concerning their qualifications for placement above the hiring rate.

## Section 4. Trainee Designation and Provisions

Applicants being considered for employment or County employees who do not meet all of the requirements for the position for which they are being considered may be hired, promoted, demoted, or

11

transferred by the County Manager to a "trainee" status or under the State Personnel Act job classes as a "work against." In such cases, a plan for training and meeting the minimum qualifications for the job classification, including a time schedule, must be prepared by the supervisor. An employee shall remain at the trainee or "work against" salary level until the Department Head certifies that the employee is qualified to assume full responsibilities of the position and the County Manager approves the certifications. The Department Head shall review the progress of each employee in a trainee or "work against" status every six months or more frequently as necessary to determine when the employee is qualified to assume full responsibilities of the position. "Trainee" salaries may be one to three grades below the Hiring rate established for the position for which the person is being trained. Assignment three grades below is appropriate when the traineeship is expected to last two years. Assignment two grades below is appropriate for more than six months but less than two years. (Note: Positions subject to the State Personnel Act may be assigned no more than two grades below as for trainee purposes.) The actual assignment should be reviewed and approved by the Human Resources Director. A new employee designated as "trainee" appointment shall be in a probationary status until requirements for the full job class are met.

If the training is not successfully completed as planned, the employee shall be transferred, demoted, or dismissed. If the training is successfully completed, the employee shall be paid at least at the Hiring rate established for the job class.

### Section 5. Probationary Pay Increases

Employees hired or promoted into the Hiring Rate of the pay range shall receive a salary increase within the salary range of approximately 5% upon successful completion of the probationary period. Employees serving a twelve-month probationary period are eligible for consideration for this pay increase after nine months of successful employment. Employees hired or promoted above the hiring rate shall receive an increase of up to 2.5% based upon performance and approval of the Human Resources Director for consistency across departmental lines when removed from probationary status. (See Article IV, Section 4 for more information on probationary periods). Such increases shall only be provided so long as the funding for such an increase is available.

### Section 6. Pay Range Increases

Upward movement within the established salary range for an employee is not automatic but rather based upon specific criteria. Procedures for determining performance levels and performance pay increases shall be established in procedures approved by the County Manager.

### Section 7. Performance Pay Bonus

If the County implements a performance pay system, employees who are at the maximum of the salary range for their position classification will be eligible to be considered for a one-time performance (merit) bonus at their regular performance evaluation time. A Performance (merit) bonus shall be awarded based upon the performance of the employee as described in the performance evaluation and shall be the same percentage of annual salary as employees within the salary range with the same performance level. Performance (merit) bonuses do not become part of base pay and shall be awarded in a lump sum one-time payment. Such bonuses are subject to the availability of funding.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 411 of 665

## Section 8. Salary Effect of Promotions, Demotions, Transfers, and Reclassifications
(See Article IV for definitions of these terms)

**Promotions.** When an employee is promoted to a position with a higher salary grade, the employee's salary shall normally be advanced to the Hiring Rate of the new position, or to a salary which provides an increase of at least approximately 5% over the employee's salary before the promotion, provided, however, that the new salary may not exceed the Maximum rate of the new salary range. The purpose of the promotional pay increase is to recognize and compensate the employee for assuming increased responsibility. The amount of the salary adjustment should be based on:

a)      the employee's related education, training, and experience;

b)      the nature and magnitude of the change in jobs;

c)      budget availability;

d)      consistency with similar situations in the past;

e)      internal equity within the department; and

f)      other relevant issues.

Cost of living (or market adjustment), probationary increases for a previous job, and other in-range increases cannot take the place of a promotional increase. The relative position of the employee's adjusted salary within the new salary range shall not exceed the relative position of the employee's salary in the current range.

**Demotions.** When an employee is demoted to a position for which qualified, the salary shall be set at the rate in the lower pay range which provides a salary commensurate with the employees' qualifications to perform the job when the demotion is not the result of discipline. If the current salary is within the new range, the employee's salary may be retained at the previous rate, if appropriate. Consideration should be given to whether the employee is receiving the same pay for decreased workload or responsibility level and action should be appropriate to this consideration along with internal equity consideration of the pay rate of other employees in the same classification. If the demotion is the result of disciplinary action, the salary shall be decreased to the same relative position in the new grade that the employee occupied in the old grade.

**Transfers.** The salary of an employee reassigned to a position in the same class or to a position in a different class within the same salary grade shall not be changed by the reassignment.

**Reclassifications.** An employee whose position is reclassified to a class having a higher salary range and who is below mid point in the current range shall be placed in the same relative range position in the new grade that the employee occupied in the old grade. If the employee is above the mid point in the current range, the employee will be placed at no greater than the mid point.

If the position is reclassified to a lower pay range, the employee's salary shall remain the same. If the employee's salary is above the maximum established for the new range, the salary of that employee shall be maintained at the current level until the range is increased above the employee's salary.

## Section 9.  Salary Effect of Salary Range Revisions

When a class of positions is assigned to a higher salary range as a result of labor market conditions,

13

employees in that class who are below mid point in the current range shall be placed in the same relative range position in the new grade that the employees occupied in the old grade. Employees who are above mid point in the current range will be placed at no greater than the mid point of the new range.

When a class of positions is assigned to a lower salary range, the salaries of employees in that class will remain unchanged. If this assignment to a lower salary range results in an employee being paid at a rate above the maximum established for the new class, the salary of that employee shall be maintained at that level until such time as the employee's salary range is increased above the employee's current salary.

## Section 10. Transition to a New Salary Plan

The following principles shall govern the transition to a new salary plan:

1) No employee shall receive a salary reduction as a result of the transition to a new salary plan.

2) All employees being paid at a rate lower than the Minimum rate established for their respective classes shall have their salaries raised to the new Minimum for their classes. The only exception will be those employees in probationary status and currently being paid at the Hiring, a trainee rate, or in a "work against" status. These employees will remain in their same relative pay status in the new salary grade assigned.

3) All employees being paid at a rate above the Minimum and below the Maximum are considered as being paid at a competitive rate for the job class and may receive any approved salary plan implementation increases as authorized by the Board.

4) All employees being paid at a rate above the Maximum rate established for their respective classes shall be maintained at that salary level with no increase in base pay until such time as the employees' salary range is increased above the employees' current salary. This means no performance/merit pay increases or market adjustment/cost of living increases or any other increases to the base pay of the employee until the employee is within the appropriate salary range.

## Section 11. Effective Date of Salary Changes

Salary changes shall become effective on the official effective date of the change, or at such specific date as may be provided by procedures approved by the County Manager.

## Section 12. Overtime Pay Provisions

Employees of the County can be requested and may be required to work overtime hours as necessitated by the needs of the County and determined by the supervisor. All overtime work must be authorized in advance.

Supervisors shall attempt to arrange employee work and schedules so as to accomplish the required work within the standard workweek and without incurring overtime.

The County will comply with the Fair Labor Standards Act (FLSA). The County Manager shall determine which jobs are "Non Exempt" and are therefore subject to the Act in areas such as hours of work and

14

work periods, rates of overtime compensation, and other provisions.

<u>Non-Exempt Employees:</u>  Non-exempt employees will be paid at a straight time rate for hours up to the FLSA established limit for their position (usually 40 hours in a 7 day period or alternative FLSA approved full time schedule). Employees in law enforcement and fire service job classes may earn overtime based on a 28 day time period or other time period as described in FLSA regulations. Hours worked beyond the FLSA established limit will be compensated in time or pay at the appropriate overtime rate. In determining eligibility for overtime in a work period, only hours actually worked shall be considered; in no event will vacation, sick leave, or holidays be included in the computation of hours worked for FLSA purposes.

Whenever practicable, departments will schedule time off on an hour-for-hour basis within the applicable work period for non-exempt employees, instead of paying overtime.  When time off within the work period cannot be granted, overtime worked will be given in the form of compensatory time off or paid in accordance with the FLSA.  Compensatory leave must be used prior to any sick or annual leave.

Earned compensatory time may be granted whenever feasible and determined by the County Manager, based on recommendations from the Department Head.  Accumulation of more than 80 hours of compensatory time is discouraged and must have the approval of the County Manager.  However, under FLSA provisions, non-exempt employees may accumulate up to 240 hours of compensatory time (sworn law enforcement, emergency medical service, and fire service employees may accumulate up to 480 hours).  Nonexempt employees separating from employment shall be paid for their compensatory time balances.

In declared disaster or emergency situations such as a FEMA declared emergency where employees are required to work long and continuous hours, the County Manager may approve compensation at a rate up to double time for those hours worked and/or grant time off with pay for rest and recuperation to ensure safe working conditions.

<u>Exempt employees:</u> Employees in positions determined to be "exempt" from the FLSA (as Executive, Administrative, or Professional staff) will not receive pay for hours worked in excess of their normal work periods. These employees may be granted compensatory leave by their supervisor where the convenience of the department allows and in accordance with procedures established by the County Manager. Such compensatory time is not guaranteed to be taken and ends without compensation upon separation from the organization.

The County intends to make deductions from the pay of exempt employees for authorized reasons and prohibits improper pay deductions.  Exempt employees who wish to question deductions they believe to be improper may use the County's Grievance procedure, as explained in this policy.  If the deduction is found to be improper the County will reimburse the employee for lost pay.

In declared disaster or emergency situations requiring long and continuous hours of work, exempt employees may be compensated at a rate of up to double time for the duration of the emergency period, at the approval of the County Manager.

## Section 13. On-Call and Call-Back Compensation

The County provides continuous twenty-four hours a day, seven days a week service to its citizens. Any employee of the County, as a condition of employment, may be required to respond to any

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 414 of 665

reasonable request for duty at any hour of the day or night. One of the conditions of employment with the County is the acceptance of a share of the responsibility for continuous service in accordance with the nature of each job. If an employee fails to respond to reasonable calls for emergency service, either special or routine, the employee may be subject to disciplinary action up to and including dismissal by the Hiring Authority.

**On-call.** On-call (standby) time consists of scheduled non-work hours in excess of the standard work period when an employee is required to be available to be called back to work on a regularly scheduled or emergency basis and must respond within a reasonable period of time and must not be impaired and able to work. On-call/standby schedules must be approved by the Department Head. The Human Resources Office shall maintain a list of employees who are approved for on-call compensation arrangements. The County Manager will review and approve on-call schedules.

An employee is required by FLSA to be compensated regular pay for on-call time if he or she must remain near an established telephone or otherwise substantially restrict personal activities in order to be ready to respond when called. The County chooses to compensate employees at a rate less than regular pay for the inconvenience of on-call pay when, for example a pager or cell phone is used, and time is not substantially restricted.

The Department of Social Services, Emergency Management, and Animal Control may recommend on-call policies specific to their needs subject to the approval of the County Manager.

**Call-back.** Call-back time consists of actual time spent when called back to work to handle an emergency situation. Non-exempt employees will be guaranteed a minimum payment of one hour of wages for being called back to work outside of normal working hours when not on stand-by. "Call-back" provisions do not apply to previously scheduled overtime work (scheduled one or more days in advance).

## Section 14. Payroll Schedule and Deductions

The payroll schedule shall be established by the County Manager and shall be administered by the Finance Department. Deductions shall be made from each employee's salary, as required by law. Additional deductions may be made upon the request of the employee on determination by the County Manager as to capability of payroll equipment and appropriateness of the deduction.

## Section 15.    Hourly Rate of Pay for full-time, part-time and Temporary Employees and for Work Weeks with Varying Hours

Employees working in a part-time or temporary capacity with the same duties as full-time employees will work at a rate in the same salary range as the full-time employees. Such employees will normally start at the Hiring Rate.

The hourly rate for employees working other than 40 hours per week, such as employees working 37.5 hours per week and law enforcement officers working an average 42 hours per week, will be determined by dividing the average number of hours scheduled per year into the annual salary established for the position.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 415 of 665

## Section 16. Longevity Pay

Full -time employees of the County are compensated for continuous years of service with the County by payment of a longevity supplement based on continuous years of service. Continuous service is continuous employment including any approved leave or involuntary reduction in force.

Longevity amounts shall be as follows:

| Years of Service | Amount |
|---|---|
| 0 - 1 years | $ 50 |
| 2 - 5 years | $100 |
| 6 - 10 years | $200 |
| 11- 15 years | $300 |
| 16 - 20 years | $400 |
| 21 - 25 years | $500 |
| 26 - 30 years | $750 |
| 31 plus years | $1,000 |

Longevity pay will be calculated effective the date of the employee's anniversary and will be issued with the payroll following the employee's anniversary date.

## Section 17. Pay for Interim Assignment in a Higher Level Classification

An employee who is formally designated for a period of at least one month to perform the duties of a job that is assigned to a higher salary grade than that of the employee's regular classification shall receive an increase for the duration of the 'interim' assignment. The employee shall receive a salary adjustment to the entry level (Hiring rate) of the job in which the employee is acting or an increase of 10%. Criteria involved in determining the amount of compensation shall include

a)    the difference between the existing job and that being filled on a temporary basis, and

b)    the degree to which the employee is expected to fulfill all the duties of the temporary assignment.

The salary increase shall be temporary and the employee shall go back to the salary he or she would have had if not assigned to the 'acting' role upon completion of the assignment.

17

# ARTICLE IV.  RECRUITMENT AND EMPLOYMENT

## Section 1. Equal Employment Opportunity Policy

It is the policy of the County to foster, maintain and promote equal employment opportunity. The County shall select employees on the basis of the applicant's qualifications for the job and award them, with respect to compensation and opportunity for training and advancement, including upgrading and promotion, without regard to race, color, religion, sex, sexual orientation, national origin, political affiliation, qualified disability, marital status, or age. Applicants with disabilities shall be given equal consideration with other applicants for positions in which their disabilities do not represent an unreasonable barrier to satisfactory performance of duties.

## Section 2. Implementation of Equal Employment Opportunity Policy

All personnel responsible for recruitment and employment will continue to review regularly the implementation of this policy and relevant practices to assure that equal employment opportunity based on reasonable, job-related job requirements is being actively observed to the end that no employee or applicant for employment shall suffer discrimination because of race, color, religion, sex, sexual orientation, national origin, political affiliation, qualified disability, marital status, or age. Notices with regard to equal employment matters shall be posted in conspicuous places on County premises in places where notices are customarily posted.

## Section 3. Recruitment, Selection and Appointment

**Recruitment Sources.** When position vacancies occur, the Human Resources Director shall publicize these opportunities for employment, including applicable salary information and employment qualifications. Information on job openings and hiring practices will be published in local and/or other news media as necessary to inform the community and create a quality and diverse pool of applicants. In addition, notice of vacancies shall be posted at designated conspicuous sites within departments. Individuals shall be recruited from a geographic area as wide as necessary and for a period of time sufficient to ensure that well-qualified applicants are obtained for County service. The North Carolina Employment Security Commission shall normally be used as a recruitment source. In rare situations because of emergency conditions, high turnover, etc., the County may hire or promote without advertising jobs, upon approval of the County Manager.

**Job Advertisements.** Employment advertisements shall contain assurances of equal employment opportunity and shall comply with Federal and State statutes.

**Application for Employment.** All persons expressing interest in employment with the County shall be given the opportunity to file an application for employment for positions which are currently being recruited.

**Applicant Interest Card.** Persons interested in employment with the County may complete an applicant interest card concerning all of the positions for which they wish to apply. These cards will be maintained for a period of six months. When a vacancy occurs in positions of interest, the card will be sent, notifying the person and requesting that the person complete an application before the designated deadline.

**Application Reserve File.** Applications shall be kept in an inactive reserve file for a period of two years, in accordance with Equal Employment Opportunity Commission guidelines.

18

**Selection.** Department heads, with the assistance of the Human Resources Director, shall make such investigations and conduct such examinations as necessary to assess accurately the knowledge, skills, abilities, physical requirements, certifications, and experience qualifications required for the position. All selection devices administered by the County shall be valid measures of job performance.

**Appointment.** Before any commitment is made to an applicant either internal or external, the Hiring Authority shall provide to the Human Resources Director the position to be filled, the salary to be paid, and the reasons for selecting the candidate over other candidates. The Human Resources Director shall review the provided information against established County policy and procedures and based upon the review, provide a recommendation on the appointments and the starting salary for all applicants to the Hiring Authority. All employment offers should be confirmed in writing. The Personnel Action Form, the original application for employment, a copy of the employment offer letter, and any additional supporting documents pertaining to the selected candidate should be submitted to the Human Resources Director prior to the beginning date of employment. The documents will become part of the new employees personnel file.

## Section 4. Probationary Period

An employee appointed or promoted to a regular position shall serve a probationary period. Employees shall serve a nine month probationary period, except that sworn law enforcement personnel and department heads shall serve a twelve-month probationary period. Employees in trainee or "work against" appointments will have specific time frames established for their probationary period.

During the probationary period, supervisors shall monitor an employee's performance and communicate with the employee concerning performance progress. Employees will participate in an interim probationary review conference at the half point of their probationary periods, a summary of which will be documented in the employee's official personnel file.

Before the end of the probationary period, the supervisor shall determine whether or not the employee is performing satisfactory work and meeting job expectations. The employee's progress (accomplishments, strengths, and areas for improvement) will be discussed with the employee and a summary of this discussion should be documented in the employee's personnel file. The supervisor shall recommend in writing whether the probationary period should be completed, extended, or the employee transferred, demoted, or dismissed. Probationary periods may be extended for three months with the possibility of one more 3 month extension for a maximum of six months. The maximum probationary period for law enforcement officers and department heads is eighteen months and for other County employees is fif.een months.

Disciplinary action, including demotion and dismissal, may be taken at any time during the probationary period of a new hire without following the steps outlined in this Policy. A promoted employee who does not successfully complete the probationary period may be transferred or demoted to a position in which the employee shows promise of success. If no such position is available, the employee shall be dismissed. Promoted employees shall retain all other rights and benefits such as the right to use of the grievance procedures.

## Section 5. Promotion

Promotion is the movement of an employee from one position to a vacant position in a class assigned to a higher salary range. It is the County's policy to create career opportunities for its employees whenever possible. Therefore, when a current employee applying for a vacant position is best suited of

19

all applicants, that applicant shall be promoted to that position. The County will balance three goals in the employment process:

a)     the benefits to employees and the organization of promotion from within;

b)     providing equal employment opportunity and a diversified workforce to the community; and

c)     obtaining the best possible employee who will provide the most productivity in that position.

Therefore, except in rare situations where previous County experience is essential or exceptional qualifications of an internal candidate so indicate, the County will consider external and internal candidates rather than automatically promote from within. Candidates for promotion shall be chosen on the basis of their qualifications and their work records. Internal candidates shall apply for promotions using the same application process as external candidates.

## Section 6. Demotion

Demotion is the movement of an employee from one position to a position in a class assigned to a lower salary range. Demotions may be voluntary or involuntary. An employee whose work or conduct in the current position is unsatisfactory may be involuntarily demoted provided that the employee shows promise of becoming a satisfactory employee in the lower position. Such demotion shall follow the disciplinary procedures outlined in this policy. Demoted employees may appeal this decision based on the Grievance Process outlined in this Personnel Policy.

An employee may request a voluntary demotion when a vacant position is available. Employees may request voluntary demotions in order to accept a position with less complex duties and reduced responsibilities, to change career paths, or for other reasons. A voluntary demotion is not a disciplinary action and is made without using the above-reference disciplinary procedures.

## Section 7. Transfer

Transfer is the movement of an employee from one position to a position in a class in the same salary range. If a vacancy occurs and an employee in another department is eligible for a transfer, the employee shall apply for the transfer using the usual application process. The Department Head wishing to transfer an employee to a different department or classification shall make a recommendation to the County Manager. Any employee transferred without requesting the action may appeal the action in accordance with the grievance procedure outlined in this policy. Employees who are transferred to a different department will serve a six month probationary period.

20

## ARTICLE V.  CONDITIONS OF EMPLOYMENT

### Section 1. Work Schedule

Department heads shall establish work schedules, with the approval of the County Manager, which meet the operational needs of the department in the most cost effective manner possible.

### Section 2. Political Activity

Each employee has a civic responsibility to support good government by every available means and in every appropriate manner.  Each employee may join or affiliate with civic organizations of a partisan or political nature, may attend political meetings, may advocate and support the principles or policies of civic or political organizations in accordance with the Constitution and laws of the State of North Carolina and in accordance with the Constitution and laws of the United States. However, no employee shall:

a)     Engage in any political or partisan activity while on duty;

b)     Use official authority of influence for the purpose of interfering with or affecting the result of a nomination or an election for office;

c)     Be required as a duty of employment or as condition for employment, promotion or tenure of office to contribute funds for political or partisan purposes;

d)     Coerce or compel contributions from another employee of the County for political or partisan purposes;

e)     Use any supplies or equipment of the County for political or partisan purposes; or

f)     Be a candidate for nomination or election to the office of Vance County Commissioner. Employees may be a candidate for any other office.  Employees who wish to run for County Commissioner must first resign.

Where appropriate, the County will comply with all federal Hatch Act requirements.  Any violation of this section shall be deemed improper conduct and shall subject the employee to disciplinary action under this policy.

### Section 3. Expectation of Ethical Conduct

The proper operation of County government requires that public officials and employees be independent, impartial, and responsible to the people; that governmental decisions and policy be made in the proper channels of the governmental structure; that public office not be used for personal gain; and that the public have confidence in the integrity of its government.

As stewards of public resources and holders of the public trust, County employees are expected to up hold the highest standards of ethical conduct while fulfilling their job duties and responsibilities.

No employee of the County shall accept any gift, favor, or thing of value (more than $25) from organizations, business firms, or individuals with whom they have official relationships because of County business.  These limitations do not prohibit the acceptance of articles of negligible value which

21

are distributed generally, nor prohibit employees from accepting social courtesies that provide good public relations, not prohibit employees from obtaining loans from public lending institutions. It is particularly important that inspectors, contracting officers, and law enforcement officers guard against relationships that might be construed as evidence of favoritism, coercion, unfair advantage, or collusion.

### Section 4. Outside Employment

The work of the County shall have precedence over other occupational interests of employees. All outside employment for salaries, wages, compensation, or commission and all self-employment must be reported in advance to the employee's supervisor, who in turn will report it to the Hiring Authority. The Hiring Authority will review such employment for possible conflict of interest and then approve or disapprove the secondary employment. The County Manager may choose to delegate such approval authority to department heads. Documentation of the approval of outside employment will be placed in the employee's personnel file.

Examples of conflicts of interest in outside employment *include but are not limited to:*

a) employment with organizations or in capacities that are regulated by the employee or employee's department; or

b) employment with organizations or in capacities that negatively impact the employee's perceived integrity, neutrality, or reputation related to performance of the employee's County duties.

Off the job injuries: An employee who sustains an injury or illness in connection with outside employment shall not be eligible to use accrued sick leave.

### Section 5. Dual Employment

A full or part-time employee of the County may simultaneously hold another position with the County if the temporary position is in a different department or agency and substantially different capacity and occupational area from that of the full or part-time position. The work must also be performed on an occasional or sporadic basis. Any other situation requires weighted average pay scales and/or overtime pay. However, the work of the full or part-time position shall take precedence over the temporary position.

### Section 6. Employment of Relatives (Nepotism)

The County prohibits the hiring and employment of immediate family in permanent positions within the same department. Except for the Sheriff, Register of Deeds, Department of Social Services and Elections, the County prohibits the employment of immediate family into a permanent position of individuals holding the following positions: County Board of Commissioners Member, County Manager, Deputy County Manager, Human Resources Director, Human Resources Support Staff, Clerk to the Board, Finance Director, Finance Support Staff, IT Director, IT Support Staff, or County Attorney. For those excepted from this provision, the County prohibits the employment of any person into a permanent position who is an immediate family member of individuals holding the following positions: a Board Member who is a member of the Board which oversees such office, their Director, Assistant Director, Human Resources and related Support Staff, Clerk to their Board, Finance/Business Officer and related staff, or Attorney. Otherwise, the County will consider employing immediate family or related persons in the service of the County, provided that such employment does not:

22

a) result in a relative supervising relatives;

b) result in a relative auditing the work of a relative

c) create a conflict of interest with either relative and the County; or

d) create the potential or perception of favoritism.

This clause shall not be retroactive concerning any relative currently working for the County or anyone who has filed for election at the time of adoption. However, it does require that a prohibited employee resign should a relative be elected as a County Commissioner.

This section also prohibits the Sheriff, Register of Deeds, Social Services Director, and Elections Director from hiring or employing their immediate family members in the departments that they supervise.

**Section 7. Workplace Romance**

For the purposes of this policy, workplace romance is defined as a relationship that may be reasonably expected to lead to the formation of a consensual "romantic" or sexual relationship. This policy applies to all employees without regard to the gender or sexual orientation of the individuals involved.

Workplace romance is strictly prohibited for employees within the same department.

**Section 8. Harassment**

Harassment on the basis or race, color, religion, sex, sexual orientation, national origin, age or disability constitutes discrimination. The County opposes harassment by supervisors and co-workers in any form. Harassment is verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of his or her race, color, religion, gender, national origin, age, or disability, or that of his or her relatives, friends, or associates.

Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when a) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; b) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or c) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

Any employee who believes that he or she may have a complaint of harassment may follow the Grievance Procedure described in this Policy or may file the complaint directly with the County Manager, Human Resources Director, or any department head who will advise the Human Resources Director of the complaint. The Human Resources Director will insure that an investigation is conducted into any allegation of harassment and advise the employee and appropriate management officials of the outcome of the investigation.

Employees witnessing harassment shall also report such conduct to an appropriate County official.

23

## Section 9. Use of County Time, Equipment, Supplies, and Vehicles

County supplies and equipment are to be used exclusively for the County's business. During working hours, an employee shall only conduct County business. Use of County time, supplies, or equipment for personal or other purposes not related to the employee's County duties and responsibilities is prohibited and subjects the employee to disciplinary action, up to and including dismissal.

All employees, who use County vehicles, are required to follow applicable motor vehicle and safety requirements. Violation or misuse of County vehicles also subjects the employee to disciplinary action, up to and including dismissal.

County equipment, materials, tool and supplies, shall not be available for personal use and are not to be removed from County property except in the conduct of official County business, unless approved by the Board. No employee shall purchase for personal use any equipment or supplies through County purchase accounts.

The County shall develop and distribute to employees a separate policy covering the use of phones, email, computers, and county cell phones.

Under North Carolina law, all electronic messages sent or received in conducting the County's business is considered a public record and is subject to inspection upon request, regardless of the device or means used.

Surrender of Property. An employee who terminates employment shall be required to return all items of equipment, including uniforms, keys, key passes, etc. owned by the County within 24 hours.


## Section 10. Performance Evaluation

Supervisors and/or Department Heads shall conduct Performance Evaluation conferences with each employee at least once a year. These performance evaluations shall be documented in writing and placed in the employee's personnel file. Procedures for the performance evaluation program shall be published by the County Manager. (Refer to Article IX, Section 2).

## Section 11. Safety

Safety is the responsibility of both the County and employees. It is the policy of the County to establish a safe work environment for employees. The County shall establish a safety program including policies and procedures regarding safety practices and precautions and training in safety methods. Department Heads and supervisors are responsible for insuring the safe work procedures of all employees and providing necessary safety training programs. Employees shall follow the safety policies and procedures and attend safety training programs. Employees who violate such policies and procedures shall be subject to disciplinary action up to and including dismissal.

Additional detailed procedures regarding safety, worker's compensation, injury, and infection control may be established by the County Manager.

## Section 12. Immigration Law Requirements

All employees are required to furnish proof of citizenship or other required documents indicating a legal

24

right to work in the United States. Copies of the completed I-9 form shall be a permanent part of their personnel file.

## Section 13. Substance Abuse

The County is firmly committed to maintaining a drug and alcohol free work environment in order to insure the safety and welfare of the general public and all County employees and to insure an efficient and effective work force. The County also seeks to aid employees experiencing substance abuse problems by offering rehabilitation opportunities. The County Manager has the authority to establish, administer, and enforce substance abuse processes and procedures within the County.

## Section 14. Credentials and Certifications

Some duties assigned to positions in local government service may be performed only by persons who are duly licensed, registered or certified as required by the relevant law, rule or regulation. Employees in such classifications are responsible for maintaining current, valid credentials as required by law, rule or regulation. Failure to obtain or maintain the required credentials is a basis for immediate dismissal without prior warning. An employee who is dismissed shall be given a written statement of the reason for the action and his/her appeal rights.

## ARTICLE VI. EMPLOYEE BENEFITS

### Section 1. Eligibility

All part-time and full-time employees of the County who are in permanent positions are eligible for employee benefits as provided for in this Article which are subject to change at the County's discretion. Hourly employees are only eligible for workers' compensation and social security.

### Section 2. Group Health and Hospitalization Insurance

The County provides group health and hospitalization insurance programs for full-time employees.

### Section 3. Group Life Insurance

The County provides paid life insurance to its employees. Information on costs, coverage, and benefits are available from the Human Resources Director.

### Section 4. Other Optional Group Insurance Plans

The County may make other group insurance plans available to employees upon authorization of the County Manager or County Board Board of Commissioners.

### Section 5. Retirement

Each employee in a permanent position who is expected to work for the County more than 1,000 hours annually shall join the North Carolina Local Governmental Employees' Retirement System when eligible as a condition of employment.

Employees contribute, through payroll deduction, six per cent of their gross salary to the system. The County contributes an actuarially determined percentage of the gross payroll each month to the system.

Provisions of this system are further outlined in the North Carolina Local Government Employees' Retirement System web site on the NC State Treasurer's web site.

Retiree Health Insurance

Each employee in a permanent position who is expected to work for the County more than 1,000 hours annually shall join the North Carolina Local Governmental Employees' Retirement System when eligible as a condition of employment.

Employees contribute, through payroll deduction, six per cent of their gross salary to the system. The County contributes an actuarially determined percentage of the gross payroll each month to the system.

Provisions of this system are further outlined in the North Carolina Local Government Employees' Retirement System web site on the NC State Treasurer's web site.

The County will provide retiree insurance to eligible employees of no more than an amount equal to active employees' premium, which said benefit and/or premium may be subject to change as directed by the governing body.

26

## ELIGIBILITY REQUIREMENTS:

- If hired <u>before July 1, 2011</u>: Employee must retire with the North Carolina Local Governmental Employees' Retirement System (LGERS) and have worked at least 15 consecutive years with Vance County as a full-time employee. Service time credit with the County will be calculated based on actual service time.

  <u>Medicare Supplement</u>: Insurance coverage will continue until the employee becomes eligible for Medicare, at which time the County will convert coverage to a Medicare Supplement policy.

- If hired <u>on or after July 1, 2011</u>: Employee must retire with the LGERS and have worked at least 30 consecutive years as a full-time employee to be eligible for this county-paid benefit. Coverage for the Medicare Supplement is the same as stated above.

- If hired on or after July 1, 2011 and the employee has at least 15 consecutive years with Vance County as a full-time employee, is at least age 55 or older and retires with the LGERS, the employee can participate with the retiree insurance program at his/her cost. (This requirement includes Disability Retirements).

  <u>Medicare Supplement</u>: No coverage will be available through the County.

## Section 6. Supplemental Retirement Benefits (401-K)

The County allows employees to defer a portion of their income before taxes into a 401-K tax deferment plan. The County provides contributions of 5% to a 401-K plan for active law enforcement personnel as required by the state, and an amount to be determined by the County Commissioners to other full and part-time employees.

The County may choose to offer other deferred compensation or supplemental programs.

## Section 7. Social Security

The County, to the extent of its lawful authority and power, has extended Social Security benefits for its eligible employees and eligible groups and classes of such employees.

## Section 8. Workers' Compensation

All employees of the County (full-time, part-time, and temporary) are covered by the North Carolina Workers' Compensation Act and are required to report all injuries arising out of and in the course of employment to their immediate supervisors at the time of the injury and no later than 24 hours following the accident or injury in order that appropriate action may be taken.

Employees may use sick leave and/or vacation during the waiting period before Workers' compensation benefits begin, except that employee may not exceed the regular salary amount using this provision. This provision also applies to reactions to small pox vaccinations administered to County employees under Section 304 of the Homeland Security Act. Such reactions shall be treated the same as any other workers compensation claim as regards leave and salary continuation.

Responsibility for claiming compensation under the Workers' Compensation Act is on the injured employee and the supervisor and such claims must be filed by the employee with the North Carolina

27

Industrial Commission within two years from date of injury. The Human Resources Director or designee will coordinate the filing of such claims.

## Section 9. Unemployment Compensation

County employees are covered by unemployment insurance. County employees who are terminated due to a reduction in force or released from County service may apply for benefits through the local Employment Security Commission office, where a determination of eligibility will be made.

## Section 10. Tuition Assistance Program

Full-time employees who have completed initial probation may apply for tuition reimbursement for courses taken on their own time, which will improve their skills for their current job or prepare them for promotional opportunities within the County service. Tuition, registration, fees, laboratory fees, and student fees are eligible expenses. Employees may be reimbursed eligible expenses up to a total of eight hundred dollars ($800) per fiscal year. Satisfactory completion of the courses will be required for reimbursement. Requests for tuition assistance shall be submitted to the Human Resources Office prior to course registration and are subject to the review and approval of Department Head and County Manager, subject to availability of funds.

## Section 11. Credit Union

Membership in the Local Government Employees' Credit Union is open to all County employees for various loan services, checking, and savings accounts. Membership in the State Employees' Credit Union is open to all employees under the State Personnel Act and their family members for various loan services, checking, and savings accounts.

## Section 12. Law Enforcement Separation Allowance

Every sworn law enforcement officer, as defined by N.C. G. S. 128-21(11d) or N.C. G. S. 143-166.50, shall be eligible for a separation allowance, as provided by N.C. G. S. 143-166.42, in the amount specified in N.C. G. S. 143-166.41(a). The purpose of this allowance is to provide additional income until the law enforcement officer is eligible for social security benefits with the consideration that the law enforcement officer may no longer be able to perform law enforcement work. Given this purpose, eligibility and continuation of these benefits are subject to the following conditions:

a.  The officer shall have completed 30 or more year of creditable service, or have attained 55 years of age and completed five or more years of creditable service; and

b.  Not have attained 62 years of age;

c.  Have completed at least five years of continuous service as a law enforcement officer immediately preceding a service retirement from Vance County, as defined by N.C. G. S. 143-166.41(a)(3) and 143-166.41(b); and

d.  The law enforcement officer, after separation from employment with the County, notifies the County of any new job involving state, local or federal employment. Such notification shall, include the nature and extent of the employment, any change of employment status, and any discontinuation of employment, within five (5) days of the new employment, change or discontinuation.

28

Such allowance shall terminate at death, or on the last day of the month prior to which the officer attains 62 years of age, or upon the first day of re-employment by any federal, State or local, agency or institution, whether in North Carolina or elsewhere in a job scheduled for 1,000 or more hours per year. Should the employee fail to notify the County of such employment, the County will seek reimbursement for any payments made after such employment.

29

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 428 of 665

# ARTICLE VII. HOLIDAYS AND LEAVES OF ABSENCE

## Section 1. Policy

The policy of the County is to provide vacation leave, sick leave, and holiday leave to all full-time and part-time employees in a regular position with the County and to provide proportionally equivalent amounts to employees having average work weeks of different lengths. Leave balances should accrue with each payroll at a pro-rated amount when employees work or are on a paid leave status. Leave balances should be printed on payroll checks or provided to employees with each paycheck, including net accrued sick leave and vacation.

## Section 2. Holidays

The policy of the County is to follow the holiday schedule as published by the State of North Carolina each year. The schedule for the calendar year will be published by December 15 of the previous calendar year for distribution to County employees.

The number of holiday hours earned by employees shall be determined in accordance with the formula set forth in Section 15 of this article.

Departments which have staff working during holidays may designate which days of the week are to be observed using the actual legal holidays when appropriate.

## Section 3. Holidays: Effect on Other Types of Leave

Regular holidays which occur during a vacation, sick or other leave period of any employee shall not be considered as vacation, sick, or other leave.

## Section 4. Holidays: Compensation When Work is Required/Shift Work

Employees required to perform work on regularly scheduled holidays shall be paid for the holiday as well as receiving regular pay. Holiday pay shall be at the number of hours described in Section 15 of this Article. If a holiday falls on a regularly scheduled off-duty day for shift personnel, the employee shall receive pay for the proportionately equivalent holiday leave hours.

Employees who work shifts for 911, Fire, Emergency Medical Services, and the Sheriff's Department and who must work on the holiday will be paid for the holiday in lieu of taking a day off. The policy of the County is to follow the holiday schedule as published by the State of North Carolina each year. However, Public Safety employees who work shift assignments will observe the actual holiday.

**Any (*planned or unexpected*) absence on a holiday will result in the holiday pay being forfeited.**

## Section 5. Vacation Leave

Vacation leave may be used for rest and relaxation, school appointments, medical appointments, and other personal needs. Employees must request vacation leave from their supervisor in advance. Vacation leave may also be used by employees who wish to observe religious holidays other than those granted by the County, upon request in advance. Supervisors are responsible for insuring proper staff coverage and may refuse vacation requests when they create a hardship for the County.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 429 of 665

**Section 6. Vacation Leave: Use by Probationary Employees**

Employees serving a probationary period following initial employment may accumulate vacation leave but shall not be permitted to take vacation leave during the first six months of employment unless agreed upon in initial conditions of employment.

**Section 7. Vacation Leave: Accrual Rate**

Each full and part-time employee of the County shall earn vacation at the following schedule, prorated by the regular number of hours in the workweek as described in Section 15 of this article:

| Years of Service | Days Accrued Per Year |
|---|---|
| 0 - 2 | 12 |
| 2 - 5 | 14 |
| 5 - 10 | 17 |
| 10 - 15 | 20 |
| 15 plus | 22 |

Vacation should be accrued in each payroll period.

**Section 8. Vacation Leave: Maximum Accumulation**

Vacation leave may be accumulated without any applicable maximum until December 31 of each year. Effective the last payroll in the calendar year, any employee with more than 30 days of accumulated leave shall have the excess accumulation removed so that only 30 days are carried forward to January 1 of the next calendar year. Employees may have the entire excess amount converted to sick leave provided that the employee has taken a minimum of three consecutive days of vacation by December 15 of the current calendar year.

Because the number of hours in employee work weeks vary, the number of hours in 30 days varies. See Section 15 of this Article for formula to calculate the number of hours in 30 days.

Employees are cautioned not to retain excess accumulated vacation leave until late in the year. Because of the necessity to keep all functions in operation, large numbers of employees cannot be granted vacation leave at any one time. If an employee has excess leave accumulation during the latter part of the year and is unable to take such leave because of staffing demands, the employee shall receive no special consideration either in having vacation leave scheduled or in receiving any exception to the maximum accumulation. Employees may not receive pay for excess vacation time.

**Section 9. Vacation Leave: Manner of Taking**

Employees shall be granted the use of earned vacation leave upon request in advance at those times designated by the Department Head which will least obstruct normal operations of the County. Department heads are responsible for insuring that approved vacation leave does not hinder the effectiveness of service delivery. Vacation leave will be taken in half hour units.

**Section 10. Vacation Leave: Payment upon Separation**

An employee who has successfully completed nine months of the probationary period will normally be paid for accumulated annual leave upon separation subject to the 30-day maximum, provided notice is given to the supervisor at least two weeks in advance of the effective date of resignation. Any employee

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 430 of 665

failing to give the notice required by this section shall forfeit payment for accumulated leave. The notice requirement may be waived by the County Manager when deemed to be in the best interest of the County.

Regular employees who are involuntarily separated shall receive payment for accumulated annual leave subject to the 30-day maximum.

## Section 11. Vacation Leave: Payment upon Death

The estate of an employee who dies while employed by the County shall be entitled to payment of all the accumulated vacation leave credited to the employee's account not to exceed the 30 day maximum.

## Section 12. Sick Leave

Sick leave with pay is not a right which an employee may demand, but a privilege granted for the benefit of an employee when sick. Sick leave may be granted to an employee absent from work for any of the following reasons: sickness, bodily injury, required physical or dental examinations or treatment, or exposure to a contagious disease, when continuing work might jeopardize the health of others.

Sick leave may be used when an employee must care for a member of his or her immediate family who is ill, but may not be used to care for healthy children when the regular care giver is sick.

Sick leave may also be used to supplement Workers' Compensation Disability Leave during the waiting period before Workers' Compensation benefits begin.

Notification of the desire to take sick leave should be submitted to the employee's supervisor prior to the leave or not later than two hours after the beginning of the scheduled workday. Failure to do so appropriately may result in disciplinary action.

In order to facilitate the recruitment of qualified persons with appropriate public sector experience, the County Manager may authorize the carry-over of all or a portion of the unused sick leave that has been certified as accumulated during employment with a past state or local government employer under the State or Local Government Employees Retirement System.

## Section 13. Sick Leave: Accrual Rate and Accumulation

Sick leave shall accrue at a rate of one day per month of service or twelve days per year. Sick leave for full-time and part-time employees working other than the basic work schedule shall be prorated as described in this Article. Sick leave will be cumulative for an indefinite period of time and may be converted upon retirement for service credit consistent with the provisions of the North Carolina Local Government Employees' Retirement System.

All sick leave accumulated by an employee shall end and terminate without compensation when the employee resigns or is separated from the County, except as stated for employees retiring or terminated due to reduction in force.

## Section 14. Sick Leave: Medical Certification

The employee's supervisor or Department Head may require a physician's certificate stating the nature of the employee or immediate family member's illness and the employee's capacity to resume duties, for each occasion on which an employee uses sick leave or whenever the supervisor observes a

32

"pattern of absenteeism." The employee may be required to submit to such medical examination or inquiry as the Department Head deems desirable. The Department Head shall be responsible for the application of this provision to the end that:

a)      Employees shall not be on duty when they might endanger their health or the health of other employees; and

b)      There will be no abuse of leave privileges.

Claiming sick leave under false pretense to obtain a day off with pay shall subject the employee to disciplinary action.

## Section 15. Leave Pro-Rated

Holiday, annual, and sick leave earned by full-time and part-time employees with fewer or more hours than the basic work week shall be determined by the following formula:

1)      The number of hours worked by such employees shall be divided by the number of hours in the basic work week (usually 40 hours).

2)      The proportion obtained in step 1 shall be multiplied by the number of hours of leave earned annually by employees working the basic work week.

3)      The number of hours in step 2 divided by 12 shall be the number of hours of leave earned monthly by the employees concerned.

## Section 16. Leave Without Pay

A full or part-time employee who are eligible for benefits may be granted a leave of absence without pay for a period of up to six months by the County Manager. The leave shall be used for reasons of personal disability after both sick leave and annual leave have been exhausted, sickness or disability of immediate family members, continuation of education, special work that will permit the County to benefit by the experience gained or the work performed, or for other reasons deemed justified by the County Manager.

The employee shall apply in writing to the Department Head for leave. The employee is obligated to return to duty within or at the end of the time determined appropriate by the County Manager. Upon returning to duty after being on leave without pay, the employee shall be entitled to return to the same position held at the time leave was granted or to one of like classification, seniority, and pay. If the employee decides not to return to work, the Department Head shall be notified immediately. Failure to report at the expiration of a leave of absence, unless an extension has been requested, shall be considered a resignation.

The County reserves the right to require a physician's statement if it appears there is a pattern or incident of abuse of leave.

## Section 17. Family Medical Leave

The County will grant up to 12 weeks of family and medical leave during any 12-month period beginning on the date leave is first used to eligible employees in accordance with the Family and Medical Leave Act of 1993 (FMLA). Eligible employees must have regular status and must have been

33

employed at least twelve months and worked at least 1,250 hours during the previous twelve months. The leave may be paid (coordinated with the County's Vacation and Sick Leave policies), unpaid, or a combination of paid and unpaid. Additional time away from the job beyond the 12-week period may be considered in accordance with the County's Leave Without Pay policy. Employees are required to exhaust eligible paid leave before going on a leave without pay status.

FMLA leave may be taken for the following reasons:

(a) to care for the employee's child after birth or placement for adoption or foster care;

(b) to care for the employee's spouse, child or parent who has a serious health condition; or

(c) for a serious health condition that makes the employee unable to perform the employee's job.

Use of earned compensatory leave may count toward FMLA leave.

A serious health condition is defined as a condition which requires inpatient care at a hospital, hospice, or residential medical care facility, or a condition which requires continuing care by a licensed health care provider. This policy covers illness of a serious and long-term nature resulting in recurring or lengthy absences. Generally, a chronic or long term health condition which results in a period of incapacity for more than three days would be considered a serious health condition.

If a husband and wife both work for the County and each wishes to take leave for the birth of a child, adoption or placement of a child in foster care, or to care for a parent (not parent in-law) with a serious health condition, the husband and wife together may only take a total of 12 weeks leave under FMLA.

An employee taking leave for the birth of a child may use paid sick leave for the period of actual disability, based on medical certification. The employee may then use paid vacation for the remainder of the 12-week period.

The request for the use of leave must be made in writing by the employee and approved by the department head or County Manager. The County may also designate qualified leave as FMLA Leave by notifying the employee of such action.

An employee who takes leave under this policy will return to the same job or a job with equivalent status, pay, benefits, and other employment terms. The position will be the same or one which entails substantially equivalent skill, effort, responsibility, and authority.

### Section 18. Family and Medical Leave: Medical Certification

In order to qualify for leave under this law, the County requires medical certification. This statement from the employee's or the family member's physician should include the date when the condition began, its expected duration, diagnosis, and brief statement of treatment. For the employee's own health condition, it should state that the employee is unable to perform the essential functions of his/her position. For a seriously ill family member, the certification must include a statement that the patient requires assistance and the employee's presence would be beneficial or desirable.

This certification should be furnished at least 30 days prior to the needed leave unless the employee's or family member's condition is a sudden one. The certification should be furnished as soon as possible (no longer than 15 days from the date of the employee's request). The certification and request must be made to the department head and filed with the Human Resources Director.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 433 of 665

**Amendment to the Vance County Personnel Policy Manual**
**Effective 4/01/2020**

### Article VII. Section 20. Workers' Compensation Leave

An employee absent from duty because of sickness or disability covered by the North Carolina Workers' Compensation Act may elect to use accrued sick leave, vacation, or compensatory time during the first waiting period. An employee on workers' compensation leave may be permitted to continue to be eligible for benefits under the County 's group insurance plans and the County will continue regular health and other insurance coverage (those for which the County normally pays) for the first *six* months of workers' compensation leave. ***At the end of the six months, the employee will be offered COBRA. All medical claims associated with the injury will continue to be covered under the laws of the Workers Compensation Act, Section 97-25.*** When workers' compensation leave extends long enough for the waiting period to be reimbursed, the employee shall return the reimbursement check to the County and have leave hours reinstated for all time covered by paid leave. In such cases the County will pay the employee for any unpaid time that is owed the employee.

a)  All injuries arising out of, and during, the course of employment should be reported by the injured employee to the immediate supervisor as soon as possible. The supervisor or department head shall file an injury report with Human Resources within twenty-four (24) hours of the time of the accident. The employee must use sick leave, *vacation* leave or comp time for the first seven (7) days of disability. These days will be reimbursed only if the disability continued for more than twenty-one (21) days.

b)  Before returning to work, a statement from the attending physician should be submitted to the Human Resources Director giving permission for the employee to resume regular duties.

c)  Upon return to work, the employee's salary will be computed on the basis of the last salary plus any merit increment or other salary increase to which the employee would have been entitled during the disability covered by Workers' Compensation. While receiving workers' compensation benefits, an employee continues to earn sick and annual leave and will retain all accumulated sick and annual leave.

This provision also applies to reactions to small pox vaccinations administered to County employees under Section 304 of the Homeland Security Act. Such reactions shall be treated the same as any other Workers Compensation claim as regards leave and salary continuation.

The employee is expected to return to work at the end of the time frame stated in the medical certification, unless he/she has requested additional time in writing under the County's Leave Without Pay policy.

**Section 19.   Family Medical Leave and Leave Without Pay: Retention and Continuation of Benefits**

When an employee is on leave under FMLA, the County will continue the employee's health benefits during the leave period at the same level and under the same conditions as if the employee had continued to work. If an employee chooses not to return to work for reasons other than a continued serious health condition, the County will require the reimbursement of the amount paid for the employee's health insurance premiums during the FMLA leave period.

Other insurance and payroll deductions are the responsibility of the employee and the employee must make those payments for continued coverage of that benefit.

An employee may retain all unused vacation and sick leave while on non-FMLA Leave Without Pay. An employee ceases to earn leave credits on the date leave without pay begins. The employee may continue to be eligible for benefits under the County's Group insurance plans at his or her own expense, subject to any provisions approved by the County Manager and the regulations of the insurance carrier. The County will continue to pay for health and other insurances for which the County normally pays during the first three months of workers' compensation leave.

**Section 20. Workers' Compensation Leave**

An employee absent from duty because of sickness or disability covered by the North Carolina Workers' Compensation Act may elect to use accrued sick leave, vacation, or compensatory time during the first waiting period. An employee on workers' compensation leave may be permitted to continue to be eligible for benefits under the County 's group insurance plans and the County will continue regular health and other insurance coverage (those for which the County normally pays) for the first three months of workers' compensation leave. When workers' compensation leave extends long enough for the waiting period to be reimbursed, the employee shall return the reimbursement check to the County and have leave hours reinstated for all time covered by paid leave. In such cases the County will pay the employee for any unpaid time that is owed the employee.

a)   All injuries arising out of, and during, the course of employment should be reported by the injured employee to the immediate supervisor as soon as possible. The supervisor or department head shall file an injury report to the Human Resources Director within twenty-four (24) hours of the time of the accident. The employee must use sick leave or annual leave for the first seven (7) days of disability. These days will be reimbursed only if the disability continued for more than twenty-one (21) days.

b)   Before returning to work, a statement from the attending physician should be submitted to the Human Resources Director giving permission for the employee to resume regular duties.

c)   Upon return to work, the employee's salary will be computed on the basis of the last salary plus any merit increment or other salary increase to which the employee would have been entitled during the disability covered by Workers' Compensation. While receiving workers' compensation benefits, an employee continues to earn sick and annual leave and will retain all accumulated sick and annual leave.

35

This provision also applies to reactions to small pox vaccinations administered to County employees under Section 304 of the Homeland Security Act. Such reactions shall be treated the same as any other Workers Compensation claim as regards leave and salary continuation.

## Section 21. Military Leave

The County will comply with the provisions of USERRA (Uniformed Services Employment and Re-employment Rights Act) and other required laws and regulations. Regular employees who are members of an Armed Forces Reserve organization or National Guard shall be granted ten workdays per year for military leave without pay. On rare occasions due to annual training being scheduled on a federal fiscal year basis, an employee may be required to attend two periods of training in one calendar year. For this purpose only, an employee shall be granted an additional ten days of military leave during the same calendar year. If the compensation received while on military leave is less than the salary that would have been earned during this same period as a County employee, the employee shall receive partial compensation equal to the difference in the base salary earned during this same period as a County employee. The effect will be to maintain the employee's salary at the normal level during this period.

If such duty is required beyond this ten workdays, the employee shall be eligible to take accumulated vacation leave or be placed in a leave without pay status, and the provisions of that leave shall apply.

While taking military leave without pay or with partial pay, the employee's leave credits and other benefits shall continue to accrue as if the employee physically remained with the County during this period. Employees who are eligible for military leave have all job rights specified by the Vietnam Veterans Readjustment Act, including members of the National Guard or a reserve unit.

Employees who volunteer for additional duty may use vacation, compensatory time or leave without pay. If there is a compensatory balance, it should be used first for nonexempt employees.

## Section 22. Reinstatement Following Military Service.

The County will fully comply with the provisions of USERRA and other required laws and regulations. An employee called to extended active duty with the United States military forces, who does not volunteer for service beyond the period for which called, shall be reinstated with full benefits provided the employee:

a) Applies for reinstatement within ninety days after tne release from military service; and

b) Is able to perform the duties of the former position or similar position; or

c) Is unable to perform the duties of the former position or a similar position due to disability sustained as a result of military service, but is able to perform the duties of another position in the service of the County. In this case the employee shall be employed in such other position as will provide the nearest approximation of the seniority, status, and pay which the employee otherwise would have been provided, if available.

Employees called to active duty must provide a copy of the orders to the Human Resources Director in advance.

36

## Section 23. Civil Leave

A County employee called for jury duty or as a court witness for the federal or state governments, or a subdivision thereof, shall receive leave with pay for such duty during the required absence without charge to accumulated leave. The employee may keep fees and travel allowances received for jury or witness duty in addition to regular compensation; except, that the employee must turn over to the County any witness fees or travel allowance awarded by that court for court appearances in connection with official duties. While on civil leave, benefits and leave shall accrue as though on regular duty.

## Section 24. Parental School Leave

Under NC General Statutes 95-28.3, a County employee who is a parent, guardian, or person standing in loco parentis (in place of the parent) may take up to four hours of unpaid leave annually to involve him or herself in school activities of his or her child(ren). This leave is subject to the three following conditions:

1)  The leave must be taken at a time mutually agreed upon by the employee and the County;
2)  The County may require the employee to request the leave in writing at least 48 hours prior to the time of the desired leave; and
3)  The County shall require written verification from the child's school that the employee was involved at the school during the leave time.

The County has chosen to go beyond the requirements of this statute and provide paid time without charge to vacation for up to eight hours per school year. To receive this paid time, the employee must match time off hour for hour with either vacation or leave without pay.

## Section 25. Funeral Leave

Funeral leave may be used for death in the employee's immediate family (see Section 12 for definition of immediate family), but may not exceed three days for any one occurrence. Additional leave time required for such occurrence may be charged to vacation or other approved leave such as compensatory time when approved by the Department Head and/or County Manager. Documentation of the death in the immediate family may be required.

## Section 26. Adverse Weather and Emergency Conditions Policy

The County has responsibility for providing emergency services. Adequate staff are required to operate these critical services seven days per week and 24 hours per day in all weather. Department Heads should designate which staff are in critical positions required to report to work regardless of weather or other hazardous conditions.

The adverse weather/hazardous conditions policy is established to be as fair as possible to all employees applying the following principles:

a)  maintain adequate staffing at all times of emergency services;

b)  provide for as much safety as possible for all employees in traveling to and from work in hazardous conditions; and

c)  not pay regular salaries to some employees for not working when others are required to be at work.

37

County offices and departments shall remain open for the full scheduled working day unless authorization for closing or other deviation is received from the County Manager's office. The County Manager will consider the hazard of driving conditions and other relevant factors in determining whether to close County offices. To the extent possible, all departments and offices will be given sufficient advance notice of any authorized closing of non-critical County functions. Employees who leave work before an official early closing time, as well as employees who report for work late or do not report for work because of hazardous conditions may use earned vacation or compensatory leave for days or hours not worked.

Critical staff are required to report in emergency situations and should make preparations for care of family and personal needs to allow them to report for duty when required. Any employee in a position designated as critical who does not report to work as directed by the County Manager or appropriate department head will be subject to disciplinary action.

Critical Staff Employees required to work during inclement weather closings will be given straight time off the number of hours equivalent to the announced early, delayed or whole day closing. Employees who do not work will be charged annual leave.

Examples: County Offices are closed due to inclement weather. Employee A is scheduled to work from 7:00 AM – 7:00 PM. Employee A will receive 7.5 hours of comp time.

Employee A does not come in to work at all on this day county offices are closed due to inclement weather. Employee A will be charged annual leave, comp leave or leave without pay.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 438 of 665

## ARTICLE VIII. SEPARATION AND REINSTATEMENT

### Section 1. Types of Separations

All separations of employees from positions in the service of the County shall be designated as one of the following types and shall be accomplished in the manner indicated: Resignation, reduction in force, disability, voluntary retirement, dismissal, or death.

### Section 2. Resignation

An employee may resign by submitting the reasons for resignation and the effective date in writing to the immediate supervisor as far in advance as possible. In all instances, the minimum notice requirement is a **two-week working notice**. Department Heads should provide a one month minimum notice. Failure to provide minimum notice shall result in forfeit of payment for accumulated annual leave unless the notice is waived upon recommendation of the Department Head, Human Resources Director, and approved by the County Manager.

Two consecutive days of absence without contacting the immediate supervisor or Department Head is considered to be a voluntary resignation.

Sick leave will only be approved during the final two weeks of a notice with a Certification of Health Care Provider form completed by the medical provider.

### Section 3. Reduction in Force

In the event that a reduction in force becomes necessary, consideration shall be given to the quality of each employee's performance, organizational needs, and seniority in determining those employees to be retained. Employees who are separated because of a reduction in force shall be given at least two weeks notice of the anticipated action. No regular employee shall be separated while there are temporary, emergency or probationary employees serving in the same class in the department, unless the regular employee is not willing to transfer to the position held by the temporary or probationary employee.

To avoid a reduction in force, or in combination with a reduction in force, general temporary salary reductions of no more than 10% may be implemented.

### Section 4. Disability

An employee who cannot perform the required duties because of a physical or mental impairment may be separated for disability. Action may be initiated by the employee or the County. In all cases, such action must be accompanied by medical evidence acceptable to the Department Head, Human Resources Director, and County Manager. The County may require an examination, at the County's expense, performed by a physician of the County's choice.

### Section 5. Voluntary Retirement

An employee who meets the conditions set forth under the provision of the North Carolina Local Government Employee's Retirement System may elect to retire and receive all benefits earned under the retirement plan.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 439 of 665

**Section 6. Death**

Separation shall be effective as of the date of death. All compensation due shall be paid to the estate of the employee.

**Section 7. Dismissal**

An employee may be dismissed in accordance with the provisions and procedures of Article IX.

**Section 8. Reinstatement**

An employee who is separated because of reduction in force may be reinstated within one year of the date of separation, upon recommendation of the supervisor and approval of the Human Resources Director and the County Manager. An employee who is reinstated in this manner shall be re-credited with his or her previously accrued sick leave and vacation accrual rate.

**Section 9. Rehiring**

An employee who resigns while in good standing may be rehired with the approval of the Hiring Authority, and shall be regarded as a new employee, subject to all of the provisions of rules and regulations of this Chapter. However, the employee may be credited with his or her previously accrued sick leave. An employee in good standing who is separated due to a reduction in force shall be given the first opportunity to be rehired in the same or a similar position.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 440 of 665

# ARTICLE IX. UNSATISFACTORY JOB PERFORMANCE AND DETRIMENTAL PERSONAL CONDUCT

## Section 1. Disciplinary Action for Unsatisfactory Job Performance

A regular employee may be placed on disciplinary suspension (without pay), demoted, or dismissed for unsatisfactory job performance, if after following the procedure outlined below, the employee's job performance is still deemed to be unsatisfactory. All cases of disciplinary suspension, demotion, or dismissal must be approved by the Human Resources Director and the County Manager or hiring authority prior to giving final notice to the employee.

## Section 2. Unsatisfactory Job Performance Defined

Unsatisfactory job performance includes any aspects of the employee's job which are not performed as required to meet the standards set by the supervisor. Examples of unsatisfactory job performance include, but are not limited to, the following:

a)  Demonstrated inefficiency, negligence, or incompetence in the performance of duties;

b)  Careless, negligent or improper use of County property or equipment;

c)  Physical or mental incapacity to perform duties;

d)  Discourteous treatment of the public or other employees or use of inappropriate or profane language;

e)  Absence without approved leave;

f)  Repeated improper use of leave privileges;

g)  Pattern of failure to report for duty at the assigned time and place;

h)  Failure to complete work within time frames established in work plan or work standards; or

i)  Failure to meet work standards over a period of time or to maintain required certifications.

## Section 3.    Communication and Warning Procedures Preceding Disciplinary Action for Unsatisfactory Job Performance

When an employee's job performance is unsatisfactory, or when incidents or inappropriate actions warrant, the supervisor should meet with the employee as soon as possible in one or more counseling sessions to discuss specific performance problems. A brief summary of these counseling sessions should be noted in the employee's file by the supervisor. An employee whose job performance is unsatisfactory over a period of time should normally receive at least two written warnings from the supervisor before disciplinary action resulting in dismissal is taken by the County Manager or Hiring Authority. In each case, the supervisor should record the dates of discussions with the employee, the performance deficiencies discussed, the corrective actions recommended, and the time limits set. If the employee's performance continues to be unsatisfactory, then the supervisor should use the following disciplinary steps:

41

a) A final written warning from the supervisor serving notice upon the employee that corrected performance must take place immediately in order to avoid suspension, demotion, or dismissal.

b) If performance does not improve, a written recommendation should be sent to the Department Head, Human Resources Director, and County Manager or Hiring Authority for disciplinary action such as suspension, demotion, or dismissal.

Suspensions should not normally exceed three days for nonexempt employees. For exempt employees, suspensions should normally be for one week to retain the exempt status of the employee.

## Section 4. Disciplinary Action for Detrimental Personal Conduct

With the approval of the Department Head, Human Resources Director, and County Manager or Hiring Authority, an employee may be placed on disciplinary suspension (without pay), demoted, or dismissed without prior warning for causes relating to personal conduct detrimental to County service in order to a) avoid undue disruption of work; b) to protect the safety of persons or property; or c) for other serious reasons.

Disciplinary suspension should not normally exceed three days for nonexempt employees and should be one full week for exempt employees as prescribed by the FLSA.

## Section 5. Detrimental Personal Conduct Defined

Detrimental personal conduct includes behavior of such a serious detrimental nature that the functioning of the County may be or has been impaired; the safety of persons or property may be or have been threatened; or the laws of the government may be or have been violated. Examples of detrimental personal conduct include, but are not limited to, the following:

a) Fraud or theft;

b) Commission of a felony or the entry of a plea of nolo contendere thereto;

c) Falsification of records for personal profit, to grant special privileges, or to obtain employment;

d) Willful misuse or gross negligence in the handling of County funds;

e) Willful or wanton damage or destruction to property;

f) Willful or wanton acts that endanger the lives and property of others;

g) Possession of unauthorized firearms or other lethal weapons on the job;

h) Brutality in the performance of duties;

i) Reporting to work under the influence of alcohol or drugs or partaking of such while on duty. Prescribed medication may be taken within the limits set by a physician as long as medically necessary;

j) Engaging in incompatible employment or servicing a conflicting interest;

k) Request or acceptance of gifts in exchange for favors or influence;

42

l)      Engaging in political activity prohibited by this policy; or

m)      Stated refusal to perform assigned duties or flagrant violation of work rules and regulations.

## Section 6. Pre-Dismissal Conference

Before dismissal action is taken, whether for detrimental personal conduct or unsatisfactory job performance, the County Manager or Hiring authority, the Human Resources Director or a Department Head will conduct a pre-dismissal conference. At this conference, the employee may present any response to the proposed dismissal to the County Manager or Hiring Authority, Human Resources Director or Department Head. The County Manager or Hiring Authority, Human Resources Director or Department Head will consider the employee's response, if any, to the proposed dismissal, and will, within three working days following the pre-dismissal conference, notify the employee in writing of the final decision. If the employee is dismissed, the notice shall contain a statement of the reason(s) for the action and the employee's appeal rights under the County's grievance procedure.

The Sheriff has authority to dismiss all employees in his or her respective department(s). Employees within these departments should consult with their departmental disciplinary procedure.

## Section 7. Non-Disciplinary Suspension

During the investigation, hearing, or trial of an employee on any criminal charge, or during an investigation related to alleged detrimental personal conduct, or during the course of any civil action involving an employee, when suspension would, in the opinion of the supervisor, be in the best interest of the County, the Department Head, with the approval of the Human Resources Director and the County Manager or Hiring Authority, may suspend the employee for the duration of the proceedings as a non-disciplinary action. In such cases, the County may:

a)      Temporarily relieve the employee of all duties and responsibilities and place the employee on paid or unpaid leave for the duration of the suspension, or

b)      Assign the employee new duties and responsibilities and allow the employee to receive such compensation as is in keeping with the new duties and responsibilities.

If the employee is reinstated following the suspension such employee shall not lose any benefits to which otherwise employee would have been entitled had the suspension not occurred. If the employee is terminated following suspension, the employee shall not be eligible for any pay from the date of suspension; provided, however, all other benefits with the exception of accrued annual leave and sick leave shall be maintained during the period of suspension.

## ARTICLE X. GRIEVANCE PROCEDURE AND ADVERSE ACTION APPEAL

### Section 1. Policy

It is the policy of the County to provide a just and prompt procedure for the presentation, consideration, and disposition of employee grievances. The purpose of this article is to outline the procedure and to assure all employees that a response to their complaints and grievances will be prompt and fair.

Employees utilizing the grievance procedure shall not be subjected to retaliation or any form of harassment from supervisors or employees for exercising their rights under the grievance procedure. Supervisors or other employees who violate this policy shall be subject to disciplinary action up to and including dismissal.

### Section 2. Grievance Defined

A grievance is a claim or complaint by an employee based upon an event or condition, which affects the circumstances under which an employee works, allegedly caused by misinterpretation, unfair application, or lack of established policy pertaining to employment conditions.

Former employees may appeal their termination from County employment within required time frames.

### Section 3. Purposes of the Grievance Procedure

The purposes of the grievance procedure include, but are not limited to:

1) Providing employees with a procedure by which their complaints can be considered promptly, fairly, and without reprisal;

2) Encouraging employees to express themselves about the conditions of work which affect them as employees;

3) Promoting better understanding of policies, practices, and procedures which affect employees;

4) Increasing employees' confidence that personnel actions taken are in accordance with established, fair, and uniform policies and procedures; and

5) Increasing the sense of responsibility exercised by supervisors in dealing with their employees.

6) Encouraging conflicts to be resolved between employees and supervisors who must maintain an effective future working relationship, and therefore, encouraging conflicts to be resolved at the lowest level possible in the chain of command; and

7) Creating a work environment free of continuing conflicts, disagreements, and negative feelings about the County or its leaders, thus freeing up employee motivation, productivity, and creativity.

### Section 4. Procedure

When an employee or group of employees has a grievance, the following successive steps are to be taken unless otherwise provided. The number of calendar days indicated for each step should be considered the maximum, unless otherwise provided, and every effort should be made to expedite the

process. However, the time limits set forth may be extended by mutual consent. The last step initiated by an employee shall be considered to be the step at which the grievance is resolved. A decision to rescind a disciplinary suspension, demotion or dismissal must be approved by the Hiring Authority before the decision becomes effective.

**Informal Resolution.** Prior to the submission of a formal grievance, the employee and supervisor should meet to discuss the problem and seek to resolve it informally. Either the employee or the supervisor may involve the Human Resources Office as a resource to help resolve the grievance. Mediation may be used at any step in the process and is encouraged. Mediation is the neutral facilitation of the conflict between or among parties where the facilitator helps the parties find a mutually agreeable outcome.

**Step 1.** If no resolution to the grievance is reached informally, the employee who wishes to pursue a grievance shall present the grievance to the supervisor in writing. The grievance must be presented within fifteen calendar days of the event or within fifteen calendar days of learning of the event or condition. The supervisor shall respond to the grievance within five work days after receipt of the grievance. The supervisor should, and is encouraged to, consult with any employee of the County in order to reach a correct, impartial, fair and equitable determination or decision concerning the grievance. Any employee consulted by the supervisor is required to cooperate to the fullest extent possible.

The response from each supervisory level for each step in the formal grievance process shall be in writing and signed and dated by the supervisor. In addition, the employee shall sign a copy to acknowledge receipt thereof. The responder at each step shall send copies of the grievance and response to the Human Resources Director.

**Step 2.** If the grievance is not resolved to the satisfaction of the employee by the supervisor, the employee may appeal, in writing, to the Department Head within five work days after receipt of the response from Step 1. The Department Head shall respond to the appeal, stating the determination of decision within five work days after receipt of the appeal.

**Step 3. (For general County employees only)** If the grievance is not resolved to the satisfaction of the employee by the Department Head, the employee may appeal, in writing, to the County Manager or Hiring Authority within five work days after receipt of the response from Step 2. The Hiring Authority shall respond to the appeal, may meet with the employee to discuss the grievance fully, and will make a decision within ten calendar days of receiving the written grievance. The Hiring Authority's decision is final. However the County Manager should inform the County Board of Commissioners of any possible legal actions. Any appeal of this decision must be made through the North Carolina Court System.

**Special Note**: The Sheriff and Register of Deeds, will carry out the responsibilities designated as the County Manager in their respective departments.

**Step 3. (For employees only in the Social Services Department)** If the grievance is not resolved to the satisfaction of the employee by the Department Head, the employee may appeal the decision to the North Carolina Office of Administrative Hearings (OAH) within thirty calendar days of the receipt of the Department Head's decision. The findings of the OAH will be forwarded to the State Personnel Commission. The decision of the State Personnel Commission shall be advisory only and the Department Head shall have the final decision. Discrimination cases may be appealed directly to the OAH.

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 445 of 665

**Department Heads.** In the case of department heads or other employees where the Hiring Authority has been significantly involved in determining disciplinary action, including dismissal, the Hiring Authority may wish to obtain a neutral outside party to either:

a)  provide mediation between the grieving department head and the Hiring Authority (see definition of mediation in informal resolution above); or

b)  consider the appeal and make recommendations back to the Hiring Authority concerning the appeal. Such parties might consist of human resource professionals, attorneys, mediators, or other parties appropriate to the situation.

Department heads may also request the application of these special provisions.

The Hiring Authority's decision regarding the disposition of the grievance shall be the final decision. The County Manager would notify the Board of Commissioners of any impending legal action.

## Section 5. Role of the Human Resources Director

Throughout the grievance procedure, the roles of the Human Resources Director shall be as follows:

a)  To advise parties (including employee, supervisors, and County Manager) of their rights and responsibilities under this policy, including interpreting the grievance and other policies for consistency of application;

b)  To be a clearinghouse for information and decisions in the matter including maintaining files of all grievance documents.

c)  To give notices to parties concerning timetables of the process, etc.;

d)  To assist employees and supervisors in drafting statements; and

e)  To facilitate the resolution of conflicts in the procedures or of the grievance at any step in the process; and

f)  To help locate mediation or other resources as needed.

The Human Resources Director shall also determine whether or not additional time shall be allowed to either side in unusual circumstances if the parties cannot agree upon extensions when needed or indicated.

## Section 6. Grievance and Adverse Action Appeal Procedure for Discrimination

When an employee, former employee, or applicant believes that any employment action discriminates illegally (i.e. is based on age, sex, sexual orientation, race, color, national origin, religion, creed, political affiliation, or disability) he or she has the right to appeal such action using the grievance procedure outlined in this policy. While such persons are encouraged to use the grievance procedure, they shall have the right to appeal directly to the Human Resources Director and the County Manager. An employee or applicant should appeal an alleged act of discrimination within thirty calendar days of the alleged discriminatory action, but may appeal for up to six months following the action.

## ARTICLE XI. PERSONNEL RECORDS AND REPORTS

### Section 1. Public Information

In compliance with GS 153A-98, Employees information will be a public record. The following information with respect to each County employee is currently a matter of public record: name; age; date of original employment or appointment to the service; current position title; current salary; and the office to which the employee is currently assigned. Effective October 1, 2010, the Public Records Law was updated to include the date and amount of each increase or decrease in salary; date and type of each promotion, demotion, transfer, suspension, separation, or other change in position classification; the date and general descriptions of the reasons for each promotion; the date and type of each dismissal, suspension, or demotion for disciplinary reasons taken; for dismissals due to disciplinary reasons, a copy of the written notice of the final decision of the county setting forth the specific acts or omissions that are the basis of the dismissal. Any person may have access to this information for the purpose of inspection, examination, and copying, during regular business hours, subject only to such rules and regulations for the safekeeping of public records as the County may adopt.

### Section 2. Access to Confidential Records

All information contained in a County employee's personnel file, other than the information mentioned above is confidential and shall be open to inspection only in the following instances:

a)  The employee or his/her duly authorized agent may examine all portions of his/her personnel file except letters of reference solicited prior to employment, and information concerning a medical disability, mental or physical, that a prudent physician would not divulge to the patient.

b)  A licensed physician designated in writing by the employee may examine the employee's medical record.

c)  A County employee having supervisory authority over the employee may examine all material in the employee's personnel file.

d)  By order of a court of competent jurisdiction, any person may examine all material in the employee's personnel file.

e)  An official of an agency of the State or Federal Government, or any political subdivision of the State, may inspect any portion of a personnel file when such inspection is deemed by the County Manager to be necessary and essential to the pursuit of a proper function of the inspecting agency, but no information shall be divulged for the purpose of assisting in a criminal prosecution of the employee, or for the purpose of assisting in an investigation of the employee's tax liability.

    However, the official having custody of the personnel records may release the name, address, and telephone number from a personnel file for the purpose of assisting in a criminal investigation.

f)  An employee may sign a written release to be placed in his/her personnel file that permits the record custodian to provide, either in person, by telephone, or by mail, information specified in the release to prospective employers, educational institutions, or other persons specified in the release.

47

g)     The County Manager, with the concurrence of the County Board of Commissioners, may inform any person of the employment, non-employment, promotion, demotion, suspension or other disciplinary action, reinstatement, transfer, or termination of a County employee, and the reasons for that action. Before releasing that information, the County Manager shall determine that the release is essential to maintaining the level and quality of County services. The written determination shall be retained in the County Manager's office, is a record for public inspection, and shall become a part of the employee's personnel file.

## Section 3. Personnel Actions

The Human Resources Director, with the approval of the County Manager, will prescribe necessary forms and reports for all personnel actions and will retain records necessary for the proper administration of the personnel system. The official personnel files are those which are maintained by the Human Resources Office. These files shall contain documents such as employment applications and related materials, records of personnel actions, documentation of employee warnings, disciplinary actions, performance evaluations, retirement and insurance records, letters of recommendation, and other personnel-related documents. Any documents not contained in these files or maintained as designated by the Human Resources Director are not an official part of the personnel file.

## Section 4. Records of Former Employees

The provisions for access to records apply to former employees as they apply to present employees.

## Section 5. Remedies of Employees Objecting to Material in File

An employee who objects to material in his/her file may place a statement in the file relating to the material considered to be inaccurate or misleading. The employee may seek removal of such material in accordance with established grievance procedures.

## Section 6. Penalties for Permitting Access to Confidential Records

Section 153A-98 of the General Statues provides that any public official or employee who knowingly and willfully permits any person to have access to any confidential information contained in an employee personnel file, except as expressly authorized by the designated custodian, is guilty of a misdemeanor and upon conviction shall be fined in an amount consistent with the General Statutes.

## Section 7. Examining and/or Copying Confidential Material without Authorization

Section 153A-98 of the General Statutes of North Carolina provides that any person, not specifically authorized to have access to a personnel file designated as confidential, who shall knowingly and willfully examine in its official filing place, remove or copy any portion of a confidential personnel file shall be guilty of a misdemeanor and upon conviction shall be fined consistent with the General Statutes.

## Section 8. Destruction of Records Regulated

No public official may destroy, sell, loan, or otherwise dispose of any public record, except in accordance with GS 121.5 (b), without the consent of the State Department of Cultural Resources. Whoever unlawfully removes a public record from the office where it is usually kept, or whoever, alters, defaces, mutilates or destroys it will be guilty of a misdemeanor and upon conviction will be fined in an amount provided in Chapter 132.3 of the General Statutes.

# ARTICLE XII. IMPLEMENTATION OF POLICIES

## Section 1. Conflicting Policies Repealed

All policies, ordinances, or resolutions that conflict with the provisions of these policies are hereby repealed.

## Section 2. Separability

If any provision of these policies or any rule, regulation, or order thereunder of the application of such provision to any person or circumstances is held invalid, the remainder of these policies and the application of such remaining provisions of these policies of such rules, regulations, or orders to persons or circumstances other than those held invalid will not be affected thereby.

## Section 3. Effective Date

These policies shall become effective on a date approved by the County Board of Commissioners.

## Section 4. Amendments

This policy may be amended by action of the Board of Commissioners and by resolution appropriately approved. Notice of any suggested amendment to the policy or any portion thereof, shall be provided to employees and opportunities for employee comment and reaction shall be made available prior to the amendments going to the Commissioners for action. Any revisions or amendments adopted in conformance with this procedure shall become effective as of the date of such adoption or a date approved by the Board of Commissioners.

49

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 449 of 665

## GLOSSARY

| Acronym | Acronym Definition |
| --- | --- |
| FLSA | Fair Labor Standards Act |
| FMLA | Family Medical Leave Act |
| G. S. | General Statutes |
| LGERS | Local Government Employees' Retirement System |
| NC OAH | North Carolina Office of Administrative Hearings |
| NC OSHR | North Carolina Office of State Human Resources |
| USERRA | The Uniformed Services Employment and Reemployment Rights Act |

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 450 of 665

# W Bullock – W. Bullock Firearms Quals



**Sheriffs' Standards Division**
PO Box 629
Raleigh, NC 27602
Telephone: (919) 779-8213
Fax: (919) 662-4515

**Criminal Justice Standards Division**
Post Office Drawer 149
Raleigh, NC 27602
Telephone: (919) 661-5980
Fax: (919) 779-8210

### FIREARMS QUALIFICATION RECORD INSTRUCTIONS

**Form F-9A** *(rev. 01.18)*

---

This form must be utilized to record the annual In-Service Firearms Training and Qualification for each certified officer in compliance with 12 NCAC 9E .0100 or 12 NCAC 10B .2104. A copy must be maintained in each officer's personnel file at the employing agency, and must be available for inspection by a Commission Staff member. A copy must be attached to the F-5A and submitted to the Criminal Justice Standards Division for all new hires.

| | |
|---|---|
| **SECTION I:** | Must be completed for every officer. |
| **SECTION II:** | Must be completed for every officer and signed and dated by the instructor(s). |
| **SECTION III:** | Must be signed and dated by the officer. |
| **SECTION IV:** | Must be signed and dated by the Agency Head or designated representative. |
| **SECTION V:** | Must be completed and signed by the specific certified Specialized Firearms Instructor(s). |

---

**I.   OFFICER'S NAME:** Weldon Bullock        **SSN (Last 4):** ▉▉▉▉

Certified by: NC Criminal Justice Education and Training Standards Commission:   ☐ Yes   ■ No
Certified by: NC Sheriffs' Education and Training Standards Commission:   ■ Yes   ☐ No

**EMPLOYING/APPOINTING AGENCY:** Vance County Sheriff's Office

**II.   FIREARMS INSTRUCTOR COMPLIANCE – CLASSROOM REQUIREMENT**

As a Specialized Firearms Instructor, I do hereby certify that the officer listed above has completed the mandatory classroom portion of the in-service firearms training, as specified in 12 NCAC 9E .0105 or 12 NCAC 10B .2103 as applicable. Failure to complete this training requires that the agency head or designated representative be notified.

The classroom session was completed on **09/06/2018** (date).

| William T. Bartholomew | *signature* | 10006104b | 9-6-18 |
|---|---|---|---|
| Print Name of Firearms Instructor | Signature of Firearms Instructor | Instructor # | Date Signed |

**III.   ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

I do hereby certify that I have been advised of my firearms qualification scores by the Specialized Firearms Instructor(s) indicated. I also understand that if I have failed to qualify with any weapons(s) required, I may not carry and/or have access to the weapon until such time as I have qualified. I further understand that I must notify my agency head or designated representative within 24 hours of my failure to qualify, and/or successfully complete the training portion as prescribed in 12 NCAC .9E .0105 or 12 NCAC 10B .2103 as applicable.

| W. Bullock | 09/06/2018 |
|---|---|
| Signature of Officer | Date Signed |

**IV.   AGENCY ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

As agency head, or designated representative, the below signature acknowledges receipt of the above officer's qualification scores and attests that the above officer has satisfactorily completed training on this department's policies regarding the use of force, N.C. State law regarding the use of deadly force, relevant case law, and safety and marksmanship as required in 12 NCAC 9E .0105 or 12 NCAC 10B .2103. I understand that if the officer has failed to qualify with any weapon(s), then I must restrict access to all applicable weapon(s) until such time as the officer has qualified with same.

☑ I certify that the in-service firearms training consisted of a minimum of four (4) hours/credits (For Criminal Justice Commission only.)

| *signature* | 9-17-18 |
|---|---|
| Signature of Agency Head/Designated Representative | Date Signed |

*Page 1 of 2*

**\*\*As a certified Specialized Firearms Instructor, I hereby certify that the officer listed below has attained the score(s) as documented below. I understand that if the officer has failed to qualify, then I must deliver a copy of this form to the officer's agency head or designated representative within 72 hours either in person, or by certified mail.\*\***

OFFICER'S NAME: Weldon Bullock    NAME OR RANGE LOCATION: HPD Training Center

### V. SERVICE HANDGUN QUALIFICATION

| Date | Weapon Type | Make | Model | Caliber or Gauge | Serial # | Ammunition | Day(D) Night(N) | Score (%) or (P/F) | Qualify Yes/No | Print and Sign Name & Instructor Number |
|------|-------------|------|-------|------------------|----------|------------|-----------------|--------------------|----------------|------------------------------------------|
| 1. 9/6/18 | SA | SIG | P220 | .45CAL. | G300658 | 230gr | D | P | 105 | D Bartholomew / B3 / 1000080 16 |
| 2. 9/6/18 | SA | SIG | P220 | .45CAL. | G300658 | 230gr | N | P | 105 | W.T Bartholomew/ B3 / 1001 61046 |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

### OFF-DUTY HANDGUN QUALIFICATION

| Date | Weapon Type | Make | Model | Caliber or Gauge | Serial # | Ammunition | Day(D) Night(N) | Score (%) (P/F) | Qualify Yes/No | Print and Sign Name & Instructor Number |
|------|-------------|------|-------|------------------|----------|------------|-----------------|-----------------|----------------|------------------------------------------|
| 1. 9/6/18 | SA | KAHR | CW9 | 9MM. | YB9149 | 147GR | D | P | 105 | W.T Bartholomew / B3 / 10001046 |
| 2. 9/6/18 | SA | KAHR | CW9 | 9MM | YB9149 | 147GR | N | P | 105 | W.T Bartholomew/ B3 / 10001046 |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

### SHOTGUN/RIFLE QUALIFICATION

| Date | Weapon Type | Make | Model | Caliber or Gauge | Serial # | Ammunition | Day(D) Night(N) | Score (%) (P/F) | Qualify Yes/No | Print and Sign Name & Instructor Number |
|------|-------------|------|-------|------------------|----------|------------|-----------------|-----------------|----------------|------------------------------------------|
| 1. 9/6/18 | SG | REM | 870 | 12GA | A8776411M | 00BUCK/SLUG | D | P | 105 | W.T Bartholomew/ B3 / 10000808 |
| 2. 9/6/18 | SG | REM | 870 | 12GA | A8776411M | 00BUCK/SLUG | N | P | 105 | W.T Bartholomew/ B3 / 10000808 |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

### AUTOMATIC/SPECIALTY WEAPONS/OTHER

| Date | Weapon Type | Make | Model | Caliber or Gauge | Serial # | Ammunition | Day(D) Night(N) | Score (%) (P/F) | Qualify Yes/No | Print and Sign Name & Instructor Number |
|------|-------------|------|-------|------------------|----------|------------|-----------------|-----------------|----------------|------------------------------------------|
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |

### COMBAT COURSE

| Date | Day/Night | Make | Pass/Fail | Comments | Print and Sign Name & Instructor Number |
|------|-----------|------|-----------|----------|------------------------------------------|
| 1. 9/6/18 | DAY | | Pass | shot on the move / 5 Hundred Shooty / Un't Shooty | W.T Bartholomew / 105 / 10000806 |
| 2. 9/6/18 | NIGHT | | Pass | shot on the move / 5 Hundred Shooty | W.T Bartholomew / 105 / 10000806 |

R-Revolver  SA-Semi Auto Handgun  SG-Shotgun  AW-Automatic Weapon  RF-Rifle

S&W-Smith & Wesson  GLO-Glock  BER-Beretta  RUG-Ruger  SIG-Sig Sauer

BEN-Benelli  CLT-Colt  WIN-Winchester  ARA-Armalite  SAV-Savage

BRO-Browning  H&K-Heckler & Koch  MOS-Mossberg  REM-Remington  BUS-Bushmaster

SW-Specialized Weapon  SPF-Springfield  REV-Rock River

Ammunition- Match: .40% ammunition or ballistic equivalent ammunition. Include sufficient information to fully describe such as caliber, projectile weight and type.
*Sltr  **s_. Standard handgun night requires use of flashlight at the 5-yd line
*Sltr  =bads accepts pass/fail rather than % scores

Sheriffs' Standards Division
PO Box 629
Raleigh, NC 27602
Telephone: (919) 779-8213
Fax: (919) 662-4515



Criminal Justice Standards Division
Post Office Drawer 149
Raleigh, NC 27602
Telephone: (919) 661-5980
Fax: (919) 779-8210

## FIREARMS QUALIFICATION RECORD INSTRUCTIONS

Form F-9A  *(rev. 01.18)*

This form must be utilized to record the annual In-Service Firearms Training and Qualification for each certified officer in compliance with 12 NCAC 9E .0100 or 12 NCAC 10B .2104. A copy must be maintained in each officer's personnel file at the employing agency, and must be available for inspection by a Commission Staff member. A copy must be attached to the F-5A and submitted to the Criminal Justice Standards Division for all new hires.

| | |
|---|---|
| SECTION I: | Must be completed for every officer. |
| SECTION II: | Must be completed for every officer and signed and dated by the instructor(s). |
| SECTION III: | Must be signed and dated by the officer. |
| SECTION IV: | Must be signed and dated by the Agency Head or designated representative. |
| SECTION V: | Must be completed and signed by the specific certified Specialized Firearms Instructor(s). |

I. **OFFICER'S NAME:** Weldon W. Bullock

SSN (Last 4): ▓▓▓▓

Certified by: NC Criminal Justice Education and Training Standards Commission: ☐ Yes ☒ No
Certified by: NC Sheriffs' Education and Training Standards Commission: ☒ Yes ☐ No

**EMPLOYING/APPOINTING AGENCY:** Vance Co Sheriff's Office

II. **FIREARMS INSTRUCTOR COMPLIANCE – CLASSROOM REQUIREMENT**

As a Specialized Firearms Instructor, I do hereby certify that the officer listed above has completed the mandatory classroom portion of the in-service firearms training, as specified in 12 NCAC 9E .0105 or 12 NCAC 10B .2103 as applicable. Failure to complete this training requires that the agency head or designated representative be notified.

The classroom session was completed on 2/4/19 (date)

WT Bartholomew / Signature of Firearms Instructor    Instructor # 100061046    2/4/19 Date Signed
Print Name of Firearms Instructor

III. **ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

I do hereby certify that I have been advised of my firearms qualification scores by the Specialized Firearms Instructor(s) indicated. I also understand that if I have failed to qualify with any weapon(s) required, I may not carry and/or have access to the weapon until such time as I have qualified. I further understand that I must notify my agency head or designated representative within 24 hours of my failure to qualify, and/or successfully complete the training portion as prescribed in 12 NCAC .9E .0105 or 12 NCAC 10B .2103 as applicable.

W. Bullock / Signature of Officer    2/4/19 Date Signed

IV. **AGENCY ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

As agency head, or designated representative, the below signature acknowledges receipt of the above officer's qualification scores and attests that the above officer has satisfactorily completed training on this department's policies regarding the use of force, N.C. State law regarding the use of deadly force, relevant case law, and safety and marksmanship as required in 12 NCAC 9E .0105 or 12 NCAC 10B .2103. I understand that if the officer has failed to qualify with any weapon(s), then I must restrict access to all applicable weapon(s) until such time as the officer has qualified with same.

☒ I certify that the in-service firearms training consisted of a minimum of four (4) hours/credits (For Criminal Justice Commission only.)

Sheriff Curt R. Brame / Signature of Agency Head/Designated Representative    2/5/19 Date Signed

**OFFICER'S NAME:** W.W. Bullock **NAME OR RANGE LOCATION:** HPD TC

F-9A (rev. 01.18)

*\*\*As a certified Specialized Firearms Instructor, I hereby certify that the officer listed below has attained the score(s) as documented below. I understand that if the officer has failed to qualify, then I must deliver a copy of this form to the officer's agency head or designated representative within 72 hours either in person, or by certified mail.\*\**

## V. SERVICE HANDGUN QUALIFICATION

| Date | Weapon Type | Make | Model | Caliber or Gauge | Serial # | Ammunition | Day(D) Night(N) | Score (%) or (P)(F) | Qualify Yes/No | Print and Sign Name & Instructor Number |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

## OFF-DUTY HANDGUN QUALIFICATION

| Date | Weapon Type | Make | Model | Caliber or Gauge | Serial # | Ammunition | Day(D) Night(N) | Score (%) (P)(F) | Qualify Yes/No | Print and Sign Name & Instructor Number |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. 2/4/19 | SA | SCCY | CPX-2 | 9mm | 213612 | | D | P | Yes | W.T. Bartholomew / TC5 / 10008.0046 |
| 2. 2/4/19 | SA | SCCY | CPX-2 | 9mm | 213612 | | N | P | Yes | W.T. Bartholomew / TC5 / 10008.0046 |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

## SHOTGUN/RIFLE QUALIFICATION

| Date | Weapon Type | Make | Model | Caliber or Gauge | Serial # | Ammunition | Day(D) Night(N) | Score (%) (P)(F) | Qualify Yes/No | Print and Sign Name & Instructor Number |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |

## AUTOMATIC/SPECIALTY WEAPONS/OTHER

| Date | Weapon Type | Make | Model | Caliber or Gauge | Serial # | Ammunition | Day(D) Night(N) | Score (%) (P)(F) | Qualify Yes/No | Print and Sign Name & Instructor Number |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |

## COMBAT COURSE

| Date | Day/Night | Pass/Fail | Comments |
|---|---|---|---|
| 1. 2/4/19 | Day | Pass | Short on the mod / situa horta / shooting |
| 2. 2/4/19 | Night | Pass | " |
| 3. | | | |

**R-Revolver**
SA= Semi Auto Handgun
SG- Shotgun
AW= Automatic Weapon
RF= Rifle

S&W= Smith & Wesson
GLO = Glock
BER= Beretta
RUG= Ruger
SIG= Sig Sauer

BEN=Benelli
CLT= Colt
WIN= Winchester
ARA = Armalite
SAV= Savage

BRO= Browning
H&K= Heckler & Koch
MOS= Mossberg
REM= Remington
BUS= Bushmaster

SW= Specialized Weapon
SPF= Springfield
RXV= Rock River

Ammunition- Must be duty ammunition or ballistic equivalent ammunition.
Include sufficient information to fully describe such as caliber, projectile weight and type.
*Sheriff's Standards handgun qualification is the 25 yard line
*Sheriff's Standard handgun night requires use of flashlight at the 5-yd line
*Sheriff's Standards accept/pass/fail rather than % scores

**Sheriffs' Standards Division**
PO Box 629
Raleigh, NC 27602
Telephone: (919) 779-8213
Fax: (919) 662-4515



**Criminal Justice Standards Division**
Post Office Drawer 149
Raleigh, NC 27602
Telephone: (919) 661-5980
Fax: (919) 779-8210

**FIREARMS QUALIFICATION RECORD INSTRUCTIONS**　　　　Form F-9A　*(rev. 01.18)*

---

This form must be utilized to record the annual In-Service Firearms Training and Qualification for each certified officer in compliance with 12 NCAC 9E .0100 or 12 NCAC 10B .2104. A copy must be maintained in each officer's personnel file at the employing agency, and must be available for inspection by a Commission Staff member. A copy must be attached to the F-5A and submitted to the Criminal Justice Standards Division for all new hires.

| | |
|---|---|
| SECTION I: | Must be completed for every officer. |
| SECTION II: | Must be completed for every officer and signed and dated by the instructor(s). |
| SECTION III: | Must be signed and dated by the officer. |
| SECTION IV: | Must be signed and dated by the Agency Head or designated representative. |
| SECTION V: | Must be completed and signed by the specific certified Specialized Firearms Instructor(s). |

---

**I.**　　**OFFICER'S NAME:** _Weldon Bullock_　　　SSN (Last 4): XXX – XX –

Certified by: NC Criminal Justice Education and Training Standards Commission: ☐ Yes　☐ No
Certified by: NC Sheriffs' Education and Training Standards Commission: ☑ Yes　☐ No

**EMPLOYING/APPOINTING AGENCY:** _Vance Co. Sheriff's office_

**II.**　　**FIREARMS INSTRUCTOR COMPLIANCE – CLASSROOM REQUIREMENT**

As a Specialized Firearms Instructor, I do hereby certify that the officer listed above has completed the mandatory classroom portion of the in-service firearms training, as specified in 12 NCAC 9E .0105 or 12 NCAC 10B .2103 as applicable. Failure to complete this training requires that the agency head or designated representative be notified.

The classroom session was completed on _12/22/19_ (date)

_WT Bartholoma_　　_W Bartholomew_　　_00061046_　　_12/22/19_
Print Name of Firearms Instructor　　Signature of Firearms Instructor　　Instructor #　　Date Signed

_William Taylor Bartholomew_

**III.**　　**ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

I do hereby certify that I have been advised of my firearms qualification scores by the Specialized Firearms Instructor(s) indicated. I also understand that if I have failed to qualify with any weapons(s) required, I may not carry and/or have access to the weapon until such time as I have qualified. I further understand that I must notify my agency head or designated representative within 24 hours of my failure to qualify, and/or successfully complete the training portion as prescribed in 12 NCAC 9E .0105 or 12 NCAC 10B .2103 as applicable.

_W Bullock_　　　　　　　_12/22/19_
Signature of Officer　　　　　　　Date Signed

**IV.**　　**AGENCY ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

As agency head, or designated representative, the below signature acknowledges receipt of the above officer's qualification scores and attests that the above officer has satisfactorily completed training on this department's policies regarding the use of force, N.C. State law regarding the use of deadly force, relevant case law, and safety and marksmanship as required in 12 NCAC 9E .0105 or 12 NCAC 10B .2103. I understand that if the officer has failed to qualify with any weapon(s), then I must restrict access to all applicable weapon(s) until such time as the officer has qualified with same.

☑ I certify that the in-service firearms training consisted of a minimum of four (4) hours/credits (For Criminal Justice Commission only.)

_Curtis R Brame_　　　　　　　　　　_____
Signature of Agency Head/Designated Representative　　　　　Date Signed

Case 5:19-cv-00467-BO　Document 70-1　Filed 04/01/21　Page 456 of 665

**\*\* As a certified Specialized Firearms Instructor, I hereby certify that the officer listed below has attained the score(s) as documented below. I understand that if the officer has failed to qualify, then I must deliver a copy of this form to the officer's agency head or designated representative within 72 hours either in person, or by certified mail. \*\***

OFFICER'S NAME: _Kelton Bullock_         NAME OR RANGE LOCATION: _Henderson_         F-9A (rev. 01.18)

## V. SERVICE HANDGUN QUALIFICATION

| Date | Weapon Type | Make | Model | Caliber or Gauge | Serial # | Ammunition | Day(D) Night(N) | Score (%) or (P/F) | Qualify Yes/No | Print and Sign Name & Instructor Number |
|------|------|------|-------|------|------|------|------|------|------|------|
| 12-22 | SA | Sig | P320 | 45 ACP | 63006058 | 230 grn | D | P | Yes | WTB attch Gun/WTB/100201046 |
| 12-22 | SA | Sig | P320 | 45 ACP | 63006058 | 230 grn | N | P | Yes | WTB attch Gun/WTB/100201046 |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |

## OFF-DUTY HANDGUN QUALIFICATION

| Date | Weapon Type | Make | Model | Caliber or Gauge | Serial # | Ammunition | Day(D) Night(N) | Score (%) (P/F) | Qualify Yes/No | Print and Sign Name & Instructor Number |
|------|------|------|-------|------|------|------|------|------|------|------|
| 12-22 | SA | Kahr | CW9 | 9mm | V891149 | 147 grn | D | P | Yes | WTB attch/B03/100201046 |
| 12-22 | SA | Kahr | CW9 | 9mm | V891149 | 147 grn | N | P | Yes | WTB attch/B03/100201046 |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |

## SHOTGUN/RIFLE QUALIFICATION

| Date | Weapon Type | Make | Model | Caliber or Gauge | Serial # | Ammunition | Day(D) Night(N) | Score (%) (P/F) | Qualify Yes/No | Print and Sign Name & Instructor Number |
|------|------|------|-------|------|------|------|------|------|------|------|
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |

## AUTOMATIC/SPECIALTY WEAPONS/OTHER

| Date | Weapon Type | Make | Model | Comments | | Day(D) Night(N) | Score (%) (P/F) | Qualify Yes/No | Print and Sign Name & Instructor Number |
|------|------|------|-------|------|------|------|------|------|------|
|  |  |  |  |  |  |  |  |  |  |

## COMBAT COURSE

| Date | Day/Night | Pass/Fail | Comments | | | Print and Sign Name & Instructor Number |
|------|------|------|------|------|------|------|
| 1. | 12-22-19 | Day | Pass Shoot | Above North Bottom | | WTB attch Gun/WTB/100201046 |
| 2. | 12-22-19 | Night | Pass Shoot | Post 1 Hendenson Shooting | | WTB attch Gun/WTB/100201046 |

R-Revolver
SA- Semi Auto Handgun
SG- Shotgun
AW- Automatic Weapon
RF- Rifle

S&W- Smith & Wesson
GLO - Glock
BER- Beretta
RUG- Ruger
SIG- Sig Sauer

BEN-Benelli
COL- Colt
WIN- Winchester
ARA - Armalite
SAV- Savage

BRO- Browning
H&K - Heckler & Koch
MOS- Mossberg
REM - Remington
BUS - Bushmaster

SW- Specialized Weapon
SPF-Springfield
RKV- Rock River

Ammunition- Must be duty ammunition or ballistic equivalent ammunition.
Include sufficient information to fully describe such as caliber, projectile weight and type.
*Sheriff's Standards handgun night require use of flashlight at the 3-yd line
*Sheriff's Standards accepts pass/fail rather than % scores

W Bullock – W. Bullock Signed Force
Policy

TITLE: USE OF DEADLY FORCE - HANDOUT

NORTH CAROLINA GENERAL STATUTE 15A-401 (d) (2) - USE OF FORCE IN ARREST.

A LAW ENFORCEMENT OFFICER IS JUSTIFIED IN USING DEADLY PHYSICAL FORCE UPON ANOTHER PERSON FOR A PURPOSE SPECIFIED IN SUBDIVISION (1) OF THIS SUBSECTION ONLY WHEN IT IS OR APPEARS TO REASONABLY NECESSARY THEREBY:

A) TO DEFEND HIMSELF OR A THIRD PERSON FROM WHAT HE REASONALBY BELIEVES TO THE USE IMMINENT USE OF DEADLY PHYISCAL FORCE:

B) TO EFFECT AN ARREST OR PREVENT THE ESCAPE FROM THE CUSTODY OF A PERSON WHO HE REASONABLY BELIEVES IS ATTEMPTING TO ESCAPE BY MEANS OF A DEADLY WEAPON, OR WHO BY HIS CONDUCT OR ANY OTHER MEANS INDICATES THAT HE PRESENTS AN IMMINENT THREAT OF DEATH OR SERIOUS PHYSICAL INJURY TO OTHERS UNLESS APPREHENDED WITHOUT DELAY; OR

C) TO PREVENT THE ESCAPE OF A PERSON FROM CUSTODY IMPOSED UPON HIM AS A RESULT OF CONVICTION FOR A FELONY.

NOTHING IN THIS SUBDIVISION CONSTITUTES JUSTIFICATION FOR WILLFUL, MALICIOUS OR CRIMINAL NEGLIGENT CONDUCT ANY PERSON WHICH INJURES OR ENDANGERS ANY PERSON OR PROPERTY, NOR SHALL IT BE CONSTRUED TO EXCUSE OR JUSTIFY THE USE OF UNREASONALBE OR EXCESSIVE FORCE.

NOTE: A LAW ENFORCEMT OFFICER ACTING OUTSIDE OF HIS/HER JURISDICTION ASSUMES THE IDENTITY OF A PRIVATE CITIZEN. WHILE THERE MAY BE JUSTICATION FOR THE INDIVIDUAL'S ACTION WHEN CONFRONTED WITH A CRIMINAL SITUATION, THE OFFICER IS STILL CIVILLY LIABLE. IT IS IMPORTANT TO NOTE THAT A CIVIL JURY MAY VIEW THIS ACTIONS AS A CITIZEN ALTOGETHER DIFFERENTLY THAN IF WERE ACTING AS A SWORN OFFICER WITHIN HIS JURISDICTIONAL LIMITS.

INSTRUCTOR: _____ DATE: 9-6-18

STUDENT(S) SIGNATURE:

_Weldon Bulloch_

*Covered Directive B. 9, eff. 9-1-09
Dept. Policy on Use of Force _____ 9-6-18

Justin J. White
6606 Clarksburg Place
Mailbox 12
Raleigh, NC 27616

May 22nd, 2017

To Whom it May Concern:

Re: Bertie Correctional Institution Termination

Good morning,

Per my interview on May 10th, 2017, I was instructed to provide a notarized statement pursuant to my dismissal from the NC Department of Public Safety: Bertie Correctional Institution.

On July 24th, 2015, I was terminated from Bertie Correctional Institution for allegations of Insubordination, categorized as unacceptable personal conduct as noted on my F-3 Personal History Statement. I filed an appeal and on September 11th, 2015, I was reinstated with back pay and full benefits. Same day, after my reinstatement, I submitted my resignation. Since the termination was overturned by upper management, then no termination exists.

Should you have any further questions or concerns please do not hesitate in contacting me.

Sincerely,

*[signature]* 5/30/2017

Justin White
Jw

Cc: File
Justin White, Applicant
W.W. Bullock, Captain, Vance County Sheriff's Office

State of North Carolina
County of Wake

On this, the _30th_ day of _May_, 20_17_, before me a notary public, the

undersigned party, personally appeared _Justin Jamel White_ known to me (or

satisfactorily proven) to be the person whose name is subscribed to the within

instrument, and acknowledged that he executed the same for the purposes

therein contained.

In witness hereof, I hereunto set my hand and official seal.

Notary Public

My Commission expires on
March 14, 2019

W Bullock – White Letters re Previous Employment

Justin J. White
6606 Clarksburg Place
Mailbox 12
Raleigh, NC 27616

May 22nd, 2017

To Whom it May Concern

Re: Louisburg College Termination

Good morning,

Per my interview on May 10th, 2017, I was instructed to provide a notarized statement pursuant to my dismissal from Louisburg College, Campus Police and Safety Department. I served in the capacity of campus safety officer pending law enforcement certification.

On January 5th, 2017, I was terminated from the aforementioned pursuant to the employee probationary policy. Management felt I was not a good fit and ended the business relationship and wished me the best in my endeavors.

Should you have any further questions or concerns please do not hesitate in contacting me.

Sincerely,

_(signature)_ 5/30/2017

Justin White
Jw

Enclosures: (1)
Copy of the Dismissal Letter

Cc: File
Justin White, Applicant
W.W. Bullock, Captain, Vance County Sheriffs Office

State of North Carolina
County of Wake

On this, the __30th__ day of __May__, 20_17_, before me a notary public, the undersigned party, personally appeared _Justin Jamel White_ known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness hereof, I hereunto set my hand and official seal.

Notary Public

My commission expires on
March 14, 2019

Justin J. White
6606 Clarksburg Place
Mailbox 12
Raleigh, NC 27616

May 22nd, 2017

To Whom it May Concern

Re: Shaw University Termination

Good morning,

Per my interview on May 10th, 2017, I was instructed to provide a notarized statement pursuant to my dismissal from Shaw University, Campus Police and Security Department. I held the position of campus security officer pending law enforcement certification.

On February 20th, 2017, I was terminated from the above-mentioned. Per human resources, I was discharged under the 6 month probationary period policy. No reason was listed on the dismissal notice. An internal appeal has been filed and such is being weighed by management for final determination.

Should you have any further questions or concerns please do not hesitate in contacting me.

Sincerely,

5/30/2017

Justin White
Jw

Enclosure: (1)
Copy of Dismissal Letter

Cc: File
Justin White, Applicant
W.W. Bullock, Captain, Vance County Sheriff's Office

State of North Carolina
County of Wake

On this, the _30th_ day of _May_, 20_17_, before me a notary public, the undersigned party, personally appeared _Justin Jamel White_ known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness hereof, I hereunto set my hand and official seal.

_____
Notary Public

My Commission expires on
March 14, 2019

W Bullock – White VCSO Application



# Office of the Sheriff
## Vance County

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone 252-738-2200
Fax 252-738-2220

*PLEASE ATTACH A PHOTOGRAPH*

**Sheriff Peter White** DATE 3/4/2017

## APPLICATION FOR DEPUTY POSITION

### PLEASE PRINT AND ANSWER ALL QUESTIONS

POSITION APPLIED FOR: Deputy Sheriff

FULL-TIME OR PART-TIME? Full time

NAME IN FULL: Justin Jamel White

PRESENT ADDRESS: 6606 Clarksburg Place - Mailbox 12 (27616)

CITY: Raleigh                                    STATE: NC

HOME PHONE: Cell # 919-961-2413   Home: 252-356-2667   WORK PHONE: N/A

HOW LONG HAVE YOU LIVED THERE? 1 1/2 months approximately

PREVIOUS ADDRESS IF LESS THAN 1 YEAR AT ABOVE ADDRESS: 643 Hwy 45 North - P.O. Box 82
Merry Hill NC 27957

SOCIAL SECURITY NUMBER: ___-__-6961   DATE OF BIRTH: 08 / 15 / 1989

DRIVER'S LICENSE NUMBER & STATE: NC DL 30643245

HEIGHT: 5 FT. 8 IN.   WEIGHT: 245   ANY PHYSICAL DEFECTS? YES__ NO ✓

IF YES TO PHYSICAL DEFECTS, DESCRIBE: N/A

HAVE YOU EVER BEEN EMPLOYED BY VANCE COUNTY?   YES____   NO ✓

IF YES, WHAT DEPARTMENT AND WHEN EMPLOYED? N/A

PAGE 2    APPLICATION FOR EMPLOYMENT

NUMBER OF DAYS LOST TO ILLNESS DURING THE PAST TWO YEARS: N/A

IF MORE THAN 14 DAYS, WHAT WAS THE ILLNESS? N/A

HOW WOULD YOU DESCRIBE THE PRESENT CONDITION OF YOUR HEALTH? (CIRCLE BELOW)

EXCELLENT        (GOOD)            FAIR              POOR

EDUCATION – HIGHEST GRADE COMPLETED Graduate School: Master's Degree

HIGH SCHOOL ATTENDED: Perquimans High School

DID YOU GRADUATE? Yes            YEAR GRADUATED: 2007

COLLEGE ATTENDED: University of Mount Olive, NC

MAJOR: Criminal Justice & Criminology DEGREE: B.S.

BASIC LAW ENFORCEMENT TRAINING (B.L.E.T.) CERTIFIED? Yes    YEAR GRADUATED: 2015

OTHER SCHOOLS ATTENDED  (TRADE, PROFESSIONAL, ETC.):
COA : BLET - Graduated on Dec 15, 2015
Southern New Hampshire University: M.S. in Justice Studies (degree conferred
on 10/15/2015 - official graduation day 5/2016)

LIST ANY SPECIAL SKILLS YOU POSSESS AND MACHINES YOU CAN OPERATE SUCH AS
COMPUTER, TYPEWRITER, ETC.

PAGE 3     APPLICATION FOR EMPLOYMENT     (RECORD OF EMPLOYMENT)

HAVE YOU EVER BEEN FIRED OR ASKED TO RESIGN FROM A POSITION? Yes
IF YES, FROM WHERE? AND EXPLAIN CIRCUMSTANCES: See F-3 : Personal History Statement.

NAME OF PRESENT OR LAST COMPANY: Shaw University     PHONE: 919-828-1730     919-719-1897

ADDRESS OF COMPANY: 118 E. South Street Raleigh NC 27601

TYPE OF BUSINESS: Educational     TITLE OF POSITION: Campus Police Officer     Security officer pending     Certified

DATES OF EMPLOYMENT: FROM 11/28/2016     TO 2/20/2017

NAME OF SUPERVISOR: Lee Wood, HR Director

MAY WE CONTACT PRESENT EMPLOYER? Yes

DESCRIPTION OF WORK: Maintain public safety.

FINAL SALARY: $ 35,000 per year     PER: Year

REASON FOR LEAVING: Terminated

NAME OF
COMPANY: Louisburg College     PHONE 919-497-3294

ADDRESS OF COMPANY: 501 N. Main Street Louisburg, NC 27549

TYPE OF BUSINESS: Educational     TITLE OF POSITION: Campus safety officer

DATES OF EMPLOYMENT: FROM Nov. 21, 2016     TO January 5th 2017

NAME OF SUPERVISOR: Terry Wright, HR Director

MAY WE CONTACT PAST EMPLOYER? Yes
DESCRIPTION OF WORK: Observe & report, open/close buildings, make quarterly rounds, etc.

FINAL SALARY: $ 13.40     PER hour

REASON FOR LEAVING: Terminated

PAGE 4    APPLICATION FOR EMPLOYMENT    (RECORD OF EMPLOYMENT)

NAME OF COMPANY: NC DPS: Bertie Corrections    PHONE: 252-794-8600

ADDRESS OF COMPANY: 218 E. Cooper Hill Rd. Windsor NC 27983

TYPE OF BUSINESS: Prison    TITLE OF POSITION: Corrections Officer

DATES OF EMPLOYMENT: FROM 11/5/2012    TO 9/11/2015

NAME OF SUPERVISOR: Nina Griswell, HR Director

MAY WE CONTACT PAST EMPLOYER: Yes

DESCRIPTION OF WORK: Care, custody & control of state offenders

FINAL SALARY: $ 29,800    PER year

REASON FOR LEAVING: Terminated & reinstated after appeal. Resigned on 9/11/15 for personal reasons (finished blet)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

NAME OF COMPANY: Health Care Options    PHONE: 252-482-6555

ADDRESS OF COMPANY: 819 U. Broad Street Edenton, NC 27932

TYPE OF BUSINESS: Health Care    TITLE OF POSITION: Receptionist

DATES OF EMPLOYMENT: FROM 5/8/2012    TO 8/31/2012

NAME OF SUPERVISOR: Shirley Stokes, Executive Director

MAY WE CONTACT PAST EMPLOYER? Yes

DESCRIPTION OF WORK: Clerical / Administrative

FINAL SALARY: $ 8.00    PER hour

REASON FOR LEAVING: Site office closed due to budget issues

IN THE SPACE BELOW, WRITE A SHORT PARAGRAPH STATING WHY YOU WANT TO BE A DEPUTY
SHERIFF. USE COMPLETE SENTENCES, GOOD GRAMMAR AND SPELLING.

From youth to current, I have always desired to be a police officer / sheriffs
deputy. I remember watching police shows as a youngster and being attracted
to law enforcement. In other words, its in my blood - apart of me. After
graduating high school, I enrolled in college and graduated with my B.S.
in Criminal Justice from the University of Mount Olive (2012). Afterwards, I
graduated with my M.S. in Justice Studies from Southern New Hampshire University
(2015). Before finishing my graduate degree, I enrolled in BLET at College
of the Albemarle and graduated in December 2015. All of my educational
accomplishments have prepared me for a career in law enforcement. I look forward
in starting my career and gaining a ~~correct~~ in. wealth of experiences.

I CERTIFY THAT THE ANSWERS GIVEN IN THIS APPLICATION ARE CORRECT TO THE BEST OF MY
KNOWLEDGE. I UNDERSTAND THAT ANY FALSE ANSWERS MAY BE USED AS GROUNDS FOR
DISMISSAL IN THE EVENT I AM EMPLOYED.

_____
SIGNATURE OF APPLICANT

3/4/2017
_____
DATE

**PLEASE NOTE: THIS APPLICATION WILL BE KEPT FOR 6 MONTHS AND THEN DESTROYED**

<u>APPLICATION FOR EMPLOYMENT</u>

<u>CHARACTER REFERENCES</u>

DO NOT LIST MERE ACQUAINTANCES, PREVIOUS EMPLOYERS OR RELATIVES. LIST ONLY
PERSONS WHO KNOW YOU WELL, EITHER PERSONALLY OR IN BUSINESS, WHO CAN ATTEST TO
YOUR CHARACTER

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NAME: Mr. T.J. Langily, State Trooper

ADDRESS: 163 Stevenson Lane Hertford NC 27944

PHONE: 252-619-7185 (cell)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NAME: Mrs. Brenda Hawkins

ADDRESS: 334 Breyhill Rd. Edenton NC 27932

PHONE: 252-333-6833 (cell)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NAME: Dr. Ellen Jordan, Vice President of Academic Affairs, Univ. of Mt. Olive

ADDRESS: 630 Henderson Street Mount Olive, NC 28365

PHONE: 919-221-8199 (cell)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NAME: Pastor Janice Williams

ADDRESS: 218 E. Maple Street Mount Olive NC 28365

PHONE: 919-330-2124 (cell)

HAVE YOU EVER BEEN CHARGED WITH ANY CRIMINAL OR TRAFFIC VIOLATIONS, INCLUDING TRAFFIC CITATIONS? Yes, 3 traffic tickets

IF YES, LIST CHARGE, EXPLANATION, PLACE OF ARREST AND DISPOSITION: Sec F-3: Personal history statement. 1) 2/23/2010 Failing to yield Goldsboro PD (dismissed by DA), 2) 12/11/2010 Going too fast for conditions NC SHP (dismissed by DA), 3) 5-13-2015 Going 70 in a 55 mph (paid ticket before court).

HAVE YOU EVER BEEN SUED OR BEEN A PARTY TO A CIVIL ACTION? Yes, 1

IF YES, PLEASE EXPLAIN: I was sued by Mr. Larry Stokes in October or November 2012 for unpaid rent for $300.00 approximately. Mr. Stokes decided to collect rent after I graduated from college. I never agreed to sued and the judge ruled in my favor. I voluntarily left his property and moved in with my grandmother

HAVE YOU EVER HAD ANYTHING REPOSSESSED? No

IF YES, PLEASE LIST ITEM(S), LOCATION AND DATE(S): N/A

PLEASE LIST YOUR OUTSTANDING DEBTS. No delinquency (creditors)
*old medical bills

| ITEM(S) | BALANCE OWED |
|---|---|
| First Point Collections – Vident Chowan Hospital | $1800.00 |
| First Point Collections – Vident Chowan Hospital | $1278.00 |
| SCA collections | $200.00 |
| ARC Management Group | $31.00 |
| First point Collections Vident Chowan Hospital | $2300.00 |
| | $ |
| | $ |
| | $ |
| | $ |

DO YOU SMOKE? No    IF YES, HOW MUCH? _____

DO YOU DRINK ALCOHOL? Yes    IF YES, HOW OFTEN? Special occassions/very seldom

HAVE YOU EVER TRIED DRUGS? No    IF YES, WHAT TYPE(S) AND APPROXIMATE DATE(S) OF LAST USE:
N/A

HAVE YOU EVER BEEN SERVED ANY DOMESTIC VIOLENCE ORDER? No    IF YES, LIST DATE AND COUNTY / STATE:
N/A

ARE YOU WILLING TO MOVE TO VANCE COUNTY IF CONSIDERED FOR THIS POSITION? Yes

ARE YOU WILLING TO SIGN A TWO-YEAR CONTRACT FOR EMPLOYMENT? Yes

_____
SIGNATURE OF APPLICANT

3/4/2017
_____
DATE

REVISED 3/01

## AUTHORIZATION TO RELEASE INFORMATION

TO WHOM IT MAY CONCERN:

I hereby authorize the Sheriff of Vance County or any authorized representative of the Vance County Sheriff's Office, within 6 months of this date, to obtain any information in your files pertaining to my employment, military, medical, credit or educational records including, but not limited to academic achievement, attendance, athletic, personal history, disciplinary, medical and credit records I hereby direct you to release such information upon the request of the bearer. This release is executed with full knowledge and understanding that the information is for the official use of the Vance County Sheriff's Office. Consent is granted for the Sheriff of Vance County or his agents to furnish such information as is described above to third parties in the course of fulfilling its official responsibilities. I hereby release you, as the custodian of such records, and any university, college, school, hospital or repository of medical records, credit bureau, lending institution, bank, consumer reporting agency, previous or current employer, or retail business establishment including its officers, employees, or related personnel, both individually and collectively, from any and all liability for damages of whatever kind, which may at any time result to me, my family, my heirs, or associates due to compliance with this authorization and request to release information pertaining to me, or any attempt to comply with such request contained therein. Should there be any question as to the validity of this release, you may contact me as indicated below.

Name: Justin Jamel White
(Printed or Typed)

Signature

Address: 6806 C. Place Mailbox 12

Raleigh NC 27616

Telephone ( 919 ) 961 - 2413

Witness:

### NOTARY PUBLIC

Subscribed and sworn to before me
this _____ day of _____ ,20 _____.

My Commission Expires:_____

_____
Signature of Notary

**SEAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:19-cv-00467-BO

**CERTIFIED TRANSCRIPT**

JUSTIN J. WHITE,                                )
                                                )
        Plaintiff,                              )
                                                )
v.                                              )
                                                )
VANCE COUNTY, NORTH CAROLINA,                   )
VANCE COUNTY SHERIFF'S OFFICE,                  )
PETER WHITE, in his official and               )
individual capacities,                          )
LAWRENCE D. BULLOCK, in his                     )
official and individual capacities,            )
WELDON WALLACE BULLOCK, in his                 )
official and individual capacities.            )
                                                )
        Defendants.                             )
_____)


        ZOOM DEPOSITION OF PETER WHITE, 30 (b)(6),

held in North Carolina on Friday, February 26, 2021

commencing at 10:17 A.M., before Dodie George,

Shorthand Reporter and Notary Public.



(866) 715-7770
advancedONE.com

Page 2

```
1   APPEARANCES:
2   THE LAW OFFICES OF SHARIKA M. ROBINSON, PLLC
    BY: SHARIKA M. ROBINSON, ESQUIRE (VIA ZOOM)
3   BY: MICHAEL MCGURL, ESQUIRE (VIA ZOOM)
    info@sharikamrobinsonlaw.com
4   10230 Berkeley Place Drive, Suite 220
    Charlotte, North Carolina 28262
5   704.561.6771
         Counsel for Plaintiff
6
7   WOMBLE BOND DICKINSON, LLP
    BY: CHRISTOPHER J. GEIS, ESQUIRE (VIA ZOOM)
8   BY: LOUISA C. CLARK, ESQUIRE (VIA ZOOM)
    chris.geis@wbd-us.com
9   louisa.clark@wbd-us.com
    One West 4th Street
10  Winston-Salem, North Carolina 27101
    336.721.3600
11       Counsel for Defendants
12
    Also Present:
13  Joi Nelson
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1            EXAMINATION INDEX
2   PETER WHITE, 30 (b)(6)
3     BY MS. ROBINSON
4
5
6            INDEX OF EXHIBITS
7   NO.                                      MARKED
8   10      Personnel Action Form *Exhibit retained*  56
9   11      F-5 Report of Separation *Exhibit retained* 59
10  12      Directives A.1 & A.2                        71
11  13      Directive B.6                               79
12  14      Directive B.9                               81
13  15      Directive D.7                              101
14  16      Directive E.2                              105
15  17      Directive E.3                              112
16  18      Request for Training Waiver                133
17  19      J. White's pay raise                       135
18  20      Notice of Charge of Discrimination         136
19  21      J. White's Rebuttal and Complaint          137
20  22      Campbell Statement                         141
21  23      P. White's Response                        144
22
23
24
25
```

Page 4

```
1            P R O C E E D I N G S
2            PETER WHITE 30(b)(6),
3   having been duly sworn, testifies as follows:
4            EXAMINATION
5   BY MS. ROBINSON:
6       Q.   Sheriff White, can you hear me?  Good
7   morning.
8       A.   Good morning.  I can hear you.
9       Q.   Okay.  So good morning.  Thank you for
10  for sitting down and -- and agreeing to answer
11  questions on behalf of your office and your tenur
12  there.  So I very -- very much appreciate that.
13       As I told Mr. Bullock yesterday, I'm ve
14  -- my style is very conversational.  And -- and s
15  it's just us having a conversation about some of
16  policies, practices and things that went on when
17  were sheriff there as it relates to Mr. White's
18  employment.
19       And for purposes of this, do you mind i
20  call you Sheriff White and I will call Mr. White,
21  Mr. White?
22       A.   That will be fine.
23            MS. ROBINSON:  Okay.  And, Chris, just
24       -- a matter of -- a preliminary matter befor
25       get started, I want to address what occurred
```

Page 5

```
1   the record yesterday.  We had that conversat
2   when we went off the record about you advisi
3   your client not to answer a question.  And y
4   know the rules do not permit you to discuss
5   type of responses with your client in breaks
6   the record, off the record at all.
7   BY MS. ROBINSON:
8       Q.   This has to be your testimony, Sheriff
9   White.  Okay?
10      A.   Okay.
11      Q.   Okay.  So my name is Sharika Robinson,
12  I represent The Law Offices of Sharika M. Robinso
13  And I want to know, have you ever been deposed
14  before?
15      A.   Yes.
16      Q.   Have you ever pro- -- provided testimon
17  before?
18      A.   Yes.
19      Q.   Okay.  So you are familiar with the rul
20  yes and no and not uh-huh and huh-uh and all of
21  that?
22      A.   Yes, I am.
23      Q.   Okay.  Are you prepared to testify toda
24  meaning that you aren't on -- you're -- you're --
25  you're not impaired, you haven't used any substan
```



Page 6

1  no medication; you're prepared to give testimony
2  under oath today?
3      A.  I am.
4      Q.  And so can you please state your name for
5  the record?
6      A.  My name is Peter White.
7      Q.  Your birth date?
8      A.  12/5/55.
9      Q.  And can you please provide your address?
10     A.  60 Frank, F-R-A-N-K, Bullock,
11  B-U-L-L-O-C-K, Road, Manson, North Carolina. The zip
12  is 27553.
13     Q.  Have you always resided in North
14  Carolina?
15     A.  Other than the time that I was in the
16  military and the time during my highway patrol
17  employment.
18     Q.  Okay. So you would -- did you go to the
19  military out of high school or....
20     A.  Yes, out of high school.
21     Q.  Okay. So did you go to Vance County High
22  School?
23     A.  Yes, Vance Senior High.
24     Q.  Okay. So let's start from there. So you
25  went to Vance Senior High and you graduated, and then

Page 7

1  you went to the military. What branch of the
2  military?
3      A.  Marine Corp.
4      Q.  How long were you in the Marine --
5      A.  I did two years.
6      Q.  Then what did you do next?
7      A.  I served my two years. I was discharged
8  honorably, came back home to Vance County, looked for
9  a job, worked two or three jobs like factory-type
10  stuff. That was in 1976. And began my law
11  enforcement career I believe in 1977.
12     Q.  Okay. Did you have to go to college or...
13     A.  I attended Vance-Granville Community
14  College. I got two associate's degrees in.
15     Q.  Uh-huh. What are your degrees in?
16     A.  One's in criminal justice, and the other
17  one is in therapeutic and municipal recreation,
18  basically recreation therapy.
19     Q.  Like sports or something?
20     A.  Well, it's kind of like a dual major. I
21  can either work in a nursing home-type atmosphere or
22  in -- on the sports side.
23     Q.  So you started your career in law
24  enforcement in 1977. Were you a deputy sheriff then
25  or....

Page 8

1      A.  No. I was a police officer.
2      Q.  Police officer.
3      Q.  Okay. What police department was that?
4      A.  This was Stovall, which is located not
5  far from here. It's in Granville County.
6      Q.  How long were you there?
7      A.  I was there about a year.
8      Q.  And then where'd -- where'd you go?
9      A.  I took a job at the Oxford Police
10  Department.
11     Q.  How long were -- what was your title
12  there?
13     A.  I was a police officer.
14     Q.  And how long were you there?
15     A.  I was there about three years, I believe
16  maybe a little more.
17     Q.  Uh-huh.
18     A.  I was there until 1981, August of 1981, I
19  believe.
20     Q.  And then what -- where'd you go?
21     A.  I joined the North Carolina State Highway
22  Patrol.
23     Q.  What was your title there?
24     A.  State trooper.
25     Q.  How long were you there?

Page 9

1      A.  I was there until, I believe, 1985. I
2  remained in Wake County, but I was assigned to the
3  executive protection detail. Some people call it
4  government security detail.
5      Q.  What does -- what does that entail?
6      A.  It entails basically making sure nothing
7  happens to the governor when he's out and about or
8  his family members. You're responsible for
9  transporting him different places in the state, if he
10  drives; if he flies, you fly with him, be it private
11  plane or commercial. If he flies overseas, a couple
12  of us on the detail have to go with him.
13     Q.  And how long were you -- you said in
14  1985?
15     A.  Around '85, yes. I did that for five
16  years.
17     Q.  Okay. So, what, 1990?
18     A.  Yes.
19     Q.  Okay. Where did you go after that?
20     A.  I was promoted to the rank of sergeant,
21  and was assigned to Martin and Pitt County here in
22  North Carolina.
23     Q.  Were you -- you weren't with the highway
24  patrol then?
25     A.  Yes, I was. I was promoted then, sent



(866) 715-7770
advancedONE.com

Page 10

1   there.

2       Q.   Okay.  Well, when you say "sent there," you
3   moved also?

4       A.   Yes.  Well, I didn't establish a permanent
5   residence.  Actually I stayed in a motel most of the
6   time I was there.

7       Q.   How long were you in that position?

8       A.   I was there right at a year, maybe a month
9   or so more.

10      Q.   And what occurred next?

11      A.   I transferred from there at Henderson County.

12

13      Q.   And you pa- -- you patrolled the whole

14  county in that position?

15      A.   Basically I supervised the --

16  the supervisors for the troopers that were here at

17  that time.

18      Q.   How many people did you supervise then?

19      A.   I believe it was 20 troopers.  I'm not

20  certain, but I believe it was 20 then in that

21  position.

22      Q.   Okay.  How many supervisors were there?

23      A.   There was three.  There was a first

24  sergeant, myself as a sergeant and then another

25  individual with the rank of sergeant.

Page 11

1       Q.   And did y'all split the county or....

2       A.   Well, no.  Basically each of us were the

3   first sergeant supervised myself and the other

4   sergeant, and basically we supervised the troopers.

5       Q.   It was like joint supervision?

6       A.   Yes.  Yes.

7       Q.   Okay.  And how long were you in that

8   position?

9       A.   I believe it was about seven years.

10      Q.   So we're at 1998 now.  So -- and what

11  occurred next?

12      A.   After that, I was promoted to the rank of

13  first sergeant, and I was transferred to Roxboro

14  which is Person County.  I supervised the troopers in

15  Person and Caswell counties.

16      Q.   And how long were you there?

17      A.   I think that was just a little bit over a

18  year.

19      Q.   And then what happened?

20      A.   I requested a lateral transfer.  There

21  was a vacancy in the first sergeant's position here,

22  and I was able to come back here as the first

23  sergeant and supervise the troopers and the sergeant

24  that was here during that time.

25      Q.   And by here, you mean Vance County?

Page 12

1       A.   Yes.  We supervised Vance, Warren and

2   three counties because the troopers worked those

3   three counties out of the Henderson office.

4       Q.   Had you established a residency in Vance

5   County at that time?

6       A.   Let's see.  Well, I was born in Vance

7   County, but actually I grew up in Vance County and

8   went to school here.  But I built a house here

9   sometime around, I guess, 1992.  But my parents

10  resided here.

11      Q.   Okay.  So your -- your family, everybody,

12  you just wanted to come back home?

13      A.   Well, where I was, as I said earlier, I

14  staying in a motel.  And, you know, that got to be

15  a little bit aggravating.  And once I found out there

16  was an opening here, I decided it would be best for

17  me to come back here.

18      Q.   Okay.  And so how long -- well, after you

19  requested your lateral transfer to first sergeant,

20  how long were you in that position in Vance County?

21      A.   I'm thinking maybe two years.

22      Q.   Okay.  And so what happened next?

23      A.   I was promoted to the rank of lieutenant

24  and assigned to the Fayetteville office.

25      Q.   And how long were you in that position?

Page 13

1       A.   I was there a year or just a little bit

2   more.

3       Q.   What were your duties?

4       A.   I was a lieutenant.  And myself, one other

5   lieutenant and a captain basically supervised first

6   sergeants in something like 13 counties down that

7   way.

8       Q.   When you say "supervised," what does

9   that -- what did that entail?

10      A.   Well, we kind of monitored what they were

11  doing, reviewed their paperwork, held regular

12  meetings with them, tried to assist them in any way

13  we could, basically making sure they were doing what

14  they were supposed to do.

15      Q.   Did you handle HR issues, any of that, any

16  workplace complaints?

17      A.   Some, yes.

18      Q.   Did you have the ability to hire and fire?

19      A.   No, but I could recommend hiring and

20  firing.

21      Q.   Okay.  How long were you in that

22  position?

23      A.   In Fayetteville I think it was just --

24  a little over a year.

25      Q.   Okay.  And what happened next?



AdvancedONE LEGAL            (866) 715-7770
                             advancedONE.com

Page 14

```
1      A.   I -- I took another lateral transfer and logistics department?
2  Raleigh office on Blue Ridge Road still in the
3  lieutenant's position.
4      Q.   How long were you there in Raleigh major?
5      A.   I -- I want to say I was in that
6  lieutenant's position probably for another year,
7  maybe a little more.
8      Q.   And the -- was the Raleigh office
9  structured the same as the Fayetteville similarly
10     A.   Yeah, similarly, just the counties were
11 different.  There were fewer -- there were fewer A.
12 counties supervising the Raleigh office than home was
13 in the eastern part of North Carolina.
14     Q.   Okay.  And what happened next?
15     A.   After that, I was promoted to the rank of
16 captain and still in Raleigh assigned to what was
17 then called communications and logistics.  Some
18 people referred it to as C&L.
19     Q.   And what -- what did that job entail?
20     A.   Well, basically I was responsible for
21 purchasing everything that the highway patrol used on
22 a day-to-day basis:  automobiles, tires, parts,
23 fuel, pens, papers, paper clips, basically whatever
24 the -- highway patrol used day-to-day, uniforms,
25     Q.   So were you supervising anyone at that
```

Page 15

```
1  point?
2      A.   Yes.
3      Q.   How many officers?
4      A.   I don't recall how many officers.  It was
5  probably -- at that point it was probably about three
6  or four that was actually on what we called the
7  complex with me, and there were several civilians
8  That entailed supervising, I think, nine highway
9  patrol garages across the state as well as the body
10 repair shops and also communication centers together.
11 also supervised what we called the in addition
12 that worked in the state across North Carolina.
13 supervised the -- the motor unit, as we called it
14 motorcycle units, and our aviation unit, which
15 included several helicopters.
16     Q.   And how long were you in that position?
17     A.   I'm not sure.  Maybe a couple of years as
18 captain.
19     Q.   Okay.  And then what happened next?
20     A.   I was promoted to the rank of major, and
21 remained at that location.
22     Q.   And what -- what does a major do?
23     A.   I kept basically my same duties because I
24 didn't move.  I was just elevated in rank.
25     Q.   And so were you still in the communications
```

Page 16

```
1  and logistics department?
2      A.   Yes.
3      Q.   Okay.  Okay.  And then how long were you
4      A.   Until my retirement from there.
5      Q.   When did you retire?
6      A.   I believe it was the last day of 2005 or
7  might have been the first day of 2006.  I want to
8  say last day of 2005.
9      Q.   And what did you do next?
10     A.   I came back here to Vance County, which
11 where home was  And shortly thereafter I decided that I would
12 run for sheriff of Vance County.
13     Q.   What year did you run for sheriff?
14     A.   2006.
15     Q.   So tell me about that process.  What was
16 like?
17     A.   Well, basically you -- you file, pay your
18 filing fee.  And then you been -- you been -- began
19 campaigning, trying to, you know, get people to
20 support you, tell them why you're running, what your
21 intentions are and just prepare for the scrutiny
22 that whatever comes along with it.
23     Q.   What was your platform?
24     A.   Basically doing the right thing, treating
```

Page 17

```
1  everybody right regardless of your ZIP code or your
2  race or any of that stuff; basically being a sheriff
3  for everybody versus certain ZIP codes, is what I
4  told the public.  And I also told them that if I
5  got elected they would never hear me say, "this is my
6  county."
7      Q.   Why did you say that?
8      A.   Because it's not my county.  I don't own
9  as a the county, and I stressed that we were all in it
10 together.  It's just as much their county as it is
11 mine.
12     Q.   Do you remember who you ran against?
13     A.   Yes, pretty much.  I remember the last
14 names.  The sheriff at the time, yes, I remember
15 he was.
16     Q.   Who was he?
17     A.   His name was Thomas Breedlove.
18     Q.   Okay.  So you won that election?
19     A.   Yes.  I won the general -- the primary.
20 No, I asked for a runoff.  I won the general.  And right
21 after that, I believe it was a sergeant with the
22 sheriff's office, he filed a petition, garnered
23 some signatures; and the board of election allowed him
24 run against me as well.
25     Q.   What happened next?
```



Page 18

1    A.    I won.
2    Q.    Okay.  So you won.
3          When were you sworn in?
4    A.    November of 2006, I believe, and then
5    in December of 2006.
6    Q.    How was the sheriff's office structured
7    then or how....
8    A.    I'm not sure how it was structured before I
9    got in there.
10   Q.    How did you structure it?
11   A.    Well, basically I put people in place, or
12   that I would have supervisors to do whatever needed
13   to be done.
14   Q.    Uh-huh.
15   A.    Some were there when I got there, and some
16   came in years later.
17   Q.    Okay.  So just -- just for a moment, we
18   talked about all your different promotions.  And I
19   would assume you -- you probably -- did you have to
20   take tests or exams to be promoted or --
21   A.    Yes.  It's an entire process.
22   Q.    So let's talk about the structure of the
23   sheriff's office under your leadership.  You
24   will just explain to me like a certified deputy, a
25   deputy, lieutenant, just that, all that --

Page 19

1    A.    A certified deputy is one that has
2    completed the BLET course somewhere during his or her
3    career.  Non-certified of course have not done that
4    yet.  Then we have sergeants that basically
5    supervises the deputies.  Then we have lieutenants
6    that supervise the sergeants and then captains.  And
7    the chief deputy position is generally a major's
8    position.
9    Q.    How large is the Vance County Sheriff's
10   Office?
11   A.    I want to say it was about 40 deputies
12   maybe.  That may not be the exact number, but I
13   believe that's pretty close to what it was.
14         And then, well, I should say 40 when I say
15   -- yeah, deputies.  Well, any members of the
16   sheriff's office, which included lieutenants,
17   captains and then about six civilians, I believe.
18   Q.    When you say "civilians," what does that
19   mean?
20   A.    Office staff.
21   Q.    Office staff?
22   A.    Yes.
23   Q.    So you're talking like secretaries?
24   A.    Basically, yes.
25   Q.    And these are all people who were on the

Page 20

1    Vance County Sheriff's Office payroll?
2    A.    Yes.
3    Q.    Did the department grow any under your
4    leadership?  So....
5    A.    In term -- no, not in terms of numbers,
6    not really.  You know, it may have grown a little bit,
7    but not much.
8    Q.    And did you maintain the same structure
9    from 2006 until your retirement?
10   A.    No, not -- not necessarily.  It was
11   similar, but it wasn't the exact same structure,
12   however I do believe.
13   Q.    What did you change?
14   A.    We -- we got -- we added -- later on down
15   the road we added a -- a position.  It was called a
16   gang resource officer.  That was new.  The overall
17   structure with the sergeants, lieutenants, captains
18   and, you know, that pretty much was very close to being
19   the same.
20   Q.    So gangs were an issue in Vance County?
21   A.    Yes.
22   Q.    What type of gang?
23   A.    Even though some -- yes, they were.
24   Q.    What type of gangs?
25   A.    Just the street gangs.  Some of them were

Page 21

1    organized.  Some weren't.  Some were homegrown.
2    I mean, like what we call the real gangs.
3    Q.    What are the real gangs?
4    A.    We had Bloods, Crips, a couple others.  I
5    don't recall their name.
6    Q.    Uh-huh.  What were the races?
7    A.    The Bloods and the Crips are mostly after
8    African-American.  There was another group called
9    Latinos or something similar to that.  They were
10   primarily Hispanic.
11   Q.    Were you able to -- I don't want to say
12   eliminate.  But were you able to get that under
13   control, the gangs?
14   A.    Well, they didn't give us much problem.
15   They kind of policed themselves, so to speak.
16   Q.    What does that mean?
17   A.    Well, they kind -- they dealt with their
18   own situations.  They didn't particularly involve law
19   enforcement.  Every now and then there would be,
20   a shooting that we may have thought was gang-related
21   but they weren't out threatening the public or
22   anything like that.
23   Q.    Okay.  So let's go back to the structure of
24   the -- the office, the sheriff's office.  Did --
25   were Vance County pay for BLET training?



AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

Page 22

```
1     A.   Yes.
2     Q.   How did that process work?
3     A.   For the deputies that were not certified,
4  when we hired them?
5     Q.   Uh-huh.
6     A.   At some point they were scheduled to attend
7  basic law enforcement training at a community college,
8  depending on which college offered the course at what
9  time.
10    Q.   What did you look for when you hired -- hired
11 a deputy when you hired a deputy?
12    A.   Well, there were several things that we
13 looked at.  Excuse me.  Number one, of course, inter
14 would be their background.
15    Q.   Background.  What do you mean by
16 background?
17    A.   We would start -- we would start a background
18 investigation, and we would go from there.  We want
19 to know where they've lived; what jobs they've held; a
20 little bit about their criminal record; their
21 family; education level; reputation, you know, the
22 community that they lived in; that type of stuff.  And
23 of course whether they were certified or not,
24 experience.  It was a whole host of things.
25          MS. ROBINSON:  Okay.  I see that the
```

Page 23

```
1  documents just came in, Mr. Geis.  Do you want to
2  take a second to look at them?
3          MR. GEIS:  No, that's okay.  If you --
4  you're free to just go ahead and --
5          MS. ROBINSON:  Uh-huh.
6          MR. GEIS:  -- go into them as you see fit.
7  BY MS. ROBINSON:
8     Q.   So you looked for community involvement,
9  reputation, education.
10         And what type of character were you looking
11 for in a deputy?
12    A.   Well, we -- we were looking for someone
13 with, you know, good character.
14    Q.   Okay.  And what is good character?
15    A.   Well, you didn't have to be perfect, but,
16 you know, obviously you couldn't have been being
17 arrested and drunk and disorderly type stuff, just
18 basically being what the average person would
19 consider a good person.
20    Q.   So did you -- did you perform interviews or
21 conduct interviews?
22    A.   Yes, I did some.
23    Q.   You said you did some?
24    A.   Yes.
25    Q.   Tell me about the structure, the hiring
```

Page 24

```
1  structure at Vance County.
2     A.   The hiring, individuals apply.  Some wa
3  certified during their application.  During the latter p
4  of my tenure as sheriff, they could apply online,
5  most people either mailed their application in or
6  brought it in themselves.  Once the
7  applications were received, I would normally get
8  them.
9          I would look through them, and then mos
10 of the time I would pass it on to the administrative
11 captain.  He would review it.  And then the ones
12 that we determined to -- or that we felt needed to b
13 interviewed, we would set up the interview for
14 them.
15    Q.   So who is -- who is "we"?
16    A.   When I say "we," basically I'm speaking
17 about the sheriff office as a whole, but it was me.
18    Q.   Uh-huh.  Right.  So you mentioned the
19 administrative captain.  What I'm -- I'm trying t
20 get the process.  So I get that you were ultimate
21 the decision maker.  But what was your -- what di
22 who did your team --
23    A.   Okay.
24    Q.   -- consist of?
25    A.   The process -- there's an interview pan
```

Page 25

```
1  that consisted of -- normally it was -- it was li
2  four individuals, I believe.  Normally it was a
3  captain.  At times it was a captain, maybe two
4  lieutenants and sometimes even a sergeant.  Then
5  again, it might have been two captains, lieutenan
6  The process was the same.
7     Q.   Okay.  Let's -- let's dial it back some
8     So how many different departments did --
9  does the Vance County Sheriff Office have?
10    A.   I'm not sure if it's seven.  We've got
11 patrol and investigations, civil, court, what we
12 call the drug unit, K-9, and I may be missing one.
13    Q.   So what does the patrol department do?
14    A.   Basically they -- they patrol the count
15 paying, particular attention to property, business
16 homes, looking out for break-ins, larcenies,
17 basically protecting the citizens and their prope
18    Q.   And what does the investigation....
19    A.   They -- they are the detectives.  A lot
20 deputies would go to a call.  Say it might
21 breaking and entering call.  A large amount of st
22 may -- may have been stolen, and that would
23 oftentimes be referred to a detective or an
24 investigator.
25    Q.   And the civil department?
```



AdvancedONE LEGAL          (866) 715-7770
                           advancedONE.com

**Page 26**

1    A.   Basically the civil department just serves
2  civil papers.
3        Q.   And the court?
4    A.   Court included working security at the
5  entrance to the courthouse X-ray machine and also
6  acting as bailiffs.
7        Q.   And the drug unit?
8    A.   Basically they stayed on the lookout for
9  drug activity in the county.  They made drug arrests.
10 Primarily that was their function.  Occasionally they
11 would engage in some patrol.
12       Q.   And the K-9?
13   A.   The K-9s were used in several instances --
14 some missing children, Alzheimer's patients, helping
15 tracking them.  The K-9 served kind of as a partner
16 to their handler basically, and they were used
17 sometimes to sniff out narcotics.
18       Q.   So you mentioned the administrative
19 captain.  What would that -- where would that person
20 be located in that structure?
21   A.   It would a captain, but he would not be in
22 the -- the -- he wouldn't be considered the same as a
23 patrol captain.  He would kind of be off to the side,
24 still under the sheriff and the chief deputy, but not
25 in the patrol supervision-type lineup.

**Page 27**

1        Q.   So kind of up there in its own little
2  wing?
3    A.   No, not really.
4        Q.   Okay.  So -- so would the administrative
5  captain fall under any of these, the six categories
6  departments you named: patrol, investigations,
7  civil or drug unit --
8    A.   I believe --
9        Q.   -- K-9s?
10   A.   I believe the administrator was separate --
11       Q.   So --
12   A.   -- in another department.  I think that's
13 the one that I missed, I believe.
14       Q.   Okay.  And what did the administrative
15 department do?
16   A.   Basically paperwork that comes into the
17 sheriff's office.  A lot of stuff would come directly
18 to me.  A lot of times I would review it and funnel
19 it to the administrative captain.  The administrative
20 captain at times would coordinate different
21 activities that was going on that the deputies
22 needed.  He would set that up, follow through with
23 the paperwork at ground investigations, some
24 investigations internally with the sheriff's
25 office.

**Page 28**

1        Q.   Did you have an evidence department?
2    A.   Yes.
3        Q.   So that's a --
4    A.   Well, it wasn't -- it wasn't a -- no.
5  We had evidence, of course; but I -- I d...
6  believe -- no, evidence was not separate.  It was
7  a separate section.
8        Q.   Okay.  What would that fall under?  Wou...
9  the evidence go under administrative or....
10   A.   They Generally, yes.
11       Q.   And so each of these seven departments
12 structured the way you suggested -- indicated at...
13 first?
14   A.   To the best that I recall.
15       Q.   The certified deputy, non-certified
16 sergeants, lieutenant, captains, chief, is that h...
17 each department was structured?
18   A.   No.  That's the sheriff's office as a...
19 person
20       Q.   Uh-huh.  So -- so there wasn't, say, a...
21 investigation's captain?
22   A.   No, not with a title investigation's
23 to captain.
24       Q.   Okay.  So how -- how -- so when you say...
25 so in K-- the K-9 unit or department, did you

**Page 29**

1  have -- you had lieutenants in that department?
2    A.   The K-9 unit was generally supervised b...
3  sergeant.  There may have -- one time may have be...
4  lieutenant there.  I'm not sure.
5        Q.   Were these -- were the -- were the depu...
6  cross-trained or did they get in a certain depart...
7  and stick there?
8    A.   Some, I guess you could say they were
9  cross-trained because they -- some moved from one
10 section within the sheriff's office to another fr...
11 time to time.
12       Q.   Well, it wasn't like they could go in o...
13 day, and one day you'll be in administrative, the...
14 next day you'll be in patrol or....
15   A.   No.
16       Q.   They had a specific location, the deput...
17 did?
18   A.   They had specific duties, yes.
19       Q.   And specific -- did they have specific
20 supervisors?
21   A.   Yes.
22       Q.   Okay.  So going back to the administrat...
23 department, and you -- and that is a department t...
24 assisted you with hiring?
25   A.   It's -- it's really not -- I wouldn't c...



Page 30

1    it a department. It was just administrative
2        Q.    So you -- you were saying that you would
3    receive an application, you would go through a
4    then you would reach out to the administrative
5    captain?
6        A.    Yes, normally or possibly the chief deputy.
7    Depended on how many applicants we had and how
8    that we had planned to interview.
9        Q.    How many applicants did you get, say, in a
10   month or in a quarter on average?
11       A.    I can't say because sometimes we would get
12   several. Sometimes we wouldn't get any of
13   it just varied.
14       Q.    Okay. What -- what was several?
15       A.    We might get two or three a month. We
16   might go three or four months and not get any
17       Q.    Okay. So you said you would convene a
18   panel?
19       A.    At right before the time of the interview --
20   the time of the interview.
21       Q.    Uh-huh. Would you -- you say I'll
22   send an e-mail. Was this a regular panel or....
23       A.    No. Normally if it was a captain that was
24   in charge of the panel, they would make the contact
25   with the applicants. And I believe most of the time

Page 32

1    generally the most senior person on the panel. I
2    would do captains, it would be most likely the
3    administrative captain.
4        Q.    Uh-huh. They would meet with you and
5    say -- and say what?
6        A.    They would let me know how they felt the
7    interview went.
8        Q.    Uh-huh.
9        A.    And then a recommendation would be made
10   to do we proceed with this particular applicant.
11       Q.    Who made the decision to have multiple
12   interviews? So was there one interview, two
13   interviews, three interviews?
14       A.    Well, it depended. It varied on the
15   individual applicant based on how they answered
16   questions, based on if they mentioned certain items
17   that they had and couldn't put their hands on it
18   right then, or the panel may have decided some
19   questions were not thoroughly answered. They may
20   call that individual back in and kind of revisit
21   questions.
22       Q.    Were you involved in that decision to c--
23       A.    No.
24       Q.    -- call them back?
25       A.    No.

Page 31

1    that was by a phone call.
2        Q.    What would happen next?
3        A.    The interview would be scheduled.
4    the applicant would report. They would go through a
5    series of questions and answers. And then after
6    that, the panel would consider everything that they
7    had -- had been put before them, and they would make
8    a recommendation as to hire or not hire
9        Q.    Did you have a standard set of questions?
10   Was there a standard?
11       A.    Yes, there was. They were put together
12   the panel.
13       Q.    What were those questions?
14       A.    I don't know what they were.
15       Q.    Do you know how many?
16       A.    No, I do not.
17       Q.    Did you review the questions?
18       A.    Yes, sometimes I did. After they
19   interviewed, I would ask for the notes, I would
20   look through them checking responses to various
21   questions.
22       Q.    So the -- the panel would -- was there
23   a chairperson who met with you or the panel would
24   meet with you after the interview?
25       A.    Normally whoever in charge of the panel

Page 33

1        Q.    Did you meet with the interviewees
2    personally before making a decision?
3        A.    Which --
4        Q.    To hire.
5        A.    To hire?
6        Q.    Yes.
7        A.    Yes. After the panel -- once the -- th
8    made a recommendation, then I would meet with the
9    individual.
10       Q.    Did it matter if it was a decision to h
11   or to pass on the applicant?
12       A.    Well, if -- if it was a decision to pass
13   an applicant, no, I wouldn't meet with them.
14       Q.    When you met with a person, what would
15   what would, you know, be the purpose of the
16   meeting?
17       A.    Basically I would talk to them briefly,
18   I would introduce myself and kind of welcome them if it
19   just looked as though we were going to hire them, thank
20   them for applying and just go over some general
21   things, such as how to treat people --
22       Q.    Uh-huh.
23       A.    -- how they're expected to behave. And
24   would also stress safety of the property and also
25   the officers. You know, that was something that



Page 34

1  did on a regular basis, and I did it with each
2  applicant, particularly their driving habits.
3      Q.  Uh-huh.
4      A.  And I would let them know that this vehicle
5  that you will be assigned will kill you if you don't
6  respect it.
7      Q.  What did --
8      A.  And I did that -- I did that because of loss of
9  a deputy, a young deputy, I think in about my second
10 year as sheriff in a motor vehicle collision.
11     Q.  So you would -- you would welcome them and
12 -- and explain to them your expectations?
13     A.  Pretty much, yes.  Not all of my
14 expectations, but just cursory.
15     Q.  Uh-huh.  Your general.
16         And what would happen next?
17     A.  After that, they would leave, and then the
18 process of gathering all of their background
19 information would begin.  And once that -- all of
20 that is completed, submitted and re- -- if it's
21 satisfactory, they would be recommended for hire to
22 Sheriff's Training and Standards.
23     Q.  And that Sheriff Training and Standards,
24 that's the state?
25     A.  Yes.

Page 36

1  each    Q.  Uh-huh.  What was the training process
2  like?
3      A.  The -- the BLET training?
4      Q.  No, the onboarding.  What was onboarding
5  like at Vance County Sheriff's Office?
6      A.  Well, basically when they -- they came
7  they got hired, they were assigned to a training
8  officer for a period of weeks.  I don't know exactly
9  how many weeks.  The weeks varied depended on --
10 depending on how -- how well the -- the trainee
11 caught on to the duties.
12         Some may have been a little longer than
13 others.  But none were shorter than the specified
14 period, but some may have been a little longer than
15 the specified period.
16     Q.  So no specified period?
17     A.  It was a specified period.  But none were
18 shorter than the specified period, but some may have
19 been a little longer --
20     Q.  Well --
21     A.  -- if the applicant had a -- you know, they
22 may have had difficulty in geography or something
23 we would have to --
24     Q.  What would --
25     A.  -- work with him another week, few days

Page 35

1      Q.  Would you say that you ran like a brotherly
2  or sisterly organization?
3      A.  No, I would not.
4      Q.  Okay.  So what -- what was the culture like
5  at Vance County Sheriff's Office?
6      A.  To me, the culture was great.  People got
7  along.  They worked together.  They took breaks
8  together.  Sometimes they may visit each other off
9  duty.  We -- over the years we had -- we would
10 would schedule a cookout, a Christmas dinner, that
11 kind of thing.  But I think the -- the culture was
12 professional one.
13     Q.  And so once you recommended someone for
14 hire to training and standards, typically what
15 occurred next?
16     A.  Once -- after -- once we -- when we right
17 that, we would have all the information we needed
18 and then we would hire them.  And basically while
19 they're working their first year, if they weren't
20 certified, then we -- we would schedule them at some
21 point as soon as we could to go BLET.  If they were
22 certified, then we would -- while they were working
23 were waiting on the paperwork to come back from the
24 Sheriff's Standards granting them their
25 certification.

Page 37

1      A.  -- him or her.
2      Q.  What was the specified period?
3      A.  I don't know if it was six weeks.  I wa
4  six weeks.  I'm -- I'm not positive.
5      Q.  Repeat that answer again.
6      A.  I said, I want to say six weeks.  I'm n
7  positive.  That's riding with a deputy and some o
8  the time spent with the sergeant.  Again, it may
9  would different.  I'm not sure.
10     Q.  Who -- who created the -- the rules rel
11 to a specified period?
12     A.  I believe that was done under my
13 administration, under my tenure as sheriff.
14     Q.  Let me take a step back.  So in --
15 somewhere in the hiring process HR was involved,
16 right?
17     A.  The only time HR was involved is after
18 applicant was hired.  Well, HR was of course in-
19 were involved in the -- payment.
20     Q.  So I'm talking about Vance County HR
21     A.  Yes, that's what I'm talking about.  I
22 working, contact the HR rep and let them know I've g
23 individual that I -- I want to hire, these are
24 some of their qualifications.  What can we pay th
25 Now I had a pay scale, but there was some varianc



Page 38

```
1    it.
2            So HR would say, Well, okay, here's what we
3    will pay them.  And at that point I would let them
4    -- the applicant know this is what is going to be
5    your pay.
6        Q.   Was -- was Vance County HR, were -- were
7    y'all in the same building or separate buildings?
8        A.   We were in an adjoining building.  There
9    was a -- like a walkway between the two buildings.
10       Q.   Okay.  So you said you had your own pay
11   chart?
12       A.   No.  The county has a pay scale.
13       Q.   Okay.
14       A.   But -- but before I tell an applicant the
15   pay, I would always verify it with HR.
16       Q.   How is the pay calculated?  Do you know
17   that?
18       A.   I don't know.
19       Q.   Is it based on years?  Is it based on...
20       A.   I don't know how it's calculated.  Again, I
21   would let HR know what I had, and the director would
22   give me the pay to offer that individual.
23       Q.   So when you let HR know what you had, what
24   would you tell HR?
25       A.   Something similar, as I said earlier.  I've
```

Page 39

```
1    got an applicant here.  They've got X number of
2    years' experience.  They're certified.  They've been
3    trained in these areas.  What can we pay them?
4        Q.   So training, the training mattered or
5    impacted pay?
6        A.   Well, sometimes it did.  Sometimes it
7    didn't.  Same as the education level.
8        Q.   So did education impact pay?
9        A.   No.
10       Q.   Well, let's clarify that because you said
11   sometimes training did and sometimes training didn't
12   impact pay and same as education level.
13       A.   Well, education level did not impact pay.
14   Training depending on HR could impact it or could
15   not.
16       Q.   Why -- why wouldn't training give me an
17   instance in which training did not impact pay.
18       A.   Well, if you had a deputy with, say, one,
19   three levels of training and a deputy with one, the
20   pay may very well be the same.
21       Q.   So was there a certain threshold of
22   training?
23       A.   No.  The -- the pay is determined strictly
24   by HR who sometimes would confer with the county
25   manager.
```

Page 40

```
1        Q.   Would you confer with the county manager?
2        A.   Normally I would go to HR, but I have
3    spoken with the county manager on some -- on some
4    occasions concerning pay.
5        Q.   In those instances, were you trying to
6    get more pay or....
7        A.   I was trying to get more.
8        Q.   Okay.  So let's -- let's go back to this
9    six weeks of riding with the deputy or sergeant.
10
11            You -- you indicated that you initiated
12   that practice at Vance County.
13       A.   Because I don't know what they did before
14   I became the sheriff.
15       Q.   Uh-huh.
16       A.   But that was, yes, a part of, I believe,
17   what I initiated when I became -- the actual
18   documentation of the training process.
19       Q.   What did that documentation look like?
20       A.   Again, I.  The training officer did basically
21   evaluations on the trainee on things as their driving
22   skills, how they interact with people, were they
23   finding their way around the county, were they able
24   to talk on the radio properly, that type of stuff.
25       Q.   So what happened typically after the
```

Page 41

```
1    training process?
2        A.   They're -- the deputies are assigned to a
3    shift or a squad, as some may call it.
4        Q.   How many shifts or squads did you have?
5        A.   I believe it was four: A, B, C and D.
6        Q.   How were they assigned to a shift or a
7    squad?
8        A.   Depending on where the vacancies were.
9        Q.   And so would each department have their
10   own shift or squad?
11       A.   No, just -- that's just the patrol division.
12   And then I'm speaking of.
13       Q.   Okay.  So -- so just explain the shifts.
14   Was it first shift, second shift, third shift?
15       A.   They rotated.
16       Q.   Uh-huh.
17       A.   Some worked days.  Two out of the -- they
18   saw worked day shift and night shift, and they rotate
19   with one month day to night.
20       Q.   What was day shift?
21       A.   Normally there were 12-hour shifts.
22       Q.   What were the hours?
23       A.   I believe ordinarily they were like from
24   6P and 6P to 6A.
25       Q.   What hours did you work?
```



Page 42

1    A.   I did not have set hours.
2    **Q.   So after they were assigned to their shift**
3    **or squad, what occurred next?**
4    A.   They went to work and began doing
5    whatever it is their supervisors had them doing.
6    **Q.   So they were in the supervisors' hands**
7    **then?**
8    A.   Yes, pretty much.
9    **Q.   So the supervisor assigned the duties?**
10   A.   No, they -- the supervisor just supervised
11   them.  The supervisor normally knew what the duties
12   were, and -- and they did also.  But the supervisor
13   made sure that they performed their duties in an
14   appropriate manner and -- and basically did what they
15   were supposed to do.
16   **Q.   Who would have -- how would the officers be**
17   **assigned duties?  How would duties be assigned?**
18   A.   If they were on a patrol squad, the
19   duties were to patrol the county.
20   **Q.   Was there any type of document that listed**
21   **the duties of, say, a patrol officer versus**
22   **investigation?  Was there any type of...**
23   A.   I don't think so.  I don't recall any type
24   of document that specifically spelled it out.  Like I
25   said, they patrolled -- their main job was to protect

Page 43

1    the homes, property of the citizens, their businesses,
2    and also serving various papers that were handed down
3    from the courts.
4    **Q.   Okay.  So the officers at some point were**
5    **evaluated --**
6    A.   Yes.  The --
7    **Q.   -- correct?**
8    A.   -- performance appraisals were done.
9    **Q.   Performance.**
10   **Did you -- did you develop that process or**
11   **that form?**
12   A.   No.  That was in process when I became the
13   sheriff.
14   **Q.   Was it a midyear performance appraisal, an**
15   **annual?**
16   A.   There was a -- I believe it was a six-month
17   for the new people coming in, but ordinarily it was
18   annual.
19   **Q.   So explain to me a little bit about that**
20   **process.  You said it was a midyear for a... a**
21   **six-month for new employees.**
22   A.   Yes.
23   **Q.   So what would happen?  The employee**
24   **would....**
25   A.   They would be evaluated by their immediate

Page 44

1    supervisor.
2    **Q.   And what would happen after that?**
3    A.   Once that's completed, it is submitted
4    -- me, and then I would forward it to -- submit it
5    through the chain to me, and I would forward it --
6    forward it to human resources.
7    **Q.   What would happen next?**
8    A.   They weren't done again until the next
9    evaluation period.
10   **Q.   Okay.  I think we're missing some links**
11   **in the chain.  Because at some point the evaluation**
12   **would reach the employee, correct?**
13   A.   Yes.  It's going -- it's -- that is before
14   it's submitted to me.
15   **Q.   Okay.**
16   A.   The immediate supervisor sits down with
17   the employee, and they go over whatever they came up
18   with.  And at that point it makes its way through the
19   chain to me.
20   **Q.   So just for clarity or just to clarify the**
21   **process, walk me through it one more time, please.**
22   A.   This is a process that was in place when
23   I became sheriff.
24   **Q.   Uh-huh.**
25   A.   If I remember correctly, there was a --

Page 45

1    if people recently hired, there was a six-month peri...
2    They were evaluated at the end of six months.  An...
3    then at the end of the following six months, which
4    would have been a year, they were evaluated again...
5    a form that we call performance appraisal form.
6    was done by their immediate supervisor.  And afte...
7    that was done, the immediate supervisor would sit
8    down with the individual, and they would go over
9    performance appraisal together.
10   **Q.   So when you say that was done, that --**
11   **that's the kind of clarity I'm talking about, tha...**
12   **be the -- the --**
13   A.   The -- the appraisal --
14   **Q.   Okay.**
15   A.   -- was done by the immediate supervisor.
16   **Q.   What is the appraisal?**
17   A.   The performance appraisal, the evaluati...
18   that we're talking about.
19   **Q.   Was it written notes?  Was it check box...**
20   **Was it not --**
21   A.   It's a form designed by human resources
22   and it had questions on it, different areas of
23   performance or ratings.  And they had to be given...
24   rating or a score with an overall score.
25   **Q.   Thank you.**



AdvancedONE LEGAL          (866) 715-7770
                           advancedONE.com

Page 46

```
1      A.    You're welcome.
2      Q.    But they were -- they were scored, and the
3  supervisor determined that score.  Was there
4  typically challenges to the score?
5      A.    No, not typically.
6      Q.    Was there a process by which an employee
7  could challenge their score?
8      A.    Yes.
9      Q.    And what was that process?
10     A.    They could -- at the time of the
11 evaluation, they could let their supervisor know that
12 they didn't agree with it.  At that point, they would
13 come to -- try to come to some kind of what I term a
14 happy medium.  And afterwards the individual would be
15 asked to sign the appraisal just acknowledging that
16 it had been done in his or her presence along with
17 them before it comes to me.  And if they couldn't do
18 that, then it would come to me.
19     Q.    Okay.  So let's -- let's talk about the --
20 the process, the termination process.  Explain to me
21 what that process would look like.
22     A.    Well, there's really not a termination
23 process.
24     Q.    So if you wanted to terminate an employee
25 -- have -- have you terminated employees other than
```

Page 47

```
1  Mr. White?
2      A.    Yes.
3      Q.    And what procedure did you employ?
4      A.    Well, it depends on the reason for
5  termination.  Generally if warranted, there was some
6  kind of investigation done.  But it didn't
7  necessarily require an investigation to terminate an
8  employee depending on the reason.
9      Q.    Okay.  So -- so give me an example of a
10 reason that did require an investigation.
11     A.    There could be allegations that we need to
12 look into that would require an investigation, if
13 something happened openly that was egregious enough,
14 that would require an investigation.
15     Q.    What -- what would be an egregious
16 example?
17     A.    If a deputy just stood in the front door
18 and cussed out everybody he saw, and if he did it and
19 my command staff heard it, I don't see that I need
20 an investigation.
21     Q.    Okay.  So let's -- let's -- let's get
22 hypothetical.
23           But can you give me an example of when you
24 terminated someone without an investigation?
25     A.    No, I cannot.
```

Page 48

```
1      Q.    So you -- are you testifying that you have
2  never terminated someone without an investigation?
3      A.    No, I'm not saying never.  I'm saying all
4  terminations during my tenure just require
5  investigation depending on the actions.
6      Q.    Can you give me an example of a termination
7  that did not require an investigation, or please give
8  me an example.
9      A.    It's -- there have been several people who
10 terminated.  There were some that did not require
11 investigation.  There was one individual that was
12 terminated because he didn't want to work for a black
13 sheriff.  That did not re- -- he made the statement
14 so it really didn't require investigation.
15     Q.    Who did he make that statement to?
16     A.    He made it to the majority of the sheriff's
17 office but that was prior to my arrival.  Well,
18 really -- he really wasn't terminated.  He just
19 wasn't -- sworn in when I got there, is the way it ends.
20     Explain to me
21     Q.    So you chose not to swear him in?
22     A.    Yes.
23     Q.    How did you learn of that statement?
24     A.    As I said, basically it was made in front
25 of everybody in the sheriff's office, and it came to
```

Page 49

```
1  me.
2      Q.    Okay.  And that was a no questions asked
3  type termination -- termination?
4      A.    I just didn't swear him in.
5      Q.    Okay.  Can you think of a situation where
6  you just terminated someone, sent the document, a
7  termination document?
8      A.    No.  Not without cause, no.
9      Q.    No.  I'm not saying that it had -- did --
10 did not have cause.  I'm just asking for an example.
11     A.    Have I just -- just terminated someone,
12 because I could or what --
13     Q.    No, no, no.  Without an investigation.
14     A.    Not that I recall, no, other than the
15 individual we are speaking of.  And, again, that was
16 just not swearing him in.
17     Q.    Right.  Well, you know, you -- you just
18 testified that you have terminated individuals
19 without an investigation.  And -- and I'm just trying
20 to get an example of a situation in which --
21     A.    Well, in this case I misspoke.  It wasn't
22 -- technically it wasn't a termination.
23     Q.    Okay.
24     A.    I just didn't swear -- re-swear him in.  He
25 worked for the previous sheriff.  I just didn't swear
```



(866) 715-7770
advancedONE.com

**Page 50**

1    him in when I took over.
2    Q. Okay. Well, give me an example of when you
3    terminated someone with an investigation, please.
4    A. I -- I don't recall that. I spent 12 years
5    as sheriff, and there were some people terminated,
6    but I don't recall all the specifics in that. But
7    there were investigations prior to termination, or
8    investigation.
9    Q. Sheriff White, it -- it may be time for a
10    break. But we have called you here to testify on
11    behalf of the Vance County Sheriff Office. And so
12    it's imperative that you provide examples and
13    because you're speaking on behalf of that entity.
14    And I'm just trying to get an understanding about how
15    that office was run, how it hired people, how it
16    fired people. And, you know, this is an employment
17    discrimination case. So it would -- if you need a
18    break -- if you ever need a break, just say.
19    A. Go ahead.
20    MR. GEIS: Are you finished testifying? Is
21    there a question on the table for the sheriff to
22    answer?
23    MS. ROBINSON: There was a question.
24    MR. GEIS: What is the question?
25    BY MS. ROBINSON:

**Page 51**

1    Q. The question is that I want -- I do you feel
2    comfortable letting me know when you need a break.
3    A. Yes.
4    Q. Okay. Do you need a break now?
5    A. No, not now.
6    Q. So can you provide me an example of when
7    you terminated someone and actually conducted an
8    investigation?
9    A. No, I cannot. I don't recall every
10    individual that was terminated over a 12-year
11    period.
12    Q. Can you recall one instance?
13    A. The one that we talked about earlier
14    technically was not a termination.
15    Q. The instance we discussed earlier was one
16    without an investigation. My question is can you
17    recall one instance in which --
18    MR. GEIS: Objection, asked and answered.
19    And I believe this lawsuit is one of those
20    instances. So....
21    MS. ROBINSON: I think that's --
22    objection.
23    MR. GEIS: Which you're familiar with
24    because I read a number of them in your
25    deposition of Justin White when I reviewed the

**Page 52**

1    transcript. So, Sheriff, just wait for her
2    question, and you can answer it. You've already
3    answered this question.
4    MS. ROBINSON: Are you instructing him
5    to answer the question?
6    MR. GEIS: Yes, I am. He's already
7    answered, or -- Do you have another question?
8    MS. ROBINSON: So you're instructing him
9    not to answer the question?
10    MR. GEIS: Do you have another question?
11    MS. ROBINSON: I do.
12    BY MS. ROBINSON:
13    Q. Sheriff White, explain to me your
14    termination process.
15    A. Well, as I said earlier, technically there's
16    no termination process per se.
17    Q. So do you make up the pro- -- does the
18    process change based on the individual?
19    A. There's not a process as I see it.
20    Q. Uh-huh. Well --
21    A. There's not a termination process.
22    Q. Well, explain to me how a person is
23    terminated?
24    A. Well, it depends on what they've done. An
25    investigation is conducted. A decision is made.

**Page 53**

1    If it warrants termination, they're terminated.
2    Q. What does the investigation consist of?
3    A. It depends on the particular situation or
4    particular incident or allegations. Normally it's
5    interviewing everybody that we can that were
6    involved.
7    Q. So you would conduct interviews?
8    A. Yes. They would be conducted, not
9    necessarily by me.
10    Q. What would occur during the interviews?
11    A. Well, I wouldn't be present during the
12    interviews, but I'm sure whatever questions that
13    thought to be relevant would be asked.
14    Q. And what would happen next?
15    A. Investigation would proceed. And at the
16    conclusion of the investigation, some type of
17    recommendation would be made. If the investigation
18    concluded that a termination would be necessary,
19    then that person may be terminated.
20    Q. How would the termination be executed?
21    A. It depends on the -- the individual.
22    Q. What does that mean?
23    A. It depends on their behavior. Normally
24    they -- we would inform them that their services
25    were no longer needed, and we would collect the ID and


AdvancedONE LEGAL  (866) 715-7770  advancedONE.com

Page 54

```
 1   weapon and that type of stuff at that time,
 2   within the sheriff's office will drive that person
 3   home or wherever they need to go, and then we would
 4   collect the car and that kind of stuff.
 5        Q.   Would the termination be effective
 6   immediately typically or....
 7        A.   Yes, immediately.  Yes.
 8        Q.   So let's go back to the example that you
 9   provided about, you know, not swearing in the -- the
10   white deputy.
11        A.   I didn't -- now I did not say he was
12   white.
13        Q.   Well, he wa- -- what was his race?  That's
14   a good point.  So what was his race?
15        A.   He was white.
16        Q.   He was white.
17        A.   Caucasian.
18        Q.   Okay.  How -- so you said you just didn't
19   swear him in?
20        A.   No, I did not.
21        Q.   So he just -- he just didn't show up to
22   work the next day?
23        A.   No.  He couldn't unless he was sworn.  If
24   he was not sworn in, he was no longer a deputy.
25   Again, he was under the previous sheriff.
```

Page 55

```
 1        Q.   So all deputies have to be sworn in under
 2   new leadership?
 3        A.   Yes, and after each election.
 4        Q.   Did you send him a letter or a note or
 5   anything?
 6        A.   Yes.  He was sent a letter.
 7        Q.   What did the letter say?
 8        A.   I believe it said his services were no
 9   longer needed.
10        Q.   Did that deputy contact HR?
11        A.   I don't know.
12        Q.   Did that deputy file a -- a grievance
13   or....
14        A.   Not that I know of.
15        Q.   Did you ever hear from that deputy again?
16        A.   No.
17             MS. ROBINSON:  Can we -- let me take a
18   five-minute break.
19             MR. GEIS:  Okay.
20                  (BREAK TAKEN)
21   BY MS. ROBINSON:
22        Q.   Sheriff -- Sheriff White, we were
23   talking about the termination process.  And, you
24   know, just to move things some -- along, some, there
25   is a document that you complete when you terminate an
```

Page 56

```
 1   employee, correct?
 2        A.   Yes.
 3        Q.   Explain to me what -- what is done after
 4   you effectuate and communicate the termination.
 5        A.   Now which document is....
 6        Q.   The termination notice.
 7        A.   Well, there's one that goes to HR.
 8        Q.   Uh-huh.
 9        A.   And there's another one that goes to
10   Sheriff Training and Standards.
11        Q.   Explain to me the -- the process by which
12   the one that goes to HR is completed.
13        A.   It's just -- has the individuals date --
14   mean the individual's name and the date that they
15   were terminated.
16        Q.   Is that a document that you complete?
17        A.   Yes.
18        Q.   Do you decide --
19             MS. ROBINSON:  So let the record reflect
20   that we have on the screen, which is Exhibit 1.
21   (EXHIBIT NUMBER 10 WAS MARKED FOR IDENTIFICATION)
22   BY MS. ROBINSON:
23        Q.   Is this the document you're referring to,
24   Sheriff White?
25        A.   Yes.  It's called a Personnel Action
```

Page 57

```
 1        Q.   Can you review that document?  Let's give
 2   him -- you a second to review that document.
 3             MS. ROBINSON:  Michael, can you scroll --
 4   is that the full document?
 5             MR. MCGURL:  (Complies.)
 6             MR. GEIS:  Are you sure you want to label
 7   this as Exhibit 1?  The rules require that
 8   exhibits in a case in the Eastern District be
 9   labeled sequentially regardless of whether
10   they're in another deposition.  I -- I don't
11   have a problem with it.  It's your call.  I'm just
12   letting you know.
13             MS. ROBINSON:  No.  The exhibits --
14             COURT REPORTER:  I'm sorry.
15             MR. GEIS:  You need to what?
16             MS. ROBINSON:  It's Exhibit 10.
17             MR. GEIS:  That was not among -- we --
18   can read that.  Can you read that, Sheriff?
19             THE WITNESS:  Let me stand up and get a
20   little closer to it.
21             MR. GEIS:  That was not among the documents
22   that we have this morning.
23             Oh, Sheriff, here it is.  But it was among
24   documents yesterday.
```



AdvancedONE LEGAL    (866) 715-7770    advancedONE.com

Page 58

```
 1        MS. ROBINSON:  Right.  Some of the
 2   documents -- can we go off the record?
 3        MR. GEIS:  Well, I've -- I've got every
 4   here.  I'll give it to him, Exhibit 10.
 5        MS. ROBINSON:  Yeah.  We sent an e-mail
 6   saying that some of the documents we sent
 7   yesterday will be used today.
 8        MR. GEIS:  Yes.  I've got it.
 9        THE WITNESS:  Yes, I see this.
10   BY MS. ROBINSON:
11        Q.   So you reviewed the document?
12        A.   Yes.
13        Q.   Do you recognize the document?
14        A.   Yes.
15        Q.   And can you explain for the record what
16   this document is?
17        A.   Well, it's called a Payroll Action Form.
18   And it basically is just letting human resources know
19   that this particular individual is no longer on the
20   payroll.
21        Q.   And you complete that document whenever you
22   terminate an employee?
23        A.   Yes, and also when an employee leaves for
24   any other reason.
25        Q.   How soon after a termination do you
```

Page 59

```
 1   complete this document?
 2        A.   We do it as soon as possible, sometimes the
 3   next the day or next couple of days.
 4        Q.   Okay.  So you mentioned a document that you
 5   send to Training and Standards also.  How soon after
 6   termination do you complete that document?
 7        A.   Sheriff Standards has a rule, and I believe
 8   it says ten days.  I'm not certain.
 9        Q.   Can you review this document, Sheriff
10   White, that we have on the screen?
11        A.   Okay.
12        Q.   Can you tell me what this document is?
13        A.   It's a report of separation.
14        Q.   And do you recognize your signature on this
15   document?
16        A.   Yes.
17        MS. ROBINSON:  Let the record reflect that
18   we are marking what is Exhibit form 11.
19   (EXHIBIT 11 WAS MARKED FOR IDENTIFICATION.)
20   BY MS. ROBINSON:
21        Q.   How soon after termination do you complete
22   this form generally?
23        A.   I believe Sheriff Standards says within ten
24   days, if I'm not mistaken.
25        Q.   Are these the only documents that are
```

Page 60

```
 1   completed when an officer is terminated?
 2        A.   I know these two are, but I don't recall
 3   every document that is submitted.  But these are
 4   I would consider the main two.
 5        Q.   Okay.  Do you send letters to employees
 6   when they are terminated?
 7        A.   Sometimes.  Sometimes we don't.
 8        Q.   Do you provide reasons for termination?
 9        A.   At times we do.  Other times we don't.
10        Q.   Why -- why would you not provide an
11   explanation?
12        A.   Generally if someone is terminated, they
13   know why.  Oftentimes we as sheriffs just tell them
14   their services are no longer needed.
15        Q.   Can you give me an example of when you
16   provide a reason for termination?
17        A.   No, I cannot.  I don't recall a specific
18   example now.
19        MS. ROBINSON:  Michael, can you take the
20   document down, please?
21        MR. MCGURL:  (Complies.)
22   BY MS. ROBINSON:
23        Q.   Well, please give me some examples for
24   reasons or reasons that you've terminated employees
25   of your deputies in your tenure.
```

Page 61

```
 1        A.   That is something that I would have to
 2   sometimes then because that was a period of 12 years,
 3   I don't recall everybody that was terminated nor
 4   why they were terminated.
 5        Q.   So, Sheriff White, I -- I don't want you
 6   I don't need you to recall every one, just a few
 7   examples if you could provide.
 8        A.   No, I cannot.
 9        Q.   Do you know how many people you've
10   terminated over your tenure?
11        A.   No, I do not.
12        Q.   Would you say it's less than ten?
13        A.   I don't know.  I haven't counted them.
14        Q.   How many people did you terminate, say, in
15   your last year of service?
16        A.   I don't know.
17        Q.   Did you terminate any individuals your
18   1 year of service?
19        A.   I know one was terminated.
20        Q.   What was that individual terminated for?
21        A.   A particular event that occurred that he
22   was involved in.
23        Q.   What was that particular event?
24        A.   It was a use of force and the ensuing
25   actions after the use of force, actually before a
```


AdvancedONE LEGAL          (866) 715-7770
                           advancedONE.com

---

Page 62

```
1   after.
2        Q.    Was someone injured?
3        A.    Yes.
4        Q.    Was the person injured?
5        A.    Excuse me?
6        Q.    I said, was that person injured?
7        A.    They suffered a broken arm.
8        Q.    Are you talking about Mr. White?
9        A.    Yes.
10       Q.    Was that the only termination during your
11  last year of service?
12       A.    That's the only one I recall at this
13  moment.
14       Q.    What about your -- the year prior to your
15  last year?  Did you terminate....
16       A.    I don't recall that.
17       Q.    You -- you said that you had a culture in
18  which you -- you invited your employees to
19  cookouts?
20       A.    Yes.  At times during my early years as
21  sheriff, we would hold cookouts, all the employees
22  invited.  We would do a Christmas dinner all the
23  employees invited and some of the county staff, you
24  county manager and other people to cookouts, know,
25  prior EMS personnel, police officers.
```

---

Page 64

```
1   BY MS. ROBINSON:
2        Q.    You can answer.
3              What type of songs would he sing?
4        A.    Are you talk -- would who?  Are you talking
5   about the county manager or --
6        Q.    You -- you said the --
7        A.    -- the deputy?
8        Q.    The deputy.
9        A.    He would -- he would just sing like maybe
10  a song or something like that.  He would --
11  wouldn't -- he would never do the whole song.  He
12  would just do snippets, Christmas songs, that type of
13  stuff.
14       Q.    Did you continue that practice?
15       A.    It went on for a while.  I don't know the
16  exact number of years we did it, but eventually --
17       Q.    Why did it stop?
18       A.    Well, we served chicken, some people
19  wanted steak.  If we served steak, somebody wanted
20  barbecue.  If we served tea, somebody wanted
21  lemonade.  And I just -- I didn't feel that it was
22  all really appreciated.  So we just didn't do it.
23  So we did it for several years.  I don't recall what
24  was the exact number.
25
```

---

Page 63

```
1   like a -- similar to just a good social gathering.
2   We just -- we just got together, ate, talked, did
3   whatever; and then everybody went on their way.
4        Q.    Were they at the facility or at your home
5   or....
6        A.    No, we -- normally we would -- we did the
7   cookouts at one of the -- at the local EMS building.
8   We would get a space at a local hotel and do the
9   Christmas dinner.  We had music, food.  Everybody
10  just enjoyed themselves.
11       Q.    Okay.  What kind of music did you play?
12       A.    Well, the county manager normally would
13  play the piano.  Well, the -- the former county
14  manager would play the piano for us.  We had a deputy
15  that at that time that liked to sing, and he would
16  tell jokes.  He was actually in charge of the
17  bailiffs.
18       Q.    So he would sing with the piano?
19       A.    No.  He would do his own thing.  He would
20  do impersonations and stuff like that.
21       Q.    Did y'all play soul music?
22       A.    No.  It was just piano.
23       Q.    The piano.
24             What type of songs would he sing?
25             MR. GEIS:  Objection, relevance.
```

---

Page 65

```
1        Q.    What -- what types of events did you --
2   asked you to -- did you do any events to replace those
3   types of events, those types of gatherings?
4        A.    No.  That was just done within the
5   sheriff's office.  And at some point the county would
6   do an annual event, a dinner, and all the employees
7   would be invited.
8        Q.    You -- you testified earlier that you
9   thought those events, you know, helped the office
10  bond, correct?
11       A.    That I thought -- no, I didn't say that --
12  I thought -- no, I didn't say that it helped them bond.
13  It was just a -- it was open to -- we invited EMS and police
14  officers and highway patrol.  It was law enforcement, EMS, fire
15  responders' deal, along with the sheriff's office
16  people as well as the jail.
17       Q.    Did you host any events or any activities
18  just for the sheriffs alone, the sheriff's deputies?
19       A.    No.
20       Q.    Was there an effort to ensure that the
21  deputies built relationships with one another?
22       A.    Well, that was up to each individual's
23  supervisors, but most of our deputies -- our deputies
24  were mature people.  And nobody had to, you know,
25  to see that they bonded or that type of thing.  Th
```



AdvancedONE LEGAL          (866) 715-7770          advancedONE.com

Page 66

```
1   automatically looked out for each other.
2       Q.  What -- what does that mean, they
3   automatically looked --
4       A.  I mean, normally in the law enforcement
5   community law enforcement officers generally eat
6   together.  They know each other.  They may visit each
7   other's homes, that type of thing.  They would know
8   each other's kids, spouse's name.
9           MS. ROBINSON:  Okay.  We are about to go
10      into a dr- -- Chris, we are about to go
11      these policies.  Do you want to break for lunch
12          MR. GEIS:  It's up to you.  W-- I
13      think Sheriff White would like a break in
14      lunch, but it's up to you when to take it.
15          MS. ROBINSON:  Sheriff White, are you ready
16      for lunch?
17          THE WITNESS:  It doesn't matter to me.
18          MS. ROBINSON:  Okay.  Well, it is 12:30 now.
19      So, you know, I can eat lunch late.  But I want
20      to make sure the sheriff is comfortable.
21          MR. GEIS:  Sure, whenever.
22          THE WITNESS:  Okay.  Yeah.  Let's do it
23      -- let's do lunch.
24          MS. ROBINSON:  Okay.  So, what's another
25          MR. GEIS:  Sure.
```

Page 67

```
1           MS. ROBINSON:  Okay.
2           MR. GEIS:  I'll see you at 1:30.
3               (LUNCH BREAK)
4   BY MS. ROBINSON:
5       Q.  Sheriff White, we left off discussing
6   certain practices that were employed.  Let's talk
7   about the -- the process in how you handled
8   complaints of harassment, discrimination, any type of
9   workplace complaint.  Can you explain to me that
10  process?
11      A.  It would depend on how the complaint came
12  in, whether it be a letter or phone or in person.
13  And that is generally -- depending on the complaint,
14  it could be assigned to an investigator if it's a
15  serious complaint.  If somebody comes in and
16  want to know why our deputy was speeding
17  on I-85, you know, that, in my opinion, doesn't
18  require an investigation.  You know, we -- we
19  we would talk to the deputy if we can figure out who
20  it was and, you know, kind of go from there.
21  was something major, then, yes, it would be an
22  investigation done generally by -- depending on the
23  complaint again.  Generally we would -- the internal
24  investigation would be done by Captain Bullock.
25      Q.  What's the last name?  I'm sorry.  Cappy --
```

Page 68

```
1   or you said captain?
2       A.  Captain.
3       Q.  Yeah.
4       A.  Captain.  Yeah.  Weldon Bullock.
5           COURT REPORTER:  Captain, what was that
6           THE WITNESS:  Weldon Bullock.
7           COURT REPORTER:  Could you just --
8           MS. ROBINSON:  Your microphone is very
9   sensitive.  We here the texts.
10          MR. GEIS:  Sorry.
11  BY MS. ROBINSON:
12      Q.  Okay.  Can you -- you continue, Sheriff
13  White?
14      A.  It depends on the -- what type of compl
15      If it's something that warrants an
16      internal investigation, then generally Captain We
17  Bullock will conduct it.
18      Q.  And so that's a citizen's complaint.  W
19  about a workplace complaint?
20      A.  Such as?
21      Q.  Harassment, discrimination, hostile wor
22  environment.
23      A.  We've only had one that I recall during
24  time as sheriff.
25      Q.  And how were those -- how was -- so --
```

Page 69

```
1   -- and I suspect we're talking about Mr. White.
2       A.  Yes.
3       Q.  So did you anticipate, have a -- a prac
4   of like if a complaint came through, how you would
5   respond to it, a procedure?
6       A.  No, we didn't -- I wouldn't say we
7   anticipated.  Again, that's the only complaint th
8   any type of in my tenure as sheriff the way you
9   described it.
10      Q.  Well, did -- so how would you com- -- h
11  you ever had a situation in which a woman said th
12  she wasn't treated the same as men, male deputies
13      A.  No.
14      Q.  Okay.  And so not had any workplace
15  complaints in terms of -- what if a officer said,
16  someone is harassing me, an employee, a co- -- a
17  deputy is harassing me or -- maybe not even those
18  words, but....
19      A.  We -- we've only had one such incident
20  similar to that.
21      Q.  Okay.  I think at this point we want to
22  look at -- go into the policies.
23          MS. ROBINSON:  Michael, can you please
24  up A.1 and A.2?
25          MR. MCGURL:  (Complies.)
```



Page 70

1  BY MS. ROBINSON:
2       Q.   Sheriff White, can you see this policy?
3       A.   Yes, I can see it, but I would have to walk
4  up there and read it.
5       Q.   Okay.  I think Mr. Geis is pulling that
6  together for you.
7            Sheriff White, will you please let me know
8  when you've had a chance to review that policy?
9       A.   Any particular section or the entire
10  policy?
11      Q.   The policy in its entirety.
12      A.   Okay.
13      Q.   Do you recognize that document, Sheriff
14  White?
15      A.   It looks to be a policy and procedure
16  manual.
17      Q.   Can you identify the document by name?
18      A.   That is Directive A.1, "Cannons of
19  Ethics."
20      Q.   And are those your signatures on that
21  document?
22      A.   Yes.
23      Q.   Did you draft these policies?
24      A.   No, I did not draft them.
25      Q.   Were you responsible for the drafting of

Page 71

1  these policies?
2       A.   Yes.
3       Q.   If you would go to the first page of
4  Directive A.1, please.
5       A.   (Complies.)
6       Q.   Can you read the date of this policy?
7       A.   7/15/2009.
8       Q.   How often did you update your policy,
9  essentially, Sheriff White?
10      A.   I believe there was only one update that I
11  recall during my tenure since this was policy was
12            MS. ROBINSON:  And let the record reflect
13      we're marking Exhibit 12, which is Directive A.1.
14      (EXHIBIT NUMBER 12 WAS MARKED FOR IDENTIFICATION.)
15  BY MS. ROBINSON:
16      Q.   You were saying that there was only one
17  update?
18      A.   That I can recall.
19      Q.   When did that update occur?
20      A.   I don't know.
21      Q.   Do you -- do you know about -- not
22  precisely when, but was it in 2008, 2007 or
23  after?
24      A.   I don't know.  It would have been after
25  this July 15, 2009 date.

Page 72

1       Q.   Okay.  How often are you required to up
2  your policies?
3       A.   I'm not aware of a requirement as far as
4  updating policy, a timeline.
5       Q.   Did you have someone who was dedicated
6  drafting policies, updating and implementing
7  policy?
8       A.   No.
9       Q.   Did you provide your deputies with copi
10  of your policies?
11      A.   They were not provided with copies of t
12  policy manual on an individual basis, but they di
13  have access to it.  There was a computer in the
14  patrol squad room that they can sit down whenever
15  they wanted to and review whatever policies they
16  chose to.
17      Q.   Why didn't you provide your deputies wi
18  copies of the policy?
19      A.   Vance County, being a poor county, we j
20  couldn't afford to print 40-something-thick polic
21  manuals.
22      Q.   Okay.  So I want to turn your attention
23  the actual exhibit, and I'm going to ask you a co
24  questions about it.
25      Q.   Can you read the primary responsibility

Page 73

1  Article 1?
2       A.   "The primary responsibility of the poli
3  service and the individual officer is the protect
4  of the people of the United States through the
5  upholding of their laws; chief among them is the
6  Constitution of the United States and its Amendme
7  The law enforcement officer always represents the
8  whole of the community and its legally expressed
9  and is never the arm of any political party or
10  other clique."
11      Q.   Do you agree with that statement?
12      A.   Yes, I agree with it.
13      Q.   What does that statement mean to you?
14      A.   It means exactly what it says to me.
15      Q.   Which is?  If you paraphrase it -- can
16  paraphrase that statement in your -- in layman's
17  terms?
18      A.   Do the right thing.
19      Q.   Okay.  I would like for you to turn you
20  attention to Article 6.
21      A.   Okay.
22      Q.   Can you just review that statement to
23  yourself?  I'm not going have you read the entire
24  paragraph.
25      A.   (Complies.)



AdvancedONE LEGAL          (866) 715-7770
                           advancedONE.com

Page 74

1    Q.   After you've reviewed that statement, will
2  you tell me what that means?  Just summarize it in
3  your terms.
4    A.   Basically be a decent, respectful person
5  and lead your life in a manner such as that.
6    Q.   Would you agree that that's on and off
7  duty?
8    A.   Yes.
9    Q.   Will you pay -- will you turn your
10  attention to Article 7?
11    A.   Okay.
12    Q.   Can you paraphrase that for me?
13    A.   Basically serving the public in -- in a
14  professional manner.
15    Q.   There is a sentence there.  It says
16  -- so the second sentence from the last in
17  that sentence, sir?
18    A.   Are you talking about the one that says
19  that it does not give satisfaction private --
20    Q.   No.  So we're still in Article 7.
21    A.   Okay.
22    Q.   And it says, "The officer will give....".
23    A.   Okay.  I see that.
24         "The officer will give service where he can
25  and require compliance with the law."

Page 75

1    Q.   What does that mean?
2    A.   He will give service where he can in
3  serving the public and require compliance with the
4  law.
5    Q.   Does that sentence mean that the officer is
6  expected to uphold the laws?
7    A.   Yes.
8    Q.   Can you turn to the -- to the "Code of
9  Ethics," Sheriff White?
10    A.   Okay.
11    Q.   Is this a document that you had each
12  officer sign?
13    A.   No, they would not have -- I don't believe
14  they would each sign this particular directive.
15    Q.   But you did expect the officers to act this
16  directed under this code of ethic?
17    A.   Yes.
18    Q.   Okay.  So if you -- you'll hold onto it --
19  we'll come back to this -- these policies.
20         Let's turn now to the domestic B --
21  Directive B-6.
22         MS. ROBINSON:  Do you have that policy,
23  Mr. Geis?
24         MR. GEIS:  Yes, we do.
25         THE WITNESS:  I have it.

Page 76

1         MS. ROBINSON:
2    Q.   Sheriff White, will you please let me know
3  when you've had a chance to review this directive.
4    A.   The entire directive?
5    Q.   If you want to skim it, we'll go through
6  it part by part like before, or if you want to read
7  review it in its entirety, either works.
8    A.   Okay.
9    Q.   Can you identify this document, Sheriff
10  White?
11    A.   It looks to be from the Vance County
12  Sheriff's Offices Policy and Procedure Manual.
13    Q.   What directive is this?
14    A.   B-6.
15    Q.   And can you read the name of the document
16  at the bottom of each page?  What does it say at the
17  bottom of each page?
18    A.   Vance County Sheriff's Office Policy
19  Manual.
20    Q.   And is it -- this your signature on these
21  policies?
22    A.   Yes.
23    Q.   Did you draft this policy?
24    A.   No, I did not.
25    Q.   Did you sign off on this policy?

Page 77

1    A.   Yes.
2    Q.   Can you go to the first page of the policy
3  document?
4    A.   Okay.
5    Q.   Okay.  And can you read the effective
6  date?
7    A.   7/15/2009.
8    Q.   Has this policy been updated since?
9    A.   It's been updated once.  I don't recall
10  date.
11    Q.   Who updated the policy?
12    A.   I did.
13    Q.   Do you know who drafted the policy?
14    A.   It was drafted by a company or a group.
15    Q.   Do you recall the name of the group?
16    A.   No, I do not.
17    Q.   If you will turn to the -- so first page
18  the policy and read the second sentence for me.
19    A.   "The Vance County Sheriff's Office
20  recognizes domestic incidents caused as high prio
21  and needing special attention due to the possibili
22  of violence directed to an involved party."
23    Q.   Did your office receive a lot of domest
24  disputes?
25



Page 78

```
 1      A.   We received some.  I don't recall how many.
 2      Q.   Will you turn your attention to -- your
 3 attention to page 7 of that document, Article 5?  Can
 4 you read that?
 5      A.   Which section on page 7?
 6      Q.   Article 5.
 7      A.   "Same Gender Disputes"?
 8      Q.   Yes.
 9      A.   "Although 50B does not address domestic
10 specifically, the issue of same-sex domestic
11 incidents, deputies are reminded that domestic
12 disputes do occur with same-sex relationships.
13 Personnel are to treat calls of this nature the same
14 way in using the same methods as opposite-sex calls.
15 However, do not apply the same standards for same-sex
16 orders under 50B if making a warrantless arrest."
17      Q.   Can you explain to me what last sentence
18 means?
19      A.   I'm not 100 percent sure, but I think
20 that it means -- applying the same standards, I think
21 distinguishing a difference between same-sex versus
22 opposite sex.  You don't apply the same rules.
23      Q.   Why wouldn't you apply the same rules?
24      A.   I don't know.  That's just what it was.
25      Q.   And you expected your deputies to carry out
```

Page 79

```
 1 your policies, correct?
 2      A.   Yes, I did.
 3      Q.   Okay.  Let's move on to --
 4           MS. ROBINSON:  Let the record reflect that
 5      Exhibit 13 is Directive B.6.
 6      (EXHIBIT NUMBER 13 WAS MARKED FOR IDENTIFICATION.)
 7 BY MS. ROBINSON:
 8      Q.   Let's move on to Exhibit B.9.  I mean
 9 not -- I mean Policy B.9.
10      A.   I have.
11      Q.   Will you please let me know when you're
12 ready to discuss this policy?
13      A.   I'm ready.
14      Q.   Okay.  Can you identify -- will you
15 identify this policy, Sheriff White?
16      A.   "Use of Force," Directive B.9, Vance County
17 Sheriff's Office Policy Manual.
18      Q.   And is that your signature?
19      A.   Yes.
20      Q.   Did you draft this policy?
21      A.   No.
22      Q.   Did you cause this policy to be drafted?
23      A.   Yes.
24      Q.   Can you go to the first page and read the
25 date of that policy?
```

Page 80

```
 1 Any.  July 15, 2009.
 2      Q.   Has this policy been updated?
 3      A.   Once that I recall.
 4      Q.   Did you disseminate the updated policy?
 5      A.   Yes.
 6      Q.   To whom did you give it to?
 7      A.   I believe every deputy received a copy
 8 the updated portion.  In fact, every -- every
 9 member -- every officer of the sheriff's office
10 should have received one.  I believe a memo went
11 along with it, if I remember correctly.
12      Q.   Do you recall what the memo may have said?
13      A.   No, I don't remember, but it would have
14 identified the policy that was updated.
15      Q.   Would you have e-mailed that update or...
16      A.   No.  I believe it was hand-delivered.
17      Q.   When you updated the policy, did you update
18 the policy as the entire Vance County Sheriff's
19 Office Policy Manual or are you saying this directive
20 was updated?
21      A.   No.  I'm not saying this directive.  It
22 particular directive, but I don't recall which
23      Q.   Okay.  Can you read the -- the -- start
24 at the second sentence of Article 1?
25      A.   "By vesting deputies the lawful authori
```

Page 81

```
 1 to use force to protect the public welfare, the
 2 careful balancing of all human interests is
 3 required."
 4      Q.   Can you continue?  Just read that whole
 5 statement, sir.
 6      A.   "Therefore, it is the policy of the Van
 7 County Sheriff's office that deputies shall use o
 8 that force which is reasonably necessary to
 9 effectively bring an incident under control while
10 protecting the lives of the officer or another.
11 Deputies shall use physical force in arrest and
12 custody situations only in strict conformance with
13 the United States Constitution, laws of the State
14 North Carolina and this policy."
15      Q.   Have your officers -- have your deputie
16 used force before?
17      A.   Yes.
18      Q.   Is that force prohibited?
19      A.   No.
20      Q.   Has a suspect been injured while using
21 force before?
22      A.   Yes.
23      Q.   Can you identify some types of force th
```



Page 82

```
 1   is used?
 2       A.   There's soft hands.  Mace is used.  There
 3   have been firearms used.
 4       Q.   You said batons?
 5       A.   Firearms.
 6       Q.   Firearms.
 7            Do your deputies have batons?
 8       A.   Yeah, some of them do.
 9       Q.   How do you decide who gets batons?
10       A.   It depends on how many we have available to
11   be issued.  And sometimes we look at seniority, and
12   other times we -- we may look to see who -- who has
13   an interest in one provided that they are certified
14   to use it.
15       Q.   Can you provide a deputy with an instrument
16   that he or she isn't certified to use?
17       A.   Normally we don't do that on ones that
18   require certification.
19       Q.   What instruments must the deputy be
20   certified to use?
21       A.   The ASP baton, your mace or OC spray,
22   firearms.  That's all I can think of right now.  And
23   also, some are issued riot batons.
24       Q.   Are all officers or deputies issued
25   firearms?
```

Page 83

```
 1       A.   Yes.
 2       Q.   Are they trained on the use?  Do you
 3   train --
 4       A.   Yeah.  Yes, they are trained by a certified
 5   firearms instructor.  They also are trained from
 6   Law Enforcement Training.
 7       Q.   And that's the BLET?
 8       A.   Yes.
 9       Q.   How does a deputy express interest in other
10   types of equipment?
11       A.   Generally if there's equipment available,
12   some deputies will maybe approach a supervisor and
13   say, can I have one of these or can I get this or --
14   provided that they have -- have recently been
15   certified in whatever that is.
16       Q.   Do you offer certification?
17       A.   Yes.
18       Q.   Would a deputy have to request
19   certification or....
20       A.   No.  No.  Sometimes they're -- some
21   deputies are a little more eager than others.
22       Q.   Were you -- who was responsible for handing
23   out the equipment?
24       A.   There were two different individuals under
25   my tenure.  The first one was Lieutenant Stainback.
```

Page 84

```
 1   He retired.  And then that went to Lieutenant Ray
 2   Pharr.
 3       Q.   Can you spell his last, sir?
 4       A.   S-E- -- S-H-E-A-R-I-N.
 5       Q.   Can you read the Chemical Agents section,
 6   Sheriff White?
 7       A.   "Only sheriff's office-issued chemical
 8   agents may be carried and used by deputies of the
 9   Vance County Sheriff's Office.  Prior to the issue
10   of available oleoresin capsicum spray, OC spray, all deputies
11   shall receive training in its use, which will include
12   instruction and actual allocation -- application
13   of the deputy an understanding of the effects.
14            Any use of OC spray other than in a training
15   instrument or spraying of animals or self-protection
16   shall be reported as required by policy."
17       Q.   Can you para- -- paraphrase that statement,
18   sir?
19       A.   Basically you should not be carrying the
20   the chemical spray unless you have been trained in
21   its use.
22       Q.   So is it fair to say that the issuance of
23   OC spray without training is against procedure if
24   issued?
25       A.   It should not have been issued without
25   training verification.
```

Page 85

```
 1       Q.   What is the training verification?
 2       A.   Some type of documentation saying that you
 3   have completed that training.
 4       Q.   And would that training verification come
 5   from Vance County Sheriff's Office?
 6       A.   It would come from the instructor that
 7   performed the training.
 8       Q.   Would that instructor be hired by Vance
 9   County or contracted by Vance County Sheriff's
10   Office?
11       A.   Well, not necessarily because it could be
12   provided through a community college.
13       Q.   But it would have been at -- would the
14   training been at the request of the Sheriff's
15   Office?
16       A.   Yes.
17       Q.   Can you turn to page 3 of that document,
18   Sheriff White?
19       A.   Okay.
20       Q.   Can you read the section where it says
21   "Serious Bodily Injury"?
22            COURT REPORTER:  And I'm sorry that --
23            THE WITNESS:  "Serious bodily injury that
24   creates a substantial risk of death or is likely
25   to cause permanent disfigurement, coma,
```



AdvancedONE LEGAL
(866) 715-7770
advancedONE.com

Page 86

```
 1     protracted, or permanent condition.  It is an
 2     inquiry -- it is an injury that causes extreme
 3     pain, prolonged or permanent loss or impairment
 4     of the function of any bodily member or organ,
 5     that results in prolonged hospitalization."
 6  BY MS. ROBINSON:
 7        Q.   What does prolonged hospitalization mean?
 8        A.   A long time in the hospital.
 9        Q.   So would a week be prolonged?
10        A.   It could be.
11        Q.   Would a day be prolonged?
12        A.   It could be depending on the individual
13  that's hospitalized, how they feel about it.
14        Q.   So it's -- it's up to how the individual
15  feels about it?
16        A.   No, it's not up to how they feel, but
17  prolonged to one person may not be prolonged to
18  another.  But basically what this policy is in the
19  way I interpret it is saying, I mean, I -- a sub-
20  -- substantial time in a hospital.
21        Q.   Well, this is -- this is a policy that you
22  signed off on, correct?
23        A.   Yes.
24        Q.   Okay.  Let's -- let's move on, and
25  let's turn to page 4.
```

Page 87

```
 1        A.   (Complies.)
 2        Q.   Can you read the first sentence of the
 3  General Guidelines?
 4        A.   "When lethal force is not authorized, a
 5  deputy should assess the situation in order to
 6  determine which less lethal technique or weapon would
 7  best de-escalate the incident to bring it under
 8  control in a safe manner."
 9        Q.   What is lethal force, Sheriff White?
10        A.   Life-threatening.
11        Q.   And what do you paraphrase this clause to
12  mean?
13        A.   A use of force that could be
14  life-threatening or possibly take someone's life.
15        Q.   The entire clause, sir.  I'm sorry say -- how
16  would you paraphrase the entire clause?
17        A.   The entire first sentence?
18        Q.   Yes.
19        A.   The deputy basically should assess the
20  situation and determine, as it says, which less
21  which lethal technique or weapon will -- which will
22  be -- will best deescalate the incident to bring it
23  under control in a safe manner.
24        Q.   Is this a subjective inquiry?
25        A.   Well, yeah, it could be.
```

Page 88

```
 1        Q.   Let's move on to page 5, Medical
 2  Assistance.
 3             Okay.
 4        Q.   Can you read where it says, "Medical
 5  assistance shall be afforded...."?
 6        A.   No.  "Medical assistance afforded shall
 7  be..."
 8        A.   The first sentence?
 9        Q.   Yes.  Yes, sir.
10        A.   "Deputies shall make the scene as safe as
11  possible and shall afford medical assistance to
12  injured persons considering:"
13        Q.   And then read the next sentence.
14        A.   "Amount and type of force...." -- the next
15  sentence?
16             "Medical assistance afforded shall be the
17  same as for any other individual with similar
18  injuries including:"
19        Q.   And can you read the two?
20        A.   Including "First aid administered by the
21  within the limits of the affected deputy's
22  level of training, calling or offering to call
23  emergency medical services as appropriate."
24        Q.   So is it your expectation that your
25  deputies if and when they injure someone, that they
```

Page 89

```
 1  seek treatment for that person also?
 2        A.   Yes, if they're in a position to do so.
 3        Q.   Can you explain that?  You said if they're
 4  in position to do so.
 5        A.   They're able to do so.
 6        Q.   When would they not be able to do so?
 7        A.   If they're injured themselves to the point
 8  where they're incapable.
 9             Let's turn to page 15 of this document.
10             MS. ROBINSON:  And also, let's -- let's
11  note that this is Exhibit 14.
12  (EXHIBIT NUMBER 14 WAS MARKED FOR IDENTIFICATION)
13  BY MS. ROBINSON:
14        Q.   Can you -- do you see the section where
15  it says "Use of Force," Sheriff White?
16        A.   "Other Use of Force"?
17        Q.   Yes.  Yes.
18        A.   Yes.
19        Q.   Can you read that first sentence?
20        A.   "A deputy shall complete the Use of
21  Force/Assault Report on each occasion that he or
22  she strikes a person with any part of his body using
23  fist, elbow, knee, or neck restraint or uses or
24  displays any defensive weapon, OC spray included,
25  order to control a subject.  On those occasions w
```



Page 90

```
 1   the deputy displayed only any defensive weapon,
 2   excluding the electronic control device, ECD, a
 3   brief, factual to-the-point narrative shall be
 4   completed. The Use of Force/Assault Report shall
 5   also be completed whenever a subject or a deputy is
 6   injured, complains of injury, or has visible injury
 7   or in any case where the subject is charged with
 8   assaulting the deputy."
 9       Q.  Okay.  What is a Use of Force Report?
10       A.  It's a form used by the sheriff's office to
11   document what took place during a use of force, such
12   as I believe a date and time and what force was used
13   and why, that type of thing.
14       Q.  Did you maintain a repository of these
15   documents?
16       A.  Yes.
17       Q.  Is a Use of Force Report the same as an
18   assault report?
19       A.  No.
20       Q.  What's the difference?
21       A.  I -- I'm not familiar with an assault
22   report.
23       Q.  The policy names an assault report.
24       A.  It says use of force, slash, assault
25   report. So reading this policy, that would be one
```

Page 91

```
 1   and the same.
 2       Q.  They're the same.  Okay.  Thank you.
 3           So if a deputy is injured, it is the
 4   expectation that the deputy document that on forms?
 5   If a -- if a deputy is injured by a suspect, it is
 6   the expectation that the deputy document that
 7   injury?
 8       A.  Yes.  If -- if the form is completed and
 9   there is an injury to the deputy, yes, it should be
10   documented on that report.
11       Q.  Okay.  Can -- let's turn to page 16 --
12       A.  Page 16 or 17?
13       Q.  16, sir.
14       A.  Okay.
15       Q.  This -- this -- this policy says, "Review
16   by Supervisor"?
17       A.  Yes.
18       Q.  Can you read that first bullet?
19           COURT REPORTER:  And could you please
20   slower, please?
21           THE WITNESS:  "The deputy's supervisor
22   shall review the use of force, slash, assault
23   report for completeness with the deputy's
24   submission.  In addition, the supervisor shall
25   review any accompanying video and this direct
```

Page 92

```
 1   as it applies to the incident with the deputy,
 2   make an initial determination about whether the
 3   deputy followed the Sheriff's Office Policy and
 4   established training procedures.  The Use of
 5   deputy Force/Assault Report -- this report and the
 6   of force policy reviewed with the deputies
 7   involved.  The supervisor performing the review
 8   and the affected deputy, shall initial the Use of
 9   Force/Assault Report below the above-mentioned
10   statement.  A supervisor who is involved in the
11   incident shall not conduct the review."
12       BY MS. ROBINSON:
13       Q.  Does this -- what do you interpret this
14   policy to mean?
15       A.  The supervisor should review the policy
16   completeness prior to submission for filing.
17       Q.  So does this mean that the supervisor makes
18   the first determination as to whether or not the
19   force used was reasonable?
20       A.  No.  The supervisor is -- is reviewing for
21   completing -- completeness and also to make sure
22   that the policy was followed.
23       Q.  Can you read the second bullet, Sheriff
24   White?
25       A.  "The deputy's supervisor shall then sign
```

Page 93

```
 1   the Use of Force/Assault Report and send it, along
 2   with a copy of the accompanying videos, if
 3   applicable, directly to the Use of Force Board
 4   lieutenant.  The Use of Force/Assault Report
 5   is not required to be submitted to the sheriff's
 6   office captain but can be provided upon request."
 7       Q.  Who -- who sits on the Use of Force
 8   Board?
 9       A.  I don't know who -- who is on it now,
10   obviously.  But when I was there, there was -- I
11   don't remember the number of people.  I think it was
12   four or five.  I remember Lieutenant Stainback was
13   one of them.  I think Captain Lloyd Watkins was one
14   and I don't recall the -- the others.  But generally
15   -- there was also -- I believe there was a review --
16   one sergeant that sat on it, if I remember correctly.
17   I don't recall who that was.
18       Q.  How regularly did the Use of Force Board
19   convene?
20       A.  I'm not sure.  That depended on the number
21   of Use of Force forms we received.
22       Q.  So in the first bullet where it says, "The
23   deputy's supervisor" --
24       A.  Yes.
25       Q.  -- were you referring to the direct
```



AdvancedONE LEGAL
(866) 715-7770
advancedONE.com

Page 94

1   supervisor?
2       A.   Yes.  That would be the sergeant.
3       Q.   And -- and would that sergeant also sit on
4   the Use of Force Board?
5       A.   It wouldn't be that -- it wouldn't be the
6   sergeant that was in -- if the sergeant was involved
7   in the incident, they wouldn't do the -- they
8   wouldn't be the one who reviewed the use of force.
9   It could very well be that the sergeant on the board
10  at the time will review a Use of Force form completed
11  by someone on his shift on that board.
12      Q.   Let's go to the third bullet.
13      A.   (Complies.)
14      Q.   Can you read that third bullet, sir?
15      A.   "Training or policy issues identified
16  during a supervisory review shall not be addressed in
17  the Use of Force/Assault Report, but instead be
18  documented on the appropriate form, performance
19  record, official complaint, etcetera and processed in
20  accordance with procedures established by the
21  sheriff's office.  A copy of the form shall be
22  attached to the Use of Force/Assault Report, and
23  shall be forwarded to the Use of Force Board."
24      Q.   What -- what was the process established by
25  the sheriff's office?

Page 95

1       A.   The officer fills out a Use of Force form
2   -- submits it to be reviewed by the immediate
3   supervisor.  It would go to the liaison lieutenant.
4   And when the Use of Force Board convened, they would
5   review the forms that they had before them.
6       Q.   Okay.  Can you specifically explain what it
7   means -- what you were inten- -- what you intended
8   when it says, "...and processed in accordance with
9   procedures established by the sheriff's office"?
10           How does a -- how does a Use of Force
11  training or policy, how was it -- how was that
12  processed, a policy issue?  How was it processed?
13      A.   If there was a -- an issue that appeared to
14  be a training or policy issue, then that would be
15  addressed as in maybe some kind of refresher training
16  or something or a reminder if it appeared to be some
17  kind of policy violation.
18      Q.   Who appointed the board members?
19      A.   I did.
20      Q.   How did you select the board members?
21      A.   Well, I tried to get somebody from patrol,
22  administrative, such as a patrol lieutenant.  And if
23  I remember correctly, from time to time there was a
24  sergeant on the board.  So I tried to have a
25  representation of the sheriff's office.

Page 96

1   words, it -- it was not all command staff on the
2   board.
3       Q.   Will you turn to the section that says,
4   "Review by Board"?
5       A.   Yes.
6       Q.   Sheriff White, I didn't ask you this.  Do
7   you have any women under your leadership, sir?
8       A.   Any?
9       Q.   Women?
10      A.   Any what?
11      Q.   Any women who served under your
12  leadership?
13      A.   Oh.  Yes.  I -- as a matter of fact, I
14  hired the first female deputy in the Vance County
15  Sheriff's Office.
16      Q.   How many women did you employ as
17  deputies?
18      A.   Well, it varied at different times.  I
19  think the highest I've ever had at one time was two
20  or three or four.  I can't remember the exact number.  One,
21  two, three, four.
22      Q.   But a woman didn't sit on the -- on the
23  "Review of Force" Board?
24      A.   No, not that I recall.
25      Q.   Okay.  So we were about to discuss the

Page 97

1   "Review by the Board."  Can you read the last two
2   bullets?
3       A.   Under "Review by the Board"?
4       Q.   Yeah.
5       A.   "All Use of Force/Assault Reports and the
6   accompanying video will be reviewed and analyzed
7   quarterly or bi-monthly by the Use of Force Board.  The
8   board may request, through the chain of command,
9   additional information and clarification on any Use
10  of Force/Assault Report.  The sheriff's office
11  captain shall appoint board members for three years
12  from the following sections, with one deputy holding
13  the rank of lieutenant who shares -- who shall serve
14  as chairperson: Patrol division, one member sergeant;
15  Internal affairs, one member; Training liaison,
16  one member responsible for coordination of training;
17  Investigations division, one sergeant or detective;
18  Deputies, two enforcement members, road deputies;
19  Operations division."
20      Q.   Who -- who was the captain?  Who....
21      A.   Generally it was Captain Bullock once he
22  was promoted to captain, which was in my -- early
23  there my term as sheriff, first term.
24           COURT REPORTER:  And who -- what was the
25  captain's name, please?


AdvancedONE LEGAL          (866) 715-7770
                           advancedONE.com

**Page 98**

```
 1              THE WITNESS:  Weldon Bullock.
 2              COURT REPORTER:  Okay.  Thank you.
 3    BY MS. ROBINSON:
 4         Q.   Do you recall how many Use of Force
 5    incident -- incident reports or summary reports you
 6    reviewed, Sheriff White?
 7         A.   No, I do not.
 8         Q.   Were there very few?
 9         A.   I would say yes.  We didn't get very
10    many.
11         Q.   Would you say like less than 20, less than
12    50?
13         A.   I don't know how -- I don't recall.
14         Q.   Is the Use of Force a closed-type review
15    process?
16         A.   Help me understand what you mean by closed.
17         Q.   Is it limited to the incident at hand or
18    did the board consider other aspects of the deputy?
19         A.   No.  That would be limited to the reports
20    that they had in hand.
21         Q.   Can you read the last bullet, Sheriff
22    White?
23         A.   "All use of force from the" -- are we still
24    on page 16?
25         Q.   Yes, sir.  17.
```

**Page 99**

```
 1         A.   Okay.  The last one.
 2              "If a deputy is involved in three or more
 3    Use of Force/Assault incidents in a quarter, or four
 4    or more within a consecutive 12-month period, the
 5    chairman of the Use of Force Review Board or his
 6    designee will obtain this information, assign
 7    the review board member from internal affairs who
 8    will review the reports and the deputy's affair's
 9    file to determine if a pattern of improper behavior
10    is apparent."
11         Q.   Who -- who -- who are you referring to when
12    you say "internal affairs"?
13         A.   Well, I didn't have --
14         Q.   What are you --
15         A.   I did not have an internal affairs section.
16    So again, that would have gone to Captain Weldon
17    Bullock.
18         Q.   What do you interpret this last bullet
19    mean?  How would you interpret that?
20         A.   That the -- the use of force should be
21    monitored.
22              MS. ROBINSON:  Okay.  Can we take a break
23    for about five minutes?
24              MR. GEIS:  Yes.
25                    (BREAK TAKEN)
```

**Page 100**

```
 1    BY MS. ROBINSON:
 2         Q.   Can you -- Sheriff White, can you review
 3    Directive D.7?
 4         A.   B.7?
 5              MR. GEIS:  Is it in there?
 6              THE WITNESS:  Say B.7 or -- okay.  B.7.
 7    Okay.
 8    BY MS. ROBINSON:
 9         Q.   So you've had time to review the policy,
10    Sheriff White?
11         A.   Yes.
12         Q.   Can you identify this policy, Sheriff
13    White?
14         A.   Directive D.7 from the Vance County
15    Sheriff's Office Policy Manual.
16         Q.   Did you sign this policy?
17         A.   Yes.
18         Q.   Did you -- policy?
19              COURT REPORTER:  What was the question?
20    BY MS. ROBINSON:
21         Q.   Did you implement this policy?
22         A.   No.  I thought you asked me did I sign
23    are policy still
24              No, I did not implement the policy.
25         Q.   Who implemented the policy?
```

**Page 101**

```
 1         A.   It was a company we hired.  You mean --
 2    I see -- I misunderstood you.  I'm thinking that you asked
 3    or, if I drafted this policy.  Yes, I implemented this
 4    policy.
 5         Q.   Okay.  Let's go to the first page of th...
 6         A.   (Complies.)
 7         Q.   Can you read the effective date?
 8         A.   July 15th, 2009.
 9         Q.   Has this policy been updated?
10         A.   The manual itself -- a portion or a
11    specific section of the manual itself have been
12    updated, but I can't say that this particular
13    directive has been updated.
14         Q.   Read the first sentence of this policy
15    section.  MS. ROBINSON:  Well, let's first identi...
16    this as Exhibit 15.
17         (EXHIBIT NUMBER 15 WAS MARKED FOR IDENTIFICATION)
18    BY MS. ROBINSON:
19         Q.   Will you read the name of this policy?
20         A.   "Grievance Procedure and Adverse Action
21    Policy."
22         Q.   Will you also read the first paragraph,
23    first two paragraphs?
24         A.   "It is the policy of the county to provi...
```



**Page 102**

```
 1   a just and prompt procedure for presentation,
 2   consideration and disposition of employee grievances.
 3   The purpose of this article is to outline the
 4   procedure and to assure all employees that response
 5   to their complaints and grievances will be prompt and
 6   fair.  Employees utilizing the grievance procedure
 7   shall not be subjected to retaliation or any form of
 8   harassment from supervisors or employees for
 9   exercising their rights under the grievance
10   procedure.  Supervisors or other employees who
11   violate this policy shall be subject to disciplinary
12   action up to and including dismissal."
13        Q.   Thank you.
14             What do you consider a complaint?
15        A.   Well, a complaint can be any number of
16   things.
17        Q.   Must it be written?
18        A.   No.  All complaints don't need to be
19   written.
20        Q.   So a complaint can be oral?
21        A.   Yes.
22        Q.   Is a complaint the same thing as a
23   grievance?
24        A.   Not necessarily.
25        Q.   Explain the difference.
```

**Page 103**

```
 1        A.   A complaint may just be something
 2   similar -- as simple as I'm working too many hours
 3   or I'm working too many days or I didn't get off for
 4   my birthday; and, you know, a complaint can be
 5   basically anything.
 6        Q.   And what's a grievance?
 7        A.   To me, a grievance would be geared
 8   toward some type of mistreatment or harassment
 9   type of thing.
10        Q.   Can a grievance be oral?
11        A.   It could be oral, but at some point the
12   individual may be asked to put it in writing, just
13   could begin in a oral fashion.
14        Q.   Was it your practice to require written
15   grievances?
16        A.   Not beginning -- it depends on what stage
17   the grievance was in.  If there was a grievance and
18   it came to me, it was in writing.
19        Q.   Did you employ the same method of
20   investigation, whether a grievance be written or
21   oral?
22        A.   Basically, yes.  But, again, a
23   grievance that required an investigation, the person
24   initiating the grievance would mostly be asked to
25   it in writing at some point.
```

**Page 104**

```
 1        Q.   How did you resolve grievances?
 2        A.   I've only had one that I recall that was
 3   forwarded to HR and then forwarded to me.  Once I
 4   ... an investigation was done, and a
 5   response was given back to the individual initiating
 6   ... grievance, and a copy was given to HR.
 7        Q.   How did you resolve complaints?
 8        A.   The investigation revealed that the
 9   alleged -- the allegations in the grievance did not
10   occur as described in the grievance, were not
11   substantiated.
12        Q.   We're going to get to that.
13             My question more specifically was how did
14   you resolve complaints?
15        A.   Oh, I thought you said grievances.
16             It would depend on the type of complaint.
17   Some -- some complaints warranted an investigation.
18   Some didn't.
19        Q.   Would you conduct the investigation?
20        A.   It depended on the type of complaint.
21        Q.   What type of complaints did you
22   investigate?
23        A.   Again, all complaints did not warrant an
24   investigation.  Again, if somebody called and I
25   answered the phone, they say, I'm wondering why
```

**Page 105**

```
 1   a deputy is speeding down I-85.  You know, I would
 2   many a bit -- little bit about how fast do you think he
 3   or I'm was going, does he have his emergency equipment on
 4   or that type of thing.  That did not warrant an
 5   investigation in my opinion.
 6        Q.   I'm -- I'm specifically asking about how
 7   did you -- how -- how did you go about investigating
 8   workplace complaints; so not citizen complaints,
 9   workplace complaints.
10        A.   I don't recall having but one workplace
11   complaint, and that was handled in the manner that
12   just described.
13        Q.   So do you consider a complaint about a
14   performance evaluation a workplace complaint?
15        A.   Yes.
16        Q.   So how -- how would you go about handling
17   workplace complaint?
18        A.   If it's -- as it relates to an evaluation
19   for a performance appraisal, I would talk with the
20   supervisor that completed the appraisal as well as
21   the individual that it was done on, try to see if it
22   or they can reach a happy medium, so to speak, if it
23   because they didn't agree on something that was on
24   the evaluation form.
25        Q.   Did you ever involve human resources?
```

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Page 106

```
 1     A.   No, not in the -- no.  Human re-
 2   only involvement human resources had on a
 3   evaluation or appraisal was the copies were forward
 4   to the HR director.
 5     Q.   Did all complaints and grievances have to
 6   go directly to you?
 7     A.   It depends on -- if it's concerning the
 8   sheriff's office, they should come to me.
 9     Q.   I would -- I would like for you to look at
10   Directive E.2.
11     (EXHIBIT NUMBER 16 WAS MARKED FOR IDENTIFICATION.)
12          THE WITNESS:  I have it.
13   BY MS. ROBINSON:
14     Q.   Do you need a moment to review it?
15     A.   Yes.
16          Okay.
17     Q.   Sheriff White, have you had an opportunity
18   to review the document?
19     A.   Yes.
20     Q.   Can you please identify the document?
21     A.   Directive E.2: "Investigation of
22   Complaints and Charges Against Personnel"
23     Q.   And what -- is this a Vance County
24   Sheriff's Office policy?
25     A.   Yes.
```

Page 107

```
 1     Q.   Is your signature at the bottom of the
 2   policy?
 3     A.   Yes, that's mine.
 4     Q.   Did you implement this policy?
 5     A.   Yes.
 6     Q.   Can you go to the first page of the
 7   document and read the date at the top right-hand
 8   corner?
 9     A.   Effective 7/15/2009.
10     Q.   Did you update this policy?
11     A.   I don't believe so.
12     Q.   Can you read the first sentence of this
13   policy?
14     A.   "This policy provides guidelines for
15   accepting, recording, resolving and forwarding
16   complaints."
17     Q.   How is a complaint accepted pursuant to
18   this policy?
19     A.   Sometimes they come in writing.  Sometimes
20   they come over the phone.  Sometimes they may come in
21   person.  And it is generally accepted by whoever
22   receives the complaint.
23     Q.   Will you read the second sentence of
24   Accepting Complaints?
25     A.   "Charges from within the sheriff's office
```

Page 108

```
 1   should be processed as provided in this policy."
 2     Q.   What does that mean?
 3     A.   That it should be accepted, documented
 4   resolved if it could be.
 5     Q.   So a complaint doesn't have to go direct
 6   to you?
 7     A.   No.
 8     Q.   And even those complaints that go to oth
 9   should be accepted and resolved?
10     A.   Yes, if possible before getting to me.
11     Q.   Let's talk about those complaints.  How
12   should those complaints be processed?
13     A.   Again, it depends on what type of compl
14   it is.  If it's a citizen's complaint, we have a
15   that we will ask the citizens to complete.  If th
16   -- if they come in person and complain, we ask th
17   complete the form.  If they complain over the
18   phone, we ask them some questions and document wh
19   they say or we may ask them to stop by and comple
20   form.
21     Q.   How should the internal complaints be
22   processed?
23     A.   Internal complaints should go from the
24   member that's doing the complaining to his immedi
25   supervisor and go up the chain of command until i
```

Page 109

```
 1   resolved.
 2     Q.   Do you require any documentation of the
 3   complaint?
 4     A.   Yes, it has to be documented.
 5     Q.   Who documents the complaint?
 6     A.   It begins with the person receiving the
 7   complaint.
 8     Q.   So if the -- if it's a supervisor, the
 9   supervisor should document the complaint?
10     A.   Yes.  If it's a deputy complaining to a
11   supervisor, the supervisor should document it.  A
12   that particular supervisor cannot resolve it,
13   should be forwarded up until it is resolved.
14     Q.   Can you read the last sentence of Accept
15   Complaints?
16     A.   "A supervisor has the obligation to
17   investigate possible violations of policy even if
18   person providing the information does not want a
19   complaint filed."
20     Q.   What does that mean?
21     A.   To me, it means that if someone, for
22   example, calls or comes in and complain about
23   something that may be a policy violation, the
24   supervisor has an obligation to look into it.
25     Q.   So that would apply in the citizen's
```



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Page 110

1   context and in the workplace context, correct?

2      A.   Yes.

3      Q.   Do you consider accusations or --

4   accusations isn't the best word.  But do you consider

5   reports about the distribution of bulletproof vests a

6   complaint?

7      A.   Can -- can you repeat that question?

8      Q.   Do you consider reports about the

9   distribution of bulletproof vests a complaint?

10     A.   Now what do you mean by distribution of

11  "distribution of bulletproof vests"?

12     Q.   Providing deputies....

13     A.   Okay.  To -- in the sheriff's office itself

14  providing bulletproof vests to deputies?

15     Q.   Yes.

16     A.   Well, yeah, that could be a complaint.

17     Q.   And you would expect that to be

18  investigated?

19     A.   It definitely needs to be looked into.

20     Q.   What would you consider a report of

21  the use of racial slurs a complaint?

22     A.   Yes.

23     Q.   What about the use of slurs related to

24  someone's sexual orientation?

25     A.   Yes.  That would be considered a

Page 111

1   complaint.

2      Q.   What -- what happens when complaints aren't

3   recorded?

4      A.   It depends on the type of complaint.  It

5   may be something that is considered minor, and

6   whoever has received a complaint may just remember

7   what it's about.  But it still needs to be looked

8   into.

9      Q.   The receiving person can store it in memory

10  and --

11     A.   Correct.  And then forward it up that way,

12  if it's something that is considered minor cr

13  simple.

14     Q.   When you say forwarded --

15     A.   Through the chain, if necessary, if it

16  cannot be resolved.

17     Q.   But if the complaint can be resolved, then

18  it doesn't need to be forwarded?

19     A.   After -- if it can be resolved, if it's not

20  resolved, then the results need to be forwarded.

21     Q.   Okay.  Who would the results be forwarded

22  to?

23     A.   They would go through the chain of command

24  and possibly end up with me.

25     Q.   Would the results be recorded in a

Page 112

1   correct person -- in the personnel file?

2      A.   It depends on the type of complaint that

3   -- is.

4      Q.   Would the result be commuted --

5   communicated to the employee?

6      A.   Yes.

7      Q.   We're going to turn back to this policy

8   but I just want to move on to E.3.

9           MR. GEIS:  Is this Exhibit Number 17 or

10  --

11          MS. ROBINSON:  17.

11          (EXHIBIT NUMBER 17 WAS MARKED FOR IDENTIFICATION

12          MR. GEIS:  Okay.  In the interest of time,

13  you are free to tell Sheriff White, but it's up

14  to you, that he doesn't have to read the whole

15  thing before you ask him questions.

16          MS. ROBINSON:  I just want him to read

17  to get acquainted with it.

18          MR. GEIS:  Okay.

19          THE WITNESS:  Okay.

20          MS. ROBINSON:

21     Q.   Have you had time to read and review the

22  policy, Sheriff White?

23     A.   Yes.

24     Q.   And for the record, can you please state

25  the -- the name of this policy?

Page 113

1      A.   It's Directive E.3:  Unlawful workplace

2   harassment.

3      Q.   And whose policy is this?

4      A.   Vance County Sheriff's Office.

5      Q.   And did you sign this policy?

6      A.   Yes.

7      Q.   Did you implement this policy?

8      A.   Yes.

9      Q.   Can you read the effective date of this

10  policy?

11     A.   July 15th, 2009.

12     Q.   Did you update the policy?

13     A.   I don't believe this particular section is

14  updated.

15     Q.   Can you read the first sentence of the

16  second paragraph?

17     A.   "It is the policy of the Vance County

18  Sheriff's Office that no employee may engage in

19  conduct that falls under the definition of unlawful

20  harassment in the workplace.  All employees are

21  guaranteed the right to work in an environment free

22  from unlawful harassment in the workplace and

23  the sheriff's office prohibits its

24  personnel from harassing clients, supervisors,

25  colleagues, community representatives, subordinate


AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Page 114

```
 1   or other persons or groups with whom the
 2   contact as representatives of the organization or
 3   sheriff's office will promptly and thoroughly
 4   investigate all complaints made by an employee and
 5   will take appropriate remedial or disciplinary action
 6   up to and including dismissal."
 7       Q.   Can you read the section where it says,
 8   "Definitions of Unlawful Workplace Harassment"?
 9       A.   "Unlawful workplace harassment is unlawful
10   or unsolicited speech or conduct based on race, sex,
11   creed, religion, national origin, age, color, or
12   handicapping condition as defined in N.C.S. below
13   that creates a hostile work environment or
14   circumstances involving quid pro quo.  Action,
15   jokes or comments based on an individual's sex, race,
16   color, national origin, disability, religion, age or
17   other status protected by State or Federal law are
18   not to be tolerated."
19       Q.   What does that mean?
20       A.   There is a zero tolerance policy in the
21   Vance County Sheriff's Office for this type of stuff.
22       Q.   So jokes about someone's sexual orientation
23   isn't allowed?
24       A.   No.
25       Q.   Jokes about someone's race isn't allowed?
```

Page 115

```
 1       A.   No.
 2       Q.   Jokes about someone's gender isn't
 3   allowed?
 4       A.   If it's in a negative or type of tone that
 5   could offend somebody, no.
 6       Q.   What happened once -- if someone does joke
 7   about someone's protected status?
 8       A.   If it is brought to the attention of a
 9   supervisor, then that supervisor has a responsibility
10   to look into what's happened, document it, try to
11   resolve it.
12       Q.   So you mentioned a zero tolerance policy.
13   What would you expect to be the outcome of a
14   investigation in which someone said -- made a comment
15   about someone's race, sexual orientation, gender?
16       A.   The outcome should be some type of mutual
17   understanding between all parties involved.
18       Q.   What do you mean by "mutual
19   understanding"?
20       A.   It could be an apology or I was not
21   offended by that or no harm done, that type of
22   thing.
23       Q.   Would there be any disciplinary action?
24       A.   It could be depending on the
25   circumstances.
```

Page 116

```
 1   have       Q.   Would you consider an apology a
 2   disciplinary action?
 3       A.   No.
 4       Q.   Do you consider tho- -- these types of
 5   instances grievances or complaints?
 6       A.   Yes, that could be either/or.
 7       Q.   Why -- why did you implement a zero
 8   tolerance policy?
 9       A.   Well, it wasn't implemented as a zero
10   tolerance policy.  That is just my characterization
11   of this policy, but it was clearly implemented
12   because this type of behavior is not tolerated.
13       Q.   Okay.  Let's -- let's go to page 2 of the
14   document.
15       A.   (Complies.)
16       Q.   Can you read or describe -- can you please
17   describe to me what's a formal complaint?
18       A.   To me, a formal complaint is it could be
19   any complaint that's documented.
20       Q.   Documented by whom?
21       A.   Whoever is receiving the complaint.
22       Q.   So if the receiving party just stored it in
23   memory, then it wouldn't be a formal complaint?
24       A.   It would depend on the complaint itself,
25   if something simple that the receiving party
```

Page 117

```
 1   may have made a mental note of.  An example:  If
 2   there's a deputy internally saying that the squad
 3   room is too hot or too cold, the supervisor can make
 4   a mental note of that and either adjust the
 5   temperature one way or the other, and hopefully it
 6   can be resolved at that point.
 7       Q.   Sheriff White, this policy is spe- --
 8   specifically addresses workplace ha- -- harassment
 9   or retaliation, correct?
10       A.   Yes.
11       Q.   So in the context of workplace harassment
12   or retaliation, can you tell me what is a formal
13   complaint?
14       A.   To me, that's any complaint that has --
15   that's alleged.
16       Q.   What is a -- an informal complaint in the
17   context of workplace harassment or retaliation?
18       A.   An informal complaint could be something
19   said in a joking manner depending on how it was
20   initiated.
21       Q.   Do you require that informal complaints be
22   investigated?
23       A.   They need to be looked -- looked into and
24   resolved if possible.
25       Q.   Do they need to be looked into by you?
```



AdvancedONE          (866) 715-7770
LEGAL                advancedONE.com

Page 118

1    A.   No, not necessarily.  It can be resolved
2  anywhere in the chain of command.
3    Q.   Would you consider an informal complaint
4  something that you would look into and resolve?
5    A.   Yes, depending on if it's involving
6  anything in this particular policy.  Yes.
7    Q.   Have you looked into or resolved any
8  informal complaints?
9    A.   I am not aware of any informal complaints
10  that has come to my attention concerning this.
11    Q.   Okay.  Let's go down to di- -- Direct
12  Observation.
13    A.   (Complies.)
14    Q.   Can you read that statement, sir?
15    A.   "Direct Observations:  Supervisors at
16  levels who directly observe potentially harassing
17  conduct must consider these observations equivalent
18  to any other form of complaint.  The investigation
19  process is indicated where a supervisor or department
20  head feels observed conduct may indeed present
21  prohibited behaviors."
22    Q.   What is potentially harassing conduct?
23    A.   Can you say that again?
24    Q.   What is potentially harassing conduct?
25    A.   It's conduct that could be construed as

Page 119

1  harassing.
2    Q.   Can you give me an example?
3    A.   No, I cannot.
4    Q.   I'm sorry, sir.  I didn't hear you.
5    A.   No, I cannot.
6    Q.   You can't because -- are you saying that
7  you cannot because you can't think of any examples or
8  you haven't experienced any examples or you just
9  don't want to give an example?
10    A.   I just can't think of any examples, and I
11  don't want to speculate on anything.
12    Q.   What do you -- what does it mean by
13  supervisors who directly observe?  What is a direct
14  observation?
15    A.   Supervisors that either sees or hear
16  something.
17    Q.   So direct observation is seeing or
18  hearing?
19    A.   Yes.  If you are in proximity to hear
20  firsthand.
21    Q.   Does the supervisor have any discretion to
22  not conduct an investigation?
23    A.   No, not in this type of stuff.
24    Q.   Does the supervisor have any type of
25  discretion to not document the situation?

Page 120

1    A.   No, it should be documented.
2    Q.   Should instances in which an employee
3  complaints that another employee is being harassed,
4  should those instances be documented also?
5    A.   Yes.
6    Q.   How many supervisors did you employ at
7  the time of Mr. White's tenure?
8    A.   At the time of his what?
9    Q.   Tenure.
10    A.   What was the question?
11    Q.   How many supervisors did you employ at
12  time of Mr. White's tenure?
13    A.   I don't recall that exact number.
14    Q.   How many deputies did you employ at the
15  time of Mr. White's tenure?
16    A.   I don't recall that number either because
17  it varied based on how many vacancies we had, how
18  fast we could fill them, that type of thing.
19    Q.   But a sergeant up is a supervisor,
20  correct?
21    A.   Yes.
22    Q.   Can you look at the "Disciplinary Action
23  section?
24    A.   Ready.
25    Q.   Can you read that?

Page 121

1    A.   "Disciplinary action taken against the
2  harasser would typically range from a written
3  warning, counseling, suspension from work, transfer
4  to a different position or termination of
5  employment."
6    Q.   What is a written warning?
7    A.   Basically putting in writing warning the
8  individual to change their behavior.
9    Q.   Is that a standard form?
10    A.   Yes.
11    Q.   What is counseling?
12          COURT REPORTER:  I'm sorry.  Say that
13  again, please.
14    BY MS. ROBINSON:
15    Q.   Counseling.  What is counseling?
16    A.   Counseling is sitting down with the
17  individual, explaining to them what they have done
18  wrong allegedly or how they could have done things
19  different and trying to get them to see how not to
20  commit the same offense again.
21    Q.   Is counseling less severe or more severe
22  than a warning?
23    A.   Well, they're both, I would say, equal.
24  Counseling is a little more detailed.
25    Q.   Is there a form that goes into an



AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

Page 122

```
 1   employee's record --
 2       A.   Yes.
 3       Q.   -- if they receive counseling?
 4       A.   Yes.  If they receive any of these things
 5   listed here.
 6       Q.   How detailed is a counseling form?
 7       A.   I would say it's not a very, very detailed
 8   form.  It's just enough to get the point across and,
 9   if necessary, change the behavior of whoever the
10   offender is.
11       Q.   How long does counseling typically last or
12   take?
13       A.   It depends on the situation.
14       Q.   Ten minutes, an hour?
15       A.   It depends on the situation.  It could
16   vary.
17       Q.   What's the shortest counseling that...
18       A.   There's really no time limit on a
19   counseling.
20       Q.   Uh-huh.  Who would perform the
21   counseling?
22       A.   It depends on the situation.  It could be
23   anywhere from the immediate supervisor up the
24   chain of command.
25       Q.   Have you ever performed counseling?
```

Page 123

```
 1       A.   I -- as sheriff?  I -- I believe so.  I --
 2   not -- I don't recall any incident specifically but
 3   I believe I have.
 4       Q.   Does -- does an employee have to sign a
 5   form indicating that they've have been counseled?
 6       A.   Yes.  They are asked to sign it, but they
 7   don't have to.
 8       Q.   If an employee doesn't sign the counseling
 9   form, is that in any way considered a rejection of
10   the counseling?
11       A.   Well, it could be construed that way but
12   not necessarily.
13       Q.   So what happens if an employee doesn't sign
14   a counseling form?
15       A.   Whoever it is that's doing the actual
16   counseling will continue to try to explain exactly
17   what is going on, trying to make sure that the
18   individual that's being counseled understands what
19   it's all about.  But in the end, they don't have to
20   sign it if they choose not to.
21       Q.   Okay.  And then the next disciplinary
22   action is suspension from work.  What does that
23   entail?
24       A.   Suspension from work, it could -- normally
25   it's without pay when you're suspended from work.
```

Page 124

```
 1       Q.   Does the person, do they have to leave
 2   their badge or -- so what's the process when a person
 3   is suspended?
 4       A.   Yes.  If someone is suspended, normally
 5   -- we keep their badge, their ID, the vehicle.
 6   Basically we keep almost all of the equipment issued
 7   to them other than the uniforms.
 8       Q.   Do you consider a K-9 equipment?
 9       A.   No, not really.  I consider a K-9 more
10   partner to the handler.
11       Q.   So the K-9 could stay with the -- the
12   handler?
13       A.   Yes, depending on the period or we could
14   get another K-9 handler to deal with that particular
15   K-9.
16       Q.   Do you have a distinction between a
17   long-term and a short-term suspension?
18       A.   No.  There's really no distinction other
19   than one is longer or shorter than the other one.
20       Q.   So what's a short-term suspension?
21       A.   The -- again, there's -- there's no
22   specific term.
23       Q.   What's the purpose of suspension?
24       A.   Disciplinary.
25       Q.   Okay.  And so then you have transfer to...
```

Page 125

```
 1   a different position.  What does that mean, to be
 2   transferred to a different position?
 3       A.   It means the changing of duties and
 4   responsibilities.
 5       Q.   Have you ever implemented this course of
 6   action?
 7       A.   I don't recall one as it pertains to
 8   disciplinary action.  I may have.  I just don't
 9   recall it at this moment.
10       Q.   Would this be -- is this similar to a
11   demotion?
12       A.   It could be or it could be included with...
13       Q.   So are you -- you -- you can't recall an
14   instance in which you demoted someone?
15       A.   Well, yes, I can recall an incident in
16   which I demoted someone.
17       Q.   Can you tell me about that instance?
18       A.   I had an individual that was reduced in
19   rank and was given a reduction in pay.
20       Q.   What was the -- the demotion for?
21       A.   Conduct.
22       Q.   I'm sorry, sir.  I didn't hear you.
23       A.   Conduct.
24       Q.   Conduct.
25
```


AdvancedONE LEGAL

(866) 715-7770
advancedONE.com

Page 126

```
 1    A.   Yes.
 2    Q.   So improper conduct.
 3         What was the race of that individual?
 4    A.   He was a white male.
 5    Q.   Can you recall what he did?
 6    A.   Yes.
 7    Q.   What did he do to deserve the demotion?
 8    A.   Allegedly he made a comment to a female
 9    that was inappropriate.
10    Q.   Are you referring to Campbell?
11    A.   I'm just saying that it was a deputy that I
12    had an opportunity to use disciplinary action on.
13    Q.   What was the comment to the female?
14    A.   I don't recall the exact comments that's left.
15    Q.   Were you involved in the investigation?
16    A.   No.
17    Q.   Was it a civilian or a -- an employee?
18    A.   A civilian.
19    Q.   Did the civilian complain?
20    A.   A member of that individual's family
21    complained.
22    Q.   Of the civilian's family?
23    A.   Yes.
24    Q.   What is the -- what was the race of the
25    civilian?
```

Page 127

```
 1    A.   The one that complained?
 2    Q.   Yes.
 3    A.   It was a white male.
 4    Q.   Was the demotion effective?
 5    A.   Yes, I believe so.
 6    Q.   Would it have -- who investigate -- you
 7    said you weren't involved in the investigation?
 8    A.   No.
 9    Q.   Would that belong to Weldon Bul- --
10    Bullock?
11    A.   I believe so.
12         MR. GEIS:  Can we take a minute,
13    please?
14         MS. ROBINSON:  You just need -- you just
15    need a minute?
16         MR. GEIS:  Yes.
17         MS. ROBINSON:  Sure.
18              (BREAK TAKEN)
19         MR. GEIS:  Yes, I'm ready.  I would like,
20    if we're going to calculate the time, then we
21    need to calculate it on the record.  There's no
22    dispute about it.  I'm not going to hold you to a
23    precise seven-hour limit, but generally we're --
24    we're going to get pretty close in at about
25    7:00.
```

Page 128

```
 1         MS. ROBINSON:  I -- ba- -- based on my
 2    estimation, we can go well beyond 7:00.
 3         MR. GEIS:  Well, then calculate, please.
 4         MS. ROBINSON:  Right.  And as long as we
 5    understand that this isn't deposition time.
 6         MR. GEIS:  Well, we're on the record.  This
 7    is deposition time.
 8         MS. ROBINSON:  Well, let's take a break.
 9         MR. GEIS:  No, we're not -- we're not going
10    to take a break.  We're here and we're ready to
11    go.
12         MS. ROBINSON:  Well, I -- and then come
13    back -- and then let's come back with the time
14    limits.
15         MR. GEIS:  Well, we're -- we're -- we're
16    here.  We're ready to go.  Please ask your
17    questions.
18         MS. ROBINSON:  Well, we would like a
19    bathroom break.
20         MR. GEIS:  Well, five minutes?  Are we
21    going to take a five-minute break?
22         MS. ROBINSON:  Let's take a ten-minute
23    break.
24         MR. GEIS:  All right.  We'll take -- we'll
25    take a ten-minute break.
```

Page 129

```
 1              (BREAK TAKEN)
 2         COURT REPORTER:  Five hours and 34 minutes
 3    is what I have.
 4         MR. GEIS:  That's about what I have.  Th
 5    you.
 6              So we have an hour and 25 minutes left.
 7    we can go until about 7:00.  I'm not going t
 8    hold you to that precise time, but I don't w
 9    to keep the Sheriff here all night.
10         MS. ROBINSON:  Sheriff White, are you r
11    to go back on the record.
12         THE WITNESS:  Yes.
13    BY MS. ROBINSON:
14    Q.   So, Sheriff White, you were telling me
15    about an instance in which an employee was demote
16    Do -- do you recall whether or not that instance
17    involves an officer asking to see a woman's breas
18    lieu of a ticket?
19    A.   -- No, I don't recall that.  No.
20    Q.   But -- and you don't recall the specifi
21    instance?
22    A.   I don't recall the in lieu of a ticket
23    part --
24    Q.   Do you recall the deputy asking to see
25    woman's breasts part?
```



Page 130

```
1        A.   Yes, that sounds familiar.
2        Q.   Okay.  And then termination of employment
3   is pretty explanatory in terms of the policy or the
4   di- -- disciplinary action?
5        A.   Yes.
6             MS. ROBINSON:  Okay.  Let's mark that
7   document -- this document -- we've marked it, this
8   document as 17, correct?
9             COURT REPORTER:  Yes.
10            MS. ROBINSON:  Okay.  I am pulling up
11  Justin White's Use of Force investigation.
12            How did we -- what exhibit was this
13  document yesterday?
14            MR. GEIS:  4.
15            MS. ROBINSON:  You said the 4?
16            MR. GEIS:  Well, I haven't seen what you're
17  putting up, but if you're talking about this
18            MS. ROBINSON:  (Inaudible.)
19            MR. GEIS:  -- Captain Bullock's three-page
20  report, it -- it was 4.  If you could pull up what
21  you want to put up, I'll -- I'll tell you if it's
22  the same thing I have.
23            MS. ROBINSON:  Yes.  So it is the same
24  it's the same thing.  It's -- it's --
25  BY MS. ROBINSON:
```

Page 131

```
1        Q.   Are you familiar with this document,
2   Sheriff White?
3        A.   Yes.
4        Q.   Okay.  Can you state what the document is
5   for me, sir?
6        A.   Administrative investigation complaint,
7   Latwanya S. Oliver accused Deputy Justin White.
8        Q.   Were you involved at all in the
9   investigation of Mr. White's use of force, alleged
10  use of force?
11       A.   No.
12       Q.   Did you convene the panel?
13       A.   I don't know if the panel was convened or
14  not.  The purpose of the panel is primarily to check
15  for patterns of the -- using force.
16       Q.   So you don't know if a panel was
17  convened?
18       A.   No.
19       Q.   But an investigation was conducted?
20       A.   Yes.
21       Q.   Weldon Bullock indicated that he spoke to
22  you about his recommendation to terminate Mr. White.
23  Do you recall that conversation?
24       A.   Yes.
25       Q.   What did he say?
```

Page 132

```
1        A.   I don't recall word for word, but he
2   presented his findings to me, which included
3   recommendation for termination.
4        Q.   And what did you do next?
5        A.   Said his services were no longer needed.
6   After I reviewed what he provided to me, at some
7   point in -- I don't recall the exact date and time, but
8   said, Okay, let's tell him that his services are no
9   longer needed.
10       Q.   Did you speak to Mr. White before that?
11       A.   I don't recall speaking directly to him
12  about that.  I may have.  I don't recall that.
13       Q.   Was the termination made effective
14  immediately?
15       A.   I believe so.
16       Q.   Did you speak to anyone other than Weldon
17  Bullock prior to terminating Mr. White about this
18  incident?
19       A.   No.  I don't recall speaking to anyone
20  about this incident because I was not involved in
21  that -- that investigation.
22       Q.   Do you recall how long of a conversation
23  that you had with Weldon Bullock?
24       A.   No, I do not.
25       Q.   Would you say it was pretty brief or...
```

Page 133

```
1        A.   I don't remember how long it was.
2             MS. ROBINSON:  Okay.  So we're -- we're
3   going to go into the newer exhibits.
4             Can you pull up the Request for Training
5   Waiver?
6             COURT REPORTER:  I'm sorry.  What was the
7             MS. ROBINSON:  It's a document, the Request
8   for Training Waiver.
9             MR. MCGURL:  (Complies.)
10            THE WITNESS:  Okay.
11  BY MS. ROBINSON:
12       Q.   Can you tell me what this document is?
13       A.   It's a memorandum from my office to Sheriff
14  Standards.  It's addressed to Ms. Diane Konopka,
15  director, pertaining to Justin Jamel White.  And I'm
16  requesting that the commission grant Mr. White a
17  Training Waiver and credit him with the BLET
18  completed in 2015.
19            MS. ROBINSON:  Let the record reflect that
20  this is Exhibit 18.
21            EXHIBIT NUMBER 18 WAS MARKED FOR IDENTIFICATION
22  BY MS. ROBINSON:
23       Q.   Can you tell me the date of this document,
24  Sheriff White?
25       A.   It says June 1st, 2018.
```



(866) 715-7770
advancedONE.com

AdvancedONE LEGAL

**Page 134**

```
 1        MS. ROBINSON:  Let's -- Mr. White's pay
 2   raise.
 3        COURT REPORTER:  What was the -- start the
 4   question?
 5        MS. ROBINSON:  Let's pull up -- pull up
 6   pull up Mr. White's pay raise.
 7        COURT REPORTER:  Oh, sorry.
 8        MR. MCGURL:  (Complies.)
 9   BY MS. ROBINSON:
10        Q.   So did Mr. White receive a pay raise?
11        A.   As far as I know, he did.
12        Q.   Do you have -- what -- do you have a
13   document in front of you that's dated June 6, 2018?
14        A.   Yes.
15        Q.   Can you tell me what that document says?
16        A.   It says, "Dear Mr. White; On June 5th,
17   2018, you satisfied the eligibility period to
18   the first year law enforcement officer salary
19   adjustment.  Your annual salary will be $34,764
20   effective June 5th, 2018.  If you have any questions
21   please feel free to give me a call at this
22   number.  Sincerely, Argretta R. Johen."
23        Q.   Who was copied on that?
24        A.   I am.  Copied Sheriff Peter White.
25        Q.   Do you recall Mr. White making complaints
```

**Page 135**

```
 1   about harassment, discrimination and performance
 2   reviews?
 3        A.   When I first learned of the harassment
 4   situation, that came to me from HR in the form of
 5   complaint to the EEOC.  The performance reviews came
 6   to me.  I'm not sure whether Mr. White came directly
 7   to me or his supervisor did.
 8        Q.   Did you -- so -- so let's -- let me clarify
 9   this.
10        Do -- are you saying that you learned of
11   his complaint of discrimination through the EEOC?
12        A.   No.  I'm saying it -- yes.  When I learned
13   of this stuff, it was all included in a EEOC
14   complaint that was given to Ms. Johen, the HR
15   director; and she forwarded it -- it to me, if my
16   memory serves me correctly.
17        MS. ROBINSON:  Michael, let's pull
18   Mr. White's complaints.
19        MR. MCGURL:  (Complies.)
20        COURT REPORTER:  Did you want the
21   documents to be marked?
22        MS. ROBINSON:  Yes.  I thought we marked
23   them as 18 and 19.
24        COURT REPORTER:  Okay.  Thank you.
25   (EXHIBIT NUMBER 19 WAS MARKED FOR IDENTIFICATION...)
```

**Page 136**

```
 1   BY MS. ROBINSON:
 2        Q.   This is a document that -- do you have
 3   a document in front of you that's showing on the
 4   screen?
 5        A.   Yes.  Okay.  It's -- yes.
 6        Q.   Can you identify this document for me,
 7   Mr. --
 8        A.   This --
 9        Q.   -- Sheriff?
10        A.   -- is a Notice of Charge of Discrimination
11   US Equal Employment Opportunity Commission.
12        MS. ROBINSON:  And this is -- this is
13   Exhibit 20.
14   (EXHIBIT NUMBER 20 WAS MARKED FOR IDENTIFICATION)
15   BY MS. ROBINSON:
16        Q.   And can you identify the date on that
17   document?
18        A.   It says September 12th, 2018.
19        Q.   And this was the first time that you
20   learned of Mr. White's allegations of harassment
21   and discrimination?
22        A.   Yeah.  I see -- are you addressing the
23   performance appraisal or the Title VII, Civil Rights
24   Act one?
25        Q.   I'm just addressing any workplace
```

**Page 137**

```
 1   harassment or discrimination complaints that
 2   Mr. White made and made in writing at this moment
 3        A.   Okay.  I've got a memorandum looks to be
 4   from Justin White dated June 15th, 2018
 5        Q.   Yes.
 6        -- when he -- when he -- in which he was
 7   complaining of Title VII, Civil Rights Acts 1964,
 8   Gender Discrimination.
 9        MS. ROBINSON:  And let's mark that as
10   Exhibit 21.
11   (EXHIBIT NUMBER 21 WAS MARKED FOR IDENTIFICATION)
12        MS. ROBINSON:  Michael, can you pull the
13   complaints up?
14        MR. MCGURL:  (Complies.)
15   BY MS. ROBINSON:
16        Q.   You have a document in front of you,
17   Sheriff White?
18        A.   Yes, the Title VII, Civil Rights Act
19   1964.
20        Q.   Yes.
21        A.   Yes.
22        Q.   Do you recognize this document?
23        A.   Say that again.
24        Q.   Do you recognize this?
25        A.   ...)  Yes.
```



Page 138

1    Q.  You considered this a complaint?
2    A.  Yes.
3    Q.  Who handed you this document?
4    A.  I don't remember who directly handed it to
5  me.  I believe this may be the one that I received on
6  June 26th or something like that.  I'm not certain of
7  the date.
8    Q.  Will you go to the second page?
9    A.  Okay.
10    Q.  The third paragraph?
11    A.  Okay.
12    Q.  Will you -- can you read that for the
13  record, sir?
14    A.  "It should be noted that there is a pattern
15  of discrimination and negligence at the Sheriff's
16  office.  Upon hire, I begged Lieutenant Ray Shearin,
17  asked for a bulletproof vest for three weeks and was
18  only given one after I approached the command staff,
19  while they were reading reports in late June 2017.
20  And Captain W. Bullock (S-3) ordered him to the same
21  vest.  I responded to emergency calls, i.e., burglary
22  in progress, no vest."
23    Q.  Can you continue reading the next
24  paragraph?
25    A.  "From late June 2018 until August 2018, I

Page 139

1  begged for tires on my patrol vehicle to no avail for
2  nearly eight weeks.  I followed the chain of command,
3  Sergeant Roberson (S-10), Lieutenant Shearin and
4  former Captain, now Chief L.D. Bullock (S-2)
5  requesting tires.  Sergeant Roberson eventually told
6  me to stop asking and go to the Sheriff because
7  people don't do their jobs.  As I was going to see
8  the Sheriff, Captain Bullock asked me what was wrong
9  after I walked in his office for the third time, and
10  where's your car.  He saw the car and went to tell
11  Lieutenant Shearin, and I got some tires the same day
12  despite both of them knowing I needed tires.
13  The metal wires were showing on rear tires."
14    Q.  Okay.  And what did you do in response to
15  these complaints?
16    A.  When you said, "these complaints," do you mean
17  everything in this entire memo?
18    Q.  Yes.
19    A.  Let me read it for a second.
20    Q.  And for purposes of this document, Sheriff
21  White, please just kind of skim it.
22    A.  Okay.  Yeah.  That's what I'm reading it
23  now.
24    Okay.
25    MR. GEIS:  Oh, was that your phone,

Page 140

1  Sheriff?
2    THE WITNESS:  Yeah.
3    MR. GEIS:  Okay.
4    THE WITNESS:  Okay.  I skimmed it.
5  BY MS. ROBINSON:
6    Q.  So how did you respond when you received
7  this document?
8    A.  I gave him a written response.
9    COURT REPORTER:  You gave him what kind of
10  a response?
11    THE WITNESS:  Written.
12    COURT REPORTER:  Okay.
13  BY MS. ROBINSON:
14    Q.  Did you do anything in the -- in between
15  that to -- investigate these --
16    A.  I believe this....
17    Q.  Were you surprised by the complaint?
18    A.  Yes, I was.
19    COURT REPORTER:  What was that?
20  BY MS. ROBINSON:
21    Q.  Were you --
22    A.  Yes.
23    Q.  -- surprised?
24    A.  Yes.
25    Q.  Did you investigate the complaint?

Page 141

1  A.  I'm not sure if I investigated this one
2  I may have and responded to him, but there
3  in several situations going on kind of close together
4  But I believe I did.
5    Q.  What did you -- what did your investiga
6  became entail?
7    A.  Let me scan this again.
8  I believe this is the one that -- that
9  I interviewed all of the individuals that was invol
10  of this if this is the same one pertaining to him changing
11  the tires and that type of thing.
12    Q.  We're talking about the -- the allegati
13  of the -- the -- the harassment -- well, the tire
14  discrimination, the pattern of discrimination and
15  the -- the comments that you just read.  What did
16  do in response to those comments?  What type of
17  investigation did you perform, if any?
18    A.  I don't recall exactly what I did step by
19  step because it's been over a couple years ago, but
20  I believe it was investigated.  I'm not sure if I
21  investigated it or not.  I believe I did.
22    Q.  So is your testimony that you -- you
23  investigated, but you can't recall the
24  investigation?
25    A.  Again, I'm -- I'm not sure if I



(866) 715-7770
advancedONE.com
AdvancedONE LEGAL

Page 142

1   investigated it. I believe that I did, but I can't
2   recall all the details because there were several
3   things going on, and it's been a couple years since I
4   retired.
5       Q.   Okay.  Do you recall -- do you recall if
6   someone in your department or office may have
7   investigated it?
8       A.   I don't.  I believe -- like I said, I'm not
9   sure if I investigated it.  If I did, it was included
10  in my written response.
11      Q.   Do you recall reviewing a statement made by
12  Durwood Campbell as it pertains to Mr. White?
13      A.   I believe so.
14           MS. ROBINSON:  Okay.  We'll -- let me make
15  I have that statement.  Let's pull that statement
16  up.
17           MR. MCGURL:  (Complies.)
18  BY MS. ROBINSON:
19      Q.   Do you recognize this document?
20      A.   Yes.
21      Q.   And can you identify this document?
22      A.   It was written by Durwood Lee Campbell,
23  July 18, 2018.
24      Q.   What is this document?
25      A.   What was the question?

Page 143

1       Q.   What is this document?
2       A.   Again, I didn't quite understand you.
3       Q.   What is this document?
4       A.   Oh.  It's a statement regarding a complaint
5   made by Deputy J.J. White from Durwood Campbell.
6            MS. ROBINSON:  Okay.  Let's mark this --
7   did we -- did I already mark this as Exhibit 21?
8            COURT REPORTER:  No.
9            MS. ROBINSON:  Let's mark this as Exhibit
10  22.
11      (EXHIBIT NUMBER 22 WAS MARKED FOR IDENTIFICATION.)
12  BY MS. ROBINSON:
13      Q.   Can you read the date of this statement?
14      A.   July 18, 2018.
15      Q.   Can you read the first paragraph?
16      A.   "On Monday, July 16th, 2018, I was
17  contacted by Captain Watkins and requested to write a
18  statement in reference to the previous incident
19  involving Deputy White and myself from back in
20  January."
21      Q.   Is it -- is it typical that a statement be
22  written seven months later?
23      A.   Well, no, it's not typical unless the
24  accusations were made much later --
25      Q.   Explain that.

Page 144

1   but I can't.  -- well, or much earlier.
2   So this was written apparently after the
3   incidents were alleged to have happened.
4       Q.   So how do you interpret that first
5   paragraph?
6       A.   It looks that a complaint had been made
7   by J.J. White saying that Deputy White was --
8   said Campbell told Deputy White, "Didn't I tell your aunt
9   or wasn't included that anymore."
10      Q.   Right.  Well, let's talk about the first
11  paragraph.  How do you interpret the first
12  paragraph?
13      A.   Statement regarding accusation made by
14  I want -- there had been a complaint made at some point,
15  that -- an accusation made at some point by Deputy
16  White.
17      Q.   So did -- do you read this to understand
18  that Captain White requested that Campbell write a
19  statement regarding a previous incident?
20      A.   Yes, Captain Watkins.
21      Q.   Okay.  And that that previous incident that
22  Campbell occurred in January of 2018; is that correct?
23      A.   Yes, sometime back in January according to
24  this.
25      Q.   And does the document show that the

Page 145

1   statement was written in July of 2018?
2       A.   Yes, it's dated July 18, 2018.
3       Q.   According to the policy, aren't
4   investigations and documents and statements to be
5   drafted at the time of the incident?
6       A.   At the time or in close proxim- --
7   proximity to.  But I don't recall exactly when J.J.
8   White made his complaint to whoever he made it to,
9   essentially, but I became aware of when he submitted
10  this stuff to me.
11      Q.   And so you were -- you were saying that you
12  did respond to Mr. White's complaints, his -- his
13  complaints that were made --
14      A.   Yes, I believe I did.  If they were
15  addressed to me, I believe I did respond.
16      Q.   And you responded via letter, correct?
17      A.   Yes.  If I remember correctly, there were
18  two letters, but I don't remember which letter went
19  back with what.  I would have to see the letter.
20           MS. ROBINSON:  Okay.  Michael, can you
21  pull up the letter?
22           MR. MCGURL:  (Complies.)
23           THE WITNESS:  Okay.
24  BY MS. ROBINSON:
25      Q.   Can you identify this document, Sheriff



AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

Page 146

1  White?
2      A.   It's a letter written by me to Justin
3  Justin J. White.
4      Q.   And is that -- is that your signature?
5      A.   Yes.
6           MS. ROBINSON:  Let's mark this as Exhibit
7  23.
8      (EXHIBIT NUMBER 23 WAS MARKED FOR IDENTIFICATION)
9  BY MS. ROBINSON:
10      Q.   Can you tell me the date of that letter?
11      A.   July 19, 2018.
12      Q.   And what was your -- what was the ultimate
13  finding that you made in this letter?
14      A.   It would be in this letter.  I'd have to
15  read it right quick.
16           Okay.  Basically they were unfounded.
17      Q.   "They" as in -- for the record, can you
18  explain --
19      A.   Yes.
20      Q.   -- who "they" is?
21      A.   He -- he alleged several different things
22  in here.  And I remember speaking with Lieutenant
23  Campbell about this, and Lieutenant Campbell was
24  disciplined for using the word "ass" when talking
25  with Deputy White.  He -- and it also says that --

Page 147

1  that -- that explains that his suspension was carried
2  out.
3      Q.   How was Lieuten- -- Lieutenant Campbell
4  disciplined?
5           MR. GEIS:  Objection.  He can't answer
6  that.
7           MS. ROBINSON:  What's the objection?
8           MR. GEIS:  It's a statutory objection,
9  153A-98.  It's a personnel record.
10  BY MS. ROBINSON:
11      Q.   What was the outcome of your -- did you
12  investigation, or did -- if you conducted one?
13      A.   Well, this is -- was included in the Title
14  VII Civil Rights Act of 1964.
15      Q.   So you concluded that there was no
16  discrimination?
17      A.   No.  None that I could see.
18      Q.   Okay.  And so who sent Mr. White that
19  letter?  How did Mr. White receive that letter?
20      A.   I don't know if this is the one that I gave
21  to him personally after talking to him.  Again, there
22  were two letters that I wrote in response to him.
23  I remember one of them concerning the Title VII stuff
24  alleging discrimination.  I met with him myself when
25  Chief Deputy Lawrence Bullock.  And at the conclusion

Page 148

1  of that meeting, I gave him a copy.  So I'm not sure
2  if this -- this may be the one or it may be the other
3  one.  I don't know.
4      Q.   So where do you meet with Mr. White at?
5      A.   Was it....
6      A.   It would have been in my office.
7      Q.   And after you met with Mr. White and handed
8  him the letter, did you receive any other
9  complaints?
10      A.   I would have to look and see again.
11  There's another letter that I addressed to him
12  saying some type of complaint or allegations, I
13  believe.  Well, no, this was on the --
14      Q.   So at -- at some --
15      A.   -- was on his performance appraisal as
16  well, and they came fairly close together.
17      Q.   At some point you received a -- the EEOC
18  complaint, correct?
19      A.   Yes, from HR.
20           MS. ROBINSON:  And we marked that as
21  Exhibit 20.
22           MR. GEIS:  Sheriff, right here.  I just
23  didn't put a number on it.
24           BY MS. ROBINSON:
25      Q.   And you said HR forwarded you this

Page 149

1  complaint?
2      A.   Yes, I believe so.
3      Q.   Can you identify the date of this
4  complaint, again?
5      A.   I see the date, but I can't -- I can't
6  it.  This is a copy.  It's faded.  I'm sorry.
7  There's a date at the bottom.
8      Q.   Yes.
9      A.   9/12/2018.
10      Q.   And what did you do when you received this
11  complaint?
12      A.   This is -- this was investigated.  I
13  believe that he filed two different complaints,
14  two -- he filed one, and there may be an amended
15  or something with EEOC, is what I'm thinking.
16      Q.   So you said you investigated this
17  complaint?
18      A.   I believe so.  I don't recall.  Like I
19  said, he's filed several things all together.  But
20  I believe this goes with this
21  letter sent to him, but there's also another letter that
22  sent to him concerning a complaint.  I don't remember
23  the details of it.  But in this one dated July 19
24  myself when he talked about his suspension and traffic
25  stops and stuff like that.



Page 150

1      Q.   Okay.  Well, let's focus on Exhibit 20, the
2  -- the September 12th, EEOC complaint.
3           And so I just would like to know what --
4  what steps did you take when you received this
5  complaint?
6      A.   The Exhibit 20?
7      Q.   Yes, sir.
8      A.   This was -- I believe this was what was
9  investigated by me.  And if it in fact was, then he
10 was given -- no.  Actually this -- this is what I
11 investigated right here.  This -- when he went to
12 EEOC, that complaint contained a lot of the stuff
13 that's in this memo that I gave him.
14     Q.   The memo -- the memo came before the
15 complaint?
16     A.   Yes, it did.
17     Q.   Okay.  So what did you do --
18     A.   From the EEOC.
19     Q.   Right.  Exactly.
20     A.   Yeah.
21     Q.   So what did you do when you received the
22 EEOC's complaint?
23     A.   I don't recall specifically what I did, but
24 I believe I conducted an investigation into his
25 allegations.

Page 151

1      Q.   Did you interview witnesses?
2      A.   Yes.  If this is the same one, I be...
3  interviewed everybody that was involved.  It...
4  of drawn out, and he talked about the di...
5  supervisors that he was with during his train...
6  different squads and shifts that he was on, if...
7  is the same situation.
8      Q.   Did you solicit statements?
9      A.   Yes.
10     Q.   Who did you ask to write a statement?
11     A.   I believe -- again, if it's the same
12 complaint, then I believe it to be that it...
13 basically everybody that was involved in this
14 training.  If I remember correctly, Captain Watkins,
15 Lieutenant Campbell, Sergeant Martin, Deputy Wams...
16 pretty much every -- the ones that were involved in
17 his training; again, if this is the situation I think
18 it is.
19     Q.   Would you say that you followed the policy,
20 the policies that we discussed?
21     A.   Yes, as best I could.  But, again, in this
22 I don't remember all the details, and I don't
23 remember which complaint came in at what time because
24 he -- there was several things filed by him right
25 together, and that's been a little bit...

Page 152

1      Q.   That's fair enough.
2           So the Use of Force Report -- but then
3  after you conducted -- or you -- you may or may
4  not have done anything in response to the EEOC
5  complaint.  Is --
6  
7      A.   I'm sure I gave some kind of response.
8      Q.   Would that have been a written response?
9      A.   Yes.
10     Q.   -- or would that have gone to -- Mr. White
11     A.   Would that have gone to -- yes, at some
12 point.  I'm not sure if this is the one that I ha...
13 here or -- this is in response to your complaint
14 dated June 15th, 2018, received on June 26th,
15 whichever one that was.
16     Q.   Okay.  So did -- were you -- were you
17 shocked to see Mr. White's EEOC complaint?
18     A.   Well, I wouldn't say I was shocked, but
19 was surprised.
20     Q.   You were surprised?
21     A.   Yes.
22     Q.   Why were you surprised?
23     A.   Because some of the stuff that he alleg...
24 I included in this response that I gave him, and
25 didn't see where that was discrimination.

Page 153

1      Q.   Okay.  So did your relationship change
2  Mr. White after the filing -- he filed the EEOC
3  complaint?
4      A.   Well, no.  I never had any relationship
5  than the -- other than same as with the rest of the members o...
6  in the sheriff's office deputies.
7      Q.   Is he the only employee who has ever fi...
8  an EEOC complaint?
9      A.   Yes, to my knowledge.  Yes.
10     Q.   Under your tenure?
11     A.   Yes.
12     Q.   Did any of your superiors or anyone con...
13 you and ask about or inquire about the complaint?
14        MR. GEIS:  Objection to form.
15        MR. ROBINSON:
16     Q.   Did anyone inquire about this complaint...
17 The EEOC complaint?
18     Q.   Yes.
19     A.   I believe the HR director may have inqu...
20 about it.
21     Q.   And who is the HR director?
22     A.   Argretta Johen.
23     Q.   And she's the only one who inquired abo...
24 right?
25        When you say -- when you say "superior,...



(866) 715-7770
advancedONE.com
AdvancedONE LEGAL

Page 154

1 really she's not -- you know, she doesn't supervise
2 me, but I know that she inquired about it.
3     Q.   Is she the only -- it doesn't even have to
4 be, you know, a superior.
5          Is she the only person who inquired about
6 it? So we're just speaking generally now.
7     A.   Okay. I don't recall anybody coming to me
8 and inquiring about the EEOC complaint, but...
9     Q.   Did Mr. White make any additional
10 complaints after the September 12th EEOC?
11     A.   He made several complaints. He made more
12 than one that I recall, but I don't recall the
13 sequence in which they were made. Again it was a
14 long time ago, near almost three years ago.
15     Q.   After the September 12th EEOC complaint,
16 did Mr. White make any additional complaint?
17     A.   I don't know.
18     Q.   Do you recall when you terminated -- the
19 date you terminated Mr. White?
20     A.   I would have to look at whatever document
21 it's documented on.
22          MS. ROBINSON: Let's pull up the
23 termination.
24          MR. MCGURL: (Complies.)
25          MS. ROBINSON: We pull -- we talked about

Page 155

1 that document earlier, and I'm looking for that type
2 thought we marked it. I think it was Exhibit 10
3 BY MS. ROBINSON:
4     Q.   Can you read in the record the date of
5 termination?
6     A.   Yes. Date of separation, October 24, 2018
7     Q.   Do you recall how close that was to the --
8 in time to the investigation of Mr. White's use of
9 force -- alleged use of force?
10     A.   No, I didn't calculate the time.
11     Q.   Let's -- let's do that now.
12          Can you turn to the -- the Use of Force
13 exhibit?
14          COURT REPORTER: Turn to what?
15          MS. ROBINSON: The Use of Force Report
16 investigation report.
17 BY MS. ROBINSON:
18     Q.   Can you read for the record the date on
19 that document?
20     A.   The --
21          MR. GEIS: What document are we talking
22 about?
23          MS. ROBINSON: The Use of Force Report
24          MR. GEIS: Do you mean the investigation?
25          MS. ROBINSON: Well, investigation...

Page 156

1 Michael, can you pull that up?
2          MR. MCGURL: (Complies.)
3          THE WITNESS: This is October 21st, 201...
4 when it occurred or when it began.
5 BY MS. ROBINSON:
6     Q.   Okay. So, Sheriff White, I want to ask
7 you about some behaviors that took place at the
8 sheriff's office when you were there. And I want
9 to -- do you recall any rumors that were made about
10 Mr. White or said --
11     A.   No, I do not.
12     Q.   Do you -- do you recall an instance for
13 which comments were made about Mr. White's sexual
14 orientation?
15     A.   No, I do not.
16     Q.   Do -- do you recall Mr. White complaining
17 about the difference in treatment between the black
18 deputies and white deputies?
19     A.   Yes, at some point he alleged that.
20     Q.   How did -- how do -- so you don't recall
21 any statements about Mr. White's sexuality?
22     A.   No, none that I heard.
23     Q.   What about comments that others may have
24 made?
25     A.   He at some point made some allegations

Page 157

1 that type of stuff may have happened, but I didn't
2 -- if I remember correctly, this was after -- it
3 surfaced long after he said that it happened.
4     Q.   What do you mean that it surfaced?
5     A.   It did not come to my attention when he...
6 the one that occurred. It was later.
7     Q.   How did it come to your attention?
8     A.   I believe it came in his complaint.
9     Q.   Did anyone investigate these allegation...
10     A.   This may be the one I investigated. I'm
11 not sure.
12     Q.   And we're specifically talking about
13 statements about his sexual orientation?
14     A.   Yeah, and these came out -- a lot of th...
15 stuff came out in his EEOC complaint, if I remember
16 correctly.
17     Q.   Anyone admit to making those statements?
18     A.   No.
19     Q.   Did anyone say they heard those statement...
20 being made?
21     A.   Excuse me. I didn't hear you.
22     Q.   Did anyone say that they heard those
23 statements being made?
24     A.   No. I believe Mr. White alleged that in
25 some of his complaint.



AdvancedONE LEGAL          (866) 715-7770
                           advancedONE.com

Page 158

1    Q.   Did you investigate those statements?
2    A.   Yes, I believe so.
3    Q.   What did you do?
4    A.   In this one, this -- I spoke to some of the
5  people that he said was involved, and then I believe
6  maybe a lieutenant, captain or somebody spoke to
7  somebody or something to that.  Again, this stuff
8  kind of runs together.  So it -- I would have to look
9  at my documents to refresh my memory.
10   Q.   Are there or were there any openly gay
11 deputies?
12   A.   No, not to my knowledge.
13   Q.   And when you say not to your knowledge, are
14 we speaking about the entire -- your entire tenure
15   A.   Yes, I -- I am.
16   Q.   -- as sheriff?
17   A.   Yes.
18        MS. ROBINSON:  Can I -- let's take a
19   five-minute break.  I think I'm almost done.
20        MR. GEIS:  Okay.
21             (BREAK TAKEN)
22        MS. ROBINSON:  At this point, Mr.
23   White, I just want to thank you for your time.
24   Thank you for sitting through this long
25   deposition.  I don't have any further questions

Page 159

1  for you.
2        THE WITNESS:  Okay.
3        MR. GEIS:  Thank you.
4             (SIGNATURE RESERVED)
5        (DEPOSITION CONCLUDED AT 6:41 P.M.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 160

STATE OF NORTH CAROLINA
COUNTY OF CATAWBA

2

REPORTER'S CERTIFICATE

4        I, Dodie F. George, a Notary Public, do
5  hereby certify that there came before me on
6  Friday, February 26, 2021, the person
   hereinbefore named who was by me duly sworn to
   tell the truth and nothing but the truth
9  of his or her knowledge concerning the matters in
   controversy in this cause; that the witness was
11 thereupon examined under oath, the examination
12 reduced to typewriting under my direction, and the
   foregoing pages are a true record of the testimony given
   by the witness.
15        I further certify that I am neither
16 attorney or counsel for, nor related to, or employed
17 by any attorney or counsel employed by the parties
18 hereto or financially interested in the action.
19        IN WITNESS WHEREOF, I have hereto set my
20 hand this 9th day of March, 2021.
21
22
23        _Dodie F. George_
24
                    _____
                    Dodie F. George, Notary Public
                    Notary Public Number 201025200033

Page 161

1             Errata Sheet
2  NAME OF CASE:      5:19- JUSTIN J. WHITE vs PETER WHITE
3  DATE OF DEPOSITION: 02/26/2021
4  NAME OF WITNESS:   Peter White, 30(b)(6)
5  Reason Codes:  1. To clarify the record.
6                 2. To conform to the facts.
7                 3. To correct transcription errors.
8  Page _____ Line _____ Reason _____
9  From _____ to _____
10 Page _____ Line _____ Reason _____
11 From _____ to _____
12 Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
17 From _____ to _____
18 Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
21 From _____ to _____
22 Page _____ Line _____ Reason _____
23 From _____ to _____
24             _____
25                  PETER WHITE, 30(B)(6)



```
                                              Page 162
 1                    WITNESS CERTIFICATION

 2

 3             I hereby certify that I have read the

 4    foregoing transcript of my deposition testimony,

 5    and that my answers to the questions propounded,

 6    with the attached corrections or changes, if

 7    any, are true and correct.

 8

 9

10

11

12

13    _____        _____

      DATE               PETER WHITE, 30(B)(6)

14

15

16

17                       _____

                         PRINT NAME

18

19

20    JOB 408577

21    5:19- JUSTIN J. WHITE vs PETER WHITE

22

23

24

25
```



### Exhibits

**Exhibit 12** 3:10
71:13,14

**Exhibit 13** 3:11
79:5,6

**Exhibit 14** 3:12
89:11,12

**Exhibit 15** 3:13
101:17,18

**Exhibit 16** 3:14
106:11

**Exhibit 17** 3:15
112:9,11

**Exhibit 18** 3:16
133:20,21

**Exhibit 19** 3:17
135:25

**Exhibit 20** 3:18
136:13,14 148:21
150:1,6

**Exhibit 21** 3:19
137:10,11

**Exhibit 22** 3:20
143:7,9,10,11

**Exhibit 23** 3:21
146:6,7,8

### $

**$1,500** 134:18

**$34,764** 134:19

### 1

**1** 56:20 57:8 73:1
81:1

**10** 56:21 57:17 58:4
155:2

**100** 78:19

**11** 59:18,19

**12** 50:4 61:2 71:13,
14

**12-hour** 41:21

**12-month** 99:4

**12-year** 51:10

**12/5/55** 6:8

**12:30** 66:18

**12th** 136:18 150:2
154:10,15

**13** 13:6 79:5,6

**14** 89:11,12

**15** 71:25 80:1 89:9
101:17,18

**153A-98** 147:9

**15th** 101:9 113:11
137:4 152:14

**16** 91:11,12,13
98:24 106:11

**168A-3** 114:12

**16th** 143:16

**17** 91:12 98:25
112:9,10,11 130:8

**18** 112:9 133:20,21
135:23 142:23
143:14 145:2

**19** 135:23,25
146:11

**1964** 137:7,19
147:14

**1976** 7:10

**1977** 7:11,24

**1981** 8:18

**1985** 9:1,14

**1990** 9:17

**1992** 12:9

**1998** 11:10

**19th** 149:23

**1:30** 67:2

**1st** 133:25

### 2

**2** 116:13

**20** 10:19,20 98:11
136:13,14 148:21
150:1,6

**2005** 16:7,9

**2006** 16:8,15 18:4,5
20:9

**2007** 71:22

**2008** 71:22

**2009** 71:25 80:1
101:9 113:11

**2015** 133:18

**2017** 138:19

**2018** 133:25
134:13,17,20
136:18 137:4
138:25 142:23
143:14,16 144:22
145:1,2 146:11
152:14 155:6 156:3

**21** 137:10,11

**21st** 156:3

**22** 143:7,10,11

**23** 146:7,8

**24** 155:6

**25** 129:6

**26th** 138:6 152:14

**27553** 6:12

### 3

**3** 85:17

**30(b)(6)** 4:2

**34** 129:2

### 4

**4** 86:25 130:14,15,
20,24

**40** 19:11

**40-something-thick**
72:20

### 5

**5** 78:3,6 88:1

**50** 98:12

**50B** 78:9,16

**5th** 134:16,20

### 6

**6** 73:20 134:13

**60** 6:10

**6:41** 159:5

**6A** 41:23,24

**6P** 41:24

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

164
Index: 7..again

**7**

**7** 74:10,20 78:3,5

**7/15/2009** 71:7 77:7 107:9

**7:00** 127:25 128:2 129:7

**8**

**85** 9:15

**9**

**9/12/2018** 149:9

**A**

**A.1** 69:24 70:18 71:4

**A.1.** 71:13

**A.2** 69:24

**ability** 13:18

**able** 11:22 21:11,12 40:23 89:5,6

**about** 4:15 5:2 8:7, 15 9:7 11:9 15:5 16:16 18:18,22 19:11,17 22:20 23:25 34:9 37:20, 21 43:19 45:11,18 46:19 50:14 51:13 54:9 55:23 62:8,14 63:2 64:5 66:9,10 67:7 68:19 69:1 71:21 72:24 74:18 86:13,15 92:2 96:25 99:23 105:2, 6,7,13,16 108:11 109:22 110:5,8,20,

23 111:7 114:22,25 115:2,7,15 123:19 125:18 127:22,24 129:4,7,15 130:17 131:22 132:17,20 135:1 141:12 144:10 146:23 149:24 151:4 153:13,16,20,23 154:2,5,8,25 155:22 156:7,9,13, 17,21,23 157:12,13 158:14

**above** 134:21

**above-mentioned** 92:9

**accepted** 107:17, 21 108:3,9

**accepting** 107:15, 24 109:14

**access** 72:13

**accompanying** 91:25 93:2 97:6

**accordance** 94:20 95:8

**according** 144:23 145:3

**accusation** 144:13, 15

**accusations** 110:3, 4 143:4,24

**accused** 131:7

**acknowledging** 46:15

**acquainted** 112:17

**across** 15:9,12 122:8

**act** 75:15 136:24

137:18 147:14

**acting** 26:6

**action** 56:25 58:17 101:21 102:12 114:5,14 115:23 116:2 120:22 121:1 123:22 125:6,8 126:12 130:4

**actions** 48:5 61:25

**activities** 27:21 65:17

**activity** 26:9

**Acts** 137:7

**actual** 40:17 72:23 84:12 123:15

**actually** 10:5 12:7 15:6 51:7 61:25 63:16 150:10

**added** 20:14,15

**addition** 15:11 91:24

**additional** 97:9 154:9,16

**address** 4:25 6:9 78:9

**addressed** 94:16 95:15 133:14 145:15 148:11

**addresses** 117:8

**addressing** 136:22, 25

**adjoining** 38:8

**adjust** 117:4

**adjustment** 134:19

**administered** 88:20

**administration**

37:13

**administrative** 24:10,19 26:18 27:4,14,19 28:9 29:13,22 30:1,4 32:3 95:22 131:6

**administrator** 27:10

**admit** 157:17

**Adverse** 101:21

**advising** 5:2

**affair's** 99:8

**affairs** 97:15 99:7, 12,15

**affected** 88:21 92:8

**afford** 72:20 84:13 88:11

**afforded** 88:5,6,16

**African-american** 21:8

**after** 9:19 11:12 12:18 14:15 17:21 21:7 31:5,18,24 33:7 34:17 35:16 37:17 40:25 42:2 44:2 45:6 55:3 56:3 58:25 59:5,21 61:25 62:1 71:23, 24 74:1 111:19 132:6 138:18 139:9 144:2 147:21 148:7 152:4 153:2 154:10,15 157:2,3

**afterwards** 46:14

**again** 18:4 25:5 37:5,8 38:20 44:8 45:4 49:15 54:25 55:15 67:23 69:7 99:16 103:22

104:23,24 108:13
116:25 118:23
121:13,20 124:21
137:23 141:7,25
143:2 147:21
148:10 149:4
151:11,17,21
154:13 158:7

**against** 17:12,24
84:23 106:22 121:1

**age** 114:11,16

**agents** 84:5,8

**aggravating** 12:15

**ago** 141:19 152:1
154:14

**agony** 16:23

**agree** 46:12 73:11,
12 74:6 105:23

**agreeing** 4:10

**ahead** 23:4 50:19

**aid** 88:20

**all** 5:6,20 16:23
17:9 18:18,25
19:25 34:13,18,19
35:17 48:3 50:6
55:1 62:21,22 65:6
81:4 82:22,24
84:10 96:1 97:5
98:23 102:4,18
104:23 106:5
113:20 114:4
115:17 118:15
123:19 124:6
128:24 129:9 131:8
135:13 141:9 142:2
149:19 151:22

**allegations** 47:11
53:4 104:9 136:20
141:12 148:12
150:25 156:25

157:9

**alleged** 104:9
117:15 131:9 144:3
146:21 152:23
155:9 156:19
157:6,24

**allegedly** 121:18
126:8

**alleging** 147:24

**allocation** 84:12

**allowed** 17:23
114:23,25 115:3

**almost** 124:6
154:14 158:19

**alone** 65:18

**along** 16:23 35:7
46:16 55:24 65:15
80:11 93:1

**already** 52:2,6
143:7

**also** 10:3 15:10,11
17:4 26:5 33:24
42:12 43:2 58:23
59:5 82:23 83:5
89:1,10 90:5 92:21
93:15 94:3 101:23
120:4 146:25
149:21

**Although** 78:9

**always** 6:13 38:15
73:7

**Alzheimer's** 26:14

**am** 5:22 6:3 52:6
118:9 130:10
134:24 158:15

**amended** 149:14

**Amendments** 73:6

**among** 57:18,22,24
73:5

**amount** 25:21
88:14

**an** 12:16 18:21
20:20 24:25 25:23
28:1 30:3,22 33:13
37:17,23 38:8,14
39:1,16 42:13
45:24 46:6,24 47:7,
9,10,12,14,15,20,
23,24 48:2,6,7,8
49:10,13,19,20
50:2,3,7,14,16
51:6,7,16 52:24
55:25 58:5,22,23
60:1,10,15 64:10
65:6,20 66:24
67:14,18,21 68:15
69:16 72:12 77:23
81:11 82:13,15
84:13 86:1,2 90:17,
21,23 91:9 92:2
95:13 99:15
103:22,23 104:4,
17,23 105:4,18
106:17 109:24
113:21 114:4,15
115:13,20 116:1
117:1,16,18 118:3
119:2,9,22 120:2
121:25 122:14
123:4,8,13 125:14,
16,19 126:12,17
129:6,15,17 131:19
135:13 144:15
149:14 150:24
153:8 156:12

**analyzed** 97:6

**and** 4:10,11,14,16,
19,20,23 5:3,11,13,
20 6:4,9,16,25
7:10,16,17 8:8,14,

20 9:7,13,20,21
10:10,13,24 11:1,3,
4,7,10,13,15,16,19,
22,23,25 12:1,7,14,
15,18,22,24,25
13:4,5,18,19,25
14:8,14,16,17,19
15:7,10,14,16,19,
20,22,25 16:1,3,10,
12,19,22 17:4,9,20,
23 18:4,15,18,23
19:6,14,17,25 20:8
21:7,19 22:18,22
23:4,10,14,17 24:9,
11 25:4,11,12,17,
18,21,22,25 26:3,5,
7,12,16,24 27:14,
18 28:11 29:7,13,
19,23 30:3,7,16,25
31:5,7 32:4,5,9,17,
20 33:18,20,23,24
34:1,4,8,11,12,16,
17,19,20,22,23
35:13,14,18 37:7,
22 38:3,21 39:11,
12,19 41:5,9,18,24
42:4,12,14 43:2
44:2,4,5,17,18
45:2,6,8,22,23
46:2,9,14,17 47:3,
18 48:14,25 49:2,
15,19 50:5,11,12,
14,16 51:7,18,19
52:2,25 53:14,15,
25 54:1,3,4 55:3,23
56:4,9,10,14 57:20
58:15,18,21,23
59:5,7,14 61:2,24,
25 62:23,24 63:3,8,
15,20 64:22 65:5,6,
13,24 67:13,15,20
68:18,25 69:1,14,
24 70:4,15,20
71:12 72:6,15,23
73:3,6,8,9 74:5,6,

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

22,25 75:3 76:12,
15,20 77:5,19,22
78:21,25 79:18,24
81:13,16 82:11,22
83:7,12 84:1,8,12
85:4,22 87:11,20
88:11,13,14,19,25
89:10 90:12,13
91:1,8,19,25 92:1,
3,5,8,21 93:1,14
94:3,19,22 95:4,8,
22 97:5,6,9,24 99:8
101:21 102:1,2,4,5,
12 103:4,6 104:3,4,
6,24 105:11 106:5,
22,23 107:7,15,21
108:3,8,9,16,18,19,
25 109:11,22
110:1,17 111:5,10,
11,24 112:21,24
113:3,5,22 114:3,4,
6 117:4,5,23 118:4
119:10 121:19
122:8 123:21
124:17,25 125:3,20
128:4,10,12,13
129:2,6,20 130:2
132:4,7 133:15,17
135:1,15,23
136:12,16,19,20
137:2,8,9 138:15,
17,20 139:3,6,9,10,
11,14,20 141:2,11,
14 142:3,21
143:17,19 144:21,
25 145:4,11,16
146:4,12,22,23,25
147:18,24,25
148:7,10,16,20,25
149:10,14,24,25
150:3,9 151:4,5,6,
22,25 152:24
153:13,21,23 154:8
155:1 156:8,18
157:2,12,14 158:5,

13

**animals** 84:15

**annual** 43:15,18
65:6 134:19

**another** 10:24 14:1,
6 21:8 27:12 29:10
36:25 52:7,10 56:9
57:11 65:21 81:12
86:18 120:3 124:14
148:11 149:21

**answer** 4:10 5:3
37:5 50:22 52:2,5,9
64:2 147:5

**answered** 32:15,19
51:18 52:3,7
104:25

**answers** 31:5

**anticipate** 69:3

**anticipated** 69:7

**any** 5:4,25 13:12,15
17:2 19:15 20:3
27:5 30:12,16
42:20,22,23 58:24
61:17 65:2,17 67:8
69:14 70:9 73:9
84:14 86:4 88:17
89:22,24 90:1,7
91:25 96:7,8,10,11
97:9 102:7,15
109:2 115:23
116:19 117:14
118:7,9,18 119:7,8,
10,21,24 122:4
123:2,9 134:20
136:25 141:17
148:8 153:4,12
154:9,16 156:9,21
158:10,25

**anybody** 154:7

**anymore** 144:9

**anyone** 14:25
132:16,19 153:12,
16 157:9,17,19,22

**anything** 21:22
55:5 103:5 118:6
119:11 140:14
152:5

**anywhere** 118:2
122:23

**ap-** 38:3

**apology** 115:20
116:1

**apparent** 99:10

**apparently** 144:2

**Appeal** 101:22

**appeared** 95:13,16

**applicable** 93:3

**applicant** 31:4
32:10,15 33:11,13
34:2 36:21 37:18
38:4,14 39:1

**applicants** 30:7,9,
25

**application** 24:3,5
30:3 84:12

**applications** 24:7

**applies** 92:1

**apply** 24:2,4 78:15,
20,22,23 109:25

**applying** 33:20

**appoint** 97:11

**appointed** 95:18

**appraisal** 43:14
45:5,9,13,16,17
46:15 105:19,20
106:3 136:23

148:15

**appraisals** 43:8

**appreciate** 4:12

**appreciated** 64:23

**approach** 83:12

**approached** 138:18

**appropriate** 42:14
88:23 94:18 114:5

**are** 5:19,23 7:15
16:22 19:25 21:3,7
25:19 37:23 41:2
48:1 49:15 50:20
52:4 53:24 57:7
59:18,25 60:2,3,6,
14 62:8 64:4 66:9,
10,15 70:20 72:1
74:18 78:11,13
80:20 82:13,23,24
83:2,4,5,21 98:23
99:11,14 112:13
113:20 119:6,19
123:6 125:14
126:10 128:20
129:10 131:1 132:8
135:10 136:22
155:21 158:10,13

**areas** 39:3 45:22

**aren't** 5:24 111:2
145:3

**Argretta** 134:22
153:22

**arm** 62:7 73:9

**around** 9:15 12:9
40:23

**arrest** 78:16 81:13

**arrested** 23:17

**arrests** 26:9



(866) 715-7770
advancedONE.com

**arrival** 48:17

**article** 73:1,20
74:10,20 78:3,6
81:1 102:3

**as** 4:3,13,17,23
10:24 11:22 12:13
14:9,18 15:9,13,17
17:10,24 23:6 24:4,
16,17 26:6,15,22
28:18 31:8 32:9
33:19,21 34:10
35:21 37:13 38:25
39:7,12 40:21 41:3
48:24 50:5 52:15,
19 57:8 59:2 60:13
62:20 65:16 68:20,
24 69:8,12 72:3
74:5 75:15 77:21
78:14 80:19 84:16
87:20 88:10,17,23
90:12,17 92:1,18
95:15,22 96:13,16
97:14,23 101:17
102:22 103:1,2
104:10 105:18,20
108:1 114:2,12
116:9 118:25 123:1
125:7 128:4 130:8
134:11 135:23
137:9 139:7 142:12
143:7,9 146:6,17
148:15,20 151:21
153:5 158:16

**ask** 31:19 72:23
96:6 108:15,16,18,
19 112:15 128:16
151:10 153:13
156:6,7

**asked** 17:20 46:15
49:2 51:18 53:13
100:22 101:2
103:12,24 123:6
138:17 139:8

**asking** 49:10 105:6
129:17,24 139:6

**ASP** 82:21

**aspects** 98:18

**ass** 144:8 146:24

**assault** 90:18,21,
23,24 91:22

**assaulting** 90:8

**assess** 87:5,19

**assign** 99:6

**assigned** 9:2,21
12:24 14:16 34:5
36:7 41:2,6 42:2,9,
17 67:14

**assist** 13:12

**assistance** 88:2,5,
6,11,16

**assisted** 29:24

**associate's** 7:14

**assume** 18:19

**assure** 102:4

**at** 5:6 8:9 10:8,11,
16 11:10 12:5
14:25 15:5,21
17:14 22:6,7,8,13
23:2 24:1 25:3 26:4
27:20,23 28:12
30:19 35:5,20 36:5
38:3 40:12 43:4
44:11,18 45:2,3
46:10,12 53:15
54:1 60:9 62:12,20
63:4,7,8,15 65:5,13
67:2 69:21,22
76:16 81:1 82:11
85:13,14 94:10
96:18,19 97:6
98:17 103:11,25

106:9 107:1,7
117:6 120:6,8,11,
14,22 125:9 127:24
131:8 132:6 134:21
137:2 138:15
144:14,15 145:5,6
147:25 148:4,14,17
149:7 151:23
152:11 154:20
156:7,19,25 158:9,
22 159:5

**ate** 63:2

**atmosphere** 7:21

**attached** 94:22

**attend** 22:6

**attended** 7:13

**attention** 25:15
72:22 73:20 74:10
77:22 78:2,3 115:8
118:10 157:5,7

**August** 8:18 138:25

**authority** 81:2

**authorized** 87:4

**auto** 14:22 15:9

**automatically** 66:1,
3

**automobiles** 14:22

**avail** 139:1

**available** 82:10
83:11

**average** 23:18
30:10

**aviation** 15:14

**aware** 72:3 118:9
145:9

                        **B**

**B-6** 75:21

**B-U-L-L-O-C-K**
6:11

**B.6.** 76:14 79:5

**B.7** 100:4,6

**B.7.** 100:6

**B.9** 79:16

**B.9.** 79:8,9

**ba-** 128:1

**back** 7:8 11:22
12:12,17 16:11
21:23 25:7 29:22
32:20,24 35:23
37:14 40:8 54:8
75:19 104:5 112:7
128:13 129:11
143:19 144:23

**background** 22:14,
15,16,17 34:18

**badge** 124:2,5

**bailiffs** 26:6 63:17

**balancing** 81:4

**barbecue** 64:21

**based** 32:15,16
38:19 52:18
114:10,15 120:17
128:1

**basic** 22:7 83:5

**basically** 7:18 9:6
10:15 11:2,4 13:5,
13 14:20,23 15:23
16:18,25 17:2
18:11 19:4,24
23:18 24:16 25:14,
17 26:1,8,16 27:16



WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

168

Index: basis..both

33:17 35:18 36:6
40:20 42:14 48:24
58:18 74:4,13
84:19 86:18 87:19
103:5,22 121:7
124:6 146:16
151:13

**basis** 14:22 34:1
72:12

**bathroom** 128:19

**baton** 82:21

**batons** 82:4,7,9,23

**be** 4:22 5:8 9:10
12:14,16 18:13,20
19:12 21:19 22:14
23:15 24:12 25:12,
20,23 26:20,21,22,
23 29:13,14 31:3
32:2,9 33:15 34:5,
21 37:8 38:4 39:20
42:16,17 43:25
45:23 46:14 47:11,
15 50:9 53:8,11,13,
17,18,19,20 54:5
55:1 57:9 58:7
67:12,14,21,24
70:15 74:4 76:11
79:22 82:11,19
84:8,16,19 85:8,11
86:9,10,11,12,17
87:13,22,25 88:5,7,
16 89:6 90:3,5,25
91:9 93:5,6 94:2,5,
8,9,16,17,21,23
95:2,14,16 97:6
98:19 99:20 102:5,
7,11,15,17,18,20
103:1,4,7,10,11,12,
20,24 108:1,3,4,9,
12,21 109:4,13,23
110:16,17,19,25
111:5,7,16,17,18,
19,20,21,25 112:4

114:18 115:13,16,
20,23,24 116:6,18,
23 117:6,18,21,23,
25 118:1,25 120:1,
4 122:22 123:11
125:1,10,12 134:19
135:21 137:3
138:5,14 143:21
145:4 146:14 148:2
149:14 151:12
154:4 157:10

**became** 40:14,17
43:12 44:23 145:9

**because** 12:2 15:23
17:8 29:9 30:11
34:8 39:10 40:13
44:11 48:12 49:12
50:13 51:24 61:2
85:11 105:23
116:12 119:6,7
120:16 132:20
139:6 141:19 142:2
151:23 152:23

**become** 83:14

**been** 4:3 5:13 16:8,
19 23:16 25:5,22
29:3 31:7 36:12,14,
19 39:2 45:4 46:16
48:9 71:24 77:8,9
80:2 81:22 82:3
84:20,24 85:13,14
101:10,12,14
117:15 123:5
141:19 142:3
144:6,14 148:6
151:25 152:8
154:13

**before** 4:24 5:14,17
18:8 30:19 31:7
33:2 38:14 40:13
44:13 46:17 61:25
71:22 76:6 81:18,
23 95:5 108:10

112:15 132:10
150:14

**began** 7:10 42:4
156:4

**begged** 138:16
139:1

**begin** 16:19 34:19
103:13

**beginning** 103:16

**begins** 109:6

**behalf** 4:11 50:11,
13

**behave** 33:23

**behavior** 53:23
99:9 116:12 121:8
122:9

**behaviors** 118:21
156:7

**being** 17:2 20:18
23:16,18 72:19
93:12 120:3 123:18
157:20,23

**believe** 7:11 8:15,
19 9:1 10:19,20
11:9 16:7 17:21
18:4 19:13,17
20:12 25:2 27:8,10,
13 28:6 30:25
37:12 40:16 41:5,
23 43:16 51:19
55:8 59:7,23 71:10
75:13 80:7,10,17
90:12 93:15 107:11
113:13 123:1,3
127:5,11 132:15
138:5 140:16
141:4,8,20,21
142:1,8,13 145:14,
15 148:13 149:2,
13,18,20 150:8,24

151:2,11,12 153:19
157:8,24 158:2,5

**belong** 127:9

**below** 92:9

**best** 12:16 28:14
87:7,21,22 110:4
151:21

**between** 38:9 78:21
115:17 124:16
140:14 156:17

**beyond** 128:2

**bi-monthly** 97:7

**birth** 6:7

**birthday** 103:4

**bit** 11:17 12:15 13:1
20:6 22:20 43:19
105:2 151:25

**black** 48:12 156:17

**BLET** 19:2 21:25
35:21 36:3 83:7
133:17

**Bloods** 21:4,7

**Blue** 14:2

**board** 17:23 93:3,8,
18 94:4,9,11,23
95:4,18,20,24 96:2,
4,23 97:1,3,7,8,11
98:18 99:5,7

**bodily** 85:21,23
86:4

**body** 15:9 89:22

**bond** 65:10,12

**bonded** 65:25

**born** 12:6

**both** 121:23 139:12



**AdvancedONE**
LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

169
Index: bottom..can

**bottom** 76:16,17 107:1 149:7

**boxes** 45:19

**branch** 7:1

**break** 50:10,18 51:2,4 55:18,20 66:11,13 67:3 99:22,25 127:12,18 128:8,10,19,21,23, 25 129:1 158:19,21

**break-ins** 25:16

**breaking** 25:21

**breaks** 5:5 35:7

**breast** 129:17

**breasts** 129:25

**Breedlove** 17:17

**brief** 90:3 132:25

**briefly** 33:17

**bring** 24:3 81:11 87:7,22

**broken** 62:7

**brotherly** 35:1

**brought** 24:6 115:8

**building** 38:7,8 63:7

**buildings** 38:7,9

**built** 12:8 65:21

**Bul-** 127:9

**bullet** 91:18 92:23 93:22 94:12,14 98:21 99:18

**bulletproof** 110:5, 9,11,14 138:17

**bullets** 97:2

**Bullock** 4:13 6:10 67:24 68:4,6,17 97:21 98:1 99:17 127:10 131:21 132:17,23 138:20 139:4,8 147:25

**Bullock's** 130:19

**burglary** 138:21

**businesses** 25:15 43:1

**but** 9:2 10:20 12:7, 8,9 13:19 19:12 20:6,11 21:12,21 23:15 24:4,17,21 25:6 26:21,24 28:5 34:14 35:11 36:13, 14,17,18 37:25 38:14 40:2,16 42:12 43:17 46:2 47:6,23 48:17 50:6, 10 53:12 57:24 60:2,3 64:16 65:23 66:14,19 69:18 70:3 71:22 72:12 75:15 78:19 80:14, 23 85:13 86:16,18 93:6,10,14 94:17 96:22 101:13 103:11,12,22 105:8,10 110:4 111:7,17 112:8,13 116:11 120:19 123:2,6,11,19 127:23 129:8,20 130:17 131:19 132:1,7 141:2,4,19, 23 142:1 145:7,9, 18 149:5,19,21,23 150:23 151:21 152:3,18 154:2,8, 12 157:1

**by** 4:5 5:7 11:25 23:7 29:2 31:1,11

39:24 43:25 45:6, 15,21 46:6 50:25 52:12 53:9 55:21 56:11,22 58:10 59:20 60:22 64:1 67:4,22,24 68:11 70:1,17 71:15 76:1, 6 77:14 79:7 81:2 83:4 84:8,16 85:8,9 86:6 88:20 89:13 90:10 91:5,16 92:12 94:11,20,24 95:2,9 96:4 97:1,3, 7 98:3,16 100:1,8, 20 101:19 106:13 107:21 108:19 110:10 112:20 114:4,17 115:18,21 116:20 117:25 119:12 121:14 129:13 130:25 133:11,22 134:9 136:1,15 137:15 140:5,13,17,20 141:18 142:11,18, 22 143:5,12,17 144:6,13,14,15 145:24 146:2,9 147:10 148:24 150:9 151:24 153:15 155:3,17 156:5

---

## C

**C&I** 14:18

**c-** 32:22

**calculate** 127:20,21 128:3 155:10

**calculated** 38:16, 20

**call** 4:20 9:3 21:2 25:11,20,21 29:25

30:21 31:1 32:20, 24 41:3 45:5 46:13 57:12 88:22 134:21

**called** 14:17 15:6, 11,13 20:15 21:8 50:10 56:25 58:17 104:24

**calling** 88:22

**calls** 78:13,14 109:22 138:21

**came** 7:8 16:11 18:16 23:1 36:6 44:17 48:25 69:4 103:18 135:4,5,6 148:16 150:14 151:23 157:8,14,15

**campaigning** 16:20

**Campbell** 126:10 142:12,22 143:5 144:8,18 146:23 147:3 151:15

**can** 4:6,8 6:4,9 7:21 37:24 39:3 47:23 48:6 49:5 51:6,12, 16 52:2 53:5 55:17 57:2,4,19 58:2,15 59:9,12 60:15,19 64:2 66:19 67:9,19 68:12 69:23 70:2,3, 17 71:6,18 72:14, 25 73:15,22 74:12, 16,24 75:2,8 76:9, 15 77:2,5 78:3,17 79:14,24 80:25 81:6,25 82:15,22 83:13 84:3,5,17 85:17,20 86:24 87:2 88:4,19 89:3, 14,19 91:11,18 92:23 93:6 94:14 95:6 97:1 98:21 99:22 100:2,12

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

101:8 102:15,20
103:4,10 105:22
106:20 107:6,12
109:14 110:7
111:9,17,19 112:24
113:9,15 114:7
116:16 117:3,12
118:1,14,23 119:2
120:22,25 125:16,
18 126:5 127:12
128:2 129:7 131:4
133:4,12,23 134:15
136:6,16 137:12
138:12,23 142:21
143:13,15 145:20,
25 146:10,18 149:3
155:4,12,18 156:1
158:18

**can't** 30:11 96:20
101:13 119:6,7,10
125:14 141:23
142:1 147:5 149:5

**Cannons** 70:18

**cannot** 47:25 51:9
60:17 61:8 109:12
111:16 119:3,5,7

**Cappy** 67:25

**capsicum** 84:10

**captain** 13:5 14:16
15:18 19:6 20:17
24:11,19 25:3
26:19,21,23 27:5,
19,20 28:21,23
30:5,23 32:3 67:24
68:1,2,4,5,16 93:6,
13 97:11,20,21,22
99:16 130:19
138:20 139:4,8
143:17 144:18,20
151:14 158:6

**captain's** 97:25

**captains** 19:17
25:5 28:16 32:2

**car** 54:4 139:10

**career** 7:11,23 19:3

**careful** 81:4

**Carolina** 6:11,14
8:21 9:22 14:13
15:12 81:16

**carried** 84:8 147:1

**carry** 78:25

**carrying** 84:19

**case** 49:21 50:17
57:9 90:7

**Caswell** 11:15

**categories** 27:5

**Caucasian** 54:17

**caught** 36:11

**cause** 49:8,10
79:22 85:25

**caused** 77:21

**causes** 86:2

**centers** 15:10

**certain** 10:20 17:3
29:6 32:16 39:21
59:8 67:6 138:6

**certification** 35:25
82:18 83:16,19

**certified** 18:24 19:1
22:3,23 28:15
35:20,22 39:2
82:13,16,20 83:4,
15

**chain** 44:5,11,19
97:8 108:25
111:15,23 118:2
122:24 139:2

**chairman** 99:5

**chairperson** 31:23
97:14

**challenge** 46:7

**challenges** 46:4

**chance** 70:8 76:3

**change** 20:13
52:18 121:8 122:9
153:1

**changing** 125:3
141:10

**character** 23:10,13,
14

**characterization**
116:10

**charge** 30:24 31:25
63:16 136:10

**charged** 90:7

**Charges** 106:22
107:25

**chart** 38:11

**check** 45:19

**checking** 31:20

**chemical** 84:5,7,20

**chicken** 64:19

**chief** 19:7 26:24
28:16 30:6 73:5
139:4 147:25

**children** 26:14

**choose** 123:20

**chose** 48:21 72:16

**Chris** 4:23 66:10

**Christmas** 35:10
62:22 63:9 64:12

**chairman** 99:5

**circumstances**
114:14 115:25

**citizen** 105:8

**citizen's** 68:18
108:14 109:25

**citizens** 25:17 43:1
108:15

**civil** 25:11,25 26:1,
2 27:7 136:23
137:7,18 147:14

**civilian** 126:17,18,
19,25

**civilian's** 126:22

**civilians** 15:7
19:17,18

**clarification** 97:9

**clarify** 39:10 44:20
135:8

**clarity** 44:20 45:11

**clause** 87:11,15,16

**clearly** 116:11

**client** 5:3,5

**clients** 113:24

**clips** 14:23

**clique** 73:10

**close** 19:13 20:18
127:24 141:3 145:6
148:16 155:7

**closed** 98:16

**closed-type** 98:14

**closer** 57:21

**co-** 69:16

**code** 17:1 75:8,16

**codes** 17:3

**cold** 117:3

**colleagues** 113:25

**collect** 53:25 54:4

**college** 7:12,14 22:7,8 85:12

**collision** 34:10

**color** 114:11,16

**com-** 69:10

**coma** 85:25

**come** 11:22 12:12, 17 27:17 35:23 46:13,18 75:19 85:4,6 106:8 107:19,20 108:16 118:10 128:12,13 157:5,7

**comes** 16:23 27:16 46:17 67:11,15 68:15 109:22

**comfortable** 51:2 66:20

**coming** 43:17 154:7

**command** 47:19 96:1 97:8 108:25 111:23 118:2 122:24 138:18 139:2

**comment** 115:14 126:8,13

**comments** 114:15 126:14 141:15,16 156:13,23

**commercial** 9:11

**commission** 133:16 136:11

**commit** 121:20

**communicate** 56:4

**communicated** 112:5

**communication** 15:10

**communications** 14:17 15:25

**community** 7:13 22:7,22 23:8 66:5 73:8 85:12 113:25

**commuted** 112:4

**company** 77:14 101:1

**complain** 108:16, 17 109:22 126:19

**complained** 126:21 127:1

**complaining** 108:24 109:10 137:7 156:16

**complains** 90:6

**complaint** 67:9,11, 13,15,23 68:14,18, 19 69:4,7 94:19 102:14,15,20,22 103:1,4 104:16,20 105:11,13,14,17 107:17,22 108:5, 13,14 109:3,5,7,9, 19 110:6,9,16,21 111:1,4,6,17 112:2 116:17,18,19,21, 23,24 117:13,14, 16,18 118:3,18 131:6 135:5,11,14 138:1 140:17,25 144:6,14 145:8 148:12,18 149:1,4, 11,17,22 150:2,5, 12,15,22 151:12,23

152:6,13,17 153:3, 8,13,16,17 154:8, 15,16 157:8,15,25

**complaints** 13:16 67:8 69:15 102:5, 18 104:7,14,17,21, 23 105:8,9 106:5, 22 107:16,24 108:8,11,12,21,23 109:15 111:2 114:4 116:5 117:21 118:8,9 134:25 135:18 137:1,13 139:15,16 145:12, 13 148:9 149:13 154:10,11

**complete** 55:25 56:16 58:21 59:1,6, 21 89:20 108:15, 17,19

**completed** 19:2 34:20 44:3 56:12 60:1 85:3 90:4,5 91:8 94:10 105:20 133:18

**completeness** 91:23 92:16,21

**completing** 92:21

**complex** 15:7

**compliance** 74:25 75:3

**Complies** 57:6 60:21 69:25 71:5 73:25 87:1 94:13 101:7 116:15 118:13 133:9 134:8 135:19 137:14 142:17 145:22 154:24 156:2

**computer** 72:13

**con-** 140:15

**concerning** 40:4 106:7 118:10 147:23 148:12 149:22

**concluded** 53:18 147:15 159:5

**conclusion** 53:16 147:25

**condition** 86:1 114:12

**conduct** 23:21 53:7 68:17 92:11 104:19 113:19 114:10 118:17,20,22,24,25 119:22 125:22,24, 25 126:2

**conducted** 51:7 52:25 53:8 131:19 147:12 150:24 152:4

**confer** 39:24 40:1

**conformance** 81:14

**consecutive** 99:4

**consider** 23:19 31:6 60:4 98:18 102:14 105:13 110:3,4,8,20 116:1, 4 118:3,17 124:8,9

**consideration** 102:2

**considered** 26:22 110:25 111:5,12 123:9 138:1

**considering** 88:12

**consist** 24:24 53:2

**consisted** 25:1



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

**Constitution** 73:6 81:15

**construed** 118:25 123:11

**contact** 30:24 37:22 55:10 114:2 153:12

**contacted** 143:17

**contained** 150:12

**context** 110:1 117:11,17

**continue** 64:14 68:12 81:6 123:16 138:23

**contracted** 85:9

**control** 21:13 81:11 87:8,23 89:25 90:2

**convene** 30:17 93:19 131:12

**convened** 95:4 131:13,17

**conversation** 4:15 5:1 131:23 132:22

**conversational** 4:14

**cookout** 35:10

**cookouts** 62:19,21, 24 63:7

**coordinate** 27:20

**coordination** 97:16

**copied** 134:23,24

**copies** 72:9,11,18 106:3

**copy** 80:7 93:2 94:21 104:6 148:1 149:6

**corner** 107:8

**Corp** 7:3

**correct** 43:7 44:12 56:1 65:10 79:1 86:22 110:1 111:11 117:9 120:20 130:8 144:22 145:16 148:18

**correctly** 44:25 80:11 93:16 95:23 135:16 145:17 151:14 157:2,16

**could** 13:13,19 24:4 29:8,12 35:21 39:14 46:7,10,11 47:11 49:12 61:7 67:14 68:7 85:11 86:10,12 87:13,25 91:19 94:9 103:11, 13 108:4 110:16 115:5,20,24 116:6, 18 117:18 118:25 120:18 121:18 122:15,22 123:11, 24 124:11,13 125:12 130:20 147:17 151:21

**couldn't** 23:16 32:17 46:17 54:23 72:20

**counseled** 123:5, 18

**counseling** 121:3, 11,15,16,21,24 122:3,6,11,17,19, 21,25 123:8,10,14, 16

**counted** 61:13

**counties** 11:15 12:2,3 13:6 14:10, 12

**county** 6:21 7:8 8:5 9:2,21 10:12,14 11:1,14,25 12:5,7, 20 16:11,13 17:6,8, 9,10 19:9 20:1,20 21:25 24:1 25:9,14 26:9 35:5 36:5 37:20 38:6,12 39:24 40:1,3,12,23 42:19 50:11 62:23, 24 63:12,13 64:5 65:5 72:19 76:11, 18 77:20 79:16 80:19 81:9 84:9 85:5,9 96:14 100:14 101:25 106:23 113:4,17 114:21

**couple** 9:11 15:17 21:4 59:3 72:23 141:19 142:3

**course** 19:2,3 22:8, 13,23 28:5 37:18 67:18 125:5

**court** 25:11 26:3,4 57:15 68:5,7 85:22 91:19 97:24 98:2 100:19 121:12 129:2 130:9 133:6 134:3,7 135:20,24 140:9,12,19 143:8 155:14

**courthouse** 26:5

**courts** 43:3

**created** 37:10

**creates** 85:24 114:13

**credit** 133:17

**creed** 114:11

**criminal** 7:16 22:20

**Crips** 21:4,7

**cross-trained** 29:6, 9

**culture** 35:4,6,11 62:17

**cursory** 34:14

**cussed** 47:18

**custody** 81:14

---

**D**

**D.7** 100:3,14

**date** 6:7 56:13,14 71:6,25 77:6,10 79:25 90:12 101:8 107:7 113:9 132:7 133:23 136:16 138:7 143:13 146:10 149:3,5,7 154:19 155:4,6,18

**dated** 134:13 137:4 145:2 149:23 152:14

**day** 16:7,8,9 29:13, 14 41:18,19,20 54:22 59:3 86:11 139:11

**day-to-day** 14:22, 24

**days** 36:25 41:17 59:3,8,24 103:3

**de-escalate** 87:7

**deal** 65:15 124:14

**dealt** 21:17

**Dear** 134:16

**death** 85:24

**December** 18:5



WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

173

Index: decent..did

decent 74:4

decide 56:18 82:9

decided 12:16 16:12 32:18

decision 24:21 32:11,22 33:2,10, 12 52:25

dedicated 72:5

deescalate 87:22

defensive 89:24 90:1

defined 114:12

definitely 110:19

definition 113:19

Definitions 114:8

degrees 7:14,15

demoted 125:15,17 129:15

demotion 125:11, 13,21 126:7 127:4

department 8:3,10 16:1 20:3 25:13,25 26:1 27:12,15 28:1, 17,25 29:1,6,23 30:1 41:9 118:19 142:6

departments 25:8 27:6 28:11

depend 67:11 104:16 116:24

depended 30:7 32:14 36:9 93:20 104:20

depending 22:8 36:10 39:14 41:8 47:8 48:5 67:13,22 86:12 115:24

117:19 118:5 124:13

depends 47:4 52:24 53:3,21,23 68:14 82:10 103:16 106:7 108:13 111:4 112:2 122:13,15,22

deposed 5:13

deposition 51:25 57:11 128:5,7 158:25 159:5

deputies 19:5,11, 15 22:3 25:20 27:21 29:5,16 41:2 55:1 60:25 65:18, 21,23 69:12 72:9, 17 78:11,25 81:2,9, 13,17 82:7,24 83:12,21 84:8,10 88:10,25 92:6 96:17 97:18 110:12,14 120:14 153:6 156:18 158:11

deputy 7:24 18:24, 25 19:1,7 22:11 23:11 26:24 28:15 30:6 34:9 37:7 39:18,19 40:9 47:17 54:10,24 55:10,12,15 63:14 64:7,8 67:16,19 69:17 80:7 82:15, 19 83:9,18 84:13 87:5,19 88:21 89:20 90:1,5,8 91:3,4,5,6,9,23 92:1,3,8 96:14 97:12 98:18 99:2 105:1 109:10 117:2 126:11 129:24 131:7 143:5,19 144:7,8,15 146:2,

25 147:25 151:15

deputy's 88:21 91:21 92:25 93:23 99:8

describe 116:16,17

described 69:9 104:10 105:12

deserve 126:7

designed 45:21

designee 99:6

despite 139:12

detail 9:3,4,12

detailed 121:24 122:6,7

details 142:2 149:23 151:22

detective 25:23 97:17

detectives 25:19

determination 92:2,18

determine 87:6,20 99:9

determined 24:12 39:23 46:3

develop 43:10

device 90:2

di- 118:11 130:4

dial 25:7

Diane 133:14

did 6:18,21 7:5,6,12 9:15,19 10:18 11:1 13:9,15,18 14:19 16:6,10,14 17:7 18:10,19 20:3,8,13 21:24 22:2,10

23:20,22,23 24:21, 22 25:8 27:14 28:1, 25 29:6,17,19 30:9 31:9,17,18 33:1,10 34:1,7,8 35:16 39:6,8,11,13,17 40:13,19,20 41:4, 25 42:1,12,14 43:10 47:3,10 48:7, 10,13,15,23 49:9, 10 54:11,20 55:4,7, 10,12,15 60:15 61:14,17 62:15 63:6,11,21 64:14, 16,18,24 65:1,2,17 69:3,10 70:23,24 71:8,19 72:5,9,12 75:15 76:23,24,25 77:12,15,24 79:2, 20,22 80:4,6,18 90:14 93:18 95:19, 20 96:6,16 98:18 99:15 100:16,18, 21,22,24 103:19 104:1,7,9,13,21,23 105:4,7,25 106:5 107:4,10 113:5,7, 12 116:7 120:6,11, 14 126:5,7,19 130:12 131:12,25 132:4,10,16 134:10,11 135:7,8, 20 139:14 140:6, 14,25 141:4,5,15, 17,18,21 142:1,9 143:7 144:17 145:12,14,15 147:12,19 148:4,8 149:10 150:4,16, 17,21,23 151:1,8, 10 152:16 153:1, 12,16 154:9,16 156:20 157:5,7,9, 19,22 158:1,3



(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

174
Index: didn't..does

**didn't** 10:4 15:24 21:14,18 23:15 39:7,11 46:12 47:6 48:12,14 49:4,24, 25 54:11,18,21 64:22,23 65:11 69:6 72:17 96:6,22 98:9 99:13 103:3 104:18 105:23 119:4 125:23 143:2 144:8 148:23 152:25 155:10 157:1,21

**difference** 78:21 90:20 102:25 156:17

**different** 9:9 14:11 18:18 25:8 27:20 37:9 45:22 83:24 96:18 121:4,19 125:1,2 146:21 149:13 151:4,6

**difficulty** 36:22

**dinner** 35:10 62:22 63:9 65:6

**direct** 93:25 118:11,15 119:13, 17

**directed** 75:16 77:23

**directive** 70:18 71:4,13 75:14,21 76:3,4,13 79:5,16 80:20,22,23 91:25 100:3,14 101:14 106:10,21 113:1

**directly** 27:17 93:3 106:6 108:5 118:16 119:13 132:11 135:6 138:4

**director** 38:21 106:4 133:15 135:15 153:19,21

**disability** 114:16

**discharged** 7:7

**disciplinary** 102:11 114:5 115:23 116:2 120:22 121:1 123:21 124:24 125:8 126:12 130:4

**disciplined** 146:24 147:4

**discretion** 119:21, 25

**discrimination** 50:17 67:8 68:21 135:1,11 136:10,21 137:1,8 138:15 141:14 147:16,24 152:25

**discuss** 5:4 79:12 96:25

**discussed** 51:15 151:20

**discussing** 67:5

**disfigurement** 85:25

**dismissal** 102:12 114:6

**disorderly** 23:17

**displayed** 90:1

**displays** 89:24

**disposition** 102:2

**dispute** 127:22

**disputes** 77:25 78:7,12

**disseminate** 80:4

**distinction** 124:16, 18

**distinguishing** 78:21

**distri-** 110:10

**distribution** 110:5, 9,11

**District** 57:9

**division** 41:11 97:14,17,19

**do** 4:19 5:4 7:6 13:14 15:22 16:10 17:12 18:12 22:15 23:1 25:13 27:15 31:15,16 32:10 38:16 42:15 46:17 51:1,4 52:7,10,11, 17 56:18 58:13,25 59:2,6,14,21 60:5, 8,9 61:3,9,11 62:22 63:8,19,20 64:11, 12,23 65:2,6 66:11, 23 70:13 71:21 73:11,18 75:22,24 77:13,16,17 78:12, 15 80:12 82:7,8,9, 17 83:2,16 87:11 89:2,4,5,6,14 92:13 94:7 98:4,7 99:18 102:14 105:2,13 106:14 109:2 110:3,4,8,10 115:18 116:4 117:21,25 119:12 124:1,8,16 126:7 129:16,24 131:23 132:4,22,24 134:12,25 135:10 136:2 137:22,24 139:7,14,22 140:14 141:16 142:5,11,19

144:4,9,11,17 149:10 150:17,21 154:18 155:7,11,24 156:9,11,12,15,16, 20 157:4 158:3

**do-** 42:4

**document** 42:20,24 49:6,7 55:25 56:5, 16,23 57:2,3,5 58:11,13,16,21 59:1,4,6,9,12,15 60:3,20 70:13,17, 21 75:11 76:9 77:3 78:3 85:17 89:9 90:11 91:4,6 106:18,20 107:7 108:18 109:9,11 115:10 116:14 119:25 130:7,8,13 131:1,4 133:7,12, 23 134:13,15 136:2,3,6,17 137:16,22 138:3 139:20 140:7 142:19,21,24 143:1,3 144:25 145:25 154:20 155:1,19,21

**documentation** 40:18,19 85:2 109:2

**documented** 91:10 94:18 108:3 109:4 116:19,20 120:1,4 154:21

**documents** 23:1 57:22,25 58:2,6 59:25 76:15 90:15 109:5 135:21 145:4 158:9

**does** 9:5 13:8 15:22 19:18 21:16 25:9,



13,18 52:17 53:2,
22 66:2 73:13
74:19 75:1,5 76:16
78:9 83:9 86:7
92:13,17 95:10
105:3 108:2
109:18,20 114:19
115:6 119:12,21,24
122:11 123:4,22
124:1 125:1 144:25

**doesn't** 66:17
67:17 108:5 111:18
112:14 123:8,13
154:1,3

**doing** 13:11,13
16:25 42:4,5
108:24 123:15

**domestic** 75:20
77:21,24 78:10,11

**don't** 15:4 17:8
20:12 21:5,11 28:5
31:14 34:5 36:8
37:3 38:18,20
40:13 42:23 47:19
50:4,6 51:9 55:11
57:11 60:2,7,9,17
61:3,5,6,13,16
62:16 64:15,24
71:20,24 75:13
77:9 78:1,22,24
80:14,23 82:17
93:9,11,14,17
98:13 102:18
105:10 107:11
113:13 119:9,11
120:13,16 123:2,7,
19 125:7,8 126:14
129:8,19,20,22
131:13,16 132:1,7,
11,12,19 133:1
138:4 139:7 141:18
142:8 145:7,18
147:20 148:3

149:18,22 150:23
151:22 154:7,12,17
156:20 158:25

**done** 18:13 19:3
37:12 43:8 44:8
45:6,7,10,15 46:16
47:6 52:24 56:3
65:4 67:22,24
85:12 104:4 105:21
115:21 121:17,18
152:5 158:19

**door** 47:17

**down** 4:10 13:6
20:14 43:2 44:16
45:8 60:20 72:14
105:1 118:11
121:16

**dr-** 66:10

**draft** 70:23,24
76:23 79:20

**drafted** 71:11
77:13,14 79:22
101:3 145:5

**drafting** 70:25 72:6

**drawn** 151:4

**drive** 54:2

**driving** 9:10 34:2
40:21

**drug** 25:12 26:7,9
27:7

**drunk** 23:17

**dual** 7:20

**due** 77:22

**duly** 4:3

**during** 6:16 11:24
19:2 24:3 48:4
53:10,11 62:10,20
68:23 71:11 90:11

94:16 151:5

**Durwood** 142:12,
22 143:5

**duties** 13:3 15:23
29:18 36:11 42:9,
11,13,17,19,21
125:3

**duty** 35:9 74:7

───────

**E**

**e-mail** 30:22 58:5

**e-mailed** 80:16

**E.2** 106:21

**E.2.** 106:10

**E.3** 113:1

**E.3.** 112:8

**each** 11:2 28:11,17
34:1 35:8 41:9 55:3
65:22 66:1,6,8
75:11,14 76:16,17
89:21

**eager** 83:21

**earlier** 12:13 38:25
51:13,15 52:15
62:20 65:8 144:1
155:1

**early** 97:22

**eastern** 14:13 57:9

**eat** 66:5,19

**ECD** 90:2

**education** 22:21
23:9 39:7,8,12,13

**EEOC** 135:5,11,13
148:17 149:15
150:2,12,18 152:5,
17 153:2,8,17

154:8,10,15 157:15

**EEOC's** 150:22

**effective** 54:5 77:5
101:8 107:9 113:9
127:4 132:13
134:20

**effectively** 81:11

**effects** 84:13

**effectuate** 56:4

**effort** 65:20

**egregious** 47:13,15

**eight** 139:2

**either** 7:21 24:5
76:7 117:4 119:15
120:16

**either/or** 116:6

**elbow** 89:23

**elected** 17:5

**election** 17:18,23
55:3

**electronic** 90:2

**elevated** 15:24

**eligibility** 134:17

**eliminate** 21:12

**Elvis** 64:10

**emergency** 88:23
105:3 138:21

**employ** 47:3 96:16
103:19 120:6,11,14

**employed** 67:6

**employee** 43:23
44:12,17 46:6,24
47:8 56:1 58:22,23
69:16 102:2 112:5
113:18 114:4



WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

176

Index: employee's..extreme

120:2,3 123:4,8,13
126:17 129:15
153:7

**employee's** 122:1

**employees** 43:21
46:25 60:5,24
62:18,21,23 65:6
102:4,6,8,10
113:20

**employment** 4:18
6:17 50:16 121:5
130:2 136:11

**EMS** 62:25 63:7
65:13,14

**end** 45:2,3 111:24
123:19

**ended** 48:19

**enforcement** 7:11,
24 21:19 22:7
65:14 66:4,5 73:7
83:6 97:18 134:18

**engage** 26:11
113:18

**enjoyed** 63:10

**enough** 47:13
122:8 152:2

**ensuing** 61:24

**ensure** 65:20

**entail** 9:5 13:9
14:19 123:23 141:6

**entailed** 15:8

**entails** 9:6

**entering** 25:21

**entire** 18:21 70:9
73:23 76:4 80:19
87:15,16,17 139:17
158:14

**entirety** 70:11 76:7

**entity** 50:13

**entrance** 26:5

**environment** 68:22
113:21 114:13

**equal** 121:23
136:11

**equipment** 83:10,
11,23 105:3 124:6,
8

**equivalent** 118:17

**essentially** 71:9

**establish** 10:4

**established** 12:4
92:4 94:20,24 95:9

**estimation** 128:2

**etcetera** 94:19

**ethic** 75:16

**Ethics** 70:19 75:9

**evaluated** 43:5,25
45:2,4

**evaluation** 44:9,11
45:17 46:11
105:14,18,24 106:3

**evaluations** 40:21

**even** 20:23 25:4
69:17 108:8 109:17
154:3

**event** 61:21,23 65:6

**events** 65:1,2,3,9,
17

**eventually** 64:16,
17 139:5

**ever** 5:13,16 50:18
55:15 69:11 96:19
105:25 122:25

125:5 153:7

**every** 21:19 51:9
60:3 61:6 80:7,8,9
151:16

**everybody** 12:11
17:1,3 47:18 48:25
53:5 61:3 63:3,9
151:3,13

**everything** 14:21
31:6 139:17

**evidence** 28:1,5,6,9

**ex-parte** 78:15

**exact** 19:12 20:11
64:16,25 96:20
120:13 126:14
132:7

**exactly** 36:8 73:14
123:16 141:18
145:7 150:19

**EXAMINATION** 4:4

**example** 47:9,16,23
48:6,8 49:10,20
50:2 51:6 54:8
60:15,18 109:22
117:1 119:2,9

**examples** 50:12
60:23 61:7 119:7,8,
10

**exams** 18:20

**excluding** 90:2

**Excuse** 22:13 62:5
157:21

**executed** 53:20

**executive** 9:3

**exercising** 102:9

**exhibit** 56:20,21
57:8,17 58:4 59:18,

19 71:13,14 72:23
79:5,6,8 89:11,12
101:17,18 106:11
112:9,11 130:12,24
133:20,21 135:25
136:13,14 137:10,
11 143:7,9,11
146:6,8 148:21
150:1,6 155:2,13

**exhibits** 57:9,14
133:3

**expect** 75:15
110:17 115:13

**expectation** 88:24
91:4,6

**expectations**
34:12,14

**expected** 33:23
75:6 78:25

**experience** 22:24
39:2

**experienced** 119:8

**explain** 18:24 34:12
41:13 43:19 46:20
52:13,22 56:3,11
58:15 67:9 78:17
89:3 95:6 102:25
123:16 143:25
146:18

**explaining** 121:17

**explains** 147:1

**explanation** 60:11

**explanatory** 130:3

**express** 83:9

**expressed** 73:8

**extreme** 86:2



**(866) 715-7770**
advancedONE.com

## F

**F-R-A-N-K** 6:10

**facility** 63:4

**fact** 80:8 96:13 150:9

**factory-type** 7:9

**factual** 90:3

**faded** 149:6

**fair** 84:22 102:6 152:2

**fairly** 148:16

**fall** 27:5 28:8

**falls** 113:19

**familiar** 5:19 51:23 90:21 130:1 131:1

**family** 9:8 12:11 22:21 126:20,22

**far** 8:5 72:3 134:11

**fashion** 103:13

**fast** 105:2 120:18

**Fayetteville** 12:24 13:23 14:9

**Federal** 114:17

**fee** 16:19

**feel** 51:1 64:22 86:13,16 134:21

**feels** 86:15 118:20

**felt** 24:12 32:6

**female** 96:14 126:8, 13

**few** 36:25 61:6 98:8

**fewer** 14:11

**figure** 67:19

**file** 16:18 55:12 99:9 112:1

**filed** 17:22 109:19 149:13,14,19 151:24 153:2,7

**filing** 16:19 92:16 153:2

**fill** 120:18

**fills** 95:1

**find** 138:20

**finding** 146:13

**findings** 132:2

**fine** 4:22

**finished** 50:20

**fire** 13:18

**firearms** 82:3,5,6, 22,25 83:5

**fired** 50:16

**firing** 13:20

**first** 10:23 11:3,13, 21,22 12:19 13:5 16:8 28:13 35:19 41:14 65:14 71:3 77:2,18 79:24 83:25 87:2,17 88:8, 20 89:19 91:18 92:18 93:22 96:14 97:23 101:5,15,16, 23,24 107:6,12 113:15 134:18 135:3 136:19 143:15 144:4,10,11

**firsthand** 119:20

**fist** 89:23

**fit** 23:6

**five** 9:15 93:12 99:23 128:20 129:2

**five-minute** 55:18 128:21 158:19

**flies** 9:10,11

**fly** 9:10

**focus** 150:1

**follow** 27:22

**followed** 92:3,22 139:2 151:19

**following** 45:3 97:12

**follows** 4:3

**food** 63:9

**for** 4:9,10,19 6:4 7:8 9:8,15 10:16 12:16 14:6,20 16:13,14,22 17:3, 20 18:17 21:25 22:3,10 23:8,11,12 24:13 25:16 26:8 31:19 33:20 34:21 35:13 36:8 43:17, 20,21 44:20 47:4 48:12 49:10,25 50:9,21 52:1 56:21 58:15,23 59:19 60:8,16,23 61:20 63:14 64:15,24 65:18 66:1,11,13, 16 70:6,25 71:14 73:19 74:12 77:19 78:15 79:6 83:22 88:17 89:1,12 91:23 92:15,16,21 97:11,16 99:23 101:18 102:1,8 105:19 106:9,11 107:14 109:21 112:11,24 114:21

125:21 131:5,15 132:1,3,11 133:4,8, 21 135:25 136:6,14 137:11 138:12,17 139:1,9,19,20 143:11 146:8,17,24 155:1,18 156:12 158:23,24 159:1

**force** 61:24,25 79:16 81:3,10,13, 18,20,23,25 87:4,9, 13 88:14 89:15,16 90:9,11,12,17,24 91:22 92:6,19 93:3, 7,18,21 94:4,8,10, 23 95:1,4,10 96:23 97:7 98:4,14,23 99:5,20 130:11 131:9,10,15 152:3 155:9,12,15,23

**Force/assault** 89:21 90:4 92:5,9 93:1,4 94:17,22 97:5,10 99:3

**form** 43:11 45:5,21 57:1 58:17 59:22 90:10 91:8 94:10, 18,21 102:7 105:24 108:14,17,20 118:18 121:9,25 122:6,8 123:5,9,14 135:4 153:14

**formal** 116:17,18, 23 117:12

**former** 59:18 63:13 139:4

**forms** 91:4 93:21 95:5

**forward** 44:4,5,6 111:11

**forwarded** 94:23



104:3 106:3 109:13
111:14,18,20,21
135:15 148:25

**forwarding** 107:15

**found** 12:15

**four** 15:6 25:2
30:16 41:5 93:12
96:20,21

**Frank** 6:10

**Franklin** 12:2

**free** 23:4 112:13
113:21 134:21

**from** 6:24 8:5 10:11
16:5 20:9 22:18
29:9,10 35:23
41:19,23 43:3
55:15 58:6 67:20
74:16 76:11 85:5,6
95:21,23 97:12
98:23 99:7 100:14
102:8 107:25
108:23 113:22,24
121:2,3 122:23
123:22,24,25
133:13 135:4 137:4
138:25 143:5,19
148:19 150:18
151:12

**front** 47:17 48:24
134:13 136:3
137:16

**fuel** 14:23

**full** 57:5

**function** 26:10 86:4

**funnel** 27:18

**further** 158:25

## G

**gang** 20:16,22

**gang-related** 21:20

**gangs** 20:20,24,25
21:2,3,13

**garages** 15:9

**garnered** 17:22

**gathering** 34:18
63:1

**gatherings** 65:3

**gave** 140:8,9
147:20 148:1
150:13 152:7,24

**gay** 158:10

**geared** 103:7

**Geis** 23:1,3,6
50:20,24 51:18,23
52:6,10 55:19 57:7,
16,18,22 58:3,8
63:25 66:12,21,25
67:2 68:10 70:5
75:23,24 99:24
100:5 112:9,12,18
127:12,16,19
128:3,6,9,15,20,24
129:4 130:14,16,19
139:25 140:3
147:5,8 148:22
153:14 155:21,24
158:20 159:3

**gender** 78:7 115:2,
15 137:8

**general** 17:19,20
33:20 34:15 87:3

**generally** 19:7
28:10 29:2 32:1
47:5 59:22 60:12

66:5 67:13,22,23
68:16 83:11 93:14
97:21 107:21
127:23 154:6

**geography** 36:22

**get** 4:25 16:20
21:12 24:7,20 29:6
30:9,11,12,15,16
40:5,7 47:21 49:20
50:14 57:20 63:8
83:13 95:21 98:9
103:3 104:12
112:17 121:19
122:8 124:14
127:24

**gets** 82:9

**getting** 108:10

**give** 6:1 21:14
38:22 39:16 47:9,
23 48:6,7 50:2 57:2
58:4 60:15,23
74:19,22,24 75:2
80:6 119:2,9
134:21

**given** 45:23 104:5,6
125:20 135:14
138:18 150:10

**go** 6:18,21 7:12 8:8,
20 9:12,19 21:23
22:18 23:4,6 25:20
28:9 29:12 30:3,16
31:4 33:20 35:21
40:2,8 44:17 45:8
50:19 54:3,8 58:2
66:9,10 67:20
69:22 71:3 76:5
77:2 79:24 94:12
95:3 101:5 105:7,
16 106:6 107:6
108:5,8,23,25
111:23 116:13
118:11 128:2,11,16

129:7,11 133:3
138:8 139:6

**goes** 56:7,9,12
121:25 149:20

**going** 27:21 29:22
33:19 38:4 44:13
72:23 73:23 104:12
105:3 112:7 123:17
127:20,22,24
128:9,21 129:7
133:3 139:7 141:3
142:3

**gone** 99:16 152:10,
11

**good** 4:6,8,9 23:13,
14,19 54:14 63:1

**got** 7:14 12:14
18:9,15 20:14
25:10 35:6 36:7
37:22 39:1 48:19
58:3,8 63:2 137:3
139:11

**government** 9:4

**governor** 9:7

**graduated** 6:25

**grant** 133:16

**granting** 35:24

**Granville** 8:5

**great** 35:6

**grew** 12:7

**grievance** 55:12
101:21 102:6,9,23
103:6,7,10,17,20,
23,24 104:6,9,10

**grievances** 102:2,5
103:15 104:1,15
106:5 116:5



(866) 715-7770
advancedONE.com

**ground** 27:23

**group** 21:8 77:14, 16

**groups** 114:1

**grow** 20:3

**grown** 20:6

**guaranteed** 113:21

**guess** 12:9 29:8 86:19

**guidelines** 87:3 107:14

---

**H**

**ha-** 117:8

**habits** 34:2

**had** 5:1 12:4 21:4 22:19,20 28:5 29:1, 16,18 30:7,8 31:7 32:17 35:9 36:21, 22 37:25 38:10,21, 23 39:18 42:5 45:22,23 46:16 49:9 62:17 63:9,14 65:24 68:23 69:8, 11,14,19 70:8 75:11 76:3 95:5 96:19 98:20 100:9 104:2 106:2,17 112:21 120:17 125:19 126:12 132:23 144:6,14 153:4

**hand** 98:17,20

**hand-delivered** 80:17

**handed** 43:2 138:3, 4 148:7

**handicapping** 114:12

**handing** 83:22

**handle** 13:15

**handled** 67:7 105:11

**handler** 26:16 124:10,12,14

**handling** 105:16

**hands** 32:17 42:6 82:2

**happen** 31:2 34:16 43:23 44:2,7 53:14

**happened** 11:19 12:22 13:25 14:14 15:19 17:25 40:25 47:13 115:6,10 144:3 157:1,3

**happens** 9:7 111:2 123:13

**happy** 46:14 105:22

**harassed** 120:3

**harasser** 121:2

**harassing** 69:16,17 113:24 118:16,22, 24 119:1

**harassment** 67:8 68:21 102:8 103:8 113:2,20,22 114:8, 9 117:8,11,17 135:1,3 136:20 137:1 141:13

**harm** 115:21

**has** 5:8 19:1 38:12 56:13 59:7 77:8 80:2 81:22 82:12 90:6 101:10,12,14

**have** 5:13,16 6:13 7:12 9:12 13:18 16:8 18:12,19 19:3, 4,5 20:6 21:20 23:15,16 25:5,9,22 28:1 29:1,3,19 31:9 32:11,18 35:17 36:12,14,18,22,23 40:2 41:4,9 42:1,16 45:4 46:25 48:1,9 49:10,11,18 50:10 52:7,10 55:1 56:20 57:11,23 59:10 61:1 69:3,10 70:3 71:24 72:5,13 73:23 75:13,22,25 79:10 80:10,12,13, 14,16 81:17 82:3,7, 10 83:13,14,18 84:20,24 85:3,13 95:24 96:7 99:13, 15,16 105:3 106:5, 12,17 108:5,14 112:14,21 114:1 117:1 118:7 119:21,24 121:17, 18 122:25 123:3,4, 5,7,19 124:1,16,25 125:5,8 127:6 129:3,4,6 130:22 132:12 134:12,20 136:2 137:16 141:2 142:6,15 144:3 145:19 146:14 148:6,10 152:5,8, 10,11,12 153:19 154:3,20 156:23 157:1 158:8,25

**haven't** 5:25 61:13 119:8 130:16

**having** 4:3,15 105:10

**he** 9:10,11 17:15, 16,19,22 24:11 26:21,22,23 27:22 36:21 47:18 48:12, 13,15,16,17,18 49:24 54:11,13,15, 16,21,23,24,25 55:6 57:18 61:21 63:15,16,18,19,24 64:3,9,10,11 74:24 75:2 82:16 84:1 89:21 97:21 105:2, 3 112:14 126:4,5,7, 8 131:21,25 132:1, 6 134:11 137:6 139:10 145:8,9 146:21,25 147:5 149:13,14,24 150:9,11 151:4,5,6, 24 152:23 153:2,7 154:11 156:19,25 157:3,5 158:5

**he's** 9:7 52:6 149:19

**head** 118:20

**hear** 4:6,8 17:5 55:15 119:4,15,19 125:23 157:21

**heard** 47:18,19 156:22 157:19,22

**hearing** 119:18

**held** 13:11

**helicopters** 15:15

**Help** 98:16

**helped** 65:9,12

**helping** 26:14

**Henderson** 12:3



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

**her** 19:2 37:1 46:16 52:1

**here** 8:5 9:21 10:11,16 11:20,21, 22,24,25 12:8,10, 16,17 16:11 39:1 50:10 57:24 58:4 68:9 122:5 128:10, 16 129:9 146:22 148:22 150:11 152:13

**here's** 38:2

**high** 6:19,20,21,23, 25 77:21

**highest** 96:19

**highway** 6:16 8:21 9:23 14:21,24 15:8 65:14

**him** 9:9,10,12 17:23 36:25 37:1 48:21 49:4,16,24 50:1 52:4,8 54:19 55:4 57:3 58:4 112:15, 16 132:8,11 133:17 138:20 140:8,9 141:2,10 147:21, 22,24 148:1,8,11 149:22 150:13 151:24 152:24

**hire** 13:18 31:8 33:4,5,10,19 34:21 35:14,18 37:23 138:16

**hired** 22:4,10,11 36:7 37:18 45:1 50:15 85:8 96:14 101:1

**hiring** 13:19 23:25 24:2 29:24 37:15

**his** 9:8 17:17 19:2

46:16 54:13,14 55:8 63:19 84:3 89:22 94:11 99:5 105:3 108:24 120:8 131:22 132:2,5,8 135:7,11 139:9 145:8,12 147:1 148:15 149:24 150:24 151:5,13,17 154:22 157:8,13, 15,25

**Hispanic** 21:10

**hold** 62:21 75:18 127:22 129:8

**holding** 97:12

**home** 7:8 12:12 16:12 54:3 63:4

**home-type** 7:21

**homegrown** 21:1

**homes** 25:16 43:1 66:7

**honorably** 7:8

**hopefully** 117:5

**hospital** 86:8,20

**hospitalization** 86:5,7

**hospitalized** 86:13

**host** 22:24 65:17

**hostile** 68:21 114:13

**hot** 117:3

**hotel** 63:8

**hour** 66:24 122:14 129:6

**hours** 41:22,25 42:1 129:2

**house** 12:8

**how** 7:4 8:6,11,14, 25 9:13 10:7,18,22 11:7,16 12:18,20, 25 13:21 14:4 15:3, 4,16 16:3 18:6,7,8, 10 19:9 22:2 25:8 28:16,24 30:7,9 31:15 32:6,15 33:21,23 36:9,10 38:16,20 40:22 41:4,6 42:16,17 48:23 50:14,15 52:22 53:20 54:18 58:25 59:5,21 61:9, 14 67:7,11 68:25 69:4,10 71:8 72:1 78:1 82:9,10 83:9 86:13,14,16 87:15 93:18 95:10,11,12, 20 96:16 98:4,13 99:19 104:1,7,13 105:2,6,7,16 107:17 108:11,21 117:19 120:6,11, 14,17 121:18,19 122:6,11 130:12 132:22 133:1 140:6 144:4,11 147:3,19 155:7 156:20 157:7

**However** 78:15

**HR** 13:15 37:15,17, 18,20,22 38:2,6,15, 21,23,24 39:14,24 40:2 55:10 56:7,12 104:3,6 106:4 135:4,14 148:19,25 153:19,21

**huh-uh** 5:20

**human** 44:6 45:21 58:18 81:4 105:25 106:1,2

**house** 12:8

**hypothetical** 47:22

---

**I**

**I'D** 146:14

**I'LL** 58:4 67:2 130:21

**I'M** 4:13 10:19 12:21 15:17 18:8 24:16,19 25:10 29:4 37:4,6,9,20,21 41:12 45:11 48:3 49:9,10,19 50:14 53:12 57:12,15 59:8,24 67:25 72:3, 23 73:23 78:19 79:13 80:22 85:22 87:15 90:21 93:20 101:2 103:2,3 104:25 105:6 119:4 121:12 123:1 125:23 126:11 127:19,22 129:7 133:6 135:6,12 136:25 138:6 139:22 141:1,20,25 142:8 148:1 149:6, 15 152:7,12 155:1 157:10 158:19

**I'VE** 37:22 38:25 58:3,8 96:19 104:2 137:3

**I-85** 67:17 105:1

**i.e.** 138:21

**ID** 53:25 124:5

**IDENTIFICATION** 56:21 59:19 71:14 79:6 89:12 101:18 106:11 112:11 133:21 135:25 136:14 137:11



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

181

Index: identified..individual

143:11 146:8

**identified** 80:15
94:15

**identify** 70:17 76:9
79:14,15 81:25
100:12 101:16
106:20 136:6,16
142:21 145:25
149:3

**if** 4:19 9:10,11 17:4
18:23 22:20 23:3
25:10 30:23 32:1,
16 33:10,12,18
34:5,20 35:19,21
36:21 37:3 39:18
42:18 44:25 46:17,
24 47:5,12,17,18
50:17,18 53:1,17
54:23 59:24 60:12
61:7 64:19,20,21
67:14,15,19,20
68:15 69:4,15 71:3
73:15 75:18 76:5,6
77:18 78:16 80:11
83:11 88:25 89:2,3,
7 91:3,5,8 93:2,16
94:6 95:13,16,22
99:2,9 101:3
103:17 104:24
105:18,21,22 106:7
108:4,10,14,15,16,
17 109:8,10,12,17,
21 111:12,15,17,19
115:4,6,8 116:22,
25 117:1,24 118:5
119:19 122:3,4,9
123:8,13,20 124:4
127:20 130:17,20,
21 131:13,16
134:20 135:15
141:1,10,17,20,25
142:5,9 145:14,17
147:12,20 148:2
150:9 151:2,6,11,

14,17 152:12
157:2,15

**immediate** 43:25
44:16 45:6,7,15
95:2 108:24 122:23

**immediately** 54:6,7
132:14

**impact** 39:8,12,13,
14,17

**impacted** 39:5

**impaired** 5:25

**impairment** 86:3

**imperative** 50:12

**impersonations**
63:20

**implement** 100:21,
24 107:4 113:7
116:7

**implemented**
100:25 101:3
116:9,11 125:5

**implementing** 72:6

**improper** 99:9
126:2

**in** 5:5 6:13,15 7:4,
10,11,15,16,17,21,
22,23,24 8:5 9:2,9,
13,21 10:5,7,14,20
11:7,14,21 12:4,6,
7,14,20,25 13:6,12,
21,23 14:2,4,5,13,
16 15:11,12,16,24,
25 17:9 18:3,5,9,
11,16 20:5,20
22:10,21,22 23:1,
11 24:3,5,6 26:9,
11,13,20,21,25
27:1,12 28:25 29:1,
6,12,13,14 30:9,10,

24 31:25 32:20,22
34:9,10 36:22
37:14,15,19,25
38:7,8 39:3,17 40:5
42:6,13 43:12,17
44:10,22 46:16
47:17 48:19,21,24,
25 49:4,16,20,21,
24 50:1,6 51:17,24
54:9,19,24 55:1
57:9,11 60:25
61:22 62:17 63:16
66:4 67:7,12,15,17
68:15 69:8,11,15
70:11 71:22 72:13
73:16 74:2,5,13,20
75:2 76:7 78:14
80:8 81:13,14
82:13 83:5,9,15
84:11,14,20 86:5,8,
20 87:5,8,23 89:2,
4,24 90:7 91:24
92:10 93:22 94:6,7,
16,19 95:8,15,25
96:14 97:22 98:20
99:2,3 100:5
103:12,13,17,18,25
104:9,10 105:5,11
106:1 107:19,20
108:1,16 109:22,25
110:1,13 111:9,25
112:1,12 113:18,
20,21,22 114:12,20
115:4,14 117:11,
16,19 118:2,6
119:19,23 120:2
121:7 123:9,19
125:15,16,19,20
126:15 127:7,24
129:15,17,22 130:3
131:8 132:20
133:18 134:13
135:4,13 136:3
137:2,6,16 138:19,
22 139:9,14,17

140:14 141:16
142:6,10 143:18,19
144:22,23 145:1,6
146:13,14,17,22
147:13,22 148:6
149:23 150:9,13
151:13,16,23
152:5,13,24 154:13
155:4,8 156:17
157:8,15,24 158:4

**in-** 37:18

**inappropriate**
126:9

**Inaudible** 130:18

**incapable** 89:8

**incident** 53:4 69:19
81:11 87:7,22 92:1,
11 94:7 98:5,17
123:2 125:16
132:18,20 143:18
144:19,21 145:5

**incidents** 77:21
78:11 99:3 144:3

**include** 84:11

**included** 15:15
19:16 26:4 89:24
125:12 132:2
135:13 142:9
147:13 152:24

**including** 88:18,20
102:12 114:6

**indeed** 118:20

**indicated** 28:12
40:11 118:19
131:21

**indicating** 123:5

**individual** 10:25
32:15,20 37:23
38:22 45:8 46:14



WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

182

Index: individual's..is

48:11 49:15 51:10 52:18 53:21 58:19 61:20 72:12 73:3 86:12,14 88:17 103:12 104:5 105:21 121:8,17 123:18 125:19 126:3

**individual's** 56:14 65:22 114:15 126:20

**individually** 33:9

**individuals** 24:2 25:2 49:18 56:13 61:17 83:24 141:9

**inform** 53:24

**informal** 117:16,18, 21 118:3,8,9

**information** 34:19 35:17 97:9 99:6 109:18

**initial** 92:2,8

**initially** 145:9

**initiated** 40:11,17 117:20

**initiating** 103:24 104:5

**injure** 88:25

**injured** 62:2,4,6 81:22 88:12 89:7 90:6 91:3,5

**injuries** 88:18

**injury** 85:21,23 86:2 90:6 91:7,9

**inquire** 153:13,16

**inquired** 153:19,23 154:2,5

**inquiring** 154:8

**inquiry** 86:2 87:24

**instance** 39:17 51:12,15,17 125:15,18 129:15, 16,21 156:12

**instances** 26:13 40:5 51:20 116:5 120:2,4

**instead** 94:17

**instructing** 52:4,8

**instruction** 84:12

**instructor** 83:5 85:6,8

**instrument** 82:15

**instruments** 82:19

**inten-** 95:7

**intended** 95:7

**intentions** 16:22

**interact** 40:22

**interest** 82:13 83:9 112:12

**interests** 81:4

**internal** 67:23 68:16 97:15 99:7, 12,15 108:21,23

**internally** 27:24 117:2

**interpret** 86:19 92:13 99:18,19 144:4,11

**interview** 24:13,25 30:8,20 31:3,24 32:7,12 151:1

**interviewed** 24:13 31:19 141:9 151:3

**interviewees** 33:1

**interviewing** 53:5

**interviews** 23:20, 21 32:12,13 53:7, 10,12

**into** 23:6 27:16 47:12 66:10 69:22 109:24 110:19 111:8 115:10 117:23,25 118:4,7 121:25 133:3 150:24

**introduce** 33:18

**investigate** 104:22 109:17 114:4 127:6 140:15,25 157:9 158:1

**investigated** 110:18 117:22 141:1,20,21,23 142:1,7,9 149:12, 16 150:9,11 157:10

**investigating** 105:7

**investigation** 22:18 25:18 27:6 42:22 47:6,7,10,12,14,20, 24 48:2,5,7,11,14 49:13,19 50:3,8 51:8,16 52:25 53:2, 15,16,17 67:18,22, 24 68:16 103:20,23 104:4,8,17,19,24 105:5 106:21 115:14 118:18 119:22 126:15 127:7 130:11 131:6,9,19 132:21 141:5,17,24 147:12 150:24 155:8,16, 24,25

**investigation's** 28:21,22

**investigations** 25:11 27:23,24 50:7 97:17 145:4

**investigator** 25:24 67:14

**invited** 62:18,22,23 65:7,13

**involve** 21:18 105:25

**involved** 32:22 37:15,17,19 53:6 61:22 77:23 92:7, 10 94:6 99:2 115:17 126:15 127:7 131:8 132:20 141:9 151:3,13,16 158:5

**involvement** 23:8 106:2

**involves** 129:17

**involving** 114:14 118:5 143:19

**is** 4:14 5:11 6:6,12 7:17 8:4 11:14 16:11 17:3,5,10 19:1,7,9 23:14 24:15 28:16 29:23 34:20 37:17 38:4, 16,19 39:23 42:5 44:3,13,14,22 45:16 48:19 50:16, 20,24 51:1,16,19 52:16,22,25 55:25 56:3,5,12,16,20,23 57:5,24 58:16,18, 19 59:12,18 60:1,3, 12 61:1 66:20 67:13 68:8 69:16, 17 70:5,18 71:13

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021
183
Index: isn't..Johen

73:3,5,9,15 74:15
75:5,11 76:13,20
79:5,18 81:4,8,10,
20 82:1,2 83:15
84:22,23 85:1,24
86:1,2,18,19,21
87:4,9,24 88:24
89:11 90:5,7,9,17
91:3,5,8,9 92:10,20
93:5,9 98:14,17
99:2,10 100:5
101:25 102:3,22
105:1 106:23
107:1,17,21 108:14
109:13 111:5,12
112:3,9 113:3,17
114:9,20 115:8
116:10,12,18,21
117:3,7,12,16
118:19,22,24
119:13,17 120:3,19
121:6,9,11,15,16,
21,24,25 122:6,10
123:9,15,17,22
124:3,4,19 125:10
126:24 128:7 129:3
130:3,23 131:4,14
133:12,20 136:2,
10,12 138:14
141:8,10,22 142:24
143:1,3,21 144:22
146:4,20 147:13,20
149:6,12,15,24
150:10 151:2,7,17,
18 152:6,12,13,24
153:7,21 154:3,5
156:3

**isn't** 82:16 110:4
114:23,25 115:2
128:5

**issuance** 84:22

**issue** 20:20 78:10
84:9 95:12,13,14

**issued** 82:11,23,24
84:24 124:6

**issues** 13:15 94:15

**it** 4:17 9:3,6,10
10:19,20 11:5,9
12:16 13:23 14:12,
18 15:4,5,13 16:7,
16,23 17:9,10,21
18:8,10 19:11,13
20:6,10,11,15
22:13,24 24:6,10,
11,17 25:1,2,3,5,7,
20 26:21 27:18,19
28:4,6 29:12 30:1,
3,13,23 32:1,2,14,
17 33:10,12,18
34:1,6 36:17 37:3,8
38:1,15,19 39:6,14
41:3,5,14 42:5,24
43:14,16,17,20
44:3,4,5,6,14,18,21
45:19,20,22 46:12,
16,17,18 47:4,6,18,
19 48:14,16,19,24,
25 49:9,21,22 50:9,
15,17 52:2,7,19,24
53:1,3,21,23 55:8
57:12,21,24 58:3,4,
8,18 59:2,8 61:24
62:25 63:22 64:15,
16,18,22,23,24
65:12,14 66:14,17
67:11,12,14,20,21
68:14,17 69:5,9
70:3,4,15 71:22,24
72:13,24 73:12,14,
15 74:2,15,19,22
75:18,25 76:5,6,7,
11,16,20 77:14
78:20,24 80:6,11,
14,17,22,24 81:8
82:10,14 84:22,24
85:6,11,13,20 86:1,
2,10,12,13,15,19

87:7,20,22,25 88:4,
24 89:14 90:24
91:3,5,9 92:1 93:1,
9,11,16,22 94:5,9
95:2,3,6,8,11,12,16
96:1,18 97:21
98:17 99:6 100:5
101:1,25 102:17
103:11,12,14,16,
18,25 104:4,16,20
105:18,21,22
106:7,12,14 107:21
108:3,4,13,14
109:4,6,11,12,13,
21,24 110:19
111:4,7,9,11,15,18,
19 112:2,16,17
113:17 114:7
115:8,10,11,20,24
116:9,11,18,22,23,
24 117:5,19 118:1
119:12 120:1,17
122:13,15,22
123:6,11,15,20,24
125:3,7,9,12
126:11,17 127:3,6,
21,22 130:20,23
132:25 133:1,25
134:16 135:12,13,
15 136:18 138:4,14
139:19,21 140:4
141:20,21 142:1,7,
9,12,22 143:21
144:6 145:8
146:14,15,25
148:2,5,6,23 149:6,
23 150:9,16 151:3,
12,18 153:20,24
154:2,3,6 155:1,2
156:4 157:2,3,4,5,
6,7,8 158:8

**it's** 4:15 7:20 8:5
17:8,10 18:21
25:10 29:25 34:20

38:20 44:13 45:21
48:9 50:12 53:4
56:13,25 57:12,17
58:17 59:13 61:12
66:12,14,18 67:14
68:15 77:9 78:20
86:14,16 90:10
105:18 106:7
108:14,25 109:8,10
111:7,12,19 112:13
113:1 115:4 118:5,
25 122:7,8 123:19,
25 130:21,24
133:7,13,14,15
136:5 141:19 142:3
143:4,23 145:2
146:2 147:8,9
149:6 151:11
154:13,21

**items** 32:16

**its** 27:1 44:18 70:11
73:6,8 76:7 84:11,
21 113:23

**itself** 101:11,12
110:13 116:24

---

**J**

**J.J.** 143:5 144:7
145:7

**jail** 65:16

**Jamel** 133:15

**January** 143:20
144:22,23

**job** 7:9 8:9 14:19
42:25

**jobs** 7:9 22:19
139:7

**Johen** 134:22
135:14 153:22



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

**joined** 8:21

**joint** 11:5

**joke** 115:6

**jokes** 63:16 114:15, 22,25 115:2

**joking** 117:19

**July** 71:25 80:1 101:9 113:11 142:23 143:14,16 145:1,2 146:11 149:23

**June** 133:25 134:13,16,20 137:4 138:6,19,25 152:14

**just** 4:15,23 11:17 12:12 13:1,23 14:10 15:24 16:22 17:10 18:17,24,25 20:25 23:1,4,17 26:1 30:1,13 31:19 33:20 34:14 41:11, 13 42:10 44:20 46:15 47:17 48:4, 18 49:4,6,10,11,16, 17,19,24,25 50:14, 18 52:1 54:18,21 55:24 56:13 57:12 58:18 60:13 61:6 63:1,2,10,22 64:9, 12,22,23 65:4,12 68:7 72:19 73:22 74:2 78:24 81:6 102:1 103:1 105:12 111:6 112:8,16 116:10,22 119:8,10 122:8 125:8 126:11 127:14 136:25 139:21 141:15 148:22 150:3 154:6 158:23

**justice** 7:16

**Justin** 51:25 130:11 131:7 133:15 137:4 146:3

---

## K

**K-** 28:25

**K-9** 25:12 26:12,15 28:25 29:2 124:8,9, 11,14,15

**K-9S** 26:13 27:9

**keep** 124:5,6 129:9

**kept** 15:23

**kids** 66:8

**kill** 34:5

**kind** 7:20 13:10 21:15,17 26:15,23 27:1 31:19 32:20 33:18 35:11 45:11 46:13 47:6 54:4 63:11 67:20 95:15, 17 139:21 140:9 141:3 151:3 152:7 158:8

**knee** 89:23

**knew** 42:11

**know** 5:4,13 12:14 16:20 20:6,18 22:19,21 23:13,16 30:12 31:14,15 32:6 33:15,25 34:4 36:8,21 37:3,22 38:4,16,18,20,21, 23 40:13 46:11 49:17 50:16 51:2 54:9 55:11,14,24 57:13 58:18 60:2, 13 61:9,13,16,19 64:15,24 65:9,24 66:6,7,19 67:16,17,

18,20 70:7 71:20, 21,24 76:2 77:13 78:24 79:11 93:9 98:13 103:4 105:1 131:13,16 134:11 147:20 148:3 150:3 154:1,2,4,17

**knowing** 139:12

**knowledge** 153:9 158:12,13

**Konopka** 133:14

---

## L

**L.D.** 139:4

**label** 57:7

**labeled** 57:10

**larcenies** 25:16

**large** 19:9 25:21

**last** 16:7,9 17:13 61:15,17 62:11,15 67:25 74:16 78:17 84:3 97:1 98:21 99:1,18 109:14 122:11 135:20

**late** 66:19 138:19, 25

**later** 18:16 20:14 143:22,24 157:6

**lateral** 11:20 12:19 14:1

**latter** 24:3

**Latwanya** 131:7

**law** 5:12 7:10,23 21:18 22:7 65:14 66:4,5 73:7 74:25 75:4 83:6 114:17 134:18

**lawful** 81:2

**Lawrence** 147:25

**laws** 73:5 75:6 81:15

**lawsuit** 51:19

**layman's** 73:16

**lead** 74:5

**leadership** 18:23 20:4 55:2 96:7,12

**learn** 48:23

**learned** 135:3,10, 12 136:20

**learning** 40:23

**least** 97:7

**leave** 34:17 124:1

**leaves** 58:23

**Lee** 142:22

**left** 67:5 128:14 129:6

**legally** 73:8

**lemonade** 64:22

**less** 61:12 87:6,20, 21 98:11 121:21

**let** 32:6 34:4 37:14, 22 38:3,21,23 46:11 55:17 56:19 57:20 59:17 70:7 71:12 76:2 79:4,11 133:19 135:8 139:19 141:7

**let's** 6:24 12:6 18:22 21:23 25:7 39:10 40:8 46:19 47:21 54:8 57:2 66:22,23 67:6 75:20 79:3,8 86:24,



**AdvancedONE**
LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

185

Index: lethal..manager

25 88:1 89:9,10
91:11 94:12 101:5,
16 108:11 116:13
118:11 128:8,13,22
130:6 132:8 134:1,
5 135:8,17 137:9
142:15 143:6,9
144:10 146:6 150:1
154:22 155:11
158:18

**lethal** 87:4,6,9,21

**letter** 55:4,6,7
67:12 145:16,18,
19,21 146:2,10,13,
14 147:19 148:8,11
149:21

**letters** 60:5 145:18
147:22

**letting** 51:2 57:13
58:18

**level** 22:21 39:7,12,
13 88:22

**levels** 39:19 118:16

**liaison** 93:4 95:3
97:15

**lieu** 129:18,22

**Lieuten-** 147:3

**lieutenant** 12:23
13:4,5 18:25 25:5
28:16 29:4 83:25
84:1 93:4,12 95:3,
22 97:13 138:16
139:3,11 146:22,23
147:3 151:15 158:6

**lieutenant's** 14:3,6

**lieutenants** 19:5,16
20:17 25:4 29:1

**life** 74:5 87:14

**life-threatening**
87:10,14

**like** 7:9,19,20 11:5
13:6 16:17 18:24
19:23 21:2,22 25:1
29:12 31:22 35:1,4
36:2,5 38:9 40:19
41:23 42:24 46:21
63:1,20 64:9,10
66:13 69:4 73:19
76:6 98:11 106:9
127:19 128:18
138:6 142:8
149:18,25 150:3

**liked** 63:15

**likely** 32:2 85:24

**limit** 122:18 127:23

**limited** 98:17,19

**limits** 88:21

**lineup** 26:25

**links** 44:10

**listed** 42:20 122:5

**little** 8:16 11:17
12:15 13:1,24 14:7
20:6 22:20 27:1
36:12,14,19 43:19
57:21 83:21 105:2
121:24 151:25

**lived** 22:19,22

**lives** 81:12

**Lloyd** 93:13

**local** 63:7,8

**located** 8:4 26:20

**location** 15:21
29:16

**logistics** 14:17
16:1

**long** 7:4 8:6,11,14,
25 9:13 10:7 11:7,
16 12:18,20,25
13:21 14:4 15:16
16:3 86:8 122:11
128:4 132:22 133:1
154:14 157:3
158:24

**long-term** 124:17

**longer** 36:12,14,19
53:25 54:24 55:9
58:19 60:14 124:19
132:5,9

**look** 22:10 23:2
24:9 31:20 40:19
46:21 47:12 69:22
82:11,12 106:9
109:24 115:10
118:4 120:22
131:14 148:10
154:20 158:8

**looked** 7:8 22:13
23:8 33:19 66:1,3
110:19 111:7
117:23,25 118:7

**looking** 23:10,12
25:16 155:1

**lookout** 26:8

**looks** 70:15 76:11
137:3 144:6

**loss** 86:3

**lost** 34:8

**lot** 25:19 27:17,18
77:24 150:12
157:14

**lunch** 66:11,14,16,
19,23 67:3

## M

**mace** 82:2,21

**machine** 26:5

**made** 26:9 32:9,11
33:8 42:13 48:13,
16,24 52:25 53:17
114:4 115:14 117:1
126:8 132:13 137:2
142:11 143:5,24
144:6,13,14,15
145:8,13 146:13
154:11,13 156:9,
13,24,25 157:20,23

**mailed** 24:5

**main** 42:25 60:4

**maintain** 20:8
90:14

**major** 7:20 15:20,
22 16:4 67:21

**major's** 19:7

**majority** 48:16

**make** 30:24 31:7
48:15 52:17 66:20
88:10 92:2,21
117:3 123:17
154:9,16

**maker** 24:21

**makes** 44:18 92:17

**making** 9:6 13:13
33:2 78:16 134:25
157:17

**male** 69:12 126:4
127:3

**manager** 39:25
40:1,3 62:24 63:12,
14 64:5



WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

186

Index: manner..missed

**manner** 42:14 74:5, 14 87:8,23 105:11 117:19

**Manson** 6:11

**manual** 70:16 72:12 76:12,19 79:17 80:20 100:15 101:11,12

**manuals** 72:21

**many** 10:18,22 15:3,4 25:8 30:7,9 31:15 36:9 41:4 61:9,14 78:1 82:10 96:16 98:4,10 103:2,3 120:6,11, 14,17

**Marine** 7:3,4

**mark** 130:6 137:9 143:6,7,9 146:6

**marked** 56:21 59:19 71:14 79:6 89:12 101:18 106:11 112:11 130:7 133:21 135:21,22,25 136:14 137:11 143:11 146:8 148:20 155:2

**marking** 59:18 71:13

**Martin** 9:21 151:15

**matter** 4:24 33:10 66:17 96:13

**mattered** 39:4

**mature** 65:24

**may** 19:12 20:6 21:20 25:12,22 29:3 32:18,19 35:8 36:12,14,18,22

**37:8** 39:20 41:3 50:9 53:19 66:6 80:12 82:12 84:8 86:17 97:8 103:1, 12 107:20 108:19 109:23 111:5,6 113:18 117:1 118:20 125:8 132:12 138:5 141:2 142:6 148:2 149:14 152:4 153:19 156:23 157:1,10

**maybe** 8:16 10:8 12:21 14:7 15:17 19:12 25:3 64:9 69:17 83:12 95:15 158:6

**MCGURL** 57:6 60:21 69:25 133:9 134:8 135:19 137:14 142:17 145:22 154:24 156:2

**me** 4:6 12:17 15:7 16:16 17:5,24 18:24 22:13 23:25 24:17 27:18 31:8 32:6 35:6 37:14 38:22 39:16 43:19 44:4,5,14,19,21 46:17,18,20 47:9, 23 48:6,8 49:1 50:2 51:2,6 52:13,22 53:9 55:17 56:3,11 57:20 59:12 60:15, 23 62:5 66:17 67:9 69:16,17 70:7 73:14 74:2,12 76:2 77:19 78:17 79:11 98:16 100:22 101:2 103:7,18 104:3 106:8 108:10 109:21 111:24 116:17,18 117:12,

14 119:2 125:18 129:14 131:5 132:2,6 133:12,23 134:15,21 135:4,6, 7,8,15,16 136:6 138:5,20 139:6,8, 19 141:7 145:10,15 146:2,10 150:9 154:2,7 157:21

**mean** 11:25 19:19 21:16 22:15 53:22 56:14 66:2,4 73:13 75:1,5 79:8,9 86:7, 19 87:12 92:14,17 98:16 99:19 101:1 108:2 109:20 110:10 114:19 115:18 119:12 125:1 139:16 155:24 157:4

**meaning** 5:24

**means** 73:14 74:2 78:18,20 95:7 109:21 125:3

**medical** 88:1,4,6, 11,16,23

**medication** 6:1

**medium** 46:14 105:22

**meet** 31:24 32:4 33:1,8,13 148:4

**meeting** 33:16 148:1

**meetings** 13:12

**member** 80:9 86:4 97:14,15,16 99:7 108:24 126:20

**members** 9:8 19:15 95:18,20 97:11,18 153:5

**memo** 80:10,12 139:17 150:13,14

**memorandum** 133:13 137:3

**memory** 111:9 116:23 135:16 158:9

**men** 69:12

**mental** 117:1,4

**mentioned** 24:18 26:18 32:16 59:4 115:12

**met** 31:23 33:14 147:24 148:7

**metal** 139:13

**method** 103:19

**methods** 78:14

**Michael** 57:4 60:19 69:23 135:17 137:12 145:20 156:1

**microphone** 68:8

**midyear** 43:14,20

**might** 16:8 25:5,20 30:15,16

**military** 6:16,19 7:1,2

**mind** 4:19

**mine** 17:11 107:3

**minor** 111:5,12

**minute** 127:12,15

**minutes** 99:23 122:14 128:20 129:2,6

**missed** 27:13



(866) 715-7770
advancedONE.com

**missing** 25:12 26:14 44:10

**misspoke** 49:21

**mistaken** 59:24

**mistreatment** 103:8

**misunderstood** 101:2

**moment** 18:17 62:13 106:14 125:9 137:2

**Monday** 143:16

**monitored** 13:10 99:21

**month** 10:8 30:10, 15

**months** 30:16 45:2, 3 143:22

**more** 8:16 10:9 13:2 14:7 40:6,7 44:21 62:25 83:21 99:2,4 103:7 104:13 121:21,24 124:9 154:11

**morning** 4:7,8,9 57:23

**most** 10:5 14:17 24:5,9 30:25 32:1,2 65:23

**mostly** 21:7 103:24

**motel** 10:5 12:14

**motor** 15:13 34:10

**motorcycle** 15:14

**move** 15:24 55:24 79:3,8 86:24 88:1 112:8

**moved** 10:3 29:9

**Mr** 4:13,17,20,21 23:1,3,6 47:1 50:20,24 51:18,23 52:6,10 55:19 57:6, 7,16,18,22 58:3,8 60:21 62:8 63:25 66:12,21,25 67:2 68:10 69:1,25 70:5 75:23,24 99:24 100:5 112:9,12,18 120:7,12,15 127:12,16,19 128:3,6,9,15,20,24 129:4 130:14,16,19 131:9,22 132:10,17 133:9,16 134:1,6,8, 10,16,25 135:6,18, 19 136:7,20 137:2, 14 139:25 140:3 142:12,17 145:12, 22 147:5,8,18,19 148:4,7,22 152:10, 17 153:2,14 154:9, 16,19,24 155:8,21, 24 156:2,10,13,16, 21 157:24 158:20 159:3

**Ms** 4:5,23 5:7 22:25 23:5,7 50:23,25 51:21 52:4,8,11,12 55:17,21 56:19,22 57:4,14,17 58:1,5, 10 59:17,20 60:19, 22 64:1 66:9,15,18, 24 67:1,4 68:8,11 69:23 70:1 71:12, 15 75:22 76:1 79:4, 7 86:6 89:10,13 92:12 98:3 99:22 100:1,8,20 101:16, 19 106:13 112:10, 16,20 121:14 127:14,17 128:1,4,

8,12,18,22 129:10, 13 130:6,10,15,18, 23,25 133:2,7,11, 14,19,22 134:1,5,9 135:14,17,22 136:1,12,15 137:9, 12,15 140:5,13,20 142:14,18 143:6,9, 12 145:20,24 146:6,9 147:7,10 148:20,24 153:15 154:22,25 155:3, 15,17,23,25 156:5 158:18,22

**much** 4:12 17:10, 13 20:6,7,18 21:14 34:13 42:8 143:24 144:1 151:16

**multiple** 32:11

**municipal** 7:17

**music** 63:9,11,21

**must** 82:19 102:17 118:17

**mutual** 115:16,18

**my** 4:14 5:11 6:6,16 7:7,10 12:9 15:23 16:5 17:5,8 24:4 34:9,13 37:12,13 47:19 48:4,17 51:16 62:20 67:17 68:23 69:8 71:11 83:25 97:22,23 103:4 104:13 105:5 116:10 118:10 128:1 133:13 135:15 139:1 142:10 148:6 153:9 157:5 158:9,12

**myself** 10:24 11:3 13:4 33:18 143:19 147:24

8,12,18,22 129:10,

**N**

**N.C.G.S.** 114:12

**name** 5:11 6:4,6 17:17 21:5 56:14 66:8 67:25 70:17 76:15 77:16 97:25 101:20 112:25

**named** 27:6

**names** 17:14 90:23

**narcotics** 26:17

**narrative** 90:3

**national** 114:11,16

**nature** 78:13

**near** 154:14

**nearly** 139:2

**necessarily** 20:10 47:7 53:9 85:11 102:24 118:1 123:12

**necessary** 53:18 81:10 111:15 122:9

**neck** 89:23

**need** 47:11 50:17, 18 51:2,4 54:3 57:16 61:6 102:18 106:14 111:18,20 117:23,25 127:14, 15,21

**needed** 18:12 24:12 27:22 35:17 53:25 55:9 60:14 132:5,9 139:12

**needing** 77:22

**needs** 110:19 111:7

**negative** 115:4



**negligence** 138:15

**never** 17:5 48:2,3 64:11 73:9 153:4

**new** 20:16 43:17,21 55:2

**newer** 133:3

**next** 7:6 10:10 11:11 12:22 13:25 14:14 15:19 16:10 17:25 29:14 31:2 34:16 35:15 42:3 44:7,8 52:1 53:14 54:22 59:3 88:13, 14 123:21 132:4 138:23

**night** 41:18,19 129:9

**nights** 103:2

**nine** 15:8

**no** 5:20 6:1 8:1 11:2 13:19 20:5,10 23:3 27:3 28:4,6,18,22, 23 29:15 30:23 31:16 32:23,25 33:13 35:3 36:4,16 38:12 39:9,23 41:11 42:10 43:12 46:5 47:25 48:3 49:2,8,9,13,14 51:5,9 52:16 53:25 54:20,23,24 55:8, 16 57:14 58:19 60:14,17 61:8,11 63:6,19,22 65:4,11, 19 69:6,13 70:24 72:8 74:20 75:13 76:24 77:17 79:21 80:14,17,22 81:21 83:20 86:16 88:6 90:19 92:20 96:24 98:7,19 100:22,24

101:1 102:18 106:1 108:7 113:18 114:24 115:1,5,21 116:3 118:1 119:3, 5,23 120:1 122:18 124:9,18,21 126:16 127:8,21 128:9 129:19 131:11,18 132:5,8,19,24 135:12 138:22 139:1 143:8,23 147:15,17 148:13 150:10 153:4 155:10 156:11,15, 22 157:18,24 158:12

**nobody** 65:24

**non-certified** 19:3 28:15

**none** 36:13,17 147:17 156:22

**nor** 61:3

**normally** 24:7 25:1, 2 30:6,23 31:25 40:2 41:21 42:11 53:4,23 63:6,12 66:4 82:17 123:24 124:4

**North** 6:11,13 8:21 9:22 14:13 15:12 81:16

**not** 5:3,4,20,25 8:4 10:19 15:17 17:8 18:8 19:3,12 20:5, 7,10 22:3,23 25:10 26:21,24 27:3 28:6, 22 29:4,25 30:16 31:8,16 32:19 34:13 35:3,19 37:4, 6,9 39:13,15,17 42:1 45:20 46:5,22 48:3,7,10,13,21

49:8,9,10,14,16 51:5,14 52:4,9,19, 21 53:8 54:9,11,20, 24 55:14 57:18,22 59:8,24 60:10 61:11 69:14,17 70:24 71:21 72:3, 11 73:23 74:19 75:13 76:24 77:17 78:9,15,19 79:9 80:22 84:19,24 85:11 86:16,17 87:4 89:6 90:21 92:11,18 93:5,20 94:16 96:1,24 98:7 99:15 100:24 102:7,24 103:16 104:9,10,23 105:4, 8 106:1 109:18 114:18 115:20 116:12 118:1,9 119:22,23,25 121:19 122:7 123:2,12,20 124:9 127:22 128:9 129:7,16 131:14 132:20,24 135:6 138:6 141:1,2,20, 21,25 142:8 143:23 144:9 148:1 152:5, 12 154:1 156:11,15 157:5,11 158:12,13

**note** 55:4 89:11 117:1,4

**noted** 138:14

**notes** 31:19 45:19

**nothing** 9:6

**notice** 56:6 136:10

**November** 18:4

**now** 11:10 21:19 37:25 51:4,5 54:11 56:5 66:18 75:20

82:22 93:9 110:10 139:4,23 154:6,14 155:11

**number** 19:12 22:13 39:1 51:24 56:21 59:19 64:16, 25 71:14 79:6 89:12 93:11,20 96:20 101:18 102:15 106:11 112:9,11 120:13,16 133:21 134:22 135:25 136:14 137:11 143:11 146:8 148:23

**numbers** 20:5

**nursing** 7:21

---

## O

**oath** 6:2

**objection** 51:18,22 63:25 147:5,7,8 153:14

**obligation** 109:16, 24

**observation** 118:12 119:14,17

**observations** 118:15,17

**observe** 118:16 119:13

**observed** 118:20

**obtain** 99:6

**obviously** 23:16 93:10

**OC** 82:21 84:10,14, 23 89:24



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

189

Index: occasion..okay

occasion 89:21

Occasionally 26:10

occasions 40:4 89:25

occur 53:10 71:19 78:12 104:10

occurred 4:25 10:10 11:11 35:15 42:3 61:21 144:22 156:4 157:6

October 155:6 156:3

of 4:11,15,19,24 5:5,12,20 6:19,20 7:1,20 8:18 9:20 10:5,15,25 11:2,12 12:3,23 13:10,15 14:13,15 15:17,20 16:7,8,9,13 17:1,2, 23 18:4,5,22 19:3, 15 20:5,22,24,25 21:15,23 22:13,22, 23,24 23:10 24:4,9, 24 25:1,19,21 26:15,23 27:1,5,17, 18 28:5,11 30:19, 20,24,25 31:5,9,19, 25 32:20 33:15,18, 24 34:13,18,19 35:11 36:8 37:7,18, 24 39:1,19,21 40:9, 16,18,24 41:12,17 42:20,21,22,24 43:1 45:2,3,11,22 46:10,13 47:6,9,23 48:6,16,23,25 49:5, 15,20 50:2,11,13 51:6,19,24,25 53:2, 16 54:1,4 55:14 57:10 58:1,6 59:3, 13 60:15 61:2,15, 18,24,25 62:11,22,

23 63:7,11,16,24 64:3,12,16 65:1,3, 23,25 66:7 67:8,18, 20 68:14 69:4,15 70:18,25 71:3,6 72:3,10,11,18 73:2, 4,5,6,8,9 75:8,16 76:15,16,17 77:2, 15,16,18,23,24 78:3,10,13 79:16, 25 80:7,9 81:1,4,8, 12,15,25 82:8,22 83:10,13 84:8,9,13, 14,15,22 85:2,14, 17,24 86:4 87:2,13 88:14,21,22 89:9, 15,16,20,22 90:4,6, 9,11,13,14,17,24 91:22 92:4,6,8 93:1,2,3,4,7,11,13, 18,21 94:4,8,10,17, 21,22,23 95:1,4,10, 15,17,25 96:13,23 97:5,7,8,10,13,16 98:4,14,18,23 99:3, 5,9,20 101:5,12,15, 20,25 102:2,3,7,15 103:8,9,19 104:16, 20,21 105:4 106:21 107:1,6,12,23 108:13,25 109:2, 14,17 110:5,9,11, 20,21,23 111:4,23 112:2,12,25 113:9, 15,17,19 114:2,8, 21 115:4,8,13,16, 21 116:4,11,12,13 117:1,4,11,17 118:2,9,18 119:7, 10,23,24 120:7,8, 12,15,18 121:4 122:4,9,24 123:9 124:6,9,23 125:3,5 126:3,20,22,24 129:18,22 130:2,3,

11 131:9,10,14,15 132:22 133:23 134:3,13 135:3,4, 10,11,13 136:3,10, 20 137:7,16 138:6, 15 139:2,12,20,21 140:9 141:3,9,11, 13,14,16 143:13 144:22 145:1,5,9 146:10 147:11,14, 23 148:1,12 149:3, 23 150:12 151:4 152:3,7,23 153:5, 12 155:4,6,8,9,12, 15,23 157:1,14,25 158:4,8

off 5:2,6 26:23 35:8 58:2 67:5 74:6 76:25 86:22 103:3

offend 115:5

offended 115:21

offender 122:10

offense 121:20

offer 38:22 83:16

offered 22:8

offering 88:22

office 4:11 12:3,24 14:2,8,12 17:22 18:6,23 19:10,16, 20,21 20:1 21:24 24:17 25:9 27:17, 25 28:18 29:10 35:5 36:5 48:17,25 50:11,15 54:2 65:5, 15 76:18 77:20,24 79:17 80:9,20 81:9 84:9 85:5,10,15 90:10 92:3 93:6 94:21,25 95:9,25 96:15 97:10 100:15 106:8,24 107:25

110:13 113:4,18,23 114:3,21 133:13 138:16 139:9 142:6 148:6 153:6 156:8

office-issued 84:7

officer 8:1,2,13 20:16 36:8 40:20 42:21 60:1 69:15 73:3,7 74:22,24 75:5,12 80:9 81:12 95:1 129:17 134:18

officers 15:3,4 33:25 42:16 43:4 62:25 65:9,13 66:5 75:15 81:17 82:24

Offices 5:12 76:12

official 94:19

often 71:8 72:1

oftentimes 25:23 60:13

Oh 57:24 96:13 104:15 134:7 139:25 143:4

okay 4:9,23 5:9,10, 11,19,23 6:18,21, 24 7:12 8:3 9:17,19 10:2,22 11:7 12:11, 18,22 13:21,25 14:14 15:19 16:3 17:18 18:2,17 21:23 22:25 23:3, 14 24:23 25:7 27:4, 14 28:8,24 29:22 30:14,17 35:4 38:2, 10,13 40:8 41:13 43:4 44:10,15 45:14 46:19 47:9, 21 49:2,5,23 50:2 51:4 54:18 55:19 59:4,11 60:5 63:11 66:9,18,22,24 67:1



(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

190

Index: oleoresin..or

68:12 69:14,21
70:5,12 72:1,22
73:19,21 74:11,21,
23 75:10,18 76:8
77:4,5 79:3,14
80:25 85:19 86:24
88:3 90:9 91:2,11,
14 95:6 96:25 98:2
99:1,22 100:6,7
101:5 106:16
110:13 111:21
112:12,18,19
116:13 118:11
123:21 124:25
130:2,6,10 131:4
132:8 133:2,10
135:24 136:5 137:3
138:9,11 139:14,
22,24 140:3,4,12
142:5,14 143:6
144:21 145:20,23
146:16 147:18
150:1,17 152:16
153:1 154:7 156:6
158:20 159:2

**oleoresin** 84:10

**Oliver** 131:7

**on** 4:11,16,25 5:5,
24 7:22 9:12 14:2,
21 15:6 19:25
20:14 22:8 24:10
26:8 27:21 30:7,10
32:1,14,15,16,17
33:11,12 34:1
35:23 36:9,10,11
38:19 39:14 40:3,
21,24 41:8 42:18
45:4,22 47:4,8 48:5
50:10,13,21 52:18,
24 53:3,21,23
56:20 58:19 59:10,
14 61:2 63:3 64:15
67:11,13,17,22
68:14 70:20 72:12

74:6 76:20,25 78:5
79:3,8 82:10,17
83:2 86:12,22,24
88:1 89:21,25 91:4,
10 93:7,9,16,20
94:3,9,11,18 95:24
96:1,22 97:9 98:24
103:3,16 104:16,20
105:3,21,23 106:2,
7 108:13 111:4
112:2,8 114:10,15
115:24 116:24
117:19 118:5,15
119:11 120:17
122:13,15,18,22,23
123:17 124:13
126:12 127:21
128:1,6 129:11
134:16,23 136:3,16
138:5 139:1,13
141:3 142:3,22
143:16 148:13,15,
23 150:1 151:6
152:14 154:21
155:18

**onboarding** 36:4

**once** 12:15 24:6
33:7 34:19 35:13,
16 44:3 77:9 80:3
97:21 104:3 111:19
115:6

**one** 7:17 10:15 13:4
19:1 22:13 25:12
27:13 29:3,9,12,13
32:12 35:12 39:19
44:21 48:11 51:12,
13,15,17,19 56:7,9,
12 61:6,19 62:12
63:7 65:21 68:23
69:19 71:10,16
74:18 80:10,23
82:13 83:13,25
86:17 90:25 93:13,
16 94:8 96:19,20

97:12,14,15,17
99:1 104:2 105:10
117:5 124:19 125:7
127:1 136:24
138:5,18 141:1,8,
10 147:12,20,23
148:2,3 149:14,23
151:2 152:12,15
153:23 154:12
157:10 158:4

**One's** 7:16

**ones** 24:11 82:17
151:16

**online** 24:4

**only** 37:17 59:25
62:10,12 68:23
69:7,19 71:10,16
81:9,14 84:7 90:1
104:2 106:2 138:18
153:7,23 154:3,5

**onto** 75:18

**open** 65:13

**opening** 12:16

**openly** 47:13
158:10

**Operations** 97:19

**opinion** 67:17
105:5

**opportunity** 106:17
126:12 136:11

**opposite** 78:22

**opposite-sex** 78:14

**or** 6:19 7:9,12,19,
21,25 9:7,11 10:9
11:1 13:1 15:6 16:7
17:1,2 18:7,20 19:2
21:9,21 22:23
23:20 24:5,12
25:23 27:7 28:9,25

29:6,14 30:6,10,15,
16,22 31:8,23
32:18 33:11 35:2
36:22,25 37:1 38:7
39:4,14,18 40:6,9
41:3,4,6,10 42:3
43:10,20 44:20
45:23,24 46:16
47:18 48:7 49:9,12
50:7 53:3,4 54:3,6
55:4,13 59:3 60:24,
25 63:4,5,18 64:5,
10 65:17,25 67:12
68:1 69:17 70:9
71:22 73:9 76:6
77:14 80:13,16,20
81:12 82:16,21,24
83:13,19 84:15
85:9,24 86:1,3,4
87:6,14,21 88:22
89:21,23 90:5,6,7
91:12 92:18 93:12
94:15 95:11,14,16
96:20 97:17 98:5,
17 99:2,3,4,5 100:6
101:11 102:7,8,10
103:3,8,20 106:3
108:19 109:22
110:3 111:12 112:9
114:1,5,10,11,13,
15,16,17 115:4,20,
21 116:5,16 117:3,
5,8,12,17 118:7,19
119:7,8,15,17
121:4,18,21 122:11
124:2,13,19 125:12
126:17 129:16
130:3 131:13
132:25 135:7
136:23 137:1 138:6
141:1,21 142:6
144:1,15 145:6
147:12 148:2,12
149:15 152:4,10,13
153:12,13 156:4,10



**(866) 715-7770**
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

191
Index: oral..performing

158:6,7

**oral** 102:20 103:10, 11,13,21,22

**order** 87:5 89:25

**ordered** 138:20

**orders** 78:16

**ordinarily** 41:23 43:17

**organ** 86:4

**organization** 35:2 114:2

**organized** 21:1

**orientation** 110:24 114:22 115:15 156:14 157:13

**origin** 114:11,16

**other** 6:15 7:16 11:3 13:4 27:23 35:8 46:25 49:14 58:24 60:9 62:24 66:1,6 82:12 83:9 84:14 88:17 89:16 95:25 98:18 102:10 114:1,17 117:5 118:18 124:7,18,19 132:16 148:2,8 153:5

**other's** 66:7,8

**others** 21:4 36:13 83:21 93:14 108:8 156:23

**our** 15:14 65:23

**out** 6:19,20 9:7 12:3,15 21:21 25:16 26:17 30:4 41:17 42:24 47:18 66:1 67:19 78:25 83:23 95:1 147:2

**outcome** 115:13,16 147:11

**outline** 102:3

**over** 11:17 13:24 33:20 35:9 44:17 45:8 50:1 51:10 61:10 107:20 108:17 141:19 151:25

**overall** 20:16 45:24

**overseas** 9:11

**own** 17:8 21:18 27:1 38:10 41:9 63:19

**Oxford** 8:9

———————

**P**

**P.M.** 159:5

**pa-** 10:13

**page** 71:3 76:16,17 77:2,18 78:3,5 79:24 85:17 86:25 88:1 89:9 91:11,12 98:24 101:5 107:6 116:13 138:8

**pain** 86:3

**panel** 24:25 30:18, 22,24 31:6,12,22, 23,25 32:1,18 33:7 131:12,13,14,16

**paper** 14:23

**papers** 14:23 26:2 43:2

**paperwork** 13:11 27:16,23 35:23

**para-** 84:17

**paragraph** 73:24 101:23 113:16 138:10,24 143:15 144:5,11,12

**paragraphs** 101:24

**paraphrase** 73:15, 16 74:12 84:17 87:11,16

**parents** 12:9

**part** 14:13 24:3 40:16 76:6 89:22 129:23,25

**particular** 25:15 32:10 53:3,4 58:19 61:21,23 70:9 75:14 80:23 101:13 109:12 113:13 118:6 124:14

**particularly** 21:18 34:2

**parties** 115:17

**partner** 26:15 124:10

**parts** 14:22

**party** 73:9 77:23 116:22,25

**pass** 24:10 33:11, 12

**patients** 26:14

**patrol** 6:16 8:22 9:24 14:21,24 15:9 25:11,13,14 26:11, 23,25 27:6 29:14 41:11 42:18,19,21 65:14 72:14 95:21, 22 97:14 139:1

**patrolled** 10:13

42:25

**pattern** 99:9 138:14 141:14

**patterns** 131:15

**pay** 16:18 21:25 37:24,25 38:3,5,10, 12,15,16,22 39:3,5, 8,12,13,17,20,23 40:4,6 74:9 123:25 125:20 134:1,6,10

**paying** 25:15

**payment** 37:19

**payroll** 20:1 58:17, 20

**pens** 14:23

**people** 9:3,12 10:18 14:18 16:20 18:11 19:25 23:12 24:5 33:21 35:6 40:22 43:17 45:1 48:9 50:5,15,16 61:9,14 62:24 64:19 65:16,24 73:4 93:11 139:7 158:5

**per** 52:16

**percent** 78:19

**perfect** 23:15

**perform** 23:20 122:20 141:17

**performance** 43:8, 9,14 45:5,9,17,23 94:18 105:14,19 135:1,5 136:23 148:15

**performed** 42:13 85:7 122:25

**performing** 92:7

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

192

Index: period..procedure

**period** 36:8,14,15, 16,17,18 37:2,11 44:9 45:1 51:11 61:2 99:4 124:13 134:17

**permanent** 10:4 85:25 86:1,3

**permit** 5:4

**person** 11:14,15 23:18,19 26:19 32:1 33:14 52:22 53:19 54:2 62:4,6 67:12 74:4 86:17 89:1,22 103:23 107:21 108:16 109:6,18 111:9 112:1 124:1,2 154:5

**personally** 33:2 147:21

**personnel** 56:25 62:25 78:13 106:22 112:1 113:24 147:9

**persons** 88:12 114:1

**pertaining** 133:15 141:10

**pertains** 125:7 142:12

**Peter** 4:2 6:6 134:24

**petition** 17:22

**phone** 31:1 67:12 104:25 107:20 108:18 139:25

**physical** 81:13

**pianist** 63:18

**piano** 63:13,14,22, 23

**Pitt** 9:21

**place** 44:22 90:11 156:7

**places** 9:9 18:11

**plane** 9:11

**planned** 30:8

**platform** 16:24

**play** 63:11,13,14,21

**please** 6:4,9 44:21 48:7 50:3 60:20,23 69:23 70:7 71:4 76:2 79:11 91:19, 20 97:25 106:20 112:24 116:16 121:13 127:13 128:3,16 134:21 139:21

**point** 15:1,5 22:6 35:21 38:3 43:4 44:11,18 46:12 54:14 65:5 69:21 89:7 103:11,25 117:6 122:8 132:7 144:14,15 148:17 152:12 156:19,25 158:22

**police** 8:1,2,3,9,13 62:25 65:13 70:18 73:2

**policed** 21:15

**policies** 4:16 66:11 69:22 70:23 71:1 72:2,6,7,10,15 75:19 76:21 79:1 151:20

**policy** 70:2,8,10,11, 15 71:6,8 72:4,12, 18,20 75:22 76:12, 18,23,25 77:2,8,11, 13,19 79:9,12,15,

17,20,22,25 80:2,4, 15,18,19,20 81:8, 16 84:16 86:18,21 90:23,25 91:15 92:3,6,14,15,22 94:15 95:11,12,14, 17 100:9,12,15,16, 18,21,23,24,25 101:3,4,6,10,15,20, 25 102:11 106:24 107:2,4,10,13,14, 18 108:1 109:17,23 112:7,22,25 113:3, 5,7,10,12,17 114:20 115:12 116:8,10,11 117:7 118:6 130:3 145:3 151:19

**political** 73:9

**poor** 72:19

**portion** 80:8 101:11

**position** 10:7,14,21 11:8,21 12:20,25 13:22 14:3,6 15:16 19:7,8 20:15 89:2,4 121:4 125:1,2

**positive** 37:4,7

**possibility** 77:22

**possible** 59:2 88:11 108:10 109:17 117:24

**possibly** 30:6 87:14 111:24

**potentially** 118:16, 22,24

**practice** 40:10,12 64:14 69:3 103:14

**practices** 4:16 67:6

**precise** 127:23 129:8

**precisely** 71:22

**preliminary** 4:24

**prepare** 16:22

**prepared** 5:23 6:1

**presence** 46:16

**present** 53:11

**presentation** 102:1

**presented** 132:2

**pretty** 17:13 19:13 20:18 34:13 42:8 127:24 130:3 132:25 151:16

**previous** 49:25 54:25 143:18 144:19,21

**primarily** 21:10 26:10 131:14

**primary** 17:19 72:25 73:2

**print** 72:20

**prior** 48:17 50:7 62:14,25 84:9 91:23 92:16 132:17 139:12

**priority** 77:21

**private** 9:10 74:19

**pro** 114:14

**pro-** 5:16 52:17

**probably** 14:6 15:5 18:19

**problem** 21:14 57:12

**procedure** 47:3 69:5 70:15 76:12 84:23 101:21 102:1,4,10



**procedures** 92:4
94:20 95:9 102:6

**proceed** 32:10
53:15

**process** 16:16
18:21 22:2 24:20,
25 25:6 34:18 36:1
37:15 40:18 41:1
43:10,12,20 44:21,
22 46:6,9,20,21,23
52:14,16,18,19,21
55:23 56:11 67:7,
10 94:24 98:15
118:19 124:2

**processed** 94:19
95:8,12 108:1,12,
22

**professional** 35:12
74:14

**progress** 138:22

**prohibited** 81:20
118:21

**prohibits** 113:23

**prolonged** 86:3,5,
7,9,11,17

**promoted** 9:20,25
11:12 12:23 14:15
15:20 18:20 97:22

**promotions** 18:18

**prompt** 102:1,5

**promptly** 114:3

**properly** 40:24

**property** 25:15,17
33:24 43:1

**protect** 42:25 81:3

**protected** 114:17
115:7

**protecting** 25:17
81:12

**protection** 9:3 73:3

**protracted** 86:1

**provide** 6:9 50:12
51:6 60:8,10,16
61:7 72:9,17 82:15
101:25

**provided** 5:16 54:9
72:11 82:13 83:14
93:6 108:1 132:6

**provides** 107:14

**providing** 109:18
110:12,14

**proxim-** 145:6

**proximity** 119:19
145:7

**public** 17:4 21:21
74:13 75:3 81:3

**pull** 69:23 133:4
134:5,6 135:17
137:12 142:15
145:20 154:22,25
156:1

**pulling** 70:5 130:10

**purchasing** 14:21

**purpose** 33:15
102:3 124:23
131:14

**purposes** 4:19
139:20 146:17

**pursuant** 107:17

**put** 18:11 31:7,11
32:17 103:12,24
130:20,21 148:23

**putting** 121:7
130:17

**Q**

**qualifications**
37:24

**quarter** 30:10 99:3

**question** 5:3 50:21,
23,24 51:1,16 52:2,
3,5,7,9,10 100:19
104:13 110:7
120:10 134:4
142:25

**questions** 4:11
31:5,9,13,17,21
32:16,19,21 45:22
49:2 53:12 72:24
108:18 112:15
128:17 134:20
158:25

**quick** 146:15

**quid** 114:14

**quite** 143:2

**quo** 114:14

**R**

**race** 17:2 54:13,14
114:10,15,25
115:15 126:3,24
137:8

**races** 21:6

**racial** 110:21

**radio** 40:24

**raise** 134:2,6,10

**Raleigh** 14:2,4,8,
12,16

**ran** 17:12 35:1

**range** 121:2

**rank** 9:20 10:25
11:12 12:23 14:15
15:20,24 97:13
125:20

**rating** 45:24

**ratings** 45:23

**Ray** 84:1 138:16

**re-** 34:20 48:13
106:1

**re-swear** 49:24

**reach** 30:4 44:12
105:22

**read** 51:24 57:19
70:4 71:6 72:25
73:23 74:16 76:6,
15 77:5,19 78:4
79:24 80:25 81:6
84:5 85:20 87:2
88:4,13,19 89:19
91:18,19 92:23
94:14 97:1 98:21
101:8,15,20,23
107:7,12,23 109:14
112:14,16,21
113:9,15 114:7
116:16 118:14
120:25 138:12
139:19 141:15
143:13,15 144:17
146:15 149:5
155:4,18

**reading** 90:25
138:19,23

**ready** 66:15 79:12,
13 120:24 127:19
128:10,16 129:10

**real** 21:2,3

**really** 27:3 29:25
46:22 48:18 64:23
122:18 124:9,18



154:1

**rear** 139:13

**reason** 47:4,8,10 58:24 60:16

**reasonable** 92:19

**reasonably** 81:10

**reasons** 60:8,24

**recall** 15:4 21:5 28:14 42:23 49:14 50:4,6 51:9,12,17 60:2,17 61:3,4,6 62:12,16 64:24 68:23 71:11,18 77:9,16 78:1 80:3, 12,23 93:14,17 96:24 98:4,13 104:2 105:10 120:13,16 123:2 125:7,9,14,16 126:5,14 129:16, 19,20,22,24 131:23 132:1,7,11,12,19, 22 134:25 141:18, 23 142:2,5,11 145:7 149:18 150:23 154:7,12,18 155:7 156:9,12,16, 20

**receive** 30:3 77:24 84:11 122:3,4 134:10,17 147:19 148:8

**received** 24:7 78:1 80:7,10 93:21 104:4 111:6 138:5 140:6 148:17 149:10 150:4,21 152:14

**receives** 107:22

**receiving** 109:6

111:9 116:21,22,25

**recently** 45:1 83:14

**recognize** 58:13 59:14 70:13 137:22,24 142:19

**recognizes** 77:21

**recommend** 13:19

**recommendation** 31:8 32:9 33:8 53:17 131:22 132:3

**recommended** 34:21 35:13

**record** 5:1,2,6 6:5 22:20 56:19 58:2, 15 59:17 71:12 79:4 94:19 112:24 122:1 127:21 128:6 129:11 133:19 138:13 147:9 155:4,18

**record's** 146:17

**recorded** 111:3,25

**recording** 107:15

**recreation** 7:17,18

**reduced** 125:19

**reduction** 125:20

**reference** 143:18

**referred** 14:18 25:23

**referring** 56:23 93:25 99:11 126:10

**reflect** 56:19 59:17 61:2 71:12 79:4 133:19

**refresh** 158:9

**refresher** 95:15

**regarding** 143:4 144:13,19

**regardless** 17:1 57:10

**regular** 13:11 30:22 34:1

**regularly** 93:18

**rejection** 123:9

**related** 37:10 110:23

**relates** 4:17 105:18

**relationship** 153:1, 4

**relationships** 65:21 78:12

**relevance** 63:25

**relevant** 53:13

**religion** 114:11,16

**remained** 9:2 15:21

**remedial** 114:5

**remember** 17:12, 13,14 44:25 80:11, 14 93:11,12,16 95:23 96:20 111:6 133:1 138:4 145:17,18 146:22 147:23 149:22 151:14,22,23 157:2,15

**reminded** 78:11

**reminder** 95:16

**rep** 37:22

**repair** 15:10

**repeat** 37:5 110:7

**replace** 65:2

**report** 31:4 59:13 89:21 90:4,9,17,18, 22,23,25 91:10,23 92:5,9 93:1,4 94:17,22 97:10 110:20 130:20 152:3 155:15,16,23

**reported** 84:16

**REPORTER** 57:15 68:5,7 85:22 91:19 97:24 98:2 100:19 121:12 129:2 130:9 133:6 134:3,7 135:20,24 140:9, 12,19 143:8 155:14

**reports** 97:5 98:5, 19 99:8 110:5,8 120:3 138:19

**repository** 90:14

**represent** 5:12 118:20

**representation** 95:25

**representatives** 113:25 114:2

**represents** 73:7

**reputation** 22:21 23:9

**request** 83:18 85:14 93:6 97:8 133:4,7

**requested** 11:20 12:19 143:17 144:18

**requesting** 133:16 139:5

**require** 47:7,10,12, 14 48:4,7,10,14 57:8 67:18 74:25



WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021                                    195
                                            Index: required..said

75:3 82:18 103:14
109:2 117:21

**required** 72:1 81:5
84:16 93:5 103:23

**requirement** 72:3

**requiring** 47:19

**RESERVED** 159:4

**resided** 6:13 12:10

**residence** 10:5

**residency** 12:4

**resolve** 104:1,7,14
109:12 115:11
118:4

**resolved** 108:4,9
109:1,13 111:16,
17,19,20 117:6,24
118:1,7

**resolving** 107:15

**resource** 20:16

**resources** 44:6
45:21 58:18 105:25
106:2

**respect** 34:6

**respectful** 74:4

**respond** 69:5 140:6
145:12,15

**responded** 138:21
141:2 145:16

**responders'** 65:15

**responding** 147:22

**response** 102:4
104:5 139:14
140:8,10 141:16
142:10 152:5,7,8,
13,24

**responses** 5:5

31:20

**responsibilities**
125:4

**responsibility**
72:25 73:2 115:9

**responsible** 9:8
14:20 70:25 83:22
97:16

**rest** 153:5

**restraint** 89:23

**result** 112:4

**results** 86:5
111:20,21,25

**retaliation** 102:7
113:23 117:9,12,17

**retire** 16:6

**retired** 84:1 142:4

**retirement** 16:5
20:9

**revealed** 104:8

**review** 24:11 27:18
31:17 57:2,3 59:9
70:8 72:15 73:22
76:3,7 91:15,22,25
92:7,11,15 94:10,
16,23 95:5 96:4
97:1,3 98:14 99:5,
7,8 100:2,9 106:14,
18 112:21

**reviewed** 13:11
51:25 58:11 74:1
92:6 94:8 95:2 97:6
98:6 132:6

**reviewing** 92:20
142:11

**reviews** 135:2,5

**revisit** 32:20

**Ridge** 14:2

**riding** 37:7 40:9

**right** 10:8 16:25
17:1,20 24:18
30:19 32:18 37:16
49:17 58:1,3 73:18
82:22 113:21
128:4,24 144:10
146:15 148:22
150:11,19 151:24

**right-hand** 107:7

**rights** 102:9 136:23
137:7,18 147:14

**riot** 82:23

**risk** 85:24

**road** 6:11 14:2
20:15 97:18

**Roberson** 139:3,5

**Robinson** 4:5,23
5:7,11,12 22:25
23:5,7 50:23,25
51:21 52:4,8,11,12
55:17,21 56:19,22
57:4,14,17 58:1,5,
10 59:17,20 60:19,
22 64:1 66:9,15,18,
24 67:1,4 68:8,11
69:23 70:1 71:12,
15 75:22 76:1 79:4,
7 86:6 89:10,13
92:12 98:3 99:22
100:1,8,20 101:16,
19 106:13 112:10,
16,20 121:14
127:14,17 128:1,4,
8,12,18,22 129:10,
13 130:6,10,15,18,
23,25 133:2,7,11,
19,22 134:1,5,9
135:17,22 136:1,
12,15 137:9,12,15

140:5,13,20
142:14,18 143:6,9,
12 145:20,24
146:6,9 147:7,10
148:20,24 153:15
154:22,25 155:3,
15,17,23,25 156:5
158:18,22

**room** 72:14 117:3

**rotated** 41:15,18

**Roxboro** 11:13

**rule** 59:7

**rules** 5:4,19 37:10
57:8 78:22,23

**rumors** 156:9

**run** 16:13,14 17:24
50:15

**running** 16:21

**runoff** 17:20

**runs** 158:8

---

**S**

**S-10** 139:3

**S-2** 139:4

**S-3** 138:20

**S-E-** 84:4

**S-H-E-A-R-I-N** 84:4

**safe** 87:8,23 88:10

**safety** 33:24

**said** 9:13 12:13
23:23 30:17 37:6
38:10,25 39:10
42:25 43:20 48:24
52:15 54:18 55:8
62:6,17 64:6 68:1
69:11,15 80:12,13,



15 82:4 89:3
104:15 115:14
117:19 127:7
130:15 132:5,8
139:16 142:8
148:25 149:16,19
156:10 157:3 158:5

**salary** 134:18,19

**same** 14:9 15:23
20:8,11,19 25:6
26:22 38:7 39:7,12,
20 69:12 78:7,13,
14,15,20,21,22,23
88:17 90:17 91:1,2
102:22 103:19
121:20 130:22,23,
24 139:11 141:10
151:2,7,11 153:5

**same-sex** 78:10,12

**sat** 93:16

**satisfaction** 74:19

**satisfactory** 34:21

**satisfied** 134:17

**saw** 47:18 139:10

**say** 10:2 13:8 14:5
16:8 17:5,7 19:11,
14,18 21:11,19
24:16 25:20 28:20,
24 29:8 30:9,11,21
32:5 35:1 37:4,6
38:2 39:18 42:21
45:10 50:18 54:11
55:7 61:12,14
65:11 67:15 69:6
76:16 83:13 84:22
98:9,11 99:12
100:6 101:13
104:25 108:19
111:14 118:23
121:12,23 122:7
131:25 132:25

137:23 151:19
152:18 153:25
157:19,22 158:13

**saying** 30:2 48:3
49:9 58:6 71:16
80:20,22 85:2
86:19 117:2 119:6
126:11 135:10,12
144:7 145:11

**says** 59:8,23 73:14
74:15,18,22 78:24
85:20 87:20 88:4
89:15 90:24 91:15
93:22 95:8 96:3
114:7 133:25
134:15,16 136:18
146:25

**scale** 37:25 38:12

**scan** 141:7

**scene** 88:10

**schedule** 35:10,20

**scheduled** 22:6
31:3

**school** 6:19,20,22
12:8

**score** 45:24 46:3,4,
7

**scored** 46:2

**screen** 56:20 59:10
136:4

**scroll** 57:4

**scrutiny** 16:22

**se** 52:16

**second** 23:2 34:9
41:14 57:3 74:16
77:19 81:1 92:23
107:23 113:16
138:8 139:19

**secretaries** 19:23

**section** 28:7 29:10
70:9 78:5 84:5
85:20 89:14 96:3
99:15 101:12
113:13 114:7
120:23

**sections** 97:12

**security** 9:4 26:4

**see** 12:6 22:25 23:6
47:19 52:19 58:9
65:25 67:2 70:2,3
74:23 82:12 89:14
105:21 121:19
129:17,24 136:22
139:7 145:19
147:17 148:10
149:5 152:17,25

**seeing** 119:17

**seek** 89:1

**seen** 130:16

**sees** 119:15

**select** 95:20

**self-protection**
84:15

**send** 30:22 55:4
59:5 60:5 93:1

**senior** 6:23,25 32:1

**seniority** 82:11

**sensitive** 68:9

**sent** 9:25 10:2 49:6
55:6 58:5 147:18
149:21,22

**sentence** 74:15,16,
17 75:5 77:19
78:17 81:1 87:2,17
88:8,13,15 89:19
101:15 107:12,23

109:14 113:15

**separate** 27:10
28:6,7 38:7

**separation** 59:13
155:6

**September** 136:18
150:2 154:10,15

**sequence** 154:13

**sequentially** 57:10

**sergeant** 9:20
10:24,25 11:3,4,13,
23 12:19 17:21
25:4 29:3 37:8 40:9
93:16 94:2,3,6,9
95:24 97:14,17
120:19 139:3,5
151:15

**sergeant's** 11:21

**sergeants** 13:6
19:4,6 20:17 28:16

**series** 31:5

**serious** 67:15
85:21,23

**serve** 97:13

**served** 7:7 26:15
64:19,20,21 96:11

**serves** 26:1 135:16

**service** 61:15,18
62:11 73:3 74:24
75:2

**services** 53:24 55:8
60:14 88:23 132:5,
8

**serving** 43:2 74:13
75:3

**set** 24:13 27:22
31:9 42:1



(866) 715-7770
advancedONE.com

**seven** 11:9 25:10 28:11 143:22

**seven-hour** 127:23

**several** 15:7,15 22:12 26:13 30:12, 14 48:9 64:24 141:3 142:2 146:21 149:19 151:24 154:11

**severe** 121:21

**sex** 78:21,22 114:10,15

**sexual** 110:24 114:22 115:15 156:13 157:13

**sexuality** 156:21

**shall** 81:9,13 84:11, 16 88:5,6,10,11,16 89:20 90:3,4 91:22, 24 92:8,11,25 94:16,17,21,23 97:11,13 102:7,11 108:1

**shares** 97:13

**Sharika** 5:11,12

**she** 69:12 82:16 89:21 135:15 154:1,2,3,5

**she's** 153:23 154:1

**Shearin** 84:2 138:16 139:3,11

**sheriff** 4:6,17,20 5:8 7:24 16:13,14 17:2,14 24:4,17 25:9 26:24 34:10, 23 37:13 40:14 43:13 44:23 48:13 49:25 50:5,9,11,21 52:1,13 54:25

55:22 56:10,24 57:19,24 59:7,9,23 61:5 62:21 66:13, 15,20 67:5 68:12, 24 69:8 70:2,7,13 71:9 75:9 76:2,9 79:15 84:6 85:18 87:9 89:15 92:23 96:6 97:23 98:6,21 100:2,10,12 106:17 112:13,22 117:7 118:14 123:1 129:9,10,14 131:2 133:13,24 134:24 136:9 137:17 139:6,8,20 140:1 145:25 148:22 156:6 158:16,22

**sheriff's** 17:22 18:6,23 19:9,16 20:1 21:24 27:17, 24 28:18 29:10 34:22 35:5,24 36:5 48:16,25 54:2 65:5, 15,18 76:12,18 77:20 79:17 80:9, 19 81:9 84:7,9 85:5,9,14 90:10 92:3 93:5 94:21,25 95:9,25 96:15 97:10 100:15 106:8,24 107:25 110:13 113:4,18,23 114:3,21 138:15 153:6 156:8

**sheriffs** 60:13 65:18

**shift** 41:3,6,10,14, 18,20 42:2 94:11

**shifts** 41:4,13,21 151:6

**shocked** 152:17,18

**shooting** 21:20

**shops** 15:10

**short-term** 124:17, 20

**shorter** 36:13,18 124:19

**shortest** 122:17

**shortly** 16:12

**should** 19:14 80:10 84:19,24 87:5,19 91:9 92:15 99:20 106:8 108:3,9,12, 21,23 109:9,11,13 115:16 120:1,2,4 138:14

**show** 54:21 144:25

**showing** 136:3 139:13

**side** 7:22 26:23

**sign** 46:15 75:12,14 76:25 92:25 100:16,22 113:5 123:4,6,8,13,20

**signature** 59:14 76:20 79:18 107:1 146:4 159:4

**signatures** 17:23 70:20

**signed** 86:22

**similar** 20:11 21:9 38:25 63:1 69:20 88:17 103:2 125:10

**similarly** 14:9,10

**simple** 103:2 111:13 116:25

**since** 71:11 77:8 142:3

**Sincerely** 134:22

**sing** 63:15,18,24 64:3,9

**sir** 74:17 81:7 84:3, 18 87:15 88:9 91:13 94:14 96:7 98:25 119:4 125:23 131:5 138:13 150:7

**sisterly** 35:2

**sit** 45:7 72:14 94:3 96:22

**sits** 44:16 93:7

**sitting** 4:10 121:16 158:24

**situation** 49:5,20 53:3 69:11 84:15 87:5,20 119:25 122:13,15,22 135:4 151:7,17

**situations** 21:18 81:14 141:3

**six** 19:17 27:5 37:3, 4,6 40:9 45:2,3 99:3

**six-month** 43:16,21 45:1

**skills** 40:22

**skim** 76:5 139:21

**skimmed** 140:4

**slash** 90:24 91:22

**slower** 91:20

**slurs** 110:21,23

**sniff** 26:17

**snippets** 64:12

**so** 4:9,12,14 5:11, 19 6:4,18,21,24



7:23 9:17 10:9
11:10 12:11,18,22
14:25 15:25 16:16
17:18 18:2,11,17,
22 19:23 20:4,20
21:15,23 23:8,20
24:15,18,20 25:8,
13 26:18 27:1,4,11
28:3,11,20,24,25
29:22 30:2,17
31:22 32:12 34:11
35:4,13 36:16
37:14,20 38:2,10,
23 39:4,8,21 40:8,
25 41:9,13 42:2,6,
9,23 43:4,19,23
44:20 45:10 46:19,
24 47:9,21 48:1,21
50:11,17 51:6,20
52:1,8,17 53:7
54:8,14,18,21 55:1
56:19 58:11 59:4
61:5 63:18 64:23
66:19,24 68:18,25
69:3,10,14 72:22,
25 74:16,20 75:18
77:18 84:22 86:9,
14 88:24 89:2,4,5,6
90:25 91:3 92:17
93:22 95:24 96:25
99:16 100:9 102:20
105:8,13,16,22
107:11 108:5
109:8,25 114:22
115:12 116:22
117:11 119:17
123:1,13 124:2,11,
20,25 125:14 126:2
127:5,11,21 129:6,
14 130:23 131:16
132:15 133:2
134:10 135:8 140:6
141:22 142:13
144:2,4,17 145:11
147:15,18 148:1,4,

14 149:2,16,18
150:3,17,21 152:3,
4,16 153:1 154:6
156:6,20 158:2,8

**social** 63:1

**soft** 82:2

**solicit** 151:8

**some** 4:15 9:3
13:17 18:15 20:23,
25 21:1 22:6 23:22,
23 24:2 25:7 26:11,
14 27:23 29:8,9
32:18 33:20 35:20
36:12,14,18 37:7,
24,25 40:3 41:3,17
43:4 44:10,11
46:13 47:5 48:10
50:5 53:16 55:24
58:1,6 60:23 62:23,
24 64:19 65:5 78:1
81:25 82:8,23
83:12,20 85:2
95:15,16 103:8,11,
25 104:17,18
108:18 115:16
132:6 139:11
144:14,15 148:12,
14,17 152:7,11,23
156:7,19,25 157:25
158:4

**somebody** 64:20,
21 67:15 95:21
104:24 115:5
158:6,7

**someone** 35:13
47:24 48:2 49:6,11
50:3 51:7 54:1
60:12 62:2 69:16
72:5 88:25 94:11
109:21 115:6,14
124:4 125:15,17
142:6

**someone's** 87:14
110:24 114:22,25
115:2,7,15

**something** 7:19
13:6 21:9 33:25
36:22 37:1 38:25
47:13 61:1 64:10
67:21 68:15 95:16
103:1 105:23
109:23 111:5,12
116:25 117:18
118:4 119:16 138:6
149:15 158:7

**sometime** 12:9
144:23

**sometimes** 25:4
26:17 30:11,12
31:18 35:8 39:6,11,
24 59:2 60:7 82:11
83:20 107:19,20

**somewhere** 19:2
37:15

**song** 64:10,11

**songs** 63:24 64:3,
12

**soon** 35:21 58:25
59:2,5,21

**sorry** 57:15 67:25
68:10 85:22 87:15
119:4 121:12
125:23 133:6 134:7
149:6

**soul** 63:21

**sounds** 130:1

**space** 63:8

**spe-** 117:7

**speak** 21:15 105:22
132:10,16

**speaking** 24:16
41:12 49:15 50:13
51:21 132:11,19
146:22 154:6
158:14

**special** 77:22

**specific** 29:16,18,
19 60:17 101:12
124:22 129:20

**specifically** 42:24
78:10 95:6 104:13
105:6 117:8 123:2
150:23 157:12

**specifics** 50:6

**specified** 36:13,15,
16,17,18 37:2,11

**speculate** 119:11

**speech** 114:10

**speeding** 67:16
105:1

**spell** 84:3

**spelled** 42:24

**spent** 37:8 50:4

**split** 11:1

**spoke** 131:21
158:4,6

**spoken** 40:3

**sports** 7:19,22

**spouse's** 66:8

**spray** 82:21 84:10,
14,20,23 89:24

**spraying** 84:15

**squad** 41:3,7,10
42:3,18 72:14
117:2

**squads** 41:4



141:11 151:6

**staff** 19:20,21
47:19 62:23 96:1
138:18

**stage** 103:16

**Stainback** 83:25
93:12

**stand** 57:20

**standard** 31:9,10
121:9

**standards** 34:22,23
35:14,24 56:10
59:5,7,23 78:15,20
133:14

**start** 6:24 22:17
134:3

**started** 4:25 7:23

**starting** 80:25

**state** 6:4 8:21,24
9:9 15:9,12 34:24
81:15 112:24
114:17 131:4

**statement** 48:13,
15,23 73:11,13,16,
22 74:1 81:7 84:17
92:10 118:14
142:11,15 143:4,
13,18,21 144:13,19
145:1 151:10

**statements** 145:4
151:8 156:21
157:13,17,19,23
158:1

**States** 73:4,6 81:15

**status** 114:17
115:7

**statutory** 147:8

**stay** 124:11

**stayed** 10:5 26:8

**staying** 12:14

**steak** 64:20

**step** 37:14 141:18,
19

**steps** 150:4

**stick** 29:7

**still** 14:2,16 15:25
26:24 74:20 98:23
111:7

**stolen** 25:22

**stood** 47:17

**stop** 64:18 108:19
139:6

**stopped** 64:17

**stops** 149:25

**store** 111:9

**stored** 116:22

**Stovall** 8:4

**street** 20:25

**stress** 33:24

**stressed** 17:9

**strict** 81:14

**strictly** 39:23

**strikes** 89:22

**structure** 18:10,22
20:8,11,17 21:23
23:25 24:1 26:20

**structured** 14:9
18:6,8 28:12,17

**stuff** 7:10 17:2
22:22 23:17 25:21
27:17 40:24 54:1,4

63:20 64:13 114:21
119:23 135:13
145:10 147:23
149:25 150:12
152:23 157:1,15
158:7

**style** 4:14

**sub-** 86:19 95:1

**subject** 89:25 90:5,
7 102:11

**subjected** 102:7

**subjective** 87:24

**submission** 91:24
92:16

**submit** 44:4

**submits** 95:2

**submitted** 34:20
44:3,14 60:3 93:5
145:9

**subordinates**
113:25

**substances** 5:25

**substantial** 85:24
86:20

**substantiated**
104:11

**such** 33:21 68:20
69:19 74:5 90:11
95:22

**suffered** 62:7

**suggested** 28:12

**summarize** 74:2

**summary** 98:5

**superior** 153:25
154:4

**superiors** 153:12

**supervise** 10:18
11:23 19:6 154:1

**supervised** 10:15
11:3,4,14 12:1
13:5,8 15:11,13
29:2 42:10

**supervises** 19:5

**supervising** 14:12,
25 15:8

**supervision** 11:5

**supervision-type**
26:25

**supervisor** 42:9,10,
11 44:1,16 45:6,7,
15 46:3,11 83:12
91:16,21,24 92:7,
10,15,17,20,25
93:23 94:1 95:3
105:20 108:25
109:8,9,11,12,16,
24 115:9 117:3
118:19 119:21,24
120:19 122:23
135:7

**supervisors** 10:16,
22 18:12 29:20
42:5,12 65:23
102:8,10 113:24
118:15 119:13,15
120:6,11 151:5

**supervisors'** 42:6

**supervisory** 94:16

**support** 16:21

**supposed** 13:14
42:15

**sure** 9:6 13:13
15:17 18:8 25:10
29:4 37:9 42:13
53:12 57:7 66:20,
21,25 78:19 92:21



93:20 123:17
127:17 135:6
141:1,20,25 142:9
148:1 152:7,12
157:11

**Surenos** 21:9

**surfaced** 157:3,4

**surprised** 140:17,
23 152:19,20,22

**suspect** 69:1 81:22
91:5

**suspended** 123:25
124:3,4

**suspension** 121:3
123:22,24 124:17,
20,23 147:1 149:24

**swear** 48:21 49:4,
24,25 54:19

**swearing** 49:16
54:9

**sworn** 4:3 18:3
48:19 54:23,24
55:1

---

**T**

---

**table** 50:21

**take** 18:20 23:2
37:14 55:17 60:19
66:14 87:14 99:22
114:5 122:12
127:12 128:8,10,
21,22,24,25 150:4
158:18

**taken** 55:20 99:25
121:1 127:18 129:1
158:21

**talk** 18:22 33:17
40:24 46:19 64:4

67:6,19 105:1,19
108:11 144:10

**talked** 18:18 51:13
63:2 149:24 151:4
154:25

**talking** 19:23
37:20,21 45:11,18
55:23 62:8 64:4
69:1 74:18 130:17
141:12 146:24
147:21 155:21
157:12

**tea** 64:21

**team** 24:22

**technically** 49:22
51:14 52:15

**technique** 87:6,21

**tell** 16:16,21 23:25
38:14,24 59:12
60:13 63:16 74:2
112:13 117:12
125:18 130:21
132:8 133:12,23
134:15 144:8
146:10

**telling** 129:14

**temperature** 117:5

**ten** 59:8,23 61:12
122:14

**ten-minute** 128:22,
25

**tenure** 4:11 24:4
37:13 48:4 60:25
61:10 69:8 71:11
83:25 120:7,9,12,
15 153:10 158:14

**term** 20:5 97:23
124:22

**terminate** 46:24
47:7 55:25 58:22
61:14,17 62:15
131:22

**terminated** 46:25
47:24 48:2,10,12,
18 49:3,6,11,18
50:3,5 51:7,10
52:23 53:1,19
56:15 60:1,6,12,24
61:3,4,10,19,20
154:18,19

**terminating** 132:17

**termination** 46:20,
22 47:5 48:6 49:3,
7,22 50:7 51:14
52:14,16,21 53:1,
18,20 54:5 55:23
56:4,6 58:25 59:6,
21 60:8,16 62:10
121:4 130:2 132:3,
13 154:23 155:5

**terminations** 48:4

**terms** 20:5 69:15
73:17 74:3 130:3

**testified** 49:18 65:8

**testifies** 4:3

**testify** 5:23 50:10

**testifying** 48:1
50:20

**testimony** 5:8,16
6:1 141:22

**tests** 18:20

**texts** 68:9

**than** 6:15 14:12
36:12,13,14,18
46:25 49:14 61:12
83:21 84:14 87:21
98:11 121:22

124:7,19 132:16
153:5 154:12

**thank** 4:9 33:19
45:25 91:2 98:2
102:13 129:4
135:24 158:23,24
159:3

**that** 4:12,16,22 5:1,
21,24 6:15 7:10 8:3
9:5,15,19 10:7,14,
16,17,20 11:7,12,
17,24 12:5,14,20,
25 13:6,9,15,21
14:5,15,19,21,25
15:5,6,8,12,16,21
16:12,16,23 17:2,4,
7,9,18,21 18:12,25
19:1,3,4,6,12,18
20:16,18 21:9,12,
16,20,22 22:2,3,12,
22,25 24:11,12,20
25:1,22 26:10,19,
20 27:6,13,16,21,
22 28:8,14,16 29:1,
23 30:2,8,23 31:1,6
32:17,20,22 33:25
34:4,5,8,17,19,20,
23 35:1,10,17 37:5,
12,23 38:3,17,22
39:10 40:11,12,16,
19,24 41:12 42:13,
20,24 43:2,10,11,
12,19 44:2,13,18,
22 45:5,7,10,11,18
46:3,9,11,12,15,18,
21 47:10,11,12,13,
14,19 48:1,7,10,11,
13,15,17,23 49:2,9,
14,15,18 50:4,6,12,
13,15 51:1,10,13
53:5,12,18,19,22,
24 54:1,2,4,8
55:10,12,14,15,25
56:7,9,12,14,16,20

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

201

Index: that's..the

57:2,3,5,8,18,19,
22,23 58:6,19,21
59:4,6,10,17,25
60:3,19,24 61:1,2,
3,20,21,23 62:6,10,
16,17 63:15,20
64:10,12,14,22
65:4,8,11,20,22,25
66:2,7 67:6,9,13,17
68:5,15,23 69:7,11,
20 70:5,8,13,18,20
71:10,16,18,19
72:14 73:11,13,16,
22 74:1,2,5,6,12,
17,18,19,23 75:1,5,
11,22 77:14 78:3,4,
11,20 79:4,18,25
80:3,15,16 81:6,9,
10,20,25 82:13,16,
17 83:14,15 84:1,
17,22 85:2,3,4,6,8,
17,22,23 86:2,5,21
87:13 88:24,25
89:1,3,11,19,21
90:13,25 91:4,6,10,
18 92:17,22 93:16,
17,20 94:2,3,5,6,9,
11,14 95:5,11,13,
14 96:3,24 98:19,
20 99:16,19,20
101:2,13 102:4
103:8,23 104:2,8,
12 105:4,11,20,21,
23 108:2,3,8,15
109:12,20,21,23,25
110:7,16,17,25
111:5,11,12 112:2,
14 113:18,19
114:13,19 115:4,9,
21 116:6,10,25
117:2,4,6,14,21
118:4,10,14,23,25
119:6,15 120:3,13,
16,18,25 121:9,12,
25 122:17 123:5,9,

11,17,22 124:14
125:1,18,19 126:3,
9,11,20 127:1,9
128:5 129:8,16,19
130:1 131:21,23
132:8,10,12 133:6,
16,19 134:15,23
135:4,10,14 136:2,
16,19 137:1,9,23
138:5,6,12,14
139:25 140:19
141:8,9,11,15,22
142:11,15 143:21,25
144:4,6,7,9,14,18,
21,22,25 145:11,13
146:4,10,13,25
147:1,6,15,17,18,
19,20,22 148:1,11,
20 149:13,20,21,25
150:12,13 151:3,5,
6,12,13,16,19,20
152:8,10,11,12,15,
23,24,25 154:2,12
155:1,7,11,19
156:1,7,9,19,22,23,
25 157:1,3,4,6,22,
24 158:5,7

that's  19:13 23:3
27:12 28:3,18
34:24 37:7,21
41:11 44:3 45:11
51:21 54:13 62:12
68:18 69:7 74:6
78:24 82:22 83:7
86:13 107:3 108:24
116:19 117:14
123:15,18 128:14
129:4 134:13 136:3
139:22 150:13
151:25 152:2

the  4:15 5:1,2,4,6,
12,19 6:5,11,15,16,
18 7:1,4,16,22 8:9,
21 9:2,7,9,12,20,23

10:5,13,15,16,25
11:1,2,3,4,12,14,
21,22,23 12:2,3,23,
24 13:18 14:1,2,8,
9,10,12,13,15,21,
24 15:6,9,11,12,13,
20,25 16:7,8,9,22,
23,25 17:4,9,13,14,
19,20,21,23 18:6,
22 19:2,5,6,7,9,12,
15,25 20:3,8,11,15,
16,17,19,25 21:2,3,
6,7,8,13,21,23,24
22:3,8,21,25 23:18,
25 24:2,3,6,10,11,
13,17,18,20,21,25
25:6,9,12,13,14,17,
18,19,25 26:1,3,4,
5,7,8,9,12,13,15,
18,22,23,24,25
27:4,5,10,13,14,16,
19,21,23,24 28:9,
12,14,15,18,25
29:2,5,10,13,16,22
30:4,6,19,20,24,25
31:3,4,6,12,17,19,
22,23,24,25 32:1,2,
6,11,14,18,20 33:1,
7,11,15,24,25
34:17,24 35:4,6,9,
11,17,23 36:1,3,4,
9,10,11,13,15,18,
21 37:2,8,10,15,17,
19,22 38:3,4,7,9,
12,16,21,22 39:4,7,
20,23,24 40:1,3,9,
17,18,20,21,23,24,
25 41:2,8,11,13,17,
22 42:6,9,10,11,12,
16,19,21 43:1,3,4,
6,17,23 44:5,8,11,
12,16,18 45:2,3,7,
8,11,12,13,15,16,
17 46:2,4,10,14,15,
19,20 47:4,8,17

48:5,13,16,19,25
49:6,14,25 50:6,11,
21,24 51:1,13,15,
25 52:5,9,17,18
53:2,3,10,11,15,16,
17,20,21,25 54:2,4,
5,8,9,22,25 55:7,23
56:4,6,11,12,13,14,
19,20,23 57:5,8,9,
14,20,22,25 58:1,2,
6,9,11,13,15,19
59:2,3,10,17,25
60:4,23 61:24,25
62:4,10,12,14,21,
22,23 63:4,6,7,12,
13,14,16,18,23
64:5,6,7,8,11,15,25
65:4,5,6,9,15,16,
18,20 66:4,17,20,
22 67:7,11,13,19,
22,23,25 68:6,9,14
69:7,8,12,22 70:9,
11,17,25 71:3,6,12
72:11,13,18,23,25
73:2,3,4,5,6,7,8,9,
18,23 74:13,16,18,
22,24,25 75:3,5,6,
8,15,20,25 76:4,11,
15,16 77:2,5,9,11,
13,16,18,19,20,22
78:10,13,14,15,20,
22,23 79:4,24 80:4,
8,9,12,15,18,19,25
81:1,2,3,8,12,15
82:17,19,21 83:2,7,
23,25 84:5,8,9,13,
19,20,22,24 85:1,6,
7,13,14,20,23 86:4,
8,12,14,18 87:2,5,
7,15,16,17,19,22
88:8,10,13,14,16,
19,20,21 89:7,14,
20 90:1,2,4,7,8,10,
17,20,23 91:1,2,3,
4,6,8,9,21,22,23,24

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

202

Index: their..these

92:1,2,3,4,5,6,7,8,
9,10,11,15,17,18,
20,22,23,25 93:1,2,
3,4,5,7,11,14,18,
20,22,25 94:2,4,5,
6,7,8,9,10,12,17,
18,20,21,22,23,24,
25 95:1,2,3,4,5,9,
18,20,24,25 96:1,3,
14,19,20,22,25
97:1,3,5,7,8,10,12,
13,20,24 98:1,14,
17,18,19,21,23
99:1,4,5,7,8,20
100:6,9,14,19,22,
24,25 101:5,8,11,
12,15,20,23,25
102:3,6,9,22,25
103:11,17,19,23,24
104:5,6,8,9,10,16,
19,20,25 105:11,
19,20,21,24 106:1,
3,4,7,12,18,20
107:1,6,7,12,20,22,
23,25 108:15,17,
20,21,23,24,25
109:2,5,6,8,9,11,
14,16,17,18,23,25
110:1,4,5,8,13,21,
23 111:4,9,15,17,
20,21,23,25 112:1,
2,4,5,12,14,19,21,
24,25 113:9,12,15,
17,19,20,21,22,23
114:2,7,20 115:8,
13,16,24 116:21,
22,24,25 117:2,3,4,
5,11,16 118:2,18
119:21,24,25
120:6,8,10,11,14,
22 121:1,7,16,20
122:4,8,9,13,15,17,
20,22,23 123:8,10,
15,17,19,21 124:1,
2,5,6,7,10,11,13,

19,21,23 125:3,21
126:3,7,13,14,15,
19,22,24 127:1,4,7,
20,21 128:6,13
129:9,11,12,20,22,
24 130:3,15,22,23,
24 131:4,8,12,13,
14,15 132:7,13,20
133:3,4,7,10,16,17,
19,23 134:3,17,18,
21 135:3,4,5,11,14,
20 136:2,3,16,19,
22,23 137:18
138:5,7,8,10,12,15,
18,23 139:2,6,8,9,
10,11,13 140:2,4,
11,14,17,25 141:8,
9,10,12,13,14,15,
23 142:2,25
143:13,15,18,23
144:2,10,11,25
145:3,5,6,19,21,23
146:10,12,17,24
147:7,11,13,20,23,
25 148:2,8,13,17
149:3,5,7,23 150:1,
2,6,12,14,18,21
151:2,4,7,11,16,17,
19,20,22 152:3,5,
12,23 153:2,5,6,7,
13,17,19,21,23
154:3,5,8,10,12,15,
18 155:4,7,8,10,12,
15,18,20,23,24
156:3,7,17 157:10
158:4,14 159:2

**their** 13:11 17:10
21:5,17 22:14,20
24:3,5 25:17 26:10,
16 32:17 34:2,18
35:19,24 37:24
38:14 39:19 40:21,
23 41:9 42:2,5,11,
13,18,25 43:1,25

45:6 46:7,11 53:23,
24 60:14 63:3 73:5
102:5,9 121:8
124:2,5 139:7

**them** 13:12 16:21
17:4 20:25 22:4
23:2,6 24:8,9,14
26:15 31:7,20
32:24 33:8,13,17,
18,19,20 34:4,11,
12 35:18,20,24
37:22,24 38:3 39:3
42:5,11 46:17
51:24 53:24 60:13
61:13 65:12 70:24
73:5 82:8 93:13
95:5 108:16,18,19
120:18 121:17,19
124:7 135:23
139:12 147:23

**themselves** 21:15
24:6 63:10 89:7

**then** 6:25 7:6,24
8:8,20 9:24,25
10:18,20,24 11:19
14:17 15:19 16:3,
19 18:4,7 19:4,5,6,
14,17 21:19 24:9,
11 25:4 30:4 31:5
32:9,18 33:8 34:17
35:18,20,22 39:12
42:7 44:4 45:3
46:18 53:18 54:3
63:3 67:21 68:16
84:1 88:13 92:25
95:14 104:3
111:11,17,20 115:9
116:23 123:21
124:25 127:20
128:3,12,13 130:2
150:9 151:12 152:3
158:5

**therapeutic** 7:17

**therapy** 7:18

**there** 4:12,17 6:24
8:6,7,12,14,15,18,
23,25 9:1 10:1,2,6,
8,11,22,23 11:16,
20 12:15 13:1 14:4,
11 15:7 16:5 18:9,
15 21:8,19 22:12,
18 27:1 28:20 29:3,
4,7 31:10,11,22
32:12 37:25 38:8
39:21 41:21 42:20,
22 43:16 44:25
45:1 46:3,6 47:5,11
48:9,10,11,19 50:5,
7,21,23 52:15
55:24 65:20 67:20
70:4 71:10,16
72:13 74:15 82:2
83:24 91:9 93:10,
15 95:13,23 98:8
100:5 103:17
114:20 115:23
121:25 138:14
141:2 142:2 144:14
145:17 147:15,21
149:14 151:24
156:8 158:10

**there's** 24:25 46:22
52:19,21 56:7,9
82:2 83:11 117:2
122:18 124:18,21
127:21 148:11
149:7,21

**thereafter** 16:12

**Therefore** 81:8

**these** 19:25 27:5
28:11 29:5 37:23
39:3 59:25 60:2,3
66:11 70:23 71:1
75:19 76:20 83:13
116:4 118:17
139:6,15,16 140:15

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

203

Index: they..times

157:9,14

**they** 13:10,13,14 17:5 20:23 21:9,14, 15,17,18,21 22:6, 20,22,23 24:4,6 25:14,19 26:8,9,10, 16 29:6,8,9,12,16, 18,19 30:24 31:4,6, 7,11,14,18 32:4,6, 15,16,17,19 33:7 34:17,21 35:7,8,19, 21 36:6,7 40:13,22, 23 41:6,15,17,18, 23 42:2,4,6,10,12, 13,14,18,25 43:25 44:8,17 45:2,4,8,23 46:2,10,11,12,17 53:8,24 54:3 56:14 60:12 61:4 62:7 63:4 65:25 66:2,6,7 72:11,12,14,15 75:13,14 82:13 83:2,4,5,14 85:2 86:13,16 88:25 89:6 93:15 94:7 95:4,5 98:20 104:25 105:22,23 106:8 107:19,20 108:15,16,17,19 111:23 114:1 117:23,25 121:17, 18 122:3,4 123:6, 19,20 124:1 138:19 145:14 146:16,17, 20 148:16 154:13 157:19,22

**they're** 33:23 35:19,22 39:2 41:2 53:1 57:11 83:20 89:2,3,5,7,8 91:2 121:23

**they've** 22:19 39:1, 2 52:24 123:5

**thing** 16:25 35:11 63:19 65:25 66:7 73:18 90:13 102:22 103:9 105:4 112:15 115:22 120:18 130:22,24 141:11

**things** 4:16 22:12, 24 33:21 40:21 55:24 102:16 121:18 122:4 142:3 146:21 149:19 151:24

**think** 11:17 13:23 15:8 27:12 34:9 35:11 42:23 44:10 49:5 51:21 66:13 69:21 70:5 82:22 93:11,13 96:19 105:2 119:7,10 151:17 155:2 158:19

**thinking** 12:21 78:19 101:2 149:15

**third** 41:14 94:12, 14 138:10 139:9

**this** 4:19 5:8 8:4 17:5 30:22 32:10 34:4 38:4 40:8 44:20,22 49:21 50:16 51:19 52:3 56:23 57:8,23 58:9, 16,19 59:1,9,12,14, 22 62:12 69:21 70:2 71:6,11,25 75:11,14,16,19 76:3,9,13,20,23,25 77:8,15 78:13 79:12,15,20,22 80:2,20,22 81:16 83:13 86:18,21 87:11,24 89:9,11 90:25 91:15,25 92:5,13,17,20 96:6

99:6,18 100:12,16, 21 101:3,5,10,13, 15,17,20 102:3,11 106:23 107:4,10, 12,14,18 108:1 112:7,9,25 113:3,5, 7,9,13 114:21 116:11,12,13 117:7 118:6,10 119:23 125:5,9,10 128:5,6 130:6,7,12 131:1 132:17,20 133:12, 20,23 135:9,13 136:2,6,8,12,19 137:2,22,24 138:1, 3,5 139:17,20 140:7,16 141:1,7,8, 10 142:19,21,24 143:1,3,6,7,9,13 144:2,17,24 145:10,25 146:6, 13,14,23 147:13,20 148:2,13,25 149:3, 6,10,12,16,20,23 150:4,8,10,11,13 151:2,6,17,21 152:12,13,24 153:16 156:3 157:2,10,14 158:4, 7,22,24

**tho-** 116:4

**Thomas** 17:17

**thoroughly** 32:19 114:3

**those** 12:2 31:13 40:5 51:19 65:2,3,9 68:25 69:17 70:20 89:25 90:14 108:8, 11,12 120:4 137:12 141:16 157:17,19, 22 158:1

**though** 20:23 33:19

**thought** 21:20 53:13 65:9,11,12 100:22 104:15 135:22 155:2

**threatening** 21:21

**three** 7:9 8:15 10:23 12:3 15:5 30:15,16 32:13 39:19 96:19,21 97:11 99:2 138:17 154:14

**three-page** 130:19

**threshold** 39:21

**through** 24:9 27:22 30:3 31:4,20 44:5, 18,21 69:4 73:4 76:5 85:12 97:8 111:15,23 135:11 158:24

**ticket** 129:18,22

**time** 6:15,16 10:6, 17 11:24 12:5 17:14 22:9 24:10 29:3,11 30:19,20, 25 37:8,17 44:21 46:10 50:9 54:1 63:15 68:24 86:8, 20 90:12 94:10 95:23 96:19 100:9 112:12,21 120:7,8, 12,15 122:18 127:20 128:5,7,13 129:8 132:7 136:19 139:9 145:5,6 151:23 154:14 155:8,10 158:23

**timeline** 72:4

**times** 25:3,20 27:18,20 60:9 62:20 82:12 96:18



(866) 715-7770
advancedONE.com

**tires** 14:22 139:1,5, 11,12,13 141:13

**title** 8:11,23 28:22 136:23 137:7,18 147:11,13,23

**to** 4:10,17,25 5:3,4, 8,13,23 6:1,18,21, 25 7:1,8,12 9:2,7, 12,20,21 10:11 11:12,13,22 12:8, 12,14,17,19,23,24 13:12,14,18 14:1,5, 15,16,18 15:20 16:8,11,20 17:23 18:12,13,19,20,24 19:11,13 20:18 21:9,11,12,15,23 22:6,19 23:1,2,4,15 24:10,12,19 25:15, 20,23 26:5,16,17, 23 27:18,19 28:14 29:10,11,22 30:4,8 31:8,20 32:10,11, 22 33:4,5,10,11,12, 17,19,21,23 34:12, 21 35:6,14,21,23 36:7,11,23 37:4,6, 11,23 38:4,22 40:2, 5,7,8,24 41:2,6,19, 24 42:2,4,15,19,25 43:19 44:3,4,5,6, 14,19,20 45:23 46:4,13,15,17,18, 20,24 47:7,11 48:12,15,16,17,21, 25 49:20 50:7,10, 14,21 52:5,9,13,22 53:13 54:3,8,21 55:1,24 56:3,7,9, 11,12,23 57:3,7,16, 21 58:4 59:5 60:5 61:1,6 62:14,18,24 63:1,15 65:2,13,20, 22,24,25 66:9,10,

11,12,14,17,20 67:9,14,16,19 69:5, 20,21 70:3,8,15 71:3 72:1,5,13,15, 16,20,22,23 73:13, 14,19,20,22 74:10 75:6,8,15,19,20 76:3,5,6,11 77:2, 18,22,23 78:2,3,13, 17,25 79:3,8,12,22, 24 80:6 81:3,10 82:10,12,14,16,20 83:18 84:1,9,12,22 85:17,25 86:14,16, 17,25 87:5,7,11 88:1,11,22 89:2,4, 5,6,7,9,25 90:10 91:9,11,23 92:1,14, 16,18,21 93:3,5,25 94:12,22,23 95:2,3, 13,16,21,23,24 96:3,25 97:22 98:17,19 99:6,9,11, 16,18 100:9 101:5, 25 102:3,4,5,7,11, 12,18 103:7,12,14, 18,24 104:3,5,6,12 105:18,21,22 106:4,5,6,8,9,14,18 107:6,17 108:5,6,8, 10,15,17,19,24 109:4,10,16,21,24 110:13,14,17,19,23 111:7,18,20,22 112:5,7,8,13,14,16, 17,21 113:21 114:6 115:8,10,13 116:13,17,18,22 117:14,23,25 118:10,11,18 119:9,11,19,21,25 121:4,8,17,19 122:8 123:4,6,7,16, 17,19,20 124:1,7, 10,14,25 125:1,2,7,

10 126:7,8,10,12, 13 127:9,20,21,22, 24 128:10,16,21 129:7,8,9,11,17,24 130:21 131:14,21, 22 132:2,6,10,11, 16,17,19 133:3,13, 14,15 134:5,17,21 135:4,5,6,7,14,15, 21 137:3 138:4,8, 20,21 139:1,6,7,10, 12,14,22 140:14 141:2,10,16 142:12,14 143:17, 18 144:3,9,17,23 145:3,4,7,8,10,12, 15,19 146:2,14 147:21,22 148:10, 11 150:3,11 151:10,12 152:5, 10,11,13,17 153:9, 14 154:3,7,20 155:7,8,12,14 156:6,9 157:5,7,17 158:4,6,7,8,9,12, 13,23

**to-the-point** 90:3

**today** 5:23 6:2 58:7

**together** 17:10 31:11 35:7,8 45:9 63:2 66:6 70:6 141:3 148:16 149:19 151:25 158:8

**told** 4:13 17:4 139:5 144:8

**tolerance** 114:20 115:12 116:8,10

**tolerated** 114:18 116:12

**tone** 115:4

**too** 8:4 103:2,3 117:3

**took** 8:9 14:1 35:7 50:1 90:11 156:7

**top** 107:7

**toward** 103:8

**tracking** 26:15

**traffic** 149:24

**train** 83:3

**trained** 39:3 83:2,4, 5 84:20

**trainee** 36:10 40:21

**training** 21:25 22:7 27:20 34:22,23 35:14 36:1,3,7 39:4,11,14,16,17, 19,22 40:18,20 41:1 56:10 59:5 83:6 84:11,14,23, 25 85:1,3,4,7,14 88:22 92:4 94:15 95:11,14,15 97:15, 16 133:4,8,17 151:5,14,17

**transcript** 52:1

**transfer** 11:20 12:19 14:1 121:3 124:25

**transferred** 10:11 11:13 125:2

**transporting** 9:9

**treat** 33:21 78:13

**treated** 69:12

**treating** 16:25

**treatment** 89:1 156:17



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

**tried** 13:12 95:21,
24

**trooper** 8:24

**troopers** 10:16,19
11:4,14,23 12:2

**try** 46:13 65:24
105:21 115:10
123:16

**trying** 16:20 24:19
40:5,7 49:19 50:14
121:19 123:17
139:22

**turn** 72:22 73:19
74:9 75:8,20 77:18
78:2 85:17 86:25
89:9 91:11 96:3
112:7 155:12,14

**two** 7:5,7,9,14
12:21 25:3,5 30:15
32:2,12 38:9 39:18
41:17 60:2,4 83:24
88:19 96:21 97:1,
18 101:24 135:20
145:18 147:22
149:13,14 151:25

**type** 5:5 20:22,24
22:22 23:10,17
40:24 42:20,22,23
53:16 54:1 63:24
64:3,12 65:25 66:7
67:8 68:14 77:15
85:2 88:14 90:13
103:8,9 104:16,20,
21 105:4 108:13
111:4 112:2 114:21
115:4,16,21 116:12
119:23,24 120:18
141:11,16 148:12
157:1

**types** 65:1,3 81:25
83:10 116:4

**typical** 143:21,23

**typically** 35:14
40:25 46:4,5 54:6
121:2 122:11

---

**U**

**uh-huh** 5:20 7:15
8:17 18:14 21:6
22:5 23:5 24:18
28:20 30:21 32:4,8
33:22 34:3,15 36:1
40:15 41:16 44:24
52:20 56:8 122:20

**ultimate** 146:12

**ultimately** 24:20

**under** 6:2 18:23
20:3 21:12 26:24
27:5 28:8,9 37:12,
13 54:25 55:1
75:16 78:16 81:11
83:24 87:7,23 96:7,
11 97:3 102:9
113:19 153:10

**understand** 98:16
128:5 143:2 144:17

**understanding**
50:14 84:13
115:17,19

**understands**
123:18

**unfounded** 146:16

**uniforms** 14:24
124:7

**unit** 15:11,13,14
25:12 26:7 27:7
28:25 29:2

**United** 73:4,6 81:15

**units** 15:14

**unlawful** 113:1,19,
22 114:8,9

**unless** 54:23 84:20
143:23

**unsolicited** 114:10

**until** 8:18 9:1 16:5
20:9 44:8 108:25
109:13 129:7
138:25

**up** 12:7 24:13 27:1,
22 44:17 48:20
52:17 54:21 57:20
65:22 66:12,14
69:24 70:4 86:14,
16 102:12 108:25
109:13 111:11,24
112:13 114:6
120:19 122:23
130:10,17,20,21
133:4 134:5,6
135:17 137:13
142:16 145:21
154:22 156:1

**update** 71:8,10,17,
19 72:1 80:16,18
107:10 113:12

**updated** 77:8,9,11
80:2,4,8,15,18,21
101:10,13,14
113:14

**updating** 72:4,6

**uphold** 75:6

**upholding** 73:5

**upon** 93:6 138:16

**us** 4:15 11:2 21:14
63:14 136:11

**use** 61:24,25 79:16
81:3,9,13 82:14,16,
20 83:2 84:11,14,
21 87:13 89:15,16,

20 90:4,9,11,17,24
91:22 92:4,5,8
93:1,3,4,7,18,21
94:4,8,10,17,22,23
95:1,4,10 96:22
97:5,7,9 98:4,14,23
99:3,5,20 110:21,
23 126:12 130:11
131:9,10 152:3
155:8,9,12,15,23

**used** 5:25 14:21,24
26:13,16 58:7
81:18 82:1,2,3 84:8
90:10,12 92:19

**uses** 89:23

**using** 78:14 81:22
89:22 131:15
146:24

**utilizing** 102:6

---

**V**

**vacancies** 41:8
120:17

**vacancy** 11:21

**Vance** 6:21,23,25
7:8 10:11 11:25
12:1,4,6,7,20
16:11,13 19:9 20:1,
20 21:25 24:1 25:9
35:5 36:5 37:20
38:6 40:12 50:11
72:19 76:11,18
77:20 79:16 80:19
81:8 84:9 85:5,8,9
96:14 100:14
106:23 113:4,17
114:21

**Vance-granville**
7:13

**variance** 37:25



**AdvancedONE**
LEGAL

**(866) 715-7770**
advancedONE.com

varied 30:13 32:14 36:9 96:18 120:17

various 31:20 43:2

vary 122:16

vehicle 34:4,10 124:5 139:1

verification 84:25 85:1,4

verify 38:15

versus 17:3 42:21

very 4:12,13,14 20:18 39:20 68:8 94:9 98:8,9 122:7

vest 138:17,21,22

vesting 81:2

vests 110:5,9,11,14

via 145:16

video 91:25 97:6

videos 93:2

VII 136:23 137:7,18 147:11,14,23

violate 102:11

violation 95:17 109:23

violations 109:17

violence 77:23

visible 90:6

visit 35:8 66:6

---

**W**

wa- 54:13

wait 52:1

waiting 35:23

Waiver 133:5,8,17

Wake 9:2

walk 24:2 44:21 70:3

walked 139:9

walkway 38:9

want 4:25 5:13 14:5 16:8 19:11 21:11 23:1 37:3,6,23 48:12 51:1 57:7 61:5 66:11,19 67:16 69:21 72:22 76:5,6 109:18 112:8,16 119:9,11 129:8 130:21 134:5 135:20 142:14 156:6,8 158:23

wanted 12:12 22:18 46:24 64:20,21 72:15

warning 121:3,6,7, 22

warrant 104:23 105:4

warranted 47:5 104:17

warrantless 78:16

warrants 53:1 68:15

Warren 12:1

was 6:15 7:7,10 8:1,3,4,7,11,13,15, 18,23 9:1,2,20,21, 25 10:6,8,15,19,20, 23 11:5,9,12,13,17, 21,22,24 12:6,13, 16,23 13:1,4,23 14:5,8,12,15,16,20 15:4,5,6,20,24

16:7,16,24 17:4,15, 16,17,21 18:6,8 19:11,13 20:10,15, 16,18 21:2,8,20 22:24 24:17,21 25:1,2,3,6 26:10 27:10,21 28:6,11, 17 29:2 30:1,14,22, 23 31:1,10,11,22 32:2,12 33:10,12, 25 35:4,6,11 36:1, 4,17 37:2,3,12,15, 17,18,25 38:6,9 39:21 40:7,16 41:5, 14,20 42:20,22,25 43:12,14,16,17,20 44:22,25 45:1,6,7, 10,15,19,20 46:3,6, 9 47:5,13 48:11,17, 24 49:2,15 50:15, 23 51:10,14,15 54:11,13,14,15,16, 23,24,25 55:6 56:21 57:18,22,24 59:19 61:2,3,19,20, 22,23,24 62:2,4,6, 10,25 63:16,22 64:22 65:4,12,14, 20,22 67:16,20,21 68:5,25 71:10,11, 14,16,22 72:5,13 77:14 79:6 80:15, 17,21,22,24 83:22, 25 89:12 90:12 92:19,22 93:10,11, 13,15,17 94:6,24 95:11,12,13,23 96:1,19 97:20,21, 22,24 100:19 101:1,18 103:14, 17,18 104:2,4,5,6, 13 105:3,11,21,22, 23 106:3,11 112:11 113:13 115:20 116:11 117:19

120:10 125:19,20, 21 126:3,4,9,11,13, 17,24 127:3,4 129:15 130:12,20 131:13,16,19 132:13,20,25 133:1,6,21 134:3, 23 135:13,14,25 136:14,19 137:6,11 138:17 139:7,8,25 140:18,19 141:9,20 142:9,22,25 143:11,16 144:2,7 145:1 146:8,12,23 147:1,3,11,13,15 148:5,13,15 149:12 150:8,9,10 151:3,5, 6,12,13,24 152:15, 18,19,25 155:2,7 157:2,6 158:5

wasn't 20:11 28:4, 20 29:12 48:18,19 49:21,22 69:12 116:9

Watkins 93:13 143:17 144:20 151:14

way 13:7,12 28:12 40:23 44:18 48:19 63:3 69:8 78:14 86:19 111:11 117:5 123:9,11

Wayne 151:15

we 4:24 5:1,2 11:4 12:1 13:10,13 15:6, 11,13 17:9 18:17 19:4,5 20:14,15 21:2,4,20 22:4,17, 18 23:12 24:12,13, 15,16 25:11 28:4,5 30:7,8,11,12,15 32:10 33:19 35:9, 16,17,18,20,21,22


LEGAL

(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

207
Index: we'll..what

37:24 38:2,8 39:3
45:5 47:11 49:15
50:10 51:13,15
53:5,24,25 54:3
55:17,22 56:20
57:18,23 58:2,5
59:2,10,18 60:7,9,
13 62:21,22 63:2,6,
8,9,14 64:16,19,20,
21,23,24 65:13
66:9,10,12 67:5,18,
19,23 68:9 69:6,19,
21 72:19 75:24
78:1 82:10,11,12,
17 93:21 96:25
98:9,23 99:22
101:1 108:14,15,
16,18,19 120:17,18
124:4,5,6,13
127:12,20 128:2,4,
18,20 129:6,7
130:12 135:22
143:7 148:20
151:20 154:25
155:2,21 158:14

**we'll** 75:19 76:5
128:24 142:14

**we're** 11:10 44:10
45:18 69:1 71:13
74:20 104:12 112:7
127:20,23,24
128:6,9,10,15,16
133:2 141:12 154:6
157:12

**we've** 25:10 68:23
69:8,19 130:7

**weapon** 54:1 87:6,
21 89:24 90:1

**week** 36:25 86:9

**weeks** 36:8,9 37:3,
4,6 40:9 138:17
139:2

**welcome** 33:18
34:11 46:1

**Weldon** 68:4,6,16
98:1 99:16 127:9
131:21 132:16,23

**welfare** 81:3

**well** 7:20 10:2,4
11:2 12:6,13,18
13:10 14:20 15:9
16:18 17:24 18:11
19:14,15 21:14,17
22:12 23:12,15
28:4 29:12 30:19
32:14 33:12 36:6,
10,20 37:18 38:2
39:6,10,13,18,20
46:22 47:4 48:17
49:17,21 50:2
52:15,20,22,24
53:11 54:13 56:7
58:3,17 60:23
63:12,13 64:19
65:16,22 66:18
69:10 85:11 86:21
87:25 94:9 95:21
96:18 99:13 101:16
102:15 105:20
110:16 116:9
121:23 123:11
125:16 128:2,3,6,8,
12,15,18,20 130:16
141:13 143:23
144:1,10 147:13
148:13,16 150:1
152:18 153:4
155:25

**went** 4:16 5:2 6:25
7:1 12:8 32:7 42:4
63:3 64:15 80:10
84:1 139:10 145:18
150:11

**were** 4:17 7:4,24
8:6,11,14,25 9:13,

23 10:7,16,22 11:2,
7,16 12:20,25 13:3,
10,13,14,21 14:4,
10,11,25 15:7,16,
25 16:3 17:9 18:3,
15 19:25 20:20,23,
25 21:1,6,9,11,12
22:3,6,12,23 23:10,
12 24:7,12,20
26:13,16 29:5,8
30:2 31:11,13,14,
18 32:19,22 33:19
35:19,21,23 36:7,
13,17 38:6,8 40:5,
22,23 41:6,8,21,22,
23 42:2,6,12,15,18,
19 43:2,4,8 45:2,4
46:2 48:10 50:5,7
53:5,12 55:8,22
56:15 61:4 63:4
65:7,24 67:6 68:25
70:25 71:16 72:11
83:22,24 93:15,25
95:7 96:25 98:8
104:10 106:3
126:15 129:14
131:8 132:5 138:19
139:13 140:17,21
141:2 142:2 143:24
144:3 145:11,13,
14,17 146:16
147:22 151:16
152:16,20,22
154:13 156:8,9,13
158:10

**weren't** 9:23 21:1,
21 44:8 127:7

**what** 4:25 7:1,6,15
8:3,11,20,23 9:5,17
10:10 11:10,19
12:22 13:3,8,9,10,
13,25 14:14,16,19
15:6,11,19,22
16:10,14,16,21,24

17:3,25 19:13,18
20:13,22,24 21:2,3,
6,16 22:8,10,15,19
23:10,14,18 24:19,
21 25:11,13,18
26:19 27:14 28:8
30:14 31:2,13,14
32:5 33:14,15 34:7,
16 35:4,14 36:1,4,
24 37:2,21,24 38:2,
4,21,23 39:3 40:13,
17,19,25 41:20,22,
25 42:3,11,14
43:23 44:2,7 45:16
46:9,13,21 47:3,15
49:12 50:24 52:24
53:2,10,14,22
54:13,14 55:7 56:3
57:16 58:15 59:12,
18 60:3 61:20,23
62:14 63:11,24
64:3 65:1 66:2,24
68:5,14,18 69:15
73:13,14 74:2 75:1
76:13,16 78:17,24
80:12 82:19 85:1
86:7,18 87:9,11
90:9,11,12 92:13
94:24 95:6,7 96:10
97:24 98:16 99:14,
18 100:19 102:14
103:16 104:21
106:23 108:2,13,18
109:20 110:10,20,
23 111:2,7 114:19
115:6,13,18
117:12,16 118:22,
24 119:12,13
120:8,10 121:6,11,
15,17 123:13,17,
18,22 125:1,21
126:3,5,7,13,24
129:3,4 130:12,16,
20 131:4,25 132:4,
6 133:6,12 134:3,



12,15 139:8,14,22
140:9,19 141:5,15,
16,18 142:24,25
143:1,3 145:19
146:12 147:11
149:10,15 150:3,4,
8,10,17,21,23
151:23 155:14,21
156:23 157:4 158:3

**what's** 67:25 90:20
103:6 115:10
116:17 122:17
124:2,20,23 147:7

**whatever** 14:23
18:12 42:5 44:17
53:12 63:3 72:15
83:15 154:20

**when** 4:16 5:2 9:7
10:2 13:8 16:6
18:3,15 19:14,18
22:4,10,11 24:16
28:24 33:14 35:16
36:6 38:23 40:17
43:12 44:22 45:10
47:23 48:19 50:1,2
51:2,6,25 55:25
58:23 60:1,15
66:14 70:8 71:19,
22 76:3 79:11
80:18 87:4 88:25
89:6 93:10 95:4,8
99:11 103:17
111:2,14 123:25
124:2 135:3,12
137:6 139:16 140:6
145:7,9 146:24
149:10,24 150:4,
11,21 153:25
154:18 156:4,8
157:5 158:13

**whenever** 58:21
66:21 72:14 90:5

**where** 9:19 12:13
22:19 26:19 41:8
49:5 74:24 75:2
85:20 88:4 89:8,14,
25 90:7 93:22
114:7 118:19 148:4
152:25

**where'd** 8:8,20

**where's** 139:10

**wherever** 54:3

**whether** 22:23
57:10 67:12 92:2,
18 103:20 129:16
135:6

**which** 8:4 11:14
15:14 16:11 19:16
22:8 33:3 39:17
45:3 46:6 49:20
51:13,17,23 56:5,
11,20 62:18 69:11
71:13 73:15 78:5
80:23 81:10 84:11
87:6,20,21 97:22
115:14 120:2
125:15,17 129:15
132:2 137:6 145:18
151:23 154:13
156:13

**whichever** 152:15

**while** 35:18,22
64:15 81:11,22
138:19

**white** 4:2,6,20,21
5:9 6:6 47:1 50:9
51:25 52:13 54:10,
12,15,16 55:22
56:24 59:10 61:5
62:8 66:13,15 67:5
68:13 69:1 70:2,7,
14 71:9 75:9 76:2,
10 79:15 84:6

85:18 87:9 89:15
92:24 96:6 98:6,22
100:2,10,13 106:17
112:13,22 117:7
118:14 126:4 127:3
129:10,14 131:2,7,
22 132:10,17
133:15,16,24
134:10,16,24,25
135:6 137:2,4,17
139:21 142:12
143:5,19 144:7,8,
16,18 145:8 146:1,
3,25 147:18,19
148:4,7 152:10
153:2 154:9,16,19
156:6,10,16,18
157:24 158:23

**White's** 4:17 120:7,
12,15 130:11 131:9
134:1,6 135:18
136:20 145:12
152:17 155:8
156:13,21

**who** 17:12,14,16
19:25 24:15,22
31:23 32:11 37:10
39:24 42:16 48:15
60:5 64:4 67:19
72:5 77:11,13 82:9,
12 83:22 92:10
93:7,9,17 94:8
95:18 96:11 97:13,
20,24 99:7,11
100:25 102:10
109:5 111:21
118:16 119:13
122:20 127:6
134:23 138:3,4
146:20 147:18
151:10 153:7,21,23
154:5

**whoever** 31:25
107:21 111:6

116:21 122:9
123:15 145:8

**whole** 10:13 22:24
24:17 28:19 64:11
73:8 81:6 112:14

**whom** 80:6 114:1
116:20

**whose** 113:3

**why** 16:21 17:7
39:16 60:10,13
61:4 64:18 67:16
72:17 78:23 90:13
104:25 116:7
152:22

**will** 4:20,22 18:24
34:5 38:3 54:2
58:6,7 68:17 70:7
73:8 74:1,9,22,24
75:2 76:2 77:18
78:2 79:11,14
83:12 84:11 87:6,
21,22 94:10 96:3
97:6 99:6,8 101:20,
23 102:5 107:23
108:15 114:3,5,17
123:16 134:19
138:8,12

**wing** 27:2

**wires** 139:13

**with** 5:5,19 9:10,12,
23 10:25 13:12
15:7 16:23 17:21
20:17 21:17 23:13
27:22,24 28:22
29:24 30:25 31:23,
24 32:4,10 33:1,8,
13,14 34:1 36:25
37:7,8 38:15 39:18,
19,24 40:1,3,9,22
44:16,18 45:8,24
46:12,16 50:3



(866) 715-7770
advancedONE.com

WHITE vs VANCE COUNTY, NC, et al.
Peter White, 30(b)(6), 02/26/2021

209

Index: within..yes

51:23 57:12 63:18 65:15,21 72:9,11, 17 73:11,12 74:25 75:3 78:12 80:11 81:14 82:15 88:17 89:22 90:7,21 91:23 92:1,6 93:2 94:20 95:8 97:12 105:19 109:6 111:24 112:17 114:1 121:16 124:11,14 125:12 128:13 131:1 132:23 133:17 145:19 146:22,25 147:24 148:4,7 149:15,20 151:5 153:1,5

**within** 29:10 54:2 59:23 65:4 88:21 99:4 107:25

**without** 47:24 48:2 49:8,13,19 51:16 84:23,24 123:25

**WITNESS** 57:20 58:9 66:17,22 68:6 75:25 85:23 91:21 98:1 100:6 106:12 112:19 129:12 133:10 140:2,4,11 145:23 156:3 159:2

**witnesses** 151:1

**woman** 69:11 96:22

**woman's** 129:17,25

**women** 96:7,9,11, 16

**won** 17:18,19,20 18:1,2

**wondering** 104:25

**word** 110:4 132:1

146:24

**words** 69:18 96:1 114:14

**work** 7:21 22:2 36:25 41:25 42:4 48:12 54:22 68:21 77:15 113:21 114:13 121:3 123:22,24,25

**worked** 7:9 12:2 15:12 35:7 41:17, 18 49:25

**working** 26:4 35:19,22 103:2,3

**workplace** 13:16 67:9 68:19 69:14 105:8,9,10,14,17 110:1 113:1,20,22 114:8,9 117:8,11, 17 136:25

**works** 76:7

**would** 6:18 12:16 16:12 17:5 18:12, 19 21:19 22:14,17, 18 23:18 24:7,9,10, 11,13 25:20,22 26:11,19,21,23 27:4,17,18,20,22 28:8 30:2,3,4,11, 17,21,24 31:2,3,4, 6,7,19,22,23 32:2, 4,6,9 33:8,14,15, 17,24 34:4,11,16, 17,19,21 35:1,3,9, 10,17,18,20,22 36:23,24 37:22 38:2,3,15,21,24 39:24 40:1,2 41:9 42:16,17 43:23,24, 25 44:2,4,5,7,12 45:4,7,8 46:12,14, 18,21 47:12,14,15

50:17 53:7,8,10,13, 14,15,17,18,20,24, 25 54:3,5 60:4,10 61:1,12 62:21,22 63:6,8,12,14,18,19, 24 64:3,4,9,10,11, 12 65:5 66:7,13 67:11,19,21,23,24 69:4,10 70:3 71:3, 24 73:19 74:6 75:13,14 80:13,14, 16 83:18 85:4,6,8, 13 86:9,11 87:16 89:6 90:25 94:2,3 95:3,4,14 98:9,11, 19 99:16,19 103:7, 24 104:16,19 105:1,16,19 106:9 109:25 110:17,20, 25 111:21,23,25 112:4 115:13,23 116:1,24 117:6 118:3,4 121:2,23 122:7,20 125:10 127:6,9,19 128:18 132:25 145:19 146:14 148:6,10 150:3 151:19 152:8,10,11 154:20 158:8

**wouldn't** 26:22 29:25 30:12 33:13 39:16 53:11 64:11 69:6 78:23 94:5,7,8 116:23 152:18

**write** 143:17 144:18 151:10

**writing** 103:12,18, 25 107:19 121:7 137:2

**written** 45:19 102:17,19 103:14, 20 121:2,6 140:8,

11 142:10,22 143:22 144:2 145:1 146:2 152:8

**wrong** 121:18 139:8

**wrote** 147:22

---

**X**

**X-RAY** 26:5

---

**Y**

**y'all** 11:1 38:7 63:21

**yeah** 14:10 19:15 58:5 66:22 68:3,4 82:8 83:4 87:25 97:4 110:16 136:22 139:22 140:2 150:20 157:14

**year** 8:7 10:8 11:18 13:1,24 14:6 16:14 34:10 35:19 45:4 61:15,18 62:11,14, 15 134:18

**years** 7:5,7 8:15 9:16 11:9 12:21 15:17 18:16 35:9 38:19 50:4 61:2 62:20 64:16,24 97:11 141:19 142:3 151:25 154:14

**years'** 39:2

**yes** 5:15,18,20,22 6:20,23 9:15,18,25 10:4 11:6 12:1 13:17 15:2 16:2 17:13,14,19 18:21 19:22,24 20:2,21, 23 22:1 23:22,24



**(866) 715-7770**
advancedONE.com

28:2,10 29:18,21
30:6 31:11,18 33:6,
7 34:13,25 37:21
40:16 42:8 43:6,22
44:13 46:8 47:2
48:22 51:3 52:6
53:8 54:7 55:3,6
56:2,17,25 58:8,9,
12,14,23 59:16
62:3,9,20 67:21
69:2 70:3,22 71:2
73:12 74:8 75:7,17,
24 76:22 77:1 78:8
79:2,19,23 80:5
81:19,24 83:1,4,8,
17 85:16 86:23
87:18 88:9 89:2,17,
18 90:16 91:8,9,17
93:24 94:2 96:5,13
98:9,25 99:24
100:11,17 101:3
102:21 103:22
105:15 106:15,19,
25 107:3,5 108:10
109:4,10 110:2,15,
22,25 112:6,23
113:6,8 116:6
117:10 118:5,6
119:19 120:5,21
121:10 122:2,4
123:6 124:4,13
125:16 126:1,6,23
127:2,5,16,19
129:12 130:1,5,9,
23 131:3,20,24
134:14 135:12,22
136:5 137:5,18,20,
21,25 138:2 139:18
140:18,22,24
142:20 144:20,23
145:2,14,17 146:5,
19 148:19 149:2,8
150:7,16 151:2,9,
21 152:9,11,21
153:9,11,18 155:6

156:19 158:2,15,17

**yesterday** 4:13 5:1
57:25 58:7 67:16
130:13

**yet** 19:4

**you** 4:6,8,9,16,19,
20 5:2,3,4,13,16,
19,23,24,25 6:4,9,
13,18,21,24,25 7:1,
4,6,12,23,24 8:6,8,
14,20,25 9:10,13,
19,23 10:2,7,13,18
11:7,16,25 12:4,12,
14,18,20,25 13:8,
15,18,21 14:4,25
15:16,25 16:3,6,10,
14,18,19,20,21
17:7,12,18 18:2,3,
10,19,23 19:18
20:6,8,13,18 21:11,
12 22:10,11,15,21
23:1,3,6,8,10,13,
15,16,20,23 24:18,
20 26:18 27:6 28:1,
12,24,25 29:1,8,23,
24 30:2,3,4,9,12,
17,21 31:9,15,17,
23,24 32:4,22 33:1,
14,15,25 34:5,11
35:1,13 36:21,23
38:10,16,23,24
39:10,18 40:1,5,11
41:4,25 43:10,20
45:10,25 46:24,25
47:3,23 48:1,6,21,
23 49:5,6,17,18
50:2,10,12,16,17,
18,20 51:1,2,4,6,7,
12,16 52:2,4,7,10,
17 53:7 54:8,9,18
55:4,15,23,25 56:4,
16,18 57:2,3,4,7,
13,16,19 58:11,13,
15,21,25 59:4,6,9,

12,14,21 60:5,8,10,
15,19 61:5,6,7,9,
12,14,17 62:8,15,
17,18 63:11 64:2,4,
6,14,23 65:1,2,8,9,
17,24 66:11,12,14,
15,19 67:2,7,9,17,
18,20 68:1,7,12
69:3,4,8,10,11,23
70:2,6,7,13,17,23,
25 71:3,6,8,16,21
72:1,5,9,17,23,25
73:11,13,15,19,22,
23 74:2,6,9,12,16,
18 75:8,11,15,18,
22 76:2,5,6,9,15,
23,25 77:2,5,13,16,
18 78:2,4,17,22,23,
25 79:11,14,20,22,
24 80:4,6,12,16,18,
20,25 81:6,25 82:4,
9,15 83:2,16,22
84:3,5,17,19,20
85:17,20 86:21
87:2,11,16 88:4,19
89:3,14,19 90:14
91:2,18,19 92:13,
23 93:25 94:14
95:6,7,20 96:3,6,7,
16 97:1 98:2,4,5,
11,16,21 99:11,12,
14,18,19 100:2,12,
16,18,21,22 101:1,
2,8,20,23 102:13,
14 103:4,19 104:1,
7,14,15,19,21
105:1,2,7,13,16,25
106:6,9,14,17,20
107:4,6,10,12,23
108:6 109:2,14
110:3,4,7,8,10,17,
20 111:14 112:13,
14,15,21,24 113:5,
7,9,12,15 114:7
115:12,13,18

116:1,4,7,16
117:12,21,25
118:3,4,7,14,23
119:2,4,6,7,8,12,19
120:6,11,14,22,25
122:25 124:8,16,25
125:5,14,15,18,23
126:5,10,15 127:6,
7,14,22 129:5,8,10,
14,16,20,24
130:15,20,21
131:1,4,8,12,16,22,
23 132:4,10,16,22,
23,25 133:4,12,23
134:12,13,15,17,
20,25 135:8,10,20,
24 136:2,3,6,16,19,
22 137:12,16,22,24
138:1,3,8,12,23
139:14,16 140:6,9,
14,17,21,25 141:5,
15,17,22,23 142:5,
11,19,21 143:2,13,
15 144:4,11,17
145:11,16,20,25
146:10,13,18
147:12,15 148:4,7,
8,17,25 149:3,10,
16 150:4,17,21
151:1,8,10,19
152:4,16,20,22
153:13,25 154:1,4,
18,19 155:4,7,12,
18,24 156:1,7,8,9,
12,16,20 157:4,21
158:1,3,13,23,24
159:1,3

**you'd** 30:21

**you'll** 29:13,14
75:18

**you're** 5:24,25 6:1
9:8 16:21 19:23
23:4 46:1 50:13
51:23 52:8 56:23



(866) 715-7770
advancedONE.com

79:11 123:25
130:16,17

**you've** 52:2 60:24
61:9 70:8 74:1 76:3
100:9

**young** 34:9

**your** 4:11 5:3,5,8
6:4,7,9 7:15,23
8:11,23 12:11,19
13:3 16:18,21,24
17:1 18:18,23 20:3,
9 24:21,22 34:12,
15 38:5,10 51:24
52:13 57:12 59:14
60:25 61:10,15,17
62:10,14,18 63:4
67:16 68:8 70:20
71:8 72:2,9,10,17,
22 73:16,19 74:3,5,
9 76:20 77:24 78:2,
25 79:1,18 81:17
82:7,21 88:24 96:7,
11 103:14 104:25
107:1 128:16
134:3,19 139:10,25
141:5,22 142:6
144:8 146:4,12
147:11 152:13
153:1,10,12 157:7
158:13,14,23

**yourself** 73:23

───────────────
                Z
───────────────

**zero** 114:20 115:12
116:7,9

**ZIP** 6:11 17:1,3

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

P. White- Campbell Statement re Incident with J. White

July 18, 2018

Statement regarding accusation made by Dep. J.J. White.

On Monday July 16, 2018, I was contacted by Capt. Watkins and requested to write a statement in reference to the previous incident involving Dep. White and myself from back in January.

The specific accusation was that I told Dep. White "didn't I tell your ass not to do that anymore and I will take care of your ass when I get to work". This conversation took place about six months ago, and I did not copy down word for word what was said, but I do remember being quite angry with him that morning over continued defiance of instructions given to him to stop taking out criminal summons on people he encountered for every little thing he saw. I do not remember the specific wording I used during that conversation, nor can I deny that as upset as I was I did not say that either.

As for the incident in the Sheriff's office later in the day, I did not say anything initially. I overheard a conversation taking place in the patrol room that was getting heated between Dep. White, Poole and Sgt. Alexander. I stepped out into the room just to see what was going on and Dep. White then began making statements to me. Dep. White got up from his seat, and started walking toward me making verbal and hand gestures, but then stopped. There was a heated exchange between us as well, but I do not remember using any specific foul language toward him while addressing him.

Durwood Lee Campbell

P. White- J. White Firearms Quals

CRIMINAL JUSTICE EDUCATION AND TRAINING STANDARDS COMMISSION
NORTH CAROLINA SHERIFFS' EDUCATION AND TRAINING STANDARDS COMMISSION

Sheriffs' Standards Division
PO Box 629
Raleigh, NC 27602
Telephone: (919) 779-8213
Fax: (919) 662-4515



Criminal Justice Standards Division
Post Office Drawer 149
Raleigh, NC 27602
Telephone: (919) 661-5980
Fax: (919) 779-8210

FIREARMS QUALIFICATION RECORD INSTRUCTIONS          Form F-9A   *(rev. 3.30.17)*

This form must be utilized to record the annual In-Service Firearms Training and Qualification for each certified officer in compliance with 12 NCAC 9E .0100 or 12 NCAC 10B .2104. A copy must be maintained in each officer's personnel file at the employing agency, and must be available for inspection by a Commission Staff member. A copy must be attached to the F-5A and submitted to the Criminal Justice Standards Division for all new hires.

| | |
|---|---|
| SECTION I: | Must be completed for every officer. |
| SECTION II: | Must be completed for every officer and signed and dated by the instructor(s). |
| SECTION III: | Must be signed and dated by the officer. |
| SECTION IV: | Must be signed and dated by the Agency Head or designated representative. |
| SECTION V: | Must be completed and signed by the specific certified Specialized Firearms Instructor(s). |

I.  **OFFICER'S NAME:** Justin J White          SSN (Last 4): 6961

Certified by: NC Criminal Justice Education and Training Standards Commission: ☐ Yes   ☐ No
Certified by: NC Sheriffs' Education and Training Standards Commission: ☑ Yes   ☐ No

**EMPLOYING/APPOINTING AGENCY:** Vance County Sheriff's Office

II.  **FIREARMS INSTRUCTOR COMPLIANCE – CLASSROOM REQUIREMENT**

As a Specialized Firearms Instructor, I do hereby certify that the officer listed above has completed the mandatory classroom portion of the in-service firearms training, as specified in 12 NCAC 9E .0105 or 12 NCAC 10B .2103 as applicable. Failure to complete this training requires that the agency head or designated representative be notified.

The classroom session was completed on 6-5-17 (date).

R.T. Robinson          R.J.B.          100094952          6-5-17
Print Name of Firearms Instructor     Signature of Firearms Instructor     Instructor #     Date Signed

III.  **ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

I do hereby certify that I have been advised of my firearms qualification scores by the Specialized Firearms Instructor(s) indicated. I also understand that if I have failed to qualify with any weapons(s) required, I may not carry and/or have access to the weapon until such time as I have qualified. I further understand that I must notify my agency head or designated representative within 24 hours of my failure to qualify, and/or successfully complete the training portion as prescribed in 12 NCAC 9E .0105 or 12 NCAC 10B .2103 as applicable.

_____          6-5-17
Signature of Officer                       Date Signed

IV.  **AGENCY ACKNOWLEDGEMENT OF QUALIFICATION SCORES:**

As agency head, or designated representative, the below signature acknowledges receipt of the above officer's qualification scores and attests that the above officer has satisfactorily completed training on this department's policies regarding the use of force, N.C. State law regarding the use of deadly force, relevant case law, and safety and marksmanship as required in 12 NCAC 9E .0105 or 12 NCAC 10B .2103. I understand that if the officer has failed to qualify with any weapon(s), then I must restrict access to all applicable weapon(s) until such time as the officer has qualified with same.

☑ I certify that the in-service firearms training consisted of a minimum of six (6) hours/credits (For Criminal Justice Commission only.)

_____          6-5-17
Signature of Agency Head/Designated Representative          Date Signed

*As a certified Specialized Firearms Instructor, I hereby certify that the officer listed below has attained the score(s) as documented below. I understand that if the officer has failed to qualify, then I must deliver a copy of this form to the officer's agency head or designated representative within 72 hours either in person, or by certified mail.

FFICER'S NAME: Justin J White    NAME OR RANGE LOCATION: Henderson Training Center

## SERVICE HANDGUN QUALIFICATION

| Date | Weapon Type | Make | Model | Caliber or Gauge | Serial # | Ammunition | Day(D) Night(N) | Score (%) or (P)(F) | Qualify Yes/No | Print and Sign Name & Instructor Number |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/5/2017 | SA | Sig Sauer | P320 | 45 cal | G310644 | 230 gr | Day | 92.6 | Yes | R.J. Robinson-RT-185 100094952-2100 |
| 6/5/2017 | SA | Sig Sauer | P320 | 45 cal | G310644 | 230 gr | Night | 90.0 | Yes | R.J. Robinson- RT-185 100094952 |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

## OFF-DUTY HANDGUN QUALIFICATION

| Date | Weapon Type | Make | Model | Caliber or Gauge | Serial # | Ammunition | Day(D) Night(N) | Score (%) (P)(F) | Qualify Yes/No | Print and Sign Name & Instructor Number |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |

## SHOTGUN/RIFLE QUALIFICATION

| Date | Weapon Type | Make | Model | Caliber or Gauge | Serial # | Ammunition | Day(D) Night(N) | Score (%) (P)(F) | Qualify Yes/No | Print and Sign Name & Instructor Number |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. 6/5/2017 | SG | Remington | 870 | 12 gauge | ABF05369M | OO Buck Slug | Day | 82.0 | Yes | R.J. Robinson- RT-185 100094952 |
| 2. 6/5/2017 | SG | Remington | 870 | 12 gauge | ABF05367M | OO Buck Slug | Night | 85 | Yes | R.J. Robinson- RT-185 100094952 |

## AUTOMATIC/SPECIALTY WEAPONS/OTHER

| Date | Weapon Type | Make | Model | Caliber or Gauge | Serial # | Ammunition | Day(D) Night(N) | Score (%) (P)(F) | Qualify Yes/No | Print and Sign Name & Instructor Number |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | | |
| 2. | | | | | | | | | | |

## COMBAT COURSE

| Date | Day/Night | Make | Pass/Fail | Comments | Print and Sign Name & Instructor Number |
|---|---|---|---|---|---|
| 1. 6/5/2017 | Day | | P | No Problems Noted | R.J. Robinson - RT-185 100094952 |
| 2. 6/5/2017 | Night | | P | No Problems Noted | R.J. Robinson - RT-185 100094952 |

**Revolver**
1-Semi Auto Handgun
2-Shotgun
3-LTL-Ruger
4-Automatic Weapon
5-Rifle

S&W-Smith & Wesson
GLO - Glock
BER- Beretta
RUG- Ruger
SIG- Sig Sauer

BEN-Benelli
CLT - Colt
WIN- Winchester
ARA - Armalite
SAV - Savage

BRO- Browning
H&K - Heckler & Koch
MOS- Mossberg
REM - Remington
BUS - Bushmaster

SW- Specialized Weapon
SPF- Springfield
RRV - Rock River

Ammunition- Must be duty ammunition or ballistic equivalent ammunition
Include sufficient information to fully describe such as caliber, projectile weight and type.
*Sheriff's Standard handgun sight requires use of flashlight at the 5-yd line
*Sheriff's Standards accepts pass/fail rather than % scores

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 573 of 665

TITLE: USE OF DEADLY FORCE - HANDOUT

NORTH CAROLINA GENERAL STATUTE 15A-401 (d) (2) - USE OF FORCE IN ARREST.

A LAW ENFORCEMENT OFFICER IS JUSTIFIED IN USING DEADLY PHYSICAL FORCE UPON ANOTHER PERSON FOR A PURPOSE SPECIFIED IN SUBDIVISION (1) OF THIS SUBSECTION ONLY WHEN IT IS OR APPEARS TO REASONABLY NECESSARY THEREBY:

A)   TO DEFEND HIMSELF OR A THIRD PERSON FROM WHAT HE
     REASONALBY BELIEVES TO THE USE IMMINENT USE OF DEADLY
     PHYISCAL FORCE:

B)   TO EFFECT AN ARREST OR PREVENT THE ESCAPE FROM THE CUSTODY
     OF A PERSON WHO HE REASONABLY BELIEVES IS ATTEMPTING TO
     ESCAPE BY MEANS OF A DEADLY WEAPON, OR WHO BY HIS CONDUCT
     OR ANY OTHER MEANS INDICATES THAT HE PRESENTS AN IMMINENT
     THREAT OF DEATH OR SERIOUS PHYSICAL INJURY TO OTHERS UNLESS
     APPREHENDED WITHOUT DELAY; OR

C)   TO PREVENT THE ESCAPE OF A PERSON FROM CUSTODY IMPOSED
     UPON HIM AS A RESULT OF CONVICTION FOR A FELONY.

NOTHING IN THIS SUBDIVISION CONSTITUTES JUSTIFICATION FOR WILLFUL, MALICIOUS OR CRIMINAL NEGLIGENT CONDUCT ANY PERSON WHICH INJURES OR ENDANGERS ANY PERSON OR PROPERTY, NOR SHALL IT BE CONSTRULED TO EXCUSE OR JUSTIFY THE USE OF UNREASONALBE OR EXCESSIVE FORCE.

NOTE:   A LAW ENFORCEMT OFFICER ACTING OUTSIDE OF HIS/HER JURISDICTION ASSUMES THE IDENTITY OF A PRIVATE CITIZEN. WHILE THERE MAY BE JUSTICATION FOR THE INDIVIDUAL'S ACTION WHEN CONFRONTED WITH A CRIMINAL SITUATION, THE OFFICER IS STILL CIVILLY LIABLE. IT IS IMPORTANT TO NOTE THAT A CIVIL JURY MAY VIEW THIS ACTIONS AS A CITIZEN ALTOGETHER DIFFERENTLY THAN IF WERE ACTING AS A SWORN OFFICER WITHIN HIS JURISDICTIONAL LIMITS.

INSTRUCTOR: _R.T. Robinson_    DATE: _6-5-17_

tt 100094953

STUDENT( S) SIGNATURE: _____   6/5/17

P. White- J. White Raise



**Vance County Human Resources**
**122 Young Street, Suite B**
Henderson, NC 27536

June 6, 2018

Justin White
Deputy Sheriff

Dear Mr. White;

On June 5, 2018, you satisfied the eligibility period to receive the first year law enforcement officer $1,500 salary adjustment. Your annual salary will be $34,764 effective June 5, 2018.

If you have any questions, please feel free to give me a call at the above number.

Sincerely,

Argretta R. Johen

c:    Sheriff Peter White

*Argretta R. Johen, HR Director*
*(252) 738-2014*
*(252) 430-0290 (Fax)*

*Johanna M. Torres, HR Specialist*
*(252) 738-2017*

# P. White- J. White Rebuttal to Alexander Appraisal

130 Chappel Lane • Kittrell, NC 27544 • (919) 961-3448 • Justinwhitencssd@yahoo.com

---

June 15th, 2018                    **Transmitted via Hand Delivery**

Sheriff Peter White                **Personnel Sensitive, Confidential & Sworn File**
Vance County Sheriff's Office
156 Church Street, Suite 004
Henderson, NC 27536
Pwhite@vancecounty.org

### Re: Employee Performance Appraisal Rebuttal

**Dear Sheriff**

I, Justin J. White, deputy sheriff, hereby file rebuttal in reference to the aforementioned done by
Sergeant Myron D. Alexander (S-12), Patrol Supervisor. Same was done on June 1st, 2018, 4
months approximately after I was transferred from his shift. I was notified of this document on
June 8th, 2018, at 6 p.m. by Sgt. Chris M. Welborn (S-13), Patrol Supervisor & presented with
same to sign in which I noted being in strong disagreement with. I shared my dissent with Sgt.
Welborn, in which Sgt. Bobby Martin (S-11) was present & I was told to appeal it. Attached is a
copy of my performance appraisal.

Sgt. Welborn advised me, JJ (me) you are a good employee, you work & you got some know
how. Sgt. Welborn stated, this report is biased because Myron have personal issues with you. He
advised me, you are a team player & professional with the citizens & us but I do get a little
carried away from time to time but not too much. Sgt. Welborn claimed, JJ we all get a little
carried away from time to time, it's going to happen. Sgt. Welborn stated, you are not
insubordinate, you follow orders & do your job. Sgt. Welborn stated, go to the sheriff & talk to
him.

**Sgt. Bobby Martin advised me to file a rebuttal with the High Sheriff so it can be reviewed &**
removed from my file & if it was not overturned then for the rebuttal to be attached to the
performance evaluation. Also, Sgt. Martin advised me that he had the same situation happen with
a supervisor in investigations. Sgt. Martin claimed to have prepared a rebuttal & presented same
to you & asked to be transferred since he could not satisfy his supervisor. Sgt. Martin won his
case.

First & foremost, I am a stern & firm individual. I am shocked that Sgt. Alexander portrayed me
negatively especially when he claimed that he did not have a problem with my job performance
and or personal conduct in early January 2018 during a meeting with management, supervision
& subordinates. Also, I have not been written up several times for my attitude & work ethics, nor
have I been very insubordinate towards supervisors. Based on those deceptive & frivolous
allegations, I request to view & copy my complete personnel file. It should be noted, I asked to
see the file that Chief Bullock had when I was suspended in February 2018, in which I was
denied & told, you have everything you need.

**EX. F**

### Justin Jamel White                                           2/3

130 Chappel Lane ● Kittrell. NC 27544 ● (919) 961-3448 ● Justinwhitencssd@yahoo.com

**How can Sgt. Alexander adjudicate my performance or personal conduct when he does not show up to work on time & has been a no call no show on calls for service on various occasions with staff that have requested back up? He is the king of absenteeism & tardiness. In fact, he is the reason why a memo was issued 6-7 months ago for patrol to report to clock on at 5:30 and report to work at 5:45 & he does not adhere to same. Plenty of times, my supervisor & I waited for him to come to work & he would show up at 7 a.m. but his staff was on time. It is substantially rare for him to clock on on-time.**

For example, Sgt. Alexander failed to report to work on time for 1 ½ hrs approximately, leaving me to answer calls in county alone & without back up, he gave Deputy I. Greene (trainee at-the-time) & Deputy T. Terry permission to come in late by using comp time. A burglary call (10-62 in progress) was assigned to me which was later downgraded to a prowler (10-76). Both calls for service were/are priority. The caller stated someone was trying to break into her residence & hung up. Then, she called back saying someone was trying to come through her window & that she heard them outside. I determined it was not a burglary or prowler but the wind causing the metal antenna & electric wires on her trailer to mimic same. In fact, day shift who was already off provided back up without my request since I was by myself. Sgt. Alexander was not appropriately disciplined for lying to Lt. Campbell (insubordination) claiming he was at work, when he was not, neglecting duty and failing to report as scheduled.

Deputy Branch (S-34) went to the sheriff's office on his day off a few months ago & met with Chief Bullock & Captain Watkins in reference to complaining on Sgt. Alexander pertinent to him not answering calls, not backing up deputies & not being accessible. As a matter of fact, Deputy Branch reported to management, supervision & co-workers that Sgt. Alexander was clearing calls after riding past the house & not stopping. Deputy Branch requested to be transferred to another shift & management told him to tough it out until the guys were out of training in May.

Deputy Poole (S-40) complained on Sgt. Alexander & wanted to be moved. In fact, on a call in January 2018, in which we had a burglary in progress call during the winter storm & Sgt. Alexander & Deputy Greene (S-41) were closer. Deputy Poole & I were near U.S. 1 S by the Franklin & Vance county line & we got there first & handled same despite them being on Warrenton road near U.S. 1. That incident triggered Deputy Poole's 10 day suspension, however, no one got on Myron for threatening Deputy Poole on the radio, you want to put your life on it in reference to who was closer to Regina Lane. Also, Sgt. Alexander, told Deputy Poole on the phone, I don't have to answer call because I am the supervisor.

Deputy Burns had problems with Sgt. Alexander not working & was constantly complaining on him to the Chief Bullock & Capt. Watkins. Also, former Deputy Lauren Matthews had a host of problems with Sgt. Alexander & was complaining.

According to supervision, every person that goes to his shift, either gets transferred or quits.

As a matter of recent fact, Deputy Al-Wadeii (S-28) worked Sgt. Alexander's shift f & was complaining to supervision on the other shift that he called for backup on Vicksboro Road & no one came but Deputy Edwards (S-24), who was the Northside car. Deputy Edwards stated he diverted from a call (pending) because Deputy Al-Wadeii called for help. Deputy Al-Wadeii claimed that Sgt. Alexander & Deputy Greene are always together.

As you can see, Sgt. Alexander has a history of unacceptable personal conduct and or grossly inefficient job performance. These matters needed attention. It is to my recommendation that Sgt. Alexander be suspended for 15 days without pay & demoted.

I look forward in hearing from you & resolving this matter internally.

Sincerely,

*6-20-18*

Justin J. White, M.S., B.S.

Enclosures: (1)
Performance Appraisal

Cc: File
Argretta Johen, HR Director
Peter White, High Sheriff
Justin White, Deputy Sheriff
Chris Welborn, Sergeant
Bobby Martin, Sergeant

State of North Carolina
County of Vance

On this, the 20 day of June, 20 18, before me a notary public, the undersigned party, personally appeared Justin J. White, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness hereof, I hereunto for the above-mentioned hereby set my hand and official seal.

Tiffany L. Ayscue
Notary Name

Notary Signature

My commission expires: July 31, 2019

(Seal)

**Justin Jamel White**                                                  1/4

130 Chappel Lane ● Kittrell. NC 27544 ● (919) 961-3448 ●

June 15th, 2018                          **Transmitted via Hand Delivery**

Sheriff Peter White                      **Personnel Sensitive, Confidential & Sworn File**
Vance County Sheriff's Office
156 Church Street, Suite 004
Henderson, NC 27536

**Re: Title VII Civil Rights Act of 1964-Race & Gender Discrimination**

Dear Sheriff

I, Justin Jamel White, deputy sheriff at the Vance County Sheriff's Office, hereby file written complaint pertinent to race and gender discrimination.

On February 20th, 2018, I was written up and suspended for 5 days without pay, publicly humiliated by the department, having to walk out of the sheriff's office without a gun and badge and being stripped of my law enforcement credentials. On my way out, I encountered several deputy sheriffs, who saw me after the issuance of corrective action. **I was heavily lied on by Lt. Durwood Campbell (S-7) and no member of management seemed to care.**

Lt. Campbell is a Caucasian male and I am an African American male. Jamie Goss, Caucasian female, called and complained which triggered this entire ordeal despite me being in the performance of my job duties and responsibilities. My main duty is to answer calls, patrol the county, observe and enforce violations of law/county ordinances. It should be noted, On June 5th, 2018, Ms. Goss pled guilty. **It is going to be too late to correct someone's action when he or she and innocent third parties are tragically killed as a result of a motorist illegally gross decisions under the wheel.** I am happy to discuss the incidents involving this in the near future.

**I was never given a chance to share my side in reference to providing verbal or written statement in reference to the deceptively egregious allegations by Lt. Durwood Campbell.** Per Sheriff White, Chief Lawrence Bullock and Captain Watkins were directed to get my side of the story before corrective action was issued. **That did not happen.** {It should be noted, this is not the first instance of insubordination with Chief Bullock and Captain Watkins as the Sheriff directed both of them to put me back on Sgt. Roberson's (S-10) shift in December 2017 and January 2018. This is because the shift transfer was not approved by the High Sheriff nor was it submitted to the Chief Deputy for review and submission for approval to the Sheriff. Also, the Sheriff did not delegate authority to Capt. Watkins or Lt. Campbell to transfer staff}. No one talked to me about anything. Out of the blue, I walk in and is suspended over hot lies. It should be noted, Chief Bullock and Capt. Watkins were insubordinate to the Sheriff by not getting my take on the situation. **Based on mere appearance, the County of Vance, NC and Sheriff Office took the white man's word over the black man.** Same is a civil rights violation.

Lt. Campbell cursed, fussed & threatened me in the presence of third parties. The first time, Deputy Poole was present in the patrol room & the second time, Sgt. Alexander & Deputy Poole were present (patrol room). I am happy to discuss the incidents involving this in the near future.

I have direct evidence of both situations and look forward to presenting same. I believe we may be able to rectify this situation administratively. My pay check was docked 911.00 dollars and 28 hours of overtime went down the drain over lies and errors by management. It should be noted. the sheriff's office nor HR will not receive copies of my evidence. If the situation goes to trial in a federal court of competent jurisdiction i.e. EEO and or state court of competent jurisdiction i.e defamation of character, libel and slander, negligence, then it will be provided during discovery as ordered by the courts.

It should be noted. there is a pattern of discrimination and negligence at the sheriff's office. Upon hire, I begged Lt. Ray Shearin (S-4) for a bullet proof vest for 3 weeks and was only given one after I approached the command staff while they were reading reports in late June 2017 and Captain W.W. Bullock (S-3) ordered him to find me a vest. I responded to emergency calls i.e. burglary in progress. no vest.

From late June 2018 until' August 2018, I begged for tires on my patrol vehicle to no avail for nearly 8 weeks. I followed the chain of command, Sgt. Roberson (S-10), Lt. Shearin and former Captain now Chief. L.D. Bullock (S-2) requesting tires. Sgt. Roberson eventually told me to stop asking and go to the sheriff because these people don't do their jobs. As I was going to see the Sheriff, Capt. Bullock asked what's wrong? (After I walked in his office for the third time) and where is your car? He saw the car and went to Lt. Shearin and I got some tires same day despite both of them knowing I needed tires prior to. The metal wires were showing on rear tires.

Last July 2017. Deputy Warren Durham (S-95) heard a bullet ricochet off of his vehicle on Breckenridge Street, near the jail and feared for his life. That was the same night that former Deputy Erik Sheftal (S-29) held a suspect at gun point in the city limits of Henderson by the library. Deputy Durham had previously asked Lt. Shearin for a vest to no avail.

In January 2018, Deputy Al-Wadeii (S-28) was responding to calls without a vest with Lt. Campbell and I questioned him being on the streets without a vest. Lt. Campbell called Lt. Shearin and he came to the sheriff's office and issued him a vest (speedily despite my sitation).

It should be noted. Lt. Shearin is a Caucasian male and the parties listed above are minorities. This is a civil rights issues. Also, Lt. Shearin was directed by the High Sheriff to issue me equipment i.e. in September 2018 twice to no avail

While I serve at the pleasure of, I contend these issue do not fit the criteria as they would reasonably violate county and or departmental policy. federal civil rights laws. NC Public Policy Doctrine, NC Tort Law, etc. Also, taking adverse action against someone after reporting the aforementioned is reprisal and or retaliation. How can one write up. suspend and dock pay of the black man but the same alleged offenses are being committed by white deputies? How can one

write up, suspend and dock pay of subordinate but allow other supervisory or managerial deputies to get away with it? How can the subordinate deputy be suspend for insubordination & the chief deputy, captain & lieutenant are not held to the same standard for being insubordinate?

*****SOMETHING IS WRONG WITH THIS PICTURE & NEEDS CORRECTING*****

It is to my recommendation that Chief Bullock be issued a corrective action and suspended for 10 days without pay in reference to insubordination by not returning me to Sgt. Roberson's shift and not obtaining statements for the allegations made by Lt. Campbell.

It is to my recommendation that Capt. Watkins receive a lesser sanction as the chief deputy had the overall responsibility as the manager with rank/seniority to ensure my transfer back to Sgt. Roberson's shift and that they met with me about the allegations by Lt. Campbell.

It is to my recommendation that Lt. Shearin be issued corrective action and suspended for 10 days without pay and demoted in reference to failing the issue the protective and necessary law enforcement equipment after being directed to do so by the Sheriff several times.

It is to my recommendation that Lt. Campbell be issued corrective action, suspended for 10 days without pay & demoted for his official misconduct & verbal/written deception pertinent to the write up.

I understand it will be difficult in disciplining members of your command staff but as you said in times past, we have to be fair.

There were no legitimate non-discriminatory reasons to issue corrective action and authorize adverse action. There are no bona-fide reasons and or business necessity for the abovementioned. Even if responsibility laid with me, then the mixed motive legal theory would apply.

I look forward in hearing from you and resolving this issue.

Sincerely,


Justin White, M.S., B.S
Jw Jw. 4-22-2018

Cc: File
Argretta Johen, HR Director
Peter White, High Sheriff
Justin White, Deputy Sheriff

_6/22/2018_    _2 Tenant_

State of North Carolina
County of Vance

On this. the _22nd_ day of _June_ , 20 _18_ . before me a notary public. the

undersigned party, personally appeared _Leonard and white_ , known to me (or

satisfactorily proven) to be the person whose name is subscribed to the within

instrument. and acknowledged that he executed the same for the purposes

therein contained.

In witness hereof, I hereunto for the above-mentioned hereby set my hand and official seal.

_Octavia Lambert_
Notary Name

_Octavia Lambert_
Notary Signature

My commission expires: _July 2, 2020_

(Seal)

OCTAVIA LAMBERT
NOTARY PUBLIC
VANCE COUNTY, NC

# Status of Complaint

### Justin White

Wed 7/11/2018 11:39 AM

To: Peter White <pwhite@vancecounty.org>;

Cc: Argretta Johen <AReid@vancecounty.org>; Justin White <JWhite@vancecounty.org>;

Good morning,

The purpose of this e-mail is to determine the status of the race and gender discrimination inquiry. It has been approximately three weeks since filing same. Also, I have requested a meeting with you and Argretta not withstanding pertinent parties listed in the unlawful, wrongful and tortious corrective action initiated by Lt. Durwood Campbell as his signature is listed on the aforementioned.

While to the best of your knowledge designated members of your command staff met with me, same is not accurate nor truthful. Let me be clear, I walked into a trap, stripped of my law enforcement credentials and gear, escorted to Ray's vehicle without a gun (someone could have been waiting around the corner to hurt me and I would have been defenseless all because of the deception and discrimination of a white supervisor involving a white female citizen), suspended without pay and transferred shifts (adverse action). Since Lt. Campbell and both shifts sergeants are working today, I can find no reason for all us to meet between today and Friday. Once the dust settles, members of your command staff should be disciplined because of their insubordination, etc.

Sheriff White and Director Johen, we have to do what is right regardless of our constitutional and hired positions. We cannot unfairly treat people but we must embrace our co-workers in the spirit of truth. I look forward to confronting my accusers with factual basis in this administrative issue in order to arrive at an internal conclusion. Please advise the status of the investigation. I look forwarding in hearing from both of you.

Warm Regards,

Justin White, M.S.

P. White- Notice of Charge of Discrimination

# Notice of Charge of Discrimination

## U.S. Equal Employment Opportunity Commission <noreply@eeoc.gov>

Wed 9/12/2018 10:15 AM

To Argretta Johen <AReid@vancecounty.org>;

U.S. Equal Employment Opportunity Commission
Raleigh Area Office
434 Fayetteville Street, Suite 700
Raleigh, NC 27601

NOTICE OF CHARGE OF DISCRIMINATION
(This Notice replaces EEOC FORM 131)

DIGITAL CHARGE SYSTEM

September 12, 2018

To:
Mrs. Argretta Johen
Director, Human Resources
VANCE COUNTY
AJOHEN@vancecounty.org

This is notice that a charge of employment discrimination has been filed with the EEOC against your organization by Justin White , under Title VII of the Civil Rights Act (Title VII). The circumstances of the alleged discrimination are based on Retaliation, Race, and Sex, and involve issues of Harassment, Discipline, and Terms/Conditions that are alleged to have occurred on or about Feb 20, 2018 through Aug 10, 2018.

The Digital Charge System makes investigations and communications with charging parties and respondents more efficient by digitizing charge documents. The charge is available for you to download from the EEOC Respondent Portal, EEOC's secure online system.

Please follow these instructions to view the charge within ten (10) days of receiving this Notice:

1. Access EEOC's secure online system  https://nxg.eeoc.gov/rsp/login.jsf
2. Enter this EEOC Charge No.: 433-2018-03289
3. Enter this temporary password: nh5275qy

Once you log into the system, you can view and download the charge, and electronically submit documents to EEOC. The system will also advise you of possible actions or responses, and identify your EEOC point of contact for this charge.

If you are unable to log into the EEOC Respondent Portal or have any questions regarding the Digital Charge System, you can send an email to Raleigh@eeoc.gov.

Preservation of Records Requirement

EEOC regulations require respondents to preserve all payroll and personnel records relevant to the charge until final disposition of the charge or litigation. 29 CFR §1602.14. For more information on your obligation to preserve records, see http://eeoc.gov/employers/recordkeeping.cfm.

Non-Retaliation Requirements
The laws enforced by the EEOC prohibit retaliation against any individual because s/he has filed a charge, testified, assisted or participated in an investigation, proceeding or hearing under these laws. Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. For more information, see http://www.eeoc.gov/laws/types/facts-retal.cfm.

Legal Representation
Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please provide the attorney's contact information when you log in to the online system.

U.S. Equal Employment Opportunity Commission
FEDERAL INVESTIGATION.
REQUEST FOR POSITION STATEMENT
AND SUPPORTING DOCUMENTARY EVIDENCE

EEOC hereby requests that your organization submit within 30 days a Position Statement setting forth all facts which pertain to the allegations in the charge of discrimination under investigation, as well as any other facts which you deem relevant for EEOC's consideration.

We recommend you review EEOC's resource guide on **"Effective Position Statements"** as you prepare your response to this request.

Fact-Based Position Statement
This is your opportunity to raise any and all defenses, legal or factual, in response to each of the allegations of the charge. The position statement should set forth all of the facts relevant to respond to the allegations in the charge, as well as any other facts the Respondent deems pertinent to EEOC's consideration. The position statement should only refer to, but not identify, information that the Respondent asserts is sensitive medical information, or confidential commercial or financial information.

EEOC also requests that you submit all documentary evidence you believe is responsive to the allegations of the charge. If you submit only an advocacy statement, unsupported by documentary evidence, EEOC may conclude that Respondent has no evidence to support its defense to the allegations of the charge.

EEOC may release your position statement and non-confidential attachments to the Charging Party and her representative and allow them to respond to enable the EEOC to assess the credibility of the information provided by both parties. It is in the Respondent's interest to provide an effective position statement that focuses on the facts. EEOC will not release the Charging Party's response, if any, to the Respondent.

If no response is received to this request, EEOC may proceed directly to a determination on the merits of the charge based on the information at its disposal.

Signed by an Authorized Representative
The Position Statement should be signed by an officer, agent, or representative of Respondent authorized to speak officially on its behalf in this federal investigation.

Segregate Confidential Information into Separately Designated Attachments
If you rely on confidential medical or commercial information in the position statement, you should provide such information in separate attachments to the position statement labeled "Sensitive Medical Information," "Confidential Commercial or Financial Information," or "Trade Secret Information" as applicable. Provide an explanation justifying the confidential nature of the information contained in the attachments. Medical information about the Charging Party is not sensitive or confidential medical

information in relation to EEOC's investigation. Segregate the following information into separate attachments and designate them as follows:

   a. Sensitive medical information (except for the Charging Party's medical information).
   b. Social Security Numbers
   c. Confidential commercial or financial information.
   d. Trade secrets information.
   e. Non-relevant personally identifiable information of witnesses, comparators or third parties, for example, social security numbers, dates of birth in non-age cases, home addresses, personal phone numbers and email addresses, etc.
   f. Any reference to charges filed against the Respondent by other charging parties.

Requests for an Extension
If Respondent believes it requires additional time to respond, it must, at the earliest possible time in advance of the due date, make a written request for extension, explain why an extension is necessary, and specify the amount of additional time needed to reply. Submitting a written request for extension of time does not automatically extend the deadline for providing the position statement.

Upload the Position Statement and Attachments into the Respondent Portal
You can upload your position statement and attachments into the Respondent Portal using the + Upload Documents button. Select the "Position Statement" Document Type and click the Save Upload button to send the Position Statement and attachments to EEOC. Once the Position Statement has been submitted, you will not be able to retract it via the Portal.

Please retain this notice for your records.

*Notice of Confidentiality: The information contained in this transmission may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact us at digital_support@eeoc.gov and destroy all copies of the original message and attachments.*



JuWh 2018 chg

2018 JW chg

JWh 20

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 433-2018-03289 |
| | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Mr. Justin White** | **(919) 961-3448** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **130 Chappell Lane, Kittrell, NC 27544** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **VANCE COUNTY – OFFICE OF THE SHERIFF** | **500 or More** | **(252) 738-2200** |

| Street Address | City, State and ZIP Code |
|---|---|
| **156 Church Street, Suite 004, Henderson, NC 27536** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **02-20-2018** Latest **08-10-2018**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I. During my employment with the Respondent, I have been the victim of harassment and differential treatment as it pertains to the terms and condition of employment in comparison to that of my non-Black coworkers. This involves but not limited to the areas of: Discipline; Corrective Action; Treatment; Disrespect; Issuance of Safety Equipment; Subordinate Status and Retaliation.

II. I have not been provided with a reason for the differential treatment concerning the areas on the part of the Respondent.

III. I believe I have been discriminated against based on my Race-Black, Gender-Male and in retaliation for taking part in a protected activity. I believe Respondent's actions are in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| August 29 2018 _Justin J. White_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date          Charging Party Signature | |

PRIVACY ACT STATEMENT: Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.  FORM NUMBER/TITLE/DATE. EEOC Form 5, Charge of Discrimination (11/09).

2.  AUTHORITY. 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.  PRINCIPAL PURPOSES. The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.  ROUTINE USES. This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.  WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION. Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please notify EEOC or the state or local agency where you filed your charge if retaliation is taken against you or others who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

P. White- P. White Response to J. White re Complaint



# Office of the Sheriff
## Vance County

**Sheriff Peter White**

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone 252-738-2200
Fax  252-738-2220

July 19, 2018

Deputy Justin J. White
156 Church Street, Suite 004
Henderson, NC  27536

Dear Deputy White:

This letter is being written in response to your complaint dated June 15, 2018 and received on June 26, 2018. In your complaint you reference "Title VII Civil Rights Act of 1964-Race & Gender Discrimination".

You were in fact suspended for five (5) days without pay beginning February 20, 2018, which included the working days February 20, 25, 26, 27 and 28 which is documented on the Personnel Action Form which you signed on February 20, 2018. This suspension as you know was for unbecoming conduct as listed on the Personnel/Payroll Action Form signed by you on February 20, 2018.

Yes, your gun and badge were kept here as well as your credentials (ID) which is customary during suspension periods. In this regard, you were treated no different than anyone else. There is no evidence that Lieutenant Campbell "heavily lied" on you as you stated in your complaint.

If you will recall, when you and I met after your suspension period ended, you admitted to saying the things to Lieutenant Campbell that he listed in the official written reprimand signed by you and he on February 20, 2018.

In regard to the Jamie Goss complaint, you had been told previously by Supervisors not to issue a criminal summons for a traffic violation or violations which was the basis of the Goss complaint, since she was served nearly 24 hours after the traffic stop. You had also been told not to focus on traffic stops since this is not your primary duty and you had not been issued a citation book. Ms. Goss was originally charged with Reckless Driving to Endanger, Driving Left of Center and a Seat Belt violation. On June 5, 2018, she pled guilty to one count of Improper Equipment while the other charges were dismissed. This is not a Caucasian/African American issue but simply you as a Deputy Sheriff with the Vance County Sheriff's Office doing what you are told and following instructions. When you made this vehicle stop knowing you were not able to issue a citation, you should have contacted a Supervisor on Duty instead of you issuing a criminal summons.

You were given a chance to "share your side" when you met with Chief L. D. Bullock, Captain L.Q. Watkins and Lieutenant D. Campbell. During this meeting, you denied making the statement listed in the reprimand dated January 27, 2018 and signed by you and Lieutenant Campbell.

In your capacity as a Deputy Sheriff, you do not get to say who on my Command Staff is "Insubordinate" to me and who is not. As Sheriff, that is my decision.

You began your Field Training on June 18, 2018 with the Sergeant Durwood Campbell. During your third week of training, you and two other trainees were rotated to different squads with you being assigned to Sergeant D. R. Roberson's squad to complete your training with Deputy Brian Wayne. You remained on this squad throughout your training and until November 2017. Due to issues within this squad you were then reassigned to the squad supervised by Sergeant Myron D. Alexander where you remained until your suspension on February 20, 2018. After returning from your suspension imposed by me, you were assigned to another squad supervised by Sergeant C. M. Welborn where you remain today.

The one rotation and two re-assignments to different squads had absolutely nothing to do with race, gender or anything else other than simply trying to place you where you would best fit and be of greater benefit to the Sheriff's Office.

Once again, this is not a RACE, SEX or GENDER ISSUE nor any other form of discrimination. Lieutenant Campbell has admitted that he was angry with you during the telephone conversation and does not deny using the word "ass" while speaking with you, which is obviously inappropriate on his part. This has been addressed by me with Lieutenant Campbell. However, this does not excuse your conduct displayed while addressing a Superior Officer (Lieutenant Campbell) in the Patrol Squad Room.

Your suspension was approved by me based on your conduct in the Patrol Squad Room in the presence of Lieutenant Campbell, whom you were addressing, Sergeant Alexander and Deputy Poole. The suspension was carried out and Nine Hundred Eleven Dollars ($911.00) was deducted from your pay.

I have not seen nor am I aware of any discrimination in the Vance County Sheriff's Office.

The incidents you alleged in your complaint involving other deputies and equipment issued is by no means discrimination. In addition, each of these deputies you mentioned is perfectly capable of speaking for themselves. In summary, I see nothing in your Complaint nor during this investigation to suggest discrimination in any shape, form or fashion.

Sincerely,

Sheriff Peter White
PW/jbm

On the date in question Lt.Campbell and Deputy White were arguing on the phone. Lt Campbell told Deputy White I done told your ass we do not give criminal summons for traffic issues.  If you want to enforce traffic join the highway patrol but you are a sheriff your job is to answer calls and serve papers and then  Lt. Campbell stated you know what I will deal with your ass at 12 when I come in.

Signed: Andre Poole

07·17-18

P. White- Request for Training Waiver

# Fw: Justin Jamel White

## Weldon Bullock

Tue 6/5/2018 9:26 AM

To:Janie Martin <JMartin@vancecounty.org>; Peter White <pwhite@vancecounty.org>;

---

**From:** Konopka, Diane <dKonopka@ncdoj.gov>
**Sent:** Monday, June 4, 2018 1:46 PM
**To:** Weldon Bullock
**Subject:** RE: Justin Jamel White

Thanks Captain Bullock. I will put this before the Commission when they meet next week.

**From:** Weldon Bullock [mailto:WBullock@vancecounty.org]
**Sent:** Monday, June 04, 2018 12:56 PM
**To:** Konopka, Diane
**Subject:** Re: Justin Jamel White

Ms. Konopka,

I'm sending you this attachment per our conversation on Friday.

Weldon Bullock

---

**From:** Konopka, Diane <dKonopka@ncdoj.gov>
**Sent:** Monday, May 28, 2018 12:52:00 PM
**To:** Weldon Bullock
**Subject:** Justin Jamel White

Hello Captain Bullock,

I am reviewing a request from Justin Jamel White asking the Sheriffs' Commission to grant him a training waiver and credit him with the BLET he completed in December of 2015.

Can you tell me if the Vance County Sheriff's Office is also requesting (in support of) that waiver for Mr. White? Also, Mr. White stated you contacted Sheriffs' Standards on 6/5/2017 in regards to his certification. Do you remember who you spoke with and what specifically was discussed?

Please call me if we need to further discuss. Thank you for your help!
Diane



**Diane N. Konopka**
Director
Sheriffs' Standards Division
Phone: 919-662-4375
Fax: 919-662-4515
dkonopka@ncdoj.gov
1700 Tryon Park Drive, Raleigh, NC 27610
Post Office Box 629, Raleigh, NC 27602-0629
ncdoj.gov

Please note messages to or from this address may be public records.

PUBLIC RECORDS NOTICE: Please note that all emails, information and attachments sent to and from this address are subject to the North Carolina Public Records Act and, subject to certain statutory exceptions, may be disclosed to third parties.



# Office of the Sheriff
## Vance County

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone 252-738-2200
Fax 252-738-2220

**Sheriff Peter White**

June 1, 2018

Diane Konopka, Director
North Carolina Sheriffs' Education Training & Standards Division
Post Office Drawer 629
Raleigh, NC 27602-8213

RE: Justin Jamel White

Dear Ms. Konopka,

This is a written request asking The Sheriff's Commission to grant Justin Jamel White a training waiver and credit him with the BLET he completed in 2015. The Vance County Sheriff's Office is in full support of a waiver for Deputy White. Deputy White has been sworn with the Vance County Sheriff's Office since June 2017.

If you have need of any further information regarding Deputy White, please do not hesitate to contact me. Thank you for your attention in this matter.

Sincerely,

Sheriff Peter White
Vance County

PW/jbm

Reply all          Delete     Junk

# Justin Jamel White

Konopka, Diane <dKonopka@ncdoj.gov>                    Reply all

Weldon Bullock

Action items

Hello Captain Bullock,

I am reviewing a request from Justin Jamel White asking the Sheriffs' Commission to grant him a training waiver and credit him with the BLET he completed in December of 2015.

Can you tell me if the Vance County Sheriff's Office is also requesting (in support of) that waiver for Mr. White?  Also, Mr. White stated you contacted Sheriffs' Standards on 6/5/2017 in regards to his certification.  Do you remember who you spoke with and what specifically was discussed?

Please call me if we need to further discuss.  Thank you for your help!
Diane



**Diane N. Konopka**
Director
Sheriffs' Standards Division
Phone: 919-662-4375
Fax: 919-662-4515
dkonopka@ncdoj.gov

ncdoj.gov

Please note messages to or from this address may be public records.

*left message  5/29/18 @ 2:38p*

F-5 Separation



Eff. Jan 2018

### NORTH CAROLINA DEPARTMENT OF JUSTICE
### SHERIFFS' STANDARDS DIVISION

POST OFFICE BOX 629
RALEIGH, NC 27602 - 0629
TELEPHONE: 919-779-8213 FAX: 919-662-4515

JOSH STEIN
ATTORNEY GENERAL

DIANE KONOPKA
DIRECTOR

---

**REPORT OF SEPARATION**
FORM F-5

[✓] **DEPUTY SHERIFF**          [ ] **DETENTION OFFICER**

---

**INSTRUCTIONS:** Please type or print all information clearly. This form shall be completed upon separation from one or both certified positions. This form must be submitted to the Commission **NO LATER THAN 10 DAYS AFTER FINAL SEPARATION.** A copy of this form must be retained in the appointing Agency's Personnel file.

SEPARATING AGENCY  VANCE COUNTY SHERIFF'S OFFICE  PHONE NUMBER (252) 738-2200

ADDRESS  156 CHURCH STREET, SUITE 004, HENDERSON, NC  ZIP CODE 27536

OFFICER'S NAME  JUSTIN          JAMEL          WHITE
                (First)          (Middle)        (Last)

CURRENT HOME ADDRESS  130 CHAPPELL LANE, KITTRELL, NC  27544

DATE OF BIRTH  08/15/1989          SOCIAL SECURITY NUMBER

DATE OF EMPLOYMENT:  DEPUTY 06/05/2017          DETENTION OFFICER

---

POSITION/RANK  DEPUTY SHERIFF          [✓] Full-Time          [ ] Part-time

DATE OF SEPARATION  10/24/2018

[ ] Death

Was this separation a result of a criminal investigation or violation of Commission rules?
[ ] YES   [✓] NO

Are you aware of any on-going or substantiated internal investigation regarding this officer within the last 18 months?
[✓] YES   [ ] NO

I, as an official representative of this agency, do advise that the above-named officer has been separated from this agency on the date indicated herein. In addition, pursuant to the requirements of 12 NCAC 10B .0405(c), the officer has been notified of this separation as evidenced by his/her signature below or the attached letter. IF this officer was ACTIVE between January and July, and did not complete the mandated In-Service Training, he/she must do so before becoming Active again. In addition, the obligation to notify the Sheriffs' Standards Division of criminal charges, domestic violence orders and civil no contact orders continues for one year from the date of separation.

_____          Sheriff     10-25-18
Signature of Sheriff or Registered Authorized Representative     Title     Date

" Signature on file "
Signature of Officer                              Date

---

**Officer has the right to submit a written statement of additional information to the Sheriffs' Standards Division regarding this separation.

EEOC Compl.

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 433-2018-03289 |
| | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Justin White | (919) 961-3448 | |

| Street Address | City, State and ZIP Code |
|---|---|
| 130 Chappell Lane, Kittrell, NC 27544 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| VANCE COUNTY -- OFFICE OF THE SHERIFF | 500 or More | (252) 738-2200 |

| Street Address | City, State and ZIP Code |
|---|---|
| 156 Church Street, Suite 004, Henderson, NC 27536 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 02-20-2018    Latest 08-10-2018

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I. During my employment with the Respondent, I have been the victim of harassment and differential treatment as it pertains to the terms and condition of employment in comparison to that of my non-Black coworkers. This involves but not limited to the areas of: Discipline; Corrective Action; Treatment; Disrespect; Issuance of Safety Equipment; Subordinate Status and Retaliation.

II. I have not been provided with a reason for the differential treatment concerning the areas on the part of the Respondent.

III. I believe I have been discriminated against based on my Race-Black, Gender-Male and in retaliation for taking part in a protected activity. I believe Respondent's actions are in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY -- When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| August 29th 2018    Justin J. White | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date          Charging Party Signature | |

PRIVACY ACT STATEMENT: Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.    FORM NUMBER/TITLE/DATE. EEOC Form 5, Charge of Discrimination (11/09).

2.    AUTHORITY. 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.    PRINCIPAL PURPOSES. The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.    ROUTINE USES. This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.    WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION. Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please notify EEOC or the state or local agency where you filed your charge if retaliation is taken against you or others who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

J. White Inv.

Claim # 30|812768||0001

# INCIDENT/INVESTIGATION REPORT

**Agency Name**
VANCE COUNTY SHERIFF'S OFFICE

**ORI**
NC0910000

**OCA**
18013870

**Date / Time Reported** S M T W T F S
Month 10 Day 22 Yr 2018 Time 20:16 Hrs

## INCIDENT DATA

**#1 Crime / Incident(s)**
9910 - WARRANT SERVICE
☐ Attempt ☒ Complete

**At Found** S M T W T F S
Month 10 Day 22 Yr 2018 Time 20:15 Hrs

**Last Known Secure** S M T W T F S
Month 10 Day 22 Yr 2018 Time 20:14 Hrs

**#2 Crime Incident**
☐ Attempt ☐ Complete

**Location of Incident**
52 DAISY LN, HENDERSON, NC 27537

**Offense Tract** 2

**#3 Crime Incident**
☐ Attempt ☐ Complete

**Premise Type**
01 - Home of Victim - Single Family Dwelling

**Victim Residence Type**
☐ Single Family ☐ Multi Family

## MO

**How Attacked or Committed**
BY ATTEMPTING TO SERVE A WARRANT

**Forcible** ☒ Yes ☐ No ☐ N/A

**Weapon / Tools**

## VICTIM

**# of Victims** 1

**Type:** ☐ Person ☐ Business ☐ Society ☐ Government ☐ Financial Institute ☐ Religious ☐ L.E. Officer Line of Duty ☐ Other/Unk

**Injury:** ☐ None ☐ Minor ☐ Loss of Teeth ☐ Broken Bones ☐ Severe Lacerations ☐ Internal ☐ Unconscious ☐ Other Major

**Drug/Alcohol Use:** ☐ Yes ☐ Unknown ☐ No ☐ N/A

**V1 Victim/Business Name (Last, First, Middle)**
STATE OF NORTH CAROLINA

**Victim of Crime #** 1

**DOB / Age**

**Race**

**Sex**

**Relationship To Offender**

**Resident Status** ☐ Resident ☐ Non-Resident ☐ Unknown

**Home Address**

**Home Phone**

**Employer Name/Address**

**Business Phone**

| VYR | Make | Model | Style | Color | Lic/Lis | Vin |
|-----|------|-------|-------|-------|---------|-----|
|     |      |       |       |       |         |     |

## OTHERS INVOLVED

**CODES:** V = Victim (Denote V2, V3)  O = Owner (if other than victim)  R = Reporting Person (if other than victim)

**Type:** ☐ Person ☐ Business ☐ Society ☐ Government ☐ Financial Institute ☐ Religious ☐ L.E. Officer Line of Duty ☐ Other/Unknown

**Code R**
**Name (Last, First, Middle)**
WHITE, J J

**Victim of Crime #**

**DOB / Age**

**Race** B

**Sex** M

**Home Address**

**Home Phone**

**Employer Name/Address**
VANCE COUNTY SHERIFF'S OFFICE - 156 CHURCH ST, Henderson, NC 27536

**Business Phone**
(252) 738-2200

**Type:** ☐ Person ☐ Business ☐ Society ☐ Government ☐ Financial Institute ☐ Religious ☐ L.E. Officer Line of Duty ☐ Other/Unknown

**Code R**
**Name (Last, First, Middle)**
WELBORN, C M

**Victim of Crime #**

**DOB / Age**

**Race**

**Sex**

**Home Address**
156 CHURCH STREET, HENDERSON, NC 27536

**Home Phone**
(252) 738-2200

**Employer Name/Address**

**Business Phone**

## PROPERTY

**Status Codes** (Check "OJ" column if recovered for other jurisdiction)
L = Lost  S = Stolen  R = Recovered  D = Damaged  Z = Seized  B = Burned  C = Counterfeit / Forged  F = Found

| Victim # | DCI | Status | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|----------|-----|--------|-------|----|----|---------------------|------------|---------------|
|          |     |        |       |    |    |                     |            |               |

**Number of Vehicles Stolen** 0

**Number of Vehicles Recovered** 0

## ID

**Officer Name**
DEPUTY J. J. WHITE

**ID#** 259

**Officer Signature**

**Supervisor Signature**
Sgt C M Welborn

## STATUS

**Complainant Signature**

**Case Status:**
☒ Further Investigation
☐ Inactive
☐ Closed/Cleared
☐ Closed/Leads Exhausted

**Case Disposition:**
☐ Unfounded ☐ Juvenile/No Custody ☐ Extradition Declined
☐ Cleared by Arrest ☐ Refuse to Cooperate ☐ Located
☐ Cleared by Arrest by Another Agency
☐ Death of Offender ☐ Prosecution Declined

Page 1 of 5

DCI-600F

Rev 3/92

OCA
18013870

| Status Codes | L = Lost | S = Stolen | R = Recovered | D = Damaged | Z = Seized | B = Burned | C = Counterfeit / Forged | F = Found |
|---|---|---|---|---|---|---|---|---|

### DRUGS

| | DCI | Status | Quantity | Type Measure | Suspected Type | Possess | Buy | Sale | Mfg. | Importing | Operating |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

Check up to 3 types of activity for each

### OFFENDER

| Offender Used | | Offender 1 | | | | | | Primary Offender |
|---|---|---|---|---|---|---|---|---|
| Alcohol/Drugs | ☐ Yes ☐ Unk / ☒ No ☐ N/A | Age: 41 Race: B Sex: F | Age Race Sex | Age Race Sex | Resident Status: ☒ Resident |
| Computer | ☐ Yes ☐ Unk / ☐ No ☒ N/A | Age: Race: Sex: | Age Race Sex | Age Race Sex | ☐ Non-Resident ☐ Unknown |

### SUSPECT

**Name (Last, First, Middle)**
OLIVER, LATWANYA SHAWNTEL

**Alias or Nickname**
LATWANYA L OLIVER ; LATWANYA SHA

**Home Address**
52 DAISY LANE, HENDERSON, NC 27537

**Occupation**

**Business Address**
PACIFIC COAST FEATHERS - 100 COMFORT DR, Henderson, NC 27536

| DOB / Age | | Race | Sex | Height | Weight | Build | Hair Color | Hair Style | Hair Length | Eye Color | Glasses |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 02/05/1977 | 41 | B | F | 5'07" | 275 | | BRO | STR | LNG | BRO | Yes |

Scars, Marks, Tattoos, or other distinguishing features (i.e. limp, foreign accent, voice characteristics)

| Hat | Jacket | Shirt/Blouse | Tie/Scarf | Coat/Suit | Pants/Dress/Skirt | Socks | Shoes |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| Was Suspect Armed? | Type of Weapon | Direction of Travel | Mode of Travel |
|---|---|---|---|
| | | | |

| VYR | Make | Model | Style | Color | Lic/Lis | Vin |
|---|---|---|---|---|---|---|
| | | | | | | |

### WITNESS

| Name (last, first, middle) | DOB / Age | Race | Sex | OCA |
|---|---|---|---|---|
| | | | | |

| Home Address | Home Phone | Employer | Phone |
|---|---|---|---|
| | | | |

Suspect Hate / Bias Motivated: Yes ☐  No ☒

### NARRATIVE

**Narrative**
CFS # 1810-049445

MSHEARIN6865 - 2018-10-22 20:22:50

S33ADV SEND HIM SOME UNITS AT HIS LOCATION

MSHEARIN6865 - 2018-10-22 20:24:56

S33 IS REQUESTING EMS 10-18 TRAFFIC REF USE OF FORCE

JCROTTY9997 - 2018-10-22 20:39:55

OLIVER, LATWANYA SHAWNTEL    02/05/1977  BLACK  FEMALE  26617872 NC  52 DAISY LN

HENDERSON, NC 27537-3095 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  VANCE

17CR53133  WARRANT FOR ARREST  OBTAIN PROPERTY FALSE PRETENSE    NO  NO  NCAWARE    ELECTRONIC

 98 OLIVER, LATWANYA SHAWNTEL    02/05/1977  BLACK  FEMALE  26617872 NC  52 DAISY LN

HENDERSON, NC 27537-3095 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  VANCE

17CR53134  WARRANT FOR ARREST  OBTAIN PROPERTY FALSE PRETENSE    NO  NO  NCAWARE    ELECTRONIC

CAD Disposition = B ARREST MADE


On 10-22-18, 2016 hours, I notified dispatch of a warrant service at 52 Daisy Lane, Henderson,

NC 27537. I knocked on the front door and

I heard a female ask, who is it? I identified myself as Deputy White with the Vance County

Sheriffs Office. The female asked again, who is it?

I re-advised the aforementioned. The female stated, I don't believe you, shine your light so I

# CONTINUATION PAGE

| 1. AGENCY | 2. ORI | 3. CONTINUATION TO: | 4. OCA FILE NO. |
|---|---|---|---|
| VANCE COUNTY SHERIFF'S OFFICE | NC0910000 | ☒ INVESTIGATION ☐ ARREST ☐ SUPPLEMENTARY INV. | 18013870 |

Narrative

can see you. I adhered to her request and she said, oh ok and opened the front door. The female turned out to be Ms. Latwanya Shawntel Oliver, who was wanted on 2 felony counts of obtaining property by false pretense. Prior to going to the residence, I asked dispatch to verify the felony warrants and they advised same were active. I told Ms. Oliver she had felony warrants and she stated, Lawd, what have I done-I aint done nothing wrong. I stated, you are under arrest and will find out further at the magistrates office. Ms. Oliver stated, I haven't done nothing-can I call my daughter and let her know. I told her she can make a phone call at the station. She said, well, ok, let me get my keys, turn off my lights, lock up my house and stuff. Can I do that? Because you are just ugh. I replied, yes, you can do that. Ms. Oliver turned off some of her lights and walked out of the front door and I asked, aren't you going to lock up and she turned around and said, I forgot, let me get my keys of the dresser and she said we are going to have to go out of the back door because something is wrong with the front door. When we walked out of the back door, she did not pull it all the way through and I pulled it for her and asked, do you have a deadbolt key and she said yes but something is wrong with it. As she was approaching my patrol vehicle, I told her to stop and submit to the handcuffs. She replied, why do you have to handcuff me? I told her it is for my safety as well as yours (standard procedure). I was able to get one handcuff on her and she became irate and would not comply with my lawful orders. She screamed to the top of her lungs help, help, help me-your not taking me anywhere until' I see some papers-I'm not going anywhere. I told her to calm down and that she was making the situation worst. I told her cooperation goes along way with law enforcement when you go before the magistrate or judge. Ms. Oliver stated, ok, sir, I apologize. I went to handcuff the second arm and she went crazy, she lost it. She pulled away from me while saying no, no, I'm not going, leave me alone. I placed her up against my car, opened the rear passenger door instructed her to get in and she became extremely combative by yelling no, I'm not going no where, help, help. She pushed her body against mines and striked me in the lower leg twice. I performed a takedown maneuver, which is an approved subject control technique. To prevent additional manipulation of the handcuffs, I tightened them while on the ground. Ms. Oliver stated, you broke my arms, oooowwwwwww, ooooowwwwwww my arms are killing me, they are hurting sir, I think my arms are sprained, I'm in so much pain. I immediately radioed for EMS 10-18 due to injuries sustained from a use of force (2024 hours). Prior to, I called for back up at 2022 hours. Sgt. Welborn arrived on scene first as back up and I told him, she has felony warrants, refused to comply, pulled away and assaulted me. EMS arrived and stated, her arm is not broke because she can move her shoulders. Ms. Oliver continued to scream in pain and the EMS Supervisor re-examined her arm and said, yep, it is broken. Ms. Oliver was transported to Maria Parham Hospital in Henderson, NC for further medical treatment. I acted in good faith to arrest Ms. Oliver and when she refused I took action as authorized. I used reasonable force to achieve the law enforcement objective and to gain compliance and to ensure public safety. I afforded her every opportunity to comply with my lawful orders and she refused. I do not have a taser and pepper spray would have been ineffective as she was moving uncontrollably and had glasses on, which would have caused same to ricohet (more likely than not). Officer presence and verbalization did not work. Thus, I had to go hands on. I made a good faith effort to maintain and restore order. I followed the objective reasonableness standard under the 4th Amendment to arrest the defendant and to seize her person due to the outstanding felony warrants notwithstanding other violation of law (assault on a law enforcement officer and resisting arrest). It should be noted, Ms. Oliver has a record of communicating

| Officer Name / ID | Officer Signature | Date / Time Submitted | Page 3 |
|---|---|---|---|
| DEPUTY J. J. WHITE - 259 | | 10-23-18 / 0400 hrs | of 5 |
| DCI-602 F | | | REV 3/92 |

| 1. AGENCY | 2. ORI | 3. CONTINUATION TO: | 4. OCA FILE NO. |
|---|---|---|---|
| VANCE COUNTY SHERIFF'S OFFICE | NC0910000 | ▨ INVESTIGATION ☐ ARREST ☐ SUPPLEMENTARY INV. | 18013870 |

**Narrative**

threats, simple assault and assault with a deadly weapon (aggravating factors on her part and mitigating factors for me). Ms. Oliver filed a verbal frivolous complaint against me for pulling her over and harrasing her at the Shell Gas Station on Warrenton Road. I did not pull her over, I never turned on my vehicle lights and sirens. I noticed a car traveling at a high rate of speed on North Garnett Street passing Parker and Bickett Streets, Old Norlina Road and Spring Valley Drive. On 10-21-2018, 2130 hours approximately, I was patrolling Old Norlina Road going towards Main Street (the intersection of Garnett, Beckford, Main, Chestnut). The vehicle was clearly exceeding safe speed. I brought my vehicle up to 60 mph and had trouble keeping up with her in a 35 MPH Zone. It was not until' she almost rear-ended a dark in color truck at the Handy Mart beside Forsyth Skippers that she slowed down but picked the speed right back up. It should be noted, she has a horrible DMV record, 15 speeding tickets, various running a red light/stop signs and several accidents. Had I known this at the time, I would have pulled her and took appropriate action. I ran the tag, which came back active and valid. I asked dispatch to run the registered owner for warrants, which came back negative. Ms. Oliver pulled into the Shell Gas Station and I pulled around to the Carey Chapel Road entrance for the station and saw her exit the vehicle (FFS-2692) and told her to slow it down and to watch her speed. I was trying to have open dialogue with her (community oriented policing ) and she started screaming and yelling for no reason, I know my rights, you should have pulled me back there and wrote the ticket, I know my rights. I advised her it was not to late to write the ticket but I'm trying to talk to you about not speeding in the future. She said, well, write the ticket then and you have a good day. Due to dispatch failing to properly do a warrant check (public safey issue, I was unaware she had felony warrants. It is unfortunate that injuries occurred, however, I have a job to do and the general welfare of the public is first and violators must be apprehended pursuant to standard operating procedures, general statue, common law and judicial precedent (state and federal case law). See Use of Force Report.This is an account of what happened and I reserve the right to amend this statement (addendum) as the situation happened so quickly.

SUPPLEMENT #3   SGT. C. M. WELBORN - 170   10/23/2018   04:37

ON 10-22-2018, I RESPONDED TO 52 DAISY LANE REFERENCE DEPUTY WHITE CALLING FOR ASSISTANCE. WHILE ENROUTE DEPUTY WHITE CALLED FOR EMS EMERGENCY TRAFFIC REFERENCE TO USE OF FORCE AND EMS WOULD BE TOLD MORE ONCE ON SCENE. WHEN I ARRIVED ON SCENE VANCE COUNTY EMS WAS ALREADY ON SCENE. WHEN I ARRIVED I NOTICE A BLACK FEMALE LAYING ON THE GROUND HANDCUFFED AND SHE WAS IDENTIFIED AS LATWANYA OLIVER. SHE WAS HOLLERING STATING HER ARM WAS BROKE. I ASKED DEPUTY WHITE WHAT HAPPENED AND HE STATED HE ATTEMPTED TO SERVE MRS. OLIVER WITH FELONY WARRANTS. DEPUTY WHITE STATED MRS. OLIVER STARTED RESISTING AND BECAME COMBATIVE KICKING HIM TWICE. DEPUTY WHITE STATED HE TOOK HER TO THE GROUND AND HANDCUFFED HER. DEPUTY WHITE STATED HE CALLED FOR ASSISTANCE AND EMS. VANCE COUNTY EMS FIRST STATED MRS. OLIVER ARM WAS NOT BROKEN THEN CHIEF OVERTON STATED HER ARM WAS BROKEN. MRS. OLIVER WAS TRANSPORTED TO MARIA PARHAM MEDICAL CENTER FOR FURTHER TREATMENT. WHEN I ARRIVED AT THE HOSPTIAL I SPOKE WITH MRS. OLIVER. SHE STATED THAT DEPUTY WHITE WAS HARASSING HER. SHE STATED DEPUTY WHITE FOLLOWED HER ON SUNDAY FROM JOHN FOSTER HOMES UNTIL SHE PULLED INTO S&N FOOD MART ABOUT EIGHT OR NINE OCLOCK ON 10-21-2018. MRS. OLIVER STATED DEPUTY WHITE UP TO HER IN THE PARKING LOT TELLING HER ABOUT HER SPEEDING. SHE STATED WRITE ME A TICKET BECAUSE I KNOW MY RIGHTS. MRS.

| Officer Name / ID | Officer Signature | Date / Time Submitted | Page 4 |
|---|---|---|---|
| DEPUTY J. J. WHITE - 259 | | 10-23-18 / 0600 hrs | of 5 |

DCI-602 F

# CONTINUATION PAGE

| 1. AGENCY | 2. ORI | 3. CONTINUATION TO: | 4. OCA FILE NO. |
|---|---|---|---|
| VANCE COUNTY SHERIFF'S OFFICE | NC0910000 | ☒ INVESTIGATION ☐ ARREST ☐ SUPPLEMENTARY INV. | 18013870 |

Narrative

OLIVER STATED DEPUTY THEN CAME TO HER RESIDENCE AFTER MIDNIGHT BANGING ON THE FRONT AND SIDE DOOR.

MRS. OLIVER STATED SHE DID NOT LOOK TO SEE WHO IT WAS BUT KNEW IT WAS DEPUTY WHITE. MRS. OLIVER

STATED DEPUTY WHITE CAME BACK TO HER RESIDENCE LATER AND STATED YOU HAVE A WARRANT. MRS. OLIVER

STATED SHE LOCKED THE DOOR AND WALKED TO THE CAR. MRS. OLIVER STATED SHE ASKED TO SEE THE WARRANT.

MRS. OLIVER STATED WHEN SHE GOT TO THE PATROL VEHICLE AND SHE DID NOT GET IN BECAUSE SHE WAS

SCARED. MRS. OLIVER STATED SHE TOLD DEPUTY WHITE TO CALL FOR SOMEONE ELSE. SHE STATED DEPUTY WHITE

PUSHED HER INTO THE PATROL VEHICLE WHEN SHE REFUSED TO GET IN. SHE STATED SHE WAS NOT HANDCUFFED

AND DEPUTY WHITE SLAMMED HER TO THE GROUND. SHE STATED WHILE ON THE GROUND DEPUTY WHITE HANDCUFFED

HER. I SPOKE WITH CHIQUITA MARROW MRS. OLIVER SISTER (252) 432-0289 AND SHE STATED DEPUTY WHITE

CAME TO THE RESIDENCE AFTER MIDNIGHT KNOCKING ON BOTH DOORS AND NOBODY WENT TO THE DOOR AND NOBODY

LOOKED OUT TO SEE HIM. MRS. OLIVER WAS SERVED WITH THE TWO FELONY WARRANTS AND THE CHARGES FOR

OBSTRUCTING OF JUSTICE AND ASSAULT ON LAW ENFORCEMENT OFFICER. SHE WAS GIVEN A $15,000.00 UNSECURED

BOND PER MAGISTATE COWAN. MRS. OLIVER WAS GIVEN A COURT DATE OF 11-19-2018.

| Officer Name / ID | Officer Signature | Date / Time Submitted | Page 5 |
|---|---|---|---|
| DEPUTY J. J. WHITE - 259 | | 10-23-18 / 0100 hrs | of 5 |
| DCI-602 F | | | REV 3/92 |

P. White Order Re. Canine Dave

# VANCE COUNTY SHERIFF'S OFFICE

## EMPLOYEE COUNSELING RECORD

DATE: 08/20/2018

TIME: 17:00 PM

EMPLOYEE: DEPUTY ADAM HIGHT

Due to the circumstances of the K-9 incident involving K-9 Dave today at the school nutrition warehouse, you are hereby instructed that going forward until further training can be conducted and K-9 Dave satisfactorily certified, you are not to bring K-9 Dave to work. K-9 Dave is to be kept at home secured in his kennel at all times unless you are exercising the dog. Any work conducted with K-9 Dave outside of the kennel shall be ON LEAD until further notice. At no time should K-9 Dave be outside his confines without physical control of the K-9 with actual leads. Per Sheriff White.

| _____ | | _____ | |
| EMPLOYEE SIGNATURE | DATE | SUPERVISOR SIGNATURE | DATE |

Am. EEOC Compl.

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | **Amended** 433-2018-03289 |
| | | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) **Mr. Justin J. White** | Home Phone (Incl. Area Code) **(919) 961-3448** | Date of Birth |
|---|---|---|

| Street Address **130 Chappell Lane,** | City, State and ZIP Code **Kittrell, NC 27544** |
|---|---|

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name **VANCE COUNTY- OFFICE OF THE SHERIFF** | No. Employees, Members **500 or More** | Phone No. (Include Area Code) **(252) 738-2200** |
|---|---|---|

| Street Address **156 Church Street, Suite 004,** | City, State and ZIP Code **Henderson, NC 27536** |
|---|---|

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|

| Street Address | City, State and ZIP Code |
|---|---|

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☒ OTHER (Specify) UNLAWFUL WORKPLACE HARASSMENT

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **Feb. 20, 2018**  Latest **Oct. 24, 2018**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I. During my employment with the above-named employer, I have been the victim of harassment and differential treatment as it pertains to the terms and condition of employment in comparison to that of my non- Black coworkers/Deputy Sheriffs. This involves, but not limited to the areas of Discipline, Corrective Actions, Treatment, Disrespect, Issuance of Safety Equipment, Subordinate Status and Retaliation.

II. I have not been provided with any reason(s) for the harassment or the difference in treatment concerning the areas on the part of the Respondent.

III. I believe that I have been discriminated against based on my Race, Black, my gender, male, and in retaliation for my taking part in a protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

Page 1 of 5

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Nov 7th, 2018** Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

| **CHARGE OF DISCRIMINATION** | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | **Amended**<br>433-2018-03289 |
| | | and EEOC |

*State or local Agency, if any*

1.   On 10-18-17, 5:30 p.m., Sgt. Bobby Martin, white male, made several sexual discriminatory comments & jokes towards me in front of others. 2 hours later, he asked me in front of others if he could talk to me & pulled me aside & apologized. He kept apologizing for the situation saying, I have a slick mouth & sometimes I get carried away. I should not have said those things about you & I'm sorry, I don't really know you but maybe you can give me another chance to get to know you. I asked him, what are you talking about? & he said, the gay jokes, you know what I said earlier. I replied, ok. His apology is an admission of responsibility as my alleged and or perceived sexuality does not have a thing to do with him or any other staff member.

2.   On 11-22-17, 8:47 p.m., I was notified by Lt. Durwood Campbell, white male, that I was being transferred from Sgt. Donald Roberson, white male, to Sgt. Myron Alexander, black male, shift effective next week. Deputy Burns, white male, and I were being switched. Lt. Campbell advised me this was because of Dep. Burns starting basic law enforcement training in January 2018. On 11-30-17, 4:00 a.m., I was notified by Sgt. Alexander that my transfer was for personal issues with Dep. Wayne, black male, because we were beefing, not backing each other up on calls, weren't getting along, so Captain Lloyd Watkins, black male & Lt. Campbell asked me to take you. Sgt. Alexander stated, I had the option of not taking you.

On 12-2-17, 12:00 a.m., Sgt. Roberson was filling in for Sgt. Alexander & I asked him about my shift transfer. Sgt. Roberson stated, when I returned from vacation, Lt. Campbell called me in his office & said, we are going to make some changes because White & Wayne aren't getting along. Sgt. Roberson asked, were they not getting along when I was gone? Lt. Campbell replied, D-Ray they don't get along when you are here.
Sgt. Roberson advised me that Chief Bullock, black male, asked him on 12-1-2017, where is White. Sgt Roberson stated, I told him that you were transferred to Sgt. Alexander's shift. Sgt. Roberson stated, Chief Bullock advised that he did not know about nor did he approve it & that Watkins or Campbell better not do it again without his or the sheriff's approval. No one questioned me or Dep. Wayne on any conflict between us prior to the transfer. 12-2-2017, 6:23 p.m., I found a purple in color female unicorn hat in my mailbox. This is a form of sexual harassment. I reported same to Sgt. Roberson & Lt. Goolsby. No action.

3.   On 2-20-18, 6:00 p.m., I was suspended over lies told by Lt. Durwood Campbell for being insubordinate to him, Sgt's. Alexander & Roberson after I gave a white female a criminal summons for several traffic violations. I was falsely accused by Lt. Campbell. I never participated in the original investigation or the re-investigation pertinent to my suspension. During my suspension meeting, I asked twice to see my personnel file & Chief Bullock denied my request. The disciplinary was one sided.

4.   On 6-8-18, 6:30 p.m., Sgt. Welborn, white male, asked me to sign a performance evaluation done by Sgt. Alexander on 6-1-18 and I refused because it was false/fabricated. Lt.
Page 2 of 5

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Nov 7th, 2018**<br>Date         Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | **Amended**<br>433-2018-03289 |
| | | and EEOC |

*State or local Agency, if any*

Goolsby, black male, asked me to sign it twice after my initial refusal with Sgt. Welborn. After the false evaluation submitted by Sgt. Alexander, I filed an internal grievance appealing same & a race/gender discrimination complaint (false allegations of insubordination-suspension). After three attempts to get me to sign the false evaluations, management met with me & corrected majority of the evaluation problems.

5. On 9-10-18, 9:30 a.m., I was allowed to see my personnel file and I found two statements not previously known to me from Sgt. Roberson & Dep. Wayne, black male, in reference to traffic stops-related to my suspension on 2-20-18.

6. On 9-2-18, I again engaged in a protected activity when I filed EEOC charge number 433-2018-03289. One month thereafter, on 10-4-18, Sgt. Bobby Martin stated at the office during the meeting, **Lt. Goolsby's ass** does not want to answer calls, **he fucking** hides around the corner until' another unit gets there but yet his **bitch ass** is the first one to get on the radio & make it seem like he is doing something! All he does is **snitch** & cause problems! It does not matter who the new sheriff is, his ass will not be a lieutenant! Also, Sgt. Martin verbally attacked me & falsely accused me of filing a complaint against him for repeatedly calling a subordinate Arab/Indian deputy, **"Osama Bin Laden"** a racially terroristic derogatory name in the presence of Lt. Goolsby, Sgt. Martin, Sgt. Welborn, Deputy Poole, Edwards, Clayton & Patel while in the patrol room. After the verbal attack, I contacted Capt. Watkins & filed complaint. Sgt. Martin came to my residence the following day at 5:30 p.m. & verbally apologized to me repeatedly saying, I was wrong & I'm man enough to admit being wrong, I should not have said those things, I'm Sorry Mr. White, I mean, and I'm just sorry man. He continued saying, Mr. White you are a good guy, you come to work, answer your calls & everyone else's calls, you do good reports, I would prefer to have you on my shift versus what I have now because you are dependable & you actually work.

Sgt. Martin was to receive a counseling form (lesser sanction which is a non-disciplinary written coaching). However, he rebutted the counseling form, inquired about who was the complaining party & said the counseling form is not valid & refused to sign. Sgt. Martin told me, Sheriff Peter White, S-1, said, I was being written up because Dep. White filed a complaint against you. Lt. Goolsby told me, Bobby was not written up, he refused to sign & Chief Dep L. Bullock said, if it comes up again then we will have to do what we have to & issue the write up. Sgt. Martin was not correctively disciplined for the discriminatory terroristic references made a multitude of times. I was lied on & my personal & professional character were defamed. Previously, Sgt. Martin addressed these issues with me in Aug, Sept & Oct 2018 & I denied filing a complaint. I was & still is offended by the terroristic discriminatory reference, multiple questionings & false allegations (harassment) of me filing a complaint. No disciplinary action (insubordination).
Page 3 of 5

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Nov 7th, 2018**<br>Date      Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | **Amended** |
| ☒ EEOC | **433-2018-03289** |
| | and EEOC |

*State or local Agency, if any*

7.   On 10-6-18, 11:00 p.m., I met with Dep. Wayne & Dep. Poole at Sunrock in Kittrell, NC & discussed the document he wrote on me. Dep. Wayne denied writing the statement. However, his signed statement was dated 1-30-2018. Dep. Wayne continued to deny writing or signing anything against or about me. Dep. Wayne apologized to me for what took place but insisted he did not write any statements on me about the things I questioned him on, he never said or wrote. Dep. Poole can verify Dep. Wayne's full denial. He lied on me in writing & admitted it. Sgt. Roberson's statement dated 2-1-18 does merit some truth. Both statements are in reference to traffic stops, which were in my personnel file.

8.   On 10-23-18, an African American female suspect reported to the employer (Chief-Bullock, Capt. Watkins & Capt. W Bullock) that I used excessive force & broke her arm while trying to effect an arrest. Later that afternoon, I was ordered to report to work because the sheriff wanted to talk to me. I never spoke with the sheriff. Instead, on October 23rd, 2018, Capt. W. Bullock met with Capt. Watkins & I. Capt. Bullock advised us he was conducting an administrative investigation in to the use-of-force & took my statement regarding the incident.

9.   On 10-24-18, I was told by Capt. Bullock, that the Sheriff had determined that my services were no longer needed & to give me a ride home in my patrol car.

10.   On 10-29-18, Dep. Poole notified me that Capt. Watkins told him that I was fired because they wrote the paperwork up as excessive force. I was not aware of same until' then.

11.   On 11-6-18, Dep. Poole notified me that Sgt. Martin said in the patrol room, all right now, you don't want to end up like your boy (seemingly referring to me getting dismissed). Dep. Poole said, if I get fired, I will find another job, everybody know White was fired because the Sheriff has a personal vendetta against him. Sgt. Welborn stated, here you go with that yall shit again.

12.   To my knowledge, no one else engaged in a protected activity & no one else was correctively disciplined or discharged similarly for alleged policy violations. To my knowledge, there have been other uses-of-force that have resulted in human fatalities, pet fatalities/injuries, broken arms, wrists/fingers & the deputies were not fired or disciplined.

13.   In fact, a Caucasian K-9 officer, was not correctively disciplined or fired for his assigned k-9 (dog) viciously attacking a female subject without cause or order by the handler during the

Page 4 out 5

| | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Nov 7th, 2018**          *[signature]*<br>Date                    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

EEOC Form 5 (11/09)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | **Amended** |
| ☒ EEOC | **433-2018-03289** |
| | and EEOC |

State or local Agency, if any

Summer of 2018. All k-9 handlers are responsible for the actions of their assigned k-9 & the department must ensure appropriate training & continuing education & training for the handler & k-9. As a matter of fact, during the 2018 summer months, a white deputy kept leaving his patrol car on during day-shift after being told by Capt. Bullock not to do so back to back as he no longer had his dog after the attack. He was never issued insubordination paperwork. Also, a host of white supervisors & deputies were not correctively disciplined for violations of policy, some of them gross in nature but I, the black deputy was.

14.   While the Office of the Sheriff is constitutional & traditionally powerful, it is not all powerful, checks & balances exist & the powers are derivative of general statute. While state agencies have sovereign immunity & localities or municipalities have government immunity, such immunity is not applicable to constitutional violations, negligence or gross negligence. There is a systemic pattern of discrimination at my former place of employment & legal corrective measures are needed to enjoin actors from continuing same. While the sheriff is the final policy maker of his department, subordinates have to follow orders of low, mid & upper level supervisors before it reaches the sheriff or face insubordination charges and if you object, management trumps up charges against staff. Also, the sheriff's decision-making does not outweigh civil rights or liberties pertinent to the color of law under 42 U.S.C Sect. 1983 of the Civil Rights Act.

15.   I believe that I was discriminated against because of my race, Black, my sex, male, and retaliation for my engagement in the protected activity of filing EEOC charge #433-2018-03289 against the employer on 8-10-18 & prior internal grievances in June 2018, in violation of Title VII of the Civil Rights Act of 1964, as Amended. Also, I believe the terroristic discriminatory references & misconduct by certain members of the command staff created a hostile work environment. I was a dedicated deputy sheriff of the Vance County Sheriff's Office & put people first to accomplish the law enforcement objective & did not deserve to be fired. I desire to be made whole by the County of Vance, The Office of the Sheriff i.e. reinstatement, compensated for back pay, allowed to fulfil my two year contract & etc. While I served at the pleasure of, I contend I was wrongfully dismissed based on the afore-mentioned merits. Also, I request a copy of my complete personnel file & use-of-force investigation file (any & all statements related).

Page 5 of 5

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Nov 7th, 2018** Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

Not. Of Appt.

 

North Carolina Sheriffs' Education and Training and Standards Commission
North Carolina Department Of Justice Post Office Drawer 629
Raleigh, North Carolina 27602
Telephone: (919) 779-8213   Fax: (919) 662-4515

## Report of Appointment - Form F-4 (revised 02/2014)

**INSTRUCTIONS:** Please type or print all information clearly. This form shall be completed for each individual irrespective of whether service is to be full-time, part-time, paid, unpaid, regular, reserve, auxiliary, honorary, or special. This appointment must be submitted to the Standards Division no later than 10 days after applicant has been appointed pursuant to 12 NCAC 10B .0403(a). A copy must be maintained in the appointing agency's personnel files.

Appointing Agency  VANCE COUNTY SHERIFF'S OFFICE

Address  156 CHURCH STREET, SUITE 004--- HENDERSON, NC          Zip Code  27536

Agency or ORI Number  NC0910000

Phone Number  (252) 738-2200

Appointee's Name:  JUSTIN          JAMEL          WHITE
                   (First)         (Middle)        (Last)
Address  6606 CLARKSBURG PLACE-MAILBOX 12, RALEIGH NC      Zip Code  27616

Date of Birth  08/15/▒▒         Operator's License Number  30643245

Gender:  Male ◆    Female ☐
Race:  African American ◆   Asian American ☐   Hispanic ☐   Caucasian ☐   Other ☐ _____

Social Security Number  ● ● ● | ● ● | ● ● ● ●

**Deputy Sheriff** ◆                     **Detention Officer** ☐
Date of Oath  06/05/2017              Date of Appointment _____
Part Time ☐      Inactive ☐          Part Time ☐      Inactive ☐
Full Time ◆      Active ◆            Full Time ☐      Active ☐

### Section for New Applicants, Probationary Appointees and Lateral Transfers

This section must be completed indicating that the requirements of the administrative code have been met with the necessary forms and documentation having been placed in the applicant's personnel file prior to submitting this application. Original substantiating documentation must be attached.

◆  **Oath of Office** (Required for Deputy Positions.)

◆  **Fingerprint Requirement**          ◆ Submitted Directly to S.B.I./F.B.I.
                                        ☐ Submitted with application

◆  **Authorization for Release of Information Form(s)**

◆  **F-1 Medical History Statement** (valid for one year)
   (Signed, and dated by Applicant and Licensed Physician, Nurse Practitioner or Physician's Assistant)

◆  **F-2 and F-2a Medical Examination Report** (valid for one year)
   (Signed, and dated by Applicant and Licensed Physician, Nurse Practitioner or Physician's Assistant)

◆  **Drug Screen Results** (valid for 60 days)

◆  **Education Requirement Verified By**     ◆ Diploma      ☐ G.E.D. Report
                                            ☐ Transcript   ☐ Other _____

◆  **Firearms Qualification** [Day/Night Handgun, Shotgun (if authorized), and Combat Course]
   **Deputy**                              **Detention Officer**
   Scores Enclosed ◆                       Scores Enclosed ☐
   Unauthorized ☐                          Unauthorized ☐

Ex. A

Perf. Appr. Rebut.

# Justin Jamel White

130 Chappel Lane ● Kittrell, NC 27544 ● (919) 961-3448 ● Justinwhitencssd@yahoo.com

June 15ᵗʰ, 2018

**Transmitted via Hand Delivery**

Sheriff Peter White
Vance County Sheriff's Office
156 Church Street, Suite 004
Henderson, NC 27536
Pwhite@vancecounty.org

**Personnel Sensitive, Confidential & Sworn File**

## Re: Employee Performance Appraisal Rebuttal

**Dear Sheriff**

I, Justin J. White, deputy sheriff, hereby file rebuttal in reference to the aforementioned done by Sergeant Myron D. Alexander (S-12), Patrol Supervisor. Same was done on June 1ˢᵗ, 2018, 4 months approximately after I was transferred from his shift. I was notified of this document on June 8ᵗʰ, 2018, at 6 p.m. by Sgt. Chris M. Welborn (S-13), Patrol Supervisor & presented with same to sign in which I noted being in strong disagreement with. I shared my dissent with Sgt. Welborn, in which Sgt. Bobby Martin (S-11) was present & I was told to appeal it. Attached is a copy of my performance appraisal.

Sgt. Welborn advised me, JJ (me) you are a good employee, you work & you got some know how. Sgt. Welborn stated, this report is biased because Myron have personal issues with you. He advised me, you are a team player & professional with the citizens & us but I do get a little carried away from time to time but not too much. Sgt. Welborn claimed, JJ we all get a little carried away from time to time, it's going to happen. Sgt. Welborn stated, you are not insubordinate, you follow orders & do your job. Sgt. Welborn stated, go to the sheriff & talk to him.

**Sgt. Bobby Martin advised me to file a rebuttal with the High Sheriff so it can be reviewed & removed from my file & if it was not overturned then for the rebuttal to be attached to the performance evaluation. Also, Sgt. Martin advised me that he had the same situation happen with a supervisor in investigations. Sgt. Martin claimed to have prepared a rebuttal & presented same to you & asked to be transferred since he could not satisfy his supervisor. Sgt. Martin won his case.**

First & foremost, I am a stern & firm individual. I am shocked that Sgt. Alexander portrayed me negatively especially when he claimed that he did not have a problem with my job performance and or personal conduct in early January 2018 during a meeting with management, supervision & subordinates. Also, I have not been written up several times for my attitude & work ethics, nor have I been very insubordinate towards supervisors. Based on those deceptive & frivolous allegations, I request to view & copy my complete personnel file. It should be noted, I asked to see the file that Chief Bullock had when I was suspended in February 2018, in which I was denied & told, you have everything you need.

*EX. F*

### Justin Jamel White                                    2/3

130 Chappel Lane ● Kittrell. NC 27544 ● (919) 961-3448 ● Justinwhitencssd@yahoo.com

**How can Sgt. Alexander adjudicate my performance or personal conduct when he does not show up to work on time & has been a no call no show on calls for service on various occasions with staff that have requested back up? He is the king of absenteeism & tardiness. In fact, he is the reason why a memo was issued 6-7 months ago for patrol to report to clock on at 5:30 and report to work at 5:45 & he does not adhere to same. Plenty of times, my supervisor & I waited for him to come to work & he would show up at 7 a.m. but his staff was on time. It is substantially rare for him to clock on on-time.**

For example, Sgt. Alexander failed to report to work on time for 1 ½ hrs approximately, leaving me to answer calls in county alone & without back up, he gave Deputy I. Greene (trainee at-the-time) & Deputy T. Terry permission to come in late by using comp time. A burglary call (10-62 in progress) was assigned to me which was later downgraded to a prowler (10-76). Both calls for service were/are priority. The caller stated someone was trying to break into her residence & hung up. Then, she called back saying someone was trying to come through her window & that she heard them outside. I determined it was not a burglary or prowler but the wind causing the metal antenna & electric wires on her trailer to mimic same. In fact, day shift who was already off provided back up without my request since I was by myself. Sgt. Alexander was not appropriately disciplined for lying to Lt. Campbell (insubordination) claiming he was at work, when he was not, neglecting duty and failing to report as scheduled.

Deputy Branch (S-34) went to the sheriff's office on his day off a few months ago & met with Chief Bullock & Captain Watkins in reference to complaining on Sgt. Alexander pertinent to him not answering calls, not backing up deputies & not being accessible. As a matter of fact, Deputy Branch reported to management, supervision & co-workers that Sgt. Alexander was clearing calls after riding past the house & not stopping. Deputy Branch requested to be transferred to another shift & management told him to tough it out until the guys were out of training in May.

Deputy Poole (S-40) complained on Sgt. Alexander & wanted to be moved. In fact, on a call in January 2018, in which we had a burglary in progress call during the winter storm & Sgt. Alexander & Deputy Greene (S-41) were closer. Deputy Poole & I were near U.S. 1 S by the Franklin & Vance county line & we got there first & handled same despite them being on Warrenton road near U.S. 1. That incident triggered Deputy Poole's 10 day suspension, however, no one got on Myron for threatening Deputy Poole on the radio, you want to put your life on it in reference to who was closer to Regina Lane. Also, Sgt. Alexander, told Deputy Poole on the phone, I don't have to answer call because I am the supervisor.

Deputy Burns had problems with Sgt. Alexander not working & was constantly complaining on him to the Chief Bullock & Capt. Watkins. Also, former Deputy Lauren Matthews had a host of problems with Sgt. Alexander & was complaining.

According to supervision, every person that goes to his shift, either gets transferred or quits.

As a matter of recent fact, Deputy Al-Wadeii (S-28) worked Sgt. Alexander's shift f & was complaining to supervision on the other shift that he called for backup on Vicksboro Road & no one came but Deputy Edwards (S-24), who was the Northside car. Deputy Edwards stated he diverted from a call (pending) because Deputy Al-Wadeii called for help. Deputy Al-Wadeii claimed that Sgt. Alexander & Deputy Greene are always together.

As you can see, Sgt. Alexander has a history of unacceptable personal conduct and or grossly inefficient job performance. These matters needed attention. It is to my recommendation that Sgt. Alexander be suspended for 15 days without pay & demoted.

I look forward in hearing from you & resolving this matter internally.

Sincerely,

6-20-18

Justin J. White, M.S., B.S.

Enclosures: (1)
Performance Appraisal

Cc: File
Argretta Johen, HR Director
Peter White, High Sheriff
Justin White, Deputy Sheriff
Chris Welborn, Sergeant
Bobby Martin, Sergeant

State of North Carolina
County of Vance

On this, the 20 day of June , 20 18, before me a notary public, the undersigned party, personally appeared Justin J. White, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness hereof, I hereunto for the above-mentioned hereby set my hand and official seal.

Tiffany L. Ayscue
Notary Name

My commission expires: July 31, 2019

Tiffany L. Ayscue
(Seal)
Notary Signature

J. White Title VII Compl.

June 15th, 2018                        <u>**Transmitted via Hand Delivery**</u>

Sheriff Peter White                    <u>**Personnel Sensitive, Confidential & Sworn File**</u>
Vance County Sheriff's Office
156 Church Street, Suite 004
Henderson, NC 27536

**Re: Title VII Civil Rights Act of 1964-Race & Gender Discrimination**

Dear Sheriff

I, Justin Jamel White, deputy sheriff at the Vance County Sheriff's Office, hereby file written complaint pertinent to race and gender discrimination.

On February 20th, 2018, I was written up and suspended for 5 days without pay, publicly humiliated by the department, having to walk out of the sheriff's office without a gun and badge and being stripped of my law enforcement credentials. On my way out, I encountered several deputy sheriffs, who saw me after the issuance of corrective action. **I was heavily lied on by Lt. Durwood Campbell (S-7) and no member of management seemed to care.**

Lt. Campbell is a Caucasian male and I am an African American male. Jamie Goss, Caucasian female, called and complained which triggered this entire ordeal despite me being in the performance of my job duties and responsibilities. My main duty is to answer calls, patrol the county, observe and enforce violations of law/county ordinances. It should be noted, On June 5th, 2018, Ms. Goss pled guilty. **It is going to be too late to correct someone's action when he or she and innocent third parties are tragically killed as a result of a motorist illegally gross decisions under the wheel.** I am happy to discuss the incidents involving this in the near future.

**I was never given a chance to share my side in reference to providing verbal or written statement in reference to the deceptively egregious allegations by Lt. Durwood Campbell.** Per Sheriff White, Chief Lawrence Bullock and Captain Watkins were directed to get my side of the story before corrective action was issued. **That did not happen.** {It should be noted, this is not the first instance of insubordination with Chief Bullock and Captain Watkins as the Sheriff directed both of them to put me back on Sgt. Roberson's (S-10) shift in December 2017 and January 2018. This is because the shift transfer was not approved by the High Sheriff nor was it submitted to the Chief Deputy for review and submission for approval to the Sheriff. Also, the Sheriff did not delegate authority to Capt. Watkins or Lt. Campbell to transfer staff}. No one talked to me about anything. Out of the blue, I walk in and is suspended over hot lies. It should be noted, Chief Bullock and Capt. Watkins were insubordinate to the Sheriff by not getting my take on the situation. **Based on mere appearance, the County of Vance, NC and Sheriff Office took the white man's word over the black man.** Same is a civil rights violation.

Lt. Campbell cursed, fussed & threatened me in the presence of third parties. The first time, Deputy Poole was present in the patrol room & the second time, Sgt. Alexander & Deputy Poole were present (patrol room). I am happy to discuss the incidents involving this in the near future.

I have direct evidence of both situations and look forward to presenting same. I believe we may be able to rectify this situation administratively. My pay check was docked 911.00 dollars and 28 hours of overtime went down the drain over lies and errors by management. It should be noted. the sheriff's office nor HR will not receive copies of my evidence. If the situation goes to trial in a federal court of competent jurisdiction i.e. EEO and or state court of competent jurisdiction i.e defamation of character, libel and slander, negligence, then it will be provided during discovery as ordered by the courts.

It should be noted. there is a pattern of discrimination and negligence at the sheriff's office. Upon hire, I begged Lt. Ray Shearin (S-4) for a bullet proof vest for 3 weeks and was only given one after I approached the command staff while they were reading reports in late June 2017 and Captain W.W. Bullock (S-3) ordered him to find me a vest. I responded to emergency calls i.e. burglary in progress. no vest.

From late June 2018 until' August 2018, I begged for tires on my patrol vehicle to no avail for nearly 8 weeks. I followed the chain of command, Sgt. Roberson (S-10), Lt. Shearin and former Captain now Chief. L.D. Bullock (S-2) requesting tires. Sgt. Roberson eventually told me to stop asking and go to the sheriff because these people don't do their jobs. As I was going to see the Sheriff, Capt. Bullock asked what's wrong? (After I walked in his office for the third time) and where is your car? He saw the car and went to Lt. Shearin and I got some tires same day despite both of them knowing I needed tires prior to. The metal wires were showing on rear tires.

Last July 2017. Deputy Warren Durham (S-95) heard a bullet ricochet off of his vehicle on Breckenridge Street, near the jail and feared for his life. That was the same night that former Deputy Erik Sheftal (S-29) held a suspect at gun point in the city limits of Henderson by the library. Deputy Durham had previously asked Lt. Shearin for a vest to no avail.

In January 2018, Deputy Al-Wadeii (S-28) was responding to calls without a vest with Lt. Campbell and I questioned him being on the streets without a vest. Lt. Campbell called Lt. Shearin and he came to the sheriff's office and issued him a vest (speedily despite my sitation).

It should be noted. Lt. Shearin is a Caucasian male and the parties listed above are minorities. This is a civil rights issues. Also, Lt. Shearin was directed by the High Sheriff to issue me equipment i.e. in September 2018 twice to no avail

While I serve at the pleasure of. I contend these issue do not fit the criteria as they would reasonably violate county and or departmental policy. federal civil rights laws. NC Public Policy Doctrine, NC Tort Law, etc. Also, taking adverse action against someone after reporting the aforementioned is reprisal and or retaliation. How can one write up. suspend and dock pay of the black man but the same alleged offenses are being committed by white deputies? How can one

write up, suspend and dock pay of subordinate but allow other supervisory or managerial deputies to get away with it? How can the subordinate deputy be suspend for insubordination & the chief deputy, captain & lieutenant are not held to the same standard for being insubordinate?

**\*\*\*\*\*SOMETHING IS WRONG WITH THIS PICTURE & NEEDS CORRECTING\*\*\*\*\***

It is to my recommendation that Chief Bullock be issued a corrective action and suspended for **10 days without pay in reference to insubordination** by not returning me to Sgt. Roberson's shift and not obtaining statements for the allegations made by Lt. Campbell.

It is to my recommendation that Capt. Watkins receive a lesser sanction as the chief deputy had the overall responsibility as the manager with rank/seniority to ensure my transfer back to Sgt. Roberson's shift and that they met with me about the allegations by Lt. Campbell.

It is to my recommendation that Lt. Shearin be issued corrective action and suspended for 10 days without pay and demoted in reference to failing the issue the protective and necessary law enforcement equipment after being directed to do so by the Sheriff several times.

It is to my recommendation that Lt. Campbell be issued corrective action, suspended for 10 days without pay & demoted for his official misconduct & verbal/written deception pertinent to the write up.

I understand it will be difficult in disciplining members of your command staff but as you said in times past, we have to be fair.

**There were no legitimate non-discriminatory reasons to issue corrective action and authorize adverse action. There are no bona-fide reasons and or business necessity for the abovementioned. Even if responsibility laid with me, then the mixed motive legal theory would apply.**

I look forward in hearing from you and resolving this issue.

Sincerely,


Justin White, M.S., B.S
Jw  *Jw*  4-22-2018

Cc: File
Argretta Johen, HR Director
Peter White, High Sheriff
Justin White, Deputy Sheriff

_[signature]_ 6/22/2018          2. Transfer

State of North Carolina
County of Vance

On this. the 22nd day of June . 20 18 . before me a notary public. the

undersigned party, personally appeared _[handwritten]_ , known to me (or

satisfactorily proven) to be the person whose name is subscribed to the within

instrument. and acknowledged that he executed the same for the purposes

therein contained.

In witness hereof, I hereunto for the above-mentioned hereby set my hand and official seal.

_[signature]_
Notary Name

_[signature]_                    My commission expires: _July 2, 2020_
Notary Signature

(Seal)

OCTAVIA LAMBERT
NOTARY PUBLIC
VANCE COUNTY, NC

P. White Resp. to Perf. Appr. Rebut.



# Office of the Sheriff
## Vance County

### Sheriff Peter White

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone 252-738-2200
Fax 252-738-2220

July 13, 2018

Deputy Justin J. White
156 Church Street, Suite 004
Henderson, NC 27536

Dear Deputy White:

This letter is being written in response to your "Performance Appraisal Rebuttal" dated June 15, 2018 and received by me on June 26, 2018. After reviewing your Performance Appraisal on June 13, 2018, completed by Sergeant Myron D. Alexander and dated on June 1, 2018, I instructed the Sergeant, through the chain of command to re-visit the appraisal form in which you indicated that you "strongly disagree" with the ones rated "1".

Sergeant Alexander completed a subsequent appraisal dated June 20, 2018 changing a rating of "1" in the dimension of Interpersonal Skills/Teamwork from a "1" to the rating of "2" which increased your total score by 1, which changed your total from 19 to 20. This particular form indicates that you refused to sign. This adjustment was made because you had only been reprimanded once instead of "several times" as previously listed for this dimension.

In an effort to resolve you disagreeing and refusing to sign the appraisal form, I requested that this appraisal be re-visited once more. This time since you had been supervised by both Sergeant M. D. Alexander and Sergeant C. M. Welborn nearly an equal amount of time during this review period, the review would involve you and both Sergeants which was completed and dated July 2, 2018 and reviewed by me on July 3, 2013. This time your rating of 1 in the dimension of Dependability Attendance was adjusted from a "2" to a "3". This change left you with a total score of 23 which is standard. Your file is maintained in my office and you're welcome to review same. The other incidents you mentioned in your "Rebuttal" have no bearing on your Performance Appraisal.

Sincerely,

Sheriff Peter White
PW/jbm

EX. G

P. White Resp. to Title VII Compl.



# Office of the Sheriff

## Vance County

156 Church Street, Suite 004
Henderson, North Carolina 27536-5574

Telephone 252-738-2200
Fax 252-738-2220

### Sheriff Peter White

July 19, 2018

Deputy Justin J. White
156 Church Street, Suite 004
Henderson, NC 27536

Dear Deputy White:

This letter is being written in response to your complaint dated June 15, 2018 and received on June 26, 2018. In your complaint you reference "Title VII Civil Rights Act of 1964-Race & Gender Discrimination".

You were in fact suspended for five (5) days without pay beginning February 20, 2018, which included the working days February 20, 25, 26, 27 and 28 which is documented on the Personnel Action Form which you signed on February 20, 2018. This suspension as you know was for unbecoming conduct as listed on the Personnel/Payroll Action Form signed by you on February 20, 2018.

Yes, your gun and badge were kept here as well as your credentials (ID) which is customary during suspension periods. In this regard, you were treated no different than anyone else. There is no evidence that Lieutenant Campbell "heavily lied" on you as you stated in your complaint.

If you will recall, when you and I met after your suspension period ended, you admitted to saying the things to Lieutenant Campbell that he listed in the official written reprimand signed by you and he on February 20, 2018.

In regard to the Jamie Goss complaint, you had been told previously by Supervisors not to issue a criminal summons for a traffic violation or violations which was the basis of the Goss complaint, since she was served nearly 24 hours after the traffic stop. You had also been told not to focus on traffic stops since this is not your primary duty and you had not been issued a citation book. Ms. Goss was originally charged with Reckless Driving to Endanger, Driving Left of Center and a Seat Belt violation. On June 5, 2018, she pled guilty to one count of Improper Equipment while the other charges were dismissed. This is not a Caucasian/African American issue but simply you as a Deputy Sheriff with the Vance County Sheriff's Office doing what you are told and following instructions. When you made this vehicle stop knowing you were not able to issue a citation, you should have contacted a Supervisor on Duty instead of you issuing a criminal summons.

You were given a chance to "share your side" when you met with Chief L. D. Bullock, Captain L.Q. Watkins and Lieutenant D. Campbell. During this meeting, you denied making the statement listed in the reprimand dated January 27, 2018 and signed by you and Lieutenant Campbell.

In your capacity as a Deputy Sheriff, you do not get to say who on my Command Staff is "Insubordinate" to me and who is not. As Sheriff, that is my decision.

You began your Field Training on June 18, 2018 with the Sergeant Durwood Campbell. During your third week of training, you and two other trainees were rotated to different squads with you being assigned to Sergeant D. R. Roberson's squad to complete your training with Deputy Brian Wayne. You remained on this squad throughout your training and until November 2017. Due to issues within this squad you were then reassigned to the squad supervised by Sergeant Myron D. Alexander where you remained until your suspension on February 20, 2018. After returning from your suspension imposed by me, you were assigned to another squad supervised by Sergeant C. M. Welborn where you remain today.

The one rotation and two re-assignments to different squads had absolutely nothing to do with race, gender or anything else other than simply trying to place you where you would best fit and be of greater benefit to the Sheriff's Office.

Once again, this is not a RACE, SEX or GENDER ISSUE nor any other form of discrimination. Lieutenant Campbell has admitted that he was angry with you during the telephone conversation and does not deny using the word "ass" while speaking with you, which is obviously inappropriate on his part. This has been addressed by me with Lieutenant Campbell. However, this does not excuse your conduct displayed while addressing a Superior Officer (Lieutenant Campbell) in the Patrol Squad Room.

Your suspension was approved by me based on your conduct in the Patrol Squad Room in the presence of Lieutenant Campbell, whom you were addressing, Sergeant Alexander and Deputy Poole. The suspension was carried out and Nine Hundred Eleven Dollars ($911.00) was deducted from your pay.

I have not seen nor am I aware of any discrimination in the Vance County Sheriff's Office.

The incidents you alleged in your complaint involving other deputies and equipment issued is by no means discrimination. In addition, each of these deputies you mentioned is perfectly capable of speaking for themselves. In summary, I see nothing in your Complaint nor during this investigation to suggest discrimination in any shape, form or fashion.

Sincerely,

Sheriff Peter White
PW/jbm

Notice of EEOC Charge

**NOTICE OF CHARGE OF DISCRIMINATION**
**(This Notice replaces EEOC FORM 131)**

**DIGITAL CHARGE SYSTEM**

September 12, 2018

To:
Mrs. Argretta Johen
Director, Human Resources
VANCE COUNTY
AJOHEN@vancecounty.org

This is notice that a charge of employment discrimination has been filed with the EEOC against your organization by Justin White , under: Title VII of the Civil Rights Act (Title VII). The circumstances of the alleged discrimination are based on Retaliation, Race, and Sex, and involve issues of Harassment, Discipline, and Terms/Conditions that are alleged to have occurred on or about Feb 20, 2018 through Aug 10, 2018.

The Digital Charge System makes investigations and communications with charging parties and respondents more efficient by digitizing charge documents. The charge is available for you to download from the EEOC Respondent Portal, EEOC's secure online system.

Please follow these instructions to view the charge within ten (10) days of receiving this Notice:

1. Access EEOC's secure online system: https://nxg.eeoc.gov/rsp/login.jsf
2. Enter this EEOC Charge No.: 433-2018-03289
3. Enter this temporary password: nh5275qy

Once you log into the system, you can view and download the charge, and electronically submit documents to EEOC. The system will also advise you of possible actions or responses, and identify your EEOC point of contact for this charge.

If you are unable to log into the EEOC Respondent Portal or have any questions regarding the Digital Charge System, you can send an email to Raleigh@eeoc.gov.

**Preservation of Records Requirement**
EEOC regulations require respondents to preserve all payroll and personnel records relevant to the charge until final disposition of the charge or litigation. 29 CFR §1602.14. For more information on your obligation to preserve records, see http://eeoc.gov/employers/recordkeeping.cfm.

**Non-Retaliation Requirements**
The laws enforced by the EEOC prohibit retaliation against any individual because s/he has filed a charge, testified, assisted or participated in an investigation, proceeding or hearing under these laws. Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. For more information, see http://www.eeoc.gov/laws/types/facts-retal.cfm.

**Legal Representation**

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please provide the attorney's contact information when you log in to the online system.

**U.S. Equal Employment Opportunity Commission**
**FEDERAL INVESTIGATION:**
**REQUEST FOR POSITION STATEMENT**
**AND SUPPORTING DOCUMENTARY EVIDENCE**

EEOC hereby requests that your organization submit within 30 days a Position Statement setting forth all facts which pertain to the allegations in the charge of discrimination under investigation, as well as any other facts which you deem relevant for EEOC's consideration.

We recommend you review EEOC's resource guide on "Effective Position Statements" as you prepare your response to this request.

**Fact-Based Position Statement**

This is your opportunity to raise any and all defenses, legal or factual, in response to each of the allegations of the charge. The position statement should set forth all of the facts relevant to respond to the allegations in the charge, as well as any other facts the Respondent deems pertinent to EEOC's consideration. The position statement should only refer to, but not identify, information that the Respondent asserts is sensitive medical information, or confidential commercial or financial information.

EEOC also requests that you submit all documentary evidence you believe is responsive to the allegations of the charge. If you submit only an advocacy statement, unsupported by documentary evidence, EEOC may conclude that Respondent has no evidence to support its defense to the allegations of the charge.

EEOC may release your position statement and non-confidential attachments to the Charging Party and her representative and allow them to respond to enable the EEOC to assess the credibility of the information provided by both parties. It is in the Respondent's interest to provide an effective position statement that focuses on the facts. EEOC will not release the Charging Party's response, if any, to the Respondent.

If no response is received to this request, EEOC may proceed directly to a determination on the merits of the charge based on the information at its disposal.

**Signed by an Authorized Representative**

The Position Statement should be signed by an officer, agent, or representative of Respondent authorized to speak officially on its behalf in this federal investigation.

**Segregate Confidential Information into Separately Designated Attachments**

If you rely on confidential medical or commercial information in the position statement, you should provide such information in separate attachments to the position statement labeled "Sensitive Medical Information," "Confidential Commercial or Financial Information," or "Trade Secret Information" as applicable. Provide an explanation justifying the confidential nature of the information contained in the attachments. Medical information about the Charging Party is not sensitive or confidential medical information in relation to EEOC's investigation. Segregate the following information into separate attachments and designate them as follows:

    a. Sensitive medical information (except for the Charging Party's medical information).
    b. Social Security Numbers
    c. Confidential commercial or financial information.

    d. Trade secrets information.
    e. Non-relevant personally identifiable information of witnesses, comparators or third parties, for example, social security numbers, dates of birth in non-age cases, home addresses, personal phone numbers and email addresses, etc.
    f. Any reference to charges filed against the Respondent by other charging parties.

**Requests for an Extension**
If Respondent believes it requires additional time to respond, it must, at the earliest possible time in advance of the due date, make a written request for extension, explain why an extension is necessary, and specify the amount of additional time needed to reply. Submitting a written request for extension of time does not automatically extend the deadline for providing the position statement.

**Upload the Position Statement and Attachments into the Respondent Portal**
You can upload your position statement and attachments into the Respondent Portal using the **+ Upload Documents** button. Select the "Position Statement" Document Type and click the **Save Upload** button to send the Position Statement and attachments to EEOC. Once the Position Statement has been submitted, you will not be able to retract it via the Portal.
Please retain this notice for your records.

*Notice of Confidentiality: The information contained in this transmission may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person (s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact us at digital-support@eeoc.gov and destroy all copies of the original message and attachments.*

J. White Susp.

## VANCE COUNTY
## PERSONNEL / PAYROLL ACTION FORM

☐ New Hire/Rehire   ☑ Change   ☐ Leave of Absence   ☐ Termination   ☐ Other

Effective Date: 02/20/2018                    Date of Hire: _____

Name: JUSTIN WHITE                            SSN: _____

Address: _____                      Marital Status: _____

City/State: _____                   Sex: _____ Race: _____

Zip/County: _____                   Date of Birth: _____

Department: SHERIFF'S OFFICE

Job Title: DEPUTY SHERIFF                      Grade: _____ Job #: _____

Monthly/Hourly Rate: _____          Annual Salary: _____

Explanation: UNBECOMING CONDUCT --SUSPENDED FIVE (5) DAYS WITHOUT PAY---

FEBRUARY 20, 25, 26, 27, 28 TO RETURN ON MARCH 1, 2018

---

**SHERIFF & 911 ONLY:** *Please check all that apply. Provide a date and a copy of the certification.*

☐ Sheriff Department-BLET Certified: _____   ☐ 911-EMD Certified: _____

Employee Signature: _____           Date: 2-20-18

Department Head Signature: _____     Date: 2-20-18

Human Resources Signature: _____     Date: _____

Payroll Signature: _____             Date: _____

*This instrument has been pre-audited in the manner required by the Local Government Budget & Fiscal Control Act*
Approved by Finance Director: _____   Date: _____

---

### HUMAN RESOURCES USE ONLY
*Please check all that apply and attach the appropriate forms.*

**DEDUCTIONS:** ☐ Employee - Medical   ☐ Employee - Dental   ☐ Employee - Life

**ATTACH THE FOLLOWING FORMS:** ☐ Federal & State Tax Forms   ☐ Direct Deposit Info   ☐ Longevity

Completed By: _____   Date: _____

*Form Revised 8/11/17*

VANCE COUNTY SHERIFF'S OFFICE

# OFFICIAL WRITTEN REPRIMAND

DATE: 01/27/18

EMPLOYEE NAME: JUSTIN J WHITE

Has Employee been verbally reprimanded? YES

Has employee been counseled? NOT FOR THIS ISSUE

Is Employee willing to make necessary changes? I CAN NOT ANSWER

REF: OFFICER COMPLAINT, INSUBORDINATION TO ME AND FOR DEFYING  PREVIOUS INSTRUCTION ON TRAFFIC MATTERS.

RECORD OF EMPLOYEE CONVERSATION:

SATURDAY MORNING JAN 27,2018 AT 9:30AM, I CALLED DEPUTY JJ WHITE. THIS WAS IN RESPONSE TO AN OFFICER COMPLAINT CALL I HAD JUST GOTTEN AT HOME FROM SGT. ALEXANDER FROM A JAMIE GOSS. SHE WAS VERY UPSET AT THE FACT THAT SHE WAS SERVED WITH A SUMMONS FOR TRAFFIC VIOLATIONS ALMOST 24 HOURS AFTER THE TRAFFIC STOP, IN WHICH SHE WAS RELEASED. I INFORMED HIM THAT HE HAD NO BUSINESS GOING BACK SERVING CRIMINAL SUMMONS FOR TRAFFIC VIOLATIONS ON PEOPLE BECAUSE HE WAS NOT ISSUED A CITATION BOOK. HE JUMPED BACK AT ME TELLING ME I WAS BEING DISRESPECTFUL TO HIM AND NOT GOING TO TALK TO HIM THAT WAY. I TOLD HIM HIS PRIMARY JOB FUNCTION WAS

NOT TRAFFIC ENFORCEMENT AND HE WAS NOT TO DO THAT AGAIN. I THEN TOLD HIM TO HAVE A GOOD DAY AND HUNG UP.

LATER IN THE DAY, WE WERE ALL IN THE PATROL ROOM AND I HEARD A CONVERSATION BETWEEN SGT. ALEXANDER AND POOLE AND WHITE THAT WAS GETTING HEATED, SO I STEPPED OUT OF MY OFFICE TO LISTEN. POOLE WAS TELLING SGT. ALEXANDER THAT HE DID NOT UNDERSTAND WHY THE SITUATION BETWEEN THEM HAD GOTTEN AS FAR AS IT DID. HE FELT THAT THE SHIFT SHOULD BE ABLE TO TALK "MAN TO MAN" AND IT STAY THERE. THE PROBLEM IS IT APPEARS THEIR IDEA OF MAN TO MAN IS THEY TELL THE SUPERVISORS WHAT THEY ARE GOING TO DO AND IT BE DROPPED. I HAD NOT SPOKEN UP SO FAR I WAS JUST LISTENING AND MAKING SURE IT DID NOT GET OUT OF HAND.

THEN DEP. WHITE STOOD UP AND SPOKE TO ME SAYING HE DID NOT APPRECIATE THE WAY I SPOKE TO HIM THIS MORNING. HE RATTLED OFF FOR SEVERAL MINUTES AND THEN I TOOK A TURN. I ASKED HIM DID HE HAVE A TICKET BOOK AND HE SAID NO. I THEN REITERATED THAT THE REASON HE DID NOT HAVE ONE WAS BECAUSE HIS PRIMARY JOB DESCRIPTION WAS NOT TRAFFIC ENFORCEMENT, IT WAS TO SERVE PAPERS AND ANSWER CALLS. I THEN MENTIONED HIS LACK OF WARRANT SERVICES THAT DIDN'T INCLUDE HIS TRAFFIC SUMMONS. HE THEN SAID HE COULDN'T HELP NO ONE WAS COMING TO THE DOOR AND THAT HE DID WARRANT SERVICES. THEN HE SAID HE ONLY HAD ONE FATHER AND HE WAS A LARGE BLACK MAN AND EVEN HE DIDN'T TELL HIM WHAT TO DO ANYMORE. HE THEN SAID THAT THE DECISIONS HE MADE ABOUT HOW TO DO HIS JOB WERE HIS DECISIONS AND WON'T NOBODY GOING TO TELL HIM WHAT TO DO. AND THEN HE MADE A REFERENCE TO KNOW KNOWING WHY I WAS CALLED "DIRTY

SOUP". I HAVE NEVER HEARD ANYONE REFERENCE ME IN THAT MANNER BEFORE. HE SAID ON THAT NOTE I'M OUT AND STOMPED OUT OF PATROL.

INCLUDED IS A COPY OF MY COUNSELING FORM I PREPARED, AS WELL AS ALL OF WHITE'S ARREST REPORTS FOR THE LAST MONTH. THERE IS ONLY ONE THAT I CAN DETERMINE WAS AN ACTUAL SERVICE ATTEMPT. THE REMAINING ARREST REPORTS ARE ALL FROM TRAFFIC STOPS IN WHICH HE HAD CRIMINAL SUMMONS ISSUED FOR TRAFFIC VIOLATIONS. ONE OR TWO HAD ADDITIONAL WARRANTS, BUT THOSE ALSO HAD HIS OWN TRAFFIC CHARGES. I THEN PRINTED OFF THE CAD REPORT FOR HIM. SINCE DECEMBER 15, MOST OF THE WARRANT CHECKS ON THERE ARE HIS SUMMONS HE SERVED FOR THE TRAFFIC VIOLATIONS OR SUBPOENAS. I RECOGNIZE THE ADDRESSES AS ONES I HAD SUBPOENAS ON. THERE WAS EVEN ONE WITH 10 C-CHARLES CLEAR CODES. THAT WAS SUBPOENAS HE WAS RIDING AROUND IN HIS CAR TWO WEEKS AFTER THEY EXPIRED SO HE DID RETURNS.

I HAD DEPUTY WHITE THE FIRST TWO WEEKS OF FIELD TRAINING. IT WAS CLEARLY EXPLAINED TO HIM IN FIELD TRAINING THAT TRAFFIC ENFORCEMENT WAS NOT A TOP PRIORITY AS HE SEEMED TO WANT TO "GO GET" EVERY MINOR TRAFFIC VIOLATION WE OBSERVED. IT WAS ALSO PREVIOUSLY DISCUSSED BETWEEN SGT. ROBERSON AND DEPUTY WHITE AFTER HE WAS ASSIGNED TO A-SHIFT THAT HE NEEDED TO CEASE STOPPING CARS BECAUSE THE MAJORITY OF HIS STOPS WERE IN THE CITY AND HE KEPT ASKING OTHER PEOPLE TO COME WRITE TICKETS OR ASSIST BECAUSE HE COULD NOT CHARGE PEOPLE.

THIS PRACTICE OF STOPPING CARS AND THEN GOING BACK ISSUING SUMMONS IS IN VIOLATION OF PREVIOUS ORDERS GIVEN TO HIM TO CEASE TRAFFIC ENFORCEMENT.

IT IS MY RECOMMENDATION THAT HE BE SUSPENDED WITHOUT PAY FOR WHATEVER AMOUNT OF TIME THE SHERIFF FEELS APPROPRIATE.

_____          2/20/18
EMPLOYEE SIGNATURE (acknowledging receipt of Reprimand)          DATE


_____

SUPERVISOR SIGNATURE          DATE

_____          02/20/18

Campbell Stat. re. J. White Traff.

SHERIFF WHITE

REF DEP J J WHITE

06/18/ 2017 BEGAN FIELD TRAINING WITH SGT. D L
CAMPBELL. IN THE THIRD WEEK OF TRAINING (AROUND
JULY 4 HOLIDAY) ALL THREE TRAINEES WERE ROTATED
DUE TO AN ISSUE UNRELATED TO WHITE. HE WAS
MOVED TO A-SQUAD UNDER SGT. ROBERSON AND FIELD
TRAINING WAS COMPLETED BY DEP. B. WAYNE. DEP.
WHITE REMAINED ON THIS SHIFT THROUGHOUT FIELD
TRAINING AND WHEN RELEASED UP UNTIL 11/29/2018.
BASED UPON SOME ISSUES WITHIN THE SHIFT DEP
WHITE WAS MOVED TO B-SQUAD UNDER SGT. MYRON
ALEXANDER. HE REMAINED ON B-SQUAD UNTIL AN
INCIDENT OCCURRED THAT CAUSED HIS SUSPENSION ON
FEB 20, 2018. UPON RETURNING FROM HIS SUSPENSION,
HE WAS ASSIGNED TO D-SQUAD UNDER SGT. C.
WELBORN WHERE HE HAS REMAINED SINCE.

AS PER THE QUESTION OF JAMIE GOSS I WENT BACK AND
RESEARCHED AND FOUND THAT SHE WAS ORIGINALLY
CHARGED WITH RECKLESS DRIVING TO ENDANGER, NO

SEAT BELT AND LEFT OF CENTER. THE CHARGES OF RECKLESS DRIVING TO ENDANGER AND SEAT BELT WERE DISMISSED, AND SHE PLEADED TO ONE COUNT OF IMPROPER EQUIPMENT IN LIEU OF LEFT OF CENTER (06/05/2018).

LT. D. L. CAMPBELL

Welborn Stat. re. Appr. Rebut.

RECEIVED
7-1-18

DEPUTY WHITE AND I SPOKE ABOUT HIS PREFORMANCE EVALUATION. DEPUTY WHITE STATED HE WAS NOT SATISFIED WITH THE WAY HIS EVALUATION WAS DONE BY SGT. ALEXANDER. I ADVISED DEPUTY WHITE TO SPEAK TO THE SHERIFF ABOUT THIS SINCE HE WAS NOT SATISFIED. DEPUTY WHITE STATED HE WAS GOING TO TALK TO THE SHERIFF AND THEN TO HUMAN RESOURCES. I ADVISED DEPUTY WHITE THAT HE NEEDED TO TALK TO THE SHERIFF.

SGT. CM WELBORN

Martin Stat. re. Appr. Rebut.

ON THE DATE AND TIME IN QUESTION DEP. J. WHITE CAME TO ME REQUESTING TO KNOW WHAT HE SHOULD DO IN REGARD TO HIS PERFORMANCE EVALUATION HE RECEIVED FROM SGT. ALEXANDER. I SPOKE TO DEP. WHITE AND ADVISED HIM TO WRITE A LETTER AND REQUEST FOR IT TO BE PLACED IN HIS PERSONAL FILE ALONG WITH THE EVALUATION. THE REASON FOR THIS IS IF SOMEONE ELSE REVIEWED THE EVALUATION THEY WOULD ALSO BE ABLE TO READ HIS OPINION OF WHY HE RECEIVED THE SCORE HE DID. I TOLD DEP. J. WHITE TO MAKE SURE HE SPOKE WITH THE SHERIFF ABOUT HIS SITUATION.

SGT. B. C. MARTIN

July 18, 2018

Statement regarding accusation made by Dep. J.J. White.

On Monday July 16, 2018, I was contacted by Capt. Watkins and requested to write a statement in reference to the previous incident involving Dep. White and myself from back in January.

The specific accusation was that I told Dep. White "didn't I tell your ass not to do that anymore and I will take care of your ass when I get to work". This conversation took place about six months ago, and I did not copy down word for word what was said, but I do remember being quite angry with him that morning over continued defiance of instructions given to him to stop taking out criminal summons on people he encountered for every little thing he saw. I do not remember the specific wording I used during that conversation, nor can I deny that as upset as I was I did not say that either.

As for the incident in the Sheriff's office later in the day, I did not say anything initially. I overheard a conversation taking place in the patrol room that was getting heated between Dep. White, Poole and Sgt. Alexander. I stepped out into the room just to see what was going on and Dep. White then began making statements to me. Dep. White got up from his seat, and started walking toward me making verbal and hand gestures, but then stopped. There was a heated exchange between us as well, but I do not remember using any specific foul language toward him while addressing him.

Durwood Lee Campbell

*Durwood Lee Campbell* (signature)

On the date in question I and Sgt. Alexander were discussing problems on our shift when we got through with the discussion. Lt. Campbell and Deputy White started arguing. Deputy White told Lt. Campbell that I respect you but you are not going to talk to me any kind of way. Lt. Campbell stated I have told several times and Sgt. Roberson has told you we do not do criminal summons on traffic matters. Deputy White replied you was not there I did was right in that situation if I would not have acted she could have killed someone. Lt. Campbell replied are you state trooper the answer is no. Deputy White stated look my father is a big black man and even he do not talk to me and disrespect me like this I am the only that has defended you when everyone in the department calls you dirty soup I say you best training officer we got but I am done with this conversation and Deputy White got up and left.

Signed: Andre Poole

07-18-18

# Vance County

## EMPLOYEE PERFORMANCE APPRAISAL (VC-2016)



| | |
|---|---|
| NAME JUSTIN WHITE | DEPARTMENT PATROL DIVISION |
| TITLE PATROL DEPUTY | DATE IN POSITION 6/5/2017 |
| SUPERVISOR SGT. M. ALEXANDER/ SGT. C. WELBORN | REVIEW PERIOD   From: 6/2017   To: 6/2018 |

**PERFORMANCE/JOB FACTORS**  At the beginning of the performance period, review the job description and responsibilities of the position with the employee. At the end of the period, assess the individual's performance for each factor listed by selecting the appropriate rating. Use the comment section to provide supporting details.

**1 = Below Standard (Needs improvement; performance is inconsistent; some counseling and documentation needed for this score)**

**2 = Standard (Fully meets requirements; adheres to County and Department policies)**

**3 = Above Standard (Occasionally exceeds requirements)**

| Performance/Job Factors | Rating | Comments |
|---|---|---|
| **Job Knowledge/Skills** The application of technical skills and procedural knowledge displayed in performing the basic job responsibilities. The degree of understanding of the operations, practices and procedures relating to one's job. | 2 | |
| **Quality** Consider the accuracy, completeness, and acceptability of the work/service provided relative to defined or generally acceptable standards, policies, guidelines, etc. | 2 | |
| **Productivity** Consider the amount or quantity of work produced as well as how efficiently time, material, or other resources are utilized in performing the duties and responsibilities of the job. | 3 | Deputy White normally has all of his work completed by the end of each work period and stays on task with each of his assignments. |
| **Public Relations** Presents positive image and impression to public; is courteous and responds to questions/phone calls timely and with accuracy. | 2 | |
| **Interpersonal Skills/Teamwork** The ability to interact effectively with co-workers and supervisors to build rapport and foster teamwork. The degree to which one is a team player. The support and cooperation given to others in order to achieve common goals and objectives. | 2 | |
| **Initiative/ Motivation** The degree of self-directed action, independence and resourcefulness displayed in accomplishing work assignments. The willingness to go beyond the basic job requirements. | 2 | |
| **Communication Skills** The ability to express oneself clearly both orally and/or in writing. The degree of effectiveness in communicating with co-workers and supervisors on issues/problems relating to one's job or department. | 1 | Deputy White sometimes speaks to the citizens and other co-workers with a very nasty attitude. |
| **Flexibility/Adaptability** The ability to apply one's skills and knowledge to a variety of tasks and assignments. The willingness to accept and adjust to changes in the work environment; learn new skills, processes or procedures. The ability to utilize skills (current and new) to gain efficiency and improve one's productivity in carrying out basic job responsibilities. | 2 | |
| **Safety Performance** Complies with Safety Program Policy and Procedures. Shows willingness to participate in safety program activities. | 2 | |
| **Dependability/Attendance** The extent to which an employee follows County policy. Is punctual, observes prescribed work breaks/meal periods and maintains a solid overall attendance record. | 3 | Deputy White attends work each day, never calls out and reports to work on time each day he is scheduled to work. |

Case 5:19-cv-00467-BO   Document 70-1   Filed 04/01/21   Page 655 of 665

| | 21 | $\approx$ **Total Score** |
|---|---|---|

**UNIQUE CONTRIBUTIONS/ACCOMPLISHMENTS** Use this section to describe extraordinary contributions or accomplishments which occurred during this review period and should be considered in the overall assessment of performance.

**OVERALL PERFORMANCE RATING** Check the appropriate performance rating box below to indicate the employee's overall level of performance during the performance review period. Consider your assessment of the performance/job factors and any unique contributions/accomplishments noted.

Look at the scale below and select the category for the Overall Performance Rating.
☐ Score is 10 – 14 - Below Standard -- Does not meet the Performance/Job Factors; Supervisor needs to establish Performance Improvement Plan
☐ Score is 15 – 23 - Standard – Meets most of the Performance/Job Factors
☐ Score is 24 - 30 - Above Standard – Exceeded all or most of the Performance/Job Factors

**IMPROVEMENTS/ENHANCEMENTS/CAREER DEVELOPMENT** Identify the type of training program, course work, or special projects/assignments that would be beneficial to employee to improve or enhance the skills required in the current position.

Deputy White needs to improve his attitude and learn to follow direct orders from his immediate supervisor. Enhance communication skills and continue to improve in learning his normal job duties as a deputy within his career.

**OUTCOMES/GOALS FOR NEXT REVIEW PERIOD.** These outcomes/goals are unique for this employee's responsibilities and may differ from other employees with the same title. Make sure they are specific, measurable, achievable, realistic, and tangible. Use back side of this page and additional sheets if needed.

1. DCI certification training

2. CJ Leads training and certification

3.

4. _____

**PERFORMANCE APPRAISAL COMMENTS**

**Employee's Comments** Attach additional page (if required) *Will do* ~~

Employee Signature: _____ Date: 7-2-2018

Signature indicates only that contents have been reviewed with the employee and does not imply agreement or disagreement.

**Signatures**

Immediate Supervisor: _____ Date: 7/2/18 – 7/3/18

Department Head: _____ Date:



# Vance County    EMPLOYEE PERFORMANCE APPRAISAL (VC-2016)

| NAME JUSTIN WHITE | DEPARTMENT PATROL DIVISION | | |
|---|---|---|---|
| TITLE PATROL DEPUTY | DATE IN POSITION 6/5/2017 | | |
| SUPERVISOR SGT. M. ALEXANDER/ SGT. C. WELBORN | REVIEW PERIOD | From: 6/2017 | To: 6/2018 |

**PERFORMANCE/JOB FACTORS** At the beginning of the performance period, review the job description and responsibilities of the position with the employee. At the end of the period, assess the individual's performance for each factor listed by selecting the appropriate rating. Use the comment section to provide supporting details.

**1 = Below Standard** (Needs improvement; performance is inconsistent; some counseling and documentation needed for this score)

**2 = Standard** (Fully meets requirements; adheres to County and Department policies)

**3 = Above Standard** (Occasionally exceeds requirements)

| Performance/Job Factors | Rating | Comments |
|---|---|---|
| **Job Knowledge/Skills** The application of technical skills and procedural knowledge displayed in performing the basic job responsibilities. The degree of understanding of the operations, practices and procedures relating to one's job. | 2 | |
| **Quality** Consider the accuracy, completeness, and acceptability of the work/service provided relative to defined or generally acceptable standards, policies, guidelines, etc. | 2 | |
| **Productivity** Consider the amount or quantity of work produced as well as how efficiently time, material, or other resources are utilized in performing the duties and responsibilities of the job. | 3 | Deputy White normally has all of his work completed by the end of each work period and stays on task with each of his assignments. |
| **Public Relations** Presents positive image and impression to public; is courteous and responds to questions/phone calls timely and with accuracy. | 2 | |
| **Interpersonal Skills/Teamwork** The ability to interact effectively with co-workers and supervisors to build rapport and foster teamwork. The degree to which one is a team player. The support and cooperation given to others in order to achieve common goals and objectives. | 2 | |
| **Initiative/ Motivation** The degree of self-directed action, independence and resourcefulness displayed in accomplishing work assignments. The willingness to go beyond the basic job requirements. | 2 | |
| **Communication Skills** The ability to express oneself clearly both orally and/or in writing. The degree of effectiveness in communicating with co-workers and supervisors on issues/problems relating to one's job or department. | 1 | Deputy White sometimes speaks to the citizens and other co-workers with a very nasty attitude. |
| **Flexibility/Adaptability** The ability to apply one's skills and knowledge to a variety of tasks and assignments. The willingness to accept and adjust to changes in the work environment; learn new skills, processes or procedures. The ability to utilize skills (current and new) to gain efficiency and improve one's productivity in carrying out basic job requirements. | 2 | |
| **Safety Performance** Complies with Safety Program Policy and Procedures. Shows willingness to participate in safety program activities. | 2 | |
| **Dependability/Attendance** The extent to which an employee follows County policy. Is punctual, observes prescribed work breaks/meal periods, and maintains a solid | 3 | Deputy White attends work each day, never calls out unless parts sick and shows up when he is scheduled to work |

| | 21 | $\approx$ Total Score |
|---|---|---|

UNIQUE CONTRIBUTIONS/ACCOMPLISHMENTS    Use this section to describe extraordinary contributions or accomplishments which occurred during this review period and should be considered in the overall assessment of performance.

OVERALL PERFORMANCE RATING    Check the appropriate performance rating box below to indicate the employee's overall level of performance during the performance review period.  Consider your assessment of the performance/job factors and any unique contributions/accomplishments noted.

Look at the scale below and select the category for the Overall Performance Rating.
☐ Score is 10 – 14 - Below Standard – Does not meet the Performance/Job Factors; Supervisor needs to establish Performance
                      Improvement Plan
☐ Score is 15 – 23 - Standard – Meets most of the Performance/Job Factors
☐ Score is 24 - 30 - Above Standard – Exceeded all or most of the Performance/Job Factors

IMPROVEMENTS/ENHANCEMENTS/CAREER DEVELOPMENT
Identify the type of training program, course work, or special projects/assignments that would be beneficial to employee to improve or enhance the skills required in the current position.

Deputy White needs to improve his attitude and learn to follow direct orders from his immediate supervisor.  Enhance communication skills and continue to improve in learning his normal job duties as a deputy within his career.

OUTCOMES/GOALS FOR NEXT REVIEW PERIOD.  These outcomes/goals are unique for this employee's responsibilities and may differ from other employees with the same title.  Make sure they are specific, measurable, achievable, realistic, and tangible. Use back side of this page and additional sheets if needed.

1. DCI certification training

2. CJ Leads training and certification

3.

4. _____

PERFORMANCE APPRAISAL COMMENTS

Employee's Comments   Attach additional page (if required) Will do ???

Employee Signature: _____    Date: 7-2-2018

Signature indicates only that contents have been reviewed with the employee and does not imply agreement or disagreement.

Signatures

Immediate Supervisor: _____  Date: 7/2/18 – 7/3/18

130 Chappel Lane ◉ Kittrell, NC 27544 ◉ (919) 961-3448 ◉

---

June 15th, 2018                **Transmitted via Hand Delivery**

Sheriff Peter White           **Personnel Sensitive, Confidential & Sworn File**
Vance County Sheriff's Office
156 Church Street, Suite 004
Henderson, NC 27536

**Re: Title VII Civil Rights Act of 1964-Race & Gender Discrimination**

Dear Sheriff

I, Justin Jamel White, deputy sheriff at the Vance County Sheriff's Office, hereby file written complaint pertinent to race and gender discrimination.

On February 20th, 2018, I was written up and suspended for 5 days without pay, publicly humiliated by the department, having to walk out of the sheriff's office without a gun and badge and being stripped of my law enforcement credentials. On my way out, I encountered several deputy sheriffs, who saw me after the issuance of corrective action. **I was heavily lied on by Lt. Durwood Campbell (S-7) and no member of management seemed to care.**

Lt. Campbell is a Caucasian male and I am an African American male. Jamie Goss, Caucasian female, called and complained which triggered this entire ordeal despite me being in the performance of my job duties and responsibilities. My main duty is to answer calls, patrol the county, observe and enforce violations of law/county ordinances. It should be noted, On June 5th, 2018, Ms. Goss pled guilty. It is going to be too late to correct someone's action when he or she and innocent third parties are tragically killed as a result of a motorist illegally gross decisions under the wheel. I am happy to discuss the incidents involving this in the near future.

I was never given a chance to share my side in reference to providing verbal or written statement in reference to the deceptively egregious allegations by Lt. Durwood Campbell. Per Sheriff White, Chief Lawrence Bullock and Captain Watkins were directed to get my side of the story before corrective action was issued. **That did not happen.** {It should be noted, this is not the first instance of insubordination with Chief Bullock and Captain Watkins as the Sheriff directed both of them to put me back on Sgt. Roberson's (S-10) shift in December 2017 and January 2018. This is because the shift transfer was not approved by the High Sheriff nor was it submitted to the Chief Deputy for review and submission for approval to the Sheriff. Also, the Sheriff did not delegate authority to Capt. Watkins or Lt. Campbell to transfer staff}. No one talked to me about anything. Out of the blue, I walk in and is suspended over hot lies. It should be noted, Chief Bullock and Capt. Watkins were insubordinate to the Sheriff by not getting my take on the situation. **Based on mere appearance, the County of Vance, NC and Sheriff Office took the white man's word over the black man.** Same is a civil rights violation.

Lt. Campbell cursed, fussed & threatened me in the presence of third parties. The first time, Deputy Poole was present in the patrol room & the second time, Sgt. Alexander & Deputy Poole were present (patrol room). I am happy to discuss the incidents involving this in the near future.

I have direct evidence of both situations and look forward to presenting same. I believe we may be able to rectify this situation administratively. My pay check was docked 911.00 dollars and 28 hours of overtime went down the drain over lies and errors by management. It should be noted. the sheriff's office nor HR will not receive copies of my evidence. If the situation goes to trial in a federal court of competent jurisdiction i.e. EEO and or state court of competent jurisdiction i.e. defamation of character, libel and slander, negligence, then it will be provided during discovery as ordered by the courts.

It should be noted. there is a pattern of discrimination and negligence at the sheriff's office. Upon hire, I begged Lt. Ray Shearin (S-4) for a bullet proof vest for 3 weeks and was only given one after I approached the command staff while they were reading reports in late June 2017 and Captain W.W. Bullock (S-3) ordered him to find me a vest. I responded to emergency calls i.e. burglary in progress. no vest.

From late June 2018 until August 2018, I begged for tires on my patrol vehicle to no avail for nearly 8 weeks. I followed the chain of command. Sgt. Roberson (S-10). Lt. Shearin and former Captain now Chief. L.D. Bullock (S-2) requesting tires. Sgt. Roberson eventually told me to stop asking and go to the sheriff because these people don't do their jobs. As I was going to see the Sheriff, Capt. Bullock asked what's wrong? (After I walked in his office for the third time) and where is your car? He saw the car and went to Lt. Shearin and I got some tires same day despite both of them knowing I needed tires prior to. The metal wires were showing on rear tires.

Last July 2017. Deputy Warren Durham (S-95) heard a bullet ricochet off of his vehicle on Breckenridge Street, near the jail and feared for his life. That was the same night that former Deputy Erik Sheftal (S-29) held a suspect at gun point in the city limits of Henderson by the library. Deputy Durham had previously asked Lt. Shearin for a vest to no avail.

In January 2018. Deputy Al-Wadeii (S-28) was responding to calls without a vest with Lt. Campbell and I questioned him being on the streets without a vest. Lt. Campbell called Lt. Shearin and he came to the sheriff's office and issued him a vest (speedily despite my sitation).

It should be noted. Lt. Shearin is a Caucasian male and the parties listed above are minorities. This is a civil rights issues. Also, Lt. Shearin was directed by the High Sheriff to issue me equipment i.e. in September 2018 twice to no avail

While I serve at the pleasure of. I contend these issue do not fit the criteria as they would reasonably violate county and or departmental policy. federal civil rights laws. NC Public Policy Doctrine, NC Tort Law, etc. Also, taking adverse action against someone after reporting the aforementioned is reprisal and or retaliation. How can one write up. suspend and dock pay of the black man but the same alleged offenses are being committed by white deputies? How can one

write up, suspend and dock pay of subordinate but allow other supervisory or managerial deputies to get away with it? How can the subordinate deputy be suspend for insubordination & the chief deputy, captain & lieutenant are not held to the same standard for being insubordinate?

*****SOMETHING IS WRONG WITH THIS PICTURE & NEEDS CORRECTING*****

It is to my recommendation that Chief Bullock be issued a corrective action and suspended for 10 days without pay in reference to insubordination by not returning me to Sgt. Roberson's shift and not obtaining statements for the allegations made by Lt. Campbell.

It is to my recommendation that Capt. Watkins receive a lesser sanction as the chief deputy had the overall responsibility as the manager with rank/seniority to ensure my transfer back to Sgt. Roberson's shift and that they met with me about the allegations by Lt. Campbell.

It is to my recommendation that Lt. Shearin be issued corrective action and suspended for 10 days without pay and demoted in reference to failing the issue the protective and necessary law enforcement equipment after being directed to do so by the Sheriff several times.

It is to my recommendation that Lt. Campbell be issued corrective action, suspended for 10 days without pay & demoted for his official misconduct & verbal/written deception pertinent to the write up.

I understand it will be difficult in disciplining members of your command staff but as you said in times past, we have to be fair.

**There were no legitimate non-discriminatory reasons to issue corrective action and authorize adverse action. There are no bona-fide reasons and or business necessity for the abovementioned. Even if responsibility laid with me, then the mixed motive legal theory would apply.**

I look forward in hearing from you and resolving this issue.

Sincerely,


Justin White, M.S., B.S
Jw- 4-22-2018

Cc: File
Argretta Johen, HR Director
Peter White, High Sheriff
Justin White, Deputy Sheriff

(30.Channel time, which will last and keep every advance as it is)

[signature] 6/22/2018                    [initials]

State of North Carolina
County of Vance

On this the ___ day of _____, 20 18, before me a notary public, the

undersigned party, personally appeared _____, known to me (or

satisfactorily proven) to be the person whose name is subscribed to the within

instrument, and acknowledged that he executed the same for the purposes

therein contained.

In witness hereof, I hereunto for the above-mentioned hereby set my hand and official seal.

[signature]
Notary Name

[signature]
Notary Signature

My commission expires: _____

(Seal)

OCTAVIA LAMBERT
NOTARY PUBLIC
VANCE COUNTY, NC

130 Chappel Lane • Kittrell, NC 27544 • (919) 961-3448 • Justinwhitencssd@yahoo.com

---

June 15th, 2018                    **Transmitted via Hand Delivery**

Sheriff Peter White                **Personnel Sensitive, Confidential & Sworn File**
Vance County Sheriff's Office
156 Church Street, Suite 004
Henderson, NC 27536
Pwhite@vancecounty.org

**Re: Employee Performance Appraisal Rebuttal**

**Dear Sheriff**

I, Justin J. White, deputy sheriff, hereby file rebuttal in reference to the aforementioned done by Sergeant Myron D. Alexander (S-12), Patrol Supervisor. Same was done on June 1st, 2018, 4 months approximately after I was transferred from his shift. I was notified of this document on June 8th, 2018, at 6 p.m. by Sgt. Chris M. Welborn (S-13), Patrol Supervisor & presented with same to sign in which I noted being in strong disagreement with. I shared my dissent with Sgt. Welborn, in which Sgt. Bobby Martin (S-11) was present & I was told to appeal it. Attached is a copy of my performance appraisal.

Sgt. Welborn advised me, JJ (me) you are a good employee, you work & you got some know how. Sgt. Welborn stated, this report is biased because Myron have personal issues with you. He advised me, you are a team player & professional with the citizens & us but I do get a little carried away from time to time but not too much. Sgt. Welborn claimed, JJ we all get a little carried away from time to time, it's going to happen. Sgt. Welborn stated, you are not insubordinate, you follow orders & do your job. Sgt. Welborn stated, go to the sheriff & talk to him.

**Sgt. Bobby Martin** advised me to file a rebuttal with the High Sheriff so it can be reviewed & removed from my file & if it was not overturned then for the rebuttal to be attached to the performance evaluation. Also, Sgt. Martin advised me that he had the same situation happen with a supervisor in investigations. Sgt. Martin claimed to have prepared a rebuttal & presented same to you & asked to be transferred since he could not satisfy his supervisor. Sgt. Martin won his case.

First & foremost, I am a stern & firm individual. I am shocked that Sgt. Alexander portrayed me negatively especially when he claimed that he did not have a problem with my job performance and or personal conduct in early January 2018 during a meeting with management, supervision & subordinates. Also, I have not been written up several times for my attitude & work ethics, nor have I been very insubordinate towards supervisors. Based on those deceptive & frivolous allegations, I request to view & copy my complete personnel file. It should be noted, I asked to see the file that Chief Bullock had when I was suspended in February 2018, in which I was denied & told, you have everything you need.

**How can Sgt. Alexander adjudicate my performance or personal conduct when he does not show up to work on time & has been a no call no show on calls for service on various occasions with staff that have requested back up? He is the king of absenteeism & tardiness. In fact, he is the reason why a memo was issued 6-7 months ago for patrol to report to clock on at 5:30 and report to work at 5:45 & he does not adhere to same. Plenty of times, my supervisor & I waited for him to come to work & he would show up at 7 a.m. but his staff was on time. It is substantially rare for him to clock on on-time.**

For example, Sgt. Alexander failed to report to work on time for 1 ½ hrs approximately, leaving me to answer calls in county alone & without back up, he gave Deputy I. Greene (trainee at-the-time) & Deputy T. Terry permission to come in late by using comp time. A burglary call (10-62 in progress) was assigned to me which was later downgraded to a prowler (10-76). Both calls for service were/are priority. The caller stated someone was trying to break into her residence & hung up. Then, she called back saying someone was trying to come through her window & that she heard them outside. I determined it was not a burglary or prowler but the wind causing the metal antenna & electric wires on her trailer to mimic same. In fact, day shift who was already off provided back up without my request since I was by myself. Sgt. Alexander was not appropriately disciplined for lying to Lt. Campbell (insubordination) claiming he was at work, when he was not, neglecting duty and failing to report as scheduled.

Deputy Branch (S-34) went to the sheriff's office on his day off a few months ago & met with Chief Bullock & Captain Watkins in reference to complaining on Sgt. Alexander pertinent to him not answering calls, not backing up deputies & not being accessible. As a matter of fact, Deputy Branch reported to management, supervision & co-workers that Sgt. Alexander was clearing calls after riding past the house & not stopping. Deputy Branch requested to be transferred to another shift & management told him to tough it out until the guys were out of training in May.

Deputy Poole (S-40) complained on Sgt. Alexander & wanted to be moved. In fact, on a call in January 2018, in which we had a burglary in progress call during the winter storm & Sgt. Alexander & Deputy Greene (S-41) were closer. Deputy Poole & I were near U.S. 1 S by the Franklin & Vance county line & we got there first & handled same despite them being on Warrenton road near U.S. 1. That incident triggered Deputy Poole's 10 day suspension, however, no one got on Myron for threatening Deputy Poole on the radio, you want to put your life on it in reference to who was closer to Regina Lane. Also, Sgt. Alexander, told Deputy Poole on the phone, I don't have to answer call because I am the supervisor.

Deputy Burns had problems with Sgt. Alexander not working & was constantly complaining on him to the Chief Bullock & Capt. Watkins. Also, former Deputy Lauren Matthews had a host of problems with Sgt. Alexander & was complaining.

According to supervision, every person that goes to his shift, either gets transferred or quits.

As a matter of recent fact, Deputy Al-Wadeii (S-28) worked Sgt. Alexander's shift f & was complaining to supervision on the other shift that he called for backup on Vicksboro Road & no one came but Deputy Edwards (S-24), who was the Northside car. Deputy Edwards stated he diverted from a call (pending) because Deputy Al-Wadeii called for help. Deputy Al-Wadeii claimed that Sgt. Alexander & Deputy Greene are always together.

As you can see, Sgt. Alexander has a history of unacceptable personal conduct and or grossly inefficient job performance. These matters needed attention. It is to my recommendation that Sgt. Alexander be suspended for 15 days without pay & demoted.

I look forward in hearing from you & resolving this matter internally.

Sincerely,

_(signature)_ 6-20-18

Justin J. White, M.S., B.S.

Enclosures: (1)
Performance Appraisal

Cc: File
Argretta Johen, HR Director
Peter White, High Sheriff
Justin White, Deputy Sheriff
Chris Welborn, Sergeant
Bobby Martin, Sergeant

State of North Carolina
County of Vance

On this, the 20 day of June , 20 18 , before me a notary public, the undersigned party, personally appeared Justin J. White known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness hereof, I hereunto for the above-mentioned hereby set my hand and official seal.

Tiffany L. Ayscue
Notary Name

_(signature)_
Notary Signature

My commission expires: July 31, 2019

(Seal)