1. J. White Dep.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:19-CV-00467-BO


JUSTIN J. WHITE,                        )
                                        )
                 Plaintiff,             )
                                        )
       vs.                              )
                                        )
VANCE COUNTY, NORTH CAROLINA;           )
VANCE COUNTY SHERIFF'S OFFICE;          )
PETER WHITE, in his official and        )
individual capacities;                  )
LAWRENCE D. BULLOCK, in his             )
official and individual capacities;     )
WELDON WALLACE BULLOCK, in his          )
official and individual capacities,     )
and WESTERN SURETY COMPANY,             )
a division of CNA SURETY,               )
                                        )
                 Defendants.            )
                                        )
------------------------------------

_____

VIDEOTAPED VIDEO CONFERENCE DEPOSITION
OF
JUSTIN J. WHITE
_____


TAKEN VIA VIDEO CONFERENCE AT THE LAW OFFICES OF:
WOMBLE BOND DICKINSON (US) LLP
ONE WEST FOURTH STREET
WINSTON-SALEM, NC 27101


                 02-10-21
               10:15 O'CLOCK A.M.
        _____

                 Lori Gruber
               Court Reporter

             Chaplin & Associates
        132 Joe Knox Ave, Suite 100-G
               Mooresville, NC 28117
    (704) 606-1434 | (336) 992-1954 | (919) 649-4444

**2**

## ATTORNEY NOTES

PAGE/LINE NOTES

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

**4**

## I N D E X

| | |
|---|---|
| STIPULATIONS | 7 |
| EXAMINATION | |
| By Mr. Castro | 9 |
| By Ms. Robinson | 236 |
| ADJOURNMENT | 242 |
| REPORTER CERTIFICATE | 243 |
| WITNESS CERTIFICATION | 244 |
| WITNESS ADDENDUM | 245 |

## E X H I B I T S

| Name | Offered By | Identified |
|---|---|---|
| Exhibit 1 (Amended Notice of Deposition, Plaintiff) | Mr. Castro | 21 |
| Exhibit 3 (Amended Complaint) | Mr. Castro | 87 |
| Exhibit 4 (Plaintiff's Motion for Leave) | Mr. Castro | 225 |
| Exhibit 6 (Plaintiff's Responses to Interrogatories and Requests for Production) | Mr. Castro | 22 |
| Exhibit 9 (Official Written Reprimand) | Mr. Castro | 89 |
| Exhibit 10 (Employee Counseling Record, Justin White) | Mr. Castro | 98 |

**3**

## APPEARANCES OF COUNSEL

FOR THE PLAINTIFF JUSTIN J. WHITE:

Sharika M. Robinson, Esquire
(via video conference)
THE LAW OFFICE OF SHARIKA M. ROBINSON, PLLC
10230 Berkeley Place Drive, Suite 220
Charlotte, NC 28262
srobinson@sharikamrobinsonlaw.com

FOR THE DEFENDANT VANCE COUNTY,
NORTH CAROLINA, ET AL.:

Brian Castro, Esquire
WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
brian.castro@wbd-us.com

OTHER APPEARANCES
Michael McGurl (via video conference)
Shannon Skoog, Technician (via video conference)

**5**

## E X H I B I T S (Continued)

| Name | Offered By | Identified |
|---|---|---|
| Exhibit 11 (Statement from Deputy Brian K. Wayne) | Mr. Castro | 101 |
| Exhibit 12 (Statement from Sergeant D.R. Roberson) | Mr. Castro | 104 |
| Exhibit 13 (Statement from Sergeant Alexander) | Mr. Castro | 107 |
| Exhibit 14 (3-27-18 Incident - Counseling Form) | Mr. Castro | 120 |
| Exhibit 16 (3-27-18 Incident - Insurance Form) | Mr. Castro | 125 |
| Exhibit 17 (3-27-2018 Video) | Mr. Castro | 126 |
| Exhibit 19 (Oliver Incident - Medical Documentation) | Mr. Castro | 169 |
| Exhibit 20 (Release Authorizations) | Mr. Castro | 209 |
| Exhibit 24 (Statement from Deputy Patel) | Mr. Castro | 224 |
| Exhibit 25 (F-5 Report of Separation Form) | Mr. Castro | 204 |

EXHIBITS (Continued)

| Name | Offered By | Identified |
|------|-----------|------------|
| Exhibit 28 | Mr. Castro | 232 |
| (Tuition Reimbursement Agreement) | | |

NOTE: Quoted material has been reproduced as read or quoted by the speaker.

---

PROCEEDINGS

1   (10:15 o'clock a.m.)
2       THE COURT REPORTER:  We are now on the
3   record.  The time is 10:15 a.m.  The date is January
4   10th -- or I'm sorry, February 10th, 2021.  This is
5   the deposition of Justin J. White in the matter of
6   Justin J. White versus Vance County Sheriff's Office,
7   et al.
8       The attorneys participating in this
9   proceeding acknowledge that I am not physically
10  present in the proceeding room and that I will be
11  reporting this proceeding remotely.
12      They further acknowledge that in lieu of an
13  oath administered in person, the witness will provide
14  his ID via video conference and verbally declare that
15  his testimony in this matter is under penalty of
16  perjury.
17      The parties and their counsel consent to
18  this arrangement and waive any objections to this
19  manner of reporting.
20      Please indicate your agreement by stating
21  your name and agreement on the record.  Also, please
22  indicate on the record all parties present in the room
23  with you.
24      MR. CASTRO:  My name is Brian Castro.

---

STIPULATIONS

Pursuant to Notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated and was conducted before Lori Gruber, Notary Public in and for the County of Iredell, State of North Carolina at Large.

Notice and/or defect in Notice of time, place, purpose and method of taking the deposition was waived. Formalities with regard to sealing and filing the deposition were waived, and it is stipulated that the original transcript, upon being certified by the undersigned court reporter, shall be made available for use in accordance with the applicable rules as amended.

It is stipulated that objections to questions and motions to strike answers are reserved until the testimony, or any part thereof, is offered for evidence, except that objection to the form of any question shall be noted herein at the time of the taking of the testimony.

Reading and signing of the testimony was requested prior to the filing of same for use as permitted by applicable rule(s).

---

1   I agree with that statement.  I'm here socially
2   distanced with the court reporter.
3       MS. ROBINSON:  My name is Sharika
4   Robinson, attorney for Mr. White, and I'm here
5   remotely with Mr. White and the court reporter.
6       MR. MCGURL:  My name is Michael McGurl.
7   Sorry, can you mute that?  Actually, can you hear me
8   through there?
9       THE COURT REPORTER:  Yes, we can hear
10  you through that.
11      MR. MCGURL:  So my name is Michael
12  McGurl.  I am present with Mr. White and Sharika
13  Robinson and remote with the court reporter, and we
14  consent to those rules.
15      The witness, JUSTIN J. WHITE, being first
16  duly sworn to state the truth, the whole truth, and
17  nothing but the truth, testifies as follows:
18          EXAMINATION
19  BY MR. CASTRO:
20  Q.   We'll begin.  Mr. White, my name is Brian
21  Castro.  I represent the Defendants in this case.  I'm
22  with the law firm Womble Bond Dickinson.  I appreciate
23  you sitting down for this deposition.  Have you ever
24  been deposed before?
25  **A.   Yes.**

10

1    Q.  Okay.  So you pretty much know how it goes.
2  I ask that you give yes or no answers rather than
3  uh-huh (yes) or huh-uh (no) in order to assist the
4  court reporter in getting this down.  Can you please
5  state your full name for the record?
6      A.  Justin Jamel White.
7    Q.  How do you spell your middle name?
8      A.  J-A-M-E-L.
9    Q.  Okay.  And whenever you need a break or
10  anything throughout this deposition, of course, feel
11  free to let us know.  That goes for the court reporter
12  and everyone that's participating on this call.  What
13  is your date of birth?
14     A.  8-15-1989.
15   Q.  And what is your current place of
16  residence?
17     A.  I live in Charlotte, North Carolina.
18   Q.  And who is currently in the room with
19  you right now?
20     A.  Attorney McGurl.
21   Q.  Okay.  Are you prepared to testify today?
22     A.  Yes.
23   Q.  Are there any substances or other
24  impairments that would stop you from testifying
25  competently?

11

1      A.  No.
2    Q.  Okay.  All right.  We'll start with some of
3  your background information.  Can you please tell us
4  where you went to high school?
5      A.  Perquimans County High School in Hertford,
6  North Carolina.
7    Q.  Did you go to college after that?
8      A.  Yes.
9    Q.  Where did you go?
10     A.  For my first year, I went to Shaw University
11  in Raleigh, North Carolina.  I transferred to Mount
12  Olive College in Mount Olive, North Carolina, which is
13  now the University of Mount Olive.
14   Q.  And what did you study?
15     A.  I studied criminal justice and criminology
16  at Mount Olive College.
17   Q.  Okay.  Did you want to become a law
18  enforcement officer during that time?
19     A.  Yes.
20   Q.  Okay.  Is that the reason you focused on
21  criminal justice?
22     A.  Yes.
23   Q.  Okay.  Can you tell us about your
24  certification as a law enforcement officer?
25     A.  Yes.  I have -- I had a basic law

12

1  enforcement training certificate and general law
2  enforcement training certification.
3    Q.  Okay.  What process does it take to get
4  those certifications and certificates?
5      A.  It's approximately a 17 to 18-week training
6  course to get your basic law enforcement training
7  certificate, which is also known as BLET.  And then
8  once you get hired at an agency, you work 12 months,
9  you get your general law enforcement training
10  certification.
11         I also have a Master's of Science Degree in
12  Justice Studies from Southern New Hampshire
13  University, and I'm also working on my doctoral in
14  Public Administration at Capella University.
15   Q.  And what was the focus of your studies for
16  your master's degree?
17     A.  Justice studies.
18   Q.  Can you elaborate on what that means?
19     A.  Yes.  Justice studies is a form of criminal
20  justice.  It's similar to a born identity of criminal
21  justice that focuses on social justice and other
22  different types of justice such as restorative --
23  distributive justice, et cetera.
24   Q.  And what is the focus of your doctoral
25  degree?

13

1      A.  Public administration.
2    Q.  Okay.  All right.  When you went through
3  BLET as you described, what type of training, what
4  aspects of the job were you trained in?
5      A.  I was trained in the fundamentals of being a
6  law enforcement officer, whether it be a police
7  officer or a deputy sheriff, ensuring public safety.
8  The training centered on achieving the law enforcement
9  objective at the basic level, which was serving,
10  protecting, preserving peace, ensuring the safety in -
11  - of all citizens in your jurisdiction.
12   Q.  Did you get any training in the use of
13  force?
14     A.  Yes.
15   Q.  Can you describe that for me?
16     A.  The use of force training continuum
17  consisted of several layers from soft hands, first arm
18  de-escalation command presence, to soft hands to hard
19  hands.  To chemical munition, such as pepper spray,
20  using your baton, using your taser, the baton and
21  taser if your department allowed, as well as, if
22  necessary, discharging your department-issued firearm.
23   Q.  And when you say, "de-escalation," what
24  types of de-escalation methods were you trained in?
25     A.  First, we need the command presence.  We

14

1   need to do everything we can to calm the situation, to
2   bring peace to the situation to prevent an escalation
3   that may require using force for control and
4   compliance purposes.
5       Q.  Is this done verbally?
6       A.  Yes.
7       Q.  And what does "soft hands" mean?
8       A.  Soft hands is a lesser form of using
9   physical force in terms of the use for escort
10  positions: handcuffing, take downs, the ultimate hand
11  strikes, stuns.  It's basically de minimis force.
12      Q.  So do you consider take down soft hands?
13      A.  It is soft hands, yes.
14      Q.  Do you consider take downs de minimis force?
15      A.  Yes.
16      Q.  So how -- is there a specific amount of time
17  that you should focus on de-escalation before you use
18  soft hands?  How does it work?
19      A.  No.  There's no specific amount of time.
20      Q.  When do you go from de-escalation to soft
21  hands?
22      A.  The officer will make a decision based on
23  the totality of circumstances, based on what's going
24  on at the scene.
25      Q.  Do you base it at all on how the citizen is

15

1   acting, the person you're dealing with is acting?
2       A.  That is part of it.
3       Q.  What do you look for when you're seeing --
4   when you're dealing with a citizen to determine
5   whether there may be aggression or non-compliance?
6       A.  I look for their cooperation.  I look for
7   their -- to determine whether or not they're going to
8   be uncooperative, if they're going to be resistive,
9   aggressive, non-compliant, non-cooperative,
10  assaultive.
11      Q.  Okay.  So you also mentioned pepper spray.
12  Were you taught about pepper spray during BLET?
13      A.  No.
14      Q.  Did they mention pepper spray at all during
15  that?
16      A.  They mentioned pepper spray, but we were not
17  trained on pepper spray.
18      Q.  Okay.  Did you -- when was the first time
19  you were actually issued pepper spray during your full
20  employment, during your entire career?
21      A.  I was issued pepper spray at Vance County
22  Sheriff's Office, and I will say approximately late 2017.
23      Q.  Did you request to be issued pepper spray?
24      A.  I requested my equipment.
25      Q.  Did you specifically request pepper spray?

16

1       A.  Pepper spray is a part of the equipment and
2   I asked for my equipment to do my job.  So for the
3   purposes of that, yes.
4       Q.  So you did not mention pepper spray when you
5   asked for your equipment?
6       A.  I told them the things that I needed.  In
7   terms of remembering word for word what I needed, I
8   unable to recall, but pepper spray was a part of my
9   equipment.
10      Q.  Okay.  So ---
11      A.  I could have, but at this time, pepper spray
12  was a part of my equipment.  So it would've been
13  requested.
14      Q.  Understood.  Was that your first time being
15  issued pepper spray at Vance County?
16      A.  Yes.
17      Q.  So did you ever get trained in pepper spray
18  after you were issued pepper spray?
19      A.  No.
20      Q.  Were you told to seek training in pepper
21  spray?
22      A.  No.  Instead, I was told that training would
23  be provided by the SO because they train our deputies
24  and sometimes the police department managers of the
25  police department would send officers over who need

17

1   training as well.
2       Q.  Do you know if you could have sought
3   training on your own?
4       A.  I'm not aware of it.
5       Q.  Are you aware of pepper spray training that
6   is outside of the Vance County Sheriff's Office, not
7   provided by them specifically?
8       A.  No.
9       Q.  Did you ever attempt to get trained or ask
10  to get trained?
11      A.  No.  I've never attempted to get trained in
12  pepper spray.
13      Q.  Why not?
14      A.  Because the department said that they will
15  provide it.
16      Q.  Okay.  Did you -- were you aware that
17  training in pepper spray involves possibly getting
18  sprayed with it?
19      A.  Yes, you will be sprayed.  They say that you
20  will be sprayed.
21      Q.  Did that concern you at all?
22      A.  No.
23      Q.  So can you briefly go through your
24  employment history with me after -- from the time you
25  left the university that you mentioned, Mount Olive?

18

1    A.   Yes.  I worked for the North Carolina
2 Department of Public Safety from 2012, I believe it
3 was November, 2012 up until September, 2015.
4    Q.   What facility were you working at?
5    A.   I was working -- I was assigned to Bertie
6 Correctional Institution.
7    Q.   What was your job title?
8    A.   I was a corrections officer.
9    Q.   What were your day-to-day duties or
10 responsibilities?
11    A.   Care, custody and control of state
12 offenders.
13    Q.   What was your next job?
14    A.   I worked at Louisburg College as a campus
15 safety officer from November, 2016 up until January,
16 2017.
17    Q.   What equipment did you have during that job?
18    A.   None.
19    Q.   Did you have a taser?
20    A.   No.
21    Q.   Flashlight?
22    A.   I had a personal flashlight, not a
23 department-issued flashlight, on a key chain.
24    Q.   Okay.  What were your day-to-day
25 responsibilities in that position at Louisburg?

19

1    A.   Observe and report.
2    Q.   Was this throughout the entire campus that
3 you worked ---
4    A.   Yes.
5    Q.   All right.
6    A.   I ---
7    Q.   After -- I'm sorry.
8    A.   After leaving there, I worked at Shaw
9 University full time.  My employment started in
10 November -- late November, 2016 up until February --
11 late February, 2017.  I was a campus security officer.
12    Q.   What were your responsibilities at that job?
13    A.   Observe and report.
14    Q.   And what equipment did you have at that job?
15    A.   None.  Same thing, I had a flashlight on my
16 personal key chain.
17    Q.   Okay.  After Shaw University, where did you
18 gain employment?
19    A.   I worked part-time in retail and also was
20 able to get unemployment up until I was hired at Vance
21 County Sheriff's Office in June of 2017.
22    Q.   And you mentioned that you've been deposed
23 before.  How many times have you been deposed?
24    A.   Once.
25    Q.   What case was that for?

20

1    A.   Justin White versus North Carolina
2 Department of Public Safety.
3    Q.   Do you remember around when that deposition
4 occurred, what time or what date?
5    A.   Approximately 2018.
6    Q.   Okay.
7    A.   Maybe February, January or February, 2018.
8    Q.   Thank you.  So without revealing any
9 attorney-client communications.  I don't want to know
10 anything about that, obviously.  How did you prepare
11 for this deposition?
12    A.   I prepared with my attorneys of record.
13    Q.   Again, without revealing any communications,
14 did you review any documents?
15    A.   I reviewed a -- documents with my attorneys.
16    Q.   What documents did you review in preparation
17 for the deposition?
18    A.   The case documents.
19    Q.   Are you talking about what's been filed?
20    A.   Yes.
21    Q.   Did you review any documents that haven't
22 been filed?
23    A.   No.
24    Q.   Did you review anything from your personnel
25 file?

21

1    A.   What you are provided, yes.
2    Q.   Okay.  So you've met with your attorneys,
3 you said?
4    A.   Yes.
5    Q.   Were any non-attorneys present during those
6 preparation sessions?
7    A.   No.
8    Q.   Were any family members or friends present?
9    A.   No.
10         (DEPOSITION EXHIBIT
11          NUMBER 1 WAS MARKED
12          FOR IDENTIFICATION)
13    Q.   (Mr. Castro)  Okay.  So I'm going to bring
14 your attention to Exhibit 1, which the court reporter
15 will share her screen, and also I have provided to
16 your counsel prior to this deposition.  And this is
17 the Notice of -- amended Notice of Deposition for this
18 deposition today.  Have you seen this?
19 (Witness examines document)
20    A.   Can you scroll down?  I may have seen it.  I
21 may not have seen it.  What is the date up there?  I'm
22 unable to recall if I've seen it.
23    Q.   Okay.
24    A.   But I was most certainly told that we had a
25 deposition today.

22

1              (DEPOSITION EXHIBIT
2              NUMBER 6 WAS MARKED
3              FOR IDENTIFICATION)
4      Q.   Thank you.  Skipping over a bit to Exhibit
5  Number 6, which consists of Plaintiff Justin White's
6  response to Defendant Peter White's first set of
7  interrogatories and requests for production.  Have you
8  seen this document?
9  (Witness examines document)
10     **A.   Scroll down.  Scroll down.  Keep scrolling.**
11  **Keep on going.  Yes.  I believe I've seen this**
12  **document.**
13     Q.   If you will scroll to the final page.  Did
14  you sign a verification?  We might have to zoom out.
15  Did you sign this verification?
16     **A.   Yes.**
17     Q.   Okay.  Thank you.  Stepping back out of the
18  exhibits, I want to talk about your employment at
19  Vance County Sheriff's Office.  How did you hear about
20  the job position?
21     **A.   I believe I looked on their website to see**
22  **if they were hiring.  I'm not sure if there was**
23  **anything up there to indicate such.  I contacted the**
24  **Vance County Sheriff's Office.  I asked if they were**
25  **hiring and they -- can't remember the name, what the**

23

1  reception was, transferred me to an individual who
2  identified himself as the Chief Deputy.
3      Q.   Do you know who that person was?
4      **A.   His name is on the tip of my tongue.  I just**
5  **can't think of it.**
6      Q.   What did you discuss?
7      **A.   He identified himself as the Chief Deputy.**
8  **He said that, "We have a few vacancies," and**
9  **encouraged me to apply.**
10     Q.   Okay.  And when did you apply for the job,
11  do you remember?
12     **A.   I believe I applied around March.  It could**
13  **have been March or April, but March or April, 2017.**
14     Q.   Okay.  And when you applied for the job,
15  were you asked to disclose previous lawsuits that you
16  had filed?
17     **A.   That may have been a question.**
18     Q.   Do you remember whether you disclosed this?
19     **A.   I don't recall whether or not anything was**
20  **disclosed.**
21     Q.   Does the same go for any EEOC complaints or
22  charges?
23     **A.   The same for what?**
24     Q.   That you don't remember if they were
25  disclosed?

24

1      **A.   Yeah.  I don't remember if they were --**
2  **disclosed.**
3      Q.   Do you remember if you disclosed previous
4  terminations or suspensions?
5      **A.   I believe on my F3, I disclosed that I had**
6  **been previously terminated and reinstated at one job,**
7  **and then another one I was dismissed as well as a**
8  **third one.**
9      Q.   And how was the interview process after you
10  applied?  What happened after that?
11     **A.   In May, Captain Bullock reached out --**
12  **Captain Welding Bullock at the time, reached out via**
13  **telephone and asked me if I was still interested in a**
14  **position and I said yes, so he invited me for what I**
15  **thought was going to be an interview with him, but it**
16  **ended up being a board -- review board with him and**
17  **two other supervisors.**
18          **I will say, prior to when I took the**
19  **application to the Sheriff's Office to deliver to the**
20  **-- the individual that identified -- his last name is**
21  **Fryson.  So for the purposes of this, Chief Fryson.**
22          **When I took the application back to the**
23  **Sheriff's office to deliver it, rather, he knew I was**
24  **coming.  He set up the day, the time.  I walked in.  I**
25  **was told that they was going to give them a buzz, and**

25

1  Sheriff Peter White walked into the building and he
2  said, "Young man, why are you dressed up?"
3          And I told him, "I have an interview with
4  the chief deputy and Sheriff White said, "Oh, no.  I
5  don't have a chief deputy.  I have a chief of staff.
6  Is that who you had to see?"  And I told him, "Chief
7  Fryson."
8          He said, "I have a chief of staff.  I do not
9  have a chief deputy," and Sheriff White said, "And in
10  fact, he's not even sworn."  And he said, "I'll take
11  whatever you have."  And he said, "Somebody will give
12  you a call later."
13          So moving forward to May, Captain W. Bullock
14  contacted me, went in for the oral review board.  They
15  interviewed me.  Captain Bullock told me afterwards
16  that it was successful and I'll be hearing from him
17  soon.
18     Q.   And can you spell that person's name?  I
19  think you said Riceland or something.
20     **A.   Fryson.  Fryson, with an F.**
21     Q.   Fryson?
22     **A.   Yes.**
23     Q.   And you mentioned a board review.  Can you
24  tell me who was in that room?
25     **A.   Then-Captain Welding Bullock, Lieutenant**

26

1  Brian Sharon and Lieutenant Lloyd Q. Watkins and I.
2      Q.  Do you remember what kind of questions were
3  asked or conversations were had?
4      A.  It was surrounding some points of the
5  application and the F3.  The specific questions I
6  cannot recall word for word, but it was around the
7  around my hiring and to that effect.
8      Q.  Was your race mentioned at all during this
9  initial board review?
10     A.  I believe so.
11     Q.  Okay.  So were you eventually offered
12  employment?
13     A.  Yes.
14     Q.  And when did -- how did you accept the
15  offer?  Can you go through that process?
16     A.  Captain Bullock called me, told me that I
17  needed to do my drug test, whatever a test -- excuse
18  me, told me I need to do the test for the hiring
19  process.
20          And I met with him in Henderson.  We went
21  Maria Parham Hospital and I did my test.  It later
22  came back acceptable, so I was approved to move
23  forward.  And so he told me that he needed it to --
24  needed a few statements in reference to potential
25  charges that were shown in the system, as well as I

27

1  needed some sworn or notarized statements in reference
2  to my education that's in the Southern New Hampshire
3  University online.
4          I've never lived in New Hampshire.  I
5  attended via online.  I got things turned into him,
6  answered his questions over the phone, and he told me
7  that the date will be set soon.  And shortly after, he
8  contacted me and said, "Sheriff White says it's going
9  to be June 5th," my sworn -- swearing-in date, and to
10  come dressed up, you know, look professional.
11          "Presentable" is what he said.  Let me clear
12  that up.  And so I was sworn in on June 5th by the
13  Clerk of Court in Vance County and began work shortly
14  afterwards.
15     Q.  Was June 5th when you think you took the
16  oath of office or took an oath regarding your
17  position?
18     A.  I took the oath on June 5th.  I believe
19  that's the date of June 5th, 2017.
20     Q.  So you mentioned that the Sheriff called
21  you.  Do you remember signing any employment contract?
22     A.  I never said that the Sheriff called me.  I
23  said that Captain Bullock called me.
24     Q.  You did say Sheriff White called you to say
25  to look presentable?

28

1      A.  No.  I was -- I'm sorry.  If I said that, I
2  meant to say -- I thought I said Captain Bullock.
3  Captain Bullock was the one that was my point of
4  contact.
5      Q.  Okay.
6      A.  And Sheriff White is the one that told him
7  the date: "Sheriff says June 5th."
8      Q.  Did anyone present you with an employment
9  contract to sign?
10     A.  Yes.  An employment contract of two years
11  was presented to me.
12     Q.  What was the -- can you describe how that
13  contract looked and what you remember from that
14  contract?
15     A.  The contract had black font, a few pages.
16  It was, I believe either like -- it was like a
17  bluish-gray color for the paper color, black font.
18          It had Sheriff's White's signature.  I
19  needed -- they needed my signature.  It had a place
20  for the director of human resources to sign as well as
21  the county manager or his designee.
22     Q.  And what was the title of that document, do
23  you remember?
24     A.  It was my contract.  As far as the specific
25  information, I can't provide.

29

1      Q.  Did you read it before you signed it?
2      A.  Yes.
3      Q.  Do you remember what it said?
4      A.  I just said, I don't know the specific
5  information in it, but it was an employment contract
6  for two years.
7      Q.  What's your basis for saying that it's a
8  two-year contract?
9      A.  Because that was in there, and outside of
10  the -- not outside of it being in there, I was told --
11  I was presented with a two-year opportunity by Captain
12  Bullock to work at Vance County for two years to help
13  -- so they could help me with my experience.
14          And also in exchange get, you know, what
15  they invested into me and get it out of me.  And so he
16  asked if I would be willing to do two years at Vance
17  County, and I said yes.  And after I started, the
18  contract was presented to me in writing, I believe the
19  same week that I started, for me to sign.
20     Q.  So when you say Captain Bullock presented
21  you with that opportunity, when was that?  How did
22  that happen?
23     A.  This was during the hiring process.  After
24  my -- on the day of my oral review board, the oral
25  review panel.

30

1    Q.  Did anyone else -- keep going.  Sorry.
2    **A.  I'm sorry, sir?**
3    Q.  Did anyone else witness this?
4    **A.  It may have been said in the oral review**
5    **panel, but I -- I believe it was said when he told me**
6    **that it was successful, and -- and I remember him**
7    **asking me if I would be willing to commit two years at**
8    **Vance County, et cetera.**
9    Q.  Was he -- I would just like to know if you
10   would know more specific terminology of what he said.
11   So was he saying, "You should stay with us for two
12   years.  We would appreciate that," or can you give me
13   more specifics?
14   **A.  As I previously said, he presented me the**
15   **opportunity to work at Vance County for two years.**
16   **That was orally.  It was verbal.  He asked me if I**
17   **would be willing to work at Vance County for two years**
18   **to help me with my experience, and that way the**
19   **department could get what they invested in me out of**
20   **me.**
21   Q.  Did Sheriff White ever tell you any of this?
22   **A.  I don't -- I'm unable to recall if Sheriff**
23   **White had said anything about the contract, but I do**
24   **believe he said something about, "White, you're at**
25   **home now.  You can work, et cetera."  But in terms of**

31

1    **specifications about the contract, that was more so of**
2    **Captain Bullock verbally asking me if I would commit**
3    **two years.**
4    Q.  So do you have a copy of that contract?
5    **A.  I'm unable to find it.**
6    Q.  Do you remember asking for a copy when you
7    signed it?
8    **A.  I believe they gave me a copy.**
9    Q.  Where would you normally keep those type of
10   documents?
11   **A.  I would keep them at my house.**
12   Q.  Do you have a specific area where you keep
13   contracts like that?
14   **A.  I keep them with my important paperwork.**
15   **That's where I'd normally keep my stuff.**
16   Q.  Is there any reason that your important
17   paperwork would go missing?
18   **A.  Well, yes.  I moved a few times since living**
19   **in Vance County when I was a Sheriff's deputy and**
20   **things got lost.**
21   Q.  So you do not have a copy of the contract?
22   **A.  I'm unable to find it.**
23        MS. ROBINSON:  I'm going to object at
24   this point.  That's asked and answered.  You asked
25   that same question three times.

32

1    Q.  (Mr. Castro)  So let's talk about your
2    initial employment when you started working at Vance
3    County Sheriff's Office.  Did you receive on-the-job
4    training?
5    **A.  Yes.**
6    Q.  What kind of training did you receive when
7    you started?
8    **A.  I received -- my first week, I rode with**
9    **Sergeant Marin Alexander for a few days, if not the**
10   **entire shift, observing Vance County, getting a feel**
11   **of it because I was new.**
12        **And then the following week, I was told that**
13   **at the time, Sergeant Durwood Campbell, he will be my**
14   **Field Train Officer, FTO.  I rode with him somewhere**
15   **around two-and-a-half, three weeks, approximately.**
16        **Afterwards, I was told by Sergeant Campbell**
17   **that I would no longer be with him and I would be --**
18   **that I would be trained by Deputy Brian Kenneth Wayne.**
19        **And Campbell further explained there were**
20   **some issues, some performance issues with one of the**
21   **new trainees as he was trying to get a hang of things**
22   **for the county and some performance issues with Deputy**
23   **Wayne.  Campbell provided information that Wayne**
24   **worked at the Highway Patrol and something happened**
25   **and it was later provided to me that Wayne was**

33

1    **terminated for -- from the Highway Patrol.**
2        **And so instead of singling Wayne out,**
3    **Campbell said that the Sheriff and then Captain**
4    **Lawrence Bullock, who later became Chief Deputy, will**
5    **just swap -- switching everybody, swapping everybody**
6    **around, and I was going to Wayne.**
7    Q.  Before I ask you more questions about that,
8    I wanted to go back to what we discussed before.  You
9    said Sheriff White said, "You are at home now," when
10   you were hired.  Is that right?
11   **A.  Yes.**
12   Q.  What did you take from that statement, or
13   how did you react to that statement?
14   **A.  I pulled up to the Sheriff's Office.**
15   **Sheriff White saw me.  It was one of the days that**
16   **Captain Bullock asked me to come in, and Sheriff**
17   **White, he approached me.  He said -- he said, "Mr.**
18   **White."  He spoke, he said, Mr. White."  He said, "I**
19   **went over a lot of paperwork about you."**
20        **I said, "Okay."  He said, "What happened at**
21   **the prison?"  And I told him that they had --**
22   **previously terminated me, but I was reinstated.  And**
23   **he asked what had happened at Louisburg, and I told**
24   **him.  I said, "I don't know.  They ended the**
25   **employment contract."  And he said, "Okay."  He said**

34

1  "Don't worry." He said, "You home now."

2      Q.  Do you think he was being sincere from what

3  you could tell?

4      A.  I have no reason to -- to say otherwise.

5      Q.  All right.  Back to what we were discussing

6  about training.  Did you hear what happened with Wayne

7  about the performance issues?

8      A.  Yes.  Sergeant Campbell provided the

9  information.

10     Q.  What was that information?

11     A.  As I previously stated, that there were

12  performance issues involving him and his trainee.  And

13  -- and Sergeant Campbell stated something to the

14  effect that there was -- there's a difference in the

15  Highway Patrol, what he referred to as "HP," and the

16  "SO," which is the Sheriff's Office.

17        He said that our responsibilities are -- are

18  different from a State Trooper's responsibility.  He

19  also said that the deputy was -- I believe it was

20  Deputy Brian Sharon.

21        Not Lieutenant Bryan Sharon, but Deputy

22  Brian Sharon.  Somebody different, so those two are

23  not the same, was having problems in answering calls,

24  getting to calls, directions, etc.  And he was asking

25  Deputy Wayne for help and Deputy Wayne would assist

35

1  him.

2        And according to Sergeant Campbell, Deputy

3  Sharon went and talked to Chief Lawrence Bullock, who

4  was the Patrol Captain at the time.  And according to

5  Campbell, he went to Sheriff White and the decision

6  was made to switch everyone around, instead of just

7  taking Deputy Sharon from Wayne; to switch everyone

8  around so it was -- Gerald Ladder(ph) was a deputy,

9  Deputy Brian Sharon and I.  We were all swapped.

10     Q.  So there's some things to unpack from what

11  you said.  So Campbell told you that there's a

12  difference between the Highway Patrol and the SO.

13  What were those differences that he described?

14     A.  He didn't go into detail, not major.  He

15  didn't elaborate on it significantly.  He just said

16  that there was a difference in the Highway Patrol and

17  the Sheriff's Office.

18     Q.  You mentioned that he said the

19  responsibilities are different.  Do you know what

20  responsibilities he was referring to?

21     A.  He just said that the responsibilities are

22  different.

23     Q.  So you also mentioned that when someone

24  asked Wayne for help, it was alleged that Wayne would

25  not help them.  Do you think that ---

36

1      A.  Campbell was -- Campbell was referring to

2  Deputy Brian Sharon asking Wayne for help, and

3  Campbell stated he heard that Wayne would not help

4  him.

5      Q.  Did Campbell explain why that was a problem?

6      A.  Campbell was basically repeating what he was

7  told by other parties at the Sheriff's Office.

8      Q.  In your experience as a law enforcement

9  officer, do you see where there would be a problem if

10  one deputy would refuse to help another?

11     A.  Yes.  That would be a problem, but it would

12  also depend on the circumstances.  So if -- if a

13  deputy needs help in terms of out there in the field,

14  then you must respond.  Okay?  But if that deputy

15  wants to just get out of work and get you to answer

16  their calls and whatnot, that's going to be an issue

17  that has to be addressed.

18     Q.  So what about when you must respond?  And

19  let's say Wayne did not respond or Brian Sharon did

20  not respond in that situation, would that be an issue?

21     A.  Yes, it would be an issue.

22     Q.  Why is that?

23     A.  If somebody is calling for help in the

24  field, you got to provide backup.  If they -- for the

25  facts of this situation, upon information and belief,

37

1  Deputy Brian needed further assistance in terms of

2  answering calls, report writing, getting to calls, the

3  directions, et cetera.

4        And he felt that, as alleged, that he wasn't

5  being provided the level of training that he needed by

6  and from Deputy Wayne, allegedly.

7      Q.  Understood.  Okay.  So did you review any

8  materials in connection with your training or as part

9  of the on-boarding process?

10     A.  When you say, "on-boarding process," are you

11  referring to personnel management or human resource

12  on-boarding process in terms of orientation?

13     Q.  Yes.  Let's start there.

14     A.  Okay.  During county orientation, the

15  policies and procedures for the county, for Vance

16  County itself, were provided.  The policies and

17  procedures for the Vance County Sheriff's Office were

18  not provided.

19     Q.  Were the policies and procedures of the

20  Sheriff's Office ever provided to you?

21     A.  Excuse me.  The employee handbook of the

22  Sheriff's Office was never provided to me as a Deputy

23  Sheriff.

24     Q.  Were you ever told to read some of the

25  provisions in that handbook?

38

1      MS. ROBINSON: Mr. Castro? We've been
2  going now for about an hour. Do you mind taking a
3  recess, scheduling it maybe within the next five
4  minutes?
5      MR. CASTRO: That's fine with me.
6      MS. ROBINSON: Okay.
7      MR. CASTRO: Thank you.
8      THE COURT REPORTER: We are now off the
9  record. The time is 11:05.
10 (Brief recess: 11:05 a.m. to 11:14 a.m.)
11     THE COURT REPORTER: We are now back on
12 the record. The time is 11:14 a.m.
13     Q. (Mr. Castro) All right. We were discussing
14 the materials you reviewed when you first started
15 working at the Vance County Sheriff's Office. What
16 documents did you review as part of the on-boarding
17 process other than the County Policy Manual?
18     MS. ROBINSON: And let me just object
19 and say, can you just kind of clarify the on-boarding
20 process? Because there was orientation, there was
21 different processes, and so just some clarities.
22     Q. (Mr. Castro) Yes. I was speaking generally
23 and I would like to walk through each of those
24 processes, so from orientation to when you started
25 on-the-job training. So let's start with orientation?

39

1      A. The orientation process consisted of
2  then-Director Argretta Johen, she may still be there,
3  provided orientation for county policies -- for
4  advanced county policy, not policy specific to
5  anyone's department or office.
6      She provided -- to answer your question
7  before the objection, there were benefits:
8  documentation, medical, dental -- benefits. There may
9  or may not have been some compensation -- compensation
10 documents that she went over. But that was based on
11 general policy for Vance County as a whole, not
12 specific to Vance County Sheriff's Office.
13     Q. Okay. And moving on to when you started
14 working and training, initially, were you told to
15 review any sheriff-specific documents?
16     A. That's the issue. I remember the County HR
17 Director providing county policy. When I was
18 terminated, Argretta Johen submitted evidence to the
19 unemployment commission and she had items asterisked
20 or starred written on a document that was typed.
21     But she handwrote in, upon -- allegedly,
22 upon information and belief. Because when I -- when I
23 reviewed my personnel file with her around the time of
24 my complaints, my personnel file that she had was
25 very, very thin, a few pages.

40

1      Nothing up there was written except for
2  signatures. There were no special notes, so I believe
3  that somebody went in there and wrote something that
4  should not have been written, especially after I've
5  seen my personnel file and it wasn't up there.
6      Q. When you say they wrote something, what did
7  they write that shouldn't have been in there?
8      A. I saw numerous things. I believe there was
9  something in there about reviewing -- possibly
10 reviewing Sheriff's Office policies and et cetera.
11     I -- I can't remember everything off top of
12 my head, but there were things in there that was
13 written that was not on those forms when I reviewed
14 personnel file with her.
15     She -- she even admitted that it was barely
16 -- there's barely nothing in here. But yet when they
17 contested my unemployment, all of a sudden they got
18 files, and then there's -- somebody went in there and
19 handwrote stuff on those PDF or Word documents.
20     Q. What do you base that -- you said, "upon
21 information and belief." What information are you
22 basing this off of?
23     A. It was not there before, and all of a sudden
24 it's there now.
25     Q. Who do you think inserted this information?

41

1      A. Well, she was the one -- initially the one
2  that contested it, so it could have been her. However,
3  I can't speculate, but it was somebody at Vance County
4  that submitted it to the unemployment commission to
5  challenge my benefits.
6      Q. Do you know if the Sheriff was involved in
7  this process at all?
8      A. Counselor, I don't know who was involved.
9      Q. Okay. So going back to what you actually
10 reviewed when you started training and taking what you
11 just said, obviously, what documents did you review
12 when you started training at the Sheriff's Office, if
13 any?
14     A. I -- I reviewed an incident report,
15 operations report. Campbell taught me how to do --
16 how to serve warrants, how to return the warrants,
17 things of that nature. In terms of a Vance County
18 Sheriff's Office employee handbook or a manual, that
19 was never provided to me.
20     Q. Okay.
21     A. And when I say Campbell, I'm talking about
22 my Sergeant Durwood Campbell, my field training officer
23 at the time.
24     Q. Ignoring the handbook, did Sheriff White
25 speak to you orally about the practices and policies

**42**

1  of the Sheriff's Office?

2    A.  Let me think.  Sheriff White did speak to me

3  about some of the practices and procedures of the

4  Sheriff's Office after I was complained on by a

5  citizen who had a fender bender, a minor collision

6  with another citizen.

7    I believe it was a black female and a

8  Hispanic male.  And he spoke briefly about that,

9  saying that I had to go back and charge this man, who

10  I felt that he should not have been charged because he

11  didn't do anything.

12    And then he had spoken to me a few months

13  later about traffic enforcement and warrants and

14  checking businesses, et cetera.  But early on during

15  this whole on-boarding process and field training as

16  you were referring to, but to cover my basis so that

17  there's no perjury, I brought that in.  He had not

18  said anything at that point in time.  But later on, he

19  did.

20    Q.  Do you remember when this fender bender

21  incident occurred approximately?

22    A.  I believe it occurred in -- somewhere maybe

23  around November or December.  Maybe December 2017.

24  Somewhere around that time.

25    Q.  All right.  Were there any other discussions

**43**

1  with Sheriff White about the policies and practices of

2  the office that you can remember?

3    A.  He may have said something else down the

4  road, maybe pertinent to my complaints and him

5  allegedly addressing it.  But based on what I remember

6  at this time, I think I covered the basis.

7    Q.  Okay.  You mentioned that you might have had

8  a discussion about traffic enforcement.  Do you

9  remember what the discussion was and when it was had?

10    A.  Yes.  In reference to the wreck on or about

11  December 2017, Sheriff White received a complaint from

12  a African-American female.  Her mother actually filed

13  the verbal complaint and then her daughter started

14  speaking, and Sheriff White asked me in front of them

15  to -- to address it.

16    And I did.  And I told them that he should

17  not have been -- that the reason why is -- I told her

18  -- her mother, "The reason why your daughter's down

19  here is because Central was showing a possible warrant

20  in the system and I need to verify."

21    Because she told me that she had never been

22  in trouble and I did not see any signs of deception,

23  but I need to verify who she was and that's why she

24  was at the Sheriff's Office.

25    I didn't cuff her.  I told her -- I said,

**44**

1  "Follow me down here," because she was being truthful.

2  And so she followed me down there.  I was able to

3  verify that it wasn't her.  Instead, one of her family

4  members and they have similar identification.

5    But her mom was upset that it was her

6  daughter.  And I explained to her that I had to verify

7  the warrant and et cetera, and it wasn't her.  So her

8  mom wanted to know, "Well, why is my daughter down

9  here instead of the guy that hit her?"

10    And I told her, I said, "Well, the reason's

11  as I've just stated.  That's why your daughter's

12  here."  "Well -- well, why isn't he here?"  I said,

13  "Well, ma'am."  I said, you know, "I didn't feel as if

14  he did anything wrong."  I said, "And there's no

15  damage to the car."

16    And she wanted a report and I said, "We can

17  get a report."  And so she -- and the mother wanted

18  the young lady to be -- the young man to be charged,

19  and Sheriff White told me to go back and charge him.

20    And I said, "Well, Sheriff, I don't have a

21  ticket book."  And he said, "You don't have a ticket

22  book?"  I said, "No."  He said, "All of them degrees

23  you got?"  Scratching his head.  I said, "No, Sheriff.

24  I don't have a ticket book."  "White, I thought I gave

25  you a ticket book."  I said, "No, Sheriff.  You didn't

**45**

1  give me a ticket book.  I don't have one."

2    And so the Sheriff told me to charge him on

3  Criminal Summons since I don't have a ticket book.

4  And I asked the Sheriff, "What do you want me to

5  charge him with?"  And the Sheriff started scratching

6  his head, and he told me he would speak to me in his

7  office in a few so we can get all the stuff sorted

8  out.

9    And we did.  And Sheriff White said, "Well,

10  White."  He said, "Where the Supervisor?"  I said,

11  "Supervisor not here today."  He said, "Well, White,

12  you the senior deputy.  All these degrees and

13  certifications you got."  And he said, "I thought I

14  gave you a ticket book."  And I said, "No, Sheriff.  I

15  -- you didn't."

16    And he told me to charge them and I said,

17  "Well, Sheriff, you know, it's a trash site."  I said,

18  "It could be construed as -- it may be considered

19  private property."  I said, "And I don't think the

20  charges are going to go anywhere because there's no

21  damage to the car."

22    And so the Sheriff said, "Well, just -- just

23  charge him because these people can go to the

24  hospital, run up insurance, et cetera.  You don't know

25  what may happen."  I said, "Yes, Sheriff."  So I went

46

1   and I put it on Criminal Sermons -- Criminal Summons.
2          And the Magistrate Judge, she did not like
3   what she saw.  And I said, "Ma'am," I said, "This is
4   coming directly from the Sheriff.  He wants this man
5   charged.  Somebody came in here -- complaining, so
6   that's why I'm here for you to find P.C.
7          She signed off on it.  I served the dude
8   with a Criminal Summons and that was it.  But the
9   sheriff told me to do Traffic Enforcement, and then
10  another time that he told me to do Traffic Enforcement
11  was in his office.
12          And he said something to the effect of, "We
13  do stock cars."  But he wanted us to be focused on bars
14  as well, on -- and then some more focus on as well, to
15  checking bills -- on businesses and buildings, serving
16  warrants, serving papers, et cetera.  But traffic
17  enforcement was and it -- well, was a part of my job
18  when I was there.
19      Q.  So going back to the -- you said it was an
20  African-American female that you were speaking with.
21  Was there a possible warrant in the system at that
22  time?
23      A.  Yes.
24      Q.  Okay.  And were you issued a ticket book
25  after this occurred?

47

1       A.  No.
2       Q.  Did you ask for a ticket book?
3       A.  I never asked him for a ticket book.  And
4   the sheriff admitted that he knew I didn't ask him for
5   a ticket book, and later said, despite after saying
6   that he thought he gave me a ticket book, he said, "If
7   I wanted you to have a ticket book, you would have
8   one."  So which one is it...
9       Q.  But you didn't have one?
10      A.  No, I did not.
11      Q.  Okay.  Do you know why you were not issued a
12  ticket book?
13      A.  The Sheriff stated to me he thought he'd
14  issued me a tissue -- a ticket book.  He later said if
15  he wanted me to have a ticket book, then he would give
16  me one.  So I guess it was at the discretion of the
17  Sheriff.
18      Q.  So in his discretion, he did not issue you a
19  ticket book thereafter?
20      A.  No.
21      Q.  I wanted to talk about the policies and
22  procedures that others may have talked to you about.
23  So you mentioned that you received training with
24  Alexander, Sergeant Alexander.  Did he discuss any
25  policies and procedures with you?

48

1       A.  Briefly, he said a few things to the effect
2   of, when we answer calls on his shift, he let the guys
3   do, and the one girl he has, whatever they want to do
4   as long as they answer calls.
5          He said a few of them had been there a
6   while.  They're waiting on to go through BLET.  He
7   said that he expects for his guys to work because
8   he'll work.  Call come out, he'll respond to it.
9          He did say that absent of a lot of calls,
10  it's pretty much laid back.  You got free will to do
11  whatever as long as you don't go out here and do
12  anything that's too crazy or stupid, left to center.
13          He did say that he liked to pull over cars,
14  and we pulled over several cars while I was riding
15  with him my first week, as well as his uncertified
16  deputies were pulling over cars.
17          And I know they pulled them over because I
18  could hear them on the radio, and then several times,
19  we backed them up on traffic stops.  In fact, Sergeant
20  Alexander said, "You might come to my shift.  I don't
21  know."  He said, "I need a certified officer."  And he
22  said, "Currently, the only two on shift that's
23  certified is you and I."
24      Q.  And when you say they stopped cars, do you
25  know for what types of violations they would stop the

49

1   cars for?
2       A.  Chapter 20 Motor -- Motor Vehicle
3   Violations.  Various ones.
4       Q.  Can you name any specifically?
5       A.  In terms of the specific names, you will
6   have to get the reports from the Vance County
7   Sheriff's Office.  Some of this stuff is three years
8   old, if not longer.
9       Q.  I understand that.  So when it came to
10  traffic enforcement, did Sergeant Alexander discuss
11  the difference between a minor or a major violation?
12      A.  No, he did not.
13      Q.  Ignoring the traffic enforcement issue, were
14  there any other policies and practices discussed that
15  you haven't mentioned by Sergeant Alexander?
16      A.  Not to my knowledge.  I believe I recalled
17  everything I could.
18      Q.  Understood.  So your Field Training Officer
19  Campbell.  Can you tell me what types of policies and
20  practices he talked to you about during your training?
21      A.  He talked about serving warrants, making
22  sure that we check our buildings, and to be work on
23  time, not calling out habitually.  He talked about
24  just getting the job done and everybody going home
25  safe.

50

1     Campbell also -- he said, "I'm sort of a
2 traffic guru." He said, "I work not just here, but
3 also with a police department," whichever one it was,
4 somewhere in Warren County. And he said, "I like to
5 serve warrants too."
6     And in fact, Campbell and I pulled over
7 multiple cars during my two-and-a-half to three weeks
8 with him. In fact, him and I had a chase, a vehicle
9 chase, through the county and the city while I was
10 still in field training with him. So traffic
11 enforcement was definitely instilled in -- by him, he
12 stated and we acted on it.
13     Q.   And you said you pulled over multiple cars.
14 Can you give me examples of why you pulled them over
15 or why he decided that they would be pulled over?
16     A.   Once more, you would have to get the reports
17 from the Vance County Sheriff's Office. I will say
18 there was less than a handful of times when we pulled
19 cars over where he told me not to say anything on the
20 radio or -- or he wouldn't call it in.
21     He would just handle it without dispatch
22 knowing. He never said why, other than he said, "We
23 don't have to call it in." And he would approach the
24 car and I would be there. I remember one time on
25 39 -- we were headed south, but it was 39 North.

51

1     But we was in the southbound lane and he
2 told me to pull a car over who was following too
3 closely. They was going -- they were going slow, but
4 -- at one point in time, but then they sped up to
5 about the speed limit and they were following closely
6 and so he told me to pull them over.
7     And he told me to stay in the car and he
8 went and handled it. And when he came back, he did
9 provide what was going on with the motorist, but I am
10 unable to recall what he said.
11     Q.   Do you know if he had a traffic or a
12 citation book?
13     A.   I'd never seen his traffic book, but he was
14 a supervisor, and so it is fair to say that he had
15 one, most likely.
16     Q.   Do you know if Sergeant Alexander had one?
17     A.   He was a supervisor, so he had one, most
18 likely. And I'm saying "most likely" based on because
19 Sheriff White had told me face-to-face before, well
20 after these incidents, when he said, "You don't have"
21 -- he said, "I know you don't have a ticket book. I
22 wanted you to have one, you would have one."
23     He said, "Well, the supervisors got one."
24 So sergeants, lieutenants, captains, chief deputy or
25 major and the sheriff, they got ticket books. They

52

1 had them. So to answer your question, all the
2 sergeants had one.
3     Q.   So when you were riding with Sergeant
4 Alexander, were -- you remember pulling people over
5 for speeding?
6     A.   There were multiple traffic stops that
7 Sergeant Alexander did. If you want the specific
8 charges, the reason of suspicion or the probable cause
9 for the stop and possible arrest, then you would have
10 to rely on the reports from the Sheriff's Office.
11 It's been too long.
12     Q.   Based on your recollection, do you remember
13 stopping anyone for speeding with Campbell or
14 Alexander?
15     A.   Like I said, it's -- the -- it will be based
16 on the reports at the Sheriff's Office in terms of
17 specific recollection of what somebody was stopped
18 for, whether it was speeding or another Chapter 20
19 violation. I'm unable to recall the specifications,
20 but there were multiple traffic stops that were done,
21 not just with Alexander but also with Campbell.
22     Q.   Okay. So moving on, did the Sheriff's
23 Office assign people to different squads or teams?
24     A.   Yes.
25     Q.   What squad were you on when you initially

53

1 started?
2     A.   I rode with Sergeant Alexander for one week.
3 The following week, I was assigned to Sergeant
4 Campbell, Campbell's squad. The squads were A, B,
5 and D. Whichever one Sergeant Alexander was on and
6 whichever one Campbell was on.
7     And later after Campbell, then in field
8 training with Deputy Wayne, I was under Sergeant
9 Donald Roberson. Whatever squad number at that time
10 at 2017, I identified their squad or team, that's the
11 one I was on.
12     Q.   Okay. Who was on -- what other deputies
13 were on your squad with Alexander? Do you remember?
14     A.   We had Deputy Terry Torrance, who was
15 uncertified at the time. We had Deputy Lauren. I
16 cannot think of her last name, but she was also
17 uncertified. And you had Deputy Cody Burns, also
18 uncertified, along with -- along with Sergeant
19 Alexander.
20     I will say for the record, those are his
21 shift members at the time, but during the time that I
22 was a law -- that I was hired, it was around the
23 summer. So school was either in the process of being
24 let out or already let out, and so there were SR roles
25 that were split up for each shift. I am unable to

54

1  recall which SR role was assigned, but it was -- it
2  did happen.
3      Q.  And do you remember the same for Campbell's
4  squad, who else was on there?
5      A.  Some of them I do.  It was Campbell,
6  Sergeant Campbell, Deputy Adam Height, certified
7  Deputy Andre Pool, certified.  And if there were any
8  other people on his shift, it's not coming to my
9  memory at this time.
10     Q.  Okay.  And finally, for -- is it Roberson?
11     A.  Sergeant Donald Roberson.  He goes by D Ray
12  (phonetic).  Yes.  It was Sergeant Roberson, Deputy
13  Wayne.  There was another deputy.  It's on the top
14  of -- it's on the tip of my tongue.  It might come to
15  me.
16        He was referred to as Sergeant Roberson's
17  Senior Deputy, an African-American male.  I can't
18  think of his name, and it was a -- it was Deputy Eri
19  Sheftal.  Eric Sheftal.
20     Q.  Do you know how to spell his last name?
21     A.  S-H-E-F-T-A-L, I believe.
22     Q.  Okay.  Did you know any of those people that
23  you just mentioned before you started working at the
24  Vance County Sheriff's Office?
25     A.  I knew of Andre Pool.

55

1      Q.  Is that the only person?
2      A.  Yes.
3      Q.  How did you know of him?
4      A.  We went through basic law enforcement
5  training together at College of the Albemarle in
6  Elizabeth City, North Carolina back in August, 2015 to
7  December, 2015.
8      Q.  Did you talk to him during that time, or you
9  just went to the same classes?
10     A.  That's the first time I met him, when we
11  went through the police academy, which is BLET.
12     Q.  Would you consider yourselves friends?  Were
13  you talking, were you hanging out outside of ---
14     A.  I guess we were co-workers -- I guess we
15  were co-workers or classmates.  We both were in the
16  law enforcement academy.
17     Q.  Did you have conversations outside of the
18  academy?
19     A.  Are you talking about during the academy?
20     Q.  During that time, would you hang out or talk
21  to him outside of that?
22     A.  No.  We wouldn't hang out at all outside of
23  the academy.  There may have been times where the
24  class went to lunch or something and him and I went
25  there along with others.  But in terms of having a

56

1  personal friendship or relationship, no.
2      Q.  Okay.  Did you know him after BLET or stay
3  in contact?
4      A.  No.  I did not stay in contact with him
5  after B -- BLET.  It was only until he saw me right
6  before I got hired at the Sheriff's Office.  He
7  recognized me and I recognized him.  So there was no
8  contact after BLET up until getting hired at the
9  Sheriff's Office.
10     Q.  So once you got hired, would you two hang
11  out outside of your work hours?
12     A.  No, we did not hang out.  I'm not a person
13  that hangs out.  Define "hang out."
14     Q.  Spend time with, lunch, dinner.  Spend time
15  at each other's homes, et cetera.
16     A.  We had lunch sometimes at the Sheriff's
17  Office together, as well as I had lunch with a few
18  other deputies, I mean -- and supervisors a few times.
19  But in terms of hang out, in terms of, like, going to
20  a club or bar, lounge or shopping, no.
21        In terms of spending time at one another's
22  house, I did not spend time at his house per se in
23  terms of hanging out there, but I definitely knew
24  where he stayed at.  But our interactions off-duty,
25  face-to-face was limited.

57

1      Q.  Did you send text messages to each other
2  off-duty?
3      A.  There were messages exchanged
4  back-and-forth: "Hello." "How are you?" "What's up
5  man?" Things of that nature.
6      Q.  How about phone calls?
7      A.  There were phone calls, as well as text
8  messages and phone calls with a few other deputies
9  that -- when I was off duty.
10     Q.  After your termination, did you remain in
11  contact with Mr. Poole?
12     A.  Yes.
13     Q.  Do you -- not to use the terminology, "hang
14  out," but spend time with one another, lunch, dinner?
15     A.  Well, no.  Well, where I live.  I live in --
16  I live in Charlotte.  He stays in Vance County.
17  That's a three-hour-plus difference, so no.
18     Q.  How about text or talk?
19     A.  We text and sometimes we talk.
20     Q.  Did you talk to him about your termination
21  or your employment at Vance County Sheriff's Office?
22     A.  Yes.  He was the one that told me the reason
23  why I was terminated after Captain Weldon Bullock
24  stated Sheriff Peter White told him not to talk about
25  it.  And so maybe a week later, then Deputy Poole

58

1  found out why I was terminated and let me know.
2      Q.  What did he tell you?
3      A.  He let me know that I was terminated for
4  excessive force.  I asked him where did he get the
5  information from, and he stated that Captain Lloyd --
6  well, Captain Watkins, but Lloyd Q. Watkins is the
7  name, told him.
8          And he also stated that Captain Watkins
9  said, "The Sheriff wanted him gone."  He don't agree
10  with the decision to terminate me, "but the Sheriff
11  didn't want his services anymore."  And so Poole told
12  me.
13          Fast-forward, Algretta challenged my
14  unemployment benefits, and there were some things --
15  some files that she sent over that were sent to me.
16  And the allegations of excessive force, what was
17  written on paper, it was true.
18      Q.  So Poole told you about the excessive force.
19  Did he mention any discrimination at play?
20      A.  No.  He simply told me -- he didn't mention
21  discrimination by word, but he simply told me that
22  Captain Watkins told him that I was terminated for
23  excessive force.  He told me that Captain Watkins told
24  him that he did not agree with the decision, said that
25  "The Sheriff wanted him gone."

59

1          And I asked him, I said, "Well, what are you
2  talking about, wanting me gone?"  "You know, because
3  you went to HR and the Sheriff didn't like that."  And
4  he said, "All of us know what took place."  Then, he
5  said, "I just wanted to tell you that you would --
6  that you were terminated for excessive force."
7      Q.  Did he explain why the Sheriff wanted you
8  gone?  Was it just because you went to HR?
9      A.  That's what he said.  There may have been
10  other things that may have been mentioned that he
11  didn't tell me, but that most certainly, what I just
12  told you, was an accurate account of what was said.
13      Q.  Thank you.
14      A.  But for Watkins telling him that I was
15  terminated for excessive force, I would not know that
16  I was terminated for excessive force because Captain
17  Bullock did not talk about it it to me.  Nobody did.
18          I was simply told on the day of my dismissal
19  that, "Your service is no longer needed," and the
20  Sheriff said not to talk about it.  They didn't give
21  me a reason, and they gave me a ride home in my patrol
22  car.
23      Q.  We'll discuss your termination more in
24  detail.  I want to talk more about your transfer.  So
25  you were transferred to another squad in November of

60

1  2017.  Is that correct, does that sound about right?
2      A.  Yeah.  It sounds approximately -- yes.
3      Q.  What led up to this transfer, do you know?
4      A.  Yes.  I was told by Sergeant Campbell, as he
5  was in the process of becoming Lieutenant Campbell
6  around that time, that I was being transferred because
7  there are some people who are getting ready to go
8  through BLET, Basic Law Enforcement Training.  And
9  they were going to do this swap of deputies in the
10  next couple of weeks.
11      Q.  Do you know what was the purpose of the
12  swap?
13      A.  Because deputies were getting ready to go to
14  BLET, is what Campbell told me.
15      Q.  Did you have any issues with being
16  transferred?
17      A.  Based on what he had told me, I had no
18  issues based on what he told me.  But I later had
19  issues based on when I found out the truth.
20      Q.  Can you tell me how that happened?
21      A.  How what happened?
22      Q.  How you allegedly found out the truth?
23      A.  I did find out the truth, and the truth is,
24  I was transferred from Sergeant Roberson's shift to
25  Sergeant Alexander's shift.

61

1          Sergeant Alexander told me directly that
2  Campbell came to him and said that, "We got to
3  transfer -- we got to separate Wayne, Deputy Wayne,
4  and White.  I don't know what's going on, but
5  something going on."
6          "They're not backing each other up on calls.
7  They're not helping one another.  They're not
8  communicating, not talking to each other, et cetera.
9  Have you heard anything about what's going on between
10  them?"
11          And Sergeant Alexander told me that he
12  didn't know that Wayne and I evidently had a beef, or
13  something was in the air.  And he said that Campbell
14  gave him an opportunity to accept my transfer or not.
15          He said, "I could have denied you the
16  opportunity to come on -- come over here, but I
17  didn't.  I said, you know, 'White rode with me for a
18  few days his first week, a few nights.'  And he was
19  like, 'And I had no problem with him, and plus I need
20  certified officers.'"
21          And so he was like, "The opportunity -- the
22  door opened up," and he told me that he didn't have a
23  problem with me.  And you know, he heard that I would
24  when I was on D. Ray's shift.  He said, "Based on
25  everything that I heard from that side, that you're a

62

1  good deputy.  You know how to do your job."  And so he
2  said, "Plus, with you being certified," he said, "I
3  definitely need that."
4        Now, Deputy Torrance Terrence, Terry --
5  excuse me, I said that wrong.  Deputy Terry,
6  T-E-R-R-Y, Torrance provided me information
7  face-to-face that Lieutenant Campbell called him in
8  the office, wanting to know if he knew anything about
9  Wayne and I not getting along, had he heard anything.
10       And Terry, Deputy Torrance, told him no.
11  And he asked Campbell what was going on, Lieutenant
12  Campbell.  And Campbell said, "Something's just going
13  on.  They are not acting as if they're working
14  together.  So you know, I said that they had to be
15  separated.  They had to be split up."  And Torrance
16  told me that Campbell told him to keep his eyes open.
17    Q.  Keep his eyes open for what?
18    A.  Torrance said that it was like, "When he
19  told me that, 'keep my eyes open,' like be on the
20  lookout or to watch out."  And he was like, Torrance
21  was like, "I'm not fitting to be no one's snitch."  He
22  was like, "White, I don't have no problems with you.
23  I don't have no problems with Wayne."
24        He was like, "You just got over here.  They
25  said you work.  Marin accepted you over here.  Like he

63

1  said, 'You don't have no -- you don't have no
2  certified deputy, so you definitely need it.'"  But
3  all what Sergeant Alexander and Sergeant -- Sergeant
4  Alexander and Deputy Terry told me, it was all put
5  back on Campbell as him being the originator.
6        Furthermore, to get specific into this
7  question, Sergeant Roberson in late December of 2017
8  filled in for Sergeant Alexander, and Sergeant
9  Roberson and I had a conversation.  I asked him, I
10  said, "What is the issue with my transfer?"  And he
11  said, "Mr. White, I -- all I know is Campbell came to
12  me" -- excuse me, the Chief Deputy.
13        "The Chief Deputy came to me and asked,
14  'Where is Mr. White?  Where is S33?'"  And he said --
15  he said, "I haven't heard him on the radio lately."
16  And he said, "Well, he was transferred."  "Transferred
17  to where?" according to the Chief Deputy.  "He was
18  transferred to Marin's shift, Sergeant Alexander."
19        And he said that the Chief Deputy said,
20  "What?"  He was like, "Who did that?"  He said, "It
21  came from Durwood, Lieutenant Campbell.  And I think
22  Watkins knows something about it too, Captain
23  Watkins."
24        And according to Sergeant Roberson, the
25  Chief Deputy said, "Oh, no.  I did not approve Mr.

64

1  White's transfer."  And he said, "The Sheriff didn't
2  approve it either because the Sheriff would have told
3  me."
4        And he said that, "I'm going to let" -- he
5  said, "I'm going to talk to the Sheriff about this and
6  I'm going to let Campbell and Watkins know not to mess
7  anymore shift transfer unless I give the go ahead or
8  the Sheriff give the go ahead."
9    Q.  Okay ---
10    A.  And -- go ahead.
11    Q.  Let me -- just so we don't get too far in
12  the weeds, who was the chief deputy that you're
13  describing?
14    A.  The former Captain of Patrol, Lawrence D.
15  Bullock.
16    Q.  Okay.  And you were informed that the reason
17  that you were transferred was because of your
18  relationship or alleged problems with Wayne.  Is that
19  right?
20    A.  I was told by Sergeant Campbell that -- not
21  Sergeant -- I was told by Sergeant Campbell that the
22  purpose of my transfer was for people going through
23  BLET, deputies.
24        But I was later told by Sergeant Alexander,
25  Sergeant Roberson and -- and Deputy Torrance that

65

1  Campbell was the one that was behind it.  And because
2  you stopped me from getting too further in the weeds,
3  I wasn't able to continue with what happened, the
4  exchange between Sergeant Robinson and I.
5        But that's essentially what I was told, that
6  Campbell was the one that was behind it.  And so the
7  shift transfer was deceptive.  It was based on
8  falsiticity (sic).
9    Q.  Was race or gender or anything like that
10  ever mentioned in these discussions?
11    A.  Counselor, the bottom line is, these
12  complaints ---
13    Q.  It's a yes or no question.
14    A.  I'm sorry?
15    Q.  It's a yes or no question.
16    A.  Repeat the question, sir.
17    Q.  Was race, gender or sexual orientation
18  mentioned in all of this regarding your transfer in
19  any of it?
20    A.  No.
21    Q.  Okay.  You can continue with what you were
22  saying.  Sorry.
23    A.  You may continue with your question.
24    Q.  Thank you.  We will discuss more about the
25  Wayne versus White relationship and I'll let you get

66

1  into that more.  I assure you of that.  So did you
2  have issues with Wayne?
3      A.  No.  I had no issues with Wayne.  In fact,
4  that's why I found the shift transfer deceptive.  And
5  furthermore, when him and I met together with
6  supervision, he admitted that he didn't have any
7  issues with me, and I also admitted.
8      In fact, Sergeant Roberson, upon me asking
9  if he had a problem with me, if he had any issues with
10  my personal conduct, if he had any issues with my
11  performance, he said no.  He said, "You work."  He
12  said, "You're a good -- good deputy."  He said, "You
13  don't have any write-ups."
14      I asked Sergeant Marin Alexander the same
15  thing and he said no.  He said, "We good."  He said,
16  "There was a -- a complaint by someone who worked at
17  911, but according" -- this was information to me.
18  According to her supervisor, the assistant director at
19  the time, he looked into it.  He pulled the records
20  and said that he can't see what I did wrong and sent a
21  letter over there.
22      And I was later told by Marin that I was
23  good to go.  He was like, "You come to work.  You do
24  your job.  We don't have a problem with you."  And so
25  I asked Captain Watkins, I said, "If they don't have a

67

1  problem, including Wayne," I said, "Then who is the
2  problem?"
3      I said, "Who's the originator of this
4  stuff?"  And Captain Watkins, he didn't say anything.
5  He was looking at all of us.  And I said, "Well, it
6  had to get -- it had to come from somebody."  And I
7  turned over to Campbell.  I said, "Well, didn't it
8  come from you?"
9      "Well, I was the one that saw what was going
10  on and I took it to Captain Watkins and said that it
11  had to change, switch -- switch you all up."  And I
12  said, "And you didn't think about coming to me before
13  all this stuff got to here so you could know that
14  there's nothing going on?"
15      "Well, you didn't need to know."  He said,
16  "No.  You didn't need to know."  And so I contend I
17  told him, I said, "I contend that I do need to know
18  because it's an alleged personnel issue of deputies
19  not getting along.  And as it comes out, we don't have
20  a problem."
21      And so Captain Watkins said, "Well, in all
22  probability, that you will probably be going back to
23  D. Ray's shift."  He said, "I might will talk to the
24  Sheriff myself," and that was that.
25      But prior to that, the Sheriff told me

68

1  himself that he didn't approve it and he told Watkins
2  to put me back a few weeks ago, but that it had not
3  happened.  And then afterwards, he said that he didn't
4  approve it and he told Watkins to put me back when I
5  was transferred again from Sergeant Marin's shift to
6  Sergeant Chris Welborn's shift.
7      So whatever took place, all those around,
8  the deception of the shift, other issues that Campbell
9  --- including what Campbell hyped up and made it seem
10  one way, and it was another way.
11      Q.  So was -- when you say, "deception," was
12  Sheriff White involved in this deceptive transfer, as
13  you call it?
14      A.  Not to my knowledge.  He was not.  But he's
15  ultimately responsible for what takes place at that
16  Sheriff's Office.
17      Q.  Okay.  Was Lawrence D. Bullock involved in
18  this?
19      A.  Not to my knowledge.
20      Q.  What about Weldon Wallace Bullock?
21      A.  Not to my knowledge.
22      Q.  Okay.  And you mentioned a complaint by 911
23  that was investigated.  Can you go into detail about
24  that?  Who made the ---
25      A.  I cannot.  As far as the issue, evidently,

69

1  according to Sergeant Alexander -- and he would be the
2  one that you need to talk to and pull the files if
3  necessary.  A 911 dispatcher complained about me
4  handling a call or something, and he said that they
5  were going to pull the -- the tapes.
6      The Assistant Director was going to pull the
7  tape and he was going to review it and let us know
8  what he found.  And he did so later on that week and
9  sent a letter -- excuse me?  I thought I heard
10  something.
11      He sent a letter -- it could have been some
12  noise.  He sent a letter saying that he was unable to
13  see what I did wrong, and I was told by Sergeant
14  Alexander that I was cleared.  I was in -- I was good
15  to go.
16      Q.  Do you know who the 911 dispatcher was?
17      A.  I believe he said that it was someone by the
18  name of Veronica, but I may be wrong.  But I believe
19  that's what he said, who he said complained.
20      Q.  Do you know of a Makin (ph) that may be a
21  911 dispatcher?
22      A.  Yes.
23      Q.  Who was that?
24      A.  She was -- I believe she was working that
25  night as well, so she may have been -- she may have

70

1 complained as well. Or it was something -- I believe
2 Veronica may have been the -- the shift supervisor and
3 Makin was the dispatcher. But somebody from there
4 complained, but I was cleared.
5    Q. Do you know if Makin -- do you know what
6 Makin's relationship was to Deputy Wayne?
7    A. Well, they -- well, allegedly, they had a
8 romantic relationship.
9    Q. To your knowledge, did that relationship
10 have anything to do with the complaint against you?
11    A. For -- from 911?
12    Q. Yes.
13    A. To my knowledge, no.
14    Q. Okay. All right. So ---
15        MS. ROBINSON: Brian, can we take a
16 bathroom break right quickly?
17        MR. CASTRO: Yes. I was going to
18 suggest that. Thank you.
19        MS. ROBINSON: Okay. Thank you.
20        THE COURT REPORTER: We are off the
21 record. The time is 12:06.
22 (Brief recess: 12:06 p.m. to 12:12 p.m.)
23        THE COURT REPORTER: We are back on the
24 record. The time is 12:12 p.m.
25        MR. CASTRO: All right. Can you hear

71

1 all right?
2        THE WITNESS: Yes, can you?
3        MR. CASTRO: Okay.
4    Q. (Mr. Castro) We're going to explore this
5 transfer in more detail. So you mentioned that Makin
6 (phonetic) and possibly another person was at 911
7 dispatch when the complaint was made. Is that right?
8    A. Yes.
9    Q. Do you ---
10        MS. ROBINSON: Objection. Let me
11 understand this. The transfer had nothing to do with
12 the 911 call. I don't think that has been what was
13 said as of yet or any testimony in evidence. I think
14 what he said --
15        MR. CASTRO: Wait ---
16        MS. ROBINSON:  --- about the ---
17        MR. CASTRO: You can't make a speaking
18 objection or testify. So if you object, you object.
19 All right.
20        MS. ROBINSON: It's misquoting the
21 witness.
22        MR. CASTRO: I'm not misquoting him.
23 I'm asking him about the transfer, and I'm asking
24 about the 911 call.
25        MS. ROBINSON: No, no. But you also

72

1 said that it was related to a 911 call and Veronica
2 and Makin. And I don't think that is what he
3 testified to.
4        MR. CASTRO: Okay.
5    Q. (Mr. Castro) Prior to your transfer, you
6 mentioned that there was a complaint by a 911
7 dispatcher. Is that correct?
8    A. Yes. There was a complaint -- no. The --
9 the complaint with the 911 dispatch happened after I
10 was transferred on Sergeant Alexander's shift.
11    Q. So before you were transferred in November
12 of 2017, did you spend time with Wayne outside of
13 normal work hours?
14    A. There were times where him and I would talk
15 on the phone or -- in terms of, like -- when you say,
16 "hang out," what are you -- what are you asking?
17    Q. I'm asking whether you ever spent time or
18 were physically present at his home or he was
19 physically present at your home outside of normal work
20 hours?
21    A. He had came by a few times. Very, very
22 limited.
23    Q. Have you ever visited him?
24    A. I had went over there a few times. Very
25 limited.

73

1    Q. Could you give an estimate of how many
2 times?
3    A. Maybe less than a handful, approximately.
4    Q. Was there ever a time where you answered
5 Deputy Wayne's personal cell phone for him?
6    A. Not that I remember.
7    Q. Do you ever remember answering his phone or
8 a phone when Makin was calling him?
9    A. No.
10    Q. Do you remember having any conversations
11 with Makin Persall (ph) or Pearsall?
12    A. She had came -- there was one day him and I
13 were working -- or well, actually, a few days him and
14 I were working and we had stopped at -- it was this --
15 it was this ice cream place in Henderson. It was near
16 like Parham Road or something, P-A-R-H-A-M.
17        And a few times -- well, nearly just about
18 every time. But I remembered directly a few times, we
19 will get there and she will pop up. Or sometimes when
20 we would get there and when I'm getting out of the car
21 and he getting out of his, it was like he had somebody
22 coming.
23        It would be about five minutes. Sometimes
24 we will wait, sometimes we will place our order if the
25 line was already long, and each time it was her.

74

1    Q.  Did you two get along?  Did you get into any
2  disputes?
3    A.  No.  We had never had any disputes.  I never
4  had any problems with her.
5    Q.  Do you remember ever talking to her or
6  joking with her about your relationship with Mr.
7  Wayne?
8    A.  No.  Him and I were co-workers.  There was a
9  professional relationship.
10    Q.  Do you remember ever making sexual jokes to
11  Makin at any time?
12    A.  No.  Absolutely not.
13    Q.  Just for the record, I'm not implying
14  anything about any conversations.  I'm just asking
15  based on my review of records.  So after you were
16  transferred, did you and Wayne get into any disputes
17  or arguments?
18    A.  No.  There were no disputes or arguments.
19  Not to my knowledge.
20        MR. CASTRO:  Okay.  Can we go off the
21  record?
22        THE COURT REPORTER:  We're off the
23  record.  The time is 12:17 p.m.
24  (Lunch recess:  12:17 p.m. to 1:21 p.m.)
25        THE COURT REPORTER:  We are back on the

75

1  record.  The time is 1:21 p.m.
2    Q.  (Mr. Castro)  All right.  Mr. White, a few
3  more questions about the 2017 transfer.  Is it correct
4  that you were transferred to Sergeant Alexander's
5  squad?
6    A.  Yes.
7    Q.  What was his reaction to you joining his
8  squad?
9    A.  He seemed to welcome me, but he also told me
10  why -- the real reasons why I had been transferred.
11    Q.  When you say he welcomed it, how did he do
12  that?
13    A.  He said that he was glad to have me.  He
14  wanted somebody else certified because he didn't have
15  anybody.
16    Q.  Had you worked well together in the past?
17    A.  I only had worked with him for -- when I
18  first started riding with him.  So we had never had
19  any issues, yes.  Based on the limited time we were
20  together.
21    Q.  Did you work well with the other members of
22  your new squad under Sergeant Alexander?
23    A.  Yes.
24    Q.  Did you have any personal issues with them?
25    A.  There was an issue.  There was a minor, very

76

1  minor issue when I was on his shift, Sergeant Marin
2  Alexander's shift, involving Deputy Torrance in terms
3  of hospital relief.  And -- but other than that minor
4  issue, there was no big issues to where we couldn't
5  work together.
6    Q.  Could you describe in detail what happened
7  regarding hospital relief?
8    A.  There was a situation.  It was -- I haven't
9  touched to the effects of it and it's been a long time
10  ago.  There was a situation involving when we were
11  being rotated in and out of the hospital.
12        Times were getting distorted.  People
13  sitting longer than what they should have been, people
14  out longer on the road than what they should have
15  been -- pursuant to the normal relief, an hour and
16  then sometimes two hours.
17        So there was an issue with the hospital
18  relief and Sergeant Alexander didn't know all the
19  facts, and he later admitted his -- he showed remorse
20  forward and -- and Torrance also was -- you know,
21  showed remorse.  But at the same time, it was a minor
22  issue and we were able to move forward.
23        There was no disciplinary action.  There was
24  no back and forth.  It was just something that came up
25  and not something that I initiated, something that

77

1  Deputy Torrance Terry initiated to Sergeant Alexander
2  on me.
3    Q.  How did he initiate that, do you know?
4    A.  He called him and talked to him.
5    Q.  And did you all just talk it out after that,
6  or how was that ---
7    A.  I believe we talked individually and then we
8  talked briefly, collectively, real brief.  But like I
9  said, it's been a long time ago.
10    Q.  Okay.  So did you lose any of your
11  responsibilities when you transferred to Sergeant
12  Alexander's shift?  Did they change?
13    A.  No, it stayed the same.  I didn't lose
14  anything.
15    Q.  Did your duties change?
16    A.  My duties as a law enforcement officer
17  changed -- did not change, excuse me, based on a
18  transfer.  Did not change.
19    Q.  Did it have any effect on your pay or
20  benefits?
21    A.  No.
22    Q.  Did you consider it to be a demotion?
23    A.  No.
24    Q.  Did you consider it to be a downgrade in any
25  way?

78

1    A.  No.
2    Q.  Okay.  So moving on to another topic, were
3  you aware that Sheriff White was previously an NC
4  Highway Patrol officer?
5    A.  I was aware that he was a major, retired
6  major.  Former state trooper, retired state trooper.
7    Q.  Were you aware of how long he was a state
8  trooper for?
9    A.  I believe somewhere between 20 to 25 years,
10  if not longer.
11    Q.  Do you agree that based on those 25 years,
12  he would be familiar with traffic enforcement?
13    A.  Yes.  He would be very familiar with it.
14    Q.  Do you agree that the Sheriff has the
15  authority to make decisions on what his deputies will
16  focus on during their shifts?
17    A.  Now, he has the power to make whatever
18  decisions for that matter, but he also -- I mean,
19  there's laws out there that tell us -- provide us what
20  to do as well.  So it's just not discretionary
21  authority.
22    Q.  And when you say there's laws out there,
23  what are you referring to exactly?
24    A.  Enforcement of traffic laws that appears to
25  be the issue or something -- well, one of the issues

79

1  in which I was told to do traffic.
2    Q.  So do those traffic laws change the
3  Sheriff's authority when it comes to telling you what
4  to do?
5    A.  No.  I'm not saying that it changed his
6  authority.  I'm just saying that there are statutory
7  obligations as law enforcement officers at that time
8  that we're required to do.
9    Q.  Do those statutory obligations, can they go
10  against what the Sheriff tells you to do?  Can they
11  allow you to disobey the Sheriff?
12    A.  Well, I'm not sure if there's any provision
13  in that statute that specifies that.
14    Q.  So if the Sheriff said, for example, "Don't
15  enforce traffic laws," but there are statutory
16  obligations to do so, would it be appropriate to
17  enforce traffic laws?
18    A.  If he says not to do it, then we're going to
19  be expected not to do it.
20    Q.  Okay.  Did you focus on the issue which you
21  pointed out, which is traffic enforcement at previous
22  jobs?
23    A.  No.
24    Q.  So can you walk me through the process of
25  how you cite someone without having a ticket book,

80

1  from when you first see a violation to the point where
2  you serve them with, let's say a summons?
3    A.  I'm not sure what you're asking, because I
4  didn't have a ticket book.
5    Q.  Yes, exactly.  So without having a ticket
6  book, how do you cite them or how do you enforce those
7  laws?
8    A.  Okay.  So as the Sheriff instructed me in
9  December of 2017, to do criminal summons.
10    Q.  How does that process work?
11    A.  I would draft the criminal summons.  It
12  would be -- a temp number would be issued to me.  I
13  would then take it -- take the criminal summons to the
14  Magistrate's Office.
15         The Magistrate would then type in the temp
16  number, pull it up, review what's on the criminal
17  summons, will spare -- swear me in.  Get my brief
18  testimony and determine the merits of whether or not
19  there's probable cause.
20    Q.  And then how do you serve the summons?
21    A.  I serve it on the person and I return it
22  back to the clerk.
23    Q.  So do you -- you issue the summons after the
24  stop is completed, after you've already let them go?
25    A.  Yes.  But I also told them that they can

81

1  expect to receive some paperwork on it.
2    Q.  Did you ever tell them, "You're free to go,"
3  and not inform them that you were going to give them a
4  summons, but then serve a summons?  Did that ---
5    A.  I believe I've told every last one of them
6  that I served those summons on to expect some
7  paperwork.  Every ---
8    Q.  Did citizens ever complain -- keep going.
9    A.  I'm sorry.  Go ahead, sir.
10    Q.  Did citizens ever complain about this
11  practice?
12    A.  I am not aware of citizens outside of Ms.
13  Jamie Goss complaining, but I told her on the side of
14  the road that she can expect to have some paperwork
15  for it because she could have killed somebody.
16    Q.  Okay.  Before we talk more about Jamie, did
17  Sheriff White ever reprimand you for issuing summons
18  after seeing a traffic violation?
19    A.  I -- I do not recall him reprimanding me for
20  a -- for such.  You're talking about issuing a
21  criminal summons after a traffic violation?
22    Q.  Or a traffic violation, yes.
23    A.  Not to my knowledge, unless you have a
24  specific case that may trigger my memory.
25    Q.  Did he ever just say, "Can you stop issuing

82

1  traffic citations," or "Can you stop issuing these
2  summonses for traffic citations?"
3      A.  Did who say that?
4      Q.  Sheriff White.
5      A.  No.  He told me to issue them.
6      Q.  Did other supervisors such as Lieutenant
7  Campbell tell you this?
8      A.  When you say "this," referring to?
9      Q.  Tell you to stop issuing summonses after
10  traffic violations?
11      A.  That's what Lieutenant Campbell wrote in the
12  write-up.  So to answer your question, yes.  Based on
13  what he wrote in the write-up.
14      Q.  Did he tell you that directly, orally?
15      A.  When he was on the phone with me, cursing me
16  out, fussing me out as well, I didn't realize there
17  was a third party in the room.  He said, "Man, you got
18  to stop issuing these" -- I believe he said, "traffic
19  summons" or "criminal summons," something.
20      It -- he said, "Because you're getting
21  complaints," and et cetera.  And at that time, I was
22  not aware of a complaint until at that -- when he told
23  me.
24      Q.  How did you respond when he told you to stop
25  doing this?

83

1      A.  I asked him what was going on.  I inquired
2  about it because I had no knowledge on what he was
3  referring to.
4      Q.  Was that after the Jamie Goss incident, to
5  your knowledge?
6      A.  Yes.
7      Q.  Was that the first time he told you
8  something of that matter about the traffic citations
9  and summonses?
10      A.  Are you asking me if there was a matter
11  before Jamie Goss where he told me not to do them?
12      Q.  Yes.  Did he ever tell you not to do ---
13      A.  Not to my knowledge.
14      Q.  Was the Jamie Goss incident the first time?
15      A.  Yes.  As I've said, Sheriff White told me to
16  do the criminal summons then because I didn't have a
17  ticket book, despite him claiming he'd gave me one.
18  And so she almost killed some -- somebody, some
19  people, so I had to enforce the laws.
20      Had I had not did what I was supposed to do,
21  it was a -- it -- she could have came up there and
22  complained, not -- not came down there and complained.
23  Somebody could have came up there and complained about
24  me being behind her and not doing anything about it.
25      Q.  Did Sheriff White address the Jamie Goss

84

1  incident with you?
2      A.  For that situation, he said that he approved
3  Campbell's written warning for me, but he never spoke
4  to me about it.
5      Q.  When did he say he approved the written
6  warning?
7      A.  Well, it was in April -- April 2018 when him
8  and I talked.  And he said that he was the one, that I
9  couldn't appeal it to him -- excuse me, or I couldn't
10  appeal it because he's the one that approves it.
11      Although Campbell wrote it up, he said that
12  as Sheriff, he approved it.  And I remember the Chief
13  Deputy saying something about when they suspended
14  that the Sheriff -- that he agrees with it and the
15  Sheriff signed off on it.
16      Q.  Okay.  So you mentioned that you believe
17  Jamie Goss could have killed people.  Can you walk me
18  through how that went, what you saw and how you went
19  about stopping her?
20      A.  Yes.  I will have to be brief with it and
21  refer you to the operation report or the incident
22  report that I did on it.  But to be brief, because
23  it's been -- it's been a while, I observed her in the
24  northern part of the county while I was on patrol.
25      She violated several traffic laws and she

85

1  put people's lives as well as her life in danger by
2  crossing some yellow lines multiple times.  She didn't
3  have a seat belt on.  There was something else.  Maybe
4  driving left to center.  Like she -- she almost caused
5  if not a few, at least one head-on collisions.
6      And I pulled her over, and she said that she
7  was sorry.  And I told her, I said, "You know, sorry
8  is not going to cut it for the family when you kill
9  somebody."  And I told her that she can expect to
10  receive some paper, and I believe a call had came out
11  for me.
12      It was only Sergeant Alexander and I on duty
13  that day as far as the squad.  From what I remember,
14  it was just him and I.  And I had to go to another
15  part of the county and handle that call, but I will
16  refer you back to the operations report or the
17  incident report that I did on it.
18      Q.  Okay.  Do you remember if you went to serve
19  the summons the next day?
20      A.  Maybe the next day, if not the next couple
21  of days.
22      Q.  Why did you serve it so quickly, or why did
23  you serve it within two days?
24      A.  Well, when I applied for PC and it was
25  granted, I didn't have a call to handle at that time.

86

1  It was a slow day. I believe it was a Saturday I
2  served her. So I -- so I served it to her -- served
3  it on her, excuse me.
4     Q. So when you stopped Jamie Goss, could you
5  have called Sergeant Alexander to bring his citation
6  book?
7     A. Well, I could have -- I could have called
8  him, but surely, I mean -- and that didn't come to my
9  mind. But surely, he most likely wouldn't have came
10 up there for that, because he was handling the
11 southern part of the county and I was handling the
12 northern part of the county.
13    Q. So after the Jamie Goss incident, did you
14 continue to conduct traffic stops?
15    A. When -- yes. Whenever the situation
16 required a vehicle to be stopped, if it was a major
17 issue, a major concern, I would stop them.
18    Q. What do you define as a major issue or a
19 major concern?
20    A. Surely, I wouldn't -- surely, I'm not going
21 to stop somebody to make a big deal out of them
22 failing to signal or something like that. But if you
23 are driving left to center, almost crash into
24 somebody's car.
25         If you're, you know, speeding to the point

87

1  of where you're putting your life and other lives in
2  danger. It has to be something -- like if you're --
3  if I suspect you of -- you know, if there's some type
4  of like, if you're impaired by an impaired substance
5  and you're all over the road, those are major issues
6  where we need to protect public safety.
7     Q. When it comes to minor issues, would you
8  consider having your headlights off in nighttime minor
9  or major?
10    A. That's a major issue. In fact, I talked to
11 the Sheriff about that when I talked to him in April,
12 and he seemed to agree. He asked me what I was going
13 to do when I got her pulled over, and I told her -- I
14 said, "Tell -- tell her to turn her headlights on
15 because she's driving with no lights on at pitch black
16 dark at night, and she didn't have no headlights on.
17        I said, "She's going to kill somebody or
18 injure somebody," something to the effect, I said.
19 And he said, "That's right." Or he said, "Okay." So
20 that is a major issue, Counselor.
21         (DEPOSITION EXHIBIT
22          NUMBER 3 WAS MARKED
23          FOR IDENTIFICATION)
24    Q. (Mr. Castro) So if we can look at Exhibit
25 3, which is the amended complaint, and turn to

88

1  Paragraph 78, which appears on Page 16 of 47.
2     A. Which number?
3     Q. Paragraph 78. So it says on Paragraph 78 --
4  if I'm reading this incorrectly, please let me know.
5  I might be looking at the wrong excerpt.
6     A. All right.
7     Q. Well, okay. Sorry, 82. So it says,
8  "Lieutenant Campbell called Mr. White and verbally
9  assaulted him." Can you describe what this verbal
10 assault was?
11    A. Of him fussing and later cursing at me about
12 Jamie Goss, a white woman who I issued traffic summ
13 to for violating the laws of the State.
14    Q. Did he mention her race during the call?
15    A. No. He didn't mention her race, but her
16 race was known that she was white, to me.
17    Q. Did he mentioned your race or anyone's race?
18    A. No, he didn't.
19    Q. Did he mention gender or sexual orientation
20 or anything of that matter?
21    A. No.
22    Q. Did he use any racial slurs or offensive
23 language of that matter?
24    A. He didn't use any racial slurs, but he said
25 the words "ass" multiple times, and "damn."

89

1     Q. Did he use anything ---
2     A. And he said he was going to handle my ass at
3  12 o'clock, whenever he came in. Said, "I'll deal
4  with your ass then."
5     Q. Did he use any language that's offensive to
6  a particular sexual orientation?
7     A. No.
8          (DEPOSITION EXHIBIT
9           NUMBER 9 WAS MARKED
10          FOR IDENTIFICATION)
11    Q. Okay. If we can turn to the Exhibit 9,
12 which is the official written reprimand regarding the
13 Jamie Goss incident. Can you please take some time to
14 review that?
15 (Witness examines document)
16    A. Somebody scroll down. Scroll down. Scroll
17 down. All right.
18    Q. Do you recognize this document?
19    A. Scroll down. Yes. That document was
20 provided to me for the first time after he wrote me
21 up, he being Lieutenant Campbell.
22    Q. And is that your signature on the fourth
23 page?
24    A. Yes, that is my signature.
25    Q. Did you sign this on February 20th, 2018?

90

1     A.  Yes, that was the date.

2     Q.  Did you read it before you signed it?

3     A.  It was read aloud to me and I read it.  I
4  told him I did not agree with it and the Chief Deputy
5  told me to sign it.

6     Q.  Okay.  I want to give you the opportunity to
7  respond to some of the statements in this document.
8  So on Page 1 ---

9     A.  Let's scroll back up.

10     Q.  In about the middle of that paragraph, it
11  says, "I informed him that he had no business going
12  back serving criminal summons for traffic violations
13  on people because he was not issued a citation book.
14  He jumped back at me telling me I was being
15  disrespectful to him and not going to talk to him that
16  way."

17        Question: did he inform you of that
18  statement right there?

19     A.  Like I said, it's been a while ago.  There
20  are a lot of things in here that he claimed happened
21  did not happen.  A lot of it's distorted.  He may have
22  said it.  He may not have said it.

23     Q.  Did he tell you to stop serving criminal
24  summons for traffic violations, to your knowledge?

25     A.  He -- like I said, he put it in the

91

1  write-up, as my previous answer.  He put it in the
2  write-up, as I previously said ---

3     Q.  Do you remember ---

4     A.  --- and he said, "Man, you got to stop
5  serving these traffic summons or criminal summons?"

6     Q.  And on Page 2, on the last paragraph.
7  Towards the end of that paragraph, it says, "Then he
8  said he only had one father and he was a large Black
9  man and even he didn't tell him what to do anymore."
10  Do you remember saying anything like that?

11     A.  My words are distorted, but it was something
12  said loosely to that effect.

13     Q.  What would be a more accurate way to
14  describe what you said?

15     A.  I told him that my father was a big Black
16  man and that "he did not talk to me the way that you
17  did."  And I was referring to the fussing, the yelling
18  and the cursing that Campbell did to me over the
19  phone.

20        And the fussing and the yelling, and maybe a
21  few curse words.  Not as many as was when he was on
22  the phone and Poole was listening into the
23  conversation.  And I told him, I said, "He didn't do
24  it."  And I said nobody else was going to do it.  And
25  I specifically said, "I'm the one around here taking

92

1  up for you.  I'm going to bat for you, speaking up for
2  you and having your back."

3        I said, "The only one."  I said, "The rest
4  of these people," I'm referring to the deputies and
5  the supervisors, "Talk negative of you, talk bad of
6  you."  And I said, "I -- now I know."  I said, I -- I
7  know I said, "I see why they call you Dirty Soup," and
8  that's how that conversation went.

9        I never walked towards him, as he falsely
10  put in his statement later on, a few months
11  afterwards.  And I never walked towards him or move
12  towards him, as Marin falsely -- Sergeant Alexander
13  falsely put in his statement.

14        I simply shut up.  I mean -- well, you know,
15  I silenced myself and I left.  I didn't do no stomping
16  out, didn't slam no doors.  I simply left.

17     Q.  What does that term, "Dirty Soup," mean?
18  What is that about?

19     A.  Sergeant Marin Alexander and Sergeant Dona
20  Roberson both told me that Campbell, Lieutenant
21  Campbell, is Dirty Soup, said his Soup is dirty.  They
22  said, "Lieutenant Campbell," his last name.  "Campbell
23  Soup, Campbell Soup."  And they said that Campbell
24  dirty.  His personality is dirty.  So they put the
25  terms together, Dirty Soup.

93

1        Now, to go a little bit specific in your --
2  your question.  Sergeant Marin Alexander and Deputy
3  Torrance Terry and I were at the Waffle House off of
4  Tiny Broadwick and Dr. Martin Luther King, those
5  roads, not too far from I-85 by Maria Parham hospital
6  in I believe December and -- December 2017.

7        And Marin, Sergeant Alexander, said that he
8  did not like Campbell.  He said that Campbell was
9  dirty, that he was sneaky, that that man just do
10  things ass backwards.  And I asked him, I said, "Well,
11  what did you mean he's dirty and sneaky?"

12        He said, "Man, my old girl and I got into it
13  and Campbell came out there with some other deputies.
14  And I said, "What do you mean, got into it?"  And he
15  said, "We just got into it."  And he said, "Campbell
16  came out there with some deputies and he said, 'We
17  don't care if he's a deputy.  Tell us what he did.
18  We'll lock him up.'"

19        I said, "Lock you up for what?"  I said,
20  "What happened?"  He said, "Well, my girl called 911
21  on me and we had an issue."  And I asked you -- I
22  asked him, I said, "Well, when you say 'issue,' are
23  you talking about domestic?"  And he shook his head
24  with an up and down motion, signaling what I thought
25  was yes.

94

1    And I asked him. I said, "Well, did -- did
2 you hit her?" He was like, my mom and dad taught me
3 not to ever let anybody put their hands on me. And so
4 she put her hands on me and we had an issue." And he
5 was -- he was, you know, shaking his head up and down
6 still.
7    And he said Campbell threatened to lock him
8 up and whatnot despite them working together. And so
9 he said, "Ever since this man tried to have me
10 arrested and had tried to locked me up for domestic."
11 And he said, "The only reason my girl didn't say
12 anything because I had her scared, I had her shook.
13 She wasn't going to say anything against me."
14    And so he said they ended up going their
15 separate way for awhile. But he said, "Now you see
16 why we say 'Dirty Soup.'"
17    Q. Got you. I got the innuendo now.
18    A. I'm sorry?
19    Q. I said I get the connection with his name
20 now.
21    A. Okay.
22    Q. Can we go to the next page? And on the
23 final paragraph, it says, "I had deputy White the
24 first two weeks of field training. It was clearly
25 explained to him in field training that traffic

95

1 enforcement was not a top priority as he seemed to
2 want to 'go get' every minor traffic violation we
3 observed."
4    Did Campbell clearly explain to you during
5 field training that traffic enforcement was not a top
6 priority?
7    A. No. He did not clearly explain that. In
8 fact, he's -- there's a specific word I was looking
9 for. I can't think of the word I'm looking for. But
10 one, he's been hypocritical, if anything, but there's
11 another word.
12    But I'll explain it. I don't know what he
13 means by "clearly explain," because him and I were
14 pulling over traffic together. I mean, I was with him
15 and he had already mentioned to himself that he was a
16 traffic guru.
17    And so there were a lot of traffic that him
18 and I did together. Some of it was calling it in by
19 him. A few times, less than a handful of times, he
20 let me radio in just to show me the -- you know, to
21 get the hang of it.
22    And then he praised me on how clear I talked
23 on the radio. And then other times he didn't call it
24 in, so that's -- that whole statement, that's done.
25 That part of it.

96

1    Q. If you go to the final page, the first
2 paragraph, it says, "This practice of stopping cars
3 and then going back issuing summons is in violation of
4 previous orders given to him to cease traffic
5 enforcement."
6    Were previous orders given to you to cease
7 traffic enforcement?
8    A. In fact, no. What I can say specifically,
9 Sergeant Roberson told me -- and it's, you know, in a
10 statement he had wrote later on that I didn't have a
11 copy on. But he told me that there was some talk
12 around the office about me stopping cars.
13    And he told me, he said, "You're not the
14 only one. It's a whole -- it's others that are
15 stopping cars too." In fact, there was another deputy
16 that -- that was doing criminal summons like I was
17 doing, if not more. And I know this from Sergeant
18 Roberson and Chief Bullock.
19    But he told me just to watch my back, and he
20 said that the Sheriff didn't like -- well, the Sheriff
21 wasn't too big on us, you know, being in the city or
22 whatnot, stopping cars, unless it was like a major or
23 serious violation or where we had to take action right
24 then to, you know, protect somebody or save someone's
25 life.

97

1    Now, when he talked to me about it, what I
2 did was -- you know, it was like I see and don't see.
3 Because I -- I mean, I don't want my name to be in
4 people mouths and whatnot all the time. And so there
5 were times where the situation was major and he told
6 me, he said, "Yes. You can pull them over for major
7 or serious issues."
8    In fact, in one of his statements, he said,
9 you know, after I talked to him, his stuff -- his
10 traffic enforcement ceased dramatically. So the --
11 the thing of telling me to not to do any more traffic
12 enforcement, that is just not true. It's false.
13    MR. CASTRO: Can we go off the record?
14 Is now a good time for a five-minute break?
15    MR. MCGURL: That's fine by ---
16    THE WITNESS: Hold on one second, sir.
17 (Witness points camera to Mr. McGurl)
18    MR. MCGURL: Yes. That would be fine
19 by us. Five minutes is fine.
20    MR. CASTRO: Okay. We can get back at
21 2:10 p.m., if that's okay.
22    MR. MCGURL: Thank you.
23    THE COURT REPORTER: We are off the
24 record at 2:04 p.m.
25 (Brief recess: 2:04 p.m. to 2:10 p.m.)

98

1          THE COURT REPORTER:  Okay.  We are back
2  on the record.  It is 2:10 p.m.
3          (DEPOSITION EXHIBIT
4          NUMBER 10 WAS MARKED
5          FOR IDENTIFICATION)
6     Q.   (Mr. Castro)  Mr. White, we are going to
7  move to Exhibit 10, what has been previously marked as
8  Exhibit 10.  Can you please review this exhibit, which
9  consists of two pages.
10  (Witness examines document)
11     **A.   Scroll down.  All right.  If you would**
12  **scroll back up.  All right.**
13     Q.   Have you seen this document before?
14     **A.   I was never issued that document.  It wasn't**
15  **until after I was terminated from the Vance County**
16  **Sheriff's Office on false allegations of excessive**
17  **force that -- after violating my rights under federal**
18  **law, that I saw this document, which was submitted by**
19  **Vance County Department of Human Resources.**
20     Q.   How do you know who submitted this document?
21     **A.   That document was never in my personnel file**
22  **with Argretta Johen when I reviewed it, in which that**
23  **personnel file that she had and to her own admission**
24  **was very thin.**
25          **Also, that document was not in my personnel**

99

1  **file, after I begged to review my personnel file at**
2  **the -- in September.  I believe it was the first two**
3  **weeks of September of 2018, one month before I was**
4  **terminated.  That document was not in there.**
5          **In fact, I asked to make a copy of my file.**
6  **It was approximately somewhere between -- no more than**
7  **50 pages, which was mostly of my F3, my application,**
8  **my suspension, corrective action and miscellaneous**
9  **files, not dealing with disciplinary.  Those were my**
10  **performance evaluations.  But most certainly, that**
11  **document was never in there.**
12     Q.   When you say there were 50 pages when you
13  reviewed it, around what time did you review the
14  personnel file?
15     **A.   As I stated, the -- somewhere around the**
16  **first two weeks of September of 2018, I reviewed my**
17  **personnel file at the Sheriff's Office and Janie**
18  **Martin's office, Sheriff White's former Executive**
19  **Assistant or Secretary.**
20     Q.   Did you ask specifically to see counseling
21  records or disciplinary actions?
22     **A.   See, here's the thing -- okay, ask that one**
23  **more question.  Ask that question again one more time.**
24     Q.   When you asked to review your personnel
25  file, did you ask to see the disciplinary documents

100

1  therein?
2     **A.   No.  I didn't specifically ask to see the**
3  **disciplinary documentation, but I asked to see my**
4  **entire personnel file.  And my written warning, the**
5  **suspension, was in there along with personnel -- the**
6  **performance evaluation.**
7          **But this is something that I need to bring**
8  **up.  The date up here is January 27th, 2017.  I didn't**
9  **start working until June 5th, 2018 (sic).  So this**
10  **employee counseling record, this counseling form,**
11  **precedes the dates of my employee -- employment.**
12     Q.   So when did you start working at the Vance
13  County Sheriff's Office?
14     **A.   June 5th, 2017.**
15     Q.   If we can go to the second page.  It says,
16  "In checking further, it was found that there are 7
17  other instances since Dec. 15, 2017 in which Deputy
18  White has made arrests for traffic violations on
19  either summons or warrants after conducting traffic
20  stops."
21          Does that number sound accurate to you?
22     **A.   I have not seen the official reports of it.**
23  **Most certainly, I will say that it may be correct.**
24  **However, I haven't received -- seen the specific**
25  **documentation that he reviewed, but I was definitely**

101

1  doing my job.
2          (DEPOSITION EXHIBIT
3          NUMBER 11 WAS MARKED
4          FOR IDENTIFICATION)
5     Q.   (Mr. Castro)  Okay.  If we can move on to
6  Exhibit 11.  Can you please review this document?
7          MS. ROBINSON:  If we can for just
8  record-keeping purposes, can you state -- ask him to
9  state what the document is?
10          MR. CASTRO:  Yes.
11     Q.   (Mr. Castro)  What is this document?
12     **A.   It appears to be a statement from Deputy**
13  **Brian K. Wayne, dated January 30th, 2018.**
14     Q.   Have you ever seen this document?
15     **A.   The first time that I seen this document --**
16  **yes.  The first time that I'd seen this document was**
17  **in September of 2018, a month before I was terminated,**
18  **when I requested to review my personnel file.  It was**
19  **not in Argretta's file, but it was in the Sheriff's**
20  **Office file and ---**
21     Q.   Does -- continue.
22     **A.   --- and also this document -- there was two**
23  **documents that Chief L.D. Bullock had during my**
24  **suspension, and I asked for copies of it.  And those**
25  **two documents, based on the look of the document**

102

1   that -- the two documents he had when he denied me,
2   saying I have everything I need, he would not give me
3   a copy of it. And I later found these in my personnel
4   file.
5       Q. Do you know if Argretta, is that who you
6   said? And the Sheriff's Office have separate
7   personnel files for you?
8       A. They do have separate personnel files.
9   Everything that was in Argretta's file was from the
10  county orientation, okay? Which was very, very, very
11  extremely thin.
12      Q. Okay. So going back to Exhibit 11, it says
13  on the first sentence, "As it pertains to Deputy J.J.
14  White's vehicle stops, I as one of his Field Training
15  Officer advised him to only make them if absolutely
16  necessary. I used the specific circumstance of an
17  egregious traffic violation (i.e. failure to stop at a
18  red light or stop sign) if it happens while in his
19  presence."
20          Did he advise you during training to only
21  make traffic stops when absolutely necessary?
22      A. No. That was not his advice. In fact, he
23  told them to make them whenever I could. And when him
24  and I were in field training, we'd stopped so many
25  cars in the City of Henderson and in Vance County

103

1       Q. It then says, "While in Field Training,
2   Deputy White asked if we could 'do some traffic' as we
3   were not very busy." Did you ask this?
4       A. No. Wayne -- Deputy Wayne made it a
5   priority to do traffic, and he made it very clear
6   that's what he likes to do since -- since he came from
7   the highway patrol.
8          In fact, he said while I'm with him, "When
9   we're not busy, when we come across something good,
10  we're going to do traffic." So it wasn't no "some
11  traffic." He made it very clear that traffic was a
12  part of what he was wanting to do in his job as a
13  deputy sheriff.
14      Q. Do you know if Deputy Wayne had a citation
15  book?
16      A. I believe he did.
17      Q. It goes on to say in the middle of that
18  paragraph, "I then pointed out that he had not been
19  issued a citation book so there was not much he could
20  do in the event that he did have a reason to perform a
21  vehicle stop." Do you remember him pointing that out
22  to you?
23      A. I have no -- recollection of him saying
24  those specific words. I do remember him saying since
25  I'm certified, I should get a traffic book from the

104

1   Sheriff amongst some other things. But the specific
2   words, I can't recall them verbatim.
3       Q. Let's turn to Exhibit 12.
4           (DEPOSITION EXHIBIT
5            NUMBER 12 WAS MARKED
6            FOR IDENTIFICATION)
7       A. But I will know, sir, that Deputy Brian
8   Kenneth Wayne admitted in front of Deputy Andre Poole
9   that he lied on me and that he was sorry for doing so.
10  And that the Chief Deputy, Lawrence Bullock, and a
11  lieutenant told him to do it, and he said he didn't
12  know what to do because he has a child.
13      Q. Lied about what? What was he referring to?
14      A. The statement that he wrote and the things
15  that he said to -- to upper management.
16      Q. And how did you find out about this?
17      A. Because Wayne told me in front of Poole,
18  Deputy Andre Poole.
19      Q. All right. Turning to Exhibit 12. I'll
20  give you some time to review this.
21  (Witness examines document)
22      A. Can you make it a little bit bigger? Thank
23  him. Go down. Yeah. Thank you. This is the
24  statement that Sergeant Roberson, dated February --
25  excuse me. February 1st, 2018, wrote in reference to

105

1   what's in his file.
2       Q. Okay. Let me know when you are finished
3   reviewing it.
4       A. Okay. (Witness examines document). Okay.
5       Q. All right. If you look towards the middle
6   of the paragraph, closer to the first half, it says --
7   it has a typo, but it says, "I also spoke with Deputy
8   White and advised him that he needed to ease up on the
9   traffic stops unless it was a major violation that had
10  to be stopped so that the general public did not have
11  a bad view of the Vance County Sheriff's Office."
12          Do you remember this conversation?
13      A. I remember him saying something to the
14  effect of. He didn't say, "a major violation." He
15  told me to protect somebody's life. Now, in terms of
16  a bad view of the Vance County Sheriff's Office, that
17  part I do not recall. And like I said, it's been a
18  long time ago.
19      Q. Got you. If we move on to the second half,
20  there is that sentence that says, "I then spoke with
21  Deputy White and advised him that he needed to stop
22  the excessive traffic stops and even explained to him
23  that the majority of his stops were in the city."
24          "I also explained to Deputy White that we
25  have enough crime in the County that we have no reason

**106**

1  to be running around -- no reason to be running around
2  in the city looking for vehicles to stop."
3      Do you remember this conversation?
4      **A.  It was the same -- on the same time that**
5  **what you just -- what we just went over previously.**
6  **Something to the effect of that.  But I will say, he**
7  **did say that a lot of my stops were in the city based**
8  **on what he could see, and he told me to ease up on**
9  **traffic stops.**
10     **And I also explained to him that there had**
11 **been another deputy or other deputies that were using**
12 **my traffic stop number that he issued me.  Because I'd**
13 **seen the traffic stop forms on his desk and it had my**
14 **number, my traffic stop number, but that was not my**
15 **handwriting, my signature.**
16     **And so he said he was going to look into it.**
17 **And when I talked to him later, he said that he did**
18 **address it.  That deputy was using my traffic stop**
19 **number because he didn't have a traffic stop number**
20 **assigned to him, and that he submitted a request,**
21 **Sergeant Roberson submitted a request, to get that**
22 **deputy a traffic stop number.**
23     Q.  Who was that deputy?
24     **A.  I believe it was Deputy Zachary (phonetic)**
25 **alone.  But it's been a long time ago, so it could've**

**107**

1  **been somebody else, but it definitely -- what I just**
2  **testified to is true and factual.**
3      Q.  What time period was this, where someone
4  might have been using your name?
5      **A.  It wasn't somebody -- they were using it.**
6  **Not might, they were.  And it was when I was on**
7  **Sergeant Roberson's shift towards the fall of 2017.**
8  **So let's see.  Somewhere between September and**
9  **November, right before I was transferred.**
10     Q.  Who has knowledge of this?
11     **A.  The person that did it.  The -- Sergeant**
12 **Roberson and I.  And I'm not sure if Sergeant Roberson**
13 **spoke to his management about it, but I definitely**
14 **brought it to him.**
15     Q.  Okay.  Towards the end of this statement, it
16 says, "Deputy White agreed to comply and from that
17 point on the traffic stops that were called by -- in
18 by Deputy White on the radio decreased dramatically."
19 Is that true?
20     **A.  Yes.**
21         (DEPOSITION EXHIBIT
22         NUMBER 13 WAS MARKED
23         FOR IDENTIFICATION)
24     Q.  Okay.  Moving on to the next exhibit,
25 Exhibit 13.  I would like you to review Exhibit 13,

**108**

1  please.  And if you could zoom a little bit.
2  (Witness complies)
3      **A.  This is a statement from Sergeant Marin**
4  Alexander, dated July 18th, 2018.  (Witness examines
5  document)  Okay.  Thank you.
6      Q.  Do you remember the argument that this is
7  referring to?
8      **A.  This argument is in reference to the**
9  **exchange -- verbal exchange between -- allegedly**
10 **between Campbell and I, but this argument -- this**
11 **statement is deceptive.**
12     Q.  In what way?
13     **A.  One, I was not in my patrol car when**
14 **Lieutenant Campbell called me.  I was in the patrol**
15 **room along with Deputy Andre Poole.  Also, I did not**
16 **walk towards Lieutenant Campbell.  I did not step**
17 **towards him.  I did not do anything to make it seem**
18 **like I was going to physically assault him.**
19     **That's not what I did.  I said what was**
20 **consistent earlier and I ended up leaving.  At no**
21 **point in time did I threaten or make movements to do**
22 **Campbell or anybody else bodily harm.**
23     Q.  Did you approach him?
24     **A.  No.**
25     Q.  Even slowly?

**109**

1      **A.  I never approached him.  He was on the other**
2  **side of the patrol room, near the entrance to the**
3  **hallway that leads to the desk -- desk secretary as**
4  **well as the -- some of the offices for criminal**
5  **investigations.  I was on the other side of the patrol**
6  **room that leads to the hallway where 911 dispatch is.**
7      Q.  Okay.  So let's talk about ---
8      **A.  This whole statement, that "I better leave**
9  **this office before I will -- before I do something I**
10 **will regret later on," no.  Marin -- Sergeant**
11 **Alexander's statement is full of lies, falsiticity**
12 **(sic).**
13     Q.  When it says, "'Let me tell you something,
14 you will not continue to talk to me the way you have
15 over the phone nor in person.'  Deputy White also
16 stated, 'That's disrespectful and I am not your child
17 neither are you my Father.'"  Is that accurate?
18     **A.  My words are twisted and distorted.  No,**
19 **it's not accurate.**
20     Q.  Do you remember what you said?
21     **A.  Like I said, it's been a long time ago.**
22 **However, when he said, "Let me tell you something, you**
23 **will not continue to talk to me the way you have over**
24 **the phone nor in person."  When he came in, I said to**
25 **Lieutenant Campbell something to the effect that, "Y**

110

1 talked to me very rude and nasty over the phone and
2 didn't appreciate it."
3        And this part about, "That's disrespectful,
4 I am not your child neither are you my father.'" I
5 said that my father is a big, Black man and he don't
6 talk to me like that.
7    Q.  Okay.  Do you recall the part where ---
8    A.  If they wanted a statement written -- if
9 they wanted a statement written, they should have
10 wrote it when the situation happened before I got
11 suspended, versus six, if not seven months later on
12 I'm sorry, Counselor, go ahead.
13    Q.  No worries.  It says that, "Deputy White
14 also stated 'You called me on the phone earlier while
15 I was in my patrol car and started talking about the
16 way I serve my criminal summons, you was very nasty to
17 me and I thought I was doing my job correctly.'"
18        Did Campbell call you about the way you were
19 serving criminal summons?
20    A.  As I answered that question earlier,
21 Campbell did call in reference to the criminal
22 summons, saying, "Man, you got to stop serving the
23 traffic or criminal summons," something to that effect
24 that he said.  All right?  But I was never in my
25 patrol car.  I was in the patrol room with a

111

1 third-party deputy, Deputy Andre Poole.
2    Q.  And Lieutenant Campbell, it says in this
3 statement, replied by saying, "Yes I did and you need
4 to stop serving the criminal summons as we have
5 directed."  Do you remember him saying that?
6    A.  No.  He didn't say that.  In fact, his words
7 are distorted.  He -- this Lieutenant
8 Campbell was very unprofessional and provocative in
9 terms of throwing around the word, "ass" and "damn,"
10 okay?  Despite threatening me.  Now, this statement
11 just is full of falsification.
12    Q.  Did you leave the room through the hallway
13 that you described, where the 911 communications
14 office is located?
15    A.  Yes.  That's the hallway I left out of.
16    Q.  What happened after this discussion occurred
17 between you and Lieutenant Campbell?
18    A.  I left the office and went to my patrol
19 room -- not patrol room, but my patrol car.  No.  Let
20 me take that back.  Let me take that back.  Let me
21 take that back.
22        I left the patrol room and I was headed to
23 my patrol car, and there was a young woman that was
24 standing on the outside of the locked door, and she
25 asked if Sergeant Alexander was available.  And I said

112

1 that he is in the office and I went back.
2        I told her, I said, "Stay right here,"
3 because I didn't know who she was, and I definitely
4 wasn't going to bring somebody in that office not
5 knowing who she was or if she was cleared to go back.
6 So I went to the -- back to the office and I told
7 Sergeant Alexander, "You have a visitor.  There was a
8 female out here asking if you're here."
9        And so he went out there, and he was like,
10 "Nobody should be coming up here for me at work."
11 I said, "Well, she's right here."  He went out there.
12 And so he got closer, he was like -- he recognized
13 her, he knew who she is.
14        And I went to my car.  And after that, my
15 phone rang and Deputy Poole advised me that Sergeant
16 Alexander said to him in front of Campbell, "Damn,
17 White was talking to a lieutenant like that."  And --
18 and he said that Marin was trying to make it seem like
19 I was in the wrong.
20        And Poole told me that he said to Marin, he
21 was like, "Don't play that man like that.  What
22 Campbell did to him over the phone when you weren't
23 there was nasty and disrespectful and White spoke his
24 piece."  So that's pretty much about it.
25    Q.  We can take this exhibit off the screen.  Do

113

1 you remember being suspended for five days around
2 February of 2018?
3    A.  Yes.
4    Q.  Can you explain why you got suspended or the
5 reasons given to you?
6    A.  The ones on the write-up that were false.
7 It says, "Officer Complaint."  I want to know who was
8 the officer that was complaining.  Maybe they meant
9 Citizens' Complaint.  Insubordination, everything that
10 was listed in the reference -- the subject line.
11    Q.  What was the incident that -- what was the
12 insubordination that they were referring to, do you
13 think?
14    A.  They most likely were referring to
15 Campbell's situation and when I allegedly, according
16 to Campbell, was disrespecting Marin, talking about
17 "man-to-man."  But, see, here's the thing.  Marin and
18 I weren't going at it.  It was Poole and Marin who
19 were having a verbal exchange.
20        This goes back to you all, your client, not
21 following the facts.  Marin and Poole were having a
22 disagreement about the things that were going on at
23 work, Marin not working, not pulling his fair end, not
24 responding to calls, especially 10-18 emergency
25 traffic.  10-18 is the 10 code for emergency traffic.

114

1  The emergency traffic is lights and sirens.
2       They were talking about a lot of things just
3  not going right on the shift, why Marin couldn't
4  answer the radio or answer his phone and was
5  constantly saying that his public service, which
6  refers to his telephone, is down.  And I was trying to
7  mediate it because Sergeant Alexander began to --
8  not going to say that he broke down crying, but he
9  began to -- I will say, show signs of sincerity.
10 There's a specific word for it.  Basically, emotional.
11      He began to be emotional and he
12 spontaneously utter that the Captain is calling him,
13 saying that the Sheriff called him, Captain Watkins
14 was called by Sheriff White, saying that Marin was a
15 bad super -- supervisor, and that he was responsible
16 for what was going wrong with the shift and that there
17 were going to be some immediate changes.
18      Before it, Marin was saying, "Captain called
19 me, Captain called me, Captain called me."  So Poole
20 asked him, "Well, which captain?"  And he asked
21 again and Marin wouldn't answer him.  So I said,
22 "Marin."  I said, "Sergeant Alexander," I said, "This
23 man is asking you a question."  I said, "At least you
24 can answer his question.  After all, you're the one
25 that's volunteering the information to us."  I said,

115

1  "The captain called you."  I said, "We're
2  subordinates.  You shouldn't be even telling us about
3  this."
4       And he was like, "But I really care and I
5  get fired.  I break down when" -- when -- "I shut
6  down," excuse me.  He said, "I shut down when people
7  start coming at me, 'boom, boom, boom'."  And I said,
8  "Which captain?"  And he was like, "Watkins."
9       And at that point in time, we heard the door
10 slam and we later found out in less than maybe 30
11 seconds that it was Campbell that was coming in
12 through the side door.  So there was never a dispute
13 between Sergeant Alexander and I.  There was a
14 dispute, a factual dispute, okay, in terms of a verbal
15 exchange between Poole and Sergeant Alexander.
16      Q.  Was Deputy Poole also suspended?
17      A.  Yes.  He was suspended for, I believe,
18 unbecoming conduct.  Something to that effect.
19      Q.  So moving on to another subject ---
20      A.  But his situation was not with my situation.
21 It was involving him and Marin having a verbal dispute
22 over 911 radio waves, which is public document.
23      Q.  And did you try to mediate that dispute?
24      A.  There was nothing for me to mediate because
25 somebody went and put paperwork on it.  Then once

116

1  more, there was emergency traffic in the County and
2  Sergeant Alexander was closer to the call by at least
3  ten miles closer, ten to 12 miles closer.
4       And Poole was at the southern line that
5  bordered Vance and Franklin counties.  And we know
6  that he was closer because two state troopers provided
7  nonverbal testimony that they were sitting there with
8  Marin at the intersection of Warrenton Road and
9  another road.
10      And when the tones -- the emergency tones
11 dropped, when it went off the radio waves, Marin drove
12 off with his lights and sirens like he was going to do
13 something, and instead, he didn't.  And so as a
14 result, after we handled the call up north, when we
15 was down south, Poole got on the radio and said
16 whatever he said and they end up having a exchange
17 over the radio.
18      And then either Poole called Marin
19 Alexander, Sergeant Alexander, or Sergeant Alexander
20 called Poole.  But Sergeant Alexander threatened
21 Poole's life, said, "You want to put your life on it?"
22 And so not long after that, Poole was suspended.
23      Q.  Do you know who those two state troopers
24 were that you said gave verbal confirmation?
25      A.  I believe it was -- I don't know their first

117

1  names.  I believe it may have been Trooper Thomas and
2  Trooper Burrell, but it was definitely a trooper
3  stationed in Vance County.  But I believe it was
4  Trooper Thomas, Trooper Burrell.
5       Q.  Do you remember a March 27, 2018 incident
6  involving a collision with a vehicle?
7       A.  I remember a -- I remember a minor fender
8  bender, yes.
9       Q.  Can you tell me what happened?
10      A.  As I previously stated about the headlights
11 when you questioned that earlier, that was involving
12 her and I and the incident has been a long time ago,
13 at least three years ago.  And I did do a report on
14 it.  I noticed the car driving, no headlights, and I
15 was going to turn around and go get the car and I
16 backed up and I hit her car.
17      Q.  Do you remember what time it was, around
18 what time?
19      A.  Maybe around -- somewhere around 8:30, nine
20 o'clock maybe.  It was at night.
21      Q.  So did you turn on your lights before you
22 tried to turn around?
23      A.  Well, that's what I was doing.  However, the
24 camera -- the camera shows, according to Sergeant
25 Welborn, when he looked at the camera, that the camera

118

1 showed me turning the lights on either as I hit a car
2 or after I hit -- after I hit her car. But according
3 to the young woman's statement, I turned my lights on
4 before I hit her car and then backed into her.
5       So whichever one it is, I definitely turned
6 my lights on. And if the camera is showing that, then
7 there is a possibility, because it's video evidence
8 that it's electronic, that there's a delay. And it's
9 not uncommon for videos of surveillance to have a
10 three to five second, if not longer, delay.
11    Q. But do you remember at what point you turned
12 on your lights?
13    A. I thought that I had turned them on when --
14 when I was backing up, trying to get turned around.
15    Q. So how did you react when you saw the car
16 without your headlights on? What did you do with
17 regard to the ---
18    A. As I said to Sheriff White, what I was going
19 to do when I saw it was turn around, get her stopped
20 or get him stopped, whomever the motorist was, and
21 tell them to turn their lights on.
22    Q. Did you slam on your brakes when you saw the
23 car without the lights on?
24    A. I began to slow down.
25    Q. How quickly did you slow down?

119

1    A. Well, I don't have a calculation for that,
2 sir.
3    Q. Okay. After you put the car in reverse, how
4 quickly did you start backing up the car?
5    A. When you say, "quickly," define ---
6    Q. How long did it take for you to start
7 backing up the car? Sorry.
8    A. Well, it definitely didn't take minute after
9 minute. Maybe a handful of, you know, seconds to get
10 turned around once I came to a complete stop.
11    Q. Did you check for traffic behind you before
12 you backed up?
13    A. Yes. I looked and I thought that she was --
14 the driver was, you know, going to slow down to let me
15 get turned around. But unfortunately, things did not
16 go as I wanted them or as they should have went.
17    Q. Why didn't you wait for the car to pass?
18    A. The car was behind me.
19    Q. You left your lane. Why didn't you wait for
20 the car that was behind you to get out of your way?
21    A. It was a one-lane road. The car was behind
22 me. In other words, you go in one lane, you come in
23 and you -- you come in in another lane. So when I was
24 backing up and the car, what I thought was going to be
25 stationary for me to go ahead, but, unfortunately, it

120

1 was not the case. But I take responsibility for that
2 because it -- it was a wreck. Luckily, there was no
3 significant injuries.
4    Q. When you say you take responsibility, what
5 do you mean?
6    A. It happened.
7    A. Was it your fault ---
8    A. I can't deny it.
9    Q. Did you cause it to happen?
10    A. Well, I didn't intentionally cause it to
11 happen. However, it happened.
12          (DEPOSITION EXHIBIT
13          NUMBER 14 WAS MARKED
14          FOR IDENTIFICATION)
15    Q. All right. If we can pull up Exhibit 14.
16 And I will ask you to review this and let us know what
17 it is.
18 (Witness examines document)
19    Q. You may need to zoom slightly.
20    A. You ready?
21    Q. Yes. What is this document?
22    A. This is the document from Sergeant Chris
23 Mark Welborn dated 4-3-18 in reference to the vehicle
24 collision that you just questioned me on, excuse me.
25    Q. And it says here, "Deputy White stated he

121

1 had his emergency lights on when he turned around in
2 the roadway." Is that what you told Sergeant Welborn?
3    A. Yes. Something to that effect.
4    Q. Was that what actually happened?
5    A. As I just told you, my -- I'm standing by my
6 story that I just provided you. I believe that I had
7 turned on my lights, my emergency equipment to get
8 that -- turn around and get that car pulled over
9 before the wreck happened.
10    Q. So you believe that happened?
11    A. Yes. I thought that that's what I was
12 doing, turning my lights on, and wanted -- wanted to
13 get this person stopped to tell them to turn their
14 lights on. Unfortunately, a wreck took place.
15    Q. And it says on the final two sentences,
16 "Deputy White has been told on several occasions not
17 to be stopping vehicles. I recommend a ten day
18 suspension for Deputy White."
19    A. Well, first -- go ahead. I'm sorry.
20    Q. Were you told on several occasions not to be
21 stopping vehicles?
22    A. No. I'm -- the statement is distorted, all
23 right? First and foremost, "on several occasions" and
24 "not to be stopping vehicles" is what I was told.
25 That That shouldn't even have been put in there by him

122

1  because while I was on his shift, him and I were
2  stopping cars together when we had our own cars.
3      He would back me up on his -- on my traffic
4  stops, and I would back him up on his. In fact, I
5  backed up some of the -- uncertified deputies on his
6  shift. I backed them up on their multiple traffic
7  stops.
8      And I just want to add for this, "I
9  recommend a ten day suspension for Deputy White"
10  since you said the last two sentences. This statement
11  that he presented me to sign is not the same statement
12  as this.
13      He had no recommendation for a ten-day
14  suspension for me. In fact, in one of the video
15  recordings of him, Goolsby and I, that same recording
16  with Sergeant Welborn -- excuse me, Sergeant
17  Alexander.
18      He was asked by I believe Lieutenant
19  Goolsby, "Do you believe that White should have got
20  suspended for that?" And Sergeant Welborn can be
21  heard saying no, or disagreeing with a suspension.
22      So this whole statement, "I recommend a ten
23  day suspension" for me, "for Deputy White," that part
24  was never in this form. Once more, this is another
25  manipulation of evidence by your client.

123

1      MS. ROBINSON: Mr. Castro. Can we take
2  a break when you get finished with this?
3      MR. CASTRO: Yes. Just a few more
4  questions on this.
5  Q. (Mr. Castro) Does it -- it says you refused
6  to sign. Is that correct?
7  A. I'm sorry?
8  Q. It says that you refused to sign this
9  document at the bottom, to the left. Is that correct,
10  did you refuse to sign this?
11  A. Yes. I refused to sign.
12  Q. Why did you refuse to sign it?
13  A. I was not going to put my signature on
14  anything else after they made a scene. Management
15  made a scene because I signed the written warning. I
16  wasn't going to put my signature on no employee
17  counseling or coaching, let alone -- written warning.
18      Because upper management made a big deal
19  because I signed the corrective action that Campbell
20  issued to me that was allegedly approved by the
21  Sheriff. So my signature did not go on any additional
22  documentation.
23  Q. Regardless of whether those documents were
24  accurate, you just didn't want to sign anything?
25  A. The documents weren't accurate. In terms of

124

1  the write-up, it was not accurate ---
2  Q. So you refused ---
3  A. --- but I signed it because I was told to
4  sign it.
5  Q. So your refusal to sign is based on the fact
6  that they made a big deal in the past about
7  signatures?
8  A. Yes. That's...
9      MR. CASTRO: Okay. We can take a break
10  now. And you're on mute, Ms. Robinson.
11      THE COURT REPORTER: We are off the
12  record. It is 2:58 p.m.
13      MR. CASTRO: You're still on mute, Ms.
14  Robinson.
15      MS. ROBINSON: Yes. I was saying I
16  kind of object to the last characterization of his
17  testimony. I think he's testified that he objected --
18  or he refused to sign because the statement wasn't
19  true and he was directed to sign the first statement.
20      MR. CASTRO: Noted. All right. We'll
21  go off the record.
22      THE COURT REPORTER: We are now off the
23  record. The time is 2:58.
24  (Brief recess: 2:58 to 3:17 p.m.)
25      THE COURT REPORTER: We are back on the

125

1  record. The time is 3:17 p.m.
2      (DEPOSITION EXHIBIT
3      NUMBER 16 WAS MARKED
4      FOR IDENTIFICATION)
5  Q. (Mr. Castro) All right. So I would like to
6  turn your attention, Mr. White, to Exhibit 16. And I
7  would like you to review it and let us know what this
8  is?
9  (Witness complies)
10  A. That is a DMV-349, traffic or -- excuse me,
11  my wreck report.
12  Q. Does this appear to be a report from the
13  collision that we were discussing before the break?
14  A. Yes, it appears to be.
15  Q. If you look at Page 2, there's an
16  illustration. Does that illustration appear to be
17  correct?
18  A. It's similar to what happened.
19  Q. Are there any inaccuracies that you can note
20  about the illustration?
21  A. I mean, it's a illustration. So I mean,
22  it's -- it's similar.
23  Q. We're going to move on to Exhibit 17, which
24  will be shared to your screen. This is a placeholder
25  because the document was too large to send via e-mail.

126

1          (DEPOSITION EXHIBIT
2          NUMBER 17 WAS MARKED
3          FOR IDENTIFICATION)
4          MR. CASTRO:  So I'll ask the court
5    reporter to share the video.
6          MS. ROBINSON:  Mr. Castro, I'm sorry.
7    What video is this of?
8          MR. CASTRO:  This is a video of the
9    March, 2018 incident involving Mr. White's vehicle.
10         MS. ROBINSON:  You all haven't produced
11   any videos at all.
12         MR. CASTRO:  We have identified them in
13   our -- this video particularly in our initial
14   disclosures, but there were no discovery requests
15   related to this video.  If we received such a request,
16   we of course can produce it.
17         MS. ROBINSON:  There were discovery
18   requests related to anything that was affiliated with
19   Mr. White and his employment.
20         MR. CASTRO:  Again, these were in the
21   initial disclosures.  They were disclosed to you
22   awhile back.
23         MS. ROBINSON:  We haven't received this
24   video and I want to -- I'm objected to viewing it.
25         MR. CASTRO:  Your objection is noted.

127

1    Can you please play the video, Ms. Court Reporter?
2    And if you can skip to the 30th second of the video.
3    Can you pause the video?  Mr. White, what is the
4    timestamp on the top of this video?
5          A.  3-17-2018, 9:40.
6          Q.  Did the collision that we discussed happen
7    on 3-17-2018?
8          A.  No.  It didn't happen on -- not that I know.
9    I don't remember it happening on 3-17-2018.  It may
10   have been 3-27-2018, but it was something, somewhere
11   around March.  But as you just said, not 3-17-2018, I
12   don't remember it happening on that date, but I know
13   it was somewhere in March.  I'm not disputing it
14   happening.
15         Q.  Can you reread the timestamp, please?
16         A.  3-27-2018 9:40:52 seconds.
17         Q.  So it's not 3-17.  It's 3-27.  Did the event
18   happen on March 27, 2018, to the best of your
19   knowledge?
20         A.  I have no reason to say otherwise.
21         Q.  To the best of your knowledge, did this
22   event happen at 9:00 -- around 9:40 p.m.?
23         A.  I have no other -- I have no reason to say
24   otherwise.  I mean, I -- I've told you somewhere
25   around 8:30, 9 o'clock approximately.  So around

128

1    that time, it was pitch-black night, so...
2          MR. CASTRO:  Okay.  You can play the
3    video, ma'am.
4    (Video plays)
5          MR. CASTRO:  You can pause the video.
6          Q.  (Mr. Castro)  Does this appear to be the
7    collision that we were discussing involving you?
8          A.  Yes.
9          Q.  Do your lights appear to be on before you
10   attempt to stop and turn?
11         A.  No, they do not.
12         Q.  When does it appear from the video that your
13   lights turned on?
14         A.  It appears from the video afterwards.
15         Q.  About how long afterward?
16         A.  I didn't count the number of seconds, but
17   shortly afterwards.
18         Q.  You mentioned that there might have been
19   lag.  Do you think this delay could be based on lag in
20   the video?
21         A.  I said that there may have been some type of
22   delay because it's not uncommon for there to be a
23   delay when it comes to surveillance.  And for that
24   matter, video surveillance, electronic surveillance or
25   even broadcasting.

129

1          Q.  Do you think ---
2          A.  And I also said -- I'm sorry, sir?
3          Q.  Continue.
4          A.  Go ahead.
5          Q.  Do you think the delay is the reason that it
6    appears your lights turn on after you attempt to turn?
7          A.  What I'm saying it, stating a -- a fact that
8    this could have been the issue.  But I'm not disputing
9    the situation happening, and as I've already said,
10   and I'll take responsibility for it.
11         Q.  Are you disputing that you did not turn on
12   your blue lights until you hit the other car?
13         A.  I'm not disputing what took place in terms
14   of the -- the wreck, the entire wreck.  What I'm --
15   what I'm saying is I take responsibility for it.  It
16   happened ---
17         Q.  Do you admit -- do you admit that you did
18   not turn on your lights until after you hit the other
19   car?
20         MS. ROBINSON:  I object.  This is the
21   third time he's answered that question.
22         MR. CASTRO:  No.  He hasn't answered
23   this question.
24         Q.  (Mr. Castro)  Can you answer the question,
25   Justin White?

130

1     A.  Based on the video, it appears that I did
2  not turn on my lights on after the wreck.
3     Q.  Why did you tell your superiors that you had
4  turned on your lights prior to the wreck?
5     A.  Because I felt that I had turned on my
6  lights prior to the wreck.  Not only that, based on
7  her statement.  She said in her writing that I turned
8  on my lights and backed up into her.
9     Q.  What belief -- you said, based on your
10  belief that you had turned on your lights.  What was
11  that belief ---
12     A.  I though that when I -- I thought I had
13  turned on my lights.  I mean, I asked that -- answered
14  that question multiple times.  I thought I turned on
15  my lights.  The video says otherwise.
16     Q.  So when the statement said that you informed
17  your superior that you did turn on the lights, but a
18  video indicated otherwise, is that an accurate
19  statement?
20     A.  Repeat the question.
21     Q.  Is it accurate that you told your superiors
22  that you had turned on your lights before the
23  collision, when in fact, you had not?
24     A.  Are you asking me if -- is it true that I
25  told my superiors that I turned them on and they

131

1  weren't turned on?
2     Q.  Yes.
3     A.  Based on the video, yes.  That's -- that's
4  accurate, that I did not have on my lights until after
5  I backed into her.
6     Q.  Okay.  We can remove the video from the
7  screen share.  Moving on to another topic, do you
8  remember responding to a breaking and entering on
9  Evans Street during your employment at Vance County
10  Sheriff's Office?
11     A.  It was so many -- no, I don't.  There was so
12  many B&Es.
13     Q.  You don't remember any particular
14  situations?
15     A.  No.  I can't even remember where Evan Street
16  is.  As you continue to ask questions, maybe something
17  will come to my mind.  I mean...
18     Q.  Well, you called in an incident, according
19  to others.  I'm not saying this is the truth.  I'm
20  asking you whether this happened.
21         Did you call an incident about a breaking
22  and entering call on Evans Street, and did you call it
23  in in a panicked manner or a fast manner?  Do you
24  remember anything like that?
25     A.  I don't recall a B&E at Evans Street.  There

132

1  are so many B&Es and burglaries and other calls of
2  services I responded to, so I can't pinpoint that one.
3  If you have some type of evidence, video, recording,
4  radio traffic, please share with me.  It might trigger
5  something to where I do remember it.
6     Q.  Okay.  We're going to move on to the Ms.
7  Latwayna Oliver incident, spelled L-A-T-W-A-Y-N-A,
8  Oliver, which happened in October of 2018.  What can
9  you tell me about Ms. Oliver?
10     A.  What is it that you want to know about Ms.
11  Oliver?  That's a very broad statement.
12     Q.  Did you know anything about her before
13  October of 2018?
14     A.  I did not know her.
15     Q.  Did you know her personally?
16     A.  No.
17     Q.  I want to talk about your first encounter
18  with Ms. Oliver.  What was the first encounter that
19  you had with Ms. Oliver and her vehicle?
20     A.  I don't remember the specific date.  It was
21  around, you know, right before the use of force, but I
22  don't remember the specific date.  But she -- I
23  observed multiple traffic violations while on patrol.
24  I radioed in her -- her plate information.
25         I recall asking if -- about if there was any

133

1  10-29s, which refers to warrants.  Although Major
2  Bullock -- well, then Captain Bullock, but now
3  Major -- well, he's retired now.  But Mr. Bullock
4  alleged in the unemployment hearing that -- the
5  appeal, rather, after I won in the initial one, the
6  initial decision.
7         But after that, he alleged that there was no
8  recording of me asking for any information on her, and
9  then he said that there was distortion of what I
10  meant by 10-29s.  But nevertheless, I radioed her
11  plate in.
12         I did not have a laptop, so I waited for the
13  information to come back.  I did not pull her over.  I
14  just took the community-oriented policing philosophy
15  the model approach, and I attempted to talk to her.
16  And she was not happy and told me to write the ticket
17  or whatever.
18         And then I said, "I'm not trying to write
19  you a ticket or anything.  The only thing I'm trying
20  to do was caution you on your violations because you
21  put somebody else's life and safety at risk and
22  jeopardy."  And so that was it.
23     Q.  What's a 10-29?
24     A.  As I've just said, 10-29 warrants.  Warrant
25  service.

134

1    Q.   And why did you first notice Ms. Oliver's
2   vehicle?
3    **A.   As I said, that she was committing several**
4   **violations.  You have to look at my report I did on**
5   **it. I'm pretty sure I put it in there.**
6    Q.   Do you recall yourself what you saw?
7    **A.   Not off the top of my head, but there was**
8   **multiple violations.**
9    Q.   Were they, in your opinion, minor
10   violations?
11    **A.   Well, they were -- they were violations that**
12   **were major that could have had severe consequences if**
13   **somebody had came into contact with her or she came**
14   **into contact with somebody, whether it had been a**
15   **personal car.  But as far as the specific reasons,**
16   **you'll have to look at my report.  I --can't**
17   **remember off the top of my head.**
18    Q.   Okay.  So did you run the vehicle
19   registration through 911 or the dispatcher?
20    **A.   Yes.**
21    Q.   What did you say to the dispatcher, do you
22   remember?
23    **A.   Well, you will have to pull the recording**
24   **and then send the recording to us.  It's been a long**
25   **time ago, but I believe I gave them their plate, gave**

135

1   **911 the plate.  The North Carolina 10-28, the vehicle**
2   **information, the plate number.**
3    **And I remember asking if there were any**
4   **10-29s and -- that would've been for the person, and**
5   **if there was something attached to the vehicle that**
6   **would've came back, and I remember being told no.**
7    **But Major Bullock said that there's no radio**
8   **evidence of me asking any of that, and then says that**
9   **there was a distortion in what the 911 dispatcher**
10   **thought I was asking for and was not asking for.  So I**
11   **don't know what's on that tape because you all haven't**
12   **provided it to us.**
13    Q.   So did you turn on your blue police lights
14   while talking to Ms. Oliver?
15    **A.   I don't remember -- I don't remember turning**
16   **on the lights or sirens.  I remember just talking to**
17   **her in my car, and she was standing outside in the**
18   **PVA.**
19    Q.   So you said that she said, "Just give me a
20   ticket."  Did she say anything else?
21    **A.   Yes.  She's -- she mumbled some words about**
22   **"Give me a ticket," or whatever, or something to that**
23   **effect.  "Let me go," or something.  It's been a long**
24   **time.  I cannot repeat verbatim what happened.**
25    Q.   Well, I'm just asking you to repeat what you

136

1   remember happened?
2    **A.   Okay.**
3    Q.   How did you react to her response?
4    **A.   I was professional and I continued the**
5   **pursuit of my duties.**
6    Q.   Did you think what she said was
7   disrespectful?
8    **A.   I can't say that she was disrespectful.**
9    Q.   Can you say that she ---
10    **A.   As a matter of fact, she said something**
11   **about -- she said something about, "I know my rights"**
12   **and some other things.  But I didn't take her stuff as**
13   **me being, like, hurting towards me.  I didn't take it**
14   **personal.**
15    Q.   So what did you do when you returned to the
16   Sheriff's Office after this discussion with Ms.
17   Oliver?
18    **A.   Well, one, I checked the system, and I went**
19   **over to verify with 911.  And because they came**
20   **across -- despite Major Bullock saying that there was**
21   **no tape that showed me asking for 10-29s or showed 911**
22   **giving me any information, and that is in the record.**
23    **And then him saying that there was**
24   **something, but there was a -- a distinction or a**
25   **distortion between what I was saying and what the 911**

137

1   dispatcher believed or said it to me.  And they
2   verified two warrants, said that they were still
3   active.
4    **And I asked, "Well, why didn't you all tell**
5   **me this when I asked for it?"  And they said, "Well,**
6   **it didn't show up."  And that was a Caucasian male**
7   **dispatcher, skinny.  I can't think of his name.  Tall**
8   **and slender.  I believe he drives a white truck, but I**
9   **can't think of his name.**
10    Q.   Thank you.  Do you -- is this what you
11   normally did, you checked for warrants on people after
12   you stopped them for a traffic violation?
13    **A.   No.  It wasn't something that I normally**
14   **did, but what they came back with so quickly was also**
15   **out of the ordinary.  So they claimed they never --**
16   **that Major Bullock claimed nobody ever said anything**
17   **about it to me.  Excuse me.**
18    **And then says that, "Oh, there was a**
19   **distinction or a distortion," something he worded.  So**
20   **I don't know what's on the tape, and I'm definitely**
21   **not going to be committing perjury or trying to commit**
22   **perjury.**
23    Q.   I understand.  So you said it's not what you
24   normally do.  Why did you do it in this instance?
25    **A.   As I just answered, they came back so**

138
1  quickly with an answer.
2      Q.  So if there were outstanding warrants and
3  you knew this when you first stopped Ms. Oliver.  If
4  that were the case, which it was not, according to
5  your testimony, would you have arrested her at that
6  point?
7      A.  She would have been arrested forthwith to
8  the Magistrate without unnecessary delay.
9      Q.  Okay.  Let's move to what you did after you
10  saw that there were warrants.  Did you go to Ms.
11  Oliver's home?
12      A.  I did go to -- I did go to her home later.
13      Q.  Do you remember around what time that was,
14  the first time?
15      A.  I don't have a -- I don't know the
16  approximate time.  I know one of the -- I believe one
17  of the reports say 2:00.  Maybe another report say
18  12:00.  I don't know what time it was.
19      Q.  Can you describe where she lived?  Was it an
20  apartment complex, development, something like that?
21      A.  I believe she lived in a -- there may have
22  been a side road or it could have been a
23  sub-development.  But wherever it was, I believe it
24  was double-wide -- she lived in a double-wide, if not
25  a modular home.

139
1      Q.  Were her neighbors close to her in
2  proximity?
3      A.  What do you mean, neighbors?
4      Q.  Were there other modular homes nearby hers?
5      A.  There were other homes there.  It could've
6  been a modular home or it might have been a
7  double-wide.  They were spaced out, but there were
8  other people in that area.
9      Q.  And I know you're not going to have a
10  perfectly accurate measurement, but if you have to
11  estimate the amount of feet between the homes, or
12  yards, what would be your estimate?
13      A.  I can't say.
14      Q.  Okay.
15      A.  Not even an estimate.
16      Q.  Okay.  So why did you arrive to her home by
17  yourself?
18      A.  To serve the warrants.
19      Q.  Did you request backup?
20      A.  I don't believe I requested backup.  Not for
21  that situation.
22      Q.  Why didn't you request for backup?
23      A.  Well -- hold on.  Hold on.  Let me go back.
24  Hold on.  Let me go back.  Let me go back.  We're
25  talking about the night after I -- after I found out

140
1  that she had the warrants?
2      Q.  Yes.  The night where it might be stated
3  that it was around 2:00 a.m., the first time.
4      A.  No.  I'm not saying it was 2:00 a.m.  I was
5  saying the reports say either 12:00 a.m. or 2:00 a.m.
6      Q.  Yes.
7      A.  Now, there is a -- I don't want to get my --
8  I don't want to get the facts distorted.  I did a
9  report about when there was -- I do remember there w
10  a time that I did ask for backup.
11      Q.  Was this from Mr. Welborn, to refresh your
12  memory?
13      A.  Yes -- yes.  I don't want to get the facts
14  distorted.  I don't want to say something that is
15  untruthful, but let me speak to what I remember.  I
16  requested backup from -- Sergeant Welborn.
17          Sergeant Welborn told me to "Go and pick her
18  ass up," and said, "Bo, you've been handling
19  school.  You know what to do."  And he said this in
20  front of -- he said this in front of -- it's a Black
21  deputy, African-American deputy, male deputy.
22          I can't think of his name, but there was a
23  third party there.  And when it comes to me, I'll say
24  it.  But there was -- he said it in front of an
25  African-American deputy.

141
1          And despite me asking for backup, he told me
2  to go and pick her up and that I'd need no backup because
3  I've been to handling school.  And he told me to "go
4  get the shit handled."  And so that's what I'd done.
5      Q.  So without admitting that this happened at
6  2:00 a.m., do you think it's appropriate to serve a
7  warrant around 2:00 a.m.?
8      A.  Well, warrants are -- well, yes.  Warrants
9  have been served later than that by other deputies and
10  supervisors.  In fact, there have been search warrants
11  served around that time at night and after that time,
12  and then before that time.
13          And it falls on the supervisor.  As a
14  supervisor, if he didn't want me to go and get her, to
15  serve her with those felony warrants, then he wouldn'
16  have to told me to go do it.
17      Q.  So you mentioned search warrants ---
18      A.  And the -- I just had his name.  Go ahead.
19  It's going to come back to me.
20      Q.  So you mentioned search warrants.  What
21  about arrest warrants around 2:00 a.m.?
22      A.  I believe that there were arrest warrants
23  done late night, early morning.  Most certainly, we
24  have served arrest warrants on day shift, night shift,
25  afternoon.  Graveyard, which is, you know, late night

142

1  Night shift, early morning. So -- and these are
2  felony warrants, which is a greater crime than a
3  misdemeanor.
4      Q.  So you mentioned that these warrants are
5  served at many times. Do you know when the most
6  common time period is that they're served? Is it the
7  morning, the afternoon, the night?
8      A.  They are served during the day, and then I
9  know some supervisors, once they -- I know one has
10  said something about, he tried not to go later than
11  10:00. Another said they tried not to go later than
12  11:00. Then, another one said they don't got no time
13  for it. Some say 12:00.
14      And these were deputies talking as well, so
15  I can't give you the specific names of these people,
16  but it was -- I mean, it was a -- it was more than one
17  or two or even three.
18      But in terms of a specific policy, those
19  were felony warrants, so the supervisor told me to go
20  served them, which was Welborn, in front of Deputy
21  Deputy Anton, Anton Edwards. Sergeant Welborn told me
22  in front of Deputy Edwards to go and pick her up,
23  along with some curse words.
24      Q.  Is it Anton or Antwon?
25      A.  I believe it is Anton, A-N-T-O-N, maybe with

143

1  an E to it. Might be an I in there. I don't know,
2  but Deputy Edwards.
3      Q.  So you mentioned that some one or more
4  people said, "No later than 10:00." You can't tell me
5  who that was?
6      A.  This was after -- this was like -- a lot of
7  this stuff came up after the incident took place.
8  Most certainly, when I was with Marin, we served
9  warrants later than 10:00, and sometimes later than
10  11:00.
11      Q.  Had you ever served another warrant at 2:00
12  a.m. before this one?
13      A.  I don't know the times. I know that I
14  served multiple warrants, whether misdemeanor or
15  felony, night shift, and served arrest warrants, I
16  mean, the same time. In terms of, like, the specific
17  cases, I'm not sure. You all would have to curate the
18  database.
19      Q.  So based on your experience as a law
20  enforcement officer, are there additional risks that
21  come when you would serve a warrant at 2:00 a.m.?
22      A.  There may or may not be any additional risk.
23  But once more, the supervisor didn't -- if the
24  supervisor thought it was risky, then the supervisor
25  shouldn't have told me to go serve it in front of a

144

1  third-party deputy, Deputy Edwards.
2      Q.  Well, notwithstanding whatever the
3  supervisor said, I'm asking you. In your experience,
4  is it more risky to serve a warrant at 2:00 a.m. than,
5  let's say, 5:00 p.m.?
6      A.  It may or may not be risky. Someone may
7  make the argument of, "Well, it's late night, early
8  morning. We don't know who's knocking at that time
9  night. It could be somebody breaking in the house,"
10  or somebody might not agree with that.
11      I mean, it's just based on the perceptions
12  of whomever mind is -- you know, whoever is in the
13  house and what's going through their mind and what.
14      Q.  But what about from the standpoint of the
15  officer, which is you in this situation?
16      A.  Well, that's the thing. Warrants are served
17  throughout, as I previously said -- as I previously
18  answered, warrants are served throughout day shift and
19  night shift. From day, morning, noon, afternoon,
20  evening, night, late night, early mornings.
21      Q.  All right. But I'm not asking you when
22  warrants are served. I'm asking you, is there more of
23  a risk based on your experience ---
24      A.  And I answered you ---
25      MR. MCGURL:  Objection. Asked and

145

1  answered.
2      MR. CASTRO:  Have you entered a notice
3  of appearance in this case, Mr. White -- I mean, Mr.
4  McGurl?
5      THE WITNESS:  I'm sorry?
6      MR. CASTRO:  I'm sorry. I don't want
7  objections from two attorneys, one who hasn't entered
8  a notice of appearance in this case. I'm going to get
9  back to Mr. White here.
10      Q.  (Mr. Castro)  You did not answer my
11  question. You ---
12      MS. ROBINSON:  I think at this point,
13  you're badgering the witness. He has answered that
14  question five times.
15      MR. CASTRO:  No, he hasn't. He's told
16  me what his supervisor did.
17      Q.  (Mr. Castro)  Okay. Anyways, you can still
18  answer the question, of course, unless you're
19  instructed not to. Is there a greater risk in your
20  opinion, not from the opinion of your supervisor or
21  from the person in the house, when you serve a warrant
22  at 2:00 a.m. versus 5:00 p.m., yes or no?
23      A.  There may or may not be a greater risk.
24      MS. ROBINSON:  And that's your answer.
25      MR. CASTRO:  I would ask Opposing

146

1  Counsel not to make commentary during the deposition.
2         MS. ROBINSON: I'm telling you, as
3  Opposing Counsel, that's your answer. And that has
4  been his answer each time you asked that question.
5         MR. CASTRO: And I'll refer you to
6  Federal Rule of Civil Procedure 30, which says you
7  cannot make speaking objections ---
8         MS. ROBINSON: Don't -- don't badger
9  the witness.
10        MR. CASTRO: I'll object to your --
11 your coaching the witness ---
12        MS. ROBINSON: I'm not coaching.
13 You're badgering the witness.
14        MR. CASTRO: Again, I'll refer you to
15 Federal Rule of Civil Procedure 30 and ask you to
16 make speaking objections.
17    Q.  (Mr. Castro) Did you announce yourself as a
18 deputy sheriff when you first visited Ms. Oliver's
19 home?
20    **A.  I can't recall.**
21    Q.  Do you recall if you knocked on any of her
22 doors?
23    **A.  Yes. I did knock on her door.**
24    Q.  Did you try to look inside to see if anyone
25 was there?

147

1     **A.  I can't recall.**
2     Q.  Have you ever been visited by a deputy or
3  police officer while at home?
4     **A.  Yes.**
5     Q.  Have you ever had a law enforcement officer
6  visit you after 12:00 a.m.?
7     **A.  I don't know if I've had one to visit. No.**
8  **I can't say that I've had one to the visit that late.**
9     Q.  Would it be reasonable for a woman alone to
10 open the door at 2:00 a.m. when a man is knocking at
11 her door?
12    **A.  It may or may not be reasonable. But to**
13 **answer your question, to go a little bit further.**
14 **According to the statements, Ms. Oliver wasn't alone.**
15 **I believe there was something in there that somebody**
16 **else was in the house with her.**
17    Q.  So let's talk about the use of force
18 incident on October 22nd, 2018. Did you go to her
19 property again after there was no answer?
20    **A.  Yes. I went to her house after she didn't**
21 **answer.**
22    Q.  When was that?
23    **A.  I believe, as you alluded to, the use of**
24 **force.**
25    Q.  Did you ask other officers to go with you

148

1  this time?
2     **A.  I don't believe that I asked another officer**
3  **to help me. Because I had already received**
4  **instructions from Sergeant Chris Welborn to go to the**
5  **house by myself and to handle it, saying that I've**
6  **been to handling school and to "go and get her ass,"**
7  **amongst some other things around that effect. So no,**
8  **I didn't ask anybody for backup.**
9     Q.  Did you want backup?
10    **A.  Well, I asked for a second officer the first**
11 **time with Welborn and he denied it.**
12    Q.  Did you bring this to the attention of any
13 other supervisors or Sheriff White?
14    **A.  Yes. I brought it to the attention of**
15 **Sheriff White. I brought it to the attention of**
16 **Argretta Johen and Captain Weldon Wallace Bullock in**
17 **writing.**
18    Q.  Before you went to the home?
19    **A.  No. Not before I went to the home.**
20    Q.  Okay. So let's discuss what happened when
21 you arrived. Where did you park in relation to her
22 home?
23    **A.  In her driveway.**
24    Q.  And did you go up to her door?
25    **A.  Yes, I walked to her door.**

149

1     Q.  Do you remember what happened after that?
2  Can you describe to me?
3     **A.  Once more, I'm going to refer you to the**
4  **reports, the use of force report, incident report, and**
5  **Captain Bullock's alleged investigative report. It's**
6  **been a long time since stuff has happened, but I can**
7  **touch briefly that I went to her house.**
8         **She -- and told her that I -- she had**
9  **warrants. She had cooperated. I noticed that she**
10 **didn't lock her front door or side door, whichever one**
11 **it was. And she said, "Thank you," and she went and**
12 **locked it, and said, "Thank you" again, walked**
13 **outside. She said I had to pull the door and she said**
14 **something was wrong with the locking device. So I**
15 **pulled it and ---**
16    Q.  Did you talk at all ---
17    **A.  --- she made sure that it was locked. I'm**
18 **sorry?**
19    Q.  Did you have any conversations during this
20 time other than, "Thanks for locking my door"?
21    **A.  Well, yes. And I told her that she was**
22 **under arrest and -- you know, for the warrants. As I**
23 **previously told her, she had warrants, and she -- she**
24 **acted as if she was going to cooperate up until she**
25 **wouldn't cooperate.**

150

1     And she wanted to -- she didn't want to
2 cooperate with me handcuffing her. She didn't want to
3 go to jail. It was a -- it was a lot of stuff. And I
4 told her, I said, "You have to go."
5     Q. Did she ask you to call other officers to
6 the scene?
7     A. She may have asked for another officer, but
8 as I -- it was something to that effect, "Can somebody
9 -- can somebody else take me?" She even asked -- I
10 think she may have asked something to the effect of,
11 "Can I see the warrant?" Or something to that effect.
12     It's been a long time, so we'd have to rely
13 on the report. But I did everything I could to get
14 her to comply and she would not cooperate.
15     Q. When she said to someone -- "Can someone
16 else take me," what was your response?
17     A. I told that I'm here to handle the matter
18 and that if she cooperated with me -- and I believe I
19 put this in my report, that I would recommend to the
20 magistrate judge a bond reduction based on her
21 cooperation. And she was like, "Okay."
22     And then when I tried to put the handcuffs
23 on, she just -- she did not cooperate at all. She --
24 became aggressive, resistive, assaultive,
25 non-cooperative, non-compliant.

151

1     And it resulted in a soft hands technique,
2 an improved takedown maneuver, straight arm bar being
3 applied. While it's unfortunate her arm was
4 fractured, despite the paramedics, two of them, saying
5 three different times that nothing was wrong with her.
6 She had evidently suffered a fracture.
7     Q. Okay. Taking a step back to when she was
8 saying all of these things like, "Can I see a warrant,
9 can someone else get me," why didn't you just call
10 someone else to handle the situation when she was
11 acting like this?
12     A. I'm sorry. Are you saying that she said
13 that she asked to see a warrant?
14     Q. You said that.
15     A. Is it -- that's -- I said that, like, on the
16 deposition or in the reports?
17     Q. I think it was today that you said it. I'm
18 not sure if it's in a report, but when she was saying
19 all of these things about the arrest that you were
20 describing, how was she sounding? Was she yelling,
21 was she crying?
22     A. Repeat the question.
23     Q. When she was -- when you were in the process
24 of escorting her to your patrol vehicle or to your
25 vehicle and she was speaking to you, was it normal

152

1 conversational tone? Was she yelling, was she
2 screaming? Can you describe the tone?
3     A. When after the door was locked and we walked
4 to the car, before I handcuffed her, or after I
5 handcuffed her?
6     Q. Let's start with before you handcuffed her,
7 taking her to the car.
8     A. Okay. She was cooperative, as I said.
9     Q. And then when did she start acting
10 uncooperative?
11     A. When I tried to handcuff her to place her
12 under arrest.
13     Q. Had she said anything before you tried to
14 handcuff her other than, "Thanks for locking my
15 doors"?
16     A. Like I said, it was -- it's been a long
17 time. We'd have to refer back to the incident report.
18     Q. So when you started trying to handcuff her,
19 how did she react?
20     A. She did -- she was not cooperative when I --
21 she was uncooperative when I tried to handcuff her.
22     Q. What do you mean, "uncooperative"? Can you
23 describe her actions?
24     A. She resisted arrest. She resisted arrest
25

153

1 unlawfully. She became aggressive and she attacked
2 me. She was assaultive. And I put it in my report,
3 of what she'd done. And I grabbed her arm, the lower
4 arm, the upper arm, and I did an arm bar takedown
5 where I got her to the ground.
6     Q. When you say she was resisting, was she
7 physically resisting?
8     A. Yeah. She was physically resisting arrest.
9     Q. Was she trying to squirm, trying to hit you?
10     A. Well, she wasn't trying to hit me because
11 she did hit me, and I put that in the report. She was
12 very adamant about not going to jail.
13     Q. Was she verbally resistant as well?
14     A. Yes.
15     Q. Why didn't you show her the actual warrant
16 when she asked you to?
17     A. One, I didn't have -- I don't believe I had
18 a warrant with me. And even if I did have a warrant
19 with me, when I tell someone they're under arrest,
20 they have to comply. That's a statute.
21     Q. Do you usually -- during your time at the
22 Vance County Sheriff's Office, did you usually arrest
23 people without having the actual warrant?
24     A. It wasn't uncommon for me to, because I
25 didn't have a laptop to even show them a warrant.

154

1    Q.  Did you have the capability to print a
2  warrant at the Sheriff's Office?
3    **A.  I could've -- I could've printed a warrant**
4  **at the Sheriff's Office, but we were already given our**
5  **activity -- well, no.  Not activity -- well, what is**
6  **it called?  It's like a -- it's a warrant log.**
7        **If we have -- if we're assigned to North or**
8  **South, it's a warrant log with the names of people.**
9  **Sometimes they have a picture.  Sometimes they don't.**
10 **Sometimes it has other identification -- not other**
11 **identification, but like -- like a date of birth.**
12 **Like, in terms of identification, like photo, other**
13 **identifying markers.**
14    Q.  Okay.  So you mentioned that she was acting
15  aggressively.  What did you do to try to de-escalate
16  the situation?
17    **A.  First, I talked to her and with her.  I did**
18  **everything I could to de-escalate the situation.  I**
19  **even went above and beyond by telling her -- excuse**
20  **me.  Excuse me.  If she complied, I would speak good**
21  **on her behalf to the judge.  I told her she had to go**
22  **to jail.  She is the one that escalated the matter**
23  **because all she had to do was comply.**
24    Q.  Did you ever try to push her into the patrol
25  car or push her against the patrol car?

155

1    **A.  I tried to get her into my car to transport**
2  **her to the Magistrate's Office.**
3    Q.  Was this before she was handcuffed?
4    **A.  This is when I tried to handcuff her and she**
5  **was resisting, so I could not, like, force the**
6  **handcuffs on her.  And unfortunately, she attacked and**
7  **assaulted me, and it led to an arm bar.**
8        MR. CASTRO:  Can we go off the record?
9        THE COURT REPORTER:  Off the record at
10  4:04 p.m.
11  (Off-record comments)
12        THE COURT REPORTER:  Back on the record
13  at 4:04 p.m.
14    Q.  (Mr. Castro)  So you tried to get her into
15  the patrol car before you had the handcuffs on her?
16    **A.  I tried to handcuff her and get her into my**
17  **patrol car.  Unfortunately, it didn't work.**
18    Q.  Okay.  So if we can look at the Exhibit 3,
19  which is the amended complaint.  And we can go to
20  Paragraph 123, and that is on Page 23 of 47.
21    **A.  All right.**
22    Q.  Does this appear to be an allegation that
23  you made?
24    **A.  "Sergeant Welborn instructed Mr. White,"**
25  **"to serve the two felony warrants."  That's what**

156

1  you're referring to?
2    Q.  Yes.
3    **A.  Yes.**
4    Q.  It goes on to say, "White, you've been to
5  handling school - Bo, you don't need me, do I have to
6  hold your hand with everything?  Go serve the damn
7  warrant and if you need me just call me and I will
8  come up there go serve the warrant JJ!"
9        So is it true that Mr. Welborn said, "If you
10  need me just call me and I will come up there"?
11    **A.  Mr. Welborn told me prior to, to go serve**
12  **warrant and to get it done.  His instructions were**
13  **clear.  Now, he said, "If you need me, just call me."**
14  **Unfortunately, during the height of the**
15  **situation, the intensity of it with be use of force is**
16  **what I'm referring to, that -- I had to deal with the**
17  **threat at the time.**
18        **So it wasn't that I was trying to ignore**
19  **calling him.  I had a female subject that was**
20  **attacking me, and truthfully, he wouldn't need me to**
21  **call him had he came up there in the first place**
22  **instead of directing me to go do it and to get it**
23  **done.**
24    Q.  So when during the process of arresting Ms.
25  Oliver did you sense that she was starting to resist

157

1  or she started to act like she's not going to comply.
2  When did you realize that?
3    **A.  I -- well, when she started resisting, I**
4  **felt that I could talk to her.  That's why I gave the**
5  **options to her, you know, prior to, to comply.  In**
6  **terms of a specific point, I mean, I'm not going to be**
7  **able to pinpoint exactly.**
8        **But I can definitely say, when she started**
9  **attacking me, that made it very clear that there was**
10  **no talking anything to her.  Anything in -- there**
11  **was -- I wasn't going to be talk her into**
12  **submitting to the handcuffs or trying to get her under**
13  **arrest.**
14    Q.  Why did you not use the pepper spray that
15  you had on you?
16    **A.  One, I -- one, I am not certified in using**
17  **pepper spray.  In fact, me having the pepper spray**
18  **without going through the proper training for it is a**
19  **liability, and it may or may not be a policy violation**
20  **because you're required to have training for it and**
21  **the Sheriff's Office didn't provide it.**
22        **Another thing, Ms. Oliver had on glasses**
23  **that I believe would have caused the steady stream to**
24  **ricochet and it was dark, and that will place me in**
25  **danger and jeopardy.  My safety would be at risk,**

158

1  especially if it would have hit me, because it's
2  designed to, you know, disable or incapacitate, at
3  least temporarily.
4       So -- and not only that.  The use of force
5  report -- not use of force report, the use of force
6  continuum from my BLET training, basic law enforcement
7  training, placed self hands techniques before chemical
8  munitions.  So I was in compliance with the training
9  protocols, what I perceive to be, you know, policy.
10      Q.  So you referenced the protocol.  Do you
11  think an arm bar takedown comes before pepper spray in
12  that ---
13      A.  It does.  It's a soft hand technique.  It
14  does.
15      Q.  Which one of those two is more likely to
16  cause an injury?
17      A.  Well, any -- any of them.  I can't say this
18  one would cause more of an injury than this one.  Use
19  of force is designed not to be pleasant outside of
20  de-escalation, all right?
21      Q.  So why did you have pepper spray on you if
22  you weren't trained to use it?
23      A.  Because I was given it and I was told that I
24  was -- that we would -- that the deputies who need
25  training for it was going to get training for it, and

159

1  I never did.
2      Q.  Before ---
3      A.  That would be a question -- I'm sorry?
4      Q.  I'm sorry.  Were you finished?
5      A.  No, go ahead.
6      Q.  Before the Ms. Oliver incident, had you ever
7  used pepper spray on anyone?
8      A.  Well, I have -- you said -- are you asking
9  me if I had used pepper spray?
10      Q.  Before the Ms. Oliver incident in October of
11  2018?
12      A.  At the Sheriff's Office, is what you're
13  talking about, before?
14      Q.  At anytime?
15      A.  At anytime.  Yes.  I had used pepper spray
16  before.
17      Q.  When was that?
18      A.  When I worked as a corrections officer and I
19  was not a sworn law enforcement officer.
20      Q.  Was that the only time?
21      A.  Yes.
22      Q.  How many times as a corrections officer did
23  you use pepper spray?
24      A.  How many times does a corrections officer do
25  what?

160

1      Q.  As a correctional officer or corrections
2  officer, how many times did you use pepper spray?
3      A.  I don't know a specific amount of time.  I
4  mean, it wasn't a lot in terms of like ten, 15, 20,
5  but maybe a handful of times during -- throughout my
6  three-year employment.
7      Q.  So is it more than five?
8      A.  I said a handful of times, approximately.
9      Q.  Were you trained as a corrections officer to
10  use it?
11      A.  Yes.  I was trained as a correctional
12  officer to use pepper spray on inmates, working under
13  the jurisdiction of the Department of Public Safety.
14      Q.  How were you trained?
15      A.  The State trained me.
16      Q.  Do you know ---
17      A.  To deal with prisoners.
18      Q.  Do you know around what time or date you
19  were trained?
20      A.  Maybe around November or December of 201
21      Q.  Do you know what agency you trained with?
22      A.  These were for corrections officers,
23  not sworn law enforcement in terms of police or
24  deputies.
25      Q.  Can you describe how they trained you?

161

1      A.  That's been a long time ago.
2      Q.  Did you actually have to use it during your
3  training?
4      A.  I remember it being used on me.  I don't
5  know -- I don't remember spraying anybody else.
6      Q.  Did they teach you how to spray the device?
7      A.  They showed us how to spray pepper spray.
8      Q.  Did they train you on where you should spray
9  it?
10      A.  I'm pretty sure it was covered in the
11  curriculum.  It's been a long time ago.
12      Q.  So can you give me any other details about
13  the curriculum that ---
14      A.  No.  No, I can't.
15      Q.  Okay.  Was this at the Bertie Correctional
16  Facility?
17      A.  Yes.
18      Q.  All right.  So you said you use an arm bar
19  takedown.  Where did you learn how to use this?
20      A.  BLET, basic law enforcement training.
21      Q.  Was it part of the course materials?
22      A.  It was a part of the curriculum.
23      Q.  Did they demonstrate to you how to use it,
24  or did they just refer to what it is?
25      A.  They referred to what it is and they

162
1  demonstrate it.
2     Q.  And can you describe just physically how to
3  complete an arm bar takedown?
4     A.  I can't give you the step-by-step directions
5  because it's been a long time, but it's in the
6  training manual and it can be pulled.
7     Q.  But you used that takedown, right?
8     A.  Yes.  And it's been a long time.
9     Q.  What do you remember about what you did?
10    A.  As I stated earlier, that I remember placing
11 one of my hands on her lower arm and another hand
12 towards her upper arm, and I believe I rotated.  I
13 can't remember everything in terms of where I could
14 take control of her arm and take her down to the
15 ground to get her under control.
16       But in terms of the specific steps, in terms
17 of stepping back or rotating the arm or however it was
18 done, I would have to rely on the training manual.
19 And that can be pulled, put into evidence.  But I
20 relied on my training, education, and experience to
21 effect the arrest, using the straight arm bar
22 technique.
23    Q.  So after you use the straight arm bar
24 technique, what happened?  What did you do after that
25    A.  Well, she was complaining of her back, her

163
1  neck, her arms, her ankles, her legs, her spine,
2  everything was broke.  Let me skip that.
3       I did call for -- let's see.  I don't have
4  the reports in front of me, but I -- I remember
5  calling for assistance, for -- for backup, and I also
6  remember calling for assistance, for her medical
7  assistance.
8       You all didn't provide us the tapes despite
9  it being public record.  I can't say word for word
10 what's on those tapes, and I'm definitely not going to
11 get hammed up in any perjury or deception allegations.
12 I can't remember everything that I did and everything
13 that was said, but I relied on my training, education
14 and experience to effect the arrest.
15    Q.  You said that we did not provide you the
16 tapes.  Do you know who has custody of those tapes?
17    A.  Your client.
18    Q.  Do you know that -- if the Sheriff Office
19 has custody of the tapes?
20    A.  Well, I'm pretty sure they have a copy of
21 it.  911 emergency services, emergency management,
22 whomever, has the 911 -- recordings as the custodian
23 -- custodian.  But at the same time, it's public
24 record and I'm pretty sure that you all have a copy of
25 that tape.

164
1     Q.  But who did you say was the custodian again?
2     A.  It may be 911.  The emergency services,
3  emergency management, whoever it is with the 911
4  center.
5     Q.  Have you asked them for the tapes?
6     A.  No.  I haven't asked anybody for anything.
7     Q.  All right.  So you said you called it in.
8  Do you remember how you called it in, what you said?
9     A.  As I just said, I do not remember everything
10 that was said.  But I did ask for backup, officer
11 backup at some point in time, and also asked for EMS
12    Q.  So when she -- when Ms. Oliver was
13 complaining, how did you react to that?  Did you get
14 panicked?
15    A.  No.  I didn't panic.  It was important that
16 she get medical services and it was also important
17 that I have backup there.  This woman had just accuse
18 me of basically police brutality by basically saying
19 that I broke her spine, her back, her arms, her legs,
20 her ankles.  Everything was broken according to her.
21       And had she not been aggressive, assaultive,
22 attacking me, then -- or resisting arrest, then the
23 soft hands technique would've never been on her.  She
24 would have been on her way to the Sheriff's Office for
25 processing and before the Magistrate.

165
1       MR. CASTRO:  Off the record.
2  (Off the record:  4:20 p.m. to 4:20 p.m.)
3     Q.  (Mr. Castro)  So did dispatch ask you for
4  more details after you called it in?  To your
5  knowledge or to your recollection, of course.
6     A.  They may have.  I'm pretty sure they asked
7  for details.  Somebody did, but as far as specifically
8  what they asked for it, I don't -- I can't remember
9  verbatim what they said.
10    Q.  Do you remember who arrived at the scene?
11    A.  Yes.  I don't know the persons, but there
12 was two paramedics first and then maybe a minute or
13 two, no longer than three, Sergeant Welborn arrived
14 and he asked what we had.  I told him, and we --
15 Goolsby arrived, blaring lights and sirens, I believe.
16       And at some point in time, well after
17 Welborn got on the scene, when he -- after he got on
18 the scene, Edwards showed up.  I do remember Welb
19 after he got on scene, downgrading the call.  But I
20 mean, it was just -- I mean, it was just us, so nobody
21 else came out there.
22    Q.  Do you remember what you told the
23 paramedics, if anything?
24    A.  It's been a long time.  I didn't see any
25 reports from any paramedics, but I told them that

166

1  she -- something to the effect that she was claiming
2  her arm is broken.  First paramedic examined her and
3  said, "Well, nothing wrong with her."
4       Welborn pulled up.  She -- he got out of the
5  car and came up there.  Second paramedic examined her
6  and said, "Well, nothing wrong with her." And she was
7  like, "But I'm in pain and everything broken.  My arm
8  is hurting real bad."
9       And so the paramedic again examined her and
10  he said, "Well, nothing wrong with her." And so at
11  that point in time, Sergeant Welborn took custody of
12  her and she was like, "Well, where we -- where we
13  going?" And he said, "To jail." And she said, "But
14  I'm in pain." And he said, "Come on.  You're going to
15  jail."
16       She said, "No, I'm -- I'm hurting." And he
17  said, "Ma'am, you're going to jail." And she said,
18  "But my arm, my arm," and she started screaming and
19  crying.  So the director of EMS pulled up and she was
20  screaming that her arm was broken, her arm was broken.
21       Or the chief of EMS, I believe the agency
22  head, pulled up.  And he examined her and he said
23  something to the effect of, "It's broken or
24  fractured." And so at that point in time, EMS
25  prepared to gurney her and transport her to Maria

167

1  Parham Hospital in Henderson, and that was it.
2       Q.  Thank you.  You said Mr. Welborn arrived at
3  the scene.  Do you remember talking to him about it at
4  all?
5       A.  Yes.  In terms of verbatim words, I'm unable
6  to provide that, but he asked what had happened.
7       Q.  And you don't remember verbatim, but do you
8  remember generally what you responded?
9       A.  I told him, "She's complaining that her arm
10  is broke." I believe I told him I did a takedown on
11  her, took her to the ground to handcuff her after she
12  attacked me, et cetera.  But in terms of the -- the
13  specifics like directly repeating it as it was said,
14  I -- it's been a long time ago and we haven't read all
15  the reports.
16       Q.  Do you know if Ms. Oliver had any injuries
17  after the October 22nd incident?
18       A.  Injuries from what?
19       Q.  From the arm bar takedown.
20       A.  Well, the -- as I said, the chief or the
21  director of EMS, he said that, "Yeah.  It's broken or
22  fractured," and so they gurneyed her.  I found out
23  later that -- later that night shift that she had a --
24  her arm was fractured, the humerus bone or something
25  like that.

168

1       Q.  Did you know that she was diagnosed with a
2  fractured humerus on her upper arm?
3       A.  Well, I just said that I knew that she had a
4  fracture to the humerus, so yes.
5       Q.  Did you fracture her humerus?
6       A.  Well, I did not break her arm, if that's
7  what you're asking, okay?
8       Q.  You did.
9       A.  It -- that was never my intent, to break her
10  arm.  She resisted arrest.  She fought me.  I did an
11  approved subject control technique, and as a result of
12  her resistance and any other factor, her arm was
13  broken.
14       She didn't have to go down that path of
15  having a possible use of force.  I did my best as a
16  law enforcement officer to de-escalate, to talk to
17  her, to calm her down and even said that I will make a
18  recommendation for bond reduction.
19       Q.  As a result of the technique you used, was
20  her arm broken?
21       A.  I can't say that as a result, that it was
22  broken.  What I can say is there were multiple
23  factors.  I'm not going to say that I broke her arm or
24  the straight arm bar takedown broke her arm.
25       Q.  What else could have broken her arm?

169

1       A.  Her resistance.  Her -- her resisting lawful
2  orders.  Her aggression.  Her -- her physical
3  resistance.  Her aggression towards me, aggressiveness
4  towards me.
5       Q.  So you think she resisted so much that she
6  broke her own arm?
7       A.  She attacked me, her resistance.  And it's
8  also in the training protocols, the guidelines that I
9  believe something to the effect of, "Physical
10  resistance or aggressiveness, not being in
11  compliance," amongst other things, "can enhance the
12  likelihood of an injury." I'm not calling it
13  verbatim, but once I look at whatever it is, I'll know
14  it.  I'll know it for myself.
15       But I definitely didn't go there to break
16  her arm and I am not going to say that I broke her
17  arm.  After all, she was cleared that weren't nothing
18  wrong with her arm two -- three times by two
19  paramedics.  And at the same time, even if her arm did
20  broke, she bears the responsibility.
21            (DEPOSITION EXHIBIT
22            NUMBER 19 WAS MARKED
23            FOR IDENTIFICATION)
24       Q.  (Mr. Castro)  I would like to present you
25  with Exhibit 19, and I would like you to review the

170

1  first page and tell me what this document is?
2  (Witness complies)
3      **A.  It appears to be aftercare instructions for**
4  **her, for Ms. Oliver.**
5      Q.  Is it true that after the incident, Ms.
6  Oliver went to Maria Parham Health?
7      **A.  Yes.**
8      Q.  Is it true that this incident occurred on
9  December 22nd, 2018?
10     **A.  I don't recall it occurring on December**
11 **22nd, 2018.**
12     Q.  Okay.  Do you know around what time this
13 incident occurred?
14     **A.  Around October, 2018.**
15     Q.  Do you remember the time of day it was?  Was
16 it 7:00 p.m., 8:00 p.m., anything like that?
17     **A.  I would have to go back to the incident**
18 **reports.  It -- I mean, it was at night, maybe 8:00 or**
19 **9:00.  At somewhere around there approximately.  It**
20 **night shift.  It was definitely, I believe, before**
21 **midnight.**
22     Q.  Okay.  And reading this first page, it says
23 on the first three paragraphs, "You have a fracture of
24 the humerus."  Paragraph 2: "The humerus is the long
25 bone in your upper arm.  Your fracture is in the top

171

1  (proximal) part of the bone."  Paragraph 3: "Apparent
2  -- a fracture means the same thing as a 'broken bone.'
3  In general, fractures heal in about 6-8 weeks.  Over
4  time, the broken area gets stronger than the area
5  around it."  Did I read that correctly?
6      **A.  I believe you did.**
7      Q.  Does this document say that Ms. Oliver had a
8  broken bone?
9      **A.  It says she had a fracture to -- of the**
10 **humerus.  And it says that a fracture means the same**
11 **thing, it's the equivalent as a broken bone.**
12     Q.  Do you have any reason to dispute this
13 document?
14     **A.  No.  This is between her and her medical**
15 **official.  I wasn't at the hospital.**
16          MR. CASTRO:  Okay.  We can remove the
17 document.
18     Q.  (Mr. Castro)  So after this incident
19 happened and you went home or you got back in your
20 vehicle, did you call anyone about what happened?
21     **A.  Yes.  I contacted -- I contacted Lieutenant**
22 **Goolsby and possibly Welborn, but I do remember**
23 **speaking to Goolsby.**
24     Q.  Can you roughly remember what you said?
25     **A.  I'm sorry, Counselor?**

172

1      Q.  Do you remember roughly what you might have
2  discussed?
3      **A.  Yes.  I asked him what the doctors are**
4  **saying and he said that they are saying it's a**
5  **fracture, and he told me again that Watkins told him**
6  **just to make sure I had my incident report, write it**
7  **up.**
8          **He told me that the family was at the**
9  **hospital, and that they were asking for me and were**
10 **asking where he was.  I said, "And what did you tell**
11 **them?"  He said, "I told them where you was."  And I**
12 **was like, "If they know like I know, they might not**
13 **want to come into there and bother you."**
14         **And I told him, I said, "Well, you know, I'm**
15 **trying to finish up my report."  And he was like,**
16 **"Yeah.  Welborn is going to come up there because the**
17 **Magistrate -- the Magistrate needs a transport to the**
18 **hospital."  And so that was it.  But let me go back**
19 **and so I can give you the full picture to ensure you**
20 **got it.**
21         **Captain Watkins contacted me after my use of**
22 **force and said that Lieutenant Goolsby contacted him**
23 **and said -- and Captain Watkins stated that he**
24 **contacted Sheriff White.  And he told me that I don't**
25 **have -- that he made the Sheriff aware, and he said**

173

1  **that I don't have anything to worry about.**
2          **He said, "I sit on the use of force**
3  **committee."  And he said, "Before it gets to the**
4  **Sheriff, it has to get through me."  And he said, "I**
5  **got your back."  He said, "You don't have to worry**
6  **about anything because you did your job.  You did wh**
7  **you were supposed to do, and had she not resisted,**
8  **this wouldn't have happened."**
9      Q.  Was this before the incident was
10 investigated that he said that?
11     **A.  Yes.  And also on that phone call, Captain**
12 **Watkins stated for me to do my incident report and u**
13 **of force report and to leave a copy of there for Ray.**
14 **And I said, "Leave a copy for Ray for what?"**
15         **He said, "Leave a copy for Lieutenant Sharon**
16 **because he's the person that handle these type of**
17 **matters and he's going to be looking into -- he's**
18 **reviewing," is what he said, "your**
19 **paperwork."  He said, "Just cover yourself."  But he**
20 **said, "You're going to be all right."**
21     Q.  Who said that?
22     **A.  Captain Watkins.  Lloyd Q Watkins, Captain**
23 **of Patrol.**
24     Q.  Does Captain Watkins decide whether to fire
25 you or not?

174

1    A.  Sheriff White makes the decision whether to
2  fire me.  But Captain Watkins spontaneously uttered,
3  without me even asking, that he had talked to the
4  Sheriff.  And he told me that the Sheriff was aware
5  and that I don't have anything to worry about.
6        Captain Watkins also said that he sit on the
7  use of force committee.  He said, "Before it gets to
8  the Sheriff, it gots to go through us."  And he said,
9  in the past, the Sheriff's always going with their
10  recommendation for the use of force committee, and
11  didn't have to worry about anything.
12    Q.  Does the Sheriff have the authority to
13  overrule the committee?
14    A.  Yes.  I mean, he has the authority.  But
15  here's the issue.  Based on Captain Watkins verbal
16  testimony to me, the Sheriff did not overrule in times
17  past.  He always went with the recommendation of the
18  use of force committee.
19        And Captain Watkins made it very clear that
20  I didn't have nothing to worried about.  I wouldn't
21  have never known that he talked to the Sheriff outside
22  of Captain Watkins telling me.
23    Q.  Does the Sheriff have to tell you if he's
24  investigating your employment?
25    A.  Come again?

175

1    Q.  Is the Sheriff obligated to tell you whether
2  he's investigating whether you should still be
3  employed, that he -- was he supposed to call you?
4    A.  If I'm being -- if I'm being investigated,
5  then it would be appropriate for him to say, "Hey, to
6  someone -- to one of his command staff members, to
7  the deputy for my case, Deputy White, know that he's
8  under investigation," or for him to tell me.
9        He don't have to tell me.  They don't have
10  to tell me.  I mean, if they don't want to do it, they
11  don't have to do it.  But if they start doing these
12  investigations, these one-sided investigations in
13  which the County is known for, then it creates a
14  problem.
15        Because while I work at the pleasure of the
16  Sheriff, there are due process rights.  There are
17  equal protection rights and there are First Amendment
18  rights when it comes to a government entity.
19    Q.  You said the County's known for one-sided
20  investigations.  What are you referring to?
21    A.  The write-up initially, of where I got
22  suspended.  The employee counseling form that is
23  predated six months approximately before I was even
24  hired, all both by Lieutenant Campbell.  Also, the
25  shift -- the deceptive shift transfer, if not other

176

1  things.
2    Q.  Did you also call or have a call with
3  Sergeant Welborn?
4    A.  I've said that I may have called Sergeant
5  Welborn, but I -- I know I remember calling
6  Sergeant -- excuse me, Lieutenant Goolsby.
7    Q.  Do you remember if you asked Goolsby whether
8  you would -- might lose your job?
9    A.  If it's not in the reports that you all
10  have, then I'm not going to be able to say that I did
11  ask that.  I don't recall that.
12    Q.  Were you concerned that you might lose your
13  job?
14    A.  Well, no.  I was -- I was already told that
15  I was in the clear, so I didn't have nothing to worry
16  about.
17    Q.  Before you were told you were in the clear,
18  were you concerned?
19    A.  I wasn't concerned about losing my job
20  because I did my job.
21    Q.  All right.  So after the ---
22    A.  However -- however, I had already been
23  threatened by Sheriff White at least three times that
24  if I didn't drop my complaints, that he was going to
25  fire me.  My protected activity complaints, in which

177

1  he threatened to fire me in front of a third party.
2    Q.  Who was the third party?
3    A.  Bullock.
4    Q.  You said this happened three times?
5    A.  Yes.  He -- Sheriff White threatened to fire
6  me three times.
7    Q.  Do you know when these three times occurred,
8  what dates?
9    A.  It's in my complaints.  It's in the summer
10  of 2018, somewhere around June or July.  I believe it
11  was July when he met with me.  Somewhere around my
12  late July, approximately, of 2018.  And he wanted me
13  to drop my complaints and I told him I wasn't going to
14  do it, and I told me to drop them.
15    Q.  Why did he want you to drop them?
16    A.  He alleged that he don't know of any
17  discrimination, race discrimination and any other
18  protected activity violation that may have been in
19  that letter, in his department.
20        And he told me that I don't go to HR.  He
21  don't -- I shouldn't go to HR because HR doesn't got
22  nothing to do with this, and he told me to drop my
23  complaints.  And I told him, I said, "I'm not going to
24  drop them."
25        And he said, "If you don't drop them, I'm

178

1  going to drop you. I am the elected sheriff." Then
2  he slammed his hands on the desk, and I told him I
3  wasn't going to drop it. And he said, "Why not? You
4  have a career here if you want it. Just drop the
5  complaints." And I said, "Well, I'm not going to drop
6  them." And so he gave me a letter and I went back to
7  work.
8      Q.  What letter did he give you?
9      A.  He gave me two letters, I believe, in
10 response to my internal EEO Protected Activity, Title
11 VII grievances.
12     Q.  Got you. Did anyone other than Bullock --
13 and which Bullock are you referring to again?
14     A.  Bullock, Chief -- excuse me. Chief Bullock.
15     Q.  Did anyone other than Chief Bullock witness
16 these events?
17     A.  It was just us in the office, so no.
18     Q.  This was done in Sheriff's White -- Sheriff
19 White's office?
20     A.  Yes.
21     Q.  After October of 2018, did you ever speak to
22 Ms. Oliver again?
23     A.  I don't believe so. After the use of force,
24 no.
25     Q.  Have you received any e-mails, calls, texts

179

1  from her or her family?
2      A.  No.
3      Q.  Do you know whether Ms. Oliver plans to sue
4  you over what happened?
5      A.  I don't have any ---
6      Q.  Without disclosing any attorney-client
7  communications, of course.
8      A.  I'm sorry?
9      Q.  Without disclosing any attorney-client
10 communications, of course. I don't want to know about
11 that. Do you know if Ms. Oliver is going to sue you
12 over what happened?
13     A.  Well, I'm not sure if she is going to change
14 her mind about not suing me. First and foremost,
15 if she sued me, I will win because I have immunity,
16 public official immunity, public officer immunity, as
17 well as other government immunities.
18         And not only that, if she sued me, she will
19 be going against the agreement that she had with the
20 County and the Sheriff.
21         And as I quote, as Lieutenant Goolsby called
22 my phone that morning that I had to go in to meet with
23 allegedly the Sheriff, and it ended up being Captain
24 Bullock, "Ms. Oliver was up here early this morning
25 complaining on you. Everybody could hear her."

180

1      He said, "Weldon talked to her," referring
2  to Captain W. Bullock. "Lawrence talked to her,"
3  referring to Chief Bullock. And I believe they said
4  that Captain and Watkins were in there.
5      But there was -- I believe there was a
6  third --- a third party command staff member in there.
7  And Lieutenant Goolsby told me that, "She came up here
8  this morning and she said, 'If you all don't fire
9  him,'" referring to me, that "'I'm going to sue the
10 County, the Sheriff and Deputy White.'"
11     And the following day, I was terminated. So
12 the agreement that they have in term -- in terms of
13 terminating me would restrict her from suing me. And
14 even if she did suing -- the immunity is going to
15 prevent. I'm not concerned about it.
16     Q.  So you're contending that the day before you
17 were fired, Ms. Oliver went into the Sheriff's Office
18 and said, "If you don't fire him, I'm going to sue
19 you"?
20     A.  I'm not -- I'm telling you exactly what
21 Lieutenant James L. Goolsby told me as a witness to
22 her conversations, with her being so loud and also
23 with them talking to him after she left.
24     And Lieutenant Goolsby let me know to be up
25 there, it might have been somewhere between 12:00 a.m.

181

1  2:00, to meet with the Sheriff. And when I got there,
2  I had to wait nearly an hour, if not more than an
3  hour, and I met with Captain Bullock.
4      Q.  And you were terminated the day after?
5      A.  Yes. At three o'clock.
6      Q.  And you are contending that those two are
7  related, those two events are related?
8      A.  I'm -- what two events, contending what?
9      Q.  That your termination was related to Ms.
10 Oliver threatening to sue?
11     A.  No. I'm just -- I'm laying out the facts
12 that took place, okay? My termination I believe is
13 related significantly to the retaliation -- the
14 retaliatory conduct of your client in threatening to
15 fire me because I would not withdrawal my protected
16 activity complaints. And I'm also saying what
17 Lieutenant Goolsby told me that Ms. Oliver said.
18     Q.  Got you. So why were you so adamant about
19 serving the warrant on Ms. Oliver? You went to her
20 house at 2:00 a.m. and then -- or around that time,
21 and then you went to her house again? Can you ---
22     A.  As I answered -- as I answered before, I was
23 told to go serve the warrant, okay? She was not the
24 first person that I had to go serve a warrant on who
25 wasn't there the first time, who wasn't there the

182

1  second time and sometimes it required a third or
2  fourth visit.
3          I mean, that happens in law enforcement.  If
4  you go back, Counselor, to the write-up, when Campbell
5  talked about, "Deputy White says that he went to the
6  house and -- the houses and he attempted warrant
7  services, et cetera."
8          I went to houses multiple times, okay?  The
9  same house multiple times, other houses multiple
10 times.  Nobody come to the door.  Sometimes later on,
11 the third or fourth, sometimes fifth visit, somebody
12 home.  Somebody car in the driveway.  Somebody come to
13 the door, and you're able to either serve the warrant
14 or get the person to provide information for the
15 person to come to the Sheriff's Office.
16         Or -- or sometimes, I mean, you just get the
17 person and you take them there.  It's accomplished the
18 the law enforcement objective.  It's not about me
19 being obsessed with Ms. Oliver in terms of being
20 adamant.
21     Q.  Is it true that you weren't told to go serve
22 the warrant until you asked someone to help you serve
23 the warrant?  Is that right?
24         You said you were instructed to serve the
25 warrant, but your complaint says you asked for help

183

1  from Sergeant Welborn.  And then he stated, "You go do
2  it."  So is it true that you weren't instructed until
3  you actually asked him about it?
4      A.  I stand by my statement.  I did ask him
5  about having a backup unit there to help me serve the
6  warrant.  I believe in teamwork.  They believe in
7  teamwork.  Unfortunately, Sergeant Welborn decided to
8  have me go up there and serve the warrant.  That's
9  what I done.
10     Q.  Do you regret serving that warrant?
11     A.  I don't regret doing my job.  I don't regret
12 going to serve the warrant because I had a job to do.
13 I took an oath, just like every other deputy there.
14 Now, it's unfortunate that the circumstances took
15 place in terms of her arm getting fractured or broken.
16         But that was definitely not intentional, and
17 it could have been avoided had Ms. Oliver complied
18 with my lawful orders, lawful request.  Had she
19 adhered to what I was trying to do, this situation
20 would have turned out so much better.
21     Q.  To your point, could this have been avoided
22 if you did not conduct a traffic stop on Ms. Oliver in
23 the first place?
24     A.  Well, I can't say it would have been
25 avoided, because every deputy is assigned to a side of

184

1  the county and you have to serve warrants.
2  Misdemeanor warrants, felony warrants, child support
3  warrants, order for arrest, criminal summons.  Take
4  somebody into custody and do a magistrate's order.
5          So I can't say it wouldn't have -- it would
6  have been avoided, because she was adamant on not
7  going to jail.  So who's the say that, had the traffic
8  issues not happened.  Which, you know, caused me to
9  radio her plate in, that I or another deputy wouldn't
10 have had the same outcome with her since she didn't
11 want to go.
12     Q.  But it was your traffic stop that ---
13     A.  And I will also say that your client -- not
14 your client.  Ms. Oliver, upon information and belief,
15 her criminal record -- she has a criminal record.
16 She's been charged before.  In terms of convictions, I
17 can't remember if she was convicted, but she
18 definitely had charges, not just for those two
19 warrants.
20     Q.  Why does that matter?
21     A.  It's a -- it shows that she is a repeat
22 offender in terms of being charged and if she's not
23 been convicted.
24     Q.  So wasn't it your traffic stop that prompted
25 you to search for Ms. Oliver's warrants?

185

1      A.  As I previously explained, Counselor, and
2  it's the -- the 911 dispatcher came back very, very
3  quick despite Major Bullock saying that there's no
4  radio traffic showing that and there's no radio
5  traffic showing anything other than me reading the
6  plate, and then later saying that there was a
7  distortion or distinction -- there was a mix-up in
8  what I was asking for and what the 911 Dispatcher
9  believed.
10     Q.  But you called ---
11     A.  But the traffic -- the traffic violations is
12 what put me on to Ms. Oliver.  And according to the
13 write-up that Campbell issued, or whatever
14 documentation issued, my -- one of my responsibilities
15 is preventing crime.  And violations of Chapter 20,
16 that's a crime.  So I was still doing my job.
17     Q.  But it was a traffic stop that put you on to
18 Ms. Oliver.  Is that correct?
19     A.  It was a traffic violation she committed,
20 multiple ones.  And I never did a traffic stop, okay?
21 I did not pull her over.  I followed her and I tried
22 to talk to her via the community-oriented policing
23 model, the philosophy.
24     Q.  Do you ever call people that have
25 outstanding warrants and tell them to come to the

186

1  Sheriff's Office to be served?
2      A.  Yes, I have.
3      Q.  Why didn't you do that with Ms. Oliver?
4      A.  One, I was told by Sergeant Welborn to go
5  get her, and so I went to get her.
6      Q.  That was after you had ---
7      A.  And the most -- and then when I called,
8  she -- when I -- when I went to get her, I was going
9  based on a supervisory order.  Whenever I called
10  somebody, it wasn't that I was actually -- actually
11  searching for their number, if we even had one,
12  because I didn't have a laptop.
13      But sometimes a number may have been -- a
14  number may have been on the warrant log.  I forgot
15  what it's called, but whatever side you're on, north
16  or south, there's a warrant log.
17      If the number was up there and after
18  multiple attempts of us not -- of me not trying to --
19  of not getting a person, then I would call.  I would
20  see if I can find something to get in contact with
21  this person.
22      MR. CASTRO:  Can we go off the record?
23      THE COURT REPORTER:  We are off the
24  record.  The time is 4:52.
25  (Brief recess:  4:52 p.m. to 5:24 p.m.)

187

1      THE COURT REPORTER:  We are back on the
2  record.  The time is 5:24 p.m.
3      Q.  (Mr. Castro)  All right.  Mr. White, we're
4  going to talk about what happened after the Ms. Oliver
5  incident with regard to your employment.  You
6  mentioned that Captain Watkins spoke to you on the
7  phone about the incident.  Is that right?
8      A.  Yes.  Captain Watkins spoke to me on the
9  phone on the night of my use of force.  After that,
10  him and I did not speak at all, outside of him calling
11  me down to his office so they could terminate me.
12  After I left the Sheriff's Office, him and I had no
13  communication.
14      Q.  What other colleagues did you talk to after
15  the incident?
16      A.  What -- are you asking me what other
17  colleagues Captain Watkins talked to, or what other
18  colleagues I talked to?
19      Q.  You talked to.
20      A.  Well, I didn't have any colleagues after
21  they fired me.
22      Q.  Well, from the time that the incident
23  occurred to the time you were fired, is what I'm
24  asking.  I'm sorry.
25      A.  From the time the incident occurred until I

188

1  was terminated, I spoke to Captain Watkins.  I spoke
2  to Lieutenant Goolsby, Sergeant Welborn.  I told
3  Poole, Deputy Poole, that I had a use of force.  I
4  said Sergeant -- I said Sergeant Welborn.  Deputy
5  Edwards.
6      Now, I can't remember off the top of my
7  head.  I mean, I do know, you know, Captain Bullock,
8  you know, he questioned, being that he did some
9  questions -- had some questions for me.
10      Q.  Did any of them tell you that you were about
11  to be terminated?
12      A.  No.  I didn't know that I was being -- going
13  to be fired until around 3:00 p.m. on the 24th,
14  when -- a few minutes before three o'clock, Captain
15  Watkins called me.  And I was working part -- I was
16  working not part-time.  Off -- off-duty at the
17  courthouse.  He told me to come to his office.
18      And when I went in his office, I saw
19  Bullock -- Weldon Bullock, Lawrence Bullock, Ray
20  Sharon.  Watkins was sitting in his office with the
21  door closed.  When I -- no.
22      Watkins was sitting in his office.  He saw
23  me.  Either he was sitting down or he was standing up
24  near the door or something.  And I went in his office,
25  and when I went to close it, I believe Captain Bullock

189

1  and Lieutenant Sharon -- Captain Bullock said
2  something about, "I need to get in here."
3      And so I opened the door, and that's when he
4  said, Captain -- Captain Bullock said, "I need your
5  gun and badge and your credentials.  Your services --
6  the Sheriff told me to tell you that your services are
7  no longer needed, no longer required," something to
8  that effect.
9      So Lieutenant Sharon wanted to take my gun,
10  and he pulled like three or four times and he couldn't
11  get it out.  And so he was like, "Well, I can't get it
12  out."  And I told him, I said, "I'll pull it out."  I
13  said, "I'm not going to do nothing other than pull it
14  out so you can get it."  And that's what I done then.
15      And he took it, and he said, "Thanks, J. J."
16  And he gave me a ride home, and he told me, "I just
17  want to let you know, I -- I didn't have nothing to do
18  with that."  He was like, "I -- I don't want you to be
19  mad at me or anything."  So that was it.
20      Q.  Who gave you the ride home?
21      A.  As I just said, Lieutenant Sharon.
22      Q.  And did you talk on your way home?
23      A.  No.  It was a quiet drive.
24      Q.  Was Sheriff White present in the office when
25  you were told that you were being terminated?

190

1    A. I don't know where he was.
2    Q. Did they mention the Ms. Oliver incident?
3    A. No. Nobody mentioned it. Everything I just
4 told you, what Captain Bullock said -- Weldon Bullock
5 "Sheriff told me to tell you your services are no
6 longer needed" ---
7    Q. That's it? You didn't ask questions ---
8    A. --- credentials, badge, gun. They needed
9 that, said somebody would give me a ride home in my
10 patrol car, and that's what happened.
11    Q. Did you ask, "Why is this happening?" or
12 anything like that?
13    A. Yes. I asked for a reason. He told me the
14 Sheriff told him not to talk about it.
15    Q. Who said that?
16    A. Captain Bullock. Weldon Bullock, Weldon
17 Wallace Bullock.
18    Q. Did anyone at the Sheriff's Office use
19 racial slurs or discriminatory language against you
20 near the time of your termination?
21    A. Yes, they did.
22    Q. Who did?
23    A. There were several deputies, such as Deputy
24 Patel, a few months prior to my termination and said
25 the N word. "What's up, N?" I observed him saying

191

1 "What's up, N" to Deputy Poole.
2        I told him he should not be saying that word
3 in the workplace, and he said that, "I'm nearly just
4 as black as you," or something to that effect, "and I
5 can say that word."
6    Q. How did Deputy Poole react?
7    A. Who?
8    Q. You said he said it to Deputy Poole as well.
9 Do you know how he reacted?
10    A. He don't like the word either, but I can't
11 testify on his behalf.
12    Q. Did you see what -- did you see how Deputy
13 Poole responded, did he say anything?
14    A. I said -- I just answered that question. I
15 said that he did not like the uses of the word.
16    Q. Other than Mr. Patel, did any other people
17 use discriminatory language against you, prior or at
18 or near the time of your termination?
19    A. Well, yes.
20    Q. Who else?
21    A. There was a few sergeants that said some
22 things, some racial epithets, N word.
23    Q. Who said the N word?
24    A. Sergeant Bobby Martin, who was a white male,
25 and Sergeant Chris Welborn, who was a white male.

192

1    Q. Can you give me some context? What did
2 Bobby Martin say, when was he using it, against whom?
3    A. He said -- well, he said it to me, mocking
4 what Patel said as well as said it to Patel. And I
5 told him that he shouldn't be saying that word. And
6 of course he's like, you know, "Mr. White, I grew up
7 with, you know, African-Americans and I got black
8 people in my family."
9        And he was like, "I never meant to
10 disrespect you or anything." I said, "Okay." And
11 Welborn used it in the context of a song that was
12 composed by or performed by Lil Deval, L-I-L, D-U-
13 L, "Smile." And one of his lyrics is, "I ain't going
14 back and forth with you Ns. I'm living my best life,"
15 et cetera.
16    Q. Was he using it -- was he directing that
17 term towards you or singing the song to you?
18    A. He was singing the song and I was sitting in
19 front of him. And I told him, I said, "Hey, man." I
20 said, "You can't be saying that word." And I said --
21 and he was like, "I can say that word, J.J. All I
22 know is your kind. I grew up with your kind. I can
23 say that word."
24    Q. How did you respond?
25    A. How did who respond?

193

1    Q. When he said, "I can say that word," what
2 did you say?
3    A. I told, I said, "No." I said, "That word
4 shouldn't be said by anybody." I said, "Especially in
5 the workplace."
6    Q. Do you know when this was, around what time,
7 what date?
8    A. It was around the summer of -- 2018.
9    Q. Can you approximate a month, or you just --
10 summer is as specific as you can get?
11    A. I'm going to just say summer.
12    Q. So you mentioned that Bobby Martin used the
13 N word without, of course, using the word. Can you
14 tell me what the sentence was?
15    A. As I already asked -- as I already answered,
16 he was like -- he said something to the effect,
17 "What's up, N," mocking Patel. That's what I just
18 said. He said the same thing that Patel said. That's
19 what I mean by that.
20    Q. So was he talking to you?
21    A. Yes. And he was also saying it and talking
22 to Patel.
23    Q. And he said he didn't mean to disrespect
24 you. Did you believe that?
25    A. I took them at his word, but he shouldn't --

194

1  he knew better.  Don't -- listen.  No African-American
2  wants to hear a Caucasian-American say the N word.
3  Let's be clear.  Let's not play dumb.
4      Q.   Was this the first time that Bobby Martin
5  had used this word in front of you?
6      A.   To my knowledge.  I don't have any
7  recollection earlier now that -- I mean, I don't have
8  any recollection that it occurred earlier, while
9  sitting here now.
10     Q.   How about Welborn?  Was this using it with
11 the song, was that the only time you can recollect?
12     A.   Yes.
13     Q.   Okay.  So you've mentioned that Mr. Patel,
14 Martin and Welborn.  Anyone else use discriminatory
15 language at or near your termination?
16     A.   Well, there were comments about -- I said
17 something to Sergeant Martin, who referred to Deputy
18 Purav, P-R -- P-U-R-A-V, Patel, P-A-T-E-L.  He called
19 him Osama Bin Laden, and I told him that he could not
20 make those terroristic threats, that it was
21 disrespectful, unprofessional, et cetera.
22         As far as the specific things that were
23 said, I'm not able to recall because it's been a long
24 time ago.  But I covered basically most of it, if not
25 all of it in my -- the EEOC file and in my complaints.

195

1  So I will say, refer to that.
2      Q.   Did Sheriff Peter White ever use
3  discriminatory language against you?
4      A.   Not -- I can't recall the specific language
5  if he may have used it, but I can say that the
6  behaviors of his office was discriminatory.
7      Q.   What about him individually?
8      A.   I -- I just answered that.
9      Q.   Did he ever make fun of you for your race or
10 gender?
11     A.   No.  He didn't make fun, whatever that
12 means.
13     Q.   To use offensive language or use it in a
14 joking manner.  Did that ever happen?
15     A.   No.  He didn't directly do it.  Not to my
16 knowledge.
17     Q.   How about Lawrence D. Bullock?
18     A.   How about?
19     Q.   Did Lawrence D. Bullock ever used
20 discriminatory language or act discriminatorily
21 against you for your race or gender?
22     A.   Well, I can say, in terms of the gender, I
23 remember an African-American female deputy who had
24 allegedly, according to Sergeant C.M. Welborn,
25 violated multiple policies in -- late 2017 and early

196

1  2018, up until April and May.
2          To the point of where -- at least May, to
3  the point of where Sergeant Welborn said that he had
4  written Deputy -- and I can't think of her name.  It's
5  on the tip of my tongue.  He -- but it was a female
6  deputy.  I can't pronounce her first name.  I think it
7  starts with a Q maybe.
8          But he had written her up several times.  He
9  had complained on her several times.  And he said when
10 he did it, the Chief Deputy, Lawrence Bullock, told
11 Lieutenant Goolsby not to do anything with it and that
12 the Sheriff won't going to do anything with it.
13         And I asked Welborn why, and he said -- the
14 Chief Deputy said, "We don't have a lot of female
15 officers and we want to keep her.  We don't want to
16 run her away."
17         And so they never disciplined her over what
18 Welborn said.  Some of it deserved a suspension, and
19 all of it combined, she could have been fired.  Now, I
20 can't recall the specific, at this time, charges he
21 made, but there were several.
22         So if Chief Bullock and the Sheriff want to
23 discipline me for these false allegations, why not
24 investigate and discipline the female deputy in
25 question for what Welborn determined was true

197

1  allegations or substantial allegations if, you know --
2  and the only thing that was different between her and
3  I was our gender.  She's a female.  I'm a male.  So to
4  answer your question about Chief Bullock, yes.
5      Q.   Anything else about Chief Bullock that you
6  can remember?
7      A.   I remember he told me that the Sheriff
8  wanted to fire me for what Cameron had written up, but
9  he talked him out of it.  He told me if I appealed it
10 that the Sheriff would fire me.  He later rescinded
11 that allegation, saying "would," in July when him and
12 the Sheriff met with me, and said that he never said I
13 would be fired.  He said I could be fired.
14         Would, could, however you want to say it.
15 As I said, he said that I would be fired if I appealed
16 it, if I went to the Sheriff, and told me to sign it
17 and -- sign the form or whatnot.
18     Q.   Which form is this?  Just a ---
19     A.   Write-up.
20     Q.   Which write-up was this about?
21     A.   The only one that I have, the written
22 warning that the -- the suspension, the falsification,
23 the falsicity, the deceptive write-up by Lieutenant
24 Durwood Campbell.
25     Q.   Okay.

198

1    A.  And if there's anything else that Chief
2  Bullock may have done, it's not coming to my head at
3  this time, but I think I covered a good portion of it.
4    Q.  All right.  That's great.  How about Weldon
5  Wallace Bullock?  Any discriminatory actions or
6  language taken against you?
7    A.  I can't say that -- I can't say that he did
8  anything directly, but I want to be clear.  This is
9  about, even before I filed any type of internal
10  grievances, EEO protective grievances, your client
11  I filed other complaints well before it went to HR
12  because of the deceptive shift transfer, okay?
13       Had -- had your client not did what they did
14  it and terms of the statements they made about me --
15  -- the purple hat being in my mailbox.  Had all this
16  stuff as well as other things not took place, then it
17  would've never triggered to something on and on and
18  onward, up into write-ups, suspensions, bad
19  performance evaluations, et cetera.
20    Q.  But going back to Mr. Weldon Bullock, you
21  said that you can't say anything directly.  How about
22  indirectly discriminatory?
23    A.  I don't have anything to say.
24    Q.  Okay.  Let's talk about this purple hat.
25  Where was your mailbox located?

199

1    A.  In the hallway adjacent from -- on the
2  outside of the patrol room.
3    Q.  Who has access to that hallway?
4    A.  Everybody at the Sheriff's Office, sworn and
5  non-sworn personnel.
6    Q.  Does anyone who's not a deputy or above have
7  access to those mailboxes?
8    A.  Sworn and non-sworn, secretaries, personal
9  assistants, they have access to it.
10    Q.  Does anyone that's not an employee of the
11  Sheriff's Office have access to those mailboxes?
12    A.  Well, the janitors and the custodians.  I
13  mean, they walk past it when they clean up.
14    Q.  Anyone else?
15    A.  No.  Not to my knowledge.
16    Q.  Can you describe this hat other than it
17  being purple?  Did it have any symbols on it or
18  anything?
19    A.  Again, I -- listen, it was a purple hat.  It
20  had multi-colors in it -- in the fabric, an overall
21  purple hat, and it may have had a snowball puff at the
22  top.  I don't -- I can't remember everything.
23    Q.  So when you say, "hat," you're not talking
24  about a baseball cap?
25    A.  No.  I'm talking about, like, a snow cap or,

200

1  you know, like a toboggan or something.
2    Q.  Something more for the winter?
3    A.  Yes.
4    Q.  Okay.  All right.  So after you were
5  terminated and you returned all your equipment, what
6  did you do after that, what happened next?  Did you
7  call anyone?
8       Of course, without discussing calling your
9  attorneys or anything like that, did you call any
10  non-attorneys about it?
11    A.  Yes.  I called Poole and I told him what
12  happened.
13    Q.  What did he say about it?
14    A.  He was like, "What?"  And I mean -- I mean,
15  you know, he wanted to know what happened.  And I
16  told him, I said, "I just called to let you know they
17  wouldn't -- they fired me for whatever reason.  I
18  don't know the reason."
19       And he told me it shouldn't be hard to find
20  out.  But I told him what happened.  You know,
21  Weldon -- Watkins called me down there, walked into
22  his office.  Weldon came behind me, told me the
23  Sheriff don't need -- want my services, and they gave
24  me a ride home in my patrol car.
25    Q.  Did you call the Sheriff to ask why you were

201

1  terminated?
2    A.  No.
3    Q.  Why not?
4    A.  Why would I?  If he wanted me to know why I
5  was terminated, he would have -- he would not have
6  told Weldon not to talk to me, not to tell me why.
7    Q.  Did Poole mention that your race played a
8  factor in your termination during your call?
9    A.  No.  And that call has been a long time ago
10  as well.
11    Q.  Did anyone from the Vance County Sheriff's
12  Office mention that race was a factor?
13    A.  No.  They denied it.  They denied race when
14  I filed my -- after I filed my complaints.
15    Q.  Did they mention gender was a factor?
16    A.  No.
17    Q.  Did they mention sexual orientation as a
18  factor?
19    A.  No.
20    Q.  Other than Poole, did you call anyone else
21  saying, "I got fired.  I don't know what happened"?
22    A.  Yes, I called Poole.  I later called -- I
23  called Welborn.  I was like, "You know I got fired?"
24  and he was like, "No.  I didn't know," X, Y and Z, and
25  it was a short call.  That's a long time ago.  I can't

202

1  remember everybody that I spoke to, but anybody I
2  spoke to would've been very, very limited because I'm
3  a private person.
4      Q.  So while you were -- when you started
5  working at the Vance County Sheriff's Office, is it
6  true that you would sometimes carry around a notebook
7  while you were on duty?
8      A.  Yes.  I was provided that notebook.
9      Q.  Who provided you that notebook?
10     A.  I believe either Campbell or Wayne gave me
11  that notebook.
12     Q.  Can you describe the notebook?  How did it
13  appear?
14     A.  In the where?
15     Q.  How large was it, what color was it?
16     A.  It was either square or rectangular.  I
17  can't remember the exact color.
18     Q.  Did it just have blank pages on the inside?
19     A.  It had had sheet paper on the inside.
20     Q.  What would you write down in that notebook?
21     A.  That was used for working purposes.  Working
22  purposes.  When I went to a call, when -- if I had to
23  get some information, do an incident report,
24  operations report, if I had to do an investigation.
25     Q.  So was it ---

203

1      A.  It was not used -- it was not used for
2  personal notes.
3      Q.  Was it used to note things regarding your
4  employment?
5      A.  It was used for my job purposes, as I just
6  said.
7      Q.  So would you write down things in your
8  notebook that offended you?
9      A.  Like I said, I used that workbook for work
10  purposes.  I do not remember writing anything down
11  about what may have happened with, like, a personnel
12  matter or something like that.  My notebook was used
13  for, like, enforcing the laws of this State.
14     Q.  Did you ever write anything in there about
15  racism towards you or others?
16     A.  Like I said, I -- I do not believe that I
17  used that notebook, wherever it may be, to write down
18  anything about that.  That workbook was used for the
19  enforcement of the criminal laws of North Carolina and
20  Vance County.
21     Q.  Where is the notebook?
22     A.  I have no idea.  Like I said, I moved
23  several times.  I don't know where the notebook is.
24     Q.  Have you looked for it?
25     A.  Yes.  I've looked for things and I don't

204

1  know where the notebook is.
2      Q.  Okay.  So can you explain how your
3  employment at the Vance County Sheriff's Office caused
4  you to suffer emotional distress?
5      A.  This was a very -- this was a serious matter
6  that affected my livelihood, that affected my working
7  ability as a law enforcement officer as well as my law
8  enforcement certification, being jobless for at least
9  six months.
10         Later not, you know, being able to work in
11  law enforcement because your client gave negative
12  references, alleged, and marked my F5A, report of
13  separation as an internal investigation.  And
14  basically did everything they could to prevent me from
15  working in law enforcement again, so it was very
16  emotional.
17         MR. CASTRO:  Can we please pull up
18  Exhibit 25?
19             (DEPOSITION EXHIBIT
20             NUMBER 25 WAS MARKED
21             FOR IDENTIFICATION)
22     Q.  (Mr. Castro)  And I will ask Mr. White to
23  review it and describe it?
24     A.  Okay.  That's my report of separation, 5A.
25     Q.  What does it say in that block at the top?

205

1      A.  "Report of Separation, Form 5A, Deputy
2  Sheriff."
3      Q.  Is there an A anywhere there?  I see F5,
4  what do you see?
5      A.  F -- F5.
6      Q.  Where in here does it say anything
7  untruthful?
8      A.  Well, first and foremost, the Social
9  Security Number is wrong.  That's untruthful.
10     Q.  Anything else?
11     A.  And I don't believe -- okay.  Okay, wow.
12  Then it says, "Signature on file," whatever that
13  means.
14     Q.  Anything else here untruthful?
15     A.  I don't see anything that stands out.
16     Q.  It asks a question, "Was this separation a
17  result of a criminal investigation or violation of
18  the commission rules?"  And the check is on, "No."  Is
19  that accurate?
20     A.  To the best of my knowledge.
21     Q.  It then asks, "Are you aware of any ongoing
22  or substantiated internal investigations regarding
23  this officer within the last 18 months?"  And it says
24  "Yes."  Were there ongoing or substantiated internal
25  investigations regarding your employment ---

206
1    A.   First and foremost, I did not know that
2 there was an ongoing internal investigation for my use
3 of force in terms of a substantiated use of force.
4 And that was the only thing that your client said
5 was -- that I was, you know, effectively terminated
6 for, the -- the excess of force, violating the -- the
7 policy, B91 or B9I.
8    Q.   Right.  Well, Mr. White, Sheriff White
9 submitted this document, so he is answering that he is
10 aware of any ongoing or substantiated internal
11 investigation.  Was there an investigation into what
12 happened with Ms. Oliver, yes or no?
13    A.   I -- I assume there was, despite me --
14 despite upper management saying that I would be
15 cleared, and that turned out to be false.
16    Q.   So regardless of what happened with the
17 investigation or whether you believe it was done
18 justly, is it accurate that there was an ongoing and
19 substantiated internal investigation regarding your
20 employment?
21    A.   I don't know what took place with that
22 internal investigation.  It was most certainly done
23 not thorough.  I don't even -- I don't even know if
24 you can call it an internal investigation because
25 there is no date that I remember -- that I remember

207
1 seeing on the internal investigation file.  So who
2 knows when it was done?
3    Q.   Do you think it was done within the last 18
4 months?
5    A.   It could have been.  It could have been, but
6 there is no date on the IA file.
7    Q.   How long were you employed at the Sheriff's
8 Office?
9    A.   Approximately a year and a half.
10    Q.   Was it more or less than 18 months?
11    A.   It was -- I believe I was employed like 16,
12 17 months at Vance County.
13    Q.   And to your recollection, when did the
14 Oliver incident occur?
15    A.   In -- around October 22nd, 23rd.  October
16 22, 2018, somewhere around there.
17    Q.   And the date on this document is October
18 25th, 2018.  So again, I'm asking you, other than the
19 Social Security Number and the signature on file, what
20 is not accurate about this F5 form?
21    A.   I don't see anything that's inaccurate, but
22 most certainly, he should have known that checking
23 something like this, whether they false allegations,
24 confirmed allegations, substantiated internal affairs
25 investigations, that that would hurt my prospects.

208
1    All they had to do was do -- have a
2 certified internal affairs investigator investigate,
3 okay?  Instead of deciding, "We're going to do a 24-
4 hour -- less than 24-hour investigation and we're
5 going to fire him."
6    Q.   But if there was an investigation, would it
7 be proper for the Sheriff to say no and lie about an
8 investigation on the F5 form?
9    A.   I don't know.  You -- that's a question for
10 your -- your client.  I don't know his state of mind.
11    Q.   What is your opinion?
12    A.   Of what?
13    Q.   You're saying that it hurt your employment
14 chances that he said that there was an investigation
15 going on in this form.  Should he have said there was
16 not one?
17    A.   I don't know what -- he answered it based on
18 how he wanted it done, all right?  He said that there
19 was a -- they alleged based on the IA report that it
20 was substantiated, so he was right to check "yes."
21    But I have no confidence in that
22 investigation and everything that took place,
23 especially because there was no fairness and I was
24 threatened with dismissal at least three times if I
25 didn't drop my EEO complaints.

209
1    MR. CASTRO:  All right.  We can remove
2 this from the screen.
3    Q.   (Mr. Castro)  I want to talk about your
4 attempts to secure employment after you were
5 terminated.  Did you send a release to the Sheriff
6 Standard Commission allowing them to view your
7 employment documents?
8    A.   What relief -- what release are you talking
9 about?
10    Q.   Let's pull up Exhibit 20.
11    (DEPOSITION EXHIBIT
12    NUMBER 20 WAS MARKED
13    FOR IDENTIFICATION)
14    Q.   (Mr. Castro)  And this is a collection of
15 doc ---
16 (Off-record comment)
17    A.   Okay.
18    Q.   So we'll start with the first page.  What is
19 this document?
20    A.   It's been a long time ago.  It's
21 authorization to release information.
22    Q.   Why did you sign this?
23    A.   It may have been for a job.
24    Q.   Is that your signature?
25    A.   Yes.

210

1    Q.  Does it say that you were allowing this
2  recruiter to obtain your information?
3    **A.  Yes.**
4        MS. ROBINSON:  Brian, can you give him
5  a moment to review this document?
6        MR. CASTRO:  Yes.
7  (Witness examines document)
8    Q.  (Mr. Castro)  Have you reviewed it?
9    **A.  Yes.**
10   Q.  Okay.  Let's go to the second page, the next
11  page.
12   **A.  Yes.**
13   Q.  What is this?  I'll give you time to review
14  it.
15   **A.  I know what it is.**
16   Q.  What is it?
17   **A.  It's a Release of Personnel File that my**
18  **lawyer drew up that you all did not honor.**
19   Q.  What was the purpose of this release?
20   **A.  To get my personnel file from Vance County.**
21   Q.  Do you need more time to review this before
22  we go on?
23   **A.  We can move on.**
24   Q.  All right.  Let's go to the next page.  Do
25  you recognize this document?

211

1    **A.  Yes.  That is a release form from Durham**
2  **County Sheriff's Office.**
3    Q.  What is the date of this document?
4    **A.  It appears either the 13th or the 5th -- the**
5  **15th of March, 2019.**
6    Q.  Why did you sign this release form?
7    **A.  Because I was being vetted by Durham County**
8  **Sheriff's Office.**
9    Q.  Did you give them permission to look at your
10  Vance County personnel file?
11   **A.  Well, yes.  That's -- it's just me signing a**
12  **release form about the -- them authorized to talk to**
13  **them.**
14   Q.  Let's go to the next page.  And this
15  consists of two pages.
16   **A.  Okay.**
17   Q.  I'll give you time to review.
18  (Witness examines document)
19   **A.  You can go ahead with your question.**
20   Q.  What was -- what is this document?
21   **A.  It's a -- Authorization for Release of**
22  **Records.**
23   Q.  Why did you sign it?
24   **A.  Because it was a requirement that it be**
25  **signed for -- and if you would scroll down, for I**

212

1  **believe company -- yeah, company police.  So I was**
2  **being -- vetted for -- as a company police officer, by**
3  **North Carolina Special Police, LLC.**
4    Q.  Does this release apply to your personnel
5  file at the Sheriff's Office?
6    **A.  I assume it would -- it would apply anywhere**
7  **I worked at in law enforcement.**
8    Q.  Did you sign these releases for the purposes
9  of obtaining employment?
10   **A.  I didn't have a choice.  If I didn't sign**
11  **the release, they weren't going to move forward with**
12  **me.**
13   Q.  So if one of these parties were using this
14  release to get your information, were they doing
15  anything wrong?
16   **A.  If it had not been for employment, I would**
17  **never have signed the -- the release forms, the**
18  **authorization.  But if I didn't sign them, I wouldn't**
19  **be able to move forward in the hiring process.  Now,**
20  **I'm not saying that they're doing anything malicious,**
21  **but I'm definitely not going to let Vance County**
22  **sign -- hide behind a release form.**
23   Q.  So if a potential employer showed Vance
24  County Sheriff the release form and he released your
25  personnel file, is he doing anything wrong?

213

1    **A.  No.  They're -- I can't say they're doing**
2  **anything wrong, but in terms of releasing a file,**
3  **that's not something that a agency does.  When -- when**
4  **an employer is looking for -- looking at an applicant**
5  **to hire, they will go to that employer, review the**
6  **file.  No reasonable employer sends a file out -- make**
7  **copies and sends a file out.  Most of the time,**
8  **somebody goes there.**
9    Q.  Did you -- do you think these employers
10  wanted to see what happened before you were terminated
11  at Vance County Sheriff's Office?
12   **A.  Yes.  Every last one of them told me that**
13  **they needed to know what took place involving my use**
14  **of force.  They said because that's a investigation.**
15  **It was a a -- an open-eye investigation.  They would**
16  **have to look at what took place.**
17   Q.  So you disclosed that -- did you disclose
18  what led to your termination?
19   **A.  When you say "disclosed," what are you**
20  **talking about?  Telling them that -- what happened?**
21   Q.  Yes.
22   **A.  Yes.**
23   Q.  What did you tell them?
24   **A.  That there was an allegation of excessive**
25  **force by a female who assaulted me, resisted,**

214

1  aggressive, attacked me, et cetera. She had warrants
2  for her arrest. Unfortunately, I had to do a arm bar
3  -- straight arm bar takedown and her arm got broke.
4  And after that -- shortly after that, they called me
5  in the office and told me that my services are no
6  longer needed.
7      Q.  Based on what you told them, do you think it
8  was proper for them to request your personnel file?
9      A.  Well, that's up for them to make that
10  decision. I know that they're going to want to know
11  what happened in the excessive force, so any
12  reasonable Internal Affairs investigator or -- or
13  manager of a -- or executive of a Police Department is
14  going to want to know what took place.
15      Q.  Is that why you signed those releases that
16  we just went through?
17      A.  I had to sign them, as I previously answered
18  your question, that same question at least two or
19  three times. I had to sign them as matter of seeking
20  employment. And getting certified, I'm going to add
21  that, again with the State. If I didn't sign the
22  forms, I couldn't get hired and I couldn't get my
23  certification.
24      Q.  So when you applied for employment after you
25  left the Vance County Sheriff's Office, did you

215

1  disclose your previous lawsuits and EEOC charges?
2      A.  I don't believe any employer asked for it.
3  And if they did, it's not off the top of my head.
4      Q.  Do you know what they ---
5      A.  So I'm going to say that I did not. I did
6  not disclose that information because it's protected
7  activity, and not only that, I don't believe any
8  employer asked for it.
9      Q.  Do you know if any of your lawsuits are
10  publicly available in court records?
11      A.  Well, yes. It's publicly available on
12  PACER.
13      Q.  Did you disclose other terminations other
14  than the Vance County Sheriff's Office termination?
15      A.  Well, yes. It's required for an F3.
16      Q.  So let's talk about the NC Special Police,
17  LLC specifically.
18      A.  Yes.
19      Q.  Did they give you the reason that they did
20  not offer you employment or that they rescinded an
21  offer?
22      A.  Yes, they gave a reason.
23      Q.  What was their stated reason?
24      A.  And I just want to say this for the record.
25  My Counselor who is representing me on this matter is

216

1  not here. So if it goes too deep, that will be
2  something that you have to reach out to him about.
3      But the reason -- and that's publicly
4  available as well. The reason that they gave is
5  because I filed a discrimination and retaliation
6  lawsuit against Vance County Sheriff's Office, and
7  that they weren't going to keep somebody employed or
8  hire somebody who has sued a law enforcement
9  department, or they could've said law enforcement
10  agency. And they also said that the State don't like
11  it either.
12      Q.  All right. Did they mention the excessive
13  force allegations of the Vance County Sheriff's
14  Office?
15      A.  Yes. That was -- well, in that phone call
16  or documentation, no. But it was definitely came up
17  after I was told that I had nothing to worry about,
18  that I was good to go with the job shortly afterwards.
19      They said something about Captain Bullock
20  wrote something about excessive force and I broke an
21  arm, amongst other things that I can't remember off
22  the top of my head.
23      Q.  Okay. So I want to talk about the specific
24  allegations and hope to be wrapping up soon. If we
25  can go to Exhibit 3, which is the amended complaint.

217

1  And if we can go to Allegation 52, which is on Page
2  13. Can you review that allegation?
3  (Witness complies)
4      A.  "Deputy Green commented that Lieutenant
5  Campbell's respectful, cool and calm to whites but
6  rude and nasty to blacks" ---
7      Q.  When did ---
8      A.  --- just like me.
9      Q.  When was this statement made, this comment
10  made?
11      A.  I will say somewhere around maybe -- maybe
12  November, when I got transferred to Marin's shift.
13  And let me just say that. Earlier I said something
14  about, there may have been some other people on the
15  shift. Deputy Green was one of the new hires that
16  came in and he was also on Marin's shift. And at that
17  time, he was riding with Marin, doing some field
18  training.
19      Q.  Did he provide you with any examples of
20  Lieutenant Campbell being rude and nasty to people of
21  a certain race?
22      A.  Yeah. He said that he rode with Campbell a
23  few times and every time it came to a black person,
24  Campbell was nasty, unprofessional, wanting to get
25  at them, but when it came to a white person, he was

218

1  respectful.  He didn't want to do nothing with it.
2  And then further, Green was going to have to be called
3  as a witness.
4      Q.   Do you plan to call him as a witness?
5      A.   I don't know what my lawyers plan to do.
6  That would be a question for them, Counselor.
7      Q.   All right.  Let's look at Allegation 69.
8  And if you -- if we look at Subsection C, it says,
9  referring to Sergeant Roberson and Sergeant Alexander,
10  "Both Sergeants praised Mr. White's performance" in
11  January of 2018.  Can you describe how they praised
12  your performance?
13      A.   True statement.  As I described earlier,
14  that Sergeant Roberson told me that I was a good
15  deputy, that I come to work, that I do my job.  That
16  he had no issues with my personal performance or work
17  performance -- personal conduct or work performance.
18      I asked the same questions to Sergeant
19  Alexander and he confirmed that he had no issues
20  either outside of that one incident that I was cleared
21  for, and so that's what I'm talking about.
22      Q.   Moving on to Allegation 84 on Page 17, it says,
23  "Mr. White understood Sheriff White's instruction to
24  issue criminal citations to Mexican-Hispanic persons."
25      Did Sheriff White tell you to issue criminal

219

1  citations to Mexican-Hispanic persons?
2      A.   In fact, when he told me to issue that
3  ticket to the Hispanic, when I as the responding
4  officer -- determined that he had not done anything
5  and didn't deserve a ticket, that's exactly what he
6  done.  Because you ---
7      Q.   But did ---
8      A.   Excuse me?
9      Q.   But did he tell you, "You need to issue
10  criminal citations to Mexican and Hispanic people"?
11      A.   He didn't say those specific words.
12      Q.   Okay.  And it says, "Lieutenant Campbell's
13  instruction not to issue criminal citations to white
14  persons."
15      Did he instruct you not to issue criminal
16  citations to white persons?
17      A.   He didn't say those specific words, but most
18  certainly his actions of me giving a -- of management
19  allowing me to give a Hispanic man traffic summons
20  then not allowing me to give a white woman traffic
21  summons, something's wrong with that picture.  And I
22  believe it's -- it's discriminatory.
23      Q.   And did you understand that to be them
24  instructing you to target a specific race?
25      A.   I understood them to be telling me to get --

220

1  that they don't have a problem with, you know,
2  deputies getting minorities, per se.  But when it
3  comes to a Caucasian-Americans, we had to be careful.
4      There is no other reason.  I mean, the
5  example speaks for itself.  In my opinion, why not
6  ticket the white woman who committed more gross
7  violations, okay under Chapter 20.  But yet you want
8  to ticket a Mexican and Hispanic male who didn't
9  deserve to be ticketed.
10      Q.   Moving on to Paragraph 110 on Page 21.  It
11  states, "Mr. White later learned that the increase in
12  hostility towards him was created by Sheriff White.
13  After Mr. White filed his internal complaints and EEOC
14  charge, Sheriff White held a conference with
15  leadership, deputies and staff members and informed
16  all of Mr. White's complaints and instructed them not
17  to speak around Mr. White."
18      When did this conference happen?
19      A.   That is a true statement confirmed by --
20  told to me by Sergeant Welborn and Sergeant Bobby
21  Martin, as well as Lieutenant Goolsby and Captain
22  Watkins.  And it was also told to me by Deputy Poole
23  because he heard it.
24      So that is a true statement.  In fact,
25  Captain Watkins told me to watch my back.  He said,

221

1  "Bro, watch your back."  In fact, in front of multiple
2  deputies, Sergeant -- Sergeant Bobby Martin told me in
3  front of multiple deputies that the command staff had
4  the meeting and that Sheriff White said those things
5  that you just wrote and directed Goolsby to get with
6  both sergeants and to tell them.
7      So this took place in the -- in around the
8  time in the summer, when -- after I filed my
9  grievances.
10      Q.   Moving on to Paragraph 131 located on Page
11  24, it says, "Since it terminated Mr. White, VCSO has
12  made remarks that deputy sheriffs who file complaints
13  against management for discrimination will end up like
14  Mr. White."  Can you tell me what this is about?
15      A.   Yeah.  Sergeant Bobby Martin said something
16  to Poole in the patrol room, said, "All right, now.
17  You don't want to end up like your boy."  And Poole
18  said, "What boy?"  "Fired."
19  and      So something for that nature.  There could
20  have been other things that's not coming to the top of
21  my head, but that was one of them.
22      Q.   So was any -- do you know of anything that
23  was said about you by Peter White after October 23rd
24  of 2018?
25      A.   I don't know what he said.

222

1    Q.   Can you identify any statements he made?

2    A.   No, I can't.

3    Q.   How about Lawrence D. Bullock, can you

4    identify any statements he made?

5    A.   No, I can't.

6    Q.   How about Weldon Wallace Bullock?

7    A.   After I had my -- I can identify the

8    statements he made during the unemployment appeal that

9    they appealed after I won against the County.  And

10   then I can -- the County and I did a -- under my

11   former lawyers, did a Rule -- Rule 408 meeting.

12       And sometime after that, I learned that it

13   was going around through the Sheriff's Office that I

14   had met with them and that it was said by management,

15   whomever it was, "We don't want him back."

16   Q.   And you said there were statements made

17   during an unemployment appeal.  What were those

18   statements?

19   A.   The same statements that I told you about

20   earlier.  When Captain Bullock said that 911 didn't

21   hear it, the information that I requested and said

22   that -- something to the effect that he believes that

23   there was a distinction or disorientation of what

24   was -- I was asking and what they thought it would be.

25   Something to that effect.

223

1    Q.   Okay.  I'm going to ask the same question

2    about anything that was said by Peter White that you

3    can identify as of August 4th of 2019.  Can you

4    identify any statements?

5    A.   August 4th of 2019.  He may have said some

6    things.  Nothing that's coming to the top of my mind.

7    Q.   How about Peter White?

8    A.   They were retired by that time -- August

9    4th, 2019.  He may have said some things, but nothing

10   is coming to the top of my head.

11   Q.   Is that the same for Weldon Wallace Bullock?

12   A.   Outside of what I've already told you, yes.

13   Q.   Okay.  So you mentioned that you worked with

14   a Deputy Patel.  Is that correct?

15   A.   Yes.

16   Q.   Did you ever call him any racial slurs?

17   A.   No.

18   Q.   Did you ever ---

19   A.   I do not remember calling him any racial

20   slurs.

21   Q.   Did you ever call him "Osama"?

22   A.   No, that -- no.  The name "Osama" was called

23   by Sergeant Bobby Martin.

24   Q.   Can I turn your attention to Exhibit 24?

25       (DEPOSITION EXHIBIT

224

1        NUMBER 24 WAS MARKED

2        FOR IDENTIFICATION)

3        MR. CASTRO:  And I would ask that we

4    zoom into the exhibit.

5    Q.   (Mr. Castro)  Once you have a chance to

6    review this, please let me know what it is?

7    (Witness examines document)

8    A.   I see it.

9    Q.   What is this?

10   A.   This is -- appears to be a statement from

11   Deputy Patel.

12   Q.   Does it say in this statement that you

13   called Patel "Osama" a few times?

14   A.   At the end, it says it.  It says

15   that, "Then Deputy White said 'Osama' a few times and

16   looked at me."  It doesn't specifically say that I

17   called him Osama, but he's referencing that I said,

18   "Osama" and looked at him, implying that I was

19   referring to him.

20   Q.   Did you say, "Osama," and look at him?

21   A.   No, I did not.

22   Q.   So is ---

23   A.   It's another deceptive statement from the

24   the members of the Vance County Sheriff's Office.

25   Q.   So is Deputy Patel lying about this?

225

1    A.   He's lying because I do not remember any of

2    this, and I contend it did not happen.

3        (DEPOSITION EXHIBIT

4        NUMBER 4 WAS MARKED

5        FOR IDENTIFICATION)

6    Q.   Okay.  I'm going to get to conclude.

7    Exhibit 4 is a Motion for Leave to File Amended

8    Complaint.  And I'm going to turn your attention to

9    Document 32-1, which is the second document.

10       On the second page of that document, it says

11   in that paragraph before the argument, and I'm going

12   to let the reporter scroll to Page 2 of 10 of Document

13   32-1, and that -- you are there?

14   A.   I'm -- I'm ---

15       MR. CASTRO:  There we go.  Scroll up a

16   little bit, please.

17   Q.   (Mr. Castro)  That paragraph before the

18   argument section, can you review that?

19   (Witness complies)

20   A.   "Since Plaintiff's Complaint was filed,

21   Defendants' continued discriminatory and illegal

22   actions have unjustifiably prevented Plaintiff from

23   securing employment in his chosen field, negatively

24   impacted his financial prospects and caused him severe

25   emotional distress.  The continued actions of

226

1  Defendants have necessitated the naming of Sheriff
2  Curtis Brame as a party to the case and given rise to
3  new causes of actions which Plaintiff seeks to add
4  through his Amended Complaint.  Additionally, pursuant
5  to the law, Plaintiff seeks the leave to add the
6  Sheriff's surety."
7       MS. ROBINSON:  I'm going to object to
8  this.  This is attorney-client privilege.  Not only
9  that, but the court has ruled on this matter and Brame
10  was not allowed to be named.  So it's irrelevant.  It
11  exceeds the scope of this case at this point.
12       MR. CASTRO:  Okay.
13       MS. ROBINSON:  And he's answered the
14  question.
15       MR. CASTRO:  I'll ask you not to make
16  speaking objections again.
17  Q.  (Mr. Castro)  So how have the Defendants
18  prevented you from securing employment, exactly?
19  A.  Because they have blocked my prospects with
20  this report of separation, saying that -- internal
21  investigation, and they have falsely charged me with
22  excessive force when there is no excessive force.  And
23  they have given negative references.
24  Q.  What negative ---
25  A.  To my prospective employers.

227

1  Q.  What negative references are you referring
2  to?
3  A.  Of me working at the Vance County Sheriff's
4  Office and the incidents that took place there
5  involving my excessive force, if not other things.
6  But the thing that keeps coming up is the excessive
7  force.
8  Q.  Do you have any proof that anyone from the
9  Vance County Sheriff's Office has contacted
10  prospective employers about you?
11  A.  My attorneys may or may not have the proof.
12  Q.  Do you have any knowledge of anyone from the
13  Vance County Sheriff's Office telling your prospective
14  employers bad things about you, or not to hire you?
15  A.  Yes.  I have knowledge that took place.
16  Q.  What is that knowledge?
17  A.  When I applied for G4S special police, the
18  captain at the time -- I can't think of his name.
19  Hold on.  It's coming to me.  Captain Bryan Kale,
20  K-A-L-E.
21       He was interested in hiring me, starting me
22  out somewhere around like $19 an hour, full-time
23  employee, et cetera.  He told me that he was a use of
24  force investigator.  He had done it for a while and he
25  was going to go to Vance County and look at the

228

1  excessive force file, the internal affairs file for
2  the excessive force.
3       And he said if it's just that, you know,
4  based on what I'm telling him as I previously told you
5  about her arm being broken and she been aggressive, et
6  cetera, then I shouldn't have a problem.  And so he
7  went down there.  He said he had to see the file, and
8  there was some other things that he said.
9       Said that he was going down there and, you
10  know, take a day off and, you know, look at my file,
11  talk to Vance County, et cetera.  And he assured me
12  that he was going to let me know what Vance County
13  said.
14       And I called him later on, and he confirmed
15  that he had just left Vance County and that he had
16  spoke to former -- my former supervisors, the
17  officials at Vance County.  I asked him for names.  He
18  would not give me names.  He just said, "Management
19       And I asked him about the -- the use of
20  force, the excessive force report.  And he said,
21  "Well, there isn't much to that.  There's not a lot to
22  it."  I said, "Okay."  He said, "But there are other
23  things."
24       And I said, "When you talk about other
25  things," I said, "Are you talking about a write-up or

229

1  something?"  He said, "No.  The write-up isn't the
2  issue.  Everybody got write-ups, but I'm not going to
3  talk to you about it."  I said, "What do you mean,
4  you're not going to talk to me?"
5       "I just told you I'm not going to talk to
6  you about it.  I need time to speak to my deputy
7  chief."  And I asked him, I said, "Well, did they give
8  negative references?"  And he hesitated, and I asked
9  him again and he said, "Mr. White, I just told you I'm
10  not going to talk to you about it.  I need to speak to
11  my deputy chief before I say anything to you."
12       And so he said he would call me in the
13  coming days, and he later called me and he told me.
14  He said, "Mr. White, I told you I was going to call
15  you after I spoke with my Deputy Chief, and he's made
16  the decision to -- for me not to tell you anything
17  about what Vance County said.  And -- but to tell you
18  that we were not going to proceed -- we will not
19  proceed with your application."
20  Q.  And is this Bryan with an I or a Y?
21  A.  I believe it was a Y.
22  Q.  And what prospective employer did you say,
23  what was their name?
24  A.  G4S Special Police, Captain Bryan Kale.
25  Q.  So did you attempt to get re-certified as a

230

1  law enforcement officer after you left the Vance
2  County Sheriff's Office?
3      A.  I did before my one-year ran up.
4      Q.  Did you have to sign releases to get
5  re-certified?
6      A.  Well, you know I did.
7      Q.  So without discussing anything that you
8  talked with your attorneys about or any attorney
9  advice, obviously.  When did you decide that you might
10  sue the Vance County Sheriff's Office?
11      A.  I can't give you that information.  I don't
12  have a specific date for you.  And I mean, if
13  anything, that is -- I mean, that situation is between
14  my attorneys and I.
15      Q.  Without discussing any attorney advice or
16  anything that your attorney has told you about this
17  case, was there any specific incident that made you
18  think you should file a lawsuit against this the Vance
19  County Sheriff's Office?
20      A.  I can't discuss that information.  I don't
21  have a specific -- specific date for you.
22      Q.  Okay.  That's fine.
23      A.  And outside of specific date -- specific,
24  excuse me.  Most certainly we'll venture into
25  attorney-client -- client privilege if that's the

231

1  case.
2      Q.  Of course.  Yes.  I'm not asking about that.
3      A.  Uh-huh (yes).
4      Q.  Okay.  So in conclusion, finally, you
5  identified William Taylor Bartholomew as someone who
6  might have knowledge about your case.  Who is Mr.
7  Bartholomew?
8      A.  Mr. Bartholomew is a former Detective
9  Sergeant at Vance County, former Detective Criminal
10  Investigator at Vance County.
11      Q.  What does he know about your case?
12      A.  Considering that he's an Internal Affairs
13  investigator and Vance County Sheriff's Office sent
14  him and Major John Shelton to go through IA, which
15  covers use of force.
16          He would -- and he would have the ability to
17  distinguish whether or not this was a quick, trumped
18  up investigation, no thoroughness, or whether or not
19  there's any credibility to the excessive force.  As
20  he's investigated multiple incidents, so if not
21  multiple, at least a few at the Sheriff's Office
22  involving other deputies.
23      Q.  Does he have -- did he personally witness
24  any of your treatment at the Vance County Sheriff's
25  Office?

232

1      A.  I don't know what he witnessed.  He was
2  there when I worked there.
3      Q.  Okay.  And the final exhibit that I will
4  show you today is one that we sent recently, which is
5  marked as Exhibit 28.  And I will ask the reporter to
6  show it and I'll ask you to review it and let me know
7  what this is?
8          (DEPOSITION EXHIBIT
9          NUMBER 28 WAS MARKED
10         FOR IDENTIFICATION)
11  (Witness complies)
12      A.  I know what it is.  It's a tuition
13  reimbursement agreement.
14      Q.  What was the purpose of this agreement?
15      A.  Tuition reimbursement.
16      Q.  Did this create an employment contract with
17  the Sheriff's Office?
18      A.  No.  It didn't create an employment contract
19  with them.
20      Q.  Does this agreement constitute a contract
21  with the Sheriff's Office?
22      A.  It certainly does not.
23      Q.  Have you searched for that two-year contract
24  that you mentioned?
25      A.  I have and I'm unable to find it.

233

1          MR. CASTRO:  Can we take a five-minute
2  break and then likely no more questions?  Thank you.
3          THE COURT REPORTER:  We are off the
4  record.
5  (Brief recess: 6:35 p.m. to 6:40 p.m)
6          THE COURT REPORTER:  We are back on the
7  record.  The time is 6:40.
8      Q.  (Mr. Castro)  Just a couple more questions.
9  Other than the Bryan Kale incident that you described,
10  do you have any other proof or incidents where VCSO
11  tried to stop you from gaining employment?
12      A.  Sorry, Brian, I was coughing.  Can you
13  repeat that question?
14      Q.  No worries at all.  Other than the incident
15  with Bryan Kale that you described, do you have any
16  other proof or incidents that you can describe where
17  VCSO tried to stop you from gaining employment?
18      A.  There may be some proof that my attorneys
19  have that's not coming to me.  I do know when I --
20  hold on.  Give me a few seconds, if you don't mind.
21          When I applied for Wake County Sheriff's
22  Office for a deputy sheriff, they asked -- the
23  recruiting officer asked about my -- if I was BLET
24  certified, and I said yes.  They asked if I had my
25  general -- no.  No, no.

234

1    I told them I had my general certification
2 and they said, "Okay, great." And they asked where 2 I
3 was previously, and I told them. (Witness coughs)
4 Excuse me. And they asked what did my F5 report of
5 excuse me. Excuse me. Report of separation say.
6    They asked if any of the boxes were checked
7 and I told them yes. Internal investigation, 18
8 months. And they said that -- that's going to be a
9 problem.
10    And they asked, "First, I need to know --
11 said, "First, I need to know what -- what internal
12 affairs investigation they were referring to, and I
13 told them. I said, "It doesn't say specifically, but
14 I believe it's -- it's for my use of force, excessive
15 force allegation."
16    They asked if it was sustaining and I said,
17 "According to the Department, it is." And so they
18 told me that the Sheriff would most likely not hire
19 me, but he was going to talk to his Lieutenant and
20 Captain and see what they say.
21    And so the word came back down. I believe
22 the investigator was Nicholas O. -- Nicholas O. Hatley
23 or Nicholas O. Garvey, somewhere around -- something
24 like that.
25    Said that a lieutenant, I believe he said

235

1 Lieutenant Bobby Sutton -- Sutton, S-U-T-T-O-N, gave
2 him an answer and said that the Sheriff was not going
3 to hire me with my form marked, my -- with the
4 excessive force as well.
5    Q. Did he inform you that he had spoken to
6 anyone at the VCSO?
7    A. I don't know -- I don't know if he spoke to
8 anybody there.
9    Q. But he saw your F5 form?
10    A. I believe so, yes.
11    Q. Other than those two incidents, anything
12 else about preventing you from securing employment?
13    A. Other than the excessive force, the
14 departments kept saying the excessive force is the
15 issue with Vance County, things that Vance County did
16 with the excessive force.
17    So evidently, what happened with G4S, when
18 the Captain wouldn't go into detail, wouldn't answer
19 my question about them providing negative references
20 and why he's not going to talk to me, et cetera, when
21 he said that he would. And saying he was going to
22 wait until he spoke to his Deputy Chief and those
23 incidents.
24    Like I said, there may be other instances.
25 It's -- it's a lot of stuff that's happened, Brian.

236

1 And I'm not Superman and I'm not God. I can't
2 remember everything.
3    MR. CASTRO: Well, I appreciate you
4 telling me what you do recall and I appreciate you
5 sitting for this deposition for such a long time. I
6 have no further questions at this time.
7    MS. ROBINSON: Can I have a few minutes
8 to see if I want to do any kind of redirect?
9    MR. CASTRO: Yes.
10    THE COURT REPORTER: We are off the
11 record. The time is 6:45.
12 (Brief recess: 6:45 p.m. to 6:51 p.m.)
13    THE COURT REPORTER: We are back on the
14 record. The time is 6:51.
15    EXAMINATION
16 BY MS. ROBINSON:
17    Q. I have a couple of questions for you.
18 First, I would like to ask, is there a distinction
19 between a traffic ticket and a criminal summons?
20    A. No. They're virtually the same thing.
21    Q. By that, what do you mean?
22    A. You can charge a criminal summons -- a
23 criminal summons, you can charge for infractions,
24 misdemeanors. Some law enforcement officers charge
25 for felonies on a criminal summon, although it

237

1 shouldn't go up there. It should go on a warrant or a
2 magistrate's order if you have that person in your
3 custody.
4    Q. Is a person arrested if they receive a
5 criminal summons?
6    A. No. Although some of the charges that may
7 be on a criminal summons is an arrestable offence,
8 that person is -- the officer or the deputy or --
9 would draft a criminal summons, present it to the
10 magistrate judge or a judge.
11    The judge would review it, swear the officer
12 or, you know, the deputy in, get a brief testimony
13 just to determine probable cause. If the court
14 declines probable cause, you can't move forward. If
15 the court allows probable cause, approves it, they'll
16 either sign it and then you go serve it.
17    You or another law enforcement officer will
18 go serve it. And then after you serve it on them, you
19 would -- you'd do a return that goes to the clerk's
20 office.
21    Q. So I'm going to change gears a bit. You
22 spoke about your complaints of discrimination being
23 made. When did you first make a complaint of
24 discrimination?
25    A. The first complaint of discrimination in

238

1   terms of my internal -- are you referring in terms of
2   my internal EEO grievances?
3       Q.  No.  Either oral or written.
4       A.  The oral complaints, they were made in 2017.
5   There were issues prior to any written warning, any
6   suspension, any internal or external EEO-protected
7   activity that went to the Sheriff, the HR Director and
8   the EEOC.  There were issues well before I put
9   something on paper.
10      Q.  What were those issues?
11      A.  The homophobic statements by Sergeant -- I
12  can't think his name.  It'll come to me.  Sergeant
13  Martin, Bobby Martin.  When he was a criminal
14  investigator in the process of becoming a sergeant,
15  around the same time.  And which he later apologized
16  for, but that still happened.
17      Q.  What homophobic statements did he make?
18      A.  He said that -- I'm sorry?
19      Q.  What homophobic statements did he make?
20      A.  He said that I was gay and that's what he
21  heard, and he said that I was getting rammed by a man
22  and that I was sucking a man, and which I was not.
23      Q.  And who did you report that to?
24      A.  I talked to Sergeant Roberson about it.
25      Q.  What did Sergeant Roberson say?  Was there

239

1   an investigation?
2       A.  No.  There was not an investigation.  He
3   said something about that -- that I could file a
4   complaint.  He said that I was new there.  He told me
5   he apologized, and so they might not do anything with
6   it, they being management, leadership, supervision.
7       Q.  You started to say that there were many
8   complaints before you decided to put anything in
9   writing.  Does anything else jump out at you?
10      A.  The purple unicorn.  There were complaints
11  about Sergeant Campbell and I when I worked -- when I
12  was in field training with him for two-and-a-half,
13  three weeks, approximately.
14          I recognized whenever we went to calls
15  involving minorities, specifically black males, that he
16  (witness coughs) -- excuse me.  Excuse me.  That he
17  was hostile.  He -- it's as if he had a vengeance, a
18  grudge about them -- about us.  Excuse me, about us.
19          He did not like African-American males for
20  whatever reasons, based on his conduct and egregious
21  behavior -- behaviors.  But when it came to
22  Caucasian-Americans, he was very respectful.
23          And this just goes back to Deputy Isaiah
24  Green's assessment without my influence or statement,
25  formulating his own opinions, which were consistent

240

1   But what the -- the testimony I've previously provided
2   and currently provided -- providing, excuse me.
3       Q.  Okay.  And I have one final question.  When
4   you were transferred from your initial squad, did your
5   hours change?
6       A.  No.  In terms of pay?  That's what you're
7   referring to?
8       Q.  No.  The shift.  Was there a shift change?
9       A.  Yes.  There was a shift change, but there
10  was no compensation change in terms of the hours I was
11  working.
12      Q.  What was the -- what was the shift change?
13      A.  I went from Sergeant Roberson's shift to
14  Sergeant Alexander's shift.
15      Q.  What was Sergeant Roberson's shift?
16      A.  I mean, both of the shifts rotated.  One was
17  on day, one was on night.
18      Q.  Uh-huh (yes).
19      A.  So I would've -- if for example, when I was
20  transferred, I would've been working day shift with
21  Roberson and then when I transferred, I was working
22  night shift with Marin.  But if I would've transferred
23  from Marin to Roberson, then it will be vice versa,
24  depending on which rotation has day shift or night
25  shift.

241

1       Q.  Was there a change -- did the change in
2   supervision, do you think it led to a change in your
3   ability to grow?
4       A.  Well, D. Ray was more of a -- he was
5   respectful, laid back.  He was -- he's somebody that
6   can lead, somebody who worked with his officers in the
7   field.  Sergeant Alexander, based on what I heard and
8   some of the things I saw, he had the ability to, you
9   know, lead.
10          But for whatever reasons, he couldn't get to
11  work on time, constantly late, absenteeism, tardiness.
12  Shutting down whenever something going on, not
13  working, not responding to calls.  Later saying that
14  he don't have to answer calls because he is a
15  supervisor.
16          So I will say that things were moving along
17  under Sergeant Roberson more so than Sergeant
18  Alexander.  But things could have been better had
19  Lieutenant Campbell not set out to persecute or
20  prosecute me wrongfully for whatever reasons.
21      Q.  Out of all the complaints you've made, was
22  there an investigation?
23      A.  There was an investigation allegedly ordered
24  by -- well, Sheriff White eventually, after he talked
25  to Director Johen, did an investigation as far as the

242

1   Campbell situation with the written warning, the
2   suspension, that issue.  No.  Not -- in terms of all
3   of my issues, whether oral or written, no.  Not every
4   one of them resulted in an investigation.
5           And I don't know how they're going to do an
6   investigation when they already say that, one, in the
7   County's EEO response done by Attorney Andrew
8   Atherton, that the County had no obligation to do
9   these investigations or let alone hear my side out,
10  something to that effect.
11          And also, it was very clear by management
12  that the Sheriff don't like deputies going to HR and
13  he wasn't a fan of me doing it.  That's why he ran me
14  out of there.  That's what -- I mean, let's just be
15  real.
16              MS. ROBINSON:  I don't have any further
17  questions.
18              MR. CASTRO:  I have no further
19  questions either.
20              THE COURT REPORTER:  This concludes the
21  deposition.  The time is 7:01 p.m.
22
23          WHEREUPON, at 07:01 o'clock p.m., the
24  deposition was adjourned.
25

---

243

CERTIFICATION

I, Lori Gruber, Notary Public in and for
the County of Iredell, State of North Carolina at Large,
do hereby certify:

That there appeared before me, via video
conference, the foregoing witness at the time and
place herein aforementioned;

That the said witness was sworn by me to state the
truth, the whole truth, and nothing but the truth, in
said cause;

That the testimony was taken before me via video
conference, and the foregoing consecutively numbered
pages are a complete and accurate record of all the
testimony given by said witness;

That the undersigned is not of kin, nor in anywise
associated with any of the parties to said cause of
action, nor their counsel, and that I am not
interested in the event(s) thereof.

Reading and signing of the testimony was requested.

IN WITNESS WHEREOF, I have hereunto set my
hand this 22nd day of February, 2021.

*Lori Gruber*

CHAPLIN & ASSOCIATES
Notary No. 201919100031

---

244

WITNESS CERTIFICATION

I, JUSTIN J. WHITE, do hereby certify,
That I have read and examined the contents of the
foregoing pages of record of testimony as given by me
at the times and place herein aforementioned;

And that to the best of my knowledge and belief,
the foregoing pages are a complete and accurate record
of all the testimony given by me at said time, except
as noted on the attached here (Addendum A).
I have _____ / have not _____ made changes/corrections
to be attached.

_____
(WITNESS SIGNATURE)

I, _____, Notary Public
for the County of _____, State of
_____, do hereby certify:

That the herein-above named personally appeared
before me this the _____ day of _____, 20____;

And that I personally witnessed the execution
of this document for the intents and purposes herein
above described.

_____
NOTARY PUBLIC

My Commission Expires:          (SEAL)

---

245

ADDENDUM A

Upon the reading and examination of my
testimony as herein transcribed, I note the following
changes and/or corrections with accompanying reasons(s)
for said change/correction:

Page    Line              Is Amended to Read

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

### Exhibits

**7180 Justin White 02-10-21 Exhibit 1** 4:13 21:10,11,14

**7180 Justin White 02-10-21 Exhibit 3** 3:15 87:21,22,24,25 155:18 216:25

**7180 Justin White 02-10-21 Exhibit 4** 4:17 225:3,4,7

**7180 Justin White 02-10-21 Exhibit 6** 4:19 22:1,2,4,5

**7180 Justin White 02-10-21 Exhibit 9** 4:21 89:8,9,11

**7180 Justin White 02-10-21 Exhibit 10** 4:23 98:3,4,7,8

**7180 Justin White 02-10-21 Exhibit 11** 5:4 101:2,3,6 102:12

**7180 Justin White 02-10-21 Exhibit 12** 5:6 104:3,4,5,19

**7180 Justin White 02-10-21 Exhibit 13** 5:8 107:21,22,25

**7180 Justin White 02-10-21 Exhibit 14** 5:10 120:12,13,15

**7180 Justin White 02-10-21 Exhibit 16** 5:12 125:2,3,6

**7180 Justin White 02-10-21 Exhibit 17-Placeholder**

**7180 Justin White 02-10-21 Exhibit 19** 5:16 169:21,22,25

**7180 Justin White 02-10-21 Exhibit 20** 5:18 209:10,11,12

**7180 Justin White 02-10-21 Exhibit 24** 5:20 223:24,25 224:1

**7180 Justin White 02-10-21 Exhibit 25** 5:22 204:18,19,20

**7180 Justin White 02-10-21 Exhibit 28** 5:4 232:5,8,9

### $

**$19** 227:22

### -

**--I** 134:16

### 0

**07:01** 242:23

### 1

**1** 21:11,14 90:8

**10** 98:4,7,8 113:25 225:12

**10-18** 113:24,25

**10-28** 135:1

**10-29** 133:23,24

**10-29s** 133:1,10 135:4 136:21

**10:00** 142:11 143:4,9

**10:15** 8:2,4

**10th** 8:5

**11** 101:3,6 102:12

**110** 220:10

**11:00** 142:12 143:10

**11:05** 38:9,10

**11:14** 38:10,12

**12** 12:8 89:3 104:3,5,19 116:3

**123** 155:20

**12:00** 138:18 140:5 142:13 147:6 180:20

**12:06** 70:21,22

**12:12** 70:22,24

**12:17** 74:23,24

**13** 107:22,25 217:2

**131** 221:10

**13th** 211:4

**14** 120:13,15

**15** 100:17 160:4

**15th** 211:5

**16** 88:1 125:3,6 207:11

### 17

**17** 12:5 125:23 126:2 207:12 218:22

**18** 205:23 207:3,10 234:7

**18-week** 12:5

**18th** 108:4

**19** 169:22,25

**1:21** 74:24 75:1

**1st** 104:25

### 2

**2** 91:6 125:15 170:24 225:12

**20** 49:2 52:18 78:9 160:4 185:15 209:10,12 220:7 244:19

**2012** 18:2,3 160:20

**2015** 18:3 55:6,7

**2016** 18:15 19:10

**2017** 15:22 18:16 19:11,21 23:13 27:19 42:23 43:11 53:10 60:1 63:7 72:12 75:3 80:9 93:6 100:8,14,17 107:7 195:25 238:4

**2018** 20:5,7 84:7 89:25 99:3,16 100:9 101:13,17 104:25 108:4 113:2 117:5 126:9 127:18 132:8,13 147:18 159:11 170:9,11,14 177:10,12 178:21 193:8 196:1 207:16,18 218:11 221:24

**2019** 211:5 223:3,5,9

**201919100031** 243:24

**2021** 8:5 243:22

**20th** 89:25

**21** 220:10

**22** 207:16

**22nd** 147:18 167:17 170:9,11 207:15 243:22

**23** 155:20

**23rd** 207:15 221:23

**24** 221:11 223:24 224:1

**24-** 208:3

**24-hour** 208:4

**24th** 188:13

**25** 78:9,11 204:18,20

**25th** 207:18

**27** 117:5 127:18

**27th** 100:8

**28** 232:5,9

**2:00** 138:17 140:3,4,5 141:6,7,21 143:11,
21 144:4 145:22 147:10 181:1,20

**2:04** 97:24,25

**2:10** 97:21,25 98:2

**2:58** 124:12,23,24

---

**3**

**3** 87:22,25 155:18 171:1 216:25

**3-17** 127:17

**3-17-2018** 127:5,7,9,11

**3-27** 127:17

**3-27-2018** 127:10,16

**30** 115:10 146:6,15

**30th** 101:13 127:2

**32-1** 225:9,13

**39** 50:25

**3:00** 188:13

**3:17** 124:24 125:1

---

**4**

**4** 225:4,7

**4-3-18** 120:23

**408** 222:11

**47** 88:1 155:20

**4:04** 155:10,13

**4:20** 165:2

**4:52** 186:24,25

**4th** 223:3,5,9

---

**5**

**50** 99:7,12

**52** 217:1

**5:00** 144:5 145:22

**5:24** 186:25 187:2

**5A** 204:24 205:1

**5th** 27:9,12,15,18,19 28:7 100:9,14 211:4

---

**6**

**6** 22:2,5

**6-8** 171:3

**69** 218:7

**6:35** 233:5

**6:40** 233:5,7

**6:45** 236:11,12

**6:51** 236:12,14

---

**7**

**7** 100:16

**78** 88:1,3

**7:00** 170:16

**7:01** 242:21

---

**8**

**8-15-1989** 110:14

**82** 88:7

**84** 218:22

**8:00** 170:16,18

**8:30** 117:19 127:25

---

**9**

**9** 89:9,11 127:25

**911** 66:17 68:22 69:3,16,21 70:11 71:6,
12,24 72:1,6,9 93:20 109:6 111:13
115:22 134:19 135:1,9 136:19,21,25
163:21,22 164:2,3 185:2,8 220:20

**9:00** 127:22 170:19

**9:40** 127:5,22

**9:40:52** 127:16

---

**A**

**A-N-T-O-N** 42:25

**a.m.** 8:2,4 38:10,12 140:3,4,5 141:6,7,21
143:12,21 144:4 145:22 147:6,10 181:20

**ability** 204:7 231:16 241:3,8

**absent** 48:9

**absenteeism** 241:11

**absolutely** 74:12 102:15,21

**academy** 55:11,16,18,19,23

**accept** 26:14 61:14

**acceptable** 26:22

**accepted** 62:25

**access** 199:3,7,9,11

**accompanying** 245:5

**accomplished** 82:17

**account** 59:12

**accurate** 59:12 91:13 100:21 109:17,19
123:24,25 124:1 130:18,21 131:4 139:10
205:19 206:18 207:20 243:14 244:8

**accused** 164:17

**achieving** 13:8

**acknowledge** 6:10,13

**act** 157:1 195:20

**acted** 50:12 149:24

**acting** 15:1 62:13 151:11 152:9 154:14

**action** 76:23 96:23 99:8 123:19 243:18

**actions** 99:21 152:24 198:5 219:18
225:22,25 226:3

**active** 137:3

**activity** 154:5 176:25 177:18 178:10
181:16 215:7 238:7

**actual** 153:15,23

**Adam** 54:6

**adamant** 153:12 181:18 182:20 184:6

**add** 122:8 214:20 226:3,5

**addendum** 244:10 245:1

**additional** 123:21 143:20,22

**Additionally** 226:4

**address** 43:15 83:25 106:18

**addressed** 36:17

**addressing** 43:5

**adhered** 183:19

**adjacent** 199:1

**adjourned** 242:24

**administered** 3:14

**administration** 12:14 13:1

**admission** 98:23

**admit** 129:17

**admitted** 40:15 47:4 66:6,7 76:19 104:8

**admitting** 141:5

**advanced** 39:4

**advice** 102:22 230:9,15

**advise** 102:20

**advised** 102:15 105:8,21 112:15

**affairs** 207:24 208:2 214:12 228:1 231:12 234:12

**affected** 204:6

**affiliated** 126:18

**aforementioned** 143:8 244:6

**African-american** 13:12 46:20 54:17 140:21,25 194:1 195:23 239:19

**African-americans** 92:7

**aftercare** 170:3

**afternoon** 141:25 142:7 144:19

**afterward** 128:15

**agency** 12:8 160:21 166:21 213:3 216:10

**aggression** 15:5 169:2,3

**aggressive** 15:9 150:24 153:1 164:21 214:1 228:5

**aggressively** 154:15

**aggressiveness** 169:3,10

**agree** 9:1 58:9,24 78:11,14 87:12 90:4 144:10

**agreed** 107:16

**agreement** 8:21,22 179:19 180:12 232:13,14,20

**agrees** 84:14

**ahead** 64:7,8,10 81:9 110:12 119:25 121:19 129:4 141:18 159:5 211:19

**air** 61:13

**Albemarle** 55:5

**Alexander** 32:9 47:24 48:20 49:10,15 51:16 52:4,7,14,21 53:2,5,13,19 61:1 63:3,4,8,18 64:24 66:14 69:1,14 75:2 76:18 77:1 85:12 86:5 92:12,19 93:2,7 108:4 111:25 112:7,16 114:7,22 115:15 116:2,19,20 122:17 218:9,19 241:7,18

**Alexander's** 50:25 72:10 75:4 77:12 109:11 240:14

**Alexander's** 76:2

**Algretta** 58:13

**allegation** 155:22 197:11 213:24 217:1,2 218:7,22 234:15

**allegations** 58:16 98:16 163:11 196:23 197:1 207:23,24 216:13,24

**alleged** 35:24 37:4 64:18 67:18 133:4,9 149:5 177:16 204:12 208:19

**allegedly** 37:6 39:21 43:5 60:22 70:7 108:9 113:15 123:20 179:23 195:24 241:23

**allowed** 13:21 226:10

**allowing** 209:6 210:1 219:19,20

**alluded** 147:23

**aloud** 90:3

**amended** 21:17 87:25 155:19 216:25 225:7 226:4 245:8

**Amendment** 175:17

**amount** 14:16,19 139:11 160:3

**and/or** 245:5

**Andre** 54:7,25 104:8,18 108:15 111:1

**Andrew** 242:7

**ankles** 163:1 164:20

**announce** 46:17

**another's** 56:21

**answering** 34:23 37:2 73:7 206:9

**answers** 10:2

**Anton** 142:21,24,25

**Antwon** 142:24

**anymore** 58:11 64:7 91:9

**anyone's** 39:5 88:17

**anytime** 159:14,15

**anywise** 243:16

**apartment** 138:20

**apologized** 238:15 239:5

**apparent** 171:1

**appeal** 84:9,10 133:5 222:8,17

**appealed** 197:9,15 222:9

**appearance** 45:3,8

**appeared** 243:6 244:18

**appears** 78:24 88:1 101:12 125:14 128:14 129:6 130:1 170:3 211:4 224:10

**applicant** 213:4

**application** 24:19,22 26:5 99:7 229:19

**applied** 23:12,14 24:10 85:24 151:3 214:24 227:17 233:21

**apply** 23:9,10 212:4,6

**approach** 50:23 108:23 133:15

**approached** 33:17 109:1

**approve** 63:25 64:2 68:1,4

**approved** 26:22 84:2,5,12 123:20 168:11

**approves** 84:10 237:15

**approximate** 138:16 193:9

**approximately** 12:5 15:22 20:5 32:15 42:21 60:2 73:3 99:6 127:25 160:8 170:19 175:23 177:12 207:9 239:13

**April** 23:13 84:7 87:11 196:1

**area** 31:12 139:8 171:4

**Argretta** 39:2,18 98:22 102:5 148:16

**Argretta's** 101:19 102:9

**argument** 108:6,8,10 144:7 225:11,18

**arguments** 74:17,18

**arm** 13:17 151:2,3 153:3,4 155:7 158:8
  161:18 162:3,11,12,14,17,21,23 166:2,
  18,20 167:9,19,24 168:2,6,10,12,20,23,
  24,25 169:6,16,17,18,19 170:25 183:15
  214:2,3 216:21 228:5

**arms** 163:1 164:19

**arrangement** 8:19

**arrest** 52:9 141:21,22,24 143:15 149:20
  151:19 152:12,25 153:8,19,22 157:13
  162:21 163:14 164:22 168:10 184:3
  214:2

**arrestable** 237:7

**arrested** 94:10 138:5,7 237:4

**arresting** 156:24

**arrests** 100:18

**arrive** 139:16

**arrived** 148:21 165:10,13,15 167:2

**asks** 205:16,21

**aspects** 13:4

**ass** 88:25 89:2,4 93:10 111:9 140:18
  148:6

**assault** 88:10 108:18

**assaulted** 88:9 155:7 213:25

**assaultive** 5:10 150:24 153:2 164:21

**assessment** 239:24

**assign** 52:23

**assigned** 18:5 53:3 54:1 106:20 154:7
  183:25

**assist** 10:3

**assistance** 37:1 163:5,6,7

**assistant** 66:18 69:6 99:19

**assistants** 199:9

**ASSOCIATES** 243:23

**assume** 206:13 212:6

**assure** 66:1

**assured** 228:11

**asterisked** 39:19

**Atherton** 242:8

**attached** 135:5 244:10,12

**attacked** 153:1 155:6 167:12 169:7
  2,214:1

**attacking** 156:20 157:9 164:22

**attempt** 17:9 128:10 129:6 229:25

**attempted** 17:11 133:15 182:6

**attempts** 186:18 209:4

**attended** 27:5

**attention** 21:14 125:6 148:12,14,15
  223:24 225:8

**attorney** 9:4 10:20 230:8,15,16 242:7

**attorney-client** 10:9 179:6,9 226:8
  230:25

**attorneys** 8:9 20:12,15 21:2 145:7
  200:9 227:11 230:8,14 233:18

**August** 55:6 223:3,5,8

**authority** 78:15,21 79:3,6 174:12,14

**authorization** 209:21 211:21 212:18

**authorized** 211:12

**avoided** 183:17,21,25 184:6

**aware** 17:4,5,16 78:3,5,7 81:12 82:22
  172:25 174:4 205:21 206:10

**awhile** 94:15 126:22

---

## B

**B&e** 131:25

**B&es** 131:12 132:1

**B91** 206:7

**B9i** 206:7

**back** 22:17 24:22 26:22 33:8 34:5 38:11
  41:9 42:9 44:19 46:19 48:10 51:8 55:6
  63:5 67:22 68:2,4 70:23 74:25 76:24
  80:22 85:16 90:9,12,14 92:2 96:3,19
  97:20 98:1,12 102:12 111:20,21 112:1,5,
  6 113:20 122:3,4 124:25 126:22 133:3
  135:6 137:14,25 139:23,24 141:19 145:8
  151:7 152:17 155:12 162:17,25 164:19
  170:17 171:19 172:18 173:5 178:6 182:4
  185:2 187:1 192:14 198:20 220:25 221:8
  222:15 233:6 234:21 236:13 239:23
  241:5

**back-and-forth** 57:4

**backed** 48:19 117:16 118:4 119:12
  122:5,6 130:8 131:5

**background** 71:3

**backing** 61:6 118:14 119:4,7,24

**backup** 36:24 139:19,20,22 140:10,16
  141:1,2 148:8,9 163:5 164:10,11,17
  183:5

**backwards** 93:10

**bad** 92:5 105:11,16 114:15 166:8 198:18
  227:14

**badge** 189:5 190:8

**badger** 146:8

**badgering** 145:13 146:13

**bar** 56:20 151:2 153:4 155:7 158:11
  161:18 162:3,21,23 167:19 168:24 214:2,
  3

**barely** 40:15,16

**Bartholomew** 231:5,7,8

**base** 14:25 40:20

**baseball** 199:24

**based** 14:22,23 39:10 43:5 51:18 52:12,
  15 60:17,18,19 61:24 65:7 74:15 75:19
  77:17 78:11 82:12 101:25 106:7 124:5
  128:19 130:1,6,9 131:3 143:19 144:11,2
  150:20 174:15 186:9 208:17,19 214:7
  228:4 239:20 241:7

**basic** 11:25 12:6 13:9 55:4 60:8 158:6
  161:20

**basically** 14:11 36:6 114:10 164:18
  194:24 204:14

**basing** 40:22

**basis** 29:7 42:16 43:6

**bat** 92:1

**bathroom** 70:16

**baton** 13:20

**bears** 169:20

**beef** 61:12

**began** 27:13 114:7,9,11 118:24

**begged** 99:1

**begin** 9:20

**behalf** 154:21 191:11

**behavior** 239:21

**behaviors** 195:6 239:21

**belief** 36:25 39:22 40:21 130:9,10,11 184:14 244:7

**believed** 137:1 185:9

**believes** 222:22

**belt** 85:3

**bender** 42:5,20 117:8

**benefits** 39:7,8 41:5 58:14 77:20

**Bertie** 18:5 161:15

**big** 76:4 86:21 91:15 96:21 110:5 123:8 124:6

**bigger** 104:22

**bills** 46:15

**Bin** 194:19

**birth** 10:13 154:11

**bit** 22:4 93:1 104:22 108:1 147:13 225:16 237:21

**black** 28:15,17 42:7 87:15 91:8,15 110:5 140:20 191:4 192:7 217:23 239:15

**blacks** 217:6

**blank** 202:18

**blaring** 165:15

**BLET** 12:7 13:3 15:12 48:6 55:11 56:2, 5,8 60:8,14 64:23 158:6 161:20 233:20

**block** 204:25

**blocked** 226:19

**blue** 129:12 135:13

**bluish-gray** 28:17

**Bo** 140:18 156:5

**board** 24:16 25:14,23 26:9 29:24

**Bobby** 191:24 192:2 193:12 194:4 220:20 221:2,15 223:23 235:1 238:13

**bodily** 108:22

**bond** 9:22 150:20 168:18

**bone** 167:24 170:25 171:1,2,8,11

**book** 44:21,22,24,25 45:1,3,14 46:24 47:2,3,5,6,7,12,14,15,19 51:12,13,21

79:25 80:4,6 83:17 86:6 90:13 103:15,19 25

**books** 51:25

**boom** 115:7

**boom'** 115:7

**bordered** 116:5

**born** 12:20

**bother** 172:13

**bottom** 65:11 123:9

**boxes** 234:6

**boy** 221:17,18

**brakes** 118:22

**Brame** 226:2,9

**break** 10:9 70:16 97:14 115:5 123:2 124:9 125:13 168:6,9 169:15 233:2

**breaking** 131:8,21 144:9

**Brian** 8:25 9:20 26:1 32:18 34:20,22 35:9 36:2,19 37:1 70:15 101:13 104:7 210:4 233:12 235:25

**briefly** 17:23 42:8 48:1 77:8 149:7

**bring** 14:2 21:13 86:5 100:7 112:4 148:12

**Bro** 221:1

**broad** 132:11

**broadcasting** 28:25

**Broadwick** 93:4

**broke** 114:8 163:2 164:19 167:10 168:23,24 169:6,16,20 214:3 216:20

**broken** 164:20 166:2,7,20,23 167:21 168:13,20,22,25 171:2,4,8,11 183:15 228:5

**brought** 42:17 107:14 148:14,15

**brutality** 164:18

**Bryan** 34:21 227:19 229:20,24 233:9,15

**building** 25:1

**buildings** 46:15 49:22

**Bullock** 24:11,12 25:13,15,25 26:16 27:23 28:2,3 29:12,20 31:2 33:4,16 35:2 57:23 59:17 64:15 68:17,20 96:18 101:2 104:10 133:2,3 135:7 136:20 137:16

148:16 177:3 178:12,13,14,15 179:24 180:2,3 181:3 185:3 188:7,19,25 189:1,4 190:4,16,17 195:17,19 196:10,22 197:4, 198:2,5,20 216:19 222:3,6,20 223:7,11

**Bullock's** 49:5

**burglaries** 132:1

**Burns** 53:17

**Burrell** 117:2,4

**business** 90:11

**businesses** 42:14 46:15

**busy** 103:3,9

**buzz** 24:25

---

## C

**C.M.** 195:24

**calculation** 19:1

**call** 10:12 25:12 48:8 50:20,23 68:13 69:4 71:12,24 72:1 85:10,15,25 88:14 92:7 95:23 110:18,21 116:2,14 131:21,2 150:5 151:9 156:7,10,13,21 163:3 165:1 171:20 173:11 175:3 176:2 185:24 186:19 200:7,9,25 201:8,9,20,25 202:22 206:24 216:15 218:4 223:16,21 229:12, 14

**called** 26:16 27:20,22,23,24 62:7 77:4 86:5,7 88:8 93:20 107:17 108:14 110:14 114:13,14,18,19 115:1 116:18,20 118:18 154:6 164:7,8 165:4 176:4 179:21 185:1 186:7,9,15 188:15 194:18 200:11,16,21 201:22,23 214:4 218:2 223:22 224:13,17 228:14 229:13

**calling** 36:23 49:23 73:8 95:18 114:12 156:19 163:5,6 169:12 176:5 187:10 200:8 223:19

**calls** 34:23,24 36:16 37:2 48:2,4,9 57:6, 7,8 61:6 113:24 132:1 178:25 239:14 241:13,14

**calm** 14:1 168:17 217:5

**camera** 97:17 117:24,25 118:6

**Cameron** 197:8

**Campbell** 32:13,16,19,23 33:3 34:8,13 35:2,5,11 36:1,3,5,6 41:15,21,22 49:19 50:1,6 52:13,21 53:4,6,7 54:5,6 60:4,5,1 62:13 62:7,11,12,16 63:5,11,21 64:6,

20,21 65:1,6 67:7 68:8,9 82:7,11 84:1
88:8 89:21 91:18 92:20,21,22,23 93:8,
15 94:7 95:4 108:10,14,16,22 109:25
110:18,21 111:2,8,17 112:16,22 113:16
115:11 123:19 175:24 182:4 185:13
197:24 202:10 217:20,22,24 239:11
241:19 242:1

**Campbell's** 53:4 54:3 84:3 113:15
217:5 219:12

**campus** 18:14 19:2,11

**can't** 22:25

**cap** 199:24,25

**capability** 154:1

**Capella** 12:14

**captain** 24:11,12 25:13,15 26:16 27:23
28:2,3 29:11,20 31:2 33:3,16 35:4 57:23
58:5,6,8,22,23 59:16 63:22 64:14 66:25
67:4,10,21 114:12,13,18,19,20 115:18
133:2 148:16 149:5 172:21,23 173:11,
24 174:2,6,15,19,22 179:23 180:2,4
181:3 187:6,8,17 188:1,7,14,25 189:14
190:4,16 216:19 220:21,25 222:20
227:18,19 229:24 234:20 235:18

**captains** 51:24

**car** 44:15 45:21 50:24 51:2,7 59:22 73:7
86:24 108:13 110:15,25 111:19,23
112:14 117:14,15,16 118:1,2,4,15,23
119:3,4,7,17,18,20,21,24 121:8 129:12,
19 134:15 135:17 152:4,7 154:25 155:3,
15,17 166:5 182:12 190:10 200:24

**care** 18:11 93:17 115:4

**career** 15:20 178:4

**careful** 220:3

**Carolina** 10:17 11:6,11,12 18:1 20:1
55:6 135:1 203:19 212:3 243:4

**carry** 202:6

**cars** 46:13 48:13,14,16,24 49:1 50:7,19
19 96:2,12,15,22 102:25 122:2

**case** 9:21 19:25 20:18 81:24 120:1 138:2
145:3,8 175:7 226:2,11 230:17 231:1,6,
11

**cases** 143:17

**Castro** 8:25 9:19,21 21:13 32:1 38:15,7,
13,22 70:17,25 71:3,4,15,17,22 72:4,5
74:20 75:2 87:24 97:13,20 98:6 101:5,10,

111 123:1,3,5 124:9,13,20 125:5 126:4,8,
11,12,20,25 128:2,5,6 129:22,24 145:2,6,
10,15,17,25 146:5,10,14,17 155:8,14
165:1,3 169:24 171:16,18 186:22 187:3
204:17,22 209:1,3,14 210:6,8 224:3,5
225:15,17 226:12,15,17 233:1,8 236:3,9
242:18

**Caucasian** 137:6

**Caucasian-american** 94:2

**Caucasian-americans** 230:3 239:22

**caused** 85:4 157:23 184:8 204:3 225:24

**caution** 133:20

**cease** 96:4,6

**ceased** 97:10

**cell** 73:5

**center** 48:12 85:4 86:23 164:4

**entered** 13:8

**Central** 43:19

**certificate** 12:1,7

**certificates** 12:4

**certification** 11:24 12:2,10 204:8
214:23 234:1 243:1 244:1

**certifications** 12:4 45:13

**certified** 48:21,23 54:6,7 61:20 62:2
75:14 103:25 157:16 208:2 214:20
233:24

**certify** 243:5 244:3,17

**cetera** 12:23 30:8,25 37:3 40:10 42:14
44:7 45:24 46:16 56:15 61:8 82:21
167:12 182:7 192:15 194:21 198:19
214:1 227:23 228:6,11 235:20

**chain** 18:23 19:16

**challenge** 41:5

**challenged** 58:13

**chance** 224:5

**chances** 208:14

**change** 67:11 77:12,15,17,18 79:2
179:13 237:21 240:5,8,9,10,12 241:15,7,

**change/correction** 245:6

**changed** 77:17 79:5

**changes/corrections** 244:11

**CHAPLIN** 243:23

**Chapter** 49:2 52:18 185:15 220:7

**characterization** 224:16

**charge** 42:9 44:19 45:2,5,16,23 220:14
236:22,23,24

**charged** 42:10 44:18 46:5 184:16,22
226:21

**charges** 23:22 26:25 45:20 52:8 184:18
196:20 215:1 237:6

**Charlotte** 10:17 57:16

**chase** 50:8,9

**check** 49:22 119:11 205:18 208:20

**checked** 136:18 137:11 234:6

**checking** 42:14 46:15 100:16 207:22

**chemical** 13:19 158:7

**chief** 23:2,7 24:21 25:4,5,6,8,9 33:4 35:3,
51:24 63:12,13,17,19,25 64:12 84:12
90:4 96:18 101:23 104:10 166:21 167:20
178:14,15 180:3 196:10,14,22 197:4,5
198:1 229:7,11,15 235:22

**child** 104:12 109:16 110:4 184:2

**choice** 212:10

**chosen** 225:23

**Chris** 68:6 120:22 148:4 191:25

**circumstance** 202:16

**circumstances** 24:23 36:12 183:14

**citation** 51:12 86:5 90:13 103:14,19

**citations** 82:1,2 83:8 218:24 219:1,10,
13,16

**cite** 79:25 80:6

**citizen** 14:25 15:4 42:5,6

**citizens** 13:11 81:8,10,12

**Citizens'** 113:9

**city** 50:9 55:6 96:21 102:25 105:23
106:2,7

**Civil** 146:6,15

**claimed** 90:20 137:15,16

**claiming** 83:17 166:1

**clarify** 38:19

**clarities** 38:21

**class** 55:24

**classes** 55:9

**classmates** 55:15

**clean** 199:13

**clear** 27:11 95:22 103:5,11 156:13 157:9 174:19 176:15,17 194:3 198:8 242:11

**cleared** 69:14 70:4 112:5 169:17 206:15 218:20

**clerk** 27:13 80:22

**clerk's** 237:19

**client** 113:20 122:25 163:17 181:14 184:13,14 198:10,13 204:11 206:4 208:10 230:25

**close** 139:1 188:25

**closed** 188:21

**closely** 51:3,5

**closer** 105:6 112:12 116:2,3,6

**club** 56:20

**co-workers** 55:14,15 74:8

**coaching** 123:17 146:11,12

**code** 113:25

**Cody** 53:17

**colleagues** 187:14,17,18,20

**collection** 209:14

**collectively** 77:8

**college** 11:7,12,16 18:14 55:5

**collision** 42:5 117:6 120:24 125:13 127:6 128:7 130:23

**collisions** 85:5

**color** 28:17 202:15,17

**combined** 196:19

**command** 13:18,25 175:6 180:6 221:3

**comment** 209:16 217:9

**commentary** 146:1

**commented** 217:4

**comments** 55:11 194:16

**commission** 39:19 41:4 205:18 209:6 244:25

**commit** 30:7 31:2 137:21

**committed** 185:19 220:6

**committee** 173:3 174:7,10,13,18

**committing** 34:3 137:21

**common** 142:6

**communicating** 61:8

**communication** 187:13

**communications** 30:9,13 111:13 179:7,10

**community-oriented** 183:14 185:22

**company** 212:1,2

**compensation** 39:9 240:10

**competently** 10:25

**complain** 81:8,10

**complained** 42:4 69:3,19 70:1,4 83:22,23 196:9

**complaining** 46:5 81:13 113:8 162:25 164:13 167:9 179:25

**complaint** 43:11,13 66:16 68:22 70:10 71:7 72:6,8,9 82:22 87:25 113:7,9 182:25 216:25 225:8,20 226:4 237:23,25 239:4

**complaints** 23:21 39:24 43:4 65:12 82:21 176:24,25 177:9,13,23 178:5 181:16 194:25 198:11 201:14 208:25 220:13,16 221:12 237:22 238:4 239:8 241:21

**complete** 119:10 162:3 243:14 244:8

**completed** 80:24

**complex** 138:20

**compliance** 14:4 158:8 169:11

**complied** 154:20 183:17

**complies** 108:2 125:9 170:2 217:3 225:19 232:11

**comply** 107:16 150:14 153:20 154:23 157:1,5

**composed** 192:12

**concern** 17:21 86:17,19

**concerned** 176:12,18,19 180:15

**conclude** 225:6

**concludes** 242:20

**conclusion** 231:4

**conduct** 66:10 86:14 115:18 181:14 183:22 218:17 239:20

**conducting** 100:19

**conference** 8:15 220:14,18 243:7,13

**confidence** 208:21

**confirmation** 116:24

**confirmed** 207:24 218:19 220:19 228:14

**connection** 87:8 94:19

**consecutively** 243:13

**consent** 8:18 9:14

**consequences** 34:12

**considered** 45:18

**consisted** 13:17 39:1

**consistent** 108:20 239:25

**consists** 22:5 98:9 211:15

**constantly** 114:5 241:11

**constitute** 232:16

**construed** 45:18

**contact** 28:4 56:3,4,8 57:11 134:13,14 186:20

**contacted** 22:23 25:14 27:8 171:21 172:21,22,24 227:9

**contend** 67:16,17 225:2

**contending** 180:16 181:6,8

**contents** 244:4

**contested** 40:17 41:2

**context** 192:1,11

**continue** 65:3,21,23 86:14 101:21 109:14,23 129:3 131:16

**continued** 136:4 225:21,25

**continuum** 13:16 158:6

**contract** 27:21 28:9,10,13,14,15,24 29:5,8,18 30:23 31:1,4,21 33:25 232:16, 18,20,23

**contracts** 31:13

**control** 14:3 18:11 162:14,15 168:11

**conversation** 63:9 91:23 92:8 105:12 106:3

**conversational** 52:1

**conversations** 26:3 55:17 73:10 74:14 149:19 180:22

**convicted** 184:17,23

**convictions** 184:16

**cool** 217:5

**cooperate** 149:24,25 150:2,14,23

**cooperated** 149:9 150:18

**cooperation** 15:6 150:21

**cooperative** 52:8,21

**copies** 101:24 213:7

**copy** 31:4,6,8,21 96:11 99:5 102:3 163:20,24 173:13,14,15

**correct** 60:1 72:7 75:3 100:23 123:6,9 125:17 185:18 223:14

**correctional** 8:6 160:1,11 161:15

**corrections** 8:8 159:18,22,24 160:1, 22 245:5

**corrective** 99:8 123:19

**correctly** 110:17 171:5

**coughing** 233:12

**coughs** 234:3 239:16

**could've** 106:25 139:5 154:3 216:9

**couldn't** 76:4 114:3

**counsel** 8:18 21:16 146:1,3 243:18

**counseling** 99:20 100:10 123:17 175:2

**Counselor** 41:8 65:11 87:20 110:12 171:25 182:4 185:1 215:25 218:6

**count** 128:16

**counties** 116:5

**county** 8:7 11:5 15:21 16:15 17:6 19:2, 22:19,24 27:13 28:21 29:12,17 30:8, 17 31:19 32:3,10,22 37:14,15,16,17 38:15,17 39:3,4,11,12,16,17 41:3,17 50:4,9,17 54:24 57:16,21 84:24 85:15 86:11,12 98:15,19 100:13 102:10,25

105:11,16,25 116:1 117:3 131:9 153:22 175:13 179:20 180:10 184:1 201:11 202:5 203:20 204:3 207:12 210:20 211:2, 7,10 212:21,24 213:11 214:25 215:14 216:6,13 222:9,10 224:24 227:3,9,13,25 228:11,12,15,17 229:17 230:2,10,19 231:9,10,13,24 233:21 235:15 242:8 243:4 244:16

**County's** 175:19 242:7

**couple** 60:10 85:20 233:8 236:17

**court** 8:3 9:2,5,9,13 10:4,11 21:14 27:13 38:8,11 70:20,23 74:22,25 97:23 98:1 124:11,22,25 126:4 127:1 155:9,12 186:23 187:1 215:10 226:9 233:3,6 236:10,13 237:13,15 242:20

**courthouse** 88:17

**cover** 42:16 173:19

**covered** 43:6 161:10 194:24 198:3

**covers** 231:15

**crash** 86:23

**crazy** 48:12

**cream** 73:15

**create** 232:16,18

**created** 220:12

**creates** 175:13

**credentials** 189:5 190:8

**credibility** 231:19

**crime** 105:25 142:2 185:15,16

**criminal** 11:15,21 12:19,20 45:3 46:1,8 80:9,11,13,16 81:21 82:19 83:16 90:15 23 91:5 96:16 109:4 110:16,19,21,23 111:4 184:3,15 203:19 205:17 218:24,25 219:10,13,15 231:9 236:19,22,23,25 237:5,7,9 238:13

**criminology** 11:15

**crossing** 85:2

**crying** 114:8 151:21 166:19

**cuff** 43:25

**curate** 143:17

**current** 10:15

**curriculum** 161:11,13,22

**curse** 91:21 142:23

**cursing** 82:15 88:11 91:18

**Curtis** 226:2

**custodian** 163:22,23 164:1

**custodians** 99:12

**custody** 18:11 163:16,19 166:11 184:4 237:3

**cut** 85:8

**D**

**D-U-V-A-** 192:12

**dad** 94:2

**damage** 44:15 45:21

**damn** 88:25 111:9 112:16 156:6

**danger** 85:1 87:2 157:25

**dark** 87:16 157:24

**database** 143:18

**date** 8:4 10:13 20:4 21:21 27:7,9,19 28:7 90:1 100:8 127:12 132:20,22 154:11 160:18 193:7 206:25 207:6,17 211:3 230:12,21,23

**dated** 101:13 104:24 108:4 120:23

**dates** 100:11 177:8

**daughter** 43:13 44:6,8

**daughter's** 43:18

**daughter's** 44:11

**day** 24:24 29:24 59:18 73:12 85:13,19,20 86:1 121:17 122:9,23 141:24 142:8 144:18,19 170:15 180:11,16 181:4 228:10 240:17,20,24 243:22 244:19

**day-to-day** 8:9,24

**days** 32:9 33:15 61:18 73:13 85:21,23 113:1 229:13

**de** 14:11,14

**de-escalate** 54:15,18 168:16

**de-escalation** 13:18,23,24 14:17,20 158:20

**deal** 86:21 89:3 123:18 124:6 156:16 160:17

**dealing** 15:1,4 99:9

**Dec** 100:17

**December** 42:23 43:11 55:7 63:7 80:9 93:6 160:20 170:9,10

**deception** 43:22 68:8,11 163:11

**deceptive** 65:7 66:4 68:12 108:11 175:25 197:23 198:12 224:23

**decide** 173:24 230:9

**decided** 50:15 183:7 239:8

**deciding** 208:3

**decision** 14:22 35:5 58:10,24 133:6 174:1 214:10 229:16

**decisions** 78:15,18

**declare** 8:15

**declines** 237:14

**decreased** 107:18

**deep** 216:1

**Defendant** 22:6

**Defendants** 9:21 225:21 226:1,17

**define** 56:13 86:18 119:5

**degree** 12:11,16,25

**degrees** 44:22 45:12

**delay** 118:8,10 128:19,22,23 129:5 138:8

**deliver** 24:19,23

**demonstrate** 61:23 162:1

**demotion** 77:22

**denied** 61:15 102:1 148:11 201:13

**dental** 39:8

**deny** 120:8

**department** 13:21 16:24,25 17:14 18:22 20:2 30:19 39:5 50:3 98:19 160:13 177:19 214:13 216:9 234:17

**department-issued** 8:22 18:23

**departments** 235:14

**depend** 36:12

**depending** 240:24

**deposed** 9:24 19:22,23

**deposition** 8:6 9:23 10:10 20:3,11,17

21:10,16,17,18,25 22:1 87:21 89:8 98:6 101:2 104:4 107:21 120:12 125:2 126:1 146:1 151:16 169:21 204:19 209:11 223:25 225:3 232:8 236:5 242:21,24

**deputies** 16:23 48:16 53:12 56:18 57:2 60:9,13 64:23 67:18 78:15 92:4 93:13,16 106:11 122:5 141:9 142:14 158:24 160:24 190:23 220:2,15 221:2,3 231:25 242:12

**deputy** 13:7 23:2,7 25:4,5,9 31:19 32:18,22 33:4 34:19,20,21,25 35:2,7,8,9 36:2,10,13,14 37:1,6,22 45:12 51:24 53:8,14,15,17 54:6,7,12,13,17,18 57:25 61:3 62:1,4,5,10 63:2,4,12,13,17,19,25 64:12,25 66:12 70:6 73:5 76:2 77:1 84:13 90:4 93:2,17 94:23 96:15 100:17 101:6 102:13 103:2,4,13,14 104:7,8,10,18 105:7,21,24 106:11,18,22,23,24 107:18 108:15 109:15 110:13 111:1 112:15,16 115:16 120:25 121:16,18 122:9,23 140:21,25 142:20,21,22 143:2 144:1 146:18 147:2 175:7 180:10 182:5 183:25 184:9 188:3,4 190:23 191:1,6,8,12 194:17 195:23 196:4,6,10,14,24 199:4 205:1 217:4,15 218:15 220:22 221:12 223:14 224:11,15,25 229:6,11,15 233:7 235:22 237:8,12 239:23

**describe** 13:15 28:12 76:6 88:9 91:14 138:19 149:2 152:2,24 160:25 162:2 199:16 202:12 204:23 218:11 233:16

**describing** 64:13 151:20

**deserve** 219:5 220:9

**deserved** 196:18

**designed** 158:2,19

**designee** 28:21

**desk** 106:13 109:3 178:2

**detail** 35:14 59:24 68:23 71:5 76:6 235:18

**details** 161:12 165:4,7

**Detective** 231:8,9

**determine** 5:4,7 80:18 237:13

**determined** 196:25 219:4

**Deval** 192:12

**development** 138:20

**device** 149:14 161:6

**diagnosed** 168:1

**Dickinson** 9:22

**didn't** 61:22 76:18 163:8 190:7

**difference** 34:14 35:12,16 49:11 57:17 58:16

**differences** 35:13

**dinner** 56:14 57:14

**directed** 111:5 124:19 221:5

**directing** 156:22 192:16

**directions** 34:24 37:3 162:4

**directly** 46:4 61:1 73:18 82:14 167:13 195:15 198:8,21

**director** 28:20 39:17 66:18 69:6 166:19 167:21 238:7 241:25

**dirty** 92:7,17,21,24,25 93:9,11 94:16

**disable** 158:2

**disagreeing** 22:21

**disagreement** 13:22

**discharging** 3:22

**disciplinary** 76:23 99:9,21,25 100:3 101:22

**discipline** 96:23,24

**disciplined** 96:17

**disclose** 23:15 213:17 215:1,6,13

**disclosed** 23:18,20,25 24:2,3,5 126:21 213:17,19

**disclosing** 179:6,9

**disclosures** 126:14,21

**discovery** 126:14,17

**discretion** 47:16,18

**discretionary** 78:20

**discrimination** 8:19,21 177:17 216:5 221:13 237:22,24,25

**discriminatorily** 95:20

**discriminatory** 90:19 191:17 194:14 195:3,6,20 198:5,22 219:22 225:21

**discuss** 23:6 47:24 49:10 59:23 65:24 148:20 230:20

**discussed** 33:8 49:14 127:6 172:2

**discussing** 34:5 38:13 125:13 128:7 200:8 230:7,15

**discussion** 43:8,9 111:16 136:16

**discussions** 42:25 65:10

**dismissal** 59:18 208:24

**dismissed** 24:7

**disobey** 79:11

**disorientation** 122:23

**dispatch** 50:21 71:7 72:9 109:6 165:3

**dispatcher** 69:3,16,21 70:3 72:7
134:19,21 135:9 137:1,7 185:2,8

**dispute** 115:12,14,21,23 171:12

**disputes** 74:2,3,16,18

**disputing** 27:13 129:8,11,13

**disrespect** 192:10 193:23

**disrespectful** 90:15 109:16 110:3
112:23 136:7,8 194:21

**disrespecting** 13:16

**distanced** 9:2

**distinction** 136:24 137:19 185:7 222:23
236:18

**distinguish** 231:17

**distorted** 76:12 90:21 91:11 109:18
111:7 121:22 140:8,14

**distortion** 133:9 135:9 136:25 137:19
185:7

**distress** 204:4 225:25

**distributive** 12:23

**DMV-349** 125:10

**doc** 209:15

**doctoral** 12:13,24

**doctors** 172:3

**document** 21:19 22:8,9,12 28:22 39:20
89:15,18,19 90:7 98:10,13,14,18,20,21,
25 99:4,11 101:6,9,11,14,15,16,22,25
104:21 105:4 108:5 115:22 120:18,21,
123:9 125:25 170:1 171:7,13,17 206:9
207:17 209:19 210:5,7,25 211:3,18,20
224:7 225:9,10,12 244:21

**documentation** 9:8 100:3,25 123:22
185:14 216:16

**documents** 20:14,15,16,18,21 31:10
38:16 39:10,15 40:19 41:11 99:25

101:23,25 102:1 123:23,25 209:7

**domestic** 93:23 94:10

**Donald** 53:9 54:11 92:19

**don't** 50:23 62:23 142:12 146:8 179:5
194:1 221:17

**door** 61:22 111:24 115:9,12 146:23
147:10,11 148:24,25 149:10,13,20 152:3
182:10,13 188:21,24 189:3

**doors** 92:16 146:22 152:15

**double-wide** 38:24 139:7

**downgrade** 77:24

**downgrading** 65:19

**downs** 14:10,14

**draft** 80:11 237:9

**dramatically** 97:10 107:18

**dressed** 25:2 27:10

**drew** 210:18

**drive** 189:23

**driver** 119:14

**drives** 137:8

**driveway** 148:23 182:12

**driving** 85:4 86:23 87:15 117:14

**drop** 176:24 177:13,14,15,22,24,25
178:1,3,4,5 208:25

**dropped** 116:11

**drove** 116:11

**drug** 26:17

**dude** 46:7

**due** 175:16

**duly** 9:16

**dumb** 194:3

**Durham** 211:1,7

**Durwood** 32:13 41:22 63:21 197:24

**duties** 18:9 77:15,16 136:5

**duty** 57:9 85:12 202:7

---

**E**

**e-mail** 125:25

**e-mails** 178:25

**earlier** 108:20 110:14,20 117:11 162:10
194:7,8 217:13 218:13 222:20

**early** 42:14 141:23 142:1 144:7,20
179:24 195:25

**ease** 105:8 106:8

**education** 27:2 162:20 163:13

**Edwards** 142:21,22 143:2 144:1 165:18
188:5

**EEO** 178:10 198:10 208:25 238:2 242:7

**EEO-PROTECTED** 238:6

**EEOC** 23:21 194:25 215:1 220:13 238:8

**effect** 26:7 34:14 46:12 48:1 77:19 87:18
91:12 105:14 106:6 109:25 110:23
115:18 121:3 135:23 148:7 150:8,10,11
162:21 163:14 166:1,23 169:9 189:8
191:4 193:16 222:22,25 242:10

**effectively** 206:5

**effects** 76:9

**egregious** 102:17 239:20

**elaborate** 12:18 35:15

**elected** 178:1

**electronic** 18:8 128:24

**Elizabeth** 55:6

**else's** 133:21

**emergency** 113:24,25 114:1 116:1,10
121:1,7 163:21 164:2,3

**emotional** 114:10,11 204:4,16 225:25

**employed** 175:3 207:7,11 216:7

**employee** 37:21 41:18 100:10,11 123:16
175:22 199:10 227:23

**employer** 212:23 213:4,5,6 215:2,8
229:22

**employers** 213:9 226:25 227:10,14

**employment** 15:20 17:24 19:9,18 22:18
26:12 27:21 28:8,10 29:5 32:2 33:25
57:21 100:11 126:19 131:9 160:6 174:24

187:5 203:4 204:3 205:25 206:20 208:4 209:4,7 212:9,16 214:20,24 215:20 225:23 226:18 232:16,18 233:11,17 235:12

**EMS** 164:11 166:19,21,24 167:21

**encounter** 132:17,18

**encouraged** 23:9

**end** 91:7 107:15 113:23 116:16 221:15,17 224:14

**ended** 24:16 33:24 94:14 108:20 179:23

**enforce** 79:15,17 80:6 83:19

**enforcement** 1:18,24 12:1,2,6,9 13:6,8 36:8 42:13 43:8 46:9,10,17 49:10,13 50:11 55:4,16 60:8 77:16 78:12,24 79:7,21 95:1,5 96:5,7 97:10,12 143:20 147:9 158:6 159:19 160:23 161:20 168:16 182:3,18 203:19 204:7,8,11,15 212:7 216:8,9 230:1 236:24 237:17

**enforcing** 203:13

**enhance** 169:11

**ensure** 172:19

**ensuring** 13:7,10

**entered** 145:2,7

**entering** 131:8,22

**entire** 15:20 19:2 32:10 100:4 129:14

**entity** 175:18

**entrance** 109:2

**epithets** 191:22

**equal** 175:17

**equipment** 15:24 16:1,2,5,9,12 18:17 19:14 121:7 200:5

**equivalent** 171:11

**Eric** 54:18,19

**escalated** 154:22

**escalation** 14:2

**escort** 14:9

**escorting** 151:24

**essentially** 65:5

**estimate** 73:1 139:11,12,15

**et al** 8:8

**evaluation** 100:6

**evaluations** 99:10 198:19

**Evan** 131:15

**Evans** 131:9,22,25

**evening** 144:20

**event** 103:20 127:17,22

**event(s)** 243:19

**events** 178:16 181:7,8

**eventually** 26:11 241:24

**evidence** 39:18 71:13 118:7 122:25 132:3 135:8 162:19

**evidently** 61:12 68:25 151:6 235:17

**exact** 202:17

**examination** 9:18 236:15 245:3

**examined** 166:2,5,9,22 244:4

**examines** 21:19 22:9 89:15 98:10 104:21 105:4 108:4 120:18 210:7 211:16 224:7

**examples** 50:14 217:19

**exceeds** 226:11

**excerpt** 88:5

**excess** 206:6

**excessive** 58:4,16,18,23 59:6,15,16 98:16 105:22 213:24 214:11 216:12,20 226:22 227:5,6 228:1,2,20 231:19 234:3 235:4,13,14,16

**exchange** 29:14 65:4 108:9 113:19 115:15 116:16

**exchanged** 57:3

**excuse** 26:17 37:21 62:5 63:12 69:9 77:17 84:9 86:3 104:25 115:6 120:24 122:16 125:10 137:17 154:19,20 176:6 178:14 219:8 230:24 234:4,5 239:16,18 240:2

**execution** 244:20

**executive** 99:18 214:13

**exhibit** 21:10,14 22:1,4 87:21,24 89:8,11 98:3,7,8 101:2,6 102:12 104:3,4,19 107:21,24,25 112:25 120:12,15 125:20,23 126:1 155:18 169:21,25 204:18,19 209:10,11 216:25 223:24,25 224:4 225:5,7 232:3,5,8

**exhibits** 22:18

**expect** 81:1,6,14 85:9

**expected** 79:19

**expects** 48:7

**experience** 29:13 30:18 36:8 143:19 144:3,23 162:20 163:14

**Expires** 244:25

**explain** 36:5 59:7 95:4,7,12,13 113:4 204:2

**explained** 32:19 44:6 94:25 105:22,24 106:10 185:1

**explore** 71:4

**external** 238:6

**extremely** 102:11

**eyes** 62:16,17,19

**F**

1:18

**F3** 24:5 26:5 99:7 215:15

**F5** 205:3,5 207:20 208:8 234:4 235:9

**F5a** 204:12

**fabric** 199:20

**face-to-face** 51:19 56:25 62:7

**facility** 18:4 161:16

**fact** 25:10 48:19 50:6,8 66:3,8 87:10 95:3 96:8,15 97:8 99:5 102:22 103:8 111:6 122:4,14 124:5 129:7 130:23 136:10 141:10 157:17 219:2 220:24 221:1

**factor** 168:12 201:8,12,15,18

**factors** 168:23

**facts** 36:25 76:19 113:21 140:8,13 181:11

**factual** 107:2 115:14

**failing** 86:22

**failure** 102:17

**fair** 51:14 113:23

**fairness** 208:23

**fall** 107:7

**falls** 141:13

**false** 97:12 98:16 113:6 196:23 206:15 207:23

**falsely** 92:9,12,13 226:21

**falsification** 11:11 197:22

**falsiticity** 65:8 109:11 197:23

**familiar** 78:12,13

**family** 21:8 44:3 85:8 172:8 179:1 192:24

**fan** 242:13

**fast** 131:23

**Fast-forward** 58:13

**father** 91:8,15 109:17 110:4,5

**fault** 120:7

**February** 8:5 19:10,11 20:7 89:25 104:24,25 113:2 243:22

**federal** 98:17 146:6,15

**feel** 10:10 32:10 44:13

**feet** 139:11

**felonies** 236:25

**felony** 141:15 142:2,19 143:15 155:25 184:2

**felt** 37:4 42:10 130:5 157:4

**female** 42:7 43:12 46:20 112:8 156:19 195:23 196:5,14,24 197:3 213:25

**fender** 42:5,20 117:7

**field** 32:14 36:13,24 41:22 42:15 49:18 50:10 53:7 94:24,25 95:5 102:14,24 103:1 217:17 225:23 239:12 241:7

**file** 20:25 39:23,24 40:5,14 98:21,23 99:1,5,14,17,25 100:4 101:18,19,20 102:4,9 105:1 194:25 205:12 207:1,6,9 210:17,20 211:10 212:5,25 213:2,6,7 214:8 221:12 225:7 228:1,7,10 230:18 239:3

**filed** 20:19,22 23:16 43:12 198:9,11 201:14 216:5 220:13 221:8 225:20

**files** 40:18 58:15 69:2 99:9 102:7,8

**filled** 63:8

**final** 22:13 94:23 96:1 121:15 232:3 240:3

**finally** 54:10 231:4

**financial** 225:24

**find** 31:5,22 46:6 60:23 104:16 186:20 200:19 232:25

**fine** 38:5 97:15,18,19 230:22

**finish** 172:15

**finished** 105:2 123:2 159:4

**fire** 173:24 174:2 176:25 177:1,5 180:8, 18 181:15 197:8,10 208:5

**firearm** 13:22

**fired** 115:5 180:17 187:21,23 188:13 196:19 197:13,15 200:17 201:21,23 221:18

**firm** 9:22

**fitting** 62:21

**five-minute** 97:14 233:1

**flashlight** 18:21,22,23 19:15

**focus** 12:15,24 14:17 46:14 78:16 79:20

**focused** 11:20 46:13

**focuses** 12:21

**Follow** 44:1

**font** 28:15,17

**force** 13:13,16 14:3,9,11,14 58:4,16,18, 23 59:6,15,16 98:17 132:21 147:17,24 149:4 152:18 155:5 156:15 158:4,5,19 168:15 172:22 173:2,13 174:7,10,18 178:23 187:9 188:3 206:3,6 213:14,25 214:11 216:13,20 226:22 227:5,7,24 228:1,2,20 231:15,19 234:14,15 235:4, 13,14,16

**foregoing** 243:7,13 244:5,8

**foremost** 121:23 179:14 205:8 206:11

**forgot** 186:14

**form** 12:19 14:8 100:10 122:24 175:22 197:17,18 205:1 207:20 208:8,15 211: 6,12 212:22,24 235:3,9

**forms** 40:13 106:13 212:17 214:22

**formulating** 239:25

**forthwith** 138:7

**forward** 25:13 26:23 76:20,22 212:11, 19 237:14

**fought** 168:10

**found** 58:1 60:19,22 66:4 69:8 100:16 102:3 115:10 139:25 167:22

**fourth** 89:22 182:2,11

**fracture** 151:6 168:4,5 170:23,25 171:2, 9,10 172:5

**fractured** 151:4 166:24 167:22,24 168:2 183:15

**fractures** 171:3

**Franklin** 116:5

**free** 10:11 48:10 81:2

**friends** 21:8 55:12

**friendship** 56:1

**front** 43:14 104:8,17 112:16 140:20,24 142:20,22 143:25 149:10 163:4 177:1 192:19 194:5 221:1,3

**Fryson** 24:21 25:7,20,21

**FTO** 32:14

**full** 10:5 15:19 19:9 109:11 111:11 172:19

**full-time** 227:22

**fun** 195:9,11

**fundamentals** 13:5

**fussing** 82:16 88:11 91:17,20

**G**

**G4s** 227:17 229:24 235:17

**gain** 19:18

**gaining** 233:11,17

**Garvey** 234:23

**gave** 31:8 44:24 45:14 47:6 59:21 61:14 83:17 116:24 134:25 157:4 178:6,9 189:16,20 200:23 202:10 204:11 215:22 216:4 235:1

**gay** 238:20

**gears** 237:21

**gender** 65:9,17 88:19 195:10,21,22 197:3 201:15

**general** 12:1,9 39:11 105:10 171:3 233:25 234:1

**generally** 38:22 167:8

**Gerald** 35:8

**get all** 45:7

**get along** 74:1

**girl** 48:3 93:12,20 94:11

**give** 10:2 24:25 25:11 30:12 45:1 47:16 50:14 59:20 64:7,8 73:1 81:3 90:6 102:2 104:20 135:19,22 142:15 161:12 162:4 172:19 178:8 190:9 192:1 210:4,13 211:9,17 215:19 219:19,20 228:18 229:7 230:11 233:20

**giving** 136:22 219:18

**glad** 75:13

**glasses** 157:22

**God** 236:1

**good** 62:1 66:12,15,23 69:14 97:14 103:4 154:20 198:3 216:18 218:14

**Goolsby** 122:15,19 165:15 171:22,23 172:22 176:6,7 179:21 180:7,21,24 181:17 188:2 196:11 220:21 221:5

**Goss** 81:13 83:4,11,14,25 84:17 86:4,13 88:12 89:13

**gots** 174:8

**government** 175:18 179:17

**grabbed** 153:3

**granted** 85:25

**Graveyard** 141:25

**great** 198:4 234:2

**greater** 142:2 145:19,23

**Green** 217:4,15 218:2

**Green's** 239:24

**grew** 192:6,22

**grievances** 178:11 198:10 221:9 238:2

**gross** 220:6

**ground** 153:5 162:15 167:11

**grow** 241:3

**Gruber** 243:3

**grudge** 239:18

**guess** 47:16 55:14

**guidelines** 169:8

**gun** 189:5,9 190:8

**gurney** 166:25

**gurneyed** 167:22

**guru** 50:2 95:16

**guy** 44:9

**guys** 48:2,7

## H

**habitually** 49:23

**half** 105:6,19 207:9

**hallway** 109:3,6 111:12,15 199:1,3

**hallways** 199:11

**hammed** 163:11

**Hampshire** 2:12 27:2,4

**hand** 14:10 156:6 158:13 162:11 243:21

**handbook** 37:21,25 41:18,24

**handcuff** 152:11,14,19,22 155:4,16 167:11

**handcuffed** 152:4,5,6 155:3

**handcuffing** 4:10 150:2

**handcuffs** 150:22 155:6,15 157:12

**handful** 50:18 73:3 95:19 119:9 160:5

**handle** 50:21 85:15,25 89:2 148:5 150:17 151:10 173:16

**handled** 51:8 116:14 141:4

**handling** 69:4 86:10,11 140:18 141:3 148:6 156:5

**hands** 13:17,18,19 14:7,8,12,13,18,21 94:3,4 151:1 158:7 162:11 164:23 178:2

**handwriting** 106:15

**handwrote** 39:21 40:19

**hang** 32:21 55:20,22 56:10,12,13,19 57:13 72:16 95:21

**hanging** 55:13 56:23

**hangs** 56:13

**happen** 29:22 45:25 54:2 90:21 120:9, 11 127:6,8,18,22 195:14 220:18 225:1

**happened** 24:10 32:24 33:20,23 34:6 60:20,21 65:3 68:3 72:9 76:6 90:20 93:2 110:10 111:16 117:9 120:6,11 121:4,9,1 125:18 129:16 131:20 132:8 135:24 136:1 141:5 148:20 149:1,6 162:24 167: 171:19,20 173:8 177:4 179:4,12 184:8 187:4 190:10 200:6,12,15,20 201:21 203:11 206:12,16 213:10,20 214:11 235:17,25 238:16

**happening** 127:9,12,14 129:9 190:11

**happy** 133:16

**hard** 13:18 200:19

**harm** 108:22

**Harvey** 234:22

**hat** 34:11 198:15,24 199:16,19,21,23

**haven't** 76:8 167:14

**he'll** 48:8

**head** 40:12 44:23 45:6 93:23 94:5 134:7, 17 166:22 188:7 198:2 215:3 216:22 221:21 223:10

**head-on** 85:5

**headed** 50:25 111:22

**headlights** 87:8,14,16 117:10,14 118:16

**heal** 171:3

**Health** 170:6

**hear** 9:7,9 22:19 34:6 48:18 70:25 179:25 194:2 222:21 242:9

**heard** 36:3 61:9,23,25 62:9 63:15 69:9 115:9 122:21 220:23 238:21 241:7

**hearing** 25:16 133:4

**height** 54:6 156:14

**held** 220:14

**helping** 61:7

**Henderson** 26:20 73:15 102:25 167:1

**herein-above** 44:18

**hereunto** 243:21

**Hertford** 11:5

**hesitated** 229:8

**Hey** 175:5 192:19

**he'd** 47:13

**he's** 241:5

**hide** 212:22

**high** 11:4,5

**highway** 32:24 33:1 34:15 35:12,16
78:4 103:7

**hire** 213:5 216:8 227:14 234:18 235:3

**hired** 12:8 19:20 33:10 53:22 56:6,8,10
175:24 214:22

**hires** 217:15

**hiring** 22:22,25 26:7,18 29:23 212:19
227:21

**Hispanic** 42:8 219:3,10,19 220:8

**history** 17:24

**hit** 44:9 94:2 117:16 118:1,2,4 129:12,18
153:9,10,11 158:1

**hold** 97:16 139:23,24 156:6 227:19
233:20

**home** 30:25 33:9 34:1 49:24 59:21
72:18,19 138:11,12,25 139:6,16 146:2
147:3 148:18,19,22 171:19 182:12
189:16,20,22 190:9 200:24

**homes** 56:15 139:4,5,11

**homophobic** 238:11,17,19

**honor** 210:18

**hope** 216:24

**hospital** 26:21 45:24 76:3,7,11,17 93:5
167:1 171:15 172:9,18

**hostile** 239:17

**hostility** 220:12

**hour** 38:2 76:15 181:2,3 208:4 227:22

**hours** 56:11 72:13,20 76:16 240:5,10

**house** 31:11 56:22 93:3 144:9,13 145:21
147:16,20 148:5 149:7 181:20,21 182:3

**houses** 182:6,8,9

**HP** 34:15

**HR** 39:16 59:3,8 177:20,21 198:11 238:7
242:12

**huh-uh** 10:3

**human** 28:20 37:11 98:19

**humerus** 167:24 168:2,4,5 170:24

171:10

**hurt** 207:25 208:13

**hurting** 136:13 166:8,16

**hyped** 68:9

**hypocritical** 75:10

---

**I**

**I-85** 93:5

**i.e** 102:17

**IA** 207:6 208:19 231:14

**ice** 73:15

**ID** 8:15

**idea** 203:22

**identification** 21:12 22:3 44:4 87:23
89:10 98:5 101:4 104:6 107:23 120:14
125:4 126:3 154:10,11,12 169:23 204:21
209:13 224:2 225:5 232:10

**identified** 23:2,7 24:20 53:10 126:12
231:5

**identify** 222:1,4,7 223:3,4

**identifying** 54:13

**identity** 12:20

**ignore** 156:18

**Ignoring** 41:24 49:13

**illegal** 225:21

**illustration** 125:16,20,21

**immunities** 179:17

**immunity** 179:15,16 180:14

**impacted** 225:24

**impaired** 87:4

**impairments** 90:24

**implying** 74:13 224:18

**important** 31:14,16 164:15,16

**improved** 151:2

**inaccuracies** 25:19

**inaccurate** 207:21

**incapacitate** 58:2

**incident** 41:14 42:21 83:4,14 84:1,21
85:17 86:13 89:13 113:11 117:5,12 126:5
131:18,21 132:7 143:7 147:18 149:4
152:17 159:6,10 167:17 170:5,8,13,17
171:18 172:6 173:9,12 187:5,7,15,22,25
190:2 202:23 207:14 218:20 230:17
233:9,14

**incidents** 51:20 227:4 231:20 233:10,16
235:11,23

**including** 67:1 68:9

**incorrectly** 88:4

**increase** 220:11

**indirectly** 198:22

**individual** 23:1 24:20

**individually** 77:7 195:7

**influence** 239:24

**inform** 81:3 90:17 235:5

**information** 1:3 28:25 29:5 32:23
34:9,10 36:25 39:22 40:21,25 58:5 62:6
66:17 114:25 132:24 133:8,13 135:2
136:22 182:14 184:14 202:23 209:21
210:2 212:14 215:6 222:21 230:11,20

**informed** 64:16 90:11 130:16 220:15

**infractions** 236:23

**initial** 26:9 32:2 126:13,21 133:5,6
240:4

**initially** 39:14 41:1 52:25 175:21

**initiate** 77:3

**initiated** 76:25 77:1

**injure** 87:18

**injuries** 120:3 167:16,18

**injury** 158:16,18 169:12

**inmates** 160:12

**innuendo** 94:17

**inquired** 83:1

**inserted** 40:25

**inside** 146:24 202:18,19

**instance** 137:24

**instances** 100:17 235:24

**instilled** 50:11

**Institution** 18:6

**instruct** 219:15

**instructed** 80:8 145:19 155:24 182:24 183:2 220:16

**instructing** 219:24

**instruction** 218:23 219:13

**instructions** 48:4 156:12 170:3

**insubordination** 113:9,12

**insurance** 45:24

**intensity** 156:15

**intent** 168:9

**intentional** 183:16

**intentionally** 120:10

**intents** 244:21

**interactions** 56:24

**interested** 24:13 227:21 243:19

**internal** 178:10 198:9 204:13 205:22,24 206:2,10,19,22,24 207:1,24 208:2 214:11 220:13 226:20 228:1 231:12 234:7,11 238:1,2,6

**interrogatories** 32:7

**intersection** 116:8

**interview** 24:9,15 25:3

**interviewed** 25:15

**invested** 29:15 30:19

**investigate** 196:24 208:2

**investigated** 58:23 173:10 175:4 231:20

**investigating** 74:24 175:2

**investigation** 175:8 202:24 204:13 205:17 206:2,11,17,19,22,24 207:1 208:4,6,8,14,22 213:14,15 226:21 231:18 234:7,12 239:1,2 241:22,23,25 242:4,5

**investigations** 109:5 175:12,20 205:22,25 207:25 242:9

**investigative** 49:5

**investigator** 208:2 214:12 227:24 231:10,13 234:22 238:14

**invited** 24:14

**involved** 41:6,8 68:12,17

**involves** 17:17

**involving** 34:12 76:2,10 115:21 117:6,11 126:9 128:7 213:13 227:5 231:22 239:15

**Iredell** 243:4

**irrelevant** 226:10

**Isaiah** 239:23

**issue** 36:16,20,21 39:16 47:18 49:13 63:10 67:18 68:25 75:25 76:1,4,17,22 78:25 79:20 80:23 82:5 86:17,18 87:10, 20 93:21,22 94:4 129:8 174:15 218:24 219:2,9,13,15 229:2 235:15 242:2

**issued** 15:19,21,23 16:15,18 46:24 47:11,14 80:12 88:12 90:13 98:14 103:19 106:12 123:20 185:13,14

**issues** 32:20,22 34:7,12 60:15,18,19 66:2,3,7,9,10 68:8 75:19,24 76:4 78:25 87:5,7 97:7 184:8 218:16,19 238:5,8,10 242:3

**issuing** 81:17,20,25 82:1,9,18 96:3

**items** 39:19

**It'll** 238:12

**it's** 40:24 48:10 54:8 71:20 90:21 96:19 105:17 125:18 154:8 158:13 162:5 166:23 167:14 171:11 184:21 196:4 198:2 211:11 224:23 239:17

**I'd** 31:15 101:16 141:2,4

**I'll** 169:13,14

**I'm** 92:4 121:22 146:12 159:4 189:13 225:6

**I've** 83:15

**—— J ——**

231:18

**J-A-M-E-L** 10:8

**J.J.** 102:13 192:21

**jail** 150:3 153:12 154:22 166:13,15,17 184:7

**Jamel** 10:6

**James** 180:21

**Jamie** 81:13,16 83:4,11,14,25 84:17 86:4,13 88:12 89:13

**Janie** 99:17

**janitors** 199:12

**January** 8:4 18:15 20:7 100:8 101:13 218:11

**jeopardy** 133:22 157:25

**JJ** 156:8

**job** 13:4 16:2 18:7,13,17 19:12,14 22:20 23:10,14 24:6 46:17 49:24 62:1 66:24 101:1 103:12 110:17 173:6 176:8,13,19, 20 183:11,12 185:16 203:5 209:23 216:18 218:15

**jobless** 204:8

**jobs** 79:22

**Johen** 39:2,18 98:22 148:16 241:25

**John** 231:14

**joining** 75:7

**jokes** 74:10

**joking** 74:6 195:14

**judge** 46:2 150:20 154:21 237:10,11

**July** 108:4 177:10,11,12 197:11

**jump** 239:9

**jumped** 90:14

**June** 19:21 27:9,12,15,18,19 28:7 100:9, 14 177:10

**jurisdiction** 13:11 160:13

**justice** 11:15,21 12:12,17,19,20,21,22,23

**Justin** 8:6,7 9:15 10:6 20:1 22:5 129:25 244:3

**justly** 206:18

**—— K ——**

**K-A-L-E** 227:20

**Kale** 227:19 229:24 233:9,15

**Kenneth** 32:18 104:8

**key** 18:23 19:16

**kill** 85:8 87:17

**killed** 81:15 83:18 84:17

**kin** 243:16

**kind** 26:2 32:6 38:19 124:16 192:22 236:8

**King** 93:4

**knew** 24:23 47:4 54:25 56:23 62:8 112:13 138:3 168:3 194:1

**knock** 146:23

**knocked** 146:21

**knocking** 144:8 147:10

**knowing** 50:22 112:5

**knowledge** 49:16 68:14,19,21 70:9,13 74:19 81:23 83:2,5,13 90:24 107:10 127:19,21 165:5 194:6 195:16 199:15 205:20 227:12,15,16 231:6 244:7

---

**L**

**L-A-T-W-A-Y-N-A** 32:7

**L-I-L** 192:12

**L.D.** 101:23

**Ladder(ph)** 35:8

**Laden** 194:19

**lady** 44:18

**lag** 128:19

**laid** 48:10 241:5

**lane** 51:1 119:19,22,23

**language** 88:23 89:5 190:19 191:17 194:15 195:3,4,13,20 198:6

**laptop** 133:12 153:25 186:12

**large** 91:8 125:25 202:15 243:4

**late** 15:22 19:10,11 63:7 141:23,25 144:7,20 147:8 177:12 195:25 241:11

**Latwayna** 32:7

**Lauren** 53:15

**law** 9:22 11:17,24,25 12:1,6,9 13:6,8 36:8 53:22 55:4,16 60:8 77:16 79:7 98:24 143:19 147:5 158:6 159:19 160:23 161:20 168:16 182:3,18 204:7,11,15 212:7 216:8,9 226:5 230:1 236:24 237:1

**lawful** 169:1 183:18

**Lawrence** 33:4 35:3 64:14 68:17 104:10 180:2 188:19 195:17,19 196:10

222:3 223:7

**laws** 78:19,22,24 79:2,15,17 80:7 83:17 84:25 88:13 203:13,19

**lawsuit** 216:6 230:18

**lawsuits** 23:15 215:1,9

**lawyer** 210:18

**lawyers** 218:5 222:11

**layers** 13:17

**laying** 181:11

**lead** 241:6,9

**leadership** 220:15 239:6

**leads** 109:3,6

**learn** 161:19

**learned** 220:11 222:12

**leave** 109:8 111:12 173:13,14,15 225:7 226:5

**leaving** 19:8 108:20

**led** 60:3 155:7 213:18 241:2

**left** 17:25 48:12 85:4 86:23 92:15,16 111:15,18,22 119:19 123:9 180:23 187:12 214:25 228:15 230:1

**legs** 163:1 164:19

**lesser** 14:8

**let alone** 123:17 242:9

**letter** 66:21 69:9,11,12 177:19 178:6,8

**letters** 178:9

**Let's** 90:9

**level** 13:9 37:5

**liability** 157:19

**lie** 208:7

**lied** 104:9,13

**lies** 109:11

**lieu** 8:13

**lieutenant** 25:25 26:1 34:21 60:5 62:7,11 63:21 82:6,11 88:8 89:21 92:20,22 104:11 108:14,16 109:25 111:2,7,17 112:17 122:18 171:21 172:22 173:15 175:24 176:6 179:21 180:7,21,24 181:7 188:2 189:1,9,21 196:11 197:23 217:4,20 219:12 220:21 234:19,25 235:1 241:19

**lieutenants** 51:24

**life** 85:1 87:1 96:25 105:15 116:21 133:21 192:14

**light** 102:18

**lights** 87:15 114:1 116:12 117:21 118:1, 3,6,12,21,23 121:1,7,12,14 128:13 129:6,12,18 130:2,4,6,8,10,13,15,17,22 131:4 135:13,16 165:15

**likelihood** 169:12

**likes** 103:6

**Lil** 192:12

**limit** 51:5

**limited** 56:25 72:22,25 75:19 202:2

**lines** 85:2

**listed** 113:10

**listen** 194:1 199:19

**listening** 91:22

**live** 10:17 57:15,16

**lived** 27:4 138:19,21,24

**livelihood** 204:6

**lives** 85:1 87:1

**living** 31:18 192:14

**LLC** 212:3 215:17

**Lloyd** 26:1 58:5,6 173:22

**located** 111:14 198:25 221:10

**lock** 93:18,19 94:7 149:10

**locked** 94:10 111:24 149:12,17 152:3

**locking** 149:14,20 152:14

**log** 154:6,8 186:14,16

**long** 48:4,11 52:11 73:25 76:9 77:9 78:7 105:18 106:25 109:21 116:22 117:12 119:6 128:15 134:24 135:23 149:6 150:12 152:16 161:1,11 162:5,8 165:24 167:14 170:24 194:23 201:9,25 207:7 209:20 236:5

**longer** 32:17 49:8 59:19 76:13,14 78:10 118:10 165:13 189:7 190:6 214:6

**looked** 22:21 28:13 66:19 117:25 119:13 203:24,25 224:16,18

**lookout** 62:20

**loosely** 91:12

**Lori** 243:3

**lose** 77:10,13 176:8,12

**losing** 176:19

**lost** 31:20

**lot** 33:19 48:9 90:20,21 95:17 106:7 114:2 143:6 150:3 160:4 196:14 228:21 235:25

**loud** 180:22

**Louisburg** 18:14,25 33:23

**lounge** 56:20

**lower** 153:3 162:11

**Luckily** 120:2

**lunch** 55:24 56:14,16,17 57:14 74:24

**Luther** 93:4

**lying** 224:25 225:1

**lyrics** 192:13

**M**

**mad** 189:19

**made** 35:6 68:9,24 71:7 100:18 103:4,5, 11 123:14,15,18 124:6 149:17 155:23 157:9 172:25 174:19 196:21 198:14 217:9,10 221:12 222:1,4,8,16 229:15 230:17 237:23 238:4 241:21 244:11

**magistrate** 16:2 80:15 138:8 150:20 164:25 172:17 237:10

**Magistrate's** 80:14

**magistrate's** 55:2 184:4 237:2

**mailbox** 198:15,25

**mailboxes** 199:7

**major** 35:14 49:11 51:25 78:5,6 86:16, 17,18,19 87:5,9,10,20 96:22 97:5,6 105:9,14 133:1,3 134:12 135:7 136:20 137:16 185:3 231:14

**majority** 105:23

**make** 14:22 64:6 71:7 78:15,17 86:21 99:5 102:15,21,23 104:22 108:17,21 112:18 144:7 146:1,7,16 168:17 172:16 194:20 195:9,11 213:6 214:9 226:15 237:23 238:17,19

**makes** 174:1

**Makin** 69:20 70:3,5 71:5 72:2 73:8,10 74:11

**Makin's** 70:6

**making** 49:21 74:10

**male** 42:8 54:17 137:6 140:21 191:24,25 197:3 220:8

**males** 239:15,19

**malicious** 212:20

**man** 25:2 42:9 44:18 46:4 57:5 82:17 91:4,9,16 93:9,12 94:9 110:5,22 112:21 114:23 147:10 192:19 219:19 238:2,4

**man-to-man** 13:17

**management** 87:11 104:15 107:13 123:14,18 163:21 164:3 206:14 219:18 221:13 222:14 228:18 239:6 242:11

**manager** 28:21 214:13

**managers** 16:24

**maneuver** 151:2

**manipulation** 122:25

**manner** 8:20 131:23 195:14

**manual** 38:17 41:18 162:6,18

**March** 23:12,13 117:5 126:9 127:11,13 18 211:5

**Maria** 26:21 93:5 166:25 170:6

**Marin** 32:9 62:25 66:14,22 76:1 92:12, 19 93:2,7 108:3 109:10 112:18,20 113:16,17,18,21,23 114:3,14,18,21,22 115:21 116:8,11,18 143:8 217:17 240:22, 23

**Marin's** 63:18 68:5 217:12,16

**Mark** 120:23

**marked** 21:11 22:2 87:22 89:9 98:4,7 101:3 104:5 107:22 120:13 125:3 126:24 169:22 204:12,20 209:12 224:1 225:4 232:5,9 235:3

**markers** 154:13

**Martin** 93:4 191:24 192:2 193:12 194:4, 14,17 220:21 221:2,15 223:23 238:13

**Martin's** 99:18

**master's** 12:11,16

**materials** 37:8 38:14 161:21

**matter** 8:6,16 78:18 83:8,10 88:20,23 128:24 136:10 150:17 154:22 184:20 203:12 204:5 214:19 215:25 226:9

**matters** 173:17

**Mcgurl** 9:6,11,12 10:20 97:15,17,18,22 144:25 145:4

**means** 12:18 95:13 171:2,10 195:12 205:13

**meant** 28:2 113:8 133:10 192:9

**measurement** 39:10

**immediate** 114:7 115:23,24

**medical** 39:8 163:6 164:16 171:14

**meet** 179:22 181:1

**meeting** 221:4 222:11

**member** 180:6

**members** 21:8 44:4 53:21 75:21 175:6 220:15 224:24

**memory** 54:9 81:24 140:12

**mention** 15:14 16:4 58:19,20 88:14,15, 19 190:2 201:7,12,15,17 216:12

**mentioned** 15:11,16 17:25 19:22 25:23 26:8 27:20 35:18,23 43:7 47:23 49:15 54:23 59:10 65:10,18 68:22 71:5 72:6 84:16 88:17 95:15 128:18 141:17,20 142:4 143:3 154:14 187:6 190:3 193:12 194:13 223:13 232:24

**merits** 80:18

**messages** 57:1,3,8

**met** 21:2 26:20 55:10 66:5 177:11 181:3 197:12 222:14

**methods** 13:24

**Mexican** 219:10 220:8

**Mexican-hispanic** 218:24 219:1

**Michael** 9:6,11

**mid** 177:11

**middle** 10:7 90:10 103:17 105:5

**midnight** 170:21

**miles** 116:3

**mind** 38:2 86:9 131:17 144:12,13 179:14 208:10 223:6 233:20

**minimis** 14:11,14

**minor** 42:5 49:11 75:25 76:1,3,21 87:7,8
  95:2 117:7 134:9

**minorities** 220:2 239:15

**minute** 119:8,9 165:12

**minutes** 38:4 73:23 97:19 188:14 236:7

**miscellaneous** 99:8

**misdemeanor** 42:3 143:14 184:2

**misdemeanors** 36:24

**misquoting** 71:20,22

**missing** 31:17

**mix-up** 185:7

**mocking** 192:3 193:17

**model** 133:15 185:23

**modular** 138:25 139:4,6

**mom** 44:5,8 94:2

**moment** 210:5

**month** 99:3 101:17 193:9

**months** 12:8 42:12 92:10 110:11 175:23
  190:24 204:9 205:23 207:4,10,12 234:8

**morning** 141:23 142:1,7 144:8,19
  179:22,24 180:8

**mornings** 144:20

**mother** 43:12,18 44:17

**motion** 93:24 225:7

**Motor** 49:2

**motorist** 51:9 118:20

**Mount** 11:11,12,13,16 17:25

**mouths** 97:4

**move** 26:22 76:22 98:7 101:5 105:19
  125:23 132:6 138:9 210:23 212:11,19
  237:14

**moved** 31:18 92:11 203:22

**movements** 108:21

**moving** 25:13 39:13 52:22 78:2 107:25
  115:19 131:7 218:22 220:10 221:10
  241:16

**multi-colors** 99:20

**multiple** 50:7,13 52:6,20 85:2 88:25
  122:6 130:14 132:23 134:8 143:14
  168:22 182:8,9 185:20 186:18 195:25
  221:1,3 231:20,21

**mumbled** 135:21

**munition** 13:19

**munitions** 58:8

**mute** 9:7 124:10,13

- - -

**N**

**named** 226:10 244:18

**names** 49:5 117:1 142:15 154:8 228:17,
  18

**naming** 226:1

**nasty** 110:1,16 112:23 217:6,20,24

**nature** 41:17 57:5 221:19

**NC** 78:3 215:16

**nearby** 139:4

**necessitated** 226:1

**neck** 163:1

**needed** 16:6,7,25 26:17,23,24 27:1
  28:19 37:1,5 59:19 105:8,21 189:7 190:8
  8 213:13 214:6

**negative** 92:5 204:11 226:23,24 227:1
  229:8 235:19

**negatively** 225:23

**neighbors** 139:1,3

**Nicholas** 234:22,23

**night** 69:25 87:16 117:20 128:1 139:25
  140:2 141:11,23,24,25 142:1,7 143:15
  144:7,9,19,20 167:23 170:18,20 187:25
  240:17,22,24

**nights** 61:18

**nighttime** 87:8

**noise** 69:12

**non-attorney** 81:5 200:10

**non-compliance** 15:5

**non-compliant** 15:9 150:25

**non-cooperative** 15:9 150:25

**non-sworn** 199:5,8

**noon** 144:19

**normal** 72:13,19 76:15 151:25

**north** 10:17 11:6,11,12 18:1 20:1 50:25
  55:6 116:14 135:1 154:7 186:15 203:19
  212:3 243:4

**northern** 84:24 86:12

**notarized** 27:1

**Notary** 243:3,24 244:15,23

**note** 125:19 203:3 245:4

**notebook** 202:6,8,9,11,12,20 203:8,12,
  17,21,23 204:1

**noted** 124:20 126:25 244:10

**notes** 40:2 203:2

**notice** 21:17 134:1 145:2,8

**noticed** 117:14 149:9

**notwithstanding** 44:2

**November** 18:3,15 19:10 42:23 59:25
  72:11 107:9 160:20 217:12

**Ns** 192:14

**number** 21:11 22:2,5 53:9 80:12,16
  87:22 88:2 89:9 98:4 100:21 101:3 104:5
  106:12,14,19,22 107:22 120:13 125:3
  126:2 128:16 135:2 169:22 186:11,13,14
  17 204:20 205:9 207:19 209:12 224:1
  225:4 232:9

**numbered** 243:13

**numerous** 40:8

- - -

**O**

**oath** 8:14 27:16,18 183:13

**object** 31:23 38:18 71:18 124:16 129:20
  146:10 226:7

**objected** 124:17 126:24

**objection** 39:7 71:10,18 126:25 144:25

**objections** 8:19 145:7 146:7,16 226:16

**objective** 13:9 182:18

**obligated** 175:1

**obligation** 242:8

**obligations** 79:7,9,16

**Observe** 19:1,13

**observed** 84:23 95:3 132:23 190:25

**observing** 32:10

**obsessed** 182:19

**obtain** 210:2

**obtaining** 212:9

**occasions** 121:16,20,23

**occur** 207:14

**occurred** 20:4 42:21,22 46:25 111:16 170:8,13 177:7 187:23,25 194:8

**occurring** 170:10

**October** 132:8,13 147:18 159:10 167:17 170:14 178:21 207:15,17 221:23

**off-duty** 56:24 57:2 188:16

**off-record** 155:11 209:16

**offence** 237:7

**offended** 203:8

**offender** 184:22

**offenders** 18:12

**offensive** 88:22 89:5 195:13

**offer** 26:15 215:20,21

**offered** 26:11

**office** 8:7 15:22 17:6 19:21 22:19,24 24:19,23 27:16 32:3 33:14 34:16 35:17 36:7 37:17,20,22 38:15 39:5,12 40:10 41:12,18 42:1,4 43:2,24 45:7 46:11 49:6 50:17 52:10,16,23 54:24 56:6,9,17 57:18 62:8 68:16 80:14 96:12 98:16 99:17,18 100:13 101:20 102:6 105:11,16 109:9 111:14,18 112:1,4,6 131:10 136:16 153:22 154:2,4 155:2 157:21 159:12 163:18 164:24 178:17,19 180:17 182:9 186:1 187:11,12 188:17,18,20,22,24 189:24 190:18 195:6 199:4,11 200:22 201:12 202:5 204:3 207:8 211:2,8 212:5 213:11 214:5,25 215:14 216:6,14 222:9 224:24 227:4,9,13 230:2,10,19 231:13, 21,25 232:17,21 233:22 237:20

**officer** 11:18,24 13:6,7 14:22 18:8,15 19:11 32:14 36:9 41:22 48:21 49:18 77:16 78:4 102:15 113:7,8 143:20 144:14 147:3,5 148:2,10 150:7 159:18,19,22,24

**officers** 16:25 61:20 79:7 147:25 150:5 160:22 196:15 236:24 241:6

**offices** 109:4

**official** 89:12 100:22 171:15 179:16

**officials** 228:17

**Olive** 11:12,13,16 17:25

**Oliver** 132:7,8,9,11,18,19 135:14 136:17 138:3 147:14 156:25 157:22 159:6,10 164:12 167:16 170:4,6 171:7 178:22 179:3,11,24 180:17 181:10,17,19 182:19 183:17,22 184:14 185:12,18 186:3 187:4 190:2 206:12 207:14

**Oliver's** 134:1 138:11 146:18 184:25

**on-boarding** 37:9,10,12 38:16,19 42:15

**on-the-job** 32:3 38:25

**one-lane** 119:21

**one-sided** 175:12,19

**one-year** 230:3

**one's** 62:21

**ongoing** 205:21,24 206:2,10,18

**online** 27:3,5

**onward** 198:18

**open** 62:16,17,19 147:10

**open-eye** 213:15

**opened** 61:22 189:3

**operation** 84:21

**operations** 41:15 85:16 202:24

**opinion** 134:9 145:20 208:11 220:5

**opinions** 239:25

**opportunity** 29:11,21 30:15 61:14,16, 21 90:6

**Opposing** 145:25 146:3

**options** 157:5

**oral** 25:14 29:24 30:4 238:3,4 242:3

**orally** 30:16 41:25 82:14

**order** 10:3 73:24 184:3,4 186:9 237:2

**ordered** 241:23

**orders** 96:4,6 169:2 183:18

**ordinary** 137:15

**orientation** 37:12,14 38:20,24,25 39:1, 3 65:17 88:19 89:6 102:10 201:17

**originator** 63:5 67:3

**Osama** 194:19 223:21,22 224:13,15,17, 18,20

**other's** 56:15

**outcome** 184:10

**outstanding** 38:2 185:25

**overrule** 174:13,16

**o'clock** 117:20 181:5 188:14

**P**

**P-A-R-H-A-M** 3:16

**P-A-T-E-L** 194:18

**P-R** 194:18

**P-U-R-A-V** 194:18

**P.C.** 46:6

**p.m** 233:5

**p.m.** 70:22,24 74:23,24 75:1 97:21,24,25 98:2 124:12,24 125:1 127:22 144:5 145:22 155:10,13 165:2 170:16 186:25 187:2 188:13 233:5 236:12 242:21,23

**PACER** 215:12

**pages** 28:15 39:25 98:9 99:7,12 202:18 211:15 243:14 244:5,8

**pain** 166:7,14

**panel** 29:25 30:5

**panic** 164:15

**panicked** 131:23 164:14

**paper** 28:17 58:17 85:10 202:19 238:9

**papers** 46:16

**paperwork** 31:14,17 33:19 81:1,7,14 115:25 173:19

**paragraph** 88:1,3 90:10 91:6,7 94:23 96:2 103:18 105:6 155:20 170:24 171:1 220:10 221:10 225:11,17

**paragraphs** 70:23

**paramedic** 66:2,5,9

**paramedics** 51:4 165:12,23,25 169:19

**Parham** 26:21 73:16 93:5 167:1 170:1

**park** 148:21

**part** 15:2 16:1,8,12 37:8 38:16 46:17 84:24 85:15 86:11,12 95:25 103:12 105:17 110:3,7 122:23 161:21,22 171:1 188:15

**part-time** 19:19 188:16

**participating** :9 10:12

**parties** 8:18,23 36:7 212:13 243:17

**party** 82:17 140:23 177:1,2 180:6 226:2

**pass** 119:17

**past** 75:16 124:6 174:9,17 199:13

**Patel** 190:24 191:16 192:4 193:17,18,22 194:13,18 223:14 224:11,13,25

**path** 168:14

**patrol** 32:24 33:1 34:15 35:4,12,16 59:21 64:14 78:4 84:24 103:7 108:13,14 109:2,5 110:15,25 111:18,19,22,23 132:23 151:24 154:24,25 155:15,17 173:23 190:10 199:2 200:24 221:16

**pause** 127:3 128:5

**pay** 77:19 240:6

**PC** 85:24

**PDF** 40:19

**peace** 13:10 14:2

**Pearsall** 73:11

**penalty** 8:16

**people** 45:23 52:4,23 54:8,22 60:7 64:22 76:12,13 83:19 84:17 90:13 92:4 97:4 115:6 137:11 139:8 142:15 143:4 153:17 154:8 185:24 191:16 192:8 217:14,20 219:10

**people's** 85:1

**pepper** 13:19 15:11,12,14,16,17,19,21, 23,25 16:1,4,8,11,15,17,18,20 17:5,12 157:14,17 158:11,21 159:7,9,15,23 160:2,12 161:7

**perceive** 158:9

**perceptions** 44:11

**perfectly** 139:10

**perform** 103:20

**performance** 32:20,22 34:7,12 66:11 99:10 100:6 198:19 218:10,12,16,17

**performed** 192:12

**period** 107:3 142:6

**perjury** 8:17 42:17 137:21,22 163:11

**permission** 211:9

**Perquimans** 1:5

**Persall** 73:11

**persecute** 241:19

**person** 8:14 15:1 23:3 55:1 56:12 71:6 80:21 107:11 109:15,24 121:13 135:4 145:21 173:16 181:24 182:14,15,17 186:19,21 202:3 217:23,25 237:2,4,8

**person's** 25:18

**personal** 18:22 19:16 56:1 66:10 73:5 75:24 134:15 136:14 199:8 203:2 218:15, 17

**personality** 92:24

**personally** 132:15 231:23 244:18,20

**personnel** 20:24 37:11 39:23,24 40:5, 67:18 98:21,23,25 99:1,14,17,24 100:4,5 101:18 102:3,7,8 199:5 203:11 210:17,20 211:10 212:4,25 214:8

**persons** 165:11 218:24 219:1,14,16

**pertains** 102:13

**pertinent** 43:4

**Peter** 22:6 25:1 57:24 195:2 221:23 223:2

**ph** 69:20 73:11

**philosophy** 133:14 185:23

**phone** 27:6 57:6,7,8 72:15 73:5,7,8 82:15 91:19,22 109:15,24 110:1,14 112:15,22 114:4 173:11 179:22 187:7,9 216:15

**phonetic** 54:12 71:6 106:24

**photo** 154:12

**physical** 14:9 169:2,9

**physically** 8:10 72:18,19 108:18 153:7, 8 162:2

**pick** 140:17 141:2 142:22

**picture** 154:9 172:19 219:21

**piece** 112:24

**pinpoint** 132:2 157:7

**pitch** 87:15

**pitch-black** 128:1

**place** 10:15 28:19 59:4 68:7,15 73:15,24 121:14 129:13 143:7 152:11 156:21 157:24 181:12 183:15,23 198:16 206:21 208:22 213:13,16 214:14 221:7 227:4,15 243:8 244:6

**placeholder** 25:24

**placing** 162:10

**Plaintiff** 22:5 225:22 226:3,5

**Plaintiff's** 225:20

**plan** 218:4,5

**plans** 179:3

**plate** 132:24 133:11 134:25 135:1,2 184:9 185:6

**play** 58:19 112:21 127:1 128:2 194:3

**played** 201:7

**plays** 128:4

**pleasant** 158:19

**pleasure** 175:15

**point** 28:3 31:24 42:18 51:4 80:1 86:25 107:17 108:21 115:9 118:11 138:6 145:12 157:6 164:11 165:16 166:11,24 183:21 196:2,3 226:11

**pointed** 79:21 103:18

**pointing** 103:21

**points** 26:4 97:17

**police** 13:6 16:24,25 50:3 55:11 135:13 147:3 160:23 164:18 212:1,2,3 214:13 215:16 227:17 229:24

**policies** 37:15,16,19 39:3 40:10 41:25 43:1 47:21,25 49:14,19 195:25

**policing** 133:14 185:22

**policy** 38:17 39:4,11,17 142:18 157:19 158:9 206:7

**Pool** 54:7,25 221:17

**Poole** 57:11,25 58:11,18 91:22 104:8, 18 108:15 111:1 112:15,20 113:18,21 114:19 115:15,16 116:4,15,18,20,22 188:3 191:1,6,8,13 200:11 201:7,20,22 220:22 221:16

**Poole's** 116:21

**pop** 73:19

**portion** 198:3

**position** 18:25 22:20 24:14 27:17

**positions** 14:10

**possibility** 118:7

**possibly** 17:17 40:9 71:6 171:22

**potential** 26:24 212:23

**power** 78:17

**practice** 81:11 96:2

**practices** 41:25 42:3 43:1 49:14,20

**praised** 95:22 218:10,11

**precedes** 100:11

**predated** 175:23

**preparation** 20:16 21:6

**prepare** 20:10

**prepared** 10:21 20:12 166:25

**presence** 13:18,25 102:19

**present** 8:11,23 9:12 21:5,8 28:8 72:18, 19 169:24 189:24 237:9

**presentable** 27:11,25

**presented** 28:11 29:11,18,20 30:14 122:11

**preserving** 13:10

**pretty** 10:1 48:10 112:24 134:5 161:10 163:20,24 165:6

**prevent** 14:2 180:15 204:14

**prevented** 225:22 226:18

**preventing** 185:15 235:12

**previous** 23:15 24:3 79:21 91:1 96:4,6 215:1

**previously** 24:6 30:14 33:22 34:11 78:8 91:2 98:7 106:5 117:10 144:17 149:23 185:1 214:17 228:4 234:3 240:1

**print** 154:1

**printed** 154:3

**prior** 21:16 24:18 67:25 72:5 130:4,6 156:11 157:5 190:24 191:17 238:5

**priority** 95:1,6 103:5

**prison** 33:21

**prisoners** 160:17

**private** 45:19 202:3

**privilege** 226:8 230:25

**probability** 67:22

**probable** 52:8 80:19 237:13,14,15

**problem** 36:5,9,11 61:19,23 66:9,24 67:1,2,20 175:14 220:1 228:6 234:9

**problems** 34:23 62:22,23 64:18 74:4

**Procedure** 46:6,15

**procedures** 37:15,17,19 42:3 47:22,23

**proceed** 229:18,19

**proceeding** 8:10,11,12

**PROCEEDINGS** 8:1

**process** 12:3 24:9 26:15,19 29:23 37:9, 10,12 38:17,20 39:1 41:7 42:15 53:23 60:5 79:24 80:10 151:23 156:24 175:16 212:19 238:14

**processes** 38:21,24

**processing** 64:25

**produce** 126:16

**produced** 126:10

**production** 22:7

**professional** 27:10 74:9 136:4

**prompted** 184:24

**pronounce** 96:6

**proof** 227:8,11 233:10,16,18

**proper** 157:18 208:7 214:8

**property** 45:19 147:19

**prosecute** 241:20

**prospective** 26:25 227:10,13 229:22

**prospects** 207:25 225:24 226:19

**protect** 87:6 96:24 105:15

**protected** 176:25 177:18 178:10 181:15 215:6

**protecting** 13:10

**protection** 175:17

**protective** 98:10

**protocol** 158:10

**protocols** 158:9 169:8

**provide** 8:14 17:15 28:25 36:24 51:9 78:19 157:21 163:8,15 167:6 182:14 217:19

**provided** 16:23 17:7 21:1,15 32:23,25 34:8 37:5,16,18,20,22 39:3,6 41:19 62:6 89:20 116:6 121:6 135:12 202:8,9 240:12

**providing** 39:17 235:19 240:2

**provision** 79:12

**provisions** 37:25

**provocative** 11:8

**proximal** 71:1

**proximity** 139:2

**public** 12:14 13:1,7 18:2 20:2 87:6 105:10 114:5 115:22 160:13 163:9,23 179:16 243:3 244:15,23

**publicly** 215:10,11 216:3

**puff** 199:21

**pull** 48:13 51:2,6 69:2,5,6 80:16 97:6 120:15 133:13 134:23 149:13 185:21 189:12,13 204:17 209:10

**pulled** 33:14 48:14,17 50:6,13,14,15,18 66:19 85:6 87:13 121:8 149:15 162:6,19 166:4,19,22 189:10

**pulling** 48:16 52:4 95:14 113:23

**Purav** 194:18

**purple** 198:15,24 199:17,19,21 239:10

**purpose** 60:11 64:22 210:19 232:14

**purposes** 14:4 16:3 24:21 101:8 202:21, 22 203:5,10 212:8 244:21

**pursuant** 76:15 226:4

**pursuit** 136:5

**push** 154:24,25

**put** 46:1 63:4 68:2,4 85:1 90:25 91:1
  92:10,13,24 94:3,4 115:25 116:21 119:3
  121:25 123:13,16 133:21 134:5 150:19,
  22 153:2,11 162:19 185:12,17 238:8
  239:8

**putting** 87:1

**PVA** 135:18

### Q

**question** 23:17 31:25 39:6 52:1 63:7
  65:13,15,16,23 82:12 90:17 93:2 99:23
  110:20 114:23,24 129:21,23,24 130:4,
  20 145:11,14,18 146:4 147:13 151:22
  159:3 191:14 196:25 197:4 205:16 208:9
  211:19 214:18 218:6 223:1 226:14
  233:13 235:19 240:3

**questioned** 17:11 120:24 188:8

**questions** 26:2,5 27:6 33:7 75:3 123:4
  131:16 188:9 190:7 218:18 233:2,8
  236:6,17 242:17,19

**quick** 185:3 231:17

**quickly** 70:16 85:22 118:25 119:4,5
  137:14 138:1

**quiet** 189:23

**quote** 179:21

### R

**race** 26:8 65:9,17 88:14,15,16,17 177:17
  195:9,21 201:7,12,13 217:21 219:24

**racial** 88:22,24 190:19 191:22 223:16,19

**racism** 203:15

**radio** 48:18 50:20 63:15 95:20,23 107:1
  114:4 115:22 116:11,15,17 132:4 135:7
  184:9 185:4

**radioed** 132:24 133:10

**Raleigh** 11:11

**rammed** 238:21

**ran** 230:3 242:13

**rang** 112:15

**Ray** 54:11 173:13,14 188:19 241:4

**Ray's** 61:24 67:23

**re-certified** 229:25 230:5

**reach** 216:2

**reached** 24:11,12

**react** 33:13 118:15 136:3 152:20 164:12
  191:6

**reacted** 191:9

**reaction** 75:7

**read** 29:1 37:24 90:2,3 167:14 171:5
  244:4 245:8

**reading** 88:4 170:22 185:5 243:20 245:7

**ready** 60:7,13 120:20

**real** 75:10 77:8 166:8 242:15

**realize** 82:16 157:2

**reason** 11:20 31:16 34:4 43:17,18 52:8
  57:22 59:21 64:16 94:11 103:20 105:25
  106:1 127:20,23 129:5 171:12 190:13
  200:17,18 215:19,22,23 216:3,4 220:4

**reason(s)** 245:5

**reasonable** 47:9,12 213:6 214:12

**reasons** 75:10 113:5 134:15 239:20
  241:10,20

**reason's** 44:10

**recall** 16:8 21:22 23:19 26:6 30:22 51:1
  52:19 54:1 81:19 104:2 105:17 110:7
  131:25 132:25 134:6 146:20,21 147:1
  170:10 176:11 194:23 195:4 196:20
  236:4

**recalled** 49:16

**receive** 32:3,6 81:1 85:10 237:4

**received** 32:8 43:11 47:23 100:24
  126:15,23 148:3 178:25

**recently** 232:4

**reception** 23:1

**recess** 38:3,10 70:22 74:24 97:25 124:24
  186:25 233:5 236:12

**recognize** 89:18 210:25

**recognized** 56:7 112:12 239:14

**recollect** 194:11

**recollection** 52:12,17 103:23 165:5
  194:7,8 207:13

**recommend** 121:17 122:9,22 150:19

**recommendation** 122:13 168:18
  174:10,17

**record** 8:4,22,23 10:5 20:12 38:9,12
  53:20 70:21,24 74:13,21,23 75:1 97:13,
  24 98:2 100:10 124:12,21,23 125:1
  136:22 155:8,9,12 163:9,24 165:1,2
  184:15 186:22,24 187:2 215:24 233:4,7
  236:11,14 243:14 244:5,8

**record-keeping** 101:8

**recording** 122:15 132:3 133:8 134:23,
  24

**recordings** 122:15 163:22

**records** 66:19 74:15 99:21 211:22
  215:10

**recruiter** 210:2

**recruiting** 233:23

**rectangular** 202:16

**red** 102:18

**redirect** 236:8

**reduction** 150:20 168:18

**refer** 84:21 85:16 146:5,14 149:3 152:17
  161:24 195:1

**reference** 26:24 27:1 43:10 104:25
  108:8 110:21 113:10 120:23

**referenced** 158:10

**references** 204:12 226:23 227:1 229:8
  235:19

**referencing** 224:17

**referred** 34:15 54:16 161:25 194:17

**referring** 35:20 36:1 37:11 42:16 78:23
  82:8 83:3 91:17 92:4 104:13 108:7
  113:12,14 156:1,16 175:20 178:13 180:1,
  3,9 218:9 224:19 227:1 234:12 238:1
  240:7

**refers** 114:6 133:1

**refresh** 140:11

**refusal** 124:5

**refuse** 36:10 123:10,12

**refused** 123:5,8,11 124:2,18

**regard** 118:17 187:5

**registration** 134:19

**regret** 109:10 183:10,11

**reimbursement** 132:13,15

**reinstated** 24:6 33:22

**related** 72:1 126:15,18 181:7,9,13

**relation** 148:21

**relationships** 56:1 64:18 65:25 70:6,8,9 74:6,9

**release** 209:5,8,21 210:17,19 211:1,6,12, 21 212:4,11,14,17,22,24

**released** 212:24

**releases** 212:8 214:15 230:4

**releasing** 213:2

**relied** 162:20 163:13

**relief** 76:3,7,15,18 209:8

**rely** 52:10 150:12 162:18

**remain** 57:10

**remarks** 221:12

**remember** 20:3 22:25 23:11,18,24 24:1, 3 26:2 27:21 28:13,23 29:3 30:6 31:6 39:16 40:11 42:20 43:2,5,9 50:24 52:14, 53:13 54:3 73:6,7,10 74:5,10 84:12 85:13,18 91:3,10 103:21,24 105:12,13 106:3 108:6 109:20 111:5 113:1 117:5, 17 118:11 127:9,12 131:8,13,15,24 132:5,20,22 134:17,22 135:3,6,15,16 136:1 138:13 140:9,15 149:1 161:4,5 162:9,10,13 163:4,6,12 164:8,9 165:8,16, 18,22 167:3,7,8 170:15 171:22,24 172:1 176:5,7 184:17 188:6 195:23 197:6,7 199:22 202:1,17 203:10 206:25 216:24 223:19 225:1 236:2

**remembered** 73:18

**remembering** 6:7

**remorse** 76:19,21

**remote** 9:13

**remotely** 8:12 9:5

**remove** 131:6 171:16 209:1

**repeat** 65:16 130:20 135:24,25 151:22 184:21 233:13

**repeating** 36:6 167:13

**replied** 111:3

**report** 19:1,13 37:2 41:14,15 44:16,17 84:21,22 85:16,17 117:13 125:11,12 134:4,16 138:17 140:9 149:4,5 150:13 151:18 152:17,18 153:2,11 158:5 172:6, 15 173:12,13 202:23,24 204:12,24 208:9 208:19 226:20 228:20 234:4,5 238:23

**reporter** 8:3 9:2,5,9,13 10:4,11 21:14 38:8,11 70:20,23 74:22,25 97:23 98:1 124:11,22,25 126:5 127:1 155:9,12 186:23 187:1 225:12 232:5 233:3,6 236:10,13 242:20

**reporting** 8:12,20

**reports** 49:6 50:16 52:10,16 100:22 138:17 140:5 149:4 151:16 163:4 165:15 167:15 170:18 176:9

**represent** 9:21

**representing** 215:25

**reprimand** 81:17 89:12

**reprimanding** 81:19

**request** 15:23,25 106:20,21 126:15 139:19,22 183:18 214:8

**requested** 15:24 16:13 101:18 139:20 140:16 222:21 243:20

**requests** 22:7 126:14,18

**require** 14:3

**required** 79:8 86:16 157:20 182:1 189:7 215:15

**requirement** 211:24

**reread** 127:15

**rescinded** 197:10 215:20

**residence** 10:16

**resist** 156:25

**resistance** 168:12 169:1,3,7,10

**resistant** 153:13

**resisted** 152:25 168:10 169:5 173:7 213:25

**resisting** 153:6,7,8 155:5 157:3 164:22 169:1

**resistive** 15:8 150:24

**resources** 28:20 37:11 98:19

**respectful** 217:5 218:1 239:22 241:5

**respond** 36:14,18,19,20 48:8 82:24 90:7 192:24,25

**responded** 132:2 167:8 191:13

**responding** 13:24 131:8 219:3 241:13

**response** 22:6 136:3 150:16 178:10 242:7

**responsibilities** 8:10,25 19:12 34:17 35:19,20,21 77:11 185:14

**responsibility** 34:18 120:1,4 129:10,15 169:20

**responsible** 68:15 114:15

**rest** 92:3

**restorative** 12:22

**restrict** 180:13

**result** 116:14 168:11,19,21 205:17

**resulted** 151:1 242:4

**retail** 19:19

**retaliation** 181:13 216:5

**retaliatory** 181:14

**retired** 78:5,6 133:3 223:8

**return** 41:16 80:21 237:19

**returned** 136:15 200:5

**revealing** 20:8,13

**reverse** 119:3

**review** 20:14,16,21,24 24:16 25:14,23 26:9 29:24,25 30:4 37:7 38:16 39:15 41:11 69:7 74:15 80:16 89:14 98:8 99:1, 13,24 101:6,18 104:20 107:25 120:16 125:7 169:25 204:23 210:5,13,21 211:17 213:5 217:2 224:6 225:18 232:6 237:11

**reviewed** 20:15 38:14 39:23 40:13 41:10,14 98:22 99:13,16 100:25 210:8

**reviewing** 40:9,10 105:3 173:18

**Riceland** 25:19

**ricochet** 157:24

**ride** 59:21 189:16,20 190:9 200:24

**riding** 48:14 52:3 75:18 217:17

**rights** 98:17 136:11 175:16,17,18

**rise** 226:2

**risk** 133:21 143:22 144:23 145:19,23 157:25

**risks** 143:20

**risky** 143:24 144:4,6

**road** 43:4 73:16 76:14 81:14 87:5 116:8 9 119:21 138:22

**roads** 93:5

**roadway** 121:2

**Roberson** 53:9 54:10,11,12 63:7,9,24 64:25 66:8 92:20 96:9,18 104:24 106:21 107:12 218:9,14 238:24,25 240:21,23 241:17

**Roberson's** 60:24 107:7 240:13,15

**Roberson's** 54:16

**Robinson** 9:3,4,13 31:23 38:1,6,18 65:4 70:15,19 71:10,16,20,25 101:7 123:14 124:10,14,15 126:6,10,17,23 129:20 145:12,24 146:2,8,12 210:4 226:7,13 236:7,16 242:16

**rode** 32:8,14 53:2 61:17 217:22

**role** 54:1

**roles** 53:24

**romantic** 70:8

**room** 8:11,23 10:18 25:24 82:17 108:1 109:2,6 110:25 111:12,19,22 199:2 221:16

**rotated** 76:11 162:12 240:16

**rotating** 162:17

**rotation** 240:24

**roughly** 171:24 172:1

**rude** 110:1 217:6,20

**Rule** 146:6,15 222:11

**ruled** 226:9

**rules** 9:14 205:18

**run** 45:24 134:18 196:16

**running** 106:1

---

**S**

**S-H-E-F-T-A-L** 54:21

**S-U-T-T-O-N** 35:1

**S33** 63:14

**safe** 49:25

**safety** 13:7,10 18:2,15 20:2 87:6 133:24 157:25 160:13

**Saturday** 86:1

**save** 96:24

**scared** 94:12

**scene** 14:24 123:14,15 150:6 165:10,17 18,19 167:3

**scheduling** 88:3

**school** 11:4,5 53:23 140:19 141:3 148:7 156:5

**Science** 12:11

**scope** 226:11

**scratching** 44:23 45:5

**screaming** 52:2 166:18,20

**screen** 21:15 112:25 125:24 131:7 209:4

**scroll** 21:20 22:10,13 89:16,19 90:9 98:11,12 211:25 225:12,15

**scrolling** 22:10

**SEAL** 244:25

**search** 141:10,17,20 184:25

**searched** 232:23

**searching** 186:11

**seat** 85:3

**seconds** 115:11 119:9 127:16 128:16 233:20

**secretaries** 99:8

**secretary** 99:19 109:3

**section** 225:18

**secure** 209:4

**securing** 225:23 226:18 235:12

**security** 19:11 205:9 207:19

**seek** 16:20

**seeking** 214:19

**seeks** 226:3,5

**send** 16:25 57:1 125:25 134:24 209:5

**sends** 213:6,7

**senior** 45:12 54:17

**sense** 156:25

**sentence** 102:13 105:20 193:14

**sentences** 121:15 122:10

**separate** 61:3 94:15 102:6,8

**separated** 62:15

**separation** 204:13,24 205:1,16 226:20 234:5

**September** 18:3 99:2,3,16 101:17 107:8

**sergeant** 32:9,13,16 34:8,13 35:2 41:22 47:24 48:19 49:10,15 51:16 52:3,7 53:2, 3,5,8,18 54:6,11,12,16 60:4,24,25 61:1, 11 63:3,7,8,18,24 64:20,21,24,25 65:4 66:8,14 68:5,6 69:1,13 72:10 75:4,22 76:1,18 77:1,11 85:12 86:5 92:12,19 93:2,7 96:9,17 104:24 106:21 107:7,11, 12 108:3 109:10 111:25 112:7,15 114:7, 22 115:13,15 116:2,19,20 117:24 120:22 121:21 122:16,20 140:16,17 142:21 148:4 155:24 165:13 166:11 176:3,4,6 183:1,7 186:4 188:2,4 191:24,25 194:17 195:24 196:3 218:9,14,18 220:20 221:2,15 223:23 231:9 238:11,12,14,24,25 239:11 240:13,14,15 241:7,17

**sergeants** 51:24 52:2 191:21 218:10 221:6

**Sermons** 46:1

**serve** 41:16 50:5 80:2,20,21 81:4 85:18, 22,23 110:16 139:18 141:6,15 143:21,25 144:4 145:21 155:25 156:6,8,11 181:23, 24 182:13,21,22,24 183:5,8,12 184:1 237:16,18

**served** 46:7 81:6 86:2 141:9,11,24 142:5,6,8,20 143:8,11,14,15 144:16,18, 22 186:1

**service** 59:19 114:5 133:25

**services** 58:11 132:2 163:21 164:2,16 182:7 189:5,6 190:5 200:23 214:5

**serving** 13:9 46:15,16 49:21 90:12,23 91:5 110:19,22 111:4 181:19 183:10

**sessions** 21:6

**set** 22:6 24:24 27:7 241:19 243:21

**severe** 134:12 225:24

**sexual** 65:17 74:10 88:19 89:6 201:17

**shaking** 94:5

**share** 21:15 126:5 131:7 132:4

**shared** 125:24

**Sharika** 9:3,12

**Sharon** 26:1 34:20,21,22 35:3,7,9 36:19 173:15 188:20 189:1,9,21

**Shaw** 11:10 19:8,17

**she'd** 153:3

**sheet** 202:19

**Sheftal** 54:19

**Shelton** 231:14

**sheriff** 13:7 25:1,4,9 27:8,20,22,24 28:6,7 30:21,22 33:3,9,15,16 35:5 37:23 41:8,24 42:2 43:1,11,14 44:19,20,23,25 45:2,4,5,9,14,17,22,25 46:4,9 47:4,13,17 51:19,25 57:24 58:9,10,25 59:3,7,20 64:1,2,5,8 67:24,25 68:12 78:3,14 79:10,11,14 80:8 81:17 82:4 83:15,25 84:12,14,15 87:11 96:20 99:18 103:13 104:1 114:13,14 118:18 123:21 146:18 148:8,12,15 163:18 172:24,25 173:4 174:1,4,8,16,21,23 175:1,16 176:23 177:5 178:1,5 179:20,23 180:10 181:1 189:6,24 190:5,14 195:2 196:12,22 197:7,10,12,16 200:23,25 205:2 206:8 208:7 209:5 212:24 218:23,25 220:12,14 221:4 226:4 233:22 234:18 235:2 238:7 241:24 242:12

**Sheriff's** 8:7 15:22 19:21 24:19,23 28:18 31:19 33:14 34:16 35:17 36:7 40:10 41:12 42:1,4 52:10,16,22 56:6,9,16 68:16 79:3 99:17 100:13 101:19 102:6 131:10 136:16 153:22 154:2,4 180:17 182:15 186:1 187:12 199:4 207:7 212:5 222:13 226:6 231:21 232:17,21 233:21

**sheriff-specific** 49:15

**sheriffs** 221:12

**Sheriff's** 17:6 22:19,24 32:3 37:17,20,22 38:15 39:12 41:18 43:24 49:7 50:17 54:24 57:21 98:16 105:11,16 157:21 159:12 164:24 174:9 178:18 190:18 199:11 201:11 202:5 204:3 213:11 214:25 215:14 216:6,13 224:24 227:3,13 230:2,10,19 231:13,24

**She's** 87:17

**shift** 32:10 48:2,20,22 53:21,25 54:8 60:24,25 61:24 63:18 64:7 65:7 66:4 67:23 68:5,6,8 70:2 72:10 76:1,2 77:12 107:7 113:23 114:3,16 122:1,6 141:24 142:1 143:15 144:18,19 167:23 170:20 175:25 198:12 217:12,15,16 240:8,9,12,13,14,15,20,22,24,25

**shifts** 78:16 240:16

**shit** 141:4

**shook** 93:23 94:12

**shopping** 56:20

**short** 201:25

**shortly** 27:7,13 128:17 214:4 216:18

**show** 95:20 114:9 137:6 153:15,25 232:4,6

**showed** 76:19,21 118:1 136:21 161:7 165:18 212:23

**showing** 43:19 118:6 185:4,5

**shown** 26:25

**shows** 117:24 184:21

**shut** 92:14 115:5,6

**Shutting** 241:12

**sic** 65:8 100:9 109:12

**side** 61:25 81:13 109:2,5 115:12 138:23 149:10 183:25 186:15 242:9

**sign** 22:14,15 28:9,20 29:19 89:25 90:5 102:18 122:11 123:6,8,10,11,12,24 124:4,5,18,19 197:16,17 209:22 211:8 212:8,10,18,22 214:17,19,21 230:4 237:16

**signal** 86:22

**signaling** 93:24

**signature** 28:18,19 89:22,24 106:15 123:13,16,21 205:12 207:19 209:24 244:13

**signatures** 40:2 124:7

**signed** 29:1 31:7 46:7 84:15 90:2 123:15,19 124:3 211:25 212:17 214:15

**significant** 120:3

**significantly** 35:15 181:13

**signing** 27:21 211:11 243:20

**signs** 43:22 114:9

**silenced** 92:15

**similar** 12:20 44:4 125:18,22

**simply** 58:20,21 59:18 92:14,16

**sincere** 34:2

**sincerity** 114:9

**singing** 192:17,18

**singling** 33:2

**sir** 30:2 65:16 81:9 97:16 104:7 119:2 129:2

**sirens** 114:1 116:12 135:16 165:15

**sit** 173:2 174:6

**site** 45:17

**sitting** 9:23 76:13 116:7 188:20,22,23 192:18 194:9 236:5

**situation** 14:1,2 36:20,25 76:8,10 84:2 86:15 97:5 110:10 113:15 115:20 129:9 139:21 144:15 151:10 154:16,18 156:15 183:19 230:13 242:1

**situations** 131:14

**skinny** 137:7

**skip** 127:2 163:2

**Skipping** 22:4

**slam** 92:16 115:10 118:22

**slammed** 178:2

**slender** 137:8

**slightly** 120:19

**slow** 51:3 86:1 118:24,25 119:14

**slowly** 108:25

**slurs** 88:22,24 190:19 223:16,20

**Smile** 192:13

**sneaky** 93:9,11

**snitch** 62:21

**snow** 199:25

**snowball** 199:21

**social** 12:21 205:8 207:19

**socially** 9:1

**soft** 13:17,18 14:7,8,12,13,18,20 151:1 158:13 164:23

**somebody's** 96:24 105:15

**someone's** 96:24

**something's** 219:21

**Something's** 82:12

**song** 192:11,17,18 194:11

**sort** 50:1

**sorted** 45:7

**sought** 17:2

**sound** 60:1 100:21

**sounding** 151:20

**sounds** 60:2

**Soup** 92:7,17,21,23,25 94:16

**south** 50:25 116:15 154:8 186:16

**southbound** 51:1

**southern** 12:12 27:2 86:11 116:4

**spaced** 139:7

**spare** 80:17

**speak** 41:25 42:2 45:6 140:15 154:20 178:21 187:10 220:17 229:6,10

**speaking** 38:22 43:14 46:20 71:17 92:3 146:7,16 151:25 171:23 226:16

**speaks** 220:5

**special** 40:2 212:3 215:16 227:17 229:5

**specific** 14:16,19 26:5 28:24 29:4 30:18 31:12 39:4,12 49:5 52:7,17 63:6 81:24 93:1 95:8 100:24 102:16 103:24 104:5 114:10 132:20,22 134:15 142:15,18 143:16 157:6 160:3 162:16 193:10 194:22 195:4 196:20 216:23 219:11,17, 24 230:12,17,21,23

**specifically** 15:25 17:7 49:4 91:25 96:8 99:20 100:2 165:7 215:17 224:16 234:7 239:15

**specifications** 51:1 52:19

**specifics** 30:13 167:13

**specifies** 79:13

**speculate** 41:3

**sped** 51:4

**speed** 51:5

**speeding** 52:5,13,18 86:25

**spell** 10:7 25:18 54:20

**spelled** 132:7

**spend** 56:14,22 57:14 72:12

**spending** 56:21

**spent** 72:17

**spine** 163:1 164:19

**split** 53:25 62:15

**spoke** 33:18 42:8 84:3 105:7,20 107:13 112:23 187:6,8 188:1 202:1,2 228:16 229:15 235:7,22 237:22

**spoken** 42:12 235:5

**spontaneously** 14:12 174:2

**spray** 13:19 15:11,12,14,16,17,19,21,23, 25 16:1,4,8,11,15,17,18,21 17:5,12,15 157:14,17 158:11,21 159:7,9,15,23 160:2,12 161:6,7,8

**sprayed** 17:18,19,20

**spraying** 161:5

**squad** 52:25 53:4,9,10,13 54:4 59:25 75:5,8,22 85:13 240:4

**squads** 52:23 53:4

**square** 202:16

**squirm** 153:9

**SR** 53:24 54:1

**staff** 25:5,8 175:6 180:6 220:15 221:3

**stand** 183:4

**Standard** 209:6

**standing** 111:24 121:5 135:17 188:23

**standpoint** 144:14

**stands** 205:15

**starred** 39:20

**start** 11:2 37:13 38:25 43:13 100:9,12 115:7 119:4,6 152:6,9 175:11 209:18

**started** 19:9 29:17,19 32:2,7 38:14,24 39:13 41:10,12 45:5 53:1 54:23 75:18 110:15 152:19 157:1,3,8 166:18 202:4 239:7

**starting** 156:25 227:21

**starts** 196:7

**state** 9:16 10:5 18:11 34:18 78:6,7 88:13 101:8,9 116:6,23 160:15 203:13 208:10 214:21 216:10 243:4,9 244:16

**stated** 34:11,13 36:3 44:11 47:13 50:12 57:24 58:5,8 99:15 109:16 110:14 117:1 120:25 140:2 162:10 172:23 173:12 183:1 215:23

**statement** 9:1 33:12,13 90:18 92:10,13 95:24 96:10 101:12 104:14,24 107:15 108:3,11 109:8,11 110:8,9 111:3,10 118:3 121:22 122:10,11,22 124:18,19 130:7,16,19 132:11 183:4 217:9 218:13 220:19,24 224:10,12,23

**statements** 26:24 27:1 90:7 97:8 147:14 198:14 222:1,4,8,16,18,19 223:4 238:11, 17,19 239:24

**states** 220:11

**stating** 8:21 129:7

**stationary** 119:25

**stationed** 117:3

**statute** 79:13 153:20

**statutory** 79:6,9,15

**stay** 30:11 51:7 56:2,4 112:2

**stayed** 56:24 77:13

**stays** 57:16

**steady** 157:23

**step** 108:16 151:7

**step-by-step** 162:4

**stepping** 22:17 162:17

**steps** 162:16

**stock** 46:13

**stomping** 92:15

**stop** 10:24 48:25 52:9 80:24 81:25 82:1, 9,18,24 86:17,21 90:23 91:4 102:17,18 103:21 105:21 106:2,12,13,14,18,19,22 110:22 111:4 119:10 128:10 183:22 184:12,24 185:17,20 233:11,17

**stopped** 48:24 52:17 65:2 73:14 86:4,16 102:24 105:10 118:19,20 121:13 137:12 138:3

**stopping** 52:13 84:19 96:2,12,15,22
    121:17,21,24 122:2

**stops** 48:19 52:6,20 86:14 100:20
    102:14,21 105:9,22,23 106:7,9 107:17
    122:4,7

**story** 121:6

**straight** 151:2 162:21,23 168:24 214:3

**stream** 157:23

**Street** 131:9,15,22,25

**strikes** 14:11

**stronger** 171:4

**studied** 11:15

**studies** 12:12,15,17,19

**study** 11:14

**stuff** 31:15 40:19 45:7 49:7 67:4,13 97:9
    136:12 143:7 149:6 150:3 198:16 235:22

**stuns** 14:11

**stupid** 48:12

**sub-development** 38:23

**subject** 113:10 115:19 156:19 168:11

**submitted** 39:18 41:4 98:18,20 106:20,
    21 206:9

**submitting** 57:12

**subordinates** 15:2

**Subsection** 218:8

**substance** 87:4

**substances** 10:23

**substantial** 97:1

**substantiated** 205:22,24 206:3,10,19
    207:24 208:20

**successful** 25:16 30:6

**sucking** 238:22

**sudden** 40:17,23

**sue** 179:3,11 180:9,18 181:10 230:10

**sued** 179:15,18 216:8

**suffer** 204:4

**suffered** 151:6

**suggest** 70:18

**suing** 179:14 180:13,14

**summer** 53:23 177:9 193:8,10,11 221:8

**summon** 236:25

**summons** 45:3 46:1,8 80:2,9,11,13,17
    20,23 81:4,6,21 82:19 83:16 85:19 88:12
    90:12,24 91:5 96:3,16 100:19 110:16,19,
    22,23 111:4 184:3 219:19,21 236:19,22,
    23 237:5,7,9

**summonses** 81:17 82:2,9 83:9

**super** 114:15

**superior** 130:17

**superiors** 130:3,21,25

**Superman** 236:1

**supervision** 66:6 239:6 241:2

**supervisor** 45:10,11 51:14,17 66:18
    70:2 114:15 141:13,14 142:19 143:23,
    144:3 145:16,20 241:15

**supervisors** 24:17 51:23 56:18 82:6
    92:5 141:10 142:9 148:13 228:16

**supervisory** 186:9

**support** 184:2

**supposed** 83:20 173:7 175:3

**surely** 86:8,9,20

**surety** 226:6

**surrounding** 26:4

**surveillance** 18:9 128:23,24

**suspect** 87:3

**suspended** 84:13 110:11 113:1,4
    115:16,17 116:22 122:20 175:22

**suspension** 99:8 100:5 101:24 121:18
    122:9,14,21,23 196:18 197:22 238:6
    242:2

**suspensions** 24:4 198:18

**suspicion** 52:8

**sustaining** 234:16

**Sutton** 235:1

**swap** 33:5 60:9,12

**swapped** 35:9

**swapping** 33:5

**swear** 80:17 237:11

**swearing-in** 27:9

**switch** 35:6,7 67:11

**switching** 33:5

**sworn** 9:16 25:10 27:1,9,12 159:19
    160:23 199:4,8 243:9

**symbols** 199:17

**system** 26:25 43:20 46:21 136:18

---

**T**

---

**T-E-R-R-Y** 62:6

**takedown** 151:2 153:4 158:11 161:19
    162:3,7 167:10,19 168:24 214:3

**takes** 68:15

**taking** 35:7 38:2 41:10 91:25 151:7
    152:7

**talk** 22:18 32:1 47:21 55:8,20 57:18,19,
    20,24 59:17,20,24 64:5 67:23 69:2 72:14
    77:5 81:16 90:15 91:16 92:5 96:11 109:7
    14,23 110:6 132:17 133:15 147:17
    149:16 157:4,11 168:16 185:22 187:4,14
    189:22 190:14 198:24 201:6 209:3
    211:12 215:16 216:23 228:11,24 229:3,4,
    5,10 234:19 235:20

**talked** 35:3 47:22 49:20,21,23 77:4,7,8
    84:8 87:10,11 95:22 97:1,9 106:17 110:1
    154:17 174:3,21 180:1,2 182:5 187:17,
    18,19 197:9 230:8 238:24 241:24

**talking** 20:19 41:21 55:13,19 59:2 61:8
    74:5 81:20 93:23 110:15 112:17 113:16
    114:2 135:14,16 139:25 142:14 157:10
    159:13 167:3 180:23 193:20,21 199:23,
    25 209:8 213:20 218:21 228:25

**Tall** 137:7

**tape** 69:7 135:11 136:21 137:20 163:25

**tapes** 69:5 163:8,10,16,19 164:5

**tardiness** 241:11

**target** 219:24

**taser** 13:20,21 18:19

**taught** 15:12 41:15 94:2

**Taylor** 231:5

**teach** 161:6

**team** 53:10

**teams** 52:23

**teamwork** 183:6,7

**technique** 151:1 158:13 162:22,24 164:23 168:11,19

**techniques** 158:7

**telephone** 24:13 114:6

**telling** 59:14 79:3 90:14 97:11 115:2 146:2 154:19 174:22 180:20 213:20 219:25 227:13 228:4 236:4

**tells** 79:10

**temp** 80:12,15

**temporarily** 158:3

**ten** 116:3 121:17 122:9,22 160:4

**ten-day** 122:13

**term** 92:17 180:12 192:17

**terminate** 58:10 187:11

**terminated** 24:6 33:1,22 39:18 57:23 58:1,3,22 59:6,15,16 98:15 99:4 101:3 180:11 181:4 188:1,11 189:25 200:5 201:1,5 206:5 209:5 213:10 221:11

**terminating** 80:13

**termination** 57:10,20 59:23 181:9,12 190:20,24 191:18 194:15 201:8 213:8 215:14

**terminations** 24:4 215:13

**terminology** 30:10 57:13

**terms** 14:9 16:7 30:25 36:13 37:1,12 41:17 49:5 52:16 55:25 56:19,21,23 72:15 76:2 92:25 105:15 111:9 115:2 123:25 129:13 142:18 143:16 154:12 157:6 160:4,23 162:13,16 167:5,12 180:12 182:19 183:15 184:16,22 195:23 198:14 206:3 213:2 238:1 240:6,10 242:4

**Terrence** 62:4

**terroristic** 194:20

**Terry** 53:14 62:4,5,10 63:4 77:1 93:3

**test** 26:17,18,21

**testified** 72:3 107:2 124:17

**testifies** 9:17

**testify** 10:21 71:18 191:11

**testifying** 10:24

**testimony** 8:16 71:13 80:18 116:7 124:17 138:5 174:16 237:12 240:1 243:12,15,20 244:5,9 245:4

**text** 57:1,7,18,19

**texts** 178:25

**that's** 48:22 97:21 146:3 151:15 189:14 199:10 223:6

**Then-captain** 125:25

**then-director** 59:2

**thereof** 243:19

**there's** 185:3

**they're** 61:6 153:19 213:1 242:5

**thin** 39:25 98:24 102:11

**thing** 19:15 66:15 97:11 99:22 113:17 133:19 144:16 157:22 171:2,11 193:18 197:2 206:4 227:6 236:20

**things** 16:6 27:5 31:20 32:21 35:10 40:8 12 41:17 48:1 57:5 58:14 59:10 90:20 93:10 104:1,14 113:22 114:2 119:15 116:12 148:7 151:8,19 169:11 176:1 191:22 194:22 198:16 203:3,7,25 216:21 221:4,20 223:6,9 227:5,14 228:8,23,25 235:15 241:8,16,18

**third-party** 111:1 144:1

**Thomas** 117:1,4

**thoroughness** 231:18

**thought** 24:15 28:2 44:24 45:13 47:6,18 69:9 93:24 110:17 118:13 119:13,24 121:11 130:12,14 135:10 143:24 222:24

**threat** 156:17

**threaten** 108:21

**threatened** 94:7 116:20 176:23 177:1,5 208:24

**threatening** 11:10 181:10,14

**threats** 194:20

**three-hour-plus** 57:17

**three-year** 160:6

**throwing** 11:9

**ticket** 44:21,24,25 45:1,3,14 46:24 47:1 3,5,6,7,12,14,15,19 51:21,25 79:25 80:4 5 83:17 133:16,19 135:20,22 219:3,5 220:6,8 236:19

**ticketed** 220:9

**time** 8:4 11:18 14:16,19 15:18 16:11,14 17:24 19:9 20:4 24:12,24 32:13 35:4 38:9,12 39:23 41:23 42:18,24 43:6 46:10 22 49:23 50:24 51:4 53:9,15,21 54:9 55:8,10,20 56:14,21,22 57:14 60:6 66:19 70:21,24 72:12,17 73:4,18,25 74:11,23 75:1,19 76:9,21 77:9 79:7 82:21 83:7,14 85:25 89:13,20 97:4,14 99:13,23 101:15 16 104:20 105:18 106:4,25 107:3 108:21 109:21 115:9 117:12,17,18 124:23 125:1 128:1 129:21 134:25 135:24 138:13,14, 16,18 140:3,10 141:11,12 142:6,12 143:16 144:8 146:4 148:1,11 149:6,20 150:12 152:17 153:21 156:17 159:20 160:3,18 161:1,11 162:5,8 163:23 164:1 165:16,24 166:11,24 167:14 169:19 170:12,15 171:4 181:20,25 182:1 186:24 187:2,22,23,25 190:20 191:18 193:6 194:4,11,24 196:20 198:3 201:9,25 209:20 210:13,21 211:17 213:7 217:17, 23 221:8 223:8 227:18 229:6 233:7 236:5,6,11,14 238:15 241:11 242:21 243:7 244:9

**times** 19:23 31:18,25 48:18 50:18 55:23 56:18 72:14,21,24 73:2,17,18 76:12 85:2 88:25 95:19,23 97:5 130:14 142:5 143:1 145:14 151:5 159:22,24 160:2,5,8 169:1 174:16 176:23 177:4,6,7 182:8,9,10 189:10 196:8,9 203:23 208:24 214:19 217:23 224:13,15 244:6

**timestamp** 127:4,15

**Tiny** 93:4

**tip** 23:4 54:14 196:5

**tissue** 47:14

**title** 18:7 28:22 178:10

**toboggan** 200:1

**today** 10:21 21:18,25 45:11 151:17 232:4

**told** 16:6,20,22 21:24 24:25 25:3,6,15 26:16,18,23 27:6 28:6 29:10 30:5 32:12, 16 33:21,23 35:11 36:7 37:24 39:14 43:16,17,21,25 44:10,19 45:2,6,16 46:9, 10 50:19 51:2,6,7,19 57:22,24 58:7,11, 18 218,20,21,22,23 59:12,18 60:4,14,17,18

61:1,11,22 62:10,16,19 63:4 64:2,20,
24 65:5 66:22 67:17,25 68:1,4 69:13
79:1 80:25 81:5,13 82:5,22,24 83:7,
85:7,9 87:13 90:4,5 91:15,23 92:20 96:9
11,13,19 97:5 102:23 104:11,17 105:15,
106:8 112:2,6,20 121:2,5,16,20,24 124:3
127:24 130:21,25 133:16 135:6 140:17
141:1,3,16 142:19,21 143:25 145:15
149:8,21,23 150:4,17 154:21 156:11
158:23 165:14,22,25 167:9,10 172:5,8
11,14,24 174:4 176:14,17 177:13,14,20
22,23 178:2 180:7,21 181:17,23 182:21
186:4 188:2,17 189:6,12,16,25 190:4,5,
13,14 191:2 192:5,19 193:3 194:19
196:10 197:7,9,16 200:11,16,19,20,23
201:6 213:12 214:5,7 216:17 218:14
219:2 220:20,22,25 221:2 222:19 223:7
227:23 228:4 229:5,9,13,14 230:16
234:1,3,7,13,18 239:4

**tone** 152:1,2

**tones** 116:10

**tongue** 23:4 54:14 196:5

**top** 40:11 54:13 95:1,5 127:4 134:7,17
170:25 188:6 199:22 204:25 215:3
216:22 221:20 223:6,10

**topic** 78:2 131:7

**Torrance** 53:14 62:4,6,10,15,18,20
64:25 76:2,20 77:1 93:3

**totality** 14:23

**touch** 149:7

**touched** 76:9

**traffic** 42:13 43:8 46:9,10,16 48:19
49:10,13 50:2,10 51:11,13 52:6,20 78:
24 79:1,2,15,17,21 81:18,21,22 82:1,2,
10,18 83:8 84:25 86:14 88:12 90:12,25
91:5 94:25 95:2,5,14,16,17 96:4,7 97:
11 100:18,19 102:17,21 103:2,5,10,11,
105:9,22 106:9,12,18,19,22 107:10,17
110:23 113:25 114:1 116:1 119:11 124:
6 125:10 132:4,23 137:12 183:22 184:7
12,24 185:4,5,11,17,19,20 219:19,20
236:19

**train** 16:23 32:14 161:8

**trained** 13:4,5,24 15:17 16:17 17:9,10,
11 32:18 158:22 160:9,11,14,15,19,21

**trainee** 34:12

**trainees** 32:21

**training** 12:1,2,5,6,9 13:3,8,12,16
16:20,22 17:1,3,5,17 32:4,6 34:6 37:5,8
38:25 39:14 41:10,12,22 42:15 47:23
49:18,20 50:10 53:8 55:5 60:8 94:24,25
95:5 102:14,20,24 103:1 157:18,20
158:6,7,8,25 161:3,20 162:6,18,20
163:13 169:8 217:18 239:12

**transcribed** 245:4

**transfer** 59:24 60:3 61:3,14 63:10 64:1,
7,22 65:7,18 66:4 68:12 71:5,11,23 72:5
75:3 77:18 175:25 198:12 240:22

**transferred** 1:11 23:1 59:25 60:6,16,
24 63:16,18 64:17 68:5 72:10,11 74:10
75:4,10 77:11 107:9 217:12 240:4,20,24

**transport** 155:1 166:25 172:17

**trash** 45:17

**treatment** 231:24

**trigger** 81:24 132:4

**triggered** 198:17

**trooper** 78:6,8 117:1,2,4

**troopers** 116:6,23

**Trooper's** 34:18

**trouble** 43:22

**truck** 137:8

**true** 58:17 97:12 107:2,19 124:19 130:24
156:9 170:5,8 182:21 183:2 196:25 202:6
218:13 220:19,24

**trumped** 231:17

**truth** 9:16,17 60:19,22,23 131:19 243:10,
12,
**truthful** 44:1

**truthfully** 156:20

**tuition** 232:12,15

**turn** 87:14,25 89:11 104:3 117:15,21,22
118:19,21 121:8,13 125:6 128:10 129:
11,18 130:2,17 135:13 223:24 225:8

**turned** 27:5 67:7 118:3,5,11,13,14
119:10,15 121:1,7 128:13 130:4,5,7,10,
13,14,22,25 131:1 183:20 206:15

**turning** 104:19 118:1 121:12 135:15

**twisted** 109:18

**two-and-a-half** 2:15 50:7 239:12

**two-year** 29:8,11 232:23

**type** 13:3 31:9 80:15 87:3 128:21 132:3
173:16 198:9

**typed** 39:20

**types** 12:22 13:24 48:25 49:19

**typo** 105:7

## U

**uh-huh** 10:3 231:3 240:18

**ultimate** 14:10

**ultimately** 68:15

**unable** 16:8 21:22 30:22 31:5,22 51:10
52:19 53:25 69:12 167:5 232:25

**unbecoming** 15:18

**uncertified** 48:15 53:15,17,18 122:5

**uncommon** 18:9 128:22 153:24

**uncooperative** 45:8 152:10,22,23

**undersigned** 243:16

**understand** 49:9 71:11 137:23 219:23

**understood** 16:14 37:7 49:18 218:23
219:25

**unemployment** 9:20 39:19 40:17
41:4 58:14 133:4 222:8,17

**unfortunate** 51:3 183:14

**unicorn** 239:10

**unit** 183:5

**university** 11:10,13 12:13,14 17:25
19:9,17 27:3

**unjustifiably** 125:22

**unlawfully** 153:1

**unnecessary** 138:8

**unpack** 35:10

**unprofessional** 11:8 194:21 217:24

**untruthful** 140:15 205:7,9,14

**upper** 104:15 123:18 153:4 162:12
168:2 170:25 206:14

**upset** 44:5

**utter** 114:12

**uttered** 174:2

---

**V**

**vacancies** 23:8

**Vance** 8:7 15:21 16:15 17:6 19:20 22:19,
24 27:13 29:12,16 30:8,15,17 31:19 32:1,2
10 37:15,17 38:15 39:11,12 41:3,17 49:4
50:17 54:24 57:16,21 98:15,19 100:12
102:25 105:11,16 116:5 117:3 131:9
153:22 201:11 202:5 203:20 204:3
207:12 210:20 211:10 212:21,23 213:11
214:25 215:14 216:6,13 224:24 227:3,9
13,25 228:11,12,15,17 229:17 230:1,9
18 231:9,10,13,24 235:15

**VCSO** 221:11 233:10,17 235:6

**vehicle** 49:2 50:8 86:16 102:14 103:21
117:6 120:23 126:9 132:19 134:2,18
135:1,5 151:24,25 171:20

**vehicles** 106:2 121:17,21,24

**vengeance** 239:17

**venture** 230:24

**verbal** 30:16 43:13 88:9 108:9 113:19
115:14,21 116:7,24 174:15

**verbally** 8:15 14:5 31:2 88:8 153:13

**verbatim** 104:2 135:24 165:9 167:5,7
169:13

**verification** 22:14,15

**verified** 137:2

**verify** 43:20,23 44:3,6 136:19

**Veronica** 69:18 70:2 72:1

**versa** 240:23

**versus** 8:7 20:1 65:25 110:11 145:22

**vetted** 211:7 212:2

**vice** 240:23

**video** 8:15 118:7 122:14 126:5,7,8,13,19
24 127:1,2,3,4 128:3,4,5,12,14,20,24
130:1,15,18 131:3,6 132:3 243:6,12

**videos** 118:9 126:11

**view** 105:11,16 209:6

**viewing** 126:24

**VII** 178:11

**violated** 84:25 195:25

**violating** 88:13 98:17 206:6

**violation** 49:11 52:19 80:1 81:18,21,23
95:2 96:3,23 102:17 105:9,14 137:12
157:19 177:18 185:19 205:17

**violations** 48:25 49:3 82:10 90:12,24
100:18 132:23 133:20 134:4,8,10,11
185:11,15 220:7

**virtually** 236:20

**visit** 147:6,7,8 182:2,11

**visited** 72:23 146:18 147:2

**visitor** 112:7

**volunteering** 14:25

---

**W**

**Waffle** 93:3

**wait** 71:15 73:24 119:17,19 181:2 235:22

**waited** 133:12

**waiting** 48:6

**waive** 8:19

**Wake** 233:21

**walk** 38:23 79:24 84:17 108:16 199:13

**walked** 24:24 25:1 92:9,11 148:25
149:12 152:3 200:21

**Wallace** 68:20 148:16 190:17 198:5
222:6 223:11

**wanted** 33:8 44:8,16,17 46:13 47:7,15,
21 51:22 58:9,25 59:5,7 75:14 110:8,9
119:16 121:12 150:1 177:12 189:9 197:8
200:15 201:4 208:18 213:10

**wanting** 59:2 62:8 103:12 217:24

**warning** 43:19 84:3,6 100:4 123:15,17
197:22 238:5 242:1

**warrant** 44:7 46:21 133:24 141:7
143:11,21 144:4 145:21 150:11 151:8,14
153:15,18,23,25 154:2,3,6,8 156:7,8,12
181:19,23,24 182:6,13,22,23,25 183:6,8,
10,12 186:14,16 237:1

**warrants** 41:16 42:13 46:16 49:21 50:5
100:19 133:1,24 137:2,11 138:2,10

139:18 140:1 141:8,10,15,17,20,21,22,24
142:2,4,19 143:9,14,15 144:16,18,22
149:9,22,23 155:25 184:1,2,3,19,25
185:25 214:1

**Warren** 50:4

**Warrenton** 16:8

**wasn't** 94:13 107:5 177:13

**watch** 62:20 96:19 220:25 221:1

**Watkins** 26:1 58:6,8,22,23 59:14 63:22,
23 64:6 66:25 67:4,10,21 68:1,4 114:13
115:8 172:5,21,23 173:12,22,24 174:2,6,
15,19,22 180:4 187:6,8,17 188:1,15,20,
22 200:21 220:22,25

**waves** 115:22 116:11

**Wayne** 32:18,23,25 33:2,6 34:6,25 35:7,
24 36:2,3,19 37:6 53:8 54:13 61:3,12
62:9,23 64:18 65:25 66:2,3 67:1 70:6
72:12 74:7,16 101:15 103:4,14 104:8,17
202:10

**Wayne's** 73:5

**website** 22:21

**weeds** 64:12 65:2

**week** 29:19 32:8,12 48:15 53:2,3 57:25
61:18 69:8

**weeks** 32:15 50:7 60:10 68:2 94:24 99:3,
3 16 171:3 239:13

**Welborn** 117:25 120:23 121:2 122:16,
20 140:11,16,17 142:20,21 148:4,11
155:24 156:9,11 165:13,17,18 166:4,11
167:2 171:22 172:16 176:3,5 183:1,7
186:4 188:2,4 191:25 192:11 194:10,14
195:24 196:3,13,18,25 201:23 220:20

**Welborn's** 68:6

**welcomed** 75:11

**Welding** 24:12 25:25

**Weldon** 57:23 68:20 148:16 180:1
188:19 190:4,16 198:4,20 200:21,22
201:6 222:6 223:11

**we'd** 150:12 152:17

**we're** 103:10 208:4

**whatnot** 36:16 94:8 96:22 97:4 144:13
197:17

**what's** 144:13 163:10

**WHEREOF** 243:21

**whichever** 50:3 53:5,6 118:5 149:10

**white** 8:6,7 9:4,5,12,15,20 10:6 20:1 25:1,4,9 27:8,24 28:6 30:21,23,24 33:9, 15,17,18 35:5 41:24 42:2 43:1,11,14 44:19,24 45:9,10,11 51:19 57:24 61:4,15 62:22 63:11,14 65:25 68:12 75:2 78:3 81:17 82:4 83:15,25 88:8,12,16 94:23 98:6 100:18 103:2 105:8,21,24 107:16,18 109:15 110:13 112:17,23 114:14 118:18 120:25 121:16,18 122:9,19,23 125:6 126:19 127:3 129:25 137:8 145:3,9 148:13,15 155:24 156:4 172:24 174:1 175:7 176:23 177:5 178:18 180:10 182:5 187:3 189:24 191:24,25 192:6 195:2 204:22 206:8 217:25 218:23,25 219:16, 16,20 220:6,11,12,13,14 221:4,11,14 23 223:2 224:15 229:9,14 241:24 244:3, 216:17

**White's** 22:5,6 64:1 99:18 102:14 126:9 178:19 218:10 220:16

**whites** 217:5

**White's** 28:18 218:23

**whomever** 18:20 144:12 163:22 222:15

**William** 231:5

**win** 179:15

**winter** 200:2

**withdrawal** 181:15

**witnessed** 232:1 244:20

**woman** 88:12 111:23 147:9 164:17 219:20 220:6

**woman's** 118:3

**Womble** 9:22

**won** 133:5 222:9

**word** 16:7 26:6 40:19 58:21 95:8,9,11 111:9 114:10 163:9 190:25 191:2,5,10, 15,22,23 192:5,20,21,23 193:1,3,13,25 194:2,5 234:21

**worded** 137:19

**words** 88:25 91:11,21 103:24 104:2 109:18 111:6 119:22 135:21 142:23 167:5 219:11,17

**work** 12:8 14:18 27:13 29:12 30:15,17, 25 36:15 48:7,8 49:22 50:2 56:11 62:25

66:11,23 72:13,19 75:21 76:5 80:10 112:10 155:17 175:15 178:7 203:9 204:10 218:15,16,17 241:11

**workbook** 203:9,18

**worked** 18:1,14 19:3,8,19 32:24 61:23 65:16 75:16,17 159:18 212:7 223:13 232:2 239:11 241:6

**working** 12:13 18:4,5 32:2 38:15 39:14 54:23 62:13 69:24 73:13,14 94:8 100:9, 12 113:23 160:12 188:15,16 202:5,21 204:6,15 227:3 240:11,20,21 241:13

**workplace** 191:3 193:5

**worried** 174:20

**worries** 110:13 233:14

**worry** 34:1 173:1,5 174:5,11 176:15 216:17

**would've** 16:12 135:4,6 164:23 198:17 202:2 240:19,20,22

**wouldn't** 184:5 235:18

**wow** 205:11

**wrapping** 216:24

**wreck** 43:10 120:2 121:9,14 125:11 129:14 130:2,4,6

**write** 40:7 133:16,18 172:6 202:20 203:7,14,17

**write-up** 82:12,13 91:1,2 113:6 124:1 175:21 182:4 185:13 197:19,20,23 228:25 229:1

**write-ups** 66:13 198:18 229:2

**writing** 29:18 37:2 130:7 148:17 203:10 239:9

**written** 39:20 40:1,4,13 58:17 84:3,5 89:12 100:4 110:8,9 123:15,17 196:4,8 197:8,21 238:3,5 242:1,3

**wrong** 44:14 62:5 66:20 69:13,18 88:5 112:19 114:16 149:14 151:5 166:3,6,10 169:18 205:9 212:15,25 213:2 219:21

**wrongfully** 241:20

**wrote** 40:3,6 82:11,13 84:11 89:20 96:10 104:14,25 110:10 216:20 221:5

---

**Y**

**yards** 139:12

**year** 11:10 207:9

**years** 28:10 29:6,12,16 30:7,12,15,17 31:3 49:7 78:9,11 117:13

**yelling** 91:17,20 151:20 152:1

**yellow** 85:2

**young** 25:2 44:18 111:23 118:3

**you'd** 237:19

**you'll** 134:16

**you're** 15:4 86:25 145:13

---

**Z**

**Zachary** 106:24

**zoom** 22:14 108:1 120:19 224:4