IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:19-cv-00467-BO

| | | |
|---|---|---|
| JUSTIN J. WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DEFENDANTS' RESPONSE** |
| | ) | **TO PLAINTIFFS' MOTION** |
| VANCE COUNTY, NORTH CAROLINA; | ) | **FOR SUMMARY JUDGMENT** |
| VANCE COUNTY SHERIFF'S OFFICE; | ) | |
| PETER WHITE, in his official and individual | ) | |
| capacities; LAWRENCE D. BULLOCK, in his | ) | |
| official and individual capacities; | ) | |
| WELDON WALLACE BULLOCK, in | ) | |
| his official and individual capacities, | ) | |
| and WESTERN SURETY COMPANY | ) | |
| a division of CNA SURETY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

NOW COME the defendants, by and through counsel, and, pursuant to Local Rule 7.1(f), respond to Plaintiff's Motion for Summary Judgment. (D.E. No. 68.) The defendants incorporate by reference their previously filed summary judgment motion and brief. (D.E. Nos. 64, 65.)

## STATEMENT OF THE CASE

The plaintiff is a former Vance County sheriff's deputy who was fired after breaking a woman's arm during an arrest. (D.E. No. 16, Answ. ¶ 1.) In his Amended Complaint he alleged 11 claims for relief under state and federal law, including for discrimination, retaliation, and wrongful discharge, and sued the former sheriff, two retired senior officers, and the surety on the sheriff's official bond. (D.E. No. 55.) The defendants filed a partial motion to dismiss on January 20, 2021, and a motion for summary judgment under Rule 56 on March 30, 2021. (D.E. Nos. 57

and 64.)  The plaintiff filed a motion for summary judgment on March 31, 2021 (D.E. No. 68), and the defendants respond to the same herein.

**FACTS**

The relevant facts are set out in the defendants' summary judgment brief.  (D.E. No. 65.) The plaintiff's brief does not set out "a concise statement of the facts" as required by Local Rule 7.2(a)(2), but refers to facts in its argument section.  (Doc. No. 68-2.)  The defendants will address the plaintiff's factual contentions under each argument set out by his brief.

First, however, the defendants note that the evidence the plaintiff filed with his summary judgment motion is misleading.  The plaintiff filed the transcript of the deposition of Weldon Bullock and 23 exhibits purportedly from this transcript.  (Doc. No. 70-1.)  However, Bullock's transcript contained only nine exhibits.  See Bullock Dep. p. 3 (Doc. No. 70-1, p. 165).  The plaintiff also filed the transcript of the deposition of Peter White and seven exhibits purportedly from that transcript.  (Doc. No. 70-1.)  However, Peter White's deposition contained 14 exhibits. See P. White Dep. p. 3 (Doc. No. 70-1, p. 479).  Thus, the plaintiff added exhibits to one deposition and subtracted them from another.

The plaintiff also represented that certain exhibits from Peter White's deposition were used in Bullock's deposition.  For example, the document labeled "W. Bullock – A.1 & A.2 Ethics" is presented as an exhibit to Bullock's deposition when it was actually Exhibit 12 in Peter White's deposition.  See White Dep. p. 3 (Doc. No. 70-1, p. 479).  It is not listed as an exhibit in Bullock's deposition transcript.  See Bullock Dep. p. 3 (Doc. No. 70-1, p. 97).

In addition, the plaintiff submitted eight deposition exhibits that were not used during the depositions.  For example, the plaintiff presented an exhibit labeled as "W. Bullock – Ogletree

2

Letter" (Doc. No. 70-1, pp. 386-89), but it is not listed as an exhibit in any of the three depositions in this case. Yet this document (only part of which was filed) is now part of the record.

As to the plaintiff's deposition, the plaintiff submitted the transcript but not the exhibits. See J. White Dep. (Doc. No. 70-1, pp. 2-94). The plaintiff appears to have renumbered and renamed some exhibits from that transcript and attached them at the end of Peter White's transcript without any attribution as to their source. See Doc. No. 70-1, pp. 569-665.

In essence, the plaintiff has created his own deposition transcripts. Because of this, the defendants ask the Court to refer to the deposition transcripts submitted by the defendants with their summary judgment motion. (D.E. Nos. 67-2 through 67-6.) The defendants submitted the complete transcripts and all exhibits from those depositions. For the Court's convenience, the defendants have attached a list of exhibits used in the depositions and labeled it as **Exhibit "A"** to this brief. The Court should disregard the plaintiff's deposition exhibit filings.

## ARGUMENT

The defendants will address each of the plaintiff's arguments in the order in which they appear in his brief.[1]

### 1. Plaintiff used excessive force on Latwanya Oliver and this was a legitimate, non-discriminatory reason to fire him.

The plaintiff claims that the force he used on the woman whose arm he broke was reasonable. The plaintiff may believe this, but Ms. Oliver and Sheriff White did not. What the plaintiff must do to support his Title VII discrimination claims, however, is not to show that the

---

[1] The plaintiff's brief (Doc. No. 68-2) is called a "Motion for Summary Judgment," but the plaintiff also filed an actual motion (Doc. No. 68). That motion cites Rule 56 of the North Carolina Rules of Civil Procedure, not Rule 56 of the Federal Rules of Civil Procedure, which controls here. The brief, on page 19, asks that the Court deny "Defendants' Partial Motion to Dismiss," not that the Court grant the plaintiff's motion for summary judgment, which the brief was filed in support of.

3

force was reasonable, but that the incident was not the reason he was fired.   However, the plaintiff has not done either.

Ms. Oliver filed a complaint with the sheriff and threatened to sue.  (Oliver Aff. Ex. A; P.'s Dep. p 180.)  The sheriff's internal affairs investigator, Capt. Weldon Bullock, a veteran officer who had very little interaction with the plaintiff after he was hired and did not know he had filed an EEOC complaint, determined that the plaintiff's handling of the incident was not reasonable and recommended that he be fired.  (W. Bullock Dep. pp. 6, 48-49, 102-03; W. Bullock Aff. ¶ 3.) Given this, Sheriff White had a legitimate, non-discriminatory reason to fire the plaintiff.  <u>See</u> Defs.' Summ. Judgmt. Brf. (Doc. No. 65), p. 17 (listing cases where law enforcement agencies had legitimate, non-discriminatory reason to fire officer who used excessive force).   The conclusion that the plaintiff had handled this incident badly was shared by the head of a law enforcement agency to which the plaintiff subsequently applied for employment.   <u>See</u> Defs.' Appx., No. 8, Ex. A (Position Statement of Jimmy L. Henley, N.C. Special Police) (Doc. No. 67-10, p. 18).

The plaintiff claims that it is "uncontroverted" that he tried to deescalate the situation with Ms. Oliver (Pl.'s Brf., p. 4), but Ms. Oliver painted a different picture.  She said the plaintiff "tried to force [her] into the back seat of the patrol car" and that she fell and then was thrown to the ground.  (Oliver Aff. ¶ 5 and Ex. A.)  This is not a description of escalation.  This makes the plaintiff's assertion questionable, not uncontroverted.

The plaintiff claims that he used a proper technique to restrain Ms. Oliver – "a soft-hands take-down maneuver" or "the armbar takedown maneuver."  (Pl.'s Brf., pp. 3-4.)  But, when asked at the time which technique he had used, he could not identify one.  (W. Bullock Dep. Ex. 4.)  In addition, he was not fired just because he caused broke Ms. Oliver's arm, but because he slammed

her to the ground without any justification and used poor judgment all the way around. (W. Bullock Dep. pp. 58-61, 69; W. Bullock Dep. Ex. 4.; P. White Aff. ¶ 4.) Immediately after the incident, other officers arrived on the scene and observed Ms. Oliver's location on the ground away from the plaintiff's patrol car. For Captain Bullock, this confirmed that the plaintiff slammed Ms. Oliver to the ground and did not use an approved or appropriate method to restrain her. (W. Bullock Dep. Ex. 4.)

Ms. Oliver was not a dangerous street criminal, but a non-violent, unarmed, middle-aged woman who had outstanding warrants from a shoplifting dispute. In addition, the plaintiff had not even brought the warrants to serve on her. (Oliver Aff. ¶¶ 1, 4-5; Pl.'s Dep. pp. 153-54.) The plaintiff claims that he used force because Ms. Oliver assaulted him and that her assault is "uncontroverted" (Pl.'s Brf., p. 4-5), but Ms. Oliver described a different scene (Oliver Aff. ¶ 4). Thus, again, the plaintiff's assertion is questionable, not uncontroverted.

The plaintiff also claims that the use of pepper spray would have been "dangerous" to him but offers nothing to support this odd assertion. The plaintiff had been trained to use pepper spray and had used it before. (Pl.'s Dep. pp. 157-60.) Captain Bullock testified that there's no "danger that's associated with the use" of pepper spray. (W. Bullock Dep. pp. 69-70.) If Ms. Oliver really was a threat to the plaintiff, he could have used pepper spray. (W. Bullock Dep. p. 68.) It would not have been dangerous to use it properly.

Finally, the plaintiff characterizes the defendants' actions against him as "a rampage." (Pl.'s Brf., p. 2.) Rampage means "a course of violent frenzied action or behavior," or "to move about wildly or violently." American Heritage College Dictionary (3d ed. 1997). There are no facts in this case to which this word would apply. The defendants do not even use this word to describe the plaintiff's use of force on Ms. Oliver even though it is the only physical activity or

violence at issue in this case. The plaintiff's actions were not a rampage, just poor judgment and execution. This, along with his previous poor performance, provided a legitimate, non-discriminatory reason to fire him, and the plaintiff cannot show otherwise.

**2. Plaintiff was not subjected to disparate treatment because of his race or gender.**

The essence of the plaintiff's claim of disparate treatment is that he and other black deputies received "less equipment than their white counterparts" and were disciplined more harshly than white deputies. (Pl.'s Brf., p. 6.) Thus, this claim is really based on race, not gender. However, there is no evidence to support this claim.

As to equipment, the plaintiff cites to his EEOC complaint. See Pl.'s Brf., p. 6 (citing "J. White Title VII Compl. p. 2"). The plaintiff filed this complaint with the EEOC but had previously put it in the form of a letter to Sheriff White dated June 15, 2018. (P. White Dep. Exs. 20 and 21.) In the letter, the plaintiff cited only two examples where he was not given the proper equipment: one involving a bullet-proof vest and the other involving worn tires on his patrol car. (P. White Dep. Ex. 21.) However, his own allegations undermine these claims. First, he claims that he went without a vest for only three weeks immediately after he was hired, and, after he complained, Captain Bullock obtained one for him. (Id.) Second, he claims that he asked for new tires for "nearly 8 weeks" in the summer of 2018 but, once he complained to Captain Bullock, he received new tires the same day.[2] (Id.)

Thus, these brief periods ended as soon as Captain Bullock knew the plaintiff needed these items. The defendants did not deny him equipment. Further, as the plaintiff's brief admits (Pl.'s Brf., p. 6), the entire sheriff's office had difficulty obtaining equipment because Vance County is a "poor county." (W. Bullock Dep. pp. 24-25.) Officers initially did not always get what they

---

[2] Chief Deputy Lawrence Bullock actually got the plaintiff the new tires, but Captain Bullock got the plaintiff new shoes. (L. Bullock Aff. ¶ 3; W. Bullock ¶ 4.)

6

needed.  (Id.)  The county's lack of resources affected not just the plaintiff, but the sheriff, the chief deputy, and Captain Bullock, to whom the equipment officer reported.  (W. Bullock Aff. ¶ 4; L. Bullock Aff. ¶ 3.)  These three officers, who are black, were the highest-ranking officials in the sheriff's office and the plaintiff has offered no explanation for why the defendants would treat deputies of their own race worse than white deputies.  That is because there was not an equipment problem based on race, just one based on a lack of resources.  The sheriff's office could not even afford to print policy manuals for 40 employees.  (P. White Dep. p. 72.)

In sum, the plaintiff was not alone in not getting what he needed immediately, but, when he complained, his complaints were addressed and he got the equipment he sought.  These allegations simply do not support a claim of disparate treatment.

### 3.  Plaintiff was not subjected to a hostile work environment.

The plaintiff claims that he was subjected to a hostile work environment based on "his race and his perceived sexuality" and again relies on his EEOC complaint in support of this claim. (Pl.'s Brf., p. 6.)  He adds that he was subjected to homophobic jokes and racial slurs and, when he complained, his complaints were not addressed.  (Id.)  He also claims that "he was subjected to a more dangerous work environment due to his extreme difficulty in acquiring a bullet proof vest" (id.), but the allegation about this three-week period after he was hired is addressed above (and, as shown above, he did not have "extreme difficulty" in getting a vest three weeks after he was hired).

However, notably, in his EEOC complaint to Sheriff White, the plaintiff did not mention racial or homophobic jokes, comments, or slurs.  (P. White Dep. Ex. 21.)  In the two letters he sent to the sheriff on June 15, 2018, he alleged many slights and grievances, including one about his employee appraisal, but made no mention of comments, slurs, or jokes.  (Id.)  He claimed racial discrimination, but not discrimination based on sexual orientation.  (Id.)

7

As discussed in detail in the defendants' summary judgment brief, the plaintiff was not subjected to a hostile work environment because of his race. The plaintiff testified that one Indian-American deputy used a racial epithet toward a black deputy as a greeting; that one white sergeant repeated what the Indian-American deputy had said, but apologized to the plaintiff for doing so and said he had not meant to be disrespectful to the plaintiff; that another white sergeant used a racial epithet when quoting a rap song, but did not use it toward the plaintiff; and that another white deputy called the Indian-American deputy "Osama bin Laden." (Pl.'s Dep. pp. 191-95.) However, no one used racial epithets toward the plaintiff or told him racial jokes, and the plaintiff did not hear Sheriff White use discriminatory or offensive language, make fun of the plaintiff, or tell offensive jokes. (Pl.'s Dep. p. 195.) The plaintiff could not point to racial remarks by any other person, much less any of the three named defendants, and no person above the rank of sergeant. (Pl.'s Dep. pp. 195-98.) This is not evidence of a racially hostile workplace.

As to the plaintiff's perceived sexual orientation, the plaintiff claims that he found a purple unicorn hat in his locker once and took this as a reference to being gay, but he does not know who put it there and admitted that someone other than an officer could have done so. (Pl.'s Dep. pp. 198-99.) A white sergeant once made homophobic comments to him but then apologized, and the plaintiff was told he could file a complaint but chose not to do so. (Pl.'s Dep. pp. 238-39.) Sheriff White never heard any comments about the plaintiff's sexual orientation and had a "zero tolerance policy" for such jokes and comments. (P. White Dep. pp. 114, 156.) Thus, the plaintiff also has not shown that he was subjected to a hostile workplace for his sexual orientation.

**4.  Defendants did not retaliate against Plaintiff, who was not fired after he filed his EEOC complaint or because he filed the complaint.**

The plaintiff's allegation that Sheriff White told him to withdraw his EEOC complaint is without any evidentiary support except his bare allegation – an allegation that he did not make until after he filed this lawsuit.

He claims that Sheriff White threatened to fire him three times in June or July 2018 after he filed his complaint and that Chief Deputy Bullock heard this.  (Pl.'s Dep. p. 177.)  However, the plaintiff was <u>not</u> fired after he filed his complaint with the sheriff.  Rather, three months went by and he was still employed (until the Oliver incident, that is).  If Sheriff White had wanted to retaliate against the plaintiff, he would have fired him in June, July, August, or September.

In addition, when the plaintiff filed his complaint with the EEOC on August 29, 2018, he did not claim that Sheriff White had told him to withdraw his complaint, a fact that would be highly relevant to his charges.  He could have reported such implied retaliation, and a reasonable person in that position would have done so, but he did not.  (P. White Dep. Ex. 20.)  No testimony or document corroborates the plaintiff's allegation, and the defendants said it did not occur.  (P. White Aff. ¶ 6; L. Bullock Aff. ¶ 3.)  Thus, this claim fails for lack of evidence.

**5.  Plaintiff did not have an employment contract that could be violated.**

The plaintiff oddly claims that the defendants "have not produced any contrary evidence" to his assertion that he had a contract.  However, the only evidence the plaintiff has produced that he had a contract is his testimony, which is rebutted not only by documentary evidence but by the defendants' testimony.  Further, the plaintiff's claim is inconsistent with North Carolina law, which holds that deputies serve sheriffs on an "at-will" basis.  The evidence, in short, is that there was no contract.  Thus, the defendants could not have violated one.

9

The plaintiff, who diligently recorded every slight against him and noted every grievance with particularity, claims that the contract "has become lost." (Pl.'s Brf., p. 9) He claims that he has accurately described the contract, however, and that this is enough. He claims that the contract "had a place for the director of human resources to sign as well as the county manager or his designee." (Pl.'s Dep., p. 28.) But this would be odd since, under North Carolina law, only the sheriff, not the county human resources director or county manager, could have a say in his hiring. The county's extremely limited role with the sheriff's office was addressed in this Court's Order Dismissing Vance County. (Doc. No. 19, pp. 4-5.) Even if such a contract existed, however, the plaintiff has not described any of its terms – such as whether it had a clause that allowed him to be fired for using excessive force during an arrest. Thus, without a contract, there is no way to know if either party breached the contract.

The evidence, though, is that there was no contract, and thus there could not have been a breach. When the plaintiff filed out his application for employment, he was asked if he would be "willing to sign a two-year contract for employment" (W. Bullock Dep. Ex. 1), but there is no evidence that he was ever presented with a contract. He signed a Tuition Reimbursement Agreement (Pl.'s Dep. Ex. 28; Doc. No. 15-4), but admits that it "didn't create an employment contract" (Pl.'s Dep. p. 230). It was simply an agreement that, if the sheriff's office paid his Basic Law Enforcement Training tuition, he would not seek law enforcement employment for two years with another agency and if he did then he had to pay back his tuition. This document never became effective because the plaintiff did not need to attend BLET since the sheriff's office obtained credit for his previous BLET course (P. White Dep. Ex. 18; P. White Aff. ¶ 5), but the agreement specifically states that the plaintiff's employment was "at-will, and this does not guarantee continued employment nor provide a contract for continued employment within the Sheriff's

Office[.]" (P. Dep. Ex. 28.) This statement is consistent with North Carolina law and Sheriff White's policy. (P. White Aff. ¶ 5.)

The plaintiff claims that "[t]he evidence suggests the existence of a contract" (Pl.'s Brf., p. 9), but the evidence does not so suggest and in any case a suggestion of a claim is not enough; one needs evidence. The plaintiff has not met his burden to show that a contract existed. Because the defendants could not have breached a contract that did not exist, this claim fails.

**6. <u>Defendants did not interfere with Plaintiff's employment opportunities.</u>**

The plaintiff has taken two similar torts and two claims – tortious interference with a contract and tortious interference with prospective economic advantage (Amd. Compl., Counts VIII and IX) – and rolled them into one confusing argument. (Pl.'s Brf., p. 10.) In any case, there is no evidence to support either claim.

First, tortious interference with a contract requires "(1) a valid contract between the plaintiff and a third person, (2) the defendant knew about that contract, (3) the defendant intentionally induced the third person not to perform the contract, (4) the defendant acted without justification, and (5) the plaintiff suffered actual damages." <u>MLC Automotive, LLC v. Town of Southern Pines,</u> 207 N.C. App. 555, 571, 702 S.E.2d 68, 79 (2010). Here, there is no evidence that the plaintiff had a contract with a third party, but even if there was a contract the defendants did not know of one and did nothing in regard to it. Finally, even if by strained reasoning the defendants' original actions that resulted in the plaintiff's firing could be a basis for this claim, the defendants acted with justification in investigating the Oliver incident and firing the plaintiff, and this also defeats this claim.

Second, tortious interference with prospective economic advantage requires showing that "the defendant, without justification, induced a third party to refrain from entering into a contract

with the plaintiff, which would have been made absent the defendant's interference." Id. Again, however, there is no evidence that the defendants did anything to prevent the plaintiff from entering into an employment contract with a third party, much less that they knew of one.

The plaintiff's claims are premised on the theory that, when Capt. Bullock wrote his internal affairs report about the plaintiff's use of force on Latwanya Oliver, and Sheriff White fired the plaintiff as a result of the incident, the defendants should have predicted that these actions would hurt the plaintiff's chances of getting another law enforcement job. (Pl.'s Brf., p. 10.) But this is not what these claims require. Under the plaintiff's theory, the defendants were supposed to ignore or hide the events that led to the plaintiff's arrest of Latwanya Oliver and her broken arm just to help the plaintiff's speculative future employment needs.

At the time Capt. Bullock wrote his report and the plaintiff was fired in October 2018, the plaintiff did not have a contract or even prospective contract with a third party. And, even if he had, the defendants did not know of any contract or prospective contract. (P. White Aff. ¶ 7; W. Bullock Aff. ¶ 7; L. Bullock Aff. ¶ 6.) They have had no contact with any employer from which the plaintiff has sought employment, nor did they know of any such possible employers.

Thus, the plaintiffs cannot meet the essential elements of these claims.

The plaintiff claims that his firing for excessive force "explicitly prevented him from being hired" by other agencies. (Pl.'s Brf., p. 10.) That may be true, but, even if it is, it cannot support these two claims. First, aside from the fact that the plaintiff did not even have a prospective contract with an employer when he was fired, the defendants acted with justification in investigating the Oliver incident and firing him, and this would defeat the plaintiff's claims even if the defendants had interfered with any such contract. "A person 'acts without justification in inducing the breach of a contract . . . if he has no sufficient lawful reason for his conduct.' A

plaintiff must show that the defendant was acting not 'in the legitimate exercise of [his] own right, 'but with a design to injure the plaintiff or gain some advantage at his expense.' " MLC Automotive, 207 N.C. App. at 571, 702 S.E.2d at 79 (citations omitted).

The plaintiff's poor handling of the arrest of Ms. Oliver was reduced to writing for the sheriff's internal use, and he was justifiably fired for it. The defendants were well within their rights to investigate these events, make conclusions, and take appropriate action. For these events, the plaintiff can blame himself, but he has no claims against the defendants for it.

**7. Defendants did not cause, and Plaintiff has not suffered, emotional distress.**

The plaintiff claims that there "is ample evidence that Defendants . . . caused severe emotional distress to Plaintiff" (Pl.'s Brf., p. 11). But the plaintiff does not cite any such evidence and has not produced any such evidence. Nor does the plaintiff show that the defendants engaged in "outrageous conduct towards him" (id.), much less any conduct that could support these claims.

Intentional infliction of emotional distress requires "(1) extreme and outrageous conduct[,] (2) which is intended to and does cause (3) severe emotional distress to another." Stamper v. Charlotte-Mecklenburg Bd. of Educ., 143 N.C. App. 172, 174, 544 S.E.2d 818, 820 (2001). Further, "[t]he conduct in question must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.' " Id. at 174-75, 544 S.E.2d at 820 (citation omitted).

In Stamper the plaintiff, a school teacher, alleged that she was subjected to a hostile work environment by school officials, who allegedly posted rules of behavior in her classroom without her permission, released falsified test results about her students that showed they had performed poorly, subjected her to excessive supervision and meetings, placed her on a remediation and improvement program that required extra work, sent her two letters about her insubordination,

placed her on probation, and transferred her to another school. Id. at 173, 544 S.E.2d at 820-21. The plaintiff alleged that this caused her "major depression, chronic anxiety, sleep disturbances, weight loss, and general malfunctioning on a daily basis," and that her family suffered "extreme stress." Id. at 174, 544 S.E.2d at 820. But the court said this conduct was insufficient to state a claim for intentional infliction. Even if school officials demonstrated "personal animosity toward plaintiff, their conduct did not go 'beyond all possible bounds of decency.' " Id. at 175, 544 .S.E2d at 821. The court relied on Wagoner v. Elkin City Schools Bd. of Educ., 113 N.C. App. 579, 566, 440 S.E.2d 119, 124 (1994), which held that causing the plaintiff "to suffer 'indignities' " was insufficient to state a claim.

Here, the plaintiff claims that he was "subject[ed] to homophobic insults" and "his supervisors" took no action, but, even if this isolated and relatively minor conduct was sufficient for this claim (and it is not), it was not committed by Sheriff White, Chief Bullock, or Captain Bullock and there is no evidence they were even aware of it, if it did occur. The plaintiff cites one homophobic comment by a sergeant and his receipt of a purple unicorn hat from an unknown person, but these incidents bothered him so little that he did not even put them in his EEOC complaint. In addition, this conduct would have been contrary to Sheriff White's policy and desired tone for the sheriff's office. (P. White Dep. pp. 114, 156.) The plaintiff's allegation of "inequitable" distribution of equipment, though baseless, is also so minor that, even if true, could not possibly support a claim of outrageous conduct required for his claim of intentional infliction.

As to his claim of negligent infliction, this also requires proof of conduct that causes severe emotional distress. Riddle v. Buncombe County Bd. of Educ., 256 N.C. App. 72, 74, 805 S.E.2d 757, 760 (2017). But, just as the with his claim for intentional infliction, the plaintiff has not provided any evidence of such distress. "The term 'severe emotional distress' means 'an emotional

or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so.' " Id. at 75, 805 S.E.2d at 760 (citation omitted). The plaintiff may not have liked everything that happened while he worked at the sheriff's office, but "[p]art of living involves some unhappy and disagreeable emotions with which we must cope without recovery of damages." Gardner v. Gardner, 334 N.C. 662, 667, 435 S.E.2d 324, 328 (1993). Absent evidence of severe emotional distress, this claim fails.

**8. Plaintiff was not wrongfully discharged.**

This claim fails for the same reason as the plaintiff's Title VII claims, as set out in the defendants' summary judgment brief. The plaintiff was fired for a year and a half of poor performance that culminated in his breaking the arm of a non-violent woman during an arrest and then panicking over it. (P. White Aff. ¶ 4; L. Bullock Dep. Ex. 4.)

The plaintiff claims that he had a contract, but has not produced one, and therefore, because it is impossible to determine whether there was a violation of the terms of the contract, this cannot be the basis for a wrongful discharge claim.[3] However, as the plaintiff notes, even without a court, he may still assert this claim if he was fired in violation of public policy. (Pl.'s Brf., p. 12.)

To succeed on such a claim, he must identify a "North Carolina public policy that was violated by [his] employer in discharging" him. McDonnell v. Tradewind Airlines Inc., 194 N.C. App. 674, 678, 670 S.E.2d 302, 305 (2009). He must show that he was fired either "(1) for refusing to violate the law at the employer[']s request, (2) for engaging in a legally protected activity, or

---

[3] The plaintiff claims that he never violated the terms of this elusive contract (Pl.'s Brf., p. 13), but he has not alleged its terms. This begs the question of whether repeatedly disobeying superiors, lying about a car accident, being disrespectful to a superior officer, or using excessive force on a woman during arrest would qualify as a breach of the terms of any such contract.

15

(3) based on some activity by the employer contrary to law or public policy." Id. (citation omitted). The plaintiff has not done so.

The plaintiff bases this claim on the fact that he was fired after he filed an EEOC complaint. But he was not fired after he filed the complaint with Sheriff White in June 2018, nor after he filed it in late August 2018 with the EEOC. He was fired only after he broke Ms. Oliver's arm in late October 2018. This firing – after the last in a long string of incidents of poor performance or misconduct by the plaintiff – was legitimate and thus not in violation of public policy. Thus, this claim fails.

### 9. Defendants did not negligently supervise or retain sheriff's deputies.

The plaintiff was fired from three previous jobs (W. Bullock Dep. pp. 18-19 and Ex. 1; Pl.'s Dep. pp. 18-19, 33), yet claims that his difficulties at the Vance County Sheriff's Office were the result of the defendants' negligent supervision and training of the plaintiff's supervisors.

The essence of a claim for negligent supervision or retention is that an employer knew he had an incompetent employee and that this incompetence damaged the plaintiff. "To support a claim of negligent retention and supervision against an employer, the plaintiff must prove that the incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the employer knew or had reason to know of the employee's incompetency." Wilkerson v. Duke University, 229 N.C. App. 670, 677, 748 S.E.2d 154, 160 (2013). The alleged tortious act must cause injury to the plaintiff. Id.

In other words, to succeed on this claim the plaintiff must show that Sheriff White knew that he employed officers who supervised the plaintiff who were incompetent and that this incompetency actually damaged the plaintiff. The evidence the plaintiff offers to support this claim is woefully inadequate, if not nonexistent. The plaintiff makes generalized allegations of

16

grievances and complaints and then cites two officers who he claims were incompetent and claims their incompetence caused his injuries. (Pl.'s Brf., pp. 14-15.) But the examples the plaintiff cites do not demonstrate incompetency, much less that it caused injury to the plaintiff.

As to the first officer, a lieutenant, the plaintiff alleges that he was demoted for asking a woman during a traffic stop "to expose her breasts to him." (Pl.'s Brf., p. 14.) Sheriff White admitted that he demoted a white male officer for making an "inappropriate" comment to a female, and that the demotion was the result of a complaint by a relative of the woman. (P. White Dep. pp. 125-30.) However, this incident, for which the officer was disciplined, did not demonstrate the officer's incompetency or that any such incompetency resulted in injury to the plaintiff. His error in judgment[4] did not make him inherently incompetent and it did not cause any injury to the plaintiff. A highly competent officer can still make one mistake and exercise poor judgment. If this officer's behavior was inappropriate in the sheriff's view, it was still not of the type that could have caused injury to the plaintiff.

As to the second officer, who was a sergeant (Amd. Compl. ¶ 28), the plaintiff claims that deputies once went to his house after a 911 call about a domestic dispute. (Pl.'s Brf., p. 15.) But, even by the plaintiff's own version of this story, there was no evidence that would have supported taking any action against the sergeant and the plaintiff fails to show that, if there had been such

---

[4] The plaintiff may claim that this incident is evidence that white officers were treated differently than black officers. However, if this is the case, this also fails. First, that officer lost rank and pay, so white officers were subjected to serious discipline. In addition, the woman did not complain; a relative did. The plaintiff did not determine whether she took offense at the comment or whether she knew the officer, and these are facts that might mitigate or explain the conduct and show that it was less serious than the plaintiff claims. Even given these possible extenuating or mitigating factors, the officer was still demoted, which undermines the claim that white officers were not seriously disciplined. Just as the officer was not fired, the plaintiff was not fired for his numerous mistakes before the Oliver incident, including his car accident and lie about whether he was running his blue lights. (Pl.'s Dep. pp. 117-21; L. Bullock Aff. ¶ 4.) This officer, like the plaintiff, was given another chance.

17

evidence, how it would have been connected to any inherent incompetency of the officer that damaged the plaintiff. The plaintiff claims he was injured because the officer gave him a bad performance evaluation. But a domestic dispute between a husband and wife, even if true, has no logical connection to whether an officer is competent enough to determine whether a subordinate should get a specific grade on a performance evaluation. Further, this evaluation, as the plaintiff's brief notes, was adjusted upward in the plaintiff's favor by the sheriff, so the plaintiff was not injured by this alleged incompetence. The plaintiff also fails to note that this officer is black. See Amd. Compl. ¶ 28. This further undercuts the plaintiff's claim that the plaintiff was the victim of racial discrimination since this sergeant, who was of the same race as the plaintiff, gave him the low evaluation.[5]

For the above reasons, the plaintiff's claim fails as a matter of law.

**10. Plaintiff was not defamed or libeled.**

The plaintiff claims that the defendants "propagated malicious falsehoods about" his firing and that this has prevented him from getting another law enforcement job. (Pl.'s Brf., p. 15.)

The plaintiff claims that two documents, an internal affairs investigative report and an F-5 report-of-separation form, provide the basis for his defamation and libel claims. (Id.) He claims, incorrectly, that "the report and F-5 form" state that "he was terminated pursuant to sustained charges of excessive force." (Pl.'s Brf., p. 16.) However, only the internal affairs report, which just recommended his termination, says that he used excessive force; the F-5 form only says that

---

[5] The logic behind the plaintiff's offering of this example is unclear. The facts the plaintiff alleged show that sheriff's deputies, including the lieutenant described in the first example, were ready to arrest one of their own if there was evidence of a crime and that they told the woman they would do so, but she did not provide a statement that would have allowed for an arrest. See Pl.'s Dep. pp. 92-94. It is also curious that the plaintiff would cite an example in which the lieutenant, who the plaintiff claims treated black suspects differently, did not arrest a black suspect after a 911 call, even if that suspect was a sheriff's deputy.

he was terminated after a substantiated investigation but does not mention excessive force. (W. Bullock Dep. Ex. 4; Pl.'s Dep. Ex. 25.)

The plaintiff has not identified any other alleged defamatory statements to support this claim. The defamation claims fail for several reasons, and the defendants will address each of these two documents.

First, as the plaintiff notes, an essential element for a claim of defamation is that a defamatory statement be published to a third party. (Pl.'s Brf., p. 15.) See Boyce & Isley, PLLC v. Cooper, 153 N.C. App. 25, 29, 568 S.E.2d 893, 897 (2002) (listing elements).

Here, the internal affairs report cannot serve as the basis for a defamation claim because, even if it was defamatory (and it is denied that it was), the defendants did not publish it to a third party. Captain Bullock wrote the report and gave it to Sheriff White. (W. Bullock Dep. 48, 57-58, and Ex. 4.) As the plaintiff acknowledges, it was placed in his personnel file, which was first provided to the plaintiff's prospective employers pursuant to the plaintiff's release authorizations, the first of which was signed on March 13, 2019, when he applied to the Durham County Sheriff's Office, and the second on August 22, 2019, when he gave a release to the North Carolina Criminal Justice Standards Division. (Pl.'s Dep. pp. 210-14 and Ex. 20.) Sheriff White and Chief Deputy Bullock retired in 2018, so they could not have released the personnel file, and they have had no contact with any of the plaintiff's prospective employers in any case. (P. White Aff. ¶¶ 4, 7; L. Bullock Aff. ¶¶ 2, 7.), Captain Bullock retired in 2019, but the plaintiff does not even allege that he released the personnel file, and he too has had no contact with prospective employers. (W. Bullock Aff. ¶¶ 2, 7.)

The plaintiff's personnel file is confidential under N.C. Gen. Stat. § 153A-98, and the defendants had no authority to release it except by statute or the plaintiff's consent. The only

19

evidence is that the plaintiff's prospective employers looked at the file with his consent months after two of the defendants had retired, and there is no allegation that the third defendant, Lawrence Bullock, had anything to do with this. Thus, none of the defendants could have published the alleged defamatory statement, which means the plaintiff cannot prove an essential element of his claim as it relates to the investigative report. Again, the report was not defamatory, but, even if it was, the defendants did not publish it to a third party.

The plaintiff claims that "he has been unable to work in law enforcement, his profession, due to the libelous charges brought against him by Defendants." (Pl.'s Brf., p. 16.) However, this precise type of allegation, with similar facts, in support of a defamation claim, has been rejected by courts before.

In Harrell v. City of Gastonia, 392 F. App'x 197, 200-02 (4th Cir. 2010), the court rejected the plaintiff's claim that a memorandum in his personnel file that outlined his deficiencies as a police officer and recommended his termination could support a claim for defamation, even if the personnel file was later provided to a third party to which the plaintiff had applied for employment. "[P]lacing information in a personnel file does not amount to publication of that information, even if the information is passively available to others to read." Id. at 206-07 (quoting Pressley v. Continental Can Co., 39 N.C. App. 467, 250 S.E.2d 676 (1979)). "In addition, '[a] publication of a libel, procured or invited by the plaintiff, is not sufficient to support an action for defamation.' " Id. (quoting Pressley, 39 N.C. App. at 469, 250 S.E.2d at 678). Rather, the court said, "[t]he consent of another to the publication of a defamatory matter concerning him is a complete defense to his action for defamation." Id. at 207 (citing Restatement of Torts (Second) § 583). Accord, Mayfield v. NASCAR Inc., 713 F. Supp. 2d 527, 536 (W.D.N.C. 2010) (citing same).

In Harrell the court also found that there was no evidence that the memorandum had been published to anyone other than the city to which the plaintiff had applied for new employment, and that publication was at the plaintiff's request and through his specific written authorization. Harrell at *8. "Under North Carolina law, if the libel was 'procured or invited' by the plaintiff, it cannot support an action for defamation." Id. The plaintiff had "requested and consented to the release of his personnel file . . . knowing that the . . . [m]emorandum was contained in that file," and thus could not "establish a claim for libel based on the disclosure of the information" to the prospective employer. Id. Thus, even if the memo contained falsehoods, because it had not been distributed except at the plaintiff's request, the defamation claim failed. Id.

The same facts apply in this case. The plaintiff has not shown that the internal affairs report was released to anyone except the employers to which he applied, and only at his request and pursuant to his written authorization. The mere placement of the internal affairs report in his personnel file was insufficient to serve as a publication under the elements of defamation. Its release was only through his written consent, and the plaintiff has not even shown that the defendants released it.

Nor can the F-5 form serve as the basis for the plaintiff's claim. It was sent to the North Carolina Sheriffs' Standards Commission, as required by state law (N.C. Gen. Stat. § 17E-4; 12 N.C. Admin. Code 10B.0405), and the plaintiff admits that it was accurate except for his Social Security Number. (Pl.'s Dep. pp. 205-08.) This form thus cannot be the basis for a defamation claim either, because, even if it was published, it was not defamatory since it was true. As the plaintiff's brief admits, truth is an absolute defense to a defamation claim. (Pl.'s Brf., p. 15.)

Moreover, the defendants had a qualified privilege to write the report and file the F-5 form with the state, as set out in the defendants' summary judgment brief. A qualified privilege requires

"good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion and publication in a proper manner and to proper parties only." Harris v. Procter & Gamble Manufacturing Co., 102 N.C. App. 329, 331, 401 S.E.2d 849, 850 (1991). In Harris the court held that an employer had a qualified privilege in informing its employees of the names of other employees who had been discharged for drug use. Id. at 330-31, 401 S.E.2d at 850-51.

In cases where even more disparaging remarks were provided, courts in North Carolina have also rejected similar claims by law enforcement officers whose terminations were reported to the state. See, e.g., Spencer v. Byrd, 917 F. Supp. 368 (M.D.N.C. 1995) (sheriff's statement in report-of-separation form that deputy was fired for insubordination and making false statements was not defamatory because it was true); Taube v. Hooper, 840 S.E.2d 313 (N.C. Ct. App. 2020) (police chief's report-of-separation form that stated she was aware of investigation concerning possible misconduct by officer was not defamatory because it was true).

In this case, the sheriff had a legitimate interest in determining, after Ms. Oliver complained, what had occurred during her arrest and in documenting this incident. It would be odd indeed if a law enforcement official could not investigate and document a potential case of excessive force by one of his officers, especially if there is the possibility that the offender could go elsewhere and engage in similar conduct[6] and if the sheriff faced the threat of a lawsuit arising

---

[6] Allowing law enforcement agencies to learn about an applicant's previous experience in the profession has taken on increased importance with the public. The North Carolina Sheriffs' Association recently recommended the enactment of "legislation to ensure that personnel records and internal investigative files are shared with any new hiring agency and with" state accrediting agencies. See Shea Denning, "Sheriffs' Association Releases Report Recommending Giglio-Related Reforms, Among Others," UNC School of Government, Nov. 18, 2020, found at https://nccriminallaw.sog.unc.edu/sheriffs-association-releases-report-recommending-giglio-related-reforms-among-others (last visited April 12, 2021).

out of such force, as is the case here. Here, the investigation provided to Sheriff White was not provided to anyone else, until the plaintiff asked his prospective employers to look at it. Sheriff White used the report for his own limited purpose and did not publish it. This report cannot provide the basis for any claim of defamation. Neither, as explained above, can the F-5 form.

Because the internal affairs report and F-5 form are the only alleged sources of "malicious falsehoods" that the plaintiff cites, the defamation claims fail for the above reasons.

## 11. <u>Plaintiff does not understand why his punitive damages claims fail.</u>

The plaintiff simply does not understand why his claims for punitive damages fail, and he makes the false assertion that "Defendants contend that no matter how egregious a defendant's actions are, punitive damages cannot be awarded in this matter under federal law because the suit is against officials in their individual and officials capacities." (Pl.'s Brf., p. 17.) That is not what the defendants contend.

First, punitive damages, as a matter of law, cannot be obtained from the defendants in their official capacities on the federal claims. When the plaintiff says that "Defendant White is not a municipality" (Pl.'s Brf., p. 17), the plaintiff is wrong when this refers to the sheriff in his official capacity, because a suit against a local government official in his official capacity is a suit against a local government, not an individual. <u>Kentucky v. Graham</u>, 473 U.S. 159, 161 (1985). The United States Supreme Court has held that a plaintiff may not recover punitive damages under federal law from local governments. <u>City of Newport v. Fact Concerts Inc.</u>, 453 U.S. 247, 270-71 (1981) (applying in Section 1983 context). This applies equally to the plaintiff's Section 1981, Section 1983, and Title VII claims. <u>Bryant v. Locklear</u>, 947 F. Supp. 915, 916 (E.D.N.C. 1996). Therefore, the federal claims for punitive damages against the defendants in their official capacities cannot proceed as a matter of law. <u>See</u>, <u>e.g.</u>, <u>Jones v. Ford</u>, 2002 WL 1009733

(M.D.N.C. Feb. 15, 2002) (stating that "punitive damages may not be awarded against a municipal officer acting in his official capacity" (citing Briggs v. Meadows, 66 F.3d 56, 61 (4th Cir. 1995)).

The defendants do not contend that the plaintiff cannot seek punitive damages against the defendants in their individual capacities, just that the facts in this case do not rise to the level that would support such damages. A plaintiff indeed may obtain punitive damages against a local government official in his individual capacity, if the facts warrant it. Id. (citing Smith v. Wade, 461 U.S. 30 (1983)). However, the plaintiff must show that the defendant's conduct "involves reckless or callous indifference to the plaintiff's federally protected rights." Id. This, the plaintiff has not done.

As to the state-law claims, the plaintiff again does not understand the law. Just as with the federal claims, the official-capacity suits against the defendants under state law are considered suits against a local government, which here is the office of the sheriff. Boyd v. Robeson County, 169 N.C. App. 460, 466, 621 S.E.2d 1, 5 (2005). So when the plaintiff claims that the sheriff is not a local government, the plaintiff is wrong again when it comes to the official-capacity claim against him. North Carolina does not allow punitive damages against local governments absent specific statutory authorization. Baucom's Nursery Co. v. Mecklenburg County, 89 N.C. App. 542, 545, 366 S.E.2d 558, 560 (1988); Jackson v. Hous. Auth. of City of High Point, 316 N.C. 259, 341 S.E.2d 523 (1986) (holding that Wrongful Death Statute is an example of such authorization). No such statutory authorization exists in this case. Thus, as a matter of law, the plaintiff may not obtain punitive damages from the defendants in their official capacities.

Finally, contrary to the plaintiff's assertion, the defendants do not claim to have governmental immunity for punitive damages. This is a matter of statutory authorization, not immunity.[7]

The plaintiff can seek punitive damages from the defendants in their individual capacities, but the facts do not support this claim either. N.C. Gen. Stat. § 1D-15 requires evidence that the defendants engaged in fraud, malice, or willful or wanton conduct, and there is no evidence of any of that in this case.

## CONCLUSION

For the reasons and authorities cited herein, the defendants respectfully request that Plaintiff's Motion for Summary Judgment be denied and that Defendants' Motion for Summary Judgment be granted.

Respectfully submitted, this 29th day of April, 2021.

/s/ Christopher J. Geis
CHRISTOPHER J. GEIS, NCSB No. 25523
BRIAN F. CASTRO, NCSB No. 53412
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 721-3600
Email: Chris.Geis@wbd-us.com
Brian.Castro@wbd-us.com
*Attorneys for Defendants*

---

[7] The plaintiff's immunity arguments are not only irrelevant but wrong. He claims that, because he alleges a claim for breach of contract, immunity is waived. But immunity is waived only for a breach-of-contract claim, not tort claims. Hill v. Medford, 158 N.C. App. 618, 624, 582 S.E.2d 324, 328-29 (2003) (Martin, J., dissenting), rev'd, 357 N.C. 650, 588 S.E.2d 467 (2003) (adopting dissent). Of course, there is no contract here. He also claims that the defendants were not performing governmental functions, but law enforcement is a governmental function. Price v. Davis, 132 N.C. App. 556, 559-60, 512 S.E.2d 783, 786 (1999). Finally, he claims that "[i]mmunity is waived with the purchase of insurance," but this is true only if the insurance policy covers the torts asserted. Estate of Earley v. Haywood County Dep't of Soc. Servcs., 204 N.C. App. 338, 694 S.E.2d 405 (2010). As shown in the defendants' summary judgment brief, no waiver exists here.

25

## <u>CERTIFICATE OF PAGE LIMITATIONS</u>

I certify that this brief complies with the page limitations set out in Local Rule 7.2(f)(2)(A).

/s/ Christopher J. Geis
CHRISTOPHER J. GEIS
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an attorney at law licensed to practice in the State of North Carolina, is attorney for defendants in this matter, and is a person of such age and discretion as to be competent to serve process.

I hereby certify that on April 29, 2021, I electronically filed the foregoing **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system, which will send notification of such to the following CM/ECF participant:

Sharika M. Robinson
10230 Berkeley Place Drive, Suite 220
Charlotte, NC 28262
Telephone: 704-561-6771
Facsimile: 704-561-6773
srobinson@sharikamrobinsonlaw.com
*Attorney for Plaintiff*

/s/ Christopher J. Geis
CHRISTOPHER J. GEIS
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 721-3543
Facsimile: (336) 721-3660
Email: Chris.Geis@wbd-us.com
*Attorney for defendants*